UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re FOCUS MEDIA HOLDING LIMITED LITIGATION | : | Master File No. 1:07-cv-10617-LTS(GWG) |
| | : | |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : | CONSOLIDATED AMENDED |
| | : | COMPLAINT FOR VIOLATIONS OF |
| ALL ACTIONS. | : | FEDERAL SECURITIES LAWS |
| | : | |

Lead Plaintiff Iron Workers Local No. 25 Pension Fund and Plaintiff Eastriver Partners, Inc. ("Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Focus Media Holding Limited ("Focus Media" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company, and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the American Depositary Shares ("ADSs") of Focus Media in the Company's secondary public offering on or about November 7, 2007 (the "Secondary Offering") as well as purchasers of the Company's ADSs between September 27, 2007 and November 19, 2007, inclusive (the "Class Period") alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      This case is simple and straightforward.  Focus Media finished its third fiscal quarter for 2007.  Then, a month and a half later but before the Company had to publicly release its third quarter earnings, Focus Media, along with certain selling shareholders, sold 13.5 million Focus Media ADSs in the Secondary Offering raising more than $888 million.  Ten days later, Focus Media released its fiscal results for the third quarter and reported sharply declining profit margins. The Company further detailed that it had made several acquisitions that had depressed its profit margins.  In response to this announcement, the price of Focus Media ADS on the first day of

trading after the announcement, declined to $52.00 per ADS more than 19% lower than the Secondary Offering price.

3.    On September 27, 2007, Focus Media issued a press release announcing, among other things, guidance for its financial results for the quarter ending September 30, 2007 ("3Q07"). This guidance, however, misrepresented the financial performance of Focus Media for 3Q07 and did not disclose that the Company was considerably less profitable in 3Q07 than represented. On November 7, 2007, Focus Media completed the Secondary Offering, selling 13.5 million shares of Focus Media ADSs generating proceeds of $888 million.

4.    The Registration Statement, which incorporated a Prospectus, issued in connection with the Secondary Offering, contained inaccurate statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation. As described below, the Registration Statement misrepresented or omitted the following facts, among others: (i) the Company was much less profitable in 3Q07 than the Company had forecasted on September 27, 2007; (ii) the Company's profit margin problems were due, in part, to the Company's acquisition of various businesses in its Internet advertising division and billboard division during the first half of 2007 and margin contraction in its In-Store division; and (iii) the Company acquired non-digital billboards that would not be able to be converted to more profitable digital billboards until the expiration of lengthy contracts and receipt of governmental approval.

5.    On November 19, 2007, after the close of trading, Focus Media announced its financial results for 3Q07 and reported a severe compression in its profit margins due to several acquisitions made during the first half of 2007 in its Internet advertising division and outdoor digital billboard division and due to problems in its In-Store division. The Company also, for the first time,

disclosed that during the first half of 2007 it acquired non-digital billboards that are less profitable than digital billboards, which contributed to the margin compression. In response to this news, on November 20, 2007, the price of Focus Media ADSs dropped from $57.15 per ADS to $52.00 per ADS, on extremely heavy trading volume.

6.    The following chart graphically depicts the key events during the relevant time period:



**JURISDICTION AND VENUE**

7.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

8.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

9.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.  The Secondary Offering was marketed in this District, the Company's ADSs are traded over the NASDAQ National Market ("NASDAQ") which is based in this District, and the Underwriter Defendants (defined below) maintain executive offices in the District.

10.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ, a national Securities Exchange.

## PARTIES

11.     Lead Plaintiff Iron Workers Local No. 25 Pension Fund purchased Focus Media ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, during the Class Period and was damaged thereby.

12.     Plaintiff Eastriver Partners, Inc. purchased Focus Media ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, in the Secondary Offering and was damaged thereby.

13.     Defendant Focus Media operates an out-of-home advertising network using audiovisual television displays in the People's Republic of China.  Its out-of-home advertising network consists of a commercial location network comprising of an LCD display network, an outdoor LED billboard network, and a movie theater advertising network; an in-store network; a

poster frame network; a mobile handset advertising network; and an Internet advertising services network.  Focus Media is incorporated in the Cayman Islands, and maintains its principal executive offices at 28-30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, the People's Republic of China.

14.     Defendant Jason Nanchun Jiang ("Jiang") founded the Company and has served as the Co-Chairman of the Board of Directors of the Company and Chief Executive Officer of the Company since May 2003.

15.     Defendant David Feng Yu ("Yu") served as the Co-Chairman of the Board of Directors of the Company since February 2003 and served as President of the Company between February 2003 and January 2007.

16.     Defendant Zhi Tan ("Tan") served as a director and President of the Company since January 2007.  Defendant Tan was a selling shareholder in the Secondary Offering and 7,166,124 ADSs, representing 35,830,620 Company shares, beneficially owned by Tan were sold in the Secondary Offering to public investors.  Prior to this sale, Defendant Tan beneficially owned 36,172,233 shares of the Company.  In the Secondary Offering, Defendant Tan sold 99% of the shares beneficially owned by him.  Defendant Tan garnered more than $464 million from the sale of his ADSs to investors in the Secondary Offering.  Defendant Tan sold 82.2% of the ADSs sold in the Secondary Offering.

17.     Defendant Daniel Mingdong Wu ("Wu") has served as the Chief Financial Officer of the Company since February 2005.

18.     Defendant Donald J. Puglisi ("Puglisi") is the Company's Authorized Representative in the United States.

19.    Defendants Jiang, Yu, Tan, Wu and Puglisi are collectively referred to herein as the Individual Defendants.  Each of the Individual Defendants signed the Registration Statement for the Secondary Offering.

20.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as a lead underwriter for the Secondary Offering.  Credit Suisse maintains its principal United States office at Eleven Madison Avenue, New York, New York, 10010-3629.

21.    Citigroup Global Markets Inc. ("Citigroup") served as a lead underwriter for the Secondary Offering.  Citigroup's executive office is located at 388 Greenwich Street, New York, New York, 10013.

22.    Merrill Lynch & Co. ("Merrill Lynch") served as a lead underwriter for the Secondary Offering.  Merrill Lynch's executive office is located at 4 World Financial Center, 250 Vesey Street, New York, New York, 10080.

23.    Credit Suisse, Citigroup and Merrill Lynch are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the Secondary Offering and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

24.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons other than Defendants who purchased the ADSs of Focus Media in the Secondary Offering as well as purchasers of the Company's ADSs between September 27, 2007 and November 19, 2007, inclusive and were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or

affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Focus Media sold more than 13.5 million ADSs in the Secondary Offering and approximately 112 million ADSs were outstanding during the Class Period (including the 5 million ADSs issued in the Secondary Offering).  The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Focus Media or its transfer agent or the underwriters to the Secondary Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

26.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

27.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that

will be encountered in the management of this litigation that would preclude its maintenance as a class action.

29.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the Secondary Offering omitted and/or misrepresented material facts about Focus Media and its business;

(c)    Whether Defendants' statements issued during the Class Period were materially false and misleading; and

(d)    The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

30.    Focus Media describes itself as China's leading multi-platform digital media company.  The Company purports to operate the largest out-of-home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat-panel television displays in its network, and also claims to be a leading provider of Internet marketing solutions in China.  Focus Media has stated that its goal is to create the largest multi-platform digital advertising network in China, reaching urban consumers at strategic locations and point-of-interests over a number of media formats, including audiovisual television displays in buildings and stores,

advertising poster frames and other new and innovative media, such as outdoor light-emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms.

31.    Focus Media's segments its business into three "Networks," as follows: (i) the Digital Out-of-home Advertising Network, which focuses on providing out-of-home advertising through liquid crystal display or LCD flat-panel televisions displays, LED billboards, movie screens, and poster and digital frames, and includes its commercial location network, in-store network and poster frame network; (ii) the Mobile Handset Advertising Network, which refers to its mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS, offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and (iii) the Internet Advertising Services Network, which refers to its Internet advertising agency and advertising services technology, including performance-based software suites.

### Focus Media's Gross Margins and Profit Margins Are a Critical Element of Its Financial Performance

32.    Gross margins and profit margins are an essential element in the evaluation of the financial performance of a company.

33.    A gross margin is a company's total sales revenue minus its cost of goods sold, divided by the total sales revenue, expressed as a percentage.  The gross margin represents the percent of total sales revenue that the company retains after incurring the direct costs associated with producing the goods and services sold by a company.  The higher the percentage, the more the company retains on each dollar of sales to service its other costs and obligations.  For example, if a company's gross margin for the most recent quarter was 35%, it would retain $0.35 from each dollar of revenue generated, to be put towards paying off, selling, general and administrative expenses,

interest expenses and distributions to shareholders. Gross margin indicates how well management is using labor and materials to support the business. As stated on Zacks.com, an investment web site, "Gross margin is the best tool to analyze a young company's potential for profitability. This tells you the profit made on the cost of sales."

34.     Profit margin is a ratio of profitability calculated as net income divided by revenues, or net profits divided by sales. It measures how much out of every dollar of sales a company actually keeps in earnings. A higher profit margin indicates a more profitable company that has better control over its costs compared to a company with a lower profit margin. Profit margin is displayed as a percentage; a 20% profit margin, for example, means the company has a net income of $0.20 for each dollar of sales. The earnings of a company do not provide a full picture of its financial performance. Increased earnings are good, but an increase does not mean that the profit margin of a company is improving. For instance, if a company has costs that have increased at a greater rate than sales, it leads to a lower profit margin. This is an indication that costs need to be under better control. For example, a company that has a net income of $10 million from sales of $100 million has a profit margin of 10% ($10 million/$100 million). If in the next year net income rises to $15 million on sales of $200 million, the company's profit margin would fall to 7.5%. So while the company increased its net income, it has done so with diminishing profit margins, resulting in a negative trend.

35.     Analyzing the margin trend of a company is an important tool in determining the relative financial performance of a company from one period to the next. An increasing margin trend is favorable for the company and a decreasing margin trend is unfavorable.

36.     Due to the importance of margins on the analysis of its business, Focus Media regularly reported its margins to investors and highlighted when margins were improving.

Additionally, research analysts were interested in learning details about Focus Media's margins, including details about whether margins would be improving or declining in specific business areas or on an overall blended basis.

37.    For example, throughout 2007, Focus Media disclosed its margins when reporting on its financial performance and research analysts sought additional details on margins during conference calls with Company management.

38.    On February 26, 2007, Focus Media reported its financial results for 4Q06.  It reported that gross margin for its Commercial Location Network, including its LED Network for 4Q06 was "73% . . . increasing from 71.44% in the [previous quarter]," for the "Poster Frame Network, gross margin was 75.4% . . . rising from 70.7% in the [previous quarter]," and that "[o]n a blended basis for the entire Company, our gross margin for the fourth quarter was 68.5%, up from 65.3% in the previous quarter."

39.    On a conference call with analysts on February 26, 2007 concerning the Company's financial results for 4Q06, Company executives responded to questions from analysts about gross margins.  For example, Safa Rashtchy, an analyst from Piper Jaffray, asked: "Your gross margins were pretty healthy and saw a good increase.  Again, is this what we could expect to be a sustainable level or was there any particular things that helped?"  Defendant Wu responded in pertinent part as follows:

> I think the gross margin, as we said for the Commercial Location Network, in the long term we expect gross margins to be over 75%.  And right now it's 73%, and we are making good progress towards that goal.

>       *      *      *

> For the residential market, we think long term gross margin will be 75%.  It seems we're already there.  And we think maybe we can continue to improve.

>       *      *      *

In the In-store Networks we think the gross margins, there is room to improve. We want to move towards 55%, 60% by end of 2007. We'll continue trying – to try our best to move towards this at that point. . . .  That will of course, if we continue to invest more aggressively in the hypermarket, that will affect the gross margins – the timing of gross margins to hit that threshold.

*      *      *

So overall, on a non-seasonal basis, without factoring in the seasonality in our business, we think the long term gross margin, the gross margin will continue to improve for the fourth quarter of 2006.

40.     On May 17, 2007, Focus Media reported its financial results for 1Q07 and reported that "[g]ross margin for the first quarter was 58.0%, as compared to 55.8% in the first quarter of 2006." It reported that, in the first quarter 2007, "gross margin for the commercial location network (including our outdoor LED network and movie theater advertising business) was 61.7%; the in-store network gross margin was 24.7%; the poster frame network gross margin was 66.9%; Focus Media wireless gross margin was 56.5%."

41.     On a conference call with analysts on May 17, 2007 concerning the Company's financial results for 1Q07, analysts were particularly interested in the Company's gross margins. Aaron Kessler, an analyst from Piper Jaffray asked: "And then can you provide some color around the expense level in Q2? With the higher revenue than we expected, it appears that you're modeling at some higher operating expenses as well or maybe some lower gross margins, so a little guidance on that." Defendant Wu responded to this question in pertinent part as follows:

On the margin actually, if you think about Focus Media business, in our business most of the media segments are fixed cost base business. So when, as we said, when the first quarter there's the Chinese new Year holiday during which most people taking time off, so no people in the office building, we do experience a little bit soft in seasonality. So the margin we believe is normal. It doesn't reflect a longer trend. But it has to do-more with the seasonality of the business.

42.     That same analyst next asked another question about margins in the Wireless business:

And finally just on the Wireless business, that appeared up about 50% sequentially and also the margins were very strong.  I think you indicated last quarter that the margins might tick down given that there's a one time benefit last quarter.  Could you just give us some commentary on the strength of the Wireless business?

43.    Defendant Wu responded to this question in pertinent part as follows:

Sure.  For the Wireless business, we do see very strong momentum in 2007.  If you think about the growth margin this quarter, actually it's lower than Q4 because Q4 we had a one time rebate for mobile operators.  Typically those rebate fees are paid at the end of the year.  So we believe today that gross margin of the Mobile business is sustainable going forward.

44.    The next question from an analyst on the May 17, 2007 conference call also concerned the Company's margins.  Jason Helfstein, an analyst from CIBC World Markets asked, in pertinent part, the following:

Thank you.  Three questions.

The first with respect to this quarter, very healthy utilization or occupancy growth this quarter particularly in tier-I markets.  Does that set you up for strong pricing in the second quarter?  That's question one.

Question two, we did notice however that the average direct cost or the margin per display for the Commercial business did tick up more than we thought.  We expected that to be flat to down.  Just any talk with respect to the margins in the Commercial Location network.

45.    Defendant Jian responded to the question from Jason Helfstein in pertinent part as follows:

First of all, Jason to answer your first question.  We expect a very healthy pricing trend going forward, especially today in the high utilization cities versus the smaller cities we have in our network, we have already, have the price ready and start talking to our clients.  We will make an announcement and put it on our website very shortly for the price increase for the later part of the year. So overall we believe the pricing trend is very healthy.

On the margins for the Commercial Location network, if you think about the margin compared actually quarter-over-quarter, it's quite similar to first quarter of 2006. So we still expect long term gross margin for the Commercial Location business, without taking into consideration seasonality, will be about 75%.  So basically we think that the Commercial Location network this quarter is affected by seasonality.

But otherwise we continue to believe for the big cities, which we have very high utilization rate today, the gross margin will be higher. But for the smaller cities where the utilization is relatively lower, which means the cities we just started our network, the gross margin will be lower given the fixed cost nature of the business. But we believe the long-term gross margin of the overall Commercial Location network will be over 75%.

46.     Later during the May 17, 2007 conference call, another analyst also asked about the Company's margins. Lin Shi, an analyst from Lehman Brothers, asked, in pertinent part, the following:

My first question is on the gross profit margin of Commercial Location network. On a year-on-year basis I notice there's a slight drop, about 1.5%. But on the other hand we've seen the occupancy rate and ASP both go up quite a bit on a year-to-year basis. Given the nature of the fixed cost business, so I just wonder what's the reason behind the gross margin decline?

47.     Defendant Wu responded to the question from Lin Shi as follows:

That's [as I said before] because last year we had many less cities versus this year. And this year it's a much bigger network. So I think that helps to hopefully answer your question. Because there are many more of cities, which are tier-III, tier-IV, tier-V cities which have low occupancy rate. And this therefore has a lower gross margin. So on a blended basis it's decreased slightly. So there's really, on a city by city basis, this overall gross margin are improving.

48.     On September 27, 2007, Focus Media reported its financial results for 2Q07 and reported that its gross margin for its "digital out-of-home business was 63.1%. Within the digital out-of-home business, commercial location network gross margin was 65.0%, in-store network gross margin was 28.4%, and the poster frame network gross margin was 71.6%." Focus Media also reported that "[b]lended gross margin for the company for the second quarter was 54.6%, as compared to 56.9% in the second quarter of 2006. . . ."

49.     On a conference call with analysts on September 27, 2007 concerning the Company's financial results for 2Q07, analysts were once again interested in the Company's gross margins. For example, James Mitchell, an analyst from Goldman Sachs, asked the following:

Okay, it's much more appropriate, but it makes my life harder. Just one other question from me, then. On Allyes, you commented that you see margins expanding over time. I guess, for the second quarter, it looked like it was a 27% or so gross margin for the business. Do you see that margin expanding relatively quickly as you [enjoy] merger synergies, or do you see that margin expanding more gradually over time as you change the business model?

50.     Defendant Wu responded to the question from James Mitchell as follows:

I think, if you look at what we said -- mentioned in the press release, 90% of our Internet advertising business still is digital media service, which is interactive agency business, itself is a lower margin. I think we discussed a little bit on the call when we acquired Allyes. Those margins can continue to improve as the revenue base becomes larger, revenue growth becomes larger, and also due to the larger media buying power of our Internet advertising business.

So coming back to your question, here, it's going to be a gradual improvement. Still today, the digital media service is still the majority of our Internet advertising business. Going forward, we see from two areas for the margin improvement. One is continued improvement of margin in the digital media service business, as we talked about earlier, due to revenue base growth as well as media buying power and also increasing operating efficiency.

But also, we see a change of the revenue mix in our Internet advertising business, because, if you look at digital performance media, itself is a higher margin business. So as that particular business contributing more and change the mix of those different contributions, we do see the margin of the Internet advertising business will improve. But those will be gradual processes.

51.     Research analysts covering Focus Media also stressed the Company's margins in research reports on the Company.

52.     A March 12, 2007 research report by Deutsche Bank commented on Focus Media's margins and associated future margins with the success of the Allyes acquisition. The Deutsche Bank research report stated, in pertinent part:

Management of Focus Media is confident that net margins of Allyes will expand as its revenues scale up due to operating leverage and some cost synergies from centralizing certain corporate functions.

*        *        *

Based on our sensitivity analysis and estimates, with net margins going up, the Allyes acquisition will be slightly accretive to Focus' bottom line with 2007E, 08E

and 09E EPS up by 7%, 6% and 8% to US$2.70, US$3.96 and US$4.97, respectively.

53.    A March 16, 2007 research report by Independent International Investment Research PLC "reiterated a BUY on fundamental grounds" for Focus Media and stated: "[g]oing forward, we expect Focus Media to continue to report healthy top-line growth with improvement in margins."

54.    A May 18, 2007 research report by Deutsche Bank raised that firm's price target and reiterated its Buy rating on Focus Media and stated in pertinent part: "[w]e expect margins to rebound in 2Q as sales ramp."

55.    A September 28, 2007 research report by WR Hambrecht & Co raised that firm's price target and reiterated its Buy rating on Focus Media and stated in pertinent part: "management expects margins (27% GM in Q2:07) to improve over time as the company increases its revenue mix of technology-based products (over traditional advertising consulting business)."

### Focus Media Forecasts Strong Growth for 3Q07

56.    On September 27, 2007, three days before the close of fiscal 3Q07, Focus Media issued a press release announcing its financial results for 2Q07, the period ending June 30, 2007 (the "9/27/07 Press Release"). The 9/27/07 Press Release was filed with the SEC on Form 6-K on October 2, 2007. The 9/27/07 Press Release provided earnings guidance for 3Q07 and stated in pertinent part as follows:

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range from $132 million to $135 million. Third quarter 2007 net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions (non-GAAP) is expected to be between $52 million and $54 million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS equivalent average shares outstanding. Due to higher-than- expected growth in our Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

57.    On September 27, 2007, Focus Media held a conference call with analysts and reiterated the financial forecasts for 3Q07 contained in the 9/27/07 Press Release.

58.    Focus Media did not publicly change its business outlook for 3Q07 after September 27, 2007. The Prospectus (defined below), under the *Where You Can Find Additional Information* section on p. 160, stated that the "SEC also maintains a website that contains reports, proxy statements and other information about issuers, such as us, who file electronically with the SEC." Thus, the Prospectus referred investors to its SEC filings, including the 9/27/07 Press Release. The next public disclosure concerning the Company's financial results for 3Q07 was when the Company disclosed its actual results on November 19, 2007. Thus, at the time of the Secondary Offering, Focus Media had not altered its business outlook for 3Q07 even though that quarter had been closed for more than 1 month.

59.    As discussed below, Focus Media's actual financial results for 3Q07 were considerably worse than represented on September 27, 2007.

### The Secondary Offering

60.    On or about November 1, 2007, Focus Media filed a Form F-1/A Registration Statement (the "Registration Statement") with the SEC for the Secondary Offering.

61.    On or about November 7, 2007, the Prospectus (the "Prospectus") with respect to the Secondary Offering, which forms part of the Registration Statement, became effective and more than 13.5 million shares of Focus Media's ADSs at $64.75 per ADS were sold to the public, thereby raising more than $888 million. The Company sold 5 million ADSs and other selling shareholders identified in the Prospectus, including Defendant Tan, sold 8,720,873 ADSs in the Secondary Offering. Each ADS represented 5 ordinary Company shares.

62.    Underwriter Defendants Citigroup, Credit Suisse and Merrill Lynch served as lead underwriters and Joint Bookrunners for the Secondary Offering. Each of the Underwriter

Defendants purchased 4,390,679 ADSs from the Company and selling shareholders and sold those shares to public investors in the Secondary Offering. CIBC World Markets Corp. and Piper Jaffray & Co. served as co-managers for the Secondary Offering and purchased 343,023 ADSs and 205,813 ADSs respectively, and sold those shares to public investors in the Secondary Offering. The Underwriter Defendants earned at least $25,586,681 as a result of their sale of Company ADSs in the Secondary Offering.

### Focus Media Experienced an Undisclosed Contraction in Its Margins

63.    During 3Q07, Focus Media suffered from a contraction in its gross and net margins, resulting in the Company being less profitable than disclosed to the marketplace. Focus Media did not disclose the decline in profit margins for 3Q07 until after the Secondary Offering. Gross margin, or the percentage of sales left after deducting production costs, fell to 50.9% in 3Q07 from 65.3% a year earlier (*i.e.*, 3Q06).

64.    Various factors caused the contraction in Focus Media's margins during 3Q07. The factors included, among others, margin problems due to several acquisitions by Focus Media during the first half of 2007 in its Internet advertising division and billboard division and margin compression in Focus Media's In-Store division.

65.    Focus Media made several acquisitions during the first half of 2007.

66.    In March 2007, the Company acquired Allyes, which operates an Internet advertising agency and service technology business. During 2007, the Company also acquired several other companies in the internet advertising space. The consolidation of these companies into Allyes had a negative impact on the Company's margins.

67.    During the second quarter of 2007, Focus Media acquired a leading outdoor billboard operator in China, which operates over 200 outdoor billboard locations in major commercial centers

in China.  This outdoor billboard operator owned static (*i.e.*, non-digital) billboards which are less profitable than the digital billboards owned by Focus Media prior to the acquisition.  Focus Media planned to upgrade some of these non-digital billboards to digital billboards upon the expiration of existing contracts.  These static billboards, however, were subject to relatively long advertising contracts of 1-2 years which needed to expire before Focus Media could alter their terms or convert the billboards to digital billboards.  Furthermore, Focus Media would need governmental approval in order to convert a static billboard to a digital billboard.

68.    Focus Media did not disclose sufficient details about these acquisitions to investors at the time of the acquisitions or in the Prospectus.  Importantly, Focus Media did not inform investors that it acquired non-digital billboards with smaller margins compared with digital billboards.

69.    Focus Media encountered problems with its In-Store division during the 3Q07, resulting in a significant decline in profit margins.  The In-Store division had gross margins of 36.2% in 3Q06 and gross margins of 28.4% during 2Q07.  During 3Q07, the In-Store division had gross margins of 17.7%, a decrease of 18.5 from 3Q06 and a decrease of 10.7 from 2Q07.

**The Registration Statement Contained Inaccurate
Statements of Material Fact and Omitted Material Information
Required to Be Disclosed Therein**

70.    The Registration Statement contained numerous inaccurate statements of material fact and omitted material information required to be disclosed therein.

71.    The Registration Statement provided general information about various Company acquisitions during the first half of 2007.

72.    The Registration Statement, stated in pertinent part as follows:

**Acquisitions in the six months ended June 30, 2007 (unaudited):**

In January and February 2007, the Group acquired five companies which provide in-elevator poster frame advertising services. . . .

- 19 -

In March 2007, the Group acquired five companies which provide mobile handset advertising services. . . .

In March 2007, the Group acquired a billboard advertising company. The purchase consideration is contingent upon the operating results over the next three years. The Group made an advance payment of $3 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group completed the acquisition of Allyes Information Technology Company Limited, or Allyes, a Cayman Islands company, which operates an Internet advertising marketing agency and technology services company through its PRC affiliated entities. Allyes is the largest Internet advertising agency and provider of Internet advertising technology in China.  The purchase price consideration was $70 million in cash and 19,969,080 ordinary shares having a fair value of $154,281,112, or $7.726 per ordinary share.  Additional consideration of 9,662,458 ordinary shares is issuable, contingent upon Allyes meeting certain earnings targets during the twelve month period from April 1, 2007 to March 31, 2008.

\*        \*        \*

In the second quarter of 2007, the Group completed acquisitions of eight companies which primarily provide mobile handset advertising, Internet advertising and outdoor billboard advertising services, for an aggregate purchase considerations of approximately $7.5 million plus additional consideration contingent upon the achievement of certain earnings targets over the next one to three fiscal years.  The Group also made an advance payment of $16.3 million, which will be deducted from the contingent purchase price consideration.

73.    The Registration Statement, stated in pertinent part as follows:

We continue, from time to time, to make acquisitions to expand our existing networks and to enter into new areas of business. For instance, in the first half of 2007, we acquired companies to expand our mobile handset advertising network and outdoor LED billboard network as well as entering into the Internet advertising business through several acquisitions including Allyes. We expect that acquisitions will continue to be an important component of our growth strategy.

In March 2007, we acquired Allyes, which operates an Internet advertising services and technology business.

74.    The statements referenced above in ¶¶72-73 were each an inaccurate statement of

material fact because they failed to disclose that recent Company acquisitions had a negative impact

on the Company's overall profit margins and that Focus Media's gross margins for 3Q07 fell to

50.9% from 65.3% a year earlier and from 54.6% in 2Q07.  The statements referenced above in ¶72 that "the Group acquired a billboard advertising company" and in ¶73 that Focus Media "acquired companies to expand" its "outdoor LED billboard network" were each an inaccurate statement of material fact because Focus Media did not acquire LED billboards but acquired non-digital billboards that had smaller profit margins than LED billboards and the Company's plan was to eventually convert some of these non-digital billboards to LED billboards after their lengthy contracts expired and after the Company obtained governmental approval.  Furthermore, the statements referenced above in ¶¶72-73 were each an inaccurate statement of material fact because they failed to disclose that the Company's consolidation of acquisitions in the Internet advertising business resulted in a contraction in the Company's blended profit margins and profit margins in the Internet advertising division.  Indeed, for 3Q07, Focus Media's gross margins in its Internet advertising division had declined to 23% as compared to 27.1% in 2Q07.

75.    The Registration Statement, stated in pertinent part as follows:

The significant increase in our operating results since we commenced our current business operations is attributable to a number of factors, including the substantial expansion of our digital out-of-home advertising networks, the ongoing expansion of our mobile handset advertising network, the introduction of Internet advertising services into our platform, the successful execution and integration of strategic acquisitions, such as Framedia, Target Media, Focus Media Wireless, ACL and Allyes, and the growing acceptance of our multi-platform network as an appealing advertising medium by our clients.

We expect our future growth to be driven by a number of factors and trends including:

*      *      *

•      Our ability to increase sales of advertising time slots and extend the duration of our advertising cycle on our commercial location and in-store networks;

*      *      *

- 21 -

• Our ability to successfully operate and market our new outdoor LED billboard network;

• Our ability to successfully operate and market our new Internet advertising services network; and

• Our ability to acquire and integrate companies that operate advertising businesses complementary to our existing operations.

76. The statements referenced above in ¶75 were each inaccurate statements of material fact because at the time of the Secondary Offering, the Company had suffered a significant reduction in its profit margins as a result of, among other things: (i) recent Company acquisitions in the Internet advertising division and billboard division; and (ii) problems in the Company's in-store division. Indeed, Focus Media's gross margins for 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07. The statements referenced above in ¶75 that the Company's "significant increase in . . . operating results" is attributable to "the introduction of Internet advertising services into our platform" were each an inaccurate statement of material fact because they failed to disclose that the Company's consolidation of acquisitions in the Internet advertising business resulted in a contraction in the Company's blended profit margins and profit margins in the Internet advertising division. Indeed, for 3Q07, Focus Media's gross margins in its Internet advertising division had declined to 23% as compared to 27.1% in 2Q07. Furthermore, the statements referenced above in ¶75 were each inaccurate statements of material fact because the Company acquired non-digital billboards and would not be able to convert those billboards to LED billboards until the expiration of lengthy contracts and receipt of governmental approval.

77. The Registration Statement positively highlighted the Company's financial results for the first six months of 2007 but failed to disclose the negative profit margin trend in 3Q07. The Registration Statement, stated in pertinent part as follows:

**Gross Profit.** As a result of the foregoing, our gross profit increased by 101.5% from $46.5 million for the six months ended June 30, 2006 to $93.6 million for the

six months ended June 30, 2007.  Our overall gross margin decreased during the same period from 55.8% to 54.8% primarily due to the addition of our Internet advertising services network in the first half of 2007, which has lower margins.  For the six months ended June 30, 2007, our gross margin for our digital out-of-home advertising network amounted to 60.1%, including gross margins for our commercial location, in-store and poster frame networks of 62.8%, 26.4% and 67.9%, respectively, compared to a gross margin for our digital out-of-home advertising networks of 61.0% for the six months ended June 30, 2006, including gross margins of 62.0%, 29.3% and 62.0% for our commercial location, in-store and poster frame networks, respectively.  Gross margin for mobile handset advertising network increased from 21.8% for the six months ended June 30, 2006 to 56.6% for the six months ended June 30, 2007.  Gross margin for out Internet advertising services network was 27.1% for the six months ended June 30, 2007.  In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network.

78.    The statements referenced above in ¶77 were each an inaccurate statement of material fact because they omitted to disclose that: (i) the Company's margins in 3Q07 trended significantly downward compared with 3Q06 and 2Q07; (ii) the Company's gross margins in 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07; (iii) Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins; (iv) the Company's profit margins for 3Q07 were significantly smaller than the Company forecasted on September 27, 2007; (v) the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07; and (vi) the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07.

79.    The Registration Statement described the Company's billboard division as consisting of LED billboards even though that division also consisted of non-digital billboards with lower profit margins.  In fact, the Prospectus described the network that operated the non-digital billboards as the LED billboard network.

80.    The Registration Statement, Overview subsection of Business, stated in pertinent part as follows:

**Our Digital Out-of-home Advertising Network** which focuses on providing out-of-home advertising through LCD flat-panel televisions displays, LED billboards,

movie screens, and poster and digital frames, includes our commercial location network, in-store network and poster frame network:

- **our commercial location network**, consisting of:

  \*        \*        \*

- **our outdoor LED billboard network**, which refers to our network of leased 5' x 5' LED digital billboards installed on the street-sides in major shopping districts and other locations with high pedestrian traffic in Shanghai;

81.    The Registration Statement, stated in pertinent part as follows:

A majority of the content displayed on our commercial location and in-store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day.  Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

\*        \*        \*

As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200 leased 5' x 5' digital billboards placed along curbsides in high-pedestrian traffic areas in Shanghai.

82.    The Registration Statement, stated in pertinent part as follows:

**Outdoor LED billboard network.**  In April 2006, we commenced operations of an outdoor LED billboard network consisting of 5' x 5' LED digital billboards that are installed on the street-sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.  Full-color audiovisual commercials are displayed on the digital billboards in a repeating six-minute cycle.  The commercials displayed on the LED billboards are highly visible even during bright daylight.  As of June 30, 2007, the number of the LED billboards in our street-side outdoor LED billboard network in prime commercial and shopping areas reached approximately 200. We market this part of our network under the name "iStreet Network."

83.    The Registration Statement, stated in pertinent part as follows:

*Advertising Contracts*.  We offer advertisers five-, fifteen- or thirty-second time slots on our out-of-home television advertising networks, including our commercial location, in-store, outdoor LED billboard and movie theater advertising networks. For our commercial location network, our standard advertising package includes a time slot on our entire network or a particular channel in each city in which the advertiser wishes to display the advertisement.  For our movie theater advertising network, time slots are sold on a regional or entire network basis.  Our sales are made pursuant to written contracts with commitments ranging from one week to several months.

84.    The statements referenced above in ¶¶80-83 were each inaccurate statements of material fact because they failed to disclose that the LED billboard division contained non-digital billboards, that advertisements are not "broadcast" over these billboards in a "repeating cycle," and that the Company would not be able to convert those billboards to LED billboards until the expiration of lengthy contracts and receipt of governmental approval.  Furthermore, calling the billboard network the "LED" billboard network was an inaccurate statement of material fact because that network also contains non-LED billboards.

85.    Under applicable SEC rules and regulations governing the preparation of the Registration Statement and Prospectus, the Prospectus was required to disclose both that: (i) the Company's margins in 3Q07 trended significantly downward compared with 3Q06 and 2Q07; (ii) the Company's gross margins in 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07; (iii) Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins in 3Q07; (iv) the Company's profit margins for 3Q07 were significantly smaller than the Company forecasted on September 27, 2007; (v) the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07; (vi) the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07; and (vii) the Company acquired non-digital billboards which have smaller profit margins than LED billboards and that even though the Company planned to convert these billboards to LED billboards, the conversions could only take place after the expiration of lengthy contracts and governmental approval.  The Prospectus failed to contain any such disclosures.

86.    Pursuant to Item 4(a) of Form 424B4, the Registration Statement was required to furnish the information required by Part I of Form 20-F.  Under Item 5(D) of Part I of Form 20-F an issuer is required to, among other things, "discuss, for at least the current fiscal year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material

effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." Additionally, under Item 8(B) of Form 20-F, the Registration Statement was required to disclose "whether or not any significant change has occurred since the date of the annual financial statements, and/or since the date of the most recent interim financial statements, if any, included in the document."

87.    The fact that the Company's margins had significantly trended downward during 3Q07 and that Company acquisitions during the first half of 2007 had contributed to this downtrend were required to be disclosed in the Registration Statement but were not. Indeed, at the time of the Secondary Offering, the Company had already completed the 3Q07 and its actual financial results showed that the Company was less profitable than the Company forecasted on September 27, 2007. The Company had also completed acquisitions, such as of the non-digital billboards and of Internet advertising companies, which negatively impacted earnings.

88.    Under Item 3(D) of Part I of Form 20-F, the Registration Statement was required to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk. . . ." Additionally, pursuant to Item 3 of Form F-1, the Registration Statement was required to furnish the information required by Item 503 of Regulation S-K. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative."

89.    The fact that: (i) the Company was much less profitable in 3Q07 than the Company had disclosed on September 27, 2007 and the fact that the Company had not corrected this forecast; and (ii) the Company acquired non-digital billboards that would not be able to be converted to LED billboards until the expiration of lengthy contracts and receipt of governmental approval, were

significant factors that made the Secondary Offering speculative or one of high risk and were required to be disclosed in the Registration Statement but were not. This risk materialized shortly after the Secondary Offering on November 19, 2007 when the Company announced its financial results for 3Q07 and more fully described the Company's acquisitions and their negative impact on the Company's financial performance.

### Post Secondary Offering Disclosures

90.     On November 19, 2007, after the close of the market, Focus Media issued a press release announcing its financial results for the third quarter of 2007, the period ending September 30, 2007 (the "11/19/07 Press Release"). Among other things, the Company reported in the 11/19/07 Press Release that its gross margins for 3Q07 had declined due to several recent acquisitions and due to problems with its In-Store division. The Company's margins were considerably less than forecasted on September 27, 2007. Compared with the forecast from September 27, 2007, the Company's revenues were greater but earnings were in-line, resulting in smaller margins than forecasted. Thus, the Company required $151.4 million in revenues (or approximately 12% - 15% more in revenues than the $132-135 million forecasted) to generate the same earnings forecasted, resulting in much smaller margins than reflected in the business outlook from 9/27/07. The 11/19/07 Press Release stated in part:

> Highlights for Third Quarter 2007:
>
> -- Total revenues grew 149.6% year-over-year and 33.6% quarter-over-quarter to $151.4 million.
>
> -- Net income for the third quarter was $46.6 million, up 72.6% year-over-year and 23.6% quarter-over-quarter. Fully diluted net income per ADS for the third quarter of 2007 was $0.37. . . .
>
>           *       *       *
>
> Gross profit for the third quarter of 2007 was $77.1 million, representing an increase of 99.9% compared to $38.6 million for the corresponding period a year ago and a

24.7% increase compared to $61.8 million in the second quarter 2007. In the third quarter 2007, gross margin for our digital out-of-home business was 62.7%. Within our digital out-of-home advertising networks, commercial location network gross margin was 64.7%, in-store network gross margin was 17.7%, and the in-elevator poster frame network gross margin was 71.1%.

91.    The 11/19/07 Press Release disclosed – for the first time - that the Company had acquired non-digital billboards and that those billboards had a negative impact on profit margins for 3Q07. The 11/19/07 Press Release also reported that the Company would need to wait for contracts on those billboards to expire, and would need to obtain governmental approval, before the billboards could be converted to digital billboards. The 11/19/07 Press Release stated in pertinent part:

> Commercial location gross margin was impacted by the acquisition of a leading outdoor billboard operator in China, which operates over 200 highly attractive outdoor billboard locations in major commercial centers in China. Excluding the non-digital outdoor billboard business we acquired in the second quarter of 2007, commercial location gross margin would have been 74.6%. We plan to upgrade some of these sites to digital LED billboards upon expiration of the current contracts with advertisers. The acquisition provides Focus Media with a stronger strategic position for the growth of outdoor digital billboard business in the future.

92.    The 11/19/07 Press Release reported the negative impact that the Company's In-Store business and acquisitions in the Internet advertising division had on its gross margins for 3Q07:

> The gross margin for our Internet advertising business was 23.0% in the third quarter 2007, lower than the previous quarter due to several small acquisitions to strengthen the market leadership of Allyes. Blended gross margin for the company for the third quarter was 50.9%, as compared to 54.6% in the second quarter of 2007, primarily due to the contribution of the lower-margin Internet advertising business and in-store business.

93.    The 11/19/07 Press Release also disclosed that during 3Q07, the In-Store division had gross margins of 17.7%, a decrease of 18.5 from 3Q06 and a decrease of 10.7 from 2Q07.

94.    Focus Media also held a conference call with analysts on November 19, 2007 (the "11/19/07 Conf. Call"), during which Company executives reiterated the financial results of 3Q07. During the 11/19/07 Conf. Call, Defendant Jiang, in response to a question about the advertising contracts for the static billboards acquired during 2Q07, stated: "Typical advertising contract[s] in

the China outdoor billboard business is roughly about one year or two years." Defendant Jiang also discussed the long process involved with converting static billboards to digital billboards:

> In terms of the converting traditional billboards to digital billboards, there are a lot of factors we need to take into consideration such as lighting impact on the surrounding neighborhood, such as the weight tolerance of the current construction, the current building, electricity supply. And of course we need to get government approval if we convert a traditional poster to a digital billboard. So all those things take time to work. Of course, it's reduced the work. The biggest entry barrier are basically access to the sites itself.

95.    Following the Company's earnings release, on November 20, 2007, the price of Focus Media ADSs dropped from $57.15 per ADS to $52.00 per ADS on extremely heavy trading volume. The next day, on November 21, 2007, the price of Focus Media ADSs continued to decline and closed at $50.35 per ADS.

96.    An article on Bloomberg on November 19, 2007 titled *Focus Media Shares Decline as Profitability Misses Estimates* reported that Focus Media's stock dropped due to a contraction in the Company's margins and described the impact that the acquisitions of internet advertising businesses had on margins. The article stated in pertinent part as follows:

> Focus Media Holding Ltd. declined 5.3 percent in U.S. after-hours trading after profitability dropped to the lowest since July 2005, when China's largest publicly traded advertising company first sold shares.

> The Shanghai-based company said its gross margin, or the percentage of sales left after deducting production costs, fell to 50.9 percent in the third quarter from 65.3 percent a year earlier. That missed estimates from analysts at Piper Jaffray & Co. and Susquehanna Financial Group.

> Focus Media bought Web ad businesses to win a bigger share of China's advertising market as the nations's economy grew by more than 11 percent for three consecutive quarters. The acquisitions eroded the company's margins, said Piper Jaffray's Aaron Kessler.

> "Margins are a near-term concern" that led to the decline in the stock, said Kessler, who rates Focus Media "outperform." He had estimated a gross margin of 60.5 percent while Susquehanna Financial's Ming Zhao had expected the margin to be 58 percent.

97.    Research analysts issued research reports commenting on the drop in the Company's stock price.  A November 20, 2007 research report by CIBC World Markets titled *Emotion is Driving Stock on Transparency; Estimates Unchanged*, stated: "We believe the sell-off is largely driven by an emotional response to FMCN's lack of transparency."  This research report stated in part:

> On 9/27, management provided 3Q revenue guidance 13% ahead of Street expectations, with the implication that upside was from organic growth.  However, after reporting 3Q earnings on Monday night, we learned that the upside was entirely from the acquisition of billboard and online assets.
>
> * Moreover, these acquired static billboards are somewhat out of the company's core-expertise. While the company plans to upgrade these to LED displays, its previous outdoor digital displays have not been a success, in our view. Moreover, until these displays are upgraded (presumably some time in 2008), margins are likely to remain below its commercial business. As such, prior '08 estimates were artificially inflated by including these revenues at commercial margins, and we have accordingly adjusted our '08 for the static billboard margins.
>
> * While we don't have an issue with the company's acquisition strategy, which is generating accretive returns above its cost of capital, the lack of disclosure is an issue for many investors.

98.    A research report from SIG Susquehanna Financial Group, LLLP on November 30, 2007 stated that Focus Media "has acquired [approximately] 200 billboards whose relatively low profitability diluted overall margin."

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

99.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all Defendants.

101.    The Registration Statement for the Secondary Offering was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

102.    Focus Media is the registrant for the Secondary Offering.  As issuer of the shares, Focus Media is strictly liable for the materially inaccurate statements contained in the Registration Statement and the Prospectus and the failure of the Registration Statement and Prospectus to be complete and accurate.

103.    The Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading.  As such, the Individual Defendants are liable to the Plaintiffs and the Class.

104.    The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Secondary Offering and the Company's securities sold through the Registration Statement.  The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts.  None of the Underwriter Defendants made a

reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not misleading.

105.    By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

106.    Plaintiff Eastriver Partners acquired Focus Media ADSs in the Secondary Offering, and in reliance on, the Registration Statement and without knowledge of the untruths and/or omissions alleged herein.  Plaintiffs and the Class sustained damages when the price of Focus Media's ADSs declined substantially due to material misstatements in the Registration Statement and Prospectus.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

107.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all Defendants.

109.    Defendants were sellers and offerors and/or solicitors of purchasers of the ADSs offered pursuant to the Prospectus.  Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the Secondary Offering.  The Registration Statement contained a Prospectus which was used to induce investors, such as the Plaintiffs and the other members of the Class, to purchase Focus Media's common stock.

110.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to

be stated therein.  The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and in "Road Shows" to promote the Secondary Offering.  Focus Media and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus.

111.    Pursuant to the Underwriting Agreement, each of the Underwriter Defendants purchased a total of at least 4,390,679 Focus Media ADSs at the public offering price, less an underwriting discount in the Secondary Offering.

112.    The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Prospectus for their own financial benefit.  But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents.  The Underwriter Defendants drafted, revised and/or approved the Prospectus.  The Prospectus was calculated to create interest in Focus Media ADSs and was widely distributed by or on behalf of these Defendants for that purpose;

(b)    finalized the Prospectus and caused it to become effective; and

(c)    conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

113.    As set forth more specifically above, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

114.    Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

115.    The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects.  Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

116.    By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the Securities Act.  Accordingly, Plaintiff Eastriver Partners and members of the Class who hold Focus Media ADSs purchased in the Secondary Offering have the right to rescind and recover the consideration paid for their Focus Media ADSs and hereby elect to rescind and tender their Focus Media common stock to the Defendants sued herein.  Plaintiff and Class members who have sold their Focus Media ADSs are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

117.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

119.    Each of the Individual Defendants acted as controlling persons of Focus Media within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior

officer of Focus Media. By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Focus Media to engage in the conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

120.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

### Materially False and Misleading
### Statements Issued During the Class Period

121.     For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants Focus Media, Jiang, Tan and Wu.

122.     The statements referenced in ¶¶72, 73, 75, 77, 80-83 from the Registration Statement are incorporated herein by reference. These statements were materially false and misleading when made for the reasons set forth above.

123.     On September 27, 2007, three days before the close of fiscal 3Q07, Focus Media issued a press release announcing its financial results for 2Q07, the period ending June 30, 2007. The 9/27/07 Press Release was filed with the SEC on Form 6-K on October 2, 2007. The 9/27/07 Press Release provided earnings guidance for 3Q07 and stated as follows:

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range from $132 million to $135 million. Third quarter 2007 net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions (non-GAAP) is expected to be between $52 million and $54 million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS equivalent average shares outstanding. Due to higher-than-expected growth in our

Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

124.    The statements referenced in ¶123 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts:

(a)    At the time of the 9/27/07 Press Release, Defendants knew, or were reckless in not knowing, that Focus Media would generate approximately $151.5 million in revenues compared with the statement on September 27, 2007 that the Company is forecasted to generate $132-135 million in revenues but would still earn the forecasted approximately $52-$54 million in non-GAAP net income.  Thus, the Company's profit margins would be considerably less in 3Q07 than forecasted even though there would be an increase in revenues;

(b)    the Company's gross margins in 3Q07 fell to approximately 50.9% from 65.3% a year earlier and from 54.6% in 2Q07;

(c)    Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins in 3Q07;

(d)    the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07;

(e)    the Company's Internet advertising division's gross margins fell to approximately 23% from 27.1% in 2Q07; and

(f)    the Company acquired non-digital billboards which have smaller profit margins than LED billboards and that even though the Company planned to convert these billboards to LED billboards, the conversions could only take place after the expiration of lengthy contracts and governmental approval.

125.    Also on September 27, 2007, Focus Media held a telephone conference with analysts in connection with its financial results for 2Q07 ("the 9/27/07 Conf. Call").  On the 9/27/07 Conf.

Call, Focus Media reiterated its business forecast for 3Q07 that was contained in the 9/27/07 Press

Release.

126.    On the 9/27/07 Conf. Call, Defendant Wu provided Focus Media's business outlook

for 3Q07 and stated that he expects that "the total revenue for the third quarter of 2007 to be between

$132m and $135m, non-GAAP fully diluted earnings per ADS to be between $0.41 and $0.43."

127.    The statements referenced above in ¶126 were each materially false and misleading

for the reasons set forth in ¶124.

128.    On the 9/27/07 Conf. Call, Defendant Jiang stated in pertinent part that going forward

Focus Media will:

> be able to increase the margin of Internet advertising business of Allyes. So going
> forward, for the Internet advertising business, the focus will be two areas. One is to
> achieve higher growth, higher -- hopefully higher than industry growth for the
> Internet advertising industry and also focus on improving the margin of the Internet
> advertising business of Focus Media.

129.    On the 9/27/07 Conf. Call, Defendant Wu responded to a question about the

expansion of the margins in the Internet advertising business:

> **James Mitchell** - Goldman Sachs - Analyst
>
> Okay, it's much more appropriate, but it makes my life harder. Just one other
> question from me, then. On Allyes, you commented that you see margins expanding
> over time. I guess, for the second quarter, it looked like it was a 27% or so gross
> margin for the business. Do you see that margin expanding relatively quickly as you
> [enjoy] merger synergies, or do you see that margin expanding more gradually over
> time as you change the business model?
>
> **Daniel Wu** - Focus Media Holding Ltd. - CFO
>
> I think, if you look at what we said -- mentioned in the press release, 90% of our
> Internet advertising business still is digital media service, which is interactive agency
> business, itself is a lower margin. I think we discussed a little bit on the call when we
> acquired Allyes. Those margins can continue to improve as the revenue base
> becomes larger, revenue growth becomes larger, and also due to the larger media
> buying power of our Internet advertising business.

So coming back to your question, here, it's going to be a gradual improvement. Still today, the digital media service is still the majority of our Internet advertising business. Going forward, we see from two areas for the margin improvement. One is continued improvement of margin in the digital media service business, as we talked about earlier, due to revenue base growth as well as media buying power and also increasing operating efficiency.

But also, we see a change of the revenue mix in our Internet advertising business, because, if you look at digital performance media, itself is a higher margin business. So as that particular business contributing more and change the mix of those different contributions, we do see the margin of the Internet advertising business will improve. But those will be gradual processes.

130.    The statements referenced in ¶¶128-29 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts:

(a)    Margins in the Internet advertising division for 3Q07 were not going to "improve as the revenue base becomes larger" or "expand" but in fact margins for the Internet advertising division were going to contract as revenues increase during 3Q07;

(b)    Company acquisitions in the Internet advertising division during the first half of 2007 negatively impacted the Company's profit margins in 3Q07; and

(c)    the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07.

### Additional Scienter Allegations

131.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Focus Media, their control

over, and/or receipt and/or modification of Focus Media's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

132.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

133.    As alleged herein, at the time of the 9/27/07 Press Release and Conf. Call and at the time of the Secondary Offering, each of the Individual Defendants was aware of the true financial performance of Focus Media for 3Q07 and that the Company's margins were considerably smaller than represented on September 27, 2007 and that the margins were trending downward.  Indeed, as stated by an analyst from Susquehanna Financial Group in a research report on September 28, 2007, "[s]ince guidance was given near the end of 3Q, we should believe the accuracy of company guidance is very high."   Furthermore, each of the Individual Defendants knew, or recklessly disregarded, that Company acquisitions during the first half of 2007 had negatively impacted the Company's profit margins.  Nevertheless, Defendants pushed forward with the Secondary Offering even though it was priced based upon an inaccurate perception of the Company's financial performance.

134.    Additionally, the fraud alleged herein relates to the core business of Focus Media so knowledge of the fraud may be imputed to the Individual Defendants.  Given Defendants' knowledge of the declining financial condition of Focus Media, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

135.    Defendants' materially false and misleading statements and material omissions caused Focus Media's ADSs to be artificially inflated.

136.    Additionally, each Defendant possessed substantial motives for misrepresenting Focus Media's financial status, operations, and prospects throughout the Class Period.

137.    In August 2007, the Company's ADSs traded at $34.57 per ADS and rose to $64.75 at the time of the Secondary Offering.  Defendants and selling shareholders capitalized on Focus Media's artificially inflated stock price by raising more than $888 million through the sale of Company ADSs in the Secondary Offering at $64.75 per ADS, close to the all-time high of 65.10 per ADS for the Company's ADSs.  Shortly after the Secondary Offering, the Company's ADSs declined and never again reached $64.74 per ADS.  The Company's ADSs closed at $27.05 per ADS on June 22, 2008.

138.    The Company sold 5 million ADSs and raised $172,850,000 and other selling shareholders identified in the Prospectus, including Defendant Tan, sold 8,720,873 ADSs in the Secondary Offering raising more than $564 million.  Defendant Tan personally sold 7,166,124 ADSs, representing 99% of his total holdings in the Company, and raised more than $464 million.

139.    Recognizing that Focus Media's valuation would decline after the announcement of its results for 3Q07, Defendants timed the Secondary Offering so that it was priced before the Company announced its disappointing financial results for 3Q07 in order to maximize the amount of money they could raise in the Secondary Offering.

<b>Applicability of Presumption of Reliance:<br>Fraud on the Market Doctrine</b>

140.    At all relevant times, the market for Focus Media ADSs was an efficient market for the following reasons, among others:

(a)     Focus Media ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Focus Media filed periodic public reports with the SEC and the NASDAQ;

(c)     Focus Media regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Focus Media was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

141.     As a result of the foregoing, the market for Focus Media ADSs promptly digested current information regarding Focus Media from all publicly available sources and reflected such information in Focus Media's share price. Under these circumstances, all purchasers of Focus Media ADSs during the Class Period suffered similar injury through their purchase of Focus Media ADSs at artificially inflated prices and a presumption of reliance applies.

**Transaction and Loss Causation**

142.     The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

143.     As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Focus Media and its financial performance.

144.    The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Focus Media's business and financial performance, thus causing Focus Media ADSs to be overvalued and artificially inflated during the Class Period. Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Plaintiffs purchasing the Company's ADSs at artificially inflated prices.

145.    Defendants' improper conduct caused the damages complained of herein. When the material misstatements and omissions made by Defendants on September 27, 2007 and in the Prospectus became known to investors, on November 20, 2007 the price of Focus Media ADSs dropped from $57.15 per ADS to $52.00 per ADS, approximately 9%, on extremely heavy trading volume. The next day, on November 21, 2007, the price of Focus Media ADSs continued to decline and closed at $50.35 per ADS, an additional drop of more than 3%.

146.    As a result of these revelations, and the corresponding drop in the price of Focus Media's ADSs, Plaintiffs and Class members suffered real economic loss.

147.    Further, the timing and magnitude of Focus Media ADSs' price decline negate any inference that the losses suffered by Plaintiffs were caused by changed market conditions, microeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Focus Media and the subsequent significant decline in the value of Focus Media ADSs when the true state of the Company's operations and finances were revealed to the market and investors.

**No Safe Harbor**

148.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Focus Media who knew that those statements were false when made.

149.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against Defendants Focus Media, Jiang, Tan and Wu

150.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. In this Count, the term "Defendants" refers only to Defendants Focus Media, Jiang, Tan and Wu.

151.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Focus Media ADSs during the Class Period.

153.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Focus Media ADSs. Plaintiffs and the Class would not have purchased Focus Media ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

154.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Focus Media ADSs during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Jiang, Tan and Wu

155.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. In this Count, the term "Defendants" refers only to Defendants Jiang, Tan and Wu.

156.    Defendants Jiang, Tan and Wu acted as controlling persons of Focus Media within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Jiang, Tan and Wu had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants Jiang, Tan and Wu were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct giving rise to the securities violations as alleged herein, and exercised the same.

158.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Jiang, Tan and Wu are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company ADSs during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for judgment as follows:

A.    declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.       awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.       with respect to Count II, Ordering that the Secondary Offering be rescinded;

D.       awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.       awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  June 23, 2008                COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                     SAMUEL H. RUDMAN
                                     EVAN J. KAUFMAN


                                     _____
                                              SAMUEL H. RUDMAN

                                     58 South Service Road, Suite 200
                                     Melville, NY 11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)

                                     *Lead Counsel for Plaintiffs*

                                     ABRAHAM FRUCHTER & TWERSKY LLP
                                     JACK G. FRUCHTER
                                     One Pennsylvania Plaza, Suite 2805
                                     New York, NY  10119
                                     Telephone:  212/279-5050
                                     212/279-3655 (fax)

- 46 -

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

*Additional Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2008, a copy of the foregoing CONSOLIDATED

AMENDED CLASS ACTION COMPLAINT was sent, via U.S. Mail, postage prepaid to the

following parties on the attached service list.

Kelly A. Stadelmann

FOCUS MEDIA (LEAD)
Service List - 6/23/2008    (07-0271)
Page 1 of 1

**Counsel For Defendant(s)**

Herbert S. Washer
Adam S. Hakki
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-4676
   212/848-4000
   212/848-7179 (Fax)

Bruce D. Angiolillo
Jonathan K. Youngwood
Andrew D.W. Cattell
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
   212/455-2000
   212/455-2502 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
   631/367-7100
   631/367-1173 (Fax)