UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
In re FOCUS MEDIA HOLDING                  :
LIMITED LITIGATION                         :   MASTER FILE
                                           :   07 Civ. 10617 (LTS)(GWG)
                                           :
This Document Relates To:                  :   ECF Case
All Actions                                :
                                           :   Electronically Filed
                                           :
                                           :   Oral Argument Requested
-----------------------------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................. 1

Summary of Allegations ......................................................................................... 3

    A.    Focus Media Releases Second Quarter 2007 Results ................................. 4

    B.    Focus Media Completes A Secondary Offering Of Its ADSs ................... 5

    C.    Focus Media Announces Third Quarter 2007 Results ................................ 6

    D.    Defendants Are Sued For Alleged Securities Fraud .................................. 8

Argument ................................................................................................................ 8

I.    Plaintiff's Section 10(b) And Rule 10b-5 Claims Should Be Dismissed Because The Allegations Do Not Meet The Heightened Pleading Standard And Do Not Allege Actionable Misstatements ....................................................... 9

    A.    None Of The Alleged Misstatements Is Actionable ................................. 9

    B.    The Complaint Does Not Allege Facts Giving Rise To A Strong Inference Of Scienter ...................................................................... 21

    C.    Plaintiff Does Not Properly Plead Loss Causation .................................. 28

II.    Plaintiff's Section 11 Claim Must Be Dismissed ................................................. 29

    A.    Plaintiff's Section 11 Claim Fails Because It Fails To Identify An Actionable Misstatement or Omission ...................................................... 30

    B.    Plaintiff's Section 11 Claim Fails Because Plaintiff Has Failed To Plead Scienter ................................................................................ 31

    C.    Plaintiff's Section 11 Claim Fails For Lack Of Loss Causation .............. 33

    D.    Plaintiff Lacks Section 11 Standing ......................................................... 33

III.    Plaintiff's Section 12(a)(2) Claim Must Be Dismissed ....................................... 34

    A.    Focus Media and the Individual Defendants Are Not Proper Section 12(a)(2) Defendants ............................................................. 34

    B.    Plaintiff Lacks Section 12(a)(2) Standing ................................................ 35

Conclusion ............................................................................................................. 36

## TABLE OF AUTHORITIES

### <u>CASES</u>

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................ 25

*Backhaus v. Streamedia Communications, Inc.*, No. 01 CIV.4889, 2002 WL
1870272 (S.D.N.Y. Aug. 14, 2002) .......................................................................... 19, 34

*Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) .................................................................... 33

*Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007) .................................................................. 33

*Demaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) ............................................ 16, 17

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................ 28

*Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115,  2000 WL 1752848
(S.D.N.Y. 2000) ......................................................................................................... 31

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).................................................................. 21

*Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783 (2d Cir. 1951)...................................................... 33

*Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980)................................................. 31

*Griffin v. Painewebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764 (S.D.N.Y. June
29, 2001) .................................................................................................................... 35

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)......................................................................... 35

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir.
1991) .......................................................................................................................... 31

*In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973 (S.D.N.Y. June
23, 2004) .................................................................................................................... 28

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192
(S.D.N.Y. 2004) ............................................................................................................ 4

*In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008)............................ 22, 24, 26

*In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y.
2006) ........................................................................................................................... 32

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ............................ 11, 16

*In re Corning Sec. Litig.*, No. 93 Civ. 7015 (AGS), 1996 WL 257603 (S.D.N.Y.
May 15, 1996)............................................................................................................. 24

*In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562 (S.D.N.Y. 2007) ........................ 23, 24, 25

*In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416
(S.D.N.Y. Nov. 25, 2003) ............................................................................................. 16

*In re Estee Lauder Cos.*, No. 06 Civ. 2505, 2007 WL 1522620 n.5 (S.D.N.Y. May
21, 2007) ...................................................................................................................... 28

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ........................ 8, 12

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243
(S.D.N.Y. 2003) ............................................................................................................ 33

*In re N2K Inc. Sec. Litig.*, 82 F. Supp.2d 204 (S.D.N.Y. 2000) ............................................. 18, 19

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.* 423 F. Supp. 2d 364 (S.D.N.Y. 2006). ................... 9, 28

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007)............................................ 28

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) ................................................................ 8

*In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007)........................ 11, 16

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y.
2001) .................................................................................................................... 17, 18, 19

*In re Veeco Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006)........................................................ 22, 27

*In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992)................................................ 31

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................ 33

*Kalnit v. Eichler*, 264 F.3d 131 (2d. Cir. 2001)................................................................... 22, 26

*Kinsey v. Cendant*, No. 04 Civ. 0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10,
2005) ............................................................................................................................ 27

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ...................................... 28, 29

*Marra v. Tel-Save Holdings, Inc.*, Master File No. 98-3145, 1999 WL 317103
(E.D. Pa. May 18, 1999) ............................................................................................... 24

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994) ................................................................... 24

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) ........................................ 4, 15, 34

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................................... 27

*O'Sullivan v. Trident Microsys., Inc.*, No. C 93-20621 (RMW), 1994 WL 12453

(N.D. Cal. Jan. 31, 1994) ................................................................................ 30

*Panther Partners, Inc. v. Ikanos Commc'ns., Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................................................................ 33

*Pinter v. Dahl*, 486 U.S. 622 (1988) ........................................................................ 34

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................ 29, 30, 31, 32

*Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402 (S.D.N.Y. 1996) .......................... 23

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801 (2d Cir. 1996) ................................................ 14, 23, 25

*Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785 (S.D.N.Y. 1997) .............. 10, 33

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996) ...................... 18

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ............................................................................ 35

*Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000) ................ 15, 25, 30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) ...................................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) .................... 22, 25

*Toussiant v. JJ Weiser & Co.*, No. 04 Civ. 2592, 2005 WL 356834 (S.D.N.Y. Feb. 9, 2005) .................................................................................................... 32

## **STATUTES**

15 U.S.C. § 77k (2008) ........................................................................................ 29, 30

15 U.S.C. § 77*l*(a)(2) ............................................................................................ 35

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* (2008) ............ 1, 11, 21

## **RULES**

Federal Rule of Civil Procedure 12(b)(6) ................................................................ 1

Federal Rule of Civil Procedure 9(b) .................................................................. 1, 21

## **REGULATIONS**

17 C.F.R. § 210.3-12 (2008) ................................................................................ 16

17 C.F.R. § 229.303(a)(3)(ii) (2008) ............................................................................ 17

Defendants Focus Media Holding Limited ("Focus Media" or the "Company"), Jason Nanchun Jiang, Zhi Tan, Daniel Mingdong Wu, and Donald J. Puglisi (collectively the "Individual Defendants"), Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., and Merrill Lynch & Co., Inc. (collectively the "Underwriter Defendants") respectfully submit this memorandum of law and the Affidavit of Andrew D. W. Cattell, sworn to on September 5, 2008 ("Cattell Aff."), in support of their motion to dismiss the Consolidated Amended Complaint filed by Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff") on June 23, 2008 (the "Complaint," attached as Cattell Aff., Ex. A), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* (2008) (the "PSLRA"), on the ground that Plaintiff has failed to allege any viable securities claims.[1]

## PRELIMINARY STATEMENT

The essence of Plaintiff's case is that Focus Media misled the market by failing to disclose materially adverse developments in its financial performance during the alleged class period from September 27, 2007 to November 19, 2007. Plaintiff claims that these developments were "revealed" on November 19, 2007, when the Company announced its results for the third quarter of that year. Ironically, what the Company actually reported on November 19 was that its financial performance had been better than projected. Focus Media's revenue and profits exceeded the guidance it provided to investors during the class period. Not surprisingly, Plaintiff's Complaint – which fails to even acknowledge that Focus Media's financial performance exceeded projections – does not come close to pleading a violation of the securities laws.

---

[1]    David Feng Yu has not yet been served in this action.

1

This is a classic example of a plaintiff distorting a relatively modest stock price decline into a purported securities claim. Such claims – typically referred to in this Circuit as "fraud by hindsight" cases – are routinely dismissed under the rigorous pleading standards Congress has imposed for securities cases.

Plaintiff does not – and could not – allege that any defendant made any false statement. Instead, Plaintiff claims that Focus Media's disclosures were materially misleading because the Company failed to disclose prior to November 19, 2007 that its "margins" (the percentage by which revenue exceeds costs) had declined for certain of its business segments in the third quarter of 2007. Plaintiff's theory fails at the threshold because investors were expressly warned during the class period of precisely this risk to margins.

Furthermore, to be actionable under the securities laws, omissions must be material and render an affirmative statement by the defendant misleading. Defendants made no affirmative projections or positive statements about margins at all. To the contrary, they warned of pressures on and fluctuations in the Company's margins. Accordingly, Plaintiff simply cannot identify an affirmative statement that was rendered misleading by the alleged omission of details concerning the Company's margin trends. Moreover, the undisputed fact that earnings exceeded the Company's projections negates any suggestion that the omission of margin detail could have been materially misleading. Results turned out better than even the Company projected despite the alleged margin declines.

The Complaint should be dismissed on five fundamental and independent grounds:

*First*, Plaintiff's claims fail because the Complaint does not identify any misstatement or materially misleading omission. Furthermore, investors were warned about the very margin risks that Plaintiff claims were concealed.

*Second*, Plaintiff's claims fail because the allegedly misleading statements were all either accurate statements of historical fact or forward-looking statements protected by the "bespeaks caution" doctrine and PSLRA safe harbor governing forward-looking statements.

*Third*, Plaintiff has failed entirely to plead facts sufficient for the Court to draw the required strong inference that Defendants acted with scienter – *i.e.* with the intent to deceive, manipulate or defraud.

*Fourth*, the Complaint fails to plead loss causation. Plaintiff's vague and conclusory allegations that it suffered losses as a result of Defendants' alleged conduct do not come close to stating a claim under the governing case law.

*Finally*, Plaintiff lacks standing to bring its claims under Sections 11 and 12(a) of the Securities Act of 1933 (the "Securities Act"). These claims are based entirely upon Focus Media's November 7, 2007 secondary offering of shares. Plaintiff lacks standing to assert these claims because it purchased its shares before the offering. For the same reason, Plaintiff's claims under Section 10(b) and other provisions of the Securities Exchange Act of 1934 (the "Exchange Act") fail insofar as they are based on the disclosures in connection with the offering.

The Court should dismiss Plaintiff's complaint in its entirety and with prejudice.

## SUMMARY OF ALLEGATIONS

Focus Media was the first Chinese company to join the Nasdaq-100 Index, which tracks the 100 largest domestic and international non-financial companies listed on the NASDAQ exchange. Cattell Aff. Ex. B. The Company operates the largest out-of-home advertising network in China. Focus Media's advertising network provides a platform on which

companies can advertise their products.  Since commencing operations as an advertising network

in May 2003, Focus Media has experienced dramatic growth, with revenues growing over 100%

year-over-year as the Company has expanded alongside China's booming economy.  Cattell Aff.

Ex. C at F-6.[2]

Jason Nanchun Jiang is Focus Media's co-chairman and Chief Executive Officer.

Zhi Tan is president and a director of Focus Media.  Daniel Mingdong Wu is Focus Media's

Chief Financial Officer.  Donald J. Puglisi is Focus Media's Authorized Representative in the

United States.  Cattell Aff. Ex. C at II-4 and II-5.

### A.     Focus Media Releases Second Quarter 2007 Results

On September 27, 2007, Focus Media issued a press release announcing its

earnings for the second quarter of 2007, which ended on June 30, 2007.  Cattell Aff. Ex. D at 1.

At that time, Focus Media disclosed that the acquisition of its lower-margin Internet advertising

business had been the primary cause of a decline in company-wide blended gross margins.

These margins declined to 54.6% in the second quarter of 2007 from 56.9% in the second quarter

of 2006.  Cattell Aff. Ex. D at 3.

In the same press release, Focus Media projected its 3Q07 total revenues and non-

GAAP net income, but did *not* project gross margins.  Cattell Aff. Ex. D at 4.  As Focus Media

had informed the market earlier in the year, it viewed revenue growth (as opposed to margins) as

its most important financial metric.  Cattell Aff. Ex. E at 18.  Focus Media advised that its

---

[2]     When deciding a motion to dismiss,"[c]ourts may consider any documents that are
attached to, referenced in, or integral to the preparation of the pleadings." *Miller v.
Lazard, Ltd.*, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007).  "[T]he court may also take
judicial notice of well-publicized stock prices without converting the motion to dismiss
into a motion for summary judgment." *Id.*  News articles, press releases, and SEC filings
may also be considered. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F.
Supp. 2d 192, 210 n.10 (S.D.N.Y. 2004).

projections were forward-looking statements and as such would "involve inherent risks and uncertainties[,]" including risks outlined in SEC filings, such as its Forms F-1, F-3, F-6 and 20-F. Cattell Aff. Ex. D at 6.

Also on September 27, 2007, Focus Media held a conference call to discuss its results for the second quarter of 2007. During the call, the Company discussed its In-Store network. Daniel Wu, Focus Media's Chief Financial Officer, described the In-Store network as "perform[ing] relatively weak[ly]." Cattell Aff. Ex. F at 12. Mr. Wu advised that this weakness was due to significant competition from an aggressive competitor and "[g]oing forward, our strategy will become a little bit more aggressive than historical levels," which, obviously, would likely impact gross margins. Cattell Aff. Ex. F at 12. On September 27, 2007 the Company's closing share price was $59.15. Cattell Aff. Ex. G.

**B.    Focus Media Completes A Secondary Offering Of Its ADSs**

On November 7, 2007, Focus Media's registration statement amendment (the "Registration Statement"), which incorporated the secondary public offering prospectus (the "Prospectus") became effective, and the Company's secondary public offering commenced (the "Secondary Offering"). Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, CIBC World Markets Corp., and Piper Jaffray & Co. served as underwriters for the Secondary Offering. Cattell Aff. Ex. C at 154. The Secondary Offering offered American Depositary Shares ("ADS" or "shares"). Focus Media raised approximately $314 million from the Secondary Offering. Cattell Aff. Ex. H at 1.

The Registration Statement described several specific risk factors associated with purchasing Focus Media shares and which speak to the central allegations of Plaintiff's Complaint. These risks included that (1) quarterly operating results were difficult to predict and could fluctuate significantly from period to period (*Id.* at 17); (2) increased competition could

reduce the Company's operating margins and profitability (*Id.* at 29); and (3) factors such as variations in revenues, earnings and cash flow could cause the market price of the shares to change substantially, and that Focus Media could not give assurances that those factors could not occur in the future (*Id.* at 38). Focus Media also disclosed that it expected costs in its commercial location network, In-Store network, and Internet advertising services network to increase. *Id.* at 67.

The Registration Statement also included un-audited consolidated quarterly financial data for each of the eight quarters from September 30, 2005 to June 30, 2007. In discussing its financial results, the Company warned that "[i]n the future, our *gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution and costs of each network.*" Cattell Aff. Ex. C at 78 (emphasis added). The Registration Statement also disclosed that the increased operating expenses seen by the Company in the first six months of 2007 "was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business[.]" Cattell Aff. Ex. C at 78. On November 7, 2007, the Company's closing share price was $64.05. Cattell Aff. Ex. G. As is standard and consistent with governing regulations, the Registration Statement and Prospectus did not include earnings, revenue, or margin projections for any quarter or other period.

## C.    Focus Media Announces Third Quarter 2007 Results

On November 19, 2007, Focus Media announced its 3Q07 financial results, for the three-month period that ended on September 30, 2007. Total revenue and non-GAAP net income *exceeded* the Company's previous projections. Total revenue was $151.4 million, a *149.6% increase* over the previous year and *over $16 million more* than the high range of the Company's projections. Cattell Aff. Ex. I at 2. Net income (non-GAAP) for the third quarter

6

was $54.6 million, which was *$600,000 more* than the high range of the Company's projections. Cattell Aff. Ex. I at 3.

The Company also announced that its digital out-of-home business had a 62.7% gross margin in the third quarter of 2007. The gross margin for the Company's Internet advertising business was 23%. Blended gross margin for the Company was 50.9%, declining from the previous quarter "due to the contribution of the lower margin Internet advertising business and in-store advertising business," which the Company had warned about during the previous quarter's conference call. Cattell Aff. Ex. I at 3

During the conference call accompanying its third quarter earnings announcement, Focus Media reported that its In-Store margin for 3Q07 was 17.7%. Cattell Aff. Ex. I at 2. Daniel Wu noted the In-Store gross margin for the third quarter reflected the competitive pressures that the Company had continued to experience. Cattell Aff. Ex. I at 5. Again, these pressures, and their likely impact on margins, were discussed during the previous quarter's conference call. Cattell Aff. Ex. F at 12.

The Company also discussed its acquisition of a traditional billboard operator in China during the second quarter of 2007. Cattell Aff. Ex. I at 2-3. Mr. Jiang, Focus Media's Chief Executive Officer, stated that the Company intended to convert select traditional billboards to LED billboards and that the "biggest entry barrier" to doing so – actually acquiring the billboards – had been completed. Cattell Aff. Ex. I at 13, 18.

Following these announcements, the CIBC World Markets analyst report cited in the Complaint reaffirmed its $70 price target and "Sector Outperformer" rating for Focus Media. Cattell Aff. Ex. J at 1. But despite these impressive results and positive analyst reaction, the Company's share price declined 5.3% in U.S. after-hours trading after the Company's

announcement on November 19, 2007 to $54.10. Cattell Aff Ex. G. On November 20, 2007, Focus Media's shares opened at $53.30 and closed at $52.10. The next day, November 21, 2007, Focus Media's shares opened at $50.80 and closed at $50.35. Cattell Aff. Ex. G. But in the following weeks the stock rebounded and traded in the mid-to-high $50s throughout December 2007 and into January 2008. *Id.*

### D.    Defendants Are Sued For Alleged Securities Fraud

On November 27, 2007, about a week after the 3Q07 results announcement, Eastriver Partners, Inc. sued the Company and the Underwriter Defendants, alleging violations of the federal securities laws. A related lawsuit by Scott Bauer was filed on December 14, 2007. On the day the Bauer action was filed, Focus Media's shares closed at $57.80; this closing price *exceeded* the closing price of Focus Media's shares on the day before the third quarter results, which precipitated this lawsuit, were announced.

On February 5, 2008, this Court consolidated the Eastriver and Bauer actions and appointed Iron Workers Local No. 25 Pension Fund as Lead Plaintiff. Cattell Aff. Ex. K. Plaintiff filed the Complaint on June 23, 2008.

## ARGUMENT

Dismissal of the Complaint is proper pursuant to Federal Rule of Civil Procedure 12(b)(6) because, after accepting all well-pleaded allegations as true and drawing all reasonable inferences in the Plaintiff's favor, the Complaint fails to allege any set of facts that would entitle Plaintiff to relief. *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005). When considering a motion to dismiss, "the court will not credit conclusory statements unsupported by factual allegations or legal conclusions presented as factual allegations." *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).

**I.**    **Plaintiff's Section 10(b) And Rule 10b-5 Claims Should Be Dismissed Because The Allegations Do Not Meet The Heightened Pleading Standard And Do Not Allege Actionable Misstatements[3]**

"To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiff[] must adequately allege (1) that Defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiffs' reliance was the proximate cause of their injury. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.* 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006).

Here, the Complaint fails to state a claim under Section 10(b) because it fails to allege with the required specificity that Defendants made any material misstatement. The Complaint also fails because its thin, perfunctory factual allegations do not satisfy the required "strong inference" of scienter. Finally, Plaintiff has failed to adequately plead loss causation. Each of these is an independently sufficient ground to dismiss Plaintiff's Section 10(b) claim.

**A.**    **None Of The Alleged Misstatements Is Actionable**

Plaintiff alleges that Focus Media and the Individual Defendants violated Section 10(b) by misstating or omitting material facts on two separate instances during the purported Class Period. The first alleged instance was on September 27, 2007, when Focus Media released its second quarter 2007 results, conducted a conference call to discuss those results, and reported financial projections for 3Q07. Cattell Aff. Ex. A at ¶¶ 123-130. The second alleged instance was on November 7, 2007, when the Registration Statement became effective. Cattell Aff. Ex. A at ¶ 122 (citing *id.* ¶¶ 72, 73, 75, 77, 80-83). An examination of the relevant disclosures reveals

---

[3]    Claims against the Underwriter Defendants are asserted only under Section 11 and 12(a)(2) of the Securities Act. Plaintiff does not assert claims against the Underwriter Defendants under the Exchange Act. Plaintiff does not allege that the Underwriter Defendants are liable for any statements or conduct other than the alleged misstatements and omissions in the Registration Statement and Prospectus for the Secondary Offering.

that at neither time did these defendants misstate or omit material information. Plaintiff's Section 10(b) claim therefore fails.

### 1.    Defendants Made No Material Misstatements On September 27, 2007

Plaintiff's allegations that Focus Media and the Individual Defendants omitted or misstated material facts on September 27, 2007 go nowhere. The alleged material misstatements relate to financial information for a quarter that had not yet closed at the time the statements were made. Cattell Aff. Ex. A at ¶¶ 122-130. Financial projections of the type disclosed on September 27, 2007 are the textbook example of forward-looking statements rendered non-actionable by the PSLRA safe harbor and the "bespeaks caution" doctrine. Plaintiff makes conclusory allegations that the 3Q07 financial projections issued on September 27, 2007 were misleading because Defendants "knew, or were reckless in not knowing" that (1) revenue and profits would exceed the Company's 3Q07 guidance but that gross margins would decline; (2) acquisitions would impact the Company's gross margins; (3) In-Store margins would fall; (4) Internet advertising division margins would decrease; and (5) non-digital billboards would have smaller profit margins than LED billboards. Cattell Aff. Ex. A at ¶¶ 124, 127.

### (a)    Defendants Could Not Disclose Information Not Yet In Existence

Plaintiff's allegations are non-sensical: when the Company made 3Q07 financial projections on September 27, 2007, the third quarter, which ended September 30, 2007, had not yet closed. Absent clairvoyance, there was no way for Defendants to definitively know what Focus Media's 3Q07 financial results would be. Courts have recognized that issuers are not psychic and "have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress[.]" *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997).

Courts have rejected the notion that issuers are under a duty to continually update information if business trends change during a quarter in progress. It is "well settled . . . that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence *does not*, in and of itself, *obligate the company to update the public as to the state of the quarter in progress*." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997). Here, then, Focus Media was under no obligation on September 27, 2007 to disclose financial information for a quarter still in progress.

> **(b)      Focus Media's 3Q07 Financial Projections Were Forward-Looking Statements Protected By The PSLRA Safe Harbor And The "Bespeaks Caution" Doctrine**

Plaintiff alleges that Focus Media's 3Q07 financial projections were materially false and misleading. *See* Cattell Aff. Ex. A at ¶¶ 124, 130. These allegations fail for the separate and independent reason that Focus Media's 3Q07 financial projections are rendered non-actionable by the PSLRA safe harbor for forward-looking statements and the judicially-created "bespeaks caution" doctrine.   Under the PSLRA, forward-looking statements accompanied by meaningful cautionary language are immaterial as a matter of law.  The PSLRA's definition of forward-looking statements encompasses earnings projections, such as those here.  15 U.S.C. § 78u-5(i)(1)(A) (2008).  A forward-looking statement cannot give rise to liability under the securities laws if it is (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) made without knowledge that the statement is false or misleading. 15 U.S.C. § 78u-5(c)(1) (2008); *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007).

The PSLRA safe harbor for forward-looking statements is related to, but does not supplant, the judicially-created "bespeaks caution" doctrine.  "Under the bespeaks caution

doctrine, courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial." *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (internal quotation marks omitted).

Both the press release announcing 3Q07 financial projections and the second quarter conference call were accompanied by meaningful cautionary language that described the specific risks that Plaintiff alleges were concealed. Both the press release and conference call explicitly refer investors to the risks outlined in the Company's SEC filings, including the Company's Form F-1 registration statement. Cattell Aff. Ex. D at 6, Ex. F at 2. At the time the alleged misstatements were made, Focus Media's Form F-1 contained extensive warnings that the Company's gross margins would change in response to the development and performance of the Company's various networks, clearly stating that *"[i]n the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network."* Cattell Aff. Ex. L at 83 (emphasis added).

This risk was exactly the cause of Focus Media's lower gross margins in the 3Q07. When announcing its 3Q07 results, the Company stated that its gross margins declined primarily *"due to the contribution of the lower-margin Internet advertising business and in-store business."* Cattell Aff. Ex. I at 3 (emphasis added). Further, Focus Media shareholders had already seen the impact of lower-margin networks on company-wide business. On September 27, 2007, the Company disclosed that company-wide margins in the second quarter of 2007 had decreased year-over-year "primarily due to the addition of lower-margin Internet advertising business to our revenue mix." Cattell Aff. Ex. F at 3. As a result, Plaintiff's allegations (1) and (2) on page 10 *supra* are non-actionable as a matter of law.

Plaintiff complains that it was not warned that the Company's In-Store margins would decline. Cattell Aff. Ex A at ¶ 124. But the Company made extensive disclosures of the risks that its In-Store margins could decline, and specifically cautioned that it was facing intense competition related to this network, as outlined on page 5 *supra*. As a result, Plaintiff's allegation (3) on page 10 *supra* is non-actionable as a matter of law.

Plaintiff further complains that they were not warned that the Company's gross margins in the Internet advertising and digital billboard business would decline due to competitive pressures. Cattell Aff. Ex. A at ¶ 130. But the Company had warned about this risk as well:

> *[I]ncreased competition* will provide advertisers with a wider range of media and advertising service alternatives, which *could lead to lower prices and decreased revenues, gross margins and profits.* We cannot assure you that we will be able to successfully compete against new or existing competitors.

Cattell Aff. Ex. L at 30-31 (emphasis added). The Company also warned:

> *Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period in the future.*

Cattell Aff. Ex. L at 19. Further, the very language quoted in the Complaint belies Plaintiff's allegations that the Company did not warn investors that they would not see immediate improvements in Internet advertising margins. When asked if Focus Media's Internet advertising margins would improve "relatively quickly" or "gradually," Mr. Wu replied that the Company saw margin improvements as more of a "gradual process." Cattell Aff. Ex. F at 8 (cited in Ex. A at ¶ 129). As a matter of fact, in 4Q07, the Internet advertising margin improved to 30.1%, higher than in 2Q07 and 3Q07. Cattell Aff. Ex. M. Plaintiff, however, complains that the admittedly "gradual" process of Internet advertising margin improvements did not bear fruit in the next quarter – the very definition of a "relatively quick[]" margin improvement that the

Company did not project. Here, again, Plaintiff complains of the very risk that was warned against. Additionally, the statements about margin growth in the Internet advertising business division were nothing more than a non-actionable statement of hope, opinion or belief about the Company's future performance. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996). As a result, Plaintiff's allegations, identified as numbers (4) and (5) on page 10 *supra*, should be rejected as non-actionable as a matter of law.

### 2.    The Registration Statement Contained No Material Misrepresentations Or Omissions

Plaintiff asserts that the Registration Statement omitted or misstated material facts because it should have disclosed allegedly material adverse trends in Focus Media's margins. In particular, the Complaint alleges that the Registration Statement should have disclosed that: (1) margins were trending "significantly" downward in 3Q07 compared with 3Q06 and 2Q07; (2) gross margins in 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07; (3) acquisitions in the first half of 2007 negatively impacted the Company's profit margins for 3Q07; (4) profit margins in 3Q07 were significantly smaller than the Company projected on September 27, 2007; (5) In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07; (6) Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07; and (7) the conversions of smaller profit margin, acquired non-digital billboards to LED billboards could only take place after the expiration of lengthy contracts and governmental approval. Cattell Aff. Ex. A at ¶ 85.

Where, as here, "[a] plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint." *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300

(S.D.N.Y. 2000).  "The Second Circuit has consistently upheld Rule 12(b)(6) dismissals of

securities claims where the risks that a plaintiff's claim went unaddressed were mentioned

explicitly in the prospectus." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).

For the multiple, independent reasons discussed below, Plaintiff has failed to plead any

actionable misstatements in or omissions from the Prospectus.

### (a)    Relevant Disclosure About Margins Had Already Been Made

Plaintiff alleges that the Registration Statement should have disclosed information

about Focus Media's 3Q07 margins.  However, the relevant disclosures had already been made.

As outlined in Part I.A.1 *supra*, Defendants had already disclosed:

- The Company's gross margins could fluctuate depending on the respective financial performance and stage of development of each of its networks as well as the relative contribution to our revenues and costs of each network.  In fact, by the second quarter of 2007 the introduction of lower-margin Internet advertising business into the Company's revenue mix had already begun to lower Company-wide gross margins.

- The Company was facing a major competitor for its In-Store network business.  As a result, the Company would be taking aggressive steps that necessarily would affect margins.

- The Company's Internet advertising margins would not improve overnight.

*See* pages 10 through 14 *supra*.  Consequently, by the time the Registration Statement became

effective, the information that Plaintiff alleges should have been included was already in the

marketplace and thus cannot constitute an actionable omission.

### (b)    Accurate Historical Information Cannot Be Misleading As A Matter Of Law

The Complaint suggests that the historical financial results contained within the

Registration Statement were made misleading by the omission of 3Q07 financial results

allegedly in the Company's possession.  But the Complaint does not allege that these historical

results were false.  And decisions within this District consistently hold that an accurate statement

15

of historical fact cannot become misleading even if less favorable future results could be predicted by the company. In *In re Duane Reade Inc. Sec. Litig.*, Judge Buchwald held that defendants' claim to have successfully predicted financial results in the past could not be misleading if it was true. No. 02 Civ. 6478 (NRB), 2003 WL 22801416 at *6 (S.D.N.Y. Nov. 25, 2003). And in *In re Sierra Wireless, Inc. Sec. Litig.*, Judge Stein held that Sierra Wireless's accurate report of quarterly results was not misleading when it did not disclose that the issuer had not been awarded a contract by palmOne. 482 F. Supp. 2d at 374-75. "While palmOne's decision may have presented an obstacle in Sierra's future . . . performance, it did not contradict, undermine or refute the statement of historical fact made in the July 21, 2004 press release[.]" *Id.* at 374.

Plaintiff's allegations here are non-actionable for the same reason as in those cases. Plaintiff alleges that Focus Media's financial information was misleading because it did not disclose the change in gross margins from the second quarter to the third quarter of 2007. But an accurate report of past performance (in the second quarter) does not represent that such performance will continue (in the third quarter). *See Burlington*, 114 F.3d at 1432. Thus, Plaintiff's allegations noted as numbers (1) through (6) on page 14 *supra* are non-actionable and cannot support Plaintiff's claim.

### (c)    Defendants Were Under No Duty To Disclose The Margin Information

A company's silence, absent a duty to speak, is not actionable. Here, Defendants had no duty to speak. Under SEC regulations applicable to the Registration Statement, the most recent financial statements in a registration statement cannot be more than 135 days old. 17 C.F.R. § 210.3-12 (2008); *Demaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) *aff'd* 318 F.3d 170 (2d Cir. 2003). Here, the Registration Statement's financial information was less

than 135 days old as of the Registration Statement's effective date of November 6, 2007. *See* Cattell Aff. Ex. C at 56-57. As a result, SEC regulations did not impose a duty on Focus Media to disclose its 3Q07 financial results. *See Demaria*, 153 F. Supp. 2d at 311 (holding that issuer was not required to disclose quarterly results in registration statement when most recent financial statements included in registration statement were not more than 135 days old.).

Anticipating a challenge to its allegations, the Complaint asserts that Items 5(D) and 8(B) of Part I of Form 20-F required the Company to disclose lower gross margins in 3Q07. Cattell Aff. Ex. A at ¶ 86. This assertion goes nowhere. First, as the Complaint acknowledges, Item 5(D) only requires a discussion of "*known trends,* uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." *Id.* (emphasis added). Item 5(D)'s disclosure requirement of "known trends" echoes similar language in Item 303 of Regulation S-K. 17 C.F.R. § 229.303(a)(3)(ii). A case in this District has recognized that Item 303 requires that a plaintiff arguing that "known trends" should have been disclosed must make allegations giving rise to a strong inference of scienter. *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001). Here, Plaintiff makes no adequate scienter allegations.[4]

Second, Item 8(B) of Form 20-F did not mandate disclosure of 3Q07 results; it only requires an issuer to disclose "whether or not any significant change has occurred since the date of the annual financial statements, and/or since the date of the most recent interim financial statements, if any, included in the document." The well-settled standard for requiring such

---

[4]     Broad statements that Defendants "knew" of lower margins in 3Q07 are inadequate to plead scienter. *See* Part I.B *infra*.

additional disclosure is whether the information is an "extreme departure" from prior financial statements. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996); *Turkcell*, 202 F. Supp. 2d at 13; *In re N2K Inc. Sec. Litig.*, 82 F. Supp.2d 204, 208 (S.D.N.Y. 2000). Focus Media's 3Q07 results were not an "extreme departure" from previous results. The "extreme departure" standard is not met when the company, as here, has *no losses whatsoever* to report from the undisclosed quarter. *See Turkcell*, 202 F. Supp. 2d at 12. Indeed, here the Company's overall financial results ended up *better than* the projections it provided to the market. Further, the "extreme departure" standard also requires a plaintiff to allege facts demonstrating that defendants acted with fraudulent intent, i.e. scienter. *Turkcell*, 202 F. Supp. 2d at 13. As discussed below, Plaintiff has not done so, and as such cannot state a claim upon which relief may be granted.

    The *Turkcell* case underscores why Plaintiff cannot state a viable claim here. In *Turkcell*, the foreign issuer's prospectus became effective on or about July 10, 2000, but did not include the issuer's financial results for the period ending June 30, 2000. *Turkcell*, 202 F. Supp. 2d at 9-10. The plaintiff alleged that the prospectus was materially misleading because it did not disclose second quarter financial results. Second quarter financial results revealed that the issuer's operating income fell by 9% from the first quarter of 2000 to the second quarter of 2000. *Turkcell*, 202 F. Supp. 2d at 10. In rejecting plaintiff's allegations, the court emphasized the sound policy grounds for its ruling: "acceptance of plaintiffs position would require the immediate release of data without the benefit of reflection or certainty provided by the traditionally recognized reporting periods." *Turkcell*, 202 F. Supp. 2d at 13. Such a position would lead to a mandatory system of instantaneous disclosure that had been repeatedly rejected

by the SEC and case law as "unworkable and potentially misleading." *Turkcell*, 202 F. Supp. 2d at 13.

Nor is *Turkcell* the only case in this District involving analogous facts. The court in *N2K* held that it was not a material omission when N2K's registration statement and prospectus (effective date: April 14, 1998) did not disclose financial results from the quarter ended March 31, 1998. *N2K*, 82 F. Supp. 2d at 209-10. The court so held despite allegations from the plaintiff that N2K, as an Internet retailer, had the ability to quickly report accurate financial results. *N2K*, 82 F. Supp. 2d at 206 n.4.

The situation here is exactly the same. Plaintiff alleges that Focus Media should have disclosed financial information for a quarter that had closed by the Registration Statement's effective date. But Plaintiff has not – and can not – allege that such disclosure was required by SEC regulations or applicable case law. Further, acceptance of Plaintiff's position would require instantaneous disclosure: a result that neither Congress, nor the SEC, nor the courts have sought.[5]

### (d)    The Registration Statement Bespoke Caution

Plaintiff's allegations also fail because the risk they argue was concealed – that Focus Media's gross margins could vary from quarter to quarter – was clearly disclosed in the Registration Statement. *See Backhaus v. Streamedia Communications, Inc.*, No. 01 CIV.4889, 2002 WL 1870272 at *5 (S.D.N.Y. Aug. 14, 2002). The Company clearly warned:

> *In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each*

---

[5]    Additionally, the release of Focus Media's 3Q07 financial results was consistent with the Company's practices both before and since. For example, financial information was released on May 17, 2007 for the first quarter of 2007; September 27, 2007 for the second quarter of 2007; March 18, 2008 for the fourth quarter of 2007; and June 5, 2008 for the first quarter of 2008. *See* Cattell Aff. Ex. N (press release for 1Q07); *id.* Ex. O (press release for 2Q07); *id.* Ex. M (press release for 4Q07); and *id.* Ex. P (press release for 1Q08).

> *of our networks as well as the relative contribution to our revenues
> and costs of each network.*

Cattell Aff. Ex. C at 78 (emphasis added). This is exactly the risk that the Complaint alleges the

Company concealed: that its gross margins could change to reflect the contribution and costs of

each of its networks. Furthermore, the Registration Statement specifically warned of the fact that

competitive pressures could affect the Company's gross margins:

> *[I]ncreased competition* will provide advertisers with a wider
> range of media and advertising service alternatives, which *could
> lead to lower prices and decreased revenues, gross margins and
> profits.*

Cattell Aff. Ex. C at 29 (emphasis added). Lastly, the Company warned:

> *Our quarterly operating results are difficult to predict and may
> fluctuate significantly from period to period based on the
> seasonality of consumer spending and corresponding advertising
> trends in China.*

Cattell Aff. Ex. C at 17 (emphasis added). These cautionary statements address the specific

matters about which Plaintiff complains, and therefore render the alleged misstatements and

omissions, identified as (1) through (7) on page 14 *supra* immaterial as a matter of law.

> **(e)    Plaintiff Misconstrues Statements Made In The Registration
>          Statement**

Plaintiff alleges that Focus Media failed to disclose that its LED billboard

network included traditional billboards that operated at lower margins than the Company's LED

billboards. Cattell Aff. Ex. A at ¶ 124. That allegation is non-sensical because Focus Media's

LED billboard network did not contain traditional billboards. Cattell Aff. Ex. I at 13. Focus

Media's LED billboard network consisted of 200 5' x 5' LED digital billboards in Shanghai.

Cattell Aff Ex. C at 1-2. Because these billboards are electronic, the Company can rotate

advertisements on them. The traditional billboards that Plaintiff describes are different. As a

result, Plaintiff's alleged non-disclosure related to Focus Media's traditional billboards, noted as number (7) on page 14 *supra*, cannot support Plaintiff's claim.

<blockquote>

**(f)      Plaintiff Lacks Standing To Bring Claims Under The Exchange Act Based On The Registration Statement And Prospectus**

</blockquote>

Plaintiff alleges that it purchased Focus Media's ADSs on October 11, 2007 – almost a month prior to the Secondary Offering and the issuance of the Registration Statement and Prospectus. Cattell Aff. Ex. A at ¶ 11; *id.* Ex. Q. Thus, by definition, misstatements in or omissions from those documents could not have misled or otherwise injured Plaintiff in connection with its purchase of securities as required to state a claim under Section 10(b). Accordingly, to the extent that Plaintiff's Section 10(b) claims are based on the Secondary Offering and its offering documents, those Section 10(b) claims must be dismissed.[6]

**B.      The Complaint Does Not Allege Facts Giving Rise To A Strong Inference Of Scienter**

A securities fraud claim under Section 10(b) and Rule 10b-5 must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires that fraud claims must be pleaded with specificity and the PSLRA requires that a securities fraud claim "state with particularity facts giving rise to a *strong* inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2). Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Supreme Court has recently held that the required "strong inference" mandates an "inherently

---

[6]      The Complaint purports to list Eastriver Partners, Inc. ("Eastriver") as a plaintiff and claims that Eastriver purchased ADSs in the Secondary Offering. Cattell Aff Ex. A at ¶ 12. That is improper. Eastriver did not apply to be Lead Plaintiff, was not appointed Lead Plaintiff, and was not authorized by the Court to file the Consolidated Amended Complaint that is the subject of this motion. Only Lead Plaintiff Iron Workers Local No. 25 Pension Fund was granted that authority, and thus it is the only relevant Plaintiff here. Cattell Aff. Ex. K.

comparative" inquiry by the court that requires balancing "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). The court may sustain the claim only if those non-fraudulent explanations are no more compelling than any inference of fraud. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

In the Second Circuit, a plaintiff may establish a strong inference of scienter by either "'(a) alleging facts to show that defendants had both motive and opportunity to commit fraud; or by (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness'." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468-69 (S.D.N.Y. 2008) (quoting *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994)). The Complaint here fails both the "motive and opportunity" test and the "conscious misbehavior or recklessness" test and therefore does not establish the required "strong inference" of scienter required by the PSLRA.

## 1.    The Complaint Fails To Properly Allege Motive And Opportunity

To properly plead motive to commit fraud, a plaintiff must allege, among other things, facts that demonstrate "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged, as well as the means and likely prospect of achieving those concrete benefits." *In re Veeco Sec. Litig.*, 235 F.R.D. 220, 230 (S.D.N.Y. 2006) (internal quotation marks omitted). The benefits must be personal and specific. A "'generalized motive, one which could be computed to any publicly owned, for-profit endeavor'," is insufficient. *AstraZeneca*, 559 F. Supp. 2d at 468 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996)); *see also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (holding that "motives that are generally possessed by most corporate directors and officers do

not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual

defendants resulting from the fraud").

### (a)     A Successful Public Offering Is Insufficient Motive & Opportunity

Here, Plaintiff's main scienter allegation is that Defendants desired a successful

stock offering. *See* Cattell Aff. Ex. A at ¶ 137 (alleging that Defendants wished to "capitalize[]

. . . on Focus Media's artificially inflated stock price [to] rais[e] more than $888 million through

the sale of Company ADSs in the Secondary Offering"). Such an allegation is insufficient to

establish motive and opportunity to commit fraud. "Plaintiff[] cannot support an inference of

scienter by alleging that Defendants were motivated to engage in the alleged fraud in order to . . .

raise capital." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007).

The Second Circuit has rejected similar allegations of a desire for a successful

public offering as a motive that gives rise to a strong inference of scienter. In *San Leandro*, the

Second Circuit rejected as insufficient the alleged motive that defendants sought to inflate the

stock price so as to maximize the marketability of a public offering. *San Leandro Emergency*

*Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801 (2d Cir.

1996).

While *San Leandro* concerned a debt offering, decisions in this District have

made clear that its holding is equally applicable to stock offerings such as the Secondary

Offering here. In *Salinger v. Projectavision, Inc.*, plaintiffs alleged that defendants misled the

investing public out of a motive to facilitate additional stock offerings. 934 F. Supp. 1402, 1406-

08 (S.D.N.Y. 1996). After examining these allegations, Judge Koeltl held that "[i]t is *not*

*sufficient* . . . to plead scienter by alleging an abstract desire to enable the company to continue to

enjoy a high stock price and thereby *ease the difficulties of raising of additional capital*." *Id.* at

1414 (citing *San Leandro*) (emphasis added); *see also AstraZeneca*, 559 F. Supp. 2d at 469 (same). This principle has been recently reaffirmed. *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007) (same). Cases in other circuits have similarly held that the desire for a successful stock offering cannot serve as a sufficient motive from which to infer scienter. *See Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Marra v. Tel-Save Holdings, Inc.*, Master File No. 98-3145, 1999 WL 317103, at *9 (E.D. Pa. May 18, 1999). As a result, Plaintiff's allegations here, which are nothing more than a purported abstract desire for a successful stock offering, are insufficient to create a strong inference of scienter.[7]

**(b)    The Stock Sales Plaintiff Alleges Are Insufficient Motive And Opportunity**

It is undisputed that Defendants Jiang, Wu, and Puglisi sold *no* shares during the purported class period and thus could not have received any concrete or personal benefit from the alleged fraud. For example, the Company's public filings show that Defendant Jiang entered the Secondary Offering with 68,604,595 shares. Cattell Aff. Ex. C at 120. As of December 31, 2007, after the close of the class period, Jiang still owned 68,604,595 shares. Cattell Aff. Ex. R at 1-2. This lack of a concrete and personal benefit by these Individual Defendants strongly negates any inference of scienter.

Plaintiff alleges that Defendant Tan personally sold 7,166,124 ADS and received $464 million as a result of the Secondary Offering. Cattell Aff. Ex. A at ¶¶ 16, 138. Plaintiff's

---

[7]    Plaintiffs also cannot argue that scienter may be inferred by a close temporal connection between the Secondary Offering and the day of the alleged corrective disclosure. *In re Corning Sec. Litig.* made clear that *San Leandro* "attached no temporal limitation to its holding, and the Court sees no reason to infer such a qualification[.]" *In re Corning Sec. Litig.*, No. 93 Civ. 7015 (AGS), 1996 WL 257603 at *6 (S.D.N.Y. May 15, 1996) (corrective disclosure came "only a few days after the successful completion of the . . . offering."). Plaintiffs' allegation here that Defendants purposefully withheld disclosure of information until after the Secondary Offering is therefore equally unavailing.

24

factual allegations are flatly contradicted by the Registration Statement (which is incorporated by reference into the Complaint) and should therefore be disregarded. *Steinberg*, 88 F. Supp. 2d at 300. The Registration Statement demonstrates that Defendant Tan did not personally own or sell *any* of the shares sold in the Secondary Offering. Instead, a company in which Defendant Tan is a minority shareholder (Total Team Investments Limited) sold shares. Cattell Aff. Ex. C at 120-22. The Registration Statement disclosed that Defendant Tan disclaimed beneficial ownership of those shares except to the extent of his indirect interest as a minority shareholder. Cattell Aff. Ex. C at 122 n.6.

Even if Mr. Tan had sold Company shares, such conduct, taken alone, would be insufficient to demonstrate a strong inference of scienter. "Generally . . . a significant stock sale by just one corporate insider is insufficient to support such [a strong] inference [of scienter]." *DRDGOLD*, 472 F. Supp. 2d at 570; *see also San Leandro*, 75 F.3d at 814; *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). This is especially true here, where Defendant Tan is the sole Individual Defendant who allegedly benefited from any stock sales during the Class Period. Plaintiff's scienter allegations premised on motive and opportunity are therefore reduced to the non-sensical assertion that Focus Media's senior management schemed to commit a fraud for the benefit of one corporate insider (Defendant Tan). The more compelling inference is that there was no fraudulent scheme. Similar allegations have already been rejected by the Second Circuit as insufficient to adequately allege scienter: "The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." *Acito*, 47 F.3d at 54 (internal quotation marks omitted). Under *Tellabs*, therefore, Plaintiff has not alleged facts giving rise to a strong inference of scienter premised on motive and opportunity.

### 2. Plaintiff's Allegations Of Conscious Misbehavior Or Recklessness Are Impermissible, Unsupported Conclusory Statements Of The Type Repeatedly Rejected By The Courts

Scienter based on conscious misbehavior or recklessness demands even stronger facts than scienter based on motive and opportunity requires. Where, as here, a plaintiff has not successfully pleaded motive or "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

Plaintiff's allegations fail to meet this high hurdle. Plaintiff offers impermissibly broad, conclusory allegations such as that the alleged fraud "could not have been perpetrated . . . without the knowledge and complicity" of the Defendants (Cattell Aff. Ex. A at ¶ 132), and that the alleged fraud related to the "core business" of Focus Media (Cattell Aff. Ex. A at ¶ 134). These allegations are generic, bald conclusions, not specific factual allegations that would permit this Court to draw the required strong inference of scienter. Pleading a strong inference of scienter requires a high level of specificity that Plaintiff here does not meet. While Plaintiff makes blanket assertions that Defendants must have known of the alleged fraud, Plaintiff fails to back up these pronouncements with specific factual allegations of precisely *how* Defendants should have known of the alleged fraud or when they should have known about it.

Conscious misbehavior is "'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it'." *AstraZeneca*, 559 F. Supp. 2d at 469 (quoting *Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000). Further, to properly plead reckless behavior, Plaintiff must demonstrate that Defendants failed to review information over which they had a duty to monitor or that they ignored obvious signs of fraud. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d

Cir. 2000); *Veeco*, 235 F.R.D. at 232 (finding the scienter requirement satisfied where plaintiffs alleged that defendants knew of or recklessly ignored a series of accounting improprieties). Plaintiff has failed to show either conscious misbehavior or recklessness.

Plaintiff's allegations of conscious misbehavior or recklessness are nothing more than the same conclusory allegations that courts have repeatedly found insufficient to establish a strong inference of scienter. Plaintiff's allegation that Defendants Jiang, Wu, Tan and Puglisi "should have known of the material misstatements and omissions" in the Registration Statement is but one such insufficient, conclusory allegation. Cattell Aff. Ex. A at ¶ 103. Plaintiff's other blanket allegations that "[n]one of the Defendants . . . made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects" and that "Defendants, by virtue of their receipt of information reflecting the true facts regarding Focus Media, their control over, and/or receipt and/or modification of Focus Media's allegedly materially misleading statements, were active and culpable participants in the fraudulent scheme" are similarly insufficient. Cattell Aff. Ex. A at ¶¶ 115, 131.

Plaintiff's allegations, powered by nothing more than a hypothesis that corporate officers must have possessed "true facts," are inadequate as a matter of law. Simply stating that a defendant had knowledge of facts by virtue of his or her position within the company is insufficient. *See Kinsey v. Cendant*, No. 04 Civ. 0582, 2005 WL 1907678 at *5 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegations that a corporate officer had access to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness.") (internal quotation marks omitted). Decisions in this District have repeatedly rejected similar allegations where defendants held senior positions within the company and held

themselves out as knowledgeable about its key operations. *Nokia*, 423 F. Supp. 2d at 406; *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973 at *17 (S.D.N.Y. June 23, 2004).

### C.     Plaintiff Does Not Properly Plead Loss Causation

Plaintiff's Section 10(b) and Rule 10b-5 claim also fails because Plaintiff does not properly plead loss causation. "[T]o establish loss causation, a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis added and internal quotation marks omitted). Requiring a plaintiff to properly plead loss causation helps to prevent the "transform[ation] [of] a private securities action into a partial downside insurance policy." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Consistent with the rest of the allegations in the Complaint, Plaintiff's loss causation allegations lack the required specificity. Plaintiff's sole loss causation contention is that it allegedly suffered an economic loss after Focus Media's stock price dropped after 3Q07 results were announced. Cattell Aff. Ex. A at ¶ 146. Plaintiff can not properly plead loss causation by simply stating the legal conclusion that the allegedly concealed truth, when disclosed, caused Plaintiff's alleged economic loss. *Lentell*, 396 F.3d at 176. In other words, Plaintiff's "contention [here] that an economic loss is sustained simply as a result of the fact that the price of the stock dropped following disclosure is unpersuasive." *In re Estee Lauder Cos.*, No. 06 Civ. 2505, 2007 WL 1522620, at *1 n.5 (S.D.N.Y. May 21, 2007). This is because "the loss causation requirement is satisfied only if the public disclosure causing injury addressed the *specific* fact allegedly concealed." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) (emphasis added).

Plaintiff's loss causation allegations are also insufficient because Plaintiff fails to plead facts that de-couple its alleged losses from intervening market events. "[W]hen the

plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174 (internal quotation marks and ellipsis omitted).  Plaintiff surely agrees that the current credit crunch and global market slowdown have had an effect on Focus Media's share price; however, in response Plaintiff only offers the spare conclusory allegation that market conditions had no effect on its alleged economic loss. Cattell Aff. Ex. A at ¶ 147.  Such unspecific, conclusory statements are insufficient.  Therefore, the Complaint fails to properly plead loss causation and Plaintiff's Section 10(b) claim should be dismissed.[8]

## II.    Plaintiff's Section 11 Claim Must Be Dismissed

Plaintiff alleges that Focus Media, the Individual Defendants, and the Underwriter Defendants are liable under Section 11 of the Securities Act, 15 U.S.C. § 77k (2008).  "Section 11 of the Securities Act imposes civil liability on issuers and signatories, such as officers of the issuer and underwriters, of a registration statement that contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading." *Rombach v. Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004) (internal quotation marks

---

[8]    Plaintiff's Section 15 and Section 20(a) claims are both derivative causes of action against alleged "control persons" of securities law violators.  Without an underlying violation of Section 10, there can be no individual liability under Section 20(a). *Brown v. Hutton Group*, 795 F. Supp. 1317, 1324-25 (S.D.N.Y. 1992) *aff'd* 991 F.2d 1020 (2d Cir. 1993).  Similarly, without an underlying violation of Section 11 or 12, there can be no individual liability under Section 15. *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003).  Because Plaintiff has failed to plead a primary violation of Section 10(b) (*see* Part I *supra*) and have failed to plead a primary violation of Section 11 or Section 12 (*see* Parts II and III *infra*), Plaintiff's Section 15 and Section 20(a) claims against the Individual Defendants must be dismissed as a matter of law.

omitted; *see also* 15 U.S.C. § 77(k)(a). Plaintiff's Section 11 claim fails on the multiple,

independent grounds explained below.

### A.    Plaintiff's Section 11 Claim Fails Because It Fails To Identify An Actionable Misstatement or Omission

By its terms, Section 11 liability is limited strictly to statements within the four

corners of the registration statement and prospectus. 15 U.S.C. § 77(k)(a); *see also O'Sullivan v.*

*Trident Microsys., Inc.*, No. C 93-20621 (RMW), 1994 WL 124453, at *3 (N.D. Cal. Jan. 31,

1994) ("Section 11 concerns only registration statements"). To state a Section 11 claim,

therefore, Plaintiff must identify an untrue statement of material fact in the Registration

Statement or a statement in the Registration Statement rendered misleading by the omission of a

material fact. *See Rombach*, 355 F.3d at 168 n.2; *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d

294, 299-300 (S.D.N.Y. 2000).

Pages 9 through 29 *supra*, which address Plaintiff's Section 10(b) claim based on

the Registration Statement, explain in detail why the Complaint fails to identify any

(1) misstatement, (2) material omission, or (3) duty to disclose the allegedly omitted information.

These arguments apply with equal force to Plaintiff's Section 11 claim and alone compel its

dismissal.

In addition, as to the Section 11 claim, Plaintiff fails to meet the additional

requirement that it identify a specific statement in the Registration Statement that was rendered

misleading by the alleged omission of margin information. Paragraphs 72, 73, 75, 77, and 80-83

of the Complaint purport to identify the misleading statements in the Registration Statement.

But there are no predictions, projections, or positive characterizations of the relevant margins

anywhere in the Registration Statement. Accordingly, the alleged omission of information

concerning declining margin trends from the Registration Statement could not have rendered any

affirmative statement misleading as required for Section 11 liability. *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992) (absent a genuine link between an alleged omission and an affirmative statement in the prospectus, there can be no Section 11 liability), *aff'd* 11 F.3d 865 (9th Cir. 1993); *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *7 (S.D.N.Y. 2000) ("[T]he Complaint fails to explain how any of the statements at issue were false or misleading at the time made. This defect is fatal to plaintiffs' claims.").

Plaintiff's claim that the alleged omission of detailed information concerning margin trends violated Section 11 is particularly absurd given that the Company's profits – which reflect margins – turned out to be greater than projected. Even assuming the margin details were known to Defendants at the time of the Secondary Offering, Plaintiff cannot seriously argue that the omission of such details rendered the Registration Statement materially misleading under these circumstances. The Second Circuit has repeatedly recognized that registration statements and prospectuses should not provide a "flood of collateral data" such that they "submerg[e] . . . truly material fact[s]." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.* 936 F.2d 759, 762 (2d Cir. 1991); *see also Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980).

**B.    Plaintiff's Section 11 Claim Fails Because Plaintiff Has Failed To Plead Scienter**

Under settled law in this Circuit, Rule 9(b) applies to Section 11 claims that sound in fraud. *Rombach*, 355 F.3d at 171-72. Although Plaintiff attempts to package its Section 11 claim as a non-fraud claim, the claim obviously is based on the same theory as Plaintiff's Section 10(b) securities fraud claim. For example, the Complaint alleges that all "Defendants" (1) knew but failed to disclose that the Company's profit margins were declining as a result of acquisitions

31

in the Internet advertising division and alleged problems in the In-Store advertising division, *see* Cattell Aff. Ex. A at ¶¶ 76, 78; (2) knew but failed to disclose that the Company would not be able to convert non-digital billboards into LED billboards until certain contracts expired and government approvals were obtained, *see id.* at ¶¶ 76, 84; and (3) knew but did not disclose the negative profit margin trend in 3Q07, *id.* at ¶¶ 77-8. These are not allegations that the wording of the Registration Statement was inaccurate or that its disclosures were made negligently. These are allegations of fraud, pure and simple: Plaintiff explicitly claims that Defendants knowingly and intentionally withheld negative information about the Company.

Under *Rombach*, the substance – and not the label – of the claim controls. Rule 9(b)'s application "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." 355 F.3d at 171. To the contrary, where, as here, a complaint relies on the same allegations to support both its Section 10(b) fraud and Section 11 claims, Rule 9(b) applies to both claims. *See, e.g., In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) (where plaintiffs "do not allege that the Registration Statement or Prospectus contains any additional untrue statement or omission of material fact independent of [the fraud] allegations," Rule 9(b) applies to the Section 11 claim) (internal quotation marks and brackets omitted).

To satisfy Rule 9(b), the pleaded facts must give rise to a "strong inference that the defendant had an intent to defraud, knowledge of falsity, or a reckless disregard for the truth" – in other words, scienter. *Toussaint v. JJ Weiser & Co.*, No. 04 Civ. 2592, 2005 WL 356834, at *9 (S.D.N.Y. Feb. 9, 2005). For all of the reasons explained at Part I.B *supra*, Plaintiff has utterly failed to plead scienter against any defendant. Moreover, Plaintiff has not even attempted to demonstrate a strong inference of scienter with respect to the Underwriter Defendants.

Plaintiff's Section 11 claim must be dismissed under Rule 9(b).[9]

**C.    Plaintiff's Section 11 Claim Fails For Lack Of Loss Causation**

Plaintiff's Section 11 claim should be dismissed for lack of loss causation for the same reasons the Section 10(b) claim should be dismissed. Although loss causation is a defense to a Section 11 claim, Section 11 claims are subject to dismissal on motion to dismiss where the plaintiff's alleged losses were not the result of the defendants' purported misstatements or omissions. *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).

**D.    Plaintiff Lacks Section 11 Standing**

Section 11 standing is limited to a "narrow class of persons i.e. those who purchase securities that are the direct subject of the prospectus and registration statement." *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 786 (2d Cir. 1951). Put another way, a "claim under § 11 may be maintained only by those who specifically received their shares pursuant to the defective registration statement pleaded in the complaint." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 172 (S.D.N.Y. 2003). The burden is on the plaintiff to establish standing. *Barnes v. Osofsky*, 373 F.2d 269, 273 n.2 (2d Cir. 1967).

Plaintiff lacks Section 11 standing because it purchased its ADSs before the Secondary Offering. Cattell Aff. Ex. Q. As a simple matter of chronology, Plaintiff could not

---

[9]    Even if Rule 9(b) did not apply, Plaintiff's claims would fail under Rule 8(a) of the Federal Rules of Civil Procedure. Under the Supreme Court's recent decision in *Bell Atlantic v. Twombly*, to satisfy Rule 8(a), "more than labels and conclusions" are required. 127 S. Ct. 1955, 1959 (2007). As applied to a Section 11 claim, an allegation "that what only became clear due to subsequent events was somehow known . . . far earlier" does not satisfy Rule 8(a). *Panther Partners, Inc. v. Ikanos Commc'ns., Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008); *see also Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 790 (S.D.N.Y. 1997) ("fraud by hindsight . . . is not actionable" under Section 11).

have purchased its shares pursuant to the Registration Statement. Accordingly, the Section 11 claim must be dismissed for lack of standing.

## III.    Plaintiff's Section 12(a)(2) Claim Must Be Dismissed

"To state a claim under § 12(a)(2), plaintiffs must satisfy the same requirements as under § 11." *Backhaus*, 2002 WL 1870272 at *5. Accordingly, for all of the reasons discussed in Point II *supra*, Plaintiff's Section 12 claim fails. As explained below, the Section 12(a)(2) claim also must be dismissed because (1) the Company and Individual Defendants are not subject to Section 12(a)(2), and (2) Plaintiff lacks standing.

### A.    Focus Media and the Individual Defendants Are Not Proper Section 12(a)(2) Defendants

Plaintiff's Section 12(a)(2) claim against Focus Media and the Individual Defendants fails for the additional reason that neither Focus Media nor any of the Individual Defendants offered or sold Focus Media ADSs to any plaintiff. Section 12(a)(2) imposes liability only on defendants who (1) pass title of the security to the plaintiff or (2) "successfully solicit[] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).

Here, neither prong of the *Pinter* test is satisfied as against Focus Media or the Individual Defendants. It is undisputed that neither Focus Media nor the Individual Defendants passed title of any security to any plaintiff. The Secondary Offering was a firm commitment underwriting. *See* Cattell Aff. Ex. C at 154. In a firm commitment underwriting, the issuer sells securities to the underwriters, who then re-sell the securities to the public. *See Miller,* 473 F. Supp. 2d at 576 (explaining firm commitment underwritings). Thus, neither Focus Media nor any of the Individual Defendants passed title of the security to any plaintiff, and therefore cannot be a "seller" for purposes of Section 12(a)(2) under the first prong of the *Pinter* standard.

The second prong of the *Pinter* standard is likewise not satisfied as against Focus Media or the Individual Defendants. Plaintiff does not plead the required fact that it "purchased the securities *as a result of* [the defendant's] solicitation." *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001); *Griffin v. Painewebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) ("[a plaintiff] must allege not only that [defendant] actively solicited investors with respect to this transaction but that he purchased securities as a result of [defendant's] solicitation."). Absent allegations of a causal connection between purported solicitations by the defendants and the plaintiff's purchase, the defendants cannot be a statutory offeror or seller for purposes of Section 12(a)(2). As a result of this additional reason, Plaintiff's claim under Section 12(a)(2) against Focus Media and the Individual Defendants must fail.[10]

**B.    Plaintiff Lacks Section 12(a)(2) Standing**

To bring a claim under Section 12(a)(2), the plaintiff must have purchased its shares directly through the offering that is the subject of the relevant registration statement. 15 U.S.C. § 77*l*(a)(2); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571-72 (1995). As discussed previously, Plaintiff did not purchase its shares in the Secondary Offering. It purchased its shares almost a month before the Secondary Offering. Accordingly, Plaintiff's Section 12(a)(2) claim must be dismissed in its entirety.

---

[10]    While this separate and additional argument does not extend to the underwriters for the Secondary Offering, Merrill Lynch & Co. was not one of the underwriters. Plaintiff's allegations (Cattell Aff. Ex. A at ¶ 22) notwithstanding, the Prospectus, which lists the underwriters for the Secondary Offering, demonstrated that Merrill Lynch & Co. was not among them. Cattell Aff. Ex. H at 154.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Consolidated Amended Complaint should be dismissed in its entirety and with prejudice.

Dated:  New York, New York
         September 5, 2008

SIMPSON THACHER & BARTLETT LLP

By _____

Bruce D. Angiolillo (BA-9271)
  *bangiolillo@stblaw.com*
Jonathan K. Youngwood (JY-2234)
  *jyoungwood@stblaw.com*
Andrew D. W. Cattell (AC-0007)
  *acattell@stblaw.com*
425 Lexington Avenue
New York, New York  10017-3954
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

Attorneys for Defendants Focus Media Holding
Limited, Jason Nanchun Jiang, Zhi Tan, Daniel
Mingdong Wu, and Donald J. Puglisi

SHEARMAN & STERLING LLP

By _____s/ Adam S. Hakki_____

Herbert S. Washer (HW-2375)
  *herbert.washer@shearman.com*
Adam S. Hakki (AH-3561)
  *ahakki@shearman.com*
599 Lexington Avenue
New York, New York  10022
Telephone: (212) 848-4000
Facsimile:  (212) 848-7179

Attorneys for Defendants Credit Suisse
Securities (USA) LLC, Citigroup Global
Markets Inc., and Merrill Lynch & Co., Inc.

37

## CERTIFICATE OF SERVICE

I, Martha DelGiudice, do hereby declare that on the 5th day of September, 2008, I served a true and correct copy of:

**-NOTICE OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**-MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**-AFFIDAVIT OF ANDREW D. W. CATTELL** with Exhibits

via Federal Express, upon:

D. Seamus Kaskela
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087

Richard A. Maniskas
Schiffrin & Barroway L.L.P.
280 King of Prussia Road
Radnor, PA 19087

Martha DelGiudice