UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
In re FOCUS MEDIA HOLDING               :
LIMITED LITIGATION                      :  MASTER FILE
                                        :  07 Civ. 10617 (LTS)(GWG)
                                        :
This Document Relates To:               :  ECF Case
All Actions                             :
                                        :  Electronically Filed
                                        :
                                        :  Oral Argument Requested
-------------------------------------------------------------x
```

## AFFIDAVIT OF ANDREW D. W. CATTELL

```
STATE OF NEW YORK      )
                       )  ss:
COUNTY OF NEW YORK     )
```

Andrew D. W. Cattell, being duly sworn, deposes and says:

1.      I am associated with the firm of Simpson Thacher & Bartlett LLP,

attorneys for Defendants Focus Media Holding Limited ("Focus Media"), Jason Nanchun Jiang,

Zhi Tan, Daniel Mingdong Wu, and Donald J. Puglisi.  I submit this affidavit in support of

Defendants Focus Media Holding Limited, Jason Nanchun Jiang, Zhi Tan, Daniel Mingdong

Wu, Donald J. Puglisi, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., and

Merrill Lynch & Co., Inc.'s motion to dismiss the Consolidated Amended Complaint pursuant to

Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform

Act, 15 U.S.C. § 78u-4 *et seq.* (2008).  I am fully familiar with the facts and circumstances stated

herein based upon personal knowledge, the attached documents and review of the files

maintained by my firm.

2.      Attached hereto as Exhibit A is a true and correct copy of the

Consolidated Amended Complaint, dated June 23, 2008.

3.    Attached hereto as Exhibit B is a true and correct copy of a press release issued by Focus Media, dated December 17, 2007.

4.    Attached hereto as Exhibit C is a true and correct copy of an amendment to a Form F-1, filed by Focus Media with the Securities and Exchange Commission on November 1, 2007.

5.    Attached hereto as Exhibit D is a true and correct copy of a press release issued by Focus Media, dated September 27, 2007.

6.    Attached hereto as Exhibit E is a true and correct copy of a transcript of a Focus Media earnings call that took place on May 17, 2007.

7.    Attached hereto as Exhibit F is a true and correct copy of a transcript of a Focus Media earnings call that took place on September 27, 2007.

8.    Attached hereto as Exhibit G is a true and correct copy of a chart reporting the opening, high, low, and closing prices and volume traded of the Focus Media ADSs listed on NASDAQ for the time period September 26, 2007 to January 31, 2008.

9.    Attached hereto as Exhibit H is a true and correct copy of a prospectus filed, pursuant to Rule 424(b)(4), by Focus Media with the Securities and Exchange Commission dated November 7, 2007.

10.    Attached hereto as Exhibit I is a true and correct copy of a transcript of a Focus Media earnings call that took place on November 19, 2007.

11.    Attached hereto as Exhibit J is a true and correct copy of an Equity Research Company Update of Focus Media authored by CIBC World Markets dated November 20, 2007.

12.     Attached hereto as Exhibit K is a true and correct copy of an Order Consolidating Cases and Granting Motions for Appointment of Lead Plaintiff and Lead Counsel signed by the Honorable Laura Taylor Swain and dated April 24, 2008.

13.     Attached hereto as Exhibit L is a true and correct copy of an amendment to a Form F-1, filed by Focus Media with the Securities and Exchange Commission on June 13, 2006.

14.     Attached hereto as Exhibit M is a true and correct copy of a Form 6-K filed by Focus Media with the Securities and Exchange Commission on March 19, 2008, containing a press release issued by Focus Media dated March 18, 2008.

15.     Attached hereto as Exhibit N is a true and correct copy of a Form 6-K filed by Focus Media with the Securities and Exchange Commission on June 12, 2007, containing a press release issued by Focus Media dated May 17, 2007.

16.     Attached hereto as Exhibit O is a true and correct copy of a Form 6-K filed by Focus Media with the Securities and Exchange Commission on October 2, 2007, containing a press release issued by Focus Media dated September 27, 2007.

17.     Attached hereto as Exhibit P is a true and correct copy of a Form 6-K filed by Focus Media with the Securities and Exchange Commission on June 10, 2008, containing a press release issued by Focus Media dated June 5, 2008.

18.     Attached hereto as Exhibit Q is a true and correct copy of a Certification of Named Plaintiff dated January 25, 2008.

19.    Attached hereto as Exhibit R is a true and correct copy of a Schedule 13G

filed with the Securities and Exchange Commission on February 15, 2008.

_Andrew Cattell_
_____

Andrew D. W. Cattell (AC-0007)

Sworn to before me this 5th day of
September, 2008

_Sheila Allen Krassner_
Notary Public

SHEILA ALLEN-KRASSNER
Notary Public, State of New York
No. 01AL6061557
Qualified in Queens County
Commission Expires July 16, 2011

4

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re FOCUS MEDIA HOLDING LIMITED   :   Master File No. 1:07-cv-10617-LTS(GWG)
LITIGATION

————————————————————   :   CLASS ACTION

This Document Relates To:   :   CONSOLIDATED AMENDED
  :   COMPLAINT FOR VIOLATIONS OF
ALL ACTIONS.   :   FEDERAL SECURITIES LAWS

———————————————————— x

Lead Plaintiff Iron Workers Local No. 25 Pension Fund and Plaintiff Eastriver Partners, Inc. ("Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Focus Media Holding Limited ("Focus Media" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company, and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the American Depositary Shares ("ADSs") of Focus Media in the Company's secondary public offering on or about November 7, 2007 (the "Secondary Offering") as well as purchasers of the Company's ADSs between September 27, 2007 and November 19, 2007, inclusive (the "Class Period") alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      This case is simple and straightforward. Focus Media finished its third fiscal quarter for 2007. Then, a month and a half later but before the Company had to publicly release its third quarter earnings, Focus Media, along with certain selling shareholders, sold 13.5 million Focus Media ADSs in the Secondary Offering raising more than $888 million. Ten days later, Focus Media released its fiscal results for the third quarter and reported sharply declining profit margins. The Company further detailed that it had made several acquisitions that had depressed its profit margins. In response to this announcement, the price of Focus Media ADS on the first day of

trading after the announcement, declined to $52.00 per ADS more than 19% lower than the Secondary Offering price.

3.    On September 27, 2007, Focus Media issued a press release announcing, among other things, guidance for its financial results for the quarter ending September 30, 2007 ("3Q07"). This guidance, however, misrepresented the financial performance of Focus Media for 3Q07 and did not disclose that the Company was considerably less profitable in 3Q07 than represented. On November 7, 2007, Focus Media completed the Secondary Offering, selling 13.5 million shares of Focus Media ADSs generating proceeds of $888 million.

4.    The Registration Statement, which incorporated a Prospectus, issued in connection with the Secondary Offering, contained inaccurate statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation. As described below, the Registration Statement misrepresented or omitted the following facts, among others: (i) the Company was much less profitable in 3Q07 than the Company had forecasted on September 27, 2007; (ii) the Company's profit margin problems were due, in part, to the Company's acquisition of various businesses in its Internet advertising division and billboard division during the first half of 2007 and margin contraction in its In-Store division; and (iii) the Company acquired non-digital billboards that would not be able to be converted to more profitable digital billboards until the expiration of lengthy contracts and receipt of governmental approval.

5.    On November 19, 2007, after the close of trading, Focus Media announced its financial results for 3Q07 and reported a severe compression in its profit margins due to several acquisitions made during the first half of 2007 in its Internet advertising division and outdoor digital billboard division and due to problems in its In-Store division. The Company also, for the first time,

disclosed that during the first half of 2007 it acquired non-digital billboards that are less profitable

than digital billboards, which contributed to the margin compression. In response to this news, on

November 20, 2007, the price of Focus Media ADSs dropped from $57.15 per ADS to $52.00 per

ADS, on extremely heavy trading volume.

      6.    The following chart graphically depicts the key events during the relevant time

period:



**September 20, 2007 to November 27, 2007**

## JURISDICTION AND VENUE

      7.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of

the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and Sections 10(b) and 20(a) of the

Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R.

§240.10b-5].

- 3 -

8.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

9.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District. The Secondary Offering was marketed in this District, the Company's ADSs are traded over the NASDAQ National Market ("NASDAQ") which is based in this District, and the Underwriter Defendants (defined below) maintain executive offices in the District.

10.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ, a national Securities Exchange.

## PARTIES

11.     Lead Plaintiff Iron Workers Local No. 25 Pension Fund purchased Focus Media ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, during the Class Period and was damaged thereby.

12.     Plaintiff Eastriver Partners, Inc. purchased Focus Media ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, in the Secondary Offering and was damaged thereby.

13.     Defendant Focus Media operates an out-of-home advertising network using audiovisual television displays in the People's Republic of China. Its out-of-home advertising network consists of a commercial location network comprising of an LCD display network, an outdoor LED billboard network, and a movie theater advertising network; an in-store network; a

- 4 -

poster frame network; a mobile handset advertising network; and an Internet advertising services network. Focus Media is incorporated in the Cayman Islands, and maintains its principal executive offices at 28-30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, the People's Republic of China.

14.     Defendant Jason Nanchun Jiang ("Jiang") founded the Company and has served as the Co-Chairman of the Board of Directors of the Company and Chief Executive Officer of the Company since May 2003.

15.     Defendant David Feng Yu ("Yu") served as the Co-Chairman of the Board of Directors of the Company since February 2003 and served as President of the Company between February 2003 and January 2007.

16.     Defendant Zhi Tan ("Tan") served as a director and President of the Company since January 2007. Defendant Tan was a selling shareholder in the Secondary Offering and 7,166,124 ADSs, representing 35,830,620 Company shares, beneficially owned by Tan were sold in the Secondary Offering to public investors.  Prior to this sale, Defendant Tan beneficially owned 36,172,233 shares of the Company.  In the Secondary Offering, Defendant Tan sold 99% of the shares beneficially owned by him.  Defendant Tan garnered more than $464 million from the sale of his ADSs to investors in the Secondary Offering.  Defendant Tan sold 82.2% of the ADSs sold in the Secondary Offering.

17.     Defendant Daniel Mingdong Wu ("Wu") has served as the Chief Financial Officer of the Company since February 2005.

18.     Defendant Donald J. Puglisi ("Puglisi") is the Company's Authorized Representative in the United States.

19.     Defendants Jiang, Yu, Tan, Wu and Puglisi are collectively referred to herein as the Individual Defendants. Each of the Individual Defendants signed the Registration Statement for the Secondary Offering.

20.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as a lead underwriter for the Secondary Offering. Credit Suisse maintains its principal United States office at Eleven Madison Avenue, New York, New York, 10010-3629.

21.     Citigroup Global Markets Inc. ("Citigroup") served as a lead underwriter for the Secondary Offering. Citigroup's executive office is located at 388 Greenwich Street, New York, New York, 10013.

22.     Merrill Lynch & Co. ("Merrill Lynch") served as a lead underwriter for the Secondary Offering. Merrill Lynch's executive office is located at 4 World Financial Center, 250 Vesey Street, New York, New York, 10080.

23.     Credit Suisse, Citigroup and Merrill Lynch are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the Secondary Offering and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons other than Defendants who purchased the ADSs of Focus Media in the Secondary Offering as well as purchasers of the Company's ADSs between September 27, 2007 and November 19, 2007, inclusive and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or

- 6 -

affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

25.     The members of the Class are so numerous that joinder of all members is impracticable. Focus Media sold more than 13.5 million ADSs in the Secondary Offering and approximately 112 million ADSs were outstanding during the Class Period (including the 5 million ADSs issued in the Secondary Offering). The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Focus Media or its transfer agent or the underwriters to the Secondary Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

26.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

27.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that

will be encountered in the management of this litigation that would preclude its maintenance as a class action.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the Secondary Offering omitted and/or misrepresented material facts about Focus Media and its business;

(c)     Whether Defendants' statements issued during the Class Period were materially false and misleading; and

(d)     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

30.     Focus Media describes itself as China's leading multi-platform digital media company. The Company purports to operate the largest out-of-home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat-panel television displays in its network, and also claims to be a leading provider of Internet marketing solutions in China. Focus Media has stated that its goal is to create the largest multi-platform digital advertising network in China, reaching urban consumers at strategic locations and point-of-interests over a number of media formats, including audiovisual television displays in buildings and stores,

- 8 -

advertising poster frames and other new and innovative media, such as outdoor light-emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms.

31.    Focus Media's segments its business into three "Networks," as follows: (i) the Digital Out-of-home Advertising Network, which focuses on providing out-of-home advertising through liquid crystal display or LCD flat-panel televisions displays, LED billboards, movie screens, and poster and digital frames, and includes its commercial location network, in-store network and poster frame network; (ii) the Mobile Handset Advertising Network, which refers to its mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS, offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and (iii) the Internet Advertising Services Network, which refers to its Internet advertising agency and advertising services technology, including performance-based software suites.

### Focus Media's Gross Margins and Profit Margins Are a Critical Element of Its Financial Performance

32.    Gross margins and profit margins are an essential element in the evaluation of the financial performance of a company.

33.    A gross margin is a company's total sales revenue minus its cost of goods sold, divided by the total sales revenue, expressed as a percentage. The gross margin represents the percent of total sales revenue that the company retains after incurring the direct costs associated with producing the goods and services sold by a company. The higher the percentage, the more the company retains on each dollar of sales to service its other costs and obligations. For example, if a company's gross margin for the most recent quarter was 35%, it would retain $0.35 from each dollar of revenue generated, to be put towards paying off, selling, general and administrative expenses,

interest expenses and distributions to shareholders. Gross margin indicates how well management is using labor and materials to support the business. As stated on Zacks.com, an investment web site, "Gross margin is the best tool to analyze a young company's potential for profitability. This tells you the profit made on the cost of sales."

34.     Profit margin is a ratio of profitability calculated as net income divided by revenues, or net profits divided by sales. It measures how much out of every dollar of sales a company actually keeps in earnings. A higher profit margin indicates a more profitable company that has better control over its costs compared to a company with a lower profit margin. Profit margin is displayed as a percentage; a 20% profit margin, for example, means the company has a net income of $0.20 for each dollar of sales. The earnings of a company do not provide a full picture of its financial performance. Increased earnings are good, but an increase does not mean that the profit margin of a company is improving. For instance, if a company has costs that have increased at a greater rate than sales, it leads to a lower profit margin. This is an indication that costs need to be under better control. For example, a company that has a net income of $10 million from sales of $100 million has a profit margin of 10% ($10 million/$100 million). If in the next year net income rises to $15 million on sales of $200 million, the company's profit margin would fall to 7.5%. So while the company increased its net income, it has done so with diminishing profit margins, resulting in a negative trend.

35.     Analyzing the margin trend of a company is an important tool in determining the relative financial performance of a company from one period to the next. An increasing margin trend is favorable for the company and a decreasing margin trend is unfavorable.

36.     Due to the importance of margins on the analysis of its business, Focus Media regularly reported its margins to investors and highlighted when margins were improving.

Additionally, research analysts were interested in learning details about Focus Media's margins, including details about whether margins would be improving or declining in specific business areas or on an overall blended basis.

37.    For example, throughout 2007, Focus Media disclosed its margins when reporting on its financial performance and research analysts sought additional details on margins during conference calls with Company management.

38.    On February 26, 2007, Focus Media reported its financial results for 4Q06. It reported that gross margin for its Commercial Location Network, including its LED Network for 4Q06 was "73% . . . increasing from 71.44% in the [previous quarter]," for the "Poster Frame Network, gross margin was 75.4% . . . rising from 70.7% in the [previous quarter]," and that "[o]n a blended basis for the entire Company, our gross margin for the fourth quarter was 68.5%, up from 65.3% in the previous quarter."

39.    On a conference call with analysts on February 26, 2007 concerning the Company's financial results for 4Q06, Company executives responded to questions from analysts about gross margins. For example, Safa Rashtchy, an analyst from Piper Jaffray, asked: "Your gross margins were pretty healthy and saw a good increase. Again, is this what we could expect to be a sustainable level or was there any particular things that helped?" Defendant Wu responded in pertinent part as follows:

> I think the gross margin, as we said for the Commercial Location Network, in the long term we expect gross margins to be over 75%. And right now it's 73%, and we are making good progress towards that goal.

<div align="center">*    *    *</div>

> For the residential market, we think long term gross margin will be 75%. It seems we're already there. And we think maybe we can continue to improve.

<div align="center">*    *    *</div>

In the In-store Networks we think the gross margins, there is room to improve. We want to move towards 55%, 60% by end of 2007. We'll continue trying – to try our best to move towards this at that point. . . . That will of course, if we continue to invest more aggressively in the hypermarket, that will affect the gross margins – the timing of gross margins to hit that threshold.

<p style="text-align:center">*     *     *</p>

So overall, on a non-seasonal basis, without factoring in the seasonality in our business, we think the long term gross margin, the gross margin will continue to improve for the fourth quarter of 2006.

40.     On May 17, 2007, Focus Media reported its financial results for 1Q07 and reported that "[g]ross margin for the first quarter was 58.0%, as compared to 55.8% in the first quarter of 2006." It reported that, in the first quarter 2007, "gross margin for the commercial location network (including our outdoor LED network and movie theater advertising business) was 61.7%; the in-store network gross margin was 24.7%; the poster frame network gross margin was 66.9%; Focus Media wireless gross margin was 56.5%."

41.     On a conference call with analysts on May 17, 2007 concerning the Company's financial results for 1Q07, analysts were particularly interested in the Company's gross margins. Aaron Kessler, an analyst from Piper Jaffray asked: "And then can you provide some color around the expense level in Q2? With the higher revenue than we expected, it appears that you're modeling at some higher operating expenses as well or maybe some lower gross margins, so a little guidance on that." Defendant Wu responded to this question in pertinent part as follows:

On the margin actually, if you think about Focus Media business, in our business most of the media segments are fixed cost base business. So when, as we said, when the first quarter there's the Chinese new Year holiday during which most people taking time off, so no people in the office building, we do experience a little bit soft in seasonality. So the margin we believe is normal. It doesn't reflect a longer trend. But it has to do-more with the seasonality of the business.

42.     That same analyst next asked another question about margins in the Wireless business:

<p style="text-align:center">- 12 -</p>

And finally just on the Wireless business, that appeared up about 50% sequentially and also the margins were very strong. I think you indicated last quarter that the margins might tick down given that there's a one time benefit last quarter. Could you just give us some commentary on the strength of the Wireless business?

43.    Defendant Wu responded to this question in pertinent part as follows:

Sure. For the Wireless business, we do see very strong momentum in 2007. If you think about the growth margin this quarter, actually it's lower than Q4 because Q4 we had a one time rebate for mobile operators. Typically those rebate fees are paid at the end of the year. So we believe today that gross margin of the Mobile business is sustainable going forward.

44.    The next question from an analyst on the May 17, 2007 conference call also concerned the Company's margins. Jason Helfstein, an analyst from CIBC World Markets asked, in pertinent part, the following:

Thank you. Three questions.

The first with respect to this quarter, very healthy utilization or occupancy growth this quarter particularly in tier-I markets. Does that set you up for strong pricing in the second quarter? That's question one.

Question two, we did notice however that the average direct cost or the margin per display for the Commercial business did tick up more than we thought. We expected that to be flat to down. Just any talk with respect to the margins in the Commercial Location network.

45.    Defendant Jian responded to the question from Jason Helfstein in pertinent part as follows:

First of all, Jason to answer your first question. We expect a very healthy pricing trend going forward, especially today in the high utilization cities versus the smaller cities we have in our network, we have already, have the price ready and start talking to our clients. We will make an announcement and put it on our website very shortly for the price increase for the later part of the year. So overall we believe the pricing trend is very healthy.

On the margins for the Commercial Location network, if you think about the margin compared actually quarter-over-quarter, it's quite similar to first quarter of 2006. So we still expect long term gross margin for the Commercial Location business, without taking into consideration seasonality, will be about 75%. So basically we think that the Commercial Location network this quarter is affected by seasonality.

- 13 -

But otherwise we continue to believe for the big cities, which we have very high utilization rate today, the gross margin will be higher. But for the smaller cities where the utilization is relatively lower, which means the cities we just started our network, the gross margin will be lower given the fixed cost nature of the business. But we believe the long-term gross margin of the overall Commercial Location network will be over 75%.

46.     Later during the May 17, 2007 conference call, another analyst also asked about the Company's margins. Lin Shi, an analyst from Lehman Brothers, asked, in pertinent part, the following:

My first question is on the gross profit margin of Commercial Location network. On a year-on-year basis I notice there's a slight drop, about 1.5%. But on the other hand we've seen the occupancy rate and ASP both go up quite a bit on a year-to-year basis. Given the nature of the fixed cost business, so I just wonder what's the reason behind the gross margin decline?

47.     Defendant Wu responded to the question from Lin Shi as follows:

That's [as I said before] because last year we had many less cities versus this year. And this year it's a much bigger network. So I think that helps to hopefully answer your question. Because there are many more of cities, which are tier-III, tier-IV, tier-V cities which have low occupancy rate. And this therefore has a lower gross margin. So on a blended basis it's decreased slightly. So there's really, on a city by city basis, this overall gross margin are improving.

48.     On September 27, 2007, Focus Media reported its financial results for 2Q07 and reported that its gross margin for its "digital out-of-home business was 63.1%. Within the digital out-of-home business, commercial location network gross margin was 65.0%, in-store network gross margin was 28.4%, and the poster frame network gross margin was 71.6%." Focus Media also reported that "[b]lended gross margin for the company for the second quarter was 54.6%, as compared to 56.9% in the second quarter of 2006. . . ."

49.     On a conference call with analysts on September 27, 2007 concerning the Company's financial results for 2Q07, analysts were once again interested in the Company's gross margins. For example, James Mitchell, an analyst from Goldman Sachs, asked the following:

- 14 -

Okay, it's much more appropriate, but it makes my life harder. Just one other question from me, then. On Allyes, you commented that you see margins expanding over time. I guess, for the second quarter, it looked like it was a 27% or so gross margin for the business. Do you see that margin expanding relatively quickly as you [enjoy] merger synergies, or do you see that margin expanding more gradually over time as you change the business model?

50.     Defendant Wu responded to the question from James Mitchell as follows:

I think, if you look at what we said -- mentioned in the press release, 90% of our Internet advertising business still is digital media service, which is interactive agency business, itself is a lower margin. I think we discussed a little bit on the call when we acquired Allyes. Those margins can continue to improve as the revenue base becomes larger, revenue growth becomes larger, and also due to the larger media buying power of our Internet advertising business.

So coming back to your question, here, it's going to be a gradual improvement. Still today, the digital media service is still the majority of our Internet advertising business. Going forward, we see from two areas for the margin improvement. One is continued improvement of margin in the digital media service business, as we talked about earlier, due to revenue base growth as well as media buying power and also increasing operating efficiency.

But also, we see a change of the revenue mix in our Internet advertising business, because, if you look at digital performance media, itself is a higher margin business. So as that particular business contributing more and change the mix of those different contributions, we do see the margin of the Internet advertising business will improve. But those will be gradual processes.

51.     Research analysts covering Focus Media also stressed the Company's margins in

research reports on the Company.

52.     A March 12, 2007 research report by Deutsche Bank commented on Focus Media's

margins and associated future margins with the success of the Allyes acquisition. The Deutsche

Bank research report stated, in pertinent part:

Management of Focus Media is confident that net margins of Allyes will expand as its revenues scale up due to operating leverage and some cost synergies from centralizing certain corporate functions.

                    *          *          *

Based on our sensitivity analysis and estimates, with net margins going up, the Allyes acquisition will be slightly accretive to Focus' bottom line with 2007E, 08E

- 15 -

and 09E EPS up by 7%, 6% and 8% to US$2.70, US$3.96 and US$4.97, respectively.

53.    A March 16, 2007 research report by Independent International Investment Research PLC "reiterated a BUY on fundamental grounds" for Focus Media and stated: "[g]oing forward, we expect Focus Media to continue to report healthy top-line growth with improvement in margins."

54.    A May 18, 2007 research report by Deutsche Bank raised that firm's price target and reiterated its Buy rating on Focus Media and stated in pertinent part: "[w]e expect margins to rebound in 2Q as sales ramp."

55.    A September 28, 2007 research report by WR Hambrecht & Co raised that firm's price target and reiterated its Buy rating on Focus Media and stated in pertinent part: "management expects margins (27% GM in Q2:07) to improve over time as the company increases its revenue mix of technology-based products (over traditional advertising consulting business)."

**Focus Media Forecasts Strong Growth for 3Q07**

56.    On September 27, 2007, three days before the close of fiscal 3Q07, Focus Media issued a press release announcing its financial results for 2Q07, the period ending June 30, 2007 (the "9/27/07 Press Release"). The 9/27/07 Press Release was filed with the SEC on Form 6-K on October 2, 2007. The 9/27/07 Press Release provided earnings guidance for 3Q07 and stated in pertinent part as follows:

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range from $132 million to $135 million. Third quarter 2007 net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions (non-GAAP) is expected to be between $52 million and $54 million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS equivalent average shares outstanding. Due to higher-than- expected growth in our Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

57.     On September 27, 2007, Focus Media held a conference call with analysts and reiterated the financial forecasts for 3Q07 contained in the 9/27/07 Press Release.

58.     Focus Media did not publicly change its business outlook for 3Q07 after September 27, 2007. The Prospectus (defined below), under the *Where You Can Find Additional Information* section on p. 160, stated that the "SEC also maintains a website that contains reports, proxy statements and other information about issuers, such as us, who file electronically with the SEC." Thus, the Prospectus referred investors to its SEC filings, including the 9/27/07 Press Release. The next public disclosure concerning the Company's financial results for 3Q07 was when the Company disclosed its actual results on November 19, 2007. Thus, at the time of the Secondary Offering, Focus Media had not altered its business outlook for 3Q07 even though that quarter had been closed for more than 1 month.

59.     As discussed below, Focus Media's actual financial results for 3Q07 were considerably worse than represented on September 27, 2007.

### The Secondary Offering

60.     On or about November 1, 2007, Focus Media filed a Form F-1/A Registration Statement (the "Registration Statement") with the SEC for the Secondary Offering.

61.     On or about November 7, 2007, the Prospectus (the "Prospectus") with respect to the Secondary Offering, which forms part of the Registration Statement, became effective and more than 13.5 million shares of Focus Media's ADSs at $64.75 per ADS were sold to the public, thereby raising more than $888 million. The Company sold 5 million ADSs and other selling shareholders identified in the Prospectus, including Defendant Tan, sold 8,720,873 ADSs in the Secondary Offering. Each ADS represented 5 ordinary Company shares.

62.     Underwriter Defendants Citigroup, Credit Suisse and Merrill Lynch served as lead underwriters and Joint Bookrunners for the Secondary Offering. Each of the Underwriter

Defendants purchased 4,390,679 ADSs from the Company and selling shareholders and sold those shares to public investors in the Secondary Offering. CIBC World Markets Corp. and Piper Jaffray & Co. served as co-managers for the Secondary Offering and purchased 343,023 ADSs and 205,813 ADSs respectively, and sold those shares to public investors in the Secondary Offering. The Underwriter Defendants earned at least $25,586,681 as a result of their sale of Company ADSs in the Secondary Offering.

### Focus Media Experienced an Undisclosed Contraction in Its Margins

63.     During 3Q07, Focus Media suffered from a contraction in its gross and net margins, resulting in the Company being less profitable than disclosed to the marketplace. Focus Media did not disclose the decline in profit margins for 3Q07 until after the Secondary Offering. Gross margin, or the percentage of sales left after deducting production costs, fell to 50.9% in 3Q07 from 65.3% a year earlier (*i.e.*, 3Q06).

64.     Various factors caused the contraction in Focus Media's margins during 3Q07. The factors included, among others, margin problems due to several acquisitions by Focus Media during the first half of 2007 in its Internet advertising division and billboard division and margin compression in Focus Media's In-Store division.

65.     Focus Media made several acquisitions during the first half of 2007.

66.     In March 2007, the Company acquired Allyes, which operates an Internet advertising agency and service technology business. During 2007, the Company also acquired several other companies in the internet advertising space. The consolidation of these companies into Allyes had a negative impact on the Company's margins.

67.     During the second quarter of 2007, Focus Media acquired a leading outdoor billboard operator in China, which operates over 200 outdoor billboard locations in major commercial centers

in China. This outdoor billboard operator owned static (*i.e.*, non-digital) billboards which are less profitable than the digital billboards owned by Focus Media prior to the acquisition. Focus Media planned to upgrade some of these non-digital billboards to digital billboards upon the expiration of existing contracts. These static billboards, however, were subject to relatively long advertising contracts of 1-2 years which needed to expire before Focus Media could alter their terms or convert the billboards to digital billboards. Furthermore, Focus Media would need governmental approval in order to convert a static billboard to a digital billboard.

68.    Focus Media did not disclose sufficient details about these acquisitions to investors at the time of the acquisitions or in the Prospectus. Importantly, Focus Media did not inform investors that it acquired non-digital billboards with smaller margins compared with digital billboards.

69.    Focus Media encountered problems with its In-Store division during the 3Q07, resulting in a significant decline in profit margins. The In-Store division had gross margins of 36.2% in 3Q06 and gross margins of 28.4% during 2Q07. During 3Q07, the In-Store division had gross margins of 17.7%, a decrease of 18.5 from 3Q06 and a decrease of 10.7 from 2Q07.

<div align="center">

**The Registration Statement Contained Inaccurate
Statements of Material Fact and Omitted Material Information
Required to Be Disclosed Therein**

</div>

70.    The Registration Statement contained numerous inaccurate statements of material fact and omitted material information required to be disclosed therein.

71.    The Registration Statement provided general information about various Company acquisitions during the first half of 2007.

72.    The Registration Statement, stated in pertinent part as follows:

**Acquisitions in the six months ended June 30, 2007 (unaudited):**

In January and February 2007, the Group acquired five companies which provide in-elevator poster frame advertising services. . . .

<div align="center">

- 19 -

</div>

In March 2007, the Group acquired five companies which provide mobile handset advertising services. . . .

In March 2007, the Group acquired a billboard advertising company. The purchase consideration is contingent upon the operating results over the next three years. The Group made an advance payment of $3 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group completed the acquisition of Allyes Information Technology Company Limited, or Allyes, a Cayman Islands company, which operates an Internet advertising marketing agency and technology services company through its PRC affiliated entities. Allyes is the largest Internet advertising agency and provider of Internet advertising technology in China.   The purchase price consideration was $70 million in cash and 19,969,080 ordinary shares having a fair value of $154,281,112, or $7.726 per ordinary share.  Additional consideration of 9,662,458 ordinary shares is issuable, contingent upon Allyes meeting certain earnings targets during the twelve month period from April 1, 2007 to March 31, 2008.

<p style="text-align:center">*     *     *</p>

In the second quarter of 2007, the Group completed acquisitions of eight companies which primarily provide mobile handset advertising, Internet advertising and outdoor billboard advertising services, for an aggregate purchase considerations of approximately $7.5 million plus additional consideration contingent upon the achievement of certain earnings targets over the next one to three fiscal years.  The Group also made an advance payment of $16.3 million, which will be deducted from the contingent purchase price consideration.

73.     The Registration Statement, stated in pertinent part as follows:

We continue, from time to time, to make acquisitions to expand our existing networks and to enter into new areas of business. For instance, in the first half of 2007, we acquired companies to expand our mobile handset advertising network and outdoor LED billboard network as well as entering into the Internet advertising business through several acquisitions including Allyes. We expect that acquisitions will continue to be an important component of our growth strategy.

In March 2007, we acquired Allyes, which operates an Internet advertising services and technology business.

74.     The statements referenced above in ¶¶72-73 were each an inaccurate statement of material fact because they failed to disclose that recent Company acquisitions had a negative impact on the Company's overall profit margins and that Focus Media's gross margins for 3Q07 fell to

50.9% from 65.3% a year earlier and from 54.6% in 2Q07. The statements referenced above in ¶72 that "the Group acquired a billboard advertising company" and in ¶73 that Focus Media "acquired companies to expand" its "outdoor LED billboard network" were each an inaccurate statement of material fact because Focus Media did not acquire LED billboards but acquired non-digital billboards that had smaller profit margins than LED billboards and the Company's plan was to eventually convert some of these non-digital billboards to LED billboards after their lengthy contracts expired and after the Company obtained governmental approval. Furthermore, the statements referenced above in ¶¶72-73 were each an inaccurate statement of material fact because they failed to disclose that the Company's consolidation of acquisitions in the Internet advertising business resulted in a contraction in the Company's blended profit margins and profit margins in the Internet advertising division. Indeed, for 3Q07, Focus Media's gross margins in its Internet advertising division had declined to 23% as compared to 27.1% in 2Q07.

75.    The Registration Statement, stated in pertinent part as follows:

The significant increase in our operating results since we commenced our current business operations is attributable to a number of factors, including the substantial expansion of our digital out-of-home advertising networks, the ongoing expansion of our mobile handset advertising network, the introduction of Internet advertising services into our platform, the successful execution and integration of strategic acquisitions, such as Framedia, Target Media, Focus Media Wireless, ACL and Allyes, and the growing acceptance of our multi-platform network as an appealing advertising medium by our clients.

We expect our future growth to be driven by a number of factors and trends including:

\*       \*       \*

•       Our ability to increase sales of advertising time slots and extend the duration of our advertising cycle on our commercial location and in-store networks;

\*       \*       \*

> •      Our ability to successfully operate and market our new outdoor LED billboard network;

> •      Our ability to successfully operate and market our new Internet advertising services network; and

> •      Our ability to acquire and integrate companies that operate advertising businesses complementary to our existing operations.

76.     The statements referenced above in ¶75 were each inaccurate statements of material fact because at the time of the Secondary Offering, the Company had suffered a significant reduction in its profit margins as a result of, among other things: (i) recent Company acquisitions in the Internet advertising division and billboard division; and (ii) problems in the Company's in-store division. Indeed, Focus Media's gross margins for 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07. The statements referenced above in ¶75 that the Company's "significant increase in . . . operating results" is attributable to "the introduction of Internet advertising services into our platform" were each an inaccurate statement of material fact because they failed to disclose that the Company's consolidation of acquisitions in the Internet advertising business resulted in a contraction in the Company's blended profit margins and profit margins in the Internet advertising division. Indeed, for 3Q07, Focus Media's gross margins in its Internet advertising division had declined to 23% as compared to 27.1% in 2Q07. Furthermore, the statements referenced above in ¶75 were each inaccurate statements of material fact because the Company acquired non-digital billboards and would not be able to convert those billboards to LED billboards until the expiration of lengthy contracts and receipt of governmental approval.

77.     The Registration Statement positively highlighted the Company's financial results for the first six months of 2007 but failed to disclose the negative profit margin trend in 3Q07. The Registration Statement, stated in pertinent part as follows:

**Gross Profit.** As a result of the foregoing, our gross profit increased by 101.5% from $46.5 million for the six months ended June 30, 2006 to $93.6 million for the

six months ended June 30, 2007. Our overall gross margin decreased during the same period from 55.8% to 54.8% primarily due to the addition of our Internet advertising services network in the first half of 2007, which has lower margins. For the six months ended June 30, 2007, our gross margin for our digital out-of-home advertising network amounted to 60.1%, including gross margins for our commercial location, in-store and poster frame networks of 62.8%, 26.4% and 67.9%, respectively, compared to a gross margin for our digital out-of-home advertising networks of 61.0% for the six months ended June 30, 2006, including gross margins of 62.0%, 29.3% and 62.0% for our commercial location, in-store and poster frame networks, respectively. Gross margin for mobile handset advertising network increased from 21.8% for the six months ended June 30, 2006 to 56.6% for the six months ended June 30, 2007. Gross margin for out Internet advertising services network was 27.1% for the six months ended June 30, 2007. In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network.

78.    The statements referenced above in ¶77 were each an inaccurate statement of material fact because they omitted to disclose that: (i) the Company's margins in 3Q07 trended significantly downward compared with 3Q06 and 2Q07; (ii) the Company's gross margins in 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07; (iii) Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins; (iv) the Company's profit margins for 3Q07 were significantly smaller than the Company forecasted on September 27, 2007; (v) the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07; and (vi) the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07.

79.    The Registration Statement described the Company's billboard division as consisting of LED billboards even though that division also consisted of non-digital billboards with lower profit margins. In fact, the Prospectus described the network that operated the non-digital billboards as the LED billboard network.

80.    The Registration Statement, Overview subsection of Business, stated in pertinent part as follows:

**Our Digital Out-of-home Advertising Network** which focuses on providing out-of-home advertising through LCD flat-panel televisions displays, LED billboards,

- 23 -

movie screens, and poster and digital frames, includes our commercial location network, in-store network and poster frame network:

- **our commercial location network**, consisting of:

  \*        \*        \*

- **our outdoor LED billboard network**, which refers to our network of leased 5' x 5' LED digital billboards installed on the street-sides in major shopping districts and other locations with high pedestrian traffic in Shanghai;

81.    The Registration Statement, stated in pertinent part as follows:

A majority of the content displayed on our commercial location and in-store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day.  Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

\*        \*        \*

As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200 leased 5' x 5' digital billboards placed along curbsides in high-pedestrian traffic areas in Shanghai.

82.    The Registration Statement, stated in pertinent part as follows:

**Outdoor LED billboard network.** In April 2006, we commenced operations of an outdoor LED billboard network consisting of 5' x 5' LED digital billboards that are installed on the street-sides in major shopping districts and other locations with high pedestrian traffic in Shanghai. Full-color audiovisual commercials are displayed on the digital billboards in a repeating six-minute cycle. The commercials displayed on the LED billboards are highly visible even during bright daylight.  As of June 30, 2007, the number of the LED billboards in our street-side outdoor LED billboard network in prime commercial and shopping areas reached approximately 200. We market this part of our network under the name "iStreet Network."

83.    The Registration Statement, stated in pertinent part as follows:

*Advertising Contracts.* We offer advertisers five-, fifteen- or thirty-second time slots on our out-of-home television advertising networks, including our commercial location, in-store, outdoor LED billboard and movie theater advertising networks. For our commercial location network, our standard advertising package includes a time slot on our entire network or a particular channel in each city in which the advertiser wishes to display the advertisement.  For our movie theater advertising network, time slots are sold on a regional or entire network basis. Our sales are made pursuant to written contracts with commitments ranging from one week to several months.

- 24 -

84.    The statements referenced above in ¶¶80-83 were each inaccurate statements of material fact because they failed to disclose that the LED billboard division contained non-digital billboards, that advertisements are not "broadcast" over these billboards in a "repeating cycle," and that the Company would not be able to convert those billboards to LED billboards until the expiration of lengthy contracts and receipt of governmental approval.  Furthermore, calling the billboard network the "LED" billboard network was an inaccurate statement of material fact because that network also contains non-LED billboards.

85.    Under applicable SEC rules and regulations governing the preparation of the Registration Statement and Prospectus, the Prospectus was required to disclose both that: (i) the Company's margins in 3Q07 trended significantly downward compared with 3Q06 and 2Q07; (ii) the Company's gross margins in 3Q07 fell to 50.9% from 65.3% a year earlier and from 54.6% in 2Q07; (iii) Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins in 3Q07; (iv) the Company's profit margins for 3Q07 were significantly smaller than the Company forecasted on September 27, 2007; (v) the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07; (vi) the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07; and (vii) the Company acquired non-digital billboards which have smaller profit margins than LED billboards and that even though the Company planned to convert these billboards to LED billboards, the conversions could only take place after the expiration of lengthy contracts and governmental approval. The Prospectus failed to contain any such disclosures.

86.    Pursuant to Item 4(a) of Form 424B4, the Registration Statement was required to furnish the information required by Part I of Form 20-F. Under Item 5(D) of Part I of Form 20-F an issuer is required to, among other things, "discuss, for at least the current fiscal year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material

effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." Additionally, under Item 8(B) of Form 20-F, the Registration Statement was required to disclose "whether or not any significant change has occurred since the date of the annual financial statements, and/or since the date of the most recent interim financial statements, if any, included in the document."

87.    The fact that the Company's margins had significantly trended downward during 3Q07 and that Company acquisitions during the first half of 2007 had contributed to this downtrend were required to be disclosed in the Registration Statement but were not. Indeed, at the time of the Secondary Offering, the Company had already completed the 3Q07 and its actual financial results showed that the Company was less profitable than the Company forecasted on September 27, 2007. The Company had also completed acquisitions, such as of the non-digital billboards and of Internet advertising companies, which negatively impacted earnings.

88.    Under Item 3(D) of Part I of Form 20-F, the Registration Statement was required to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk. . . ." Additionally, pursuant to Item 3 of Form F-1, the Registration Statement was required to furnish the information required by Item 503 of Regulation S-K. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative."

89.    The fact that: (i) the Company was much less profitable in 3Q07 than the Company had disclosed on September 27, 2007 and the fact that the Company had not corrected this forecast; and (ii) the Company acquired non-digital billboards that would not be able to be converted to LED billboards until the expiration of lengthy contracts and receipt of governmental approval, were

significant factors that made the Secondary Offering speculative or one of high risk and were required to be disclosed in the Registration Statement but were not. This risk materialized shortly after the Secondary Offering on November 19, 2007 when the Company announced its financial results for 3Q07 and more fully described the Company's acquisitions and their negative impact on the Company's financial performance.

### Post Secondary Offering Disclosures

90.    On November 19, 2007, after the close of the market, Focus Media issued a press release announcing its financial results for the third quarter of 2007, the period ending September 30, 2007 (the "11/19/07 Press Release"). Among other things, the Company reported in the 11/19/07 Press Release that its gross margins for 3Q07 had declined due to several recent acquisitions and due to problems with its In-Store division. The Company's margins were considerably less than forecasted on September 27, 2007. Compared with the forecast from September 27, 2007, the Company's revenues were greater but earnings were in-line, resulting in smaller margins than forecasted. Thus, the Company required $151.4 million in revenues (or approximately 12% - 15% more in revenues than the $132-135 million forecasted) to generate the same earnings forecasted, resulting in much smaller margins than reflected in the business outlook from 9/27/07. The 11/19/07 Press Release stated in part:

Highlights for Third Quarter 2007:

-- Total revenues grew 149.6% year-over-year and 33.6% quarter-over-quarter to $151.4 million.

-- Net income for the third quarter was $46.6 million, up 72.6% year-over-year and 23.6% quarter-over-quarter. Fully diluted net income per ADS for the third quarter of 2007 was $0.37. . . .

\*        \*        \*

Gross profit for the third quarter of 2007 was $77.1 million, representing an increase of 99.9% compared to $38.6 million for the corresponding period a year ago and a

24.7% increase compared to $61.8 million in the second quarter 2007. In the third quarter 2007, gross margin for our digital out-of-home business was 62.7%. Within our digital out-of-home advertising networks, commercial location network gross margin was 64.7%, in-store network gross margin was 17.7%, and the in-elevator poster frame network gross margin was 71.1%.

91.     The 11/19/07 Press Release disclosed – for the first time - that the Company had acquired non-digital billboards and that those billboards had a negative impact on profit margins for 3Q07. The 11/19/07 Press Release also reported that the Company would need to wait for contracts on those billboards to expire, and would need to obtain governmental approval, before the billboards could be converted to digital billboards. The 11/19/07 Press Release stated in pertinent part:

> Commercial location gross margin was impacted by the acquisition of a leading outdoor billboard operator in China, which operates over 200 highly attractive outdoor billboard locations in major commercial centers in China. Excluding the non-digital outdoor billboard business we acquired in the second quarter of 2007, commercial location gross margin would have been 74.6%. We plan to upgrade some of these sites to digital LED billboards upon expiration of the current contracts with advertisers. The acquisition provides Focus Media with a stronger strategic position for the growth of outdoor digital billboard business in the future.

92.     The 11/19/07 Press Release reported the negative impact that the Company's In-Store business and acquisitions in the Internet advertising division had on its gross margins for 3Q07:

> The gross margin for our Internet advertising business was 23.0% in the third quarter 2007, lower than the previous quarter due to several small acquisitions to strengthen the market leadership of Allyes. Blended gross margin for the company for the third quarter was 50.9%, as compared to 54.6% in the second quarter of 2007, primarily due to the contribution of the lower-margin Internet advertising business and in-store business.

93.     The 11/19/07 Press Release also disclosed that during 3Q07, the In-Store division had gross margins of 17.7%, a decrease of 18.5 from 3Q06 and a decrease of 10.7 from 2Q07.

94.     Focus Media also held a conference call with analysts on November 19, 2007 (the "11/19/07 Conf. Call"), during which Company executives reiterated the financial results of 3Q07. During the 11/19/07 Conf. Call, Defendant Jiang, in response to a question about the advertising contracts for the static billboards acquired during 2Q07, stated: "Typical advertising contract[s] in

- 28 -

the China outdoor billboard business is roughly about one year or two years." Defendant Jiang also

discussed the long process involved with converting static billboards to digital billboards:

> In terms of the converting traditional billboards to digital billboards, there are a lot of factors we need to take into consideration such as lighting impact on the surrounding neighborhood, such as the weight tolerance of the current construction, the current building, electricity supply. And of course we need to get government approval if we convert a traditional poster to a digital billboard. So all those things take time to work. Of course, it's reduced the work. The biggest entry barrier are basically access to the sites itself.

95.     Following the Company's earnings release, on November 20, 2007, the price of Focus

Media ADSs dropped from $57.15 per ADS to $52.00 per ADS on extremely heavy trading volume.

The next day, on November 21, 2007, the price of Focus Media ADSs continued to decline and

closed at $50.35 per ADS.

96.     An article on Bloomberg on November 19, 2007 titled *Focus Media Shares Decline*

*as Profitability Misses Estimates* reported that Focus Media's stock dropped due to a contraction in

the Company's margins and described the impact that the acquisitions of internet advertising

businesses had on margins. The article stated in pertinent part as follows:

> Focus Media Holding Ltd. declined 5.3 percent in U.S. after-hours trading after profitability dropped to the lowest since July 2005, when China's largest publicly traded advertising company first sold shares.

> The Shanghai-based company said its gross margin, or the percentage of sales left after deducting production costs, fell to 50.9 percent in the third quarter from 65.3 percent a year earlier. That missed estimates from analysts at Piper Jaffray & Co. and Susquehanna Financial Group.

> Focus Media bought Web ad businesses to win a bigger share of China's advertising market as the nations's economy grew by more than 11 percent for three consecutive quarters. The acquisitions eroded the company's margins, said Piper Jaffray's Aaron Kessler.

> "Margins are a near-term concern" that led to the decline in the stock, said Kessler, who rates Focus Media "outperform." He had estimated a gross margin of 60.5 percent while Susquehanna Financial's Ming Zhao had expected the margin to be 58 percent.

97.    Research analysts issued research reports commenting on the drop in the Company's

stock price.  A November 20, 2007 research report by CIBC World Markets titled *Emotion is*

*Driving Stock on Transparency; Estimates Unchanged*, stated: "We believe the sell-off is largely

driven by an emotional response to FMCN's lack of transparency."  This research report stated in

part:

> On 9/27, management provided 3Q revenue guidance 13% ahead of Street expectations, with the implication that upside was from organic growth.  However, after reporting 3Q earnings on Monday night, we learned that the upside was entirely from the acquisition of billboard and online assets.
>
> * Moreover, these acquired static billboards are somewhat out of the company's core-expertise. While the company plans to upgrade these to LED displays, its previous outdoor digital displays have not been a success, in our view. Moreover, until these displays are upgraded (presumably some time in 2008), margins are likely to remain below its commercial business. As such, prior '08 estimates were artificially inflated by including these revenues at commercial margins, and we have accordingly adjusted our '08 for the static billboard margins.
>
> * While we don't have an issue with the company's acquisition strategy, which is generating accretive returns above its cost of capital, the lack of disclosure is an issue for many investors.

98.    A research report from SIG Susquehanna Financial Group, LLLP on November 30,

2007 stated that Focus Media "has acquired [approximately] 200 billboards whose relatively low

profitability diluted overall margin."

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

99.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

forth herein.

100.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k,

and is asserted against all Defendants.

101.    The Registration Statement for the Secondary Offering was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

102.    Focus Media is the registrant for the Secondary Offering. As issuer of the shares, Focus Media is strictly liable for the materially inaccurate statements contained in the Registration Statement and the Prospectus and the failure of the Registration Statement and Prospectus to be complete and accurate.

103.    The Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to the Plaintiffs and the Class.

104.    The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Secondary Offering and the Company's securities sold through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a

reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not misleading.

105.    By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

106.    Plaintiff Eastriver Partners acquired Focus Media ADSs in the Secondary Offering, and in reliance on, the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the Class sustained damages when the price of Focus Media's ADSs declined substantially due to material misstatements in the Registration Statement and Prospectus.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

107.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all Defendants.

109.    Defendants were sellers and offerors and/or solicitors of purchasers of the ADSs offered pursuant to the Prospectus. Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the Secondary Offering. The Registration Statement contained a Prospectus which was used to induce investors, such as the Plaintiffs and the other members of the Class, to purchase Focus Media's common stock.

110.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to

be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and in "Road Shows" to promote the Secondary Offering. Focus Media and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus.

111.    Pursuant to the Underwriting Agreement, each of the Underwriter Defendants purchased a total of at least 4,390,679 Focus Media ADSs at the public offering price, less an underwriting discount in the Secondary Offering.

112.    The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Prospectus for their own financial benefit. But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectus. The Prospectus was calculated to create interest in Focus Media ADSs and was widely distributed by or on behalf of these Defendants for that purpose;

(b)    finalized the Prospectus and caused it to become effective; and

(c)    conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

113.    As set forth more specifically above, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

114.    Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

115.    The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

116.    By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the Securities Act. Accordingly, Plaintiff Eastriver Partners and members of the Class who hold Focus Media ADSs purchased in the Secondary Offering have the right to rescind and recover the consideration paid for their Focus Media ADSs and hereby elect to rescind and tender their Focus Media common stock to the Defendants sued herein. Plaintiff and Class members who have sold their Focus Media ADSs are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

117.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

119.    Each of the Individual Defendants acted as controlling persons of Focus Media within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior

- 34 -

officer of Focus Media. By reason of their senior management positions and/or directorships at the
Company, as alleged above, these Individual Defendants, individually and acting pursuant to a
common plan, had the power to influence and exercised the same to cause Focus Media to engage in
the conduct complained of herein. By reason of such conduct, the Individual Defendants are liable
pursuant to Section 15 of the Securities Act.

120.    Each of the Individual Defendants was a culpable participant in the violations of
Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having
signed the Registration Statement and having otherwise participated in the process which allowed
the Secondary Offering to be successfully completed.

<div align="center">

**Materially False and Misleading
Statements Issued During the Class Period**

</div>

121.    For the purposes of this section of the Complaint, the term "Defendants" refers only
to Defendants Focus Media, Jiang, Tan and Wu.

122.    The statements referenced in ¶¶72, 73, 75, 77, 80-83 from the Registration Statement
are incorporated herein by reference. These statements were materially false and misleading when
made for the reasons set forth above.

123.    On September 27, 2007, three days before the close of fiscal 3Q07, Focus Media
issued a press release announcing its financial results for 2Q07, the period ending June 30, 2007.
The 9/27/07 Press Release was filed with the SEC on Form 6-K on October 2, 2007. The 9/27/07
Press Release provided earnings guidance for 3Q07 and stated as follows:

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range
from $132 million to $135 million. Third quarter 2007 net income excluding share-
based compensation expense and intangible assets amortization expense resulting
from acquisitions (non-GAAP) is expected to be between $52 million and $54
million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS
equivalent average shares outstanding. Due to higher-than-expected growth in our

Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

124.   The statements referenced in ¶123 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts:

(a)   At the time of the 9/27/07 Press Release, Defendants knew, or were reckless in not knowing, that Focus Media would generate approximately $151.5 million in revenues compared with the statement on September 27, 2007 that the Company is forecasted to generate $132-135 million in revenues but would still earn the forecasted approximately $52-$54 million in non-GAAP net income. Thus, the Company's profit margins would be considerably less in 3Q07 than forecasted even though there would be an increase in revenues;

(b)   the Company's gross margins in 3Q07 fell to approximately 50.9% from 65.3% a year earlier and from 54.6% in 2Q07;

(c)   Company acquisitions during the first half of 2007 negatively impacted the Company's profit margins in 3Q07;

(d)   the Company's In-Store gross margins for 3Q07 fell to 17.7% from 28.4% in 2Q07;

(e)   the Company's Internet advertising division's gross margins fell to approximately 23% from 27.1% in 2Q07; and

(f)   the Company acquired non-digital billboards which have smaller profit margins than LED billboards and that even though the Company planned to convert these billboards to LED billboards, the conversions could only take place after the expiration of lengthy contracts and governmental approval.

125.   Also on September 27, 2007, Focus Media held a telephone conference with analysts in connection with its financial results for 2Q07 ("the 9/27/07 Conf. Call"). On the 9/27/07 Conf.

Call, Focus Media reiterated its business forecast for 3Q07 that was contained in the 9/27/07 Press Release.

      126.    On the 9/27/07 Conf. Call, Defendant Wu provided Focus Media's business outlook for 3Q07 and stated that he expects that "the total revenue for the third quarter of 2007 to be between $132m and $135m, non-GAAP fully diluted earnings per ADS to be between $0.41 and $0.43."

      127.    The statements referenced above in ¶126 were each materially false and misleading for the reasons set forth in ¶124.

      128.    On the 9/27/07 Conf. Call, Defendant Jiang stated in pertinent part that going forward Focus Media will:

> be able to increase the margin of Internet advertising business of Allyes. So going forward, for the Internet advertising business, the focus will be two areas. One is to achieve higher growth, higher -- hopefully higher than industry growth for the Internet advertising industry and also focus on improving the margin of the Internet advertising business of Focus Media.

      129.    On the 9/27/07 Conf. Call, Defendant Wu responded to a question about the expansion of the margins in the Internet advertising business:

> **James Mitchell** - Goldman Sachs - Analyst
>
> Okay, it's much more appropriate, but it makes my life harder. Just one other question from me, then. On Allyes, you commented that you see margins expanding over time. I guess, for the second quarter, it looked like it was a 27% or so gross margin for the business. Do you see that margin expanding relatively quickly as you [enjoy] merger synergies, or do you see that margin expanding more gradually over time as you change the business model?
>
> **Daniel Wu** - Focus Media Holding Ltd. - CFO
>
> I think, if you look at what we said -- mentioned in the press release, 90% of our Internet advertising business still is digital media service, which is interactive agency business, itself is a lower margin. I think we discussed a little bit on the call when we acquired Allyes. Those margins can continue to improve as the revenue base becomes larger, revenue growth becomes larger, and also due to the larger media buying power of our Internet advertising business.

So coming back to your question, here, it's going to be a gradual improvement. Still today, the digital media service is still the majority of our Internet advertising business. Going forward, we see from two areas for the margin improvement. One is continued improvement of margin in the digital media service business, as we talked about earlier, due to revenue base growth as well as media buying power and also increasing operating efficiency.

But also, we see a change of the revenue mix in our Internet advertising business, because, if you look at digital performance media, itself is a higher margin business. So as that particular business contributing more and change the mix of those different contributions, we do see the margin of the Internet advertising business will improve. But those will be gradual processes.

130.    The statements referenced in ¶¶128-29 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts:

(a)    Margins in the Internet advertising division for 3Q07 were not going to "improve as the revenue base becomes larger" or "expand" but in fact margins for the Internet advertising division were going to contract as revenues increase during 3Q07;

(b)    Company acquisitions in the Internet advertising division during the first half of 2007 negatively impacted the Company's profit margins in 3Q07; and

(c)    the Company's Internet advertising division's gross margins fell to 23% from 27.1% in 2Q07.

## Additional Scienter Allegations

131.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Focus Media, their control

- 38 -

over, and/or receipt and/or modification of Focus Media's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

132.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

133.    As alleged herein, at the time of the 9/27/07 Press Release and Conf. Call and at the time of the Secondary Offering, each of the Individual Defendants was aware of the true financial performance of Focus Media for 3Q07 and that the Company's margins were considerably smaller than represented on September 27, 2007 and that the margins were trending downward. Indeed, as stated by an analyst from Susquehanna Financial Group in a research report on September 28, 2007, "[s]ince guidance was given near the end of 3Q, we should believe the accuracy of company guidance is very high." Furthermore, each of the Individual Defendants knew, or recklessly disregarded, that Company acquisitions during the first half of 2007 had negatively impacted the Company's profit margins. Nevertheless, Defendants pushed forward with the Secondary Offering even though it was priced based upon an inaccurate perception of the Company's financial performance.

134.    Additionally, the fraud alleged herein relates to the core business of Focus Media so knowledge of the fraud may be imputed to the Individual Defendants. Given Defendants' knowledge of the declining financial condition of Focus Media, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

- 39 -

135.    Defendants' materially false and misleading statements and material omissions caused Focus Media's ADSs to be artificially inflated.

136.    Additionally, each Defendant possessed substantial motives for misrepresenting Focus Media's financial status, operations, and prospects throughout the Class Period.

137.    In August 2007, the Company's ADSs traded at $34.57 per ADS and rose to $64.75 at the time of the Secondary Offering. Defendants and selling shareholders capitalized on Focus Media's artificially inflated stock price by raising more than $888 million through the sale of Company ADSs in the Secondary Offering at $64.75 per ADS, close to the all-time high of 65.10 per ADS for the Company's ADSs. Shortly after the Secondary Offering, the Company's ADSs declined and never again reached $64.74 per ADS. The Company's ADSs closed at $27.05 per ADS on June 22, 2008.

138.    The Company sold 5 million ADSs and raised $172,850,000 and other selling shareholders identified in the Prospectus, including Defendant Tan, sold 8,720,873 ADSs in the Secondary Offering raising more than $564 million. Defendant Tan personally sold 7,166,124 ADSs, representing 99% of his total holdings in the Company, and raised more than $464 million.

139.    Recognizing that Focus Media's valuation would decline after the announcement of its results for 3Q07, Defendants timed the Secondary Offering so that it was priced before the Company announced its disappointing financial results for 3Q07 in order to maximize the amount of money they could raise in the Secondary Offering.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

140.    At all relevant times, the market for Focus Media ADSs was an efficient market for the following reasons, among others:

(a)     Focus Media ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Focus Media filed periodic public reports with the SEC and the NASDAQ;

(c)     Focus Media regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Focus Media was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

141.    As a result of the foregoing, the market for Focus Media ADSs promptly digested current information regarding Focus Media from all publicly available sources and reflected such information in Focus Media's share price. Under these circumstances, all purchasers of Focus Media ADSs during the Class Period suffered similar injury through their purchase of Focus Media ADSs at artificially inflated prices and a presumption of reliance applies.

**Transaction and Loss Causation**

142.    The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

143.    As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Focus Media and its financial performance.

- 41 -

144.    The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Focus Media's business and financial performance, thus causing Focus Media ADSs to be overvalued and artificially inflated during the Class Period. Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Plaintiffs purchasing the Company's ADSs at artificially inflated prices.

145.    Defendants' improper conduct caused the damages complained of herein. When the material misstatements and omissions made by Defendants on September 27, 2007 and in the Prospectus became known to investors, on November 20, 2007 the price of Focus Media ADSs dropped from $57.15 per ADS to $52.00 per ADS, approximately 9%, on extremely heavy trading volume. The next day, on November 21, 2007, the price of Focus Media ADSs continued to decline and closed at $50.35 per ADS, an additional drop of more than 3%.

146.    As a result of these revelations, and the corresponding drop in the price of Focus Media's ADSs, Plaintiffs and Class members suffered real economic loss.

147.    Further, the timing and magnitude of Focus Media ADSs' price decline negate any inference that the losses suffered by Plaintiffs were caused by changed market conditions, microeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Focus Media and the subsequent significant decline in the value of Focus Media ADSs when the true state of the Company's operations and finances were revealed to the market and investors.

### No Safe Harbor

148.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Focus Media who knew that those statements were false when made.

149.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT IV

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against Defendants Focus Media, Jiang, Tan and Wu

150.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. In this Count, the term "Defendants" refers only to Defendants Focus Media, Jiang, Tan and Wu.

151.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)      Employed devices, schemes, and artifices to defraud;

    (b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Focus Media ADSs during the Class Period.

153.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Focus Media ADSs. Plaintiffs and the Class would not have purchased Focus Media ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

154.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Focus Media ADSs during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Jiang, Tan and Wu

155.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. In this Count, the term "Defendants" refers only to Defendants Jiang, Tan and Wu.

156.    Defendants Jiang, Tan and Wu acted as controlling persons of Focus Media within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Jiang, Tan and Wu had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants Jiang, Tan and Wu were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct giving rise to the securities violations as alleged herein, and exercised the same.

158.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Jiang, Tan and Wu are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company ADSs during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for judgment as follows:

A.    declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.    with respect to Count II, Ordering that the Secondary Offering be rescinded;

D.    awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.    awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: June 23, 2008

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN

_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

- 46 -

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

*Additional Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2008, a copy of the foregoing CONSOLIDATED

AMENDED CLASS ACTION COMPLAINT was sent, via U.S. Mail, postage prepaid to the

following parties on the attached service list.


Kelly A. Stadelmann

FOCUS MEDIA (LEAD)
Service List - 6/23/2008     (07-0271)
Page 1 of 1

**Counsel For Defendant(s)**

Herbert S. Washer
Adam S. Hakki
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-4676
   212/848-4000
   212/848-7179 (Fax)

Bruce D. Angiolillo
Jonathan K. Youngwood
Andrew D.W. Cattell
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
   212/455-2000
   212/455-2502 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
   631/367-7100
   631/367-1173 (Fax)

# Exhibit B

**Focus Media to Join Nasdaq-100 Index**

SHANGHAI, China, Dec. 17 /Xinhua-PRNewswire/ -- Focus Media Holding Limited (Nasdaq: FMCN), China's largest digital media group, today announced that the company will be added to the Nasdaq-100 Index.

At the opening of trading on Monday, December 24, 2007, Focus Media will join the Nasdaq-100 Index, which includes 100 of the largest domestic and international non-financial securities listed on Nasdaq based on market capitalization across major industry groups. Focus Media is the first Chinese media company to join the Nasdaq-100 Index.

"Focus Media is pleased to have been selected for the Nasdaq-100 Index," said Jason Jiang, chairman and CEO of Focus Media. "We will continue to further strengthen our market leadership and dedicate ourselves to creating value for our advertising clients and our investors."

About Focus Media Holding Limited

Focus Media Holding Limited (Nasdaq: FMCN) is China's leading multi- platform digital media company, operating the largest out-of-home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat-panel television displays in our network, and is also a leading provider of mobile handset advertising and Internet marketing solutions in China. Through Focus Media's multi-platform digital advertising network, the company reaches urban consumers at strategic locations and point- of-interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light-emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of September 30, 2007, Focus Media's digital out-of-home advertising network had approximately 95,398 LCD display in its commercial location network, approximately 43,315 LCD displays in its in-store network and 170,605 advertising in-elevator poster frames, installed in over 90 cities throughout China, and approximately 200 outdoor LED billboard displays in Shanghai. For more information about Focus Media, please visit our website at http://ir.focusmedia.cn .

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward- looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

For more information, please contact:

```
 Investor and Media contact:
  Jie Chen
  Tel:   +86-21-3212-4661 x6607
  Email: ir@focusmedia.cn

SOURCE  Focus Media Holding Limited
    -0-                        12/17/2007
    /CONTACT: Investor and Media contact - Jie Chen, +86-21-3212-4661 x6607,
or ir@focusmedia.cn, for Focus Media Holding Limited/
    /Web site: http://ir.focusmedia.cn /
    (FMCN)

CO:  Focus Media Holding Limited
ST:  China
IN:  ADV CPR MLM
SU:  ASI



MM
-- CNM014 --
5368 12/17/2007 07:00 EST http://www.prnewswire.com
```

# Exhibit C

# Focus Media Holding LTD (FMCN)

28-30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# F-1/A

**FOCUS MEDIA HOLDING LIMITED**
**Filed on 11/01/2007**
File Number 333-146913



GSI
LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

As filed with the U.S. Securities and Exchange Commission on November 1, 2007

Registration No. 333–146913

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Amendment No. 1
### to

# Form F–1
## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# Focus Media Holding Limited
*(Exact name of Registrant as Specified in its Charter)*

| Cayman Islands | 7311 | Not Applicable |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**Focus Media Holding Limited**
**28–30/F, Zhao Feng World Trade Building**
**369 Jiangsu Road**
**Shanghai 200050**
**China**
**(86–21) 3212–4661**
*(Address and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)*

**CT Corporation System**
**111 Eighth Avenue, 13th Floor**
**New York, New York 10011**
**(212) 894–8940**
*(Name, Address, Including Area Code, and Telephone Number, Including Area Code, of Agent for Service)*

*Copies to:*

| Chris K.H. Lin, Esq. | Thomas M. Britt III, Esq. |
|---|---|
| Simpson Thacher & Bartlett LLP | Debevoise & Plimpton LLP |
| ICBC Tower, 35th Floor | Entertainment Building, 13th Floor |
| 3 Garden Road, Central | 30 Queen's Road Central |
| Hong Kong SAR | Hong Kong SAR |
| China | China |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post–effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered(1) | Amount to be Registered(1) | Proposed Maximum Offering Price Per Ordinary Share(2) | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee |
|---|---|---|---|---|
| Ordinary Shares, par value US$0.00005 per share(4) | 78,604,365 | $11.995 | $942,859,358 | $28,946(3) |

(1)  Includes (a) all ordinary shares represented by American depositary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of the distribution or within 40 days after the later of the effective date of this registration statement and the date the securities are first

bona fide offered to the public, and (b) ordinary shares represented by American depositary shares that are issuable upon the exercise of the underwriters' option to purchase additional shares.

(2) Estimated solely for the purpose of computing the registration fee. The estimate is made pursuant to Rule 457(c) of the Securities Act of 1933, as amended, based on $11.595 per ordinary share, which is based on the average of the high and low sales prices of the Registrant's American depositary shares, as reported by the Nasdaq Stock Market on October 29, 2007.

(3) US$26,755 previously paid.

(4) American depositary shares evidenced by American depositary receipts issuable upon deposit of the ordinary shares registered hereby are included in a separate registration statement on Form F-6 (File No.: 333-141830). Each American depositary share represents five ordinary shares.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

> The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

<div align="center">

**SUBJECT TO COMPLETION, DATED NOVEMBER 1, 2007**



# Focus Media Holding Limited

### 13,720,873 American Depositary Shares
### Representing
### 68,604,365 Ordinary Shares

</div>

Focus Media Holding Limited, or Focus Media, is offering 5,000,000 American depositary shares, or ADSs, and the selling shareholders identified in this prospectus are offering an additional 8,720,873 ADSs. Each ADS represents five ordinary shares, par value $0.00005 per share of Focus Media. The ADSs may be evidenced by American depositary receipts, or ADRs. We will not receive any proceeds from the ADSs sold by the selling shareholders.

Our ADSs are quoted on the Nasdaq Global Market under the symbol "FMCN." On October 31, 2007, the last sale price for our ADSs as reported on the Nasdaq Global Market was US$62.00 per ADS.

**See "Risk Factors" beginning on page 16 to read about risks you should consider before buying the ADSs.**

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per ADS | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount | $ | $ |
| Proceeds, before expenses, to Focus Media | $ | $ |
| Proceeds, before expenses, to the selling shareholders | $ | $ |

To the extent the underwriters sell more than 13,720,873 ADSs, the underwriters have an option to purchase up to an additional 2,000,000 ADSs from us at the public offering price less the underwriting discount.

The underwriters expect to deliver the ADSs against payment in U.S. dollars in New York, New York on          , 2007.

<div align="center">

*Joint Bookrunners*

</div>

| | | |
|---|---|---|
| **Citi** | **Credit Suisse** | **Merrill Lynch & Co.** |
| | *Co-Managers* | |
| **CIBC World Markets** | | **Piper Jaffray** |

<div align="center">

Prospectus dated          , 2007.

</div>

## TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 16 |
| Forward-Looking Statements | 43 |
| Our Corporate Structure | 45 |
| Use of Proceeds | 50 |
| Dividend Policy | 51 |
| Market Price Information for Our ADSs | 52 |
| Capitalization | 53 |
| Exchange Rates | 54 |
| Selected Consolidated Financial and Operating Data | 56 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 60 |
| Business | 88 |
| Our Recent Significant Acquisitions | 101 |
| Regulation of Our Industry | 105 |
| Management | 110 |
| Principal and Selling Shareholders | 120 |
| Related Party Transactions | 124 |
| Description of Share Capital | 130 |
| Description of American Depositary Shares | 138 |
| Shares Eligible for Future Sale | 147 |
| Taxation | 150 |
| Underwriting | 154 |
| Enforcement of Civil Liabilities | 159 |
| Legal Matters | 160 |
| Experts | 160 |
| Where You Can Find Additional Information | 160 |
| Index to Consolidated Financial Statements – Focus Media | F–1 |
| Index to Consolidated Financial Statements – Allyes | F–59 |
| Index to Consolidated Financial Statements – Target Media | F–80 |
| Index to Consolidated Financial Statements – InfoAchieve | F–111 |
| Index to Unaudited Pro Forma Condensed Consolidated Financial Information | P–1 |
| EX–1.1 UNDERWRITING AGREEMENT | |
| EX–23.1 CONSENT OF DELOITTE TOUCHE TOHMATSU | |
| EX–23.5 CONSENT OF KPMG | |

i

Table of Contents

## PROSPECTUS SUMMARY

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in the ADSs discussed under "Risk Factors", before deciding whether to buy our ADSs.*

*As used in this prospectus, references "Focus Media", "we", "us" and "our" are to Focus Media Holding Limited and its consolidated subsidiaries and affiliates. References to "Framedia" are to Infoachieve Limited and its consolidated subsidiary and affiliates, including Shenzhen E–Times Advertising Co., Ltd., or E–Times Advertising, and its affiliates. References to Target Media are to Target Media Holdings Limited and its consolidated subsidiaries and affiliates. References to "Focus Media Wireless" are to Dotad Holdings Limited and its consolidated subsidiary and affiliate. References to "ACL" are to Appreciate Capital Limited, in which we hold a 70% equity interest and through which we initially acquired our movie theater network. References to "Allyes" are to Allyes Information Technology Co., Ltd. and its consolidated subsidiaries and affiliates.*

### Our Business

We are China's leading multi–platform digital media company, operate the largest out–of–home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat–panel television displays in our network, and also are a leading provider of Internet marketing solutions in China. It is our goal to create the largest multi–platform digital advertising network in China, reaching urban consumers at strategic locations and point–of–interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light–emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of June 30, 2007, our out–of–home advertising network consists of our digital out–of–home advertising network, our mobile handset advertising network and our Internet advertising services network:

***Our Digital Out–of–home Advertising Network*** which focuses on providing out–of–home advertising through liquid crystal display or LCD flat–panel televisions displays, LED billboards, movie screens, and poster and digital frames, includes our commercial location network, in–store network and poster frame network:

- ***our commercial location network***, which consists of:

  - *our LCD display network*, which refers to our network of flat–panel television displays placed in high–traffic areas of commercial and public buildings marketed to advertisers as a network or as seven separate channels targeting different types of consumers — our premier A and B office building channels, travel, fashion, elite, IT mall and healthcare channels;

  - *our outdoor LED billboard network*, which refers to our network of leased 5' x 5' LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai; and

  - *our movie theater advertising network*, which refers to our right to sell advertising time on movie screens for the three minutes prior to movie screenings at movie theaters in China.

- ***our in–store network***, which refers to our network of flat–panel television displays placed in specific product areas inside stores with high–traffic concentrations such as selected consumer product sections, the main aisles and check–out lines in large–scale chain retail stores, or hypermarkets, as well as inside selected supermarkets and convenience stores; and

- ***our poster frame network***, which refers to our network of traditional and digital advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

***Our Mobile Handset Advertising Network***, which refers to our mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS,

1

Table of Contents

offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

*Our Internet Advertising Services Network*, which refers to our Internet advertising agency and advertising services technology, including performance–based software suites.

We derive revenue principally by:

- selling advertising time slots on our out–of–home television networks, which include our commercial location network and our in–store network;

- by selling frame space on our poster and digital frame network;

- selling advertisements on our mobile handset advertising network; and

- providing advertising agency and technology services and software for online advertising.

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day. Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. Our advertising posters include both traditional printed posters as well as digital LCD poster frames with integrated sound, all–angle and remote control technologies. Generally two or three advertising poster frames can be placed in each elevator.

Advertisements on our mobile phone advertising network are advertisements that are sent to mobile phone users over China Mobile and China Unicom's networks.

Our Internet advertising services network, which we acquired through our acquisition of Allyes in March 2007, uses proprietary software applications provide online ad publishing, creative production, tracking, targeting, and performance analysis. We also provide performance–based online advertising services providing advertisers with pay by CPA (cost–per–action), which directly links advertising cost with performance. Our Internet advertising services network has integrated advertising resources from over 5,000 popular websites, making it the largest performance–based online advertising network in China.

As of December 31, 2006, over 4,000 advertisers purchased advertising time on our advertising networks. Our five largest advertising clients in terms of revenue, which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of June 30, 2007, we operated our commercial location network directly in over fifty major cities throughout China, including Beijing, Shanghai, Guangzhou and Shenzhen. As of June 30, 2007, we covered approximately 40 additional cities through contractual arrangements with regional distributors. Between January 1, 2005 and June 30, 2007, the number of displays in our commercial location network increased from 15,415 to 89,687. As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200 leased 5' x 5' digital billboards placed along curbsides in high–pedestrian traffic areas in Shanghai. We had installed over 161,435 advertising poster frames and our in–store network consisted of 41,322 flat–panel displays placed in 3,995 store locations in our directly operated cities, including 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores.

For the six months ended June 30, 2007, we recorded total revenues of $170.6 million and net income of $54.0 million as compared to total revenues of $83.3 million and net income of $26.1 million for the six months ended June 30, 2006. In 2006, we recorded total revenues of $211.9 million and net income of $83.2 million as compared to total revenues of $68.2 million and net income of $23.5 million in 2005.

2

Table of Contents

<center>Our Strategies, Risks and Uncertainties</center>

Our objective is to become the leading multi–platform digital media brand in China's advertising industry. We intend to achieve this objective by implementing the following strategies:

- Enhance our market position and revenues by expanding our networks;

- Identify and create new networks and advertising channels that target specific consumer demographics and expand network capacity;

- Promote our brand name and augment our service offerings to attract a wider client base and increase revenues; and

- Continue to explore new digital media opportunities to target segmented consumer groups.

See "Business — Strategies" for additional details on our strategies.

Our ability to realize our business objectives and execute our strategies is subject to risks and uncertainties, including the following:

- our ability to successfully integrate and manage our recently acquired entities, businesses and networks into our existing business;

- our limited operating history for our current operations and the short history of the out–of–home television advertising sector that make it difficult for you to evaluate the viability and prospects of our business;

- competition from present and future competitors in China's growing advertising market, particularly large multi–national advertisers that may now more readily compete in China;

- our limited ability to control and oversee the everyday business activities or regulatory compliance of our regional distributors; and

- the possibility that the PRC government could determine that our operating structure does not comply with PRC government restrictions on foreign investment in the advertising industry, which could potentially subject us to severe penalties.

See "Risk Factors" and other information included in this prospectus for a discussion of these and other risks.

<center>Our Corporate History and Structure</center>

We were incorporated on April 11, 2003 as an international business company formed under the laws of the British Virgin Islands, and changed our corporate domicile to the Cayman Islands on April 1, 2005. Our ADSs representing our ordinary shares have been quoted on the Nasdaq Global Market Inc. since our initial public offering on July 13, 2005. Due to PRC government restrictions that apply to foreign investment in China's advertising industry, our advertising business is currently conducted through contractual arrangements among us, our subsidiaries and our consolidated affiliated entities in China. Focus Media Advertisement, several of its subsidiaries and Shanghai New Focus Media Advertisement Co., Ltd., or New Focus Media Advertisement, Shanghai New Structure Advertisement Co., Ltd., or New Structure Advertisement, Shanghai Framedia Advertisement Development Co., Ltd., or Framedia Advertisement, Guangdong Shiji Shenghuo Advertisement Co., Ltd., or Guangdong Framedia, Beijing Focus Media Wireless Co., Ltd., or Focus Media Wireless, and seven PRC entities affiliated with Allyes hold the requisite licenses to provide advertising services in China. Except for New Focus Media Advertisement, which is our indirect subsidiary, we refer to these companies collectively as our PRC operating affiliates. These contractual arrangements enable us to:

- exercise effective control over our PRC operating affiliates and their respective subsidiaries;

- receive a substantial portion of the economic benefits from our PRC operating affiliates and their respective subsidiaries; and

<center>3</center>

Table of Contents

- have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries, as well as all or part of the assets of Focus Media Advertisement, in each case when and to the extent permitted by PRC law.

See "Our Corporate Structure" and "Related Party Transactions" for further information on our contractual arrangements with these parties.

### Recent Developments

*Audit Committee Investigation.* As a result of an audit committee investigation prompted by allegations raised by the U.S. counsel representing an anonymous investor, we failed to timely file our 2006 annual report on Form 20–F. The unnamed investor, described as holding a short position in our ADSs at the time of the allegations in June 2007, alleged that: (a) Everease, a company previously run by our founder and CEO, Jason Jiang, is a related party as a result of ongoing ties between Everease and Mr. Jiang and members of Mr. Jiang's family; and (b) we made undisclosed rebate payments to a third–party advertising agency through Everease in order to inflate our reported financial performance. Our audit committee commenced an investigation of the allegations on June 28, 2007. It hired independent U.S. legal counsel and independent forensic accountants, who reviewed documents and interviewed witnesses. On September 25, 2007, the audit committee completed its investigation and discussed the results with our independent registered public accounting firm. Based upon its review of the evidence, the audit committee concluded that nothing had come to its attention — apart from the initial allegations that gave rise to the investigation — that would cause the audit committee to believe that we made undisclosed rebate payments to a third party advertising agency through Everease. We informed the investigators that we concluded that Everease is a related party based upon information developed during the investigation. See "Related Party Transactions" for further information on our contractual arrangements with Everease. On September 25, 2007, we filed our 2006 annual report on Form 20–F.

*Appointment of Director.* On September 28, 2007, we appointed David Ying Zhang as our independent director, bringing our total number of directors to nine and giving us a majority of independent directors on our board. See "Management".

*Compliance with Nasdaq Listing Requirements.* On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our 2006 annual report on Form 20–F.

### OUR OFFICES

Our principal executive offices are located at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China, and our telephone number is (86–21) 3212–4661. Our website address is http://www.focusmedia.cn. The information on our website does not form part of this prospectus.

### CONVENTIONS THAT APPLY TO THIS PROSPECTUS

This prospectus contains translations of Renminbi amounts into U.S. dollars at specified rates solely for the convenience of the reader. Unless otherwise noted, all translations from Renminbi to U.S. dollars were made at the noon buying rate in New York, New York for cable transfers in Renminbi per U.S. dollar as certified for customs purposes by the Federal Reserve Bank of New York, or the noon buying rate, as of June 30, 2007, which was RMB 7.6120 to $1.00. We make no representation that the Renminbi amounts referred to in this prospectus could have been or could be converted into U.S. dollars at any particular rate or at all. On October 31, 2007, the noon buying rate was RMB 7.4682 to $1.00.

Unless we indicate otherwise, all information in this prospectus reflects the following:

- no exercise by the underwriters of their option to purchase up to 2,000,000 additional ADSs representing 10,000,000 ordinary shares;

4

Table of Contents

- all share splits, so that share number, per share price and par value data is presented as if the share splits had occurred from our inception; and

- our ADS–to–share ratio change on April 12, 2007, so that all ADS trading prices are presented as if the ratio change had occurred from the original listing of our ADSs on the Nasdaq Global Market in July 2005.

5

Table of Contents

## The Offering

The following assumes that the underwriters do not exercise their option to purchase additional ADSs in the offering, unless otherwise indicated.

| | |
|---|---|
| Offering price | $ per ADS |
| ADSs offered by Focus Media | 5,000,000 ADSs |
| ADSs offered by the selling shareholders | 8,720,873 ADSs |
| ADSs outstanding after this offering | 111,930,414 ADSs |
| Ordinary shares outstanding after this offering | 643,144,062 ordinary shares |
| ADS to ordinary share ratio | 1:5 |
| Nasdaq Global Market symbol | "FMCN" |
| The ADSs | Each ADS represents five ordinary shares, par value $0.00005 per share. The ADSs may be evidenced by American depositary receipts, or ADRs. The depositary will be the holder of the ordinary shares underlying your ADSs and you will have rights as provided in the amended and restated deposit agreement, or the deposit agreement. Although we do not expect to pay dividends in the foreseeable future, in the event we declare dividends on our ordinary shares, the depositary will pay you the cash dividends and other distributions it receives on our ordinary shares, after converting the funds received into U.S. dollars and deducting its fees and expenses. You may surrender your ADSs to the depositary to withdraw the ordinary shares underlying your ADSs. The depositary will charge you fees for such surrenders and withdrawals. We may amend or terminate the deposit agreement without your consent, and if you continue to hold your ADSs, you agree to be bound by the deposit agreement as amended. You should carefully read the section in this prospectus entitled "Description of American Depositary Shares" to better understand the terms of our ADSs. You should also read the form amended and restated deposit agreement, which is incorporated by reference as an exhibit to the registration statement on Form F–6 (File No. 333–141820). |
| Lock–up Agreements | We have agreed with the underwriters that we will not, without the prior consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated, or Merrill Lynch, for a period of 90 days following the date of this prospectus: (1) offer, sell, contract to sell, pledge, grant any option to purchase, make any share sale or otherwise dispose of any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or (2) enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares subject to certain exceptions. The restrictions above do not apply, among other items, to the ADSs to be sold in this offering and the ordinary shares underlying such ADSs. See "Shares Eligible for Future Sale" and "Underwriting". |
| Depositary | Citibank, N.A. |

6

Table of Contents

| | |
|---|---|
| Option to purchase additional ADSs | We have granted the underwriters an option, exercisable within 30 days from the date of this prospectus, to purchase up to an additional 2,000,000 ADSs. |
| Timing and settlement for ADSs | The ADSs are expected to be delivered against payment on        , 2007. The ADR evidencing the position of The Depository Trust Company, or DTC, with respect to the ADSs will be updated to reflect the number of ADSs sold hereunder and will continue to be safe kept by a custodian for, and registered in the name of a nominee of DTC in New York, New York. In general, beneficial interests in the ADSs will be shown on, and transfers of these beneficial interests will be effected only through, records maintained by DTC and its direct and indirect participants. |
| Use of proceeds | Our net proceeds from this offering are expected to be approximately $299.2 million, or approximately $419.5 million if the underwriters exercise their over-allotment option in full based on an assumed public offering price of US$62.00 per ADS which was the last trading price of our ADSs on October 31, 2007. We anticipate using the net proceeds of this offering to fund potential acquisitions. We may use any remaining amounts for our future general corporate purposes. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of risks you should carefully consider before deciding to invest in our ADSs. |

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL AND OPERATING DATA

The following summary consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financial statements, which include the consolidation of Focus Media Advertisement, two entities operating Framedia, Focus Media Wireless and the entities that operate our Internet advertising services network as variable interest entities, thereafter, and are presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our statements of operations for 2004, 2005 and 2006 and our balance sheets as of December 31, 2005 and 2006 are derived from those financial statements that have been included elsewhere in this prospectus. Our statement of operations for each of the six months ended June 30, 2006 and 2007 and balance sheet data as of June 30, 2006 and 2007 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus.

Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The summary consolidated financial information for the periods and as of the dates indicated should be read in conjunction with those statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we were an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out–of–home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in–store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless. In March 2007, we acquired Allyes.

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | | | | (In thousands of U.S. dollars) | | | |
| **Summary Consolidated Statements of Operations Data:** | | | | | | | |
| Gross Advertising Service revenues | $ 24 | $ 3,671 | $ 29,109 | $ 73,419 | $ 231,186 | $ 90,680 | $ 183,517 |
| Net Advertising Service revenues: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location*[1] | — | $ 3,369 | $ 26,321 | $ 61,435 | $ 132,061 | 51,819 | 82,704 |
| *In–store network*[1] | | | | 5,469 | 26,907 | 11,832 | 13,882 |
| *Poster frame network*[1] | — | — | — | — | 40,904 | 15,845 | 31,217 |
| Mobile handset advertising[1] | — | — | — | — | 10,101 | 3,076 | 16,890 |
| Internet advertising services[1] | | | | | — | — | 25,236 |
| | | | | | | | |
| Advertising service revenue[1] | | 3,369 | 26,321 | 66,904 | 209,973 | 82,572 | 169,929 |
| Other revenues | — | 389 | 2,889 | 1,325 | 1,932 | 690 | 687 |
| | | | | | | | |
| Total net revenues | 24 | 3,758 | 29,210 | 68,229 | 211,905 | 83,262 | 170,616 |
| | | | | | | | |
| Cost of revenues: | | | | | | | |
| Net advertising service cost: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location* | — | 1,566 | 6,804 | 18,325 | 42,836 | 19,713 | 30,767 |
| *In–store network* | — | — | — | 7,423 | 18,106 | 8,367 | 10,214 |
| *Poster frame network* | — | — | — | — | 13,621 | 6,014 | 10,011 |

8

Table of Contents

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | | | (In thousands of U.S. dollars) | | | | |
| Mobile Handset Advertising | — | — | — | — | 6,052 | 2,405 | 7,323 |
| Internet Advertising | — | — | — | — | — | — | 18,405 |
| Advertising service cost | — | 1,566 | 6,804 | 25,748 | 80,615 | 36,499 | 76,720 |
| Other costs | — | 275 | 1,934 | 976 | 765 | 312 | 303 |
| Total cost of revenues | — | 1,841 | 8,738 | 26,724 | 81,380 | 36,811 | 77,023 |
| Gross profit | 24 | 1,917 | 20,472 | 41,505 | 130,525 | 46,451 | 93,593 |
| Operating expenses: | | | | | | | |
| General and administrative | 21 | 985 | 3,988 | 9,120 | 25,723 | 10,693 | 20,329 |
| Selling and marketing | 3 | 407 | 3,473 | 9,599 | 25,762 | 9,783 | 23,041 |
| Other operating income | — | — | — | — | (1,338) | (157) | (2,384) |
| Goodwill impairment loss | — | — | 58 | — | — | — | — |
| Total operating expenses | 24 | 1,392 | 7,519 | 18,719 | 50,147 | 20,319 | 40,986 |
| Income from operations | — | 525 | 12,953 | 22,786 | 80,378 | 26,132 | 52,607 |
| Interest income | — | 1 | 10 | 1,812 | 4,560 | 1,781 | 4,634 |
| Interest expenses | — | — | — | (50) | (305) | (288) | (7) |
| Other income | — | — | 54 | 70 | 271 | (11) | 252 |
| Other expenses | — | (9) | (58) | (231) | (558) | (470) | (212) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | — | (11,692) | — | — | — | — |
| Income before income taxes and minority interest | — | 517 | 1,267 | 24,387 | 84,346 | 27,144 | 57,274 |
| Total income taxes | — | (482) | (908) | (694) | (1,044) | (989) | (3,286) |
| Minority interest | — | 8 | 13 | (145) | (105) | (51) | 18 |
| Equity loss of affiliates | — | (18) | — | — | — | — | — |
| Net income | — | $ 25 | $ 372 | $ 23,548 | $ 83,197 | 26,104 | 54,006 |

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Earnings per share data: | | | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | (8,308) | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | (2,191) | — | — | — | — |
| Deemed dividend on Series C-1 convertible redeemable preference shares | — | — | (13,356) | — | — | — | — |

9

| | For the Year Ended December 31, | | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
| | (In thousands of U.S. dollars, except share and per share data) | | | | | | |
| Premium of Series B convertible redeemable preference shares | — | — | 12,906 | — | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ — | $ 25 | $ (10,577) | $ 23,548 | $ 83,197 | $ 26,104 | $ 54,006 |
| Income (loss) per share — basic | $ — | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ — | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income per share | — | 144,657,600 | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income per share | — | 144,657,600 | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

| | As of December 31, | | | | | As of June 30, 2007 | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | Actual | As adjusted(2)(3) |
| | (In thousands of U.S. dollars, except share data) | | | | | | |
| **Consolidated Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | $ 15 | $ 716 | $ 22,669 | $ 36,653 | $ 164,611 | $ 187,592 | $ 486,792 |
| Other current assets(4) | 106 | 1,902 | 12,713 | 104,988 | 78,712 | 240,632 | 240,632 |
| Non–current assets | 8 | 2,688 | 21,033 | 70,713 | 862,919 | 1,098,745 | 1,098,745 |
| Total assets | 129 | 5,306 | 56,415 | 212,354 | 1,106,242 | 1,526,969 | 1,826,169 |
| Current liabilities | 7 | 4,119 | 8,634 | 20,694 | 51,837 | 113,069 | 113,069 |
| Non–current liabilities | — | — | — | — | 3,303 | 6,132 | 6,132 |
| Total liabilities | 7 | 4,119 | 8,634 | 20,694 | 55,140 | 119,201 | 119,201 |
| Minority interest | — | 4 | 81 | 245 | 358 | 447 | 447 |
| Mezzanine equity | — | — | 53,273 | — | — | — | — |
| Ordinary shares (nil, 200,000,000, 142,464,600, 378,306,000 and 534,896,873 and 611,242,827 shares issued and outstanding in 2002, 2003, 2004, 2005 and 2006 and June 30, 2007, respectively) | — | 10 | 7 | 19 | 27 | 31 | 32 |
| Other shareholders' equity (deficiency) | 122 | 1,173 | (5,580) | 191,396 | 1,050,717 | 1,407,290 | 1,706,489 |
| Total liabilities and shareholders' equity (deficiency) | $ 129 | $ 5,306 | $ 56,415 | $ 212,354 | $ 1,106,242 | $ 1,526,969 | $ 1,826,169 |

Table of Contents

| | As of December 31, | | | As of June 30, |
| --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location: | | | | |
| Our direct cities | 12,786 | 45,049 | 80,263 | 85,010 |
| Our regional distributors[5] | 2,629 | 3,177 | 5,197 | 4,677 |
| Total | 15,415 | 48,226 | 85,460 | 89,687 |
| Number of displays in our in-store network | — | 27,849 | 38,742 | 41,322 |
| Number of stores in our in-store network | — | 4,130 | 3,898 | 3,995 |
| Number of installed frames in our poster frame network[6] | — | — | 99,784 | 161,435 |

(1) Advertising service revenue is presented net of which includes business tax of 5.55% and cultural industries tax of ranging from 0% to 4.0% of our gross advertising service revenue. The following table sets forth the business tax incurred on our revenues for the periods indicated:

| | For the Year Ended December 31, | | | For the Six Months Ended June 30 | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | (In thousands of U.S. dollars) | | |
| **Business sales taxes:** | | | | | |
| Digital out-of-home | | | | | |
| *Commercial locations* | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
| *In-store network* | — | 524 | 2,803 | 1,221 | 1,442 |
| *Poster frame network* | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile Handset Advertising** | — | — | 779 | 289 | 398 |
| **Internet Advertising Services** | — | — | — | — | 1,182 |
| Total business sales taxes | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

(2) Our consolidated balance sheet data as of June 30, 2007 are adjusted to give effect to the issuance and sale of 5,000,000 ADSs by us in this offering, based on an assumed public offering price of US$62.00 per ADS which was the last trading price of our ADSs on October 31, 2007, after deducting estimated underwriting discounts, commissions and estimated offering expenses payable by us and assuming no exercise of the underwriters' over-allotment option.

(3) A US$1.00 increase (decrease) in the assumed public offering price of US$62.00 per ADS would increase (decrease) the amounts representing cash and cash equivalents, total assets and other shareholders' equity, and total liabilities and shareholders' equity by US$4.85 million.

(4) Other current assets are equal to total current assets less cash and cash equivalents.

(5) Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(6) Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

11

Table of Contents

## CONSOLIDATED PRO FORMA FINANCIAL DATA OF FOCUS MEDIA, TARGET MEDIA AND ALLYES

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes thereto. Financial information with respect to the acquisitions is derived from the historical financial statements and management accounts of Target Media Holdings Limited, or Target Media and Allyes Information Technology Company Limited, or Allyes, appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with US GAAP. These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Target Media and Allyes. The acquired businesses have permitted us to expand our network of out–of–home consumers and to expand into the Internet advertising services business.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2006 presents adjustments as if the acquisitions of Target Media and Allyes had been consummated on January 1, 2006. The unaudited pro forma condensed consolidated statement of operations for the six months ended June 30, 2007 presents adjustments as if the acquisition of Allyes had been consummated on January 1, 2007.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Allyes, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006, and the financial information of Allyes for the period between January 1, 2007 and March 28, 2007, the respective dates of the acquisitions, have not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information for the two–month period ended February 28, 2006 and the period from January 1, 2007 through March 28, 2007 of Target Media and Allyes, respectively, that has been used to calculate the pro forma financial information for the six–month and twelve–month periods ended June 30, 2007 and December 31, 2006, may differ significantly from any actual consolidated statements of operations had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm, and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

12

Table of Contents

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**
**For the Year Ended December 31, 2006**

| | Focus Media For the year ended December 31, 2006 | Allyes For the year ended December 31, 2006 | Target Media For the two months ended February 28, 2006 | Pro forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|---|---|
| | (in thousands of U.S. dollars, except share data) | | | | | |
| **Net Revenues:** | | | | | | |
| Advertising Service Revenue | $ 209,973 | $ 47,235 | $ 3,068 | | | $ 260,276 |
| Other Revenue | 1,932 | 1,899 | — | | | 3,831 |
| Total net revenues | 211,905 | 49,134 | 3,068 | | | 264,107 |
| **Cost of Revenues:** | | | | | | |
| Advertising Service Cost | 80,615 | 37,821 | 3,792 | 3,000 | (1) | 125,229 |
| Other Cost | 765 | — | — | | | 765 |
| Total cost of revenues | 81,380 | 37,821 | 3,792 | | | 125,994 |
| Gross profit | 130,525 | 11,313 | (724) | | | 138,114 |
| **Operating expenses (income):** | | | | | | |
| General and administrative | 25,723 | 6,525 | 2,541 | | | 34,789 |
| Selling and marketing | 25,762 | 4,376 | 3,114 | 1,880 | (1) | 35,132 |
| Research and development | — | 649 | — | | | 649 |
| Amortization of acquired Intangible Assets | | | | 205 | (1) | 205 |
| Other operating income | (1,338) | — | — | | | (1,338) |
| Total operating expenses | 50,147 | 11,550 | 5,665 | | | 69,437 |
| Income from operations | 80,378 | (237) | (6,379) | | | 68,676 |
| Interest income | 4,560 | 584 | — | | | 5,144 |
| Interest expense | (305) | — | (23) | | | (328) |
| Other income | 271 | 201 | — | | | 472 |
| Other expense | (558) | (40) | (1,755) | | | (2,354) |
| Income before income taxes and minority interests | 84,346 | 508 | (8,158) | | | 71,610 |
| Income taxes | 1,044 | 1,003 | (59) | | | 1,987 |
| Net income after income taxes before minority interests | 83,302 | (495) | (8,098) | | | 69,623 |
| Minority interests | 105 | — | (30) | | | 74 |
| Net income attributable to holders of ordinary shares | $ 83,197 | $ (495) | $ (8,068) | | | $ 69,549 |
| Income per share — basic | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating basic income per share | 505,411,079 | | | | (2) | 537,826,734 |
| Income per share — diluted | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating diluted income per share | 521,536,381 | | | | (2) | 553,952,036 |

13

Table of Contents

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**
**For the Six Months Ended June 30, 2007**

| | Focus Media For the Six Months Ended June 30, 2007 | Allyes For the Three Months Ended March 28, 2007 | Pro Forma Adjustment | Notes | Pro Forma |
|---|---|---|---|---|---|
| | (In thousands of U.S. dollars, except share data) | | | | |
| **Net Revenues:** | | | | | |
| Advertising Service Revenue | $ 169,929 | $ 10,350 | | | $ 180,279 |
| Other Revenue | 687 | 239 | | | 926 |
| Total net revenues | 170,616 | 10,589 | | | 181,205 |
| **Cost of Revenues:** | | | | | |
| Advertising Service Cost | 76,720 | 9,303 | 750 | (1) | 86,773 |
| Other Cost | 303 | — | | | 303 |
| Total cost of revenues | 77,023 | 9,303 | | | 87,076 |
| Gross profit | 93,593 | 1,286 | | | 94,128 |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 20,329 | 8,049 | | | 28,378 |
| Selling and marketing | 23,041 | 1,344 | 470 | (1) | 24,855 |
| Research and development | — | 199 | | | 199 |
| Other operating income | (2,384) | — | | | (2,384) |
| Total operating expenses | 40,986 | 9,592 | | | 51,048 |
| Income/(loss) from operations | 52,607 | (8,306) | | | 43,080 |
| Interest income | 4,634 | 27 | | | 4,661 |
| Interest expense | (7) | — | | | (7) |
| Other income | 252 | 1 | | | 253 |
| Other expense | (212) | — | | | (212) |
| Income/(loss) before income taxes and minority interests | 57,274 | (8,278) | | | 47,775 |
| Income taxes: | 3,286 | (157) | | | 3,129 |
| Net income/(loss) after income taxes before minority interests | 53,988 | (8,121) | | | 44,646 |
| Minority interests | (18) | — | | | (18) |
| Net income/(loss) attributable to holders of ordinary shares | $ 54,006 | $ (8,121) | | | $ 44,664 |
| Income per share — basic | $ 0.10 | | | | $ 0.08 |
| Shares used in calculating basic income per share | 560,510,907 | | | (2) | 580,479,987 |
| Income per share — diluted | $ 0.09 | | | | $ 0.07 |
| Shares used in calculating diluted income per share | 577,365,911 | | | (2) | 597,334,991 |

14

Table of Contents

(1) Reflects amortization for the acquired intangibles recorded as a result of our acquisition of Allyes in March 2007 as if the acquisition had been consummated on January 1, 2006.

The aggregate purchase price of $224.7 million of Allyes is comprised of the following:

|  | | (In thousands of U.S. dollars) |
| --- | --- | --- |
| Cash consideration | $ | 70,000 |
| Fair Value of ordinary shares issued | | 154,698 |
|  | $ | 224,698 |

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

Preliminary purchase price allocation:

|  | (In thousands of U.S. dollars) | Amortization Period |
| --- | --- | --- |
| Net tangible assets acquired | 21,957 | |
| Acquired intangible assets | 36,095 | 1–7 years |
| Goodwill | 166,646 | |
| Total | $    224,698 | |

The preliminary purchase price allocation and preliminary intangible asset valuations described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

Additional payment of up to 9,662,458 ordinary shares may be made contingent upon Allyes attaining certain earning target in 12-months period ended March 28, 2008.

The amortization expense for Allyes of $4,879,893 and $1,219,973 for the year ended December 31, 2006 and three months ended March 28, 2007, respectively have been estimated based on a valuation report provided by a third-party valuation firm.

The amortization expense for Target Media of $205,350 for the two months ended February 28, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(2) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

|  | December 31, 2006 | June 30, 2007 |
| --- | --- | --- |
|  | 505,411,079 | 560,510,907 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 537,826,734 | 580,479,987 |

|  | December 31, 2006 | June 30, 2007 |
| --- | --- | --- |
|  | 521,536,381 | 577,365,911 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 553,952,036 | 597,334,991 |

15

Table of Contents

# RISK FACTORS

*You should consider carefully all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in our ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

## Risks Relating to Our Business and Industry

*Our failure to timely file our 2006 annual report on Form 20-F as a result of allegations raised by an anonymous investor holding a short position in our ADSs may subject us to shareholder litigation, which may materially and adversely affect our business.*

As a result of the audit committee investigation of allegations raised by attorneys representing an anonymous investor, we failed to timely file our 2006 annual report on Form 20-F. The unnamed investor, described as currently holding a short position in our ADSs, alleged that: (a) Everease, a company previously run by our founder and CEO, Jason Jiang, is a related party as a result of ongoing ties between Everease and Mr. Jiang and members of Mr. Jiang's family; and (b) we were making undisclosed rebate payments to a third-party advertising agency through Everease in order to inflate our reported financial performance.

Our audit committee commenced its investigation of the allegations on June 28, 2007. It hired independent U.S. legal counsel and independent forensic accountants, who reviewed documents and interviewed witnesses.

On September 25, 2007, our audit committee completed its previously disclosed investigation into allegations made by U.S. counsel to an investor described as holding a short position in our stock. The results of the investigation have been discussed with our independent registered public accounting firm. Based upon its review of the evidence, the audit committee concluded that nothing had come to its attention — apart from the initial allegations that gave rise to the investigation — that would cause the audit committee to believe that we made undisclosed rebate payments to a third party advertising agency through another advertising agency, namely, Everease. We have informed the investigators that we have concluded that Everease is a related party based upon information developed during the investigation. Based upon its review of the evidence, the audit committee concurs with our conclusion that Everease should be deemed a related party. For detailed descriptions of our related party transactions with Everease, see "Related Party Transactions — Transactions with Everease; "— Other Related Party Transactions — Loan from Relative of Jason Nanchun Jiang." On September 25, 2007, we filed our 2006 annual report on Form 20-F.

Our failure to timely file our 2006 annual report on Form 20-F as a result of the allegations subjected us to delisting review by the Nasdaq Listing Qualifications Panel. We received a Nasdaq Staff Determination letter on July 10, 2007 that we were not in compliance with the filing requirement for continued listing as set forth in Nasdaq Marketplace Rule 4320(e)(12). On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our 2006 annual report on Form 20-F.

In addition, as a result of these allegations, we may be subject to shareholder litigation, which may divert the attention of our management and force us to expend resources to defend against such claims. Any litigation may have a material and adverse effect on our business and future results of operations.

*The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent registered public accounting firm and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information.*

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Target Media and Allyes, it is not intended to show how

16

Table of Contents

the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period.

In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006 (date of acquisition) and Allyes for the period between January 1, 2007 and March 28, 2007 (date of acquisition) has not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information of Target Media and Allyes for that period, including the statements of operations relating to Target Media and Allyes, that has been used to calculate the pro forma financial information as of and for the year ended December 31, 2006 and six-month period ended June 30, 2007 may differ significantly from any actual consolidated financial information had it been audited or reviewed by an independent registered public accounting firm. See "Consolidated Pro Forma Financial Data of Focus Media, Target Media and Allyes".

### We have a limited operating history, which may make it difficult for you to evaluate our business and prospects.

We began operations of our commercial location network in May 2003. In addition, we have operated our in-store network since April 2005 and acquired and began to operate our poster frame network from January 2006 under the brand name "Framedia". In March 2006, September 2006 and March 2007, respectively, we added a mobile handset advertising network, an outdoor LED billboard advertising network, a movie theater advertising network and an Internet advertising services network to our business. Accordingly, we have a very limited operating history for our current operations upon which you can evaluate the viability and sustainability of our business and its acceptance by advertisers and consumers. It is also difficult to evaluate the viability of our use of audiovisual advertising displays in commercial buildings, hypermarkets, supermarkets and convenience stores and other out-of-home commercial locations and our use of advertising poster frames in residential complexes, SMS-, MMS- and WAP-based mobile handset advertising and Internet advertising services as a business model because we do not have sufficient experience to address the risks frequently encountered by early stage companies using new forms of advertising media and entering new and rapidly evolving markets. These circumstances may make it difficult for you to evaluate our business and prospects.

### We derive a substantial majority of our revenues from the provision of advertising services, and advertising is particularly sensitive to changes in economic conditions and advertising trends.

Demand for advertising time slots and advertising frame space on our networks, and the resulting advertising spending by our clients, is particularly sensitive to changes in general economic conditions and advertising spending typically decreases during periods of economic downturn. Advertisers may reduce the money they spend to advertise on our networks for a number of reasons, including:

- a general decline in economic conditions;

- a decline in economic conditions in the particular cities where we conduct business;

- a decision to shift advertising expenditures to other available advertising media; or

- a decline in advertising spending in general.

A decrease in demand for advertising media in general and for our advertising services in particular would materially and adversely affect our ability to generate revenue from our advertising services, and our financial condition and results of operations.

### Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period in the future.

Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period based on the seasonality of consumer spending and corresponding advertising trends in China. In addition, advertising spending generally tends to decrease during January and February each year due to the Chinese Lunar New Year holiday. We also experience a slight decrease in revenues during the hot summer months of July and

17

Table of Contents

August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. As a result, you may not be able to rely on period to period comparisons of our operating results as an indication of our future performance. Factors that are likely to cause our operating results to fluctuate, such as the seasonality of advertising spending in China, a deterioration of economic conditions in China and potential changes to the regulation of the advertising, Internet and wireless communications industries in China, are discussed elsewhere in this prospectus. If our revenues for a particular quarter are lower than we expect, we may be unable to reduce our operating expenses for that quarter by a corresponding amount, which would harm our operating results for that quarter relative to our operating results from other quarters.

***Our failure to maintain existing relationships or obtain new relationships with businesses that allow us to access to desirable locations and platforms on which we operate our network could harm or reverse our growth potential and our ability to increase our revenues.***

Our ability to generate revenues from advertising sales depends largely upon our ability to provide large networks of flat–panel displays placed in desirable building, commercial and store locations, of advertising poster frames placed in residential complexes, to secure desirable locations of large outdoor LED digital billboards, throughout major urban areas in China and access to wireless communications and Internet service providers. We also depend on the ability of our third–party location provider to secure desirable LED digital billboard locations for our outdoor LED network. This, in turn, requires that we develop and maintain business relationships with real estate developers, landlords, property managers, hypermarkets, retailers and other businesses and locations in which we rent space for our displays and digital billboards, and wireless communications network and Internet service providers and websites. Although a majority of our display placement agreements and advertising frame placement agreements have terms ranging from three to five years and two to three years, respectively, and upon expiration give us the right to renew the agreement on terms no less favorable than those offered by competing bidders, we may not be able to maintain our relationships with them on satisfactory terms, or at all. If we fail to maintain our relationships with landlords and property managers, or if a significant number of our existing display or advertising frame placement agreements are terminated or not renewed or if we fail to maintain our relationship with our location provider of LED billboard space, advertisers may find advertising on our networks unattractive and may not wish to purchase advertising time slots or advertising frame space on our networks, which would cause our revenues to decline and our business and prospects to deteriorate. Moreover, if we are unable to maintain relationships with wireless communications network operators and Internet service providers, we would be unable to maintain our mobile handset advertising and Internet advertising services networks.

Under some of our display placement agreements in Guangzhou, Shenzhen, Dalian and Chongqing, the property manager has the right to terminate the agreement if landlords or tenants in the building lodge complaints about our flat–panel displays. In addition, some of our display placement agreements in other cities allow the property manager to terminate the agreement if we fail to keep each flat–panel display operational for a minimum amount of time each year. If these tenants complain about our displays, or if the property manager claims we have failed to keep the flat–panel displays operational for the stipulated number of days each year, we may be required to remove our panels from these commercial locations.

In accordance with PRC real estate laws and regulations, prior consent of landlords and property managers is required for any commercial use of the public areas or facilities of residential properties. With regard to our network of advertising poster frames and some of our flat–panel displays placed in the elevators and public areas of residential complexes, we have entered into frame or display placement agreements with property managers and landlords. For those frame or display placement agreements entered into with property managers, we intend to obtain or urge property managers to obtain consents from landlords. However, if the landlords of a residential complex object to our placing advertising poster frames or flat–panel displays in the elevators and public areas of the complex, we may be required to remove our advertising poster frames or flat–panel displays from the complex and may be subject to fines. We may not be able to successfully expand our out–of–home advertising network into new regions or diversify our network into new advertising networks or media platforms, which could harm or reverse our growth potential and our ability to increase our revenues.

18

Table of Contents

*If we are unable to obtain or retain desirable placement locations for our flat–panel displays, advertising poster frames and outdoor LED billboards on commercially advantageous terms or if the supply of desirable locations diminishes or ceases to expand, we could have difficulty in maintaining or expanding our network, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.*

Our location costs, which include lease payments to landlords and property managers under our display placement agreements, maintenance and monitoring fees and other associated costs, comprise a significant portion of our cost of revenues. In 2005, our location costs accounted for 61.7% of our cost of revenues and 24.0% of our total revenues, respectively. In 2006, our location costs accounted for 66.2% of our cost of revenues and 24.3% of our total revenues, respectively. For the six months ended June 30, 2007, our location costs accounted for 73.7% of our cost of revenues and 33.3% of our total revenues, respectively. In the future, we may need to increase our expenditures on our display and frame placement agreements to obtain new and desirable locations, to renew existing locations, and to secure favorable exclusivity and renewal terms. In addition, lessors of space for our flat–panel displays, advertising poster frames and LED billboards may charge increasingly higher display location lease fees, or demand other compensation arrangements, such as profit sharing. If we are unable to pass increased location costs on to our advertising clients through rate increases, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.

In addition, in more developed cities, it may be difficult to increase the number of desirable locations in our network because most such locations have already been occupied either by us or by our competitors, or in the case of outdoor LED billboards, because the placement of outdoor installments may be limited by municipal zoning and planning policies. In recently developing cities, the supply of desirable locations may be small and the pace of economic development and construction levels may not provide a steadily increasing supply of desirable commercial and residential locations. If, as a result of these possibilities, we are unable to increase the placement of our out–of–home television and poster frame advertising networks into commercial and residential locations that advertisers find desirable, we may be unable to expand our client base, sell advertising time slots and poster frame space on our network or increase the rates we charge for time slots and poster frame space, which could decrease the value of our network to advertisers.

*If we are unable to attract advertisers to advertise on our networks, we will be unable to maintain or increase our advertising fees and the demand for time on our networks, which could negatively affect our ability to grow revenues.*

The amounts of fees we can charge advertisers for time slots on our out–of–home television networks depend on the size and quality of our out–of–home television networks and the demand by advertisers for advertising time on our out–of–home television networks. Advertisers choose to advertise on our out–of–home television networks in part based on the size of the networks and the desirability of the locations where we have placed our flat–panel displays and where we lease LED digital billboards as well as the quality of the services we offer. If we fail to maintain or increase the number of locations, displays and billboards in our networks, diversify advertising channels in our networks, or solidify our brand name and reputation as a quality provider of advertising services, advertisers may be unwilling to purchase time on our networks or to pay the levels of advertising fees we require to remain profitable.

In addition, the fees we can charge advertisers for frame space on our poster frame network depends on the quality of the locations in which we place advertising poster frames, demand by advertisers for frame space and the quality of our service. If we are unable to continue to secure the most desirable residential locations for deployment of our advertising poster frames, we may be unable to attract advertisers to purchase frame space on our poster frame network.

Our failure to attract advertisers to purchase time slots and frame space on our networks will reduce demand for time slots and frame space on our networks and the number of time slots and amount of frame space we are able to sell, which could necessitate lowering the fees we charge for advertising time on our network and could negatively affect our ability to increase revenues in the future.

19

Table of Contents

***Our acquisitions of Framedia, Target Media, Focus Media Wireless, ACL, Allyes and any future acquisitions may expose us to potential risks and have an adverse effect on our ability to manage our business.***

Selective acquisitions, such as our recent acquisitions of Framedia, Target Media, Focus Media Wireless, ACL and Allyes, form part of our strategy to further expand our business. If we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business. Our integration of the acquired entities into our business may not be successful and may not enable us to expand into new advertising platforms as well as we expect. This would significantly affect the expected benefits of these acquisitions. Moreover, the integration of Framedia, Target Media, Focus Media Wireless and Allyes into our operations has required, and will continue to require, significant attention from our management. Future acquisitions will also likely present similar challenges.

The diversion of our management's attention and any difficulties encountered in any integration process could have an adverse effect on our ability to manage our business. In addition, we may face challenges trying to integrate new operations, services and personnel with our existing operations. Our recent acquisitions and possible future acquisitions may also expose us to other potential risks, including risks associated with unforeseen or hidden liabilities, the diversion of resources from our existing businesses and technologies, our inability to generate sufficient revenue to offset the costs, expenses of acquisitions and potential loss of, or harm to, relationships with employees and advertising clients as a result of our integration of new businesses and new regulations governing cross–border investment by PRC residents. In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, ACL, Allyes and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

***There may be unknown risks inherent in our acquisitions of Framedia, Target Media, Focus Media Wireless, ACL and Allyes, which could result in a material adverse effect on our business.***

Although we have conducted due diligence with respect to the major acquisitions we have undertaken and undertake, we may not be aware of all of the risks associated with the targets of such acquisitions including Framedia, Target Media, Focus Media Wireless, ACL and Allyes. Any discovery of adverse information concerning Framedia, Target Media, Focus Media Wireless, ACL or Allyes since we acquired these entities could have a material adverse effect on our business, financial condition and results of operations. While we are entitled to seek indemnification in certain circumstances, successfully asserting indemnification or enforcing such indemnification could be costly and time consuming or may not be successful at all.

***Our recent entry into mobile handset advertising and Internet advertising services through our acquisitions of Focus Media Wireless and Allyes, respectively, may expose us to risks associated with operating in the telecommunications and Internet industries in China which could materially affect our financial condition or results of operation.***

In March 2006, we completed our acquisition of Focus Media Wireless, which operates a mobile handset advertising service over China Mobile's and China Unicom's mobile telecommunications networks. As a result, we now operate a portion of our advertising network on mobile telecommunications networks and are subject to risks associated with operations in the telecommunications sector in China. In addition, in March 2007, we acquired Allyes, which operates an Internet advertising agency and service technology business. Our operation of the business of Allyes subjects us to risks associated with operations in the Internet sector in China. These potential risks include:

- loss or deterioration of our relationship with China Mobile or China Unicom, the two primary mobile telecommunications operators in China that currently provide wireless value–added services to mobile phone users;

- loss or deterioration of our relationship with Internet service providers who use our mobile handset advertisement platform;

20

Table of Contents

- failure to reach traditional advertisers and to take advantage of marketing networks through our existing business;

- changes in operating policies or guidelines by mobile telecommunications operators applicable to all wireless value–added service providers using their platforms or which restrict content supplied by others to us;

- regulation of the telecommunications sector in China that could impose burdensome approval or licensing requirements on value–added service providers such as advertising companies that sell advertising time on mobile telecommunications networks;

- a decision by either or both China Mobile and China Unicom to directly enter into the mobile handset advertising business;

- consumer dissatisfaction with, or any related regulations restricting, the use or "pushing" of unsolicited advertisements, commonly known as "spam";

- the performance and reliability of the Internet infrastructure and mobile telecommunications network;

- changes in technology in the Internet and mobile telecommunications industries; and

- the continued growth of the Internet, e–commerce industries and wireless value–added services.

As a result of any such change or event, the operation of our advertising network using the mobile telecommunications networks of the mobile telecommunications operators in China may be disrupted, which could in turn lower our advertising revenues or result in higher operating costs to us, and we cannot assure you that our financial condition and results of operation would not be materially adversely affected.

In addition, under PRC law, the services offered by Focus Media Wireless may be deemed value–added telecommunication services, which requires an operation permit that has a valid period of five years. Focus Media Wireless has been granted the operation permit for its wireless advertising business. If the permit is revoked or if we are unable to renew the operation permit upon expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected.

***One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business.***

As of June 30, 2007, we covered approximately 40 out of the approximately 90 cities where we provide our commercial location network through contractual arrangements with regional distributors. Under these arrangements, we provide our business model and operating expertise to local advertising companies in exchange for their acting as regional distributors of our advertising services. We also sell our flat–panel displays to our regional distributors, who are responsible for developing and maintaining an advertising network in office buildings and other commercial locations in the city where they operate. We also grant our regional distributors the right to use our "Focus Media" brand name and logo. However, our contractual arrangements with our regional distributors do not provide us with control or oversight over their everyday business activities, and one or more of our regional distributors may engage in activities that violate PRC laws and regulations governing the advertising industry and advertising content, or other PRC laws and regulations generally. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold, which could result in local regulators suspending the operations of the network in those cities. In addition, we do not independently review the advertising content that our regional distributors display on the portion of our commercial location network that they operate independently, and our regional distributors may include advertising content on their part of the commercial location network and violate PRC advertising laws or regulations or expose them and us to lawsuits or result in the revocation of their business license. If any of these events occurs, it could harm our reputation in the industry.

21

Table of Contents

*Failure to manage our growth could strain our management, operational and other resources and we may not be able to achieve anticipated levels of growth in the new networks and media platforms we are beginning to operate, either of which could materially and adversely affect our business and growth potential.*

We have been rapidly expanding, and plan to continue to rapidly expand, our operations in China. We must continue to expand our operations to meet the demands of advertisers for larger and more diverse network coverage and the demands of current and future landlords and property managers for installing and configuring flat–panel displays, advertising poster frames and outdoor LED billboards in our existing and future commercial, store, residential and curbside locations. This expansion has resulted, and will continue to result, in substantial demands on our management resources. It has also increased our need for a reliable supply of equipment, particularly flat–panel displays and large LED digital billboards for our out–of–home television networks which are manufactured by a few third–party contract assemblers according to our specifications. To manage our growth, we must develop and improve our existing administrative and operational systems and, our financial and management controls and further expand, train and manage our work force. As we continue this effort, we may incur substantial costs and expend substantial resources in connection with any such expansion due to, among other things, different technology standards, legal considerations and cultural differences. We may not be able to manage our current or future international operations effectively and efficiently or compete effectively in such markets. We cannot assure you that we will be able to efficiently or effectively manage the growth of our operations, recruit top talent and train our personnel. Any failure to efficiently manage our expansion may materially and adversely affect our business and future growth.

As we continue to expand into new networks and new media platforms, we expect the percentage of revenues derived from our commercial location network to decline. However, the new advertising networks and media platforms we pursue may not present the same opportunities for growth that we have experienced with our commercial location network and, accordingly, we cannot assure you that the level of growth of our networks will not decline over time. Moreover, we expect the level of growth of our commercial location network to decrease as many of the more desirable locations have already been leased by us or our competitors.

*If advertisers or the viewing public do not accept, or lose interest in, our out–of–home advertising network, our revenues may be negatively affected and our business may not expand or be successful.*

The market for out–of–home advertising networks in China is relatively new and its potential is uncertain. We compete for advertising spending with many forms of more established advertising media. Our success depends on the acceptance of our out–of–home advertising network by advertisers and their continuing interest in these mediums as components of their advertising strategies. Our success also depends on the viewing public continuing to be receptive towards our advertising network. Advertisers may elect not to use our services if they believe that consumers are not receptive to our networks or that our networks do not provide sufficient value as effective advertising mediums. Likewise, if consumers find some element of our networks, such as the audio feature of our commercial location, in–store and outdoor LED billboard networks, to be disruptive or intrusive, commercial locations and stores may decide not to place our flat–panel displays in their properties and advertisers may view our advertising network as a less attractive advertising medium compared to other alternatives. In that event, advertisers may determine to reduce their spending on our advertising network. If a substantial number of advertisers lose interest in advertising on our advertising network for these or other reasons, we will be unable to generate sufficient revenues and cash flow to operate our business, and our advertising service revenue, liquidity and results of operations could be negatively affected.

*If the Internet and, in particular, Internet marketing are not broadly adopted in China, our ability to generate revenue and sustain profitability from Allyes could be materially and adversely affected.*

Our future revenues and profits from our online advertising agency business we operate through Allyes are dependent in part upon advertisers in China increasingly accepting the use of the Internet as a marketing channel, which is at an early stage in China. Penetration rates for personal computers, the Internet and broadband in China are all relatively low compared to those in more developed countries. Furthermore, many Chinese Internet users are not accustomed to using the Internet for e–commerce or as a medium for other transactions. Many of our current and potential clients have limited experience with the Internet as a marketing channel, and have not historically devoted

22

Table of Contents

a significant portion of their marketing budgets to Internet marketing and promotion. As a result, they may not consider the Internet as effective in promoting their products and services as traditional print and broadcast media.

***The growth of our online advertising agency business is substantially dependent on the acceptance of the cost–per–thousand–impressions, or CPM Internet advertising sales model, and certain performance–based Internet advertising sales models, including CPC and CPA models, by industry participants in China.***

The most prevalent Internet advertising sales model in China currently is cost–per–day, whereby web publishers are paid based on the number of days an Internet ad is on display without regard to the ad's effectiveness or the number of times the ad is displayed. We believe that the full advantages of Internet marketing in general and our Internet marketing solutions specifically can only be fully realized when more sophisticated Internet advertising sales models such as cost–per–thousand–impressions, or CPM, cost–per–click, or CPC, and cost–per–action, or CPA, are used to purchase ad space. If CPM, CPC and CPA fail to gain acceptance in China, our Internet marketing solutions will be less attractive to industry participants, and the market for those solutions may develop more slowly than we expect or even decline, which would materially and adversely affect our prospects and our business. In addition, if industry participants in China favor other newly–developed Internet advertising sales models incompatible with CPM, CPC or CPA, sales of our Internet marketing solutions may suffer and our revenue and profitability may be materially and adversely affected.

***If the delivery of ads or the use of cookies is limited or blocked, our ability to update and expand our user data would be hindered and demand for our Internet marketing solutions could decline.***

Our business may be adversely affected by practices and technologies that impair or undermine the performance of our Internet marketing solutions. For example, Internet users may use software designed to filter or prevent the delivery of Internet ads, including pop–up and pop–under ads; block, disable or remove cookies used by our Internet marketing technologies; or misrepresent measurements of advertising effectiveness. In particular, because we rely on cookies to obtain data about Internet users for our database of user information, widespread usage of software in China that disables or removes cookies would limit our ability to update and expand our user information and hinder our ability to provide effective targeted Internet marketing solutions to our clients. We cannot assure you that the proportion of Internet users who employ these or other similar technologies will not increase, thereby diminishing the efficiency of our Internet marketing solutions and causing demand for those solutions to decline.

***Our role through Allyes as a supplier of ad space may harm our reputation as an independent purchasing agent and the reputation of our performance–based advertising network as a marketplace for ad space.***

We currently participate in both the purchase and supply of Internet ad space through our online advertising agency business. We also facilitate purchases by our clients of ad space on our performance–based advertising network and may act as sales representative to other web publishers in the future. In addition, we supply ad space that we purchase from web publishers on our performance–based advertising network from time to time to advertisers. Our role as a supplier of ad space might harm both our reputation as an independent purchasing agent and the reputation of our performance–based advertising network as a marketplace for ad space. If our reputation as an independent purchasing agent or the reputation of our performance–based advertising network is harmed, our clients may not purchase ad space from us and our business, financial condition and results of operations could be materially and adversely affected.

***Our Internet advertising business could be materially and adversely affected if we are unable to introduce new or enhanced Internet marketing services and technologies that meet our clients' requirements.***

Our future success depends in part upon our ability to enhance and integrate our existing Internet marketing services and technologies that we provide through Allyes and to introduce new, competitively priced services and technologies with features that meet evolving client requirements, all in a timely and cost–effective manner. A

23

Table of Contents

number of factors, including the following, could have a negative impact on the success of our services and technologies:

- our failure to anticipate changes in clients' requirements;

- our competitors' introduction of new services and technologies ahead of our new services and technologies, or their introduction of superior or cheaper services and technologies;

- our failure to adapt to Internet advertising technology trends and evolving industry standards; and

- delays or difficulties in technology integration, customization or development.

***The business and prospects of our online advertising agency business could be harmed if "click-through" fraud is not detected.***

We are exposed to the risk of fraudulent clicks on ads posted on the performance-based advertising network of Allyes by individuals seeking to increase the advertising fees paid to our web publishers. We may in the future have to refund revenue that our advertisers have paid to us and that was later attributed to click-through fraud. Click-through fraud occurs when an individual clicks on an ad displayed on a website for the sole intent of generating the revenue share payment to the publisher rather than to view the underlying content. From time to time we have experienced fraudulent clicks on the performance-based advertising network of Allyes and we do not allow our advertisers to be charged for such fraudulent clicks. This negatively affects the profitability of our online advertising agency business, and this type of fraudulent act could hurt our brand. If fraudulent clicks are not detected, the affected advertisers may experience a reduced return on their investment in our performance-based advertising network, which could lead the advertisers to become dissatisfied with our online advertising agency business, and in turn lead to loss of advertisers and the related revenue. Furthermore, fraudulent clicks directed at our performance-based advertising network or at other performance-based advertising platforms might encourage the perception among advertisers in China that performance-based sales models like CPC and CPA are not effective, which could slow or even reverse the development of those sales models in China. This could adversely affect our business and our prospects.

***System failures could significantly disrupt the operations of our online advertising agency business, which would cause us to lose clients or ad inventory.***

Our ability to successfully provide clients with Internet marketing services and our performance-based advertising network, and our ability to access user information depends on the continuing and uninterrupted performance of our systems. Sustained or repeated system failures that interrupt our ability to provide services to clients, including failures affecting our ability to deliver ads quickly and accurately and to access our user information base to provide targeted solutions, would reduce significantly the attractiveness of our services to advertisers and web publishers. Our online advertising agency business could be materially and adversely affected by any damage or failure that impacts data integrity or interrupts or delays our operations. Our computer systems are vulnerable to damage from a variety of sources, including telecommunications failures, power outages, malicious or accidental human acts, and natural disasters. Moreover, despite network security measures, our servers are potentially vulnerable to physical or electronic break-ins, computer viruses and similar disruptive problems in part because we cannot control the maintenance and operation of our third-party data centers. Despite the precautions taken, unanticipated problems affecting our systems could cause interruptions in the delivery of our solutions in the future and our ability to provide a record of past transactions. Our data centers and systems incorporate varying degrees of redundancy. All data centers and systems may not automatically switch over to their redundant counterpart. We carry no business insurance policies to compensate us for losses that could occur due to any failures in our systems.

***If our Internet marketing technologies contain design or performance defects, our reputation and business may be harmed and we may need to expend significant resources to address liability.***

Technologies as complex as ours may contain design and/or performance defects which are not detectable even after extensive internal testing. Such defects may become apparent only after widespread commercial use. Any

24

Table of Contents

design or performance defects in our Internet marketing technologies could have a material and adverse effect on our reputation and business. It is not clear whether China's existing product liability laws apply to technology products like ours. We cannot assure you that if our Internet marketing technologies are found to have design or performance defects, we will not be liable for product liability claims in China. We do not carry any product liability insurance. Our contracts with our clients currently do not contain provisions to completely limit our exposure to liabilities resulting from product liability claims. Although we have not experienced any product liability claims to date, we cannot assure you that we will not do so in the future.

Additionally, we rely on our Internet marketing technologies (particularly our ad serving technology) to enhance our Internet marketing services and our performance–based advertising network. Any defect in those technologies could hinder the effectiveness of our Internet marketing services and our performance–based advertising network, which would have a material and adverse effect on our competitiveness, business and future prospects.

***We may be liable for content that we serve onto web publishers' websites, which could increase our expenses.***

We purchase ad space and then serve our clients' ads into that ad space. We are liable under PRC law to ensure that the content of the ads that we serve are fair and accurate and are in full compliance with applicable law. Additionally, we may be liable to third–parties for content in our clients' ads that we serve on web publishers' websites or deliver through our performance–based advertising network if those ads contain artwork, text or other content that violates third–parties' copyrights, trademarks, or other intellectual property rights or if the content is defamatory. We typically indemnify web publishers against liability arising from the content or nature of ads that we serve on their websites. Any claims or counterclaims against us could harm our reputation, be time–consuming, could result in costly litigation and could divert management's attention.

***The successful operation of our business depends upon the performance and reliability of the Internet infrastructure and fixed telecommunications networks in China.***

Our business depends on the performance and reliability of the Internet infrastructure in China. Almost all access to the Internet is maintained through state–owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Information Industry of China. In addition, the national networks in China are connected to the Internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the Internet. We cannot assure you that a more sophisticated Internet infrastructure will be developed in China. We or our clients may not have access to alternative networks in the event of disruptions, failures or other problems with China's Internet infrastructure. In addition, the Internet infrastructure in China may not support the demands associated with our growth strategies. For example, we intend to expand our sales of rich media technologies, which are bandwidth–intensive. Limited bandwidth in China may hamper the effectiveness of our rich media technologies, which could harm our prospects and business and require us to purchase additional servers in our content distribution network.

***We depend on the leadership and services of Jason Nanchun Jiang, who is our founder, chairman, chief executive officer and our largest shareholder, and our business and growth prospects may be severely disrupted if we lose his services.***

Our future success is dependent upon the continued service of Jason Nanchun Jiang, our founder, chairman and chief executive officer and our largest shareholder. We rely on his industry expertise and experience in our business operations, and in particular, his business vision, management skills, and working relationships with our employees, our other major shareholders, many of our clients and landlords and property managers of the locations in our network. We do not maintain key–man life insurance for Mr. Jiang. If he was unable or unwilling to continue in his present position, or if he joined a competitor or formed a competing company in violation of his employment agreement and noncompetition agreement, we may not be able to replace him easily or at all. As a result, our business and growth prospects may be severely disrupted if we lose his services.

Table of Contents

*We may need additional capital and we may not be able to obtain it, which could adversely affect our liquidity and financial position.*

We believe that our current cash and cash equivalents and cash flow from operations will be sufficient to meet our anticipated cash needs including for working capital and capital expenditures, for the foreseeable future. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities, could result in additional dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations and liquidity.

Our ability to obtain additional capital on acceptable terms is subject to a variety of uncertainties, including:

- investors' perception of, and demand for, securities of alternative advertising media companies;

- conditions of the U.S. and other capital markets in which we may seek to raise funds;

- our future results of operations, financial condition and cash flows;

- PRC governmental regulation of foreign investment in advertising services companies in China;

- economic, political and other conditions in China; and

- PRC governmental policies relating to foreign currency borrowings.

We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us could have a material adverse effect on our liquidity and financial condition.

*If we are unable to adapt to changing advertising trends and the technology needs of advertisers and consumers, we will not be able to compete effectively and we will be unable to increase or maintain our revenues which may materially and adversely affect our business prospects and revenues.*

The market for out-of-home advertising requires us to continuously identify new advertising trends and the technology needs of advertisers and consumers, which may require us to develop new features and enhancements for our advertising network. The majority of our displays use 17-inch LCD screens. We also have a growing number of displays that use larger LCD and plasma screens as well as large size LED digital billboards. Portions of our poster frame network are being upgraded to use digital poster LCD displays. Through our recent acquisition of Focus Media Wireless, we now also provide advertising services to mobile phone users over the mobile phone networks of China Mobile and China Unicom, while Allyes provides online advertising services to advertising customers. In the future, subject to relevant PRC laws and regulations, we may use other technology, such as cable or broadband networking, advanced audio technologies and high-definition panel technology. We may be required to incur development and acquisition costs in order to keep pace with new technology needs but we may not have the financial resources necessary to fund and implement future technological innovations or to replace obsolete technology. Furthermore, we may fail to respond to these changing technology needs. For example, if the use of wireless or broadband networking capabilities on our advertising network becomes a commercially viable alternative and meets all applicable PRC legal and regulatory requirements, and we fail to implement such changes on our commercial location network and in-store network or fail to do so in a timely manner, our competitors or future entrants into the market who do take advantage of such initiatives could gain a competitive advantage over us. If we cannot succeed in developing and introducing new features on a timely and cost-effective basis, advertiser demand for our advertising networks may decrease and we may not be able to compete effectively or attract advertising clients, which would have a material and adverse effect on our business prospects and revenues.

26

Table of Contents

*We may be subject to, and may expend significant resources in defending against, government actions and civil suits based on the content and services we provide through our digital out–of–home advertising networks mobile handset advertising network or Internet advertising services network.*

PRC advertising laws and regulations require advertisers, advertising operators and advertising distributors, including businesses such as ours, to ensure that the content of the advertisements they prepare or distribute are fair and accurate and are in full compliance with applicable law. Violation of these laws or regulations may result in penalties, including fines, confiscation of advertising fees, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the PRC government may revoke a violator's license for advertising business operations.

As an out–of–home advertising service provider, we are obligated under PRC laws and regulations to monitor the advertising content that is shown on our out–of–home advertising networks for compliance with applicable law. In addition, each of our regional distributors is obligated under PRC laws and regulations to monitor the advertising content shown on the portion of our out–of–home television advertising network each of them operates. In general, the advertisements shown on our out–of–home television advertising network and the portion of our advertising network operated by our regional distributors have previously been broadcast over public television networks and have been subjected to internal review and verification of such networks. We and our regional distributors are still separately required to independently review and verify these advertisements for content compliance before displaying the advertisements. In addition, where a special government review is required for specific product advertisements before broadcasting, we and our regional distributors are separately obligated to confirm that such review has been performed and approval has been obtained. We employ, and our regional distributors are required under the terms of our agreements with them to employ, qualified advertising inspectors who are trained to review advertising content for compliance with relevant PRC laws and regulations. In addition, for advertising content related to specific types of products and services, such as alcohol, cosmetics, pharmaceuticals and medical procedures, we and our distributors are required to confirm that the advertisers have obtained requisite government approvals including the advertiser's operating qualifications, proof of quality inspection of the advertised products, government pre–approval of the contents of the advertisement and filing with the local authorities. We endeavor to comply, and encourage our regional distributors to take measures to comply, with such requirements, including by requesting relevant documents from the advertisers. Starting in January 2006, we began to operate a network of advertising poster frames placed primarily in elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as print advertisements under PRC laws and regulations and are also subject to the same legal requirements as advertisements shown on our out–of–home television advertising networks. Outdoor advertisements must be registered with the local branch of the State Administration for Industry and Commerce, or SAIC, before dissemination, and advertising distributors are required to submit a registration application form and the content of the advertisement to the local SAIC and receive an advertising registration certificate from the local SAIC. Our reputation will be tarnished and our results of operations may be adversely affected if advertisement shown on our out–of–home television advertising networks, poster frame network or outdoor LED network is provided to us by our advertising clients in violation of relevant PRC advertising laws and regulations or that the supporting documentation and government approvals provided to us by our advertising clients in connection with such advertising content are not complete or that the advertisements that our regional distributors have procured for broadcasting on our network have not received required approval from the relevant local supervisory bodies or are not content compliant.

In addition, we commenced operation of our outdoor LED billboard network in April 2006. The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

China has also enacted regulations governing telecommunication service providers and the distribution of news and other information. In the past, the Chinese government has stopped the distribution of information over the Internet and telecommunications networks that it believes to violate Chinese law, including content that is

27

Table of Contents

pornographic or obscene, incites violence, endangers national security, is contrary to the national interest or is defamatory. China Unicom and China Mobile also have their own policies regarding the distribution of inappropriate content by wireless value–added service providers and have punished certain providers for distributing inappropriate content, including the imposition of fines and service suspensions. Focus Media Wireless undertakes to the telecommunication operators which grant us access to their mobile phone networks that we will not distribute any advertisements with illegal content. We require the Internet service providers which use our mobile handset advertising platform to provide us the same undertaking, but we cannot completely control the content of their advertisements. If any of the content that we deliver through our mobile handset advertising network is found to violate Chinese laws and regulations or the policies of China Mobile and China Unicom, we could be subject to fines or suspensions.

Moreover, civil claims may be filed against us for fraud, defamation, subversion, negligence, copyright or trademark infringement or other violations due to the nature and content of the information displayed on our advertising network. If consumers find the content displayed on our advertising network to be offensive, landlords, property managers, other location providers or telecommunication network operators may seek to hold us responsible for any consumer claims or may terminate their relationships with us.

In addition, if the security of our content management system is breached through the placement of unauthorized compact flash, or CF' cards in our flat–panel displays and unauthorized images, text or audio sounds are displayed on our advertising network, viewers or the PRC government may find these images, text or audio sounds to be offensive, which may subject us to civil liability or government censure despite our efforts to ensure the security of our content management system. Any such event may also damage our reputation. If our advertising viewers do not believe our content is reliable or accurate, our business model may become less appealing to viewers in China and our advertising clients may be less willing to place advertisements on our advertising network.

*We may be subject to intellectual property infringement claims, which may force us to incur substantial legal expenses and, if determined adversely against us, may materially disrupt our business.*

We cannot be certain that our advertising displays or other aspects of our business do not or will not infringe upon patents, copyrights or other intellectual property rights held by third parties. Although we are not aware of any such claims, we may become subject to legal proceedings and claims from time to time relating to the intellectual property of others in the ordinary course of our business. If we are found to have violated the intellectual property rights of others, we may be enjoined from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives. In addition, we may incur substantial expenses in defending against these third party infringement claims, regardless of their merit. Successful infringement or licensing claims against us may result in substantial monetary liabilities, which may materially and adversely disrupt our business.

*Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may adversely affect our business.*

We regard our copyrights, trademarks, trade secrets and other intellectual property as critical to our success. Unauthorized use of the intellectual property used in our business may adversely affect our business and reputation.

We have historically relied on a combination of trademark and copyright law, trade secret protection and restrictions on disclosure to protect our intellectual property rights. We enter into confidentiality and invention assignment agreements with all our employees. We cannot assure you that these confidentiality agreements will not be breached, that we will have adequate remedies for any breach, or that our proprietary technology will not otherwise become known to, or be independently developed by, third parties.

We are in the process of registering in China many of the trademarks used in our business. We cannot assure you that any of our trademark applications will ultimately proceed to registration or will result in registration with scope adequate for our business. Some of our pending applications or registration may be successfully challenged or invalidated by others. If our trademark applications are not successful, we may have to use different marks for affected services or technologies, or enter into arrangements with any third parties who may have prior registrations, applications or rights, which might not be available on commercially reasonable terms, if at all.

28

Table of Contents

In addition, policing unauthorized use of our proprietary technology, trademarks and other intellectual property is difficult and expensive, and litigation may be necessary in the future to enforce our intellectual property rights. Future litigation could result in substantial costs and diversion of our resources, and could disrupt our business, as well as have a material adverse effect on our financial condition and results of operations.

***We face significant competition, and if we do not compete successfully against new and existing competitors, we may lose our market share, and our profitability may be adversely affected.***

We compete with other advertising companies in China. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also face competition from other out-of-home television advertising network operators for access to the most desirable locations in cities in China. Individual buildings, hotels, restaurants and other commercial locations and hypermarket, supermarket and convenience store chains may also decide to independently, or through third-party technology providers, install and operate their own flat-panel television advertising screens. Our in-store network faces competition with similar networks operated by domestic out-of-home advertising companies, including Shanghai Xicheng Cultural Dissemination Co., Ltd., also known as CGEN. Our Internet advertising services compete with those provided by domestic and international advertising agencies, including the WPP Group. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, wireless communications, street furniture, billboard, frame and public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

In the future, we may also face competition from new entrants into the out-of-home television advertising sector. Our sector is characterized by relatively low fixed costs and, as is customary in the advertising industry, we do not have exclusive arrangements with our advertising clients. In addition, since December 10, 2005, wholly foreign-owned advertising companies are allowed to operate in China, which may expose us to increased competition from international advertising media companies attracted to opportunities in China.

Increased competition could reduce our operating margins and profitability and result in a loss of market share. Some of our existing and potential competitors may have competitive advantages, such as significantly greater financial, marketing or other resources, or exclusive arrangements with desirable locations, and others may successfully mimic and adopt our business model. Moreover, increased competition will provide advertisers with a wider range of media and advertising service alternatives, which could lead to lower prices and decreased revenues, gross margins and profits. We cannot assure you that we will be able to successfully compete against new or existing competitors.

***We do not maintain any business liability disruption or litigation insurance coverage for our operations, and any business liability, disruption or litigation we experience might result in our incurring substantial costs and the diversion of resources.***

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products and do not, to our knowledge, offer business liability insurance. While business disruption insurance is available to a limited extent in China, we have determined that the risks of disruption, cost of such insurance and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. As a result, we do not have any business liability, disruption or litigation insurance coverage for our operations in China. Any business disruption or litigation may result in our incurring substantial costs and the diversion of resources.

***These have been historical deficiencies with our internal controls and these remain areas of our internal and disclosure controls that require improvements, and we are exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes-Oxley Act of 2002.***

While we believe that we currently have adequate internal control procedures in place, we are still exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes-Oxley Act of 2002. Under the supervision and with the participation of our management, we have evaluated our internal controls systems in order to allow management to report on, and our registered independent public accounting firm

29

Table of Contents

to attest to, our internal controls, as required by Section 404 of the Sarbanes–Oxley Act. We have performed the system and process evaluation and testing required in an effort to comply with the management certification and auditor attestation requirements of Section 404. As a result, we have incurred additional expenses and a diversion of management's time. If we are not able to continue to meet the requirements of Section 404 in a timely manner or with adequate compliance, we might be subject to sanctions or investigation by regulatory authorities, such as the SEC or the Nasdaq Global Market. Any such action could adversely affect our financial results and the market price of our ADSs.

In connection with their audit of our consolidated financial statements as of and for the period ended December 31, 2006, our auditors identified one significant deficiency under standards established by the Public Company Accounting Oversight Board (United States), or the PCAOB, in our internal accounting controls. Specifically, the auditors noted that, with regard to determination of related party status, we lack a process for timely review of changes in relationships with companies that were excluded from related party status in prior years, namely with Everease Advertising & Communication Ltd., or Everease. Following the identification of this significant deficiency, we have consulted with our audit committee and are taking remedial steps to address the deficiency, including reviewing our policies for the evaluation of transactions with past related party companies. If we are unable to implement solutions to any weaknesses in our existing internal and disclosure controls and procedures, or if we fail to maintain an effective system of internal and disclosure controls in the future for our company and for companies that we acquire, we may be unable to accurately report our financial results or prevent fraud and investor confidence and the market price of our ADSs may be adversely impacted.

### Risks Relating to Regulation of Our Business and to Our Structure

*If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties.*

Substantially all of our operations are or will be conducted through Focus Media Technology (Shanghai) Co., Ltd., or Focus Media Technology, Framedia Investment and Beijing Dotad Technology Co., Ltd., or Dotad Technology, our indirectly wholly–owned operating subsidiaries in China, Focus Media Digital Information Technology (Shanghai) Co., Ltd., or Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, and New Allyes Information Technology Co., Ltd., or New Allyes Technology, which we collectively refer to as our PRC operating subsidiaries, and through our contractual arrangements with several of our consolidated affiliated entities in China. PRC regulations require any foreign entities that invest in the advertising services industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been allowed to own directly 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising industry outside of China or less than 100% if the foreign investor has at least two years of direct operations in the advertising industry outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify under PRC regulations any earlier than two or three years after we commence any such operations outside of China or until we acquire a company that has directly operated an advertising business outside of China for the required period of time. Accordingly, our PRC operating subsidiaries are currently ineligible to apply for the required licenses for providing advertising services in China. Substantially all of our advertising business is currently provided through our contractual arrangements with our PRC operating subsidiaries' consolidated affiliated entities in China, which we collectively refer to as our PRC operating affiliates, including Focus Media Advertisement and its subsidiaries with regard to our out–of–home television networks, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, Focus Media Wireless with regard to our mobile handset advertising network, and seven PRC companies with regard to our online advertising agency business which operate the business of Allyes, and which we refer to as the Allyes operating affiliates. Our PRC operating affiliates are currently owned in each case either (i) by two PRC citizens designated by us or (ii) by two PRC entities owned by our subsidiaries or by our designated appointees. Our PRC operating affiliates and certain of their respective subsidiaries hold the requisite licenses to provide advertising services in China. Our PRC operating affiliates and their respective subsidiaries directly operate our advertising network. We have been and are expected to continue to be dependent on these PRC operating affiliates and their subsidiaries to operate our advertising

30

Table of Contents

business for the foreseeable future. We have entered into contractual arrangements with PRC operating affiliates and their respective subsidiaries, pursuant to which we, through our PRC operating subsidiaries, provide technical support and consulting services to our PRC operating affiliates and their subsidiaries. In addition, we have entered into agreements with our PRC operating affiliates and each of their shareholders which provide us with the substantial ability to control these affiliates and their existing and future subsidiaries.

If we, our existing or future PRC operating subsidiaries and affiliates are found to be in violation of any existing or future PRC laws or regulations or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities, including the SAIC, which regulates advertising companies, would have broad discretion in dealing with such violations, including:

- revoking the business and operating licenses of our PRC subsidiaries and affiliates;

- discontinuing or restricting our PRC subsidiaries' and affiliates' operations;

- imposing conditions or requirements with which we or our PRC subsidiaries and affiliates may not be able to comply;

- requiring us or our PRC subsidiaries and affiliates to restructure the relevant ownership structure or operations; or

- restricting or prohibiting our use of the proceeds of this offering to finance our business and operations in China.

The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business.

***We rely on contractual arrangements with our PRC operating affiliates and their subsidiaries and shareholders for our China operations, which may not be as effective in providing operational control as direct ownership.***

We have in the past relied, and to a lesser but significant extent will continue in the future to rely, on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders to operate our advertising business. For a description of these contractual arrangements, see the sections titled "Our Corporate Structure" and "Related Party Transactions". These contractual arrangements may not be as effective in providing us with control over our PRC operating affiliates and their subsidiaries as direct ownership. If we had direct ownership of our PRC operating affiliates and their respective subsidiaries, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of those companies, which in turn could effect changes, subject to any applicable fiduciary obligations, at the management level. However, under the current contractual arrangements, as a legal matter, if our PRC operating affiliates or any of their subsidiaries and shareholders fails to perform its or his respective obligations under these contractual arrangements, we may have to incur substantial costs and resources to enforce such arrangements, and rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you to be effective. For example, if Jason Nanchun Jiang were to refuse to transfer his equity interest in Focus Media Advertisement to us or our designee when we exercise the purchase option pursuant to these contractual arrangements, or if Mr. Jiang were otherwise to act in bad faith toward us, then we may have to take legal action to compel him to fulfill his contractual obligations. In addition, Focus Media Advertisement, which holds certain of the business licenses required to operate our advertising network in China, is jointly owned and effectively managed by Mr. Jiang and Mr. Yu. Similarly, each of the Allyes operating affiliates, which hold the licenses necessary to operate the business of Allyes, is jointly owned by a set of two PRC nationals. Accordingly, it may be difficult for us to change our corporate structure or to bring claims against our PRC operating affiliates if they do not perform their obligations under its contracts with us or if any of the PRC citizens who hold the equity interest in our PRC operating affiliates do not cooperate with any such actions.

Many of these contractual arrangements are governed by PRC law and provide for the resolution of disputes through either arbitration or litigation in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal environment

31

Table of Contents

in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. In the event we are unable to enforce these contractual arrangements, we may not be able to exert effective control over our operating entities, and our ability to conduct our business may be negatively affected.

***Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment.***

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions we have entered into among our subsidiaries and affiliated entities are found not to be on an arm's-length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late payment interest and penalties. See "Management's Discussion and Analysis of Financial Condition and Results of Operation — Taxation" for a discussion of the transactions referred to above. A finding by the PRC tax authorities that Focus Media Digital, Shanghai Focus Media Advertising Agency Co., Ltd., or Focus Media Advertising Agency, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement or New Structure Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings.

We rely principally on dividends and other distributions on equity paid by our wholly-owned operating subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our operating subsidiary to pay dividends to us could have a material adverse effect on our ability to conduct our business.

We are a holding company, and we rely principally on dividends and other distributions on equity paid by our PRC operating subsidiaries for our cash requirements, including the funds necessary to service any debt we may incur. If any of our PRC operating subsidiaries incurs debt on its own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us. In addition, the PRC tax authorities may require us to adjust our taxable income under the contractual arrangements our PRC operating subsidiaries currently have in place with our PRC operating affiliates and their respective subsidiaries in a manner that would materially and adversely affect our PRC operating subsidiaries' ability to pay dividends and other distributions to us. Furthermore, relevant PRC laws and regulations permit payments of dividends by our PRC operating subsidiaries only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. Under PRC laws and regulations, each of our PRC operating subsidiaries is also required to set aside a portion of its net income each year to fund specific reserve funds. These reserves are not distributable as cash dividends. In addition, subject to certain cumulative limits, the statutory general reserve fund requires annual appropriations of 10% of after-tax income to be set aside prior to payment of dividends. As a result of these PRC laws and regulations, our PRC operating subsidiaries and our PRC operating affiliates are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2006, the amount of these restricted portions was approximately $223,386,461. Any limitation on the ability of our PRC operating subsidiaries to pay dividends to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends, or otherwise fund and conduct our business.

***Our business operations may be affected by legislative or regulatory changes.***

There are no existing PRC laws or regulations that specifically define or regulate out-of-home television or mobile handset advertising. Changes in laws and regulations or the enactment of new laws and regulations governing placement or content of out-of-home advertising or distribution of mobile handset advertising, our business licenses or otherwise affecting our business in China may materially and adversely affect our business prospects and results of operations. For example, the PRC government has promulgated regulations allowing foreign companies to hold a 100%-interest in PRC advertising companies starting from December 10, 2005. We are

32

Table of Contents

not certain how the PRC government will implement this regulation or how it could affect our ability to compete in the advertising industry in China.

*PRC regulation of loans and direct investment by offshore holding companies to PRC entities may delay or prevent us from using funds to make loans or additional capital contributions to our PRC operating subsidiaries and affiliates.*

As an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- loans by us to Focus Media Technology, Framedia Investment, Dotad Technology, or New Allyes Technology or any other of our foreign invested enterprises, to finance its activities cannot exceed statutory limits and must be registered with the PRC State Administration of Foreign Exchange or its local counterpart; and

- loans by us to our PRC operating affiliates or their respective subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authorities and must also be registered with the PRC State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital and New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement or any of our foreign invested enterprises through Focus Media Technology, Framedia Investment, Dotad Technology and New Allyes Technology or our other PRC operating affiliates, by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Because our PRC operating affiliates and their respective subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in "Regulation of Our Industry" in this prospectus. We cannot assure you that we can obtain these government registrations or approvals on a timely basis, if at all, with respect to future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement Framedia Investment, Focus Media Advertisement, Dotad Technology, New Allyes Technology or any of their respective subsidiaries. If we fail to receive such registrations or approvals, our ability to use our funds and to capitalize our PRC operations would be negatively affected which would adversely and materially affect our liquidity and our ability to expand our business.

### Risks Relating to the People's Republic Of China

Substantially all of our assets are located in China and substantially all of our revenues are derived from our operations in China. Accordingly, our business, financial condition, results of operations and prospects are subject, to a significant extent, to economic, political and legal developments in China.

*The PRC's economic, political and social conditions, as well as governmental policies, could affect the financial markets in China and our liquidity and access to capital and our ability to operate our business.*

The PRC economy differs from the economies of most developed countries in many respects, including the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. While the PRC economy has experienced significant growth over the past, growth has been uneven, both geographically and among various sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures benefit the overall PRC economy, but may also have a negative effect on us. For example, under current PRC regulations, starting December 10, 2005, foreign entities are allowed to directly own 100% of a PRC advertising business if the foreign entity has at least three years of direct operations of an advertising business outside of China, or to directly own less than 100% of a PRC advertising business if the foreign entity has at least two years of direct operations of an advertising business outside of China. This may encourage foreign advertising companies with more experience, greater technological know–how and larger financial resources than we have to compete against us and limit the

33

**Table of Contents**

potential for our growth. Moreover, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations that are applicable to us.

The PRC economy has been transitioning from a planned economy to a more market–oriented economy. Although the PRC government has implemented measures since the late 1970s emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the PRC government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through the allocation of resources, controlling payment of foreign currency–denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Since late 2003, the PRC government implemented a number of measures, such as raising bank reserves against deposit rates to place additional limitations on the ability of commercial banks to make loans and raise interest rates, in order to slow down specific segments of China's economy which it believed to be overheating. These actions, as well as future actions and policies of the PRC government, could materially affect our liquidity and access to capital and our ability to operate our business.

***The PRC legal system embodies uncertainties which could limit the legal protections available to you and us.***

The PRC legal system is a civil law system based on written statutes. Unlike common law systems, it is a system in which decided legal cases have little precedential value. In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past 26 years has significantly enhanced the protections afforded to various forms of foreign investment in China. Each of our PRC operating subsidiaries and affiliates is subject to PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, we may have to resort to administrative and court proceedings to enforce the legal protection that we enjoy either by law or contract. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. For example, these uncertainties may impede our ability to enforce the contracts we have entered into with the Group. In addition, such uncertainties, including the inability to enforce our contracts, could materially and adversely affect our business and operation. In addition, intellectual property rights and confidentiality protections in China may not be as effective as in the United States or other countries. Accordingly, we cannot predict the effect of future developments in the PRC legal system, particularly with regard to the advertising industry, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement thereof, or the preemption of local regulations by national laws. These uncertainties could limit the legal protections available to us, including our ability to enforce our agreements with the Group, and other foreign investors, including you.

***If tax benefits currently available to us in PRC were no longer available under the new Enterprise Income Taxes (EIT") law which will be effective on January 1, 2008, our effective income tax rates for our PRC operations could increase.***

We are incorporated in the Cayman Islands where no income taxes are imposed.

We generated substantially all our net income from our PRC operations. Our China operations are conducted through various subsidiaries and variable interest entities, or VIEs. Pursuant to the PRC Income Tax Laws, our subsidiaries and VIEs are generally subject to EIT at a statutory rate of 33%, which comprises 30% national income tax and 3% local income tax. Some of the Company's subsidiaries and VIEs are newly incorporated enterprises engaged in advertising industry which are entitled to a two–year tax exemption holiday, commencing from the first profitable year. One of our VIEs, Beijing Focus Media Wireless Co., Ltd., is a qualified new technology enterprise and under PRC Income Tax Laws are subject to a preferential tax rate of 15%, plus a three–year tax exemption followed by three years with a 50% reduction in the tax rate, commencing from the first profitable year.

34

Table of Contents

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

***We may be deemed a Chinese resident enterprise under the EIT Law and be subject to PRC taxation on our worldwide income.***

The EIT Law also provides that enterprises established outside of China whose "de facto management bodies" are located in China are considered "resident enterprises" and will generally be subject to the uniform 25% enterprise income tax rate as to their global income, including income we receive from our subsidiaries. The EIT Law, however, does not define the term "de facto management bodies" and it is currently unclear under what situations an enterprise's "de facto management body" would be considered to be located in China. Substantially all of our management is currently based in China, and may remain in China after the effectiveness of the EIT Law. Therefore, we may be treated as a Chinese resident enterprise for enterprise income tax purposes. The tax consequences of such treatment are currently unclear, as they will depend on regulations that have not yet been issued that would implement the EIT Law, and on local tax authorities' ability to follow such regulations in tax administration. See "Dividends payable by us to our foreign investors may become subject to withholding taxes under PRC tax laws" and "Gains on the sales of our shares or ADSs may become subject to PRC income taxes" below.

***Recent PRC regulations relating to offshore investment activities by PRC residents may increase our administrative burden and restrict our overseas and cross–border investment activity. If our shareholders who are PRC residents fail to make any required applications and filings under such regulations, we may be unable to distribute profits and may become subject to liability under PRC laws.***

The PRC National Development and Reform Commission, or NDRC, and SAFE recently promulgated regulations that require PRC residents and PRC corporate entities to register and obtain approvals from relevant PRC government authorities in connection with their direct or indirect offshore investment activities. These regulations apply to our shareholders who are PRC residents and may apply to any offshore acquisitions that we make in the future.

Under the SAFE regulations, PRC residents who make, or have previously made, direct or indirect investments in offshore companies will be required to register those investments. In addition, any PRC resident who is a direct or indirect shareholder of an offshore company is required to file with the local branch of SAFE, with respect to that offshore company, any material change involving capital variation, such as an increase or decrease in capital, transfer or swap of shares, merger, division, long term equity or debt investment or creation of any security interest over the assets located in China. If any PRC shareholder fails to make the required SAFE registration, the PRC subsidiaries of that offshore parent company may be prohibited from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation, to their offshore parent company, and the offshore parent company may also be prohibited from injecting additional capital into their PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

35

Table of Contents

We cannot assure you that all of our shareholders who are PRC residents will comply with our request to make or obtain any registrations or approvals required under these regulations or other related legislation. Furthermore, as the regulations are relatively new, the PRC government has yet to publish implementing rules, and much uncertainty remains concerning the reconciliation of the new regulations with other approval requirements. It is unclear how these regulations, and any future legislation concerning offshore or cross–border transactions, will be interpreted, amended and implemented by the relevant government authorities. The failure or inability of our PRC resident shareholders to comply with these regulations may subject us to fines and legal sanctions, restrict our overseas or cross–border investment activities, limit our ability to inject additional capital into our PRC subsidiaries and the ability of Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Investment or New Allyes Technology, our PRC subsidiaries, to make distributions or pay dividends, or materially and adversely affect our ownership structure. If any of the foregoing events occur, our acquisition strategy and business operations and our ability to distribute profits to you could be materially and adversely affected.

***The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China.***

Our operations and transactions are subject to review by the PRC tax authorities pursuant to relevant PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, in the case of some of our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China, we cannot assure you that the PRC tax authorities will not require us to pay additional taxes in relation to such acquisitions, in particular where the PRC tax authorities take the view that the previous taxable income of the PRC affiliates of the acquired offshore entities needs to be adjusted and additional taxes be paid. In the event that the sellers failed to pay any taxes required under PRC law in connection with these transactions, the PRC tax authorities might require us to pay the tax, together with late–payment interest and penalties. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Acquisitions".

***A new PRC rule on mergers and acquisitions may subject us to sanctions, fines and other penalties and affect our future business growth through acquisition of complementary business.***

On August 8, 2006, six PRC government and regulatory authorities, including the PRC Ministry of Commerce and the Chinese Securities Regulatory Commission, or the CSRC, promulgated a rule entitled "Provisions regarding Mergers and Acquisitions of Domestic Enterprises by Foreign Investors," or the New M&A Rule, which became effective on September 8, 2006. The New M&A Rule, among other things, requires that an offshore specific purpose vehicle, or SPV, formed for the listing purpose through acquisition of PRC domestic entity and controlled by PRC residents should obtain approval from the CSRC prior to publicly listing its securities on an overseas stock market. Based on consultation with the International Department of the CSRC regarding its interpretation of the New M&A Rule, our PRC counsel, Global Law Offices, advised us that the CSRC approval was not required for this offering. However, we cannot assure you that the relevant PRC government agency, including the Ministry of Commerce or other applicable departments of the CSRC, would reach the same conclusion as our PRC counsel. If the CSRC or other PRC regulatory body subsequently determines that the CSRC's approval was required for this offering, we may face sanctions by the CSRC or other PRC regulatory agencies. In such event, these regulatory agencies may impose fines and penalties on our operations in the PRC, limit our operating privileges in the PRC, delay or restrict the repatriation of the proceeds from this offering into the PRC, or take other actions that could have a material adverse effect on our business, financial condition, results of operations, reputation and prospects, as well as the trading price of our ADSs.

The New M&A Rule also established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time–consuming and complex, including requirements in some instances that the Ministry of Commerce be notified in advance of any change–of–control transaction in which a foreign investor takes control of a PRC domestic enterprise. In the future, we may grow our business in part by acquiring complementary businesses, although we do not have any plans to do so at this time. Complying with the requirements of the New M&A Rule to complete such transactions could be time–consuming, and any required

36

Table of Contents

approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit the completion of such transactions, which could affect our ability to expand our business or maintain our market share.

***Restrictions on currency exchange may limit our ability to utilize our revenues effectively.***

Substantially all of our revenues and operating expenses are denominated in Renminbi. The Renminbi is currently convertible under the "current account", which includes dividends, trade and service–related foreign exchange transactions, but not under the "capital account", which includes foreign direct investment and loans. Currently, each of our PRC subsidiaries may purchase foreign exchange for settlement of "current account transactions", including payment of dividends to us, without the approval of SAFE. However, we cannot assure you that the relevant PRC governmental authorities will not further limit or eliminate our ability to purchase foreign currencies in the future. Since a significant amount of our future revenues will be denominated in Renminbi, any existing and future restrictions on currency exchange may limit our ability to utilize revenues generated in Renminbi to fund our business activities outside China, if any, or expenditures denominated in foreign currencies. Foreign exchange transactions under the capital account are still subject to limitations and require approvals from, or registration with, the State Administration of Foreign Exchange and other relevant PRC governmental authorities. This could affect the ability of each of Focus Media Technology and Framedia Investment to obtain foreign exchange through debt or equity financing, including by means of loans or capital contributions from us.

***Fluctuations in exchange rates could result in foreign currency exchange losses.***

Because our earnings and cash and cash equivalent assets are denominated in Renminbi and the net proceeds from this offering will be denominated in U.S. dollars, fluctuations in exchange rates between U.S. dollars and Renminbi will affect the relative purchasing power of these proceeds and our balance sheet and earnings per share in U.S. dollars following this offering. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our financial results reported in U.S. dollar terms without giving effect to any underlying change in our business or results of operations. Since July 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it is reported to be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on October 23, 2007 the Renminbi was revalued against the U.S. dollar to approximately RMB 7.5020 to the U.S. dollar. The Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the long term, depending on the fluctuation of the basket of currencies against which it is currently valued or it may be permitted to enter into a full float, which may also result in a significant appreciation or depreciation of the Renminbi against the U.S. dollar. Fluctuations in the exchange rate will also affect the relative value of any dividend we issue in the future which will be exchanged into U.S. dollars and earnings from and the value of any U.S. dollar–denominated investments we make in the future.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

***Any future outbreak of severe acute respiratory syndrome or avian flu in China, or similar adverse public health developments, may severely disrupt our business and operations.***

From December 2002 to June 2003, China and other countries experienced an outbreak of a new and highly contagious form of atypical pneumonia now known as severe acute respiratory syndrome, or SARS. On July 5, 2003, the World Health Organization declared that the SARS outbreak had been contained. Since September 2003, however, a number of isolated new cases of SARS have been reported, most recently in central China in April 2004. During May and June of 2003, many businesses in China were closed by the PRC government to prevent transmission of SARS. In addition, many countries, including China, have encountered incidents of the H5N1 strain of bird flu, or avian flu. This disease, which is spread through poultry populations, is capable in some circumstances of being transmitted to humans and is often fatal. A new outbreak of SARS or an outbreak of avian flu may result in

Table of Contents

health or other government authorities requiring the closure of our offices or other businesses, including office buildings, retail stores and other commercial venues, which comprise the primary locations where we provide our digital out–of–home advertising services. Any recurrence of the SARS outbreak, an outbreak of avian flu or a development of a similar health hazard in China, may deter people from congregating in public places, including a range of commercial locations such as office buildings and retail stores. Such occurrences would severely impact the value of our digital out–of–home advertising networks to advertisers, significantly reduce the advertising time purchased by advertisers and severely disrupt our business and operations.

**Risks Relating to this Offering, Our ADSs and Our Trading Markets**

***The price of our ADSs has been volatile and may continue to be volatile, which may make it difficult for holders to resell the ADSs when desired or at attractive prices.***

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. Since July 13, 2005, the closing prices of our ADSs on the Nasdaq Global Market has ranged from $8.90 to $63.00 per ADS and the last reported sale price on October 31, 2007 was $62.00. From July 13, 2005 until April 10, 2007, we used an ADS–to–share ratio of 10–to–one. Starting April 11, 2007, we reduced this ratio to five–to–one. All ADS trading prices on the Nasdaq set forth in this prospectus, including historical trading and closing prices, have been adjusted to reflect the new ADS–to–share ratio of five–to–one. Our ADS price may fluctuate in response to a number of events and factors. The financial markets in general, and the market prices for many PRC companies in particular, have experienced extreme volatility that often has been unrelated to the operating performance of such companies.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for specific business reasons. Factors such as variations in our revenues, earnings and cash flow, announcements of new investments, cooperation arrangements or acquisitions, and fluctuations in market prices for our advertising network could cause the market price for our ADSs to change substantially. Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade. We cannot give any assurance that these factors will not occur in the future.

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

In connection with this offering, we have agreed not to sell any ordinary shares or ADSs for 90 days after the date of this prospectus without the written consent of the Merrill Lynch and subject to certain exceptions. The underwriters may from time to time continue to release other securities of ours that are currently subject to lock–up, subject to applicable regulations of the National Association of Securities Dealers, or NASD. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs. See "Underwriting" and "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling our securities after this offering.

***We have in the past failed to comply with Nasdaq Marketplace Rules, including the timely filing of our annual report and maintaining a majority of independent directors on our board of directors.***

Our failure to timely file our 2006 annual report on Form 20–F subjected us to delisting review by the Nasdaq Listing Qualifications Panel. See "— Our failure to timely file the 2006 annual report on Form 20–F as a result of allegations raised by an anonymous investor holding a short position in our ADSs may subject us to shareholder litigation and delisting review, either of which may materially and adversely affect our business". In addition, in the past we previously failed to maintain a majority of independent directors on our board of directors, which put us out of compliance with Nasdaq Marketplace Rule 4350. See "Management". On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our annual report for 2006.

Our historical failure to comply with Nasdaq Marketplace Rules has on one occasion subjected us to delisting review. If for any reason we fail to maintain compliance with Nasdaq Marketplace Rules in the future, we could be subject to additional delisting procedures and sanctions, which could affect our reputation and the market value of

Table of Contents

our securities, and could result in shareholder litigation, which may divert the attention of our management and force us to expend resources to defend against such claims. Any litigation may have a material and adverse effect on our business and future results of operations.

***A significant percentage of our outstanding ordinary shares is beneficially owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer, and as a result, he may have significantly greater influence on us and our corporate actions by nature of the size of his shareholdings relative to our public shareholders.***

Following this offering, Jason Nanchun Jiang will beneficially own approximately 10.53% of our outstanding ordinary shares, or 10.37% if the underwriters exercise their option to purchase additional ADSs in full. Accordingly, Jason Nanchun Jiang has significant influence in determining the outcome of any corporate transaction or other matter submitted to the shareholders for approval, including mergers, consolidations and the sale of all or substantially all of our assets, election of directors and other significant corporate actions. Further, Jason Nanchun Jiang is also an 85% shareholder of our affiliated PRC entity, Focus Media Advertisement, with which we have contractual arrangements that are essential to our business. The continuing cooperation of Focus Media Advertisement, and its shareholders, branches and subsidiaries, is important to our business. Without Jason Nanchun Jiang's consent, we could be prevented from entering into transactions or conducting business that could be beneficial to us. Accordingly, Mr. Jiang's control of Focus Media Advertisement could hinder any change in control of our business, particularly where such change of control would benefit shareholders other than Mr. Jiang. It would be difficult for us to change our corporate structure if any disputes arise between us and Mr. Jiang or if he fails to carry out his contractual and fiduciary obligations to us. Thus, Jason Nanchun Jiang's interests as an officer and employee may differ from his interests as a shareholder or from the interests of our other shareholders, including you.

***Anti–takeover provisions in our charter documents may discourage any hostile acquisition attempt by a third party, which could limit our shareholders' opportunity to sell their shares at a premium.***

Our amended and restated memorandum and articles of association include provisions that could limit the ability of others to acquire control of us, modify our structure or cause us to engage in change–of–control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of us in a tender offer or similar transaction.

For example, our board of directors will have the authority, without further action by our shareholders, to issue preference shares in one or more series and to fix the powers and rights of these shares, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares. Preference shares could thus be issued quickly with terms calculated to delay or prevent a change in control or make removal of management more difficult. In addition, if the board of directors issues preference shares, the market price of our ordinary shares may fall and the voting and other rights of the holders of our ordinary shares may be adversely affected.

In addition, some actions require the approval of a supermajority of at least two thirds of our board of directors which, among other things, would allow our non–independent directors to block a variety of actions or transactions, such as a merger, asset sale or other change of control, even if all of our independent directors unanimously voted in favor of such action, further depriving our shareholders of an opportunity to sell their shares at a premium. In addition, our directors serve terms of three years each, which terms are not staggered. The length of these terms could present an additional obstacle against the taking of action, such as a merger or other change of control, that could be in the interest of our shareholders.

***We are a Cayman Islands company and, because judicial precedent regarding the rights of shareholders is more limited under Cayman Islands law than under U.S. law, you may have less protection of your shareholder rights than you would under U.S. law.***

Our corporate affairs are governed by our amended and restated memorandum and articles of association, the Cayman Islands Companies Law and the common law of the Cayman Islands. The rights of shareholders to take

39

**Table of Contents**

action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. In addition, some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands.

As a result of all of the above, public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a U.S. company.

***Judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands company and substantially all of our assets are located outside of the United States. All of our current operations are conducted in the PRC. In addition, most of our directors and officers are nationals and residents of countries other than the United States. A substantial portion of the assets of these persons are located outside the United States. As a result, it may be difficult for you to effect service of process within the United States upon these persons. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors, most of whom are not resident in the United States and the substantial majority of whose assets are located outside of the United States. In addition, there is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of United States courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state. In addition, there is uncertainty as to whether such Cayman Islands or PRC courts would be competent to hear original actions brought in the Cayman Islands or the PRC against us or such persons predicated upon the securities laws of the United States or any state.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement.***

Holders of our ADSs may only exercise their voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Upon receipt of voting instructions from a holder of ADSs in the manner set forth in the deposit agreement, the depositary will endeavor to vote the underlying ordinary shares in accordance with these instructions. Under our amended and restated memorandum and articles of association and Cayman Islands law, the minimum notice period required for convening a general meeting is ten days. When a general meeting is convened, you may not receive sufficient notice of a shareholders' meeting to permit you to withdraw your ordinary shares to allow you to cast your vote with respect to any specific matter at the meeting. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if your ordinary shares are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, the depositary will give us a discretionary proxy to vote our ordinary shares underlying your ADSs at shareholders' meetings if you do not vote, unless:

• we have failed to timely provide the depositary with our notice of meeting and related voting materials;

• we have instructed the depositary that we do not wish a discretionary proxy to be given;

Table of Contents

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- voting at the meeting is made on a show of hands.

The effect of this discretionary proxy is that you cannot prevent our ordinary shares underlying your ADSs from being voted, absent the situations described above, and it may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

***You may not receive distributions on our ordinary shares or any value for them if it is illegal or impractical to make them available to you.***

The depositary of our ADSs has agreed to pay you the cash dividends or other distributions it or the custodian for our ADSs receives on our ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of our ordinary shares your ADSs represent. However, the depositary is not responsible if it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed pursuant to an applicable exemption from registration. The depositary is not responsible for making a distribution available to any holders of ADSs if any government approval or registration required for such distribution cannot be obtained after reasonable efforts made by the depositary. We have no obligation to take any other action to permit the distribution of our ADSs, ordinary shares, rights or anything else to holders of our ADSs. This means that you may not receive the distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may have a material and adverse effect on the value of your ADSs.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***We have not determined a specific use for a portion of our net proceeds from this offering and we may use these proceeds in ways with which you may not agree.***

We have not determined a specific use for a portion of our net proceeds of this offering. Our management will have considerable discretion in the application of these proceeds received by us. You will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. The net proceeds may be used for corporate purposes that do not improve our profitability or increase our ADS price. The net proceeds from this offering may also be placed in investments that do not produce income or lose value.

***Dividends payable by us to our foreign investors may become subject to withholding taxes under PRC tax laws.***

Under the EIT Law, dividends payable to foreign investors which are "derived from sources within the PRC" may be subject to income tax at the rate of 20% by way of withholding. Since we are a holding company and substantially all of our income will come from dividends that we receive from our PRC subsidiaries, dividends that

41

Table of Contents

we declare from such income may be deemed "derived from sources within the PRC" for purposes of the EIT Law and therefore subject to a 20% withholding tax. While the EIT Law stipulates that such taxes may be exempted or reduced, no rules or guidance implementing the EIT Law have been issued yet, and it is unclear under what circumstances, and to what extent, such tax would be exempted or reduced.

The EIT Law also provides that dividend income between "qualified resident enterprises" is exempted income, which may imply that dividends we receive from our PRC subsidiaries would be exempt from tax, but we cannot assure you that we will be able to obtain such treatment for dividends paid to us by our PRC subsidiaries. Moreover, if we are deemed to be a PRC resident enterprise under the EIT law, a foreign investor in us may be able to claim the benefits of any income tax treaty between his or her resident country and China. We cannot assure you, however, that treaty benefits will be available to you (for example with respect to the withholding tax rate on dividends) even if we are deemed a PRC resident enterprise.

If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our foreign shareholders and ADSs holders, the value of your investment in our ADSs may be materially and adversely affected.

***Gains on the sales of our shares or ADSs may become subject to PRC income taxes.***

Under the EIT Law, our foreign enterprise shareholders and enterprise ADSs holders may be subject to a 20% income tax upon any gains they realize from the transfer of their shares or ADSs, if such income is regarded as income from "sources within the PRC." What will constitute "sources within the PRC" and whether or not there will be any exemption or reduction in taxation for our foreign corporate investors, however, are unclear since no rules or guidance concerning the new tax law has been issued yet. If our foreign shareholders and ADSs holders are required to pay PRC income tax on the transfers of their shares or ADSs, the value of your investment in our ADSs may be materially and adversely affected.

42

Table of Contents

## FORWARD–LOOKING STATEMENTS

This prospectus contains forward–looking statements that are based on our current expectations, assumptions, estimates and projections about us and our industry. All statements other than statements of historical fact in this prospectus are forward–looking statements. These forward–looking statements can be identified by words or phrases such as "may", "promising", "anticipate", "estimate", "plan", "believe", "is/are likely to" or other similar expressions. The forward–looking statements included in this prospectus relate to, among others:

- our goals and strategies;

- our future business development, financial condition and results of operations;

- projected revenues, profits, earnings and other estimated financial information;

- our ability to acquire businesses complementary to our core business and integrate the acquired companies into our business;

- achieving anticipated or potential synergies with companies we acquire, including Framedia, Target Media, E–Times, Focus Media Wireless, ACL and Allyes;

- our plans to expand our advertising network into new cities and regions in China and diversify into new networks, such as mobile handset advertising, outdoor LED billboard advertising, Internet advertising services and new advertising channels;

- the growth or acceptance of Framedia's poster frame network, Focus Media Wireless's mobile handset advertising network, our outdoor LED billboard network and Allyes' Internet advertising services business;

- our plan to develop our business into a multi–platform out–of–home advertising network, including through operation of Focus Media Wireless's mobile handset advertising network services and Allyes' Internet advertising services business;

- our plan to identify and create additional advertising channels that target specific consumer demographics, which could allow us to increase our advertising revenue;

- competition in the PRC advertising industry;

- the expected growth in the urban population, consumer spending, average income levels and advertising spending levels;

- PRC governmental policies and regulations relating to the advertising industry and regulations and policies promulgated by the State Administration of Foreign Exchange;

- other risks outlined in our filings with the Securities and Exchange Commission, including our registration statements on Form F–1, as amended, annual reports of Form 20–F and periodic reports on Form 6–K; and

- those other risks identified in "Risk Factors" of this prospectus.

These forward–looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward–looking statements are reasonable, we cannot assure you that our expectations will turn out to be correct. Our actual results could be materially different from or worse than our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Risk Factors", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Business" and other sections of this prospectus.

This prospectus also contains data relating to the advertising industry that includes projections based on a number of assumptions. The advertising market may not grow at the rates projected by market data, or at all. The failure of these markets to grow at the projected rates may have a material adverse effect on our business and the market price of our ADSs. In particular, the relatively new and rapidly changing nature of the out–of–home advertising sector subjects any projections or estimates relating to the growth prospects or future condition of our sector to significant uncertainties. Furthermore, if any one or more of the assumptions underlying the market data

**Table of Contents**

turns out to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward–looking statements.

The forward–looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. We undertake no obligation to update any forward–looking statements to reflect events or circumstances after the date on which the statements are made or to reflect the occurrence of unanticipated events.

44

Table of Contents

**OUR CORPORATE STRUCTURE**

**Our History**

Our predecessor company, Shanghai Aiqi Advertisement Co., Ltd., or Aiqi Advertisement, was established by immediate family members of Jason Nanchun Jiang in September 1997 and operated as an advertising agency. In May 2003, Aiqi Advertisement discontinued its advertising agency business, was renamed Shanghai Focus Media Advertisement Co., Ltd., commenced operation of our out–of–home television advertising network in China and reorganized its shareholdings. At the same time, we entered into arrangements with Focus Media Advertisement that resulted in the consolidation of Focus Media Advertisement. Following this reorganization Jason Nanchun Jiang continued to hold a controlling interest in Focus Media Advertisement.

In conjunction with the change in our business model in May 2003 and to facilitate foreign investment in our company, we established our offshore holding company, Focus Media Holding Limited as a company registered in the British Virgin Islands in April 2003. In April 2005, we completed the process of changing Focus Media Holding Limited's corporate domicile to the Cayman Islands and we are now a Cayman Islands company. On July 13, 2005, our ADSs were listed for quotation on the Nasdaq Global Market. Throughout our operating history, we have expanded our existing businesses and entered into new business areas through acquisitions. The following paragraphs present the material acquisitions we have entered into during the past three years.

In January 2006, we acquired Framedia, which operates networks of advertising poster frames placed primarily in elevators and public areas of residential complexes in China. In February 2006, we acquired Target Media. Target Media operated an out–of–home advertising network using flat–panel displays placed in elevator lobbies and other public areas in commercial buildings, hospitals, hotels, banks, residential buildings, convenience stores and other locations in cities in China. Following the acquisition of Target Media, we combined Target Media's network into our existing commercial location and in–store networks. Other than holding their existing contracts, the former Target Media entities no longer conduct any operations, and the combined network is operated through our existing corporate entities. In March 2006, we acquired Focus Media Wireless, which operates a mobile handset advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. In September 2006, we acquired a 70% equity interest in ACL, which through its affiliated PRC entity, leases screen time from movie theaters in cities in China, which it then sells as screen time slots to advertisers. We continue, from time to time, to make acquisitions to expand our existing networks and to enter into new areas of business. For instance, in the first half of 2007, we acquired companies to expand our mobile handset advertising network and outdoor LED billboard network as well as entering into the Internet advertising business through several acquisitions including Allyes. We expect that acquisitions will continue to be an important component of our growth strategy.

In March 2007, we acquired Allyes, which operates an Internet advertising services and technology business.

**Our Corporate Structure and Contractual Arrangements**

Substantially all of our operations are conducted in China as follows:

- with regard to the operation of our out–of–home television networks, through Focus Media Technology, our indirect wholly–owned subsidiaries in China, Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, and New Focus Media Advertisement, a 90%–owned subsidiary of Focus Media Digital, and through our contractual arrangements with several of our consolidated affiliated entities in China, including Focus Media Advertisement, and its subsidiaries. Focus Media Advertisement owns the remaining 10% equity interest in Focus Media Digital and New Focus Media Advertisement;

- with regard to the operation of our poster frame network, through Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, each of which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively;

- with regard to the operation of our mobile handset advertising network, through Focus Media Wireless, which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively; and

**Table of Contents**

- with regard to the operation of the Internet advertising marketing agency business of Allyes, through seven PRC operating companies, which we refer to as the Allyes operating affiliates, each of which is owned by PRC citizens.

Each of Framedia Investment, Dotad Technology, Allyes Information Technology Co., Ltd. and their respective affiliated entities and shareholders, have entered into contractual arrangements substantially similar to those control agreements entered into among Focus Media Technology, Focus Media Digital, New Focus Media Advertisements, Focus Media Advertisement and its shareholders and subsidiaries. See "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Enterprises, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries".

In connection with its entry into the World Trade Organization, China is required to relax restrictions on foreign investment in the advertising industry in China. Accordingly, PRC regulations stipulate that starting from December 10, 2005, foreign investors are allowed to directly own 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising business outside of China or to directly own less than 100% if the foreign entity has at least two years of direct operations in the advertising business outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify for direct ownership of a PRC advertising company under PRC regulations any earlier than two or three years, respectively, after we commence any such operations or until we acquire a company which has directly operated an advertising business for the required period of time. We do not currently know how or when we will be able to qualify under these regulations. Even if we do qualify in the future, it may be burdensome or not cost effective for us to meet the required criteria for direct ownership. If and when we qualify for direct ownership, we intend to explore the commercial feasibility of changing our current structure, including possibly direct ownership of Focus Media Advertisement and its subsidiaries, taking into consideration relevant cost, market, competitive and other factors. In the event we take such steps, we cannot assure you that we will be able to identity or acquire a qualified foreign company for a possible future restructuring or that any restructuring we may undertake to facilitate direct ownership will be successful.

46

Table of Contents

The following diagram of our current corporate structure includes our primary businesses and the primary entities involved in the operation of those businesses and excludes dormant entities and entities, which aside from holding existing contracts, no longer conduct any operations:



(1)  Loans used to capitalize our PRC operating companies and to facilitate our control over them.
(2)  Agreements that give us effective control over our PRC operating affiliates and their respective subsidiaries, as described in "Related Party Transactions".
(3)  Agreement that transfer a substantial portion of the economic benefits of our PRC operating affiliates and their respective subsidiaries to us, as described in "Related Party Transactions".
(4)  Each of our PRC operating affiliates is owned by two PRC shareholders, which are in each case either (i) two PRC citizens designated by us or our subsidiaries or (ii) by two PRC entities owned by our subsidiaries or by our designated appointees.
(5)  The wholly–owned entities relating to our out–of–home television network operations include New Focus Media Technology, Focus Media Technology, Focus Media Digital and New Focus Media Digital. These consist of subsidiaries of Focus Media Advertisement, which holds between 60% and 99% of the subsidiaries, with the remaining minority interest held by Jimmy Wei Yu, Focus Media Advertising Agency or unrelated third parties.
(6)  The PRC operating affiliates engaged in the operating of our poster frame network include: New Structure Advertisement, Framedia Advertisement and Guangzhou Framedia.
(7)  The Allyes operating affiliates engaged in the operation of our online advertising agency business consist of seven different companies under our control.
(8)  Our out–of–home television network operations comprises our commercial location, in–store, outdoor LED and movie theater advertising networks.

47

Table of Contents

Accordingly, since we have not been involved in the direct operation of an advertising business outside of China, our domestic PRC subsidiaries, Focus Media Technology, Framedia Investment, Focus Media Digital and New Allyes Technology, which are considered foreign−invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through contractual arrangements with our consolidated affiliated entities in China, including (i) Focus Media Advertisement and its subsidiaries with regard to our commercial location, in−store and outdoor LED networks, (ii) Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, (iii) Focus Media Wireless with regard to our mobile handset advertising network, and (iv) each of the seven Allyes operating affiliates, and each of their respective shareholders with regard to our Internet advertising services network. Focus Media Advertisement is owned by two PRC citizens, Jason Nanchun Jiang, our chairman and chief executive officer, and Jimmy Wei Yu, one of our directors. Each of Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and Focus Media Wireless is owned by Focus Media Advertisement and Focus Media Advertising Agency. Each of the Allyes operating affiliates is owned by two PRC citizens. . Each of Focus Media Advertisement, several of its subsidiaries, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless, and the Allyes operating affiliates, which we refer to collectively as our PRC operating affiliates, holds the requisite licenses to provide advertising, telecommunications or Internet services in China, as applicable. In 2006, we began operating a portion of our advertising business through our 90%−owned indirect subsidiary Focus Media Advertisement after which time we will no longer entirely rely on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders for the operation of our advertising business.

We have been and are expected to continue to be dependent on our PRC operating affiliates to operate our advertising business until we acquire them as our wholly−owned subsidiaries. We and Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Investment, Dotad Technology, New Allyes Information Technology (Shanghai) Co., Ltd. and New Allyes Technology, which we refer to as our wholly−foreign owned entities, have entered into contractual arrangements with their respective PRC operating affiliates and shareholders, pursuant to which:

- we are able to exert effective control over our PRC operating affiliates;

- a substantial portion of the economic benefits of our PRC operating affiliates will be transferred to us; and

- each of our wholly−foreign owned entities or their respective designees has an exclusive option to purchase all or part of the equity interests in our PRC affiliated entities or their respective nominee holders, or, in some cases, all or part of the assets of our PRC affiliated entities, in each case when and to the extent permitted by PRC law.

Each of our contractual arrangements with our PRC affiliated entities and their respective shareholders and subsidiaries can only be amended with the approval of our audit committee or another independent body of our board of directors. See "Related Party Transactions" for further information on our contractual arrangements with these parties.

In the opinion of Global Law Office, our PRC legal counsel:

- the respective ownership structures of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

- the contractual arrangements among Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates, subsidiaries and shareholders, in each case governed by PRC law are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- the PRC business operations of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

48

**Table of Contents**

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in advertising businesses, we could be subject to severe penalties. See "Risk Factors — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties", "— Our business operations may be affected by legislative or regulatory changes" and "— The PRC legal system embodies uncertainties which could limit the legal protections available to you and us".

49

**Table of Contents**

## USE OF PROCEEDS

We estimate that we will receive net proceeds from this offering of approximately $299.2 million, or approximately $419.5 million if the underwriters exercise their option in full to purchase additional ADSs, in each case based on an assumed public offering price of US$62.00 per ADS which was the last trading price of our ADSs on October 31, 2007, after deducting underwriting discounts and the estimated offering expenses payable by us. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. A US$1.00 increase (decrease) in the assumed public offering price of US$62.00 per ADS would increase (decrease) the net proceeds we expect to receive by US$4.85 million.

We anticipate using the net proceeds of this offering to fund potential acquisitions. We may use any remaining amounts for our future general corporate purposes.

The foregoing represents our current intentions with respect to the use of the net proceeds of this offering based upon our present plans and business conditions, but our management will have significant flexibility and discretion in applying the net proceeds of the offering. The occurrence of new business opportunities, unforeseen events or changed business conditions may result in application of the proceeds of this offering in a manner other than as described in this prospectus. At this time, we have not entered into advanced discussions or negotiations with respect to any potential material acquisitions.

To the extent that the net proceeds we receive from this offering are not immediately applied for the above purposes, we intend to invest our net proceeds in short–term, interest bearing debt instruments or bank deposits. These investments may have a material adverse effect on the U.S. federal income tax consequences of your investment in our ADSs. It is possible that we may become a passive foreign investment company for United States federal income tax purposes, which could result in negative tax consequences for you. These consequences are described in more detail elsewhere in this prospectus.

In utilizing the proceeds of this offering in the manner described above, as an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- loans by us to Focus Media Technology and Focus Media Digital through Focus Media Technology, each a foreign invested enterprise, to finance its activities cannot exceed statutory limits and must be registered with the State Administration of Foreign Exchange or its local counterpart; and

- loans by us to Focus Media Advertisement or its subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authority and must also be registered with the State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital, New Focus Media Advertisement through Focus Media Technology, Framedia Investment, Dotad Technology or New Allyes Information by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Because Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless, New Allyes Information and their respective subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in "Regulation of Our Industry". We cannot assure you that we can obtain these government registrations or approvals on a timely basis, if at all, with respect to future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Focus Media Wireless, Focus Media Advertisement, New Allyes Information or any of their respective subsidiaries.

50

**Table of Contents**

## DIVIDEND POLICY

We have not previously declared any dividends. In 2004, we recorded deemed dividends of $8.3 million, $2.2 million and $13.4 million in connection with our Series A, Series B and Series C−1 and Series C−2 convertible redeemable preference shares, of which $4.9 million of the deemed dividend related to the difference between the fair value at that time of the Series C−1 convertible redeemable preference shares and ordinary shares in connection with a sale of 9,729,600 ordinary shares by Jason Nanchun Jiang, our chairman and CEO, to a third–party investor, which shares were redesignated as Series C−1 convertible redeemable preference shares. These deemed dividends were not cash dividends and upon conversion of our Series A, Series B and Series C−1 and Series C−2 convertible redeemable preference shares into ordinary shares, we are no longer required to record deemed dividends prospectively. We currently intend to retain all available funds and any future earnings for use in the operation and expansion of our business and do not anticipate paying any cash dividends on our ordinary shares, or indirectly on our ADSs, for the foreseeable future.

Future cash dividends, if any, will be at the discretion of our board of directors and will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, shareholders' interests, contractual restrictions and other factors as our board of directors may deem relevant. In addition, we can pay dividends only out of our profits or other distributable reserves. Any dividend we declare will be paid to the holders of ADSs, subject to the terms of the deposit agreement, to the same extent as holders of our ordinary shares, less the fees and expenses payable under the deposit agreement. Other distributions, if any, will be paid by the depositary to holders of our ADSs in any means it deems legal, fair and practical. Any dividend will be distributed by the depositary, in the form of cash or additional ADSs, to the holders of our ADSs. Cash dividends on our ADSs, if any, will be paid in U.S. dollars. See "Description of American Depositary Shares".

51

**Table of Contents**

### MARKET PRICE INFORMATION FOR OUR ADSs

Our ADSs have been listed on the Nasdaq Global Market since July 13, 2005. Our ADSs trade under the symbol "FMCN". From July 13, 2005 until April 10, 2007, each of our ADSs represented ten of our ordinary shares. Starting April 11, 2007, we reduced this ratio to five–to–one. All ADS trading prices on the Nasdaq set forth in this prospectus, including historical trading and closing prices, have been adjusted to reflect the new ADS–to–share ratio of five–to–one. For the period from July 1, 2006 to October 31, 2007 the closing price of our ADSs on Nasdaq has ranged from US$26.05 to US$63.00 per ADS. The following table provides the high and low trading prices for our ADSs on the Nasdaq Global Market for each month since July 2006 and all prices have been retroactively adjusted to reflect the change in ratio effective on April 12, 2007 for all periods presented.

| | Sale Price | |
|---|---|---|
| Monthly Highs and Lows | High | Low |
| | US$ | US$ |
| **2006 (from July 1)** | | |
| July | 33.72 | 28.31 |
| August | 31.78 | 27.70 |
| September | 31.00 | 27.26 |
| October | 30.46 | 26.05 |
| November | 36.44 | 26.50 |
| December | 36.56 | 33.02 |
| **2007** | | |
| January | 42.92 | 33.50 |
| February | 44.25 | 38.00 |
| March | 40.05 | 35.63 |
| April | 41.26 | 35.81 |
| May | 45.45 | 35.23 |
| June | 52.09 | 41.90 |
| July | 53.29 | 39.25 |
| August | 43.00 | 34.57 |
| September | 61.39 | 39.88 |
| October | 63.00 | 54.30 |

**Table of Contents**

## CAPITALIZATION

The following table sets forth, as of June 30, 2007:

- our actual capitalization; and

- our pro forma capitalization, to give effect to the issuance and sale of 5,000,000 ADSs offered by our company in this offering at the assumed public offering price of $12.40 per share based on the last trading price of our ADS, on October 31, 2007, as adjusted to reflect the ratio of one ADS to five ordinary shares, after deducting underwriting discounts, commissions and estimated offering expenses.

You should read this table in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, included elsewhere in this prospectus.

| | As of June 30, 2007 | |
|---|---|---|
| | **Actual** | **Pro Forma(1)(2)** |
| | **(In thousands of U.S. dollars, except for share data)** | |
| Short term borrowings(3) | $ 394 | $ 394 |
| Shareholders' Equity: | | |
| Ordinary shares ($0.00005 par value; 885,516,600 shares authorized; 611,242,827 shares issued and outstanding (actual) and 636,242,827 shares issued and outstanding) (pro forma) | $ 31 | $ 32 |
| Additional paid–in capital | 1,242,816 | 1,542,015 |
| Retained earnings | 148,734 | 148,734 |
| Accumulated other comprehensive loss | 15,740 | 15,740 |
| Total shareholders' equity | 1,407,321 | 1,706,521 |
| Total capitalization | $ 1,407,715 | $ 1,706,915 |

(1)  Assumes that the underwriters do not exercise their over–allotment option.

(2)  A US$1.00 increase (decrease) in the assumed public offering price of US$62.00 per ADS would increase (decrease) the amounts representing total shareholders' equity and total capitalization by US$4.85 million.

(3)  None of our short–term borrowings is guaranteed.

**Table of Contents**

## EXCHANGE RATES

Our operating businesses are currently conducted in China and substantially all of our revenues and expenses are denominated in Renminbi. The People's Bank of China, or PBOC, sets and publishes daily a base exchange rate with reference primarily to the supply and demand of Renminbi against a basket of currencies in the market during the prior day. The PBOC also takes into account other factors, such as the general conditions existing in the international foreign exchange markets. Since 1994, the conversion of Renminbi into foreign currencies, including Hong Kong dollars and U.S. dollars, has been based on rates set by the PBOC, which are set daily based on the previous day's inter–bank foreign exchange market rates and current exchange rates in the world financial markets. From 1994 to July 20, 2005, the official exchange rate for the conversion of Renminbi to U.S. dollars was generally stable. Although PRC governmental policies were introduced in 1996 to reduce restrictions on the convertibility of Renminbi into foreign currency for current account items, conversion of Renminbi into foreign exchange for capital items, such as foreign direct investment, loans or securities, requires the approval of the State Administration for Foreign Exchange and other relevant authorities. On July 21, 2005, the PRC government introduced a managed floating exchange rate system to allow the value of the Renminbi to fluctuate within a regulated band based on market supply and demand and by reference to a basket of currencies. On the same day, the value of the Renminbi appreciated by 2.0% against the U.S. dollar. Since then, the PRC government has made, and may in the future make, further adjustments to the exchange rate system. The PBOC announces the closing price of a foreign currency traded against the Renminbi in the inter–bank foreign exchange market after the closing of the market on each working day, and makes it the central parity for the trading against the Renminbi on the following working day.

The conversion of Renminbi into U.S. dollars in this prospectus is based on the noon buying rate in The City of New York for cable transfers of Renminbi as certified for customs purposes by the Federal Reserve Bank of New York. For your convenience, this prospectus contains translations of Renminbi at $1.00 to RMB 7.6120, which was the prevailing rate on June 30, 2007. The prevailing rate at October 31, 2007 was $1.00 to RMB 7.4682. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, the rates stated below, or at all. The PRC government imposes controls over its foreign currency reserves in part through direct regulation of the conversion of Renminbi into foreign exchange and through restrictions on foreign trade.

Table of Contents

The following table sets forth information concerning exchange rates between the Renminbi and the U.S. dollar for the periods indicated. These rates are provided solely for your convenience and are not necessarily the exchange rates that we used in this prospectus or will use in the preparation of our periodic reports or any other information to be provided to you.

| | Renminbi per U.S. Dollar Noon Buying Rate | | | |
|---|---|---|---|---|
| | Average | High | Low | Period–End |
| 2001 | 8.2771 | 8.2786 | 8.2709 | 8.2766 |
| 2002 | 8.2770 | 8.2800 | 8.2700 | 8.2800 |
| 2003 | 8.2772 | 8.2800 | 8.2765 | 8.2769 |
| 2004 | 8.2768 | 8.2774 | 8.2764 | 8.2765 |
| 2005 | 8.1940 | 8.2765 | 8.0702 | 8.0702 |
| December | 8.0755 | 8.0808 | 8.0702 | 8.0702 |
| 2006 | 7.9723 | 8.0702 | 7.8041 | 7.8087 |
| 2007 | | | | |
| January | 7.7876 | 7.8127 | 7.7705 | 7.7714 |
| February | 7.7502 | 7.7632 | 7.7410 | 7.7410 |
| March | 7.7369 | 7.7454 | 7.7232 | 7.7232 |
| April | 7.7247 | 7.7345 | 7.7090 | 7.7090 |
| May | 7.6773 | 7.7065 | 7.6463 | 7.6516 |
| June | 7.6333 | 7.6680 | 7.6120 | 7.6120 |
| July | 7.5757 | 7.6055 | 7.5580 | 7.5720 |
| August | 7.5734 | 7.6181 | 7.5420 | 7.5462 |
| September | 7.5196 | 7.5540 | 7.4928 | 7.4928 |
| October | 7.5016 | 7.5158 | 7.4682 | 7.4682 |

*Source:* Federal Reserve Bank of New York.

**Table of Contents**

## SELECTED CONSOLIDATED FINANCIAL AND OPERATING DATA

The following selected consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financials, which include the consolidation of Focus Media Advertisement, Shanghai Perfect Media, Focus Media Wireless and the entities that operate our Internet advertising services network as variable interest entities, thereafter and are presented in accordance with U.S. GAAP. Our statements of operations for 2004, 2005 and 2006 and our balance sheets as of December 31, 2005 and 2006 are derived from those financial statements that has been included elsewhere in this prospectus.

Our selected consolidated financial information for the years ended December 31, 2002 and 2003 have been derived from Focus Media Advertisement audited consolidated financial statements, which are not included in this prospectus. Our statement of operations for each of the six months ended June 30, 2006 and 2007 and balance sheet data as of June 30, 2006 and 2007 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus. We have prepared the unaudited consolidated financial data on the same basis as the audited consolidated financial statements and have included, in our opinion, all adjustments, consisting only of normal and recurring adjustments, that we consider necessary for a fair presentation of the financial information set forth in those statements. Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The selected consolidated financial information for the periods and as of the dates indicated should be read in conjunction with our financial statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we operated as an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time or space to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out–of–home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in–store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless. In March 2007, we acquired Allyes.

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | | | | (In thousands of U.S. dollars) | | | |
| **Selected Consolidated Statements of Operations Data:** | | | | | | | |
| Gross Advertising Service revenues | $   24 | $  3,671 | $  29,109 | $  73,419 | $  231,186 | $  90,680 | $  183,517 |
| Net Advertising Service revenues: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location*[1] | — | $  3,369 | $  26,321 | $  61,435 | $  132,061 | 51,819 | 82,704 |
| *In–store network*[1] | — | — | — | 5,469 | 26,907 | 11,832 | 13,882 |
| *Poster frame network*[1] | — | — | — | — | 40,904 | 15,845 | 31,217 |
| Mobile handset advertising[1] | — | — | — | — | 10,101 | 3,076 | 16,890 |
| Internet advertising services[1] | — | — | — | — | — | — | 25,236 |
| Advertising service revenue[1] | — | 3,369 | 26,321 | 66,904 | 209,973 | 82,572 | 169,929 |
| Other revenues | — | 389 | 2,889 | 1,325 | 1,932 | 690 | 687 |
| Total net revenues | 24 | 3,758 | 29,210 | 68,229 | 211,905 | 83,262 | 170,616 |

56

Table of Contents

|  | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
|  | | | (In thousands of U.S. dollars) | | | | |
| **Cost of revenues:** | | | | | | | |
| Net advertising service cost: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location* | — | 1,566 | 6,804 | 18,325 | 42,836 | 19,713 | 30,767 |
| *In–store network* | — | — | — | 7,423 | 18,106 | 8,367 | 10,214 |
| *Poster frame network* | — | — | — | — | 13,621 | 6,014 | 10,011 |
| Mobile Handset Advertising | — | — | — | — | 6,052 | 2,405 | 7,323 |
| Internet Advertising | — | — | — | — | — | — | 18,405 |
| Advertising service cost | — | 1,566 | 6,804 | 25,748 | 80,615 | 36,499 | 76,720 |
| Other costs | — | 275 | 1,934 | 976 | 765 | 312 | 303 |
| Total cost of revenues | — | 1,841 | 8,738 | 26,724 | 81,380 | 36,811 | 77,023 |
| Gross profit | 24 | 1,917 | 20,472 | 41,505 | 130,525 | 46,451 | 93,593 |
| **Operating expenses:** | | | | | | | |
| General and administrative | 21 | 985 | 3,988 | 9,120 | 25,723 | 10,693 | 20,329 |
| Selling and marketing | 3 | 407 | 3,473 | 9,599 | 25,762 | 9,783 | 23,041 |
| Other operating income | — | — | — | — | (1,338) | (157) | (2,384) |
| Goodwill impairment loss | — | — | 58 | — | — | — | — |
| Total operating expenses | 24 | 1,392 | 7,519 | 18,719 | 50,147 | 20,319 | 40,986 |
| Income from operations | — | 525 | 12,953 | 22,786 | 80,378 | 26,132 | 52,607 |
| Interest income | — | 1 | 10 | 1,812 | 4,560 | 1,781 | 4,634 |
| Interest expenses | — | — | — | (50) | (305) | (288) | (7) |
| Other income | — | — | 54 | 70 | 271 | (11) | 252 |
| Other expenses | — | (9) | (58) | (231) | (558) | (470) | (212) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | — | (11,692) | — | — | — | — |
| Income before income taxes and minority interest | — | 517 | 1,267 | 24,387 | 84,346 | 27,144 | 57,274 |
| Total income taxes | — | (482) | (908) | (694) | (1,044) | (989) | (3,286) |
| Minority interest | — | 8 | 13 | (145) | (105) | (51) | 18 |
| Equity loss of affiliates | — | (18) | — | — | — | — | — |
| Net income | — | $    25 | $    372 | $  23,548 | $   83,197 | 26,104 | 54,006 |

|  | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
|  | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| **Earnings per share data:** | | | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | (8,308) | — | — | — | — |

57

Table of Contents

|  | | For the Year Ended December 31, | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|  | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | (2,191) | — | — | — | — |
| Deemed dividend on Series C−1 convertible redeemable preference shares | — | — | (13,356) | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | — | 12,906 | — | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ — | $ 25 | $ (10,577) | $ 23,548 | $ 83,197 | $ 26,104 | $ 54,006 |
| Income (loss) per share — basic | $ — | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ — | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income per share | — | 144,657,600 | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income per share | — | 144,657,600 | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

|  | As of December 31, | | | | | As of June 30, |
|---|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|  | | | (In thousands of U.S. dollars, except share data) | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | $ 15 | $ 716 | $ 22,669 | $ 36,653 | $ 164,611 | $ 187,592 |
| Other current assets[2] | 106 | 1,902 | 12,713 | 104,988 | 78,712 | 240,632 |
| Non−current assets | 8 | 2,688 | 21,033 | 70,713 | 862,919 | 1,098,745 |
| Total assets | 129 | 5,306 | 56,415 | 212,354 | 1,106,242 | 1,526,969 |
| Current liabilities | 7 | 4,119 | 8,634 | 20,694 | 51,837 | 113,069 |
| Non−current liabilities | — | — | — | — | 3,303 | 6,132 |
| Total liabilities | 7 | 4,119 | 8,634 | 20,694 | 55,140 | 119,201 |
| Minority interest | — | 4 | — | 245 | 358 | 447 |
| Mezzanine equity | — | — | 53,273 | — | — | — |
| Ordinary shares (nil, 200,000,000, 142,464,600, 378,306,000 and 534,896,873 and 611,242,627 shares issued and outstanding in 2002, 2003, 2004, 2005 and 2006 and June 30, 2007, respectively) | — | 10 | 7 | 19 | 27 | 31 |
| Other shareholders' equity (deficiency) | 122 | 1,173 | (5,580) | 191,396 | 1,050,717 | 1,407,290 |
| Total liabilities and shareholders' equity (deficiency) | $ 129 | $ 5,306 | $ 56,415 | $ 212,354 | $ 1,106,242 | $ 1,526,969 |

**Table of Contents**

| | As of December 31, | | | As of June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location network: | | | | |
| Our direct cities | 12,786 | 45,049 | 80,263 | 85,010 |
| Our regional distributors[3] | 2,629 | 3,177 | 5,197 | 4,677 |
| Total | 15,415 | 48,226 | 85,460 | 89,687 |
| Number of displays in our in–store network | — | 27,849 | 38,742 | 41,322 |
| Number of stores in our in–store network | — | 4,130 | 3,898 | 3,995 |
| Number of installed frames in our poster frame network[4] | — | — | 99,784 | 161,435 |

(1) Advertising service revenue is presented net of tax which includes business tax of 5.55% and cultural industries tax of ranging from 0% to 4.0% of our gross advertising service revenue. The following table sets for the business tax incurred on our revenues for the periods indicated:

| | For the Year Ended December 31, | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | (In thousands of U.S. dollars) | | | |
| Business sales taxes: | | | | | | | |
| **Digital out–of–home** | | | | | | | |
| *Commercial locations* | — | — | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
| *In–store network* | — | — | — | 524 | 2,803 | 1,221 | 1,442 |
| *Poster frame network* | — | — | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile handset advertising** | — | — | — | — | 779 | 289 | 398 |
| **Internet advertising services** | — | — | — | — | — | — | 1,182 |
| Total business sales taxes | — | — | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

(2) Other current assets are equal to total current assets less cash and cash equivalents.

(3) Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(4) Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

**Table of Contents**

**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and the related notes included elsewhere in this prospectus. Our consolidated financial statements have been prepared in accordance with U.S. GAAP. In addition, our consolidated financial statements and the financial data included in this prospectus reflect our reorganization and have been prepared as if our current corporate structure had been in place throughout the relevant periods. The following discussion and analysis contains forward–looking statements that involve risks and uncertainties. Actual results could differ materially from those projected in the forward–looking statements. For additional information regarding these risks and uncertainties, see "Risk Factors".*

**Overview**

Our out–of–home advertising network consists of (i) our digital out–of–home advertising networks, comprising our commercial location network, in–store network and poster frame network, (ii) our mobile handset advertising network; and (iii) our Internet advertising services network. We have experienced significant revenue and earnings growth, and the size of our network has grown significantly since we commenced our current business operations in May 2003.

The significant increase in our operating results since we commenced our current business operations is attributable to a number of factors, including the substantial expansion of our digital out–of–home advertising networks, the ongoing expansion of our mobile handset advertising network, the introduction of Internet advertising services into our platform, the successful execution and integration of strategic acquisitions, such as Framedia, Target Media, Focus Media Wireless, ACL and Allyes, and the growing acceptance of our multi–platform network as an appealing advertising medium by our clients.

We expect our future growth to be driven by a number of factors and trends including:

- Overall economic growth in China, which we expect to contribute to an increase in advertising spending in major urban areas in China where consumer spending is concentrated;

- Our ability to increase sales of advertising time slots and extend the duration of our advertising cycle on our commercial location and in–store networks;

- Our ability to increase sales of frame space on our poster frame network;

- Our ability to expand our client base through promotion of our services and cross–selling;

- Our ability to identify and create new advertising channels by establishing separate advertising networks that enable advertisers to target a diverse range of consumer groups with specific demographic profiles;

- Our ability to successfully enter into the mobile handset advertising business, in part through our recent acquisition of Focus Media Wireless;

- Our ability to successfully operate and market our new outdoor LED billboard network;

- Our ability to successfully operate and market our new Internet advertising services network; and

- Our ability to acquire and integrate companies that operate advertising businesses complementary to our existing operations.

Because our primary source of revenue is our advertising service revenue, we focus on factors that directly affect our advertising service revenue such as the size and scope of our network, the quality of the locations where we place our network and the price we charge for our advertising time slots after taking into account any discounts.

As we continue to expand our network, we expect to face a number of challenges. We have expanded our network rapidly, and we, as well as our competitors, have occupied many of the most desirable locations in China's major cities. In order to continue expanding our network in a manner that is attractive to potential advertising clients, we may continue to enter into new advertising media platforms and to establish additional stand–alone

**Table of Contents**

networks that provide effective channels for advertisers. In addition, we must react to continuing technological innovations, such as the potential uses of wireless and broadband technology in our network, and changes in the regulatory environment.

Our financial results for 2006 also include those of Framedia that we acquired on January 1, 2006, of Target Media that we acquired on February 28, 2006 and, starting in the second quarter of 2006, those of Focus Media Wireless that we acquired in March 2006. Starting in March 2007, our financial results also include those of Allyes, the acquisition of which we completed in March 2007.

**Revenues**

In 2004, 2005 and 2006, and for the six months ended June 30, 2007, we had total revenues of $29.2 million, $68.2 million, $211.9 million and $170.6 million, respectively. We generate revenues from the sale of advertising time slots on our digital out–of–home advertising networks, from the sale of frame space on our poster frame network, from advertising services through our mobile handset advertising network and, since April 2007, from Internet advertising services and software. Our advertising service revenue includes the sale of advertising time slots on our network, as well as a small amount of revenue attributable to other advertising related services we provide to our advertising clients. We also derive revenues from the sale of our flat–panel displays to regional distributors, which we refer to as our advertising equipment revenue. In 2004, 2005 and 2006 and for the six months ended June 30, 2007, our advertising service revenue accounted for 90.1%, 98.0%, 99.1% and 99.6% of our total revenues, respectively. The following table sets forth a breakdown of our total revenues for the periods indicated:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands of U.S. dollars, except percentages) | | | | | | |
| **Net revenues:** | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial location* | $ 26,321 | 90.1% | $ 61,435 | 90.0% | $ 132,061 | 62.3% | $ 51,819 | 62.2% | $ 82,704 | 48.5% |
| *In–store network* | — | — | 5,469 | 8.0% | 26,907 | 12.7% | 11,831 | 14.2% | 13,882 | 8.1% |
| *Poster frame network* | — | — | — | — | 40,904 | 19.3% | 15,846 | 19.0% | 31,217 | 18.3% |
| **Mobile handset advertising** | — | — | — | — | 10,101 | 4.8% | 3,076 | 3.8% | 16,890 | 9.9% |
| **Internet advertising** | — | — | — | — | — | — | — | — | 25,236 | 14.8% |
| Advertising service revenue | 26,321 | 90.1% | 66,904 | 98.0% | 209,973 | 99.1% | 82,572 | 99.2% | 169,929 | 99.6% |
| Other revenue | 2,889 | 9.9% | 1,325 | 2.0% | 1,932 | 0.9% | 690 | 0.8% | 687 | 0.4% |
| Total revenues | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |

| | For the Year Ended December 31, | | | For the Six Months Ended June 30 | |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|
| | | (In thousands of U.S. dollars) | | | |
| **Business sales taxes:** | | | | | |
| **Digital out–of–home** | | | | | |
| *Commercial locations* | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
| *In–store network* | — | 524 | 2,803 | 1,221 | 1,442 |
| *Poster frame network* | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile handset advertising** | — | — | 779 | 289 | 398 |
| **Internet advertising services** | — | — | — | — | 1,182 |
| Total business sales taxes | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

Table of Contents

We also break down our total revenues into related–party and unrelated–party sources. The following table presents a more detailed breakdown of our gross revenues and its component parts:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | (In thousands of U.S. dollars, except percentages) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial Locations* | | | | | | | | | | |
| — Unrelated parties | $ 25,386 | 86.9% | $ 59,435 | 87.1% | $ 130,474 | 61.6% | $ 50,485 | 60.6% | $ 87,734 | 51.4% |
| — Related parties | 3,723 | 12.7% | 7,991 | 11.7% | 15,228 | 7.2% | 6,382 | 7.7% | 2,552 | 1.5% |
| Total Commercial Locations | 29,109 | 99.6% | 67,426 | 98.8% | 145,702 | 68.8% | 56,867 | 68.3% | 90,286 | 52.9% |
| *In–store Network* | | | | | | | | | | |
| — Unrelated parties | — | — | 5,475 | 8.0% | 25,330 | 12.0% | 11,006 | 13.2% | 14,009 | 8.2% |
| — Related parties | — | — | 518 | 0.8% | 4,380 | 2.0% | 2,046 | 2.5% | 1,315 | 0.8% |
| Total In–store Network | — | — | 5,993 | 8.8% | 29,710 | 14.0% | 13,052 | 15.7% | 15,324 | 9.0% |
| *Poster Frame Network* | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | 44,893 | 21.2% | 17,395 | 20.9% | 34,104 | 20.0% |
| — Related parties | — | — | — | — | — | — | — | — | 98 | 0.1% |
| Total Poster Frame Network | — | — | — | — | 44,893 | 21.2% | 17,395 | 20.9% | 34,202 | 20.1% |
| **Mobile Handset Advertising** | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | 10,880 | 5.1% | 3,365 | 4.0% | 17,199 | 10.1% |
| — Related parties | — | — | — | — | — | — | — | — | 89 | 0.1% |
| Total Mobile Handset Advertising Network | — | — | — | — | 10,880 | 5.1% | 3,365 | 4.0% | 17,288 | 10.2% |
| **Internet Advertising Services** | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | — | — | — | — | 26,088 | 15.2% |
| — Related parties | — | — | — | — | — | — | — | — | 330 | 0.2% |
| Total Internet Advertising Services Network | — | — | — | — | — | — | — | — | 26,418 | 15.4% |
| Gross Advertising Services Revenue: | 29,109 | 99.6% | 73,419 | 107.6% | 231,185 | 109.1% | 90,680 | 108.9% | 183,518 | 107.6% |
| Less: Sales taxes: | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial Locations* | 2,788 | 9.5% | 5,991 | 8.8% | 13,641 | 6.4% | 5,048 | 6.0% | 7,582 | 4.5% |
| *In–store Network* | — | — | 524 | 0.8% | 2,803 | 1.3% | 1,221 | 1.5% | 1,442 | 0.8% |
| *Poster Frame Network* | — | — | — | — | 3,989 | 1.9% | 1,549 | 1.9% | 2,984 | 1.7% |
| **Mobile Handset Advertising** | — | — | — | — | 779 | 0.4% | 289 | 0.3% | 398 | 0.3% |
| **Internet Advertising Services** | — | — | — | — | — | — | — | — | 1,182 | 0.7% |
| Total sales taxes | 2,788 | 9.5% | 6,515 | 9.6% | 21,212 | 10.0% | 8,107 | 9.7% | 13,588 | 8.0% |
| Net Advertising Service Revenue | 26,321 | 90.1% | 66,904 | 98.0% | 209,973 | 99.1% | 82,572 | 99.2% | 169,929 | 99.6% |
| Other revenue: | 2,889 | 9.9% | 1,325 | 2.0% | 1,932 | 0.9% | 690 | 0.8% | 687 | 0.4% |
| Net revenues: | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |

### *Advertising Service Revenue*

*Sources of Revenue.* We derive most of our total revenues from the sale of time slots and frame space on our digital out–of–home advertising networks to unrelated third parties and to some of our related parties. We report our advertising revenue between related and unrelated parties because historically more than 10% of our advertising

62

**Table of Contents**

service revenues came from clients related to some of our directors. Our advertising services to related parties were provided in the ordinary course of business on the same terms as those provided to our unrelated advertising clients on an arm's–length basis.

Our advertising service revenue is recorded net of any sales discounts and agency rebates from our standard advertising rate cards that we may provide to our advertising clients. These discounts include volume discounts and other customary incentives offered to our advertising clients, including additional broadcast time for their advertisements if we have unused time slots or frame space available in a particular city's advertising cycle, and represent the difference between our standard rate card and the amount we charge our advertising clients. Our advertising clients include advertisers that directly engage in advertisement placements with us and advertising agencies retained by some advertisers to place advertisements on the advertiser's behalf. We occasionally agree to pay advertising agency customers sales rebates calculated on the revenues generated by them. We expect that our advertising service revenue will continue to be the primary source, and constitute the substantial majority of, our revenues for the foreseeable future.

Our advertising service revenue reflects a deduction for business taxes and related surcharges incurred in connection with our operations. Their revenues are subject to a sales tax consisting of approximately 5.55% business tax and a cultural industries tax ranging from 0% to 4.0% on revenues earned from their advertising services provided in China. We deduct these amounts from our advertising service revenues to arrive at our total revenues attributable to advertising services.

*Factors that Affect Our Advertising Service Revenue*

### Digital Out–of–home Advertising Service Revenues

Prices for advertising services on our digital out–of–home advertising networks also vary significantly from city to city as income levels, standards of living and general economic conditions vary significantly from region to region in China, which in turn affect the advertising rates we are able to charge for time slots and frame space.

### Commercial Location Network

Our advertising service revenue derived from our commercial location network is directly affected by the average price we charge for the advertising package provided to our customers, after taking into account any discount offered, as well as by the following factors:

- *LCD display network.* The number of flat–panel displays in our network and the desirability, quality and pedestrian traffic of the locations where we are able to lease space to install our flat–panel displays and;

- *Outdoor LED billboard network.* The number of publicly placed LED billboards in our network and the desirability, quality and pedestrian traffic of the locations of the LED billboards we own or lease from third–parties; and

- *Movie theater advertising network.* The number of movie theaters in which we have leased screen time, our expansion into additional theaters, and the length of the leased screen time, which is currently three minutes per screening per theater prior to movie screenings at movie theaters.

### In–store Network

Our advertising service revenue derived from our in–store network is directly affected by the number of flat–panel displays in our network, the number of hypermarkets, supermarkets and convenience stores in the network, and the average price we charge for the advertising package provided to our customers, after taking into account any discount offered.

Table of Contents

*Poster Frame Network*

Our advertising service revenue derived from our poster frame network is directly affected by:

- the number of frames in our poster frame network. We sell frame space on our poster frame network on a per frame basis. Increasing the number of residential and other locations on our poster frame network allows us to increase the number of frames on our network, thereby increases the available frame space for sale to advertisers. As we upgrade the network to incorporate more digital poster frames, we will also increase the available space as multiple advertisements can be placed on a digital frame on time–shared basis; and

- the average price we charge for frame space on a per frame basis, after taking into account any discount offered.

*Mobile Handset Advertising Service Revenues*

Our advertising service revenue derived from our mobile handset advertising network is directly affected by:

- the number of messages we deliver to mobile phone users. We charge advertisers fees based on the number of successfully delivered messages; and

- the average price we charge per message.

*Internet Advertising Service Revenues*

As of March 2007, we derive revenue from our Internet advertising business operated by Allyes. Our advertising service revenue derived from our Internet advertising services is directly affected by:

- the number of customers who purchase agency services from us. We agree to provide advertising agency services and technology, and we charge fees based on the size and duration of the advertising campaign and the number of daily impressions or "hits" on the Internet advertisement; and

- our ability to identify relevant Internet user traffic and deliver effective advertisements for our advertising clients

*Network Expansion.* Many of the most desirable locations for our digital out–of–home advertising network have been occupied, either by our network as a result of our expansion or by our competitors. As a result, we will need to rely on means other than the rapid increase in the number of locations, flat–panel displays, LED billboards and advertising poster frames in order to continue growing our revenues. We have focused, and expect to continue to focus, on developing new channels in our out–of–home television advertising networks and entering into new types of advertising media operations to continue to grow our revenues and to address these potential capacity constraints on our existing network. These steps have included: (1) expanding our digital out–of–home advertising network through increasing the size and scope of our existing commercial location, in–store and poster frame networks, and adding new media such as LED billboards and movie theater screens to our out–of–home television networks, (2) establishing discrete stand–alone channels on our commercial location network, such as our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels and (3) expanding our media platform into new areas such as mobile handset advertising services and Internet advertising services and software packages. We expect to continue to explore opportunities to open up additional channels on our existing network and to enter into new advertising media platforms in China. We intend to continue expanding our out–of–home advertising network both through increasing the number of locations, displays and advertising poster frames on our commercial location, in–store and poster frame networks and through strategic acquisition of competitors and businesses that complement our existing out–of–home advertising network. In addition, we entered into new advertising platforms through Focus Media Wireless' mobile handset advertising network and our outdoor LED billboard network, and into Internet advertising services through our recent acquisition of Allyes. We believe these measures will enable us to continue the future growth of our business.

*Seasonality.* Our advertising service revenue is subject to key factors that affect the level of advertising spending in China generally. In addition to fluctuations in advertising spending relating to general economic and market conditions, advertising spending is also subject to fluctuations based on the seasonality of consumer

64

**Table of Contents**

spending. In general, a disproportionately larger amount of advertising spending is concentrated on product launches and promotional campaigns prior to the holiday season in December. In addition, advertising spending generally tends to decrease in China during January and February each year due to the Chinese Lunar New Year holiday as office buildings and other commercial venues in China tend to be closed during the holiday. We believe this effect will be less pronounced with regard to advertising spending on our in–store network, as we believe commercial activity in hypermarkets and supermarkets is stable or even enhanced during the period of Chinese Lunar New Year. We also experience a slight decrease in revenues during the hot summer months of July and August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. Our past experience, although limited, indicates that our revenues would tend to be lower in the first quarter and higher in the fourth quarter of each year, assuming other factors were to remain constant, such as our advertising rates and the number of available time slots on our network.

*Revenue Recognition.* We typically sign standard advertising contracts with our advertising clients, which require us to run the advertiser's advertisements on our network in specified cities for a specified period, typically from four to twelve weeks. We do not bill our advertising clients under these contracts until we perform the advertising service by broadcasting the advertisement on our network. Advertising service revenues are recognized in accordance with Topic 13 of Staff Accounting Bulletin ("SAB") "Revenue Recognition (SAB 101 and SAB 104)" when all four of the following criteria are met: (i) persuasive evidence of agreement exists; (ii) delivery of service has occurred; (iii) the price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

For digital out–of–home advertising revenues, net of agency rebates are recognized ratably over the period in which the advertisement is displayed. Revenue collected from our poster frame network is recognized in substantially the same manner as revenues collected under the advertising contracts used for our commercial location and in–store networks. For mobile handset advertising revenues, advertising revenues primarily consists of service revenue for delivering advertisement and other messages to the targeted mobile phone devices through channels provided by telecommunication vendors. Revenues from such services, net of agency rebates, are recognized when these messages are delivered to the vendor's channels. For Internet advertising services revenue, revenues primary consist of revenues from advertising and advertising–related services and revenues from sales of Adforward software. We sell Adforward subscriptions and perpetual licenses, from which revenues are recognized in accordance with the Statement of Position ("SOP") No. 97–2 "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Under SOP No. 97–2, revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. For perpetual license agreements, revenue is generally recognized when delivery has occurred, software has been installed and training has been provided as we do not currently have vendor–specific objective evidence of fair value, or VSOE, for either installation or training services. When we are considered as an agent, we recognize revenue on a net basis.

We generally collect our advertising service fees by billing our advertising clients within 60 to 90 days after completion of the advertising contract and book these unbilled or unpaid amounts as accounts receivable until we receive payment or determine the account receivable to be uncollectible.

Our accounts receivable are general unsecured obligations of our advertising clients and we do not receive interest on unpaid amounts. We make specific reserves for accounts that we consider to be uncollectible. We also provide a general reserve for uncollectible accounts that we reassess on an annual basis. We made no provision for uncollectible accounts in 2003. In 2004, 2005, 2006 and six months ended June 30, 2007, we made provision of $173,837, $396,657, $1,308,554 and $4,163,933, respectively, for accounts receivable that were outstanding for longer than six months. The average number of days outstanding of our accounts receivable, including from related parties, was 51, 70, 66 and 91, respectively, as of December 31, 2004, 2005, 2006 and June 30, 2007.

**Other Revenue**

We also derive a portion of our total revenues from the sale of flat–panel displays to our regional distributors on a cost–plus basis, and franchise fee which we record as other revenue. Other revenue represented 9.9%, 2.0%, 0.9%

65

**Table of Contents**

and 0.4% of our total revenues in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. Other revenue derived from sale of flat–panel displays is recorded net of the 17% value added tax to which equipment sales in China are subject. We expect that other revenue as a percentage of our total revenues will continue to be low.

**Cost of Revenues**

Our cost of revenues consists of costs directly related to the offering of our advertising services and costs related to our sales of advertising equipment.

The following table sets forth our cost of revenues, divided into its major components, by amount and percentage of our total revenues for the periods indicated:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30, | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands of U.S. dollars, except percentages) | | | | | | |
| Total revenues | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |
| Cost of revenues: | | | | | | | | | | |
| Advertising service cost: | | | | | | | | | | |
| Digital out-of-home | | | | | | | | | | |
| *Commercial location network* | 6,804 | 23.3% | 18,325 | 26.9% | 42,836 | 20.2% | 19,713 | 23.7% | 30,767 | 18.0% |
| *In-store network* | — | — | 7,423 | 10.9% | 18,106 | 8.5% | 8,367 | 10.0% | 10,214 | 6.0% |
| *Poster frame network* | — | — | — | — | 13,621 | 6.4% | 6,014 | 7.2% | 10,011 | 5.9% |
| Mobile handset advertising | — | — | — | — | 6,052 | 2.9% | 2,405 | 2.9% | 7,323 | 4.3% |
| Internet advertising services | — | — | — | — | — | — | — | — | 18,405 | 10.8% |
| Advertising service cost | 6,805 | 23.3% | 25,748 | 37.8% | 80,615 | 38.0% | 36,499 | 43.8% | 76,720 | 45.0% |
| Other costs | 1,934 | 6.6% | 976 | 1.4% | 765 | 0.4% | 312 | 0.4% | 303 | 0.2% |
| Total cost of revenues | 8,738 | 29.9% | 26,724 | 39.2% | 81,380 | 38.4% | 36,811 | 44.2% | 77,023 | 45.2% |
| Gross profit | 20,472 | 70.1% | 41,505 | 60.8% | 130,525 | 61.6% | 46,451 | 55.8% | 93,593 | 54.8% |

*Advertising Service Costs*

Our cost of revenues related to the offering of our advertising services on our advertising network consists of location costs, flat–panel display depreciation costs, amortization of acquired intangible assets and other cost items, including salaries for and travel expenses incurred by our network maintenance staff and costs for materials.

Our location costs for our out–of–home television networks consist of:

- rental fees and one–time signing payments we pay to landlords, property managers and stores pursuant to the display placement agreements we enter into with them;

- commissions and public relations expenses we incur in connection with developing and maintaining relationships with landlords and property managers; and

- maintenance fees for keeping our displays in proper operating condition.

Generally, we capitalize the cost of our media displays and recognize depreciation costs on a straight–line basis over the term of their useful lives, which we estimate to be five years. The primary factors affecting our depreciation

**Table of Contents**

costs are the number of flat–panel displays in our network and the unit cost for those displays, as well as the remaining useful life of the displays.

Amortization of acquired intangible assets consists of operating and broadcasting rights, lease agreements, completed technology and others. We expect our results of operations for a period of at least seven years beginning in 2006 to be negatively affected by the amortization of intangible assets in relation to, among other things, material contracts and customer lists as a result of several acquisitions, particularly Framedia, Target Media, Focus Media Wireless and Allyes.

Our other cost of revenues consists of salary for and travel expenses incurred by our network maintenance staff and costs for materials and maintenance in connection with the upkeep of our advertising network. The primary factor affecting our other costs of revenues is the size of our network maintenance staff. As the size of our network increases, we expect our network maintenance staff, and associated costs, to increase in absolute terms, but to decrease as a percentage of total revenues.

*Commercial Location Network.*  Location costs are the largest component of our cost of revenues for our commercial location network. The primary factors affecting the amount of our location costs include the number of display placement agreements we enter into and the rental fees we pay under those agreements. We expect these costs to decrease as a percentage of our advertising service revenue for our commercial location network in the future, as our advertising service revenue for our commercial location network is expected to increase faster than the additional cost we incur from entering into new display placement agreements and any increases we may experience in renewing existing display placement agreements. However, when our display placement agreements expire, we may be unable to renew these agreements on favorable terms and the rental fee portion of our location costs attributable to these existing locations could increase. As we continue to increase the size of our network and as we update and replace our existing displays with new technology, our depreciation costs in connection with our commercial location network are expected to increase.

*In–store Network.*  The primary costs of revenues connected with our in–store network are location costs resulting from rental and maintenance fees and depreciation costs for our displays. We expect these costs to continue to increase in 2007 as we expand our in–store network.

*Poster Frame Network.*  The primary costs of revenues connected with our poster frame network are location costs resulting from rental fees. Depreciation costs for our frames and other costs for salary and maintenance fees also account for a significant portion of cost of revenues for our poster frame network. We expect these costs to increase in 2007 as we expand and upgrade our poster frame network but to decrease as a percentage of advertising service revenue for our poster frame network.

*Mobile Handset Advertising Network.*  The primary costs of revenues connected with our mobile handset advertising network are message costs charged by telecommunications network operations. We expect these costs to increase as the number of advertising messages and campaigns on this network increases.

*Internet Advertising Services Network.*  The primary costs of revenues connected with our Internet advertising services network are advertising space leasing costs charged by gateway websites and research and development costs in connection with the development of Internet advertising software packages. We expect these costs to increase as we continue to expand this part of our business as Internet use continues to grow in China.

### Other Costs

Other costs consists of the amounts we pay to the contract assembler who purchases the components and assembles them into the flat–panel displays we sell to our regional distributors. Other costs were 6.6%, 1.4%, 0.4%, 0.4% and 0.2% of our total revenues in 2004, 2005, 2006 and for the six months ended June 30, 2006 and June 30, 2007, respectively. The primary factors affecting other costs are the number of flat–panel displays we sell and the unit cost we pay to our contract assembler for each such flat–panel display.

Table of Contents

*Operating Expenses and Net Income*

Our operating expenses consist of general and administrative, selling and marketing expenses, other operating income. In 2004, our operating expenses also included a goodwill impairment loss. The following table sets forth our operating expenses, divided into their major categories by amount and as a percentage of our total revenues for the periods indicated.

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30, | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
| | | | | | (In thousands of U.S. dollars, except percentages) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross profit | $ 20,472 | 70.1% | $ 41,505 | 60.8% | $ 130,525 | 61.6% | $ 46,450 | 55.8% | $ 93,593 | 54.8% |
| Operating expenses: | | | | | | | | | | |
| General and administrative | 3,988 | 13.7% | 9,120 | 13.4% | 25,723 | 12.1% | 10,693 | 12.8% | 20,329 | 11.9% |
| Selling and marketing | 3,473 | 11.9% | 9,599 | 14.0% | 25,762 | 12.2% | 9,783 | 11.7% | 23,041 | 13.5% |
| Other operating income | — | 0.0% | — | 0.0% | (1,338) | (0.6)% | (158) | (0.1)% | (2,384) | (1.4)% |
| Goodwill impairment loss | 58 | 0.2% | — | — | — | — | — | — | — | — |
| Total | 7,519 | 25.8% | 18,719 | 27.4% | 50,147 | 23.7% | 20,318 | 24.4% | 40,986 | 24.0% |
| Income from operations | 12,953 | 44.3% | 22,786 | 33.4% | 80,378 | 37.9% | 26,132 | 31.4% | 52,607 | 30.8% |

*General and Administrative.* General and administrative expenses primarily consist of salary and benefits for management, finance and administrative personnel, share–based compensation expense for our administrative staff, office rental, maintenance and utilities expenses, depreciation of office equipment, other office expenses and professional services fees. General and administrative expenses were 13.7%, 13.4%, 12.1% and 11.9% of our total revenues in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. Salaries and benefits accounted for 20.2%, 26.9%, 23.3% and 19.7% of our general and administrative expenses in 2004, 2005, 2006 and six months ended June 30, 2007, respectively. We expect that our general and administrative expenses will be relatively stable as a percentage of total revenues in the near term but to increase in absolute terms as we hire additional personnel and incur additional costs in connection with the expansion of our business and with being a publicly traded company, including costs of enhancing our internal controls.

*Selling and Marketing.* Our selling and marketing expenses primarily consist of salaries and benefits, share–based compensation expense for our sales staff, marketing and promotional expenses, amortization of certain acquired intangible assets such as customer base, and other costs related to supporting our sales force. Selling and marketing expenses were 11.9%, 14.0%, 12.2% and 13.5% of our total revenues in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. As we acquired more of our regional distributors, continue to expand our client base and have commenced operation of new advertising platforms, we increased our sales force, which resulted in an increase in salary expenses. We now budget approximately 15% of our advertising revenues to be used for selling and marketing in 2007. We expect selling and marketing expenses to remain relatively stable as a percentage of total revenues.

*Share–based Compensation.* Prior to 2006, our share–based compensation expense relating to general and administrative and selling and marketing primarily consists of the amortized portion of deferred share–based compensation recognized by us. We issued options representing 10.87% of our issued share capital under our 2003 Employee Share Option Scheme, or the 2003 Option Plan. In addition, we have issued options representing 3.95% of our issued share capital under our 2005 Share Option Plan, or the 2005 Option Plan. Our share–based compensation relating to general and administrative accounted for 11.6%, 7.5%, 23.8% and 23.2% of our general and administrative expenses in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. Share–based compensation relating to selling and marketing accounted for 0.8%, 0.5%, 8.1% and 18.0% of our selling and marketing expenses in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. The share–based compensation has increased following the effectiveness, as of January 2006, of Statement of Financial Accounting

68

Table of Contents

Standards No. 123(R) relating to share–based compensation, which requires us to record the fair value of such awards as compensation expense. As a result, we recorded total share–based compensation expense of $8.4 million and $9.4 million for 2006 and for the six months ended June 30, 2007, respectively.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities on the date of the financial statements and the reported amounts of revenues and expenses during the financial reporting period. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from those estimates. Some of our accounting policies require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our financial statements as these policies address some of the most significant accounts in our financial statements and their application places the most significant demands on our management's judgment.

*Share–based Compensation*

Through 2005, we accounted for our share option plan using the intrinsic value method under Accounting Principles Board, or APB, No. 25. Effective the beginning of 2006, we adopted Statement of Financial Accounting Standards, or SFAS, No. 123–R, "*Share–Based Payment*", and elected to adopt the modified prospective application method. SFAS No. 123–R requires us to use a fair–value based method to account for share–based compensation. Accordingly, share–based expense is measured at the grant date, based on the fair value of the award, and is recognized as expense over the employees' requisite service period. Our share option plans are described in Note 10 to our consolidated financial statements.

We estimated the fair value of share options granted using the Black–Scholes–Merton option pricing model, which requires the input of highly subjective assumptions, including the estimated expected life of the share options, estimated forfeitures and the price volatility of the underlying shares. The assumptions used in calculating the fair value of share options represent management's best estimates, but these estimates involve inherent uncertainties and the application of management judgement. As a result, if factors change and we use different assumptions, our share–based compensation expense could be materially different in the future. In addition, we estimate our expected forfeiture rate and recognize the expense only for those shares expected to vest. These estimations are based on past employee retention rates and our expectations of future retention rates. We will prospectively revise our estimated forfeiture rates based on actual history. Our compensation expense may change based on changes to our actual forfeitures of these share options.

*Income Taxes*

We account for income taxes under the provisions of SFAS No. 109, "*Accounting for Income Taxes*", with the required disclosures as described in Note 11 to our consolidated financial statements. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In the event we were to determine that we would be able to realize our deferred tax assets in the future in excess of their recorded amount, an adjustment to our deferred tax assets would increase our income in the period such determination was made. Likewise, if we determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to our deferred tax assets would be charged to our income in the period such determination is made. We record income tax expense on our taxable income using the balance sheet liability method at the effective rate applicable to each of our affiliated entities in China in our consolidated statements of operations and comprehensive income.

*Goodwill and Long–lived Assets Impairment*

We test goodwill for possible impairment on an annual basis as of December 31 of each year and at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting

69

**Table of Contents**

unit below its carrying amount. Circumstances that could trigger an impairment test between annual tests include, but are not limited to:

- a significant adverse change in the business climate or legal factors;

- an adverse action or assessment by a regulator;

- unanticipated competition;

- loss of key personnel;

- the likelihood that a reporting unit or a significant portion of a reporting unit will be sold or disposed of;

- a change in reportable segments;

- results of testing for recoverability of a significant asset group within a reporting unit; and/or

As of December 31, 2004, 2005, 2006 and June 30, 2007, we had a goodwill balance of $9.1 million, $13.3 million, $739.7 million and $924.2 million, respectively, which is not deductible for tax purposes. We incurred a goodwill impairment loss of $58,397 in 2004 in connection with our acquisition of Perfect Media which is part of the commercial location reporting segment. In conducting our annual impairment test, we undertook a valuation of Perfect Media using the expected present value of cash flow and the income approach valuation methods, which resulted in a goodwill impairment loss of $58,397 in 2004, indicating that the value of Perfect Media was less than what we paid at the time we acquired it.

The fair value of each reporting unit is determined by allocating our total fair value among our reporting units using a certain valuation technique. We may incur additional goodwill impairment charges in the future although we cannot predict whether this will occur when we perform our goodwill impairment test each year.

We test long–lived assets for possible impairment if an event occurs or circumstances change that would more likely than not reduce the fair value of an asset group below its carrying amount. Asset recoverability is an area involving management judgement, requiring assessment in two steps as to whether the carrying value of assets can be supported by (1) the undiscounted future cash flows and (2) the net present value of future cash flows derived from such assets using cash flow projections which have been discounted at an appropriate rate. In calculating the net present value of the future cash flows, certain assumptions are required to be made in respect of highly uncertain matters such as revenue growth rates, gross margin percentages and terminal growth rates.

**Taxation**

*Cayman Islands, the British Virgin Islands and Hong Kong*

Under the current laws of the Cayman Islands, the British Virgin Islands and Hong Kong, neither Focus Media Holding Limited, incorporated in the Cayman Islands, nor Infoachieve Limited and Dotad Holdings Limited, incorporated in the British Virgin Islands, are subject to tax on its income or capital gains. Focus Media Hong Kong, our wholly owned subsidiary incorporated in Hong Kong, is subject to profits tax rate of 17.5% on its assessable profits, yet interest derived from deposits placed in Hong Kong with authorized institutions are exempted from the Hong Kong profits tax. In addition, payment of dividends by either company is not subject to withholding tax in those jurisdictions.

*PRC*

Our PRC entities are subject to PRC business tax. We primarily pay business tax on gross revenues generated from our advertising services. Focus Media Advertisement and its subsidiaries, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement and Framedia Advertisement, pay a 5% business tax, whereas Focus Media Wireless pays a 3% business tax on the gross revenues derived from advertising services and this business tax is deducted from total revenues in calculating the net revenues. Focus Media Technology and Focus Media Digital pay a 5% business tax on the gross revenues derived from their contractual arrangements with Focus Media Advertisement and its subsidiaries and these taxes are primarily recorded in operating expenses.

70

Table of Contents

In addition to business tax and cultural industries tax imposed on our advertising business and VAT imposed on our sales of advertising equipment. Focus Media Technology, Focus Media Digital and Focus Media Advertisement and its subsidiaries, including Focus Media Advertising Agency and New Focus Media Advertisement, are subject to PRC enterprise income tax on their taxable income, except to the extent some of them enjoy temporary tax exempt status as described in further detail below.

Pursuant to PRC law, enterprise income tax is generally assessed at the rate of 33% of taxable income. Focus Media Technology, Focus Media Digital, Focus Media Advertisement and its subsidiaries and New Focus Media Advertisement are currently subject to this 33% enterprise income tax. State Administration of Taxation and its delegates of the PRC are authorized to grant an exemption from enterprise income tax of up to two years to newly established domestic companies that have no direct foreign ownership and that are financially independent and engaged in consulting services, technology services or the information industry, which includes advertising services. A qualifying company must apply for this tax–exempt status for each of the two years separately. Focus Media Digital and Focus Media Advertising Agency were established in October 2004 and both were granted exemptions from enterprise income tax in 2004 and 2005. In 2006 and 2007, we continued our tax exempt status through New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, New Structure Advertisement and Focus Media Wireless, which were established during the period from October 2005 to June 2006 and have obtained tax–exempt approval for 2006 and 2007.

In November 2004, Focus Media Technology, Focus Media Advertisement and some of its subsidiaries sold all of their flat–panel display equipment to Focus Media Digital at fair market value. As a result of this sale, Focus Media Technology and Focus Media Advertisement recorded a non–cash charge to earnings in the aggregate of $4,773,030 in the fourth quarter of 2004, which reflected the difference between the fair market value of the equipment and its then current book value. In addition, since its establishment, through December 31, 2005, Focus Media Advertising Agency has generated revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for Focus Media Advertising Agency's clients on our network. Finally, Focus Media Agency also license technology used in our business operations from Focus Media Digital in exchange for license fees paid to Focus Media Digital. As a result of Focus Media Agency's amortization of the license fee paid to Focus Media Digital, it incurred a charge to earnings of $3.7 million in the fourth quarter of 2004. See "Related Party Transactions" for further information on these transactions and contractual agreements. Although these transactions were eliminated upon consolidation as transactions among members of our consolidated companies for financial accounting purposes, they did have the affect of reducing our total income tax expense and increasing our after tax net income in 2004.

As a result of these transactions, our effective tax rates were 71.6% and 2.8% in 2004 and 2005, respectively. Excluding the non–recurring non–cash charge resulting from the change in fair value of derivative liability associated with Series B convertible redeemable preference shares and goodwill impairment loss, our effective tax rate for 2004 would have been 7.0%. The tax savings resulting from the non–cash charge to earnings from the write–down of flat–panel display equipment in 2004 and the charge to earnings from the amortization of the license fee paid in 2004 will not continue in the future.

In December 2005, we established New Focus Media Advertisement which has received tax–exempt approval for 2006 and 2007. We further incorporated New Focus Media Agency and Focus Media Defeng Advertisement in 2006 which also received tax–exempt approval for 2006 and 2007. Besides, New Structure Advertisement, which was incorporated in October 2005, also received its tax–exempt approval for 2006 and 2007. Focus Media Wireless, as a high–tech company incorporated in Zhonguancun District, Beijing, China, is exempted from income tax from 2006 to 2008, plus a 50% reduction holiday from 2009 to 2011.

In December 2005, Focus Media Digital sold all of its flat–panel display equipment to New Focus Media Advertisement at fair market value and Focus Media Digital sold all of its technology to New Focus Media Advertisement in January 2006 at a fixed fee. As of January 2006, New Focus Media Advertisement generates revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for New Focus Media Advertisement's clients on our network. Both New Focus Media Agency and Focus Media Defeng Advertisement act as advertising agencies for New Focus Media Advertisement and receive agency fees. While these transactions are eliminated upon

71

Table of Contents

consolidation as they are transactions among members of our consolidated group for financial accounting purposes, they effectively reduce our effective tax rate to 1.3% for 2006. We also expect these transactions will reduce our total income tax expense and increase our after tax net income in 2007. See "Related Party Transactions" for further information on these transactions and contractual agreements. In addition, upon expiration of these tax exemptions, we will consider available options, in accordance with applicable law, that would enable us to qualify for further tax exemptions, if any, to the extent they are then available to us.

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions described above are found not to be on an arm's–length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late–payment interest and penalties. A finding by the PRC tax authorities that we are ineligible for the tax savings we achieved in 2004, 2005 and 2006, or that we expect to achieve in 2007, or that Focus Media Digital, Focus Media Advertising Agency, New Focus Media Advertisement, New Structure Advertisement, or Framedia Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment."

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

**Recently Issued Accounting Standards**

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities, ("SFAS 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 applies under most other accounting pronouncements that require or permit fair value measurements and does not require any new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years, with earlier application encouraged. The provisions of SFAS 157 should be applied prospectively as of the beginning of the fiscal year in which the statement is initially applied, except for a limited form of retrospective application for certain financial instruments. The Group is currently evaluating the impact, if any, of this statement on the consolidated combined financial statements.

72

Table of Contents

**Acquisitions**

Since we commenced our current business operations in May 2003, we have acquired numerous companies to expand the coverage of our network in China and to acquire businesses that are complementary to our operations. See "Our Recent Significant Acquisitions" for descriptions of the most recent such acquisitions.

Some of the businesses we acquired had entities located both in and outside of China. The consideration we paid for these businesses was made in two parts, one part for the entity located in China, and the other part for the entity located outside of China. For consideration paid to acquire entities located in China, we withheld on behalf of sellers who are natural persons 20% of the amount by which the acquisition price exceeded the registered capital of such PRC entity as required under the PRC Individual Income Tax Law and related implementation rules. We were not required to and did not withhold any tax in connection with payments made to acquire the entities located outside of China. See "Risks Relating to the People's Republic of China — The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China".

The financial statements of:

- Infoachive Limited, for the periods ended, and as of, December 31, 2004 and 2005;

- Target Media Holdings Limited, for the periods ended, and as of, December 31, 2004 and 2005; and

- Allyes Information Technology Co., Ltd. for the year ended, and as of, December 31, 2006 are included elsewhere in this prospectus.

**Quarterly Results of Operation**

The following table presents unaudited consolidated quarterly financial data by amount for each of the eight quarters in the period from September 30, 2005 to June 30, 2007. You should read the following table in conjunction with our audited consolidated financial statements and related notes included elsewhere in this prospectus. We have prepared the unaudited consolidated quarterly financial information on substantially the same basis as our audited consolidated financial statements and using information derived from our unaudited consolidated financial statements which are not included in this prospectus. The following information contains normal recurring adjustments which are, in the opinion of our management, necessary for a fair presentation of the results for such unaudited period. Our operating results for any quarter are not necessarily indicative of results that may be expected for any future period.

| Consolidated Statement of Operations Data | | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| | | | | | (In thousands of U.S. dollars) | | | | |
| Net revenues: | | | | | | | | |
| Digital out-of-home | | | | | | | | |
|   *Commercial location*[1] | $ 17,287 | $ 20,735 | $ 21,380 | $ 30,438 | $ 38,519 | $ 41,724 | $ 31,644 | $ 51,060 |
|   *In-store network*[1] | 1,813 | 3,317 | 5,294 | 6,538 | 7,239 | 7,836 | 6,638 | 7,244 |
|   *Poster frame network*[1] | — | — | 6,067 | 9,778 | 11,284 | 13,775 | 12,669 | 18,548 |
| Mobile handset advertising[1] | — | — | — | 3,076 | 3,516 | 3,509 | 6,008 | 10,882 |
| Internet advertising services[1] | — | — | — | — | — | — | — | 25,236 |
| Total advertising service revenue | 19,100 | 24,052 | 32,741 | 49,830 | 60,558 | 66,844 | 56,959 | 112,970 |
| Other revenue | 366 | 553 | 457 | 233 | 90 | 1,152 | 381 | 305 |
| **Total revenues** | **19,466** | **24,605** | **33,198** | **50,063** | **60,648** | **67,996** | **57,340** | **113,275** |

73

**Table of Contents**

| Consolidated Statement of Operations Data | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Cost of revenues: | | | | | | | | |
| Digital out-of-home | | | | | | | | |
| *Commercial location network* | 5,047 | 5,857 | 8,226 | 11,487 | 11,404 | 11,719 | 12,898 | 17,868 |
| *In-store network* | 2,606 | 3,451 | 3,973 | 4,394 | 4,616 | 5,123 | 5,027 | 5,187 |
| *Poster frame network* | — | — | 2,792 | 3,222 | 3,756 | 3,851 | 4,746 | 5,265 |
| Mobile handset advertising network | — | — | — | 2,405 | 2,219 | 1,428 | 2,754 | 4,569 |
| Internet advertising services network | — | — | — | — | — | — | — | 18,405 |
| Advertising service cost: | 7,653 | 9,308 | 14,991 | 21,508 | 21,995 | 22,121 | 25,425 | 51,294 |
| Other cost | 285 | 432 | 232 | 80 | 80 | 373 | 165 | 138 |
| **Total cost of revenues** | **7,938** | **9,740** | **15,223** | **21,588** | **22,075** | **22,494** | **25,590** | **51,432** |
| **Gross profit** | **11,528** | **14,865** | **17,975** | **28,475** | **38,573** | **45,502** | **31,750** | **61,843** |
| Operating expenses: | | | | | | | | |
| General and administrative | 2,337 | 2,585 | 4,395 | 6,298 | 5,956 | 9,074 | 8,683 | 11,646 |
| Selling and marketing | 2,719 | 3,381 | 4,407 | 5,376 | 6,784 | 9,195 | 9,886 | 13,154 |
| Other operating income | — | — | (20) | (137) | (5) | (1,176) | (1,263) | (1,121) |
| Total operating expenses | 5,056 | 5,966 | 8,782 | 11,537 | 12,735 | 17,093 | 17,306 | 23,679 |
| **Income from operations** | **6,472** | **8,899** | **9,193** | **16,938** | **25,838** | **28,409** | **14,444** | **38,164** |
| Interest income (expenses), net | 791 | 939 | 888 | 605 | 1,070 | 1,692 | 2,693 | 1,870 |
| Other income (expenses), net | 8 | (171) | (71) | (408) | (175) | 367 | 92 | 12 |
| Income before income taxes and minority interest | 7,271 | 9,667 | 10,010 | 17,135 | 26,733 | 30,468 | 17,229 | 40,046 |
| Total income taxes | (87) | (204) | (617) | (373) | 317 | (371) | (968) | (2,318) |
| Minority interests | (52) | (38) | 40 | (91) | (45) | (9) | 31 | (13) |
| **Net income attributed to shareholders** | $   **7,132** | $   **9,425** | $   **9,433** | $ **16,671** | $   **27,005** | $   **30,088** | $ **16,292** | $ **37,715** |

(1)   Advertising service revenue is presented net of sales taxes. The following tables presents the unaudited quarterly sales taxes information:

| | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Sales taxes: | | | | | | | | |
| Commercial location network | $   1,769 | $   1,867 | $   2,082 | $   2,968 | $   4,062 | $   4,529 | $   3,274 | $   4,308 |
| In-store network | 187 | 304 | 524 | 697 | 763 | 819 | 688 | 754 |
| Poster frame network | — | — | 591 | 958 | 1,102 | 1,338 | 1,185 | 1,799 |
| Mobile handset advertising network | — | — | — | 289 | 285 | 205 | 12 | 386 |
| Internet advertising services network | — | — | — | — | — | — | — | 1,182 |
| Total | $   1,956 | $   2,171 | $   3,197 | $   4,912 | $   6,212 | $   6,891 | $   5,159 | $   8,429 |

74

Table of Contents

The following table presents our unaudited consolidated quarterly financial data as a percentage of our total revenues for the periods indicated.

| Consolidated Statement of Operations Data | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands of U.S. dollars) | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location network*[1] | 88.8% | 84.3% | 64.4% | 60.8% | 63.6% | 61.4% | 55.2% | 45.1% |
| *In–store network*[1] | 9.3% | 13.5% | 15.9% | 13.1% | 11.9% | 11.5% | 11.6% | 6.4% |
| *Poster frame network*[1] | — | — | 18.3% | 19.5% | 18.6% | 20.2% | 22.1% | 16.4% |
| Mobile handset advertising network[1] | — | — | — | 6.1% | 5.8% | 5.2% | 10.5% | 9.6% |
| Internet advertising services network[1] | — | — | — | — | — | — | — | 22.3% |
| Other revenues | 1.9% | 2.2% | 1.4% | 0.5% | 0.1% | 1.7% | 0.6% | 0.2% |
| **Total revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Cost of revenues: | | | | | | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location network* | 25.9% | 23.8% | 24.8% | 22.9% | 18.8% | 17.2% | 22.5% | 15.8% |
| *In–store network* | 13.4% | 14.0% | 12.0% | 8.8% | 7.6% | 7.5% | 8.8% | 4.6% |
| *Poster frame network* | — | — | 8.4% | 6.4% | 6.2% | 5.7% | 8.3% | 4.6% |
| Mobile Handset Advertising Network | — | — | — | 4.8% | 3.7% | 2.1% | 4.8% | 4.1% |
| Internet advertising services network | — | — | — | — | — | — | — | 16.2% |
| Other costs | 1.5% | 1.8% | 0.7% | 0.2% | 0.1% | 0.5% | 0.3% | 0.1% |
| **Total cost of revenues** | **40.8%** | **39.6%** | **45.9%** | **43.1%** | **36.4%** | **33.0%** | **44.7%** | **45.4%** |
| **Gross profit** | **59.2%** | **60.4%** | **54.1%** | **56.9%** | **63.6%** | **67.0%** | **55.3%** | **54.6%** |
| Operating expenses: | | | | | | | | |
| General and administrative | 12.0% | 10.5% | 13.2% | 12.6% | 9.8% | 13.3% | 15.1% | 10.3% |
| Selling and marketing | 14.0% | 13.7% | 13.3% | 10.7% | 11.2% | 13.5% | 17.2% | 11.6% |
| Other operating income | — | — | (0.1)% | (0.3)% | (0.0)% | (1.7)% | (2.2)% | (1.0)% |
| Total operating expenses | 26.0% | 24.2% | 26.4% | 23.0% | 21.0% | 25.1% | 30.1% | 20.9% |
| **Income from operations** | **33.2%** | **36.2%** | **27.7%** | **33.9%** | **42.6%** | **41.9%** | **25.2%** | **33.7%** |
| Interest income (expenses), net | 4.1% | 3.8% | 2.7% | 1.2% | 1.8% | 2.5% | 4.7% | 1.7% |
| Other income (expenses), net | 0.1% | (0.7)% | (0.2)% | (0.8)% | (0.3)% | 0.5% | 0.2% | 0.0% |
| Income before income taxes and minority interest | 37.4% | 39.3% | 30.2% | 34.3% | 44.1% | 44.9% | 30.1% | 35.4% |
| Total income taxes | (0.4)% | (0.8)% | (1.9)% | (0.7)% | 0.5% | (0.5)% | 1.7% | 2.0% |
| Minority interest | (0.3)% | (0.2)% | 0.1% | (0.2)% | (0.1)% | 0.0% | (0.1)% | 0.0% |
| **Net income attributable to shareholders** | **36.7%** | **38.3%** | **28.4%** | **33.4%** | **44.5%** | **44.4%** | **28.5%** | **33.4%** |

Table of Contents

(1) Advertising service revenue is presented net of sales taxes. The following table presents the unaudited quarterly percentage of sales taxes against gross revenues:

|  | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
|  | (In thousands of U.S. dollars) | | | | | | | |
| Sales taxes: | | | | | | | | |
| Commercial location network | 9.3% | 8.3% | 8.9% | 8.9% | 9.5% | 9.8% | 9.4% | 7.8% |
| In–store network | 9.4% | 8.4% | 9.0% | 9.6% | 9.5% | 9.5% | 9.4% | 9.4% |
| Poster frame network | — | — | 8.9% | 8.9% | 8.9% | 8.9% | 8.6% | 8.8% |
| Mobile handset advertising network | — | — | — | 8.6% | 7.5% | 5.5% | 0.2% | 3.4% |
| Internet advertising services network | — | — | — | — | — | — | — | 4.5% |
| Total | 9.3% | 8.3% | 8.9% | 9.0% | 9.3% | 9.3% | 8.3% | 6.9% |

Certain quarterly financial information related to each fiscal quarters of the fiscal year ended December 31, 2006 are presented differently from previously announced information in the Forms 6–K furnished to the SEC on May 26, 2006, August 21, 2006, November 20, 2006 and February 26, 2007 as a result of the following:

*Advertising agency rebates for each fiscal quarter of the fiscal year ended December 31, 2006.* We classified $88,537, $624,365, $425,807, $257,205 and $774,260 advertising agency rebates, respectively, as selling expenses rather than as a reduction of revenues in the quarter ended March 31, June 30, September 30, December 31, 2006 and March 31, 2007, respectively. This adjustment resulted in a decrease in the originally reported gross margin and a decrease to reported selling expenses from our filings on Form 6–K dated May 26, 2006, August 21, 2006, November 20, 2006, February 26, 2007 and June 12, 2007, respectively. The foregoing reclassifications did not affect net income or earnings per share.

**Results of Operations**

***Six Months Ended June 30, 2007 Compared to Six Months Ended June 30, 2006***

**Total Revenues.** Our total revenues increased substantially from $83.3 million for the six months ended June 30, 2006 to $170.6 million for the six months ended June 30, 2007 due primarily to an increase in our advertising service revenue.

*Digital Out–of–home Advertising Network.* Advertising service revenue from our digital out–of–home advertising network, which includes our commercial location, in–store and poster frame networks, increased 60.8% from $79.5 million for the six months ended June 30, 2006 to $127.8 million for the six months ended June 30, 2007, primarily due to a 59.6% increase in revenues from our commercial location network and a 97.0% increase in revenues from our poster frame network.

- *Commercial location network.* Advertising service revenue from our commercial location network increased significantly from $51.8 million for the six months ended June 30, 2006 to $82.7 million for the six months ended June 30, 2007. The increase in advertising service revenue is attributable to: (i) continued acceptance of our media by an increasing number of advertising clients; (ii) the steady expansion of our media network, including the number of LCD displays and LED billboards on our network; and (iii) the sale of tailored advertising packages including through the seven specialized channels on our commercial location network and by targeting advertising campaigns on specific lists of buildings requested by advertising clients.

- *In–store network.* Advertising service revenue from our in–store network, increased 17.8% to $13.9 million for the six months ended June 30, 2007 from $11.8 million for the six months ended June 30, 2006. This increase was attributable to steady sales of advertising services on the network as it continued to increase in size. Specifically, the number of displays installed in the in–store network amounted to 41,322 as of June 30,

76

Table of Contents

2007, up from 35,511 as of June 30, 2006. The number of hypermarkets in our networks, where we derives most of our in−store network revenue, increased from 872 as of June 30, 2006 to 1,205 as of June 30, 2007.

- *Poster frame network.*  Advertising service revenue from our poster frame network increased 97.0% to $31.2 million for the six months ended June 30, 2007 compared to $15.8 million for the same period in 2006. This increase in revenue is primarily attributable to robust sales as the total number of frames installed nearly doubled from 82,200 as of June 30, 2006 to 161,435 as of June 30, 2007.

*Mobile Handset Advertising Network.*  Advertising service revenue from our mobile handset advertising network increased from $3.0 million for the six months ended June 30, 2006 to $16.9 million for the six months ended June 30, 2007 due to the increasing acceptance by advertisers of mobile handset advertising as telecommunications services and mobile handset ownership continues to grow in China.

*Internet Advertising Services Network.*  We commenced providing Internet advertising services and software solutions in March 2007 upon our acquisition of Allyes. Advertising service revenue from our Internet advertising services network totalled $25.2 million for the six months ended June 30, 2007 attributable primarily to sales of our digital media services, sales of our performance−based advertising service 'SmartTrade' and sales of our Internet advertising software package 'AdForward'.

*Cost of Revenues.*  Our cost of revenues increased significantly from $36.5 million for the six months ended June 30, 2006 to $76.7 million for the six months ended June 30, 2007 due to increases in costs of expanding and maintaining our digital out−of−home advertising networks and mobile handset advertising network as well as from costs related to our Internet advertising services network, which we began to incur in April 2007 upon the acquisition of Allyes.

*Digital out−of−home advertising costs.*  Cost of revenues associated with our digital out−of−home advertising networks increased 49.6% from $34.1 million for the six months ended June 30, 2006 to $51.0 million for the six months ended June 30, 2007. This increase is primarily attributable to increased costs associated with the expansion of our commercial location network and an increase in the number of LED billboards.

- *Net advertising service cost — commercial location network.*  Our net advertising service cost for our commercial location network increased substantially from $19.7 million for the six months ended June 30, 2006 to $30.8 million for the six months ended June 30, 2007. This increase was due to (i) the substantial increase in our advertising service business on our commercial location network between these two periods including substantial increases in our location costs due to a substantial increase in the number of commercial locations where we entered into display placement agreements, (ii) an increase in flat−panel display depreciation costs as a result of an increase in the number of flat−panel displays we own and operate directly from 69,446 as of June 30, 2006 to 85,101 as of June 30, 2007; (iii) our acquisition of 5 regional distributors during this period, (iv) an increase in other direct costs associated with maintaining the network and (v) payments associated with our lease of curbside LED billboards and screen time at movie theaters.

- *Net advertising service cost — in−store network.*  We incurred $10.2 million in net advertising service cost for our in−store network for the six months ended June 30, 2007 compared to $8.4 million for the six months ended June 30, 2006, consisting of location costs and depreciation costs relating to the installation and maintenance of our in−store network.

- *Net advertising service cost — poster frame network.*  Our net advertising service cost for our poster frame network increased 66.5% to $10.0 million for the six months ended June 30, 2007 compared to $6.0 million for the six months ended June 30, 2006, attributable to location costs and depreciation costs relating to the installation and maintenance of poster frames on our network as we significantly increased the number of traditional poster frames on our network and, in June 2007, began to incur location costs associated with our digital poster frames.

*Net advertising service cost — mobile handset advertising network.*  Net advertising service cost associated with our mobile handset advertising network increased significantly from $2.4 million for the six months ended June 30, 2006 to $7.3 million for the six months ended June 30, 2007. These costs consist primarily of message costs charged by mobile operators.

77

Table of Contents

*Net advertising service cost — Internet advertising service network.* We incurred net advertising service costs of $18.4 million for the six months ended June 30, 2007. These costs consist primarily of advertising space leasing costs charged by gateway websites.

***Gross Profit.*** As a result of the foregoing, our gross profit increased by 101.5% from $46.5 million for the six months ended June 30, 2006 to $93.6 million for the six months ended June 30, 2007 . Our overall gross margin decreased during the same period from 55.8% to 54.8% primarily due to the addition of our Internet advertising services network in the first half of 2007, which has lower margins. For the six months ended June 30, 2007, our gross margin for our digital out–of–home advertising network amounted to 60.1%, including gross margins for our commercial location, in–store and poster frame networks of 62.8%, 26.4% and 67.9%, respectively, compared to a gross margin for our digital out–of–home advertising networks of 61.0% for the six months ended June 30, 2006, including gross margins of 62.0%, 29.3% and 62.0% for our commercial location, in–store and poster frame networks, respectively. Gross margin for mobile handset advertising network increased from 21.8% for the six months ended June 30, 2006 to 56.6% for the six months ended June 30, 2007. Gross margin for out Internet advertising services network was 27.1% for the six months ended June 30, 2007. In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network.

***Operating Expenses.*** Our operating expenses increased significantly from $20.3 million for the six months ended June 30, 2006 to $41.0 million for the six months ended June 30, 2007. Operating expenses remained relatively consistent as a percentage of revenues, 24.4% for the six months ended June 30, 2006 compared to 24.0% for the six months ended June 30, 2007. The increase in operating expenses was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, and in share–based compensation expenses under SFAS 123–R.

- *General and Administrative.* General and administrative expenses increased substantially from $10.7 million for the six months ended June 30, 2006 to $20.3 million for the six months ended June 30, 2007 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as our operations have grown, increases in share–based compensation expense and increases in costs associated with being a publicly listed company.

- *Selling and Marketing.* Selling and marketing expenses increased substantially from $9.8 million for the six months ended June 30, 2006 to $23.0 million for the six months ended June 30, 2007 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force as well as share–based compensation expenses.

***Income from Operations.*** As a result of the foregoing, we had income from operations of $52.6 million for the six months ended June 30, 2007 compared to $26.1 million for the six months ended June 30, 2006.

***Income Before Income Taxes and Minority Interest.*** Income before income taxes and minority interest was $27.1 million for the six months ended June 30, 2006 compared to $57.3 million for the six months ended June 30, 2007, which included interest income and other income (expenses).

- *Interest Income.* Interest income increased from $1.8 million for the six months ended June 30, 2006 to $4.6 million for the six months ended June 30, 2007. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from our follow–on public offerings.

- *Income Taxes.* Our income taxes were $1.0 million for the six months ended June 30, 2006 with an effective tax rate of 3.6% compared to $3.3 million for the six months ended June 30, 2007 with an effective tax rate of 5.7%. The increase resulted from newly acquired subsidiaries with higher effective tax rates.

***Net Income.*** As a result of the foregoing, our net income increased 106.9% from $26.1 million for the six months ended June 30, 2006 to $54.0 million for the six months ended June 30, 2007.

***Year Ended December 31, 2006 Compared to Year Ended December 31, 2005***

***Total Revenues.*** Our total revenues increased substantially from $68.2 million in 2005 to $211.9 million in 2006 due to an increase in our advertising service revenue.

Table of Contents

Our total advertising service revenue increased significantly from $66.9 million in 2005 to $210.0 million in 2006, including the advertising service revenues derived from our poster frame network amounting to $40.9 million and $10.1 million from mobile handset advertising network primarily as a result of our acquisitions in 2006.

*Digital Out−of−home Advertising Network.* Advertising service revenue from our digital out−of−home advertising network increased significantly from $66.9 million in 2005 to $199.9 million in 2006, primarily due to rapid growth in revenues from our commercial location network as well as from the addition of revenues from our poster frame network.

- *Commercial location network.* Advertising service revenue from our commercial location network increased significantly from $61.4 million in 2005 to $132.1 million, including $13.8 million to related parties in 2006. The increase in advertising service revenue for our commercial location network is attributable to:

  - An increase in the number of flat−panel displays on our network from 48,226 as of December 31, 2005 to 85,460 as of December 31, 2006 including our regional distributors;

  - Our network reach increased from 58 cities as of December 31, 2005, including 26 cities directly operated by our company and 32 cities operated by our regional distributors, to 91 cities as of December 31, 2006, including 51 cities directly operated by our company and 40 cities operated by our regional distributors;

  - We gained an additional seven minutes of advertising cycle time from each of the regional distributors we acquired between January 1, 2006 and December 31, 2006; and

  - The increase in the average selling price was largely due to increased demand in our Tier II cities, while the average selling price of our advertising services in our Tier I cities increased between these two periods.

- *In−store network .* Advertising service revenue from our in−store network, which commenced operations in April 2005, totaled $26.9 million in 2006. We expect the contribution to our total revenues from our in−store network to increase in the near future.

- *Poster frame network.* We generated $40.9 million in net revenues from our poster frame network in 2006. We commenced operation of our poster frame network in 2006 following our acquisition of Framedia.

*Mobile handset advertising network.* We generated $10.1 million in net revenues from our mobile handset advertising network in 2006. We commenced operations of this network in May 2006.

Other revenues increased from $1.3 million in 2005 to $1.9 million in 2006, primarily from license fees that we received from our overseas franchise companies. By the end of 2006, we granted licenses to approximately 10 overseas franchise companies using the Focus Media brand in operating local LCD advertising networks in India, Malaysia, Indonesia, the Philippines, the Gulf Cooperation Council region (including Saudi Arabia), Hong Kong, Taiwan and Singapore.

**Cost of Revenues.** Our cost of revenues increased significantly from $26.7 million in 2005 to $81.4 million in 2006 due to increases in our net advertising service cost for our commercial location network, our in−store network and two new business lines: our poster frame network and mobile handset advertising network.

*Net Advertising Service Cost — Digital Out−of−home Advertising Network.* Our net advertising service cost for our digital out−of−home advertising network increased significantly from $25.7 million in 2005 to $74.6 million in 2006, primarily as a result of substantial growth in the size of our commercial location network and in−store network as well as costs associated with our poster frame network following our acquisition of Framedia.

- *Net advertising service cost — commercial location network.* Our net advertising service cost for our commercial location network increased substantially from $18.3 million in 2005 to $42.8 million in 2006. This increase was due to the substantial increase in our advertising service business on our commercial location network between these two periods. Our location costs increased substantially from $11.3 million in 2005 to $25.8 million in 2006 due to a substantial increase in the number of commercial locations where we entered into display placement agreements. Our rental fees increased as a percentage of total revenues

79

Table of Contents

between these two periods as a result of (1) a significant increase in the number of locations in our commercial location network, including those previously operated by Target Media; and (2) average increased rental payments for the renewal of display placement agreements in the more desirable locations on our commercial location network. Flat–panel display depreciation costs increased from $3.4 million in 2005 to $9.2 million in 2006, as a result of an increase in the number of flat–panel displays we own and operate directly from 45,049 as of December 31, 2005 to 80,623 as of December 31, 2006 and to our acquisition of Target Media and 3 regional distributors during this period. Other cost of revenues related to net advertising service cost increased from $3.2 million in 2005 to $6.1 million in 2006 as a result of (1) increase in number of personnel responsible for monitoring the network following the acquisition of Target Media; (2) an increase in the volume of CF cards we purchased even as the per–unit cost of CF cards decreased and (3) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and monitoring our network.

- *Net advertising service cost — in–store network.*  We began incurring net advertising service cost relating to our in–store network in April 2005 when we launched our in–store network. We incurred $18.1 million in net advertising service cost for our in–store network in 2006, consisting of location costs of $12.7 million and depreciation costs relating to the installation and maintenance of our in–store network amounting to $3.5 million.

- *Net advertising service cost — poster frame network.*  We began incurring net advertising service cost relating to our poster frame network in 2006 following our acquisition of Framedia. We incurred $13.6 million in net advertising service cost for our poster frame network in 2006, consisting primarily of frame costs and depreciation costs relating to the installation and maintenance of the poster frames.

- *Net advertising service cost — mobile handset advertising network.*  We began incurring net advertising service cost relating to our mobile handset advertising network in 2006 following our acquisition of Dotad, now known as Focus Media Wireless. We incurred $6.1 million in net advertising service cost for our mobile handset advertising network in 2006, primarily consisting of message costs charged by mobile network providers

- *Other cost.*  We incurred net advertising equipment costs of $975,747 in 2005 compared to $764,959 in 2006, which decrease reflects the fact that we have acquired many of our fastest–growing regional distributors. We expect net advertising equipment costs to continue to decrease.

**Gross Profit.**  As a result of the foregoing, our gross profit increased from $41.5 million in 2005 to $130.5 million in 2006 and our overall gross margin increased during the same period from 60.8% to 61.6%. The increase in our gross margin was due to a combination of the continuous increase in the sell–out rate and cost optimization.

**Operating Expenses.**  Our operating expenses increased significantly from $18.7 million in 2005 to $50.1 million in 2006. This increase was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business.

- *General and Administrative.*  General and administrative expenses increased substantially from $9.1 million in 2005 to $25.7 million in 2006 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as well as accounting and administrative costs related to being a public company. In addition, in connection with the options granted to our directors, employees and consultants since July 2004, we recorded stock–based compensation of $6.1 million in 2006 following the adoption of SFAS No. 123 (revised 2005), *"Share–Based Payment"*.

- *Selling and Marketing.*  Selling and marketing expenses increased substantially from $9.6 million in 2005 to $25.8 million in 2006 due to increases in marketing and promotional expenses by our sales force and in salary and benefits associated with the expansion of our sales force.

**Income from Operations.**  As a result of the foregoing, we had income from operations of $22.8 million in 2005 compared to $80.4 million in 2006.

80

Table of Contents

***Income Before Income Taxes and Minority Interest.*** Income before income taxes and minority interest was $24.4 million in 2005 compared to $84.3 million in 2006.

- *Interest Income, net.* Interest income, net of interest expenses increased from 1.8 million in 2005 to $4.3 million in 2006. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations and proceeds from our follow−on offerings.

- *Other Expense, net.* We recorded net other expense of $161,148 in 2005 compared to other income of $287,539, in 2006.

- *Income Taxes.* Our income taxes were $694,453 in 2005 compared to $1,043,538 in 2006.

- *Minority Interests.* We had minority interests expense of $144,433 and $104,773 in 2005 and 2006, respectively, in connection with the pro rata income attributable to minority shareholders of our subsidiaries.

***Net Income.*** As a result of the foregoing, we recorded net income of $83.2 million in 2006 compared to net income of $23.5 million in 2005.

### Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

***Total Revenues.*** Our total revenues increased substantially from $29.2 million in 2004 to $68.2 million in 2005 due to an increase in our advertising service revenue which was partially offset by a decrease in advertising equipment revenue.

Our total advertising service revenue increased significantly from $26.3 million in 2004 to $66.9 million in 2005.

*Digital out−of−home advertising network.* Advertising service revenue from our digital out−of−home advertising network, which in 2004 and 2005 consisted of only our commercial location network, increased significantly from $26.3 million in 2004 to $61.4 million, including $7.2 million to related parties in 2005. The increase in advertising service revenue for our commercial location network is attributable to:

- Increased acceptance of our network among our advertising clients, which we believe is primarily due to the increased coverage and effectiveness of our network that grew from 15,415 flat−panel displays as of December 31, 2004 to 48,226 displays as of December 31, 2005, including our regional distributors;

- Our network reach increased from 34 cities as of December 31, 2004, including 11 cities directly operated by our company and 23 cities operated by our regional distributors, to 58 cities as of December 31, 2005, including 26 cities directly operated by our company and 32 cities operated by our regional distributors;

- We gained an additional seven minutes of advertising cycle time from each of our regional distributors after we acquired them between January 1, 2005 and December 31, 2005; and

- On July 1, 2005, we extended the cycle time in our directly operated Tier II cities from nine minutes to twelve minutes.

The decrease in the average selling price was largely due to growth in sales of advertising services with lower selling prices in our Tier II cities, while the average selling price of our advertising services in our Tier I cities increased between these two periods.

*In−store network.* Advertising service revenue from our in−store network, which commenced operations in April 2005, totaled $5.5 million in 2005. We expect the contribution to our total revenues from our in−store network to increase in the near future.

Our advertising equipment revenue decreased from $2.9 million in 2004 to $1.3 million in 2005. This decrease was primarily attributable to our acquisition of a number of our regional distributors during 2004 and 2005 because, following each acquisition, we no longer sell flat−panel displays to each former regional distributor. This decrease was also partially attributable to decreased sales to our existing regional distributors, as the initial installation of the network in their respective cities of operation was largely completed in 2004 and the first quarter of 2005. We

**Table of Contents**

expect advertising equipment revenue to remain stable or decrease over time as we continue to acquire our existing regional distributors and as the most desirable cities for the establishment of similar networks by regional distributors become saturated.

**Cost of Revenues.**  Our cost of revenues increased significantly from $8.7 million in 2004 to $26.7 million in 2005 due to increases in our net advertising service cost for our commercial location network and our in–store network and in our net advertising equipment cost.

- *Net advertising service cost.*  Our net advertising services cost for our digital out–of–home advertising network which during 2004 and 2005 consisted only of commercial location network, increased substantially from $6.8 million in 2004 to $18.3 million in 2005. This increase was due to the substantial increase in our advertising service business on our commercial location network between these two periods. Our location costs increased substantially from $4.6 million in 2004 to $11.3 million in 2005 due to a substantial increase in the number of commercial locations where we entered into display placement agreements. Our rental fees increased as a percentage of total revenues between these two periods as a result of (1) a significant increase in the number of locations in our commercial location network (2) increased rental payments for the renewal of display placement agreements in the more desirable locations on our commercial location network offset in part by lower rental payments paid for new locations in our commercial location network because of a further reduction in the number of available desirable locations that command more expensive rental fees. Flat–panel display depreciation costs increased from $774,375 in 2004 to $3.4 million in 2005, as a result of an increase in the number of flat–panel displays we own and operate directly from 12,786 as of December 31, 2004 to 45,049 as of December 31, 2005 and to our acquisition of 14 regional distributors during this period. Other cost of revenues related to net advertising service cost increased from $1.4 million in 2004 to $3.2 million in 2005 as a result of (1) an increase in the volume of CF cards we purchased even as the per–unit cost of CF cards decreased and (2) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and monitoring our network.

- *Net advertising service cost — in–store network.*  We began incurring net advertising service cost relating to our in–store network in April 2005 when we launched our in–store network. We incurred $7.4 million in net advertising service cost for our in–store network in 2005, consisting of location costs and depreciation costs relating to the installation and maintenance of our in–store network.

- *Net advertising equipment cost.*  We incurred net advertising equipment costs of $1.9 million in 2004 compared to $975,747 in 2005, which decrease reflects the fact that we have acquired many of our fastest–growing regional distributors. We expect net advertising equipment costs to continue to decrease.

**Gross Profit.**  As a result of the foregoing, our gross profit increased from $20.5 million in 2004 to $41.5 million in 2005 although our overall gross margin decreased during the same period from 70.0% to 60.8%. The decrease in our gross margin was largely a result of increased rental payments, including fixed initial payments, to stores and depreciation incurred as we launched our in–store network.

**Operating Expenses.**  Our operating expenses increased significantly from $7.5 million in 2004 to $18.7 million in 2005. This increase was primarily due to increases in our business tax, our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, such as salaries and costs associated with preparing to become a publicly listed company.

- *General and Administrative.*  General and administrative expenses increased substantially from $4.0 million in 2004 to $9.1 million in 2005 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as well as accounting and administrative costs relating to being a public company. In addition, in connection with the options granted to our directors, employees and consultants since July 2004, we recorded stock based compensation of $683,186 in 2005.

- *Selling and Marketing.*  Selling and marketing expenses increased substantially from $3.5 million in 2004 to $9.6 million in 2005 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force.

Table of Contents

*Income from Operations.* As a result of the foregoing, we had income from operations of $13.0 million in 2004 compared to $22.8 million in 2005.

*Income Before Income Taxes and Minority Interest.* Income before income taxes and minority interest was $1.3 million in 2004 compared to $24.4 million in 2005, which included interest income and other income (expenses) and change in fair value of series B convertible redeemable preferred shares in 2004.

- *Interest Income, net.* Interest income increased from $9,739 in 2004 to $1.8 million in 2005. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations, sales of our preference shares and proceeds from our initial public offering.

- *Other Expense, net.* We recorded net other expense of $3,843 in 2004 compared to other expense of $161,148 in 2005.

- *Change in Fair Value of Series B Convertible Redeemable Preferred Shares.* We incurred a change in fair value of series B convertible redeemable preferred shares of $11.7 million in 2004. Upon the occurrence of our initial public offering in July 2005, all outstanding preference shares were converted into ordinary shares, and accordingly we did not incur any change in fair value of series B convertible redeemable preferred shares in 2005.

- *Income Taxes.* Our income taxes were $907,550 in 2004 compared to $694,453 in 2005, which decrease resulted from the fact that in 2005, we derived most of our revenue from Focus Media Advertising Agency, which had no tax liability during this period, whereas during 2004, we derived most of our revenues from Focus Media Advertisement, which had tax liability.

- *Minority Interest.* We had minority interest income of $13,516 and minority interest expense of $144,433 in 2004 and 2005, respectively, in connection with the pro rata income attributable to minority shareholders of four of our subsidiaries.

*Net Income.* As a result of the foregoing, we recorded net income of $23.5 million in 2005 compared to net income of $372,752 in 2004.

## Liquidity and Capital Resources

*Cash Flows and Working Capital*

To date, we have financed our operations primarily through cash generated from operating activities and sales of equity in private and public transactions. As of June 30, 2007, we had approximately $187.6 million in cash and cash equivalents. As we have expanded our network, entered into a large number of display placement agreements, increased our acquisition of regional distributors and related businesses, and made strategic acquisitions, our cash needs for such acquisitions, the purchase of flat–panel displays, payment of our location and maintenance costs and employee costs increased significantly and accounted for the net cash used in investing activities. Our cash and cash equivalents primarily consist of cash on hand and liquid investments with original maturities of three months or less that are deposited with banks and other financial institutions. We generally deposit our excess cash in interest bearing bank accounts. Although we consolidate the results of our PRC operating affiliates in our consolidated financial statements and we can utilize their cash and cash equivalents in our operations through our PRC operating affiliates, we do not have direct access to the cash and cash equivalents or future earnings of our PRC operating affiliates. However, these cash balances can be utilized by us for our normal operations pursuant to our agreements with our PRC operating affiliates that provide us with effective control over our PRC operating affiliates. In addition, we have access to the cash flows of Focus Media Advertisement and its subsidiaries through contractual arrangements with our subsidiaries Focus Media Technology and Focus Media Digital, which provide technical and other services in exchange for fees. See "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries".

We expect to require cash in order to fund our ongoing business needs, particularly the location costs connected with the placement of our television displays, to fund the ongoing expansion of our network and for payments in connection with our acquisitions. Other possible cash needs may include the upgrading of technology

Table of Contents

on our network as well as any payment of claims that could be made against us. We have not encountered any difficulties in meeting our current cash needs.

The following table shows our cash flows with respect to operating activities, investing activities and financing activities in 2004, 2005 and 2006 and for the six months ended June 30, 2006 and 2007:

| | For The Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | (In thousands of U.S. dollars) | | | | |
|---|---|---|---|---|---|
| Net cash provided by operating activities | $  4,045 | $  11,269 | $  93,355 | $  17,393 | $  56,568 |
| Net cash (used) in investing activities | (11,070) | (117,667) | (121,994) | (98,668) | (158,126) |
| Net cash provided by financing activities | 28,978 | 119,169 | 153,521 | 167,476 | 116,583 |
| Net increase in cash and cash equivalent | 21,953 | 13,984 | 127,958 | 86,031 | 22,981 |

We had net cash provided by operating activities of $4.0 million, $11.3 million, $93.4 million and $56.6 million for 2004, 2005, 2006 and six months ended June 30, 2007, respectively. This was primarily attributable to net income generated from the operation of our advertising network, and adjusted by share–based compensation expense, minority interests, depreciation and amortization expenses, bad debt provision expenses, and change in current assets and liabilities.

We had net cash used in investing activities of $158.1 million for the six months ended June 30, 2007, primarily in connection with the acquisition of companies, including Allyes, prepayments made to acquire certain companies engaged in poster frame advertising business, mobile handset advertising business, outdoor billboards advertising business and Internet advertising services business, purchase of equipment used to expand our networks, and rental deposits paid for locations on our out–of–home television, poster frame and outdoor LED billboard networks. Our acquisition of Allyes involved our payment of $70.0 million in cash and issuance of $154.3 million of our ordinary shares to the seller parties at a fixed value of $7.726 per ordinary share. We had net cash used in investing activities of $122.0 million in 2006, primarily in connection with the acquisition of companies, including Target Media and Focus Media Wireless, subsidiaries and regional distributors, purchase of equipment used to expand our networks, and rental deposits paid for locations on our out–of–home television, poster frame and outdoor LED billboard networks. Our acquisition of Framedia involved our payment of $39.6 million in cash and issuance of $55.4 million of our ordinary shares to the seller parties at a fixed value of $2.456 per ordinary share. In addition, in connection with the earn–out payment for Framedia, we issued an additional 35,830,619 Focus Media ordinary shares, at a fair value of $6.639 per ordinary share, to the seller parties in 2007. Pursuant to the share purchase agreement we entered into with E–Times and Skyvantage, we paid the seller parties $5.0 million. We also paid $94.0 million in cash and issued 77 million ordinary shares to the shareholders of Target Media. The issuance of such additional ordinary shares will also result in lower earnings per share or per ADS when we calculate our earnings for 2007 than would otherwise be the case were such additional shares not issued. We had net cash used in investing activities of $117.7 million in 2005, primarily in connection with the acquisition of companies, subsidiaries and regional distributors, purchase of equipment used to expand our commercial location and in–store networks, and rental deposits paid for locations on both our commercial location and in–store networks. We had net cash used in investing activities of $11.1 million in 2004. This was primarily attributable to our purchase of property and equipment for the operation of our network, rental deposits made in connection with our display placement agreements and our acquisition of eleven businesses, eight of which were our former regional distributors.

We had net cash provided by financing activities of $116.6 million for the six months ended June 30, 2007, primarily from the proceeds of $115.0 million, net of issuance costs, from our follow–on offering in January 2007. $153.5 million net cash was provided by financing activities in 2006, primarily from the proceeds of $142.7 million, net of issuance costs, from our follow–on offerings. $119.2 million net cash was provided by financing activities in 2005, primarily from the proceeds of our initial public offering in July 2005. We had net cash provided by financing activities of $29.0 million in 2004. This was attributable to the proceeds from the issuance of our Series B and Series C–2 convertible redeemable preference shares, offset slightly by the repayment of a short–term loan from one of our shareholders.

84

Table of Contents

We believe that our current cash and cash equivalents, cash flow from operations and the proceeds from our recent follow−on offerings will be sufficient to meet our anticipated cash needs, including for working capital and capital expenditures, for the foreseeable future. These additional cash needs may include costs associated with the expansion of our network, such as the purchase of flat−panel displays, LED digital billboards, digital poster frames and increased location cost, including in connection with our acquisitions of business and regional distributors. We are also required under PRC law to set aside 10% of our after−tax profits into a general reserve fund. We expect that revenues from operation of our advertising network and the proceeds from our offerings will be sufficient to cover any such obligations and costs. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell debt securities or additional equity securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities could result in additional dilution to our shareholders. The incurrence of indebtedness would result in debt service obligations and could result in operating and financial covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

From time to time, we evaluate possible investments, acquisitions or divestments and may, if a suitable opportunity arises, make an investment or acquisition or conduct a divestment.

**Contractual Obligations and Commercial Commitments**

The following table sets forth our contractual obligations and commitments with definitive payment terms on a consolidated basis which will require significant cash outlays in the future as of December 31, 2006.

| | Payments Due December 31 | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | **2007** | **2008** | **2009** | **2010** | **Thereafter** |
| Display and poster frame placement agreement obligations | $ 107,242 | $ 46,186 | $ 31,363 | $ 19,098 | $ 8,683 | $  1,912 |
| Office premise lease obligations | 4,198 | 1,971 | 1,153 | 773 | 251 | 50 |
| Total contractual obligations | $ 111,440 | $ 48,157 | $ 32,516 | $ 19,871 | $ 8,934 | $  1,962 |

Other than certain leasing arrangements relating to the placement of our flat−panel and office premises, as of December 31, 2006, we did not have any long−term debt obligations, operating lease obligations or purchase obligations.

As of December 31, 2006, we had no other indebtedness, material contingent liabilities, or material mortgages or liens. We intend to meet our future funding needs primarily through net cash provided from operating activities and the proceeds of this offering. Our objective is to maintain the safety and liquidity of our cash. Therefore we intend to keep our cash and cash equivalents in short−term bank deposits and short−term bonds.

By June 30, 2007, the Group completed several business acquisitions in which the considerations were partially or fully contingent on future earnings targets for the one to three years ended from the respective dates of acquisition. The aggregate contingent consideration is estimated by management to be approximately $292.5 million, of which $42.8 million has been paid out as deposit for acquisition of subsidiaries. The rest of the payment is contingent on future earnings targets over the next one to four fiscal years.

**Capital Expenditures**

The following table sets forth our historical capital expenditures for the periods indicated. Actual future capital expenditures may differ from the amounts indicated below.

| | For The Year Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | (In thousands of U.S. dollars) | | | | |
| Total capital expenditures | $ 6,373 | $ 36,765 | $ 22,878 | $ 11,608 | $ 25,265 |

85

**Table of Contents**

Our capital expenditures were made primarily to acquire flat–panel displays for our advertising network. Our capital expenditures are primarily funded by net cash provided from operating activities. We expect our capital expenditures in 2007, in an amount of approximately $40.0 million, to primarily consist of purchases of components for our flat–panel displays and new digital poster frames as we continue to expand our commercial location network and in–store network and expand and upgrade our poster frame network. We also intend to upgrade our financial, accounting systems and internal control systems. As opportunities arise, we may make additional acquisitions of regional distributors and other businesses that complement our operations. We believe that we will be able to fund these upgrades and equipment purchases through the revenues we generate, and do not anticipate that these obligations will have a material impact on our liquidity needs.

**Foreign Exchange**

We maintain our accounts in Renminbi and substantially all of our revenues and expenses are denominated in Renminbi, while we report our financial results in U.S. dollars. Fluctuations in exchange rates, primarily those involving the U.S. dollar against the Renminbi, may affect our reported operating results in U.S. dollar terms. In addition, we will receive the proceeds of this offering in U.S. dollars and changes in the U.S. dollar/Renminbi exchange rate could affect the buying power of those proceeds. Under the current foreign exchange system in the PRC, our operations in the PRC may not be able to hedge effectively against currency risk, including any possible future Renminbi devaluation. Moreover, due to the recent devaluation of the U.S. dollar against the Euro and several other currencies, the PRC government recently revised its decade–old policy of pegging the value of the Renminbi to the U.S. dollar. As of July 21, 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it will be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on July 21, 2005 the Renminbi was revalued against the U.S. dollar to approximately RMB 8.11 to the U.S. dollar, representing an upward revaluation of 2.1% of the Renminbi against the U.S. dollar, as compared to the exchange rate on the previous day. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

**Restricted Net Assets**

Relevant PRC laws and regulations permit payments of dividends by our PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, our PRC subsidiaries and our affiliated PRC entities are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2005 and 2006, the amount of our restricted net assets was approximately $75.9 million and $223.4 million, respectively.

**Off–Balance Sheet Commitments and Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. In addition, we have not entered into any derivative contracts that are indexed to our own shares and classified as shareholder's equity, or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. Moreover, we do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**Quantitative and Qualitative Disclosures About Market Risk**

*Interest Rate Risk*

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest–bearing bank deposits. We have not used derivative financial instruments in our investment portfolio. Interest earning instruments carry a degree of interest rate risk. We have not been exposed nor do we

86

Table of Contents

anticipate being exposed to material risks due to changes in market interest rates. However, our future interest income may fall short of expectations due to changes in market interest rates.

### Foreign Currency Risk

Substantially all our revenues and expenses are denominated in Renminbi. We have not had any material foreign exchange gains or losses. Although in general, our exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will be affected by the foreign exchange rate between U.S. dollars relative to the Renminbi because the value of our business is effectively denominated in Renminbi, while the ADSs will be traded in U.S. dollars. Furthermore, a decline in the value of the Renminbi could reduce the U.S. dollar equivalent of the value of the earnings from, and our investments in, our subsidiaries and PRC–incorporated affiliates in China. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our reported financial results in U.S. dollar terms. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

## Inflation

In recent years, China has not experienced significant inflation, and thus inflation has not had a significant effect on our business historically. According to the National Bureau of Statistics of China, the change in the Consumer Price Index in China was 0.7%, (0.8)%, 1.2%, 3.9%, 1.8% and 1.5% in 2001, 2002, 2003, 2004, 2005 and 2006, respectively.

87

Table of Contents

**BUSINESS**

**Overview**

    We are China's leading multi–platform digital media company, operate the largest out–of–home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat–panel television displays in our network, and also are a leading provider of Internet marketing solutions in China. It is our goal to create the largest multi–platform digital advertising network in China, reaching urban consumers at strategic locations and point–of–interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of June 30, 2007, our out–of–home advertising network consists of our digital out–of–home advertising network, our mobile handset advertising network and our Internet advertising services network:

    ***Our Digital Out–of–home Advertising Network*** which focuses on providing out–of–home advertising through LCD flat–panel televisions displays, LED billboards, movie screens, and poster and digital frames, includes our commercial location network, in–store network and poster frame network:

- ***our commercial location network***, consisting of:

- *our LCD display network*, which refers to our network of flat–panel television displays placed in high–traffic areas of commercial and public buildings marketed to advertisers as a network or as seven separate channels targeting different types of consumers — our premier A and B office building channels, travel, fashion, elite, IT mall and healthcare channels;

- *our outdoor LED billboard network*, which refers to our network of leased 5' x 5' LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai; and

- *our movie theater advertising network*, which refers to our right to sell advertising time on movie screens for the three minutes prior to movie screenings at movie theaters in China.

- ***our in–store network***, which refers to our network of flat–panel television displays placed in specific product areas inside stores with high–traffic concentrations such as selected consumer product sections, the main aisles and check–out lines in large–scale chain retail stores, or hypermarkets, as well as inside selected supermarkets and convenience stores; and

- ***our poster frame network***, which refers to our network of traditional and digital advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

***Our Mobile Handset Advertising Network***, which refers to our mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS, offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

***Our Internet Advertising Services Network***, which refers to our Internet advertising agency and advertising services technology, including performance–based software suites.

We derive revenue principally by:

- selling advertising time slots on our out–of–home television networks, which include our commercial location network and our in–store network;

- by selling frame space on our poster and digital frame network;

- selling advertisements on our mobile handset advertising network; and

- providing advertising agency and technology services and software for online advertising.

Table of Contents

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day. Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. Our advertising posters include both traditional printed posters as well as digital LCD poster frames with integrated sound, all–angle and remote control technologies. Generally two or three advertising poster frames can be placed in each elevator.

Advertisements on our mobile phone advertising network are advertisements that are sent to mobile phone users over China Mobile and China Unicom's networks.

Our Internet advertising services network, which we acquired through our acquisition of Allyes in March 2007, uses proprietary software applications to provide online ad publishing, creative production, tracking, targeting, and performance analysis. We also provide performance–based online advertising services providing advertisers with pay by CPA (cost–per–action), directly link advertising cost with performance. Our Internet advertising services network has integrated advertising resources from over 5,000 popular websites, making it the largest performance–based online advertising network in China.

As of December 31, 2006, over 4,000 advertisers purchased advertising time on our advertising networks. Our five largest advertising clients in terms of revenue, which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006.

Our network has the following key features:

- Substantially all of the content we broadcast or place on our digital out–of–home advertising network consists of advertisements.

- The advertising cycle on our commercial location network consists of advertising content broadcast repeatedly approximately 60 times per day, approximately 120 times per day in the case of our outdoor LED network, and is sold to advertising clients according to advertising packages purchased from us, and for three minutes before the screening of each showing of a film in the case of our movie theater advertising network.

- The advertising cycle of our out–of–home television advertising networks is broadcast repeatedly for approximately twelve–hours per day.

- The majority of our flat–panel displays contain a 17–inch LCD screen, while the remainder contain larger size plasma or LCD screens.

- Over 160,000 450 mm x 600 mm advertising poster frames, including, as of August 31, 2007, approximately 7,000 digital poster frames have been installed in elevators on our poster frame network.

- Approximately 200 5' x 5' LED digital billboards that we lease from a third party and that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

- A mobile handset advertising platform that delivers approximately eight million messages per day with a customer base of over 100 wireless value–added service providers in China and a database of over 70 million mobile handset users with SMS, MMS or WAP capability.

- An Internet advertising services network that offers performance–based advertising services and Internet advertising publishing software suites.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of June 30, 2007, we operated our commercial location network directly in over fifty major cities throughout China, including Beijing, Shanghai, Guangzhou and Shenzhen. As of June 30, 2007, we covered approximately 40 additional cities through contractual arrangements with regional distributors. Between January 1, 2005 and June 30, 2007, the number of displays in our commercial location network increased from 15,415 to 89,687. As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200

89

**Table of Contents**

leased 5' x 5' digital billboards placed along curbsides in high–pedestrian traffic areas in Shanghai. We had installed over 161,435 advertising poster frames and our in–store network consisted of 41,322 flat–panel displays placed in 3,995 store locations in our directly operated cities, including 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores.

The following table sets forth operating data related to our network for the periods indicated:

| | For and as of the Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| **Commercial location network:** | | | | | | | | | |
| Number of displays: | | | | | | | | | |
| Our direct cities | 20,267 | 34,079 | 45,049 | 71,230 | 69,446 | 68,723 | 80,263 | 83,256 | 85,010 |
| Our regional distributors(1) | 2,664 | 3,273 | 3,177 | 3,779 | 3,712 | 5,290 | 5,197 | 4,010 | 4,677 |
| Total | 22,931 | 37,352 | 48,226 | 75,009 | 73,158 | 74,013 | 85,460 | 87,296 | 89,687 |
| **In–store network:** | | | | | | | | | |
| Number of displays in our in–store network | 12,779 | 20,061 | 27,849 | 33,765 | 35,511 | 36,387 | 38,742 | 40,736 | 41,322 |
| Number of stores in our in–store network | 1,835 | 2,702 | 4,130 | 5,218 | 4,174 | 3,894 | 3,898 | 3,935 | 3,995 |
| **Poster Frame Network:** | | | | | | | | | |
| Number of frames installed in our poster frame network | — | — | — | 74,353 | 82,200 | 95,878 | 99,784 | 124,542 | 161,435 |
| **Frame slot data:** | | | | | | | | | |
| Number of frame slots available for sale | — | — | — | 208,659 | 243,959 | 267,603 | 294,294 | 195,603 | 161,435 |

(1)  Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

**Our Competitive Strengths**

We believe we have the following competitive strengths:

*Effective and Focused Advertising Network Accepted by Both Advertisers and Consumers.*

Since commencing our current business operations in May 2003, we have created an advertising network that:

- *Targets Segmented Consumer Groups.*  Our flat–panel displays, LED billboards and poster frames are primarily placed in venues that have a high concentration of consumers with higher–than–average disposable incomes or that have a high concentration of consumers who are likely to be interested in particular types of products and services. As a result, our network enables advertisers to target consumers with demographic profiles attractive to them. Moreover, our network allows advertisers to further segment these consumers through separate specified advertising channels, such as our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels, which are marketed as stand–alone channels of our commercial location network. Because our network is able to target specific consumer groups, it allows advertisers to more cost–effectively reach consumers with demographic profiles desirable to them.

- *Reaches Captive Viewers in Low Distraction Environments.*  Our displays are placed in lobbies, near elevator banks, in elevators, on high–traffic urban curbsides and in other environments where there are few broadcast or display media competing for viewers' attention, which we believe increases the effectiveness of our network.

- *Tailored Advertising Solutions.*  Through the various media platforms and specialized channels on our network, we are able to offer tailored advertising solutions to our customers to enable them to target the consumers and locations that are most important to them. For example, we are increasingly providing custom advertising packages to our customers that focus exclusively on a certain suite of buildings, networks and channels accordingly to their requests and needs.

90

Table of Contents

We believe these characteristics and advantages of our business model have made us an effective and well–accepted alternative advertising medium with a strong market position that enables us to compete successfully in China's advertising market.

***The Largest Digital Out–of–home Advertising Network in China with Nationwide Coverage.***

We believe we operate the largest digital out–of–home advertising network in China based on the number of locations and the number of displays in our network. As of June 30, 2007, we operated:

- 85,010 flat–panel displays installed in over 90 cities in China, and through our regional distributors, we also operated approximately 4,677 flat–panel displays in approximately 40 cities in China;

- 41,322 flat–panel displays installed in 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores in cities in China; and

- 161,435 poster frames available for sale installed in elevators primarily in residential buildings. As of August 31, 2007, our poster frame network also included 6,796 digital poster frames;

- over 200 5' by 5' LED digital billboards placed in high pedestrian traffic outdoor locations in Shanghai; and

- the right to broadcast advertising on movie theater screens for three minutes prior to the screening of each movie in major cities in China.

***Out–of–home Advertising Network with Multiple Media Platforms Provides Advertisers with Complementary and Reinforcing Avenues to Reach Targeted Consumers.***

Our network provides advertisers with multiple advertising media to reach their target audience. Our network currently enables advertisers to reach (1) consumers with higher than average incomes through our commercial location network, (2) consumers at the point–of–purchase through our in–store network, (3) consumers as they leave and return home through our poster frame network, (4) mobile handsets users throughout the day via our mobile handset advertising network, (5) urban consumers throughout the day via our strategically placed outdoor LED billboards in shopping and high pedestrian traffic areas in Shanghai and (6) internet users through our performance–based Internet advertising services and software suites. By offering advertisers a range of advertising media that can reach consumers during different times of the day in a wide variety of locations, we believe our network has enhanced appeal to advertisers over competitors who offer limited advertising media or channels to advertisers. We believe that by offering multiple advertising media platforms, we enable advertisers to reach a wide range of consumers with complementary and mutually reinforcing advertising campaigns and are better able to attract advertisers who want to reach targeted consumer groups through a number of different advertising media in different venues and at different times of the day.

***Sustainable Competitive Advantages through the Size of Our Network and Our Exclusive, Renewable Agreements.***

We believe the following factors provide us with a sustainable business advantage over existing and prospective competitors:

- *Early Market Presence and Coverage in Many of the Most Desirable Locations.* We were one of the first companies to establish a large–scale out–of–home television advertising network in commercial buildings and other commercial locations in China. By recognizing this market opportunity and entering this sector early, we have occupied many of the most desirable locations and have grown the size of our network, which we believe has created high barriers to entry for potential competitors. We believe that we have secured a high percentage of the most desirable locations in many of China's major urban centers, and that this early mover advantage is important because landlords and building managers typically permit only one out–of–home television advertising network operation in each building. We believe that, through our acquisition of Target Media, we have enhanced these advantages. Through our acquisition of Framedia, we also have gained a strong market presence in the poster frame advertising market in residential complexes. We also believe we have established the first outdoor LED digital billboard advertising network in China, currently

91

Table of Contents

comprising over 200 5' x 5' LED digital billboards placed in high pedestrian traffic outdoor locations in Shanghai that we lease from a third–party location provider.

- *Large–scale Network that Attracts Advertising Clients.* Our multi–platform out–of–home advertising network includes flat–panel displays located in a wide range of commercial, retail locations and in–store locations in over 90 cities in China, poster frames placed in residential complexes in cities in China, LED digital billboards placed in high pedestrian curbside locations in Shanghai, and advertising services provided to mobile handset users. We believe the extent of our network coverage makes us more attractive to advertising clients than competing networks. Through the number of advertising media platforms we operate and the national scope of our network, we enable advertising clients to reach a wide audience in urban consumer markets across China. We believe the size and scope of our network has attained a scale that draws advertising clients to our network and gives us a competitive edge over competing networks as well as over many traditional advertising media.

- *Exclusive and Renewable Display Placement Agreements.* As of June 30, 2007, the majority of our display placement agreements on our out–of–home television advertising networks give us the exclusive right to place our flat–panel displays in the elevator and lobby areas of the locations in which we operate and, in the cities we operate directly, give us the right to renew the contract under terms that are no less favorable than those offered by competing bidders, enabling us to maintain exclusive coverage of many of the most desirable locations in our network for significant lengths of time.

We believe our high market share of desirable locations in key cities in China, the wide extent of our network coverage and the exclusivity and renewal terms contained in the majority of our display placement agreements with landlords and property managers create higher barriers to entry for potential competitors than other out–of–home and outdoor advertising business models.

***Our Brand Name And Reputation Have Attracted A Large Base Of Leading Advertising Clients.***

We believe we have established a well recognized brand name in the advertising industry in China by developing a reputation for innovative and effective delivery of large–scale yet focused high–quality advertising to consumers with desirable demographic profiles. This has enabled us to develop a strong client base consisting of major international and brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006. All of our top ten advertisers based on total advertising contracts in 2005 had entered into advertising contracts with us in 2006. Moreover, the total contract amount accounted for by our top ten advertisers increased by approximately 123.5% from 2005 to 2006. In addition, as of December 31, 2006, more than 4,000 advertisers purchased advertising time on our out–of–home television display networks. The strength and depth of our client base enhance our reputation in the industry and position us to further expand our advertising network.

We believe our acquisitions of Framedia, Focus Media Wireless and Allyes have further enhanced our brand name as a leading digital media company in China.

***Strong Management and Sales Team with Extensive Industry Experience.***

We have assembled a management and sales team with extensive experience in China's advertising industry. Jason Nanchun Jiang, our founder, chairman, chief executive officer and a principal shareholder, has over 10 years of experience in China's advertising industry, including his previous experience until 2003 as chief executive officer of Shanghai Everease Advertising Corporation, or Everease. Daniel Wu, our chief financial officer, has over six years of experience in investment banking, including for Merrill Lynch and Lehman Brothers, and served as chief financial officer of Harbour Networks, a telecommunications equipment provider in China. In August 2005, we hired our chief operating officer Cindy Chan, who was deputy general manager for iMPACT, ZenithOptimedia's outdoor media department and the largest outdoor media buyer in China. With our acquisition of Framedia, Zhi Tan, who was chairman and chief executive officer of Framedia and now serves as our president and director. Following our acquisition of Target Media, David Yu, the founder and former chairman and chief executive officer of Target Media, continues to act as co–chairman. Following our acquisition of Allyes, David Zhu, the founder, chairman and

Table of Contents

chief executive officer of Allyes, had added his entrepreneurial and management expertise and remains on as chief executive officer of Allyes. In addition, we employ experienced and knowledgeable managers to run operations in each of the cities we operate directly. Our marketing managers have many years of experience in the advertising industry in China and have worked for a number of major domestic and international advertising firms in China. We believe the strength, experience and diverse background of our management and sales teams have enabled us to expand our advertising network, enhance our reputation in our industry and build up a strong client base.

## Our Strategies

Our objective is to become the number one multi–platform digital media company in China. We intend to achieve this objective by implementing the following strategies:

### Enhance Our Market Position and Revenues by Expanding Our Networks.

We intend to aggressively expand our out–of–home digital media networks in order to erect barriers to expansion and entry by current and prospective competitors, enhance critical mass appeal to our advertisers, and increase our fee rates and revenues. To achieve this goal, we intend to increase the number of locations, flat–panel television displays, poster frames and LED billboards in our network. We intend to aggressively enter into new display and poster frame placement agreements to increase the number of locations in which we install our flat–panel television displays and poster frames in order to enhance our current position in many of the most desirable locations in key urban areas in China.

### Identify And Create New Networks and Advertising Channels that Target Specific Consumer Demographics and Expand Network Capacity.

*In–store Network.* We commenced commercial operations of our in–store network in April 2005, enabling our advertising clients to target consumers at the time and place where consumers are likely to purchase a range of consumer and household products. As of June 30, 2007, we had placed 41,322 flat–panel displays in 3,995 locations on our in–store network. We intend to expand this network and will continue to strengthen efforts to enter into long–term and exclusive relationships with hypermarkets, supermarkets and convenience stores and to market this service to advertisers.

*Targeted Advertising Channels.* We have placed flat–panel television displays in office buildings, shopping malls, restaurants, beauty parlors, golf country clubs, automobile repair shops, banks, pharmacies, airports, hospitals and other commercial locations. As many of these venues are suitable for targeting specific consumer groups, we have begun to separate some of them into distinct stand–alone networks and to market them to specific advertising clients who wish to advertise their products and services to targeted consumer groups. Currently, our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels are marketed as independent channels of our commercial location network, as we believe these channels are attractive to a diverse range of advertisers who wish to target consumers likely to frequent these venues. We believe our ability to identify and create focused advertising networks distinguishes us from our competitors and attracts additional advertising clients who will use our services to reach their target consumers in a more effective manner.

*Complementary Advertising Media Platforms.* We intend to continue expanding the scope of our advertising activities and type of media platforms we employ by entering into new types of advertising media businesses, such as large–size outdoor LED digital billboards, telecommunications channels such as Focus Media Wireless, and online opportunities such as Allyes. We believe by expanding our business into complementary media businesses that focus on venues and at periods of the day less comprehensively covered by traditional advertising media, we will enhance the value of our advertising services to advertisers and provide us with a competitive advantage over existing and potential competitors. We intend to continue expanding into new and complementary advertising media platforms, which will enable us to provide advertisers with additional advertising platforms to reach targeted consumers.

Table of Contents

***Promote Our Brand Name and Augment Our Service Offerings to Attract a Wider Client Base and Increase Revenues.***

Enhancing our brand name in the industry will allow us to solidify and broaden our client base by enhancing market awareness of our services and our ability to target discrete consumer groups more effectively than mass media. We believe the low cost of reaching consumers with higher–than–average disposable incomes through our network and our development of additional advertising media platforms and channels within our network we plan to develop in the future can enable advertisers to reach that goal. As we increase our advertising client base and increase sales, demand for and sale of time slots and frame space on our network will grow.

***Continue to Explore New Digital Media Opportunities to Target Segmented Consumer Groups.***

Consumer acceptance of technology–driven advertising and entertainment media, including the Internet and advanced mobile communications systems, is a feature of the advertising industry in China. We intend to identify and take advantage of new opportunities in the PRC advertising market in order to enhance our ability to target segmented consumer groups through innovative advertising techniques and media. As new opportunities that fit our brand image, business model and strategy present themselves, we expect to expand our operations and continue to pursue innovative advertising techniques and media that provide effective solutions to advertising clients and target consumers with desirable demographic profiles as we have already done with our acquisitions of Focus Media Wireless and Allyes.

## Our Network

Our network includes:

- *our digital out–of–home advertising network*, including our commercial location network (LCD display, outdoor LED billboard and movie theater advertising networks), in–store network and poster frame network;

- *our mobile handset advertising network*; and

- *our Internet advertising services network*.

### Digital Out–of–home Advertising Networks

#### *Commercial Location Network*

*LCD display network.* The majority of displays on our LCD display network are currently placed in high–traffic areas of commercial office buildings. The locations in our LCD display network also include shopping malls, banks and hotels as well as more specialized locations such as hospitals, beauty parlors and golf country clubs. We market our LCD display network to advertisers of consumer products and services, such as automobiles, home electronics, mobile communications devices and services, cosmetics, health products and financial services. As of June 30, 2007, our LCD display network, including the portions of our LCD display network operated by our regional distributors, was comprised of approximately 89,687 flat–panel displays placed in over 90 cities throughout China. We operate our LCD display network directly in approximately 50 cities and indirectly through contractual arrangements with regional distributors in approximately 40 additional cities. We have established joint ventures in several cities outside of mainland China, including Hong Kong, Taipei and Singapore through contracts with local operators which operate local commercial location networks and which license our brand name. None of these arrangements outside of China currently constitutes a material part of our business.

As we expand the number of venues in our LCD display network, we continue to separate certain types of venues into distinct stand–alone channels of this network. As of June 30, 2007, we had established seven such stand–alone channels that are marketed as separate focused channels of our LCD display network: our premier office building A and B, travel, fashion, elite, IT mall and healthcare channels. We believe that by increasingly offering new advertising channels on our out–of–home television networks, we will be able to offer advertisers more targeted and effective audience reach, thereby enabling us to increase our advertising rates.

Expanding our network through regional distributors enables us to provide our advertisers with broader nationwide coverage and to test, develop and evaluate these regional advertising markets without our having to

94

**Table of Contents**

***Promote Our Brand Name and Augment Our Service Offerings to Attract a Wider Client Base and Increase Revenues.***

Enhancing our brand name in the industry will allow us to solidify and broaden our client base by enhancing market awareness of our services and our ability to target discrete consumer groups more effectively than mass media. We believe the low cost of reaching consumers with higher–than–average disposable incomes through our network and our development of additional advertising media platforms and channels within our network we plan to develop in the future can enable advertisers to reach that goal. As we increase our advertising client base and increase sales, demand for and sale of time slots and frame space on our network will grow.

***Continue to Explore New Digital Media Opportunities to Target Segmented Consumer Groups.***

Consumer acceptance of technology–driven advertising and entertainment media, including the Internet and advanced mobile communications systems, is a feature of the advertising industry in China. We intend to identify and take advantage of new opportunities in the PRC advertising market in order to enhance our ability to target segmented consumer groups through innovative advertising techniques and media. As new opportunities that fit our brand image, business model and strategy present themselves, we expect to expand our operations and continue to pursue innovative advertising techniques and media that provide effective solutions to advertising clients and target consumers with desirable demographic profiles as we have already done with our acquisitions of Focus Media Wireless and Allyes.

## Our Network

Our network includes:

- *our digital out–of–home advertising network*, including our commercial location network (LCD display, outdoor LED billboard and movie theater advertising networks), in–store network and poster frame network;

- *our mobile handset advertising network*; and

- *our Internet advertising services network*.

### Digital Out–of–home Advertising Networks

#### *Commercial Location Network*

*LCD display network.* The majority of displays on our LCD display network are currently placed in high–traffic areas of commercial office buildings. The locations in our LCD display network also include shopping malls, banks and hotels as well as more specialized locations such as hospitals, beauty parlors and golf country clubs. We market our LCD display network to advertisers of consumer products and services, such as automobiles, home electronics, mobile communications devices and services, cosmetics, health products and financial services. As of June 30, 2007, our LCD display network, including the portions of our LCD display network operated by our regional distributors, was comprised of approximately 89,687 flat–panel displays placed in over 90 cities throughout China. We operate our LCD display network directly in approximately 50 cities and indirectly through contractual arrangements with regional distributors in approximately 40 additional cities. We have established joint ventures in several cities outside of mainland China, including Hong Kong, Taipei and Singapore through contracts with local operators which operate local commercial location networks and which license our brand name. None of these arrangements outside of China currently constitutes a material part of our business.

As we expand the number of venues in our LCD display network, we continue to separate certain types of venues into distinct stand–alone channels of this network. As of June 30, 2007, we had established seven such stand–alone channels that are marketed as separate focused channels of our LCD display network: our premier office building A and B, travel, fashion, elite, IT mall and healthcare channels. We believe that by increasingly offering new advertising channels on our out–of–home television networks, we will be able to offer advertisers more targeted and effective audience reach, thereby enabling us to increase our advertising rates.

Expanding our network through regional distributors enables us to provide our advertisers with broader nationwide coverage and to test, develop and evaluate these regional advertising markets without our having to

**Table of Contents**

incur start–up and ongoing expenses at the early stages of their development. We also seek to acquire our regional distributors when we believe it is more likely for us to benefit economically from the full integration of their operations into our network. We do not have the contractual right to purchase our regional distributors, and any such acquisition must be negotiated with each regional distributor separately.

Each of our regional distributors operates independently from us and is responsible for independently complying with all relevant PRC laws and regulations including those related to advertising. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content. See "Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

*Outdoor LED billboard network.*  In April 2006, we commenced operations of an outdoor LED billboard network consisting of 5' x 5' LED digital billboards that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai. Full–color audiovisual commercials are displayed on the digital billboards in a repeating six–minute cycle. The commercials displayed on the LED billboards are highly visible even during bright daylight. As of June 30, 2007, the number of the LED billboards in our street–side outdoor LED billboard network in prime commercial and shopping areas reached approximately 200. We market this part of our network under the name "iStreet Network".

*Movie theater advertising network.*  We operate our movie theater advertising network by leasing screen time from movie theaters in cities in China. We then sell this leased screen time as time slots to advertisers. We have the right to three minutes of screen time prior to the screening of each movie shown in the theater.

### In–store Network

As part of our growth strategy, we commenced operations of our in–store network in April 2005. As of June 30, 2007, we had placed 41,322 flat–panel displays in 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores throughout China. We believe the rapid expansion of hypermarkets and other chain retail stores in China provides opportunities and incentives for advertisers to take advantage of in–store television advertising networks such as our in–store network. Our in–store network primarily attracts advertisers of food and beverage products, household, kitchen and bathroom products, and household appliances.

### Poster Frame Network

We own and operate a network of traditional and digital advertising poster frames deployed primarily in the elevators and public areas of residential complexes under the brand name "Framedia". We place two or three advertising frames in each elevator in which we lease space and sell frame space to advertising clients on a per frame basis for periods of two weeks or longer. As of June 30, 2007, we had installed 161,435 poster frames including 6,796 digital poster frames in cities throughout China. Our digital frames use high–resolution LCD displays with integrated sound, all–angle viewing and remote control technologies. We believe the new media format provides a more effective advertising media to our advertising customers.

## Mobile Handset Advertising Network

Through Focus Media Wireless, we operate an advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. Focus Media Wireless delivers SMS–, MMS– and WAP–based advertisements to mobile handset users accessed through service providers in China. Focus Media Wireless receives a fee from advertisers for delivering advertisements and pays mobile service providers a fee for accessing their networks. It also sells advertising to other mobile handset service providers and to traditional advertisers. As of June 30, 2007, Focus Media Wireless had accumulated a database of over 70 million mobile handset users with SMS, MMS or WAP capability to whom it can deliver advertisements, based on which Focus Media Wireless is able to deliver advertisements tailored to the users' consumer preferences based on information in the database such as a user's historical purchases, handset model and other indicative data.

95

**Table of Contents**

**Internet Advertising Services Network**

In March 2007, we completed the acquisition of 100% of the equity interests in Allyes. Allyes is a leading Internet advertising agency and provider of Internet advertising technology in China. Its proprietary software application suite, 'AdForward', which covers all aspects of online ad publishing, creative production, tracking, targeting, and performance analysis, is used by independent commercial websites and ad agencies in China. Based on the significant number of Internet advertising campaigns it has executed since its inception in 2000, its widely–used Internet application software and its unique tracking technology, Allyes has accumulated a large database of Internet viewers, segmented based on individual behavior. Allyes initiated the performance–based online advertising model in China. Its advertising network, 'SmartTrade', allows advertisers to pay by CPA (cost–per–action), and directly links advertising cost with performance. SmartTrade has integrated advertising resources from over 5,000 popular websites, making it one of the largest performance–based online advertising networks in China, and generating over 300 million daily impressions as of June 30, 2007. We have also expanded our Internet services network through acquisitions such as our purchase in July 2007 of a 70% equity stake in Beijing Wonder Advertising Company Ltd., also known as WonderAd.

*Advertising Clients, Sales and Marketing*

*Our Advertising Clients.* The quality and coverage of our network has attracted a broad base of international and domestic advertising clients. As of December 31, 2006, more than 4,000 advertisers purchased advertising time slots on our out–of–home television networks. Our advertising clients include leading international and domestic brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which were our five largest customers and together accounted for 10.1% of our total revenues in 2006. Our top ten customers in 2006 accounted for 22.2% of our total revenues in that year.

No single advertising client accounted for more than 4% of our revenues in 2006. We believe the appeal and effectiveness of our advertising network is largely evidenced by the number of advertising clients who place multiple advertising campaigns on our network, which is reflected in the percentage increase of advertising fees we receive from clients over time.

*Sales.* We employ an experienced advertising sales force in each city in which we operate. We provide in–house education and training to our sales force to ensure they provide our current and prospective clients with comprehensive information about our services, the advantages of using our advertising networks as marketing channels, and relevant information regarding the advertising industry. Our sales team is organized by city, industry and client accounts. We also market our advertising services from time to time by placing advertisements on third–party media, including primarily magazines and Internet websites. We maintain separate sales teams for our poster frame network, our mobile handset advertising network and our Internet advertising services network. We have begun engaging in cross–selling initiatives to enable existing and potential advertising clients to take advantage of our multi–platform advertising network.

*Advertising Contracts.* We offer advertisers five–, fifteen– or thirty–second time slots on our out–of–home television advertising networks, including our commercial location, in–store, outdoor LED billboard and movie theater advertising networks. For our commercial location network, our standard advertising package includes a time slot on our entire network or a particular channel in each city in which the advertiser wishes to display the advertisement. For our movie theater advertising network, time slots are sold on a regional or entire network basis. Our sales are made pursuant to written contracts with commitments ranging from one week to several months. Our advertising rates vary by city and by the number of cities in which the advertisement is placed, as well as by the length of the time slot purchased and the duration of the advertising campaign. We generally require our clients to submit advertising content at least seven days prior to the campaign start date. We also reserve the right to refuse to disseminate advertisements that are not in compliance with content requirements under PRC laws and regulations.

Advertising contracts for our in–store network, outdoor LED billboard network and movie theater advertising network are substantially similar to those used for our commercial location network. Advertising clients generally purchase time slots on our in–store network on a chain–by–chain basis, while time slots on the outdoor LED billboard network cover the entire network and contracts on our movie theater advertising network are done on regional or entire network basis.

**Table of Contents**

For our poster frame network, advertising clients purchase frame space on a per–frame basis for terms of two weeks or more. For our mobile handset advertising network, our contracts agree to deliver advertising messages to mobile devices based on specific selection criteria set by the advertisers. For our Internet advertising services network, we provide Internet advertising solutions for advertisers tailored to their needs.

*Network Monitoring and Evaluation.* We provide a number of services in connection with each client's advertising campaign following the sales process. Our network operations team monitors the displays in our network on a daily basis. They are also responsible for compiling reports that are supplied under some of our agreements to clients as evidence of the broadcast of their advertisements on our network. The report generally includes a list of buildings where our client's advertisements were broadcast as well as photographs of representative television displays showing their advertisements being displayed. The advertising campaign reports are provided to our clients for information purposes and do not constitute a customer acceptance provision. The reports we provide to our clients may also contain portions prepared by independent third–party research companies that verify the proper functioning of our flat–panel displays and the proper dissemination of the advertisement, by conducting on–site evaluations and polls to analyze the effectiveness of and public reaction to the advertisement.

Aside from third–party verification services, we and our regional distributors conduct substantially all client services using our own employees or the employees of the relevant regional distributor. In Beijing and Guangzhou, we contract some of these services to third–party agents. These agents provide us with network development, installation, maintenance, monitoring and reporting services.

*Market Research.* We believe our advertising clients derive substantial value from our ability to provide advertising services targeted at specific segments of consumer markets. Market research is an important part of evaluating the effectiveness and value of our business to advertisers. We conduct market research, consumer surveys, demographic analysis and other advertising industry research for internal use to evaluate new and existing advertising channels. We also purchase or commission studies containing relevant market study data from reputable third–party market research firms, such as Nielsen Media Research, CTR Market Research and Sinomonitor. Our acquisition of iResearch Consulting Co., Ltd. in September 2007 has also provided us with enhanced in–house market research capabilities. iResearch is a market research company focusing on the Internet and new media industries in urban areas of China. We typically consult such studies to assist us in evaluating the effectiveness of our network to our advertisers. A number of these studies contain research on the numbers and socio–economic and demographic profiles of the people who visit the locations of our network.

## Programming

Substantially all of the content on our digital out–of–home advertising networks consists of audiovisual television advertising provided to us by our advertising clients. We also provide a limited amount of time for landlords and property managers to display location–specific information, building announcements and related promotional material on our network. We do not produce or create any of the advertising content shown on our network, except our own marketing content. All of the advertising content displayed on the portion of the network we operate directly is reviewed by qualified members of our staff to ensure compliance with PRC laws and regulations, while our agreements with our regional distributors require each of them to review the contents shown on the portion of the network they operate for compliance with PRC laws and regulations. See "Regulation of Our Industry — Regulation of Advertising Services — Advertising Content".

Advertisements on our poster frame network consist of full–color glossy advertising posters designed and provided by our advertising clients.

## Pricing

For information regarding factors affecting our pricing, refer to "Factors that Affect Our Advertising Service Revenue" in "Management's Discussion and Analysis of Financial Condition and Results of Operation".

**Table of Contents**

*Relationships with Location Providers*

We install our flat–panel displays in selected spaces we lease in office buildings and other commercial locations, hypermarkets, supermarkets and convenience stores. We install our advertising poster frames in elevators and other public areas in residential complexes. Establishing and maintaining long–term relationships with landlords and property managers is a critical aspect of our business. We employ a team of location relationship personnel in each city in which we operate directly who are responsible for identifying desirable locations, negotiating display and frame placement agreements and engaging in ongoing site placement relations.

In addition to helping us expand our network, our location relationship personnel ensure that the needs and concerns of landlords and property managers are being met and addressed effectively and on a timely basis. These concerns generally include ensuring that the flat–panel displays are properly installed and are in proper working condition. We undertake to landlords and property managers in our network to maintain the proper operation of our flat–panel displays. We generally rely on our own employees to install, maintain, monitor and repair our flat–panel displays and advertising poster frames. Each of our flat–panel displays is inspected at least once daily.

We enter into display placement agreements with individual landlords, property managers, hotels, shopping malls and chain store companies under which we generally pay a fixed annual rent in exchange for the right to display advertising and commercial media in lobby and elevator areas in the case of our commercial location network and in specific product areas in the major aisles and near check–out counters in hypermarkets, supermarkets and convenience stores in the case of our in–store network. In Beijing and Guangzhou, we contract a portion of the location development, monitoring and maintenance work to local agents. We attempt to maintain terms favorable to our network operations in our display placement agreements, such as long–term leases and exclusivity provisions. We are not reliant on any one landlord or property manager for a material portion of our network coverage and as of June 30, 2007, no individual landlord or property manager accounted for more than 1% of the locations in our commercial location network. As hypermarkets, supermarkets and convenience stores have control over multiple locations, a smaller number of display placement agreements and contractual arrangements account for a larger percentage of our in–store network coverage.

We believe that landlords and property managers generally do not view us as a major source of revenue and are instead primarily attracted to our flat–panel displays as an innovative and visually pleasing medium that complements their public areas and that provides an engaging means of conveying building–related information to their tenants. In connection with certain of our display placement agreements, we agree to provide concessions and services, such as displaying building–related notifications, publicity and other information provided by the landlord or property manager or granting time slots to the landlord or property manager for their own promotional purposes.

Our display placement agreements have initial terms ranging anywhere from one to ten years. As of June 30, 2007, we had the right under the majority of our display placement agreements to renew the display placement agreements provided that the terms offered by us are no less favorable than those offered by competing bidders. The rental terms and fees under our display placement agreements vary considerably depending on the city, location of the building, size of the building and number of flat–panel displays that may be installed. Under our display placement agreements, we retain ownership of the flat–panel displays.

We enter into similar frame placement agreements for the deployment of our advertising poster frames in elevators and public areas of residential complexes and commercial buildings. The majority of our frame placement agreements have terms of two to three years, and contain exclusivity and best offer renewal rights.

**Technology and Suppliers**

Out–of–home television advertising is a relatively new advertising medium that owes its development in large part to the emergence of new technologies, such as low–cost, light–weight, flat–panel television displays and compact storage technology. The primary hardware required for the operation of our business consists of components that comprise the flat–panel displays we use in our advertising network. We also develop and install software in our flat–panel displays to assist us with the configuration, editing and operation of our advertising content cycles. Maintaining a steady supply of our proprietary flat–panel displays is important to our operations and the growth of our advertising network.

Table of Contents

We design the distinctive shape of our flat–panel displays, identify suppliers of component parts used in our displays and contract the assembly of our flat–panel displays to third–party contract assemblers. Our contract assemblers are responsible for purchasing the component parts from suppliers we identify each month and assembling the flat–panel displays according to our specifications using components purchased in off–the–shelf form from wholesale distributors. We select component suppliers based on price and quality. As there are many qualified alternative suppliers for our equipment, our obligation to our current contract assemblers is not exclusive. We have never experienced any material delay or interruption in the supply of our flat–panel displays.

Our services provided through Allyes use proprietary ad serving solutions that assist advertisers, advertising agencies and web publishers in creating and delivering Internet ads, monitoring and analyzing website traffic, tracking the performance of advertising campaigns and implementing direct marketing. Most of the Allyes software applications, from Internet marketing technologies to the applications that operate our servers, are proprietary and were developed in–house by Allyes' research and development team.

### Research and Development

We intend to continue to develop a more advanced model of flat–panel display that uses mobile communications and wireless technology to receive, store, configure and play back advertising content. Whether or not we deploy this newer technology will depend upon cost and network security. We are also developing related software systems that will enable us to configure and run the content on our advertising network in conjunction with mobile communications systems. We also continue to develop proprietary software and systems in connection with the operation of and provision of services through our online advertising services business through Allyes.

### Patents and Trademarks

We believe that the value of our advertising network derives from its effectiveness in reaching a large number of consumers with higher–than–average disposable incomes in urban areas. To a great extent, our business model does not rely on advanced or sophisticated technology or on proprietary trade secrets because our flat–panel displays are assembled with components purchased in off–the–shelf form from wholesale distributors. We endeavor to protect certain of the designs and operating software we use in each generation of our flat–panel displays. We currently hold design patents for our new model of flat–panel display and our software. We have the right to use several trademarks relating to the "Focus Media" brand name in China and in Singapore. We also have the right to use several trademarks relating to the "Framedia" brand name in China. Following our acquisition of Allyes, we also acquired all of its intellectual property including that held by its subsidiaries and affiliates.

We do not know if our trademark applications will lead to registered trademarks with the scope of the goods and services we seek, if at all, or whether any trademark we have registered or may receive registration in the future will be challenged or invalidated. See Risk Factor on "Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may adversely affect our business." We have also obtained copyright registration for a number of our software. We will continue to assess appropriate occasions for seeking trademark, copyright and other intellectual property protections for those aspects of our business that we believe provide significant competitive advantages.

The technology developed by Allyes enables us to collect and use data derived from user activity on the Internet. Although we believe that we have the right to use this information and to compile it in our databases, we cannot assure you that any trade secret, copyright or other protection will be available for this information. In addition, our clients and other parties may claim rights to this information.

### Competition

We compete with other advertising companies in China including companies that operate out–of–home or telecommunications–based advertising media networks, such as JCDecaux, ClearMedia, WPP and CGEN. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, wireless telecommunications, street furniture, billboard, frame and

Table of Contents

public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

**Employees**

As of June 30, 2007, we had a total of 4,445 full–time employees and no part–time employees. The following table sets out the number of staff by business area as of June 30, 2007:

|  | Number of Employees(1) | Percentage |
|---|---|---|
| Sales and marketing | 1,250 | 28.1% |
| Operations | 2,112 | 47.5% |
| Management and administration | 1,083 | 24.4% |
| Total number of employees | 4,445 | 100% |

(1)  This excludes employees our regional distributors and agents who are not directly under our employ.

As required by PRC regulations, we participate in various employee benefit plans that are organized by municipal and provincial governments, including pension, work–related injury benefits, maternity insurance, medical and unemployment benefit plans. We are required under PRC law to make contributions to the employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date.

Generally we enter into a three–year standard employment contract with our officers and managers and a one–year standard employment contract with other employees. According to these contracts, all of our employees are prohibited from engaging in any activities that compete with our business during the period of their employment with us. Furthermore, the employment contracts with officers or managers include a covenant that prohibits officers or managers from engaging in any activities that compete with our business for two years after the period of their employment with us.

**Facilities**

We currently maintain our headquarters at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China. We also have offices in more than 50 other cities including those operated by our regional distributors.

**Legal Proceedings**

On March 16, 2006, Shanghai Xicheng Cultural Dissemination Co., Ltd., also referred to as CGEN, brought a suit against us in Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. CGEN, which is developing a network of flat–panel displays in hypermarkets and supermarkets, claims to have established an exclusive business relationship with the Hymart chain of supermarkets in Shanghai. Hymart notified us that it had requested in writing to terminate its relationship with CGEN. In CGEN's pleadings, it alleges that Focus Media encouraged and supported Hymart to allegedly violate its agreement with CGEN, resulting in losses to CGEN. In its pleadings, CGEN has requested that the court order Focus Media to cease any alleged unfair competitive behavior, to undo the effects of any alleged unfair competition and to pay RMB 13,570,920 (US\$1.7 million) to CGEN. On July 25, 2007, we received the civil judgment of first instance by the Shanghai No. 1 Intermediate People's Court which issued a ruling dismissing the case. CGEN has appealed that ruling. We intend to defend against CGEN's claims to the fullest extent of the law. However, there can be no assurance that we will prevail in any such litigation. We believe the outcome of this suit, even if adversely determined, will not have a material adverse effect on our business or results of operations.

Except as disclosed above, we are not currently a party to any material legal proceeding. From time to time, we may be subject to various claims and legal actions arising in the ordinary course of business.

100

**Table of Contents**

## OUR RECENT SIGNIFICANT ACQUISITIONS

**Allyes**

In March 2007, we completed the acquisition of Allyes Information Technology Company Limited, and its wholly–owned PRC subsidiaries New Allyes Information Technology (Shanghai) Co., Ltd. and Allyes Information Technology (Shanghai) Co., Ltd. and their affiliated PRC operating companies. David Zhu, the founder, former chairman and chief executive officer of Allyes, signed an employment agreement with Focus Media and remains as the chief executive officer of Allyes.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the actual Allyes Share Purchase Agreement.

*Purchase Price.*  We paid the selling shareholders of Allyes $70 million in cash and 19,969,080 Focus Media ordinary shares upon closing in March 2007. In addition, if Allyes's audited annual net income for the twelve month period ending March 31, 2008 is greater than $9 million, we will issue our ordinary shares to the Allyes selling shareholders equal in value to 25 times the amount by which Allyes's audited annual net income for such twelve month period exceeds $9 million, up to a maximum amount not to exceed $75 million in our ordinary shares, based upon a fixed price per ordinary share of $7.726. Fifty percent of the ordinary shares received by the Allyes selling shareholders at the first closing are locked up for 180 days from March 28, 2007, with the remaining ordinary shares locked up until 365 days from March 28, 2007. The ordinary shares to be received in connection with the earn out, if any, will not be subject to any lock–up.

*Representations and Warranties.*  In the share purchase agreement, the Allyes selling shareholders made customary representations and warranties to us, which generally survive for a period of fifteen months following the closing date. However, a number of specified representations and warranties survive for longer periods. We made customary representations and warranties to the Allyes selling shareholders, which survive for a period of one year following the closing date.

*Covenants.*  The definitive share purchase agreement includes customary covenants relating to, among other things, the conducting of the business in the ordinary course prior to closing, notification of certain matters, confidentiality, non–compete agreements for key employees, treatment of related party accounts and preparation of financial statements.

*Indemnification.*  The management shareholders have agreed to indemnify us for damages resulting from any breach of any representation or warranty, covenant or other agreement made by the management shareholders in the share purchase agreement, including but not limited to losses arising out of materially inaccurate disclosures made in Allyes's financial statements; losses arising out of failure to report any material changes in Allyes or its affiliates; losses arising out of failure to adequately disclose terms of any material contracts of Allyes or its affiliates; and losses arising out of any tax or legal liabilities.

The non–management shareholders have also agreed to indemnify us for damages resulting from any breach of any representation or warranty, covenant or other agreement made by the non–management shareholders in the share purchase agreement.

The Allyes selling shareholders collectively shall not be liable to indemnify losses greater than the aggregate consideration of the share purchase agreement, and each selling shareholder is only liable up to the product of (x) the amount of his percentage equity interest in the company prior to the closing multiplied by (y) the aggregate consideration of the share purchase agreement. The Allyes selling shareholders are not obligated to indemnify our losses until and unless such losses exceed $1 million. If our losses exceed $1 million, the Allyes selling shareholders are liable for all amounts including the first $1 million. Management shareholders will be jointly and severally liable. Non–management shareholders will be severally but not jointly liable.

We have agreed to indemnify the Allyes selling shareholders for damages resulting from any breach of any representation or warranty, covenant or other agreement of ours in the share purchase agreement. Our indemnification obligations are capped at the aggregate consideration of the share purchase agreement.

Table of Contents

Amounts of losses are subject to insurance recoveries and other mitigating circumstances. Indemnification payments may be made in–kind with Focus Media ordinary shares received under the share purchase agreement.

Under the terms of the transaction, we also granted certain registration rights to the former shareholders of Allyes. See "Shares Eligible for Future Sale".

### Control Over Allyes

New Allyes Technology, which is our wholly–owned indirect subsidiary, entered into a series of agreements with the Allyes operating affiliates and their current respective shareholders that provide us with effective control over the Allyes operating affiliates while enabling the Allyes business to be consolidated with Allyes Information Technology Company Limited, which is our wholly–owned direct subsidiary. See "Our Corporate Structure" and "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders".

## Framedia

On January 1, 2006, we completed the acquisition of Infoachieve Limited, and its affiliate Framedia Advertisement by purchasing 100% of the shares of Infoachieve from Total Team, through which the former shareholders held their respective interests in Infoachieve. Framedia installs and deploys advertising poster frames mainly inside elevators and throughout the public areas of residential complexes in major cities in China and sells frame space to advertising clients.

### Share Purchase Agreement

On October 15, 2005, we entered into a share purchase agreement to acquire the business of Infoachieve, its subsidiary and affiliated PRC entities, by purchasing 100% of the shares in Infoachieve from Total Team. Infoachieve, Total Team and its shareholders are referred to as the seller parties below.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement.

***Structure.*** We acquired 100% of the shares of Infoachieve, which controls its affiliates Framedia Advertisement, New Structure Advertisement and Guangdong Framedia through contractual relationships with Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their shareholders. Under the share purchase agreement, we gain control of Framedia Advertisement, New Structure Advertisement and Guangdong Framedia by gaining the right (i) to appoint their equity holders and (ii) to take over the contractual arrangements among Infoachieve, Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their equity holders.

***Purchase Price.*** On December 15, 2005, we paid the shareholders of Infoachieve $39.6 million in cash. At the closing on January 1, 2006, we also issued to the former shareholders of Infoachieve 19,306,840 of our ordinary shares. We also issued 2,850,163 of our ordinary shares to Total Team in consideration for their cancellation of the share option plan of Infoachieve prior to our acquisition of it. In March 2007, we issued an additional 35,830,619 of our ordinary shares, to Total Team as part of the purchase consideration. All shares issued to Total Team in connection with our acquisition of Framedia were valued at a fixed price of $2.456 per share and locked up for a specified period of time.

***Representations and Warranties.*** In the share purchase agreement, the seller parties made customary representations and warranties to us, which representations and warranties survive for a period of two years following the closing date, and we made customary representations and warranties to the seller parties, which representations and warranties survive for a period of six months following the closing date.

***Covenants.*** The share purchase agreement also includes customary covenants relating to, among other things, notification of certain matters, access to information, public announcements, non–competition of certain persons, treatment of related party accounts, agreement to pay back or cancel all outstanding loans of Framedia, and preparation of financial accounts.

Table of Contents

*Voting Rights.* Under the terms of the share purchase agreement, after we issue shares to Total Team on behalf of the seller parties, each of the shareholders of Total Team is required to exercise their voting rights in Focus Media's shares independently of each other and Total Team's authorized representative is required to solicit a proxy statement from each shareholder indicating how the votes to which each shareholder is entitled should be voted. In the event a shareholder does not provide a proxy, the shareholder will be deemed to have abstained and Total Team will not be entitled to cast such votes.

*Indemnification.* The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement. The seller parties' indemnification obligation is limited to the total consideration we are to pay to them. If the seller parties indemnify us using our common shares, the value of such shares shall be the value of the shares when any indemnified losses become payable. If the seller parties' lock–up agreements are still in effect at such time, they may dispose of only those shares that cover the amount of the indemnified losses.

We have agreed to indemnify the seller parties for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Our indemnification obligation is limited to the total consideration (excluding any earnout payment) to be paid to the seller parties.

### Control Over Framedia

We have entered into a series of agreements with Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and its current shareholders and New Structure Advertisement that provide us with effective control over Framedia Advertisement, Guangdong Framedia and New Structure Advertisement while enabling the Framedia business to be consolidated with Infoachieve. See "Item 4.C Information on Our Company — Organization Structure — Our Corporate Structure and Contractual Arrangements" and " Item 7.B Major Shareholders and Related Party Transactions — Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders".

## Target Media

On February 28, 2006, we acquired Target Media, its affiliated PRC entity Shanghai Target Media and its subsidiary Target Multi–Media, by purchasing 100% of the shares of Target Media from its shareholders. Target Media and several of its principal shareholders, including David Feng Yu, its chairman of the board of directors and SII International Holding Limited, are referred to as the seller parties. Collectively, Target Media's shareholders, including The Carlyle Group, are referred to as the Target Media selling shareholders.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement filed as an exhibit to our registration statement.

*Purchase Price.* We have agreed to pay the shareholders of Target Media US$94 million in cash, subject to a working capital adjustment, and 77 million of our ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of $45 million was paid at closing on February 28, 2006. The second installment of $25 million was paid on April 28, 2006. The final installment of $24 million was paid on July 31, 2006.

*Focus Media Options.* We also granted options to purchase up to 3,000,000 of our ordinary shares to an agreed upon list of employees of Target Media who entered into new employment agreements with Focus Media.

*Representations and Warranties.* In the share purchase agreement, the seller parties made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, the Target Media selling shareholders also made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, we made customary representations and warranties to the Target Media selling shareholders,

**Table of Contents**

which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely.

*Covenants.* The definitive share purchase agreement includes customary covenants relating to, among other things, notification of certain matters, public announcements, non–competition of certain persons, treatment of related party accounts and preparation of financial accounts. The share purchase agreement also contains covenants requiring us to enter into employment agreements with key employees of Target Media.

We agreed under the definitive share purchase agreement and the employment agreement with Mr. David Feng Yu to appoint him as co–chairman of the board of directors and president of Focus Media upon the completion of the acquisition. We also agreed to increase our board of directors from five to seven members at closing, and to assist in the nomination and appointment of David Feng Yu, the founder, chairman and chief executive officer of Target Media, and a nominee of David Feng Yu to fill the additional seats at the first annual meeting of our shareholders following the closing. The director nominated by David Feng Yu will qualify as an independent director for the purpose of complying with NASDAQ listing standards and Sarbanes–Oxley Act requirements so that a majority of our board of directors continues to be independent. See "Item 6.A Directors, Senior Management and Employees — Directors and Senior Management". We have also agreed to permit The Carlyle Group to appoint an observer to our board of directors for a limited period of time.

*Indemnification.* The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement; losses arising out of indebtedness of Target Media not reflected in its financial statements; losses arising out of or pursuant to terms of the contracts of Target Media that were not disclosed to us prior to the closing date due to their commercially sensitive nature and those terms are not in the ordinary course of business of Target Media; and certain tax liabilities.

Two Target Media selling shareholders that hold an approximately 49.7% equity interest in Target Media, or collectively, the Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Controlling Target Media Selling Shareholders, respectively, or failure of Target Media or the Controlling Target Media Selling Shareholders to perform their respective obligations under the share purchase agreement. The Target Media selling shareholders other than the Controlling Target Media Selling Shareholders and The Carlyle Group, or collectively, the Non–Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Non–Controlling Target Media Selling Shareholders, respectively, or failure of the Non–Controlling Target Media Selling Shareholders to perform their obligations under the share purchase agreement. The Carlyle Group has agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to The Carlyle Group, or failure of The Carlyle Group to perform its obligations under the share purchase agreement.

The indemnification obligations of all Target Media selling shareholders (excluding The Carlyle Group) are limited to US$80 million, provided that the Controlling Target Media Selling Shareholders shall be responsible for indemnifying us up to $325 million for additional losses arising out of several specified claims, including such contracts not disclosed to us prior to the closing of the acquisition, which contracts contain clauses that are out of ordinary course of Target Media's business. The indemnification obligation of The Carlyle Group is limited to $16.3 million, except for a breach with respect to their ownership of the shares they are selling to us.

For so long as the shares received by Target Media selling shareholders in this acquisition are restricted from sales in the open market by either the lock–up, or securities laws, the Target Media selling shareholders have the right to settle any indemnification obligation by paying us in kind with our ordinary shares, valued at one–tenth of the closing price of our ADSs (each of which represents ten of our ordinary shares) on the business day prior to the payment of such shares.

We have agreed to indemnify the seller parties for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Certain of our indemnification obligations are capped at $39 million, while several specified indemnification obligations of our company are capped at the total consideration to be paid to the selling shareholders.

**Table of Contents**

**REGULATION OF OUR INDUSTRY**

We operate our business in China under a legal regime consisting of the State Council, which is the highest authority of the executive branch of the National People's Congress, and several ministries and agencies under its authority including the SAIC.

China's Advertising Law was promulgated in 1994. In addition, the State Council, SAIC and other ministries and agencies have issued regulations that regulate our business, which are discussed below.

**Limitations on Foreign Ownership in the Advertising Industry**

The principal regulations governing foreign ownership in the advertising industry in China include:

- The Catalogue for Guiding Foreign Investment in Industry (2004); and

- The Administrative Regulations on Foreign–invested Advertising Enterprises (2004).

These regulations require foreign entities that directly invest in the advertising industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been permitted to own directly a 100% interest in advertising companies in China, but such foreign investors are also required to have at least three years of direct operations in the advertising industry outside of China. PRC laws and regulations do not permit the transfer of any approvals, licenses or permits, including business licenses containing a scope of business that permits engaging in the advertising business. In the event we are able to qualify to acquire the equity interest of Focus Media Advertisement under the rules allowing complete foreign ownership, Focus Media Advertisement would continue to exist as the holder of the required advertising license consistent with current regulatory requirements.

Since we have not been involved in advertising outside of China for the required number of years, our domestic PRC operating subsidiaries, which are considered foreign invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through our contractual arrangements with our consolidated affiliated entities in China, including Focus Media Advertisement and its subsidiaries, New Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless and the Allyes operating affiliates. Each of our PRC operating affiliates is currently owned or controlled either by Jason Nanchun Jiang and Jimmy Wei Yu, both of whom are PRC citizens, or by PRC companies owned by them or by us. Our PRC operating affiliates and certain of their respective subsidiaries hold the requisite licenses to provide advertising services in China. We, Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Dotad Technology and New Allyes Technology have entered into a series of contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders under which:

- we are able to exert effective control over our PRC operating affiliates and their respective subsidiaries;

- a substantial portion of the economic benefits of our PRC operating affiliates and their respective subsidiaries will be transferred to us; and

- we have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries that are owned by Focus Media Advertisement or its nominee holders, as well as all or a part of the assets of our PRC operating affiliates, in each case when and to the extent permitted by PRC law.

See "Our Corporate Structure" and "Related Party Transactions."

In the opinion of Global Law Office, our PRC legal counsel,

- the respective ownership structures of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

- the contractual arrangements (i) among Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC affiliates, subsidiaries and PRC shareholders, in each case governed by PRC law are valid,

105

Table of Contents

binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- the PRC business operations of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government determines that the agreements establishing the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in the advertising industry, we could be subject to severe penalties. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties".

**Regulation of Advertising Services**

*Business License for Advertising Companies*

The principal regulations governing advertising businesses in China include:

- The Advertising Law (1994);

- The Advertising Administrative Regulations (1987); and

- The Implementing Rules for the Advertising Administrative Regulations (2004).

These regulations stipulate that companies that engage in advertising activities must obtain from the SAIC or its local branches a business license which specifically includes operating an advertising business within its business scope. Companies conducting advertising activities without such a license may be subject to penalties, including fines, confiscation of advertising income and orders to cease advertising operations. The business license of an advertising company is valid for the duration of its existence, unless the license is suspended or revoked due to a violation of any relevant law or regulation. We do not expect to encounter any difficulties in maintaining our business licenses. Each of Focus Media Advertisement, its subsidiaries and New Focus Media Advertisement has obtained, or in the case of some of our new directly-operated cities, are in the process of obtaining such a business license from the local branches of the SAIC as required by the existing PRC regulations. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content, although it is possible that one or more of our regional distributors may not be in compliance with all PRC regulations at all times. To our knowledge, all of our regional distributors have received, or are in the process of obtaining, the licenses required to operate an advertising business. If we learn that any of our regional distributors are not in compliance with applicable terms and regulations we notify such regional distributors of the need to complete any necessary procedures and to report any developments to us. If a regional distributor fails to complete the steps necessary to receive the required licenses, we will take steps to terminate the contract with such regional distributor. See "Risk Factors — Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

*Advertising Content*

PRC advertising laws and regulations set forth certain content requirements for advertisements in China, which include prohibitions on, among other things, misleading content, superlative wording, socially destabilizing content or content involving obscenities, superstition, violence, discrimination or infringement of the public interest. Advertisements for anesthetic, psychotropic, toxic or radioactive drugs are prohibited. It is prohibited to

106

**Table of Contents**

disseminate tobacco advertisements via broadcast or print media. It is also prohibited to display tobacco advertisements in any waiting lounge, theater, cinema, conference hall, stadium or other public area. There are also specific restrictions and requirements regarding advertisements that relate to matters such as patented products or processes, pharmaceuticals, medical instruments, agrochemicals, foodstuff, alcohol and cosmetics. In addition, all advertisements relating to pharmaceuticals, medical instruments, agrochemicals and veterinary pharmaceuticals advertised through radio, film, television, newspaper, magazine, out–of–home and other forms of media, together with any other advertisements which are subject to censorship by administrative authorities according to relevant laws and administrative regulations, must be submitted to the relevant administrative authorities for content approval prior to dissemination. We do not believe that advertisements containing content subject to restriction or censorship comprise a material portion of the advertisements shown on our network.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the content of the advertisements they prepare or distribute are true and in full compliance with applicable law. In providing advertising services, advertising operators and advertising distributors must review the prescribed supporting documents provided by advertisers for advertisements and verify that the content of the advertisements comply with applicable PRC laws and regulations. In addition, prior to distributing advertisements for certain commodities which are subject to government censorship and approval, advertising distributors are obligated to ensure that such censorship has been performed and approval has been obtained. Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the SAIC or its local branches may revoke violators' licenses or permits for advertising business operations. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties in the course of their advertising business.

We employ qualified advertising inspectors who are trained to review advertising content for compliance with relevant laws and regulations.

*Outdoor Advertising*

The Advertising Law stipulates that the exhibition and display of outdoor advertisements must not:

• utilize traffic safety facilities and traffic signs;

• impede the use of public facilities, traffic safety facilities and traffic signs;

• obstruct commercial and public activities or create an eyesore in urban areas;

• be placed in restrictive areas near government offices, cultural landmarks or historical or scenic sites; and

• be placed in areas prohibited by the local governments from having outdoor advertisements.

In additional to the Advertising Law, the SAIC promulgated the Outdoor Advertising Registration Administrative Regulations on December 8, 1995, as amended on December 3, 1998, which governs the outdoor advertising industry in China.

Outdoor advertisements in China must be registered with the local SAIC before dissemination. The advertising distributors are required to submit a registration application form and other supporting documents for registration. After review and examination, if an application complies with the requirements, the local SAIC will issue an Outdoor Advertising Registration Certificate for such advertisement. The content of the outdoor advertisement must be submitted for filing with the local SAIC.

The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor

107

Table of Contents

advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

*Print Advertising*

Following our acquisition of Framedia on January 1, 2006, we also operate a network of advertising poster frames placed primarily in the elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as "normal print advertisements" under the Print Advertisements Administrative Regulations promulgated by the SAIC on January 13, 2000, as amended on November 30, 2004, or the Print Advertisements Regulations. Under these regulations, print advertisements must not be placed in areas prohibited by laws or regulations from posting print advertisements.

**Regulation of Telecommunications Value–added Service Providers**

The Telecommunications Regulations (2000), or the Telecom Regulations, and the Administrative Measures for Telecommunications Business Operating License (2002), or the Telecom License Measures, contain provisions governing providers of telecommunications services, including value–added service providers. The Telecom Regulations categorize all telecommunication services businesses in China as either infrastructure telecommunication services businesses or value–added telecommunication services businesses. The latter category includes SMS, MMS and WAP services. Under the Telecom Regulations, certain services are classified as being of a value–added nature and require the commercial mobile operator of such services to obtain an operating license, including online data processing and transaction processing, call centers and Internet access. The Telecom Regulations also set forth extensive guidelines with respect to different aspects of telecommunications operations in China. Under the Telecom License Measures, an approved value–added telecommunication services provider must conduct its business in accordance with the specifications recorded on its value–added telecommunication services operating license. Under PRC law, it is unclear whether the services offered by Focus Media Wireless should be deemed value–added telecommunication services, which requires an operation permit which has a valid period of five years. Focus Media Wireless has applied for an operation permit for its wireless advertising operations. If Focus Media Wireless is deemed by the PRC regulatory authorities to be providing value–added telecommunication services but an operation permit is not issued or if, once issued, it is revoked or if we are unable to renew its operation permit upon its expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected. See "Risk Factors — Our recent entry into mobile handset and Internet advertising services through our acquisition of Focus Media Wireless and Allyes may expose us to risks associated with operating in the telecommunications and Internet industries in China which could materially affect our financial condition or results of operation".

**Regulation of Foreign Exchange in Certain Onshore and Offshore Transactions**

In January and April 2005, the PRC State Administration of Foreign Exchange, or SAFE, issued two rules that require PRC residents to register with and receive approvals from SAFE in connection with their offshore investment activities. SAFE has announced that the purpose of these regulations is to achieve the proper balance of foreign exchange and the standardization of the cross–border flow of funds.

On October 21, 2005, SAFE issued the Notice on Issues Relating to the Administration of Foreign Exchange in Fund–raising and Reverse Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or Notice 75, which became effective as of November 1, 2005. Notice 75 replaced the two rules issued by SAFE in January and April 2005 mentioned above.

According to Notice 75:

- prior to establishing or assuming control of an offshore company for the purpose of financing that offshore company with assets or equity interests in an onshore enterprise in the PRC, each PRC resident, whether a natural or legal person, must complete the overseas investment foreign exchange registration procedures with the relevant local SAFE branch;

Table of Contents

- an amendment to the registration with the local SAFE branch is required to be filed by any PRC resident that directly or indirectly holds interests in that offshore company upon either (1) the injection of equity interests or assets of an onshore enterprise to the offshore company, or (2) the completion of any overseas fund raising by such offshore company; and

- an amendment to the registration with the local SAFE branch is also required to be filed by such PRC resident when there is any material change involving a change in the capital of the offshore company, such as (1) an increase or decrease in its capital, (2) a transfer or swap of shares, (3) a merger or division, (4) a long term equity or debt investment, or (5) the creation of any security interests over the relevant assets located in China.

Moreover, Notice 75 applies retroactively. As a result, PRC residents who have established or acquired control of offshore companies that have made onshore investments in the PRC in the past are required to complete the relevant overseas investment foreign exchange registration procedures by March 31, 2006. Under the relevant rules, failure to comply with the registration procedures set forth in Notice 75 may result in restrictions being imposed on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliate and the capital inflow from the offshore entity, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

As a Cayman Islands company, and therefore a foreign entity, if Focus Media Holding purchases the assets or equity interest of a PRC company owned by PRC residents in exchange for our equity interests, such PRC residents will be subject to the registration procedures described in Notice 75. Moreover, PRC residents who are beneficial holders of our shares are required to register with SAFE in connection with their investment in us.

As a result of the lack of implementing rules and other uncertainties relating to the interpretation and implementation of Notice 75, we cannot predict how these regulations will affect our business operations or strategies. For example, our present or future PRC subsidiaries' ability to conduct foreign exchange activities, such as remittance of dividends and foreign–currency– denominated borrowings, may be subject to compliance with such SAFE registration requirements by relevant PRC residents, over whom we have no control. In addition, we cannot assure you that any such PRC residents will be able to complete the necessary approval and registration procedures required by the SAFE regulations. We require all the shareholders in Focus Media Holding who are PRC residents to comply with any SAFE registration requirements, but we have no control over either our shareholders or the outcome of such registration procedures. Such uncertainties may restrict our ability to implement our acquisition strategy and adversely affect our business and prospects.

Table of Contents

**MANAGEMENT**

The following table sets forth certain information relating to our directors and executive officers. The business address of each of our directors and executive officers is 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China.

| Name | Age | Position |
|------|-----|----------|
| Jason Nanchun Jiang | 34 | Chairman of the Board of Directors and Chief Executive Officer |
| David Feng Yu(1) | 45 | Co–chairman of the Board of Directors |
| Jimmy Wei Yu | 34 | Director |
| Fumin Zhuo(2) | 55 | Director |
| Neil Nanpeng Shen(2) | 39 | Director |
| Charles Chao(2) | 41 | Director |
| Daqing Qi(3) | 43 | Director |
| David Ying Zhang(4) | 34 | Director |
| Zhi Tan | 52 | President and Director |
| Daniel Mingdong Wu | 40 | Chief Financial Officer |
| Diana Congrong Chen | 39 | Chief Operating Officer |
| July Lilin Wang | 35 | Chief Accounting Officer |
| Cindy Yan Chan | 41 | Chief Strategy Officer |
| Ergo Xueyuan Liu | 36 | Vice President — Commercial Location Network |
| Acer Jiawei Zhang | 30 | Vice President — In–store Network |

(1) Mr. Yu was appointed as co–chairman of the board of directors of Focus Media on February 28, 2006 pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

(2) Independent director and a member of our audit committee, compensation committee and nomination committee.

(3) Mr. Qi was appointed as an independent director on February 28, 2006 by the seller parties of Target Media pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

(4) David Ying Zhang was appointed as an independent director on September 28, 2007 by our nominations committee and board of directors in order to restore a majority of independent directors to our board.

*Jason Nanchun Jiang*, our founder, has served as the chairman of our board of directors and our chief executive officer since May 2003. From 1994 to 2003, Mr. Jiang was the chief executive officer of Everease Advertising Corporation. Starting in 2003, Mr. Jiang was general manager of Aiqi Advertising, an advertising company founded by his immediate family members in 1997 which was renamed Focus Media Advertisement in May 2003 in connection with the establishment of our current business operations. In December 2003, Mr. Jiang was selected by China News Publisher's Media magazine as one of the "Media People of the Year". In September 2003, Mr. Jiang was selected by the Television and Newspaper Committees of the China Advertising Commission as one of its "contemporary outstanding advertising media personalities". Mr. Jiang received a Bachelor of Arts degree in Chinese language and literature from Huadong Normal University in 1995.

*David Feng Yu* resigned from his position as president since January 2007 and retains his position as co–chairman of the Board. He has served as co–chairman of our board of directors and as our president since February 28, 2006. From 2003 until February 2006, Mr. Yu was chairman and chief executive Officer of Target Media, which we acquired in February 2006. From 2000 to 2003, Mr. Yu was chief executive offer and the sole beneficial owner of Dian Yang, whose flat panel display advertising business was transferred to Target Media in December 2003. From 1999 to 2000, Mr. Yu was the general manager of Shanghai Yuanye Info Tech Co., Ltd. In May 2005, Mr. Yu was selected by the Advertising Newspaper in China as one of the "Most Influential Advertising

110

Table of Contents

People of the Year." In December 2004, Mr. Yu was selected by China Venture Capital Forum 2004 as one of the "Top 10 Enterprisers of the Year." Mr. Yu received an Executive M.B.A. degree from China Europe International Business School in 2001 and a Master of Arts degree in philosophy from Fudan University in 1991.

**Jimmy Wei Yu** has served as our director since May 2003. Mr. Yu is the chairman and chief executive officer of United Capital Investment (China) limited, the management company of United China Investment Limited and KTB/UCI China Ventures I Limited and UCI China Venture II Limited. Mr. Yu is also the chairman of Shanghai Multimedia Park Venture Capital, a position he has held since 2003. From 1995 to 1999, Mr. Yu served in various capacities in several telecommunications companies, including as chief representative of UTStarcom (Hong Kong) Ltd. He also has been the chief representative of Softbank China Venture capital, which is the management company of SB China Holdings Pte. Ltd.

**Fumin Zhuo** has served as our director since December 2004 and has more than 27 years of experience in investment and corporate management. Mr. Zhuo has also served as a general partner in SIG Capital Limited since July 2005. Prior to this, Mr. Zhuo served as chairman and chief executive officer of Vertex China Investment Company (VCI), a company concentrating in investments in the Greater China region, since he joined the fund in July 2002. From 1995 to July 2002, Mr. Zhuo was chief executive officer of Shanghai Industrial Holding Ltd. and chairman of SIIC Medical Science & Technology (Group). Prior to this, starting in 1987, Mr. Zhuo served as chief assistant officer of the Shanghai Economic System Reform Committee. Mr. Zhuo has extensive experience in venture capital fund formation, mergers and acquisitions, and investment management. Mr. Zhuo graduated from Shanghai Jiaotong University's Electrical Engineering School with a degree in enterprise management and also holds a Master's degree in economics from Fudan University.

**Neil Nanpeng Shen** has served as our director since December 2004. Mr. Shen is the founding managing partner of Sequoia Capital China, or Sequoia China, a China–focused venture capital fund which was established in August 2005. Prior to founding Sequoia China, Mr. Shen was president and chief financial officer of Ctrip.com International Limited, or Ctrip, a Nasdaq–listed online travel services company he co–founded and for which he continues to serve as a director. Prior to founding Ctrip, Mr. Shen worked for more than eight years in the investment banking industry in New York and Hong Kong. He was a director at Deutsche Bank Hong Kong where he worked from 1996 to 1999. Prior to 1996, he worked at Chemical Bank, Lehman Brothers and Citibank in various investment banking positions. Mr. Shen is also co–founder and co–chairman of Home Inns & Hotels Management (Hong Kong) Limited. Mr. Shen received his Master's degree from the School of Management at Yale University and his Bachelor's degree from Shanghai Jiaotong University.

**Charles Chao** was appointed as our director in November 2005 to replace Ted Tak Dee Sun who passed away in September 2005. Mr. Chao is president and chief executive officer of SINA Corporation, an online media company listed on the NASDAQ Global Market. Before he joined SINA Corporation in September 1999, Mr. Chao served as an experienced audit manager with PricewaterhouseCoopers LLP, providing auditing and business consulting services for high tech companies in Silicon Valley, California. Mr. Chao received his master of professional accounting from University of Texas at Austin. He also holds an MA degree in journalism from University of Oklahoma and a BA degree in Journalism from Fudan University in Shanghai, China. Mr. Chao is a certified public accountant and a member of the American Institute of Certified Public Accountants.

**Daqing Qi** was appointed as our director in February 28, 2006 upon the closing of our acquisition of Target Media. Professor Qi is professor of accounting and associate dean of the Cheong Kong Graduate School of Business, where he has taught since 2002. From 1996 until 2002, Professor Qi taught in the School of Accountancy at the Chinese University of Hong Kong. Professor Qi also has extensive experience in providing executive training and consulting services in accounting and corporate finance to government departments and private companies, including the Ministry of Information Industries of the People's Republic of China, the Shanghai Municipal Government, China Mobile, China Unicom, China Telecom, China Netcom, Nokia and Ericsson. Professor Qi also serves on the board of directors of Sohu.com, a Nasdaq–listed company that provides online services in China. Professor Qi holds a B.S. degree in biophysics and a B.A. degree in journalism from Fudan University, an MBA degree from the University of Hawaii Manoa with a concentration in accounting and finance and a Ph.D. degree in accounting from the Eli Broad Graduate School of Management of Michigan State University.

111

Table of Contents

*David Ying Zhang* was appointed as our director on September 28, 2007. Mr. Zhang is the managing director and head of the Beijing office of WI Harper, a private equity investment fund. Mr. Zhang joined WI Harper in late 2001 in the San Francisco office and moved back to China in early 2003. Prior to joining WI Harper, Mr. Zhang was a senior venture associate with ABN AMRO Capital focusing on the life sciences, information technology, and Internet sectors. Before joining ABN AMRO Capital, Mr. Zhang worked at Salomon Smith Barney. At WI Harper, Mr. Zhang Mr. Zhang has been responsible for investments in a number of companies including Pollex, Cardiva, Celestry Designs, Focus Media and iKang Healthcare. Mr. Zhang was born in Shanghai, grew up in the United States and holds a M.S. degree in biotechnology and business from Northwestern University and a B.S. in biology and chemistry from California State University, San Francisco.

*Zhi Tan* was appointed as our president and director in January 2007. Prior to his appointment as president, Dr. Tan was the senior vice president in charge of the operations of our poster frame network. Dr. Tan was previously the chairman and chief executive officer of Framedia. Dr. Tan has extensive management and operational experience. He served as senior advisor at Tom.com of Hong Kong prior to join Framedia. From 1999 to 2002, he was the chief executive officer of 8848.net Corporation, which was one of the largest online e–commerce organizations in China. Before joining 8848.net, Dr. Tan was deputy general manager for Microsoft China in 1999. Prior to Microsoft, Dr. Tan was senior vice–president for UTStarcom China from 1995 to 1998. He was directly responsible for all aspects of operations for both Microsoft China and UTStarcom China. Dr. Tan received his PhD in Computer Science from Worcester Polytechnic Institute of Massachusetts in 1987 and a B.S. in Computer Engineering from Jilin Industrial University in China in 1980.

*Daniel Mingdong Wu* has served as our chief financial officer since February 2005. Mr. Wu was chief financial officer and a director of Harbour Networks Ltd. from January 2004 until January 2005. Prior to that, Mr. Wu was a partner of Bridgecross Ltd. from 2001 until 2003 and acting chief financial officer of Wi–Comm United Communications Inc. from May 2003 until January 2004. From 2000 until 2001, Mr. Wu was a vice president for technology investment banking at Merrill Lynch (Asia Pacific) Ltd. From 1996 to 2000, Mr. Wu worked in the global communications group of Lehman Brothers Inc. Mr. Wu holds a B.A. degree from the State University of New York at Buffalo and an MBA degree from Columbia Business School.

*Diana Congrong Chen* was appointed as our chief operating officer in November 2006. Ms. Chen joined Focus Media as chief marketing officer in May 2005. Before joining Focus Media, Ms. Chen worked for Phoenix Satellite TV from 1998 to 2004, serving as general manager, director of international advertising and president of East China region. While at Phoenix Satellite TV, Ms. Chen successfully developed business in Zhejiang and East China region and was awarded Best Sales Team for several years. In 2004, Ms. Chen was honored with a Most Outstanding Employee Award by Phoenix Satellite TV. Prior to that, Ms. Chen was the vice president of sales for Tucano Clothing China and office manager for China Animal By–product Import and Export Co. Ms. Chen holds a B.A. degree in journalism from Zhejiang University.

*July Lilin Wang* joined Focus Media as chief accounting officer in April 2005. Prior to joining Focus Media, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office from April 2004 to April 2005. From November 2002 to April 2004, Ms. Wang was a senior supervisor at Ernst & Young's San Jose, California office. From 1994 to 2002, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office. Ms. Wang received a B.A. degree in economics from Shanghai University of Economics and Finance.

*Cindy Yan Chan* joined Focus Media in August 2005 as chief strategy officer. Ms. Chan has over 10 years of experience in the advertising industry in China. Before joining Focus Media, Ms. Chan was deputy general manger for iMPACT, ZenithOptimedia's outdoor media department, an outdoor media buyer in China, from 2000 to 2005. Ms. Chan is also among the most reputable media researchers in China, and has published articles on the theory of outdoor media and China's outdoor media market, which has been quoted in prominent publications such as Forbes magazine and Media magazine. Ms. Chan holds a master's degree in economics from Nankai University.

*Ergo Xueyuan Liu* joined Focus Media as Vice President — Commercial Location Network in June 2004. Prior to joining Focus Media, Mr. Liu worked for Everease as an account manager from March 2003 until June 2004. From June 2002 until February 2003, Mr. Liu was general manager and a director of Beijing Fanenchangmei Advertising Co., Ltd., prior to which he was general manager of Manager magazine from January 2001 until May 2002. In 1999 and 2000, Mr. Liu worked in the enterprise department of the Shenzhen Special Economic Zone

Table of Contents

Group Company and was assistant manager of Yigao Electronics Co., Ltd. Mr. Liu received a B.A. degree in Chinese literature from Huazhong College of Engineering (now Huazhong Science and Technology University) in 1992.

*Acer Jiawei Zhang* joined Focus Media as Vice President — In-store Network in March 2005. Prior to joining Focus Media, Mr. Zhang worked for Media Partners International Holdings Inc. from 2001 to 2004, serving as account director, business director of the Beijing branch office and director of agency relations. While at Media Partners International, Mr. Zhang established a national "key account" service system, improved consulting and client services, and managed the development of its digital outdoor media project. From 1998 to 2001, Mr. Zhang was a sales director for Media Century Holdings Inc. in the Wuhan, Chengdu and Beijing offices. At Media Century, Mr. Zhang assisted with developing new markets and preparing for its domestic initial public offering and assisted in the acquisition of one of its key competitors. Mr. Zhang received a B.A. degree in arts design from Hubei Polytechnic Institute.

We increased the maximum number of our board of directors from seven to twelve members in May 2007. Our board of directors currently consists of nine directors.

## Duties of Directors

Under Cayman Islands law, our directors have a duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skills that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our amended and restated memorandum and articles of association. A company has the right to seek damages if a duty owed by our directors is breached.

The functions and powers of our board of directors include, among others:

- convening shareholders' meetings and reporting its work to shareholders at such meetings;

- implementing shareholders' resolutions;

- determining our business plans and investment proposals;

- formulating our profit distribution plans and loss recovery plans;

- determining our debt and finance policies and proposals for the increase or decrease in our registered capital and the issuance of debentures;

- formulating our major acquisition and disposition plans, and plans for merger, division or dissolution;

- proposing amendments to our amended and restated memorandum and articles of association; and

- exercising any other powers conferred by the shareholders' meetings or under our amended and restated memorandum and articles of association.

## Terms of Directors and Executive Officers

Each of our directors holds office until a successor has been duly elected and qualified unless the director was appointed by our board of directors, in which case such director holds office until the next following annual meeting of shareholders at which time such director is eligible for reelection. All of our executive officers are appointed by and serve at the discretion of our board of directors.

## Board Practices

### Board Committees

Our board of directors has established an audit committee, a compensation committee and a nominations committee.

*Audit Committee.* Our audit committee currently consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Shen is the chairman of our audit committee. Our board of directors has determined that all of our audit

**Table of Contents**

committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15) and meet the criteria for independence set forth in Section 10A(m)(3) of the U.S. Securities Exchange Act of 1934, or the Exchange Act.

Our audit committee is responsible for, among other things:

- recommending to our shareholders, if appropriate, the annual re–appointment of our independent auditors and pre–approving all auditing and non–auditing services permitted to be performed by the independent auditors;

- annually reviewing an independent auditors' report describing the auditing firm's internal quality–control procedures, any material issues raised by the most recent internal quality control review, or peer review, of the independent auditors and all relationships between the independent auditors and our company;

- setting clear hiring policies for employees or former employees of the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- reviewing and approving all proposed related–party transactions, as defined in Item 404 of Regulation S–K under the U.S. securities laws;

- discussing the annual audited financial statements with management and the independent auditors;

- discussing with management and the independent auditors major issues regarding accounting principles and financial statement presentations;

- reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments;

- reviewing with management and the independent auditors the effect of regulatory and accounting initiatives, as well as off–balance sheet structures on our financial statements;

- discussing policies with respect to risk assessment and risk management;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- timely reviewing reports from the independent auditors regarding all critical accounting policies and practices to be used by our company, all alternative treatments of financial information within U.S. GAAP that have been discussed with management and all other material written communications between the independent auditors and management;

- establishing procedures for the receipt, retention and treatment of complaints received from our employees regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time;

- meeting separately, periodically, with management, the internal auditors and the independent auditors; and

- reporting regularly to the full board of directors.

*Compensation Committee.*  Our current compensation committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Chao is the chairman of our compensation committee. Our board of directors has determined that all of our compensation committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Our compensation committee is responsible for:

- determining and recommending the compensation of our chief executive officer;

Table of Contents

- reviewing and making recommendations to our board of directors regarding our compensation policies and forms of compensation provided to our directors and officers;

- reviewing and determining bonuses for our officers;

- reviewing and determining share–based compensation for our directors and officers;

- administering our equity incentive plans in accordance with the terms thereof; and

- such other matters that are specifically delegated to the compensation committee by our board of directors from time to time.

*Nominations Committee.* Our current nominations committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Zhuo is the chairman of our nominations committee. Our board of directors has determined that all of our nominations committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Our nominations committee is responsible for, among other things, selecting and recommending the appointment of new directors to our board of directors.

### Corporate Governance

Our board of directors has adopted a code of business conduct and ethics, which is applicable to our employees, officers and directors. Our code of business conduct and ethics is available on our website.

In addition, our board of directors has adopted a set of corporate governance guidelines. The guidelines reflect certain guiding principles with respect to our board's structure, procedures and committees. The guidelines are not intended to change or interpret any law, or our amended and restated memorandum and articles of association.

### Compensation Of Directors And Executive Officers

In 2006, we paid aggregate cash compensation of approximately $850,000 to our directors and executive officers as a group. In 2004, 2005, 2006 and for the six months ended June 30, 2007, we granted to selected directors, officers and employees options to acquire an aggregate 25,208,200, 23,843,630, 14,800,000 and 1,300,000 ordinary shares, respectively. We have no service contracts with any of our directors or executive officers that provide benefits to them upon termination. We do not pay or set aside any amounts for pension, retirement or other benefits for our officers and directors.

### Share Option Plans

Our 2003 Employee Share Option Scheme, or our 2003 Option Plan, was adopted by our board of directors at a meeting on June 1, 2003. Our members and board of directors adopted our 2005 Share Option Plan, or our 2005 Option Plan, in May 2005. At our 2005 shareholders meeting, our shareholders approved the adoption of our 2006 Share Option Plan, or our 2005 Option Plan. Our option plans are intended to promote our success and to increase shareholder value by providing an additional means to attract, motivate, retain and reward selected directors, officers, employees and third–party consultants and advisors.

Originally, under our 2003 Option Plan, not more than 30% of our share capital was reserved for grants of options. Prior to the adoption of our 2005 Option Plan, we issued options equivalent to 10.87% of our issued share capital under our 2003 Option Plan. Under our 2005 Option Plan, the amount of options we may issue has been reduced to an aggregate of 20% of our share capital, including the 10.87% already granted under our 2003 Option Plan. In addition, during the three years from the adoption of our 2005 Option Plan, we may issue no more than 5% of our share capital for grants of options. Under our 2006 Option Plan, from the three years from the adoption of the 2006 Option Plan, we may issue no more than 3.6% of our outstanding share capital from time to time.

**Table of Contents**

Under our 2003 Option Plan:

- In July and August 2004, we granted:

- options to purchase 12,181,600 shares to certain members of our board of directors and our management group. Each of these options has an exercise price of $0.24 per share. 8,460,800 of these options vest over three years while the remaining 3,720,800 options vest over one year.

- options to purchase 8,461,800 shares to members of our staff. Each of these options has an exercise price of $0.24 per share. 2,159,800 of these options vest over three years while the remaining 6,302,000 options vest over one year.

- options to purchase 4,564,800 shares, representing 1.4% of our pre−offering diluted share capital, to third−party consultants and advisors. Each of these options have an exercise price of $0.24 per share. 1,310,400 of these options vest over three years while the remaining 3,254,400 options vest over one year.

Under our 2005 Option Plan:

- In January 2005, we granted additional options to purchase 1,200,000 of our ordinary shares to some of our directors with an exercise price of $0.58 per share. All of these options vest over three years.

- In February 2005, we granted:

- options to purchase 2,000,000 and 2,100,000 of our ordinary shares with an exercise price of $0.58 and $0.75, respectively, to certain of our executive officers and options to purchase 720,000 of our ordinary shares with an exercise price of $0.75 to certain of our employees. All of these options vest over three years.

- options to purchase 1,240,000 of our ordinary shares to third−party consultants and advisors with an exercise price of $0.75. All of these options vest over three years.

- In July 2005, we granted:

- options to purchase 11,683,630 of our ordinary shares with an exercise price of $1.70, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 100,000 of our ordinary shares to a third−party consultant with an exercise price of $1.70. All of these options vest over three years.

- In November 2005, we granted:

- options to purchase 800,000 of our ordinary shares with an exercise price of $2.60, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 4,000,000 of our ordinary shares with an exercise price of $2.70, to certain of our executive officers and employees. All of these options vest over three years.

- In March 2006, we granted options to purchase 3,000,000 of our ordinary shares with an exercise price of $5.09, to certain of our executive officers, employees and directors. All of these options vest over three years.

Under our 2006 Option Plan:

- In November 2006, we granted options to purchase 11,800,000 of our ordinary shares to certain of our employees, executive officers and directors. Of these options, 10,300,000 were issued to non−management employees and 1,500,000 were issued to our directors and officers. The issuance to our officers and directors included a grant to Jason Nanchun Jiang of options to purchase 500,000 of our ordinary shares. No other director or officer, upon exercise of all options granted, would beneficially own more than 1% of our outstanding ordinary shares. All of the options granted vest over a three year period, beginning one year from the date of issuance. The exercise price of the options is $5.724 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on November 14, 2016.

**Table of Contents**

- In March 2007 and May 2007, we granted options to purchase 1,200,000 and 100,000 of our ordinary shares to certain of our employees. The exercise price of the options is $7.20 and $7.394 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on March 18, 2017 and May 8, 2017, respectively.

- In October 2007, we granted options to purchase 9,592,685 of our ordinary shares to certain of our employees, executive officers and directors. Of these options, 6,982,500 were issued to non−management employees and 2,610,185 were issued to our directors and officers. The issuance to our officers and directors included grants to Jason Nanchun Jiang and Zhi Tan our committee that administers our option plans to purchase 210,185 and 250,000 of our ordinary shares, respectively. No other director or officer, upon exercise of all options granted, would beneficially own more than 1% of our outstanding ordinary shares. All of the options granted vest over a three year period, beginning one year from the date of issuance. The exercise price of the options is $11.422 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on October 3, 2017.

Options generally do not vest unless the grantee remains under our employment or in service with us on the given vesting date. However, in circumstances where there is a death or disability of the grantee, or, for certain option holders, a change in the control of our company, the vesting of options will be accelerated to permit immediate exercise of all options granted to a grantee.

Our compensation committee, which administers our option plans, has wide discretion to award options. Subject to the provisions of our option plans and the above allocation targets, our committee that administers our option plans determines who will be granted options, the type and timing of options to be granted, vesting schedules and other terms and conditions of options, including the exercise price. Any of our employees may be granted options. The number of options awarded to a person, if any, is based on the person's potential ability to contribute to our success, the person's position with us and other factors chosen by our board of directors.

Generally, to the extent an outstanding option granted under our option plans has not become vested on the date the grantee's employment by or service with us terminates, the option will terminate and become unexercisable.

Our board of directors may amend, alter, suspend, or terminate each of our option plan at any time, provided, however, that in order to increase the limit of 20% of our share capital that may be granted as options, our board of directors must first seek the approval of our shareholders and, if such amendment, alteration, suspension or termination would adversely affect the rights of an optionee under any option granted prior to that date, the approval of such optionee. Without further action by our board of directors, our 2003 Option Plan, 2005 Option Plan and 2006 Option Plan will terminate in June 2013, May 2015 and August 2016, respectively.

Table of Contents

The table below sets forth the option grants made to our directors and executive officers pursuant to our 2003, 2005 and 2006 Option Plan as of October 23, 2007.

| | Number of Ordinary Shares to be Issued Upon Exercise of Options | Exercise per Ordinary Share | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| | | (In U.S. dollars) | | |
| Jason Nanchun Jiang | 5,882,000 | $ 0.24 | August 25, 2004 | August 24, 2014 |
| " | 3,080,000 | $ 2.60 | November 2, 2005 | November 1, 2015 |
| " | 1,051,100 | $ 2.70 | November 16, 2005 | November 15, 2015 |
| " | 210,185 | $ 11.42 | October 3, 2007 | October 2, 2017 |
| David Feng Yu | * | $ 5.09 | March 10, 2006 | March 9, 2016 |
| Jimmy Wei Yu | * | $ 0.24 | July 5, 2004 | July 4, 2014 |
| " | * | $ 0.24 | August 25, 2004 | August 24, 2014 |
| " | * | $ 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Fuming Zhuo | * | $ 0.24 | August 10, 2004 | August 9, 2014 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Neil Nanpeng Shen | * | $ 0.58 | January 1, 2005 | December 31, 2014 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Charles Chao | * | $ 2.60 | November 2, 2005 | November 1, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Daqing Qi | * | $ 5.09 | March 10, 2006 | March 9, 2016 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Zhi Tan | * | $ 5.72 | November 16, 2006 | November 15, 2015 |
| " | 250,000 | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Daniel Mingdong Wu | * | $ 0.58 | February 2, 2005 | February 1, 2015 |
| " | * | $ 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| July Lilin Wang | * | $ 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Ergo Xueyuan Liu | * | $ 0.24 | July 5, 2004 | July 4, 2014 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Acer Jiawei Zhang | * | $ 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Diana Congrong Chen | * | $ 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |
| Cindy Yan Chan | * | $ 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ 11.42 | October 3, 2007 | October 2, 2017 |

\*    Upon exercise of all options granted, would beneficially own less than 1% of our outstanding ordinary shares, assuming all of our outstanding preference shares are converted into our ordinary shares.

### Manager Non–Competition Agreement

Pursuant to the manager non–competition agreement entered into by and between us and Jason Nanchun Jiang in December 2004, Jason Nanchun Jiang agrees not to engage in activities that compete with our business operations during the term of his employment with us and for a period of two years after any termination of his

**Table of Contents**

employment with us. Jason Nanchun Jiang also agrees not to disclose to any third party any confidential information regarding us or any of our subsidiaries and affiliated companies or to accept or invest in any opportunity that is in line with our business operations, came to him as a result of his employment with us or involves any of our assets, unless approved by our board of directors.

119

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d–3 under the Exchange Act, of our ordinary shares, as of October 31, 2007 and as adjusted to reflect the sale of the ADSs offered in this offering for:

- each person known to us to own beneficially more than 5% of our ordinary shares;

- each of our directors and executive officers who beneficially own our ordinary shares; and

- each selling shareholder participating in this offering.

Beneficial ownership includes voting or investment power with respect to the securities. Except as indicated below, and subject to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all ordinary shares shown as beneficially owned by them. The number of our ordinary shares outstanding used in calculating the percentage for each listed person includes our ordinary shares underlying options held by such person that are exercisable within 60 days of October 31, 2007, but excludes ordinary shares underlying options held by any other person. Percentage of beneficial ownership is based on 618,144,062 ordinary shares outstanding prior to this offering and 643,144,062 ordinary shares outstanding after completion of this offering, assuming the underwriters do not exercise their over–allotment options. The underwriters may choose to exercise the over–allotment options in full, in part or not at all.

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to be Sold by Selling Shareholders in This Offering | | Shares Beneficially Owned After This Offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Principal Shareholders** | | | | | | |
| JJ Media Investment Holding Ltd./ Jason Nanchun Jiang[1] | 68,604,595 | 10.95% | — | — | 68,604,595 | 10.53% |
| Total Team Investments Limited[2] | 35,830,622 | 5.80% | 35,830,620 | 5.80% | * | * |
| | | | | | | |
| **Directors and Executive Officers[3]** | | | | | | |
| JJ Media Investment Holding Ltd./ Jason Nanchun Jiang[4] | 68,604,595 | 10.95% | — | — | 68,604,595 | 10.53% |
| David Feng Yu | * | * | — | — | * | * |
| Jimmy Wei Yu | * | * | — | — | * | * |
| Neil Nanpeng Shen[5] | * | * | 51,815 | 0.01% | * | * |
| Charles Chao | * | * | — | — | * | * |
| Fumin Zhuo | * | * | — | — | * | * |
| Daqing Qi | * | * | — | — | * | * |
| David Ying Zhang | * | * | — | — | * | * |
| Zhi Tan[6] | 36,172,233 | 5.85% | 35,830,620 | 5.80% | * | * |
| Daniel Mingdong Wu | * | * | — | — | * | * |
| Diana Congrong Chen | * | * | — | — | * | * |
| July Lilin Wang | * | * | — | — | * | * |
| Cindy Yan Chan | * | * | — | — | * | * |
| Ergo Xueyuan Liu | * | * | — | — | * | * |
| Acer Jiawei Zhang | * | * | — | — | * | * |
| | | | | | | |
| **Other Selling Shareholders** | | | | | | |
| IDG Technology[7] | 10,342,583 | 1.67% | 6,499,089 | 1.05% | 3,843,494 | 0.60% |
| Magic Elite Group Ltd.[8] | 2,394,845 | 0.39% | 1,197,420 | 0.19% | 1,197,425 | 0.19% |
| Dallsfield Ltd.[9] | 1,500,000 | 0.24% | 1,500,000 | 0.24% | — | — |
| LinkValue Ltd.[10] | 1,104,575 | 0.18% | 552,285 | 0.09% | 552,290 | 0.09% |

**Table of Contents**

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to be Sold by Selling Shareholders in This Offering | | Shares Beneficially Owned After This Offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Techware Holding Company Ltd.[11] | 641,365 | 0.10% | 320,680 | 0.05% | 320,685 | 0.05% |
| Aura Investment Holdings Limited[12] | 562,817 | 0.09% | 281,405 | 0.05% | 281,412 | 0.04% |
| KingHill International Holding Co, Limited[13] | 546,151 | 0.09% | 273,075 | 0.04% | 273,076 | 0.04% |
| Sharvest Capital Limited[14] | 481,025 | 0.08% | 240,510 | 0.04% | 240,515 | 0.04% |
| Premacy Co. Limited[15] | 426,578 | 0.07% | 213,285 | 0.03% | 213,293 | 0.03% |
| Sea Dragon Holding Company Ltd[16] | 380,241 | 0.06% | 190,120 | 0.03% | 190,121 | 0.03% |
| Latitude Holdings Group Limited[17] | 168,594 | 0.03% | 84,295 | 0.01% | 84,299 | 0.01% |
| Trans China Ltd.[18] | 156,946 | 0.03% | 78,470 | 0.01% | 78,476 | 0.01% |
| Captains Enterprises Limited[19] | 103,863 | 0.02% | 51,930 | 0.01% | 51,933 | 0.01% |
| Dai Zhou[20] | 110,444 | 0.02% | 55,220 | 0.01% | 55,224 | 0.01% |
| Smart Master International Limited[21] | 576,630 | 0.09% | 51,815 | 0.01% | 524,815 | 0.08% |
| Wei Li[22] | 84,877 | 0.01% | 42,435 | 0.01% | 42,442 | 0.01% |
| Junzhi Li[23] | 3,223 | 0.00% | 1,610 | 0.00% | 1,613 | 0.00% |
| Yuling Han[24] | 3,223 | 0.00% | 1,610 | 0.00% | 1,613 | 0.00% |
| Junni Zhai[25] | 2,829 | 0.00% | 1,410 | 0.00% | 1,419 | 0.00% |
| Jun Zhang[26] | 2,358 | 0.00% | 1,175 | 0.00% | 1,183 | 0.00% |
| Lu Li[27] | 2,309 | 0.00% | 1,150 | 0.00% | 1,159 | 0.00% |
| Yunhai Bai[28] | 1,768 | 0.00% | 880 | 0.00% | 888 | 0.00% |

\*     Upon exercise of all options currently exercisable or vesting within 60 days of the date of this prospectus, would beneficially own less than 1% of our ordinary shares.

(1)   Includes 53,975,959 ordinary shares owned by JJ Media Investment Holding Ltd., 6,228,185 ordinary shares held by Citi (Nominees) Limited and beneficially owned by Mr. Jiang upon the expiry of the variable pre–paid forward contract entered into with Credit Suisse in September 2006 which expired in September 2007, and 5,222,552 and 3,177,899 options to purchase our ordinary shares owned by Target Sales International Limited and Target Management Group Limited, respectively. Other than Citi (Nominees) Limited, all of these entities are 100% owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer.

(2)   Total Team, a British Virgin Island company, is 13.37%, 10.79%, 10.46%, 9.99%, 9.30%, 9.23%, 8.14%, 5.81%, 5.76%, 5.54%, 5.23%, 4.04%, 1.74% and 0.58% owned by First Choice Investments Limited (jointly owned by Zhi Tan, our president, Gongquan Wang and Hong Chen), IDG Technology Venture Investment III, L.P. (owned by a group of unrelated parties), All in One International Limited (wholly owned by Lei Liu), Timeleader Profits Limited (wholly owned by Haiqi Zhao), Be First Investments Limited (wholly owned by Yue Yin), Yee On Investments Limited (wholly owned by Shisheng Liu), Excellent China (Group) Limited (wholly owned by Chunlong Xu), Dukeland Investments Limited (wholly owned by Xiaolu Sun who is Mr. Zhi Tan's wife), Red Focus Inc. (wholly owned by Xuxia Yang), Nice Excel Investments Limited (wholly owned by Zhixue Ding), Sparkle Media Limited (wholly owned by Haijin Li), Yufai Investments Limited (wholly owned by Yong Shi), Best Star Profits Limited (wholly owned by Zefei Wu) and Hong Chen, respectively. Each shareholder of Total Team exercises the investment and voting power over our ordinary shares held by Total Team in proportion to its respective ownership right in Total Team. The address of Total Team is c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(3)   The address of our current directors and executive officers is c/o 28F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China.

(4)   See note 1.

Table of Contents

(5)  Includes 576,630 ordinary shares held by Smart Master International Limited, or Smart Master, a British Virgin Islands company, which is 100% owned by Neil Nanpeng Shen, and includes 51,815 ordinary shares being sold in this offering. The address of Smart Master is Suite 3202A, 32/F, The Centrium, 60 Wyndham Street, Central, Hong Kong.

(6)  Includes 35,830,622 ordinary shares held by Total Team (including 35,830,620 ordinary shares being sold in this offering) and 341,611 options to purchase our ordinary shares owned by Dukeland Investments Limited (wholly owned by Xiaolu Sun who is Dr. Tan's wife). Dr. Tan is a joint shareholder of First Choice Investment Limited, which holds a 13.37% equity interest in Total Team. Dr. Tan disclaims beneficial ownership in the shares owned by Total Team except to the extent of his pecuniary interest therein.

(7)  IDG Technology includes 5,934,524 ordinary shares owned by IDG Technology Venture Investments, L.P. (including 2,362,000 ordinary shares being sold in this offering), 416,210 ordinary shares owned by IDG–Accel China Growth Fund L.P. (including 208,105 ordinary shares being sold in this offering), 86,545 ordinary shares owned by IDG–Accel China Growth Fund–A L.P. (including 43,270 ordinary shares being sold in this offering), 39,180 ordinary shares owned by IDG–Accel China Investors L.P. (including 19,590 ordinary shares being sold in this offering), and 3,866,124 ordinary shares beneficially owned by IDG Technology Venture Investment III, L.P. through Total Team (see note 2 above). The general partner of IDG Technology Venture Investments, LP is IDG Technology Venture Investments, LLC. Messrs. Patrick McGovern and Quan Zhou are managing members of IDG Technology Venture Investments, LLC. The address of IDG Technology Venture Investments, LP is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Growth Fund L.P. is IDG–Accel China Growth Fund Associates L.P. The general partner of IDG–Accel China Growth Fund Associates L.P. is IDG–Accel China Growth Fund GP Associates Ltd. Messrs. Patrick McGovern and Quan Zhou are directors of IDG–Accel China Growth Fund GP Associates Ltd. The address of IDG–Accel China Growth Fund L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Growth Fund–A L.P. is IDG–Accel China Growth Fund Associates L.P. The general partner of IDG–Accel China Growth Fund Associates L.P. is IDG–Accel China Growth Fund GP Associates Ltd. Messrs. Patrick McGovern and Quan Zhou are directors of IDG–Accel China Growth Fund GP Associates Ltd. The address of IDG–Accel China Growth Fund–A L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Investors L.P. is IDG–Accel China Investors Associates Ltd. Messrs. Jim Breyer and Mr. Quan Zhou are the directors of IDG–Accel China Investors Associates Ltd. The address of IDG–Accel China Investors L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China.

(8)  Magic Elite Group Ltd., or Magic Elite, a British Virgin Islands company, holds the ordinary shares converted from share options of Allyes owned by the employees of Allyes when we acquired Allyes in March 2007. The address of Magic Elite is Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands.

(9)  Dallsfield Ltd., a British Virgin Islands company, is 100% owned by Maodong Xu. The address of Dallsfield Ltd. is 28/F., No. 369, Zhao Feng World Trade Tower, Jiangsu Road, Shanghai, PRC.

(10)  LinkValue Ltd., a British Virgin Islands company, is 40.47%, 37.42% and 22.11% owned by Kaizhen Xu, Jie Li and YellowBee Holdings Limited, or YellowBee (wholly owned by Jianfeng Wang). The address of LinkValue Ltd. is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(11)  Techware Holding Company Ltd., or Techware, a British Virgin Islands company, is 50.85%, 30.68% and 18.47% owned by YellowBee (wholly owned by Jianfeng Wang), Aura Investment Holdings Limited, or Aura (wholly owned by Jingbo Wang) and China Alliance Investment Limited (wholly owned by Yuanzhe Fu). The address of Techware is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(12)  The address of Aura is Room 101, Building No. 789, Tianshanxi Road, Shanghai, China.

122

Table of Contents

(13) KingHill International Holding Co, Limited, or KingHill, a British Virgin Islands company, is 100% owned by Jiangang Wang. The address of KingHill is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(14) Sharvest Capital Limited, or Sharvest, a British Virgin Islands company, is 10.00% and 90.00% owned by Chen Yang and Jiefang Ji. The address of Sharvest is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(15) Premacy Co. Limited, or Premacy, a British Virgin Islands company, is 31.80%, 3.22% and 64.98% owned by Aura (wholly owned by Jingbo Wang), Newcastle Investment Holdings Limited (wholly owned by William Chen) and Ting Jia. The address of Premacy is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(16) Sea Dragon Holding Company Ltd, or Sea Dragon, a British Virgin Islands company, is 100% owned by Hailong Zhu. The address of Sea Dragon is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(17) Latitude Holdings Group Limited, or Latitude, a British Virgin Islands company, is 100% owned by Wei Chen. The address of Latitude is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(18) Trans China Ltd., a British Virgin Islands company, is 100% owned by Kingsland Pacific Ltd. (wholly owned by Joseph Ho). The address of Trans China Ltd. is Balizhuang Xili, Bldg 72 Rm 904, Ocean Plaza, Chao Yang District, Beijing 100025, China.

(19) Captains Enterprises Limited, or Captains, a British Virgin Islands company, is 100% owned by Kingsland Pacific Ltd. (wholly owned by Joseph Ho). The address of Trans China Ltd. is Balizhuang Xili, Bldg 72 Rm 904, Ocean Plaza, Chao Yang District, Beijing 100025, China.

(20) The address of Dai Zhou is Unit 6C, Buliding No. 1, Jiari Wan, Huaqiao Cheng, Nanshan District, Shenzhen, China.

(21) See note 5.

(22) The address of Wei Li is Room 20–9–201 Dongkou Qu, Tiantong Yuan, Changping District, Beijing, China.

(23) The address of Junzhi Li is Room 17–114, Buliding No. 2, Bei Yuan, Beiyuan Road, Chaoyang District, Beijing, China.

(24) The address of Yuling Han is Room 6–1–501, Benjiarun Garden, Donghuashi Street, Beijing, China.

(25) The address of Junni Zhai is Room No. 3, Gate No. 1, No. 126, Building No. 19, Xisanhuan Road, Haidian District, Beijing, China.

(26) The address of Jun Zhang is Room E–1007, No. 16, Jingmao Guoji Building, Baliqiao nan Street, Tongzhou District, Beijing, China.

(27) The address of Lu Li is 11/F, Unit D, Buliding D, Hui Fang Gardon, Xuefu Road Nanshan District, Shenzhen, China.

(28) The address of Yunhai Bai is Room 506, Buliding No. 4, Yijia Garden, No. 8, Tonghuinan Road, Tongzhou District, Beijing, China.

As of October 17, 2007, 491,047,705 shares were registered in the name of a nominee of Citibank, N.A., the depositary under the deposit agreement. We have no further information as to shares held, or beneficially owned, by U.S. persons. Since the completion of our initial public offering in July 2005, all ordinary shares underlying the ADSs quoted on the Nasdaq Global Market, Inc. have been held in Hong Kong by the custodian, Citibank Hong Kong, on behalf of Citibank, N.A., the depositary.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

Table of Contents

### RELATED PARTY TRANSACTIONS

Details of advertising service revenue from related parties in 2004, 2005 and 2006 and the six months ended June 30, 2006 and 2007 are as follows:

| Name of Related Parties | Director Interested | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2004 | 2005 | 2006 | 2006 | 2007 |
| Shanghai Everease Advertising & Communication Ltd. | Jason Nanchun Jiang | $ 1,302,331 | $ 1,552,039 | $ 7,764,977 | $ 1,084,189 | $ 3,735,103 |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 1,227,267 | 2,330,945 | 3,885,546 | 2,606,373 | 104 |
| Shanghai Jobwell Business Consulting Co., Ltd. | Jimmy Wei Yu | 411,034 | 1,050,258 | 1,382,695 | 749,684 | — |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | 372,488 | 757,850 | 1,122,945 | 1,122,945 | — |
| Shanghai Wealove Business Consulting Co., Ltd. | Jimmy Wei Yu | — | — | 671,488 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | 361,371 | 908,100 | 982,527 | 420,218 | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | Jimmy Wei Yu | — | 1,646,120 | 3,230,040 | 2,106,475 | 44,542 |
| Beijing Sina Internet Information Services Co., Ltd. | Charles Chao | — | — | 190,563 | 149,958 | 59,345 |
| Beijing Sohu New–age Information Technology Co., Ltd. | Daqing Qi | — | — | 119,768 | 9,573 | 272,337 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | Neil Nanpeng Shen | — | — | 78,742 | — | — |
| UUSEE | Neil Nanpeng Shen | — | — | — | — | 27,939 |
| Beijing Yadu Science & Technology Co., Ltd. | Fumin Zhuo | — | — | — | — | 97,826 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | Neil Nanpeng Shen | 48,287 | 264,120 | 178,933 | 178,933 | 105,014 |
| Total | | $ 3,722,778 | $ 8,509,432 | $ 19,608,224 | $ 8,428,348 | $ 4,342,210 |

In 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited), office rentals were paid to Multimedia Park Venture Capital amounting to $140,305, $395,083, $476,902, $226,506 and $306,137, respectively.

In 2006, Everease charged us $47,804 for providing administration services.

In March 2006, Weiqiang Jiang, father of Jason Nanchun Jiang, provided a short–term loan to us of approximately $2.5 million to relieve a temporary shortage of Renminbi we experienced at that time. The loan was unsecured and was provided to us at no interest. At the end of June 2006, we paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

124

Table of Contents

Details of amounts due from related parties as of December 31, 2004, 2005, 2006 and June 30, 2007 are as follows:

| Name of Related Parties | Note | Director Interested | 2004 | 2005 | 2006 | As of June 30, 2007 |
|---|---|---|---|---|---|---|
| Shanghai Everease Advertising & Communication Ltd. | 1 | Jason Nanchun Jiang | $ 1,259,138 | $ 572,525 | $ 6,331,549 | $ 5,346,287 |
| Multimedia Park Venture Capital | 1 | Jimmy Wei Yu | 690,212 | 330,700 | 12,705 | 9,464 |
| Shanghai Jobwell Business Consulting Ltd. | 1 | Jimmy Wei Yu | 275,971 | 546,207 | — | — |
| Shanghai Wealove Wedding Service Co., Ltd. | 1 | Jimmy Wei Yu | 251,556 | 662,954 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | 1 | Jimmy Wei Yu | 263,155 | 533,469 | — | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | 1 | Jimmy Wei Yu | — | 474,351 | 403,889 | — |
| Beijing Sina Internet Information Services Co., Ltd. | 1 | Charles Chao | — | — | — | 802,317 |
| Beijing Sohu New–age Information Technology Co., Ltd. | 1 | Daqing Qi | — | — | — | 864,335 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | 1 | Neil Nanpeng Shen | — | — | — | 58,888 |
| UUSEE | 1 | Neil Nanpeng Shen | — | — | — | 32,828 |
| Beijing Yadu Science & Technology Co., Ltd. | 1 | Fumin Zhuo | — | — | — | 65,758 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | 1 | Neil Nanpeng Shen | — | — | 39,699 | — |
| David Yu | 2 | David Yu | — | — | 1,064,947 | — |
| | | | $ 2,740,032 | $ 3,120,206 | $ 7,852,789 | $ 7,179,877 |

Details of amounts due to related parties as of December 31, 2004, 2005, 2006 and June 30, 2007 are as follows:

| Name of Related Parties | Note | Director Interested | 2004 | 2005 | 2006 | As of June 30, 2007 |
|---|---|---|---|---|---|---|
| 51.com | 3 | Neil Nanpeng Shen | — | — | — | 27,477 |
| Beijing Sina Internet Information Services Co., Ltd. | 3 | Charles Chao | — | — | — | 3,238,744 |
| Qihoo.com | 3 | Neil Nanpeng Shen | — | — | — | 116,174 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | 3 | Neil Nanpeng Shen | — | — | — | 205 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | 3 | Neil Nanpeng Shen | — | — | — | 7,550 |
| Zhi Tan | 4 | Zhi Tan | — | — | 345,768 | — |
| | | | $ — | $ — | $ 345,768 | $ 3,390,150 |

(1) These amounts represent trade receivables for advertising services provided.

(2) The amount represents a payment due from the ex–shareholder of Target Media for an indemnification of a contingent liability which arose after the acquisition. This amount was paid out in cash in 2007.

(3) These amounts represent trade payables for web spaces leased.

(4) The amount represents the amount due to the president of Focus Media for operating funds of Framedia. The loan was non–interest bearing and was repayable within one year.

125

Table of Contents

**Agreements among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries**

The following is a summary of the material provisions of these agreements. For more complete information you should read these agreements in their entirety. Directions on how to obtain copies of these agreements are provided in this prospectus under "Additional Information".

We have entered into a series of contractual arrangements with our PRC operating affiliates and their respective shareholders and subsidiaries, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with our PRC operating affiliates and their respective shareholders and subsidiaries may only be amended with the approval of our audit committee or another independent body of our board of directors. In connection with our acquisition of Framedia, we entered into a series of contractual arrangements with Focus Media Advertisement's subsidiaries relating to our poster frame network, Framedia Advertisement, New Structure Advertisement, and Guangdong Framedia, each of which is a subsidiary of Focus Media Advertisement, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and their shareholders may only be amended in writing by all of its parties unless the provisions being amended only involve certain parties' interests in which case the amendment shall be made in writing by such parties. Each of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement is 90%–owned by Focus Media Advertisement and 10%–owned by Focus Media Advertising Agency, respectively. In addition, with regard to Allyes, which we acquired in March 207, New Allyes Information has entered into a series of contractual arrangements with the Allyes operating affiliates and their shareholders, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of the contractual arrangements with the Allyes operating affiliates and their shareholders may only be amended with the approval of our audit committee or another independent body of our board of directors.

*Transfer of Ownership When Permitted By Law*

Pursuant to call option agreements, including in certain cases subsequent participation letters by new subsidiaries of our PRC operating affiliates, by and among our wholly foreign–owned subsidiaries, our PRC operating affiliates, and their respective shareholders and its subsidiaries, the two shareholders of each of our PRC operating affiliates, which shareholders are either (i) two PRC citizens designated by us or (ii) two PRC entities owned by our subsidiaries or by our designated appointees, has granted the relevant wholly foreign–owned subsidiary or its designee an exclusive option to purchase all or part of their equity interests in the relevant PRC operating affiliate, and its subsidiaries, or all or part of the assets of the relevant PRC operating affiliate, in each case, at any time determined by the relevant wholly foreign–owned subsidiary and to the extent permitted by PRC law. In some cases, pursuant to separate letters of, undertaking each such shareholder agrees to pay to the relevant wholly foreign–owned subsidiary or us any excess of the purchase price paid for the equity interests in, or assets of, the relevant PRC operating affiliate or its subsidiaries over the respective registered capital of such affiliate or its subsidiaries in the event that the wholly–foreign owned subsidiary or its designee exercises such option.

*Voting Arrangements*

Pursuant to voting rights proxy agreements and in certain cases subsequent participation letters by new subsidiaries of the PRC operating affiliates, by and among our wholly foreign–owned subsidiaries, the PRC operating affiliates and their subsidiaries, each of the respective shareholders of the PRC operating affiliates has granted a PRC individual designated by the wholly foreign–owned subsidiaries the right to appoint all of the directors and senior management of the PRC operating affiliates and those subsidiaries and all of their other voting rights as shareholders of the PRC operating affiliates and their subsidiaries, as the case may be, as provided under the articles of association of each such entity. Under the voting rights proxy agreement, there are no restrictions on the number, to the extent allowed under the respective articles of association of the PRC operating affiliates and their respective subsidiaries, or identity of those persons we can appoint as directors and officers.

Table of Contents

### Equity Pledge Agreements

Pursuant to equity pledge agreements and, in certain instances, subsequent participation letters by new subsidiaries of the PRC operating affiliates, by and among the relevant wholly foreign–owned subsidiaries, the relevant PRC operating affiliates and their respective subsidiaries, each shareholder of the relevant PRC operating affiliates has pledged his or its equity interest in the relevant PRC operating affiliates and their subsidiaries, as the case may be, to certain of the wholly foreign–owned subsidiaries to secure their obligations under the relevant contractual control agreements to which each is a party, including but not limited to, the obligations of the relevant PRC operating affiliates and their respective subsidiaries under certain technical services agreements, trademark licence agreements and exclusive services agreements, as the case may be, and the obligation of each shareholder of the PRC operating affiliates under the respective loan agreements between the relevant shareholder and wholly foreign–owned subsidiary, for the sole purpose of increasing the registered capital of the PRC operating affiliates, as the case may be and acquiring certain of our regional distributors, respectively. See ''— Loans to the Shareholders of the PRC Operating Affiliates''. Under these equity pledge agreements, each shareholder has agreed not to transfer, assign, pledge or otherwise dispose of their interest in the relevant PRC operating affiliate or its subsidiaries, as the case may be, without the prior written consent of the relevant wholly foreign–owned subsidiary.

### Equity Trust Agreements

Pursuant to the equity trust agreement by and among Focus Media Advertisement and Focus Media Technology dated as of March 28, 2005, Focus Media Advertisement holds a 9% equity interest in Focus Media Digital in trust for the benefit of Focus Media Technology. Under the equity trust agreement, Focus Media Technology provides trust funds to Focus Media Advertisement to be used for the purchase of a 9% equity interest in Focus Media Digital and Focus Media Technology agrees to be the beneficiary of any profits or other benefit generated that is attributable to the management, use or disposal of the trust funds. Through these arrangements, we have enabled our indirect subsidiary, Focus Media Technology, to beneficially hold an additional 9% of the interest in Focus Media Digital in addition to the 90% equity interest it holds in its own name.

### Trademark License Agreement

Pursuant to the trademark license agreement by and among Focus Media Technology, Focus Media Advertisement and its subsidiaries dated as of March 28, 2005, Focus Media Technology has agreed to license the use of its trademarks to be registered in China to Focus Media Advertisement and its subsidiaries in exchange for a monthly licensing fee of RMB10,000 ($1,247) for each affiliated company using such trademarks.

### Cooperation Agreements

Pursuant to the cooperation agreements by and among New Focus Media Advertisement, Focus Media Advertisement and its subsidiaries, dated as of May 22, 2006, New Focus Media Advertisement entrusted Focus Media Advertisement and its subsidiaries to disseminate advertisements as required by New Focus Media Advertisement in all locations rented by Focus Media Advertisement and its subsidiaries, and to sell advertising time slots for those locations, and each of Focus Media Advertisement and its subsidiaries ensures the allocation of advertising time slots on its respective portion of the advertising network adequate for the dissemination of advertising content as agreed upon between New Focus Media Advertisement and its advertising clients. New Focus Media Advertisement pays a dissemination fee to Focus Media Advertisement and its relevant subsidiaries for dissemination services on a cost–plus basis.

### Asset Transfer Agreement

Pursuant to the asset transfer agreement entered into by and between Focus Media Digital and New Focus Media Advertisement, dated as of December 31, 2005, Focus Media Digital transferred to New Focus Media Advertisement all of its assets relating to its out–of–home LCD television advertising business at fair market value.

127

Table of Contents

*Technology Transfer Agreement*

Pursuant to the technology and assets transfer agreement by and between Focus Media Digital and New Focus Media Advertisement, dated as of May 22, 2006, Focus Media Digital transferred to New Focus Media Advertisement all of its technology at a fixed fee.

*Advertisement Dissemination Agreement*

Pursuant to the advertisement dissemination agreement by and between New Focus Media Advertisement and Focus Media Advertising Agency, dated as of May 22, 2006, New Focus Media Advertisement agrees to disseminate advertisements for Focus Media Advertising Agency pursuant to the agreements by and among Focus Media Advertising Agency and its clients, and Focus Media Advertising Agency agrees to pay a dissemination fee to New Focus Media Advertisement for the dissemination services.

*Exclusive Services Agreement*

Pursuant to the exclusive services agreements by and among New Allyes Information, and certain of its PRC operating affiliates, New Allyes Information has agreed to provide exclusive services in respect of the business operations of Shanghai the relevant PRC operating affiliates and those operating affiliates have agreed to pay a service fee totaling equal to 100% of their tax excluded annual revenues to New Allyes Information.

**Other Related Party Transactions**

*Registration Rights Agreement*

See "Shares Eligible for Future Sale" for a description of our amended shareholders' agreement.

*Loans to Shareholders of Our PRC Operating Affiliates*

Pursuant to loan agreements entered into by the relevant wholly foreign–owned subsidiaries and the shareholders of each of our PRC operating affiliates, respectively, the shareholders obtained a loan of the registered capital of the relevant PRC operating affiliate from the relevant wholly foreign–owned for the sole purpose of establishing or increasing, as the case may be, the registered capital of each such PRC operating affiliate. As of December 31, 2006, the full amounts of the loans to these shareholders remained outstanding. The relevant wholly foreign–owned subsidiary granted these loans without interest.

*Loan from Relative of Jason Nanchun Jiang*

In March 2006, Weiqiang Jiang, the father of Jason Nanchun Jiang, provided a short–term loan to us of RMB 20.0 million ($2.5 million) to relieve a temporary shortage of Renminbi we experienced at that time. The loan was unsecured and was provided to us at no interest. At the end of June 2006, we paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

**Transactions with Evereas**

Prior to establishing our business, Jason Nanchun Jiang, our founder, chairman and chief executive officer, served as the legal representative and general manager of Evereas from 2000 to 2004. From 2004 to March 2005, Ms. Shen Yacheng, the mother of Jason Jiang, served as legal representative of Evereas. Evereas and our company were considered to be under common control through March 2005 and all transaction we entered into with Evereas were treated as related party transactions. Subsequent to Shen Yacheng's resignation in March 2005, Jason's father continued to serve as finance manager of Evereas (effective from 1994) as a result of which he is able to exert a certain degree of influence over Evereas. Therefore, Evereas continues to be deemed a related party of Focus Media. In connection with the audit of our financial statements as of and for the period ended December 31, 2006, our auditors noted that, with regard to determination of related party status, we lack a process for timely review of changes in relationships with companies that were excluded from related party status in prior years. The auditors identified this as a significant deficiency under standards established by the PCAOB in our internal accounting controls. See "Risk Factors — There have been historical deficiencies with our internal

Table of Contents

controls and there remain areas of our internal and disclosure controls that require improvement, and we are exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes–Oxley Act of 2002."

### Everease Non–Competition Agreement

Pursuant to the Everease non–competition Agreement between Everease and us, dated as of November 2004, Everease, its affiliates, or its directors, officers or employees have agreed not to disclose any confidential information regarding Focus Media to any third–party without our written consent. In addition, for so long as Jason Nanchun Jiang continues to hold any equity interest in our company and for two years thereafter, none of Everease, its affiliates, or its directors, officers or employees may (i) engage in, or lend its name to, any business that competes with our business, (ii) deal in a competitive manner with any of our customers, (iii) solicit any of our directors, officers, employees or agents to become directors, officers, employees or agents of others entities, or (iv) engage in any business conducted under a name that is the same as, or similar to, ours or any trade name used by us where the use of such name is reasonably likely be confused for our name. Everease entered into the non–competition agreement in consideration of its business relationship with us at the time, which relationship was subsequently terminated, and received no cash or other monetary compensation.

### Advertising Services Provided to Everease

We have provided our advertising services to Everease in the aggregate amounts of $1.3 million, $1.6 million, $7.7 million and $3.8 million in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

### Certain Services Provided by Everease

In 2006, Everease charged us $47,804 for providing administration services.

### Transactions with Entities Affiliated with Jimmy Wei Yu

We have provided our advertising services to certain companies for which Jimmy Wei Yu, one of our directors, also serves as a director. The advertising service revenue for these services totalled in the aggregate $2.3 million, $6.7 million and $11.3 million in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. As of June 30, 2007, $9,464 remained outstanding.

These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

### Transactions with Ctrip.com International

We have provided our advertising services to Ctrip.com International, Limited, which is affiliated with Neil Nanpeng Shen, one of our directors, in the aggregate amount of $48,287, $264,120, $178,933 and $58,888 in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively, all of which has been paid as of June 30, 2007. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

129

Table of Contents

## DESCRIPTION OF SHARE CAPITAL

As of the date hereof, our authorized share capital is $990,000 divided into 19,800,000,000 shares, par value $0.00005 per share, and the issued share capital is $30,907.20 divided into 618,144,062 ordinary shares fully paid or credited as fully paid.

We were incorporated as Focus Media Holding Limited in the British Virgin Islands on April 11, 2003 as an international business company. On April 1, 2005, we changed our corporate domicile to the Cayman Islands, becoming an exempted company with limited liability under the Companies Law (2004 Revision) Cap. 22 of the Cayman Islands, or the Companies Law. Our shareholders who are non–residents of the Cayman Islands may freely hold and vote their shares. A Cayman Islands exempted company:

- is a company that conducts its business outside of the Cayman Islands;

- is exempted from certain requirements of the Companies Law, including a filing of an annual return of its shareholders with the Registrar of Companies or the Immigration Board;

- does not have to make its register of shareholders open to inspection; and

- may obtain an undertaking against the imposition of any future taxation.

Our amended and restated memorandum and articles of association authorize the issuance of up to 19,800,000,000 shares, par value $0.00005 per share. The following summarizes the terms and provisions of our share capital upon the completion of this offering, as well as the material applicable laws of the Cayman Islands. This summary is not complete, and you should read the form of our amended and restated memorandum and articles of association, which are filed as exhibits to the registration statement of which this prospectus is a part.

The following discussion primarily concerns ordinary shares and the rights of holders of ordinary shares. The holders of ADSs will not be treated as our shareholders and will be required to surrender their ADSs for cancellation and withdrawal from the depositary facility in which the ordinary shares are held in order to exercise shareholders' rights in respect of the ordinary shares. The depositary will agree, so far as it is practical, to vote or cause to be voted the amount of ordinary shares represented by ADSs in accordance with the non–discretionary written instructions of the holders of such ADSs.

### Meetings

Subject to our regulatory requirements, an annual general meeting and any extraordinary general meeting shall be called by not less than 10 days' notice in writing. Notice of every general meeting will be given to all of our shareholders other than those that, under the provisions of our amended and restated articles of association or the terms of issue of the ordinary shares they hold, are not entitled to receive such notices from us, and also to our principal external auditors. Extraordinary general meetings may be called only by the chairman of our board of directors or a majority of our board of directors, and may not be called by any other person. All business shall be deemed extraordinary that is transacted at an extraordinary general meeting, and also all business that is transacted at an annual general meeting other than with respect to (1) declarations of dividends, (2) the adoption of our financial statements and reports of directors and auditors thereon, (3) the granting of any mandate or authority to our directors, to grant options not in excess of 20% of the nominal value of our existing issued share capital, (4) our ability to repurchase our securities, (5) the election of directors, (6) the appointment of auditors (where special notice of the intention to make such appointment is not required by the Companies Law) and other officers, and (7) the fixing of the remuneration of the auditors and the voting of remuneration or extra remuneration to the directors.

Notwithstanding that a meeting is called by shorter notice than that mentioned above, but, subject to applicable regulatory requirements, it will be deemed to have been duly called, if it is so agreed (1) in the case of a meeting called as an annual general meeting by all of our shareholders entitled to attend and vote at the meeting; or (2) in the case of any other meeting, by a majority in number of our shareholders having a right to attend and vote at the meeting, being a majority together holding not less than 75% in nominal value of the ordinary shares giving that right.

Table of Contents

At any general meeting, two shareholders entitled to vote and present in person or by proxy that represent not less than one–third of our issued and outstanding voting shares will constitute a quorum. No business other than the appointment of a chairman may be transacted at any general meeting unless a quorum is present at the commencement of business. However, the absence of a quorum will not preclude the appointment of a chairman. If present, the chairman of our board of directors shall be the chairman presiding at any shareholders meetings.

A corporation being a shareholder shall be deemed for the purpose of our amended and restated articles of association to be present in person if represented by its duly authorized representative being the person appointed by resolution of the directors or other governing body of such corporation to act as its representative at the relevant general meeting or at any relevant general meeting of any class of our shareholders. Such duly authorized representative shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were our individual shareholder.

The quorum for a separate general meeting of the holders of a separate class of shares is described in "— Modification of Rights" below.

**Voting Rights Attaching to the Shares**

Subject to any special rights or restrictions as to voting for the time being attached to any shares, at any general meeting on a show of hands every shareholder who is present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly authorized representative) shall have one vote, and on a poll every shareholder present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly appointed representative) shall have one vote for each fully paid share which such shareholder is the holder.

No shareholder shall be entitled to vote or be reckoned in a quorum, in respect of any share, unless such shareholder is registered as our shareholder at the applicable record date for that meeting and all calls or installments due by such shareholder to us have been paid.

If a clearing house (or its nominee(s)) is our shareholder, it may authorize such person or persons as it thinks fit to act as its representative(s) at any meeting or at any meeting of any class of shareholders, provided that, if more than one person is so authorized, the authorization shall specify the number and class of shares in respect of which each such person is so authorized. A person authorized pursuant to this provision is entitled to exercise the same powers on behalf of the recognized clearing house (or its nominee(s)) as if such person was the registered holder of our shares held by that clearing house (or its nominee(s)) including the right to vote individually on a show of hands.

While there is nothing under the laws of the Cayman Islands which specifically prohibits or restricts the creation of cumulative voting rights for the election of our directors, unlike the requirement under Delaware law that cumulative voting for the election of directors is permitted only if expressly authorized in the certificate of incorporation, it is not a concept that is accepted as a common practice in the Cayman Islands, and we have made no provisions in our amended and restated memorandum and articles of association to allow cumulative voting for such elections.

**Protection of Minority Shareholders**

The Grand Court of the Cayman Islands may, on the application of shareholders holding not less than one fifth of our shares in issue, appoint an inspector to examine our affairs and report thereon in a manner as the Grand Court shall direct.

Any shareholder may petition the Grand Court of the Cayman Islands which may make a winding up order, if the court is of the opinion that it is just and equitable that we should be wound up.

Claims against us by our shareholders must, as a general rule, be based on the general laws of contract or tort applicable in the Cayman Islands or their individual rights as shareholders as established by our amended and restated memorandum and articles of association.

The Cayman Islands courts ordinarily would be expected to follow English case law precedents which permit a minority shareholder to commence a representative action against, or derivative actions in our name to challenge (1) an act which is ultra vires or illegal, (2) an act which constitutes a fraud against the minority and the wrongdoers

131

**Table of Contents**

are themselves in control of us, and (3) an irregularity in the passing of a resolution which requires a qualified (or special) majority.

**Pre–emption Rights**

There are no pre–emption rights applicable to the issue of new shares under either Cayman Islands law or our amended and restated memorandum and articles of association.

**Liquidation Rights**

Subject to any special rights, privileges or restrictions as to the distribution of available surplus assets on liquidation for the time being attached to any class or classes of shares (1) if we are wound up and the assets available for distribution among our shareholders are more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the excess shall be distributed pari passu among those shareholders in proportion to the amount paid up at the commencement of the winding up on the shares held by them, respectively, and (2) if we are wound up and the assets available for distribution among the shareholders as such are insufficient to repay the whole of the paid–up capital, those assets shall be distributed so that, as nearly as may be, the losses shall be borne by the shareholders in proportion to the capital paid up at the commencement of the winding up on the shares held by them, respectively.

If we are wound up, the liquidator may with the sanction of our special resolution and any other sanction required by the Companies Law, divide among our shareholders in specie or kind the whole or any part of our assets (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as the liquidator deems fair upon any property to be divided and may determine how such division shall be carried out as between the shareholders or different classes of shareholders. The liquidator may also vest any part of these assets in trustees upon such trusts for the benefit of the shareholders as the liquidator shall think fit, but so that no shareholder will be compelled to accept any assets, shares or other securities upon which there is a liability.

**Modification of Rights**

Except with respect to share capital (as described below) alterations to our amended and restated memorandum and articles of association may only be made by special resolution of no less than two–thirds of votes cast at a meeting of the shareholders.

Subject to the Companies Law of the Cayman Islands, all or any of the special rights attached to shares of any class (unless otherwise provided for by the terms of issue of the shares of that class) may be varied, modified or abrogated with the sanction of a special resolution passed at a separate general meeting of the holders of the shares of that class. The provisions of our articles of association relating to general meetings shall apply similarly to every such separate general meeting, but so that the quorum for the purposes of any such separate general meeting or at its adjourned meeting shall be a person or persons together holding (or represented by proxy) not less than one–third in nominal value of the issued shares of that class, every holder of shares of the class shall be entitled on a poll to one vote for every such share held by such holder and that any holder of shares of that class present in person or by proxy may demand a poll.

The special rights conferred upon the holders of any class of shares shall not, unless otherwise expressly provided in the rights attaching to or the terms of issue of such shares, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

**Alteration of Capital**

We may from time to time by ordinary resolution:

- increase our capital by such sum, to be divided into shares of such amounts, as the resolution shall prescribe;

- consolidate and divide all or any of our share capital into shares of larger amount than our existing shares;

Table of Contents

- cancel any shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person, and diminish the amount of our share capital by the amount of the shares so cancelled subject to the provisions of the Companies Law;

- sub–divide our shares or any of them into shares of smaller amount than is fixed by our amended and restated memorandum and articles of association, subject nevertheless to the Companies Law, and so that the resolution whereby any share is sub–divided may determine that, as between the holders of the share resulting from such subdivision, one or more of the shares may have any such preference or other special rights, over, or may have such deferred rights or be subject to any such restrictions as compared with the others as we have power to attach to unissued or new shares; and

- divide shares into several classes and without prejudice to any special rights previously conferred on the holders of existing shares, attach to the shares respectively as preferential, deferred, qualified or special rights, privileges, conditions or such restrictions which in the absence of any such determination in general meeting may be determined by our directors.

We may, by special resolution, subject to any confirmation or consent required by the Companies Law, reduce our share capital or any capital redemption reserve in any manner authorized by law.

**Transfer of Shares**

Subject to any applicable restrictions set forth in our amended and restated memorandum and articles of association, any of our shareholders may transfer all or any of his or her shares by an instrument of transfer in the usual or common form or in a form prescribed by the Nasdaq Global Market or in any other form which our directors may approve.

Our directors may decline to register any transfer of any share which is not paid up or on which we have a lien. Our directors may also decline to register any transfer of any share unless:

- the instrument of transfer is lodged with us accompanied by the certificate for the shares to which it relates and such other evidence as our directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of share;

- the instrument of transfer is properly stamped (in circumstances where stamping is required);

- in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four; and

- a fee of such maximum sum as the Nasdaq Global Market may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer, they shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, on notice being given by advertisement in such one or more newspapers or by any other means in accordance with the requirements of the Nasdaq Global Market, be suspended and the register closed at such times and for such periods as our directors may from time to time determine; provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year as our directors may determine.

**Share Repurchase**

We are empowered by the Companies Law and our amended and restated memorandum and articles of association to purchase our own shares, subject to certain restrictions. Our directors may only exercise this power on our behalf, subject to the Companies Law, our amended and restated memorandum and articles of association and to any applicable requirements imposed from time to time by the U.S. Securities and Exchange Commission, the Nasdaq Global Market, or by any recognized stock exchange on which our securities are listed.

**Table of Contents**

**Dividends**

Subject to the Companies Law, we may declare dividends in any currency to be paid to our shareholders but no dividend shall be declared in excess of the amount recommended by our directors. Dividends may be declared and paid out of our profits, realized or unrealized, or from any reserve set aside from profits which our directors determine is no longer needed. Our board of directors may also declare and pay dividends out of the share premium account or any other fund or account which can be authorized for this purpose in accordance with the Companies Law.

Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provides (1) all dividends shall be declared and paid according to the amounts paid up on the shares in respect of which the dividend is paid, but no amount paid up on a share in advance of calls shall be treated for this purpose as paid up on that share and (2) all dividends shall be apportioned and paid pro rata according to the amounts paid upon the shares during any portion or portions of the period in respect of which the dividend is paid.

Our directors may also pay any dividend that is payable on any shares semi–annually or on any other dates, whenever our financial position, in the opinion of our directors, justifies such payment.

Our directors may deduct from any dividend or other moneys payable to any shareholder all sums of money (if any) presently payable by such shareholder to us on account of calls, installments or otherwise.

No dividend or other money payable by us on or in respect of any share shall bear interest against us.

In respect of any dividend proposed to be paid or declared on our share capital, our directors may resolve and direct that (1) such dividend be satisfied wholly or in part in the form of an allotment of shares credited as fully paid up, provided that our shareholders entitled thereto will be entitled to elect to receive such dividend (or part thereof if our directors so determine) in cash in lieu of such allotment or (2) the shareholders entitled to such dividend will be entitled to elect to receive an allotment of shares credited as fully paid up in lieu of the whole or such part of the dividend as our directors may think fit. We may also, on the recommendation of our directors, resolve in respect of any particular dividend that, notwithstanding the foregoing, it may be satisfied wholly in the form of an allotment of shares credited as fully paid up without offering any right of shareholders to elect to receive such dividend in cash in lieu of such allotment.

Any dividend, interest or other sum payable in cash to the holder of shares may be paid by check or warrant sent by mail addressed to the holder at his registered address, or addressed to such person and at such addresses as the holder may direct. Every check or warrant shall, unless the holder or joint holders otherwise direct, be made payable to the order of the holder or, in the case of joint holders, to the order of the holder whose name stands first on the register in respect of such shares, and shall be sent at his or their risk and payment of the check or warrant by the bank on which it is drawn shall constitute a good discharge to us.

All dividends unclaimed for one year after having been declared may be invested or otherwise made use of by our board of directors for the benefit of our company until claimed. Any dividend unclaimed after a period of six years from the date of declaration of such dividend may be forfeited and, if so forfeited, shall revert to us.

Whenever our directors or our shareholders in general meeting have resolved that a dividend be paid or declared, our directors may further resolve that such dividend be satisfied wholly or in part by the distribution of specific assets of any kind, and in particular of paid up shares, debentures or warrants to subscribe for our securities or securities of any other company. Where any difficulty arises with regard to such distribution, our directors may settle it as they think expedient. In particular, our directors may issue fractional certificates, ignore fractions altogether or round the same up or down, fix the value for distribution purposes of any such specific assets, determine that cash payments shall be made to any of our shareholders upon the footing of the value so fixed in order to adjust the rights of the parties, vest any such specific assets in trustees as may seem expedient to our directors, and appoint any person to sign any requisite instruments of transfer and other documents on behalf of a person entitled to the dividend, which appointment shall be effective and binding on our shareholders.

134

Table of Contents

**Untraceable Shareholders**

We are entitled to sell any shares of a shareholder who is untraceable, provided that:

1. all checks or warrants in respect of dividends of such shares, not being less than three in number, for any sums payable in cash to the holder of such shares have remained uncashed for a period of twelve years prior to the publication of the advertisement and during the three months referred to in paragraph (3) below;

2. we have not during that time received any indication of the whereabouts or existence of the shareholder or person entitled to such shares by death, bankruptcy or operation of law; and

3. we have caused an advertisement to be published in newspapers in the manner stipulated by our amended and restated memorandum and articles of association, giving notice of our intention to sell these shares, and a period of three months has elapsed since such advertisement and the Nasdaq Global Market has been notified of such intention.

The net proceeds of any such sale shall belong to us, and when we receive these net proceeds we shall become indebted to the former shareholder for an amount equal to such net proceeds.

**Differences in Corporate Law**

The Companies Law is modeled after similar laws in the United Kingdom but does not follow recent changes in United Kingdom laws. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the United States.

*Mergers and Similar Arrangements.* Cayman Islands law does not provide for mergers as that expression is understood under United States corporate law. However, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement in question is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three–fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder would have the right to express to the court the view that the transaction should not be approved, the court can be expected to approve the arrangement if it satisfies itself that:

- the company is not proposing to act illegally or ultra vires and the statutory provisions as to majority vote have been complied with;

- the shareholders have been fairly represented at the meeting in question;

- the arrangement is such as a businessman would reasonably approve; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law or that would amount to a "fraud on the minority".

When a takeover offer is made and accepted by holders of 90.0% of the shares within four months, the offerer may, within a two–month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection may be made to the Grand Court of the Cayman Islands but is unlikely to succeed unless there is evidence of fraud, bad faith or collusion.

If the arrangement and reconstruction are thus approved, any dissenting shareholders would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of United States corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

*Shareholders' Suits.* We are not aware of any reported class action or derivative action having been brought in a Cayman Islands court. In principle, we will normally be the proper plaintiff and a derivative action may not be

135

Table of Contents

brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of its authority, could be effected duly if authorized by more than a simple majority vote which has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority".

*Corporate Governance.*  Cayman Islands laws do not restrict transactions with directors, requiring only that directors exercise a duty of care and owe a fiduciary duty to the companies for which they serve. Under our amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of The Nasdaq Global Market or unless disqualified by the chairman of the relevant board meeting, so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested and may be counted in the quorum at such meeting.

## Board of Directors

We are managed by our board of directors. Our amended and restated memorandum and articles of association provide that the number of our directors will be fixed from time to time exclusively pursuant to an ordinary resolution adopted by our members, but must consist of not less than three directors. We have set our board of directors to have not less than three directors and not more than twelve directors. Any director on our board may be removed by way of an ordinary resolution of shareholders. Any vacancies on our board of directors or additions to the existing board of directors can be filled by way of an ordinary resolution of shareholders or by the affirmative vote of a simple majority of the remaining directors, although this may be less than a quorum where the number of remaining directors falls below the minimum fixed by our board of directors. Any director so appointed by the board of directors shall hold office only until the next following annual general meeting of the Company and shall then be eligible for re–election. Our directors shall serve a 3 year term from their appointment date and shall retire from office (unless he vacates his office sooner) at the expiry of such term provided their successors are elected or appointed. Such directors who retire at the expiry of their term are eligible for re–election. Our directors are not required to hold any of our shares to be qualified to serve on our board of directors.

Meetings of our board of directors may be convened at any time deemed necessary by our secretary on request of a director or by any director.

A meeting of our board of directors shall be competent to make lawful and binding decisions if at least three of the members of our board of directors are present or represented unless the board has fixed any other number. At any meeting of our directors, each director is entitled to one vote.

Questions arising at a meeting of our board of directors are required to be decided by simple majority votes of the members of our board of directors present or represented at the meeting. In the case of a tie vote, the chairman of the meeting shall have a second or deciding vote. Our board of directors may also pass resolutions without a meeting by unanimous written consent.

Certain actions require the approval of a supermajority of at least two–thirds of our board of directors, including:

- the appointment or removal of our chief executive officer, chief financial officer and other executive officers of the Company;

- any anti–takeover action in response to a takeover attempt;

- the establishment of any joint venture requiring a capital contribution from us in excess of $1,000,000;

- our acquisition of any company for aggregate consideration in excess of the equivalent of $10,000,000;

- any material change to our business scope;

136

Table of Contents

- any merger resulting in our shareholders immediately prior to such merger holding less than a majority of the voting power of the outstanding share capital of the surviving business entity;

- the sale or transfer of all or substantially all of our assets;

- any change in our dividend policy or the declaration or payment of a dividend or other distribution by us other than a distribution or dividend to us, our subsidiaries or our consolidated affiliated entities; or

- the settlement by us of any litigation in excess of $250,000.

**Committees of Board Of Directors**

Pursuant to our amended and restated articles of association, our board of directors has established an audit committee, a compensation committee and a nominations committee.

**Issuance of Additional Ordinary Shares or Preference Shares**

Our amended and restated memorandum of association authorizes our board of directors to issue additional ordinary shares from time to time as our board of directors shall determine, to the extent of available authorized but unissued shares.

Our amended and restated memorandum of association authorizes our board of directors to establish from time to time one or more series of preference shares and to determine, with respect to any series of preference shares, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the dividend rights, dividend rates, conversion rights, voting rights; and

- the rights and terms of redemption and liquidation preferences.

Our board of directors may issue series of preference shares without action by our shareholders to the extent authorized but unissued. Accordingly, the issuance of preference shares may adversely affect the rights of the holders of the ordinary shares. In addition, the issuance of preference shares may be used as an anti–takeover device without further action on the part of the shareholders. Issuance of preference shares may dilute the voting power of holders of ordinary shares.

Subject to applicable regulatory requirements, our board of directors may issue additional ordinary shares without action by our shareholders to the extent of available authorized but unissued shares. The issuance of additional ordinary shares may be used as an anti–takeover device without further action on the part of the shareholders. Such issuance may dilute the voting power of existing holders of ordinary shares.

**Registration Rights**

See "Shares Eligible for Future Sale".

**Inspection of Books and Records**

Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements. See "Where You Can Find Additional Information".

Table of Contents

### DESCRIPTION OF AMERICAN DEPOSITARY SHARES

**American Depositary Shares**

Citibank, N.A. is the depositary bank for the American Depositary Shares. Citibank's depositary offices are located at 388 Greenwich Street, New York, New York 10013. American Depositary Shares are frequently referred to as "ADSs" and represent ownership interests in securities that are on deposit with the depositary bank. ADSs may be represented by certificates that are commonly known as "American Depositary Receipts" or "ADRs". The depositary bank typically appoints a custodian to safekeep the securities on deposit. In this case, the custodian is Citibank Hong Kong, located at 10/F, Harbour Front (II), 22,Tak Fung Street, Hung Hom, Kowloon, Hong Kong.

We appointed Citibank as depositary bank pursuant to a deposit agreement dated as of July 18, 2005, as amended and restated by the amended and restated deposit agreement, dated as of April 9, 2007. A copy of the form of amended and restated deposit agreement (the "deposit agreement") is on file with the SEC under cover of a Registration Statement on Form F–6 (File No. 333–141820). You may obtain a copy of the deposit agreement from the SEC's Public Reference Room at Headquarters Office, 100 F Street, N.E., Room 1580, Washington, D.C. 20549 and from the SEC's website (http://www.sec.gov). Please refer to Registration Number 333–141820 when retrieving such copy.

We are providing you with a summary description of the material terms of the ADSs and of your material rights as an owner of ADSs. Please remember that summaries by their nature lack the precision of the information summarized and that a holder's rights and obligations as an owner of ADSs will be determined by reference to the terms of the deposit agreement and not by this summary. We urge you to review the deposit agreement in its entirety.

Each ADS represents the right to receive five ordinary shares on deposit with the custodian. An ADS will also represent the right to receive any other property received by the depositary bank or the custodian on behalf of the owner of the ADS but that has not been distributed to the owners of ADSs because of legal restrictions or practical considerations.

If you become an owner of ADSs, you will become a party to the deposit agreement and therefore will be bound to its terms and to the terms of the ADR that represents your ADSs. The deposit agreement and the ADR specify our rights and obligations as well as your rights and obligations as owner of ADSs and those of the depositary bank. As an ADS holder you appoint the depositary bank to act on your behalf in certain circumstances. The deposit agreement and the ADRs are governed by New York law. However, our obligations to the holders of ordinary shares will continue to be governed by the laws of the Cayman Islands which may be different from the laws in the United States.

In addition, applicable laws and regulations may require you to satisfy reporting requirements and obtain regulatory approvals in certain circumstances. You are solely responsible for complying with such reporting requirements and obtaining such approvals. Neither the depositary, the custodian, us or any of their or our respective agents or affiliates shall be required to take any actions whatsoever on behalf of you to satisfy such reporting requirements or obtain such regulatory approvals under applicable laws and regulations.

As an owner of ADSs, you may hold your ADSs either by means of an ADR registered in your name, through a brokerage or safekeeping account, or through an account established by the depositary bank in your name reflecting the registration of uncertificated ADSs directly on the books of the depositary bank (commonly referred to as the "direct registration system" or "DRS"). The direct registration system reflects the uncertificated (book–entry) registration of ownership of ADSs by the depositary bank. Under the direct registration system, ownership of ADSs is evidenced by periodic statements issued by the depositary bank to the holders of the ADSs. The direct registration system includes automated transfers between the depositary bank and The Depository Trust Company ("DTC"), the central book–entry clearing and settlement system for equity securities in the United States. If you decide to hold your ADSs through your brokerage or safekeeping account, you must rely on the procedures of your broker or bank to assert your rights as ADS owner. Banks and brokers typically hold securities such as the ADSs through clearing and settlement systems such as DTC. The procedures of such clearing and settlement systems may limit your ability to exercise your rights as an owner of ADSs. Please consult with your broker or bank if you have any questions concerning these limitations and procedures. This summary description assumes you have opted to own the ADSs

138

Table of Contents

directly by means of an ADS registered in your name and, as such, we will refer to you as the "holder". When we refer to "you," we assume the reader owns ADSs and will own ADSs at the relevant time.

**Dividends and Distributions**

As a holder, you generally have the right to receive the distributions we make on the securities deposited with the custodian bank. Your receipt of these distributions may be limited, however, by practical considerations and legal limitations. Holders will receive such distributions under the terms of the deposit agreement in proportion to the number of ADSs held as of a specified record date.

**Distributions of Cash**

Whenever we make a cash distribution for the securities on deposit with the custodian, we will deposit the funds with the custodian. Upon receipt of confirmation of the deposit of the requisite funds, the depositary bank will arrange for the funds to be converted into U.S. dollars and for the distribution of the U.S. dollars to the holders, subject to the laws of the Cayman Islands and regulations.

The conversion into U.S. dollars will take place only if practicable and if the U.S. dollars are transferable to the United States. The amounts distributed to holders will be net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. The depositary will apply the same method for distributing the proceeds of the sale of any property (such as undistributed rights) held by the custodian in respect of securities on deposit.

The distribution of cash will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement.

**Distributions of Shares**

Whenever we make a free distribution of ordinary shares for the securities on deposit with the custodian, we will deposit the applicable number of shares with the custodian. Upon receipt of confirmation of such deposit, the depositary bank will *either* distribute to holders new ADSs representing the ordinary shares deposited *or* modify the ADS−to−ordinary shares ratio, in which case each ADS you hold will represent rights and interests in the additional shares so deposited. Only whole new ADSs will be distributed. Fractional entitlements will be sold and the proceeds of such sale will be distributed as in the case of a cash distribution.

The distribution of new ADSs or the modification of the ADS−to−shares ratio upon a distribution of shares will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes or governmental charges, the depositary bank may sell all or a portion of the new shares so distributed.

No such distribution of new ADSs will be made if it would violate a law (i.e., the U.S. securities laws) or if it is not operationally practicable. If the depositary bank does not distribute new ADSs as described above, it may sell the ordinary shares received upon the terms described in the deposit agreement and will distribute the proceeds of the sale as in the case of a distribution of cash.

**Distributions of Rights**

Whenever we intend to distribute rights to purchase additional ordinary shares, we will give prior notice to the depositary bank and we will assist the depositary bank in determining whether it is lawful and reasonably practicable to distribute rights to purchase additional ADSs to holders.

The depositary bank will establish procedures to distribute rights to purchase additional ADSs to holders and to enable such holders to exercise such rights if it is lawful and reasonably practicable to make the rights available to holders of ADSs, and if we provide all of the documentation contemplated in the deposit agreement (such as opinions to address the lawfulness of the transaction). You may have to pay fees, expenses, taxes and other governmental charges to subscribe for the new ADSs upon the exercise of your rights. The depositary bank is not

139

Table of Contents

obligated to establish procedures to facilitate the distribution and exercise by holders of rights to purchase new ordinary shares other than in the form of ADSs.

The depositary bank will *not* distribute the rights to you if:

- We do not timely request that the rights be distributed to you or we request that the rights not be distributed to you; or

- We fail to deliver satisfactory documents to the depositary bank; or

- It is not reasonably practicable to distribute the rights.

The depositary bank will sell the rights that are not exercised or not distributed if such sale is lawful and reasonably practicable. The proceeds of such sale will be distributed to holders as in the case of a cash distribution. If the depositary bank is unable to sell the rights, it will allow the rights to lapse.

**Elective Distributions**

Whenever we intend to distribute a dividend payable at the election of shareholders either in cash or in additional shares, we will give prior notice thereof to the depositary bank and will indicate whether we wish the elective distribution to be made available to you. In such case, we will assist the depositary bank in determining whether such distribution is lawful and reasonably practicable.

The depositary bank will make the election available to you only if it is reasonably practical and if we have provided all of the documentation contemplated in the deposit agreement. In such case, the depositary bank will establish procedures to enable you to elect to receive either cash or additional ADSs, in each case as described in the deposit agreement.

If the election is not made available to you, you will receive either cash or additional ADSs, depending on what a shareholder in the Cayman Islands would receive upon failing to make an election, as more fully described in the deposit agreement.

**Other Distributions**

Whenever we intend to distribute property other than cash, ordinary shares or rights to purchase additional ordinary shares, we will notify the depositary bank in advance and will indicate whether we wish such distribution to be made to you. If so, we will assist the depositary bank in determining whether such distribution to holders is lawful and reasonably practicable.

If it is reasonably practicable to distribute such property to you and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will distribute the property to the holders in a manner it deems practicable.

The distribution will be made net of fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes and governmental charges, the depositary bank may sell all or a portion of the property received.

The depositary bank will *not* distribute the property to you and will sell the property if:

- We do not request that the property be distributed to you or if we ask that the property not be distributed to you; or

- We do not deliver satisfactory documents to the depositary bank; or

- The depositary bank determines that all or a portion of the distribution to you is not reasonably practicable.

The proceeds of such sale will be distributed to holders as in the case of a cash distribution.

140

Table of Contents

**Redemption**

Whenever we decide to redeem any of the securities on deposit with the custodian, we will notify the depositary bank. If it is reasonably practicable and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will mail notice of the redemption to the holders.

The custodian will be instructed to surrender the shares being redeemed against payment of the applicable redemption price. The depositary bank will convert the redemption funds received into U.S. dollars upon the terms of the deposit agreement and will establish procedures to enable holders to receive the net proceeds from the redemption upon surrender of their ADSs to the depositary bank. You may have to pay fees, expenses, taxes and other governmental charges upon the redemption of your ADSs. If less than all ADSs are being redeemed, the ADSs to be retired will be selected by lot or on a *pro rata* basis, as the depositary bank may determine.

**Changes Affecting Shares**

The ordinary shares held on deposit for your ADSs may change from time to time. For example, there may be a change in nominal or par value, a split–up, cancellation, consolidation or reclassification of such shares or a recapitalization, reorganization, merger, consolidation or sale of assets.

If any such change were to occur, your ADSs would, to the extent permitted by law, represent the right to receive the property received or exchanged in respect of the ordinary shares held on deposit. The depositary bank may in such circumstances deliver new ADSs to you or call for the exchange of your existing ADSs for new ADSs. If the depositary bank may not lawfully distribute such property to you, the depositary bank may sell such property and distribute the net proceeds to you as in the case of a cash distribution.

**Issuance Of ADSs Upon Deposit of Ordinary Shares**

The depositary bank may create ADSs on your behalf if you or your broker deposit ordinary shares with the custodian. The depositary bank will deliver these ADSs to the person you indicate only after you pay any applicable issuance fees and any charges and taxes payable for the transfer of the ordinary shares to the custodian. Your ability to deposit ordinary shares and receive ADSs may be limited by U.S. and legal considerations in the Cayman Islands applicable at the time of deposit.

The issuance of ADSs may be delayed until the depositary bank or the custodian receives confirmation that all required approvals have been given and that the ordinary shares have been duly transferred to the custodian. The depositary bank will only issue ADSs in whole numbers.

When you make a deposit of ordinary shares, you will be responsible for transferring good and valid title to the depositary bank. As such, you will be deemed to represent and warrant that:

• The ordinary shares are duly authorized, validly issued, fully paid, non–assessable and legally obtained.

• All preemptive (and similar) rights, if any, with respect to such ordinary shares have been validly waived or exercised.

• You are duly authorized to deposit the ordinary shares.

• The ordinary shares presented for deposit are free and clear of any lien, encumbrance, security interest, charge, mortgage or adverse claim, and are not, and the ADSs issuable upon such deposit will not be, "restricted securities" (as defined in the deposit agreement).

• The shares presented for deposit have not been stripped of any rights or entitlements.

If any of the representations or warranties are incorrect in any way, we and the depositary bank may, at your cost and expense, take any and all actions necessary to correct the consequences of the misrepresentations.

141

**Table of Contents**

**Transfer, Combination And Split Up Of ADRs**

As an ADR holder, you will be entitled to transfer, combine or split up your ADRs and the ADSs evidenced thereby. For transfers of ADRs, you will have to surrender the ADRs to be transferred to the depositary bank and also must:

- Ensure that the surrendered ADR certificate is properly endorsed or otherwise in proper form for transfer;

- Provide such proof of identity and genuineness of signatures as the depositary bank deems appropriate;

- Provide any transfer stamps required by the State of New York or the United States; and

- Pay all applicable fees, charges, expenses, taxes and other government charges payable by ADR holders pursuant to the terms of the deposit agreement, upon the transfer of ADRs.

To have your ADRs either combined or split up, you must surrender the ADRs in question to the depositary bank with your request to have them combined or split up, and you must pay all applicable fees, charges and expenses payable by ADR holders, pursuant to the terms of the deposit agreement, upon a combination or split up of ADRs.

**Withdrawal of Shares upon Cancellation of ADSs**

As a holder, you will be entitled to present your ADSs to the depositary bank for cancellation and then receive the corresponding number of underlying ordinary shares at the custodian's offices. Your ability to withdraw the ordinary shares may be limited by U.S. and legal considerations applicable at the time of withdrawal. In order to withdraw the ordinary shares represented by your ADSs, you will be required to pay to the depositary the fees for cancellation of ADSs and any charges and taxes payable upon the transfer of the ordinary shares being withdrawn. You assume the risk for delivery of all funds and securities upon withdrawal. Once canceled, the ADSs will not have any rights under the deposit agreement.

If you hold ADSs registered in your name, the depositary bank may ask you to provide proof of identity and genuineness of any signature and such other documents as the depositary bank may deem appropriate before it will cancel your ADSs. The withdrawal of the shares represented by your ADSs may be delayed until the depositary bank receives satisfactory evidence of compliance with all applicable laws and regulations. Please keep in mind that the depositary bank will only accept ADSs for cancellation that represent a whole number of securities on deposit.

You will have the right to withdraw the securities represented by your ADSs at any time except for:

- Temporary delays that may arise because (i) the transfer books for the ordinary shares or ADSs are closed, or (ii) ordinary shares are immobilized on account of a shareholders' meeting or a payment of dividends.

- Obligations to pay fees, taxes and similar charges.

- Restrictions imposed because of laws or regulations applicable to ADSs or the withdrawal of securities on deposit.

The deposit agreement may not be modified to impair your right to withdraw the securities represented by your ADSs except to comply with mandatory provisions of law.

**Voting Rights**

As a holder, you generally have the right under the deposit agreement to instruct the depositary bank to exercise the voting rights for the ordinary shares represented by your ADSs. The voting rights of holders of ordinary shares are described in "Description of Share Capital — Voting Rights Attaching to the Shares" above.

At our request, the depositary bank will distribute to you any notice of shareholders' meeting received from us together with information explaining how to instruct the depositary bank to exercise the voting rights of the securities represented by ADSs.

If the depositary bank timely receives voting instructions from a holder of ADSs, it will endeavor to vote the securities represented by the holder's ADSs in accordance with such voting instructions.

142

Table of Contents

In the event of voting by a show of hands, each shareholder has one vote irrespective of the number of shares held by such person and the depositary shall vote or cause the custodian to vote all the shares then on deposit in accordance with instructions received from a majority of holders giving voting instructions. In the event of poll voting, each shareholder has an amount of votes equal to the number of shares held as of record date for the meeting and the depositary shall vote or cause the custodian to vote the shares on deposit in respect of ADSs for which holder of ADSs have timely given voting instructions to the depositary.

If the depositary timely receives voting instructions from a holder of ADSs that fail to specify the manner in which the depositary is to vote the shares represented by that holder's ADSs, the depositary will deem the holder to have voted in favor of the items set forth in the voting instructions. If the depositary does not timely receive voting instructions from a holder of ADSs and we have timely provided the depositary with our notice of meeting and related materials, that holder will be deemed, and the depositary will deem that holder to have instructed the depositary to give a discretionary proxy to a person designated by us to vote the shares represented by the ADSs at our discretion, unless:

- we have failed to timely provide the depositary with our notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- voting at the meeting is made on a show of hands.

Please note that the ability of the depositary bank to carry out voting instructions may be limited by practical and legal limitations and the terms of the securities on deposit. We cannot assure you that you will receive voting materials in time to enable you to return voting instructions to the depositary bank in a timely manner. Securities for which no voting instructions have been received will not be voted.

### Fees and Charges

As an ADS holder, you will be required to pay the following service fees to the depositary bank:

| Service | Fees |
|---|---|
| Issuance of ADSs | Up to U.S. 5¢ per ADS issued |
| Cancellation of ADSs | Up to U.S. 5¢ per ADS canceled |
| Distribution of cash dividends or other cash distributions | Up to U.S. 2¢ per ADS held |
| Distribution of ADSs pursuant to share dividends, free share distributions or exercise of rights | Up to U.S. 5¢ per ADS issued |
| Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to U.S. 5¢ per share (or share equivalent) distributed |
| Annual Depositary Services Fee | Annually up to U.S. 2¢ per ADS held at the end of each calendar year, except to the extent of any cash dividend fee(s) charged during such calendar year |
| Transfer of ADRs | U.S. $1.50 per certificate presented for transfer |

As an ADS holder you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges such as:

- Fees for the transfer and registration of ordinary shares charged by the registrar and transfer agent for the ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of ordinary shares).

- Expenses incurred for converting foreign currency into U.S. dollars.

- Expenses for cable, telex and fax transmissions and for delivery of securities.

143

**Table of Contents**

- Taxes and duties upon the transfer of securities (i.e., when ordinary shares are deposited or withdrawn from deposit).

- Fees and expenses incurred in connection with the delivery or servicing of ordinary shares on deposit.

We have agreed to pay certain other charges and expenses of the depositary bank. Note that the fees and charges you may be required to pay may *vary* over time and may be changed by us and by the depositary bank. You will receive prior notice of such changes.

**Amendments and Termination**

We may agree with the depositary bank to modify the deposit agreement at any time without your consent. We undertake to give holders 30 days' prior notice of any modifications that would materially prejudice any of their substantial rights under the deposit agreement. We will not consider to be materially prejudicial to your substantial rights any modifications or supplements that are reasonably necessary for the ADSs to be registered under the Securities Act or to be eligible for book–entry settlement, in each case without imposing or increasing the fees and charges you are required to pay. In addition, we may not be able to provide you with prior notice of any modifications or supplements that are required to accommodate compliance with applicable provisions of law.

You will be bound by the modifications to the deposit agreement if you continue to hold your ADSs after the modifications to the deposit agreement become effective. The deposit agreement cannot be amended to prevent you from withdrawing the ordinary shares represented by your ADSs (except as permitted by law).

We have the right to direct the depositary bank to terminate the deposit agreement. Similarly, the depositary bank may in certain circumstances on its own initiative terminate the deposit agreement. In either case, the depositary bank must give notice to the holders at least 30 days before termination.

Upon termination, the following will occur under the deposit agreement:

- *for a period of six months after termination,* you will be able to request the cancellation of your ADSs and the withdrawal of the ordinary shares represented by your ADSs and the delivery of all other property held by the depositary bank in respect of those ordinary shares on the same terms as prior to the termination. During such six–month period, the depositary bank will continue to collect all distributions received on the ordinary shares on deposit (i.e., dividends) but will not distribute any such property to you until you request the cancellation of your ADSs.

- *After the expiration of such six–month period,* the depositary bank may sell the securities held on deposit. The depositary bank will hold the proceeds from such sale and any other funds then held for the holders of ADSs in a non–interest bearing account. At that point, the depositary bank will have no further obligations to holders other than to account for the funds then held for the holders of ADSs still outstanding.

**Books of Depositary**

The depositary bank will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the ADSs and the deposit agreement.

The depositary bank will maintain in New York facilities to record and process the issuance, cancellation, combination, split–up and transfer of ADRs. These facilities may be closed from time to time, to the extent not prohibited by law.

**Limitations on Obligations and Liabilities**

The deposit agreement limits our obligations and the depositary bank's obligations to you. Please note the following:

- We and the depositary bank are obligated only to take the actions specifically stated in the deposit agreement without negligence or bad faith.

144

Table of Contents

- The depositary bank disclaims any liability for any failure to carry out voting instructions, for any manner in which a vote is cast or for the effect of any vote, provided that it acts in good faith and in accordance with the terms of the deposit agreement.

- The depositary bank disclaims any liability for any failure to determine the lawfulness or practicality of any action, for the content of any document forwarded to you on our behalf or for the accuracy of any translation of such a document, for the investment risks associated with investing in ordinary shares, for the validity or worth of the ordinary shares, for any tax consequences that result from the ownership of ADSs, for the credit–worthiness of any third party, for allowing any rights to lapse under the terms of the deposit agreement, for the timeliness of any of our notices or for our failure to give notice.

- We and the depositary bank will not be obligated to perform any act that is inconsistent with the terms of the deposit agreement.

- We and the depositary bank disclaim any liability if we are prevented or forbidden from acting on account of any law or regulation, any provision of our amended and restated memorandum and articles of association, any provision of any securities on deposit or by reason of any act of God or war or other circumstances beyond our control.

- We and the depositary bank disclaim any liability by reason of any exercise of, or failure to exercise, any discretion provided for in the deposit agreement or in our amended and restated memorandum and articles of association or in any provisions of securities on deposit.

- We and the depositary bank further disclaim any liability for any action or inaction in reliance on the advice or information received from legal counsel, accountants, any person presenting shares for deposit, any holder of ADSs or authorized representatives thereof, or any other person believed by either of us in good faith to be competent to give such advice or information.

- We and the depositary bank also disclaim liability for the inability by a holder to benefit from any distribution, offering, right or other benefit which is made available to holders of ordinary shares but is not, under the terms of the deposit agreement, made available to you.

- We and the depositary bank may rely without any liability upon any written notice, request or other document believed to be genuine and to have been signed or presented by the proper parties.

- We and the depositary bank also disclaim liability for any consequential or punitive damages for any breach of the terms of the deposit agreement.

**Pre–release Transactions**

The depositary bank may, in certain circumstances, issue ADSs before receiving a deposit of ordinary shares or release ordinary shares before receiving ADSs for cancellation. These transactions are commonly referred to as "pre–release transactions". The deposit agreement limits the aggregate size of pre–release transactions and imposes a number of conditions on such transactions (i.e., the need to fully collateralize, the type of collateral required, the representations required from brokers, etc.). The depositary bank may retain the compensation received from the pre–release transactions.

**Taxes**

You will be responsible for the taxes and other governmental charges payable on the ADSs and the securities represented by the ADSs. We, the depositary bank and the custodian may deduct from any distribution the taxes and governmental charges payable by holders and may sell any and all property on deposit to pay the taxes and governmental charges payable by holders. You will be liable for any deficiency if the sale proceeds do not cover the taxes that are due.

The depositary bank may refuse to issue ADSs, to deliver, transfer, split and combine ADRs or to release securities on deposit until all taxes and charges are paid by the applicable holder. The depositary bank and the custodian may take reasonable administrative actions to obtain tax refunds and reduced tax withholding for any

Table of Contents

distributions on your behalf. However, you may be required to provide to the depositary bank and to the custodian proof of taxpayer status and residence and such other information as the depositary bank and the custodian may require to fulfill legal obligations. You are required to indemnify us, the depositary bank and the custodian for any claims with respect to taxes based on any tax benefit obtained for you.

**Foreign Currency Conversion**

The depositary bank will arrange for the conversion of all foreign currency received into U.S. dollars if such conversion is practical, and it will distribute the U.S. dollars in accordance with the terms of the deposit agreement. You may have to pay fees and expenses incurred in converting foreign currency, such as fees and expenses incurred in complying with currency exchange controls and other governmental requirements.

If the conversion of foreign currency is not practical or lawful, or if any required approvals are denied or not obtainable at a reasonable cost or within a reasonable period, the depositary bank may take the following actions in its discretion:

- Convert the foreign currency to the extent practical and lawful and distribute the U.S. dollars to the holders for whom the conversion and distribution is lawful and practical.

- Distribute the foreign currency to holders for whom the distribution is lawful and practical.

- Hold the foreign currency (without liability for interest) for the applicable holders.

146

**Table of Contents**

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this offering, we will have outstanding 111,930,414 ADSs representing approximately 87.02% of our ordinary shares assuming no exercise by the underwriters of their over–allotment option. All of the ADSs sold in this offering and the ordinary shares they represent will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs.

**Lock–up Agreements**

We have agreed with the underwriters that we will not, without the prior consent of Merrill Lynch, for a period of 90 days following the date of this prospectus:

- offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

- enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, our ordinary shares or such other securities, in cash or otherwise. The restrictions above do not apply to (1) the ADSs to be sold in this offering and the ordinary shares underlying such ADSs, (2) or the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 32.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of June 30, 2007.

The underwriters may release other securities held by us that are currently subject to lock–up, subject to applicable FINRA regulations. The underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would depend on a number of factors, which may include market conditions, the performance of our ADSs in the market and our financial condition at that time.

In connection with our acquisition of Allyes, the former Allyes shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition. Any additional shares they may receive upon payment of the earn–out payment, if any, will not be subject to lock–up. See "Our Recent Significant Acquisitions".

**Rule 144**

Under Rule 144 as currently in effect, beginning twelve months after the date of our most recently filed annual report a person who owns our restricted ordinary shares and who has beneficially owned those shares for at least one year is entitled to sell within any three–month period a number of shares, including ADSs representing such number of shares, that does not exceed the greater of the following:

- 1% of the number of our ordinary shares then outstanding, in the form of ADSs or otherwise, which will equal approximately 4 million shares immediately after this offering; and

- the average weekly trading volume of our ADSs on the Nasdaq Global Market during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

147

Table of Contents

Sales under Rule 144 are also subject to manner of sale provisions, notice requirements and the availability of current public information about us. Persons who are not our affiliates may be exempt from these restrictions under Rule 144(k) discussed below.

**Rule 144(k)**

Under Rule 144(k), a person who is not one of our affiliates at any time during the three months preceding a sale, and who has beneficially owned the shares, in the form of ADSs or otherwise, proposed to be sold for at least two years, including the holding period of any prior owner other than an affiliate, is entitled to sell those shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless otherwise restricted, "144(k) shares" may be sold at any time.

**Registration Rights**

Upon the closing of our acquisition of Allyes, we granted the former shareholders of Allyes registration rights with regard to the ordinary shares we issued to them. Under the terms of our agreement with the former Allyes shareholders:

- prior to September 18, 2009 or prior to the time when the shares proposed to be sold by the former Allyes shareholders may be sold in a 90–day period under Rule 144, any former Allyes shareholders or shareholders holding 3 million of our ordinary shares in aggregate may request that we effect the registration of the ordinary shares held by them, provided that if the offering is part of an underwritten offering, the expected proceeds from such an offering would not be less than 40 million; we are obligated to effect up to three such registrations; and

- one of the Allyes shareholders, Magic Elite, on a date at least 150 days and no more than 330 days following March 28, 2007, may request that we effect the registration of the ordinary shares held by the shareholder; we are obligated to effect only one such registration.

We are not obligated to take any action to effect any such registration more than once in any six month period or within six months of any other public offering we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement.

Registrable securities are ordinary shares issued or issuable to the former Allyes shareholders. We are not, however, obligated to effect any such demand registration:

- if we, within ten days of receipt of a request for such registration, give notice of our bona fide intention to effect the filing of a registration statement with the SEC (or any comparable regulatory agency for a registration in a jurisdiction other than the United States) within 60 days of receipt of such request (other than a registration of securities in a business combination transaction pursuant to Rule 145 under the Securities Act or an offering solely to employees);

- within six months immediately following the effective date of any registration statement pertaining to our securities (other than a registration in a transaction pursuant to Rule 145 under the Securities Act or with respect to an employee benefit plan); or

- if we furnish to the holders of registrable securities a certificate signed by our Chief Executive Officer stating that in the good faith judgment of our Board of Directors, it would be materially detrimental to us or our shareholders for a registration statement to be filed in the near future, in which event we have the right to defer the filing of the registration statement, no more than once during any 12 month period, for a period not to exceed 90 days from the receipt of the request to file such registration statement.

Holders of registrable securities also have "piggyback" registration rights, which may require us to register all or any part of the registrable securities then held by such holders when we register any of our ordinary shares other than a registration:

- relating solely to the sale of securities to participants in our share option plan;

- relating to a corporate reorganization or other transaction pursuant to Rule 145 under the Securities Act;

148

Table of Contents

- on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the registrable securities; and

If any of the offerings involves an underwriting, the managing underwriter of any such offering has certain rights to limit the number of shares included in such registration. However, the number of registrable securities included in an underwritten public offering subsequent to our initial public offering pursuant to "piggyback" registration rights may not be reduced to less than 30% of the aggregate securities included in such offering.

We are not obligated to register any registrable securities if, in the opinion of counsel retained by us concurred in by counsel for the holder of registrable securities, no registration under the Securities Act (or comparable law) is required in connection with the sale of the registrable securities to the public.

**Share Option Plan**

Since July 2003, when we first granted options to purchase our ordinary shares, we have granted in options to purchase in aggregate 76,110,615 of our ordinary shares. All of these ordinary shares are or will be eligible for sale in the public market from time to time, subject to vesting and exercise provisions of the options, Rule 144 volume limitations applicable to our affiliates and other holders of restricted shares and the lock–up agreements.

We filed a registration statement under the Securities Act covering a total of 44,251,830 ordinary shares reserved for issuance under our 2003 Plan and 2005 Plan on February 28, 2006. The ordinary shares registered under such registration statement, subject to the lockup agreements and Rule 144 volume limitations applicable to affiliates, are available for sale in the open market upon the exercise of vested options.

149

Table of Contents

# TAXATION

## Cayman Islands Taxation

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty or withholding tax applicable to us or to any holder of ADS, or ordinary shares. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. No stamp duty is payable in the Cayman Islands on transfers of shares of Cayman Islands companies except those which hold interests in land in the Cayman Islands. The Cayman Islands is not party to any double taxation treaties. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Pursuant to Section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, we have obtained an undertaking from the Governor–in–Council:

- (1) that no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciation shall apply to us or our operations; and

- (2) that the aforesaid tax or any tax in the nature of estate duty or inheritance tax shall not be payable on the shares, debentures or other obligations of the Company.

The undertaking for us is for a period of twenty years from May 3, 2005.

## People's Republic of China Taxation

Under the Income Tax Law for Enterprises with Foreign Investment and Foreign Enterprises currently in effect, any dividends payable by foreign–invested enterprises to non–PRC investors are exempt from any PRC withholding tax. In addition, under currently effective PRC laws, any dividends payable, or distributions made, by us to holders or beneficial owners of our ADSs will not be subject to any PRC tax, provided that such holders or beneficial owners are not deemed as PRC residents, including individuals and enterprises, under the PRC tax law and have not become subject to PRC tax.

On March 16, 2007, the National People's Congress approved and promulgated a new tax law named "Enterprise Income Tax Law of the PRC", or the EIT Law, which will take effect beginning January 1, 2008. Under the EIT Law, enterprises established under the laws of non–PRC jurisdictions but whose "de facto management body" is located in the PRC are considered "resident enterprises" for PRC tax purposes. The EIT Law does not define the term "de facto management" and it is currently unclear under which situation a non–PRC enterprise's "de facto management body" is considered to be located in the PRC. However, substantially all of our management is currently based in the PRC, and may remain in the PRC after the effectiveness of the EIT Law. If we are treated as a "resident enterprise" for PRC tax purposes, we will be subject to PRC income tax on our worldwide income at a uniform tax rate of 25%, which will include the dividend income we receive from our subsidiaries. In addition, although the EIT Law provides that dividend income between qualified "resident enterprises" is exempted income, it is unclear what is considered to be a qualified "resident enterprise" under the EIT Law.

Moreover, the EIT Law provides that an income tax rate of 20% will normally be applicable to dividends payable to non–PRC investors who are individuals or considered as "non–resident enterprise", to the extent such dividends are derived from sources within the PRC, although such income tax may be subsequently exempted or reduced by the State Council. We are a Cayman Islands holding company and substantially all of our income may be derived from dividends we receive from our operating subsidiaries located in the PRC. If we declare dividends from such income, it is unclear whether such dividends will be deemed to be derived from sources within the PRC under the EIT law and be subject to the 20% income tax.

In addition, under the EIT Law, foreign shareholders enterprise and enterprise ADSs holders may be subject to a 20% income tax upon any gains they relize from the transfer of their shares or ADSs, if such income is regarded as income from sources with the PRC. However, what will constitute as income from sources within the PRC and

150

Table of Contents

whether or not there will be any exemption or reduction in taxation for our foreign shareholders or ADS holders are still currently unclear.

**United States Federal Income Taxation**

    The following summary describes the material United States federal income tax consequences to U.S. Holders (defined below) under present law of an investment in the ADSs or ordinary shares. This summary applies only to investors that acquire their ADSs or ordinary shares in the offering, that hold the ADSs or ordinary shares as capital assets and that have the U.S. dollar as their functional currency. This discussion is based on the tax laws of the United States as in effect on the date of this Prospectus and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this prospectus, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax consequences described below.

    The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- certain financial institutions;

- insurance companies;

- a regulated investment company;

- a real estate investment trust;

- broker dealers;

- U.S. expatriates;

- traders that elect to mark to market;

- tax−exempt entities;

- persons liable for alternative minimum tax;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own 10.0% or more of our voting stock; or

- persons holding ADSs or ordinary shares through partnerships or other pass−through entities.

The discussion below of the U.S. federal income tax consequences to "U.S. Holders" will apply if you are a beneficial owner of ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- an individual citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized under the laws of the United States, any State thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If you are a partner in partnership or other entity taxable as a partnership that holds ADSs or ordinary shares, your tax treatment generally will depend on your status and the activities of the partnership.

    **PROSPECTIVE PURCHASERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE APPLICATION OF THE U.S. FEDERAL TAX RULES TO THEIR PARTICULAR**

Table of Contents

CIRCUMSTANCES AS WELL AS THE STATE AND LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF ADSs OR ORDINARY SHARES.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you should be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes. Exchanges of ordinary shares for ADSs and ADSs for ordinary shares generally will not be subject to U.S. federal income tax.

The U.S. Treasury has expressed concerns that intermediaries in the chain of ownership between the holder of an ADS and the issuer of the security underlying the ADS may be taking actions that are inconsistent with the claiming, by U.S. Holders of ADSs, of foreign tax credits for U.S. federal income tax purposes. Such actions would also be inconsistent with the claiming of the reduced rate of tax applicable to dividends received by certain non–corporate U.S. Holders, as described below. Accordingly, the analysis of the creditability of PRC taxes, if any, and the availability of the reduced tax rate for dividends received by certain non–corporate holders below could be affected by actions taken by intermediaries in the chain of ownership between the holder of an ADS and our company.

**Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares**

The gross amount of all our distributions to you with respect to the ADSs or ordinary shares generally will be included in your gross income as foreign source dividend income on the date of actual or constructive receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The dividends will not be eligible for the dividends–received deduction allowed to corporations in respect of dividends received from other U.S. corporations.

With respect to non–corporate U.S. Holders including individual U.S. Holders, for taxable years beginning before January 1, 2011, certain dividends received from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. U.S. Treasury Department guidance indicates that our ADSs, but not our ordinary shares, are readily tradable on an established securities market in the United States. Thus, we believe that dividends we pay on our ordinary shares that are represented by ADSs, but not on our Shares that are not so represented, currently meet such conditions required for the reduced tax rates. There can be no assurance that our ADSs will be considered readily tradable on an established securities market in later years. A qualified foreign corporation also includes a foreign corporation that is eligible for the benefits of certain income tax treaties with the United States. In the event that we are deemed to be a Chinese "resident enterprise" under the PRC tax law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC, and if we are eligible for such benefits, dividends we pay on our ordinary shares, regardless of whether such shares are represented by ADSs, would be subject to the reduced rates of taxation. See "— People's Republic of China Taxation." Non–corporate U.S. Holders that do not meet a minimum holding period requirement during which they are not protected from the risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. The rate reduction will also not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You are urged to consult your tax advisors regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

To the extent that the amount of the distribution exceeds our current and accumulated earnings and profits, it will be treated first as a tax–free return of your tax basis in your ADSs or ordinary shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain. We do not intend to calculate our earnings and profits under U.S. federal income tax principles. Therefore, a U.S. Holder should expect that a distribution will generally be treated as a dividend.

152

Table of Contents

In the event that we are deemed to be a Chinese "resident enterprise" under the PRC tax law, you may be subject to PRC withholding taxes on dividends paid to you with respect to the ADSs or ordinary shares. See discussion under "Taxation — People's Republic of China Taxation". In that case, however, you may be able to obtain a reduced rate of PRC withholding taxes under the treaty between the United States and the PRC if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends, if any, may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. The rules governing the foreign tax credit are complex. You are urged to consult your tax advisors regarding the availability of the foreign tax credit under your particular circumstances.

**Taxation of Disposition of ADSs or Ordinary Shares**

You will recognize taxable gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss generally will be capital gain or loss. If you are a non–corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes. However, in the event that gain from the disposition of the ADSs or ordinary shares may be taxed in the PRC (see discussion under "Taxation — People's Republic of China Taxation"), the gain would be treated as PRC–source income under the income tax treaty between the United States and the PRC. You are urged to consult your tax advisors regarding the tax consequences if a foreign tax is imposed on gain on a disposition of our ADSs or ordinary shares, including the availability of the foreign tax credit under your particular circumstances.

**Passive Foreign Investment Company**

We do not believe that we are, for U.S. federal income tax purposes, a passive foreign investment company (a "PFIC"), and we expect to operate in such a manner so as not to become a PFIC. If, however, we are or become a PFIC, you could be subject to additional U.S. federal income taxes on gain recognized with respect to the ADSs or ordinary shares and on certain distributions, plus an interest charge on certain taxes treated as having been deferred under the PFIC rules. Non–corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us for taxable years beginning before January 1, 2011, if we are a PFIC in the taxable year in which such dividends are paid or in the preceding taxable year.

**Information Reporting and Backup Withholding**

Dividend payments with respect to ADSs or ordinary shares and proceeds from the sale, exchange or redemption of ADSs or ordinary shares may be subject to information reporting to the Internal Revenue Service, unless you are an exempt recipient such as a corporation. A backup withholding tax may apply, however, backup withholding will not apply to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification or who is otherwise exempt from backup withholding. U.S. Holders who are required to establish their exempt status generally must provide such certification on Internal Revenue Service Form W–9. You are urged to consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the Internal Revenue Service and furnishing any required information.

153

**Table of Contents**

**UNDERWRITING**

Focus Media, the selling shareholders and the underwriters named below have entered into an underwriting agreement with respect to the ADSs being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of ADSs indicated in the following table. Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated are joint bookrunners. Citigroup Global Markets Inc.'s address is 388 Greenwich Street, New York, New York 10013. Credit Suisse Securities (USA) LLC's address is Eleven Madison Avenue, New York, New York 10010–3629. Merrill Lynch, Pierce, Fenner & Smith Incorporated's address is 4 World Financial Center, 250 Vesey Street, New York, New York 10080.

| Underwriters | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | |
| Credit Suisse Securities (USA) LLC | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| CIBC World Markets Corp. | |
| Piper Jaffray & Co. | |
| Total | |

The underwriters are committed to take and pay for all of the ADSs being offered, if any are taken, other than the ADSs covered by the option described below unless and until this option is exercised.

If the underwriters sell more ADSs than the total number set forth in the table above, the underwriters have an option to buy up to an additional 2,000,000 ADSs from us to cover such sales. They may exercise that option for 30 days. If any ADSs are purchased pursuant to this option, the underwriters will severally purchase ADSs in approximately the same proportion as set forth in the table above.

The following tables show the per ADS and total underwriting discounts and commissions to be paid to the underwriters by Focus Media and the selling shareholders. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase a total of 2,000,000 additional ADSs from us.

**Paid by Focus Media**

| | No Exercise | Full Exercise |
|---|---|---|
| Per ADS | $ | $ |
| Total | $ | $ |

**Paid by Selling Shareholders**

| | No Exercise | Full Exercise |
|---|---|---|
| Per ADS | $ | $ |
| Total | $ | $ |

Total underwriting discounts and commissions to be paid to the underwriters represent    % of the total amount of the offering.

ADSs sold by the underwriters to the public will initially be offered at the public offering price set forth on the cover of this prospectus. Any ADSs sold by the underwriters to securities dealers may be sold at a discount of up to $     per ADS from the public offering price. Any such securities dealers may resell any ADSs purchased from the underwriters to certain other brokers or dealers at a discount of up to $     per ADS from the public offering price. If all the ADSs are not sold at the public offering price, the representative may change the offering price and the other selling terms.

Total expenses for this offering are estimated to be approximately $2.4 million, including SEC registration fees of $28,946, FINRA filing fees of $75,500, printing fees of approximately $400,000, legal fees of approximately $500,000, accounting fees of approximately $800,000, roadshow costs and expenses of approximately

154

Table of Contents

$120,000, travel and other out–of–pocket expenses of approximately $20,000 and ADS issuance fees of approximately $440,000. All amounts are estimated except for the fees relating to the SEC registration and the FINRA filing. The underwriters have agreed to pay for the roadshow, printing, out–of–pocket expenses and filing fees for this offering.

Some of the underwriters are expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker–dealers registered with the SEC.

The underwriters have entered into an agreement in which they agree to restrictions on where and to whom they and any dealer purchasing from them may offer ADSs, as a part of the distribution of the ADSs. The underwriters also have agreed that they may sell ADSs among themselves.

Focus Media has agreed with the underwriters that it will not, without the prior consent of Merrill Lynch, for a period of 90 days following the date of this prospectus:

- offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or its ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

- enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of its ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, its ordinary shares or such other securities, in cash or otherwise.

The 90–day restricted period described in the preceding paragraph will be automatically extended if (1) during the last 17 days of the 90–day restricted period the company issues an earnings release or announces material news or a material event; or (2) prior to the expiration of the 90–day restricted period, the company announces, or if the representatives of the underwriters determine, that the company will release earnings results during the 15–day period following the last day of the 90–day period, in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18–day period beginning on the issuance of the earnings release of the announcement of the material news or material event. The restrictions applicable to Focus Media do not apply to (1) the ADSs to be sold in this offering, and the ordinary shares underlying such ADSs, (2) the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 32.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of June 30, 2007.

The lock–up period will be extended if, (i) during the final 17 days of the lock–up period, any earnings release or announcement of a material event or news or, (ii) prior to the expiry of a lock–up period, the Company announces that it will release earnings results during the 15–day period following the last day of the lock–up period. In each case the applicable lock–up period will be automatically extended until the expiration of the 18–day period beginning on the date of release of the earnings results or the announcement of the material news or material event, as applicable unless the representatives waive, in writing, such extension.

In connection with our acquisition of Allyes, the former Allyes shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition. Any additional shares they may receive upon payment of the earn–out payment, if any, will not be subject to lock–up.

The representatives of the underwriters may release the securities subject to the above restrictions at any time, subject to applicable FINRA regulations. The representatives of the underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would

155

**Table of Contents**

depend on a number of factors, which may include market conditions, the performance of Focus Media's ADSs in the market and Focus Media's financial condition at that time.

Our ADSs are listed for quotation on the Nasdaq Global Market under the symbol "FMCN".

In connection with the offering, the underwriters may purchase and sell ADSs in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of ADSs than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional ADSs from Focus Media and the selling shareholders. The underwriters may close out any covered short position by either exercising their option to purchase additional ADSs or purchasing ADSs in the open market. In determining the source of ADSs to close out the covered short position, the underwriters will consider, among other things, the price of ADSs available for purchase in the open market as compared to the price at which they may purchase additional ADSs pursuant to the option granted to them. "Naked" short sales are any sales in excess of such option. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for, or purchases of, ADSs made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased ADSs sold by, or for the account of, such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of the ADSs, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the ADSs. As a result, the price of the ADSs may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they are required to be conducted in accordance with applicable laws and regulations, and may be discontinued at any time. These transactions may be effected on the Nasdaq Global Market, in the over–the–counter market or otherwise.

**Selling restrictions**

No action has been taken in any jurisdiction (except in the United States) that would permit a public offering of the ADSs, or the possession, circulation or distribution of this prospectus or any other material relating to us or the ADSs in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither this prospectus nor any other offering material relating to the ADSs may be distributed or published, in or from any jurisdiction except under circumstances that will result in compliance with the applicable laws and regulations thereof.

*Cayman Islands*

This prospectus does not constitute an invitation or offer to the public in the Cayman Islands of the ADSs, whether by way of sale or subscription. The underwriters have not offered or sold, and will not offer or sell, directly or indirectly, any ADSs in the Cayman Islands.

*United Kingdom*

No offer of ADSs has been made or will be made to the public in the United Kingdom within the meaning of Section 102B of the Financial Services and Markets Act 2000, as amended, or FSMA, except to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by us of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority, or FSA. Each underwriter: (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial

Table of Contents

Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which Section 21 of FSMA does not apply to us; and (ii) has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the ADSs in, from or otherwise involving the United Kingdom.

### Hong Kong

The ADSs may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the ADSs may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to ADSs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

### Japan

The ADSs have not been and will not be registered under the Securities and Exchange Law of Japan, or the Securities and Exchange Law, and ADSs will not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re–offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to any exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

### Singapore

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the ADSs may not be circulated or distributed, nor may the ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

### European Economic Area

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive, which we refer to as a Relevant Member State, with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, which we refer to as the Relevant Implementation Date, no offer of ADSs has been made and or will be made to the public in that Relevant Member State prior to the publication of a prospectus in relation to the ADSs which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that, with effect from and including the Relevant Implementation Date, an offer of ADSs may be made to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than €43,000,000 and (iii) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or (c) in any other circumstances which do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive. For the purposes of this provision, the expression

Table of Contents

an "offer of ADSs to the public" in relation to any ADSs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the ADSs to be offered so as to enable an investor to decide to purchase or subscribe for the ADSs, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

No action may be taken in any jurisdiction other than the United States that would permit a public offering of the ADSs or the possession, circulation or distribution of this prospectus in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither the prospectus nor any other offering material or advertisements in connection with the ADSs may be distributed or published in or from any country or jurisdiction except under circumstances that will result in compliance with any applicable rules and regulations of any such country or jurisdiction.

A prospectus in electronic format will be made available on the websites maintained by the global coordinator or one or more securities dealers. The global coordinator may agree to allocate a number of ADSs for sale to their online brokerage account holders. ADSs to be sold pursuant to an Internet distribution will be allocated on the same basis as other allocations. In addition, ADSs may be sold by the underwriters to securities dealers who resell ADSs to online brokerage account holders.

Focus Media and the selling shareholders have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act.

This prospectus may be used by the underwriters and other dealers in connection with offers and sales of the ADSs, including the ADSs initially sold by the underwriters in the offering being made outside of the United States, to persons located in the United States.

Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking and other services for Focus Media or its officers and directors for which they have received customary fees and commissions.

The underwriters and their affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking and other services for Focus Media or its officers and directors for which they have received or will receive customary fees, commissions and expenses.

In addition, certain of the underwriters and/or their affiliates have purchased in the past, and the underwriters may continue to purchase in the future, advertising services from Focus Media on an arm's length basis and on market terms.

Contracts entered into with Focus Media by Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated and/or their affiliates for such sales aggregated to $1.2 million for 2006. The underwriters and/or their affiliates expect to spend approximately $4.88 million to purchase advertising services from Focus Media in 2007.

Table of Contents

## ENFORCEMENT OF CIVIL LIABILITIES

We are registered under the laws of the Cayman Islands as an exempted company with limited liability. We are registered in the Cayman Islands because of certain benefits associated with being a Cayman Islands corporation, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of foreign exchange control or currency restrictions and the availability of professional and support services. However, the Cayman Islands has a less developed body of securities laws as compared to the United States and provides protections for investors to a significantly lesser extent. In addition, Cayman Islands companies do not have standing to sue before the federal courts of the United States.

Substantially all of our assets are located outside the United States. In addition, a majority of our directors and officers and our special PRC counsel, Global Law Office are nationals or residents of jurisdictions other than the United States and all or a substantial portion of their assets are located outside the United States. As a result, it may be difficult for investors to effect service of process within the United States upon us or these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us, our officers and directors and Global Law Office.

We have appointed CT Corporation System as our agent to receive service of process with respect to any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States or of any state in the United States or any action brought against us in the Supreme Court of the State of New York in the County of New York under the securities laws of the State of New York.

Conyers Dill & Pearman, our counsel as to Cayman Islands law, and Global Law Office, our counsel as to PRC law, have advised us that there is uncertainty as to whether the courts of the Cayman Islands or the PRC would, respectively, (1) recognize or enforce judgments of United States courts obtained against us or our directors or officers or Global Law Office predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States, or (2) entertain original actions brought in the Cayman Islands or the PRC against us or our directors or officers or Global Law Office predicated upon the securities laws of the United States or any state in the United States.

Conyers Dill & Pearman have informed us that the uncertainty with regard to Cayman Islands law relates to whether a judgment obtained from the U.S. courts under civil liability provisions of the securities law will be determined by the courts of the Cayman Islands as penal or punitive in nature. The courts of the Cayman Islands will not recognize or enforce such judgments against a Cayman company, and because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands. Conyers Dill & Pearman, has further advised us that a final and conclusive judgment in the federal or state courts of the United States under which a sum of money is payable, other than a sum payable in respect of taxes, fines, penalties or similar charges, may be subject to enforcement proceedings as a debt in the courts of the Cayman Islands under the common law doctrine of obligation.

Global Law Office has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Global Law Office has advised us further that under PRC law, a foreign judgment, which does not otherwise violate basic legal principles, state sovereignty, safety or social public interest, may be recognized and enforced by a PRC court, based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. As there currently exists no treaty or other form of reciprocity between China and the United States governing the recognition of judgments, including those predicated upon the liability provisions of the U.S. federal securities laws, there is uncertainty whether and on what basis a PRC court would enforce judgments rendered by U.S. courts.

159

**Table of Contents**

**LEGAL MATTERS**

We are being represented by Simpson Thacher & Bartlett LLP with respect to legal matters of United States federal securities and New York State law. Certain legal matters in connection with this offering will be passed upon for the underwriters by Debevoise & Plimpton LLP. The validity of the ordinary shares represented by the ADSs offered in this offering and legal matters as to Cayman Islands law will be passed upon for us by Conyers Dill & Pearman. Legal matters as to PRC law will be passed upon for us by Global Law Office and for the underwriters by Commerce & Finance Law Offices. Conyers Dill & Pearman and Simpson Thacher & Bartlett LLP may rely upon Global Law Office with respect to matters governed by PRC law. Debevoise & Plimpton LLP may rely upon Commerce & Finance Law Offices with respect to matters governed by PRC law.

**EXPERTS**

Our consolidated financial statements and the related financial statements as of December 31, 2005 and 2006 and for each of the three years in the period ended December 31, 2004, 2005 and 2006 included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of and for the year ended December 31, 2006 for Allyes Information Technology Company Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of December 31, 2003, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005 for Infoachieve Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements of Target Media Holdings Limited as of December 31, 2004 and 2005 and for each of the years in the two–year period ended December 31, 2005 have been included in this registration statement in reliance upon the report of KPMG, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of such firm as experts in accounting and auditing.

The statements included in this prospectus under the caption "Prospectus Summary", "Risk Factors", "Our Corporate Structure", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Our Industry", "Business", "Regulation of Our Industry", "Management", "Related Party Transactions", "Taxation" and "Enforcement of Civil Liabilities", to the extent they constitute matters of PRC law, have been reviewed and confirmed by Global Law Office, special PRC counsel to us, as experts in such matters, and are included herein in reliance upon such review and confirmation.

**WHERE YOU CAN FIND ADDITIONAL INFORMATION**

We have filed with the SEC a registration statement on Form F–1 (Registration Number 333–146913) and a registration statement on Form F–6 (Registration Number 333–141820), including relevant exhibits and schedules under the Securities Act, covering the ordinary shares represented by the ADSs offered by this prospectus, as well as the ADSs. You should refer to our registration statements and their exhibits and schedules if you would like to find out more about us and about the ADSs and the ordinary shares represented by the ADSs. This prospectus summarizes material provisions of contracts and other documents that we refer you to. Since the prospectus may not contain all the information that you may find important, you should review a full text of these documents.

The SEC also maintains a website that contains reports, proxy statements and other information about issuers, such as us, who file electronically with the SEC. The address of that website is http://www.sec.gov. The information on that website is not a part of this prospectus.

Table of Contents

We will furnish to Citibank, N.A., as depositary of our ADSs, our annual reports. When the depositary receives these reports, it will upon our request promptly provide them to all holders of record of ADSs. We will also furnish the depositary with all notices of shareholders' meetings and other reports and communications in English that we make available to our shareholders. The depositary will make these notices, reports and communications available to holders of ADSs and will upon our request mail to all holders of record of ADSs the information contained in any notice of a shareholders' meeting it receives.

We are subject to periodic reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. Accordingly, we are required to file reports, including annual reports on Form 20–F, and other information with the SEC. As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of proxy statements to shareholders under the federal proxy rules contained in Sections 14(a), (b) and (c) of the Exchange Act, and our executive officers, directors and principal shareholders are exempt from the reporting and short–swing profit recovery provisions contained in Section 16 of the Exchange Act. The registration statements, reports and other information so filed can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of these documents upon payment of a duplicating fee, by writing to the SEC. Please call the SEC at 1–800–SEC–0330 for further information on the operation of the public reference rooms.

161

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**CONTENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated balance sheets as of December 31, 2004, 2005 and 2006 and June 30, 2007 (unaudited) | F–4 |
| Consolidated statements of operations for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited) | F–6 |
| Consolidated statements of shareholders' equity (deficiency) and comprehensive income for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2007 (unaudited) | F–7 |
| Consolidated statements of cash flows for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited) | F–9 |
| Notes to the consolidated financial statements | F–12 |
| Additional information — Financial statement schedule I | F–56 |

F–1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF FOCUS MEDIA HOLDING LIMITED**

We have audited the accompanying consolidated balance sheets of Focus Media Holding Limited and subsidiaries (the "Group") as of December 31, 2004, 2005 and 2006 and the related consolidated statements of operations, shareholders' equity (deficiency) and comprehensive income, and cash flows for each of the three years in the period ended December 31, 2004, 2005 and 2006, and the related financial statement schedule included in Schedule 1. We also have audited management's assessment, included in the accompanying Report by Management on Internal Control over Financial Reporting, that the Group maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in the *Report by Management on Internal Control over Financial Reporting,* management excluded from its assessment the internal control over financial reporting at Infoachieve Limited, Dotad Holdings Limited, DongGuan Advertisement & Communications Co., Ltd., Appreciate Capital Ltd., Bestwin Partners Limited and Glomedia Holdings Limited, which were acquired on January 1, March 20, April 8, September 1, October 1 and December 1, 2006, respectively, and whose aggregated financial statements constitute 4.6 percent and 4.0 percent of net and total assets, respectively, 25.2 percent of revenues, and 31.4 percent of net income of the consolidated financial statement amounts as of and for the year ended December 31, 2006. Accordingly, our audit did not include the internal control over financial reporting at Infoachieve Limited, Dotad Holdings Limited, DongGuan Advertisement & Communications Co., Ltd., Appreciate Capital Ltd., Bestwin Partners Limited or Glomedia Holdings Limited. The Group's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on these financial statements and financial statement schedule, an opinion on management's assessment, and an opinion on the effectiveness of the Group's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audit of financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with the authorization of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements. Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are

F–2

**Table of Contents**

subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2004, 2005 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, 2005 and 2006, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein. Also in our opinion, management's assessment that the Group maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

As discussed in Note 2(s) to the consolidated financial statements, effective January 1, 2006, the Group changed its method of accounting for share–based payments to conform to Statement of Financial Accounting Standards No. 123R "Share–based Payment".

Furthermore, in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

/s/ Deloitte Touche Tohmatsu CPA Ltd.
Shanghai, China
September 25, 2007

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 |
| | | | | (Unaudited) |
| | (In U.S. Dollars) | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ 22,669,106 | $ 36,653,180 | $ 164,610,942 | $ 187,591,825 |
| Investment in equity and debt securities | — | 34,835,850 | — | 41,317,191 |
| Accounts receivable, net of allowance for doubtful accounts of $173,837, $396,657, $1,308,554 and $4,163,933 in 2004, 2005, 2006 and June 30, 2007 (unaudited), respectively | 6,619,949 | 21,188,531 | 61,614,343 | 118,769,566 |
| Inventories | 1,243,140 | 479,529 | 519,095 | 2,339,283 |
| Prepaid expenses and other current assets | 1,746,996 | 4,444,303 | 5,199,355 | 15,787,855 |
| Deposits paid for acquisition of subsidiaries | 362,472 | 40,919,530 | 3,526,370 | 31,872,785 |
| Amounts due from related parties | 2,740,032 | 3,120,206 | 7,852,789 | 7,179,877 |
| Rental deposits | | | | 23,365,408 |
| **Total current assets** | **35,381,695** | **141,641,129** | **243,322,894** | **428,223,790** |
| Rental deposits | 1,606,378 | 11,819,095 | 11,833,290 | — |
| Equipment, net | 9,197,143 | 43,694,888 | 70,249,324 | 81,229,140 |
| Acquired intangible assets, net | 708,306 | 1,157,920 | 34,717,019 | 73,009,317 |
| Goodwill | 9,058,086 | 13,298,072 | 739,743,871 | 924,201,721 |
| Other long–term assets | 463,051 | 742,914 | 6,375,682 | 20,304,604 |
| **Total assets** | **$ 56,414,659** | **$ 212,354,018** | **$ 1,106,242,080** | **$ 1,526,968,572** |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | | |
| **Current liabilities:** | | | | |
| Short–term debts | $ — | $ 991,301 | $ 2,769,459 | $ 393,933 |
| Accounts payable | 607,091 | 5,847,530 | 5,987,593 | 32,167,361 |
| Accrued expenses and other current liabilities | 6,591,435 | 11,746,902 | 38,674,175 | 65,178,999 |
| Income taxes payable | 1,435,486 | 2,108,071 | 4,060,170 | 10,840,551 |
| Amounts due to related parties | — | — | 345,768 | 3,390,150 |
| Deferred tax liabilities | — | — | — | 1,097,630 |
| **Total current liabilities** | **8,634,012** | **20,693,804** | **51,837,165** | **113,068,624** |
| Deferred tax liabilities | — | — | 3,303,110 | 6,132,493 |
| **Total liabilities** | **$ 8,634,012** | **$ 20,693,804** | **$ 55,140,275** | **$ 119,201,117** |
| **Commitments (Note 16)** | | | | |
| **Minority interest** | 80,692 | 245,563 | 357,814 | 446,701 |
| **Mezzanine equity** | | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and 41,967,400, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 6,295,110 | — | — | — |

F–4

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED BALANCE SHEETS — (Continued)**

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 |
| | | | | (Unaudited) |
| | (In U.S. Dollars) | | | |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and 48,191,600, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 12,062,696 | — | — | — |
| Series C–1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and 34,054,000, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 17,500,350 | — | — | — |
| Series C–2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and 34,053,400, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 17,415,000 | — | — | — |
| **Shareholders' equity (deficiency)** Ordinary shares ($0.00005 par value; 885,516,600, 19,800,000,000, 19,800,000,000 and 19,800,000,000 shares authorized in 2004, 2005, 2006 and June 30, 2007 (unaudited); 142,464,600, 378,306,000, 534,896,873 and 611,242,827 issued and outstanding in 2004, 2005, 2006 and June 30, 2007 (unaudited), respectively) | 7,124 | 18,916 | 26,745 | 30,562 |
| Additional paid–in capital | 5,981,154 | 177,419,761 | 709,196,246 | 1,242,816,802 |
| Acquisition consideration to be issued | — | — | 237,879,480 | — |
| Deferred share–based compensation | (969,959) | (246,569) | — | — |
| Retained earnings (accumulated deficit) | (10,550,414) | 12,997,237 | 96,194,969 | 148,733,828 |
| Accumulated other comprehensive income (loss) | (41,106) | 1,225,306 | 7,446,551 | 15,739,562 |
| **Total shareholders' equity (deficiency)** | $  (5,573,201) | $  191,414,651 | $  1,050,743,991 | $  1,407,320,754 |
| **Total liabilities, mezzanine equity and shareholders' equity (deficiency)** | $  56,414,659 | $  212,354,018 | $  1,106,242,080 | $  1,526,968,572 |

The accompanying notes are an integral part of these consolidated financial statements.

F–5

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | (In U.S. Dollars, except per share data) | (Unaudited) | (Unaudited) |
| **Net revenues:** | | | | | |
| Advertising Service Revenue | $ 26,321,179 | $ 66,903,679 | $ 209,973,935 | $ 82,571,649 | $ 169,929,351 |
| Other Revenue | 2,888,720 | 1,325,234 | 1,931,530 | 689,992 | 686,634 |
| **Total net revenues** | **29,209,899** | **68,228,913** | **211,905,465** | **83,261,641** | **170,615,985** |
| **Cost of revenues:** | | | | | |
| Advertising Service Cost | 6,804,410 | 25,748,318 | 80,615,408 | 36,499,457 | 76,720,176 |
| Other Cost | 1,934,331 | 975,747 | 764,959 | 311,976 | 303,017 |
| **Total cost of revenues** | **8,738,741** | **26,724,065** | **81,380,367** | **36,811,433** | **77,023,193** |
| **Gross profit** | **20,471,158** | **41,504,848** | **130,525,098** | **46,450,208** | **93,592,792** |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 3,987,496 | 9,119,846 | 25,723,413 | 10,693,275 | 20,328,874 |
| Selling and marketing | 3,472,088 | 9,599,226 | 25,761,948 | 9,782,742 | 23,040,846 |
| Other operating income | — | — | (1,338,334) | (157,732) | (2,384,031) |
| Goodwill impairment | 58,397 | — | — | — | — |
| **Total operating expenses/(income)** | **7,517,981** | **18,719,072** | **50,147,027** | **20,318,285** | **40,985,689** |
| **Income from operations** | **12,953,177** | **22,785,776** | **80,378,071** | **26,131,923** | **52,607,103** |
| Interest income | 9,739 | 1,811,782 | 4,560,798 | 1,781,089 | 4,633,869 |
| Interest expense | — | (49,873) | (305,287) | (288,488) | (6,971) |
| Other income | 53,940 | 70,471 | 271,451 | (10,910) | 252,442 |
| Other expense | (57,783) | (231,619) | (558,990) | (469,662) | (211,890) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | (11,692,287) | — | — | — | — |
| **Income before income taxes and minority interest** | **1,266,786** | **24,386,537** | **84,346,043** | **27,143,952** | **57,274,553** |
| Income taxes | 907,550 | 694,453 | 1,043,538 | 988,919 | 3,286,351 |
| **Net income after income taxes before minority interest** | **359,236** | **23,692,084** | **83,302,505** | **26,155,033** | **53,988,202** |
| Minority interest | 13,516 | (144,433) | (104,773) | (50,943) | 18,165 |
| **Net income** | **372,752** | **23,547,651** | **83,197,732** | **26,104,090** | **54,006,367** |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | (13,356,087) | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — | — | — | — |
| **Net income (loss) attributable to holders of ordinary shares** | **$ (10,576,414)** | **$ 23,547,651** | **$ 83,197,732** | **$ 26,104,090** | **$ 54,006,367** |
| Income (loss) per share — basic | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income (loss) per share | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income (loss) per share | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

The accompanying notes are an integral part of these consolidated financial statements.

F–6

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIENCY)
AND COMPREHENSIVE INCOME**

| | Ordinary Shares | Amount | Additional Paid-in Capital | Deferred Share Based Compensation | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficiency) | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|
| | | | | (In U.S. dollars, except share data) | | | | |
| **Balance at January 1, 2004** | 200,000,000 | $ 10,000 | $ 1,188,817 | $ — | $ 26,000 | $ (41,755) | $ 1,183,062 | — |
| Issuance of ordinary shares | 14,594,200 | 730 | 4,484,068 | — | — | — | 4,484,798 | — |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | (62,400,000) | (3,120) | (1,048,469) | — | — | — | (1,051,589) | — |
| Reclassification of ordinary shares to Series C–1 convertible redeemable preference shares | (9,729,600) | (486) | (101,932) | — | — | — | (102,418) | — |
| Deferred share–based compensation | — | — | 1,334,835 | (1,334,835) | — | — | — | — |
| Share–based compensation expense | — | — | 123,835 | 364,876 | — | — | 488,711 | — |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | — | — | (8,308,411) | — | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | — | — | (2,191,442) | — | (2,191,442) | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | — | — | — | (13,356,087) | — | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | — | — | — | — | 12,906,774 | — | 12,906,774 | — |
| Cumulative translation adjustment | — | — | — | — | — | 649 | 649 | $ 649 |
| Net income | — | — | — | — | 372,752 | — | 372,752 | 372,752 |
| **Balance at December 31, 2004** | 142,464,600 | $ 7,124 | $ 5,981,154 | $ (969,959) | $ (10,550,414) | $ (41,106) | $ (5,573,201) | $ 373,401 |
| Series A convertible redeemable preference shares converted into ordinary shares upon initial public offering | 41,967,400 | 2,098 | 6,293,012 | — | — | — | 6,295,110 | — |
| Series B convertible redeemable preference shares converted into ordinary shares upon initial public offering | 48,191,600 | 2,409 | 12,060,287 | — | — | — | 12,062,696 | — |
| Series C–1 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,054,000 | 1,703 | 17,498,647 | — | — | — | 17,500,350 | — |
| Series C–2 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,053,400 | 1,703 | 17,413,297 | — | — | — | 17,415,000 | — |
| Issuance of ordinary shares upon initial public offering, net of issuance cost of $13,703,370 | 77,575,000 | 3,879 | 118,170,251 | — | — | — | 118,174,130 | — |
| Deferred share–based compensation | — | — | (264,751) | 264,751 | — | — | — | — |
| Share–based compensation expense | — | — | 267,864 | 458,639 | — | — | 726,503 | — |
| Unrealized loss on debt securities | — | — | — | — | — | (164,150) | (164,150) | $ (164,150) |
| Cumulative translation adjustments | — | — | — | — | — | 1,430,562 | 1,430,562 | 1,430,562 |
| Net income | — | — | — | — | 23,547,651 | — | 23,547,651 | 23,547,651 |
| **Balance at December 31, 2005** | 378,306,000 | $ 18,916 | $ 177,419,761 | $ (246,569) | $ 12,997,237 | $ 1,225,306 | $ 191,414,651 | $ 24,814,063 |

F–7

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIENCY)
AND COMPREHENSIVE INCOME — (continued)**

| | Ordinary Shares | Amount | Additional Paid–in Capital | Deferred Share Based Compensation | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficiency) | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In U.S. dollars, except share data) | | | |
| **Balance at December 31, 2005** | **378,306,000** | **$ 18,916** | **$ 177,419,761** | **$ (246,569)** | **$ 12,997,237** | **$ 1,225,306** | **$ 191,414,651** | — |
| Issuance of ordinary shares upon follow–on offering on January 27, 2006, net of issuance cost of $3,466,700 | 15,000,000 | 750 | 61,782,550 | — | — | — | 61,783,300 | |
| Issuance of ordinary shares upon follow–on offering on June 16, 2006, net of issuance cost of $2,740,407 | 16,000,000 | 800 | 80,966,793 | — | — | — | 80,967,593 | — |
| Issuance of ordinary shares in connection with acquisitions | 99,254,193 | 4,962 | 365,660,061 | — | — | — | 365,665,023 | |
| Issuance of ordinary shares pursuant to share option plans | 26,336,680 | 1,317 | 15,246,244 | — | — | — | 15,247,561 | — |
| Ordinary shares to be issued in connection with acquisitions | — | — | 237,879,480 | — | — | — | 237,879,480 | |
| Adjustment for the adoption of SFAS 123R | — | — | (246,569) | 246,569 | — | — | — | |
| Share–based compensation expense | — | — | 8,367,406 | — | — | — | 8,367,406 | — |
| Unrealized gain on debt securities | — | — | — | — | — | 164,150 | 164,150 | $ 164,150 |
| Cumulative translation adjustments | — | — | — | — | — | 6,057,095 | 6,057,095 | 6,057,095 |
| Net income | — | — | — | — | 83,197,732 | — | 83,197,732 | 83,197,732 |
| **Balance at December 31, 2006** | **534,896,873** | **$ 26,745** | **$ 947,075,726** | **$ —** | **$ 96,194,969** | **$ 7,446,551** | **$ 1,050,743,991** | **$ 89,418,977** |
| Issuance of ordinary shares upon follow–on offering in January, 2007, net of issuance cost of $668,911 | 15,000,000 | 750 | 114,873,031 | — | — | — | 114,873,781 | — |
| Issuance of ordinary shares in connection with acquisitions | 57,299,699 | 2,864 | 166,047,247 | — | — | — | 166,050,111 | — |
| Issuance of ordinary shares pursuant to share option plans | 4,046,255 | 203 | 5,384,083 | — | — | — | 5,384,286 | — |
| Share–based compensation expense | — | — | 9,436,715 | — | — | — | 9,436,715 | |
| Net profit for the period | — | — | — | — | 54,006,367 | — | 54,006,367 | 54,006,367 |
| Adjustment to retained earnings upon adoption of FIN 48 on January 1, 2007 | — | — | — | — | (1,467,508) | — | (1,467,508) | — |
| Unrealized gains on equity securities | — | — | — | — | — | 601,893 | 601,893 | 601,893 |
| Translation adjustments | — | — | — | — | — | 7,691,118 | 7,691,118 | 7,691,118 |
| **Balance at June 30, 2007 (unaudited)** | **611,242,827** | **$ 30,562** | **$ 1,242,816,802** | **$ —** | **$ 148,733,828** | **$ 15,739,562** | **$ 1,407,320,754** | **$ 62,299,378** |

The accompanying notes are an integral part of these consolidated financial statements.

F–8

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | (In U.S. Dollars) | **(Unaudited)** | **(Unaudited)** |
| Operating activities: | | | | | |
| Income (loss) attributable to holders of ordinary shares | $ (10,576,414) | $ 23,547,651 | $ 83,197,732 | $ 26,104,090 | $ 54,006,367 |
| Deemed dividend on Series A convertible redeemable preference shares | 8,308,411 | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | 2,191,442 | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | 13,356,087 | — | — | — | — |
| Premium relating to Series B convertible redeemable preference shares | (12,906,774) | — | — | — | — |
| Net income | 372,752 | 23,547,651 | 83,197,732 | 26,104,090 | 54,006,367 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest | (13,516) | 144,433 | 104,773 | 50,943 | (18,165) |
| Bad debt provision | 173,837 | 235,604 | 1,844,605 | 770,198 | 2,415,557 |
| Share–based compensation | 488,711 | 726,503 | 8,367,406 | 3,362,908 | 9,436,715 |
| Depreciation and amortization | 923,163 | 4,927,016 | 19,511,552 | 8,623,010 | 12,711,757 |
| Loss on disposal of equipment | 22,470 | — | — | — | — |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | 11,692,287 | — | — | — | — |
| Goodwill impairment | 58,397 | — | — | — | — |
| Deferred taxes | 78,586 | (20,664) | (63,383) | 371,250 | (993,241) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | | |
| Accounts receivable, net | (4,525,148) | (14,710,176) | (22,289,344) | (8,946,951) | (13,408,874) |
| Inventories | (1,030,529) | (408,223) | 23,334 | (255,662) | (1,819,183) |
| Prepaid expenses and other current assets | (1,740,427) | (2,347,426) | 7,857,172 | 9,441,676 | 8,171,806 |
| Amounts due from related parties | (2,487,456) | (380,174) | (4,732,583) | (1,186,331) | (7,505,920) |
| Rental deposits | (1,035,474) | (10,076,230) | 3,104,667 | 4,384,783 | (11,532,118) |
| Accounts payable | (1,609,816) | 5,007,564 | (3,174,405) | (3,924,856) | 6,127,476 |
| Accrued expenses and other current liabilities | 4,174,214 | 3,950,903 | (1,673,496) | (22,123,772) | (5,803,423) |
| Amounts due to related parties | (2,322,276) | — | — | — | 2,709,578 |
| Income tax payable | 825,100 | 672,585 | 1,276,252 | 722,211 | 2,070,151 |
| **Net cash provided by operating activities** | $ **4,044,875** | $ **11,269,366** | $ **93,354,282** | $ **17,393,497** | $ **56,568,483** |

F–9

Table of Contents

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| | | | (In U.S. Dollars) | | |
| **Investing activities:** | | | | | |
| Purchase of equipment and other long–term assets | $ (6,373,124) | $ (36,765,294) | $ (22,878,254) | $ (11,607,977) | $ (25,264,583) |
| Acquisition of intangible assets | — | — | (6,403,114) | — | (105,049) |
| Purchase of subsidiaries, net of cash acquired | (4,697,378) | (4,982,523) | (124,062,515) | (87,060,235) | (56,773,608) |
| Deposit paid to acquire subsidiaries | — | (40,919,530) | (3,710,369) | — | (35,267,750) |
| Disposal of an equity investment | — | — | 60,005 | — | — |
| Expiration (investment) in debt securities | — | (35,000,000) | 35,000,000 | — | — |
| Investment in equity securities | | | | | (40,715,298) |
| **Net cash used in investing activities** | **$ (11,070,502)** | **$ (117,667,347)** | **$ (121,994,247)** | **$ (98,668,212)** | **$ (158,126,288)** |
| **Financing activities:** | | | | | |
| Repayment of short–term loan from a shareholder | (500,000) | — | — | | |
| Proceeds from issuance of ordinary shares, net of issuance costs of $nil, $13,703,370, $6,207,107, $5,076,536 and $668,911 in 2004, 2005, 2006 and June 30, 2006 (unaudited) and 2007 (unaudited), respectively | — | 118,174,130 | 142,750,893 | 143,881,465 | 114,873,781 |
| Proceeds from issuance of ordinary shares pursuant to share option plans | — | — | 15,247,561 | 4,798,131 | 5,384,286 |
| Proceeds from issuance of Series B convertible redeemable preference shares (net of issuance costs of $437,304) | 12,062,696 | — | — | | |
| Proceeds from issuance of Series C–2 convertible redeemable preference shares (net of issuance costs of $85,000) | 17,415,000 | — | — | | |
| Proceeds from short–term loans | — | 991,301 | 24,598,037 | 24,598,037 | — |
| Repayment of short–term loans | — | — | (29,402,066) | (6,051,378) | (3,771,783) |
| Capital injection from minority shareholders | — | 3,089 | 326,307 | 249,470 | 96,972 |
| **Net cash provided by financing activities** | **$ 28,977,696** | **$ 119,168,520** | **$ 153,520,732** | **$ 167,475,725** | **$ 116,583,256** |
| Effect of exchange rate changes | $ 649 | $ 1,213,535 | $ 3,076,995 | (169,833) | 7,955,432 |
| **Net increase in cash and cash equivalents** | **$ 21,952,718** | **$ 13,984,074** | **$ 127,957,762** | **$ 86,031,177** | **22,980,883** |
| Cash and cash equivalents, beginning of year/period | 716,388 | 22,669,106 | 36,653,180 | 36,653,180 | 164,610,942 |
| Cash and cash equivalents, end of year/period | $ 22,669,106 | $ 36,653,180 | $ 164,610,942 | $ 122,684,357 | $ 187,591,825 |
| Supplemental disclosure of cash flow information | | | | | |
| Income taxes paid | $ 738 | $ 94,391 | $ 153,526 | $ 114,485 | 577,991 |
| Interest paid | $ — | $ 11,581 | $ 244,702 | $ 26,463 | $ — |

F–10

Table of Contents

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| | | | (In U.S. Dollars) | | |
| **SUPPLEMENTAL DISCLOSURES OF NON–CASH INVESTING AND FINANCING ACTIVITIES** | | | | | |
| Non–cash investing activities: | | | | | |
| Acquisition of subsidiaries: | | | | | |
| Value of ordinary shares issued | $ 4,484,798 | $ — | $ 365,665,023 | $ 365,665,023 | $ 166,050,111 |
| Ordinary share consideration to be issued | $ — | $ — | $ 237,879,480 | $ — | $ — |
| Accounts payable | $ 538,860 | $ 99,130 | $ 4,530,745 | $ 27,318,061 | $ 1,242,042 |
| Non–cash financing activities: | | | | | |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | $ 9,360,000 | $ — | $ — | $ — | $ — |
| Reclassification of Series A convertible redeemable preference shares to Series C–1 convertible redeemable preference share | $ 3,064,890 | $ — | $ — | $ — | $ — |
| Reclassification of Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference share | $ 976,955 | $ — | $ — | $ — | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

F–11

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

**1.    Organization and Principal Activities**

Focus Media Holding Limited and all of its subsidiaries (collectively referred to as the "Group") are mainly engaged in selling out–of home television advertising time slots on its network of flat–panel television advertising displays located in high traffic areas such as commercial locations and in–store network. Starting from 2006, the Group also engaged in providing advertising services on in–elevator poster frames network and mobile handset advertising network.

PRC regulations currently limit foreign ownership of companies that provide advertising services, including out–of–home television advertising services. To comply with these regulations, the Group conducts substantially all of its activities through Focus Media Advertisement Co., Ltd. ("Focus Media Advertisement") and its subsidiaries, a variable interest entity which was renamed from Aiqi, and was established in Shanghai China on September 2, 1997. On April 11, 2004, the majority shareholder of Focus Media Advertisement, Jason Nanchun Jiang, incorporated Focus Media Holding Limited ("Focus Media Holding" or the "Company") with the same shareholders of Focus Media Advertisement. Focus Media Advertisement entered into various agreements with 100% owned subsidiaries of Focus Media Holding, i.e. Focus Media Technology (Shanghai) Co., Ltd. ("Focus Media Technology") and Focus Media Digital Information Technology (Shanghai) Co., Ltd. ("Focus Media Digital"), including a transfer of trademarks and exclusive services agreement. Under these agreements, Focus Media Advertisement has the right to use the trade name of Focus Media Technology, and Focus Media Digital, provides technical and consulting services to Focus Media Advertisement and its subsidiaries. In return, Focus Media Advertisement and its subsidiaries are required to pay Focus Media Technology services fees for the use of trade name and Focus Media Digital for the technical and consulting services it receives. The technical and consulting service fees are adjusted at the Focus Media Digital's sole discretion. Focus Media Digital is entitled to receive service fees in an amount up to all of the net income of Focus Media Advertising.

In addition, Focus Media Holding, through Focus Media Technology, has been assigned all voting rights by the direct and indirect owners of Focus Media Advertisement through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally Focus Media Holding, through Focus Media Technology has the option to acquire the equity interests of Focus Media Advertisement and its subsidiaries for a purchase price equal to the respective registered capital of Focus Media Advertisement and its subsidiaries or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. Each of the shareholders of Focus Media Advertisement has agreed to pay Focus Media Holding, any excess of the purchase price paid for such equity interests in, or assets of, Focus Media Advertisement or its subsidiaries over the registered capital of Focus Media Advertisement or its subsidiaries in the event that such option is exercised.

Through contractual arrangements described above, Focus Media Holding is deemed the primary beneficiary of Focus Media Advertisement resulting in Focus Media Advertisement being deemed a subsidiary of Focus Media Holding under the requirements of FIN 46 (Revised), "Consolidation of Variable Interest Entities" ("FIN 46(R)"). In substance, an existing company, Focus Media Advertisement, has been reorganized as a subsidiary of the new company Focus Media Holding. Focus Media Holding has the same controlling shareholder and the same non–controlling shareholders. Accordingly, the Group's financial statements reflect the financial statements of Focus Media Advertisement through May 2003 and, thereafter, the consolidated financial statements of Focus Media Holding and its subsidiaries, which include Focus Media Advertisement and its subsidiaries.

As of June 30, 2007, the major subsidiaries of Focus Media Holding and Focus Media Advertisement are included in the Appendix 1 attached.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**2. Summary of Significant Accounting Policies**

*(a) Basis of Presentation*

The consolidated financial statements of the Group have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*(b) Basis of Consolidation*

The consolidated financial statements include the financial statements of Focus Media Holding, its majority–owned subsidiaries and its variable interest entity, Focus Media Advertisement and its majority–owned subsidiaries. All inter–company transactions and balances have been eliminated upon consolidation.

*(c) Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of 3 months or less when purchased.

*(d) Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's financial statements include allowance for doubtful accounts, useful lives and impairment for long–lived assets and goodwill, the recognition and measurement of current and deferred income tax assets, and the valuation and recognition of share–based compensation. The actual results experienced by the Company may differ from management's estimates.

*(e) Significant Risks and Uncertainties*

The Group participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: the Group's limited operating history, rapid growth associated with newly acquired business; advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on share market in the U.S.; competition from other competitors; regulatory or other PRC related factors; risks associated with the Group's ability to attract and retain employees necessary to support its growth; risks associated with the Group's growth strategies; and general risks associated with the advertising industry.

*(f) Investment in Equity and Debt Securities*

The Group classifies all of its short–term investments as available–for–sale securities. Such short–term investments consist primarily of equity and debt instrument which are stated at fair market value, with unrealized gains and losses recorded as accumulated other comprehensive income (loss).

*(g) Inventory*

Inventory is comprised of media display equipments and compact flash cards, which are held for sale. Inventory is stated at the lower of cost or market value. Adjustments are recorded to write down the cost of obsolete and excess inventory to the estimated market value based on historical and forecast demand.

F–13

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*(h)   Equipment, Net*

Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Media display equipment | 5 years |
| Computers and office equipment | 5 years |
| Vehicles | 5 years |
| Leasehold Improvements | lesser of the term of the lease or the estimated useful lives of the assets |

The Group assembles certain of the media display equipment. In addition to costs under assembly contracts, external costs directly related to the assembly of such equipment, including duty and tariff, equipment installation and shipping costs, are capitalized.

*(i)   Acquired intangible assets, net*

Acquired intangible assets, which consist of operation and broadcasting rights, lease agreements, customer bases, customer backlogs, trademarks, non–compete agreements, and acquired technology are valued at cost less accumulated amortization. Amortization is calculated using the straight–line method over their expected useful lives of 1 to 10 years.

*(j)   Impairment of Long–Lived Assets*

The Group evaluates its long–lived assets and finite–lived intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. When these events occur, the Group measures impairment by comparing the carrying amount of the assets to the future undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the future undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss equal to the excess of the carrying amount over the fair value of the assets.

*(k)   Goodwill*

SFAS No. 142 *"Goodwill and Other intangible Assets"* requires the Group to complete a two–step goodwill impairment test. The first step compares the fair value of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

Management performed the annual goodwill impairment test as of December 31, 2004 and an impairment loss of $58,397 was recorded for the Perfect Media Holding Ltd. ("Perfect Media") reporting unit. The fair value of the Perfect Media reporting unit was estimated using a combination of expected present value of future cash flow and income approach valuation methodologies. The Group recorded an impairment charge because the amount the Group paid for the acquisition of Perfect Media exceeded its fair market value. Commencing in 2005, the financial

F–14

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

information of Perfect Media was prepared together with that of Commercial location network. Management also performed an annual goodwill impairment test for each of its reporting units as of December 31, 2005 and 2006, and no impairment loss was required.

The changes in the carrying amount of goodwill by segment for the year ended December 31, 2004, 2005 and 2006 and six months ended June 30, 2007 (unaudited) are as follows:

| | Out–of–Home Television Advertising Services | In–elevator Poster–frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Total |
|---|---|---|---|---|---|
| Balance as of January 1, 2004 | $ — | $ — | $ — | $ — | $ — |
| Goodwill acquired during the year | 9,519,658 | — | — | — | 9,519,658 |
| Modification of preliminary purchase price allocation | (18,124) | — | — | — | (18,124) |
| Tax benefits arising from acquired subsidiaries | (385,051) | — | — | — | (385,051) |
| Impairment losses | (58,397) | — | — | — | (58,397) |
| **Balance as of December 31, 2004** | **$ 9,058,086** | $ — | $ — | $ — | **$ 9,058,086** |
| Goodwill acquired during the year | 4,043,747 | — | — | — | 4,043,747 |
| Tax benefits arising from acquired subsidiaries | (244,236) | — | — | — | (244,236) |
| Modification of preliminary purchase price allocation | 64,477 | — | — | — | 64,477 |
| Translation adjustments | 375,998 | — | — | — | 375,998 |
| **Balance as of December 31, 2005** | **$ 13,298,072** | $ — | $ — | $ — | **$ 13,298,072** |
| Goodwill acquired during the year | 374,932,052 | 96,926,862 | 8,364,095 | — | 480,223,009 |
| Modification of preliminary purchase price allocation | 5,177,181 | 2,756,299 | 80,369 | — | 8,013,849 |
| Goodwill recorded as a result of contingent consideration resolved | — | 237,879,480 | — | — | 237,879,480 |
| Translation adjustments | 329,461 | — | — | — | 329,461 |

F–15

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Out–of–Home Television Advertising Services | In–elevator Poster–frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Total |
|---|---|---|---|---|---|
| **Balance as of December 31, 2006** | $ 393,736,766 | $ 337,562,641 | $ 8,444,464 | $ — | $ 739,743,871 |
| Goodwill acquired during the year | 373,072 | — | — | 171,512,259 | 171,885,331 |
| Modification of preliminary purchase price allocation | 980,796 | (455,646) | 37,851 | — | 563,001 |
| Recognition of contingent consideration resolved | — | — | 11,769,000 | — | 11,769,000 |
| Translation adjustments | 240,518 | — | — | — | 240,518 |
| **Balance as of June 30, 2007 (unaudited)** | $ 395,331,152 | $ 337,106,995 | $ 20,251,315 | $ 171,512,259 | $ 924,201,721 |

*(l)      Revenue Recognition*

The Group's revenues are primarily derived from advertising services and to a lesser extent, sales from advertising equipment, and sales from Internet subscriptions and perpetual licenses to its Adforward software.

Revenues from advertising services and advertising equipment are recognized when (i) persuasive evidence of an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

The Group generates advertising service revenues from the sale of advertising time slots in the out–of–home television advertising networks, the sales of frame space on the poster frame network, and the sales of advertising service through the mobile handset advertising and internet network. . In the majority of advertising arrangements, the Group acts as a principal in the transaction and records advertising revenues on a gross basis. The associated expenses are recorded as cost of revenues. In some instances the Group is considered as an agent, it recognizes revenue on a net basis. Revenues from advertising services are recognized, net of agency rebates, ratably over the period in which the advertisement is displayed, assuming all other revenue recognition criteria have been met.

Revenues from the sale of advertising equipment are recognized upon delivery, assuming all other revenue recognition criteria have been met.

Adforward software sales typically include multiple elements, including sale of software licenses and services. Service includes installation, training and post contract customer support ("PCS"), which consists of when–and–if available software license updates and technical support. The Group recognizes revenues based on the provisions of the American Institute of Certified Public Accountants Statement of Position ("SOP") No. 97–2, "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Revenues under multiple–element arrangements are allocated to each element in the arrangement primarily using the residual method based upon the fair value of the undelivered elements, which is specific to the Group (vendor–specific objective evidence of fair value or VSOE). This means that the Group defers revenue from the arrangement fee equivalent to the fair value of the undelivered elements. Discounts, if any, are applied to the delivered elements, usually software licenses, under the residual method. VSOE for PCS is determined based on either the renewal rate specified in each contract or the price

F–16

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

charged when each element is sold separately. If the Group does not have VSOE for the undelivered elements, revenue recognition is deferred until VSOE for such elements are obtained or until all elements have been delivered.

The Group sells Adforward subscriptions and perpetual licenses. Revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. Under perpetual license agreements, revenue recognition is generally commenced when delivery has occurred, software has been installed and training has been provided as the Group does not currently have VSOE for either installation or training services.

The Group entered into franchise arrangements with a number of third party franchisors. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 45 "Accounting For Franchise Fee Revenue", revenue from initial franchise fees was recognized when the franchise sale transaction was completed, that is, when all material services or conditions relating to the sale had been substantially performed or satisfied by the franchisor.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Group presents advertising service revenue, net of sales taxes incurred, as follows:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | | | (In U.S. dollars) | | |
| Advertising Service Revenue, Net of Agency rebates | | | | | |
| *Commercial Locations* | | | | | |
| — Unrelated parties | $ 25,386,634 | $ 59,434,823 | $ 130,474,324 | $ 50,485,084 | $ 87,733,556 |
| — Related parties | 3,722,778 | 7,991,434 | 15,227,937 | 6,382,176 | 2,551,865 |
| Total Commercial Locations | 29,109,412 | 67,426,257 | 145,702,261 | 56,867,260 | 90,285,421 |
| *In–store Network* | | | | | |
| — Unrelated parties | — | 5,475,192 | 25,330,654 | 11,006,074 | 14,009,857 |
| — Related parties | — | 517,998 | 4,380,287 | 2,046,172 | 1,314,907 |
| Total in–store network | — | 5,993,190 | 29,710,941 | 13,052,246 | 15,324,764 |
| *In–elevator poster frame* | | | | | |
| — Unrelated parties | — | — | 44,893,004 | 17,394,650 | 34,103,674 |
| — Related parties | — | — | — | — | 97,826 |
| Total In–elevator poster frame | — | — | 44,893,004 | 17,394,650 | 34,201,500 |
| *Mobile handset advertising* | | | | | |
| — Unrelated parties | — | — | 10,880,075 | 3,365,206 | 17,199,534 |
| — Related parties | — | — | — | — | 88,525 |
| Total mobile handset advertising | — | — | 10,880,075 | 3,365,206 | 17,288,059 |
| *Internet advertising* | | | | | |
| — Unrelated parties | — | — | — | — | 26,088,417 |
| — Related parties | — | — | — | — | 329,543 |
| Total Internet advertising | — | — | — | — | 26,417,960 |
| Advertising Services Revenue: | 29,109,412 | 73,419,447 | 231,186,281 | 90,679,362 | 183,517,704 |

F–17

**FOCUS MEDIA HOLDING LIMITED**

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | | | (In U.S. dollars) | | |
| Less: Sales taxes: | | | | | |
| Commercial Locations | 2,788,233 | 5,991,497 | 13,641,118 | 5,048,856 | 7,583,093 |
| In-store Network | — | 524,271 | 2,803,349 | 1,220,902 | 1,442,318 |
| In-elevator poster frame | — | — | 3,988,769 | 1,549,146 | 2,983,542 |
| Mobile handset advertising | — | — | 779,110 | 288,809 | 397,438 |
| Internet Advertising | — | — | — | — | 1,181,962 |
| Total sales taxes | 2,788,233 | 6,515,768 | 21,212,346 | 8,107,713 | 13,588,353 |
| **Net Advertising Service Revenue** | 26,321,179 | 66,903,679 | 209,973,935 | 82,571,649 | 169,929,351 |
| Add: Other Revenue: | 2,888,720 | 1,325,234 | 1,931,530 | 689,992 | 686,634 |
| **Net revenues:** | $ 29,209,899 | $ 68,228,913 | $ 211,905,465 | $ 83,261,641 | $ 170,615,985 |

**(m)    Operating Leases**

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

**(n)    Advertising Costs**

The Group expenses advertising costs as incurred. Total advertising expenses were $17,919, $45,712, $1,157,672, $569,296 and $568,908 for the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited), respectively, and have been included as part of selling and marketing expenses.

**(o)    Foreign Currency Translation**

The functional and reporting currency of Focus Media Holding is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in other income or other expenses.

The financial records of the Group's subsidiaries and its variable interest entity are maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive income (loss) in the statement of shareholders' equity (deficiency).

**(p)    Income Taxes**

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance

F-18

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(q)  Comprehensive Income*

Comprehensive income includes foreign currency translation adjustments and unrealized gains (losses) on marketable securities classified as available–for–sale debt securities. Comprehensive income is reported in the statements of shareholders' equity (deficiency).

*(r)  Fair Value of Financial Instruments*

Financial instruments include cash and cash equivalents, investment in available–for–sale debt securities, and short–term loans. The carrying values of cash and cash equivalents, investment in available–for–sale debt securities and short–term borrowing approximate their fair values due to their short–term maturities.

*(s)  Share–based Compensation*

Effective January 1, 2006 the Group adopted SFAS No. 123 (revised 2005), *"Share–Based Payment"* ("SFAS 123–R"), using the modified prospective application transition method, which establishes accounting for share–based awards exchanged for employee services. Accordingly, share–based compensation cost is measured at grant date, based on the fair value of the award, and recognized in expense over the requisite service period. The Group previously applied Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees"* ("APB 25"), and related Interpretations and provided the pro forma disclosures required by SFAS No. 123, *"Accounting for Stock–Based Compensation"* ("SFAS 123"). APB 25 required the Group to record a compensation charge for the excess of the market value of the share at the grant date or any other measurement date over the amount an employee must pay to acquire the share. The compensation expense is recognized over the service period which is the vesting period.

**Periods prior to the adoption of SFAS 123–R**

Prior to the adoption of SFAS 123–R, the Group provided the disclosures required under SFAS 123, as amended by SFAS No. 148, *"Accounting for Stock–Based Compensation — Transition and Disclosures"*.

F–19

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The following table illustrates the effect on net income and income per share as if the Group had applied the fair value recognition provisions of SFAS 123 to options granted under the Group's share–based compensation plans prior to the adoption. For purposes of this pro forma disclosure the value of the options was estimated using the Black–Scholes option–pricing model and amortized using an accelerated method over the respective vesting periods of the awards.

|  | Year Ended December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Net income, as reported | $ 372,752 | $ 23,547,651 |
| Add: Share–based compensation as reported | 488,711 | 726,503 |
| Less: Share–based compensation determined using the fair value method | (566,819) | (3,225,668) |
| Pro forma net income | $ 294,644 | $ 21,048,486 |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — |
| Pro forma net income (loss) attributable to holders of ordinary shareholders | $ (10,654,522) | $ 21,048,486 |
| Basic income (loss) per share: | | |
| As reported | $ (0.07) | $ 0.09 |
| Pro forma | $ (0.07) | $ 0.08 |
| Diluted income (loss) per share: | | |
| As reported | $ (0.07) | $ 0.06 |
| Pro forma | $ (0.07) | $ 0.06 |

As required by SFAS 123–R, management has made an estimate of expected forfeitures and is recognizing compensation costs only for those equity awards expected to vest. The cumulative effect of initially adopting SFAS 123–R was not significant. The Group's total share–based compensation expense for the year ended December 31, 2006 was $8,367,406. As a result of adopting SFAS 123–R, income before income tax and net income were both lower by $8,119,732 than if the Group had continued to account for share–based compensation under APB 25. The impact on basic and diluted earnings per shares in 2006 was a decrease of $0.02 and $0.02 per share respectively.

The following table summarizes the share–based compensation recognized in the consolidated statement of operations:

|  | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|  | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
|---|---|---|---|---|---|
| Cost of sales | $ — | $ — | $ 146,942 | $ — | $ 565,885 |
| General and administrative | 461,183 | 683,186 | 6,130,076 | 2,685,304 | 4,726,193 |
| Selling and marketing | 27,528 | 43,317 | 2,090,388 | 677,604 | 4,144,637 |

F–20

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*(t)  Income (loss) per Share*

Basic income (loss) per share is computed by dividing income (loss) attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the year. Diluted income per ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation in loss years as their effects would be anti–dilutive.

*(u) Recently Issued Accounting Standards*

In September 2006, the FASB issued SFAS No. 157, *"Fair Value Measurements"* ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 applies under most other accounting pronouncements that require or permit fair value measurements and does not require any new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years, with earlier application encouraged. The provisions of SFAS 157 should be applied prospectively as of the beginning of the fiscal year in which the statement is initially applied, except for a limited form of retrospective application for certain financial instruments. The Group is currently evaluating the impact, if any, of this statement on the consolidated financial statements and related disclosures.

In February 2007, the FASB issued SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities"*, ("SFAS 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. The Group is currently evaluating the impact, if any, of this statement on its consolidated financial statements and related disclosures.

In June 2006, the FASB issued Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes"* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, *"Accounting for Income Taxes"*. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Group adopted FIN 48 on January 1, 2007 and estimated the cumulative effect on adoption of FIN 48 to be a reduction of consolidated retained earnings as of January 1, 2007 of approximately $1.5 million.

In June 2006, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 06–3, *"How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (That Is, Gross Versus Net Presentation)"* ("EITF 06–3"). The scope of EITF 06–3 includes sales, use, value added and some excise taxes that are assessed by a governmental authority on specific revenue–producing transactions between a seller and customer. EITF 06–3 states that a company should disclose its accounting policy (i.e. gross or net presentation) regarding the presentation of taxes within its scope, and if significant, these disclosures should be applied retrospectively to the financial statements for all periods presented. EITF 06–3 is effective for interim and annual reporting periods beginning after December 15, 2006. The Group is currently evaluating the impact, if any, of this statement on its consolidated combined financial statements and related disclosures.

*(v)  Reclassification*

Certain prior year amounts have been reclassified to conform to the current period's presentation.

F–21

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

3. **Acquisitions**

*2004 Acquisitions:*

In 2004, the Group acquired 10 entities in order to expand their out–of–home television advertising networks for total cash consideration of $4,921,069. As a result of these acquisitions, the Group recorded goodwill and intangible assets of $4,657,492 and $603,520, respectively. All of the goodwill was assigned to the out–of–home television advertising services segment.

In addition, on September 22, 2004, the Group acquired 100% of the outstanding ordinary shares of Perfect Media which includes its then variable interest entity Shanghai Perfect Media, an advertising services provider, in exchange for cash of $500,000 and 14,594,200 ordinary shares having a fair value $4,484,798, or approximately $0.31 per ordinary share, The fair value of the Group's ordinary shares was determined by management considering multiple factors, including a retrospective valuation performed by a third party valuation firm.

The valuation was based on the guideline companies approach which incorporates the market performance of comparable listed companies as well as the financial results and growth trends of the Group to derive the total equity value of the Group. The valuation model then allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two scenarios: preference shares that have a value in excess of their conversion price were treated as if they had converted into ordinary shares; and preference shares that have a value below their conversion price were assigned a value that into consideration their liquidation preference. Ordinary shares were assigned a value equal to their pro rata share of the residual amount (if any) that remained after consideration of the liquidation preference of preferred stock with a value below their conversion price.

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The Group's primary reason for the acquisition of Perfect Media was its complementary business model and its strong relationships with landlords and property managers of commercial building locations in which the Group desired to locate its flat–panel displays. The acquisition of Perfect Media resulted in a significant amount of goodwill because the amount the Group paid for Perfect Media exceeded its fair market value. The Group was willing to pay in excess of Perfect Media's fair market value in order to maintain its competitive advantage within the commercial buildings the Group already occupied. F–18

The purchase price was allocated as follows:

|  |  | Amortization Period |
|---|---:|---:|
| Net tangible assets acquired | $ 40,597 | |
| Intangible assets: | | |
| Lease Agreements | 185,947 | 2.3 years |
| Customer base | 14,016 | 7 years |
| Goodwill | 4,744,238 | N/A |
| Total | $ 4,984,798 | |

*2005 Acquisitions:*

In 2005, the Group acquired nine entities in order to further expand its out–of–home television advertising network for total consideration of $3,083,244, which was paid primarily in cash. As a result of these acquisitions,

F–22

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

the Group recorded goodwill and intangible assets of $2,847,388 and $382,400, respectively. All of the goodwill was assigned to the out–of–home television advertising services segment.

In addition, on March 21, 2005, the Group acquired Capital Beyond Limited, including its then variable interest entity Guangdong Framedia, an advertising services provider, in exchange for cash consideration of $2,054,008, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization Period |
| --- | --- | --- |
| Net tangible assets acquired | $  337,252 |  |
| Intangible assets: |  |  |
| Lease agreements | 471,818 | 2.3 years |
| Customer base | 10,633 | 7 years |
| Goodwill | 1,234,305 | N/A |
| Total | $ 2,054,008 |  |

*2006 Acquisitions:*

On January 1, 2006, the Group acquired Infoachieve Limited ("Infoachieve"), which included its then variable interest entity Shanghai Framedia Advertising Development Ltd. ("Framedia"), the largest in–elevator poster frame advertising network operator in China. The purchase price included cash of $39,600,000, all of which was paid as of December 31, 2005, and 22,157,003 ordinary shares having a fair value of $54,690,130, or approximately $2.47 per ordinary share. The fair value of the ordinary shares was based on the average market price of Focus Media Holding's ordinary shares over a reasonable period before and after the date that the terms of the acquisition were agreed to and announced. Framedia achieved certain earnings targets for the year ended December 31, 2006 and, as a result, on June 15, 2007 the Group issued 35,830,619 ordinary shares as additional purchase consideration. As the contingency was resolved as of December 31, 2006, the Group recorded $237,879,480 in consideration payable as a component of shareholders' equity, which represents the fair value of the 35,830,619 shares as of December 31, 2006.

The aggregate purchase price is comprised of the following:

|  |  |
| --- | --- |
| Cash consideration | $   39,600,000 |
| Other acquisition costs | 311,110 |
| Value of the ordinary shares issued | 54,690,130 |
| Value of contingent consideration resolved (ordinary shares to be issued) | 237,879,480 |
| Total consideration | $ 332,480,720 |

F–23

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition as follows:

|  |  | Amortization Period |
|---|---|---|
| Net tangible liabilities assumed | $   (8,443,960) |  |
| Intangible assets: |  |  |
| Lease agreements | 8,281,999 | 6 years |
| Customer base | 2,664,685 | 7 years |
| Non–compete agreement | 463,558 | 3 years |
| Trademark | 939,377 | 1 years |
| Contract backlog | 70,120 | 1 years |
| Goodwill | 328,504,941 | N/A |
| Total | $   332,480,720 |  |

The goodwill was assigned to the in–elevator poster frame advertising services segment.

On February 28, 2006, the Group acquired Target Media Holdings Limited ("Target Media"), which used to be the Group's biggest competitor in out–of–home television advertising services, and its wholly–owned subsidiary, Target Media Multi–Media technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity, Shanghai Target Media Co., Ltd. ("STM"), one of the largest out–of–home advertising network operators in China. The purchase price included cash of $94,000,000, all of which was paid in 2006, and 77,000,000 ordinary shares having a fair value of $310,464,000, or $4.032 per ordinary share. The fair value of the ordinary shares was based on average market price of Focus Media Holding's ordinary shares over a reasonable period before and after the date that the terms of the acquisition were agreed to and announced.

The aggregate purchase price of $407,321,524 consisted of the following:

| | |
|---|---|
| Cash consideration | $   94,000,000 |
| Other acquisition costs | 2,857,524 |
| Value of the ordinary shares issued | 310,464,000 |
| Total consideration | $   407,321,524 |

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition as follows:

|  |  | Amortization Period |
|---|---|---|
| Net tangible assets acquired | $   19,629,853 |  |
| Intangible assets: |  |  |
| Lease agreements | 4,510,494 | 10 years |
| Customer base | 449,631 | 7 years |
| Trademark | 5,721,874 | 10 years |
| Contract backlog | 148,550 | 1 years |
| Goodwill | 376,861,122 | N/A |
| Total | $   407,321,524 |  |

F–24

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The goodwill was assigned to the out–of–home television advertising services segment.

The purchase price allocation and intangible asset valuations for each of the two acquisitions described above were determined by management based on a number of factors including a valuation report provided by a third party valuation firm. The valuation report utilized and considered generally accepted valuation methodologies such as the income, market, cost and actual transaction of Group shares approach. The Group has incorporated certain assumptions which include projected cash flows and replacement costs.

In the valuation of lease agreements, customer base and contract backlog, an indication of value was developed through the application of a form of income approach, known as excess earnings method. The first step to apply the excess earning method was to estimate the future debt–free net income attributable to the intangible asset. The resulting debt–free net income was then reduced by an estimated fair rate of return on contributory assets necessary to realize the projected earnings attributable to the intangible assets. These assets include fixed assets, working capital and other intangible assets.

The valuation of the trademark was based on the relief from royalty method whereby an asset is valued based upon the after–tax cash flow savings accruing to the owner by virtue of the fact that the owner does not have to pay a "fair royalty" to a third party for the use of that asset. Accordingly, a portion of the owner's earnings, equal to the after–tax royalty that would have been paid for use of the asset can be attributed to that asset. The value of the asset depends on the present worth of future after–tax royalties attributable to the asset to their present worth at market–derived rates of return appropriate for the risks of that particular asset.

Also in 2006, the Group completed a number of individually insignificant acquisitions which are described below:

On March 21, 2006, the Group acquired Dotad Media Holdings Limited ("Dotad"') in exchange for cash consideration of $15,000,000, all of which was paid as of December 31, 2006. On June 15, 2007, additional 1,500,000 ordinary shares were issued as Dotad has met its earning targets in the first year it was acquired. An additional 1,500,000 ordinary shares is issuable contingent upon Dotad's meeting certain earning targets in 2007. The Group acquired intangible assets of $6,587,095 and recognized goodwill of $8,444,464. The goodwill was assigned to the mobile handset advertising services segment.

The Group acquired three entities in the poster–frame advertising business for cash consideration of $10,670,222. The Group recognized acquired intangible assets of $1,682,771 and recognized goodwill of $9,057,700, which was assigned to the in–elevator poster frame advertising services segment.

The Group acquired three entities which provide out–of–home television advertising services and the remaining minority interest in six subsidiaries, for cash consideration of $5,314,923 and 97,190 ordinary shares. Certain of these acquisitions have contingent consideration based on future earnings targets, The group recognized acquired intangible assets of $12,507 and recognized goodwill of $3,453,332, which was assigned to the out–of–home television advertising services segment.

The Group acquired 70% of the outstanding ordinary shares of Appreciated Capital Ltd. and its then variable interest entity Beijing YangShiSanWei Advertisement Co., Ltd. (collectively, "ACL"). ACL sells advertising in movie theatres to its customers. The purchase consideration is fully contingent and is based on earnings targets for the years ending August 31, 2007, 2008 and 2009, subject further to the attainment of certain operational targets. The Group advanced $2.8 million to ACL. The purchase price allocation can not be completed until the contingent consideration is resolved. As such, the Group has recorded a liability of $358,574, which is equal to the excess of the fair value of the assets acquired over cost on the date of acquisition.

F–25

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Acquisitions in the six months ended June 30, 2007 (unaudited):*

In January and February 2007, the Group acquired five companies which provide in–elevator poster frame advertising services. The purchase consideration for each of these five entities is contingent upon the achievement of certain earning targets over the next one to three fiscal years. The Group made an advance payment of $6.2 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group acquired five companies which provide mobile handset advertising services. The purchase consideration for each of these five entities is contingent upon the achievement of certain earnings target over the next 12 months to 25 months. The Group made an advance payment of $8.7 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group acquired a billboard advertising company. The purchase consideration is contingent upon the operating results over the next three years. The Group made an advance payment of $3 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group completed the acquisition of Allyes Information Technology Company Limited, or Allyes, a Cayman Islands company, which operates an Internet advertising marketing agency and technology services company through its PRC affiliated entities. Allyes is the largest Internet advertising agency and provider of Internet advertising technology in China. The purchase price consideration was $70 million in cash and 19,969,080 ordinary shares having a fair value of $154,281,112, or $7.726 per ordinary share. Additional consideration of 9,662,458 ordinary shares is issuable, contingent upon Allyes meeting certain earnings targets during the twelve month period from April 1, 2007 to March 31, 2008.

The aggregate purchase price, excluding contingent consideration, of $224,698,474 consisted of the following:

| | | |
|---|---:|---:|
| Cash consideration | $ | 70,000,000 |
| Other acquisition costs | | 417,362 |
| Value of the ordinary shares issued | | 154,281,112 |
| | | |
| Total consideration | $ | 224,698,474 |

The purchase price has been preliminarily allocated as follows:

| | | | Amortization Period |
|---|---:|---:|---:|
| Net tangible assets acquired | $ | 21,957,393 | |
| Intangible assets: | | | |
| Acquired technology | | 11,832,000 | 6 years |
| Customer relationship | | 10,249,000 | 7 years |
| Other | | 14,014,000 | 1–7 years |
| Goodwill | | 166,646,081 | N/A |
| | | | |
| Total | $ | 224,698,474 | |

In the second quarter of 2007, the Group completed acquisitions of eight companies which primarily provide mobile handset advertising, Internet advertising and outdoor billboard advertising services, for an aggregate purchase considerations of approximately $7.5 million plus additional consideration contingent upon the achievement of certain earnings targets over the next one to three fiscal years. The Group also made an advance payment of $16.3 million, which will be deducted from the contingent purchase price consideration.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**Pro forma (unaudited)**

The following summarized unaudited pro forma results of operations for the years ended December 31, 2004, 2005 and 2006 and six months ended June 30, 2007, have been prepared assuming that the individually material acquisitions, being Infoachieve Limited, Target Media Holdings Limited, Capital Beyond Limited, Perfect Media and Allyes Information Technology Company Limited, occurred as of January 1, 2004, 2005, 2006 and 2007. These pro forma results have been prepared for comparative purposes only based on management's best estimate and do not purport to be indicative of the results of operations which actually would have resulted had the acquisitions occurred as of January 1, 2004, 2005, 2006 and 2007.

| | Pro Forma | | | | | | |
|---|---|---|---|---|---|---|---|
| | For the Years Ended December 31, | | | | | For the Six Months Ended June 30, | |
| | **2004** | | **2005** | | **2006** | | **2007** |
| | (Unaudited) | | (Unaudited) | | (Unaudited) | | (Unaudited) |
| Revenues | $ | 29,296,705 | $ | 113,750,432 | $ | 264,107,708 | $ | 181,204,576 |
| Net income (loss) attributable to holders of ordinary shares | | (10,703,970) | | 3,127,583 | | 69,549,229 | | 44,664,816 |
| Income (loss) per share — basic | $ | (0.06) | $ | 0.01 | $ | 0.13 | $ | 0.08 |
| Income (loss) per share — diluted | $ | (0.06) | $ | 0.01 | $ | 0.13 | $ | 0.07 |

**4.  Investment in Equity and Debt Securities**

The following is a summary of short–term available–for–sale equity and debt securities:

| | December 31, | | | | | | June 30, |
|---|---|---|---|---|---|---|---|
| | **2004** | | **2005** | | **2006** | | **2007** |
| | | | | | | | (Unaudited) |
| Debt Securities | $ | — | $ | 35,000,000 | $ | — | $ | — |
| Equity Securities | | — | | — | | — | | 40,715,298 |
| Gross unrealized gains (loss) | | — | | (164,150) | | — | | 601,893 |
| Fair Value | $ | — | $ | 34,835,850 | $ | — | $ | 41,317,191 |

**5.  Accounts Receivable, net**

Accounts receivable, net consists of the following:

| | December 31, | | | | | | June 30, |
|---|---|---|---|---|---|---|---|
| | **2004** | | **2005** | | **2006** | | **2007** |
| | | | | | | | (Unaudited) |
| Billed receivables | $ | 4,782,521 | $ | 13,684,419 | $ | 37,922,093 | $ | 103,502,684 |
| Unbilled receivables | | 1,837,428 | | 7,504,112 | | 23,692,250 | | 15,266,882 |
| Total | $ | 6,619,949 | $ | 21,188,531 | $ | 61,614,343 | $ | 118,769,566 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of balance sheet dates.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

6.  **Acquired Intangible Assets, Net**

As of December 31, 2004, 2005, 2006 and the six months ended June 30,2007 (unaudited), the Group has the following amounts related to intangible assets:

|  | December 31, | | | June 30, 2007 |
|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | (Unaudited) |
| **Cost:** | | | | |
| Operation and broadcasting rights | $ — | $ — | $ 6,403,114 | $ 6,565,557 |
| Lease agreements | 511,929 | 1,249,843 | 16,336,586 | 18,613,024 |
| Customer bases | 273,820 | 430,879 | 7,827,587 | 20,233,245 |
| Trademark | — | — | 6,861,065 | 15,716,237 |
| Acquired technology | — | — | 2,546,519 | 14,800,472 |
| Others | — | — | 1,177,276 | 8,378,045 |
| Total | $ 785,749 | $ 1,680,722 | $ 41,152,147 | $ 84,306,580 |
| **Accumulated amortization:** | | | | |
| Operation and broadcasting rights | $ — | $ — | $ 80,039 | $ 410,347 |
| Lease agreements | 58,888 | 447,578 | 3,015,639 | 4,514,815 |
| Customer bases | 18,555 | 75,224 | 1,051,403 | 2,151,849 |
| Trademark | — | — | 1,462,163 | 1,801,212 |
| Acquired technology | — | — | 381,978 | 1,164,172 |
| Others | — | — | 443,906 | 1,254,868 |
| Total | $ 77,443 | $ 522,802 | $ 6,435,128 | $ 11,297,263 |
| Intangible assets, net: | $ 708,306 | $ 1,157,920 | $ 34,717,019 | $ 73,009,317 |

The Group recorded amortization expense as follows:

|  | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| Cost of revenues | $ 58,888 | $ 382,359 | $ 3,207,079 | $ 1,363,026 | $ 3,062,647 |
| Selling and marketing | 18,555 | 55,478 | 2,567,002 | 1,129,363 | 1,541,394 |
| Total | $ 77,443 | $ 437,837 | $ 5,774,081 | $ 2,492,389 | $ 4,604,041 |

The Group will record amortization expense of $5,724,504, $5,490,514, $5,148,733, $5,078,621 and $4,585,056 for the years ended December 31, 2007, 2008, 2009, 2010 and 2011, respectively.

F–28

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**7.  Equipment, Net**

Equipment, net consists of the following:

| | December 31, | | | June 30, 2007 |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **(Unaudited)** |
| Media display equipment | $  9,384,262 | $  40,191,968 | $  77,088,464 | $  85,657,032 |
| Computers and office equipment | 675,053 | 1,267,696 | 3,360,590 | 6,541,392 |
| Leasehold improvements | 167,932 | 537,130 | 713,524 | 723,718 |
| Vehicles | 83,834 | 349,575 | 658,825 | 1,027,533 |
| | $  10,311,081 | $  42,346,369 | $  81,821,403 | $  93,949,675 |
| Less: accumulated depreciation and amortization | (1,142,742) | (5,975,119) | (22,767,910) | (31,893,128) |
| | 9,168,339 | 36,371,250 | 59,053,493 | 62,056,547 |
| Assembly in progress | 28,804 | 7,323,638 | 11,195,831 | 19,172,593 |
| Total | $  9,197,143 | $  43,694,888 | $  70,249,324 | $  81,229,140 |

Depreciation expense for 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) was $870,597, $4,489,178, $13,666,912, $6,132,059 and $8,058,205, respectively.

Assembly in process relates to the assembly of flat–panel television screens. No provision for depreciation is made on assembly in process until such time as the relevant assets are completed and put into use.

**8.  Short–term Debts**

| | December 31, | | | June 30, 2007 |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **(Unaudited)** |
| Short term bank loan (a) | $  — | $  991,301 | $  — | $  393,933 |
| Other loan due to ex–shareholders of Framedia (b) | — | — | 2,769,459 | — |
| Total | $  — | $  991,301 | $  2,769,459 | $  393,933 |

(a)  The Group had $nil, $991,301, $nil and $393,933 outstanding under a line of credit arrangement as of December 31, 2004, 2005 2006 and June 30, 2007 (unaudited), respectively. The amount available for additional borrowings under this line of credit at December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited) was $nil, $2,106,516, $nil and $nil, respectively. The line of credit was subject to an interest rate of 10%, discounted by an amount equal to the six month loan interest rate of The People's Bank of China. As of December 31, 2005, the line of credit bore interest at 4.698% per annum. The Group recorded interest expense under the line of credit in 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) of $nil, $49,873, $305,287, $288,488 and $6,971, respectively.

(b)  At December 31, 2006, the short–term loan from ex–shareholders of Framedia are non–interest bearing, all of which are repayable within one year.

F–29

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**9.  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

| | December 31, | | | June 30, |
| | 2004 | 2005 | 2006 | 2007 |
| --- | --- | --- | --- | --- |
| | | | | (Unaudited) |
| Accrued sales commissions | $    691,888 | $    2,583,270 | $    5,813,761 | $    8,091,174 |
| Other accrued expenses | 67,929 | 577,863 | 1,844,781 | 2,777,196 |
| Other taxes payables | 1,728,850 | 3,037,443 | 7,451,787 | 9,560,768 |
| Advance from customers | 1,459,976 | 3,387,224 | 6,381,032 | 14,902,876 |
| Accrued employee payroll and welfare | 473,054 | 1,059,717 | 1,465,142 | 2,975,594 |
| Accrued offering costs | 767,821 | — | — | — |
| Payables related to acquisitions | 538,860) | 99,130) | 4,530,745)) | 12,332,330 |
| Amount due to minority shareholders of subsidiary | 426,858 | 200,848 | — | — |
| Withholding individual PRC income tax | — | — | 9,046,576 | 6,932,777 |
| Others | 436,199 | 801,407 | 2,140,351 | 7,606,284 |
| Total | $  6,591,435 | $  11,746,902 | $  38,674,175 | $  65,178,999 |

**10.   Share–based Compensation**

In June 2003, the Group adopted the 2003 Employee Share Option Scheme ("2003 Plan") under which not more than 30% of issued share capital was reserved for grants of options. In May 2005, the Group adopted the 2005 Share Option Plan ("2005 Plan"), under which the amount of options that may issue has been reduced to an aggregate of 20% of issued share capital, including the 10.87% already granted under the 2003 Plan. In addition, during the three years after the adoption of our 2005 Plan, the Group may issue no more than 5% of issued share capital for grants of options. In October 2006, the Group further adopted the 2006 Employee Share Option Plan ("2006 Plan"), under which the Group may issue no more than 3.6% of issued ordinary shares for grant of options. The option plans are intended to promote the success and to increase shareholder value by providing an additional means to attract, motivate, retain and reward selected directors, officers, employees and third–party consultants and advisors.

In 2004, 2005, 2006 and six months ended June 30, 2007 (unaudited), options to purchase 25,208,200, 23,843,630, 14,800,000 and 1,300,000 ordinary shares were authorized under the option plans, respectively. Under the terms of each option plan, options are generally granted at prices equal to the fair market value as determined by the Board of Directors, expire 10 years from the date of grant and generally vest over three years while certain options granted vest over one year. Subsequent to the initial public offering, options were generally granted at the fair market value of the ordinary shares at the date of grant. As of December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited), options to purchase 25,208,200, 49,051,830, 37,515,150 and 34,768,895 ordinary shares were granted to employees and non–employees. Share options granted to external consultants and advisors in exchange for services were expensed based on the estimated fair value utilizing the Black–Scholes option pricing model.

F–30

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The fair value of options granted is estimated on the date of grant using the Black–Scholes option–pricing model with the following weighted–average assumptions:

|  | For the Years Ended December 31, | | | For the Six Months Ended June 30, |
|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2007 |
|  |  |  |  | (unaudited) |
| Option granted to employees: |  |  |  |  |
| Average risk–free rate of return | 2.97% | 3.10–4.43% | 4.74%–4.80% | 4.61%–4.68% |
| Weighted average expected option life | 1–3 years | 2–3 years | 2 years | 2 years |
| Volatility rate | 36.2% | 30.49%–36.2% | 40.0–53.7% | 50.61% |
| Dividend yield | 0% | 0% | 0% | 0% |

Prior to the initial public offering in July 2005, the derived fair value of the ordinary shares underlying the options was determined by management by factoring into their consideration a retrospective valuation conducted by a third party valuation firm using a generally accepted valuation methodology, the guideline companies approach, which incorporates certain assumptions including the market performance of comparable listed companies as well as the financial results and growth trends of the Group, to derive the total equity value of the Group. The valuation model allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two assumptions: where conversion into ordinary shares would result in a higher economic value, preference shares were treated as if they had converted into ordinary shares; and preference shares that have a value higher than their conversion price were assigned a value that took into consideration their liquidation preference.

The ordinary shares were assigned a value equal to their pro rata share of the residual amount, if any, that remained after consideration of the liquidation preference of preferred shares with a value below their conversion price. Also prior to July 2005, the expected volatilities are estimated based on the average volatility of comparable companies with the time period commensurate with the expected time period. Following the initial public offering, the expected volatilities were estimated based on the historical volatility. The expected term of options granted represents the period of time that options granted are expected to be outstanding. The risk–free interest rate assumption is determined using the Federal Reserve nominal rates for U.S. Treasury zero–coupon bonds with maturities similar to those of the expected term of the award.

The weighted average fair value of options granted as of December 31, 2004, 2005, 2006 and six months ended June 30, 2007 (unaudited) was $0.09, $0.39, $1.77 and $2.76, respectively.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

A summary of the share option activities are as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Remaining Contract Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Options outstanding at January 1, 2006 | 49,051,830 | $  0.89 | | |
| Granted | 14,800,000 | 5.60 | | |
| Cancelled | — | — | | |
| Exercised | 26,336,680 | 0.58 | | |
| Options outstanding at December 31, 2006 | 37,515,150 | $  2.97 | 8.81 years | $  137,600,699 |
| Granted | 1,300,000 | 7.21 | | |
| Cancelled | — | | | |
| Exercised | 4,046,255 | 1.29 | | |
| Options outstanding at June 30, 2007 (unaudited) | 34,768,895 | $  3.33 | 8.45 years | $  235,477,683 |
| Options vested or expected to vest at December 31, 2006 | 34,000,844 | $  0.66 | 7.82 years | $  203,335,095 |
| Options exercisable at December 31, 2006 | 7,664,164 | $  0.94 | 8.00 years | $  43,688,834 |
| Options vested or expected to vest at June 30, 2007 (unaudited) | 41,613,095 | $  0.86 | 7.44 years | $  384,508,746 |
| Options exercisable at June 30, 2007 (unaudited) | 11,230,160 | $  1.36 | 7.66 years | $  98,126,788 |

The total intrinsic value of options exercised during the years ended December 31, 2004, 2005, 2006 and six months period ended June 30, 2007 (unaudited), was $nil, $nil, $146,119,111 and $24,487,297, respectively.

As of December 31, 2006 and June 30, 2007 (unaudited), there was $25,111,999 and $19,267,984, respectively, in total unrecognized compensation expense related to unvested share–based compensation arrangements, which is expected to be recognized over weighted–average period of 1.29 years and 0.86 years, respectively.

**11. Income Taxes**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gain. In addition, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*British Virgin Islands*

The Group's subsidiaries incorporated in the BVI are not subject to taxation.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Hong Kong*

Focus Media (China) Holding Ltd.is subject to Hong Kong profit tax at a rate of 17.5% on its assessable profit. No Hong Kong profit tax has been provided as the Group does not have assessable profit that is earned in or derived from Hong Kong during the years presented.

*PRC*

Pursuant to the PRC Income Tax Laws, the Company's subsidiaries and VIEs are generally subject to Enterprise Income Taxes ("EIT") at a statutory rate of 33%, which comprises 30% national income tax and 3% local income tax. Some of the Company's subsidiaries and VIEs are newly incorporated enterprises engaged in the advertising industry which are entitled to a two–year tax exemption holiday, commencing from the first operating year. One of the subsidiaries of the Company, Beijing Focus Media Wireless Co., Ltd., is a qualified new technology enterprise and under PRC Income Tax Laws and is subject to a preferential tax rate of 15%, plus a three–year tax exemption followed by three years with a 50% reduction in the tax rate, commencing from the first profitable year.

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

*Composition of income tax expense*

The current and deferred portion of income tax expense (benefit) included in the consolidated statements of operations for the years ended December 31 is as follows:

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2006** (Unaudited) | **2007** (Unaudited) |
| Current income tax expense | $ 828,962 | $ 715,117 | $ 1,106,921 | $ 617,669 | $ 3,784,693 |
| Deferred income tax expense (benefit) | 78,588 | (20,664) | (63,383) | 371,250 | (498,342) |
| Income tax expense | $ 907,550 | $ 694,453 | $ 1,043,538 | $ 988,919 | $ 3,286,351 |

F–33

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Reconciliation of the differences between statutory tax rate and the effective tax rate*

Reconciliation between total income tax expense and that amount computed by applying the PRC statutory income tax rate of 33% to income before taxes is as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| Statutory rate | 33.0% | 33.0% | 33.0% |
| Effect of different tax rate of group entities operation in other jurisdiction | 318.4% | 0.0% | 2.4% |
| Effect on tax holiday | (182.8)% | (31.5)% | (35.6)% |
| Permanent differences | (78.4)% | 1.1% | 2.2% |
| Change in valuation allowance | (18.6)% | 0.2% | (0.7)% |
| Effective tax rate | 71.6% | 2.8% | 1.3% |

The following table sets forth the effects of the tax holidays granted to the entities of the Group for the periods presented:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| Tax holiday effect | $ 7,007,620 | $ 23,212,97 | $ 99,641,998 |
| Net income per share effect — basic | $ 0.04 | $ 0.09 | $ 0.2 |
| Net income per share effect — diluted | $ 0.04 | $ 0.06 | $ 0.19 |

The principal components of the Group's deferred income tax assets/liabilities are as follows:

| | December 31, | | | June 30, 2007 |
| --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | (Unaudited) |
| Deferred tax assets: | | | | |
|   Net operating loss carry forwards | $ 276,673 | $ 545,208 | $ 2,317,316 | $ 3,061,405 |
|   Accrued expenses temporarily non–deductible | 54,281 | 46,695 | 242,106 | 84,018 |
|   Pre–operating expenses | 62,862 | 80,102 | — | — |
|   Bad debt provision | 57,147 | 130,897 | 704,429 | 1,199,508 |
| Total deferred tax assets | $ 450,963 | $ 802,902 | $ 3,263,851 | $ 4,344,931 |
| Valuation allowance on deferred tax assets | — | (59,988) | (2,438,008) | (3,466,395) |
| Net deferred tax assets | $ 450,963 | $ 742,914 | $ 825,843 | $ 878,536 |
| Deferred tax liabilities: | | | | |
|   Intangible assets basis difference | $ — | $ — | $ 3,303,110 | $ 7,230,123 |
| Total deferred tax liabilities | $ — | $ — | $ 3,303,110 | $ 7,230,123 |

A significant portion of the deferred tax assets recognized relate to net operating loss carry forwards. The Group had tax losses of $7,689,311 as of December 31, 2006 to be carried forward against future taxable income, which will expire if unused in the years ending December 31, 2008 through 2011. The Group operates through multiple subsidiaries and the valuation allowance is considered on each individual subsidiary basis. Where a

F–34

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

valuation allowance was not recorded, the Group believes that there was sufficient positive evidence to support its conclusion not to record a valuation allowance as it expects to generate sufficient taxable income in the future.

The valuation allowance in 2005 and 2006 has been increased in connection with an increase in net operating loss carry forwards for which the Group believes it cannot generate future taxable income sufficient to recognize the income tax benefit.

In July 2006, the Financial Accounting Standards Board (FASB) issued FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109 (FIN 48), which clarifies the accounting and disclosure for uncertainty in tax positions, as defined in that statement. FIN 48 prescribes a more–likely–than–not threshold for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This interpretation also provides guidance on de–recognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, accounting for income taxes in interim periods and income tax disclosures.

The Group adopted the provisions of FIN 48 effective January 1, 2007. Based on its FIN 48 analysis documentation, the Group has made its assessment of the level of tax authority for each Tax Position (including the potential application of interest and penalties) based on the technical merits, and has measured the unrecognized tax benefits associated with the Tax Positions. The adoption of FIN 48 has reduced the retained earnings as of January 1, 2007 by $1.5 million with a corresponding increase in the liability for uncertain tax positions, which is transfer pricing related matters. Based on the current China tax practice, it appears there is a prevailing administrative practice not to assess interest or penalty on transfer pricing related adjustments. Therefore, it is more likely than not that interest or penalty is not required to be accrued for the assessment of the transfer pricing related tax position. As a result, no corresponding interests and/or penalties are assessed in association with the transfer pricing related matters for the purpose of FIN 48 adoption. The aforementioned liability is recorded in other current liabilities in the consolidated balance sheet. The Group has no material unrecognized tax benefit which would favorably affect the effective income tax rate in future periods. The Group classifies interest and/or penalties related to income tax matters in income tax expenses. The additional increase in the FIN 48 liability for uncertain tax positions during the period ended June 30, 2007 was immaterial.

According to the PRC Tax Administration and Collection Law, the statute of limitations is three years if the underpayment of taxes is due to computational errors made by the taxpayer or the withholding agent. The statute of limitations will be extended to five years under special circumstances, which are not clearly defined (but an underpayment of tax liability exceeding RMB 100,000 is specifically listed as a special circumstance). In the case of a related party transaction, the statute of limitations is 10 years. There is no statute of limitation in the case of tax evasion.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**12.   Net income (loss) per Share**

The following table sets forth the computation of basic and diluted income (loss) per share for the years indicated:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | | | (In U.S. Dollars, expect per share data) | | |
| Income (loss) attributable to holders of ordinary shares (numerator): | $  (10,576,414) | $  23,547,651 | $  83,197,732 | $  26,104,090 | $  54,006,367 |
| Shares (denominator): | | | | | |
| Weighted average ordinary shares outstanding used in computing basic income (loss) per share | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Plus weighted average preference shares outstanding | — | 84,119,675 | — | — | — |
| Plus incremental weighted average ordinary shares from assumed conversions of stock option using treasury stock method | — | 29,689,874 | 16,125,302 | 31,998,480 | 16,855,004 |
| Weighted average ordinary shares outstanding used in computing diluted income (loss) per share | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |
| Net income (loss) per share — basic | $       (0.07) | $       0.09 | $       0.16 | $       0.06 | $       0.10 |
| Net income (loss) per share — diluted | $       (0.07) | $       0.06 | $       0.16 | $       0.05 | $       0.09 |

For the above mentioned years, the Group had securities outstanding which could potentially dilute basic earnings per share in the future, but which were excluded from the computation of diluted net income (loss) per share in the periods presented, as their effects would have been anti–dilutive. Such outstanding securities consist of the following:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | | | (In U.S. Dollars, expect per share data) | | |
| Series A convertible redeemable preference shares | 41,967,400 | — | — | — | — |
| Series B convertible redeemable preference shares | 48,191,600 | — | — | — | — |
| Series C–1 convertible redeemable preference shares | 34,054,000 | — | — | — | — |
| Series C–2 convertible redeemable preference shares | 34,053,400 | — | — | — | — |

F–36

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

|  | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|  | 2004 | 2005 | 2006 | 2006 | 2007 |
|  | | | | (Unaudited) | (Unaudited) |
|  | | | (In U.S. Dollars, expect per share data) | | |
| Outstanding options to purchase ordinary shares | 25,208,200 | 49,051,830 | 37,515,150 | 35,541,220 | 34,768,895 |
| Total | 183,474,600 | 49,051,830 | 37,515,150 | 35,541,220 | 34,768,895 |

**13.    Convertible Redeemable Preference Shares**

Each Series A, Series B, Series C−1 and Series C−2 convertible redeemable preference shares was automatically converted into ordinary shares at the then effective conversion price upon the closing of a qualified underwritten public offering of the ordinary shares of the Group. Upon the completion of the Group's initial public offering on July 13, 2005, all of the issued and outstanding Series A, Series B, Series C−1 and Series C−2 convertible redeemable preference shares were converted into ordinary shares.

*a)* In April 2004, the Group issued 52,083,400 Series B convertible redeemable preference shares to a group of third party investors for cash proceeds of $12,062,696, net of issuance costs of $437,304. The holders of Series B redeemable convertible preference shares could have redeemed the Series B convertible redeemable preference shares at any time (i) before December 31, 2006 if the Group received a notice from the holders of a majority of Series B convertible redeemable preference shares indicating a material breach by the Group and its affiliates of their representation, warranties or covenants under Series B convertible redeemable preference shares, the shareholders agreement or the Restructuring Documents (as defined in the amended Series B Purchase Agreement), or (ii) after April 28, 2004 ("Redemption Start Date"), at the option of a majority of the holders of the Series B convertible redeemable preference shares then outstanding. In the event of a redemption pursuant to this right, the Group could have redeemed up to all of the Series B convertible redeemable preference shares at a redemption price per redeemable convertible preference share equal to $0.24×(1+(0.15×N)) plus all declared but unpaid dividends. N refers to a fraction, the numerator of which is the number of calendar days between April 28, 2004 and the Redemption Start Date and the denominator of which is 365. The Group recorded a deemed dividend of $2,191,442 in 2004, which resulted from the amortization of the 15% redemption premium associated with Series B convertible redeemable preference shares. According to the articles of association amended on November 29, 2004, the redemption price of Series B preferred stock was $0.24.

*b)* In April 2004, 62,400,000 outstanding ordinary shares were reclassified and re−designated into 62,400,000 Series A convertible redeemable preference shares. The re−designation has resulted in a deemed dividend of $8,308,411 which represents the difference between the fair value of the Series A convertible redeemable preference shares at the date of re−designation of $0.15 and the initial issuance price of the ordinary shares of $0.05 for 10,000,000 shares and approximately $0.01 for 52,400,000 shares.

The holders of Series A convertible redeemable preference shares had the right to cause the Group to redeem such preference shares, at any time commencing on a Redemption Start Date, at the option of a majority of holders of Series A redeemable convertible preference shares at a redemption price per Series A redeemable convertible preference share equal to $0.06 plus all declared but unpaid dividends. Series A convertible redeemable preference shares could not have been redeemed until the Group had redeemed all of the Series B convertible redeemable preference shares and paid the aggregate Series B convertible redeemable preference shares redemption price in full.

*c)* On November 29, 2004, the Group issued 34,053,400 Series C−2 convertible redeemable preference shares to group of third party investors for cash proceeds of $17,415,000, net of issuance costs of $85,000. The holder of a

F−37

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Series C–2 convertible redeemable preference share could have redeemed Series C–2 convertible redeemable preference shares at any time after the earlier of (i) such time as the holders of a majority of the Series C–2 convertible redeemable preference share delivered notice in writing to the Group that the Group and/or its affiliates was in material breach of any of its representations, warranties and covenants under the Series C Purchase Agreement, the Shareholders Agreement or the Ancillary Documents (as defined in the Series C Purchase Agreement) so long as such notice was to have been delivered before December 31, 2006 and (ii) anytime following the fourth anniversary of the issuance of the Series C–2 convertible redeemable preference share under the Series C Purchase Agreement. In connection with the redemption of any Series C–2 convertible redeemable preference share, the Group was to pay a redemption price equal to the Series C–2 convertible redeemable preference share Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–2 convertible redeemable preference share through to the date of redemption thereof.

*d)* On November 29, 2004, certain investors of Series A and/or Series B convertible redeemable preference shares sold 20,432,600 outstanding Series A convertible redeemable preference shares and 3,891,800 outstanding Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference shares investors at a price of US$0.51. These Series A convertible redeemable preference shares and Series B convertible redeemable preference shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $8,458,464 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of Series A and Series B convertible redeemable preference shares of $0.15 and $0.24, respectively.

*e)* In December 2004, an investor of ordinary shares sold 9,729,600 outstanding ordinary shares to third party investors at a price of $0.51. These ordinary shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $4,897,623 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of ordinary shares of $0.01.

Prior to the redemption or conversion of all Series C–2 convertible redeemable preference shares issued by the Group, any holder of Series C–1 convertible redeemable preference shares thereof could have, at any time, required the Group to redeem such shares out of funds legally available therefore in connection with the redemption of any Series C–1 convertible redeemable preference shares under this Clause, the Group would have paid a redemption price equal to the Series C–1 convertible redeemable preference shares Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–1 convertible redeemable preference shares through to the date of redemption thereof.

The significant terms of the Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares are as follows:

*Conversion*

Each Series A and Series B convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.15 and $0.24, respectively, upon the consummation of a Series A/B Qualified Public Offering or obtaining the necessary written consent from the holders of Series A and Series B convertible redeemable preference shares. A Series A/B Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that was registered under the Securities Act of 1933 representing at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $200,000,000 immediately prior to the offering.

F–38

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Each Series C–1 and Series C–2 convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.51 and $0.51, respectively, upon the consummation of a Series C Qualified Public Offering or obtaining the necessary written consent from the holders of Series C–1 and Series C–2 convertible redeemable preference shares. A Series C Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that has been registered under the Securities Act of 1933 which represents at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $335,000,000 immediately prior to the offering.

The conversion price of Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares was subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization.

Additionally, the conversion price was to be adjusted for dilution in the following circumstances:

1) In the event that the Group issued additional ordinary shares at a price per share less than the then prevailing Series A, Series B and Series C convertible redeemable preference shares' respective conversion price, the Series A, Series B and Series C convertible redeemable preference shares' respective conversion price was to be reduced, concurrently with such issuance, to a price (calculated to the nearest cent) equal to the price per share at which such additional shares were to be issued.

2) If the Group's financial results of 2004 and 2005 did not meet specified targets. Under the terms of the amended and restated memorandum and articles of association in April 2005, the performance–based adjustment was not triggered in 2004.

*Voting Rights*

Each Series A, Series B, Series C–1 and Series C–2 redeemable convertible preference share had voting rights equivalent to the number of shares of ordinary shares into which it was convertible.

*Dividends*

The holders of Series A, Series B, Series C–1 and Series C–2 redeemable convertible preference shares were to be entitled to receive out of any funds legally available therefore, when and if declared by the Board of Directors of the Group, dividends at the rate or in the amount as the Board of Directors considers appropriate.

*Liquidation Preference*

In the event of any liquidation, dissolution or winding up of the Group, as defined, the holders of Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares were to receive $0.06 per share, $0.24 per share, $0.51 per share and $0.51 per share, respectively, plus all declared but unpaid dividends. Such amounts were to be adjusted for any share splits, share dividends and recapitalization.

In the event of any liquidation, dissolution or winding up of the Group caused by a "Trade Sale", which is defined as any sales of shares, merger, consolidation or other similar transaction involving the Group in which its shareholders do not retain a majority of the voting power in the surviving entity, or a sale of all or substantially all the Group's assets, the holder of Series B redeemable convertible preference shares were to receive the higher of (i) 200% of the original purchase price of the Series B preference shares, for each Series B redeemable convertible preference share outstanding or (ii) the amount the holder would have received if all of the Series B redeemable convertible preference shares held by such holder were to be converted to ordinary shares immediately prior to such

F–39

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

liquidation, dissolution or winding up of the Group. According to the articles of association amended on November 29, 2004 (the "Modification Date"), the net settlement feature of the Series B convertible redeemable preference shares under trade sale was removed.

The embedded conversion option of Series B convertible redeemable preference shares has been recorded at its fair value of $1,179,689 and accounted for separately as an embedded conversion option. The Group has accounted for the derivative liability relating to the conversion option by adjusting the liability to its estimated fair value at each subsequent balance sheet date up to the Modification Date, with adjustments recorded as other income or expenses. In 2004, the Group adjusted the derivative liability to fair market value and recorded a change in fair value of the derivative liability of $11,692,287 in the consolidated statements of operations. The Group recorded a deemed dividend of $1,179,689 in 2004, which resulted from the accretion of the discount of Series B convertible redeemable preference shares. On the Modification Date, the Group has re−combined the fair value of the derivative liability of $12,871,976 with Series B convertible redeemable preference shares and subsequently recorded an accretion of premium of $12,906,774, which represented the difference of the carrying balance of Series B convertible redeemable preference shares at the Modification Date and its initial issuance date.

**14.    Ordinary Shares**

(1) In April 2003 the Group issued 2,000,000 ordinary shares for cash proceeds of $1,625,000.

(2) In May 2003, the Board of Directors approved a share split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's financial statements.

(3) In April 2004, 62,400,000 outstanding ordinary shares were reclassified and redesignated into 62,400,000 Series A convertible redeemable preference shares.

(4) In September 2004, the Group issued 14,594,200 ordinary shares as partial consideration of the acquisition of Perfect Media (Note 3).

(5) In December 2004, 9,729,600 outstanding ordinary shares were sold and redesignated in 9,729,600 Series C−1 convertible redeemable preference shares.

(6) On May 31, 2005, shareholders of the Group approved a 200−for−1 split of the Company's shares, with immediate effect. The 200−for−1 share split of the Company's shares has been retroactively applied to all periods presented.

(7) Upon initial public offering on July 13, 2005, the Group issued 77,575,000 ordinary shares, for US$1.7 per ordinary share, for total proceeds of US$118,174,130, net of offering expenses.

(8) On January 1, 2006, the Group issued 22,157,003 ordinary shares as partial consideration of the acquisition of Infoachieve (Note 3).

(9) On January 27, 2006, the Group issued 15,000,000 ordinary shares, for US$4.35 per ordinary share, for total proceeds of US$61,783,300, net of offering expenses.

(10) On February 28, 2006, the Group issued 77,000,000 ordinary shares as partial consideration of the acquisition of all the outstanding ordinary shares of Target Media (Note 3).

(11) On March 1, 2006, the Group issued 74,720 ordinary shares related to an acquisition (Note 3).

(12) On May 30, 2006, the Group issued 22,470 ordinary shares related to an acquisition (Note 3).

(13) On June 16, 2006, the Group issued 16,000,000 ordinary shares, for US$5.4 per ordinary share, for total proceeds of US$80,967,593, net of offering expenses.

F–40

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

(14) During the year ended December 31, 2006, the Group issued 26,336,680 ordinary shares pursuant to share–based compensation plans upon exercise of options.

(15) On January 27, 2007, the Group issued 15,000,000 ordinary shares, for US$7.95 per ordinary share, for total proceeds of US$114,873,031, net of offering expenses.

(16) On March 28, 2007, the Group issued 19,969,080 ordinary shares related to an acquisition (Note 3).

(17) In June, 2007, the Group issued 37,330,619 ordinary shares as a result of contingent consideration resolved in connection with the Infoachieve and Dotad acquisitions (Note 3).

**15.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $338,923, $619,831, $2,326,895 and $1,475,967 for the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2007(unaudited), respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group subsidiaries in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end) until such cumulative appropriation reaches 50% of the registered capital; the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. For the years ended December 31, 2004, 2005 and 2006, the Group made total appropriations of $1,488,000, $98,729, and $650,851 respectively.

**16.    Commitments**

*Leases commitments*

The Group has entered into certain leasing arrangements relating to the placement of the flat–panel television screens in various locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expense under operating leases for 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) were $3,648,829, $15,481,200, $50,106,121, $22,774,932 and $40,308,808, respectively.

F–41

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Future minimum lease payments under non–cancelable operating lease agreements were as follows:

|  | | For the Years Ended December 31, |
| --- | --- | --- |
| 2007 | $ | 48,156,647 |
| 2008 | | 32,515,865 |
| 2009 | | 19,871,379 |
| 2010 | | 8,933,276 |
| 2011 and thereafter | | 1,961,718 |
| Total | $ | 111,438,885 |

**17.    Segment Information**

The Group is mainly engaged in operating an out–of–home advertising network in the PRC using flat–panel television advertising displays located in high traffic commercial locations and in–store areas. The Group also provides in–elevator poster frame advertising services, mobile handset advertising services and internet advertising services.

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO"), who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. The Group uses the management approach to determine the operating segments. The management approach considers the internal organization and reporting used by the Group's chief operating decision maker for making decisions, allocating resources and assessing the performance. The Group has four operating segments and determined that it has four reporting segments, which are out–of–home television advertising services (consists commercial location advertising network and in–store advertising network), in–elevator poster frames, mobile handset advertising and internet advertising. The fifth operating segment did not meet the significance threshold for separate disclosure and has been classified in "other". These segments all derive their revenues from the sale of advertising services. In March 2007, the Group further acquired Allyes Information Technology Co., Ltd., which is referred to as Internet advertising services. The Group did not have any Internet advertising service business prior to the acquisition and therefore, the segmental information is only provided from March 2007 onwards.

The Group's chief operating decision maker does not assign assets to these segments. Consequently, it is not practical to show assets by reportable segments. Prior to 2006, the Group only had a single operating segment, out–of–home television advertising services. The in–elevator poster frame advertising services, mobile handset advertising services and others segments were the result of acquisitions made in 2006.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The following table presents selected financial information relating to the Group's segments for 2006:

| | Out–of–Home Television Advertising Services | In–Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|
| Net revenues — external | $ 160,210,414 | $ 40,904,235 | $ 10,100,965 | $ 689,851 | — | $ 211,905,465 |
| Net revenues — intersegment | — | 245,274 | — | — | (245,274) | — |
| Total net revenues | 160,210,414 | 41,149,509 | 10,100,965 | 689,851 | (245,274) | 211,905,465 |
| Cost of revenues — external | 60,948,103 | 13,622,059 | 6,051,846 | 758,359 | — | 81,380,367 |
| Cost of revenues — intersegment | 245,274 | — | — | — | (245,274) | — |
| Total cost of revenues | 61,193,377 | 13,622,059 | 6,051,846 | 758,359 | (245,274) | 81,380,367 |
| Gross profit (loss) | 99,017,037 | 27,527,450 | 4,049,119 | (68,508) | — | 130,525,098 |
| Interest income | 4,419,572 | 123,740 | 17,194 | 292 | — | 4,560,798 |
| Interest expense | 304,294 | 52 | 941 | — | — | 305,287 |
| Depreciation and amortization | 15,008,162 | 3,599,827 | 843,896 | 59,667 | — | 19,511,552 |
| Income taxes | 1,060,314 | 103,434 | (120,210) | — | — | 1,043,538 |
| Net income (loss) | $ 61,447,995 | $ 20,006,067 | $ 2,222,970 | $ (479,300) | — | $ 83,197,732 |

**For the six months ended June 30, 2006 (unaudited):**

| | Out–of–Home Television Advertising Services | In–Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|
| Net revenues — external | 63,649,748 | 15,845,504 | 3,076,397 | 689,992 | — | 83,261,641 |
| Net revenues — intersegment | | 173,767 | | | (173,767) | — |
| Total net revenues | 63,649,748 | 16,019,271 | 3,076,397 | 689,992 | (173,767) | 83,261,641 |
| Cost of revenues — external | 28,114,514 | 6,008,726 | 2,376,217 | 311,976 | | 36,811,433 |
| Cost of revenues — intersegment | 173,767 | | | | (173,767) | |
| Total cost of revenues | 28,288,281 | 6,008,726 | 2,376,217 | 311,976 | (173,767) | 36,811,433 |
| Gross profit (loss) | 35,361,467 | 10,010,545 | 700,180 | 378,016 | — | 46,450,208 |
| Interest income | 1,673,678 | 101,830 | 5,581 | — | — | 1,781,089 |
| Interest expense | 287,987 | 39 | 462 | | | 288,488 |
| Depreciation and amortization | 6,651,282 | 1,696,695 | 274,945 | — | — | 8,622,922 |
| Income taxes | 985,938 | 2,981 | | | | 988,919 |
| Net income (loss) | 19,175,568 | 6,720,653 | 208,679 | — | — | 26,104,090 |

F–43

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

For the six months ended June 30, 2007 (unaudited):

| | Out–of–Home Television Advertising Services | In–Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|---|
| Net revenues — external | 96,584,774 | 31,217,958 | 16,890,621 | 25,235,998 | 686,634 | | 170,615,985 |
| Net revenues — intersegment | | 182,493 | | | | (182,493) | — |
| Total net revenues | 96,584,774 | 31,400,451 | 16,890,621 | 25,235,998 | 686,634 | (182,493) | 170,615,985 |
| Cost of revenues — external | 40,981,343 | 10,010,772 | 7,323,056 | 18,405,005 | 303,017 | | 77,023,193 |
| Cost of revenues — intersegment | 182,493 | | | | | (182,493) | — |
| Total cost of revenues | 41,163,836 | 10,010,772 | 7,323,056 | 18,405,005 | 303,017 | (182,493) | 77,023,193 |
| Gross profit (loss) | 55,420,938 | 21,389,679 | 9,567,565 | 6,830,993 | 383,617 | — | 93,592,792 |
| Interest income | 4,357,062 | 65,911 | 39,388 | 171,508 | — | — | 4,633,869 |
| Interest expense | 6,074 | 897 | — | — | — | — | 6,971 |
| Depreciation and amortization | 8,770,889 | 1,789,700 | 718,400 | 1,383,257 | — | — | 12,662,246 |
| Income taxes | 1,036,479 | 588,833 | 472,935 | 1,188,104 | — | — | 3,286,351 |
| Net income (loss) | 31,111,291 | 12,748,294 | 7,239,494 | 2,907,288 | — | — | 54,006,367 |

*Geographic Information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

*Major Customers*

As of December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited), there were no customers who accounted for 10% or more of the Group's net revenues or accounts receivables.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUTIED) AND 2007 (UNAUDITED) — (Continued)**

*Major Service lines*

The Group derives revenues from the following major service lines:

| | For the Years Ended December 31 | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | %of total | 2005 | %of total | 2006 | %of total | 2006 | %of total | 2007 | %of total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | (Unaudited) | | | |
| Net revenues | | | | | | | | | | |
| Commercial location network | $ 26,321,179 | 90.1% | $ 61,434,760 | 90.0% | $ 131,371,292 | 62.0% | $ 51,818,404 | 62.2% | $ 80,862,803 | 47.4% |
| In-store network | — | — | 5,468,919 | 8.0% | 26,907,592 | 12.7% | 11,831,344 | 14.2% | 13,882,446 | 8.1% |
| Poster frame network | — | — | — | — | 40,904,235 | 19.3% | 15,845,504 | 19.0% | 31,217,958 | 18.3% |
| Mobile handset advertising network | — | — | — | — | 10,100,965 | 4.7% | 3,076,397 | 3.7% | 16,890,621 | 9.9% |
| Movie theaters | — | — | — | — | 689,851 | 0.3% | — | — | 25,235,998 | 14.8% |
| Internet advertising network | — | — | — | — | — | — | — | — | 1,839,525 | 1.1% |
| Advertising service revenue | 26,321,179 | 90.1% | 66,903,679 | 98.0% | 209,973,935 | 99.0% | 82,571,649 | 99.2% | 169,929,351 | 99.6% |
| Equipment revenue | 2,888,720 | 9.9% | 1,325,324 | 2.0% | 945,606 | 0.5% | 409,575 | 0.5% | 346,168 | 0.2% |
| Franchise revenue | — | — | — | — | 985,924 | 0.5% | 280,417 | 0.3% | 340,466 | 0.2% |
| Total net revenues | $ 29,209,899 | 100.0% | $ 68,228,913 | 100.0% | $ 211,905,465 | 100.0% | $ 83,261,641 | 100.0% | $ 170,615,985 | 100.0% |

F–45

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

18.    Related Party Transactions

Details of advertising service revenue from related parties are as follows:

| Name of Related Parties | Director Interested | Year Ended December 31, 2004 | 2005 | 2006 | For the Six Months Ended June 30, 2006 (Unaudited) | 2007 (Unaudited) |
|---|---|---|---|---|---|---|
| Shanghai Everease Advertising & Communication Ltd. ("Everease") | Jason Nanchun Jiang | $ 1,302,331 | $ 1,552,039 | $ 7,764,977 | $ 1,084,189 | $ 3,735,103 |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 1,227,267 | 2,330,945 | 3,885,546 | 2,606,373 | 104 |
| Shanghai Jobwell Business Consulting Co., Ltd. | Jimmy Wei Yu | 411,034 | 1,050,258 | 1,382,695 | 749,684 | — |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | 372,488 | 757,850 | 1,122,945 | 1,122,945 | — |
| Shanghai Wealove Business Consulting Co., Ltd. | Jimmy Wei Yu | — | — | 671,488 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | 361,371 | 908,100 | 982,527 | 420,218 | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | Jimmy Wei Yu | — | 1,646,120 | 3,230,040 | 2,106,475 | 44,542 |
| Beijing Sina Internet Information Services Co., Ltd. | Charles Chao | — | — | 190,563 | 149,958 | 59,345 |
| Beijing Sohu New-age Information Technology Co., Ltd. | Daqing Qi | — | — | 119,768 | 9,573 | 272,337 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | Neil Nanpeng Shen | — | — | 78,742 | — | — |
| UUSEE | Neil Nanpeng Shen | — | — | — | — | 27,939 |
| Beijing Yadu Science & Technology Co., Ltd | Fumin Zhuo | — | — | — | — | 97,826 |
| Ctrip Travel Information Technology Shanghai) Co., Ltd. | Neil Nanpeng Shen | 48,287 | 264,120 | 178,933 | 178,933 | 105,014 |
| Total | | $ 3,722,778 | $ 8,509,432 | $ 19,608,224 | $ 8,428,348 | $ 4,342,210 |

F–46

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Details of amounts due from related parties are as follows:

| Name of Related Parties | Note | Director Interested | December 31, 2004 | December 31, 2005 | December 31, 2006 | June 30, 2007 (Unaudited) |
|---|---|---|---|---|---|---|
| Shanghai Everease Advertising & Communication Ltd. | (a) | Jason Nanchun Jiang | $ 1,259,138 | $ 572,525 | $ 6,331,549 | $ 5,346,287 |
| Multimedia Park Venture Capital | (a) | Jimmy Wei Yu | 690,212 | 330,700 | 12,705 | 9,464 |
| Shanghai Jobwell Business Consulting Ltd. | (a) | Jimmy Wei Yu | 275,971 | 546,207 | — | — |
| Shanghai Wealove Wedding Service Co., Ltd. | (a) | Jimmy Wei Yu | 251,556 | 662,954 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | (a) | Jimmy Wei Yu | 263,155 | 533,469 | — | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | (a) | Jimmy Wei Yu | — | 474,351 | 403,889 | — |
| Beijing Sina Internet information Services Co., Ltd | (a) | Charles Chao | — | — | — | 802,317 |
| Beijing Sohu New–age Information Technology Co., Ltd | (a) | Daqing Qi | — | — | — | 864,335 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | (a) | Neil Nangpeng Shen | — | — | — | 58,888 |
| UUSEE | (a) | Neil Nangpeng Shen | — | — | — | 32,828 |
| Beijing Yadu Science & Technology Co., Ltd | (a) | Fumin Zhuo | — | — | — | 65,758 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | (a) | Neil Nanpeng Shen | — | — | 39,699 | — |
| David Yu | (b) | David Yu | — | — | 1,064,947 | — |
| Total | | | $ 2,740,032 | $ 3,120,206 | $ 7,852,789 | $ 7,179,877 |

Note (a) — These amounts represent trade receivables for advertising services provided.

Note (b) — The amount represents a payment due from the ex–shareholder of Target Media for an indemnification of a contingent liability which arose after the acquisition. This amount was paid out in cash in 2007.

F–47

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Details of amounts due to related parties are as follows:

| Name of Related Parties | Note | Director Interested | 2004 | 2005 | 2006 | June 30, 2007 (Unaudited) |
|---|---|---|---|---|---|---|
| 51.com | (d) | Neil Nanpeng Shen | — | — | — | 27,477 |
| Beijing Sina Internet Information Services Co., Ltd. | (d) | Charles Chao | — | — | — | 3,238,744 |
| Qihoo.com | (d) | Neil Nanpeng Shen | — | — | — | 116,174 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | (d) | Neil Nanpeng Shen | — | — | — | 205 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | (d) | Neil Nanpeng Shen | — | — | — | 7,550 |
| Zhi Tan | (c) | Zhi Tan | — | — | 345,768 | — |
| | | | $ — | $ — | $ 345,768 | $ 3,390,150 |

Note (c)  — The amount represents the amount due to the president of Focus Media for operating funds of Framedia. The loan was non–interest bearing and was repayable within one year.

Note (d)  — These amounts represent trade payables for web spaces leased.

**Other related party transactions**

For each of the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited), office rentals were paid to Multimedia Park Venture Capital amounting to $140,305, $395,083, $476,902, $226,506 and $306,137, respectively.

In 2006, Everease charged the Group $47,804 for providing administration services.

In March 2006, Weiqiang Jiang, father of Jason Nanchun Jiang, provided a short–term loan to the Group of approximately $2.5 million to relieve a temporary shortage of Renminbi the Group experienced at that time. The loan was unsecured and non–interesting bearing. At the end of June 2006, the Group paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

**19.  Restricted Net Assets**

Relevant PRC statutory laws and regulations permit payments of dividends by the Group's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, the Group's PRC subsidiaries and PRC affiliates are restricted in their ability to transfer a portion of their net assets to Focus Media Holding in the form of dividends, loans or advances, which restricted portion amounted to approximately $223,386,461 as of December 31, 2006.

**20.  Subsequent Events**

In the third quarter of 2007, the Group completed acquisitions of nine companies which primarily provide out–of–home television advertising, poster–frame advertising, mobile handset advertising and Internet advertising services, for an aggregate purchase considerations of approximately $0.9 million plus additional consideration

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

contingent upon the achievement of certain earnings targets over the next one to three fiscal years. The Group also will make aggregate down payment of $24.9 million, which will be deducted from the contingent purchase price consideration.

F–49

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**Appendix 1**

**Subsidiaries of Focus Media Holding Limited**

The following table sets forth information concerning our direct subsidiaries:

| Subsidiary | Place of Incorporation | Percentage of Ownership |
| --- | --- | --- |
| Focus Media (China) Holding Ltd. | Hong Kong | 100% |
| Focus Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Perfect Media Holding Ltd. | British Virgin Islands ("BVI") | 100% |
| Focus Media Qingdao Holding Ltd. | BVI | 100% |
| Focus Media Dalian Holding Ltd. | BVI | 100% |
| Focus Media Changsha Holding Ltd. | BVI | 100% |
| Focus Media Digital Information Technology (Shanghai) Co., Ltd. | PRC | 100% |
| New Focus Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Sorfari Holdings Limited | BVI | 100% |
| Focus Media Tianjin Limited | BVI | 80% |
| Capital Beyond Limited | BVI | 100% |
| Shanghai New Focus Media Advertisement Co., Ltd. | PRC | 90% |
| Shanghai New Focus Media Agency Co., Ltd. | PRC | 90% |
| Shanghai Focus Media Defeng Advertisement Co., Ltd. | PRC | 90% |
| Shanghai Focus Media Baiwang Advertising Co., Ltd. | PRC | 70% |
| Shanghai Focus Media Xiangkun Advertising Co., Ltd. | PRC | 70% |
| Infoachieve Limited | BVI | 100% |
| Shanghai Framedia Investment Consultation Co., Ltd. | PRC | 100% |
| Target Media Holdings Limited | Cayman Islands | 100% |
| Target Media Multi–Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Dotad Holdings Limited | BVI | 100% |
| ProfitBest Worldwide Limited | BVI | 100% |
| Wiseglobal Investments Limited | BVI | 100% |
| Summitworld Limited | BVI | 100% |
| Newking Investment Limited | BVI | 100% |
| Surge Zhenghe Holding Limited | BVI | 100% |
| Speedaccess Limited | BVI | 100% |
| Peakbright Group Limited | BVI | 100% |
| Homesky Investment Limited | BVI | 100% |
| Bestwin Partners Limited | BVI | 100% |
| Glomedia Holdings Limited | BVI | 100% |
| Appreciate Capital Ltd. | BVI | 70% |
| Richcrest Pacific Limited | BVI | 100% |
| Wealthstar Holdings Limited | BVI | 100% |

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| Subsidiary | Place of Incorporation | Percentage of Ownership |
|---|---|---|
| Highmark Asia Limited | BVI | 100% |
| Plentiworth Investment Limited | BVI | 100% |
| Directwealth Holdings Limited | BVI | 100% |
| Better off Investments Limited | BVI | 100% |
| Topstart Holdings Limited | BVI | 100% |
| Vast Well Development Limited | BVI | 100% |
| Crownsky Limited | BVI | 100% |
| Pear Commercial Inc. | BVI | 100% |
| Active Max Limited | BVI | 100% |
| Allyes Information Technology Company Limited | BVI | 100% |
| Advantage Way Limited | BVI | 100% |
| Angeli Education Development Limited | BVI | 100% |

The following table sets forth information concerning Focus Media Advertisement's subsidiaries each of which is incorporated in China:

| Subsidiary | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Shanghai Focus Media Advertising Co., Ltd. | 90.0%(1) | Shanghai | Advertising agency |
| Shanghai Perfect Media Advertising Agency Co., Ltd. | 90.0%(1) | Shanghai | Advertising company that operates advertising services network on shoe–shining machines |
| Qingdao Fukesi Advertisement Co., Ltd. | 90.0%(1) | Qingdao | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Changsha Focus Media Shiji Advertisement Co., Ltd. | 90.0%(1) | Changsha | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Dalian Focus Media Advertising Co., Ltd. | 90.0%(1) | Dalian | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Qianjian Advertising Co., Ltd. | 90.0%(1) | Shanghai | Operation and maintenance of out–of–home television advertising network in banking locations |
| Guangzhou Framedia Advertising Company Ltd. | 90.0%(1) | Guangzhou | Operation and maintenance of out–of–home television advertising network |
| Zhuhai Focus Media Culture and Communication Company Ltd. | 90.0%(1) | Zhuhai | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Focus Media Digital Information Technology Co., Ltd. | 10%(3) | Shanghai | Technical and business consultancy |
| Shenzhen Bianjie Building Advertisement Co., Ltd. | 90.0%(2) | Shenzhen | Operation and maintenance of frame advertising network |
| Hebei Tianma Weiye Advertising Company Ltd. | 90.0%(2) | Hebei | Operation and maintenance of out–of–home television advertising network (former regional distributor) |

F–51

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Xiamen Focus Media Advertising Company Ltd. | 90.0%(2) | Xiamen | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Sichuan Focus Media Advertising Communications Co., Ltd. | 90.0%(3) | Chengdu | Operation and maintenance of out–of–home television advertising network |
| Shanghai New Structure Advertisement Co., Ltd. | 90.0%(2) | Shanghai | Technical and business consultancy for poster frame network |
| Shanghai Framedia Advertising Development Co., Ltd. | 90.0%(2) | Shanghai | Operation and maintenance of advertising poster frame network |
| GuangZhou Shiji Shenghuo Advertisement Co., Ltd. | 90.0%(2) | Guangzhou | Operation and maintenance of advertising poster frame network |
| Hefei Fukesi Advertising Co. Ltd. | 90.0%(2) | Hefei | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Jinan Focus Media Advertising Co., Ltd. | 90.0%(2) | Jinan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shenzhen E–Times Consulting Co., Ltd. | 90.0%(2) | Shenzhen | Operation and maintenance of advertising poster frame network |
| Shanghai Target Media Co., Ltd. | 90.0%(2) | Shanghai | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Shenyang Target Media Ltd. | 90.0%(2) | Shenyang | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Fuzhou Hengding United Media Ltd. | 90.0%(2) | Fuzhou | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Beijing Focus Media Wireless Co., Ltd. | 90.0%(2) | Beijing | Operation of mobile handset advertising service network |
| Guangzhou Feisha Advertisement Co., Ltd. | 90.0%(2) | Guangzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| DongGuan Focus Media Advertisement & Communications Co., Ltd. | 90.0%(2) | Dongguan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai FengJing Advertisement & Communications Co., Ltd. | 95.0%(2) | Shanghai | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Zhengzhou Focus Media Advertisement & Communications Co., Ltd. | 85.0%(2) | Zhengzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shijiazhuang Focus Media HuiHuang Business Advertisement Co., Ltd. | 90.0%(2) | Shijiazhuang | Operation and maintenance of advertising poster frame network |
| Nanjing Focus Media Advertising Co., Ltd. | 90.0%(3) | Nanjing | Operation and maintenance of out–of–home television advertising network (former regional distributor) |

F–52

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Yunnan Focus Media Co., Ltd. | 89.5%(2) | Kunming | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Tianjin Focus Tongsheng Advertising Company Ltd. | 80.0%(2) | Tianjin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Zhejiang Ruihong Focus Media Advertising Communications Co., Ltd. | 80.0%(2) | Hangzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Wuhan Geshi Focus Media Advertising Co., Ltd. | 75.0%(2) | Wuhan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Xian Focus Media Advertising & Information Company Ltd. | 70.0%(3) | Xian | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shenyang Focus Media Advertising Co., Ltd. | 70.0%(3) | Shenyang | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Fuzhou Focus Media Advertising Co., Ltd. | 70.0%(3) | Fuzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Chongqing Geyang Focus Media Culture & Broadcasting Co., Ltd. | 60.0%(2) | Chongqing | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai On–Target Advertisement Co., Ltd. | 60.0%(3) | Shanghai | Dormant |
| BeiJing YangShiSanWei Advertisement Co., Ltd. | 70.0%(3) | Beijing | Operation and maintenance of In–movie theater advertising network |
| Shanghai Jiefang Focus Media Advertisement & Communications Co., Ltd. | 70.0%(3) | Shanghai | Operation and maintenance of Direct Mailing advertising network |
| Jilin Focus Media Advertising Co., Ltd. | 100.0% | Jilin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Haerbin Focus Media Advertising Co., Ltd. | 100.0% | Haerbin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Haerbin Yifang Focus Media Advertising Co., Ltd. | 100.0% | Haerbin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Quanzhou New Continetal Culture and Communication Company Ltd. | 100.0% | Quanzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Direct Media Advertising Co., Ltd. | 100.0% | Shanghai | Operation and maintenance of Direct Mailing advertising network |
| Tianjin Saige Advertising Planning Co., Ltd. | 100.0% | Tianjin | Operation and maintenance of advertising poster frame network |
| Beijing QuanShi Advertising Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Shanghai Allyes Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |

F–53

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Shanghai Interactive Information Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shenzhen BaiFen Innovation Advertising Co., Ltd. | 100.0% | Shenzhen | Provide internet advertising agency services |
| Shanghai Meisien Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Tianjin FeiNiao Interactive Advertising Co., Ltd. | 100.0% | Tianjin | Provide internet advertising agency services |
| Shanghai QuanShi Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Beijing LangTian Interactive Advertising Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Shanghai KuanTong Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shanghai iResearch Marketing Consulting Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shanghai Aike Marketing Consulting Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Catch Stone Advertising (Beijing) Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Yibolande Advertising (Beijing) Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Beijing Pengpai Dongli Advertising Co., Ltd. | 100.0% | Beijing | Operation and maintenance of advertising poster frame network |
| Shanghai Yuanyuan Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation and maintenance of advertising poster frame network |
| Shanghai Yuanchi Advertising Agency Co., Ltd. | 100.0% | Zhejiang | Operation and maintenance of advertising poster frame network |
| Shanghai Lizhu Advertising Agency Co., Ltd. | 100.0% | Zhejiang | Operation and maintenance of advertising poster frame network |
| Shanghai Honghao Advertising Agency Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Nanjing Haozheng Advertising Media Co., Ltd. | 100.0% | | Operation and maintenance of advertising poster frame network |
| Suzhou Haozheng Advertising Media Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Nanjing Hongzhong Advertising Media Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Shengyang Longyuantao Advertising Agency Co., Ltd. | 100.0% | Liaoning | Operation and maintenance of advertising poster frame network |
| Shengyang Xiangyida Advertising Agency Co., Ltd. | 100.0% | Liaoning | Operation and maintenance of advertising poster frame network |
| Shanghai Zhiyi Advertising Agency Co., Ltd. | 100.0% | Wuhan | Operation and maintenance of advertising poster frame network |
| Wuhan Daosen Advertising Agency Co., Ltd. | 100.0% | Wuhan | Operation and maintenance of advertising poster frame network |
| Yitong Wireless Information Technology (Beijing) Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Guangzhou Xuanwu Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |

F–54

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Guangzhou Xuanfu Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |
| Zhengzhou Meihe SMS Technolofy Co., Ltd. | 100.0% | He'nan | Operation of mobile handset advertising service network |
| Beifang Meihe Telecommunication Technology (Beijing) Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Shenzhen Julan Information Technology Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Shenzhen Julan Network Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Guangzhou Julan Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |
| Dongguan Julan Information Technology Co., Ltd. | 100.0% | Dongguan | Operation of mobile handset advertising service network |
| Shenzhen Fenxin Techonology Development Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Beijing Century Zhongkai Technology Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Beijing Eastern Boxin Technology Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Shenzhen Jingzhun Fenzhong Technology Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Beijing Together Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |
| Shanghai Qianzhong Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Chuanzhi Huakuang Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Beijing Chuanzhi Huakuang Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |
| Shanghai Xinnuo Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Chuanzhi Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Ruili Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Beijing Huakuang Chuangzhi Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |

(1) The remaining equity interest is held by Jimmy Wei Yu as our nominee holder.

(2) The remaining equity interest is held by Focus Media Advertising Agency.

(3) The remaining equity interest in this entity is owned by unrelated third parties.

(4) The remaining equity interest in this entity is owned by Focus Media Digital.

Table of Contents

ADDITIONAL INFORMATION — FINANCIAL STATEMENT SCHEDULE 1

FOCUS MEDIA HOLDING LIMITED

These financial statements have been prepared in conformity with accounting principles generally accepted in the United States

FINANCIAL INFORMATION OF PARENT COMPANY

BALANCE SHEETS

| | December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | (In U.S. Dollars, except share data) | | |
| **Assets** | | | |
| Cash and cash equivalents | $ — | $ — | $ 37,483,101 |
| Prepaid expenses and other current assets | — | 121,482 | 151,257 |
| Amounts due from related parties | 25,072,466 | 94,813,430 | 94,949,887 |
| Acquired intangible assets, net | — | — | 6,323,076 |
| Investments in subsidiaries and affiliates | 23,806,034 | 96,877,616 | 925,981,259 |
| **Total assets** | **$ 48,878,500** | **$ 191,812,528** | **$ 1,064,888,580** |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | |
| **Current liabilities:** | | | |
| Accrued expenses and other current liabilities | 1,178,545 | 397,877 | 14,144,589 |
| **Total current liabilities** | **1,178,545** | **397,877** | **14,144,589** |
| **Mezzanine equity** | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and 41,967,400, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 6,295,110 | — | — |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and 48,191,600, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 12,062,696 | — | — |
| Series C–1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and 34,054,000, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 17,500,350 | — | — |
| Series C–2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and 34,053,400, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 17,415,000 | — | — |
| **Shareholders' equity (deficiency)** | | | |
| Ordinary shares ($0.00005 par value; 885,516,600, 19,800,000,000 and 19,800,000,000 shares authorized in 2004, 2005 and 2006; 142,464,600, 378,306,000 and 534,896,873 shares issued and outstanding in 2004, 2005 and 2006, respectively) | 7,124 | 18,916 | 26,745 |
| Additional paid–in capital | 5,981,154 | 177,419,761 | 709,196,246 |
| Acquisition consideration to be issued | — | — | 237,879,480 |
| Deferred share–based compensation | (969,959) | (246,569) | — |
| Retained earnings (accumulated deficit) | (10,550,414) | 12,997,237 | 96,194,969 |
| Accumulated other comprehensive income (loss) | (41,106) | 1,225,306 | 7,446,551 |
| **Total shareholders' equity (deficiency)** | **$ (5,573,201)** | **$ 191,414,651** | **$ 1,050,743,991** |
| **Total liabilities, mezzanine equity and shareholders' equity (deficiency)** | **$ 48,878,500** | **$ 191,812,528** | **$ 1,064,888,580** |

Table of Contents

FINANCIAL INFORMATION OF PARENT COMPANY

STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | (In U.S. dollars) | | |
| **Net revenues:** | $        — | $        — | $    719,978 |
| **Cost of revenues:** | — | — | 146,943 |
| **Gross profit** | — | — | 573,035 |
| **Operating expenses:** | | | |
| General and administrative | 461,183 | 1,300,511 | 7,894,125 |
| Selling and marketing | 27,528 | 43,317 | 2,090,387 |
| Amortization of acquired intangible assets | — | — | 79,377 |
| **Total operating expenses** | 488,711 | 1,343,828 | 10,063,889 |
| **Loss from operations** | (488,711) | (1,343,828) | (9,490,854) |
| Interest income | — | — | 791,669 |
| Other expense | — | (7,339) | (44,755) |
| Equity in earnings of subsidiaries and equity affiliates | 12,553,750 | 24,898,818 | 91,941,672 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | (11,692,287) | — | — |
| **Income (loss) before income taxes** | 372,752 | 23,547,651 | 83,197,732 |
| Income tax expenses | — | — | — |
| **Net income (loss)** | 372,752 | 23,547,651 | 83,197,732 |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — | — |
| Deemed dividend on Series C−1 convertible redeemable preference shares | (13,356,087) | — | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — | — |
| **Income (loss) attributable to holders of ordinary shares** | $  (10,576,414) | $  23,547,651 | $  83,197,732 |

F–57

Table of Contents

**Financial Information of parent company**

STATEMENTS OF CASHFLOWS

| | For the Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | | (In U.S. dollars) | |
| **Operating activities:** | | | |
| Income (loss) attributable to holders of ordinary shares | $ (10,576,414) | $ 23,547,651 | $ 83,197,732 |
| Deemed dividend on Series A convertible redeemable preference shares | 8,308,411 | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | 2,191,442 | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | 13,356,087 | — | — |
| Premium relating to Series B convertible redeemable preference shares | (12,906,774) | — | — |
| Net income (loss) | 372,752 | 23,547,651 | 83,197,732 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Share–based compensation | 488,711 | 726,503 | 8,367,406 |
| Amortization of intangibles | | | 80,039 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | 11,692,287 | — | — |
| Equity in earning of subsidiaries | (12,553,750) | (24,898,818) | (91,941,672) |
| Changes in assets and liabilities: | | | |
| Prepaid expenses and other current assets | — | (121,482) | (29,775) |
| Amounts due from related parties | (23,915,404) | (69,740,965) | (136,456) |
| Accrued expenses and other current liabilities | 1,178,545 | (780,665) | 9,239,041 |
| **Net cash used in operating activities** | $ (22,736,859) | $ (71,267,776) | $ 8,776,315 |
| **Investing activities:** | | | |
| Investments in subsidiaries and affiliates | (6,741,485) | (8,208,870) | (124,508,517) |
| Deposit paid to acquire subsidiaries | — | (40,919,530) | (696,228) |
| Purchase of intangibles | — | — | (3,225,161) |
| **Net cash used in investing activities** | $ (6,741,485) | $ (49,128,400) | $ (128,429,906) |
| **Financing activities:** | | | |
| Proceeds from issuance of ordinary shares | — | 118,174,130 | 142,750,893 |
| Proceeds from issuance of ordinary shares pursuant to stock option plans | — | — | 15,247,561 |
| Proceeds from issuance of Series B convertible redeemable preference shares (net of issuance costs of $437,304) | 12,062,696 | — | — |
| Proceeds from issuance of Series C–2 convertible redeemable preference shares (net of issuance costs of $85,000) | 17,415,000 | — | — |
| **Net cash provided by financing activities** | $ 29,477,696 | $ 118,174,130 | $ 157,998,454 |
| Effect of exchange rate changes | 648 | 2,222,046 | (861,762) |
| **Net increase in cash and cash equivalents** | — | — | 37,483,101 |
| Cash and cash equivalents, beginning of year | — | — | — |
| Cash and cash equivalents, end of year | $ — | $ — | $ 37,483,101 |

F–58

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

| | Page |
|---|---|
| Independent Auditors' Report | F–60 |
| Consolidated balance sheet as of December 31, 2006 | F–61 |
| Consolidated statement of operations for the year ended December 31, 2006 | F–62 |
| Consolidated statements of shareholders' equity and comprehensive income for the year ended December 31, 2006 | F–63 |
| Consolidated statement of cash flows for the year ended December 31, 2006 | F–64 |
| Notes to the consolidated financial statements | F–65 |

Table of Contents

**INDEPENDENT AUDITORS' REPORT**

TO THE BOARD OF DIRETORS OF FOCUS MEDIA HOLDING LIMITED ("FOCUS MEDIA")

    We have audited the accompanying consolidated balance sheet of Allyes Information Technology Company Limited and subsidiaries (the "Company") as of December 31, 2006 and the related consolidated statements of operations, shareholders' equity and comprehensive income, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements based on our audit.

    We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

    In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2006 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/  Deloitte Touche Tohmatsu CPA Ltd.
Shanghai, China
October 24, 2007

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED BALANCE SHEET**
**(In U.S. dollars, except share data)**

|  |  | December 31, 2006 |
|---|---:|---:|
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ | 21,468,931 |
| Accounts receivable, net of allowance for doubtful accounts of $212,749 |  | 22,803,220 |
| Rebate receivable |  | 3,025,631 |
| Deferred income taxes |  | 454,124 |
| Prepaid expenses and other current assets |  | 1,703,796 |
|  |  |  |
| Total current assets |  | 49,455,702 |
| Equipment, net |  | 1,065,575 |
| Acquired intangible assets, net |  | 126,035 |
| Other non–current assets |  | 249,183 |
| Non–current deferred income taxes |  | 7,939 |
|  |  |  |
| Total assets | $ | 50,904,434 |
|  |  |  |
| **Liabilities and shareholders' equity:** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ | 12,143,975 |
| Accrued employee bonus |  | 1,048,179 |
| Customer receipts in advance |  | 755,412 |
| Income tax payable |  | 1,826,176 |
| Accrued expenses and other current liabilities |  | 4,021,351 |
|  |  |  |
| Total current liabilities |  | 19,795,093 |
| Deferred income taxes |  | 31,271 |
|  |  |  |
| Total liabilities |  | 19,826,364 |
|  |  |  |
| Commitments (Note 11) |  |  |
| **Shareholders' equity:** |  |  |
| Series A convertible preference shares |  |  |
| $0.0001 par value; 40,000,000 shares authorized, issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $471,000 |  | 4,000 |
| Series A–1 convertible preference shares |  |  |
| $0.0001 par value; 44,925,500 shares authorized, issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $1,615,566 |  | 4,493 |
| Series B convertible preference shares |  |  |
| $0.0001 par value; 60,556,758 shares authorized issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $58,750,000 |  | 6,056 |
| Common shares, $0.0001 par value, 354,517,742 shares authorized, |  |  |
| 62,188,023 issued and outstanding as of December 31, 2006 |  | 6,219 |
| Additional paid–in capital |  | 26,834,540 |
| Subscription receivables |  | (594,810) |
| Retained earnings |  | 3,499,999 |
| Accumulated other comprehensive income |  | 1,317,573 |
|  |  |  |
| Total shareholders' equity |  | 31,078,070 |
|  |  |  |
| Total liabilities and shareholders' equity | $ | 50,904,434 |

The accompanying notes are an integral part of these consolidated financial statements.

F–61

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF OPERATIONS**
**(In U.S. dollars, except share data)**

|  | For the Year Ended December 31, 2006 |
|---|---|
| Revenues: |  |
| Advertising service revenue | $ 47,234,757 |
| Other revenue | 1,899,197 |
| Total net revenues | 49,133,954 |
| Cost and expenses: |  |
| Cost of revenues | 37,820,920 |
| General and administrative | 6,524,900 |
| Selling and marketing | 4,376,213 |
| Research and development | 648,732 |
| Total cost and expenses | 49,370,765 |
| Loss from operations | (236,811) |
| Interest income | 583,738 |
| Other income | 201,078 |
| Other expense | (40,200) |
| Income before income taxes | 507,805 |
| Income taxes: |  |
| –Current | 1,149,557 |
| –Deferred | (146,613) |
| Total income taxes | 1,002,944 |
| Net loss | $ (495,139) |

The accompanying notes are an integral part of these consolidated financial statements.

F–62

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY AND COMPREHENSIVE INCOME**
**(In U.S. dollars, except share data)**

| | Convertible Preference Shares | | | | | | Common Shares | | Additional Paid-in Capital | Subscription Receivables | Retained Earnings | Accumulated Other Comprehensive Income | Total | Comprehensive Income |
| | Series A Shares | | Series A-1 Shares | | Series B Shares | | | | | | | | | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2006 | 40,000,000 | $ 4,000 | 44,925,500 | $ 4,493 | 60,556,758 | $ 6,056 | 57,203,006 | $ 5,720 | $ 25,820,611 | $ (116,575) | $ 3,995,138 | $ 528,700 | $ 30,248,143 | |
| Exercise of share options | — | — | — | — | — | — | 5,295,700 | 530 | 652,377 | (572,069) | — | — | 80,838 | — |
| Repurchase of common shares | — | — | — | — | — | — | (310,683) | (31) | (153,926) | 72,576 | — | — | (81,381) | — |
| Share-based compensation | — | — | — | — | — | — | — | — | 515,478 | — | — | — | 515,478 | — |
| Collection of subscription receivables | — | — | — | — | — | — | — | — | — | 21,258 | — | — | 21,258 | — |
| Cumulative translation adjustment | — | — | — | — | — | — | — | — | — | — | — | 788,873 | 788,873 | $ 788,873 |
| Net loss | — | — | — | — | — | — | — | — | — | — | (495,139) | — | (495,139) | (495,139) |
| Balance as of December 31, 2006 | 40,000,000 | $ 4,000 | 44,925,500 | $ 4,493 | 60,556,758 | $ 6,056 | 62,188,023 | $ 6,219 | $ 26,834,540 | $ (594,810) | $ 3,499,999 | $ 1,317,573 | $ 31,078,070 | $ 293,734 |

F-63

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF CASH FLOWS**

**(In U.S. dollars, except share data)**

|  | For The Year Ended December 31, 2006 |
|---|---|
| **Operating activities:** | |
| Net loss | $          (495,139) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Bad debt provision | 413,983 |
| Depreciation | 232,185 |
| Amortization | 51,160 |
| Impairment of acquired intangible assets | 287,765 |
| Share–based compensation | 515,478 |
| Loss on disposal of equipment | 40,200 |
| Deferred income taxes | (146,613) |
| Changes in assets and liabilities: | |
| Accounts receivable | (10,898,678) |
| Rebate receivable | 14,511 |
| Prepaid expenses and other current assets | (1,103,549) |
| Other non–current assets | 411,623 |
| Accounts payable | 921,825 |
| Accrued employee bonus | 312,011 |
| Customer receipts in advance | 40,433 |
| Accrued expenses and other current liabilities | 2,590,515 |
| Income tax payable | 1,208,830 |
| | |
| **Net cash used in operating activities** | (5,603,460) |
| | |
| **Investing activities:** | |
| Purchase of equipment | (630,654) |
| Payment for acquisitions of subsidiary and operation | (323,998) |
| | |
| **Cash used in investing activities** | (954,652) |
| | |
| **Financing activities:** | |
| Proceeds from exercise of employee share options | 80,838 |
| Collection of subscription receivables from employees | 21,258 |
| Payment for repurchase of common shares | (81,381) |
| | |
| **Net cash provided by financing activities** | 20,715 |
| | |
| Effect of exchange rate changes | 777,513 |
| Net decrease in cash and cash equivalents | (5,759,884) |
| Cash and cash equivalents, beginning of year | 27,228,815 |
| | |
| Cash and cash equivalents, end of year | $          21,468,931 |

The accompanying notes are an integral part of these consolidated financial statements.

F–64

Table of Contents

ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

**1.  Organization and Principal Activities**

Allyes Information Technology Company Limited (the "Company"), a Cayman Island Company, was established under the Cayman law on March 10, 2000. Allyes (China) Holding Company Limited ("Allyes China"), a wholly–owned subsidiary of the Company, was registered in Hong Kong on March 29, 2000. In June 2000, New Allyes Information Technology (Shanghai) Co., Ltd. ("New Allyes Shanghai"), a wholly–own subsidiary of Allyes China, was established in Shanghai, China. New Allyes Shanghai's primary business is the development and sale of Adforward software, which enables advertisers to receive real–time analysis of the effectiveness of online advertisements.

Through various contractual arrangements as described below and under the requirements of FIN 46 (Revised), "Consolidation of Variable Interest Entities" ("FIN 46(R)"), New Allyes Shanghai is deemed the primary beneficiary of a group of subsidiaries that are deemed variable interest entities ("VIEs") under the requirements of FIN 46(R). These subsidiaries primarily engage in commercial advertisement agency businesses and specialize in the design, development and placement of online advertisements primarily on large Chinese gateway websites or mid–sized specialized websites, and include the following:

*Names of variable interest entities:*

| Entities | Date of Acquisition | Date of Incorporation | Place of Incorporation |
|---|---|---|---|
| Beijing QuanShi Advertising Co., Ltd. ("Beijing QS") | N/A | December 4, 2000 | The People's Republic of China (the "PRC") |
| Shanghai Allyes Advertising Co., Ltd. ("Shanghai Allyes") | N/A | January 20, 2003 | PRC |
| Shanghai Interactive Information Advertising Co., Ltd. ("Shanghai Interactive") | N/A | October 11, 2004 | PRC |
| Shenzhen BaiFen Innovation Advertising Co., Ltd. ("Shenzhen BF") | November 1, 2004 | June 4, 2001 | PRC |
| Shanghai Meisien Advertising Co., Ltd. ("Shanghai Meisien") | N/A | November 3, 2004 | PRC |
| Tianjin FeiNiao Interactive Advertising Co., Ltd. ("Tianjin FN") | July 1, 2005 | October 11, 2004 | PRC |
| Shanghai QuanShi Advertising Co., Ltd. ("Shanghai QS") | N/A | April 30, 2005 | PRC |
| Beijing LangTian Interactive Advertising Co., Ltd. ("Beijing LT") | February 15, 2006 | December 30, 2005 | PRC |
| Shanghai KuanTong Advertising Co., Ltd. ("Shanghai KT") | N/A | June 28, 2006 | PRC |

PRC law restricts foreign ownership of entities engaged in advertising businesses in China. For the Company and its subsidiaries, namely Allyes China and New Allyes Shanghai, to comply with these restrictions, the Company conducts its commercial trading and advertising activities through the VIEs that hold the acquired advertising licenses. All of the VIEs are 100% owned by four PRC nationals: Zhu Hailong, Chief Executive Officer of the Company, Wang Jiangang, Chief Technology Officer of the Company, Zhang Suyang, Board Director, and Xiong Xiangdong, one of the founding shareholders of the Company. The contributions made by these four individuals in forming the VIEs were financed by New Allyes Shanghai.

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

New Allyes Shanghai has entered into various agreements with the VIEs, including the use of trademarks and intellectual property of the Company and exclusive service agreements, entitling New Allyes Shanghai to receive service fees up to but not exceeding the net income of the VIEs. New Allyes Shanghai has also been assigned all voting rights by the owners of the VIEs through agreements that are valid indefinitely and which cannot be amended or terminated except through the written consent of all parties. In addition, New Allyes Shanghai has the option to acquire all of the equity interests of the VIEs once permitted under PRC law.

FIN 46(R) requires VIEs to be consolidated by the primary beneficiary of the VIE if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the VIE to finance its activities without additional subordinated financial support from other parties. New Allyes Shanghai holds all of the variable interests in and is the primary beneficiary of these VIEs and has consolidated all such VIEs in accordance with FIN 46(R) since their respective dates of inception or date on which the variable interest was obtained ("date of acquisition).

**2. Summary of Significant Accounting Policies**

*(a) Basis of Presentation*

The accompanying financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*(b) Basis of Consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiaries and variable interest entities for which it is the primary beneficiary. All inter–company transactions and balances have been eliminated upon consolidation.

*(c) Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

*(d) Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements including computation of fair value for share–based awards, allowance for doubtful accounts, estimates to recognize rebate receivable estimates to compute the fair value of the Company's common stock, useful lives and impairment of equipment and intangible assets and valuation allowance for deferred tax assets. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes to be reasonable under the circumstances.

*(e) Significant Risks and Uncertainties*

The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: the Company's limited operating history; advances and trends in new technologies and industry standards; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth; risks associated with the Company's growth strategies; and general risks associated with the advertising industry.

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*(f)   Rebates Receivable*

The Company receives incentives from suppliers that operate gateway websites providing advertising space, in the form of product and volume rebates. These incentives are generally paid to the Company on a monthly, quarterly, or annual basis depending on the agreements with the suppliers and are determined based on the actual cash payments made to the suppliers based on a pre–determined sliding scale.

The Company estimates the rebate receivable at the end of each month based on the aggregate purchases of advertising space using the applicable actual rebate rate. Rebates are recorded as a reduction of cost of revenues.

*(g)   Equipment, Net*

Equipment, net is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Computers and office equipment | 5 years |
| Vehicles | 5 years |

*(h)   Acquired Intangible Assets*

Acquired intangible assets represent customer bases, which are valued at cost less accumulated amortization. Amortization is calculated using the straight–line method over their expected useful life of 7 years.

*(i)   Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amount of the assets, the Company would recognize an impairment loss equal to the excess of the carrying value of the asset over its fair value.

*(j)   Customer Receipts in Advance*

The Company receives prepayments for services in advance from certain customers. The amount received in advance is deferred and recognized in the period the service is performed.

*(k)   Revenue Recognition*

Revenues primary consist of revenues from advertising and advertising–related services and revenues from sales of Adforward software.

Advertising revenues, net of agency rebates are recognized ratably over the period in which the advertisement is displayed. Advertising revenues are recognized in accordance with Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition in Financial Statements" ("SAB 104"). In accordance with SAB 104, revenues are recognized when all four of the following criteria are met: (i) persuasive evidence of agreement exists; (ii) delivery of service has occurred; (iii) the price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

In the majority of advertising arrangements, the Company acts as a principal in the transaction and records advertising revenues on a gross basis, in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 99–19, "Reporting Revenue Gross as a Principal versus Net as an Agent." The associated expenses are

F–67

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

recorded as cost of revenues. In some instances, the Company acts as a preferred representative for certain customer's online advertising business and earns a commission equal to a fixed percentage of the respective transaction. In such instances, the Company is considered as an agent and recognizes commission revenue on a net basis.

Adforward software sales typically include multiple elements, including sale of software licenses and services. Service includes installation, training and post contract customer support ("PCS"), which consists of when–and–if available software license updates and technical support. The Company recognizes revenues based on the provisions of the American Institute of Certified Public Accountants Statement of Position ("SOP") No. 97–2, "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Revenues under multiple–element arrangements are allocated to each element in the arrangement primarily using the residual method based upon the fair value of the undelivered elements, which is specific to the Company (vendor–specific objective evidence of fair value or VSOE). This means that the Company defers revenue from the arrangement fee equivalent to the fair value of the undelivered elements. Discounts, if any, are applied to the delivered elements, usually software licenses, under the residual method. VSOE for PCS is determined based on either the renewal rate specified in each contract or the price charged when each element is sold separately. If the Company does not have VSOE for the undelivered elements, revenue recognition is deferred until VSOE for such elements are obtained or until all elements have been delivered.

The Company sells Adforward subscriptions and perpetual licenses. Revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. Under perpetual license agreements, revenue recognition is generally commenced when delivery has occurred, software has been installed and training has been provided as the Company does not currently have VSOE for either installation or training services.

*(l)*  *Operating Leases*

Leases where substantially all the risks and rewards of ownership of assets remain with the leasing company are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

*(m)*  *Foreign Currency Translation*

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into the US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.

The financial records of the Company's subsidiaries and its VIEs are maintained in their local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive income in the statement of shareholders' equity.

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*(n)   Income Taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(o)   Comprehensive Income*

Comprehensive income includes net loss and foreign currency translation adjustments. Comprehensive income is reported in the statement of shareholders' equity.

*(p)   Concentration of Credit Risk*

Financial instruments that potentially expose the Company to concentration of credit risk consist primarily of cash, cash equivalents and accounts receivable. All of the Company's cash and cash equivalents are held at financial institutions that management believes to be of high credit quality. The Company conducts credit evaluations of customers and generally does not require collateral or other security from its customers. The Company establishes an allowance for doubtful accounts primarily based upon the age of the receivables and factors surrounding the credit risk of specific customers.

*(q)   Fair Value of Financial Instruments*

The carrying amounts of the Company's financial instruments, including cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities, approximate fair value due to the their short–term nature.

*(r)   Share–Based Compensation*

The Company may grant share options to its employees, directors, consultants and advisors. Under the provisions of Statement of Financial Accounting Standard ("SFAS") 123(R), "Share–based Payment" ("SFAS 123(R)"), share–based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the requisite service period (generally the vesting period of the equity grant).

The Company elected to early adopt the provisions of SFAS 123(R) prior to January 1, 2006.

*(s)   Recently Issued Accounting Standards*

In September 2006, the Financial Accounting Standard Board ("FASB") issued Statement No. 157, "Fair Value Measurements" (SFAS 157). The Statement defines fair value, establishes a framework for measuring fair value in Generally Accepted Accounting Principles ("GAAP"), and expands disclosures about fair value measurements. SFAS 157 does not require any new fair value measurements but applies under other financial pronouncements that permit or require fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007 and early application is encouraged. The Company does not expect the adoption of this Statement to have a material impact on its results of operations or financial position.

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (SFAS 159). SFAS 159 expands opportunities to use fair value measurements in financial reporting and permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS 159 is effective for us on January 1, 2008, although it may be early adopted on January 1, 2007 if the Company also adopts

F–69

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

SFAS 157 at that time. The Company has not decided if it will early adopt SFAS 159 or if it will choose to measure any eligible financial assets and liabilities at fair value.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"). FIN 48 clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 will be effective for us beginning in fiscal year 2007. The Company is currently evaluating the interpretation to determine the effect on its financial statements and related disclosures.

In June 2006, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 06–3, "How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (That Is, Gross Versus Net Presentation)" ("EITF 06–3"). The scope of EITF 06–3 includes sales, use, value added and some excise taxes that are assessed by a governmental authority on specific revenue–producing transactions between a seller and customer. EITF 06–3 states that a company should disclose its accounting policy (i.e. gross or net presentation) regarding the presentation of taxes within its scope, and if significant, these disclosures should be applied retrospectively to the financial statements for all periods presented. EITF 06–3 is effective for interim and annual reporting periods beginning after December 15, 2006. The Company is currently evaluating the impact, if any, of this statement on its consolidated combined financial statements and related disclosures.

**3. Acquisitions**

During 2006, the Company made the following acquisitions in order to continue to expand its customer base in desirable locations:

(1) Beijing LT

On February 15, 2006, Shanghai Allyes and Shanghai QS acquired 100% of equity interest in Beijing LT for cash consideration of $124,057. The only asset acquired from this acquisition was cash equal to the purchase price. As a result, the purchase price, net of cash acquired was zero.

On February 21, 2006, Beijing LT entered into an Asset Transfer Agreement (the "Agreement") with the selling corporate shareholder of Beijing LT (the "Selling Corporate Shareholder") to acquire fixed assets and a customer list for cash consideration of $640,311, payable in three installments. The first installment of $256,125 was paid at the date of execution of the Agreement. The second installment of $192,093 was to be paid before March 31, 2007 if the net income of Beijing LT from February 1, 2006 to January 31, 2007 was greater than $256,125. The third installment of $192,093 was to be paid before March 31, 2008, if the General Manager maintained employment with Beijing LT for at least two years subsequent to February 1, 2006.

As discussed in Note 13, the Agreement was terminated in 2007. The second installment was not earned or paid. The terms of the third installment, which the Company considered to be additional compensation, were modified.

F–70

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

The purchase price was allocated as follows:

|  | Amount |
|---|---|
| Tangible assets — equipment, net | $   7,158 |
| Intangible assets — customer bases | 320,367 |
| Deferred tax liability | (71,400) |
| **Total** | **$   256,125** |

Deferred tax liability was recognized upon acquisition of the customer–based intangible assets.

(2) Shenzhen BF

In March 2006, the Company paid an additional $67,873 contingent consideration associated with the acquisition of Shenzhen BF in November 2004, which has been allocated to intangible assets.

**4.  Equipment, Net**

Equipment, net consists of the following:

|  | December 31, 2006 |
|---|---|
| Computers and office equipment | $   1,373,869 |
| Vehicles | 121,706 |
| Total | 1,495,575 |
| Less: accumulated depreciation | (430,000) |
| **Equipment, net** | **$   1,065,575** |

The Company recorded depreciation expense of $232,185 for the year ended December 31, 2006.

**5.  Intangible Assets**

The Company's intangible assets consist of the following:

|  | December 31, 2006 |
|---|---|
| Customer bases | $   481,543 |
| Less: Accumulated amortization | (355,508) |
| **Customer bases, net** | **$   126,035** |

The Company recorded amortization expense of $51,160 for the year ended December 31, 2006. The Company expects to record amortization expense of $25,311 for each of the next four years and $24,791 for the remaining years.

Beijing LT's primary business is to act as an agent for a third party website under a Cooperation Agreement ("Cooperation Agreement"). Near the end of 2006, the third party significantly increased the contract price making the acquired operations of Beijing LT unprofitable. Consequently, the Company decided not to renew the Cooperation Agreement and to terminate the Agreement (See Note 3) as discussed in Note 13. As a result, the Company recorded a full impairment of $287,765 related to the Beijing LT customer base given a lack of future projected earnings.

F–71

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2006
(In U.S. dollars, except share data)

**6.  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

|  | December 31, 2006 |
|---|---|
| Professional fees | $  1,910,190 |
| Business tax and other taxes payable | 1,296,160 |
| Deferred revenue | 390,000 |
| Others | 425,001 |
| **Total** | **$  4,021,351** |

**7.  Share–Based Compensation and Warrant**

On August 18, 2000, the Company adopted the 2000 employee share option plan (the "Option Plan"), which allows the Company to offer a variety of incentive awards to employees, directors, consultants and advisors or any members of the Company. The purpose of the Option Plan is to promote the success of the Company and to increase shareholder value by providing an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons of the Company. The Company granted 67,222,733 share options during the period from 2001 to 2005, and a further 340,000 share options to its employees under the Option Plan in 2006. Under the terms of the Option Plan, the share options are generally granted at exercise prices not less than 100% of the fair market value as determined by the Board of Directors and expire 10 years from the date of grant and vest over 3 years.

The fair value of the common shares underlying the options were determined by the Company for all grants and considered several factors, including retrospective valuations. These valuations utilized the guideline companies approach, which incorporates certain assumptions including the market performance of comparable listed companies as well as the financial results and growth trends of the Company, to derive the total equity value of the Company. The valuation model allocated the equity value between the common shares and the preference shares and determined the fair value of common shares based on two assumptions: conversion into common shares would result in a higher economic value, preference shares were treated as if they had converted into common shares; and preference shares that have a value higher than their conversion price were assigned a value that takes into consideration their liquidation preference. The common shares were assigned a value equal to their pro rata share of the residual amount, if any, that remained after consideration of the liquidation preference of preference shares with a value below their conversion price.

The fair value of options granted during the year ended December 31, 2006 was estimated on the date of grant using the Black–Scholes option pricing model, assuming no dividends and the following weighted average assumptions:

|  | 2006 |
|---|---|
| Risk–free rate of return | 5.78% |
| Expected term | 6.0 years |
| Expected volatility | 68% |
| Expected dividend yield | 0% |

Expected volatility is based on the standard deviation of similar companies' daily stock prices. The expected term of options represents the period of time that options granted are expected to be outstanding. The risk–free rate

F–72

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

of return is based on the US treasury bond yield curve in effect at the time of grant for periods corresponding with the expected term of the option.

The Company recorded share–based compensation expenses with respect to Option Plan of $515,478 for the year ended December 31, 2006.

A summary of the share option activity during the year ended December 31, 2006 is as follows:

| Share Options | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In years) |
|---|---|---|---|
| Outstanding as of January 1, 2006 | 44,330,116 | $ 0.24 | |
| Granted | 340,000 | $ 0.60 | |
| Exercised | (5,295,700) | $ 0.12 | |
| Forfeited | (358,966) | $ 0.29 | |
| Outstanding as of December 31, 2006 | 39,015,450 | $ 0.26 | 8.1 |
| Vested and expected to vest as of December 31, 2006 | 35,699,137 | $ 0.26 | 8.1 |
| Exercisable as of December 31, 2006 | 16,868,095 | $ 0.21 | 7.7 |

The Company granted 340,000 stock options during the year ended December 31, 2006, with a weighted average grant–date fair value per share of $0.004. The intrinsic value of stock options exercised was approximately $10,799 for the year ended December 31, 2006.

As of December 31, 2006, there was $485,043 of total unrecognized compensation cost related to unvested share–based compensation arrangements granted under the Option Plan which is expected to be recognized over a weighted–average period of 1.1 years.

*Restricted Shares*

On June 1, 2006, the Company granted 2,725,055 shares to an officer of the Company at the price of $0.50 per share. The shares are subject to repurchase by the Company. The repurchase right on 908,352 of these shares will expire on June 1, 2007 if the officer remains employed with the Company. The repurchase right on the remaining 1,816,703 shares will expire rateably on a monthly basis from June 1, 2007 to May 31, 2009 for as long as the officer is employed with the Company. In addition, the Company entered into a loan agreement (the "Loan Agreement") with the officer to grant an interest–free, non–recourse loan to the officer of $1,349,992 to purchase the restricted shares. The loan will be due and payable if the officer breaches any term of the Loan Agreement or fails to perform any obligation specified in the Loan Agreement; voluntarily ceases to be an employee; or immediately prior to the US public offering of the Company's common shares. If at any time before the repurchase right has expired or the Company merges with or into another corporation, the repurchase right on all shares shall immediately expire.

The arrangement is treated as a share option until the loan is repaid. Further, as the shares sold were on a non–recourse basis and are accounted for as options, issuance of the restricted shares was not recorded. Rather, compensation cost will be recognized over the service period with an offsetting increase in additional paid–in

F–73

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

capital. The fair value of the award was $19, and was therefore not recorded as the amount was insignificant, and was based on the following assumptions:

| | |
|---|---|
| Risk–free rate of return | 5.40% |
| Expected term | 2.3 years |
| Expected volatility | 49% |
| Expected dividend yield | 0% |

A summary of the non–vested restricted share activity is as follows:

| | Shares | Weighted Average Grant Date Fair Value | |
|---|---|---|---|
| Outstanding as of January 1, 2006 | — | $ | — |
| Granted | 2,725,055 | | 0.00 |
| Restricted shares outstanding as of December 31, 2006 | 2,725,055 | $ | 0.00 |

*2004 Warrants*

In December 2004, warrants were issued in connection with the issuance of a convertible note (the "2004 Note"). In May 2005, the Company repaid the 2004 Note and fixed the exercise price of the warrants at $0.20 and modified the expiration date to June 2007.

As of December 31, 2006, the above warrants were exercisable into 8,817,720 common shares.

*2005 Warrants*

In May 2005, warrants were issued in connection with an investor's purchase of 11,752,500 common shares. The warrants have an exercise price of $0.30 and will expire in June 2007.

As of December 31, 2006, the 2005 Warrants were exercisable into 11,752,500 common shares.

The 2004 and 2005 Warrants were canceled as a result of the Company's acquisition by Focus Media on March 28, 2007 (refer to Note 13).

**8.  Income Taxes**

*Cayman Islands*

The Company is a tax–exempted company incorporated in the Cayman Islands.

*Hong Kong*

Allyes China has not recorded a tax provision for Hong Kong tax purposes as it does not have any assessable profit in Hong Kong.

*PRC*

Except for Allyes China, the Company's subsidiaries are subject to Enterprise Income Tax ("EIT") on the taxable income in accordance with the Enterprise Income Tax Law and the Income Tax Law of the PRC concerning Foreign Investment Enterprise and Foreign Enterprises (collectively "PRC Enterprise Income Tax Laws").

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

New Allyes Shanghai enjoys EIT preferential treatment and is entitled to a two–year EIT exemption followed by a three–year, 50% reduction in rate, effective from the first profit making year after absorbing all prior year tax losses which can be carried forward for five years. New Allyes Shanghai entered the first profit making year in 2004 and was therefore subject to 50% EIT rate reduction for the year ended December 31, 2006.

Shanghai QS, Beijing LT and Shanghai KT also enjoy EIT preferential treatment and are entitled to a two–year EIT exemption, effective from the first year of establishment. The exemption period ended December 31, 2006 for Shanghai QS and Beijing LT, and is to be ended December 31, 2007 for Shanghai KT. All three companies were exempted from EIT for the year ended December 31, 2006.

The Company's remaining entities registered in the PRC are subject to a statutory EIT rate of 33% in accordance with the relevant PRC Enterprise Income Tax Laws.

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transfer to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises otherwise classified as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate. The income tax rates for most of the Company's PRC entities are expected to transit from 33% to 25% starting from January 1, 2008.

Income tax expense (benefit) consists of the following:

|  | Year Ended December 31, 2006 |
|---|---|
| Current income tax expense | $ 1,149,557 |
| Deferred income tax benefit | (146,613) |
| Total income taxes | $ 1,002,944 |

The effective income tax rate for the year ended December 31, 2006 differs from the statutory rate primarily due to excess of payroll over EIT deduction limit, write–off of bad debt without tax authority approval, impairment loss recognized and tax holiday effect of certain PRC entities.

F–75

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

The principal components of the Company's deferred income tax assets and liabilities as of December 31, 2006 are as follows:

|  | Current | | Non−current |
|---|---|---|---|
| Deferred tax assets: | | | |
| Bad debt provision | 69,737 | | — |
| Accrued expenses temporarily non−deductible | 320,037 | | — |
| Others | 64,350 | | 7,939 |
| Total deferred tax assets | $ 454,124 | $ | 7,939 |
| Deferred tax liabilities: | | | |
| Acquired intangible assets | $ — | $ | 31,271 |

The Company operates through multiple subsidiaries and the valuation allowance is considered on each individual subsidiary basis. Where a valuation allowance was not recorded, the Company believes that sufficient positive evidence exists to generate sufficient taxable income in the future.

**9.   Convertible Preference Shares**

*Series A Preference Shares*

On July 15, 2000, the Company issued an aggregate of 40,000,000 shares of Series A Preference Shares at $0.0001 per share for gross proceeds of $4,000.

*Series A−1 Preference Shares*

The Company issued 42,840,000 and 2,085,500 shares of Series A−1 Preference Shares at $0.0001 per share for gross proceeds of $4,284 and $209 on August 1, 2001 and September 1, 2004, respectively.

*Series B Preference Shares*

The Company issued 50,463,966 and 10,092,792 shares of Series B Preference Shares at $0.0001 per share for gross proceeds of $5,047 and $1,009 on May 23, 2005 and September 6, 2005, respectively.

The convertible preference shares are not redeemable at the option of holder.

The significant terms of the Series A, Series A−1, and Series B convertible preference shares are as follows:

*Conversion*

A. Optional Conversion

Any preference share may, at the option of the holder, be converted at any time into common shares based on the then−effective conversion price.

The conversion price is initially equal to original issue price and may be subsequently adjusted for:

(i) Share splits or combination

(ii) Common share dividends and distributions

(iii) Other dividends

(iv) Reorganizations, mergers, consolidations, reclassifications, exchanges or substitutions.

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

(v) Sale of shares below conversion price

(vi) Material adjustment to financial statements

(vii) Other dilutive events

The initial conversion ratio for each series of preference shares was 1:1 except for automatic conversion.

B. Automatic Conversion

Series A and Series A−1 preference shares shall automatically be converted into common shares upon the closing of a qualified initial public offering (the "IPO"), based on the then−effective conversion price.

Series B shall automatically be converted upon the closing of a qualified IPO into the greater of:

(i) the number of common shares that each Series B would be convertible into based on the then−effective conversion price; or

(ii) a number of common shares that shall be calculated as follows:

a) if the closing of such IPO is on or before the 12 month anniversary of the original Series B issue date and the offering prices of the common shares is less than 150% of the original Series B issue price (US$0.50), then the number of common shares each Series B can be converted into shall be the result of:

Number of common shares = ((Original Series B Issue Price) X 150%) / (Offering Price)

b) If the closing of a qualified IPO is after 12 month anniversary but on or before the 18 month anniversary of the original Series B issue date and the offering prices of the common shares is less than 175% of the original Series B issue price (US$0.50), then the number of common shares each Series B can be converted into shall be the result of:

Number of common shares = ((Original Series B Issue Price) X 175%) / (Offering Price)

c) If the closing of such IPO is after the 18 month anniversary of the original Series B issue date and the offering price of the common shares is less than 200% of the original Series B issue price (US$0.495403), then the number of common shares each Series B can be converted into shall be the result of:

Number of common shares = ((Original Series B Issue Price) X 200%) / (Offering Price)

*Voting Rights*

Each preference share shall be entitled to the same number of votes as the number of common shares into which as if preference were converted.

*Dividends*

The holders of Series A and Series B preference shares shall be entitled to receive on a pari passu basis, when, as, and if declared by the Board of Directors but only out of funds that are legally available, cash dividends at the rate or in the amount as the Board considers appropriate. No dividends shall be declared or paid on the common shares until a dividend is declared or paid on each outstanding preference share.

F−77

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*Liquidation Preference*

Upon any liquidation, dissolution, or winding up of the Company (a "Liquidation Event"), whether voluntary or involuntary:

(A) Before any distribution or payment shall be made to the holders of Series A, Series A−1 and common shares, each holder of Series B preference shares shall be entitled to receive, on a pari passu basis, an amount equal to the original Series B issue price (US$0.50) plus all declared and unpaid dividends.

Additionally, each holder of Series B preference shares shall be entitled to receive, an amount equal to:

(i) Original issue price x 0.50, if the liquidation date is on or before the 12 month anniversary of the original Series B issue date;

(ii) Original issue price x 0.75, if the liquidation date is after the 12 month anniversary but on or before the 18 month anniversary of the original Series B issue date;

(iii) Original issue price x 1.00, if the liquidation date is after the 18 month anniversary of the original Series B issue date;

(B) After distribution or payment to holders of Series B preference shares, each holder of Series A preference shares shall be entitled to receive, on a pari passu basis, an amount equal to original Series A issue price (US$0.01 as adjusted for two 1:100 stock−splits) and original Series A−1 issue price (US$0.02 as adjusted for two 1:100 stock−splits) plus all declared and unpaid dividends.

Additionally, each holder of Series A preference shares shall be entitled to receive US$0.001 for each Series A preference share and US$0.01 for each Series A−1 preference share.

**10.     Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Company located in the PRC participate in a government−mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Company to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits was $655,051 for the year ended December 31, 2006.

**11.     Commitments**

*Leases*

The Company has entered into certain leasing arrangements relating to the Company's office. Rental expense under operating leases for the year ended December 31, 2006 was $804,979.

Future minimum lease payments under non−cancelable operating lease agreements were as follows;

| December 31, | |
|---|---:|
| 2007 | $ 1,113,145 |
| 2008 | 838,410 |
| 2009 | 758,696 |
| 2010 | 689,769 |
| 2011 | 689,769 |

F−78

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

| | |
|---|---:|
| 2012 and thereafter | 205,986 |
| Total | $  4,295,775 |

**12.    Restricted Net Assets**

Relevant PRC statutory laws and regulations permit payments of dividends by the Company's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, the Company's PRC subsidiaries and PRC affiliates are restricted in their ability to transfer a portion of their net assets in the form of dividends. Assets subject to restriction amounted to $827,814 as of December 31, 2006.

**13.    Subsequent events**

*Termination of Beijing LT's Business*

On March 15, 2007, the Company terminated the Agreement (See Note 3) and executed a contract (the "Contract") with the Selling Corporate Shareholder and the General Manager of Beijing LT. Under the Contract, the Company will pay the Selling Corporate Shareholder (of which the General Manager has an 80% ownership interest) a percentage of the total collected amount of Beijing LT's accounts receivable outstanding as of the date of the Contract, not to exceed $384,187.

*Acquisition by Focus Media*

On February 28, 2007, the Company's shareholders entered into a definitive Share Purchase Agreement (the "Share Purchase Agreement") with Focus Media pursuant to which Focus Media acquired 100% of the Company's share capital. The consideration was $70 million in cash and 19,969,080 common shares with a fair value of $154,281,112 or $7.726 per common share. Additional consideration of 9,662,458 common shares are to be issued by Focus Media contingent upon the Company meeting certain earning targets during the twelve–month period from April 1, 2007 to March 31, 2008. The acquisition was completed in March 2007. Coincident with the acquisition, all the Company's outstanding options and warrants were cancelled.

*Release of Restricted Shares*

Effective upon the Company's acquisition by Focus Media, the repurchase right related to certain issued shares (refer to Note 7) expired.

On March 31, 2007, the officer holding the previously restricted shares severance agreement under which the Company agreed to pay the officer US$62,341 and the loan payable from the officer to the Company as a result of the purchase of the restricted shares is due and payable on December 31, 2007.

*Dividend Payment*

On March 28, 2007, the Board of Directors approved a special cash dividend of US$5 million which is payable to an entity wholly owned by the CEO, who is also a shareholder of the Company. The Company recorded this non prorate dividend as compensation charge.

* * * * *

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Table of Contents**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–81 |
| Consolidated Balance Sheets as of December 31, 2004 and 2005 | F–82 |
| Consolidated Statements of Operations for the years ended December 31, 2004 and 2005 | F–83 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2004 and 2005 | F–84 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004 and 2005 | F–85 |
| Notes to the Consolidated Financial Statements for the years ended December 31, 2004 and 2005 | F–86 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
TARGET MEDIA HOLDINGS LIMITED:

We have audited the accompanying consolidated balance sheets of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the years in the two–year period ended December 31, 2005, all expressed in Renminbi. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the results of their operations and their cash flows for each of the years in the two–year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

The accompanying consolidated financial statements as of and for the year ended December 31, 2005, have been translated into United States dollars solely for the convenience of the reader. We have audited the translation and, in our opinion, such consolidated financial statements expressed in Renminbi have been translated into United States dollars on the basis set forth in note 2(c) to the consolidated financial statements.

/s/ KPMG

Hong Kong, China
February 13, 2006

F–81

**Table of Contents**

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
AS OF DECEMBER 31, 2004 AND 2005

| | Note | December 31, 2004 RMB | December 31, 2005 RMB | December 31, 2005 US$ |
|---|---|---|---|---|
| | | (Amounts in thousands, except share data) | | |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | | 103,804 | 83,837 | 10,388 |
| Time deposits | (3) | 828 | 20,596 | 2,552 |
| Accounts receivable, net | (4) | 45,505 | 123,423 | 15,293 |
| Due from related parties | (15) | 4,611 | 116 | 14 |
| Prepaid expenses and other current assets | (5) | 5,969 | 76,371 | 9,463 |
| Deferred tax assets | (10) | 112 | 112 | 14 |
| Total current assets | | 160,829 | 304,455 | 37,724 |
| Rental deposits | | 202 | 2,250 | 279 |
| Property, equipment and software, net | (6) | 35,586 | 173,821 | 21,539 |
| Long–term prepayments | (6) | — | 14,617 | 1,811 |
| Intangible assets | (7) | — | 7,982 | 989 |
| Goodwill | (7) | — | 1,613 | 200 |
| Total assets | | 196,617 | 504,738 | 62,542 |
| **Liabilities and shareholders' equity** | | | | |
| Current liabilities | | | | |
| Accounts and bills payable | | 5,311 | 48,428 | 6,001 |
| Accrued expenses and other payables | (8) | 8,052 | 69,948 | 8,667 |
| Due to related parties | (15) | 10,033 | 30,000 | 3,717 |
| Income tax payable | | 442 | 442 | 55 |
| Total current liabilities | | 23,838 | 148,818 | 18,440 |
| Deferred tax liability | (7) | — | 377 | 47 |
| Total liabilities | | 23,838 | 149,195 | 18,487 |
| Commitments and contingencies | (11) | | | |
| Series A redeemable convertible preferred shares: US$0.0001 par value; 44,000,000 authorized; 41,641,679 shares issued and outstanding as of December 31, 2004 and 2005 | (12) | 130,978 | 157,512 | 19,518 |
| Series B redeemable convertible preferred shares: US$0.0001 par value; 22,000,000 authorized; nil and 21,820,243 shares issued and outstanding as of December 31, 2004 and 2005, respectively | (12) | — | 128,528 | 15,926 |
| Shareholders' equity | | | | |
| Common shares: US$0.0001 par value; 200,000,000 and 210,000,000 shares authorized as of December 31, 2004 and 2005, respectively; 111,100,000 shares issued and outstanding as of December 31, 2004 and 2005 | (13) | 92 | 92 | 11 |
| Paid–in capital | | 25,045 | 62,712 | 7,771 |
| Statutory reserves | | 5,011 | 7,166 | 888 |
| Retained earnings (deficit) | | 11,653 | (467) | (59) |
| Total shareholders' equity | | 41,801 | 69,503 | 8,611 |
| Total liabilities and shareholders' equity | | 196,617 | 504,738 | 62,542 |

The accompanying notes are an integral part of these consolidated financial statements.

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Note | 2004 RMB | 2005 RMB | 2005 US$ |
|---|---|---|---|---|
| | | (Amounts in thousands, except per share data) | | |
| Advertising service revenue | | 80,475 | 271,911 | 33,693 |
| Cost of revenues | | (32,407) | (131,710) | (16,321) |
| Gross profit | | 48,068 | 140,201 | 17,372 |
| Operating expenses: | | | | |
|    Sales and marketing | | (16,317) | (69,277) | (8,584) |
|    General and administrative | | (5,344) | (15,696) | (1,945) |
|       Total operating expenses | | (21,661) | (84,973) | (10,529) |
| Income from operations | | 26,407 | 55,228 | 6,843 |
| Other income (expenses): | | | | |
|    Interest income | | 86 | 628 | 78 |
|    Interest expense | | (362) | (79) | (10) |
|    Exchange loss | | (25) | (755) | (94) |
| Income before income tax expense and minority interests | | 26,106 | 55,022 | 6,817 |
| Income tax expense | (10) | (330) | — | — |
| Income after income tax expense | | 25,776 | 55,022 | 6,817 |
| Minority interests | | — | 180 | 22 |
| Net income | | 25,776 | 55,202 | 6,839 |
| Accretion to Series A redeemable convertible preferred shares redemption value | | (8,663) | (26,534) | (3,288) |
| Accretion to Series B redeemable convertible preferred shares redemption value | | — | (7,747) | (960) |
| Beneficial conversion of Series A redeemable convertible preferred shares | | — | (24,378) | (3,021) |
| Beneficial conversion of Series B redeemable convertible preferred shares | | — | (6,508) | (806) |
| Net income (loss) available to common shareholders | | 17,113 | (9,965) | (1,236) |

The accompanying notes are an integral part of these consolidated financial statements.

F–83

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Common shares | | Paid–in capital | Statutory reserves | Retained earnings (deficit) | Total shareholders' equity |
|---|---|---|---|---|---|---|
| | Number of shares | Amount | | | | |
| | | RMB | RMB | RMB | RMB | RMB |
| | | | (Amounts in thousands, except share data) | | | |
| January 1, 2004 | — | — | 23,184 | — | (449) | 22,735 |
| Issuance of common shares | 111,100,000 | 92 | — | — | — | 92 |
| Share–based compensation (note 9) | — | — | 1,861 | — | — | 1,861 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (8,663) | (8,663) |
| Net income | — | — | — | — | 25,776 | 25,776 |
| Appropriation to statutory reserves | — | — | — | 5,011 | (5,011) | — |
| December 31, 2004 | 111,100,000 | 92 | 25,045 | 5,011 | 11,653 | 41,801 |
| Share–based compensation (note 9) | — | — | 6,781 | — | — | 6,781 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (26,534) | (26,534) |
| Accretion to Series B redeemable convertible preferred shares redemption value | — | — | — | — | (7,747) | (7,747) |
| Beneficial conversion of Series A redeemable convertible preferred shares | — | — | 24,378 | — | (24,378) | — |
| Beneficial conversion of Series B redeemable convertible preferred shares | — | — | 6,508 | — | (6,508) | — |
| Net income | — | — | — | — | 55,202 | 55,202 |
| Appropriation to statutory reserves | — | — | — | 2,155 | (2,155) | — |
| December 31, 2005 | 111,100,000 | 92 | 62,712 | 7,166 | (467) | 69,503 |
| December 31, 2005 (US$) | | 11 | 7,771 | 888 | (59) | 8,611 |

The accompanying notes are an integral part of these consolidated financial statements.

F–84

**Table of Contents**

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005

| | Years ended December 31, | | |
|---|---|---|---|
| | **2004** | **2005** | **2005** |
| | **RMB** | **RMB** | **US$** |
| | | **(Amounts in thousands)** | |
| Cash flows from operating activities: | | | |
| Net income | 25,776 | 55,202 | 6,839 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | | |
| Minority interests | — | (180) | (22) |
| Allowance for doubtful accounts | 340 | — | — |
| Gain on disposal of equipment | (69) | (37) | (5) |
| Depreciation and amortization | 4,383 | 19,594 | 2,428 |
| Share–based compensation | 1,861 | 6,781 | 840 |
| Deferred income tax | (112) | — | — |
| Changes in operating assets and liabilities, net of effects of business acquired: | | | |
| Accounts receivable | (45,845) | (77,534) | (9,607) |
| Due from related parties | (4,611) | 4,495 | 557 |
| Prepaid expenses and other current assets | (5,501) | (53,457) | (6,623) |
| Rental deposits | (202) | (2,048) | (254) |
| Accounts and bills payable | 1,730 | 1,225 | 152 |
| Accrued expenses and other payables | 7,789 | 57,856 | 7,169 |
| Due to related parties | (737) | (33) | (4) |
| Income tax payable | 442 | — | — |
| Net cash (used in) provided by operating activities | (14,756) | 11,864 | 1,470 |
| Cash flows from investing activities: | | | |
| Purchase of time deposits | (828) | (45,524) | (5,641) |
| Maturity of time deposits | — | 25,756 | 3,191 |
| Initial investment deposits | — | (16,945) | (2,100) |
| Purchase of property, equipment and software | (24,045) | (127,420) | (15,789) |
| Purchase of intangible assets | — | (4,809) | (596) |
| Proceeds from disposal of equipment | 346 | 255 | 32 |
| Net cash paid for acquisitions of subsidiaries | — | (3,925) | (486) |
| Net cash used in investing activities | (24,527) | (172,612) | (21,389) |
| Cash flows from financing activities: | | | |
| Proceeds from loan from shareholder | 31,655 | 30,000 | 3,717 |
| Repayment of loan from shareholder | (21,655) | (10,000) | (1,239) |
| Proceeds from issuance of common shares | 92 | — | — |
| Proceeds from issuance of redeemable convertible preferred shares, net of issuance costs | 122,315 | 120,781 | 14,966 |
| Distributions to shareholders in connection with the Restructuring | (10,000) | — | — |
| Net cash provided by financing activities | 122,407 | 140,781 | 17,444 |
| Net increase(decrease) in cash and cash equivalents | 83,124 | (19,967) | (2,475) |
| Cash and cash equivalents at beginning of year | 20,680 | 103,804 | 12,863 |
| Cash and cash equivalents at end of year | 103,804 | 83,837 | 10,388 |
| Supplemental disclosures of cash flow and non–cash information: | | | |
| Cash paid for income taxes | — | — | — |
| Cash paid for interest | 348 | 79 | 10 |
| Accrual for purchase of property, equipment and software | 3,581 | 41,765 | 5,175 |
| Accrual for purchase of intangible assets | — | 4,040 | 501 |

The accompanying notes are an integral part of these consolidated financial statements.

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(1) Principal Activities, Organization and Basis of Presentation**

*Principal activities*

The accompanying consolidated financial statements consist of the financial statements of Target Media Holdings Limited (the "Company"), its wholly–owned subsidiary, Target Media Multi–Media Technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity ("VIE"), Shanghai Target Media Co., Ltd. ("STM"). The Company and its subsidiary and consolidated VIE are collectively referred to as the "Group". The Group is principally engaged in operating a nationwide flat panel display advertising network in the People's Republic of China ("PRC"), which is made up of liquid crystal displays, or LCD, and plasma screens placed in the elevator lobbies or other waiting areas of commercial buildings, high–end residential buildings, hotels, banks and supermarkets. Using the advertisement content provided by its customers, the Group displays commercial advertisements for its customers on this network to capture targeted consumers who work, live or shop at these locations.

On January 7, 2006, the Company signed a definitive agreement ("the Agreement") with Focus Media Holding Limited ("Focus Media") whereby Focus Media will purchase 100% of the Company's equity interests from selling shareholders in exchange for a total consideration of US$325,000, of which US$94,000 will be paid in cash and US$231,000 will be paid in the form of Focus Media's ordinary shares (priced at US$30.00 per ADS, each of which represents 10 Focus Media ordinary shares), equal to 77 million Focus Media ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of US$45,000 is to be paid upon closing. The second installment of US$25,000 is to be paid on April 28, 2006. The final installment of US$24,000 is to be paid on July 31, 2006, and may be increased or decreased based on a calculation of Target Media's net working capital as of the closing date. All of the Focus Media ordinary shares to be delivered at closing under the Agreement will be in the form of newly issued shares. This proposed business combination is expected to close following the satisfaction or waiver of customary closing conditions provided in the Agreement.

*Organization*

In July 2004, the shareholders of STM incorporated the Company in the Cayman Islands as part of the reorganization of STM (the "Reorganization"). The purpose of the Reorganization was to enable a group of foreign investors to invest in STM where current PRC laws restrict direct foreign investment or ownership in advertising companies in the PRC. In connection with the Reorganization, the Company entered into the following series of transactions:

(1) The formation and incorporation and issuance of the Company's common shares to the STM shareholders in the same direct proportion to their relative equity interests of STM in August 2004. See note 13.

(2) The formation and incorporation of TMM as a wholly–owned subsidiary of the Company in August 2004.

(3) The entering into certain contractual agreements and arrangements between TMM and STM in August 2004 since the Company and TMM currently are ineligible to apply and hold the required licenses for provision of advertising services in the PRC.

(4) The issuance of the Company's Series A redeemable convertible preferred shares to a group of foreign investors for cash consideration of US$15,000 as discussed in note 12(a).

The contractual agreements and arrangements between TMM and STM have resulted in the Company receiving substantially all the economic benefits and residual returns, absorbing substantially all the risks of expected losses of STM, and controlling the operating and financial decision making of STM. In addition, under the terms of these contractual agreements and arrangements, the Company, through TMM and its de facto agents, is

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

considered to be the primary beneficiary of STM since it holds substantially all the variable interests of STM and is determined to be most closely associated with STM.

Under Financial Accounting Standard Board ("FASB") Interpretation No. 46(R), "*Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51*" ("FIN 46R"), a variable interest entity is required to be consolidated by the primary beneficiary of the entity if the equity investors in the entity do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. Accordingly, the financial statements of STM have been consolidated in the Company's financial statements from August 2004, which is the date when the Company first became the primary beneficiary of STM through the above contractual agreements and arrangements.

The fees, payments or other sources of income and expenses arising from the transactions between TMM and STM under the terms of these agreements are eliminated against the related expenses or income on consolidation and do not have any impact on the consolidated financial position and operations and cash flow of the Group other than to reflect such amounts on a separate legal entity basis. The key terms and salient features of these contractual agreements and arrangements, which became effective from August 2004, are as follows:

*Assets Purchase Agreement*  Under the Assets Purchase Agreement, TMM purchased all of the tangible and intangible assets of STM other than (i) advertisement contracts with customers, (ii) flat panel display placement contracts, and (iii) other assets prohibited from transfer under applicable PRC laws and regulations. The purchase price was equal to the net book value of these assets as of July 31, 2004 and is payable by TMM through deducting the fees and expenses payable to TMM by STM under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement described below.

*Lease and Service Agreement*  Under the Lease and Service Agreement, STM exclusively leases flat panel display and related equipment from TMM. STM also undertakes to exclusively procure certain services from TMM from time to time, including (i) repair and maintenance of flat panel display equipment, (ii) secondment of TMM's employees to STM and (iii) business promotion services. Equipment rental is charged based on the amount of depreciation charge of the equipment plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. Service fees are charged based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the Lease and Service Agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration. The terms of this agreement also prohibit STM from purchasing or leasing flat panel display equipment, hiring new employees and procuring the services described above from any other third parties without TMM's written consent.

*Software License and Exclusive Technical Service Agreement*  Under the Software License and Exclusive Technical Service Agreement, TMM provides a non–exclusive, non–transferable and non–assignable license to STM to install and run its licensed software solely in the PRC. TMM is the exclusive technical service provider to STM and STM is not permitted to procure any similar or identical technical services from other third parties. STM further agrees that TMM is the sole owner of any and all intellectual property rights or any other rights arising by way of research and development under this agreement. The software license fees payable by STM to TMM shall be based on a certain percentage of the business income generated from the use of TMM's software in STM's business operations as determined and approved by TMM and the Board of Directors of the Company. The technical service fees payable by STM to TMM shall be based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*Guarantee Agreement*  Under the Guarantee Agreement and as security for STM's obligations under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement, each of the shareholders of STM has guaranteed STM's performance under, and settlement of obligations arising from the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement by pledging all their equity interests in STM. Furthermore, the shareholders of STM have agreed to appoint the general manager, chief financial officer and other senior management of STM according to the Company's or TMM's instruction.

*Future Equity Transfer Agreement*  Under the Future Equity Transfer Agreement, the shareholders of STM shall transfer to the Company or its nominee, and the Company or its nominee shall acquire, when the PRC laws permit, their entire equity interests in the registered capital of STM at a nominal amount of RMB 10, provided that the prevailing PRC laws at the time of transfer do not require a valuation of the transferred equity interests or post other restrictions. Furthermore, the terms of the Future Equity Transfer Agreement place significant restrictions on the shareholders of STM as summarized below:

(a) Without the written consent of the Company, each of the shareholders of STM shall not use their equity interests in STM as a guarantee or security against a loan, or shall not cause STM to enter into any loan transaction.

(b) Without the written consent of the Company, each of the shareholders of STM shall not dispose of their equity interests in the registered capital of STM in any form, including but not limited to transfer, security, or other forms of entitlements.

(c) Without the written consent of the Company, each of the shareholders of STM shall not adopt any measure which may cause the current approved business scope of STM to be altered, or may cause STM to be liquidated or wound up.

(d) Each of the shareholders of STM shall cause their respective nominees on STM's Board not to pay any dividend or declare any dividend payable to the legal shareholders unless the Company's prior approval is obtained.

(e) Each of the shareholders of STM shall invite the Company to attend STM's shareholders and Board of Directors' meetings, cast their votes at the shareholders' meeting in accordance with the Company's instructions and direct their respective nominees on STM's Board to vote in accordance with the Company's instructions.

(f) Each of the shareholders of STM shall ensure that STM's capital structure remains unchanged unless otherwise instructed by the Company, and that STM's registered capital will not be increased, nor will it be assigned, in whole or in part, to any third party without prior written consent of the Company.

With respect to the Company's direct variable interest in STM, no minority interests (or noncontrolling interests) have been presented since the Company, through TMM and its de facto agents (who are also all the shareholders of STM), has a 100% controlling financial interest in STM through the terms of the aforementioned contractual agreements and arrangements. In addition, the common shareholders of the Company and the shareholders of STM are the same and their shareholders' equity interests in the Company are in the same proportion as to their equity interests in STM.

STM is a domestic company incorporated in Shanghai, the PRC, in December 2003 and was formed in connection with the restructuring of Shanghai Dian Yang Digital Media Technology Co., Ltd. ("Dian Yang"), whose sole beneficial equity owner is also the controlling and majority shareholder of STM and the Company. Dian Yang was established in 2000 and initially operated as an advertising agency company by placing advertisements with media companies on behalf of advertising clients. In March 2003, Dian Yang commenced the flat panel display advertising business as an extension to its advertising agency business. As part of the restructuring of Dian Yang

F–88

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

(the "Restructuring"), all tangible and intangible assets, assignable business contracts and employees relevant to the flat panel display advertising business were transferred from Dian Yang to STM in December 2003 at the time of STM's incorporation. In connection with the transfer, RMB 20,000 was distributed to Dian Yang, of which RMB 10,000 was paid by STM at the end of December 2003 and the remaining RMB 10,000 was paid by STM in January 2004. Following the Restructuring, STM began to operate the flat panel display advertising business.

*Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("US GAAP").

Since the controlling and majority shareholder of STM prior to the Reorganization remained the controlling and majority shareholder of the Company after consummation of the Reorganization, the assets and liabilities of STM have been stated and recognized by the Company at the historical carrying amounts of STM. As discussed above, the financial position and results of operations of STM have been consolidated and included in the Company's consolidated financial statements from August 2004 onwards. For the periods prior to August 2004, since the Company was formed for the sole purpose of the Reorganization to allow a group of foreign investors to invest in STM's flat panel display advertising business, the accompanying consolidated financial statements include the financial position and the related results of operations of STM from the earliest date presented through August 2004 at historical cost basis with no lapse in financial information. Accordingly, the results of operations for the years ended December 31, 2004 and 2005 are comparable.

As of December 31, 2005, the Group had working capital (current assets less current liabilities) of approximately RMB 155,637 (US$19,285) and off–balance sheet operating lease commitments of RMB 117,994 (US$14,621) payable over the next 12–months (see note 11). The Company has historically relied on capital infusions and credit enhancements from its shareholders to provide working capital to fund its flat panel display network build–out and acquisitions. Management believes that its current cash on hand and expected cash flow from operations will be sufficient to meet its operating requirements, including existing operating lease commitments over the foreseeable future. However, should the acquisition of the Company by Focus Media (see note 1) not occur or the consummation date be delayed beyond a short period of time, it may be necessary for the Company to seek additional capital infusions from current and new shareholders and/or provide shareholder credit enhancements to third party lenders to satisfy its anticipated liquidity requirements for further network expansion. Should the Company be unable to obtain liquidity at levels necessary to meet its anticipated requirements or at commercially acceptable rates, future network expansion plans may need to be curtailed or postponed.

**(2) Summary of Significant Accounting Policies**

*(a) Principles of consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiary and its VIE, since the Company is the primary beneficiary. All significant inter company balances and transactions have been eliminated on consolidation.

*(b) Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, management reviews its estimates, including those related to the allowance for doubtful accounts, estimates to

F–89

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

recognize rebate receivables, valuation allowance for deferred tax assets, asset depreciable lives and residual values, and carrying values of long–lived assets, based on currently available information. Changes in facts and circumstances may result in revised estimates.

*(c) Foreign currencies*

The Group's functional currency is the Renminbi ("RMB"). Monetary assets and liabilities denominated in foreign currencies are translated into RMB using the applicable exchange rates quoted by the People's Bank of China at the balance sheet dates. All such exchange gains and losses are included in the consolidated statements of operations.

The accompanying consolidated financial statements have been expressed in RMB. The translations of amounts from RMB into United States dollars ("US$") as of and for the year ended December 31, 2005, are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB 8.0702, on December 31, 2005, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2005, or at any other rate. See also note 14.

*(d) Commitments and contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated.

*(e) Cash and cash equivalents*

Cash and cash equivalents consist of cash at bank and on hand and certificates of deposit with an initial term of less than three months when purchased. None of the Group's cash and cash equivalents is restricted for withdrawal.

*(f) Accounts receivable*

Accounts receivable billed are recorded at the invoiced amount and are non interest bearing. The allowance for doubtful accounts is the Group's best estimate of the amount of probable credit losses in the Group's existing accounts receivable. The Group determines the allowance based on historical write–off experience by customer types and reviews specific larger amounts individually for collectibility. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Group does not have any off–balance–sheet credit exposure related to its customers.

*(g) Property, equipment and software, net*

Property, equipment and software are stated at cost, net of accumulated depreciation, amortization and impairment.

F–90

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Depreciation and amortization are calculated using the straight–line method over the following estimated useful lives, taking into account the assets' estimated residual value:

| | |
|---|---|
| Flat panel display equipment, primarily LCD and plasma television screens | 5 years |
| Computers and office equipment and software | 3–5 years |
| Motor vehicles | 5 years |
| Leasehold improvements | Shorter of 5 years or term of the lease |

In accordance with SFAS 143, *"Accounting for Asset Retirement Obligations,"* legal obligations associated with the retirement of long–lived assets that result from the acquisition, construction, development or normal use of the asset are recognized at fair value in the period in which the liability is incurred if a reasonable estimate of fair value can be made. For the periods presented there were no legal retirement obligations associated with the placement and use of the Group's flat panel display equipment.

*(h) Impairment of long–lived assets*

In accordance with Statements of Financial Accounting Standards ("SFAS") No. 144, *"Accounting for the Impairment or Disposal of Long–Lived Assets,"* long–lived assets, such as property, equipment and software, and acquired intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. No impairment of long–lived assets was recognized for the years ended December 31, 2004 and 2005.

*(i) Goodwill and other intangible assets*

Goodwill and intangible assets which are determined to have indefinite useful lives are not amortized, but instead tested for impairment at least annually in accordance with the provisions of SFAS No. 142, *"Goodwill and Other Intangible Assets."* Intangible assets with determinable useful lives are amortized over their respective useful lives and reviewed for impairment in accordance with SFAS No. 144.

*(j) Fair value of financial instruments*

Financial instruments of the Group include cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties, other receivables, accounts and bills payable, and amounts due to related parties, for which the carrying values approximate their fair values due to their short–term maturities.

*(k) Statutory Reserve*

TMM and STM are required under PRC laws to provide for certain statutory reserves, such as a general reserve, an enterprise expansion fund and a staff welfare and bonus fund. TMM and STM are required to allocate at least 10% of their after tax profits as reported in their PRC statutory financial statements to the general reserve and have the right to discontinue allocations to the general reserve if the balance of such reserve has reached 50% of their registered capital. These statutory reserves are not available for distribution to the shareholders (except in liquidation) and may not be transferred in the form of loans, advances or cash dividends. As of December 31, 2004 and 2005, RMB 5,011 and RMB 7,166 were appropriated from retained earnings and set aside for these statutory

F–91

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

reserves respectively by TMM and STM. As of December 31, 2005, a future appropriation of RMB 91,220 is necessary to reach the general reserve requirement.

*(l) Revenue recognition*

The Group's revenue is derived from the rendering of advertising services. Revenues from advertising services are recognized ratably on a straight–line basis over the period in which the advertisement is contractually required to be displayed, starting from the date the customer provides the advertisement content and the Group displays such content on its flat panel display equipment, and only when all four of the following criteria are met: (i) pervasive evidence of an arrangement exists; (ii) the advertising services have been rendered; (iii) the service fee is fixed or determinable; and (iv) collectibility is reasonably assured.

Billing terms of the Group's advertising service contracts are in the form of the following: (i) full billing after the end of the advertisement displayed period (the "Service Period"); (ii) progress billings over the Service Period; and (iii) partial cash down payment at the beginning of the Service Period with the remainder being billed in the form of progress payments during or after the end of the Service Period. Payments are due between 30 to 90 days from the date of billing. The Group's accounts receivable comprise amounts billed under the contract terms and revenues recognized under contractual terms but not yet billed (unbilled receivables). The Group expects that substantially all unbilled receivables will be billed and collected within twelve months of the balance sheet date. Historically the Group has been able to collect substantially all amounts due under the contract terms without making any concessions on payments.

*(m) Cost of revenues*

Cost of revenues consists primarily of operating lease costs associated with the placement of flat panel display equipment, business tax and surcharges, depreciation of flat panel display equipment and personnel and other related expenses that are directly attributable to the rendering of advertising services.

The Group's advertising revenues are subject to a 5% business tax on revenues generated from services in the PRC. In addition, advertising revenues are subject to a cultural and education development fee at 4% of revenue earned and various other surcharges at 5% of the business tax levied.

*(n) Operating leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the respective lease terms.

*(o) Advertising costs*

The Group expenses its advertising and promotion costs as incurred. Total advertising and promotion costs were RMB 333 and RMB 497 for the years ended December 31, 2004 and 2005, respectively, and were included in sales and marketing expenses.

*(p) Income taxes*

Deferred income taxes are provided using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforward. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided to reduce the carrying amount of deferred tax assets if it is considered more likely than not that some portion, or all, of the deferred tax assets will not be realized.

*(q) Share–based compensation*

The Company has adopted SFAS No. 123R, *"Share–based Payment"*, which requires that share–based payment transactions with employees, such as share options, be measured based on the grant–date fair value of the equity instrument issued and recognized as compensation expense over the requisite service period, with a corresponding addition to paid–in capital. Under this method, compensation cost related to employee share options or similar equity instruments is measured at the grant date based on the fair value of the award and is recognized over the period during which an employee is required to provide service in exchange for the award, which generally is the vesting period.

The Company accounts for equity instruments issued to non–employee vendors in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 96–18, *"Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* All transactions in which goods or services are received in exchange for equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date of the fair value of the equity instrument issued is the date on which the counterparty's performance is completed. For the periods presented, the Company did not issue any equity instruments to non–employee vendors.

*(r) Employee benefit plans*

As stipulated by the regulations of the PRC, the Company's subsidiary and consolidated VIE and its acquired companies participate in various defined contribution plans organized by municipal and provincial governments for their employees. These companies are required to make contributions to these plans at rates ranging from 9% to 24% of the salaries, bonuses and certain allowances of employees. The Group has no other material obligation for the payment of employee benefits associated with these plans beyond the annual contributions described above. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date. Employee benefits associated with these plans are expensed when incurred. During the years ended December 31, 2004 and 2005, the Group made contributions of RMB 903 and RMB 3,221, respectively.

*(s) Segment reporting*

The Company uses the management approach in determining operating segments. The management approach considers the internal organization and reporting used by the Company's chief operating decision maker for making operating decisions, allocating resources and assessing performance. Based on this assessment, the Company has determined that it has only one operating segment which is the rendering of flat panel display advertising services in the PRC.

*(t) Comprehensive income*

Comprehensive income is defined as the change in equity during a period from transactions and other events and circumstances except for transactions resulting from investments by shareholders and distributions to shareholders. The Company has no comprehensive income other than net income for the years ended December 31, 2004 and 2005.

F–93

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(3)  Time Deposits**

As of December 31, 2005, time deposits amounting to RMB 19,789 have been pledged as security for bank guarantees in respect of RMB 43,620 of bills payable issued by the Company to equipment vendors.

**(4)  Accounts Receivable, Net**

Accounts receivable, net is analyzed as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Billed receivables | 20,496 | 96,185 |
| Unbilled receivables | 25,349 | 27,578 |
|  | 45,845 | 123,763 |
| Less: allowance for doubtful accounts | (340) | (340) |
|  | 45,505 | 123,423 |

The activities in the allowance for doubtful accounts for accounts receivable for the years ended December 31, 2004 and 2005, were as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Beginning allowance for doubtful accounts | — | 340 |
| Additions charged to bad debt expense | 340 | — |
| Ending allowance for doubtful accounts | 340 | 340 |

**(5)  Prepaid Expenses and Other Current Assets**

Components of prepaid expenses and other current assets are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Prepaid lease rental expenses | 4,710 | 24,996 |
| Advances to employees | 470 | 2,033 |
| Tax receivable | 655 | — |
| Initial investment deposits | — | 16,945 |
| Deferred share offering expenses | — | 30,773 |
| Other receivables and deposits | 134 | 1,624 |
|  | 5,969 | 76,371 |

On September 30, 2005, the Company entered into a Memorandum of Understanding ("MOU") with Tulip Media (International) Limited, or Tulip International, and its shareholders to acquire all of the outstanding equity interest of Tulip International and its group companies ("the Tulip Group"). The Tulip Group provides outdoor advertising services primarily through outdoor light emitting diodes, or LED, advertising displays, neon light

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

displays and traditional billboard displays that are located mostly in Shanghai. As of December 31, 2005, a refundable initial cash deposit of US$2,000 (equivalent to RMB 16,145) was paid to Tulip Group that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of the Tulip Group pursuant to the current MOU.

On January 1, 2006, STM signed a definitive agreement to acquire 20% equity interest in Shanghai Xinna Media Co., Ltd. ("Xinna") for a total cash consideration of RMB 7,500. As of December 31, 2005, a refundable initial cash deposit of RMB 800 was paid to Xinna's shareholders that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of Xinna pursuant to the current definitive agreement.

Deferred share offering expenses represent specific incremental direct costs of the initial public offering ("IPO") of the Company's common shares that will be charged against the gross proceeds of the offering or to the statement of operations in the period in which the offering is aborted. On January 7, 2006, upon signing of the definitive agreement with Focus Media (see note 1), the Company temporarily postponed its IPO process pending the outcome of acquisition discussions with Focus Media. Should the acquisition by Focus Media be consummated, the IPO will be aborted and the deferred share offering expenses will be charged to the statement of operations in that period.

**(6) Property, Equipment and Software, Net**

Property, equipment and software, net consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Flat panel display equipment | 36,826 | 182,075 |
| Computers and office equipment | 1,722 | 6,114 |
| Leasehold improvements | 709 | 4,198 |
| Motor vehicles | 860 | 2,003 |
| Software | 250 | 2,533 |
|  | 40,367 | 196,923 |
| Less: Accumulated depreciation and amortization | (4,781) | (23,102) |
|  | 35,586 | 173,821 |

Long−term prepayments in the accompanying consolidated balance sheet represent deposits on flat panel display equipment that will be reclassified to property, equipment and software upon the transfer of title and risks and rewards of ownership to the Company from the equipment suppliers.

**(7) Acquisitions of Business and Assets**

In October 2005, STM acquired 70% of the equity interests in Shenyang Target Media Ltd. ("Shenyang TM") for a total cash consideration of RMB 3,150. In addition, in October 2005, STM acquired 100% of the equity interests in Fuzhou Heng Ding United Media Ltd. ("Heng Ding") for a total cash consideration of RMB 1,280. The acquisitions have been accounted for as purchase business combinations with the results of operations included in the Company's consolidated financial statements since the date of acquisition. No supplemental financial information on a pro forma basis as if consummation of the acquisitions, had occurred on January 1, 2004, is provided

F–95

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

since these acquisitions are not considered material to the financial position and results of operations of the Company.

Shenyang TM and Heng Ding are regional providers of flat panel display advertising services in Liaoning province and Fujian province of the PRC. As a result of these acquisitions, the Company has expanded its network coverage and has enhanced its market position in the aforementioned regions in the PRC. The following table summarizes the estimated fair value of the assets acquired and liabilities assumed on the date of acquisition. The final allocation of the purchase price is as follows:

|  | Shenyang TM RMB | Heng Ding RMB | Total RMB |
|---|---|---|---|
| Cash | 500 | 5 | 505 |
| Other current assets | 347 | 37 | 384 |
| Property and equipment | 560 | 173 | 733 |
| Intangible assets | 1,509 | 470 | 1,979 |
| Goodwill | 791 | 822 | 1,613 |
| Total assets acquired | 3,707 | 1,507 | 5,214 |
| Current payables | — | (227) | (227) |
| Deferred tax liability | (377) | — | (377) |
| Minority interests | (180) | — | (180) |
| Total liabilities assumed | (557) | (227) | (784) |
|  | 3,150 | 1,280 | 4,430 |

The goodwill represents the benefits that the acquired enterprises will bring to the Company in the future by providing access to potential strategic partners and customers as a result of expanding its network coverage.

During the year ended December 31, 2005, the Company entered into an agreement with Shandong Fu Er Media Limited ("Fu Er") and acquired all of Fu Er's flat panel display equipment, computers, office equipments and lease contracts for the placement of flat panel displays, for a total cash consideration of RMB 7,280. Total cash consideration of RMB 7,280 was allocated to fixed assets of RMB 1,498 and lease contracts of RMB 5,782, respectively, based on their estimated fair value at the date of acquisition. As of December 31, 2005, STM has paid RMB 3,240 of the purchase price to Fu Er. The remaining balance of RMB 4,040 will be paid in 2006.

During the year ended December 31, 2005, the Company acquired lease contracts for the placement of flat panel displays from Wuhan Hai Ming Broadcasting Advertising Ltd. ("Hai Ming") for a total cash consideration of RMB 1,088.

Intangible assets representing the market rate adjustment of acquired lease contracts for the placement of the flat panel displays is as follows:

|  | December 31, 2005 | |
|---|---|---|
|  | RMB | Amortization period |
| Flat panel display lease | 8,849 | 2–5 yrs |
| Less: Accumulated amortization | (867) |  |
|  | 7,982 |  |

F–96

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Aggregate amortization expense of intangible assets was RMB 867 for the year ended December 31, 2005. Estimated amortization expense for future years is as follows: RMB 2,918 in 2006, RMB 2,457 in 2007, RMB 2,049 in 2008, RMB 221 in 2009, RMB 161 in 2010 and RMB 176 in the years thereafter.

In addition, see note 5 for the potential acquisitions of the Tulip Group and equity investment in Xinna.

**(8) Accrued Expenses and Other Payables**

Components of accrued expenses and other payables are as follows:

|  | December 31, | |
| --- | --- | --- |
|  | **2004** | **2005** |
|  | **RMB** | **RMB** |
| Accrued payroll and welfare | 3,881 | 14,130 |
| Accrued expenses | 1,764 | 36,210 |
| Business tax and surcharges payable | 2,264 | 14,269 |
| Receipts in advance | 143 | 5,339 |
|  | 8,052 | 69,948 |

**(9) Share–Based Compensation**

Upon the approval by the Board of Directors, the Company grants share options to its executives and employees to reward for services.

During the year ended December 31, 2004, 12,495,344 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.36 to US$0.45 with a contractual term of ten years and vesting period of four years.

During the year ended December 31, 2005, 8,009,077 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.50 to US$0.80 with a vesting period of four years.

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

The fair value of each option award is estimated on the date of grant using a lattice–based option valuation model that uses the assumptions and exercise price of the options noted in the following table. Because the Company does not maintain an internal market for its shares, the expected volatility was based on the historical volatilities of comparable publicly traded advertising companies operating in the PRC and in the United States. The Company uses historical data to estimate employee termination within the valuation model. The expected life of options granted is derived from the output of the option valuation model and represents the period of time that options granted are expected to be outstanding. The employees that were granted the share options are expected to exhibit the same behavior. Since the share options once exercised will primarily trade in the U.S. capital market and there was no comparable PRC zero coupon rate, the risk–free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

|  | 2004 | |
|---|---|---|
|  | **August** | **December** |
| Expected volatility | 45% | 45% |
| Expected dividends | 0% | 0% |
| Expected life | 5 years | 5 years |
| Risk–free interest rate | 3.36% | 3.71% |
| Exercise price | US$0.36 | US$0.45 |
| Estimated fair value of underlying common shares | US$0.36 | US$0.48 |

|  | 2005 | | | | |
|---|---|---|---|---|---|
|  | **April** | **May** | **August** | **November** | **December** |
| Expected volatility | 45% | 45% | 45% | 45% | 45% |
| Expected dividends | 0% | 0% | 0% | 0% | 0% |
| Expected life | 5 years | 5 years | 5 years | 5 years | 5 years |
| Risk–free interest rate | 3.85% | 3.77% | 4.26% | 4.54% | 4.47% |
| Exercise price | US$0.50 | US$0.55 | US$0.68 | US$0.80 | US$0.80 |
| Estimated fair value of underlying common shares | US$0.66 | US$0.66 | US$0.68 | US$1.65 | US$1.65 |

The estimated fair value of the underlying common shares on the date of grant was determined based on management valuation of the Company's common shares which considered the cash issuance prices for the Series A and Series B redeemable convertible preferred shares paid by groups of unrelated investors (see note 12), the purchase price of the company's equity interests to be paid by an unrelated party (see note 1), the proximity of such transactions to the date of the share option grant and the forecasted profitability and cash flows of the Company. The weighted–average grant–date fair value of options granted during 2004 and 2005 was US$0.13 and US$0.58 per share, respectively. The Company recorded non–cash share–based compensation expense of RMB 1,861 and RMB 6,781 for the years ended December 31, 2004 and 2005, respectively in respect of share options granted in 2004 and 2005, of which RMB 193 and RMB 839 was allocated to costs of revenues, RMB 1,668 and RMB 4,615 was allocated to general and administrative expenses, and nil and RMB 1,327 was allocated to sales and marketing expenses, respectively.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

A summary of option activities during 2004 and 2005 is presented below:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Outstanding as of January 1, 2004 | — | | — | | |
| Granted | 12,495,344 | US$ | 0.37 | | |
| Exercised | — | | — | | |
| Forfeited or expired | (399,800) | US$ | 0.37 | | |
| Outstanding as of December 31, 2004 | 12,095,544 | US$ | 0.37 | 9.7 years | RMB 11,296 |
| Granted | 8,009,077 | US$ | 0.73 | | |
| Exercised | — | | — | | |
| Forfeited or expired | (708,852) | US$ | 0.51 | | |
| Outstanding as of December 31, 2005 | 19,395,769 | US$ | 0.52 | 9.1 years | RMB 42,857 |
| Exercisable as of December 31, 2005 | 4,438,645 | US$ | 0.52 | 9.1 years | |

The following is additional information relating to options outstanding as of December 31, 2005:

| Options outstanding as of December 31, 2005 | | | | Options exercisable as of December 31, 2005 | | | |
|---|---|---|---|---|---|---|---|
| Number of Shares | Exercise Price Per Share | | Remaining Contractual Life | Number of Shares | Exercise Price Per Share | | Remaining Contractual Life |
| 10,587,840 | US$ | 0.36 | 8.7 | 3,256,312 | US$ | 0.36 | 8.7 |
| 1,507,704 | US$ | 0.45 | 9.0 | 452,311 | US$ | 0.45 | 9.0 |
| 100,000 | US$ | 0.55 | 9.5 | 10,000 | US$ | 0.55 | 9.5 |
| 963,873 | US$ | 0.68 | 9.6 | 96,387 | US$ | 0.68 | 9.6 |
| 1,650,000 | US$ | 0.68 | 9.6 | 165,000 | US$ | 0.68 | 9.6 |
| 777,500 | US$ | 0.80 | 9.9 | 77,750 | US$ | 0.80 | 9.9 |
| 3,808,852 | US$ | 0.80 | 10.0 | 380,885 | US$ | 0.80 | 10.0 |
| 19,395,769 | | | 9.1 | 4,438,645 | | | 9.1 |

As of December 31, 2005, there was RMB 42,617 of total unrecognized compensation cost related to nonvested share options. This cost is expected to be recognized over the next four years. The Company is expected to issue new shares to satisfy share option exercises.

**(10) Income Taxes**

The Company, its subsidiary and consolidated VIE file separate income tax returns.

*Cayman Islands*  Under the current laws of the Cayman Islands, the Company is not subject to tax on its income or capital gains. In addition, upon any payment of dividends by the Company, no Cayman Islands withholding tax is imposed.

*Peoples' Republic of China*  TMM is governed by the income tax law of the PRC concerning foreign investment and foreign enterprises (the "Income Tax Law"). Under the Income Tax Law, foreign enterprises satisfying certain criteria can enjoy preferential tax treatment. Since TMM has obtained the status of a software enterprise, and is registered and operating in the Shanghai Zhangjiang High Technology Park, it has been granted a

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

reduced income tax rate of 15% and a "tax holiday" for exemption from foreign enterprise income tax for 2 years starting from the calendar year of 2005 and is entitled to a 50% tax reduction for the succeeding 3 years beginning from 2007. In addition, TMM is entitled to exemption from local income tax.

STM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2004. Upon the expiration of the tax holiday, STM will be subject to the PRC enterprise income tax rate of 33%.

Shenyang TM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2005. Upon the expiration of the tax holiday, Shenyang TM will be subject to the PRC enterprise income tax rate of 33%. Heng Ding is subject to the PRC enterprise income tax rate of 33%.

Income tax expense attributable to income from operations, which substantially is derived from PRC sources, consists of:

|  | 2004 RMB | 2005 RMB |
|---|---|---|
| Current | 442 | — |
| Deferred | (112) | — |
|  | 330 | — |

Income tax expense attributable to income from operations was RMB 330 and nil for the years ended December 31, 2004 and 2005, respectively, and differed from the amounts computed by applying the statutory PRC enterprise income tax rate of 33% to pre−tax income from operations as a result of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 RMB | 2005 RMB |
| Computed expected tax expense | 8,615 | 18,157 |
| Increase (reduction) in income taxes resulting from: |  |  |
| Tax rate differential | 92 | 4,238 |
| Tax holiday | (8,382) | (22,452) |
| Non−deductible items | 5 | 57 |
|  | 330 | — |

F−100

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
|  | **RMB** | **RMB** |
| Deferred tax assets: | | |
|    Allowance for doubtful accounts | 112 | 112 |
| Less: valuation allowance | — | — |
| Net deferred tax assets | 112 | 112 |
| Deferred tax liabilities: | | |
|    Intangible assets acquired in a business combination | — | (377) |
| Total deferred liabilities | — | (377) |
| Net deferred tax asset/(liability) | 112 | (265) |

    In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible or utilized. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon an assessment of the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax assets are deductible or can be utilized, no valuation allowance has been provided as of December 31, 2004 and 2005. The deferred tax assets of RMB 112 as of December 31, 2004 and 2005, represent the tax benefits of deductible temporary differences which are more likely than not to be realized in a non tax holiday year. The amount of the deferred tax assets considered realizable, however, could be reduced in the near term if estimates of future taxable income are reduced.

    The PRC tax system is subject to substantial uncertainties and has been subject to recently enacted changes, the interpretation and enforcement of which are also uncertain. There can be no assurance that changes in PRC tax laws or their interpretation or their application will not subject the Group's PRC entities to substantial PRC taxes in the future.

**(11) Commitments and Contingencies**

    The Group has entered into operating lease agreements relating to the placement of flat panel display equipment.

    The Group has also entered into operating lease arrangements in connection with the lease of the Group's office premises.

F–101

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Future minimum lease payments under non–cancelable operating leases (with initial or remaining lease terms in excess of one year) as of December 31, 2005 are as follows:

|  | Flat Panel Display Equipment RMB | Office Premises RMB |
|---|---|---|
| 2006 | 111,467 | 6,527 |
| 2007 | 87,074 | 3,978 |
| 2008 | 53,161 | 2,177 |
| 2009 | 32,950 | — |
| 2010 | 12,321 | — |
| Thereafter | 18,272 | — |
|  | 315,245 | 12,682 |

Rental expenses incurred under operating leases for placement of flat panel display equipment for the years ended December 31, 2004 and 2005, amounted to RMB 15,210 and RMB 72,942, respectively. Rental expenses incurred under operating leases for office premises for the years ended December 31, 2004 and 2005 amounted to RMB 1,685 and RMB 6,532, respectively.

**(12)  Redeemable Convertible Preferred Shares**

*(a) Issuance of Series A redeemable convertible preferred shares*

In August 2004, the Company issued 41,641,679 Series A redeemable convertible preferred shares ("Series A Shares") to a group of investors at US$0.360216 per share (the "Series A issue price") for total cash consideration of US$15,000 (RMB 124,148 ). The holders of Series A Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of Series A Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series A Shares at a redemption price equal to 100% of the Series A issue price, plus an additional amount equal to 20% of the Series A issue price compounded annually from the date of issuance to the date of redemption plus all declared but unpaid dividends (the "Series A Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 8,663 and RMB 26,534 for the years ended December 31, 2004 and 2005, respectively. Total direct external incremental costs of issuing the security of RMB 1,833 was charged against the proceeds of the Series A Shares.

The significant terms of the Series A Shares are as follows:

*Conversion*

The holders of Series A Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series A Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public offering price of at least four times the Series A issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

F–102

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Each Series A Share is convertible into one common share, subject to a conversion ratio adjustment equal to US$6,900 divided by the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005 (the "Series A Performance Multiplier"). The Series A Performance Multiplier shall be limited to a maximum of 1.6 common shares (that is, one Series A Share converted into 1.6 common shares or 66,626,686 common shares, on a fully converted basis) and a minimum of 0.727273 common shares (that is, one Series A Share converted into 0.727273 common shares or 30,284,869 common shares, on a fully converted basis) and shall be automatically set at 1.6 in the event that the audited US GAAP consolidated net income of the Group for the period from July 1, 2004 to June 30, 2005, is not made available to the holders of Series A Shares before November 15, 2005, for the purpose of determining the Series A Performance Multiplier.

The conversion price of Series A Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series A Share Subscription Agreement at a price per share less than the then prevailing Series A Shares' respective conversion price ("Additional Common Shares"), the Series A Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Common Shares are issued (the "Series A Dilution Adjustment"). Common shares specifically excluded from this provision include common shares issued or issuable upon conversion of Series A Shares, up to 15,274,168 common shares which are issuable or issued under the Company's equity incentive plan, common shares issued in an underwritten public offering, common shares issued in a bona fide acquisition or merger transaction, and common shares issued to third party providers in exchange for services rendered to the Company. The impact of such potential adjustment to the conversion price is contingent upon the issuance of Additional Common Shares at an issuance price less than the conversion price of Series A Shares. No issuance of Additional Common Shares was made during the years ended December 31, 2004 and 2005 which caused the conversion price of Series A Shares to be reduced under this adjustment provision.

The Company has determined that at the date of issuance of the Series A Shares there was no embedded beneficial conversion feature attributable to the Series A Shares, since the initial conversion price of the Series A Shares is equal to the Series A issue price, which was negotiated and agreed between the Company and a group of third party investors on an arm's length basis and, which was determined by management to approximate the fair value of the Company's common shares at the commitment date since there was no existence of a public or active market of the Company's common shares, nor were there any cash transactions involving the Company's common shares that occurred prior to this date. In addition, under the provisions of EITF Issue No. 00–27 *"Application of Issue No. 98–5 to Certain Convertible Instrument"*, the Company has determined that the contingent beneficial conversion feature relating to the conversion ratio adjustment in respect of the Series A Performance Multiplier will be recognized only when the Performance Multiplier is determined and the contingency is resolved and with respect of the Series A Dilution Adjustment, upon the issuance of Additional Common Shares.

Based on the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005, the Company has calculated the Series A Performance Multiplier to be 1.196365 which resulted in a conversion ratio of 1.000000 to 1.196365 for Series A Shares. Accordingly, on a fully–converted basis, the Series A Shares will be converted to 49,818,647 common shares under the conversion terms of the Series A Shares. The intrinsic value of the contingent beneficial conversion feature of the Series A Shares of RMB 24,378 was recognized as an addition to paid–in capital with a corresponding charge to net income available to common shareholders on June 30, 2005, the date the contingency period ended and the contingency was resolved. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series A Shares.

F–103

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

In January 2006, the Company entered into an agreement with the Series A shareholders whereby each of the Series A shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series A shares to 1.00000 to 1.05767 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series A Shares. The impact of the adjustment on the Series A conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series A shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series A Share has voting rights equivalent to the number of common shares into which it is convertible.

*Registration rights*

Holders of Series A Shares have registration rights similar to the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggyback registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series A Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate prior to any dividend payments to common shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series A Shares shall receive an amount per share equal to the Series A Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

*(b) Issuance of Series B redeemable convertible preferred shares*

On July 29, 2005, the Company issued 21,820,243 Series B redeemable convertible preferred shares ("Series B Shares") to a group of investors at US$0.687435 per share (the "Series B issue price") for total cash consideration of

F–104

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

US$15,000 (RMB 121,620). The holders of Series B Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of the Series B Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series B Shares at a redemption price equal to 100% of the Series B issue price, plus an additional amount equal to 15% of the Series B issue price, compounded annually from the date of issuance to the date of redemption, plus all declared but unpaid dividends (the "Series B Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 7,747 for the year ended December 31, 2005. Total direct external incremental costs of issuing the security of RMB 839 were charged against the proceeds of the Series B Shares.

The significant terms of the Series B Shares are as follows:

***Conversion***

The holders of Series B Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series B Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below, upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public offering price of at least two times the Series B issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

Each Series B Share is convertible into one common share, where the conversion price is equal to the Series B issue price, except in the event that the initial conversion ratio for the Series A Shares is adjusted for the Series A Performance Multiplier as described in note 12(a), the conversion price for Series B Shares shall immediately be adjusted by multiplying the Series B conversion price then in effect by a fraction, the numerator of which shall be 152,741,679, and the denominator of which shall be the sum of (i) the number of outstanding common shares, and (ii) the number of outstanding Series A Shares multiplied by the Series A Performance Multiplier (the "Series B Performance Multiplier").

The conversion price of Series B Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series B Share Subscription Agreement at a price per share less than the then prevailing Series B Shares' respective conversion price ("Additional Series B Common Shares"), the Series B Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Series B Common Shares are issued ("Series B Dilution Adjustment"). The impact of the Series B Dilution Adjustment to the conversion price is contingent upon the issuance of Additional Series B Common Shares at an issuance price less than the conversion price of Series B Shares. No issuance of Additional Series B Common Shares was made during the year ended December 31, 2005 which caused the conversion price of Series B Shares to be reduced under this adjustment provision.

As a result of the initial conversion ratio for the Series A Shares being adjusted for the Series A Performance Multiplier described in note 12(a), the Company has calculated the Series B Performance Multiplier to be 0.949186 which resulted in a conversion ratio of 1.000000 to 1.053535 for Series B Shares. Accordingly, on a fully–converted basis, the Series B Shares will be converted into 22,988,390 common shares under the conversion terms of the Series B Shares. The intrinsic value of the contingent beneficial conversion feature of the Series B Shares of RMB 6,508 was recognized as an addition to paid–in capital with a corresponding charge to net income available to

F–105

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

common shareholders on July 29, 2005, the date of the issuance of the Series B Shares. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series B Shares.

In January 2006, the Company entered into an agreement with the Series B shareholders whereby each of the Series B shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, as discussed in note 12 (a), in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series B shares to 1.00000 to 1.01572 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series B Shares. The impact of the adjustment on the Series B conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series B shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series B Share has voting rights equivalent to the number of common shares into which it is convertible.

*Registration rights*

Holders of Series B Shares have registration rights similar to the holders of Series A Shares and the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggy back registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series B Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate, prior to any dividend payments to common shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series B Shares shall receive an amount per share equal to the Series B Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

F–106

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(13)  Common Shares**

The Company's Memorandum and Articles of Association, as amended, authorizes the Company to issue 210,000,000 shares with a par value of US$0.0001 per share. In August 2004, the Company issued 111,100,000 common shares at par value in connection with the Reorganization as discussed in note 1. During the years ended December 31, 2004 and 2005, no additional common shares were issued by the Company.

**(14)  Concentration of Risks**

*Credit and concentration risks*  The carrying amounts of cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties and other receivables represent the Group's maximum exposure to credit risk in relation to financial assets. As of December 31, 2004 and 2005, substantially all of the Group's cash and cash equivalents were held in major financial institutions located in the PRC and the Hong Kong Special Administrative Region, which management believes have high credit ratings. Accounts receivable are typically unsecured and denominated in RMB, and are derived from revenues generated in the PRC. The Group performs ongoing credit evaluations of its customers' financial condition and, generally, requires no collateral from its customers.

All of the Group's customers are located in the PRC. The following are the customers that directly or indirectly contributed, on an individual basis, 10% or more of revenue for the year ended December 31, 2004 or for the year ended December 31, 2005:

|  | 2004 | | 2005 | |
|---|---|---|---|---|
|  | RMB | % | RMB | % |
| SAIC–Volkswagen Sales Co., Ltd. | 19,978 | 25% | 30,006 | 11% |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 9,567 | 12% | 19,767 | 7% |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 12% | 14,187 | 5% |

As of December 31, 2004 and 2005, approximately 56% and 15% of the Group's gross accounts receivable were due from the above customers.

The accounts receivable due from major customers, as of December 31, 2004 and 2005, were as follows:

|  | 2004 | 2005 |
|---|---|---|
|  | RMB | RMB |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 15,926 |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 8,567 | 2,946 |
| SAIC–Volkswagen Sales Co., Ltd. | 7,276 | — |
|  | 25,789 | 18,872 |

As of January 31, 2006, the Group received subsequent collections of approximately RMB 4,000 from the above customers with respect to outstanding accounts receivable as of December 31, 2005. The Group expects to collect all the remaining outstanding balances from these customers in accordance with the contract terms.

The Group does not have concentrations of available sources of labor, services, franchises, or other rights that could, if suddenly eliminated, severely impact its operations.

*Business and economic risks*  The Group operates in a dynamic industry with limited operating history and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: advances and new trends in new technologies and industry standards; competition from other competitors; changes in certain strategic relationships or customer relationships;

F–107

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

regulatory or other factors; the ability to obtain necessary financial and other resources at commercially viable terms; dependence on revenues generated from operations in the cities of Shanghai, Beijing, Guangzhou and Shenzhen; the ability to attract and retain employees necessary to support the Group's growth and general risks associated with the advertising industry.

The Group conducts its principal operations in the PRC and, accordingly, is subject to special considerations and significant risks not typically associated with companies operating in the United States and Western Europe. These include risks associated with, among others, the political, economic, legal environment and social uncertainties in the PRC, government agencies' influence over certain aspects of the Group's operations and competition in the advertising industry.

The Group is currently targeting the PRC market. The Chinese government regulates the provision of advertising services through strict business licensing requirements and other governmental regulations. These regulations include limiting foreign ownership in Chinese companies providing advertising services. Management, after consultation and advice from PRC legal counsel, is of the opinion that the Company's business structure and contractual agreements with STM comply with existing PRC laws and regulations. However, there are uncertainties regarding the interpretation and application of current PRC laws and regulations and any change in such laws and regulations that renders these business structure and contractual agreements to be non–compliant could have an adverse effect on the Group's business, financial position and result of operations.

In addition, the ability to negotiate and implement specific business development projects in a timely and favorable manner may be impacted by political considerations unrelated to or beyond the control of the Group. Although the PRC government has been pursuing economic reform policies for the past two decades, no assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered. There is also no guarantee that the PRC government's pursuit of economic reforms will be consistent or effective and as a result, changes in the rate or method of taxation, and changes in State policies and regulations affecting the advertising industry may have a negative impact on the Group's operating results and financial position.

*Currency risk* Substantially all of the revenue generating operations of the Group are transacted in RMB, which is not fully convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted by the People's Bank of China. However, the unification of the exchange rate does not imply convertibility of RMB into United States dollars or other foreign currencies. All foreign exchange transactions must take place either through the People's Bank of China or other institutions authorized to buy and sell foreign exchange or at a swap center. Approval of foreign currency payments by the People's Bank of China or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

On July 21, 2005, the People's Bank of China announced that the PRC government reformed the exchange rate regime by adopting a managed floating exchange rate regime based on market supply and demand with reference to a basket of currencies. The exchange rate of United States dollars against RMB was adjusted to RMB 8.11 per United States dollar with effect from July 21, 2005. This reform did not have a material impact on the Group's financial position or results of operations.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(15)   Related Party Transactions**

The principal related party transactions during the years ended December 31, 2004 and 2005 were as follows:

| | Note | 2004 RMB | 2005 RMB |
|---|---|---|---|
| Provision of advertising services | (a) | 1,511 | — |
| Collection of advertising revenues on behalf of STM | (b) | 4,173 | 2,349 |
| Payments made by a related party on STM's behalf | (b) | 1,073 | 5,399 |
| Loan from a shareholder | (c) | 31,655 | 30,000 |
| Repayment of shareholder loan | (c) | 21,655 | 10,000 |
| Interest expense | (c) | 348 | 79 |
| Lease of office premises | (d) | 540 | 810 |

Amounts due from and due to related parties as of December 31, 2004 and 2005 were as follows:

| | Note | 2004 RMB | 2005 RMB |
|---|---|---|---|
| Due from related parties: | | | |
| Huashan Dian Yang Hospital Service Co., Ltd. ("HS DY") | (a) | 1,511 | — |
| Dian Yang | (b) | 3,100 | 50 |
| The Company's Chief Executive Officer ("CEO") | (d) | — | 66 |
| | | 4,611 | 116 |
| Due to related parties: | | | |
| Shanghai Investment Information Co., Ltd. ("SII") | (c) | 10,000 | 30,000 |
| The Company's CEO | (d) | 33 | — |
| | | 10,033 | 30,000 |

Notes:

(a)   During 2004, the Group provided advertising services to HS DY, a company in which the Company's CEO has an equity interest. As of December 31, 2004, the balance due from HS DY was RMB 1,511, which was collected in full in August 2005. The Company has not provided any advertising services to HS DY since then.

(b)   Dian Yang, an entity controlled by the Company's CEO and also a 9% shareholder of STM, makes lease payments and collects advertising revenues on STM's behalf until certain unassignable contracts expire. The unassignable contracts associated with advertising contracts have expired at the end of 2005, and the unassignable contracts associated with display placements will expire by the end of 2008, except for three contracts which will expire in 2009, 2010 and 2011 respectively. The balance as of December 31, 2004 and December 31, 2005, represented the amount of revenue collected by Dian Yang on behalf of STM, less payments made by STM on behalf of Dian Yang. The balance is interest free and is settled continuously and periodically.

(c)   SII is a shareholder of the Company and of STM. SII provided a short–term loan of RMB 30,000 to STM in 2004, of which RMB 20,000 was repaid in November 2004 and RMB 10,000 was repaid in January 2005. The balance bore interest at a monthly rate of 0.39825%. The interest expense incurred by STM on this loan was RMB 348 for the year ended December 31, 2004 and RMB 40 for the year ended December 31, 2005.

In August 2004, SII International Holding Limited, a company wholly–owned by SII, provided a short–term loan of US$200 (equivalent to RMB 1,655) to the Company at a monthly interest rate of 0.02%. The loan was repaid in full in September 2004.

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

In December 2005, SII provided a short–term loan of RMB 30,000 to STM. The loan bears interest at a monthly rate of 0.3915%. The interest expense incurred by STM on this loan was RMB 39 for the year ended December 31, 2005. This loan is due for full repayment in June 2006.

(d)     The Group leased office premises from the Company's CEO. Rental expense of RMB 540 and RMB 810, which was determined with reference to market price, was charged for the years ended December 31, 2004 and 2005, respectively. The lease agreement with the Company's CEO will expire in 2006. As of December 31, 2005, the amount due from the CEO of RMB 66 related to miscellaneous expense paid by STM on behalf of the CEO.

F–110

**Table of Contents**

**INFOACHIEVE LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

|  | Page(s) |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–112 |
| Consolidated balance sheets as of December 31, 2004 and 2005 | F–113 |
| Consolidated statements of operations for the years ended December 31, 2004 and 2005 | F–114 |
| Consolidated statements of shareholders' equity and other comprehensive income (loss) for the years ended December 31, 2004 and 2005 | F–115 |
| Consolidated statements of cash flows for the years ended December 31, 2004 and 2005 | F–116 |
| Notes to consolidated financial statements | F–118 |

F–111

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND
SHAREHOLDERS OF INFOACHIEVE LIMITED

We have audited the accompanying consolidated balance sheets of Infoachieve Limited and its subsidiaries (the "Group") as of December 31, 2004 and 2005 and the related consolidated statements of operations, shareholders' equity and comprehensive loss, and cash flows for the years ended December 31, 2004 and 2005. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2004 and 2005 and the results of its operations and its cash flows for the above stated periods in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.
Beijing, China
May 8, 2006

**Table of Contents**

**INFOACHIEVE LIMITED**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, | |
|---|---|---|
| | **2004** | **2005** |
| | **(In U.S. dollars, except share data)** | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 228,909 | $ 1,355,010 |
| Accounts receivable, net of allowance for doubtful accounts of $Nil and $3,994 in 2004 and 2005 | 1,293,569 | 3,728,200 |
| Inventories | 6,572 | 791 |
| Prepaid expenses and other current assets | 367,635 | 733,110 |
| Amounts due from related parties | 501,819 | — |
| Total current assets | 2,398,504 | 5,817,111 |
| Equipment, net | 1,031,010 | 1,013,871 |
| Acquired intangible assets, net | — | 764,282 |
| Goodwill | — | 13,936,500 |
| Total assets | $ 3,429,514 | $ 21,531,764 |
| **Liabilities and shareholders' equity** | | |
| Current liabilities: | | |
| Short–term loans from shareholders | $ 365,802 | $ 3,109,685 |
| Accounts payable | 113,817 | 590,035 |
| Accrued expenses and other current liabilities | 868,129 | 8,057,141 |
| Amounts due to related parties | 1,677,741 | 761,292 |
| Total current liabilities | 3,025,489 | 12,518,153 |
| Commitments (Note 13) | | |
| **Shareholders' equity** | | |
| Ordinary shares ($0.01 par value; 4,620,000 shares authorized in 2004 and 2005, respectively; 40,000 and 1,000,000 issued and outstanding in 2004 and 2005, respectively) | 400 | 10,000 |
| Additional paid–in capital | 543,110 | 27,812,636 |
| Accumulated deficit | (140,669) | (18,739,464) |
| Accumulated other comprehensive income (loss) | 1,184 | (69,561) |
| Total shareholders' equity | $ 404,025 | $ 9,013,611 |
| Total liabilities and shareholders' equity | $ 3,429,514 | $ 21,531,764 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| | (In U.S. dollars, except share data) | |
| Revenues: | | |
| Advertising service revenue | $ 4,323,551 | $ 11,828,519 |
| Cost of revenues: | | |
| Advertising service cost | 3,336,840 | 7,233,043 |
| Gross profit | 986,711 | 4,595,476 |
| Operating expenses: | | |
| General and administrative (including share–based compensation of nil and $1,395,100 for 2004 and 2005, respectively) | 543,351 | 5,428,018 |
| Selling and marketing | 821,518 | 3,363,704 |
| Total operating expenses | 1,364,869 | 8,791,722 |
| Loss from operations | (378,158) | (4,196,246) |
| Interest income | 1,691 | 2,012 |
| Interest expense | (254,962) | (172,569) |
| Other income (expense), net | 36,820 | (3,857) |
| Loss before income taxes | (594,609) | (4,370,660) |
| Income taxes | 3,880 | 1,941 |
| Total income taxes | 3,880 | 1,941 |
| Net loss | (598,489) | (4,372,601) |
| Deemed dividend on ordinary shares | — | (15,187,200) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | (1,136,700) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | (378,985) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | (623,700) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | (207,820) |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Loss per share–basic and diluted | $ (35.10) | $ (27.10) |
| Shares used in calculating basic and diluted loss per share | 17,049 | 808,302 |

The accompany notes are an integral part of these consolidated financial statements.

F–114

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
AND OTHER COMPREHENSIVE INCOME (LOSS)**

| | Ordinary Shares | Amount | Additional paid–in capital | Retained earnings (Accumulated deficit) | Accumulated other comprehensive income (loss) | Total shareholders' equity | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|
| | | | | (In U.S. dollars, except share data) | | | |
| **Balance at January 1, 2004** | — | $ — | $ 477,950 | $ 457,820 | $ 31 | $ 935,801 | $ 61,134 |
| Issuance of ordinary shares to incorporate Infoachieve | 40,000 | 400 | — | — | — | 400 | |
| Incorporation of Wuhan Framedia | — | — | 65,160 | — | — | 65,160 | |
| Cumulative translation adjustment | — | — | — | — | 1,153 | 1,153 | 1,153 |
| Net loss | — | — | — | (598,489) | — | (598,489) | (598,489) |
| **Balance at December 31, 2004** | 40,000 | $ 400 | $ 543,110 | $ (140,669) | 1,184 | $ 404,025 | $ (597,336) |
| Issuance of ordinary shares | 960,000 | 9,600 | 15,187,200 | (15,187,200) | — | 9,600 | |
| Reclassification of ordinary shares to Series A–1 convertible redeemable preference shares | (270,000) | (2,700) | — | — | — | (2,700) | — |
| Reclassification of ordinary shares to Series A–2 convertible redeemable preference shares | (110,000) | (1,100) | — | — | — | (1,100) | |
| Issuance of ordinary shares for acquisitions | 614,200 | 6,142 | 8,878,966 | — | — | 8,885,108 | |
| Liquidation of entities under common control | — | — | (545,087) | 3,308,211 | — | 2,763,124 | |
| Issuance of ordinary shares to Chief Executive Officer | 40,000 | 400 | 1,394,700 | — | — | 1,395,100 | |
| Deemed dividend on Series A–1 convertible redeemable preference shares | — | — | — | (1,515,685) | — | (1,515,685) | |
| Deemed dividend on Series A–2 convertible Redeemable preference shares | — | — | — | (831,520) | — | (831,520) | |
| Conversion of Series A–1 convertible redeemable preference shares to ordinary shares | 270,000 | 2,700 | 1,515,685 | — | — | 1,518,385 | |
| Conversion of Series A–2 convertible redeemable preference shares to ordinary shares | 110,000 | 1,100 | 831,520 | — | — | 832,620 | — |
| Cancellation of ordinary shares | (654,200) | (6,542) | 6,542 | — | — | — | |
| Cumulative translation adjustment | — | — | — | — | (70,745) | (70,745) | (70,745) |
| Net loss | — | — | — | (4,370,601) | — | (4,370,601) | (4,370,601) |
| **Balance at December 31, 2005** | 1,000,000 | $ 10,000 | $ 27,812,636 | $ (18,739,464) | $ (69,561) | $ 9,013,611 | $ (4,441,346) |

F–115

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| | (In U.S. dollars) | |
| Operating activities: | | |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Deemed dividend on ordinary shares | — | 15,187,200 |
| Deemed dividend on Series A−1 convertible redeemable preference shares — Redesignation | — | 1,136,700 |
| Deemed dividend on Series A−1 convertible redeemable preference shares — Accretion of redemption premium | — | 378,985 |
| Deemed dividend on Series A−2 convertible redeemable preference shares — Redesignation | — | 623,700 |
| Deemed dividend on Series A−2 convertible redeemable preference shares — Accretion of redemption premium | — | 207,820 |
| Net loss | (598,489) | (4,372,601) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Share−based compensation expense | — | 1,395,100 |
| Depreciation and amortization | 157,990 | 471,326 |
| Bad debt allowance | — | 3,994 |
| Changes in assets and liabilities, net of effects of acquisitions | | |
| Accounts receivable, net | (568,897) | (2,438,625) |
| Inventories | 35 | 5,152 |
| Prepaid expenses and other current assets | (75,185) | (369,658) |
| Amounts due from related parties | (133,800) | 248,522 |
| Accounts payable | 34,696 | 476,204 |
| Accrued expenses and other current liabilities | 566,431 | 7,099,537 |
| Amounts due to related parties | 738,591 | (916,449) |
| Net cash provided by operating activities | 121,372 | 1,602,501 |
| Investing activities: | | |
| Acquisition of businesses, net of cash acquired of $nil | — | (1,703,972) |
| Purchase of equipment | (636,378) | (561,068) |
| Net cash used in investing activities | $ (636,378) | $ (2,265,040) |
| Financing activities: | | |
| Proceeds from short−term loans from shareholders | $ 365,802 | $ 2,743,883 |
| Repayment of short−term loans from shareholders | (81,892) | — |
| Proceeds of amounts due to related parties | 435,681 | 761,292 |
| Repayment of amounts due to related parties | (120,824) | (1,655,390) |
| Proceeds from issuance of ordinary shares | 400 | 9,600 |
| Net cash provided by financing activities | $ 599,167 | $ 1,859,385 |
| Effect of exchange rate changes | $ 1,153 | $ (70,745) |
| Net increase in cash and cash equivalents | 85,314 | 1,126,101 |

F−116

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)**

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2004 | | 2005 | |
| | (In U.S. dollars) | | | |
| Cash and cash equivalents, beginning of year | | 143,595 | | 228,909 |
| Cash and cash equivalents, end of year | $ | 228,909 | $ | 1,355,010 |
| Supplemental disclosure of cash flow information | | | | |
|   Income taxes paid | $ | 3,880 | $ | 7,673 |
|   Interest paid | $ | — | $ | — |
| Supplemental disclosures of non–cash activities: | | | | |
| Non–cash investing activities: | | | | |
|   Acquisition of businesses: | | | | |
|     Value of ordinary shares issued | $ | — | $ | 8,885,108 |
|     Cash consideration | | — | | 6,209,656 |
| Businesses acquired (including intangibles of $1,036,914, goodwill of $13,936,500, equipment of $121,350) | $ | — | $ | 15,094,764 |
| Non–cash financing activities: | | | | |
|   Reclassification of ordinary shares to Series A–1 convertible redeemable preference shares | $ | — | $ | 1,139,400 |
|   Reclassification of ordinary shares to Series A–2 convertible redeemable preference shares | $ | — | $ | 624,800 |
| Issuance of ordinary shares to shareholders in exchange for services | $ | — | $ | 15,187,200 |
| Issuance of ordinary shares to Chief Executive Officer in exchange for services | $ | — | $ | 1,395,100 |
| Conversion of Series A–1 convertible redeemable preference shares to ordinary shares | $ | — | $ | 1,518,385 |
| Conversion of Series A–2 convertible redeemable preference shares to ordinary shares | $ | — | $ | 832,620 |

The accompany notes are an integral part of these consolidated financial statements.

F–117

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**1.   Organization and Principal Activities**

Prior to April 28, 2004, the Group operated through the following entities (collectively "the Combined Entities"):

| Entities under common control | Place of incorporation | Date of incorporation |
|---|---|---|
| Shanghai Framedia Advertisement Co., Ltd. ("Shanghai Framedia") | People's Republic of China ("PRC") | November 4, 2002 |
| Beijing Framedia Advertisement Co., Ltd. ("Beijing Framedia") | PRC | May 9, 2000 |
| Guangdong Framedia Advertisement Co., Ltd. ("Guangdong Framedia") | PRC | December 16, 2003 |
| Shenzhen Framedia Advertisement Co., Ltd. ("Shenzhen Framedia") | PRC | May 8, 2003 |
| Wuhan Framedia Advertisement Co., Ltd. ("Wuhan Framedia") | PRC | November 28, 2003 |

Subsequent to April 28, 2004, Framedia Advertisement Development (Shanghai) Co., Ltd. ("Framedia Development"), a PRC entity, was incorporated by the same shareholders of the Combined Entities and all of the operations of the Combined Entities were transferred to Framedia Development.

On July 28, 2004, the same shareholders of the Combined Entities and Framedia Development incorporated Infoachieve Limited ("Infoachieve"), a British Virgin Islands entity.

In substance, the combined entities which are existing companies have been reorganized into the new company Framedia Development. Accordingly, the Group's financial statements are prepared by including the financial statements of the combined entities through April 2004 and subsequently the Group's consolidated financial statements which include Framedia Development, Infoachieve and its variable interest entities.

The Group is principally engaged in the sale of frame space advertising in high–end residential complex in the PRC.

The PRC rules and regulations currently limit direct foreign ownership in companies that provide advertising services, including frame space advertising services. To comply with these rules and regulations, when the shareholders established Infoachieve in July 2004, Framedia Development entered into various agreements with Infoachieve, including transfer of operation agreements and exclusive consulting and service agreements. Under these agreements, Infoachieve is the exclusive provider of management consulting services to Framedia Development. In return, Framedia Development is required to pay Infoachieve services fees for the management consulting services received. The management consulting service fees are the net profits of Framedia Development. In addition, Infoachieve has been assigned all voting rights by the direct owners of Framedia Development through agreements valid for ten years. Finally, Infoachieve has the option to acquire the equity interest of Framedia Development. Infoachieve holds all the variable interests of Framedia Development and has been determined to be most closely associated with Framedia Development and is considered the primary beneficiary of Framedia Development.

On June 1, 2005, Infoachieve provided loans to two of its shareholders to acquire 100% of the outstanding shares of Guangdong Century Sparkle Advertisement Co., Ltd. ("Sparkle"), a frame advertisement service provider. Principal terms of the loan agreements provide that (i) Infoachieve entitles to receive service fees by providing management consulting services to Sparkle; (ii) Infoachieve has been assigned all voting rights valid indefinitely that cannot be amended or terminated except by written consent of all parties; and (iii) Infoachieve has

F–118

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

the options to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle and is considered the primary beneficiary of Sparkle.

Through the above arrangements, under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)"), Framedia Development and Sparkle have become the variable interest entities of Infoachieve, as a result, the financial statements of Framedia Development and Sparkle have been consolidated with Infoachieve as its subsidiaries since they were established or acquired.

On June 16, 2005, Infoachieve applied to establish Shanghai Framedia Investment Consultation Co., Ltd. ("Framedia Consultation") in Shanghai with an operating period of 30 years, and related capital contribution was completed on December 21, 2005. Framedia Consultation is wholly owned by Infoachieve and is engaged in provision of consultation and management services to other entities within the group and to third party customers.

As of December 31, 2005, Infoachieve's variable interest entities and subsidiary include the following entities:

| Entity | Date of incorporation | Place of incorporation |
|---|---|---|
| Framedia Development* | April 28, 2004 | PRC |
| Sparkle* | March 25, 2005 | PRC |
| Framedia Consultation | June 16, 2005 | PRC |

\* Represents a variable interest entity.

These Companies have been entities under common control which has established the basis to consolidate them from their inception. Accordingly, the accompanying financial statements include the financial statements of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia, Framedia Development and Infoachieve and its variable interest entities, collectively the "Group."

From June 2005 to December 2005, Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia were liquidated, their balances sheets as of December 31, 2005 have not been included in the consolidated balance sheet as of December 31, 2005.

Between June 1, 2005 and December 31, 2005, the Group through Infoachieve acquired the frame advertising net assets from eight companies that operated in the same industry in the PRC. These acquisitions were accounted for as acquisition of a business and for details, see Note 3, Acquisitions.

On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team Investments Limited ("Total Team") in the British Virgin Islands. According to the Share Purchase Agreement, the shareholders of Infoachieve transferred all the issued shares in Infoachieve Limited to Total Team. Total Team became the only shareholder of Infoachieve.

**2.   Summary of Significant Accounting Policies**

*(a)   Basis of presentation*

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP"). The consolidated financial statements reflect the operations of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia and Wuhan Framedia through April 2004 and the Group's consolidated financial statements thereafter.

*(b)   Cash and cash equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

F–119

Table of Contents

## INFOACHIEVE LIMITED

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005

*(c)   Use of estimates*

The preparation of the consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include allowance for doubtful accounts, the useful lives and impairment of equipment, intangible assets and goodwill and valuation allowance for deferred tax assets.

*(d)   Significant risks and uncertainties*

The Group participates in a dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations, or cash flows: the Group's limited operating history; advances and trends in new technologies and industry standards; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Group's ability to attract and retain employees necessary to support its growth; risks associated with the Group's growth strategies; and general risks associated with the advertising industry.

*(e)   Equipment, net*

Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Frame | 5 years |
| Computer and office equipment | 5 years |
| Liquid crystal display | 5 years |

*(f)   Impairment of long–lived assets*

The Group reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the longlived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets. The Group recognized impairment loss of Nil and $115,789 for the years ended December 31, 2004 and 2005. In 2005, the Group decided to replace the remaining tangible assets acquired through the acquisitions and assessed the recoverable amounts of the net tangible assets to be nil, therefore, the Group recognized an impairment loss of $115,789 which is equal to the remaining amount of the tangible assets acquired from the acquisitions.

*(g)   Goodwill*

SFAS No. 142 requires the Group to complete a two–step goodwill impairment test. The first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. SFAS No. 142 requires completion of this first step within the first six months of initial adoption and annually thereafter. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry

F–120

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

Management has performed the annual goodwill impairment test, no events had occurred and no indications had been identified as of December 31, 2005 that reduced the fair value of the Group's reporting units below the carrying value of the goodwill and intangible assets.

The changes in the carrying amount of goodwill for the year ended December 31, 2005 are as follows:

| | | |
|---|---|---:|
| Balance as of January 1, 2005 | $ | — |
| Goodwill acquired during the year | | 13,936,500 |
| Goodwill impaired since acquired | | — |
| Balance as of December 31, 2005 | $ | 13,936,500 |

**(h)   Revenue recognition**

The Group's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Accordingly, revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Group presents advertising service revenue, net of business tax incurred, which amounts to $442,593 and $1,066,409 for the years ended December 31, 2004 and 2005, respectively.

**(i)   Operating leases**

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

**(j)   Foreign currency translation**

The reporting currency of the Group is the United States dollar ("US dollar"). The functional currency of the Group is the Renminbi ("RMB"). Monetary assets and liabilities denominated in currencies other than US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than US dollar during the periods are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the consolidated statements of operations.

**(k)   Income taxes**

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws and regulations applicable to the Group as enacted by the relevant tax authorities.

F–121

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*(l)  Comprehensive income/loss*

Comprehensive income/loss includes foreign currency translation adjustments. Comprehensive income/loss is reported in the statements of shareholders' equity.

*(m)  Concentration of credit risk*

Financial instruments that potentially expose the Group to concentrations of credit risk consist primarily of cash and cash equivalents and accounts receivable. The Group places their cash and cash equivalents with financial institutions with high–credit ratings and quality.

The Group conducts credit evaluations of customers and generally do not require collateral or other security from their customers. The Group establishes an allowance for doubtful accounts primarily based upon the age of the receivables and factors surrounding the credit risk of specific customers.

*(n)  Fair value of financial instruments*

Financial instruments include cash and cash equivalents and short–term loans from shareholders. The carrying values of cash and cash equivalents and short–term loans from shareholders approximate their fair values due to their short–term maturities.

*(o)  Loss per share*

Basic loss per share is computed by dividing loss attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the years. Diluted loss per ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation of diluted loss per ordinary share in loss years as their effects would be antidilutive. Basic loss per share is equal to diluted loss per share as there are no potential convertible securities for the end of years presented.

*(p)  Recently issued accounting standards*

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share–Based Payment" ("SFAS No. 123R"). This statement is a revision to SFAS No. 123 and supercedes APB Opinion No. 25. This statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services, primarily focusing on the accounting for transactions in which an entity obtains employee services in share–payment transactions. Entities are required to measure the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award (with limited exceptions).That cost will be recognized over the period during which an employee is required to provide service, the requisite service period (usually the vesting period), In exchange for the award. The grant–date fair value of employee share options and similar instruments are to be estimated using option–pricing models. If an equity award is modified after the grant date, incremental compensation cost will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. This statement is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. In accordance with the standard, the Company is required to adopt SFAS No. 123R effective January 1, 2006.

Upon adoption, the Company has two application methods to choose from: the modified–prospective transition approach or the modified–retrospective transition approach. Under the modified–prospective transition method the Company would be required to recognize compensation cost for share–based awards to employees based on their grant–date fair value from the beginning of the fiscal period in which the recognition provisions are first applied as well as compensation cost for awards that were granted prior to, but not vested as of the date of adoption. Prior

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

periods remain unchanged and pro forma disclosures previously required by SFAS No. 123 continue to be required. Under the modified–retrospective transition method, the Company would restate prior periods by recognizing compensation cost in the amounts previously reported in the pro forma footnote disclosure under SFAS No. 123. Under this method, the Company is permitted to apply this presentation to all periods presented or to the start of the fiscal year in which SFAS No. 123R is adopted. The Company would follow the same guidelines as in the modified–prospective transition method for awards granted subsequent to adoption and those that were granted and not yet vested. The Company believes that the impact that the adoption of SFAS No. 123R will have on its financial position or results of operations will not be significant.

In March 2006, the FASB issued FSP FAS 123(R)–2, "Practical Accommodation to the Application of Grant Date as Defined in FASB Statement No. 123(R)", which provides clarification of the concept of mutual understanding between employer and employee with respect to the grant date of a share–based payment award. This FSP provides that a mutual understanding of the key terms and conditions of an award shall be presumed to exist on the date the award is approved by management if the recipient does not have the ability to negotiate the key terms and conditions of the award and those key terms and conditions will be communicated to the individual recipient within a relatively short time period after the date of approval. This guidance shall be applied upon initial adoption of SFAS 123(R). The Company is currently evaluating the effect that the adoption of the FSP will have on its consolidated results of operations and financial condition but does not expect it to have a material impact.

In May 2005, the FASB issued SFAS No. 154, Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20 and FASB Statement No. 3. SFAS No. 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of the correction of an error. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The Company does not expect the adoption of SFAS No. 154 on January 1, 2006 to have a material impact on its results of operations and financial condition.

In February 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments–an amendment of FASB Statements No. 133 and 140." SFAS No. 155 amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", to permit fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided that the whole instrument is accounted for on a fair value basis. SFAS No. 155 amends SFAS No. 140, "Accounting for the Impairment or Disposal of Long–Lived Assets", to allow a qualifying special–purpose entity (SPE) to hold a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS No. 155 applies to all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006, with earlier application allowed. The Company does not expect the adoption of SFAS No. 155 to have a material impact on its consolidated results of operations and financial condition.

In March 2005, the FASB issued FIN 47, "Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143" ("FIN 47"), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The Company does not expect the adoption of FIN 47 will have a material impact on its results of operations and financial condition.

F–123

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**3.  Acquisitions**

During 2005 and 2004, the Group has made the following acquisitions to continue to expand its networks in desirable locations to establish other stand alone networks that provide effective channels for advertisers:

(a) On June 1, 2005, two shareholders of Infoachieve, Lei Liu and Shi Yong acquired 100% of the equity of Guangdong Century Sparkle Advertising Co., Ltd. ("Sparkle"), a frame advertising service provider, in exchange for cash of $701,330 and 90,000 ordinary shares of Infoachieve having a fair value of $15.62 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. The cash consideration was satisfied by a loan from the Group to Lei Liu and Yong Shi. At the completion of the acquisition, Lei Liu and Yong Shi entered into various agreements with Infoachieve, including an exclusive service agreement entitled Infoachieve to receive service fees in an amount up to all of the net income of Sparkle. In addition, Infoachieve has been assigned all the voting rights by Lei Liu and Yong Shi through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally, Infoachieve has the option to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle. Therefore Infoachieve is the primary beneficiary of Sparkle. As a result, the consolidated financial statements reflect the consolidation of Sparkle into Infoachieve. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,107,130 consisted of the following:

| | |
|---|---:|
| Cash consideration | $   701,330 |
| Value of the ordinary shares issued | 1,405,800 |
| Total consideration | $ 2,107,130 |

The purchase price was allocated as follows:

| | | Amortization period |
|---|---:|---:|
| Net tangible assets acquired | $      23,942 | |
| Intangible assets: | | |
| Lease agreements | 111,473 | 5 years |
| Customer base | 18,237 | 5 years |
| Contract backlog | 14,372 | 2.5 months |
| Goodwill | 1,939,106 | N/A |
| Total | $ 2,107,130 | |

(b) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Langmei Co. Ltd., a frame advertising service provider, in exchange for cash of $828,295 and 160,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $3,106,695 consisted of the following:

| | |
|---|---:|
| Cash consideration | $   828,295 |
| Value of the ordinary shares issued | 2,278,400 |
| Total consideration | $ 3,106,695 |

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

| | | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 12,563 | |
| Intangible assets: | | |
|    Lease agreements | 56,878 | 5 years |
|    Customer base | 41,314 | 5 years |
|    Contract backlog | 49,891 | 2.5 months |
| Goodwill | 2,946,049 | N/A |
| Total | $ 3,106,695 | |

(c) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Xinchengsihai Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,207,730. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

| | | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 6,642 | |
| Intangible assets: | | |
|    Lease agreements | 63,043 | 5 years |
|    Customer base | 5,918 | 5 years |
|    Contract backlog | 483 | 2.5 months |
| Goodwill | 1,131,644 | N/A |
| Total | $ 1,207,730 | |

(d) On July 5, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Tuojia Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $870,617 and 95,200 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,226,265 consisted of the following:

| | |
|---|---|
| Cash consideration | $ 870,617 |
| Value of the ordinary shares issued | 1,355,648 |
| Total consideration | $ 2,226,265 |

F–125

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---:|---|
| Net tangible assets acquired | $ 21,263 |  |
| Intangible assets: |  |  |
|    Lease agreements | 92,546 | 5 years |
|    Customer base | 12,323 | 5 years |
|    Contract backlog | 43,735 | 2.5 months |
| Goodwill | 2,056,398 | N/A |
| Total | $ 2,226,265 |  |

    (e) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Shanghai Yangguangjiaxin Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $241,838 and 99,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,651,598 consisted of the following:

| | |
|---|---:|
| Cash consideration | $ 241,838 |
| Value of the ordinary shares issued | 1,409,760 |
| Total consideration | $ 1,651,598 |

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---:|---|
| Net tangible assets acquired | $ 15,340 |  |
| Intangible assets: |  |  |
|    Lease agreements | 140,475 | 5 years |
|    Customer base | 11,233 | 5 years |
|    Contract backlog | 30,680 | 2.5 months |
| Goodwill | 1,453,870 | N/A |
| Total | $ 1,651,598 |  |

    (f) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Guangzhou Liju Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $483,676 and 140,000 ordinary shares of Infoachieve having a fair market value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,477,276 consisted of the following:

| | |
|---|---:|
| Cash consideration | $ 483,676 |
| Value of the ordinary shares issued | 1,993,600 |
| Total consideration | $ 2,477,276 |

F–126

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $      10,146 |  |
| Intangible assets: |  |  |
|    Lease agreements | 139,751 | 5 years |
|    Customer base | 21,863 | 5 years |
|    Contract backlog | 16,427 | 2.5 months |
| Goodwill | 2,289,089 | N/A |
| Total | $  2,477,276 |  |

     (g) On September 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Lingxian Media Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,011,097. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $      25,893 |  |
| Intangible assets: |  |  |
|    Lease agreements | 52,898 | 5 years |
|    Customer base | 19,852 | 5 years |
|    Contract backlog | 25,030 | 2.5 months |
| Goodwill | 887,424 | N/A |
| Total | $  1,011,097 |  |

     (h) On October 1, 2005, the Group acquired the signed lease agreements, frames and ongoing advertising agreements of Shenzhen Xinghuo Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $865,073 and 30,000 ordinary shares having a fair market value of $14.73 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,306,973 consisted of the following:

|  |  |
| --- | --- |
| Cash consideration | $      865,073 |
| Value of the ordinary shares issued | 441,900 |
| Total consideration | $  1,306,973 |

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $       5,561 | |
| Intangible assets: | | |
|    Lease agreements | 53,910 | 5 years |
|    Customer base | 6,055 | 5 years |
|    Contract backlog | 8,527 | 2.5 months |
| Goodwill | 1,232,920 | N/A |
| Total | $  1,306,973 | |

*Pro forma*

The following summarized unaudited pro forma results of operations for the year ended December 31, 2005 assuming that all acquisitions during the year ended December 31, 2005 occurred as of January 1, 2004 and 2005. These pro forma results have been prepared for comparative purposes only based on management's best estimate and do not purport to be indicative of the results of operations which actually would have resulted had the acquisitions occurred as of January 1, 2004 and 2005.

|  | Pro forma | |
|---|---|---|
|  | Year ended December 31, 2004 | Year ended December 31, 2005 |
|  | (unaudited) | (unaudited) |
| Revenues | $   14,110,552 | $   12,084,864 |
| Net loss attributable to holders of ordinary shares | $      (550,713) | $  (18,624,320) |
| Loss per share — basic and diluted | $        (32.30) | $         (23.04) |

**4.  Accounts Receivable, Net**

Accounts receivable, net consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Billed receivables | $     589,634 | $  3,149,886 |
| Unbilled receivables | 703,935 | 578,314 |
|  | $  1,293,569 | $  3,728,200 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of the balance sheet dates.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

5.  **Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Other receivables | $ 135,576 | $ 383,835 |
| Prepaid expenses | 111,870 | 279,743 |
| Employee advances | 72,026 | 69,532 |
| Other taxes refundable | 48,163 | — |
|  | $ 367,635 | $ 733,110 |

6.  **Equipment, Net**

Equipment, net consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Frame | $ 641,008 | $ 1,148,014 |
| Computers and office equipment | 174,164 | 351,315 |
| Liquid crystal displays | 562,080 | — |
|  | 1,377,252 | 1,499,329 |
| Less: accumulated depreciation and amortization | (346,242) | (485,458) |
|  | $ 1,031,010 | $ 1,013,871 |

7.  **Acquired Intangible Assets, Net**

Acquired intangible assets, net consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Lease agreements | $ — | $ 710,974 |
| Customer base | — | 136,795 |
| Contract backlogs | — | 189,145 |
| Less: accumulated amortization | — | (272,632) |
|  | $ — | $ 764,282 |

In 2005, the Group acquired certain lease agreements, customer base and contract backlogs through various acquisitions (see Note 3). The Group recorded an amortization expense of $272,632 for the year ended December 31, 2005. The Group will record amortization expenses of $172,883, $172,883, $172,883, $172,883 and $72,750 for 2006, 2007, 2008, 2009 and 2010, respectively.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

8.  **Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Payables related to acquisitions | $          — | $  4,505,684 |
| Professional fees | — | 939,113 |
| Sales commission | 30,688 | 592,729 |
| Advances from employees | 244,847 | 621,330 |
| Other taxes payable | 387,074 | 467,560 |
| Employee payroll and welfare | 43,954 | 299,345 |
| Accrued expenses | 45,315 | 261,504 |
| Advance from customers | 75,580 | 42,007 |
| Others | 40,671 | 327,870 |
| | $  868,129 | $  8,057,141 |

9.  **Income Taxes**

Infoachieve is a tax–exempted company incorporated in the British Virgin Islands.

Beijing Framedia, Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve's variable interest entities were all registered in the PRC, which are all subject to PRC Enterprise Income Tax ("EIT") on the taxable income in accordance with the relevant PRC income tax laws.

The tax rate for Beijing Framedia was 33% and the taxable income was calculated at 8% of gross revenue in the periods presented.

The EIT rate for Shanghai Framedia was 33% but no income tax was provided as Shanghai Framedia was exempted from income tax in 2004 and there was no assessable taxable income in 2005.

The EIT rate for Guangdong Framedia was 33%. No income tax has been provided as Guangdong Framedia was exempted from income tax in the periods presented.

The EIT rate for Shenzhen Framedia was 15% and no income tax was provided as Shenzhen Framedia had no assessable taxable income.

Wuhan Framedia was subject to a fixed amount of income tax, which was $445 per year.

The EIT rate for Framedia Development is 33%. No income tax has been provided in the periods presented as Framedia Development was exempted from income tax in 2004 and 2005.

The EIT rate for Sparkle is 33%, and the taxable income was calculated at 20% of gross revenue in the period presented. Sparkle enjoys an 18% preferential tax rate determined by its operating scale.

The EIT rate for Framedia Consultation was 33%. No income tax has been provided as there was no assessable taxable income in 2005.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The principal components of the Group's deferred income tax assets are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Deferred tax assets: |  |  |
| Pre–operating expenses | $    — | $    12,088 |
| Allowance for doubtful accounts | — | 1,318 |
| Total deferred tax assets | — | 13,406 |
| Valuation allowance on deferred tax assets | — | (13,406) |
| Net deferred tax assets | $    — | $    — |

The Group operates through multiple subsidiaries and variable interest entities and the valuation allowance is considered on each individual subsidiary and variable interest entity basis.

The Group did not have any timing differences relating to deferred tax liabilities as of December 31, 2004 and 2005.

Full valuation allowance has been provided for the deferred tax assets arising mainly from pre–operating expenses and allowance for doubtful accounts as the Group believes that it is more likely than not that the deferred tax assets will not be realized.

A reconciliation between total income tax expense and the Group's effective tax rate is as follows:

|  | For the year ended December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Statutory tax rate | 33.0% | 33.0% |
| Permanent book–tax differences | (27.1)% | (32.7)% |
| Change in valuation allowance | (5.9)% | (0.3)% |
| Effective tax rate | — | — |

**10.    Convertible Redeemable Preference Shares**

(a) In May 2005, 270,000 outstanding ordinary shares were reclassified and re–designated into 270,000 Series A–1 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $1,136,700 which represents the difference between the fair value of the Series A–1 convertible redeemable preference shares at the date of the re–designation of $4.22 and the initial issuance price of the ordinary shares of $0.01 for 270,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $4.22 per share for Series A–1 convertible redeemable preference shares in effect on the redemption date plus all declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $378,985 for the year ended December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

F–131

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

(b) In May 2005, 110,000 outstanding ordinary shares were reclassified and re–designated into 110,000 Series A–2 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $623,700 which represents the difference between the fair value of the Series A–2 convertible redeemable preference shares at the date of the re–designation of $5.68 and the initial issuance price of the ordinary shares of $0.01 for 110,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $5.68 per share for Series A–2 convertible redeemable preference shares in effect on the redemption date plus all declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $207,820 as of December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

The significant terms of the Series A–1 and Series A–2 convertible redeemable preference shares are as follows:

***Conversion***

Each of the Series A–1 and Series A–2 convertible redeemable preference shares is convertible into one ordinary share at a conversion price of $4.22 per share for Series A–1 convertible redeemable preference shares and $5.68 per share for Series A–2 convertible redeemable preference shares, at the option of the holder at any time after the date of issuance of such shares, or is automatically converted into ordinary shares at the then effective Series A conversion price upon a Qualified IPO. The conversion price should be subject to the following adjustment:

Adjustment of the Series A–1 and Series A–2 convertible redeemable preference shares conversion price upon issuance of additional ordinary shares at below Series A convertible redeemable preference shares conversion price — in the event that Infoachieve shall issue any additional ordinary shares at a subscription price per share less than the Series A–1 and Series A–2 convertible redeemable preference shares conversion price, in effect on the date of and immediately prior to such issuance, the Series A convertible redeemable preference shares conversion price shall be reduced to a price equal to the consideration per share for which such additional ordinary shares are issued.

***Voting rights***

All ordinary shares shall have one vote each. Each convertible redeemable preference share shall be entitled to the number of votes equal to the number of ordinary shares into which such Series A convertible redeemable preference could be converted at the record date for determination of the members entitled to vote on such matters. The holders of the Series A–1 and Series A–2 convertible redeemable preference shares and the ordinary shares shall vote together and not as a separate class, except as otherwise specifically required by the merger and acquisition agreements.

***Dividends***

The holders of the Series A–1 and Series A–2 convertible redeemable preference shares shall be entitled to receive out of any funds legally available therefore, when and if declared by the Directors, equivalent dividends or other distributions made or declared, whether in cash, in property or in any shares of Infoachieve, in respect of any other class or series of shares of Infoachieve.

F–132

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of Infoachieve, the holders of Series A–2 convertible redeemable preference shares shall receive the amount equal to 100% of the Series A Original Reference Price. After setting aside or paying in full the preferential amount due to the holders of Series A–2 convertible redeemable preference shares, the holders of the Series A–1 convertible redeemable preference shares shall be entitled to receive, the amount equal to 100% of the Series A Original Reference Price.

Series A Original Reference Price means, with respect to the Series A–1 convertible redeemable preference shares, $4.22, being the price at which the Series A–1 convertible redeemable preference shares were valued on the date on which the Series A–1 preference shares were first created by the Group by the redesignation of ordinary shares then in issue, and, with respect to the Series A–2 preference shares, $5.68, being the price at which the Series A–2 convertible redeemable preference shares were valued on the date on which the Series A–2 convertible redeemable preference shares were first created by the Group by the redesignation of ordinary shares then in issue.

**11. Ordinary Shares**

(a) On July 28, 2004, in order to incorporate Infoachieve, the Group issued 400 ordinary shares to the shareholders of the combined entities for cash proceeds of $400.

(b) On March 12, 2005 the Board of Directors approved a stock split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's consolidated financial statements.

(c) On March 21, 2005, the Group issued 960,000 ordinary shares to the Founders for cash proceeds of $9,600. This has resulted in a deemed dividend of $15,187,200 which represents the difference between the fair value of the ordinary shares at the date of issuance of $15.83 and the par value of $0.01 for 960,000 shares. The fair value was determined based on a retrospective independent third party valuation.

(d) On May 12, 2005, 380,000 outstanding ordinary shares were reclassified and redesignated into 270,000 Series A–1 convertible redeemable preference shares and 110,000 Series A–2 convertible redeemable preference shares. (See Note 10(a)(b))

(e) On May 12, 2005 and September 2, 2005, the principal shareholders of the Group transferred 50,000 ordinary shares of their own and the Group issued 40,000 ordinary shares to the Chief Executive Officer of Infoachieve in return for his service, respectively. These have resulted in a compensation expense of $1,395,100, which was based on the fair value of the price of ordinary shares. The fair value was determined based on a retrospective independent third party valuation.

(f) On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team in the British Virgin Islands. According to the Share Purchase Agreement and the supplemental agreements, following arrangements were made:

(i) 620,000 Ordinary Shares issued to the founders were transferred to Total Team,

(ii) The Chief Executive Officer who owned 40,000 ordinary shares and the shareholders of the entities being acquired by Infoachieve who were issued 614,200 ordinary shares of Infoachieve all agreed to exchange these issues with the same number of shares of Total Team, these 654,200 ordinary shares were cancelled by Total Team immediately after this transfer,

(iii) The 270,000 Series A–1 Preferred Shares and the 110,000 Series A–2 Preferred Shares were first converted to same number of Infoachieve's ordinary shares, then were transferred to Total Team.

After these arrangements, Infoachieve's total issued and outstanding ordinary shares were 1,000,000, which were fully acquired by Focus Media Holding Limited ("Focus Media") on January 1, 2006.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**12. Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $18,991, and $115,726 for the years ended December 31, 2004 and 2005, respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group's variable interest entities in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) a enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the Group's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. In 2004 and 2005, the Group did not make any appropriations.

**13. Commitments**

*(a) Leases*

The Group has entered into operating leasing arrangements relating to the placement of the print in the commercial locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expenses under operating leases for 2004 and 2005 were $1,935,891 and $3,881,981, respectively.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

|  | December 31, 2005 |
|---|---|
| December 31, |  |
| 2006 | $    3,687,665 |
| 2007 | 1,446,995 |
| 2008 | 399,542 |
| 2009 | 50,112 |
| 2010 and thereafter | 14,336 |
|  | $    5,598,650 |

**14. Segment and Geographic Information**

The Group is engaged in selling print advertisement on its network of frame located in high traffic areas in commercial locations throughout China.

The Group's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group.

Although the Group operates through multiple cities in China which include Beijing, Shanghai, Guangzhou, Shenzhen and Wuhan, it believes it operates in one segment as all cities provide selling frame space to the customers and advertisers. Accordingly all financial segment information can be found in the consolidated financial statements.

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*Geographic information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

**15.  Major Customers**

Details of the customers accounting for 10% or more of total revenues are as follows:

|  | Years ended December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd. | 16.9 | 15.5 |

Details of the customers accounting for 10% or more of accounts receivable are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd | 26.6 | 22.6 |
| Beijing Guanliang Advertising Co., Ltd. | 18.2 | — |
| Beijing Taihedongfang Advertising Co., Ltd. | 10.3 | — |

**16.  Related Party Balances**

*(a)  Amounts due from related parties*

The amounts due from related parties were cash advances to the Founders to invest in Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve. The amounts were unsecured and interest free and fully repaid in 2005.

*(b)  Short–term loans from shareholders*

At December 31, 2004, the short–term loans from shareholders represented the principal of $365,802, which was interest bearing starting from January 1, 2005 at an interest rate of 7% per annum and was repayable in December 2005.

At December 31, 2005, the short–term loans from shareholders are comprised of the principal of $3,048,522 and the interest calculated at 7% per annum, all of which was repayable within one year.

The short–term loans were provided to the Group to be used as part of the consideration to complete the acquisitions described in Note 3.

*(c)  Amounts due to related parties*

Details of amounts due to related parties as of December 31, 2004 and 2005 were as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Principal shareholders | $ 1,677,741 | $ 761,292 |

At December 31, 2004, the loans from a Founder's relative and employees were unsecured, bore interest ranging from 20% to 30% per annum and were repaid in 2005.

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

At December 31, 2005, the loan from Focus Media Holding Limited ("Focus Media") was unsecured, bore interest 5.58% per annum. As mentioned in note 17, Focus Media became the only shareholder of the Group subsequently.

**17.    Subsequent Events**

(a) Pursuant to the Share Purchase Agreement signed on October 15, 2006 by Focus Media Holding Limited, a publicly listed company on NASDAQ to acquire all the issued shares of Infoachieve Limited, the acquisition was effectively completed on January 1, 2006 and since then Infoachieve Limited has become a subsidiary of Focus Media Holding Limited.

(b) On March 7, 2006, Infoachieve entered into an agreement with its shareholders (IDG Technology Venture Investments Fund, Chen Hong, Shi Yong, Liu Shisheng and Zhao Haiqi, collectively called "Lending Parties")) and Focus Media. According to the agreement, to the extent the 2006 Audited Annual Net Income (as defined in the agreement) of Infoachieve exceeds US$17,000,000, any such excess amount not to exceed USD3,262,483.83 shall be applied by Infoachieve to repay the outstanding principal of the loans made by the Lending Parties to Infoachieve, in proportion to the amounts of the loan made by the Lending Parties, provided (a) the Credits (as defined in Funding Agreement as discussed below), and (b) the Work Capital Credits (as defined in the Share Purchase Agreement) if any, shall have been fully repaid before any loan is repaid pursuant to this Agreement.

On March 7, 2006, Infoachieve entered into the Funding Agreement with Focus Media and Total Team. According to this agreement, Focus Media shall provide a working capital loan of RMB6,361,773.64 or the US dollar equivalent and a loan against accounts receivables of RMB30,000,000 or the US dollar equivalent (collectively the "Credits") to Infoachieve, the Credits shall not bear any interest. Upon receipt of the Credit from Focus Media, Infoachieve shall apply the Credits in their entirety to repay the due and unpaid portion of the cash consideration payable by Infoachieve pursuant to the applicable Acquisition Agreements.

**Table of Contents**

**INDEX TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION**

| | Page |
|---|---|
| Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information | P–2 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2006 | P–3 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the six–months ended June 30, 2007 | P–4 |
| Notes to the Unaudited Pro Forma Condensed Consolidated Financial Information | P–5 |

P–1

Table of Contents

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION**
**(in U.S. dollars)**

**Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information**

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes thereto. Financial information with respect to the acquisitions is derived from the historical financial statements and management accounts of Target Media Holdings Limited, or Target Media and Allyes Information Technology Company Limited, or Allyes, appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with US GAAP. These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Target Media and Allyes. The acquired businesses have permitted us to expand our network of out–of–home consumers and to expand into the Internet advertising business.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2006 presents adjustments as if the acquisitions of Target Media and Allyes had been consummated on January 1, 2006. The unaudited pro forma condensed consolidated statement of operations for the six months ended June 30, 2007 presents adjustments as if the acquisition of Allyes had been consummated on January 1, 2007.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Allyes, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006, and the financial information of Allyes for the period between January 1, 2007 and March 28, 2007, the respective dates of the acquisitions, have not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information for the two–month period ended February 28, 2006 and the period from January 1, 2007 through March 28, 2007 of Target Media and Allyes, respectively, that has been used to calculate the pro forma financial information for the six–month and twelve–month periods ended June 30, 2007 and December 31, 2006, may differ significantly from any actual consolidated statements of operations had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm, and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

P–2

**Table of Contents**

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED**

**STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. Dollars, except share data)**

| | FOCUS MEDIA HOLDING LIMITED For The Year Ended December 31, 2006 | ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED For The Year Ended December 31, 2006 | TARGET MEDIA HOLDINGS LIMITED For The Two Months Ended February 28, 2006 | Pro Forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|---|---|
| **Net Revenues:** | | | | | | |
| Advertising Service Revenue | $ 209,973,935 | $ 47,234,757 | $ 3,068,289 | | | $ 260,276,981 |
| Other Revenue | 1,931,530 | 1,899,197 | — | | | 3,830,727 |
| | | | | | | |
| **Total net revenues** | **211,905,465** | **49,133,954** | **3,068,289** | | | **264,107,708** |
| **Cost of Revenues:** | | | | | | |
| Advertising Service Cost | 80,615,408 | 37,820,920 | 3,792,503 | 3,000,000 | (1) | 125,228,831 |
| Other Cost | 764,959 | — | — | | | 764,959 |
| | | | | | | |
| **Total cost of revenues** | **81,380,367** | **37,820,920** | **3,792,503** | | | **125,993,790** |
| **Gross profit** | **130,525,098** | **11,313,034** | **(724,214)** | | | **138,113,918** |
| **Operating expenses/(income):** | | | | | | |
| General and administrative | 25,723,413 | 6,524,900 | 2,541,194 | | | 34,789,507 |
| Selling and marketing | 25,761,948 | 4,376,213 | 3,114,507 | 1,879,893 | (1) | 35,132,561 |
| Research and development | — | 648,732 | — | | | 648,732 |
| Amortization of acquired intangibles | — | — | — | 205,350 | (1) | 205,350 |
| Other operating income | (1,338,334) | — | — | | | (1,338,334) |
| | | | | | | |
| **Total operating expenses** | **50,147,027** | **11,549,845** | **5,655,701** | | | **69,437,816** |
| **Income from operations** | **80,378,071** | **(236,811)** | **(6,379,915)** | | | **68,676,102** |
| Interest income | 4,560,798 | 583,738 | — | | | 5,144,536 |
| Interest expense | (305,287) | — | (23,177) | | | (328,464) |
| Other income | 271,451 | 201,078 | — | | | 472,529 |
| Other expense | (558,990) | (40,200) | (1,755,019) | | | (2,354,209) |
| | | | | | | |
| **Income before income taxes and minority interests** | **84,346,043** | **507,805** | **(8,158,111)** | | | **71,610,494** |
| Income taxes: | 1,043,538 | 1,002,944 | (59,402) | | | 1,987,080 |
| | | | | | | |
| **Net income after income taxes before minority interests** | **83,302,505** | **(495,139)** | **(8,098,709)** | | | **69,623,414** |
| Minority interests | 104,773 | — | (30,588) | | | 74,185 |
| | | | | | | |
| **Net income attributable to holders of ordinary shares** | **$ 83,197,732** | **$ (495,139)** | **$ (8,068,121)** | | | **$ 69,549,229** |
| | | | | | | |
| Income per share — basic | $ 0.16 | | | | | $ 0.13 |
| | | | | | | |
| Shares used in calculating basic income per share | 505,411,079 | | | | (2) | 537,826,734 |
| | | | | | | |
| Income per share — diluted | $ 0.16 | | | | | $ 0.13 |
| | | | | | | |
| Shares used in calculating diluted income per share | 521,536,381 | | | | (2) | 553,952,036 |

The accompanying notes are an integral part of these unaudited pro forma condensed consolidated financial statements.

P–3

Table of Contents

UNAUDITED PRO FORMA CONDENSED CONSOLIDATED

STATEMENT OF OPERATIONS
FOR THE SIX MONTHS ENDED JUNE 30, 2007
(In U.S. Dollars, except share data)

| | FOCUS MEDIA HOLDING LIMITED For the 6 Months Ended June 30, 2007 | ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED For the 3 Months Ended March 28, 2007 | Pro Forma Adjustment | Notes | Pro Forma |
|---|---|---|---|---|---|
| **Net Revenues:** | | | | | |
| Advertising Service Revenue | $ 169,929,351 | $ 10,349,639 | | | $ 180,278,990 |
| Other Revenue | 686,634 | 238,952 | | | 925,586 |
| **Total net revenues** | **170,615,985** | **10,588,591** | | | **181,204,576** |
| **Cost of Revenues:** | | | | | |
| Advertising Service Cost | 76,720,176 | 9,303,052 | 750,000 | (1) | 86,773,228 |
| Other Cost | 303,017 | — | | | 303,017 |
| **Total cost of revenues** | **77,023,193** | **9,303,052** | | | **87,076,245** |
| **Gross profit** | **93,592,792** | **1,285,539** | | | **94,128,331** |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 20,328,874 | 8,049,092 | | | 28,377,966 |
| Selling and marketing | 23,040,846 | 1,343,808 | 469,973 | (1) | 24,854,627 |
| Research and development | — | 199,341 | | | 199,341 |
| Other operating income | (2,384,031) | — | | | (2,384,031) |
| **Total operating expenses** | **40,985,689** | **9,592,241** | | | **51,047,903** |
| **Income/(loss) from operations** | **52,607,103** | **(8,306,702)** | | | **43,080,428** |
| Interest income | 4,633,869 | 26,782 | | | 4,660,651 |
| Interest expense | (6,971) | — | | | (6,971) |
| Other income | 252,442 | 1,323 | | | 253,765 |
| Other expense | (211,890) | — | | | (211,890) |
| **Income/(loss) before income taxes and minority interests** | **57,274,553** | **(8,278,597)** | | | **47,775,983** |
| Income taxes: | 3,286,351 | (157,019) | | | 3,129,332 |
| **Net income/(loss) after income taxes before minority interests** | **53,988,202** | **(8,121,578)** | | | **44,646,651** |
| Minority interests | 18,165 | — | | | 18,165 |
| **Net income/(loss) attributable to holders of ordinary shares** | **$ 54,006,367** | **$ (8,121,578)** | | | **$ 44,664,816** |
| Income per share — basic | $ 0.10 | | | | $ 0.08 |
| Shares used in calculating basic income per share | 560,510,907 | | | (2) | 580,479,987 |
| Income per share — diluted | $ 0.09 | | | | $ 0.07 |
| Shares used in calculating diluted income per share | 577,365,911 | | | (2) | 597,334,991 |

The accompanying notes are an integral part of these unaudited pro forma condensed consolidated financial statements.

P–4

**Table of Contents**

### NOTES TO THE UNAUDITED PRO FORMA CONDENSED

### CONSOLIDATED FINANCIAL INFORMATION

The following pro forma adjustment has been made to the unaudited pro forma condensed consolidated financial information.

(1) Reflects amortization for the acquired intangibles recorded as a result of our acquisition of Allyes Information Technology Company Limited ("Allyes") in March 2007 as if the acquisition had been consummated on January 1, 2006.

The aggregate purchase price of $224.7 million of Allyes is comprised of the following:

|  | | (In thousands of U.S. dollars) |
| --- | --- | --- |
| Cash consideration | $ | 70,000 |
| Fair Value of ordinary shares issued | | 154,698 |
| | $ | 224,698 |

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

Preliminary purchase price allocation:

|  | | (In thousands of U.S. dollars) | Amortization Period |
| --- | --- | --- | --- |
| Net tangible assets acquired | | 21,957 | |
| Acquired intangible assets | | 36,095 | 1–7 years |
| Goodwill | | 166,646 | |
| Total | $ | 224,698 | |

The preliminary purchase price allocation and preliminary intangible asset valuations described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

Additional payment of up to 9,662,458 ordinary shares may be made contingent upon Allyes attaining certain earning target in 12–months period ended March 28, 2008.

The amortization expense for Allyes of $4,879,893 and $1,219,973 for the year ended December 31, 2006 and three months ended March 28, 2007, respectively have been estimated based on a valuation report provided by a third–party valuation firm.

The amortization expense for Target Media of $205,350 for the two months ended February 28, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(2) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

|  | December 31, 2006 | June 30, 2007 |
| --- | --- | --- |
| Shares used in calculating basic income per share on a pro forma basis: | | |
| Weighted average ordinary shares outstanding used in computing basic income per share for Focus Media Holding Limited | 505,411,079 | 560,510,907 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
| | 537,826,734 | 580,479,987 |

P–5

**Table of Contents**

**NOTES TO THE UNAUDITED PRO FORMA CONDENSED**

**CONSOLIDATED FINANCIAL INFORMATION — (Continued)**

|  | December 31, 2006 | June 30, 2007 |
|---|---|---|
| Shares used in calculating diluted income per share on a pro forma basis: |  |  |
| Weighted average ordinary shares outstanding used in computing basic income per share for Focus Media Holding Limited | 521,536,381 | 577,365,911 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 553,952,036 | 597,334,991 |

P–6

Table of Contents



Table of Contents

## PART II

### Information not required in prospectus

**Item 6.**    *Indemnification of directors and officers*

The registrant's amended and restated memorandum and articles of association provide that, subject to the Companies Law, every director or other officer of the registrant shall be indemnified out of the assets of the registrant against any liability incurred by him or her in defending any proceedings, whether civil or criminal, which relate to anything done or omitted or alleged to have been done or omitted by him or her as a director or officer of the registrant and in which judgment is given in his or her favor, or in which he or she is acquitted, or in connection with any application in which relief is granted to him or her by the court pursuant to the Companies Law from liability for negligence, default, breach of duty or breach of trust in relation to the affairs of the registrant. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**Item 7.**    *Recent sales of unregistered securities*

During the past three years, the registrant has issued and sold the securities listed below without registering the securities under Securities Act of 1933, as amended (the "Securities Act"). None of these transactions involved any underwriters' underwriting discounts or commissions, or any public offering. The registrant believes that each of the following issuances was exempt from registration under the Securities Act in reliance on Regulation D, Regulation S or Rule 701 under the Securities Act or pursuant to Section 4(2) of the Securities Act regarding transactions not involving a public offering.

(a) In November 2004, we, UCI, Milestone and China Alliance entered into a sale and purchase agreement with the Series C investors, which consisted of GS Focus Holding Limited, 3i Group, KTBIUCI China Ventures I Limited and Max Wealth Enterprises Limited, pursuant to which we issued a total of 291,886 Series C convertible redeemable preference shares to the Series C investors at a price of $103 per preference share.

(b) In December 2004, Jason Nanchun Jiang sold 48,648 ordinary shares to Capital Investment Private Equity at a price of $103 per ordinary share, which shares were simultaneously exchanged for Series C preference shares. At the same time, Yibing Zhou and Victory Venture sold a total of 42,324 ordinary shares to UCI, Smart Create Group Ltd., East Concord Ltd., Meridian Pacific Angel Capital Co., Ltd., Li Lai Holding Ltd., Elufar Ltd. and Tong An Investment Co. Ltd. at a price of $103 per share.

(c) In January 2005, we granted additional options to purchase 1,200,000 of our ordinary shares to some of our directors with an exercise price of $0.58 per share. All of these options vest over three years.

(d) In February 2005, we granted:

- options to purchase 2,000,000 and 2,100,000 of our ordinary shares with an exercise price of $0.58 and $0.75, respectively, to certain of our executive officers and options to purchase 720,000 of our ordinary shares with an exercise price of $0.75 to certain of our employees. All of these options vest over three years.

- options to purchase 1,240,000 of our ordinary shares to third–party consultants and advisors with an exercise price of $0.75. All of these options vest over three years.

(e) In May 2005, we executed a 200 to 1 share split of our ordinary shares and each series of our convertible redeemable preference shares.

(f) In July 2005, we granted:

- options to purchase 11,683,630 of our ordinary shares with an exercise price of $1.70, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 100,000 of our ordinary shares to a third–party consultant with an exercise price of $1.70. All of these options vest over three years.

Table of Contents

(g) In November 2005, we granted:

- options to purchase 800,000 of our ordinary shares with an exercise price of $2.60, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 4,000,000 of our ordinary shares with an exercise price of $2.70, to certain of our executive officers and employees. All of these options vest over three years.

(h) On January 3, 2006, we issued an aggregate of 22,157,003 of our ordinary shares to Total Team Investments Limited, in connection with our acquisition of Infoachieve valued at $2.456 per share.

(i) On February 28, 2006, we issued an aggregate of 77,000,000 of our ordinary shares valued at $3.00 per share to the former shareholders of Target Media in connection with our acquisition of Target Media.

(j) In March 2006, we granted options to purchase 3,000,000 of our ordinary shares with an exercise price of $5.09, to certain of our executive officers, employees and directors. All of these options vest over three years.

(k) In March 2006, we issued an aggregate of 1,500,000 of our ordinary shares to the former shareholders of Dotad Wireless Holdings Co., Ltd., or Focus Media Wireless, in connection with our acquisition of Focus Media Wireless valued at $5.00 per share.

(l) In November 2006, we granted options to purchase 11,800,000 of our ordinary shares to certain of our employees, executive officers and directors. Of these options, 10,300,000 were issued to non–management employees and 1,500,000 were issued to our directors and officers. The issuance to our officers and directors included a grant to Jason Nanchun Jiang of options to purchase 500,000 of our ordinary shares. No other director or officer, upon exercise of all options granted, would beneficially own more than 1% of our outstanding ordinary shares. All of the options granted vest over a three year period, beginning one year from the date of issuance. The exercise price of the options is $5.724 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on November 14, 2016.

(m) In March 2007, we granted options to purchase 1,200,000 of our ordinary shares to certain of our employees. The exercise price of the options is $7.20 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on March 18, 2017.

(n) In March 2007, we issued an aggregate of 19,969,080 of our ordinary shares valued at $7.762 per share to the former shareholders of Allyes Information Technology Company Limited in connection with our acquisition of Allyes.

(o) In June 2007, we issued an aggregate of 35,830,619 of our ordinary shares to Total Team Investments Limited in connection with the earn–out payment for our acquisition of Framedia.

(p) In October 2007, we granted options to purchase an aggregate 9,592,685 of our ordinary shares to certain of our employees, executive officers and directors.

**Item 8.**    *Exhibits and financial statement schedules*

(a) Exhibits

See the Exhibit Index at the end of this Part II.

(b) Financial statement schedules

Schedule 1 — Condensed financial information of registrant prepared in accordance with Rule 12–04 of Regulation S–X pursuant to Item 4(b) and Item 8 of Form F–1, and Item 17 of Form 20– F, has been included herein.

**Item 9.**    *Undertakings*

The undersigned registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreements, certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant under the provisions described in Item 6, or otherwise, the registrant has

Table of Contents

been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant under Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post–effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) For the purpose of determining liability under the Securities Act of 1933 to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(4) For the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

II–3

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F−1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Shanghai, China on November 1, 2007.

FOCUS MEDIA HOLDING LIMITED

By:  /s/  Jason Nanchun Jiang
     Name:   Jason Nanchun Jiang
     Title:   Co−chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement has been signed by the following persons in the capacities indicated on November 1, 2007.

| Signature | Capacity |
|---|---|
| /s/  Jason Nanchun Jiang | Co−chairman and Chief Executive Officer (principal executive officer) |
| Jason Nanchun Jiang | |
| /s/  * | Co−chairman |
| David Feng Yu | |
| /s/  * | Director and President |
| Zhi Tan | |
| /s/  * | Director |
| Jimmy Wei Yu | |
| | Director |
| Fumin Zhuo | |
| | Director |
| Neil Nanpeng Shen | |
| /s/  * | Director |
| Charles Chao | |
| | Director |
| Daqing Qi | |

II−4

Table of Contents

| Signature | Capacity |
|---|---|
| | Director |
| David Ying Zhang | |
| /s/<br>Daniel Mingdong Wu | Chief Financial Officer |
| Daniel Mingdong Wu | |
| /s/<br>July Wang | Chief Accounting Officer |
| July Wang | |
| /s/<br>* | Authorized Representative in the United States |
| Donald J. Puglisi | |
| *By: /s/<br>Jason Nanchun Jiang | Attorney−in−fact |
| Jason Nanchun Jiang | |

II−5

**Table of Contents**

**ITEM 8. EXHIBITS**

| Exhibit Number | Description of Exhibits |
|---|---|
| 1.1 | Underwriting Agreement |
| 3.1* | Amended and Restated Memorandum and Articles of Association of Focus Media Holding Limited |
| 4.1* | Specimen Ordinary Share Certificate |
| 5.1* | Opinion of Conyers Dill & Pearman, Cayman Islands special counsel to the registrant, regarding the validity of the ordinary shares being registered |
| 5.2* | Form of opinion of Global Law Office, counsel to the registrant as to PRC law, regarding the validity of the corporate structure of Focus Media and its PRC operating subsidiaries, affiliates and shareholders |
| 8.1* | Opinion of Conyers Dill & Pearman, special Cayman Islands tax counsel to the registrant, regarding tax matters |
| 8.2* | Form of opinion of Simpson Thacher & Bartlett LLP regarding United States federal taxation matters |
| 10.1* | Technology License and Service Agreement, dated March 28, 2005, by and among Focus Media Digital Information Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisements Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.2* | Business Cooperation Agreement, dated March 28, 2005, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.3* | Equity Pledge Agreement, dated March 28, 2005, by and among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.4* | Call Option Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.5* | Shareholders' Voting Rights Proxy Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.6* | Trust Agreement, dated March 28, 2005, by and between Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.7* | Trademark License Agreement, dated March 28, 2005, by and among Focus Media Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisement Co., Ltd. and its subsidiaries |
| 10.8* | Loan Agreement, dated June 10, 2003, among Focus Media Holding Limited, Jason Nanchun Jiang, Jimmy Wei Yu, Yuanzhe Fu, Yibing Zhou and Yiqing Hou |
| 10.9* | Loan Agreement, dated March 28, 2005, by and between Jason Nanchun Jiang and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.10* | Manager Non–Competition Agreement entered into by Focus Media Holding Limited and Jason Nanchun Jiang on November 29, 2004 |
| 10.11* | Technology Transfer Agreement entered into by Jimmy Wei Yu and Focus Media Digital Information (Shanghai) Co., Ltd., dated November 1, 2004 |
| 10.12* | Everease Non–competition Agreement between Focus Media Holding Limited and Shanghai Everease Communication Company, dated as of November 2004 |
| 10.13* | Acknowledgement Letter entered into as of March 28, 2005 by and among Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.14* | Form of Acknowledgement Letter for Participation of Equity Pledge Agreement |

II–6

**Table of Contents**

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.15* | Form of Acknowledgement Letter for Participation of Call Option Agreement |
| 10.16* | Form of Acknowledgement Letter for Participation of Shareholders Voting Rights Agreement |
| 10.17* | Equity Pledge Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein |
| 10.18* | Call Option Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein |
| 10.19* | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein |
| 10.20* | Equity Pledge Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.21* | Call Option Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.22* | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. |
| 10.23* | Asset Transfer Agreement, dated December 31, 2005, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.24* | Share Purchase Agreement, dated March 7, 2006, by and among Focus Media Holding Limited and Dotad Wireless Holdings Co., Ltd. |
| 10.25* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.26* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.27* | Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.28* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.29* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.30* | Cooperation Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co. Ltd. and its local advertising subsidiaries named therein and Shanghai New Focus Media Advertisement Co. Ltd. |
| 10.31* | Technology Transfer Agreement, dated as of May 22, 2006, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.32* | Advertisement Dissemination Agreement, dated May 22, 2006, by and between Shanghai Focus Media Advertising Agency Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |

**Table of Contents**

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.33* | Asset Transfer Agreement, dated January 30, 2003, by and among Shanghai Allyes Advertisement Co. Ltd., New Allyes Information Technology (Shanghai) Co., Ltd., Xiangdong Xiong, and Jiangang Wang |
| 10.34* | Call Option Agreement, dated January 30, 2003, by and among Jiangang Wang, New Allyes Information Technology (Shanghai) Co., Ltd., and Shanghai Allyes Advertisement Co., Ltd. |
| 10.35* | Call Option Agreement, dated January 30, 2003, by and among Xiangdong Xiong, New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Allyes Advertisement Co., Ltd. |
| 10.36* | Equity Interests Pledge Agreement, dated January 30, 2003, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Jiangang Wang |
| 10.37* | Equity Interest Pledge Agreement, dated January 30, 2003, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Xiangdong Xiong |
| 10.38* | Exclusive Service Agreement, dated January 20, 2003, by and among Shanghai Allyes Advertisement Co., Ltd. and New Allyes Information Technology (Shanghai) Co., Ltd. |
| 10.39* | Loan Agreement, dated January 10, 2003, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Jiangang Wang (Borrower) |
| 10.40* | Loan Agreement, dated January 10, 2003, by and among New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Xiangdong Xiong (Borrower) |
| 10.41* | Shareholders' Voting Rights Proxy Agreement, dated January 30, 2003, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Allyes Advertisement Co., Ltd. and Xiangdong Xiong |
| 10.42* | Call Option Agreement, dated November 1, 2004, by and among Jiangang Wang, New Allyes Information Technology (Shanghai) Co., Ltd. and Shenzhen Baifen Creation Advertisement Co., Ltd. |
| 10.43* | Call Option Agreement, dated November 1, 2004, by and among Xiangdong Xiong, New Allyes Information Technology (Shanghai) Co., Ltd. and Shenzhen Baifen Creation Advertisement Co., Ltd. |
| 10.44* | Equity Interests Pledge Agreement, dated November 1, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Jiangang Wang |
| 10.45* | Equity Interests Pledge Agreement, dated November 1, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Xiangdong Xiong |
| 10.46* | Exclusive Service Agreement, dated November 1, 2004, by and between Shenzhen Baifen Creation Co., Ltd. and New Allyes Information Technology (Shanghai) Co., Ltd. |
| 10.47* | Loan Agreement, dated November 1, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Jiangang Wang (Borrower) |
| 10.48* | Loan Agreement, dated November 1, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Xiangdong Xiong (Borrower) |
| 10.49* | Shareholders' Voting Rights Proxy Agreement, dated November 1, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shenzhen Baifen Creation Advertisement Co., Ltd., and Jiangang Wang |
| 10.50* | Shareholders' Voting Rights Proxy Agreement, dated November 1, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shenzhen Baifen Creation Advertisement Co., Ltd., and Xiangdong Xiong |
| 10.51* | Asset Transfer Agreement, dated November 30, 2004, by and among Shanghai Huxin Advertisement Co., Ltd., New Allyes Information Technology (Shanghai) Co., Ltd., Suyang Zhang and Hailong Zhu |
| 10.52* | Call Option Agreement, dated November 30, 2004, by and among Suyang Zhang, New Allyess Information technology (Shanghai) Co., Ltd. and Shanghai Huxin Advertisement Co., Ltd. |
| 10.53* | Call Option Agreement, dated November 30, 2004, by and among Hailong Zhu, New Allyess Information technology (Shanghai) Co., Ltd. and Shanghai Huxin Advertisement Co., Ltd. |

**Table of Contents**

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.54* | Equity Interests Pledge Agreement, dated November 30, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Suyang Zhang |
| 10.55* | Equity Interests Pledge Agreement, dated November 30, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Hailong Zhu |
| 10.56* | Exclusive Services Agreement, dated November 11, 2004, by and between Shanghai Huxin Advertisement Co., Ltd. and New Allyess Information Technology (Shanghai) Co., Ltd. |
| 10.57* | Loan Agreement, dated November 1, 2004, by and between New Allyess Information Technology (Shanghai) Co., Ltd (Lender) and Suyang Zhang (Borrower) |
| 10.58* | Loan Agreement, dated November 1, 2004, by and between New Allyess Information Technology (Shanghai) Co., Ltd (Lender) and Hailong Zhu (Borrower) |
| 10.59* | Shareholders' Voting Proxy Agreement, dated November 30, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Huxin Advertisement Co., Ltd. and Hailong Zhu |
| 10.60* | Asset Transfer Agreement, dated November 30, 2004, by and among Shanghai MSN Advertisement Co., Ltd., New Allyes Information Technology (Shanghai) Co., Ltd., Suyang Zhang and Hailong Zhu |
| 10.61* | Call Option Agreement, dated November 30, 2004, by and among Suyang Zhang, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai MSN Advertisement Co., Ltd. |
| 10.62* | Call Option Agreement, dated November 30, 2004, by and among Hailong Zhu, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai MSN Advertisement Co., Ltd. |
| 10.63* | Equity Interests Pledge Agreement, dated November 30, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Suyang Zhang |
| 10.64* | Equity Interests Pledge Agreement, dated November 30, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Hailong Zhu |
| 10.65* | Exclusive Service Agreement, dated November 3, 2004, by and among Shanghai MSN Advertisement Co., Ltd. and New Allyes Information Technology (Shanghai) Co., Ltd. |
| 10.66* | Loan Agreement, dated November 1, 2004, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Hailong Zhu (Borrower) |
| 10.67* | Loan Agreement, dated November 1, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Suyang Zhang (Borrower) |
| 10.68* | Shareholders' Voting Rights Proxy Agreement, dated November 30, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai MSN Advertisement Co., Ltd. and Suyang Zhang |
| 10.69* | Shareholders' Voting Rights Proxy Agreement, dated November 30, 2004, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai MSN Advertisement Co., Ltd. and Hailong Zhu |
| 10.70* | Asset Transfer Agreement, dated May 17, 2005, by and among Shanghai Quanshi Advertisement Co., Ltd., New Allyes Information Technology (Shanghai) Co., Ltd. and Hailong Zhu |
| 10.71* | Call Option Agreement, dated May 17, 2005, by and among Hailong Zhu, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai Quanshi Advertisement Co., Ltd. |
| 10.72* | Call Option Agreement, dated May 17, 2005, by and among Suyang Zhang, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai Quanshi Advertisement Co., Ltd. |
| 10.73* | Equity Interests Pledge Agreement, dated May 17, 2005, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Suyang Zhang |
| 10.74* | Equity Interests Pledge Agreement, dated May 17, 2005, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Hailong Zhu |
| 10.75* | Exclusive Service Agreement, dated April 30, 2005, by and between Shanghai Quanshi Advertisement Co., Ltd. and New Allyes Information Technology (Shanghai) Co., Ltd. |

II–9

Table of Contents

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.76* | Loan Agreement, dated April 20, 2005, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Suyang Zhang (Borrower) |
| 10.77* | Loan Agreement, dated April 20, 2005, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Hailong Zhu (Borrower) |
| 10.78* | Shareholders' Voting Rights Proxy Agreement, dated May 17, 2005, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Quanshi Advertisement Co., Ltd. and Suyang Zhang |
| 10.79* | Shareholders' Voting Rights Proxy Agreement, dated May 17, 2005, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Quanshi Advertisement Co., Ltd. and Hailong Zhu |
| 10.80* | Supplemental Agreement for Loan Agreement, dated March 20, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Suyang Zhang (Borrower) |
| 10.81* | Supplemental Agreement for Loan Agreement, dated March 20, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Hailong Zhu (Borrower) |
| 10.82* | Call Option Agreement, dated July 1, 2006, by and among Jiangang Wang, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai Kuantong Advertisement Co., Ltd. |
| 10.83* | Call Option Agreement, dated July 1, 2006, by and among Suyang Zhang, New Allyes Information Technology (Shanghai) Co., Ltd. and Shanghai Kuantong Advertisement Co., Ltd. |
| 10.84* | Equity Interests Pledge Agreement, dated July 1, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Jiangang Wang |
| 10.85* | Equity Interests Pledge Agreement, dated July 1, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. and Suyang Zhang |
| 10.86* | Exclusive Service Agreement, dated July 1, 2006, by and between Shanghai Kuantong Advertisement Co., Ltd. and New Allyes Information Technology (Shanghai) Co., Ltd. |
| 10.87* | Loan Agreement, dated June 20, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Jiangang Wang (Borrower) |
| 10.88* | Loan Agreement, dated June 20, 2006, by and between New Allyes Information Technology (Shanghai) Co., Ltd. (Lender) and Suyang Zhang (Borrower) |
| 10.89* | Shareholders' Voting Rights Proxy Agreement, dated July 1, 2006, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Kuantong Advertisement Co., Ltd. and Jiangang Wang |
| 10.90* | Shareholders' Voting Rights Proxy Agreement, dated July 1, 2006, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Kuantong Advertisement Co., Ltd. and Suyang Zhang |
| 10.91* | Shareholders' Voting Rights Proxy Agreement, dated January 30, 2003, by and among New Allyes Information Technology (Shanghai) Co., Ltd., Shanghai Allyes Advertisement Co., Ltd. and Jiangang Wang |
| 10.92* | Form of Employment Agreement of Focus Media Technology (Shanghai) Co. Ltd. |
| 10.93* | Asset and Business Acquisition Agreement between Focus Media Holding Limited and Shanghai Everease Communication Company, dated as of July 1, 2003 |
| 10.94* | 2006 Share Option Plan, dated August 22, 2006, of Focus Media Holding Ltd. |
| 10.95* | Share Purchase Agreement, dated as of February 28, 2007, among Allyes Information Technology Company Limited, the selling shareholders named therein and Focus Media Holding Limited |
| 10.96* | Registration Rights Agreement, dated March 28, 2007, by and among Focus Media Holding Limited, and option holders of Allyes Information Technology Company Limited |
| 10.97* | Share Purchase Agreement dated as of January 7, 2006, among Focus Media Holding Limited, Target Media Holding Limited, and the Selling Shareholders |

II–10

Table of Contents

| Exhibit Number | Description of Exhibits |
| --- | --- |
| 10.98* | Share Purchase Agreement, dated as of October 15, 2005, among Focus Media Holding Limited, Total Team Investments Limited, and the other Infoachieve Limited Parties thereto |
| 21.1* | List of Subsidiaries |
| 23.1 | Consent of Deloitte Touche Tohmatsu Certified Public Accountants Ltd. |
| 23.2* | Consent of Global Law Office (included in Exhibit 5.2) |
| 23.3* | Consent of Conyers, Dill & Pearman (included in Exhibit 5.1 and 8.1) |
| 23.4* | Consent of Simpson Thacher & Bartlett LLP (included in Exhibit 8.2) |
| 23.5 | Consent of KPMG |
| 23.6* | Power of Attorney (included in signature pages in Part II of this Registration Statement) |

\* Previously filed

II–11

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# EX–1.1

**EX–1.1 UNDERWRITING AGREEMENT**
**F–1/A Filed on 11/01/2007**
File Number 333–146913



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 1.1

FOCUS MEDIA HOLDING LIMITED

AMERICAN DEPOSITARY SHARES
REPRESENTING
ORDINARY SHARES
(PAR VALUE US$0.00005 PER SHARE)

UNDERWRITING AGREEMENT

[_____], 2007

Citigroup Global Markets Inc.,
   388 Greenwich Street,
   New York, New York 10013.

Credit Suisse Securities (USA) LLC,
   Eleven Madison Avenue,
   New York, New York 10010 3629.

Merrill Lynch, Pierce, Fenner & Smith Incorporated,
   4 World Financial Center,
   250 Vesey Street,
   New York, New York 10080.

As representatives of the several Underwriters
   named in Schedule I hereto,

Ladies and Gentlemen:

Focus Media Holding Limited, a Cayman Islands company (the "Company"), proposes, subject to the terms and conditions stated herein, to issue and sell to the Underwriters named in Schedule I hereto (the "Underwriters") an aggregate of 5,000,000 American Depositary Shares representing 25,000,000 Ordinary Shares, par value US$0.00005 per share (the "Ordinary Shares"), of the Company and the shareholders of the Company named in Schedule II (the "Selling Shareholders") hereto propose, subject to the terms and conditions stated herein, to sell to the Underwriters an aggregate of 8,720,873 American Depositary Shares representing 43,604,365 Ordinary Shares and the Company proposes, subject to the terms and conditions stated herein, to sell to the Underwriters, at the election of the Underwriters, up to 2,000,000 American Depositary Shares representing 10,000,000 Ordinary Shares. The aggregate of 13,720,873 American Depositary Shares representing 68,604,365 Ordinary Shares to be sold by the Company and the Selling Shareholders, as applicable, are herein called the "Firm ADSs", and the aggregate of 2,000,000 American Depositary Shares

representing 10,000,000 additional Ordinary Shares to be sold by the Company are herein called the "Optional ADSs". The Firm ADSs, together with the Optional ADSs that the Underwriters elect to purchase pursuant to Section 2 hereof, are herein collectively called the "ADSs". The ADSs to be sold by the Selling Shareholders are herein called the "Selling Shareholder ADSs". The Ordinary Shares represented by the Firm ADSs are hereinafter called the "Firm Shares" and the Ordinary Shares represented by the Optional ADSs are hereinafter called the "Optional Shares" and the Firm Shares and the Optional Shares are hereinafter collectively called the "Shares".

The ADSs are to be issued pursuant to an amended and restated deposit agreement (the "Deposit Agreement"), dated as of April 9, 2007, among the Company, Citibank, N.A., as depositary (the "Depositary"), and holders and beneficial owners of ADSs issued by the Depositary thereunder. Each ADS will initially represent the right to receive five Ordinary Shares deposited pursuant to the Deposit Agreement.

It is understood by all the parties that the Underwriters are offering ADSs in the United States and internationally outside of the People's Republic of China (the "PRC").

1. (a) Each of Jason Nanchun Jiang (the "Controlling Person") and the Company jointly and severally represents and warrants to, and agrees with, each of the Underwriters that:

(i) A registration statement on Form F-1 (File No. 333-146913) (the "Initial Registration Statement") in respect of the Shares and the ADSs has been filed with the Securities and Exchange Commission (the "Commission"); the Initial Registration Statement and any post effective amendment thereto, each in the form heretofore delivered to you, and, excluding exhibits thereto, to you, have been declared effective by the Commission in such form; other than a registration statement, if any, increasing the size of the offering (a "Rule 462(b) Registration Statement"), filed pursuant to Rule 462(b) under the U.S. Securities Act of 1933, as amended (the "Act"), which became effective upon filing, no other document with respect to the Initial Registration Statement has heretofore been filed with the Commission; and no stop order suspending the effectiveness of the Initial Registration Statement, any post-effective amendment thereto or the Rule 462(b) Registration Statement, if any, has been issued and no proceeding for that purpose has been initiated or, to the best of the Company's knowledge, threatened by the Commission (any preliminary prospectus included in the Initial Registration Statement, is hereinafter called a "Preliminary Prospectus"); the various parts of the Initial Registration Statement and the Rule 462(b) Registration Statement, if any, including all exhibits thereto and including the information contained in the form of final prospectus filed with the Commission pursuant to Rule 424(b) under the Act in accordance with Section 5(a) hereof and deemed by virtue of Rule 430A under the Act to be part of the Initial Registration Statement at the time it was declared effective, each as amended at the time such part of the Initial Registration Statement became effective or such part of the Rule 462(b) Registration Statement, if any, became or hereafter becomes effective, are hereinafter collectively called the "Registration Statement"; the Preliminary Prospectus relating to the ADSs that was included in the Registration Statement immediately prior to the Applicable Time (as defined in Section 1(a)(iii) hereof) is hereinafter called the "Pricing Prospectus"; the form of the final prospectus relating to the Shares and the ADSs filed with the Commission pursuant to Rule 424(b) under the Act in accordance with Section 5(a)(ii) hereof, is hereinafter called the "Prospectus"; such final prospectus, in the form first filed pursuant to Rule 424(b) under the Act, is hereinafter called the "Prospectus"; any reference to any amendment or supplement to any Preliminary

2

Prospectus or the Prospectus shall be deemed to refer to and include any documents filed after the date of such Preliminary Prospectus or Prospectus, as the case may be, under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and incorporated therein; and any "issuer free writing prospectus" as defined in Rule 433 under the Act relating to the ADSs is hereinafter called an "Issuer Free Writing Prospectus";

(ii) No order preventing or suspending the use of any Preliminary Prospectus or any Issuer Free Writing Prospectus has been issued by the Commission, and each Preliminary Prospectus, at the time of filing thereof, conformed in all material respects to the requirements of the Act and the rules and regulations of the Commission thereunder, and did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively, the "Representatives") expressly for use therein;

(iii) For the purposes of this Agreement, the "Applicable Time" is 5:00 p.m. (Eastern Standard Time) on the date of this Agreement. The Pricing Prospectus, as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; and each Issuer Free Writing Prospectus listed on Schedule III(a) hereto does not conflict with the information contained in the Registration Statement, the Pricing Prospectus or the Prospectus and each such Issuer Free Writing Prospectus, as supplemented by and taken together with the Pricing Prospectus as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that this representation and warranty shall not apply to statements or omissions made in an Issuer Free Writing Prospectus in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through the Representatives expressly for use therein;

(iv) The Registration Statement conforms, and the Prospectus and any further amendments or supplements to the Registration Statement and the Prospectus will conform, in all material respects to the requirements of the Act and the rules and regulations of the Commission thereunder and do not and will not, as of the applicable effective date as to each part of the Registration Statement and as of the applicable filing date as to the Prospectus and any amendment or supplement thereto, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through the Representatives expressly for use therein;

(v) A registration statement on Form F-6 (File No. 333-141820) in respect of the ADSs was filed with the Commission on July 11, 2005; such registration statement in the form heretofore delivered to you and, excluding exhibits, to you for each of the other Underwriters, has been declared effective by the Commission in such form; no other document with respect to such registration statement has heretofore been filed with the

3

Commission; no stop order suspending the effectiveness of such registration statement has been issued and no proceeding for that purpose has been initiated or, to the best of the Company's knowledge, threatened by the Commission (the various parts of such registration statement, including all exhibits thereto, each as amended at the time such part of the registration statement became effective, being hereinafter called the "ADS Registration Statement"); and the ADS Registration Statement when it became effective conformed, and any further amendments thereto will conform, in all material respects to the requirements of the Act and the rules and regulations of the Commission thereunder, and did not, as of the applicable effective date, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

        (vi) A registration statement on Form 8-A (File No. 000-51387) in respect of the registration of the Shares and the ADSs under the Exchange Act was filed with the Commission on June 28, 2005; such registration statement in the form heretofore delivered to you and, excluding exhibits, to you for each of the other Underwriters, was declared effective by the Commission in such form; no other document with respect to such registration statement has heretofore been filed with the Commission; no stop order suspending the effectiveness of such registration statement has been issued and no proceeding for that purpose has been initiated or, to the best of the Company's knowledge, threatened by the Commission (the various parts of such registration statement, including all exhibits thereto, each as amended at the time such part of the registration statement became effective, being hereinafter called the "Form 8-A Registration Statement"); and the Form 8-A Registration Statement when it became effective conformed, and any further amendments thereto, if any, will conform, in all material respects to the requirements of the Exchange Act and the rules and regulations of the Commission thereunder, and did not and will not, as of the applicable effective date, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through the Representatives expressly for use therein;

        (vii) The following entities constitute all of the entities held or controlled directly or indirectly by the Company (collectively referred to herein as the "Group Entities"): (A) (i) Focus Media (China) Holding Ltd, a Hong Kong company ("Focus Media Hong Kong"), (ii) Focus Media Technology (Shanghai) Co., Ltd., a PRC wholly-foreign owned enterprise ("Focus Media Technology"), (iii) New Focus Media Technology (Shanghai) Co., Ltd., a PRC wholly-foreign owned enterprise ("New Focus Media Technology"), (iv) Focus Media Digital Information Technology (Shanghai) Co., Ltd., a PRC company ("Focus Media Digital"), (v) Perfect Media Holding Ltd., Focus Media Dalian Holding Ltd, Focus Media Changsha Holding Ltd., Focus Media Qingdao Holding Ltd., Sorfari Holdings Limited, Focus Media Tianjin Limited, Capital Beyond Limited, Skyvantage Group Limited, Billion Honest Group Limited and Pinone Advertisement Co. Ltd. ("Pinone"), each a British Virgin Islands company (collectively, the "Company Subsidiaries"), (vi) Shanghai Focus Media Advertising Agency Co. Ltd. ("Focus Media Advertising Agency"), Shanghai New Perfect Media Advertisement Co., Ltd. ("New Perfect Media"), Shanghai New Focus Media Advertisement Co., Ltd. ("New Focus Media Advertisement"), Shenzhen E-Time Commercial Consulting Co. Ltd. ("Shenzhen E-Time") and Shanghai Focus Media Defeng Advertisement Co., Ltd. ("Focus Media Defeng"), each a PRC company, and (vii) Shanghai Focus Media Advertisement Co., Ltd., a PRC company ("Focus Media Advertisement"), its

4

branches in Beijing, Shenzhen, Guangzhou, Wenzhou, Suzhou, Wuxi, Mianyang and Maoming (collectively, the "Focus Media Advertisement Branches") and the other PRC subsidiaries of Focus Media Advertisement listed in Schedule IV hereto, excluding Focus Media Digital, New Focus Media Advertisement, New Structure Advertisement, Framedia Advertisement, Guangdong Framedia and Focus Media Wireless (collectively, the "Focus Media Advertisement Subsidiaries"), (B) (i) InfoAchieve Limited, a British Virgin Islands company ("InfoAchieve"), (ii) Shanghai Framedia Investment Consulting Co., Ltd., a PRC wholly-foreign owned enterprise ("Framedia Investment"), (iii) Shanghai New Structure Advertisement Co., Ltd. ("New Structure Advertisement") and Guangdong Shiji Shenghou Advertisement Co., Ltd. ("Guangdong Framedia"), each a PRC company, and (iv) Shanghai Framedia Advertisement Development Co., Ltd., a PRC company, ("Framedia Advertisement") and its branches in Beijing, Guangzhou, Shenzhen, Wuhan, Nanjing and Dongwan (collectively, the "Framedia Branches"), (C) (i) Target Media Holdings Limited, a Cayman Islands company ("Target Media Holdings"), (ii) Target Media Multi-Media Technology (Shanghai) Co., Ltd., a PRC wholly-foreign owned enterprise ("Target Multi-Media"), and (iii) Shanghai Target Media Co., Ltd., a PRC company ("Shanghai Target Media"), and its subsidiaries, branches and representative offices, (D) (i) Dotad Media Holdings Limited, a British Virgin Islands company ("Dotad Holdings"), (ii) Beijing Dotad Technology Co., Ltd. ("Dotad Technology") and (iii) Beijing Focus Media Wireless Co., Ltd. ("Focus Media Wireless"), and (E) (i) Appreciate Capital Ltd. ("ACL"), a British Virgin Islands company, (ii) Beijing Jingrongtian Technology Co., Ltd. ("Beijing ACL"), a PRC wholly-foreign owned enterprise, and (iii) Beijing Yangshi Sanwei Advertisement Co., Ltd. ("Beijing Sanwei") and Shenzhen Yangshi Sanwei Advertisement Co., Ltd. ("Shenzhen Sanwei"), each a PRC company. The Company and the Group Entities taken as a whole have not sustained since the date of the latest audited financial statements in the Pricing Prospectus any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Prospectus; and, since the respective dates as of which information is given in the Registration Statement and the Pricing Prospectus, there has not been any change in the share capital, short term debt or long term debt of the Company or any material adverse change or any development involving a prospective material adverse change in or affecting the general affairs, management, financial position, shareholders' equity or results of operations of the Company and the Group Entities taken as a whole otherwise than as set forth or contemplated in the Pricing Prospectus. Other than the Group Entities, no other subsidiary or entity affiliated with the Company or with the Controlling Person is or would be if owned or controlled by the Company a "Significant Subsidiary" as defined in Regulation S-X under the Act;

(viii) Neither the Company nor any of the Group Entities owns any real property and each of the Company and the Group Entities has good and marketable title to all personal property owned by it, in each case free and clear of all liens, encumbrances and defects except such as are described in the Pricing Prospectus or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by each of the Company and the Group Entities; and any real property and buildings held under lease by each of the Company and the Group Entities are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by each of the Company and the Group Entities;

5

(ix) The description and information in the Pricing Prospectus and the Prospectus regarding the distribution agreements is true and accurate in all material respects. Each of Focus Media Advertisement and Focus Media Defeng, and to the best knowledge of the Company, the other parties to the distribution agreements, has full power, authority and legal right to enter into, execute, adopt, assume, issue, deliver and perform their respective obligations under each of the distribution agreements to which they are a party, and has authorized, executed and delivered each of the distribution agreements to which they are a party, and such obligations constitute valid, legal and binding obligations enforceable against each of them in accordance with the terms of each of the distribution agreements. Focus Media Advertisement and Focus Media Defeng are the only Group Entities to have entered into any of the distribution agreements. Each of the distribution agreements is in proper legal form under PRC laws and regulations for the enforcement thereof against each of the parties thereto in the PRC without further action by any of them. The execution, delivery and performance of each of the distribution agreements by the parties thereto did not and will not (A) result in any violation of the business license, articles of association, other constitutional documents (if any) or permits of Focus Media Advertisement or Focus Media Defeng or, to the best knowledge of the Company, any of the other parties thereto; (B) result in any violation of or penalty under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC; or (C) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which Focus Media Advertisement or Focus Media Defeng is a party or by which Focus Media Advertisement or Focus Media Defeng is bound or to which any of its property or assets is subject, except, in the case of clauses (B) and (C), where any such conflict, breach, violation or default would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on or affecting the general affairs, management, business, financial position, shareholders' equity, results of operations or prospects of the Company and the Group Entities taken as a whole (a "Material Adverse Effect"). Each of the distribution agreements is in full force and effect and none of Focus Media Advertisement or Focus Media Defeng or, to the best knowledge of the Company, the other parties to any of the distribution agreements is in breach or default in the performance or observance of any of the terms or provisions of the distribution agreements, except where such breach or default would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. To the best knowledge of the Company, none of the parties to any of the distribution agreements has sent or received any communication regarding termination of, or intention not to perform its obligations under, any of the distribution agreements, and no such termination or non-performance has been threatened by any of the parties thereto;

(x) The description and information in the Pricing Prospectus and the Prospectus regarding the display and poster frame placement agreements (collectively, the "Placement Agreements") and the outdoor LED billboard lease agreement (the "LED Lease Agreement"), is true and accurate in all material respects. Each of the Group Entities, as applicable, and to the best knowledge of the Company, the other parties to the Placement Agreements, the LED Lease Agreement and the agreements with local branches of China Mobile Communications Corporation ("China Mobile") and China United Communications Corporation ("China Unicom") in connection with the mobile handset WAP-based advertising network (collectively, the "WAP Agreements") has full power, authority and legal right to enter into, execute, adopt, assume, issue, deliver and perform their respective obligations under each of the Placement Agreements, the LED Lease Agreement and the

WAP Agreements to which they are a party, and has authorized, executed and delivered each of the Placement Agreements, the LED Lease Agreement and the WAP Agreements to which they are a party, and such obligations constitute valid, legal and binding obligations enforceable against each of them in accordance with the terms of each of the Placement Agreements, the LED Lease Agreement and the WAP Agreements. Each of the Placement Agreements, the LED Lease Agreement and the WAP Agreements is in proper legal form under PRC laws and regulations for the enforcement thereof against each of the parties thereto in the PRC without further action by any of them. The execution, delivery and performance of each of the Placement Agreements, the LED Lease Agreement and the WAP Agreements by the parties thereto did not and will not (A) result in any violation of the business license, articles of association, other constitutional documents (if any) or permits of the Group Entities or, to the best knowledge of the Company, any of the other parties thereto; (B) result in any violation of or penalty under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC, including without limitation any applicable building or zoning ordinances, covenants, or restrictions; or (C) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which any of the Group Entities is a party or by which any of the Group Entities is bound or to which any of their property or assets is subject, except, in the case of clauses (B) and (C), where any such conflict, breach, violation or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of the Placement Agreements, the LED Lease Agreement and the WAP Agreements is in full force and effect and none of the Group Entities which are a party or, to the best knowledge of the Company, the other parties to any of the Placement Agreements, the LED Lease Agreement and the WAP Agreements is in breach or default in the performance or observance of any of the terms or provisions of the Placement Agreements, the LED Lease Agreement and the WAP Agreements, except where such breach or default would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. To the best knowledge of the Company, none of the parties to any of the Placement Agreements, the LED Lease Agreement and the WAP Agreements has sent or received any communication regarding termination of, or intention not to renew, any of the Placement Agreements, the LED Lease Agreement and the WAP Agreements, and no such termination or non-renewal has been threatened by any of the parties thereto, except where any such termination or non-renewal would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of Focus Media Advertisement, Focus Media Defeng, the Focus Media Advertisement Subsidiaries, and the Focus Media Advertisement Branches and the regional distributors has rights of access sufficient to install, replace, upgrade, inspect, maintain, monitor and repair the flat-panel television displays that are intended to be placed in the locations contemplated by each of the Placement Agreements to which it is a party. Each of Framedia Advertisement and the Framedia Branches and the regional distributors has rights of access sufficient to install, replace, upgrade, inspect, maintain, monitor and repair the advertising poster frames that are intended to be placed in the locations contemplated by each of the Placement Agreements to which it is a party, except where the lack of such rights would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. Focus Media Wireless operates a mobile handset WAP-based advertising service over China Mobile and China Unicom's mobile telecommunication networks. Focus Media Wireless may be required by the PRC regulatory authorities to obtain a value-added telecommunication service permit for its mobile handset WAP-based advertising service and it has applied for such permit. To the best knowledge of the Company, Yihukuan Media Co., Ltd. has rights of access sufficient to

7

install, replace, upgrade, inspect, maintain, monitor and repair the LED
billboards that are intended to be placed in the locations contemplated by the
LED Lease Agreement to which it is a party. Focus Media Advertisement, Focus
Media Defeng, the Focus Media Advertisement Subsidiaries, the Focus Media
Advertisement Branches, Framedia Advertisement, the Framedia Branches and the
regional distributors are the only Group Entities that have entered into any
Placement Agreements, New Focus Media Advertisement is the only Group Entity
that has entered into the LED Lease Agreement, and none of the Company or the
Company Subsidiaries is a party to any Placement Agreements or the LED Lease
Agreement;

    (xi) Each of the Company and the Group Entities has full power, authority
and legal right to enter into, execute, adopt, assume, issue, deliver and
perform their respective obligations under each of the contracts and agreements
referred to or described in, or filed as an exhibit to, the Registration
Statement to which it is a party (the "Disclosed Contracts"), and has
authorized, executed and delivered each of the Disclosed Contracts, and such
obligations constitute valid, legal and binding obligations enforceable against
each of them in accordance with the terms of each of the Disclosed Contracts.
Each of the Disclosed Contracts is in proper legal form under relevant laws for
the enforcement thereof against each of the parties thereto without further
action by any of them. The execution, delivery and performance of each of the
Disclosed Contracts by the parties thereto did not and will not (A) result in
any violation of the business license, articles of association, other
constitutional documents (if any) or permits of any of the parties thereto; (B)
result in any violation of or penalty under any laws, regulations, rules,
orders, decrees, guidelines, judicial interpretations, notices or other
legislation of the PRC or any other jurisdiction; or (C) conflict with or result
in a breach or violation of any of the terms or provisions of, or constitute a
default under, any other contract, license, indenture, mortgage, deed of trust,
loan agreement, note, lease or other agreement or instrument to which any of
them is a party or by which any of them is bound or to which any of their
property or assets is subject, except, in the case of clauses (B) and (C), where
any such conflict, breach, violation or default would not, individually or in
the aggregate, reasonably be expected to have a Material Adverse Effect. Each of
the Disclosed Contracts is in full force and effect and none of the parties to
any of the Disclosed Contracts is in breach or default in the performance or
observance of any of the terms or provisions of the Disclosed Contracts. Neither
the Company nor any of the Group Entities has sent or received any communication
regarding termination of, or intention not to renew, any of the Disclosed
Contracts, and no such termination or non-renewal has been threatened by the
Company or, to the best knowledge of the Company and the Controlling Person, any
other party to any Disclosed Contract;

    (xii) The Company has been duly organized and is validly existing as a
company in good standing under the laws of the Cayman Islands, with legal right,
power and authority (corporate and other) to own, lease and operate its
properties and conduct its business as described in the Pricing Prospectus and
the Prospectus, and has been duly qualified as a foreign corporation for the
transaction of business and is in good standing under the laws of each other
jurisdiction in which it owns or leases properties or conducts any business so
as to require such qualification, except where the failure to be so qualified in
any such jurisdiction would not, individually or in the aggregate, reasonably be
expected to have a Material Adverse Effect; and each of the Group Entities has
been duly organized and is validly existing in good standing under the laws of
its jurisdiction of organization, with legal right, power and authority
(corporate and other) to own, lease and operate its properties and conduct its
business as described in the Pricing Prospectus and the Prospectus, and has been

8

duly qualified as a foreign corporation for the transaction of business and is
in good standing under the laws of each other jurisdiction in which it owns or
leases properties or conducts any business so as to require such qualification,
or is subject to no material liability or disability by reason of the failure to
be so qualified in any such jurisdiction; and each of the business licenses and
articles of association of each of the Group Entities formed under the laws and
regulations of the PRC is in full force and effect under, and in compliance
with, PRC law;

(xiii) Except for Focus Media Hong Kong, none of the Group Entities owns or
leases properties or conducts any business outside of the PRC; none of the Group
Entities needs to be duly qualified as a foreign corporation for the transaction
of business under the laws of any jurisdiction in which it is not now so
qualified;

(xiv) Each of the Company and the Group Entities, as applicable, has the
legal right, power and authority (corporate and other) to enter into and perform
its obligations under each of the agreements which have been executed by the
parties thereto and are described in the Pricing Prospectus and the Prospectus
under the captions "Related Party Transactions – Agreements Among Us, Our
Subsidiaries, Our PRC Operating Affiliates and Their Shareholders and
Subsidiaries, "Related Party Transactions – Other Related Party Transactions"
and "Our Corporate Structure" in the Pricing Prospectus and the Prospectus and
filed as Exhibits 10.1 through 10.91 to the Registration Statement
(collectively, the "Structure Agreements") to which it is a party and has taken
all necessary corporate action to authorize the execution, delivery and
performance of, and has authorized, executed and delivered, each of the
Structure Agreements to which it is a party; and each of the Structure
Agreements to which each of the Company and the Group Entities, as applicable,
is a party constitutes a valid and legally binding obligation of each of them
enforceable in accordance with its terms, subject, as to enforceability, to
bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and
similar laws of general applicability relating to or affecting creditors' rights
and to general equity principles;

(xv) Each entity or PRC citizen that is a nominee shareholder of our PRC
Operating Affiliates (the "PRC Nominee Shareholders") has executed and delivered
each of the Structure Agreements to which he is a party; and each of the
Structure Agreements to which he is a party constitutes a valid and legally
binding obligation of each of them enforceable in accordance with its terms,
subject as to enforceability to bankruptcy, insolvency, reorganization and
similar laws of general applicability relating to or affecting creditors' rights
and to general equity principles;

(xvi) The execution and delivery by each of the Company and the Group
Entities of, and the performance by each of them of its respective obligations
under, each of the Structure Agreements to which it is a party and the
consummation by them of the transactions and the occurrence of the events
contemplated therein will not: (A) conflict with or result in a breach or
violation of any of the terms or provisions of, or constitute a default under,
any indenture, mortgage, deed of trust, loan agreement or other agreement or
instrument to which any of the Company and the Group Entities, as applicable, is
bound or to which any of their properties or assets is bound or subject, except
where any such conflict, breach, violation or default would not, individually or
in the aggregate, reasonably be expected to have a Material Adverse Effect; (B)
result in any violation of the provisions of the respective articles of
association, business license, other constitutional documents (if any) or
permits of any of the Company and the Group Entities; or (C) result in any
violation of or penalty under any laws, regulations, rules, orders, decrees,
guidelines, judicial interpretations, notices or other legislation of the PRC;

9

(xvii) The execution and delivery by each of PRC Nominee Shareholder of, and the performance by each of them of his or its obligations under, each of the Structure Agreements to which each of them is a party and the consummation by them of the transactions contemplated therein will not: (A) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which he or it is a party or by which he is bound or to which any of his properties or assets is bound or subject; or (B) result in any violation of or penalty under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC;

(xviii) Each of the Structure Agreements is in proper legal form under the laws and regulations of the PRC for the enforcement thereof against each of the parties thereto in the PRC without further action by any of them; and to ensure the legality, validity, enforceability or admissibility in evidence of each of the Structure Agreements in the PRC, it is not necessary that any such document be filed or recorded with any court or other authority in the PRC or that any stamp or similar tax be paid on or in respect of any of the Structure Agreements except as disclosed in the Pricing Prospectus and the Prospectus, which the Company undertakes to file with the relevant PRC government authorities upon the assignment of the pledged equity as the result of the exercise by the pledgees of the right described therein);

(xix) Except as disclosed in the Pricing Prospectus, the Company and each of the Group Entities has all necessary licenses, franchises, concessions, consents, authorizations, approvals, orders, certificates and permits of and from, and has made all declarations and filings with, all governmental agencies to own, lease, license and use its properties, assets and conduct its business in the manner described in the Pricing Prospectus except where the lack of such licenses, franchises, concessions, consents, authorizations, approvals, orders, certificates and permits would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and such licenses, consents, authorizations, approvals, orders, certificates or permits contain no materially burdensome restrictions or conditions not described in the Pricing Prospectus except where any such restrictions or conditions would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as described in the Pricing Prospectus, none of the Company or any of the Group Entities has any reason to believe that any regulatory body is considering modifying, suspending or revoking any such licenses, consents, authorizations, approvals, orders, certificates or permits and the Company and each of the Group Entities is in compliance with the provisions of all such licenses, consents, authorizations, approvals, orders, certificates or permits in all material respects;

(xx) Except as disclosed in the Pricing Prospectus, none of the Company or any of the Group Entities is (A) in violation of any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC; (B) in breach of or in default under any approval, consent, waiver, authorization, exemption, permission, endorsement or license granted by any court or governmental agency or body of any stock exchange authorities ("Governmental Agency") in the PRC; (C) in violation of its constituent documents, business license, articles of association or permits; or (D) in breach or default in the performance or observance of any obligation, agreement, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except, in the case of clauses (A), (B) and (D), where any such violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

10

(xxi) The Company has an authorized and paid-in capitalization as set forth in the Pricing Prospectus, and all of the issued shares of capital stock of the Company have been duly and validly authorized and issued, and are fully paid and non-assessable and conform to the description of the Ordinary Shares contained in the Pricing Prospectus; and all of the equity interests of each of the Group Entities has been duly and validly authorized and issued, and are fully paid and non-assessable; all of the share capital of each of Focus Media Hong Kong, InfoAchieve, Dotad Holdings, Allyes Information Technology and Pinone and 70% of the equity interest of ACL is owned by the Company, free and clear of all liens, encumbrances, equities or claims; all of the equity interest of each of Focus Media Technology and New Focus Media Technology is owned by Focus Media Hong Kong, free and clear of all liens, encumbrances, equities or claims; all of the equity interest of Framedia Investment is owned by InfoAchieve, free and clear of all liens, encumbrances, equities or claims; all of the equity interest of Dotad Technology is owned by Dotad Holdings, free and clear of all liens, encumbrances, equities or claims; all of the registered capital of Beijing ACL has been fully paid and all of the equity interest in Beijing ACL is owned by ACL, free and clear of all liens, encumbrances, equities or claims; all of the registered capital of Focus Media Digital has been fully paid and 90% of the equity interest of Focus Media Digital is owned by Focus Media Technology and 10% of the equity interest of Focus Media Digital is owned by Focus Media Advertisement, and except as described in the Pricing Prospectus under the caption "Related Party Transactions", such equity interest is owned by each of them free and clear of all liens, encumbrances, equities or claims; all of the registered capital of New Focus Media Advertisement has been fully paid and 90% of the equity interest of New Focus Media Advertisement is owned by Focus Media Digital and 10% of the equity interest of New Focus Media Advertisement is owned by Focus Media Advertisement, and except as described in the Pricing Prospectus under the caption "Related Party Transactions", such equity interest is owned by each of them free and clear of all liens, encumbrances, equities or claims; and all of the registered capital of Focus Media Defeng has been fully paid and 90% of the equity interest in Focus Media Defeng is owned by Focus Media Digital and 10% of the equity interest in Focus Media Defeng is owned by Focus Media Advertising Agency, such equity interest is owned by each of them free and clear of all liens, encumbrances, equities or claims. Focus Media Advertisement owns the equity interest of its Subsidiaries in the percentages set forth in Schedule IV hereto, free and clear of all liens, encumbrances, equities or claims, except as described in the Pricing Prospectus; each PRC Operating Affiliate is in each case wholly owned by two PRC Nominee Shareholders, each of which is either (i) a PRC citizen designated by us or (ii) a PRC entity wholly owned by our subsidiaries; there are no outstanding securities convertible into or exchangeable for, or warrants, rights or options to purchase from the Company, or obligations of the Company to issue, the Ordinary Shares or any other class of capital stock of the Company except as set forth in the Pricing Prospectus; the Shares may be freely deposited by the Company and the Selling Shareholders with Custodian for the Depositary against issuance of the ADSs; the ADSs, when issued and delivered against payment therefore, will be freely transferable by the Company and the Selling Shareholders to or for the account of the several Underwriters and (to the extent described in the Pricing Prospectus and the Prospectus) the initial purchasers thereof; and there are no restrictions on subsequent transfers of the ADSs under the laws of the Cayman Islands, the PRC or the United States except as described in the Pricing Prospectus under the captions "Description of Share Capital" and "Description of American Depositary Shares";

(xxii) The unissued Shares to be issued underlying the ADSs to be sold by the Company to the Underwriters hereunder have been duly and validly authorized and, when

11

issued and delivered against payment therefor as provided herein, will be duly and validly issued and fully paid and non-assessable and will conform in all material respects to the description of the Ordinary Shares contained in the Prospectus. Apart from the Ordinary Shares, there are no other classes or series of shares of capital stock (or securities convertible, exchangeable or exercisable for shares of capital stock) of the Company; except as disclosed in the Pricing Prospectus, there are no outstanding options, warrants, rights (including without limitation special voting rights, veto rights, minority shareholder or equity interest holder rights, preemptive rights or rights of first refusal), proxy or shareholder agreements, or contracts, agreements or understandings of any kind for the purchase or acquisition from the Company or any of the Group Entities of any of their shares, equity interests or other securities;

(xxiii) Except as disclosed in the Pricing Prospectus, there are no contracts, agreements or understandings between the Company and any person granting such person the right to require the Company to file a registration statement under the Act with respect to, or to list on any U.S. or non-U.S. securities exchange or inter-dealer quotation system, any securities of the Company owned or to be owned by such person or to require the Company to include such securities in the securities registered pursuant to the Registration Statement, the ADS Registration Statement or in any securities being registered pursuant to any other registration statement filed by the Company under the Act or being listed on any U.S. or non-U.S. securities exchange or inter-dealer quotation system;

(xxiv) This Agreement has been duly authorized, executed and delivered by the Company and the Controlling Person, and constitutes a valid and legally binding agreement of the Company and the Controlling Person, enforceable in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, reorganization and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(xxv) The Deposit Agreement has been duly authorized, executed and delivered by the Company and the Depositary, and constitutes a valid and legally binding agreement of the Company enforceable in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, reorganization and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; upon issuance by the Depositary of the ADSs and the deposit of Shares in respect thereof in accordance with the provisions of the Deposit Agreement, such ADSs will be duly and validly issued and the persons in whose names the ADSs are registered will be entitled to the rights specified therein and in the Deposit Agreement; and the Deposit Agreement and the ADSs conform in all material respects to the descriptions thereof contained in the Pricing Prospectus and Prospectus;

(xxvi) No consents, approvals, authorizations, orders, registrations, clearances or qualifications of or with any Governmental Agency having jurisdiction over the Company or any of the Group Entities or any of their respective properties or any stock exchange authorities (hereinafter referred to as "Governmental Authorizations") are required for the deposit of Shares, and the issuance of ADSs in respect thereof and for the execution and delivery by the Company of this Agreement to be duly and validly authorized except for the registration of the Shares and the ADSs under the Act, any filings required under Rule 424 under the Act, and such consents, approvals, authorizations, orders, registrations, clearances and qualifications as may be necessary under state securities or other blue sky laws;

(xxvii) Except as disclosed in the Pricing Prospectus, all dividends and other distributions declared and payable on the shares of capital stock of the Company and each

12

Overseas Subsidiary, PRC Subsidiary and PRC Operating Affiliate may under the current laws and regulations of its respective jurisdiction of incorporation, as applicable, be paid to their respective shareholders in foreign currency that may be converted, in the case of the Company, into U.S. dollars and, in the case of the PRC Subsidiaries and PRC Operating Affiliates, freely transferred out of the PRC, and except as disclosed in the Pricing Prospectus, all such dividends and other distributions will not be subject to withholding or other taxes under the laws and regulations of the PRC, the Cayman Islands, the British Virgin Islands or Hong Kong, as applicable, and are otherwise free and clear of any other tax, withholding or deduction in the its jurisdiction of incorporation, as applicable, and without the necessity of obtaining any Governmental Authorization in its jurisdiction of incorporation, as applicable;

(xxviii) The issue and sale of the Shares to be sold by the Company hereunder and the deposit of the Shares being deposited with the Depositary against issuance of the ADSs and the compliance by the Company with all of the provisions of this Agreement and the Deposit Agreement and the consummation of the transactions herein and therein contemplated will not (A) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of the Group Entities is a party or by which the Company or any of the Group Entities is bound or to which any of the property or assets of the Company or any of the Group Entities is subject, except where any such breach or violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; nor (B) will such action result in any violation of the provisions of the constituent documents of the Company or any of the Group Entities or any statute or any order, rule or regulation of any Governmental Agency having jurisdiction over the Company or any of the Group Entities or any of their properties or assets; and no consent, approval, authorization, order, registration or qualification of or with any such Governmental Agency is required for the issue and sale of the Shares or the ADSs, for the deposit of the Shares being deposited with the Depositary against issuance of the ADSs to be delivered or the consummation by the Company of the transactions contemplated by this Agreement and the Deposit Agreement, except (A) the registration under the Act of the Shares and the ADSs, (B) such Governmental Authorizations as have been duly obtained and are in full force and effect and copies of which have been furnished to you and (C) such Governmental Authorizations as may be required under state securities or blue sky laws or any laws of jurisdictions outside the Cayman Islands and the United States in connection with the purchase and distribution of the Shares and ADSs by or for the respective accounts of the Underwriters;

(xxix) The ADSs have been approved for listing on the National Association of Securities Dealers Automated Quotations Global Market System ("Nasdaq Global Market"), subject to official notice of issuance, and apart from the ADSs, the other American depositary shares representing ordinary shares of the Company are validly maintained for listing on the Nasdaq Global Market;

(xxx) None of the Company or any of the Group Entities is engaged in any trading activities involving commodity contracts or other trading contracts which are not currently traded on a securities or commodities exchange and for which the market value cannot be determined;

(xxxi) Except as set forth in the Pricing Prospectus, no stamp or other issuance or transfer taxes or duties and no capital gains, income, withholding or other taxes are payable by or on behalf of the Underwriters to the government of the Cayman Islands, or any political

13

subdivision or taxing authority thereof or therein, in connection with: (A) the deposit with the Depositary of the Shares by the Company against the issuance of the ADSs, (B) the sale and delivery by the Company of the Shares and the ADSs to or for the respective accounts of the several Underwriters or (C) the sale and delivery by the Underwriters of the Shares and the ADSs to the initial purchasers thereof;

(xxxii) None of the Underwriters will be deemed to be resident, domiciled, carrying on business or subject to taxation in the Cayman Islands solely by reason of its execution, delivery, performance or enforcement of, or the consummation of any transaction contemplated by, this Agreement, the Deposit Agreement or any other document furnished hereunder or thereunder;

(xxxiii) Neither the Company nor any of the Group Entities has taken, directly or indirectly, any action which was designed to or which has constituted or which might reasonably be expected to cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Shares and the ADSs;

(xxxiv) The statements set forth in the Pricing Prospectus and the Prospectus under the captions "Description of Share Capital" and "Description of American Depositary Shares", insofar as they purport to constitute a summary of the terms of the Ordinary Shares and the ADSs, respectively;

(xxxv) Except as set forth in the Pricing Prospectus, there are no legal, arbitration or governmental proceedings pending to which the Company or any of the Group Entities is a party or of which any property of the Company or any of the Group Entities is the subject (A) which, if determined adversely to the Company or any of the Group Entities, would individually or in the aggregate have a Material Adverse Effect; or (B) that are required to be described in the Registration Statement or the Prospectus and are not so described; and, to the best knowledge of the Company and the Controlling Person, no such proceedings are threatened or contemplated by any Governmental Agency or others;

(xxxvi) The statements set forth in the Pricing Prospectus and the Prospectus under the caption "Business - Legal Proceedings" are true, accurate and complete in all material respects;

(xxxvii) The Company is not and, after giving effect to the offering and sale of the Shares and the ADSs and the application of proceeds thereof, will not be an "investment company", as such term is defined in the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act");

(xxxviii) Each of this Agreement and the Deposit Agreement is in proper form to be enforceable in the Cayman Islands in accordance with its terms; to ensure the legality, validity, enforceability or admissibility into evidence in the Cayman Islands of this Agreement or the Deposit Agreement, it is not necessary that this Agreement or the Deposit Agreement be filed or recorded with any court or other authority in the Cayman Islands or that any stamp, documentary, registration, notary, excise or similar tax in the Cayman Islands be paid on or in respect of this Agreement, the Deposit Agreement or any other documents to be furnished hereunder;

(xxxix) The Registration Statement, the Prospectus and the ADS Registration Statement and the filing of the Registration Statement, the Prospectus and the ADS

14

Registration Statement with the Commission have been duly authorized by and on behalf of the Company, and the Registration Statement and the ADS Registration Statement have been duly executed pursuant to such authorization by and on behalf of the Company;

(xl) Except as disclosed in the Pricing Prospectus and the Prospectus, each of the Company and the Group Entities own, possess, license or have other rights to use the patents and patent applications, copyrights, trademarks, service marks, trade names, Internet domain names, technology, know-how (including trade secrets and other unpatented and/or unpatentable proprietary rights) and other intellectual property necessary or used in any material respect to conduct their business in the manner in which it is being conducted and in the manner in which it is contemplated as set forth in the Pricing Prospectus and the Prospectus (collectively, the "Intellectual Property"); to the knowledge of the Company, none of the material copyrights owned or licensed by the Company or any of the Group Entities is unenforceable or invalid; except as disclosed in the Pricing Prospectus, neither the Company nor any of the Group Entities has received any notice of violation or conflict with (and none of the Company or any of the Group Entities knows of any basis for violation or conflict with) rights of others with respect to the Intellectual Property that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; except as disclosed in the Pricing Prospectus, there are no pending or to the best of the Company's knowledge, threatened actions, suits, proceedings or claims by others that allege the Company or any of the Group Entities is infringing any patent, trade secret, trade mark, service mark, copyright or other intellectual property or proprietary right that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; and the discoveries, inventions, products or processes of the Company and the Group Entities referenced in the Pricing Prospectus and the Prospectus do not, to the best knowledge of the Company and the Controlling Person, violate or conflict with any intellectual property or proprietary right of any third person, or any discovery, invention, product or process that is the subject of a patent application filed by any third person; the Company and the Group Entities are not in breach of, and have complied in all material respects with all terms of, any license or other agreement relating to the Intellectual Property; to the extent the Intellectual Property is sublicensed to the Company or any of the Group Entities by a third party, such sublicensed rights shall continue in full force and effect if the principal third party license terminates for any reason; and there are no contracts or other documents material to the Intellectual Property other than those described in the Pricing Prospectus. All trademarks related to the brand name Focus Media are held by Focus Media Technology and validly licensed to the PRC Operating Subsidiaries under the caption "Related Party Transactions";

(xli) The Company was not for 2006, and does not expect to be for 2007, a Passive Foreign Investment Company ("PFIC") within the meaning of Section 1297(a) of the United States Internal Revenue Code of 1986, as amended, and does not expect to become a PFIC in the future;

(xlii) At the earliest time after the filing of the Registration Statement that the Company or another offering participant made a bona fide offer (within the meaning of Rule 164(h)(2) under the Act) of the Shares or the ADSs, the Company was not an "ineligible issuer" as defined in Rule 405 under the Act;

(xliii) Deloitte Touche Tohmatsu CPA Ltd., who have certified certain consolidated financial statements of the Company, are the independent public accountants of the Company as required by the Act and the Exchange Act and the rules and regulations of the Commission thereunder;

15

(xliv) The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles in the United States ("US GAAP"); (C) access to assets is permitted only in accordance with management's general or specific authorization; (D) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate actions are taken with respect to any differences; and (E) each of the Company and the Group Entities has made and kept books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of such entity and provide a sufficient basis for the preparation of financial statements in accordance with US GAAP;

(xlv) Except as disclosed in the Pricing Prospectus and the Prospectus, the Company maintains a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that complies with the requirements of the Exchange Act and has been designed by the Company's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Since the date of the latest audited financial statements in the Pricing Prospectus there has been no change in the Company's internal control over financial reporting, and, except as disclosed in the Pricing Prospectus, the Company's independent accountants have not notified the Company of any "significant deficiency" (as that term is defined under standards established by the Public Company Accounting Oversight Board (United States) in the Company's internal accounting controls, or other weaknesses or deficiencies in the design or operation of the Company's internal accounting controls, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting, or could adversely affect the Company's ability to record, process, summarize and report financial data consistent with the assertions of the Company's management in the financial statements. The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Exchange Act) that comply with the requirements of the Exchange Act, such disclosure controls and procedures have been designed to ensure that material information relating to the Company and the Group Entities is made known to the Company's principal executive officer and principal financial officer by others within those entities. Such disclosure controls and procedures are effective;

(xlvi) Except as set forth in the Pricing Prospectus, the Company has no obligation to provide retirement, death or disability benefits to any of the present or past employees of the Company or any of the Group Entities, or to any other person;

(xlvii) No material labor dispute, work stoppage, slow down, strike or other conflict with the employees of the Company or any of the Group Entities exists or, to the best knowledge of the Company and the Controlling Person, is threatened or contemplated;

(xlviii) The section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies" in the Pricing Prospectus and the Prospectus accurately and fully describes in all material respects: (A) accounting policies which the Company believes are the most important in the portrayal of the Company's financial condition and results of operations and which require management's most difficult, subjective or complex judgments ("Critical Accounting Policies"); (B)

16

judgments and uncertainties affecting the application of Critical Accounting Policies; and (C) the likelihood that materially different amounts would be reported under different conditions or using different assumptions; and the Company's board of directors and management have reviewed and agreed with the selection, application and disclosure of Critical Accounting Policies and have consulted with its legal advisers and independent accountants with regard to such disclosure; true and complete copies of all reports, letters or notices delivered to the Company by the Company's independent accountants regarding the Company's internal accounting controls have been delivered to the Representatives;

(xlix) Since the date of the latest audited financial statements in the Pricing Prospectus, none of the Company or any of the Group Entities has: (A) entered into or assumed any contract, (B) incurred or agreed to incur any liability (including any contingent liability) or other obligation, (C) acquired or disposed of or agreed to acquire or dispose of any business or any other asset or (D) assumed or acquired or agreed to assume or acquire any liabilities (including contingent liabilities) that would be material to the Company or the Group Entities, and that are not otherwise described in the Pricing Prospectus;

(l) The section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources" in the Pricing Prospectus and the Prospectus accurately and fully describes all material trends, demands, commitments, events, uncertainties and risks, and the potential effects thereof, that the Company believes would materially affect liquidity and are reasonably likely to occur; none of the Company nor any of the Group Entities is a party to or subject to, any off-balance sheet transactions, arrangements, and obligations, including, without limitation, relationships with unconsolidated entities that are contractually limited to narrow activities that facilitate the transfer of or access to assets by the Company or the Group Entities, such as structured finance entities and special purpose entities (collectively, "off-balance sheet arrangements");

(li) Except as set forth in the Pricing Prospectus, none of the Company or any of the Group Entities is engaged in any transactions that are material (or that would otherwise require disclosure pursuant to Item 404 of Regulation S-K under the Act) with its directors, officers, management, shareholders, or any other person, including persons formerly holding such positions, on terms that are not available from unrelated third parties on an arm's-length basis;

(lii) No holder of any of the Shares or the ADSs after the consummation of the transactions contemplated by this Agreement or the Deposit Agreement is or will be subject to any liability in respect of any liability of the Company by virtue only of its holding of any such Shares or ADSs; except as set forth in the Pricing Prospectus, there are no limitations on the rights of holders of the Shares or the ADSs to hold, vote or transfer their securities;

(liii) The audited and unaudited consolidated financial statements (and the notes and schedules thereto) of the Company, Alleys Information Technology Company Limited, InfoAchieve, and Target Media Holdings Limited and its subsidiaries in the Pricing Prospectus and the Prospectus (including without limitation interim financial statements) present fairly the consolidated financial position of the respective entities as of the dates specified and the consolidated results of operations and changes in consolidated financial position of the respective entities for the periods specified, and such financial statements have been prepared in conformity with US GAAP applied on a consistent basis throughout the periods presented (other than as described therein); and the summary and selected consolidated financial data and other unaudited financial information in the Pricing

17

Prospectus and the Prospectus (including without limitation unaudited yearly and interim financial statements and unaudited quarterly financial information in the Pricing Prospectus and the Prospectus) present fairly the information shown therein and have been compiled on a basis consistent with that of the audited consolidated financial statements included therein subject, in the case of unaudited interim financial information, to ordinary year-end adjustments consistent with past practice, and the assumptions used in preparing the pro forma financial statements in the Pricing Prospectus and the Prospectus as of the dates specified provide a reasonable basis for presenting the significant effects directly attributable to the transactions or events described therein, the related pro forma adjustments give appropriate effect to those assumptions, and the pro forma columns therein reflect the proper application of those adjustments to the corresponding historical financial statement amounts;

(liv) Under the laws of the Cayman Islands, each holder of ADSs issued pursuant to the Deposit Agreement shall be entitled, subject to the Deposit Agreement, to seek enforcement of its rights through the Depositary or its nominee registered as representative of the holders of the ADSs in a direct suit, action or proceeding against the Company;

(lv) Except as set forth in the Pricing Prospectus, or this Agreement, all amounts payable by the Company to the Underwriters hereunder or in respect of the ADSs or the underlying Shares shall be made free and clear of and without deduction for or on account of any taxes imposed, assessed or levied by the Cayman Islands or any authority thereof or therein (except such income taxes as may otherwise be imposed by the Cayman Islands on payments hereunder to any Underwriter whose net income is otherwise subject to tax or withholding by the Cayman Islands by virtue of its conducting any direct business in the Cayman Islands unrelated to any transaction contemplated hereunder with respect to any such income tax) nor are any taxes imposed in the Cayman Islands on, or by virtue of the execution or delivery of, such documents;

(lvi) Except where any conflict, breach, violation, failure or breach would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all returns, reports or filings which ought to have been made by or in respect of the Company and the Group Entities for all taxation purposes have been made and all such returns are up to date, true, correct and on a proper basis, and are not the subject of any dispute with the relevant revenue or other appropriate authorities; each of the Company and the Group Entities has paid all taxes required to be paid by them and any related assessments, charges, levies, fines or penalties; there is no tax deficiency, assessment, charge, levy, fine or penalty against the Company or the Group Entities as to which a reserve would be required to be established under US GAAP which has not been so reserved or which is required to be disclosed in the Pricing Prospectus and the Prospectus which has not been so disclosed and there are no facts or circumstances in existence which would be expected to give rise to any such deficiency, assessment, charge, levy, fine or penalty; all local and national PRC governmental tax holidays, exemptions, waivers, financial subsidies, and other local and national PRC tax relief, concessions and preferential treatment enjoyed by the Company or any of the Group Entities are valid, binding and enforceable and do not violate any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC; none of the Company or any of the Group Entities has received notice of any tax deficiency with respect to the Company or any of the Group Entities; and none of the Company, the Controlling Person or the Group Entities, to the best knowledge of the Company and the Controlling Person, is aware of any tax deficiency or representation of the facts on any tax return made by the Company or any of the Group Entities individually or

18

collectively that would be expected to be challenged or asserted against the Company or any of the Group Entities or any of their respective properties or assets other than which would not have a Material Adverse Effect;

(lvii) Each of Focus Media Digital, Focus Media Advertising Agency, New Perfect Media, and New Focus Media Advertisement is, and has since its inception been, in compliance with all requirements under all applicable PRC laws and regulations to qualify for their exemptions from enterprise income tax in 2004, 2005, 2006 and/or 2007 (the "Tax Exemptions") as described in the Pricing Prospectus and the Prospectus under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations - Taxation", and the actual operations and business activities of each of Focus Media Digital and Focus Media Advertising Agency are sufficient to meet the qualifications for their Tax Exemptions. No submissions made to any PRC government authority in connection with obtaining their Tax Exemptions contained any misstatement or omission that would have affected the granting of their Tax Exemptions. None of Focus Media Digital, Focus Media Advertising Agency, New Perfect Media or New Focus Media Advertisement has received notice of any deficiency in their respective applications for their Tax Exemptions, and neither the Company nor the Controlling Person is aware, to its or his best knowledge, is not aware of any reason why any of Focus Media Digital, Focus Media Advertising Agency, New Perfect Media or New Focus Media Advertisement might not qualify for, or be in compliance with the requirements for, their Tax Exemptions;

(lviii) The Company has provided you true, correct, and complete copies of all documentation pertaining to any extension of credit in the form of a personal loan made, directly or indirectly, by the Company or any of the Group Entities to any director or executive officer of the Company; and since December 31, 2006, except as disclosed in the Pricing Prospectus and the Prospectus under the caption "Related Party Transactions - Other Related Party Transactions - Loans to Shareholders of Our PRC Operating Affiliates", the Company has not, directly or indirectly, including through any of the Group Entities: (A) extended credit, arranged to extend credit, or renewed any extension of credit, in the form of a personal loan, to or for any director or executive officer of the Company, or to or for any family member or affiliate of any director or executive officer of the Company; or (B) made any material modification, including any renewal thereof, to any term of any personal loan to any director or executive officer of the Company, or any family member or affiliate of any director or executive officer, which loan was outstanding on December 31, 2006;

(lix) Any statistical or market-related data, or any other operating data or statistics provided by third parties in the Pricing Prospectus and the Prospectus are based on or derived from sources that the Company reasonably believes to be reliable and accurate, and the Company has obtained the written consent for the use of such data from such sources to the extent required; and all the operating data and statistics contained in the Pricing Prospectus and the Prospectus that are generated or supplied by the Company or members of its management are derived from the books and records of account of the Company, and the Company reasonably believes such operating data and statistics are true and accurate and such operating data and statistics fairly reflect the information presented;

(lx) There are no contracts, agreements or understandings between the Company and any person that would give rise to a claim against the Company or any Underwriter for a brokerage commission, finder's fee or other like payment in connection with the issuance and sale of the ADSs;

19

(lxi) The description and information in the Pricing Prospectus and the Prospectus under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations - Acquisitions" and "Our Recent Significant Acquisitions" regarding the acquisitions described therein (the "Acquisitions") is true and accurate in all material respects and nothing has been omitted from such description which would make the same misleading in any material respect. Each of the parties to any agreements entered into in connection with the Acquisitions (collectively, the "Acquisition Agreements") has full power, authority and legal right to enter into, execute, adopt, assume, issue, deliver and perform its respective obligations under each of the Acquisition Agreements to which they are a party, and has authorized, executed and delivered each of the Acquisition Agreements to which they are a party, and such obligations constitute valid, legal and binding obligations enforceable against each of them in accordance with the terms of each of the Acquisition Agreements. Each of the Acquisition Agreements is in proper legal form under relevant laws and regulations for the enforcement thereof against each of the parties thereto without further action by any of them. The execution, delivery and performance of each of the Acquisition Agreements by the parties thereto, and the consummation of the transactions contemplated thereunder (taken individually or together as a whole), did not and will not (A) result in any violation of the business license, articles of association, other constitutional documents (if any) or permits of any of the parties thereto; (B) result in any violation of or penalty under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC; or (C) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which any of them is a party or by which any of them is bound or to which any of their property or assets is subject, except, in the case of clauses (B) and (C), where any such breach, violation or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as described in the Pricing Prospectus, all of the parties to the Acquisition Agreements have fully performed all of their obligations under each of the Acquisition Agreements to which they are a party and all the transactions contemplated under each of the Acquisition Agreements have been consummated in accordance with the terms thereof, including without limitation registration with the relevant PRC governmental authorities necessary to make the Acquisitions effective under PRC laws and regulations. In each Acquisition involving the acquisition of entities located both in and outside of China, prior to the time each such Acquisition was contemplated, each of the related entities had in place legally binding and effective agreements (the "Control Agreements") sufficient for the entity located in China to be considered a "variable interest entity" of the entity located outside China as defined in FIN 46 issued by the Financial Accounting Standards Board in 2003, and the execution, delivery and performance of each of the Control Agreements by the parties thereto did not and will not (A) result in any violation of the business license, articles of association, other constitutional documents (if any) or permits of any of the parties thereto; (B) result in any violation of or penalty under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC; or (C) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which any of them is a party or by which any of them is bound or to which any of their property or assets is subject, except, in the case of clauses (B) and (C), where any such breach, violation or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. To the best knowledge of the Company and the Controlling Person, there is no reason that either the structure of the Acquisitions as

20

contemplated under the Acquisition Agreements or the structures contemplated under the Control Agreements, might be subject to challenge by the relevant PRC governmental authorities under any laws, regulations, rules, orders, decrees, guidelines, judicial interpretations, notices or other legislation of the PRC;

(lxii) Under the laws of the Cayman Islands, the courts of the Cayman Islands recognize and give effect to the choice of law provisions set forth in Section 18 hereof and enforce judgments of U.S. courts obtained against the Company to enforce this Agreement; subject to the conditions described under the caption "Enforcement of Civil Liabilities" in the Pricing Prospectus, under the laws and regulations of the PRC, the courts of the PRC recognize and give effect to the choice of law provisions set forth in Section 18 hereof and enforce judgments of U.S. courts obtained against the Company to enforce this Agreement provided that the judgment: (A) is not obtained by fraud; (B) is final and conclusive; (C) in the opinion of the relevant PRC court after the review of such judgment pursuant to international treaties concluded or acceded to by the PRC or in accordance with the Civil Procedure Law of the PRC, does not contradict the basic principles of PRC law; (D) in the opinion of the relevant PRC court after its review of such judgment pursuant to international treaties concluded or acceded to by the PRC or in accordance with the principle of reciprocity, or otherwise in accordance with the Civil Procedure Law of the PRC, does not violate state sovereignty, security or public interest and (E) is for a definite sum of money;

(lxiii) To the best of the Company's knowledge, none of the Company or any of the Group Entities, nor any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of the Group Entities, has used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to a political activity, made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or made or received any bribe, rebate, payoff, influence payment, kickback or other unlawful payment; or made or received any unlawful payment that is of a character required to be disclosed in the Registration Statement, the Pricing Prospectus or the Prospectus;

(lxxiii) Each PRC Nominee Shareholder that is a natural person is a citizen of the PRC, excluding Taiwan, The Hong Kong Special Administrative Region and The Macau Special Administrative Region, and no application is pending in any other jurisdiction by him or on his behalf for naturalization or citizenship;

(lxiv) The descriptions of the events and transactions set forth in the Pricing Prospectus and the Prospectus under the captions "Our Corporate Structure", "Related Party Transactions - Agreements Among Us, Our Wholly-Foreign Owned Subsidiaries, Our PRC Operating Affiliates and Their Subsidiaries and Shareholders" are true, accurate and complete in all material respects;

(lxv) All consents, approvals, authorizations, orders, registrations and qualifications, if any, required in connection with the Structure Agreements have been made or unconditionally obtained in writing, and no such consent, approval, authorization, order, registration or qualification has been withdrawn or is subject to any condition precedent which has not been fulfilled or performed;

(lxvi) None of the Company nor any of the Group Entities and the businesses or entities operated or owned by the Company and the Group Entities, nor any of their

21

respective officers, directors or senior management (as defined under Section F of Form 20-F), key management personnel (as defined under Item 7.B of Form 20-F), or, to the best knowledge of the Company, the Company's agents or employees, directly or indirectly, own any interest in any entity, or have entered into any transactions that may compete with the Company and the Group Entities or are otherwise involved in the businesses of the Company and the Group Entities as described in the Pricing Prospectus and the Prospectus, except for (i) ownership, directly or indirectly, by the Controlling Person of equity securities (or securities convertible or exchangeable into or exercisable for such equity securities) in Allyes Information Technology Company Limited solely for passive investment purposes, and (ii) ownership, directly or indirectly, by the unrelated third party minority equity interest holders (that are not nominee holders holding on behalf of any of the Group Entities) of the remaining equity interests of the Focus Media Advertisement Subsidiaries as described in the Pricing Prospectus under the caption "Our Corporate Structure", and for which the Company has no knowledge of any such persons or entities owning any direct or indirect interest in, or having any other involvement in, any business that competes with the Company or the Group Entities;

(lxvii) Each of the Company and the Group Entities are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which they are engaged; neither the Company nor any of the Group Entities has been refused any insurance coverage sought or applied for and neither the Company nor any of the Group Entities has any reason to believe that it will not be able to renew any existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue their respective businesses at a cost that would not have a Material Adverse Effect;

(lxviii) The Company is in full compliance with all applicable obligations and duties imposed on it by the United States Sarbanes-Oxley Act of 2002, and has timely made all required disclosures and filings required thereby with the Commission;

(lxix) There are no contracts, documents, arrangements or understandings that are required to be described in the Registration Statement, the ADS Registration Statement, the Pricing Prospectus or the Prospectus or to be filed as exhibits thereto that have not been so described and filed as required;

(lxx) The Company is, and upon giving effect to the offering and sale of the Shares and the ADSs will still be, a foreign private issuer within the meaning of Rule 405 under the Act;

(lxxi) Except as disclosed in the Pricing Prospectus, to the best knowledge of the Company and the Controlling Person after due inquiry, there are no affiliations or associations between any member of the FINRA and any of the officers or directors of the Company or the Group Entities, or holders of 5% or greater of the securities of the Company;

(lxxii) The (A) irrevocable submission of each of the Company and the Controlling Person to the jurisdiction of any state or federal court located in the Borough of Manhattan, The City of New York, New York (each a "New York Court"), (B) waiver by each of the Company of any objection to the venue of a proceeding in a New York Court, (C) waiver and agreement not to plead an inconvenient forum, (D) waiver of sovereign immunity, and (E) agreement of each of the Company that the Underwriting Agreement and the Deposit Agreement shall be construed in accordance with and governed by the laws of the State of

New York, in each case is legal, valid and binding under PRC law and will be respected by the government of the PRC and any political subdivision or authority thereof or therein; service of process duly effected in the manner set forth in the Underwriting Agreement and the Deposit Agreement will be effective, insofar as PRC law is concerned, to confer valid personal jurisdiction over each of the Company; and any judgment obtained in a New York Court arising out of or in relation to the obligations of each of the Company under the Underwriting Agreement and the Deposit Agreement will be recognized by the Government of the PRC and any political subdivision or authority thereof or therein subject to the conditions described under the caption "Enforceability of Civil Liabilities" in the Pricing Prospectus;

(lxxiii) Each of the Company and the Controlling Person has taken, or is in the process of taking, all reasonable steps to comply with, and to ensure compliance by all of the Company's shareholders, option holders, directors and officers who are PRC residents or PRC citizens with, any applicable rules and regulations of the State Administration of Foreign Exchange (the "SAFE Rules and Regulations"), including without limitation, requiring each shareholder, option holder, director and officer that is, or is directly or indirectly owned or controlled by, a PRC resident or PRC citizen to complete any registration and other procedures required under applicable SAFE Rules and Regulations, and to irrevocably authorize the Controlling Person in writing, in accordance with applicable SAFE Rules and Regulations, to handle any registrations and other procedures required under applicable SAFE Rules and Regulations on their behalf; and

(lxxiv) The application of the net proceeds from the offering of ADSs, as described in the Pricing Prospectus and the Prospectus, will not contravene any provision of any applicable laws or the constitutive documents of the Company or any of the Group Entities or contravene the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument binding upon the Company or any of the Group Entities or any Governmental Authorization applicable to the Company or any of the Group Entities.

(b) Each of the Selling Shareholders severally and not jointly represents and warrants to, and agrees with, each of the Underwriters that:

(i) Such Selling Shareholder that is not an individual has been duly organized, is validly existing, and is in good standing (where applicable), in its jurisdiction of organization;

(ii) No consents, approvals, authorizations, orders, registrations, clearances or qualifications of or with any Governmental Agency having jurisdiction over such Selling Shareholder or any of its respective properties or any stock exchange authorities are required for the deposit of the Shares being deposited with the Depositary by such Selling Shareholder against issuance of the ADSs to be delivered at the Time of Delivery (as defined in Section 4 hereof), for the sale and delivery of the ADSs to be sold by such Selling Shareholder hereunder and for the execution and delivery by such Selling Shareholder of this Agreement, the Power of Attorney (as defined below) and the Custody Agreement (as defined below), except for such consents, approvals, authorizations, orders, registrations, clearances or qualifications (A) as have been obtained or made prior to the date hereof and are in full force and effect, (B) required for the registration of the Shares under the Act, and any filings required under Rule 424 under the Act and (C) as may be required under any state securities or blue sky laws; and such Selling Shareholder has full legal right, power and authority

23

(corporate and other) to enter into and perform its obligations under this Agreement, the Power of Attorney and the Custody Agreement, and to sell, assign, transfer and deliver the ADSs to be sold by such Selling Shareholder hereunder;

(iii) The sale of the ADSs to be sold by such Selling Shareholder hereunder, the deposit of such Selling Shareholder's Shares with the Depositary against issuance of the ADSs to be delivered at the Time of Delivery and the compliance by such Selling Shareholder with all of the provisions of this Agreement, the Deposit Agreement, the Power of Attorney and the Custody Agreement and the consummation of the transactions herein and therein contemplated will not (A) conflict with or result in a breach or violation of any of the terms and provisions of, or constitute a default under, (i) the constituent documents of such Selling Shareholder if such Selling Shareholder is a legal entity, (ii) any bond, debenture, note or other evidence of indebtedness, lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which such Selling Shareholder is a party or by which such Selling Shareholder may be bound, or to which any of the property or assets of such Selling Shareholder is subject or (B) to such Selling Shareholder's knowledge after due inquiry, result in any violation of any law, order, rule, statute, regulation, writ, injunction, judgment or decree of any Governmental Agency or body, domestic or foreign, having jurisdiction over such Selling Shareholder or over the properties of such Selling Shareholder, except, with respect to clause A(ii), any such conflict, breach, violation or default as would not, individually or in the aggregate, materially impair with the consummation of any transaction contemplated hereunder or encumber or otherwise adversely affect the prospective rights of the Underwriters, and subsequent transferees, in and to the ADSs to be sold by such Selling Shareholder pursuant hereto;

(iv) Such Selling Shareholder has, and immediately prior to the Time of Delivery such Selling Shareholder will have, good and marketable title to the Shares to be represented by the ADSs to be sold by such Selling Shareholder hereunder, free and clear of all liens, encumbrances, equities or claims; and, upon delivery of the ADSs representing such Shares against payment therefor pursuant hereto, good and marketable title to such ADSs, free and clear of all liens, encumbrances, equities or claims, will pass to the several Underwriters;

(v) Such Selling Shareholder has duly authorized, executed and delivered, in the form heretofore furnished to the Underwriters, an irrevocable Power of Attorney (the "Power of Attorney") appointing one or more attorneys-in-fact (collectively, the "Attorneys" and individually, an "Attorney") and a custody agreement (the "Custody Agreement") between such Selling Shareholder and the Company, as the custodian (the "Custodian"); each of such Selling Shareholder's Power of Attorney and Custody Agreement constitutes a valid and binding obligation on the part of such Selling Shareholder, enforceable in accordance with its terms, subject as to enforceability to bankruptcy, insolvency, reorganization and similar laws of general applicability relating to or affecting creditors rights generally and to general principles of equity; and each of such Selling Shareholder's Attorneys, acting alone, is authorized to execute and deliver this Agreement and the certificate referred to in Section 8(s) hereof on behalf of such Selling Shareholder, to determine the purchase price to be paid by the several Underwriters to such Selling Shareholder as provided in Section 2 hereof, to authorize the delivery of the Selling Shareholder ADSs under this Agreement and to duly endorse (in blank or otherwise) a stock power with respect thereto, to accept payment therefor, and otherwise to act on behalf of such Selling Shareholder in connection with this Agreement;

24

(vi) A stock power duly endorsed in blank by such Selling Shareholder, has been placed in custody with the Custodian for the purpose of effecting delivery hereunder of such Selling Shareholder's Shares underlying the ADSs to be sold under this Agreement, subject to the terms of the Custody Agreement;

(vii) The Shares held in custody for such Selling Shareholder by the Custodian are subject to the interests of the Underwriters hereunder; the arrangements made by such Selling Shareholder for such custody are to that extent irrevocable; the obligations of such Selling Shareholder hereunder shall not be terminated by operation of law, whether by the death or incapacity of any individual Selling Shareholder or, in the case of an estate or trust, by the death or incapacity of any executor or trustee or the termination of such estate or trust, or in the case of a partnership or corporation, by the dissolution of such partnership or corporation or by the occurrence of any other event; and if any individual Selling Shareholder or any such executor or trustee should die or become incapacitated, or if any such estate or trust should be terminated, or if any such partnership or corporation should be dissolved, or if any other such event should occur, before the delivery of the Shares hereunder, the Shares shall be delivered by or on behalf of such Selling Shareholder in accordance with the terms and conditions of this Agreement and the Custody Agreement;

(viii) Neither such Selling Shareholder nor any of its affiliates over which such Selling Shareholder can exercise control, nor any person acting on its or their behalf has taken or will take, directly or indirectly, any action which is designed to or which has constituted or which might reasonably be expected to cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Shares or the ADSs;

(ix) To the extent that any statements or omissions made in the Registration Statement, any Preliminary Prospectus, the Pricing Prospectus, the Prospectus or any amendment or supplement thereto are made in reliance upon and in conformity with written information furnished to the Company and the Underwriters by such Selling Shareholder expressly for use therein, such Preliminary Prospectus, Pricing Prospectus and the Registration Statement did, and the Prospectus and any further amendments or supplements to the Registration Statement and the Prospectus, when they become effective or are filed with the Commission, as the case may be, do not and will not, as of the applicable effective date as to each part of the Registration Statement and any amendment thereto and as of the applicable filing date as to the Prospectus and any amendment or supplement thereto, contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made in the case of any Preliminary Prospectus, the Prospectus, the Pricing Prospectus or any Issuer Free Writing Prospectus or any amendment or supplement thereto, made, in reliance upon and in conformity with such written information furnished to the Company by such Selling Shareholder expressly for use therein, not misleading;

(x) The ADSs delivered at each Time of Delivery by such Selling Shareholder will be freely transferable by such Selling Shareholder to or for the respective accounts of the Underwriters and (to the extent described in the Prospectus) to the initial purchasers thereof; and there are no restrictions on subsequent transfers of the Shares or ADSs under the laws of the Cayman Islands, the PRC or the United States except as described in the Pricing Prospectus under the captions "Description of Share Capital" or "Description of American Depositary Shares";

25

(xi) Except as set forth in the Pricing Prospectus, no stamp or other issuance or transfer taxes or duties and no capital gains, income, withholding or other taxes are payable by or on behalf of the Underwriters to the government of the Cayman Islands, the British Virgin Islands, Hong Kong or the PRC, or any political subdivision or taxing authority thereof or therein, in connection with (A) the deposit with the Depositary of the Shares by such Selling Shareholder against the issuance of the ADSs to be delivered at each Time of Delivery, (B) the sale and delivery by such Selling Shareholder of the Shares and the ADSs to or for the respective accounts of the Underwriters, (C) the sale and delivery by the Underwriters of the Shares and the ADSs to the initial purchasers thereof or (D) this Agreement or any other documents to be furnished hereunder;

(xii) In order to document the Underwriters' compliance with the reporting and withholding provisions of the Tax Equity and Fiscal Responsibility Act of 1982 with respect to the transactions herein contemplated, such Selling Shareholder will deliver to you prior to or at the First Time of Delivery (as hereinafter defined) a properly completed and executed United States Treasury Department Form W-8BEN (or other applicable form or statement specified by Treasury Department regulations in lieu thereof);

(xiii) Except as described in the Pricing Prospectus, all amounts payable by such Selling Shareholder under this Agreement shall be made free and clear of and without deduction for or on account of any taxes imposed, assessed or levied by the Cayman Islands or the PRC or any authority thereof or therein (except such income taxes as may otherwise be imposed by the Cayman Islands or the PRC on payments hereunder to any Underwriter whose net income is otherwise subject to tax or withholding by the Cayman Islands or the PRC by virtue of its conducting any direct business in the Cayman Islands or the PRC unrelated to any transaction contemplated hereunder with respect to any such income tax) nor are any taxes imposed in the Cayman Islands or the PRC on, or by virtue of the execution or delivery of, such documents;

(xiv) This Agreement has been duly authorized, executed and delivered by such Selling Shareholder, and is enforceable against such Selling Shareholder in accordance with its terms; and to ensure the legality, validity, enforceability or admissibility into evidence in the Cayman Islands or the PRC of this Agreement, it is not necessary that this Agreement be filed or recorded with any court or other authority in the Cayman Islands or the PRC or that any stamp or similar tax in the Cayman Islands or the PRC be paid on or in respect of this Agreement or any other documents to be furnished hereunder;

(xv) Other than this Agreement, there are no contracts, agreements or understandings between such Selling Shareholder and any person that would give rise to a valid claim against such Selling Shareholder or any Underwriter for a brokerage commission, finder's fee or other like payment in connection with the offer and sale of the Shares and the ADSs to be sold by such Selling Shareholder;

(xvi) Each of the Selling Shareholders and/or its direct or indirect owners or controlling persons, that is a PRC resident or PRC citizen is in compliance with any applicable SAFE Rules and Regulations, including without limitation, having completed or being in the process of completing any registration and other procedures required under applicable SAFE Rules and Regulations, and irrevocably authorizing the Controlling Person in writing, in accordance with applicable SAFE Rules and Regulations, to handle any registrations and other procedures required under applicable SAFE Rules and Regulations on their behalf; and

26

(xvii) The (A) irrevocable submission of each of such Selling Shareholder to the jurisdiction of any New York Court, (B) waiver by such Selling Shareholder of any objection to the venue of a proceeding in a New York Court, (C) waiver and agreement not to plead an inconvenient forum, (D) waiver of sovereign immunity, and (E) agreement of such Selling Shareholder that the Underwriting Agreement and the Deposit Agreement shall be construed in accordance with and governed by the laws of the State of New York, in each case is legal, valid and binding under PRC law and will be respected by the government of the PRC and any political subdivision or authority thereof or therein; service of process duly effected in the manner set forth in the Underwriting Agreement and the Deposit Agreement will be effective, insofar as PRC law is concerned, to confer valid personal jurisdiction over such Selling Shareholder; and any judgment obtained in a New York Court arising out of or in relation to the obligations of such Selling Shareholder under the Underwriting Agreement and the Deposit Agreement will be recognized by the Government of the PRC and any political subdivision or authority thereof or therein subject to the conditions described under the caption "Enforceability of Civil Liabilities" in the Pricing Prospectus;

(xviii) Such Selling Shareholder is not prompted by any material, non-public information concerning the Company or its subsidiaries to sell its Shares pursuant to this Agreement.

2. Subject to the terms and conditions herein set forth, (a) the Company and each of the Selling Shareholders agree, severally and not jointly, to sell to each of the Underwriters, and each of the Underwriters agrees, severally and not jointly, to purchase from the Company and each of the Selling Shareholders, at a purchase price per ADS of US$[_____], the number of Firm ADSs (to be adjusted by you so as to eliminate fractional shares) determined by multiplying the aggregate number of Firm ADSs to be sold by the Company and each of the Selling Shareholders as set forth opposite their respective names in Schedule II hereto by a fraction, the numerator of which is the aggregate number of Firm ADSs to be purchased by such Underwriter as set forth opposite the name of such Underwriter in Schedule I hereto and the denominator of which is the aggregate number of Firm ADSs to be purchased by all of the Underwriters from the Company and all of the Selling Shareholders hereunder and (b) in the event and to the extent that the Underwriters shall exercise the election to purchase Optional ADSs as provided below, the Company agrees, to sell to each of the Underwriters, and each of the Underwriters agrees, severally and not jointly, to purchase from the Company, at the purchase price per ADS set forth in clause (a) of this Section 2, that portion of the number of Optional ADSs as to which such election shall have been exercised (to be adjusted by you so as to eliminate fractional shares), determined by multiplying such number of Optional ADSs by a fraction, the numerator of which is the maximum number of Optional ADSs which such Underwriter is entitled to purchase as set forth opposite the name of such Underwriter in Schedule I hereto and the denominator of which is the maximum number of Optional ADSs that all of the Underwriters are entitled to purchase hereunder.

The Company, as and to the extent indicated in Schedule II hereto, hereby grants to the Underwriters the right to purchase at their election up to 2,000,000 Optional ADSs, at the purchase price per ADS set forth in the paragraph above. Any such election to purchase Optional ADSs shall be made in accordance with a letter agreement among the Representatives and the Company setting forth the amount of Optional ADSs to be purchased by the Underwriters from the Company. Any such election to purchase Optional ADSs may be exercised only by written notice from you to the Attorneys, given within a period of 30 calendar days after the date of this Agreement and setting forth the aggregate number of Optional ADSs to be purchased and the date on which such Optional ADSs are to be

27

delivered, as determined by you but in no event earlier than the First Time of Delivery (as defined in Section 4 hereof) or, unless you, the Company and the Attorneys otherwise agree in writing, earlier than two or later than ten business days after the date of such notice.

3. Upon the authorization by you of the release of the Firm ADSs, the several Underwriters propose to offer the Firm ADSs for sale upon the terms and conditions set forth in the Prospectus.

4. (a) The ADSs to be purchased by each Underwriter hereunder, in definitive form, and in such authorized denominations and registered in such names as the Representatives may request upon at least forty-eight hours' notice to the Company and the relevant Selling Shareholders prior to a Time of Delivery (as defined below) (the "Notification Time"), shall be delivered by or on behalf of the Company and the Selling Shareholders to the Representatives through the facilities of The Depository Trust Company ("DTC"), for the account of such Underwriter, against payment by or on behalf of such Underwriter of the purchase price therefor by wire transfer of Federal (same-day) funds to the accounts specified by the Company and the Selling Shareholders to the Representatives at least forty-eight hours in advance of such Time of Delivery. The Company will cause the certificates representing the ADSs to be made available for checking at least twenty-four hours prior to the Time of Delivery (as defined below) with respect thereto at the office of DTC or its designated custodian (the "Designated Office").

The time and date of such delivery and payment shall be, with respect to the Firm ADSs, 9:30 a.m., Eastern Standard Time, on [_____], 2007 or such other time and date as the Representatives and the Company may agree upon in writing, and, with respect to the Optional ADSs, 9:30 a.m., Eastern Standard Time, on the date specified by the Representatives in the written notice given by the Representatives of the Underwriters' election to purchase such Optional ADSs, or such other time and date as the Representatives and the Attorneys may agree upon in writing. Such time and date for delivery of the Firm ADSs is herein called the "First Time of Delivery", such time and date for delivery of the Optional ADSs, if not the First Time of Delivery, is herein called the "Second Time of Delivery", and each such time and date for delivery is herein called a "Time of Delivery".

(b) The documents to be delivered at each Time of Delivery by or on behalf of the parties hereto pursuant to Section 8 hereof, including the cross-receipt for the ADSs and any additional documents requested by the Underwriters pursuant to Section 8(s) hereof, will be delivered at the offices of Debevoise & Plimpton LLP, 13/F Entertainment Building, 30 Queen's Road Central, Hong Kong S.A.R. (the "Closing Location"), and the ADSs will be delivered as specified in Section (a) above, all at such Time of Delivery. A meeting will be held at the Closing Location at 6 p.m., Hong Kong time, on the New York Business Day (as defined herein) next preceding such Time of Delivery, at which meeting the final drafts of the documents to be delivered pursuant to the preceding sentence will be available for review by the parties hereto. For the purposes of this Section 4, "New York Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

5. (a) The Company agrees with each of the Underwriters:

(i) To prepare the Prospectus in a form approved by you and to file such Prospectus pursuant to Rule 424(b) under the Act not later than the Commission's close of

28

business on the second business day following the execution and delivery of this Agreement; to make no further amendment or any supplement to the Registration Statement or the Prospectus prior to the Time of Delivery which shall be disapproved by you promptly after reasonable notice thereof; to advise you, promptly after it receives notice thereof, of the time when any amendment to the Registration Statement has been filed or becomes effective or any amendment or supplement to the Prospectus has been filed and to furnish you with copies thereof; to file promptly all materials required to be filed by the Company with the Commission pursuant to Rule 433(d) under the Act; to file promptly all reports required to be filed by the Company with the Commission pursuant to Section 13(a), 13(c), or 15(d) of the Exchange Act subsequent to the date of the Prospectus and for so long as the delivery of a prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) is required in connection with the offering or sale of the ADSs; to advise you, promptly after it receives notice thereof, of the issuance by the Commission of any stop order or of any order preventing or suspending the use of any Preliminary Prospectus or other prospectus in respect of the ADSs, of any notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) under the Act, of the suspension of the qualification of the ADSs for offering or sale in any jurisdiction, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; and, in the event of the issuance of any stop order or of any order preventing or suspending the use of any Preliminary Prospectus or other prospectus or suspending any such qualification, promptly to use its best efforts to obtain the withdrawal of such order; and in the event of any such issuance of a notice of objection, promptly to take such steps including, without limitation, amending the Registration Statement or filing a new registration statement, at its own expense, as may be necessary to permit offers and sales of the Shares and the ADSs by the Underwriters (references herein to the Registration Statement shall include any such amendment or new registration statement);

(ii) If required by Rule 430B(h) under the Act, to prepare a form of prospectus in a form approved by you and to file such form of prospectus pursuant to Rule 424(b) under the Act not later than may be required by Rule 424(b) under the Act; and to make no further amendment or supplement to such form of prospectus which shall be disapproved by you promptly after reasonable notice thereof;

(iii) Promptly from time to time to take such action as you may reasonably request to qualify the ADSs for offering and sale under the securities laws of such jurisdictions as you may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the ADSs; provided that in connection therewith the Company shall not be required to qualify as a foreign corporation or to file a general consent to service of process in any jurisdiction or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise subject;

(iv) Prior to 10:00 a.m., Eastern Standard Time, on the New York Business Day next succeeding the date of this Agreement and from time to time, to furnish the Underwriters with written and electronic copies of the Prospectus in New York City in such quantities as you may reasonably request, and, if the delivery of a prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) is required at any time prior to the expiration of nine months after the time of issue of the Prospectus in connection with the offering or sale of the ADSs and if at such time any events shall have occurred as a result of which the Prospectus as then amended or supplemented would include an untrue statement of a material fact or

29

omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) is delivered, not misleading, or, if for any other reason it shall be necessary during such same period to amend or supplement the Prospectus in order to comply with the Act or the Exchange Act, to notify you and upon your request to file such document and to prepare and furnish without charge to each Underwriter and to any dealer in securities as many written and electronic copies as you may from time to time reasonably request of an amended Prospectus or a supplement to the Prospectus which will correct such statement or omission or effect such compliance, and in case any Underwriter is required to deliver a Prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) in connection with sales of any of the ADSs at any time nine months or more after the time of issue of the Prospectus, upon your request but at the expense of such Underwriter, to prepare and deliver to such Underwriter as many written and electronic copies as you may request of an amended or supplemented Prospectus complying with Section 10(a)(3) of the Act;

(v) To make generally available to its security holders as soon as practicable, but in any event not later than eighteen months after the effective date of the Registration Statement (as defined in Rule 158(c) under the Act), a consolidated earnings statement of the Company and the Group Entities (which need not be audited) complying with Section 11(a) of the Act and the rules and regulations of the Commission thereunder (including, at the option of the Company, Rule 158);

(vi) To furnish to its shareholders within such time period required by the Exchange Act after the end of each fiscal year an annual report (in English) (including a consolidated balance sheet and consolidated statements of income, shareholders' equity and cash flows of the Company certified by independent public accountants and prepared in conformity with US GAAP and, as soon as practicable after the end of each of the first three quarters of each fiscal year prepared in accordance with US GAAP (beginning with the fiscal quarter ending after the effective date of the Registration Statement), to make available to its shareholders consolidated summary financial information of the Company and the Group Entities for such quarter in reasonable detail;

(vii) During a period of five years from the effective date of the Registration Statement, to furnish to you copies of all reports or other communications (financial or other) furnished to shareholders, and to deliver to you (A) as soon as they are available, copies of any reports and financial statements furnished to or filed with the Commission or any securities exchange on which any class of securities of the Company is listed; and (B) such additional information concerning the business and financial condition of the Company as you may from time to time reasonably request (such financial statements to be on a consolidated basis to the extent the accounts of the Company are consolidated in reports furnished to its shareholders generally or to the Commission), provided that this obligation will be deemed to have been satisfied where any such reports or communications have been publicly filed on EDGAR;

(viii) Not to (and to cause the Group Entities not to) take, directly or indirectly, any action which is designed to or which constitutes or which might reasonably be expected to cause or result in stabilization or manipulation of the price of any security of the Company or facilitate the sale or resale of the Shares and the ADSs;

(ix) To pay the required Commission filing fees relating to the Shares and ADSs within the time required by Rule 456(b)(1) under the Act and otherwise in accordance with Rules 456(b) and 457(r) under the Act;

(x) To use its best efforts to include and maintain for quotation the ADSs on the Nasdaq Global Market, and apart from the ADSs, to use best efforts to maintain for quotation the American depositary shares representing ordinary shares of the Company currently being traded on the Nasdaq Global Market;

(xi) To file with the Nasdaq Global Market all documents and notices required by the Nasdaq Global Market of companies that are traded on the Nasdaq Global Market and quotations for which are reported by the Nasdaq Global Market;

(xii) To file with the Commission such information on Form 20-F as may be required by Rule 463 under the Act;

(xiii) Upon request of any Underwriter, to furnish, or cause to be furnished, to such Underwriter an electronic version of the Company's trademarks, service marks and corporate logo for use on the website, if any, operated by such Underwriter for the purpose of facilitating the offering of the Shares (the "License"); provided, however, that the License shall be used solely for the purpose described above, is granted without any fee and may not be assigned or transferred;

(xiv) To indemnify and hold each Underwriter harmless against any documentary, stamp or similar issuance or transfer taxes, duties or fees and any transaction levies, commissions or brokerage charges, including any interest and penalties, which are or may be required to be paid in connection with the creation, allotment, issuance, offer and distribution of the Shares and ADSs to be sold by the Company and the execution and delivery of this Agreement and the Deposit Agreement;

(xv) The Company, during the period when any Prospectus is required to be delivered under the Act or the Exchange Act, will file all documents required to be filed with the Commission pursuant to the Act or the Exchange Act within the time periods required therein;

(xvi) Between the date hereof and the Time of Delivery (both dates inclusive), the Company will not, without the prior approval of the Representatives (such approval not to be unreasonably withheld), make any official announcement which would have an adverse effect on the marketability of the ADSs;

(xvii) The Company will take such steps as shall be necessary to ensure that, prior to the expiration of one year after the Time of Delivery, it shall not be required to be registered as an "investment company" under the Investment Company Act;

(xviii) The Company shall comply with the SAFE Rules and Regulations, and shall use best efforts to cause its directors, officers, option holders and shareholders that are, or that are directly or indirectly owned or controlled by, PRC residents or PRC citizens, to comply with the SAFE Rules and Regulations applicable to them in connection with the Company, including without limitation, requiring each shareholder, option holder, director and officer that is, or is directly or indirectly owned or controlled by, a PRC resident or PRC citizen to

31

complete any registration and other procedures required under applicable SAFE Rules and Regulations;

[(xix) In the event that any Selling Shareholder breaches its commitment to sell ADSs pursuant to the terms of this Underwriting Agreement, the Company will sell to the Underwriters additional ADSs in the same number as the ADSs committed to be sold by such Selling Shareholder pursuant the terms of this Underwriting Agreement but not sold by such Selling Shareholder;]

[(xx) During the period beginning from the date hereof and continuing to and including the date 90 days after the date of the Pricing Prospectus (the "Lock-up Period"), not to, without the prior permission of Merrill Lynch, Pierce, Fenner & Smith Incorporated, offer, sell, announce the intention to sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of, directly or indirectly, or cause the Company to file with the Commission a registration statement under the Act with respect to, (A) any ADSs or Ordinary Shares or any securities of the Company represented by the ADSs, or any securities of the Company substantially similar to the ADSs or Ordinary Shares, including but not limited to any options or warrants to purchase or any securities that are convertible into or exchangeable for, or that represent the right to receive, ADSs or Ordinary Shares or any such substantially similar securities; and (B) any shares or equity interests in the Company's subsidiaries or controlled affiliates or depositary shares or depositary receipts representing such shares or equity interests, including by not limited to securities that are convertible into or exchangeable for or that represent the right to receive such shares or equity interests or such depositary shares or receipts, or any such substantially similar securities, whether now owned or hereinafter acquired (of record, beneficially or otherwise, including as a custodian) (the securities covered by the foregoing clauses (A) and (B), collectively, are referred to as the "Lock-up Securities"; except that the foregoing restrictions shall not apply to (1) the ADSs and the Ordinary Shares underlying such ADSs, (2) the issuance of Ordinary Shares in connection with bona fide strategic acquisitions by the Company not to exceed 32.0 million Ordinary Shares in the aggregate, (3) grants of options pursuant to the Company's employee stock option plans, and (4) any Ordinary Shares to be issued by the Company upon the exercise of any options described in clause (3) above; provided however, that if (x) during the last 17 days of the Lock-up Period, the Company releases earnings results or announces material news or a material event or (y) prior to the expiration of the Lock-up Period, the Company announces that it will release earnings results during the 15-day period following the last day of the Lock-up Period, then in each case the Lock-up Period will be automatically extended until the expiration of the 18-day period beginning on the date of release of the earnings results or the announcement of the material news or material event, as applicable unless the Representative waives, in writing, such extension; and provided further that, if the Company issues ADSs pursuant to (2) above, the Lock-Up Period will be automatically extended until the expiration of the remainder of 90-day lock-up period. The Company will provide Merrill Lynch, Pierce, Fenner & Smith Incorporated and each holder of ADSs subject to the Lock-up Period with prior notice of any such announcement that gives rise to an extension of the Lock-up Period;]

(xxi) To use the net proceeds received by it from the sale of the ADSs pursuant to this Agreement in the manner specified in the Prospectus under the caption "Use of Proceeds"; and

(xxii) Prior to each Time of Delivery to deposit the Ordinary Shares with the Depositary in accordance with the provisions of the Deposit Agreement and otherwise to

32

comply with the Deposit Agreement so that the ADSs will be executed (and, if applicable, countersigned) and issued by the Depositary against receipt of such Ordinary Shares and delivered to the Underwriters at such Time of Delivery.

(b) Each of the Selling Shareholders agrees with each of the Underwriters:

(i) Prior to the Time of Delivery applicable to such Selling Shareholder, to deposit, or cause to be deposited on its behalf pursuant to the Custody Agreement, Ordinary Shares with the Depositary in accordance with the provisions of the Deposit Agreement and otherwise to comply with the Deposit Agreement so that the ADSs will be executed (and, if applicable, countersigned) and issued by the Depositary against receipt of such Ordinary Shares and delivered to the Underwriters at such Time of Delivery;

(ii) Not to (and to cause its affiliates over which it can exercise control not to) take, directly or indirectly, any action which is designed to or which constitutes or which might reasonably be expected to cause or result in stabilization or manipulation of the price of any security of the Company or facilitate the sale or resale of the Shares or the ADSs;

(iii) To deliver to the Representatives prior to or at the First Time of Delivery a properly completed and executed United States Treasury Department Form W-8BEN (or other applicable form or statement specified by the Treasury Department regulations in lieu thereof) in order to facilitate the Underwriters' documentation of their compliance with the reporting and withholding provisions of the Tax Equity and Fiscal Responsibility Act of 1982 with respect to the transactions herein contemplated;

(iv) To indemnify and hold each Underwriter harmless against any documentary, stamp or similar issuance or transfer taxes, duties or fees and any transaction levies, commissions or brokerage charges, including any interest and penalties, which are or may be required to be paid in connection with the creation, allotment, issuance, offer and distribution of the Shares and ADSs to be sold by such Selling Shareholder and the execution and delivery of this Agreement; provided, however, that such Selling Shareholder shall not be responsible for any such taxes, duties, fees, levies or charges that arise as a result of the distribution of the Shares and ADSs by any Underwriters in a manner other than that as is customary in such transactions or that relate to the ADSs to be sold by the other Selling Shareholders; and

(v) Each of the Selling Shareholders and/or its direct or indirect owners or controlling persons, that is a PRC resident or PRC citizen will use its best efforts to comply with any applicable SAFE Rules and Regulations, including without limitation, completing any registration and other procedures required under applicable SAFE Rules and Regulations, and irrevocably authorizing the Controlling Person in writing, in accordance with applicable SAFE Rules and Regulations, to handle any registrations and other procedures required under applicable SAFE Rules and Regulations on their behalf.

33

6. (a) The Company represents and agrees that, without the prior consent of each of the Representatives, it has not made and will not make any offer relating to the Shares and the ADSs that would constitute a "free writing prospectus" as defined in Rule 405 under the Act; each Selling Shareholder represents and agrees that, without the prior consent of each of the Representatives and the Company, it has not made and will not make any offer relating to the Shares and the ADSs that would constitute a "free writing prospectus"; each Underwriter represents and agrees that, without the prior consent of the Company and each of the Representatives, it has not made and will not make any offer relating to the Shares and the ADSs that would constitute a free writing prospectus required to be filed by the Company with the Commission; any such free writing prospectus the use of which has been consented to by the Company and each of the Representatives is listed on Schedule III(a) hereto;

(b) The Company has complied and will comply with the requirements of Rule 433 under the Act applicable to any Issuer Free Writing Prospectus, including timely filing with the Commission or retention where required and legending; the Company represents that it has satisfied and agrees that it will satisfy the conditions under Rule 433 under the Act to avoid a requirement to file with the Commission any electronic road show;

(c) The Company agrees that if at any time following issuance of an Issuer Free Writing Prospectus any event occurred or occurs as a result of which such Issuer Free Writing Prospectus would conflict with the information in the Registration Statement, the Pricing Prospectus or the Prospectus or would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances then prevailing, not misleading, the Company will give prompt notice thereof to each of the Representatives and, if requested by any of the Representatives, will prepare and furnish without charge to each Underwriter an Issuer Free Writing Prospectus or other document which will correct such conflict, statement or omission; provided, however, that this representation and warranty shall not apply to any statements or omissions in an Issuer Free Writing Prospectus made in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through the Representatives expressly for use therein.

7. (a) The Company covenants and agrees with the several Underwriters that (A) the Company will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's accountants and U.S., PRC, Cayman Islands, British Virgin Islands, Hong Kong and other legal counsel of the Company in connection with the registration of the Shares and the ADSs under the Act; (ii) all expenses and taxes arising as a result of the deposit by the Company and each of the Selling Shareholders of the Shares with the Depositary and the issuance and delivery of the ADSs in exchange therefor by the Depositary, of the sale and delivery of the ADSs and the Shares by the Company and the Selling Shareholders to or for the account of the Underwriters and of the sale and delivery of the ADSs and the Shares by the Underwriters to each other and to the initial purchasers thereof in the manner contemplated under this Agreement, including, in any such case, any Cayman Islands income, capital gains, withholding, transfer or other tax asserted against an Underwriter by reason of the purchase and sale of an ADS or a Share pursuant to this Agreement; (iii) the fees and expenses (including fees and disbursements of counsel), if any, of the Depositary and any custodian appointed under the Deposit Agreement, other than the fees and expenses to be paid by holders of ADSs (other than the Underwriters in connection with the initial purchase of ADSs); and (B) each Selling Shareholder will pay or cause to be paid at the Time of Delivery applicable to such Selling Shareholder all costs and expenses incident to the performance of such Selling Shareholder's obligations hereunder which are

34

not otherwise specifically provided for in this Section, including (1) the fees, expenses and disbursements of counsel for such Selling Shareholders and (2) all expenses and taxes incident to the sale and delivery of the ADSs and the Shares to be sold by such Selling Shareholder hereunder.

(b) The Underwriters covenant and agree with the Company that the Underwriters will pay or cause to be paid (as described in further detail below) the following: (A)(i) the fees, disbursements and expenses of the Underwriters' U.S. and PRC legal counsels and other advisors in connection with the registration of the Shares and the ADSs under the Act and all other expenses in connection with the preparation, printing, reproduction and filing of the Registration Statement, the ADS Registration Statement, any Preliminary Prospectus, any Issuer Free Writing Prospectus and the Prospectus and amendments and supplements to any of the foregoing and the mailing and delivering of copies thereof to the dealers; (ii) the cost of printing or producing any Agreement among Underwriters, this Agreement, the Deposit Agreement, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the ADSs; (iii) subject to the provisions of paragraph (B) above, all expenses in connection with the qualification of the shares and the ADSs for offering and sale under state securities laws as provided in Section 5 hereof, including the fees and disbursements of counsel for the Underwriters in connection with such qualification and in connection with any blue sky survey; (iv) all fees and expenses in connection with applying to include the ADSs for quotation on the Nasdaq Global Market; and (v) the road show expenses, including travel, accommodation and meal expenses, incurred by the Company's management and other staff, and expenses for organized luncheons and investor meetings during the road show; (B) the Underwriters will pay or cause to be paid: (i) the fees and expenses of the Authorized Agent (as defined in Section 16 hereof); (ii) the cost and charges of any transfer agent or registrar; (iii) all other costs and expenses incident to the performance of the Company's obligations hereunder which are not otherwise specifically provided for in this Section (including the fees in relation to the Financial Industry Regulatory Authority filing); and (iv) all stamp duty, documentary, registration, excise, notary or other taxes imposed on any of the Underwriters by virtue of the execution, delivery, performance or enforcement of this Agreement, the Deposit Agreement or any other document furnished hereunder or thereunder (other than any income or withholding taxes imposed by a taxing jurisdiction by virtue of such Underwriter conducting direct business in such taxing jurisdiction unrelated to any transaction contemplated hereunder).

8. The obligations of the Underwriters hereunder, (i) as to the Firm ADSs to be delivered at the First Time of Delivery, shall be subject, in their discretion, to the condition that all representations and warranties and other statements of the Company, the Controlling Person, and the Selling Shareholders herein are, at and as of such Time of Delivery, true and correct, and the condition that the Company and the Selling Shareholders shall have performed all of its and their respective obligations hereunder theretofore to be performed, and (ii) as to the Optional ADSs to be delivered at a Time of Delivery, shall be subject, in their discretion, to the condition that all representations and warranties and other statements of the Company and the Controlling Person herein are, at and as of such Time of Delivery, true and correct, and the condition that the Company shall have performed all of its obligations hereunder theretofore to be performed, and the following additional conditions:

(a) The Prospectus shall have been filed with the Commission pursuant to Rule 424(b) under the Act within the applicable time period prescribed for such filing by the rules

35

and regulations under the Act and in accordance with Section 5(a) hereof; all material required to be filed by the Company pursuant to Rule 433(d) under the Act shall have been filed with the Commission within the applicable time period prescribed for such filings by Rule 433 under the Act; no stop order suspending the effectiveness of the Registration Statement or any part thereof shall have been issued and no proceeding for that purpose shall have been initiated or threatened by the Commission and no notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) under the Act shall have been received; no stop order suspending or preventing the use of the Prospectus or any Issuer Free Writing Prospectus shall have been initiated or threatened by the Commission; and all requests for additional information on the part of the Commission shall have been complied with to your reasonable satisfaction;

(b) Debevoise & Plimpton LLP, United States counsel for the Underwriters, shall have furnished to you such written opinion or opinions, dated such Time of Delivery, in form and substance satisfactory to you, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters;

(c) Commerce & Finance Law Offices, PRC counsel for the Underwriters, shall have furnished to you such written opinion or opinions, dated such Time of Delivery, in form and substance satisfactory to you, with respect to the matters covered in paragraphs (i) through (iv) and (vi) through (xviii) of subsection (e) below (but limited to the Structure Agreements) as well as such other related matters as you may reasonably request, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters;

(d) Simpson Thacher & Bartlett LLP, United States counsel for the Company, shall have furnished to you their written opinion, dated such Time of Delivery, in form and substance satisfactory to you, to the effect that:

(i) This Agreement has been duly executed and delivered by the Company and by the Controlling Person in accordance with the law of the State of New York;

(ii) The Deposit Agreement has been duly executed and delivered by the Company in accordance with the law of the State of New York and, assuming that the Deposit Agreement is the valid and legally binding obligation of the Depositary, constitutes a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms;

(iii) Assuming due authorization, execution, issuance and delivery by the Depositary of the ADSs against the deposit of the Shares in accordance with the provisions of the Deposit Agreement and payment therefor in accordance with this Agreement, such ADSs will be duly and validly issued, and persons in whose names such ADSs are registered will be entitled to the rights specified therein and in the Deposit Agreement;

(iv) Assuming the validity of such actions under Cayman Islands law, under the law of the State of New York relating to personal jurisdiction, each of the Company and the Controlling Person has, pursuant to this Agreement, validly and irrevocably submitted to the personal jurisdiction of the New York State or U.S. federal courts located in the Borough of Manhattan, The City of New York, New York in any action arising out of or relating to this Agreement, has, to the extent permitted by applicable law, validly and irrevocably waived any objection to the venue of a proceeding in any such court, and has validly and irrevocably

appointed CT Corporation System, currently located at 111 Eighth Avenue, New York, New York 10011, as its authorized service of process agent for the purposes described in this Agreement, and service of process effected on such agent will be effective to confer in the manner set forth in this Agreement and will be effective to confer valid personal jurisdiction over the Company, the Controlling Person and the Selling Shareholders;

(v) Assuming the validity of such actions under Cayman Islands law, under the law of the State of New York relating to personal jurisdiction, the Company has, pursuant to the Deposit Agreement, validly and irrevocably submitted to the personal jurisdiction of the New York State or U.S. federal courts located in the Borough of Manhattan, The City of New York, New York in any action or proceeding arising out of or relating to the Deposit Agreement, and has validly and irrevocably appointed CT Corporation System, currently located at 111 Eighth Avenue, New York, New York 10011, as its authorized service of process agent for the purposes described in the Deposit Agreement; and service of process effected in the manner set forth in Section 7.6 of the Deposit Agreement will be effective to confer valid personal jurisdiction over the Company in connection with any such action or proceeding;

(vi) The statements made in the Pricing Prospectus under the caption "Description of American Depositary Shares", insofar as they purport to constitute summaries of certain provisions of the ADSs and the Deposit Agreement, constitute accurate summaries of such provisions in all material respects;

(vii) The statements made in the Pricing Prospectus under the caption "Taxation – United States Federal Income Taxation", insofar as they purport to constitute summaries of matters of U.S. federal tax law and regulations or legal conclusions with respect thereto, constitute accurate summaries of the matters described therein in all material respects;

(viii) The statements made in the Prospectus under the caption "Underwriting", insofar as they purport to constitute summaries of certain provisions of the Underwriting Agreement, constitute accurate summaries of such provisions in all material respects;

(ix) The issuance by the Company of the Shares to be represented by the ADSs, deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the execution, delivery and performance by the Company of the Deposit Agreement, this Agreement and the Custody Agreements will not (A) violate, breach, or result in a default under, any agreement or other instrument governed by the law of the State of New York of the Company or any of the subsidiaries that has been filed as an exhibit to the Registration Statement, or (B) violate any U.S. federal or New York state statute or any rule or regulation that has been issued pursuant to any such U.S. federal or New York state statute or, to our knowledge, any order of any U.S. federal or New York state governmental agency or body having jurisdiction over the Company;

(x) The deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the execution, delivery and performance by the Controlling Person of this Agreement will not violate any U.S. federal or New York state statute or any rule or regulation that has been issued pursuant to any such U.S. federal or New York state statute or, to our knowledge, any order of any U.S. federal or New York state governmental agency or body having jurisdiction over the Controlling Person;

37

(xi) No consent, approval, authorization, order, registration or qualification of or with any U.S. federal or New York governmental agency or body, or to our knowledge, any U.S. federal or New York court is required for the issuance by the Company of the Shares to be represented by the ADSs, the deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the compliance by the Company with the provisions of the Deposit Agreement and this Agreement, except for the registration under the Act and the Exchange Act of the Shares and the ADSs, and such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the ADSs by the Underwriters;

(xii) No consent, approval, authorization, order, registration or qualification of or with any U.S. federal or New York governmental agency or body, or to our knowledge, any U.S. federal or New York court is required for the deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the compliance by the Controlling Person with the provisions of this Agreement, except for the registration under the Act and the Exchange Act of the Shares and the ADSs, and such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the ADSs by the Underwriters;

(xiii) The Registration Statement has become effective under the Act; the Prospectus was filed pursuant to Rule 424(b) of the rules and regulations of the Commission under the Act; and, to our knowledge, no stop order suspending the effectiveness of the Registration Statement has been issued or proceeding for that purpose has been instituted or threatened by the Commission;

(xiv) The Company is not an "investment company" within the meaning of, and subject to regulation under, the U.S. Investment Company Act of 1940, as amended;

(xv) The Registration Statement, the Pricing Prospectus and any further amendments and supplements thereto, as applicable, made by the Company prior to such Time of Delivery (other than the financial statements, related schedules therein or other financial data, as to which such counsel need express no opinion) comply as to form in all material respects with the requirements of the Act and/or the Exchange Act, as applicable, and the rules and regulations thereunder; although such counsel does not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement, the Pricing Prospectus or the Prospectus, except for those referred to in the opinion in subsections (viii) to (x) of this Section 8(d), nothing has come to such counsel's attention that causes such counsel to believe that (a) the Registration Statement, or the ADS Registration Statement, as of their respective effective or filing dates, or any further amendment thereto made by the Company prior to such Time of Delivery, as of the effective or filing date of any such amendment, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading; (b) the Pricing Prospectus, as of the Applicable Time, when considered together with the number of shares and price to the public set forth on the cover page of the supplement to the Pricing Prospectus, as of the Applicable Time, contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or (c) as of its date or as of such Time of Delivery, the Prospectus, or any further amendment or supplement thereto made by the Company prior to such Time of Delivery contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the

circumstances under which they were made, not misleading, except that such counsel need not express any belief in any of clauses (a), (b) or (c) above with respect to the financial statements, financial statement schedules or other financial data contained in or omitted from the Registration Statement, the Pricing Prospectus or the Prospectus.

In rendering such opinion, such counsel may state that they express no opinion as to the laws of any jurisdiction outside the United States;

(e) Global Law Office, PRC counsel for the Company and the Selling Shareholders, shall have furnished to you such written opinion or opinions, dated such Time of Delivery, in form and substance satisfactory to you, to the effect that:

(i) Each of Focus Media Technology, New Focus Media Technology, Framedia Investment, Dotad Technology and Beijing ACL (collectively, the "PRC WOFEs") has been duly organized and is validly existing as a wholly foreign owned enterprise with legal person status and limited liability under all applicable laws, regulations, rules, orders, decrees, guidelines, judicial interpretations and other legislation of the PRC, including tax laws and regulations, in effect as of the date of this Agreement (collectively "PRC Law") and its business license and articles of association are in full force and effect under, and in compliance with PRC Law. All of the registered capital of each of Focus Media Technology, New Focus Media Technology, Framedia Investment, Dotad Technology and Beijing ACL has been fully paid. All the equity interest of each of Focus Media Technology and New Focus Media Technology is owned by Focus Media Hong Kong, and all the equity interest of Framedia Investment and Dotad Technology is owned by InfoAchieve and Dotad Holdings, respectively, in each case, to the best of such counsel's knowledge after due inquiry, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or other third party right (collectively, "Encumbrances"). All of equity interest of Beijing ACL is owned by ACL to the best of such counsel's knowledge after due inquiry, free and clear of any Encumbrance;

(ii) Each of Focus Media Advertisement, Focus Media Advertising Agency, Focus Media Digital, the Focus Media Advertisement Subsidiaries, New Perfect Media, New Focus Media Advertisement, Framedia Advertisement, New Structure Advertisement, Guangdong Framedia, Shenzhen E-Time, Focus Media Wireless, Beijing ACL, Focus Media Defeng, Shanghai Sanwei and Shenzhen Sanwei (collectively and together with the PRC WOFEs, the "PRC Group Entities"), has been duly organized and is validly existing as a limited liability company under PRC Law and its business license and articles of association are in full force and effect under, and in compliance with, PRC Law. All of the registered capital of Focus Media Advertisement has been fully paid; 85% of the equity interest of Focus Media Advertisement is owned by Jason Nanchun Jiang and 15% of the equity interest of Focus Media Advertisement is owned by Jimmy Wei Yu, in each case, to the best of such counsel's knowledge after due inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time. Each of Jason Nanchun Jiang and Jimmy Wei Yu is a PRC citizen. All of the registered capital of each of Framedia Advertisement, New Structure Advertisement, Guangdong Framedia and Focus Media Wireless has been fully paid; 90% of the equity interest of each of Framedia Advertisement, New Structure Advertisement, Guangdong Framedia and Focus Media Wireless is owned by Focus Media Advertisement and 10% of the equity interest of each of Framedia Advertisement, New Structure Advertisement, Guangdong Framedia and Focus Media Wireless is owned by Focus Media Advertising Agency, in each case, to the best of such counsel's knowledge after due

39

inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time. Each of the Focus Media Advertisement Branches and Framedia Branches has been duly established and is validly existing with its business license in full force and effect under PRC Law. All of the registered capital of Focus Media Advertising Agency has been fully paid and 90% of the equity interest of Focus Media Advertising Agency is owned by Focus Media Advertisement and 10% of the equity interest of Focus Media Advertising Agency is owned by Jimmy Wei Yu, in each case, to the best of such counsel's knowledge after due inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time. All of the registered capital of each of Focus Media Digital and New Focus Media Advertisement has been fully paid, 90% of the equity interest of Focus Media Digital is owned by Focus Media Technology and 10% of the equity interest of Focus Media Digital is owned by Focus Media Advertisement, and 90% of the equity interest of New Focus Media Advertisement is owned by Focus Media Digital and 10% of the equity interest of New Focus Media Advertisement is owned by Focus Media Advertisement, in each case, to the best of such counsel's knowledge after due inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time. All of the registered capital of each of the Focus Media Advertisement Subsidiaries has been fully paid, and all the equity interests in the Focus Media Advertisement Subsidiaries are owned by Focus Media Advertisement in the percentages set forth in Schedule IV hereto as of the Applicable Time and, to the best of such counsel's knowledge after due inquiry, such equity interests are owned by Focus Media Advertisement free and clear of any Encumbrances, except as described in the Pricing Prospectus as of the Applicable Time. All of the registered capital of Shenzhen E-Time has been fully paid; 70% of the equity interest of Shenzhen E-Time is owned by JJ Media Investment Holding Limited and 30% of the equity interest of Shenzhen E-Time is owned by Jimmy Wei Yu, in each case, to the best of such counsel's knowledge after due inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time. All of the registered capital of Focus Media Defeng has been fully paid, 90% of the equity interest of Focus Media Defeng is owned by Focus Media Digital and 10% of the equity interest of Focus Media Defeng is owned by Focus Media Advertising Agency, in each case, to the best of our knowledge after due inquiry, free and clear of any Encumbrances except as described in the Pricing Prospectus as of the Applicable Time;

(iii) Except as described in the Pricing Prospectus as of the Applicable Time, each of the PRC Group Entities has full legal right, authority, power and all necessary approvals, consents, waivers, sanctions, certificates, authorizations, filings, disclosures, registrations, exemptions, permissions, endorsements, annual inspections, qualifications, permits and licenses required by any court, tribunal or any other judicial or arbitral body in the PRC, or any body exercising, or entitled to exercise, any administrative, judicial, legislative, police, regulatory, or taxing authority or power of similar nature in the PRC ("Approvals") pursuant to any PRC Law to own, sell, lease license and use its properties and assets and conduct its business in the manner described in the Pricing Prospectus as of the Applicable Time, none of the approvals contains any materially burdensome restrictions or conditions not described in the Pricing Prospectus as of the Applicable Time, and each of the PRC Group Entities is in compliance with the provisions of such Approvals in all material respects. Except as described in the Pricing Prospectus as of the Applicable Time, such counsel is not aware, after due inquiry, of anything that will cause such counsel to reasonably believe that any national, provincial or local governmental, regulatory or administrative authority, agency or commission in the PRC, or any court, tribunal or any other judicial or arbitral body in the PRC, or any body exercising, or entitled to exercise, any administrative, judicial, legislative,

police, regulatory, or taxing authority or power of similar nature in the PRC ("PRC Authorities") are considering modifying, suspending, revoking or not renewing any such Approvals;

(iv) Except as described in the Pricing Prospectus as of the Applicable Time, to the best of such counsel's knowledge after due inquiry, none of the PRC Group Entities is (A) in violation of any PRC Law; (B) in violation of its business license, articles of association, other constitutional documents (if any) or Approvals; (C) in breach or default in the performance or observance of any of the terms or provisions of the Acquisition Agreements, distribution agreements and Structure Agreements (collectively, the "Covered Agreements") to which it is a party; or (D) apart from the Covered Agreements to which it is a party, in breach or default in the performance or observance of any of the terms or provisions of any contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except for such violation, breach or default under clauses (A) and (D) which would not, individually or in the aggregate, have a Material Adverse Effect on the general affairs, management, shareholders' equity, results of operations or position, financial or otherwise, of the PRC Group Entities;

(v) In the course of such counsel's representation of the Company, nothing has come to such counsel's attention that would lead such counsel to reasonably believe (A) that the description of the Placement Agreements, the LED Lease Agreement and the WAP Agreements in the Pricing Prospectus is not true, complete and accurate in all material respects, or (B) that any of the Placement Agreements, the LED Lease Agreement or the WAP Agreements would be unenforceable under PRC Law, provided that the Underwriters understand that such counsel's opinion in this paragraph is based solely on such counsel's review of what such counsel believes, based upon such counsel's due inquiry with the Company, is a representative sample of the Placement Agreements and that such counsel has not performed any comprehensive review of all of the Placement Agreements;

(vi) Each of the PRC Group Entities and PRC Nominee Shareholders has full power, authority and legal right to enter into, execute, adopt, assume, issue, deliver and perform their respective obligations under each of the Covered Agreements to which it or he is a party, and has authorized, executed and delivered each of the Covered Agreements to which it or he is a party, and such obligations constitute valid, legal and binding obligations enforceable against each of them in accordance with the terms of each of the Covered Agreements, except as described in the Pricing Prospectus as of the Applicable Time. Each of the Covered Agreements that is governed by PRC Law is in proper legal form under PRC Law for the enforcement thereof against each of the PRC Group Entities and PRC Nominee Shareholders, as the case may be, in the PRC without further action by any of them;

(vii) The execution, delivery and performance of each of the Covered Agreements by the parties thereto, and the consummation of the transactions contemplated thereunder, will not (A) result in any violation of the business license, articles of association, other constitutional documents (if any) or Approvals of any of the PRC Group Entities; (B) result in any violation of or penalty under any PRC Law; or (C) to the best of such counsel's knowledge after due inquiry conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which any of them is a party or by which any of them is bound or to which any of their property or assets is subject, except for such violation, breach or default under clauses (B) and (C) which would

41

not, individually or in the aggregate, have a Material Adverse Effect on the general affairs, management, shareholders' equity, results of operations or position, financial or otherwise, of the PRC Group Entities;

(viii) The description of the corporate structure of the PRC Group Entities and the Covered Agreements set forth in the Pricing Prospectus under the captions "Our Corporate Structure" and "Related Party Transactions - Agreements Among Us, Our Wholly-Foreign Owned Subsidiaries, Our PRC Operating Affiliates, Their Shareholders and Subsidiaries" are true and accurate in all material respects and nothing has been omitted from such description which would make the same misleading in any materials respect. No Approvals are required under any PRC Law in connection with the Covered Agreements or the performance of the terms thereof (except for the filing of the trademark license agreement and approval and filing requirements under the call option agreements and equity pledge agreements described in the Pricing Prospectus under the caption "Related Party Transactions"), and no stamp duty or similar tax is required to be paid in connection with the Covered Agreements;

(ix) None of the PRC Group Entities is entitled to any immunity from any legal proceedings or process or from enforcement, execution or attachment in respect of their obligations in the transactions contemplated under any of the Covered Agreements;

(x) Except as described in the Pricing Prospectus as of the Applicable Time, to the best of such counsel's knowledge after due inquiry, there are no legal, arbitration or governmental proceedings pending, threatened or contemplated in the PRC by or against any of the PRC Group Entities, or to which the property of any of them may be subject, which, if determined adversely against any of the PRC Group Entities, would individually or in the aggregate have a Material Adverse Effect on the PRC Group Entities;

(xi) The statements in the Pricing Prospectus under the captions "Summary", "Risk Factors", "Our Corporate Structure", Management's Discussion and Analysis of Financial Condition and Results of Operations", "Industry", "Business", Our Recent Significant Acquisitions", "Regulation of Our Industry", "Management", "Related Party Transactions", "Taxation" and "Enforcement of Civil Liabilities", to the extent such statements relate to matters of PRC Law or legal conclusions with respect thereto, are true and accurate in all material respects, and nothing has been omitted from such statements which would make the same misleading in any material respect;

(xii) The choice of PRC Law as the governing law in any of the Covered Agreements that by their terms are governed by PRC Law is a valid choice of governing law and will be binding on the parties to the relevant Covered Agreement;

(xiii) Except as disclosed in the Pricing Prospectus as of the Applicable Time, all dividends declared and payable upon the equity interests in each of Focus Media Technology, Framedia Investment, Dotad Technology and Beijing ACL may under PRC Law be paid to Focus Media Hong Kong, InfoAchieve, Dotad Holdings and ACL, respectively, in Renminbi that may be converted into U.S. dollars and freely transferred out of the PRC, and all such dividends are not and, except as disclosed in the Pricing Prospectus as of the Applicable Time, will not be subject to withholding or other taxes under PRC Law and, except as disclosed in the Pricing Prospectus as of the Applicable Time, are otherwise free and clear of any other tax, withholding or deduction in the PRC, and without the necessity of obtaining any authorization from PRC Authorities;

42

(xiv) No stamp or other issuance or transfer taxes or duties and no capital gains, income, withholding or other taxes are payable by or on behalf of the Underwriters to the government of the PRC and any political subdivision or authority thereof or therein in connection with (A) the deposit with the Depositary of Shares against the issuance of the ADSs, (B) the sale and delivery by the Company and the Selling Shareholders of the ADSs and the Shares to or for the respective accounts of the Underwriters or (C) the sale and delivery outside PRC by the Underwriters of the ADSs and the Shares to the initial purchasers thereof in the manner contemplated herein;

(xv) The Underwriters will not be deemed to be resident, domiciled, carrying on business or subject to taxation in the PRC solely by reason of its execution, delivery, performance or enforcement of, or the consummation of any transaction contemplated by, this Agreement, the Deposit Agreement or any other document furnished hereunder or thereunder;

(xvi) The (A) irrevocable submission of each of the Company and the Selling Shareholders to the jurisdiction of any New York Court, (B) waiver by each of the Company and the Selling Shareholders of any objection to the venue of a proceeding in a New York Court, (C) waiver and agreement not to plead an inconvenient forum, (D) waiver of sovereign immunity, and (E) agreement of each of the Company and the Selling Shareholders that the Underwriting Agreement and the Deposit Agreement shall be construed in accordance with and governed by the laws of the State of New York, in each case is legal, valid and binding under PRC Law and will be respected by the government of the PRC and any political subdivision or authority thereof or therein; service of process duly effected in the manner set forth in the Underwriting Agreement and the Deposit Agreement will be effective, insofar as PRC Law is concerned, to confer valid personal jurisdiction over each of the Company and the Selling Shareholders; and any judgment obtained in a New York Court arising out of or in relation to the obligations of each of the Company and the Selling Shareholders under the Underwriting Agreement and the Deposit Agreement will be recognized by the government of the PRC and any political subdivision or authority thereof or therein subject to the conditions described under the caption "Enforceability of Civil Liabilities" in the Pricing Prospectus;

(xvii) The indemnification and contribution provisions set forth in Section 9 hereof and Section 5.8 of the Deposit Agreement do not contravene PRC Law;

(xviii) The (A) issue and sale of the Shares and the ADSs being delivered at the Time of Delivery, (B) deposit of the Shares with the Depositary against issuance of the ADSs to be delivered at such Time of Delivery, (C) compliance by the Company with all of the provisions of the Underwriting Agreement and the Deposit Agreement, (D) compliance by each of the Selling Shareholders with all of the provisions of the Underwriting Agreement, and (E) consummation of the transactions contemplated under the Underwriting Agreement, in each case will not (i) result in any violation of or penalty under any PRC Law, or (ii) result in any violation or breach of the business license, articles of association or other constitutional or organizational documents of the PRC Group Entities, or (iii) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which any of the PRC Group Entities is a party or by which any of the PRC Group Entities is bound or to which any of the property or assets of any of the PRC Group Entities is subject, except for such violation, breach or default under clauses (i) and (iii) which would not, individually or in the aggregate, have a material adverse effect on

the general affairs, management, shareholders' equity, results of operations or position, financial or otherwise, of the PRC Group Entities and which would not prevent the transactions in clauses (A), (B), (C), (D) and (E) of this paragraph from occurring;

(xix) Except as disclosed in the Pricing Prospectus as of the Applicable Time, no approval is required for the issue and sale of the Shares and the ADSs, the deposit of the Shares with the Depositary against issuance of the ADSs to be delivered at such Time of Delivery or the consummation of the transactions contemplated by the Underwriting Agreement and the Deposit Agreement; and

(xx) Although they do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement, the Pricing Prospectus as of the Applicable Time or the Prospectus (except as otherwise specifically stated in opinion (viii) and opinion (xi) above), they have no reason to believe (A) that, as of its effective date, the Registration Statement or any further amendment thereto made by the Company prior to such Time of Delivery (other than the financial statements and related schedules therein, as to which such counsel need express no opinion) contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading; (B) that the Pricing Prospectus, as of the Applicable Time (other than the financial statements and related schedules therein, as to which such counsel need express no opinion), contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; (C) that, as of its date, the Prospectus or any further amendment or supplement thereto made by the Company prior to such Time of Delivery (other than the financial statements and related schedules therein, as to which such counsel need express no opinion) contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; (D) that, as of such Time of Delivery, the Registration Statement, or any further amendment thereto made by the Company prior to such Time of Delivery (other than the financial statements and related schedules therein, as to which such counsel need express no opinion), contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading; or (E) that, as of such Time of Delivery, the Prospectus or any further amendment or supplement thereto made by the Company prior to such Time of Delivery (other than the financial statements and related schedules therein, as to which such counsel need express no opinion) contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(f) Conyers Dill & Pearman, Cayman Islands and British Virgin Islands counsel for the Company and each of the Selling Shareholders that is an entity formed under the laws of either the Cayman Islands or the British Virgin Islands (the "Covered Selling Shareholders"), shall have furnished to you their written opinion, dated such Time of Delivery, in form and substance satisfactory to you, to the effect that:

(i) The Company has been duly organized and is validly existing as a company in good standing under the laws of the Cayman Islands with legal right, power and authority (corporate and other) to own its properties and conduct its business as described in the Prospectus;

44

(ii) The Company has an authorized capitalization as set forth in the Prospectus, and all of the issued shares of capital stock of the Company (including the Shares being delivered at such Time of Delivery) have been duly and validly authorized and issued and are fully paid and non-assessable; the holders of outstanding shares of capital stock of the Company are not entitled to pre-emptive or other rights to acquire the ADSs to be deposited by the Company and the Selling Shareholders or to be purchased from the Company and the Selling Shareholders under this Agreement which have not been complied with; the Shares to be deposited by the Company and the Selling Shareholders may be freely deposited with the Depositary against issuance of the ADSs; the ADSs and the Shares to be sold by the Company and the Selling Shareholders are freely transferable to or for the account of the several Underwriters in the manner contemplated herein;

(iii) Each of InfoAchieve, Dotad Holdings, Pinone and ACL has been duly organized and is validly existing as a company in good standing under the laws of the British Virgin Islands with legal right, power and authority (corporate and other) to own its properties and conduct its business as described in the Prospectus; based solely on a review of a certified true copy of the register of members of each of InfoAchieve, Dotad, Pinone and ACL and a certified true copy of the register of mortgages and charges of the Company, all of the issued shares of each of InfoAchieve, Dotad, Pinone and ACL have been duly and validly authorized and issued, are fully paid and non-assessable and are owned by the Company free and clear of any Encumbrances;

(iv) Each of the Covered Selling Shareholders that is a company, partnership or other business entity has been duly organized and is validly existing in good standing in either the Cayman Islands or in the British Virgin Islands, as applicable;

(v) To the best of such counsel's knowledge, after having conducted a search of the register of writs and other originating processes, and except as set forth in the Prospectus, there are no legal, arbitration or governmental proceedings pending to which the Company or any of the Covered Selling Shareholders is a party or of which any property of the Company or any of the Covered Selling Shareholders is the subject which, if determined adversely to the Company or any of the Covered Selling Shareholders, would individually or in the aggregate have a Material Adverse Effect on the current or future consolidated financial position, shareholders' equity or results of operations of the Company and the Group Entities or on the ability of the Covered Selling Shareholders to convey good and marketable title to the Shares and ADSs held by them free and clear of any liens, encumbrances, equities or claims; and, to the best of such counsel's knowledge, no such proceedings are threatened or contemplated by any Governmental Agency or by others;

(vi) This Agreement has been duly authorized, executed and delivered by the Company and by an Attorney on behalf of each of the Covered Selling Shareholders and constitutes a valid and legally binding agreement of the Company and the Covered Selling Shareholders enforceable in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, reorganization and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(vii) Each of the Power of Attorney and the Custody Agreement has been duly authorized, executed and delivered by the Company and the Covered Selling Shareholders and constitutes a valid and legally binding obligation of the Company and the Covered Selling Shareholders enforceable in accordance with its terms, subject as to enforceability, to

45

bankruptcy, insolvency, reorganization and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(viii) Each of this Agreement, the Deposit Agreement and the Custody Agreement is in proper form to be enforceable in the Cayman Islands in accordance with its terms; to ensure the legality, validity, enforceability or admissibility into evidence in the Cayman Islands of this Agreement, the Deposit Agreement or the Custody Agreement, it is not necessary that this Agreement, the Deposit Agreement or the Custody Agreement be filed or recorded with any court or other authority in the Cayman Islands or that any stamp or similar tax in the Cayman Islands be paid on or in respect of this Agreement, the Deposit Agreement, the Custody Agreement or any other documents to be furnished hereunder or thereunder;

(ix) The issue and sale of the Shares and the ADSs being delivered at such Time of Delivery and the deposit of the Shares with the Depositary against issuance of the ADSs to be delivered at such Time of Delivery and the compliance by the Company with all of the provisions of this Agreement, and the Deposit Agreement and the consummation of the transactions herein and therein contemplated will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument known to such counsel to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company is subject, nor will such action result in any violation of the provisions of the constituent documents of the Company or any statute or any order, rule or regulation known to such counsel of any Governmental Agency having jurisdiction over the Company or its respective properties;

(x) The sale of the ADSs to be sold by the Covered Selling Shareholders hereunder and the compliance by the Covered Selling Shareholders with all of the provisions of this Agreement and the consummation of the transactions herein contemplated will not conflict with or result in a breach or violation of any terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument known to such counsel to which a Covered Selling Shareholder is a party or by which a Covered Selling Shareholder is bound, or to which any of the property or assets of a Covered Selling Shareholder is subject, nor will such action result in any violation of the provisions of the constituent documents of a Covered Selling Shareholder or any order, rule or regulation known to such counsel of any court or governmental agency or body having jurisdiction over a Covered Selling Shareholder or the property of a Covered Selling Shareholder;

(xi) No Governmental Authorization of or with any Governmental Agency in the Cayman Islands is required for the issue and sale of the Shares and the ADSs, the deposit of the Shares with the Depositary against issuance of the ADSs to be delivered at the Time of Delivery or the consummation of the transactions contemplated by this Agreement and the Deposit Agreement;

(xii) Immediately prior to such Time of Delivery, each Covered Selling Shareholder had good and marketable title to the ADSs to be sold at such Time of Delivery by such Covered Selling Shareholder under this Agreement, free and clear of all liens, encumbrances, equities or claims, and legal right, power and authority (corporate and other) to sell, assign, transfer and deliver the ADSs to be sold by such Covered Selling Shareholder hereunder and thereunder; and, upon delivery of the ADSs representing such Shares and

46

payment therefore pursuant to this Agreement, good and marketable title to such ADSs, free and clear of all liens, encumbrances, equities or claims, will pass to the several Underwriters;

(xiii) The statements set forth in the Prospectus under the caption "Description of Share Capital", insofar as they purport to constitute a summary of the terms of the Ordinary Shares are accurate, complete and fair;

(xiv) The opinions of such counsel set forth in the Prospectus under the caption "Taxation - Cayman Islands Taxation" are confirmed as of such Time of Delivery;

(xv) No stamp or other issuance or transfer taxes or duties and no capital gains, income, withholding or other taxes are payable by or on behalf of the Underwriters to the Cayman Islands or to any political subdivision or taxing authority thereof or therein in connection with (A) the deposit with the Depositary of Shares by the Company and the Covered Selling Shareholders against the issuance of the ADSs, (B) the sale and delivery by the Company and each Covered Selling Shareholder of the ADSs and the Shares to or for the respective accounts of the Underwriters or (C) the sale and delivery outside the Cayman Islands by the Underwriters of the ADSs and the Shares to the initial purchasers thereof in the manner contemplated herein;

(xvi) The Underwriters will not be deemed to be resident, domiciled, carrying on business or subject to taxation in the Cayman Islands or the British Virgin Islands solely by reason of its execution, delivery, performance or enforcement of, or the consummation of any transaction contemplated by, this Agreement;

(xvii) Insofar as matters of the Cayman Islands law are concerned, the Registration Statement and the filing of the Registration Statement with the Commission have been duly authorized by and on behalf of the Company; and the Registration Statement has been duly executed pursuant to such authorization by and on behalf of the Company;

(xviii) The Company's agreement, and the Covered Selling Shareholder's agreement, to the choice of law provisions set forth in Section 18 hereof will be recognized by the courts of the Cayman Islands or the British Virgin Islands, as applicable; the Company and the Covered Selling Shareholders can sue and be sued in their own names under the laws of the Cayman Islands or the British Virgin Islands, as applicable; the irrevocable submission of the Company and the Covered Selling Shareholders to the exclusive jurisdiction of a New York Court, the waiver by the Company and the Covered Selling Shareholders of any objection to the venue of a proceeding of a New York Court and the agreement of the Company and the Covered Selling Shareholders that this Agreement shall be governed by and construed in accordance with the laws of the State of New York are legal, valid and binding; service of process effected in the manner set forth in Section 15 hereof will be effective, insofar as the law of the Cayman Islands or the British Virgin Islands, as applicable, is concerned, to confer valid personal jurisdiction over the Company and the Covered Selling Shareholders; and judgment obtained in a New York Court arising out of or in relation to the obligations of the Company or a Covered Selling Shareholder under this Agreement would be enforceable against the Company or each Covered Selling Shareholder, respectively, in the courts of the Cayman Islands or the British Virgin Islands, as applicable;

(xix) The indemnification and contribution provisions set forth in Section 9 hereof and Section 5.8 of the Deposit Agreement do not contravene the public policy or laws of the Cayman Islands or the British Virgin Islands;

47

(xx) All dividends and other distributions declared and payable on the shares of capital stock of the Company may under the current laws and regulations of the Cayman Islands be paid to the Depositary and freely transferred out of the Cayman Islands, and all such dividends and other distributions will not be subject to withholding or other taxes under the laws and regulations of Cayman Islands and are otherwise free and clear of any other tax, withholding or deduction in the Cayman Islands and without the necessity of obtaining any Governmental Authorization in the Cayman Islands; and

(xxi) The Company is not in violation of its constituent documents or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any license, indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound.

In giving such opinion, such counsel may state that (A) with respect to all matters of United States federal and New York law, they have relied upon the opinions of United States counsel for the Company delivered pursuant to paragraph (d) of this Section 8, (B) with respect to all matters of PRC law, they have relied upon the opinions of PRC counsel for the Company delivered pursuant to paragraph (e) of this Section 8 and (C) with respect to all matters of Hong Kong law, they have relied upon the opinions of Hong Kong counsel for the Company delivered pursuant to paragraph (g) of this Section 8. In addition, in rendering the opinion in subparagraph (xii), such counsel may rely upon a certificate of the Covered Selling Shareholders in respect of matters of fact as to ownership of and liens, encumbrances, equities or claims on, the Shares or ADSs sold by the Covered Selling Shareholders; provided that such counsel shall state that they believe that both you and they are justified in relying upon such certificate;

(g) Pun & Associates, Hong Kong counsel for the Company shall have furnished to you their written opinion, dated such Time of Delivery, in form and substance satisfactory to you, to the effect that: (A) Focus Media Hong Kong has been duly organized and is validly existing in good standing under the laws of Hong Kong with legal right, power and authority (corporate and other) to own its properties and conduct its business as described in the Prospectus, (B) all of Focus Media Hong Kong's share capital has been duly and validly issued, are fully paid and non-assessable, and are owned directly by the Company, free and clear of all liens, encumbrances, equities or claims, and (C) Focus Media Hong Kong is not in violation of its constituent documents or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any license, indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound;

In giving such opinion, such counsel may state that (A) with respect to all matters of United States federal and New York law, they have relied upon the opinions of United States counsel for the Company delivered pursuant to paragraph (d) of this Section 8, (B) with respect to all matters of PRC law, they have relied upon the opinions of PRC counsel for the Company delivered pursuant to paragraph (e) of this Section 8 and (C) with respect to all matters of Cayman Islands and British Virgin Islands law, they have relied upon the opinions of Cayman Islands and British Virgin Islands counsel for the Company delivered pursuant to paragraph (f) of this Section 8;

48

(h) You shall have received the written opinion of Simpson Thacher & Bartlett LLP, special United States counsel to the Selling Shareholders, addressed to you, and dated the First Time of Delivery, in form and substance satisfactory to you, stating that:

(i) The Underwriting Agreement has been duly executed and delivered by the Selling Shareholders in accordance with the law of the State of New York;

(ii) Upon payment for and transfer of the ADSs representing the Shares to be sold by the Selling Shareholders in accordance with the Underwriting Agreement, the Underwriters will acquire a security entitlement with respect to such ADSs and no action based on an adverse claim may be asserted against the Underwriters;

(iii) The Power of Attorney and the Custody Agreement with respect to each Selling Shareholder have been duly executed and delivered by such Selling Shareholder in accordance with the law of the State of New York;

(iv) Assuming the validity of such actions under Cayman Islands law under the law of the State of New York relating to personal jurisdiction, the Selling Shareholders have, pursuant to the Underwriting Agreement, validly and irrevocably submitted to the personal jurisdiction of the New York State or U.S. federal courts located in the Borough of Manhattan, The City of New York, New York in any action arising out of or relating to the Underwriting Agreement, has, to the extent permitted by applicable law, validly and irrevocably waived any objection to the venue of a proceeding in any such court, and has validly and irrevocably appointed CT Corporation System, currently located at 111 Eighth Avenue, New York, New York 10011, as its authorized service of process agent for the purposes described in the Underwriting Agreement, and service of process effected on such agent will be effective to confer in the manner set forth in the Underwriting Agreement and will be effective to confer valid personal jurisdiction over the Selling Shareholders;

(v) The deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the execution, delivery and performance by each Selling Shareholder of the Power of Attorney, the Underwriting Agreement and the Custody Agreement will not (A) violate, breach, or result in a default under, any agreement or other instrument governed by the law of the State of New York of such Selling Shareholder that has been filed as an exhibit to the Registration Statement or (B) violate any U.S. federal or New York State statute or any rule or regulation that has been issued pursuant to any such U.S. federal or New York State statute or, to our knowledge, any order of any U.S. federal or New York State governmental agency or body having jurisdiction over such Selling Shareholder;

(vi) No consent, approval, authorization, order, registration or qualification of or with any US. federal or New York governmental agency or body, or to our knowledge, any U.S. federal or New York court is required for the deposit of the Shares and the issuance of the ADSs pursuant to the Deposit Agreement, the sale of the ADSs and the compliance by each Selling Shareholder with the provisions of the Underwriting Agreement and the Custody Agreement and the Power of Attorney, except for the registration under the Securities Act and the Exchange Act of the Shares and the ADSs, and such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the ADSs by the Underwriters;

49

(i) Patterson, Belknap, Webb & Tyler LLP, counsel for the Depositary, shall have furnished to you their written opinion, dated such Time of Delivery, in form and substance satisfactory to you, to the effect that:

(ii) The Deposit Agreement has been duly authorized, executed and delivered by the Depositary and constitutes a valid and legally binding obligation of the Depositary, enforceable in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity;

(iii) The ADSs issued under and in accordance with the provisions of the Deposit Agreement to evidence the ADSs will entitle the holders thereof to the rights specified therein and in the Deposit Agreement, assuming that (A) the Shares represented by the ADSs, have been duly authorized and validly issued and are fully paid and non-assessable and that any preemptive rights with respect to such Shares have been validly waived and exercised and (B) such Shares have been duly deposited with Citibank, N.A., as Custodian (as defined in the Deposit Agreement), in each case under and in accordance with all applicable laws and regulations;

(iv) Upon issuance by the Depositary of the ADSs against the deposit of Shares in respect thereof in accordance with the provisions of the Deposit Agreement, such ADSs will be duly and validly issued and the persons in whose name the ADSs are registered will be entitled to the rights specified therein and in the Deposit Agreement; and

(v) The ADS Registration Statement has been filed and the Commission has declared the ADS Registration Statement effective and, to the best of such counsel's knowledge, no stop order suspending the effectiveness of the ADS Registration Statement or any part thereof has been issued and no proceedings for that purpose have been instituted or are pending or contemplated under the Act, and the ADS Registration Statement, and each amendment thereof, as of their respective effective dates, complied as to form in all material respects with the requirements of the Act and the rules and regulations of the Commission thereunder;

(j) On the date of the Prospectus at a time prior to the execution of this Agreement, at 9:30 a.m., New York City time, on the effective date of any post effective amendment to the Registration Statement filed subsequent to the date of this Agreement and also at each Time of Delivery, Deloitte Touche Tohmatsu CPA Ltd. shall have furnished to you a letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to you, to the effect set forth in Annex I hereto (the executed copy of the letter delivered prior to the execution of this Agreement is attached as Annex I (A) hereto and a draft of the form of letter to be delivered on the effective date of any post-effective amendment to the Registration Statement and as of each Time of Delivery is attached as Annex I (B) hereto);

(k) (A) None of the Company or any of the Group Entities shall have sustained since the date of the latest audited financial statements in the Pricing Prospectus any loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Prospectus and (B) since the respective dates as of which information is given in the Pricing Prospectus there shall not have been any change in the capital stock, short-term debt or long term debt of the Company

50

or any of the Group Entities or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, shareholders' equity or results of operations of the Company and the Group Entities, otherwise than as set forth or contemplated in the Pricing Prospectus, the effect of which, in any such case described in clause (A) or (B), is in the judgment of the Representatives so material and adverse as to make it impracticable or inadvisable to proceed with the public offering or the delivery of the Shares and the ADSs being delivered at such Time of Delivery on the terms and in the manner contemplated in the Prospectus;

(l) On or after the Applicable Time (A) no downgrading shall have occurred in the rating accorded to any of the Company's debt securities, if any, by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) under the Act, and (B) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Company's debt securities;

(m) On or after the Applicable Time, there shall not have occurred any of the following: (A) a suspension or material limitation in trading in securities generally on the Nasdaq Global Market, the New York Stock Exchange or the London Stock Exchange, (B) a suspension or material limitation in trading in the Company's securities on the Nasdaq Global Market, (C) a general moratorium on commercial banking activities in New York, London, the PRC or the Cayman Islands declared by the relevant authorities, or a material disruption in commercial banking or securities settlement or clearance services in the United States, the United Kingdom, the PRC or the Cayman Islands, (D) a change or development involving a prospective change in taxation affecting the Company, any of the Group Entities or the Shares or the ADSs or the transfer thereof, (E) the outbreak or escalation of hostilities involving the United States, the United Kingdom the PRC or the Cayman Islands or the declaration by the United States, the United Kingdom, the PRC or the Cayman Islands of a national emergency or war or (F) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions or currency exchange rates or controls in the United States, the United Kingdom, the PRC, the Cayman Islands or elsewhere, if the effect of any such event specified in clause (E) or (F) in the judgment of the Representatives makes it impracticable or inadvisable to proceed with the public offering or the delivery of the Shares and the ADSs being delivered at such Time of Delivery on the terms and in the manner contemplated in the Prospectus;

(n) The ADSs to be sold by the Company and the Selling Shareholders at such Time of Delivery shall have been duly included for listing on the Nasdaq Global Market;

(p) The Depositary shall have furnished or caused to be furnished to you at each Time of Delivery certificates satisfactory to you evidencing the deposit with it of the Shares being so deposited against issuance of the ADSs to be delivered by the Selling Shareholders at such Time of Delivery, and the execution, countersignature (if applicable), issuance and delivery of such ADSs pursuant to the Deposit Agreement;

(q) The Company shall have entered into an agreement in the form of Annex II hereto;

(r) The Company shall have complied with the provisions of Section 5(a)(iii) hereof with respect to the furnishing of Prospectuses on the New York Business Day next succeeding the date of this Agreement;

51

(s) The Company has paid the required Commission filing fees relating to the Shares and ADSs in such amount and within the time frame provided in the Act and the Rule 456(b)(1) thereunder;

(t) The Company shall have furnished or caused to be furnished to you at such Time of Delivery certificates of the officers of the Company, reasonably satisfactory to you as to the accuracy of the representations and warranties of the Company and the Controlling Person, respectively, herein at and as of such Time of Delivery, as to the performance by the Company and the Controlling Person of all of their respective obligations hereunder to be performed at or prior to such Time of Delivery, and as to such other matters as you may reasonably request, and the Company shall have furnished or caused to be furnished certificates as to the matters set forth in subsections (a) and (k) of this Section, and as to such other matters as you may reasonably request; and each Selling Shareholder shall have furnished or caused to be furnished to you at such Time of Delivery a certificate reasonably satisfactory to you as to the accuracy of its representations and warranties at and as of such Time of Delivery and as to the performance by such Selling Shareholder of its obligations hereunder to be performed at or prior to such Time of Delivery;

(u) No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority that would, as of such Time of Delivery, prevent the issuance of the Shares, the deposit of such Shares with the Depositary against issuance of the ADSs or the sale of such ADSs; and no injunction or order of any federal, state or foreign court shall have been issued that would, as of such Time of Delivery, prevent the issuance of the Shares, the deposit of such Shares with the Depositary against issuance of the ADSs or the sale of such ADSs;

(v) The Company shall have caused to be furnished to you at or prior to the First Time of Delivery, a certificate of the Chief Executive Officer and the Chief Financial Officer of the Company relating to certain financial and disclosure matters in form and substance reasonably satisfactory to counsel for the Underwriters; and

(w) All opinions, letters, certificates and evidence mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if they are in form and substance reasonably satisfactory to counsel for the Underwriters.

9. (a) The Company will indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, the ADS Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus or any "issuer information" filed or required to be filed pursuant to Rule 433(d) under the Act, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Underwriter for any legal or other expenses reasonably incurred by such Underwriter in connection with investigating or defending any such action or claim as such expenses are incurred; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the

52

Registration Statement, the ADS Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus, in reliance upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives expressly for use therein;

(b) Each of the Selling Shareholders, severally and not jointly, will indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, the ADS Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, not misleading, and will reimburse each Underwriter for any legal or other expenses reasonably incurred by such Underwriter in connection with investigating or defending any such action or claim as such expenses are incurred in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Registration Statement, the ADS Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus, in reliance upon and in conformity with written information furnished to the Company or such Underwriter by such Selling Shareholder expressly for use therein; provided, however, that the liability of each Selling Shareholder pursuant to this subsection (b) shall not exceed the product of (i) the number of ADSs sold by such Selling Shareholder and (ii) the public offering price per ADSs as set forth on the cover page of the Pricing Prospectus, less underwriting discount per ADS as set forth on the cover page of the Pricing Prospectus;

(c) Each Underwriter will indemnify and hold harmless the Company and each Selling Shareholder against any losses, claims, damages or liabilities to which the Company or such Selling Shareholder may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Registration Statement, any Preliminary Prospectus, the Pricing Prospectus or the Prospectus, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus, in reliance upon and in conformity with written information furnished to the Company by such Underwriter through the Representatives expressly for use therein; and will reimburse the Company and each Selling Shareholder for any legal or other expenses reasonably incurred by the Company or such Selling Shareholder in connection with investigating or defending any such action or claim as such expenses are incurred;

(d) Promptly after receipt by an indemnified party under subsection (a), (b) or (c) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against an indemnifying party under such subsection, notify

53

the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under such subsection. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (which shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party shall, without the written consent of the relevant indemnified party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim against such indemnified party in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (A) includes an unconditional release of such indemnified party from all liability arising out of such action or claim and (B) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party from whom such consent is required hereunder but has not been obtained;

(e) If the indemnification provided for in this Section 9 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a), (b) or (c) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Selling Shareholders on the one hand and the Underwriters on the other from the offering of the ADSs. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (d) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company and the Selling Shareholders on the one hand and the Underwriters on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Company and the Selling Shareholders on the one hand and the Underwriters on the other shall be deemed to be in the same proportion as the total net proceeds from the offering of the ADSs purchased under this Agreement (before deducting expenses) received by the Company and the Selling Shareholders bear to the total underwriting discounts and commissions received by the Underwriters with respect to the ADSs purchased under this Agreement, in each case as set forth in the table on the cover page of the Pricing Prospectus. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Selling Shareholders on the one hand or the Underwriters on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company, each of the Selling Shareholders and the Underwriters

54

agree that it would not be just and equitable if contributions pursuant to this subsection (e) were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (e). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (e) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (e), no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the ADSs underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations in this subsection (e) to contribute are several in proportion to their respective underwriting obligations and not joint. Further notwithstanding the provisions of this subsection (e), no Selling Shareholder shall be required to contribute any amount in excess of the product of (i) the number of ADSs sold by such Selling Shareholder and (ii) the public offering price per ADS as set forth on the cover page of the Pricing Prospectus, less the underwriting discount per ADS as set forth on the cover page of the Pricing Prospectus; and

(f) The obligations of the Company and the Selling Shareholders under this Section 9 shall be in addition to any liability which the Company and the Selling Shareholders may otherwise have and shall extend, upon the same terms and conditions, to the respective affiliates of each Underwriter and to each person, if any, who controls any Underwriter within the meaning of the Act and each broker-dealer affiliate of any Underwriter; and the obligations of the Underwriters under this Section 9 shall be in addition to any liability which the respective Underwriters may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Company (including any person who, with his or her consent, is named in the Registration Statement as about to become a director of the Company) and any Selling Shareholder and to each person, if any, who controls the Company or any Selling Shareholder within the meaning of the Act;

10. (a) If any Underwriter shall default in its obligation to purchase the ADSs which it has agreed to purchase hereunder at a Time of Delivery, you may in your discretion arrange for you or another party or other parties to purchase such ADSs on the terms contained herein. If within thirty-six hours after such default by any Underwriter you do not arrange for the purchase of such ADSs, then the Company and the applicable Selling Shareholders shall be entitled to a further period of thirty-six hours within which to procure another party or other parties satisfactory to you to purchase such ADSs on such terms. In the event that, within the respective prescribed periods, you notify the Company and the Selling Shareholders that you have so arranged for the purchase of such ADSs, or the Company and the Selling Shareholders notify you that they have so arranged for the purchase of such ADSs, you or the Company and the applicable Selling Shareholders shall have the right to postpone such Time of Delivery for a period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Registration Statement or the Prospectus, or in any other documents or arrangements, and the Company agrees to file promptly any amendments or supplements to the Registration Statement or the Prospectus which in your opinion may thereby be made necessary. The term "Underwriter" as used in

55

this Agreement shall include any person substituted under this Section with like effect as if such person had originally been a party to this Agreement with respect to such ADSs;

(b) If, after giving effect to any arrangements for the purchase of the ADSs of a defaulting Underwriter or Underwriters by you and the Company and the applicable Selling Shareholders as provided in subsection (a) above, the aggregate number of such ADSs which remains unpurchased does not exceed one eleventh of the aggregate number of all of the ADSs to be purchased at such Time of Delivery, then the Company and the applicable Selling Shareholders shall have the right to require each non-defaulting Underwriter to purchase the number of ADSs which such Underwriter agreed to purchase hereunder at such Time of Delivery and, in addition, to require each non-defaulting Underwriter to purchase its pro rata share (based on the number of ADSs which such Underwriter agreed to purchase hereunder) of the ADSs of such defaulting Underwriter or Underwriters for which such arrangements have not been made; but nothing herein shall relieve a defaulting Underwriter from liability for its default; and

(c) If, after giving effect to any arrangements for the purchase of the ADSs of a defaulting Underwriter or Underwriters by you or the Company and the applicable Selling Shareholders as provided in subsection (a) above, the aggregate number of such ADSs which remains unpurchased exceeds one eleventh of the aggregate number of all of the ADSs to be purchased at such Time of Delivery, or if the Company and the applicable Selling Shareholders shall not exercise the right described in subsection (b) above to require non-defaulting Underwriters to purchase ADSs of a defaulting Underwriter or Underwriters, then this Agreement (or, with respect to the Second Time of Delivery, the obligations of the Underwriters to purchase, and of the Company to sell, the Optional ADSs) shall thereupon terminate, without liability on the part of any non-defaulting Underwriter, the Company or the Selling Shareholders, except for the expenses to be borne by the Company and the Selling Shareholders and the Underwriters as provided in Section 6 hereof and the indemnity and contribution agreements in Section 9 hereof; but nothing herein shall relieve a defaulting Underwriter from liability for its default.

11. The respective indemnities, agreements, representations, warranties and other statements of the Company, the Controlling Person, the Selling Shareholders and the Underwriters, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Underwriter or any controlling person of any Underwriter, the Company, or any of the Selling Shareholders, or any officer or director or controlling person of the Company, or any controlling person of any Selling Shareholder, and shall survive delivery of and payment for the ADSs.

12. If this Agreement shall be terminated pursuant to Section 10 hereof, none of the Company, the Controlling Person and the Selling Shareholders shall then be under any liability to any Underwriter except as provided in Sections 6 and 9 hereof; but, if for any other reason any ADSs are not delivered by or on behalf of the Company and the Selling Shareholders as provided herein, the Company will reimburse the Underwriters through you for all out of pocket expenses approved in writing by you, including fees and disbursements of counsel, reasonably incurred by the Underwriters in making preparations for the purchase, sale and delivery of the ADSs not so delivered, but the Company and the Selling Shareholders shall then be under no further liability to any Underwriter in respect of the ADSs not so delivered except as provided in Sections 6 and 9 hereof.

56

13. In all dealings hereunder, you shall act on behalf of each of the Underwriters, and the parties hereto shall be entitled to act and rely upon any statement, request, notice or agreement on behalf of any Underwriter made or given by you jointly or by the Representatives as the representatives of the several Underwriters.

All statements, requests, notices and agreements hereunder shall be in writing, and if to the Underwriters shall be delivered or sent by mail, telex or facsimile transmission to you as the representatives of the Underwriters, (A) Credit Suisse Securities (USA) LLC, Eleven Madison Avenue, New York, New York 10010-3629, facsimile number: (212) 325-8278, attention: Transactions Advisory Group, (B) Merrill Lynch, Pierce, Fenner & Smith Incorporated, 4 World Financial Center, 250 Vesey Street, New York, New York 10080, facsimile number: (212) 449-2785, attention: Equity Capital Markets Desk and (C) Citigroup Global Markets Inc., 388 Greenwich Street, New York, New York 10013, facsimile number: (212) 816-7912, attention: General Counsel; if to the Controlling Person or any Selling Shareholder shall be delivered or sent by mail, telex or facsimile transmission to counsel for the Controlling Person or Selling Shareholders at its address set forth in Schedule II hereto; and if to the Company shall be delivered or sent by mail, telex or facsimile transmission to the address of the Company set forth in the Registration Statement, Attention: Chief Executive Officer; provided, however, that any notice to an Underwriter pursuant to Section 9(d) hereof shall be delivered or sent by mail, telex or facsimile transmission to such Underwriter at its address set forth in its Underwriters' Questionnaire or telex constituting such Questionnaire, which address will be supplied to the Company or the Selling Shareholders by you upon request. Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

14. This Agreement shall be binding upon, and inure solely to the benefit of, the Underwriters, the Company, the Controlling Person and the Selling Shareholders and, to the extent provided in Sections 9 and 11 hereof, the officers and directors of the Company and each person who controls the Company, any Selling Shareholder or any Underwriter, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement. No purchaser of any of the ADSs from any Underwriter shall be deemed a successor or assign by reason merely of such purchase.

15. Each of the parties hereto irrevocably (A) agrees that any legal suit, action or proceeding against the Company, the Controlling Person or the Selling Shareholders brought by any Underwriter or by any person who controls any Underwriter arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in any New York Court, (B) waives, to the fullest extent it may effectively do so, any objection which it may now or hereafter have to the laying of venue of any such proceeding and (C) submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Each of the Company, the Controlling Person and the Selling Shareholders has appointed CT Corporation System, 111 Eighth Avenue, New York, New York, as its authorized agent (the "Authorized Agent") upon whom process may be served in any such action arising out of or based on this Agreement or the transactions contemplated hereby which may be instituted in any New York Court by any Underwriter or by any person who controls any Underwriter, expressly consents to the jurisdiction of any such court in respect of any such action, and waives any other requirements of or objections to personal jurisdiction with respect thereto. Such appointment shall be irrevocable. Each of the Company, the Controlling Person and the Selling Shareholders represents and warrants that the Authorized Agent has agreed to act as such agent for service of process and agrees to take any and all action, including the filing of

57

any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the Authorized Agent and written notice of such service to the Company, the Controlling Person or the Selling Shareholders shall be deemed, in every respect, effective service of process upon the Company, the Controlling Person or the Selling Shareholders, as the case may be.

16. In respect of any judgment or order given or made for any amount due hereunder that is expressed and paid in a currency (the "judgment currency") other than United States dollars, the Company, the Controlling Person and the Selling Shareholders, as the case may be, will indemnify each Underwriter against any loss incurred by such Underwriter as a result of any variation as between (A) the rate of exchange at which the United States dollar amount is converted into the judgment currency for the purpose of such judgment or order and (B) the rate of exchange at which an Underwriter is able to purchase United States dollars with the amount of the judgment currency actually received by such Underwriter. The foregoing indemnity shall constitute a separate and independent obligation of the Company, the Controlling Person and the Selling Shareholders and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of or conversion into United States dollars.

17. Time shall be of the essence in this Agreement.

18. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

19. This Agreement may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

20. Notwithstanding anything herein to the contrary, the Company is authorized to disclose to any persons the U.S. federal and state income tax treatment and tax structure of the potential transaction and all materials of any kind (including tax opinions and other tax analyses) provided to the Company relating to that treatment and structure, without the Underwriters imposing any limitation of any kind. However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax structure" is limited to any facts that may be relevant to that treatment.

21. This Agreement constitutes the entire agreement among the parties and supersedes all prior agreements and understandings, oral or written, with respect to the matters set forth herein.

22. Each of the Company, the Controlling Person and the Selling Shareholders acknowledges and agrees that (i) the purchase and sale of the ADSs pursuant to this Agreement is an arm's-length commercial transaction between the Company and Selling Shareholders, on the one hand, and the several Underwriters, on the other, (ii) in connection therewith each Underwriter is acting solely as a principal and not the agent or fiduciary of the Company, the Controlling Person or such Selling Shareholder, and (iii) no Underwriter has assumed an advisory or fiduciary responsibility in favor of the Company with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether such Underwriter has advised or is currently advising the Company or such Selling Shareholder on

other matters) or any other obligation to the Company except the obligations expressly set forth in this Agreement and (iv) each of the Company, the Controlling Person and the Selling Shareholders has consulted its own legal and financial advisors to the extent it deemed appropriate. Each of the Company, the Controlling Person and the Selling Shareholders agrees that it will not claim that the Underwriters, or any of them, has rendered advisory services of any nature or respect, or owes a fiduciary duty to the Company, the Controlling Person, or such Selling Shareholder, in connection with such transaction or the process leading thereto.

23. Each of the Company, the Controlling Person, the Selling Shareholders and the Underwriters hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

59

If the foregoing is in accordance with your understanding, please sign and return to us five counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Underwriters, this letter and such acceptance hereof shall constitute a binding agreement among each of the Underwriters, the Company, the Controlling Person and each of the Selling Shareholders. It is understood that your acceptance of this letter on behalf of each of the Underwriters is pursuant to the authority set forth in a form of Agreement among Underwriters, the form of which shall be submitted to the Company, the Controlling Person and the Selling Shareholders for examination upon request, but without warranty on your part as to the authority of the signers thereof.

                              Very truly yours,

                              Focus Media Holding Limited

                              By:
                                 ------------------------------------
                              Name: Jason Nanchun Jiang
                              Title: Chairman and Chief Executive
                                     Officer


                              Jason Nanchun Jiang, the Controlling
                              Person


                              ----------------------------------------

```
Selling Shareholders (as listed below)
Aura Investment Holdings Limited
Bai Yunhai
Captains Enterprises Ltd.
Dallsfield Ltd.
Han Yuling
IDG-ACCEL China Growth Fund-A L.P.
IDG-ACCEL China Growth Fund L.P.
IDG-ACCEL China Investors L.P.
IDG Technology Venture Investments, LP
KingHill International Holding Co,
Limited
Latitude Holdings Group Limited
Li Junzhi
Li Lu
Li Wei
LinkValue Ltd.
Magic Elite Group Ltd.
Neil Nanpeng Shen
Premacy Co. Limited
Sea Dragon Holding Company Ltd.
Sharvest Capital Limited
Smart Master International Limited
Techware Holding Company Ltd.
Total Team Investments Ltd.
Trans China Ltd.
Zhai Junni
Zhang Jun
Zhi Tan
Zhou Dai


By:
    ------------------------------------
Name:
Title:
```

SCHEDULE I

| Underwriter | TOTAL NUMBER OF ADSS TO BE PURCHASED |
| ----------- | --------------- |
| Citigroup Global Markets Inc. | [              ] |
| Credit Suisse Securities (USA) LLC | [              ] |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | [              ] |
| TOTAL ..................................................... | [              ] |

SCHEDULE II

| Selling Shareholders | TOTAL NUMBER OF FIRM ADSS TO BE SOLD |
| --- | --- |
| Aura Investment Holdings Limited<br>Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands | 281,405 |
| Bai Yunhai<br>23/F, Jing Au Center, No. 8 North Third Ring Road East, Chao Yang District, Beijing, China | 880 |
| Captains Enterprises Limited<br>Balizhuang Xili, Bldg 64, Rm 103, Ocean Plaza, Chao Yang District, Beijing 100025, China | 51,930 |
| Dai Zhou<br>21/F, Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, P.R.China | 55,220 |
| Dallsfield Ltd.<br>17/F, Block C, SP Tower, Tsinghua Science Park, Haidian, Beijing, P.R.China 100084 | 1,500,000 |
| IDG-ACCEL China Growth Fund-A L.P<br>c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd. Rm. 616, Tower A, COFCO Plaza, 8 Jianguomennei Ave. Beijing, China | 43,270 |
| IDG Technology<br>c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd. Rm. 616, Tower A, COFCO Plaza, 8 Jianguomennei Ave. Beijing, China | 6,499,089 |
| Jun Zhang<br>No. 1911, Tower 3, Dongfangruijing Mansion, 16# Jianwai Street, Chaoyang District, Beijing, China | 1,175 |
| Jinni Zhai<br>126-1-3 Beiqu, No. 19 Xisanhuanzhang Road, Haidian District, Beijing, China | 1,410 |
| Junzhi Li<br>17-114, No. 2 Bei Yuan, Chao Yang District, Beijing, China | 1,610 |
| KingHill International Holding Co, Limited<br>P.O. Box 4301, Road Town, Tortola, British Virgin Islands | 273,075 |
| Latitude Holdings Group Limited<br>Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands | 84,295 |
| LinkValue Ltd.<br>P.O. Box 4301, Road Town, Tortola, British Virgin IslandS | 552,285 |
| Lu Li<br>Room 6C, 1th Building, OCT, Nanshan District, Shenzhen, China | 1,150 |
| Magic Elite Group Ltd.<br>P.O. Box 3140, Road Town, Tortola, British Virgin Islands | 1,197,420 |

```
Neil Nanpeng Shen                                           51,815
c/o Suite 3202A, 32/F, The Centrium, 60 Wyndham Street,
Central, Hong Kong

Premacy Co. Limited                                        213,285
Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British
Virgin Islands

Sea Dragon Holding Company Ltd.                            190,120
Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British
Virgin Islands

Sharvest Capital Limited                                   240,510
Kingston Chambers, P.O. Box 173, Road Town, Tortola, British
Virgin Islands

Smart Master International Limited                          51,815
Room 2215, 22/F, Two Pacific Place, Hong Kong

Techware Holding Company Ltd.                              320,680
P.O. Box 4301, Road Town, Tortola, British Virgin Islands

Total Team Investments Ltd.                            35,830,620
4th Floor, SCITECH, Plaza, 22 Jianguomenwai Avenue, Beijing,
P.R.C. 100004

Trans China Ltd.                                           78,470
Bailizhuang Xili, Bldg. 64, Rm. 103, Ocean Plaza, Chaoyang
District, Beijing 100025, China

Wei Li                                                     42,435
28th Floor, Building 10, Wandu Plaza, 93 Jianguo Road,
Chaoyang District, Beijing, China

Yuling Han                                                  1,610
6-1-501 Benjia Run Yuan Dong Hua Shi Street, Chong Wen
District, Beijing, China

Zhi Tan                                                35,830,620
c/o 4th Floor, SCITECH, Plaza, 22 Jianguomenwai Avenue,
Beijing, P.R.C. 100004
                                                       ----------
TOTAL.....................................................  83,396,194
                                                       ==========
```

SCHEDULE III

(a) Issuer Free Writing Prospectuses:

NONE

(b) Additional Documents Incorporated by Reference:

NONE

SCHEDULE IV

List of Focus Media Advertisement Subsidiaries:

| Name of Subsidiary | Percentage Acquired |
|---|---|
| Lanzhou Focus Media Advertisement Co., Ltd. | 100% |
| [Guizhou Focus Media Advertisement Co., Ltd. | 100%] |
| [Quanzhou New Land Culture and Communication Co., Ltd. | 100%] |
| [Zhengzhou Focus Media Framedia Advertisement Co., Ltd. | 100%] |
| Shenzhen Bianjie Building Advertisement Co. Ltd. | 99% |
| Shanghai Fengjing Advertisement Co., Ltd | 95% |
| Shanghai Target Media Co., Ltd. | 90% |
| Beijing Focus Media Wireless Co., Ltd. | 90% |
| Guangzhou Feisha Advertisement Co., Ltd. | 90% |
| Shanghai Perfect Media Advertising Agency Co., Ltd | 90% |
| Qingdao Focus Media Advertisement Co., Ltd. | 90% |
| Changsha Focus Media Shiji Advertisement Co., Ltd. | 90% |
| Hebei Focus Media Advertising Co. Ltd. | 90% |
| Dalian Focus Media Advertising Co., Ltd. | 90% |
| Nanjing Focus Media Advertising Co., Ltd. | 90% |
| Sichuan Focus Media Advertising Communications Co., Ltd | 90% |
| Shanghai Qianjian Advertising Co., Ltd | 90% |
| Guangzhou Fuke Advertising Co., Ltd. | 90% |
| Zhuhai Focus Media Culture Communication Co., Ltd. | 90% |
| Hefei Fukesi Advertising Co., Ltd. | 90% |
| Xiamen Focus Media Advertising Co., Ltd. | 90% |
| Liaoning Framedia Advertisement Co., Ltd. | 90% |
| Shijiazhuang Focus Media Huihuang Commercial Advertisement Co., Ltd. | 90% |
| Dongguan Focus Media Advertisement Co., Ltd. | 90% |
| Haerbin Focus Media Advertising Co., Ltd. | 90% |
| Catch Stone Advertising (Beijing) Co., Ltd. | 90% |
| Beijing Yitong Wireless Information Technology Co., Ltd. | 90% |
| Shanghai Yuanchi Advertisement Co., Ltd. | 90% |
| Shanghai Qianzhong Advertisement Co., Ltd. | 90% |
| Shanghai Lizhu Advertisement Co., Ltd. | 90% |
| Shanghai Honghao Advertisement Co., Ltd. | 90% |
| Shanghai Yuanyuan Advertisement Co., Ltd. | 90% |
| Shanghai Zhiyi Advertisement Co., Ltd. | 90% |
| [Jilin Focus Media Advertisement Co., Ltd. | 90%] |
| [Beijing Power Media Advertisement Co., Ltd. | 90%] |
| [Beijing Tuojia Chengyuan Advertisement Co., Ltd. | 90%] |
| Beiijing Yibo Lande Advertisement Co., Ltd. | 90% |
| Jinan Framedia Advertisement Co., Ltd. | 90% |
| [Taiyuan Framedia Juzhong Advertisement Co., Ltd. | 90%] |
| Shanghai Typical Channel Advertisement Co., Ltd. | 90% |
| [Tianjin Saige Advertisement Planning Co., Ltd. | 90%] |
| [Hefei Tiandi Advertisement Co., Ltd. | 90%] |
| Yunnan Focus Media Advertising Co., Ltd | 89.5% |

```
Zhengzhou Focus Media Advertisment Co., Ltd.                      84%
Jinan Focus Media Advertising Co., Ltd.                           80%
[Beijing Jiahua Hengshun Advertisment Co., Ltd.                   80%]
[Beijing Jiahua Hengshun Media Advertisement Co., Ltd.            80%]
[Beijing Jiahua Zhongwang Media Advertising Co., Ltd.             80%]
Tianjin Focus Media Tongsheng Advertising Co., Ltd.               80%
Zhejiang Ruihong Focus Media Advertising Communication Co., Ltd.  80%
Wuhan Ge Shi Focus Media Advertising Co., Ltd.                    75%
Dushi Caiping (Beijing) Advertisement Co., Ltd.                   75%
Fuzhou Fukesi Culture Communication Co., Ltd.                     70%
Xi'an Focus Media Advertising and Information Co., Ltd.           70%
Shenyang Focus Media Advertising Co., Ltd.                        70%
Beijing Yangshi Sanwei Advertisement Co., Ltd.                    70%
Beijing Chuangshi Qiji Advertisement Co., Ltd.                    70%
Beijing Kudong Media Advertisement Co., Ltd.                      70%
Shanghai Yuewei Computer Information Technology Co., Ltd.          70%
Guangzhou Hengxun Advertisement Co., Ltd.                         63%
Chongqing Geyang Focus Media Culture Communication Co., Ltd.      60%
Shanghai Jiefang Focus Media Advertisement Co., Ltd.              60%
Shanghai On-Target Advertisement Co., Ltd.                        60%
```

ANNEX I

FORM OF DESCRIPTION OF COMFORT LETTER

Pursuant to Section 8(j) of the Underwriting Agreement, the accountants shall
furnish letters to the Underwriters to the effect that:

(i) They are independent certified public accountants with respect to the
Company and the Subsidiaries within the meaning of the Act and the applicable
published rules and regulations thereunder;

(ii) In their opinion, the financial statements and any supplementary financial
information and schedules (and, if applicable, financial forecasts and/or pro
forma financial information) examined by them and in the Prospectus or the
Registration Statement comply as to form in all material respects with the
applicable accounting requirements of the Act and the related published rules
and regulations thereunder; and, if applicable, they have made a review in
accordance with standards established by the American Institute of Certified
Public Accountants of the unaudited consolidated interim financial statements,
selected financial data, pro forma financial information, financial forecasts
and/or condensed financial statements derived from audited financial statements
of the Company for the periods specified in such letter, as indicated in their
reports thereon, copies of which have been separately furnished to the
representative of the Underwriters (the "Representative");

(iii) They have made a review in accordance with standards established by the
American Institute of Certified Public Accountants of the unaudited condensed
consolidated statements of income, consolidated balance sheets and consolidated
statements of cash flows in the Prospectus as indicated in their reports thereon
copies of which have been separately furnished to the Representative; and on the
basis of specified procedures including inquiries of officials of the Company
who have responsibility for financial and accounting matters regarding whether
the unaudited condensed consolidated financial statements referred to in
paragraph (vi)(a)(i) below comply as to form in all material respects with the
applicable accounting requirements of the Act and the related published rules
and regulations, nothing came to their attention that caused them to believe
that the unaudited condensed consolidated financial statements do not comply as
to form in all material respects with the applicable accounting requirements of
the Act and the related published rules and regulations;

(iv) They have compared the information in the Prospectus under selected
captions with the disclosure requirements of Regulation S-K and on the basis of
limited procedures specified in such letter nothing came to their attention as a
result of the foregoing procedures that caused them to believe that this
information does not conform in all material respects with the disclosure
requirements of Items 8 and 11 of Form 20-F and of Regulation S-K;

(v) On the basis of limited procedures, not constituting an examination in
accordance with generally accepted auditing standards, consisting of a reading
of the unaudited financial

statements and other information referred to below, a reading of the latest available interim financial statements of the Company and its subsidiaries, inspection of the minute books of the Company and its subsidiaries since the date of the latest audited financial statements in the Prospectus, inquiries of officials of the Company and its subsidiaries responsible for financial and accounting matters and such other inquiries and procedures as may be specified in such letter, nothing came to their attention that caused them to believe that:

(a) (i) the unaudited consolidated statements of operations, consolidated balance sheets, consolidated statements of shareholders' equity and consolidated statements of cash flows in the Prospectus do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related published rules and regulations, or (ii) any material modifications should be made to the unaudited condensed consolidated statements of operations, consolidated balance sheets, consolidated statements of shareholders' equity and consolidated statements of cash flows in the Prospectus for them to be in conformity with generally accepted accounting principles;

(b) any other unaudited statement of operations data and balance sheet items in the Prospectus do not agree with the corresponding items in the unaudited consolidated financial statements from which such data and items were derived, and any such unaudited data and items were not determined on a basis substantially consistent with the basis for the corresponding amounts in the audited consolidated financial statements in the Prospectus;

(c) the unaudited financial statements which were not in the Prospectus but from which were derived any unaudited condensed financial statements referred to in clause (a) and any unaudited income statement data and balance sheet items in the Prospectus and referred to in clause (b) were not determined on a basis substantially consistent with the basis for the audited consolidated financial statements in the Prospectus;

(d) any unaudited pro forma consolidated condensed financial statements in the Prospectus do not comply as to form in all material respects with the applicable accounting requirements of the Act and the published rules and regulations thereunder or the pro forma adjustments have not been properly applied to the historical amounts in the compilation of those statements;

(e) as of a specified date not more than five days prior to the date of such letter, there have been any changes in the consolidated capital stock (other than issuances of capital stock upon exercise of options and stock appreciation rights, upon earn-outs of performance shares and upon conversions of convertible securities, in each case which were outstanding on the date of the latest financial statements in the Prospectus) or any increase in the consolidated long-term debt of the Company and its subsidiaries, or any decreases in consolidated net current assets or shareholders' equity or other items specified by the Representative, or any increases in any items specified by the Representative, in each case as compared with amounts shown in the latest balance sheet included in the Prospectus, except in each case for changes,

A-I-2

increases or decreases which the Prospectus discloses have occurred or may occur or which are described in such letter; and

(f) for the period from the date of the latest financial statements included in the Prospectus to the specified date referred to in clause (e) there were any decreases in consolidated net revenues or operating profit or the total or per share amounts of consolidated net income or other items specified by the Representative, or any increases in any items specified by the Representative, in each case as compared with the comparable period of the preceding year and with any other period of corresponding length specified by the Representative, except in each case for decreases or increases which the Prospectus discloses have occurred or may occur or which are described in such letter; and

(vi) In addition to the examination referred to in their report(s) included in the Prospectus and the limited procedures, inspection of minute books, inquiries and other procedures referred to in paragraph (iii) above, they have carried out certain specified procedures, not constituting an examination in accordance with generally accepted auditing standards, with respect to certain amounts, percentages and financial information specified by the Representative, which are derived from the general accounting records of the Company and the Subsidiaries, which appear in the Prospectus, or in Part II of, or in exhibits and schedules to, the Registration Statement specified by the Representative, specified by the Representative, and have compared certain of such amounts, percentages and financial information with the accounting records of the Company and the Subsidiaries and have found them to be in agreement.

A-I-3

ANNEX I (A)

EXECUTED COMFORT LETTER DELIVERED PRIOR TO EXECUTION OF THIS
AGREEMENT

[ATTACHED]

ANNEX I (B)

FORM OF COMFORT LETTER TO BE DELIVERED ON THE EFFECTIVE DATE OF
ANY POST-EFFECTIVE AMENDMENT TO THE REGISTRATION STATEMENT AND
AS OF EACH TIME OF DELIVERY

Pursuant to Section 8(j) of the Underwriting Agreement, the accountants shall
furnish letters to the Underwriters to the effect that:

(i) They are independent certified public accountants with respect to the
Company and its subsidiaries within the meaning of the Act and the applicable
published rules and regulations thereunder;

(ii) In their opinion, the financial statements and any supplementary financial
information and schedules (and, if applicable, financial forecasts and/or pro
forma financial information) examined by them and in the Registration Statement
or the Prospectus comply as to form in all material respects with the applicable
accounting requirements of the Act or the Exchange Act, as applicable, and the
related published rules and regulations thereunder; and, if applicable, they
have made a review in accordance with standards established by the American
Institute of Certified Public Accountants of the consolidated interim financial
statements, selected financial data, pro forma financial information, financial
forecasts and/or condensed financial statements derived from audited financial
statements of the Company for the periods specified in such letter, as indicated
in their reports thereon, copies of which have been separately furnished to the
representative of the Underwriters (the "Representative");

(iii) They have made a review in accordance with standards established by the
American Institute of Certified Public Accountants of the unaudited condensed
consolidated statements of income, consolidated balance sheets and consolidated
statements of cash flows included in the Prospectus as indicated in their
reports thereon copies of which have been separately furnished to the
Representative; and on the basis of specified procedures including inquiries of
officials of the Company who have responsibility for financial and accounting
matters regarding whether the unaudited condensed consolidated financial
statements referred to in paragraph (vi)(A)(i) below comply as to form in all
material respects with the applicable accounting requirements of the Act and the
related published rules and regulations, nothing came to their attention that
caused them to believe that the unaudited condensed consolidated financial
statements do not comply as to form in all material respects with the applicable
accounting requirements of the Act and the related published rules and
regulations;

(iv) They have compared the information in the Prospectus under selected
captions with the disclosure requirements of Regulation S-K and on the basis of
limited procedures specified in such letter nothing came to their attention as a
result of the foregoing procedures that caused them to believe that this
information does not conform in all material respects with the disclosure
requirements of Items 8 and 11 of Form 20-F and of Regulation S-K;

(v) On the basis of limited procedures, not constituting an examination in accordance with generally accepted auditing standards, consisting of a reading of the unaudited financial statements and other information referred to below, a reading of the latest available interim financial statements of the Company and its subsidiaries, inspection of the minute books of the Company and its subsidiaries since the date of the latest audited financial statements in the Prospectus, inquiries of officials of the Company and its subsidiaries responsible for financial and accounting matters and such other inquiries and procedures as may be specified in such letter, nothing came to their attention that caused them to believe that:

(A) (i) the unaudited condensed consolidated statements of income, consolidated balance sheets and consolidated statements of cash flows included in the Prospectus do not comply as to form in all material respects with the applicable accounting requirements of the Exchange Act and the related published rules and regulations, or (ii) any material modifications should be made to the unaudited condensed consolidated statements of income, consolidated balance sheets and consolidated statements of cash flows included in the Prospectus, for them to be in conformity with generally accepted accounting principles;

(B) any other unaudited income statement data and balance sheet items included in the Prospectus do not agree with the corresponding items in the unaudited consolidated financial statements from which such data and items were derived, and any such unaudited data and items were not determined on a basis substantially consistent with the basis for the corresponding amounts in the audited consolidated financial statements included or incorporated by reference in the Company's Annual Report on Form 20-F for the most recent fiscal year;

(C) the unaudited financial statements which were not included in the Prospectus but from which were derived the unaudited condensed financial statements referred to in clause (A) and any unaudited income statement data and balance sheet items included in the Prospectus and referred to in clause (B) were not determined on a basis substantially consistent with the basis for the audited financial statements included or incorporated by reference in the Company's Annual Report on Form 20-F for the most recent fiscal year;

(D) any unaudited pro forma consolidated condensed financial statements in the Prospectus do not comply as to form in all material respects with the applicable accounting requirements of the Act and the published rules and regulations thereunder or the pro forma adjustments have not been properly applied to the historical amounts in the compilation of those statements;

(E) as of a specified date not more than five days prior to the date of such letter, there have been any changes in the consolidated capital stock (other than issuances of capital stock upon exercise of options and stock appreciation rights, upon earn outs of performance shares and upon conversions of convertible securities, in each case which were outstanding on the date of the latest balance sheet in the Prospectus) or any increase in the consolidated long term debt of the Company and its subsidiaries, or any decreases in consolidated net current assets or stockholders' equity or other items specified by the

A-I(B)-2

Representative, or any increases in any items specified by the Representative, in each case as compared with amounts shown in the latest balance sheet in the Prospectus, except in each case for changes, increases or decreases which the Prospectus discloses have occurred or may occur or which are described in such letter; and

(F) for the period from the date of the latest financial statements in the Prospectus to the specified date referred to in clause (E) there were any decreases in consolidated net revenues or operating profit or the total or per share amounts of consolidated net income or other items specified by the Representative, or any increases in any items specified by the Representative, in each case as compared with the comparable period of the preceding year and with any other period of corresponding length specified by the Representative, except in each case for increases or decreases which the Prospectus discloses have occurred or may occur or which are described in such letter; and

(vi) In addition to the examination referred to in their report(s) in the Prospectus and the limited procedures, inspection of minute books, inquiries and other procedures referred to in paragraphs (iii) and (vi) above, they have carried out certain specified procedures, not constituting an examination in accordance with generally accepted auditing standards, with respect to certain amounts, percentages and financial information specified by the Representative which are derived from the general accounting records of the Company and its subsidiaries, which appear in the Prospectus or in Part II of, or in exhibits and schedules to, the Registration Statement specified by the Representative, and have compared certain of such amounts, percentages and financial information with the accounting records of the Company and its subsidiaries and have found them to be in agreement.

<div align="center">A-I(B)-3</div>

ANNEX II

FORM OF COMPANY LOCK-UP AGREEMENT

[_____], 2007

Merrill Lynch, Pierce, Fenner & Smith
Incorporated

As representative of the Underwriters
    named in Schedule I to the Underwriting Agreement

Re:  Focus Media Holding Limited--Lock-up Agreement

Ladies and Gentlemen:

     The undersigned understands that you, as representative (the
"REPRESENTATIVE") propose to enter into an underwriting agreement on behalf of
the Underwriters named in Schedule I to such agreement (collectively, the
"UNDERWRITERS"), to be dated as of [_____], 2007 (the "UNDERWRITING
AGREEMENT") with Focus Media Holding Limited, a Cayman Islands company (the
"COMPANY"), and those selling shareholders named in the Underwriting Agreement
(collectively, the "SELLING SHAREHOLDERS"), providing for a public offering of
American Depositary Shares ("ADSS") representing Ordinary Shares of the Company,
par value US$0.00005 per share (the "ORDINARY SHARES"), pursuant to a
Registration Statement on Form F-1 (File No. 333-146913) and a Registration
Statement on Form F-6 (File No. 333-141820) filed with the U.S. Securities and
Exchange Commission (the "SEC").

     In consideration of the agreement by the Underwriters to offer and sell the
ADSs, and of other good and valuable consideration the receipt and sufficiency
of which is hereby acknowledged, the undersigned agrees that, without your prior
permission, during the period beginning from the date hereof and continuing to
and including the date 90 days after the date of the final Prospectus (the
"LOCK-UP PERIOD"), not to offer, sell, announce the intention to sell, contract
to sell, pledge, grant any option to purchase, make any short sale or otherwise
dispose of, directly or indirectly, or cause the Company to file with the SEC a
registration statement under the Securities Act of 1933, as amended (the "ACT")
with respect to, (A) any ADSs or Ordinary Shares or any securities of the
Company represented by the ADSs, or any securities of the Company substantially
similar to the ADSs or Ordinary Shares, including but not limited to any options
or warrants to purchase or any securities that are convertible into or
exchangeable for, or that represent the right to receive, ADSs or Ordinary
Shares or any such substantially similar securities; and (B) any shares or
equity interests in the Company's subsidiaries or controlled affiliates or
depositary shares or depositary receipts representing such shares or equity
interests, including by not limited to securities that are convertible into or
exchangeable for or that represent the right to receive such shares or equity
interests or such depositary shares or receipts, or any such substantially
similar securities, whether now owned or hereinafter acquired (of record,
beneficially or otherwise, including as a custodian) (the securities covered by
the foregoing clauses (A) and (B), collectively, are referred to as the "LOCK-UP
SECURITIES"; except that the foregoing restrictions shall not apply to (1) the

A-I(B)-3

ADSs and the Ordinary Shares underlying such ADSs, (2) the issuance of Ordinary Shares in connection with bona fide strategic acquisitions by the Company not to exceed 32.0 million Ordinary Shares in the aggregate, (3) grants of options pursuant to the Company's employee stock option plans, and (4) any Ordinary Shares to be issued by the Company upon the exercise of any options described in clause (3) above; provided however, that if (x) during the last 17 days of the Lock-up Period, the Company releases earnings results or announces material news or a material event or (y) prior to the expiration of the Lock-up Period, the Company announces that it will release earnings results during the 15-day period following the last day of the Lock-up Period, then in each case the Lock-up Period will be automatically extended until the expiration of the 18-day period beginning on the date of release of the earnings results or the announcement of the material news or material event, as applicable unless you waive, in writing, such extension; and provided further that, if the Company issues ADSs pursuant to (2) above, the Lock-Up Period will be automatically extended until the expiration of the remainder of 90-day lock-up period. The Company will provide you and each holder of ADSs subject to the Lock-up Period with prior notice of any such announcement that gives rise to an extension of the Lock-up Period.

The foregoing restriction is expressly agreed to preclude the undersigned from engaging in any hedging, swap or other transaction or arrangement which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Undersigned's Securities even if such securities would be disposed of by someone other than the undersigned, or transfers, in whole or in part, any of the economic consequences of ownership of the Undersigned's Securities, whether any of these transactions are to be settled by delivery of the Undersigned's Securities or other securities, in cash or otherwise. Such prohibited hedging or other transactions would include without limitation any short sale or any purchase, sale or grant of any right (including without limitation any put or call option) with respect to any of the Undersigned's Securities or with respect to any security that includes, relates to, or derives any significant part of its value from such securities. In addition, the undersigned agrees not to publicly disclose the intention to make any offer, sale, pledge, disposition or filing, without the prior written consent of the Representative.

The undersigned understands that the Company, the Selling Shareholders and the Underwriters are relying upon this Lock-up Agreement in proceeding toward consummation of the offering. The undersigned further understands that this Lock-up Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors, and assigns. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the Undersigned's Securities except in compliance with the foregoing restrictions.

This Lock-up Agreement shall terminate upon the expiration of the Lock-up Period or in the event that there is no delivery of, and payment for, the ADSs pursuant to the Underwriting Agreement, upon three days' prior written notice of such non-delivery and non-payment given by the undersigned to you.

A-I-2

Notwithstanding the foregoing, any prior lock-up agreement entered into by the undersigned remains in full effect except as superseded by the terms of this lock-up agreement. During the Lock-Up Period, the terms of this agreement prevail in any conflict with any prior lock-up agreement. Upon termination, cancellation or waiver of this lock-up agreement, the terms of any prior lock-up agreement remain in full effect.

Very truly yours,

------------------------------

A-I-3

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# EX–23.1

**EX–23.1 CONSENT OF DELOITTE TOUCHE TOHMATSU**
**F–1/A Filed on 11/01/2007**
File Number 333–146913



Exhibit 23.1

(DELOITTE LETTERHEAD)

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM


We consent to the use in this Registration Statement on Form F-1 of our reports dated September 25, 2007 relating to the consolidated financial statements and related financial statement schedule of Focus Media Holding Limited and management's report on the effectiveness of internal control over financial reporting, appearing in the Prospectus, which is part of this Registration Statement.

We also consent to the reference to us under the heading "Experts" in such Prospectus.

/s/ DELOITTE TOUCHE TOHMATSU CPA LTD.

DELOITTE TOUCHE TOHMATSU CPA LTD.

Shanghai, China

November 1, 2007

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the use in this Registration Statement on Form F-1 of our report dated October 24, 2007 relating to the consolidated financial statements of Allyes Information Technology Company Limited, appearing in the Prospectus, which is part of this Registration Statement.

We also consent to the reference to us under the heading "Experts" in such Prospectus.

/s/ DELOITTE TOUCHE TOHMATSU CPA LTD.

DELOITTE TOUCHE TOHMATSU CPA LTD.

Shanghai, China

November 1, 2007

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the use in this Registration Statement on Form F-1 of our report dated May 8, 2006 relating to the consolidated financial statements of Infoachieve Limited, appearing in the Prospectus, which is part of this Registration Statement.

We also consent to the reference to us under the heading "Experts" in such Prospectus.

/s/ DELOITTE TOUCHE TOHMATSU CPA LTD.

Deloitte Touche Tohmatsu CPA Ltd.

Beijing, the Peoples' Republic of China

November 1, 2007

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# EX–23.5

**EX–23.5 CONSENT OF KPMG**
**F–1/A Filed on 11/01/2007**
File Number 333–146913



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Ex. 23.5

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors
Focus Media Holding Limited:


We consent to the use of our report  included herein and to the reference to our
firm under the heading "Experts" in the registration statement.


/s/ KPMG

Hong Kong, China
November 1, 2007

# Exhibit D



**Focus Media Reports Second Quarter 2007 Results**

Second Quarter Revenue Increased by 126.3% and Net Income Increased by 126.2%

                                    Year-over-year


SHANGHAI, China, Sept. 27 /Xinhua-PRNewswire/ -- Focus Media Holding Limited (Nasdaq: FMCN), China's largest digital media group, today announced its unaudited financial results for the second quarter ended June 30, 2007.

```
    Highlights for Second Quarter 2007:
    -- Total revenues grew 126.3% year-over-year and 97.5% quarter-over-
       quarter to $113.3 million.
    -- Net income for the second quarter was $37.7 million, up 126.2% year-
       over-year and 131.5% quarter-over-quarter.  Fully diluted net income
       per ADS for the second quarter of 2007 was $0.32.  Focus Media also
       provides operating margin, net income and earnings per ADS on a non-
       GAAP basis that exclude non-cash share-based compensation expense and
       acquired intangible assets amortization expense to enable investors to
       better assess the Company's operating performance.  The non-GAAP
       measures are described below and reconciled to the corresponding GAAP
       measure in the section below titled ''Use of non-GAAP Financial
       Measures''.  Net income, excluding non-cash share-based compensation
       expenses and amortization of acquired intangible assets resulting from
       acquisitions (non-GAAP) for the second quarter was $45.3 million or
       $0.38 per fully diluted ADS.
    -- As our digital media offerings to our advertising clients continue to
       expand, we will be reporting our advertising service revenues under
       three separate lines going forward: Digital out-of-home which includes
       our commercial location network (which includes our Premier Office
       Building Channel A and other commercial location network channels, our
       outdoor LED network and our movie theater network), our in-store
       network and our in-elevator poster frame network; Mobile handset
       advertising; and Internet advertising.  In the second quarter of 2007,
       digital out-of-home advertising revenue was $76.9 million.
       -- Advertising service revenue from our commercial location network,
          including revenue from our outdoor LED network (also referred to as
          our iStreet Network) and movie theater advertising network, grew
          67.8% year-over-year and 61.4% quarter-over quarter to $51.1 million.
       -- Advertising service revenue from our in-store network grew 10.8%
          year-over-year and 9.1% quarter-over-quarter to $7.2 million.
       -- Advertising service revenue from our in-elevator poster frame
          network grew 89.7% year-over-year and 46.4% quarter-over-quarter to
          $18.5 million in the second quarter 2007.
    -- Mobile handset advertising revenue grew 253.8% year-over-year and 81.1%
```

```
        quarter-over-quarter, to $10.9 million in the second quarter 2007.
    -- Internet advertising revenue, primarily from revenues following the
       acquisition of Allyes in the first quarter 2007, was $25.2 million in
       the second quarter of 2007.
```

"We saw strong demand growth in the second quarter of 2007. In addition, upon the successful integration of Allyes, we have further expanded our ability to offer highly-effective cross-media solutions catering to the needs of our advertising clients. We believe Internet advertising will become another key growth driver for Focus Media in the future," said Jason Jiang, CEO of Focus Media. "Among our media networks, the in-store business is characterized by relatively low margin and intense competition. Going forward, we will focus on market share expansion by investing aggressively to secure additional store locations throughout China. Recently, we have signed up RT- Mart, one of the leading hypermarket chains with more than 60 stores in major cities in China and a partner of Auchan Group in France. We believe, by developing the largest in-store digital advertising network in China, we will be able to offer the most attractive media solutions for our fast-moving- consumer-goods (FMCG) advertising clients."

Second Quarter Financial Results

For the second quarter of 2007, Focus Media reported total revenues of $113.3 million, an increase of 126.3% compared to $50.1 million for the second quarter of 2006, and an increase of 97.5% compared to $57.3 million for the first quarter of 2007.

Our total digital out-of-home advertising revenue was $76.9 million in the second quarter of 2007, an increase of 64.4% from $46.8 million in the second quarter of 2006 and a sequential increase of 50.8% from $51.0 million in the first quarter of 2007. In the second quarter of 2007, commercial location advertising revenue was $51.1 million, contributing 66.4% of total digital out-of-home advertising revenue. Advertising service revenue from our in- store network was $7.2 million, or 9.4% of total digital out-of-home advertising revenue. Advertising service revenue from our poster frame network placed primarily in the elevators of residential complexes was $18.5 million in the second quarter of 2007, or 24.1% of total digital out-of-home advertising revenue.

Due to continuing expansion of our media offerings and strong demand from our customers, we have started to offer customized media solutions tailored to the needs of our large advertising clients. We have also extended the cycle time of our commercial location network in certain cities to more than 12 minutes. As a result, the number of 30-second equivalent time slots sold ("Slot Sold") and average revenue per 30-second equivalent time slot ("ASP") for our networks are no longer as representative. Therefore, going forward, we will no longer provide such data in our earning reports.

As of June 30, 2007, the total installed base of displays in our commercial location network was 89,687 nationwide, including 85,010 displays through our directly owned networks, and 4,677 displays through our regional distributors. In the second quarter of 2007, we continued to expand the installed base of our hypermarkets to 1,205 stores from 1,196 hypermarkets as of March 31, 2007. The installed base of supermarkets and convenience stores was 734 and 2,056, respectively, as of June 30, 2007. The number of displays installed in our in-store network increased to 41,322 as of June 30, 2007 compared to 40,736 as of March 31, 2007. The total number of frames available for sale was 161,435 as of June 30, 2007, as compared to 124,542 as of March 31, 2007. As of August 30, 2007, we had installed 6,796 digital 2.0 frames, mainly in Beijing, Shanghai, Guangzhou and Shenzhen.

Mobile Advertising Business

Advertising service revenue from Focus Media Wireless in the second quarter of 2007 was $10.9 million, up 253.8% from $3.1 million in the second quarter of 2006 and 81.1% from $6.0 million in the first quarter of 2007.

Internet Advertising Business

Advertising service revenue from Allyes was $25.2 million in the second quarter of 2007. Digital marketing service, digital marketing technology and digital performance media contributed 90.0%, 3.4%, 6.6% respectively to the total Internet advertising revenue.

Gross profit for the second quarter of 2007 was $61.8 million, representing an increase of 117.2% compared to $28.5 million for the corresponding period a year ago and a 94.8% increase compared to $31.8 million in the first quarter 2007. In the second quarter 2007, gross margin for our digital out-of-home business was 63.1%. Within the digital out-of-home business, commercial location network gross margin was 65.0%, in-store network gross margin was 28.4%, and the poster frame network gross margin was 71.6%. The gross margin for our mobile advertising business was 58.0%. The gross margin for our Internet advertising business was 27.1% in the second quarter 2007. Blended gross margin for the company for the second quarter was 54.6%, as compared to 56.9% in the second quarter of 2006, primarily due to the addition of the lower-margin Internet advertising business to our revenue mix.

In the second quarter of 2007, operating expenses totaled $23.7 million, including $0.8 million in acquired intangible asset amortization resulting from acquisitions and non-cash share-based compensation expense of $4.6 million. Operating expenses as a percentage of total revenues in the second quarter 2007 was 20.9%, as compared to 30.2% in the previous quarter. Selling and marketing expenses in the second quarter totaled $13.2 million including $2.0 million in share compensation expense, or 11.6% of total revenues. General and administrative expense in the second quarter was $11.6 million including $2.6 million in share-based compensation expense, or 10.3% of total revenues. Our operating margin in the second quarter of 2007 was 33.7%, up significantly from 25.2% in the first quarter 2007. Excluding non-cash share- based compensation expense and acquired intangible asset amortization expense, operating margin (non-GAAP) was 40.4% in the second quarter 2007.

Net income for the second quarter of 2007 was $37.7 million, an increase of 126.2% compared to $16.7 million for the same period in 2006. Fully diluted net income per ADS for the second quarter of 2007 was $0.32. Net income excluding non-cash share-based compensation expense and acquired intangible assets amortization expense resulting from acquisitions (non-GAAP) in the second quarter of 2007 was $45.3 million, or $0.38 per fully diluted ADS.

Other Recent Developments

On March 16, 2006, Shanghai Xicheng Cultural Dissemination Co.,Ltd, also referred to as CGEN, brought a suit against us in the Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. On July 25, 2007, we received the civil judgment of first instance by the Shanghai No.1 Intermediate People's Court which dismissed the lawsuit.

In September 2007, the Audit Committee completed its investigation into allegations made by U.S. counsel to an investor described as holding a short position in Focus Media shares. Based upon its review of the evidence, the audit committee concluded that nothing has come to its attention -- apart from the initial allegations that gave rise to the investigation -- that would cause the audit committee to believe that Focus Media made undisclosed rebate payments to a third party advertising agency through another advertising agency, namely, Everease. We concluded that Everease is a related party based upon information developed during the investigation. Based upon its review of the evidence, the audit committee concurred with our conclusion that Everease should be deemed a related party. Subsequently, the Company filed its delayed 2006 20-F annual report on September 25, 2007. Our 2006 annual report on form 20-F is available at the investor relations portion of our website ( http://ir.focusmedia.cn ).

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range from $132 million to $135 million. Third quarter 2007 net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions (non-GAAP) is expected to be between $52 million and $54 million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS equivalent average shares outstanding. Due to higher-than- expected growth in our Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

USE OF NON-GAAP FINANCIAL MEASURES

In addition to Focus Media's consolidated financial results under GAAP, the Company also provides non-GAAP financial measures, including non-GAAP operating margin, non-GAAP net income and non-GAAP earnings per fully diluted ADS, all excluding non-cash share-based compensation and acquired intangible asset amortization expense resulting from acquisitions. The Company believes that these non-GAAP financial measures provide investors with another method for assessing Focus Media's operating results in a manner that is focused on the performance of its ongoing operations. Readers are cautioned not to view non-GAAP results on a stand-alone basis or as a substitute for results under GAAP, or as being comparable to results reported or forecasted by other companies, and should refer to the reconciliation of GAAP results with non- GAAP results for the three-month periods ended March 31 2007, and the three- and six-month periods ended June 30, 2006 and 2007, in the attached financial information.

The Company believes that both management and investors benefit from referring to these non-GAAP financial measures in assessing the performance of Focus Media and when planning and forecasting future periods. The Company computes its non-GAAP financial measures using the same consistent method from quarter to quarter. The accompanying tables have more details on the GAAP financial measures that are most directly comparable to non-GAAP financial measures and the related reconciliation between these financial measures.

```
                    Focus Media Holding Ltd.
                Reconciliation of Non-GAAP to GAAP
            (U.S. Dollar in thousands, except share data)
```

|  | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
|  | 2007-6-30 (unaudited) | 2006-6-30 (unaudited) | 2007-3-31 (unaudited) | 2007-6-30 (unaudited) | 2006-6-30 (unaudited) |
| GAAP net income attributable to shareholders | $37,715 | $16,671 | $16,292 | $54,007 | $26,104 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| Non-GAAP net income | $45,306 | $20,062 | $22,741 | $68,047 | $31,960 |

GAAP income per

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| ADS – basic | $0.33 | $0.16 | $0.15 | $0.48 | $0.27 |
| GAAP income per |  |  |  |  |  |
| ADS – diluted | $0.32 | $0.16 | $0.15 | $0.47 | $0.26 |
| Non-GAAP income per |  |  |  |  |  |
| ADS – basic | $0.39 | $0.20 | $0.21 | $0.61 | $0.34 |
| Non-GAAP income per |  |  |  |  |  |
| ADS – diluted | $0.38 | $0.19 | $0.21 | $0.59 | $0.32 |
| Shares used in calculating basic GAAP/Non-GAAP income per ADS | 115,701,382 | 101,826,234 | 107,179,635 | 112,102,181 | 94,735,718 |
| Shares used in calculating diluted GAAP/ Non-GAAP income per ADS | 119,385,064 | 106,547,388 | 110,390,777 | 115,473,182 | 99,135,414 |
| GAAP income from operations | $38,164 | $16,938 | $14,444 | $52,608 | $26,131 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| Non-GAAP income from operations | $45,755 | $20,329 | $20,893 | $66,648 | $31,987 |
| Non-GAAP operating margin | 40.4 % | 40.6 % | 36.4 % | 39.1 % | 38.4 % |

TODAY'S CONFERENCE CALL

Focus Media will host a conference call to discuss the second quarter 2007 financial results and third quarter 2007 business outlook at 9:00 p.m. U.S. Eastern Time on September 27, 2007 (6:00 p.m. U.S. Pacific Time on September 27, 2007; 9:00 a.m. Beijing/Hong Kong time on September 28, 2007). The dial- in details for the live conference call are: U.S. Toll Free Number +1-866-700- 7477, Hong Kong dial-in number +852-3002-1672, International dial-in number +1-617-213-8840; Pass code 81045580.

A replay of the call will be available from September 27, 2007 until October 4, 2007 (U.S. Eastern Time). The dial-in details for the replay are: U.S. Toll Free Number +1-888-286-8010; international dial-in number +1-617- 801-6888; pass code

34979673. A webcast of this call will also be available live and archived on Focus Media's website at http://ir.focusmedia.cn .

About Focus Media Holding Limited

Focus Media Holding Limited (Nasdaq: FMCN) is the largest digital media group in China, leading China's digital out-of-home, mobile advertising and internet advertising markets. Based on audience-centric approach, Focus Media provides targeted advertising channels, powered by a broad portfolio of LCD, digital frame, wireless, internet and other new media technologies, which cover specific demographic groups and their daily activities, from office buildings to retail chain stores, residential buildings, shopping malls, golf country clubs, airports, and airport transit buses in China. As of June 30, 2007, Focus Media digital out-of-home had approximately 131,000 LCD display units and 161,400 advertising poster frames, installed in over 90 cities throughout China and 200 outdoor LED displays in Shanghai. Over 4,000 international and domestic advertisers have placed advertisements through our digital out-of-home advertising networks as of June 30, 2007. For more information about Focus Media, please visit our website at http://ir.focusmedia.cn .

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward- looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F, in each case as amended. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

```
                    Focus Media Holding Limited
            UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS
                      (U.S. Dollars in thousands)


                                         2007-6-30        2006-12-31
          ASSETS
          Current assets
            Cash and cash equivalents    $187,592          $164,611
            Investment in debt securities  41,317                --
            Accounts receivables, net     119,118            61,614
            Inventories                     2,339               519
            Prepaid expenses and other current
             assets                         15,788             5,199
          Deposits paid for acquisition of
           subsidiaries                     31,873             3,526
```

| | | |
|---|---:|---:|
| Amount due from related parties | 6,832 | 7,853 |
| Rental deposits | 23,365 | -- |
| Total current assets | $428,224 | $243,322 |
| Rental Deposits | -- | 11,833 |
| Equipment, net | 81,229 | 70,250 |
| Acquired intangible assets, net | 73,009 | 34,717 |
| Goodwill | 924,202 | 739,744 |
| Other long term assets | 20,305 | 6,376 |
| Total assets | $1,526,969 | $1,106,242 |

LIABILITIES AND SHAREHOLDERS' EQUITY
(DEFICIENCY)

| | | |
|---|---:|---:|
| Current liabilities | | |
| Short term debt | $394 | $2,769 |
| Accounts payable | 32,502 | 5,987 |
| Accrued expenses and other current liabilities | 65,179 | 38,674 |
| Income taxes payable | 10,841 | 4,060 |
| Amount due to related parties | 3,055 | 347 |
| Deferred tax liabilities | 1,098 | -- |
| Total current liabilities | $113,069 | $51,837 |
| Deferred tax liabilities | 6,132 | 3,303 |
| Total liabilities | $119,201 | $55,140 |
| Minority interests | 447 | 358 |
| Shareholders' equity | | |
| Ordinary shares | 31 | 27 |
| Additional paid in capital | 1,242,817 | 709,196 |
| Acquisition consideration to be issued | -- | 237,879 |
| Retained earnings | 148,734 | 96,195 |
| Accumulated other comprehensive income | 15,739 | 7,447 |
| Total shareholders' equity | $1,407,321 | $1,050,744 |
| Total liabilities and shareholders' equity | $1,526,969 | $1,106,242 |

Focus Media Holding Limited
UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
(U.S. Dollar in thousands, except share data)

| | Three months ended | | Six months ended | |
|---|---|---|---|---|
| 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |

|  | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
|---|---|---|---|---|---|
| Gross revenues |  |  |  |  |  |
| (note 3): |  |  |  |  |  |
| Digital |  |  |  |  |  |
| out-of-home |  |  |  |  |  |
| Commercial |  |  |  |  |  |
| Locations | $55,368 | $33,406 | $34,918 | $90,286 | $56,868 |
| In-store |  |  |  |  |  |
| network | 7,998 | 7,235 | 7,326 | 15,324 | 13,053 |
| In-elevator |  |  |  |  |  |
| Poster Frame |  |  |  |  |  |
| Network | 20,347 | 10,736 | 13,854 | 34,201 | 17,394 |
| Mobile handset |  |  |  |  |  |
| advertising | 11,268 | 3,365 | 6,020 | 17,288 | 3,365 |
| Internet |  |  |  |  |  |
| advertising | 26,418 | -- | -- | 26,418 | -- |
| Other revenue | 305 | 233 | 381 | 686 | 690 |
| Total gross |  |  |  |  |  |
| revenues | 121,704 | 54,975 | 62,499 | 184,203 | 91,370 |
| Less: Sales |  |  |  |  |  |
| taxes | 8,429 | 4,912 | 5,159 | 13,588 | 8,109 |
| Total revenues | 113,275 | 50,063 | 57,340 | 170,615 | 83,261 |
|  |  |  |  |  |  |
| Cost of |  |  |  |  |  |
| revenues |  |  |  |  |  |
| (note 4): |  |  |  |  |  |
| Digital |  |  |  |  |  |
| out-of-home |  |  |  |  |  |
| Commercial |  |  |  |  |  |
| Locations | 17,868 | 11,487 | 12,898 | 30,766 | 19,713 |
| In-store |  |  |  |  |  |
| Network | 5,187 | 4,394 | 5,027 | 10,214 | 8,367 |
| In-elevator |  |  |  |  |  |
| Poster Frame |  |  |  |  |  |
| Network | 5,265 | 3,222 | 4,746 | 10,011 | 6,014 |
| Mobile handset |  |  |  |  |  |
| advertising | 4,569 | 2,405 | 2,754 | 7,323 | 2,405 |
| Internet |  |  |  |  |  |
| advertising | 18,405 | -- | -- | 18,405 | -- |
| Total |  |  |  |  |  |
| advertising |  |  |  |  |  |
| service |  |  |  |  |  |
| costs | 51,294 | 21,508 | 25,425 | 76,719 | 36,499 |
| Other costs | 138 | 80 | 165 | 303 | 312 |
| Total cost of |  |  |  |  |  |
| revenues | 51,432 | 21,588 | 25,590 | 77,022 | 36,811 |
| Gross profit | 61,843 | 28,475 | 31,750 | 93,593 | 46,450 |

| | | | | | |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| General and administrative (note 4) | 11,646 | 6,298 | 8,683 | 20,329 | 10,693 |
| Selling and marketing (note 4) | 13,154 | 5,376 | 9,886 | 23,040 | 9,783 |
| Other operating income | (1,121) | (137) | (1,263) | (2,384) | (157) |
| Total operating expenses | 23,679 | 11,537 | 17,306 | 40,985 | 20,319 |
| Income from operations | 38,164 | 16,938 | 14,444 | 52,608 | 26,131 |
| Interest income, net | 1,870 | 605 | 2,693 | 4,563 | 1,493 |
| Other income (expenses), net | 12 | (408) | 92 | 104 | (479) |
| Income before tax and minority interests | 40,046 | 17,135 | 17,229 | 57,275 | 27,145 |
| Income tax expense | | | | | |
|   - Current | 2,683 | 553 | 1,101 | 3,784 | 618 |
|   - Deferred | (365) | (180) | (133) | (498) | 372 |
| Total income taxes | 2,318 | 373 | 968 | 3,286 | 990 |
| Income before minority interests | 37,728 | 16,762 | 16,261 | 53,989 | 26,155 |
| Minority Interests | 13 | 91 | (31) | (18) | 51 |
| Net income | $37,715 | $16,671 | $16,292 | $54,007 | $26,104 |
| | | | | | |
| Income per ADS - basic | $0.33 | $0.16 | $0.15 | $0.48 | $0.27 |
| Income per ADS - diluted | $0.32 | $0.16 | $0.15 | $0.47 | $0.26 |
| | | | | | |
| Shares used in calculating | | | | | |

```
basic
income
per ADS     115,701,282 101,826,234 107,179,635 112,102,181  94,735,718

Shares used in
 calculating
 diluted
 income
per ADS     119,385,064 106,547,388 110,390,777 115,473,182  99,135,414
```

```
                    Focus Media Holding Limited
         UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASHFLOWS
                     (U.S. Dollar in thousands)
```

| | Three months ended | | Six months ended | |
|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| Operating activities: | | | | |
| Net income | $37,715 | $16,671 | $54,007 | $26,104 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Minority interest | 13 | 91 | (18) | 51 |
| Bad debt provision | 1,620 | 575 | 2,416 | 770 |
| Share based compensation | 4,919 | 1,896 | 9,436 | 3,363 |
| Depreciation and amortization | 4,269 | 3,523 | 8,108 | 6,131 |
| Amortization of acquired intangible assets | 2,672 | 1,493 | 4,604 | 2,492 |
| Changes in assets and liabilities, net of effects of acquisitions | (21,754) | (11,622) | (21,983) | (21,518) |
| Net cash provided by operating activities | 29,454 | 12,627 | 56,570 | 17,393 |
| Investing activities: | | | | |
| Purchase of equipment and other Long term assets | (15,274) | (3,254) | (25,265) | (11,608) |
| Acquisition of an intangible asset | (105) | -- | (105) | -- |
| Purchase of subsidiaries, net of cash acquired | (4,514) | (29,341) | (56,774) | (87,060) |
| Deposits paid to acquire subsidiaries | (15,198) | -- | (35,268) | -- |
| Investment in debt securities | (18,735) | -- | (40,715) | -- |
| Net cash used in investing | | | | |

| | | | | |
|---|---|---|---|---|
| activities | (53,826) | (32,595) | (158,127) | (98,668) |
| Financing activities: | | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs | 3,063 | 83,015 | 120,258 | 148,680 |
| Proceeds from short-term bank loans | -- | 23,351 | -- | 24,598 |
| Capital injection from minority shareholders | -- | -- | 97 | 250 |
| Repayment of short-term bank loans | (656) | (1,247) | (656) | (2,239) |
| Repayment of short-term other loans | -- | (3,734) | (3,115) | (3,813) |
| Net cash provided by financing activities | 2,407 | 101,385 | 116,584 | 167,476 |
| Effect of exchange rate changes | 4,994 | (596) | 7,955 | (170) |
| Net (decrease) increase in cash and cash equivalents | (16,971) | 80,821 | 22,982 | 86,031 |
| Cash and cash equivalents, beginning of period | 204,563 | 41,863 | 164,610 | 36,653 |
| Cash and cash equivalents, end of period | 187,592 | 122,684 | 187,592 | 122,684 |
| Supplemental disclosure of cash flow information: | | | | |
| Income taxes paid | 297 | 114 | 577 | 114 |
| Interest paid | -- | 13 | -- | 26 |
| Supplemental disclosure of non-cash investing activity: | | | | |
| Acquisition of subsidiaries: | | | | |
| Value of ordinary share consideration | $11,769 | $79,874 | $166,050 | $365,665 |
| Accounts payable | $1,129 | $27,318 | $1,129 | $27,318 |

Notes:

Note 1: Basic income per ADS is computed by dividing income attributable
        to holders of ordinary shares by the weighted average number of
        ADS outstanding during the year/period. Diluted income per ADS
        reflects the potential dilution that could occur if securities or
        other contracts to issue ADS were exercised or converted into ADS.

Note 2: The conversion of Renminbi (''RMB'') amounts into USD amounts is
        based on the rate of USD1 = RMB7.6155 on June 30, 2007.

Note 3: Details of net revenues are as follows (U.S. Dollars in thousands):

| | Three months ended | | | Six months ended | |
| --- | --- | --- | --- | --- | --- |
| | 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| Gross Advertising Service Revenue: | | | | | |
| Digital out-of-home: | | | | | |
| Commercial Locations | | | | | |
|   - Unrelated parties | $55,321 | $30,564 | $32,413 | $87,734 | $50,586 |
|   - Related parties | 47 | 2,842 | 2,505 | 2,552 | 6,382 |
| Total Commercial Locations | 55,368 | 33,406 | 34,918 | 90,286 | 56,868 |
| In-store Network | | | | | |
|   - Unrelated parties | 7,998 | 6,146 | 6,011 | 14,009 | 11,007 |
|   - Related parties | -- | 1,089 | 1,315 | 1,315 | 2,046 |
| Total in-store network | 7,998 | 7,235 | 7,326 | 15,324 | 13,053 |
| In-elevator Poster Frame Network | | | | | |
|   - Unrelated parties | 20,249 | 10,736 | 13,854 | 34,103 | 17,394 |
|   - Related parties | 98 | -- | -- | 98 | -- |
| Total In-elevator Poster Frame Network | 20,347 | 10,736 | 13,854 | 34,201 | 17,394 |
| Mobile handset advertising | | | | | |
|   - Unrelated parties | 11,179 | 3,365 | 6,020 | 17,199 | 3,365 |
|   - Related parties | 89 | -- | -- | 89 | -- |
| Total mobile handset advertising | 11,268 | 3,365 | 6,020 | 17,288 | 3,365 |
| Internet advertising | | | | | |
|   - Unrelated parties | 26,088 | -- | -- | 26,088 | -- |
|   - Related parties | 330 | -- | -- | 330 | -- |
| Total internet advertising | 26,418 | -- | -- | 26,418 | -- |
| Gross Advertising Services Revenue: | 121,399 | 54,742 | 62,118 | 183,517 | 90,680 |

Less: Sales taxes:
Commercial

| | | | | | |
|---|---|---|---|---|---|
| locations: | 4,308 | 2,968 | 3,274 | 7,582 | 5,050 |
| In-store Network | 754 | 697 | 688 | 1,442 | 1,221 |
| In-elevator Poster | | | | | |
| Frame Network | 1,799 | 958 | 1,185 | 2,984 | 1,549 |
| Digital out-of-home | 6,861 | 4,623 | 5,147 | 12,008 | 7,820 |
| Mobile handset | | | | | |
| advertising | 386 | 289 | 12 | 398 | 289 |
| Internet advertising | 1,182 | -- | -- | 1,182 | -- |
| Total sales taxes: | 8,429 | 4,912 | 5,159 | 13,588 | 8,109 |

| | | | | | |
|---|---|---|---|---|---|
| Net Advertising | | | | | |
| Service Revenue | 112,970 | 49,830 | 56,959 | 169,929 | 82,571 |
| Add: Other revenue: | 305 | 233 | 381 | 686 | 690 |
| Net revenues: | $113,275 | $50,063 | $57,340 | $170,615 | $83,261 |

Note 4: Share based compensations included under SFAS 123R are as follows
(U.S. Dollars in thousands):

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| Cost of revenues | $284 | $- | $281 | $565 | $- |
| Selling and | | | | | |
| marketing | 2,084 | 341 | 2,061 | 4,145 | 678 |
| General and | | | | | |
| administrative | 2,551 | 1,556 | 2,175 | 4,726 | 2,685 |
| Sub-total | $4,919 | $1,897 | $4,517 | $9,436 | $3,363 |

Note 5: The Company has performed preliminary purchase price allocation on
their acquisition made in the third and fourth quarters of 2006
and the first two quarters of 2007 based on an internal valuation
performed by management.  The purchase price allocation will be
finalized once the independent valuation analysis is completed.

Note 6: The earnings per ADS is based on the new conversion ratio of 1 ADS
to 5 ordinary shares, effective as of April 11, 2007. The
comparative numbers haven been adjusted to reflect the conversion.

Focus Media Holding Ltd.

Reconciliation of Non-GAAP to GAAP

(U.S. Dollar in thousands, except percentages, share and per-share data)

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| GAAP net income attributable to shareholders | $37,715 | $16,671 | $16,292 | $54,007 | $26,104 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| Non-GAAP net income | $45,306 | $20,062 | $22,741 | $68,047 | $31,960 |
| GAAP income per ADS - basic | $0.33 | $0.16 | $0.15 | $0.48 | $0.27 |
| GAAP income per ADS - diluted | $0.32 | $0.16 | $0.15 | $0.47 | $0.26 |
| Non-GAAP income per ADS - basic | $0.39 | $0.20 | $0.21 | $0.61 | $0.34 |
| Non-GAAP income per ADS - diluted | $0.38 | $0.19 | $0.21 | $0.59 | $0.32 |
| Shares used in calculating basic GAAP/ Non-GAAP income per ADS | 115,701,382 | 101,826,234 | 107,179,635 | 112,102,181 | 94,735,718 |
| Shares used in calculating diluted GAAP/ Non-GAAP income per ADS | 119,385,064 | 106,547,388 | 110,390,777 | 115,473,182 | 99,135,414 |
| GAAP income from operations | $38,164 | $16,938 | $14,444 | $52,608 | $26,131 |

```
Amortization of
 acquired
 intangible
 assets          2,672     1,494     1,932     4,604     2,493
Share-based
 compensation    4,919     1,897     4,517     9,436     3,363
Non-GAAP income
 from
 operations    $45,755   $20,329   $20,893   $66,648   $31,987


Non-GAAP
 operating
 margin          40.4 %    40.6 %    36.4 %    39.1 %    38.4 %
```

```
For more information, please contact:

Investor and Media contact:
 Jie Chen
 Tel:  +86-21-3212-4661 x6607
 Email: ir@focusmedia.cn
```

```
SOURCE  Focus Media Holding Ltd.
    -0-                  09/27/2007
    /CONTACT:  Jie Chen of Focus Media, +86-21-3212-4661 x6607, or
ir@focusmedia.cn /
    /Web Site:  http://ir.focusmedia.cn /
    (FMCN)
```

```
CO:  Focus Media Holding Ltd.
ST:  China
IN:  ADV MLM PUB
SU:  ASI CCA ERN
```

```
MM
-- CNTH026 --
8009 09/27/2007 16:00 EDT http://www.prnewswire.com
```

# Exhibit E

## Thomson StreetEvents℠

### FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

Event Date/Time: May. 17. 2007 / 9:00PM ET

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call**

## CORPORATE PARTICIPANTS

**Jie Chen**
*Focus Media Holdings Ltd - IR Manager*

**Daniel Wu**
*Focus Media Holdings Ltd - CFO*

**Zhi Tan**
*Focus Media Holdings Ltd - Director of the Board and President*

**Jason Jiang**
*Focus Media Holding Ltd - Chairman & CEO*

## CONFERENCE CALL PARTICIPANTS

**Jason Brueschke**
*Citigroup - Analyst*

**Kit Low**
*Goldman Sachs - Analyst*

**Aaron Kessler**
*Piper Jaffray - Analyst*

**Jason Helfstein**
*CIBC World Markets - Analyst*

**James Lee**
*W R Hambrecht & Co - Analyst*

**Richard Ji**
*Morgan Stanley Research Asia Pacific - Analyst*

**Eddie Leung**
*Deutsche Bank Asia China - Analyst*

**Lin Shi**
*Lehman Brothers - Analyst*

**Louis Corrigan**
*Kingsford Capital - Analyst*

## PRESENTATION

**Operator**

Good day ladies and gentlemen. I would like to welcome you to your first quarter 2007 Focus Media Holding Limited earnings conference call. My name is Alexis and I will be your coordinator for today. [OPERATOR INSTRUCTIONS]. As a reminder ladies and gentlemen this conference is being recorded for replay purposes. I would now like to turn the presentation over to your host for today's call Ms. Jie Chen, Investor Relations Manager of Focus Media. Please proceed.

---

**Jie Chen** - *Focus Media Holdings Ltd - IR Manager*

Thank you. Welcome to Focus Media first quarter 2007 earnings conference call. Today our management will discuss the Company's financial results for the first quarter of 2007 and discuss the business outlook for the second quarter of 2007. With me here are Jason Jiang, Chairman of the Board and Chief Executive Officer, Zhi Tan, Director of the Board and President, and Daniel Wu, Chief Financial Officer. After Daniel updates you our first quarter 2007 operational and financial performance, we

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

will open the call for questions. This call is also broadcasted through Internet and available through our Investor Relations website ir.focusmedia.cn.

Before we begin I would like to remind you that during the course of this call we will make forward looking statements that are subject to risks and uncertainties. The statements include but are not limited to statements regarding Focus Media's business objectives and plans [reflecting] the expectations of the development of our networks and our outlook for the second quarter 2007, for example. You can also identify forward looking statements by terms such as will, expects, anticipates, future, intends, plans, believes, estimates and similar statements.

The accuracy of these statements may be affected by a number of risks and uncertainties that could cause our actual results to differ materially from those projected or anticipated. These risks and uncertainties include but are not limited to our limited operating history for current operations or such history of the [audio comms] or audiovisual sector, which will make it difficult for you to evaluate the viability and prospects of business. The integration of [inaudible] business, competition from our present and future competitors in China's growing advertising market and other risks are in our filings with the SEC including our interpretations and statements on Form F1. We do not undertake any obligation to update these forward looking information except as required under applicable law. Now I will turn the call over to our CFO, Daniel Wu for a summary of the first quarter 2007 financial results.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Thank you Jie. I am pleased to report to you a solid first quarter of 2007. Gross revenue including various business taxes reached $63.3m. Our total revenue excluding sales taxes reached $58.1m, an increase of 75.4 from the same period last year. Our first quarter revenues include $32.4m from our Commercial Location business, $6.7m from our In-store business, $12.7m from our In Elevator Poster Frame business and $6.0m from our Wireless business.

First let me review in detail the results of our Commercial Location business. Total advertising revenue from our Commercial Location network in the first quarter was $32.4m. For our Premier Channel A, total network capacity increased to 16,320 time slots as compared to 15,939 time slots in the last quarter. Total network time slots sold on our Premier Channel A in the first quarter 2007 was 6,414, down from 8,533 time slots in the previous quarter due to the first quarter seasonality relating to the Chinese New Year holidays, but higher than the [3,904] time slots sold in the first quarter of 2006.

In tier-I cities, namely Beijing, Shanghai, Guangzhou, Shenzhen slots sold in the first quarter were 1,117, representing a network sell out rate of 89.5%. Average advertising revenue per time slot from our Premier Channel A in the tier-I cities was $12,029 in the first quarter. Slots sold in the tier-II cities were 5,298, representing a network sell out rate of 35.1%, while the average advertising revenue per time slot was 1,684.

Premier Channel A contributed 70% of total Commercial Location revenue. Other channels, including Office Channel B, Elite Channel, Travel Channel, Fashion Channel, [IT] [inaudible] Channel, Healthcare Channel, together with our Outdoor network and the movie theater advertising network contributed the remaining 30%.

For our In-store network total revenue was $6.7m in the first quarter of 2007. In the first quarter we further expanded the installed base of our hypermarkets to 1,196 hypermarkets from 1,100 hypermarkets at end of last year. Slots sold were 100,322 with a network sellout rate of 27.8% based on the increased capacity. The average advertising revenue per 30-second equivalent time slot per week per store was $67.

The advertising service revenue for our Poster Frame network in the first quarter was $12.7m, up 108.8% from $6.1m in the same period last year. The number of frame slots on a monthly basis totaled sold in the first quarter of 2007 was 195,603 up 17.2% as compared to 166,825 in the previous quarter. Total number of frames available for sale increased to 124,542 at the

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

end of March from 907 -- no, from 99,784 as of end of December 2006. The network sellout rate was 52.1. Average advertising revenue per frame slot was $65.

During the first quarter Focus Media Wireless generated revenue of $6.0m, up from $3.5m in the fourth quarter of 2006.

Gross profit for the first quarter of 2007 was $33.7m representing an increase of 82.1% from $18.5m for the corresponding period a year ago. The gross margin for our Commercial Location network in the first quarter was 61.7%. The In-store network gross margin was 24.7%. Poster Frame network gross margin was 66.9%. Focus Media Wireless gross margin was 56.5%. On a blended basis our gross margin for the first quarter was 58% as compared to 55.5% [sic - see press release].

First quarter operating expense totaled $20.5m including $1.9m in acquired intangible asset amortization resulting from historic acquisitions and non cash share based compensation expense of $4.5m. Selling and marketing expenses in the first quarter totaled $9.9m, including $2.1m in stock compensation expense, or 17% of total revenues. G&A expense in the first quarter was $8.7m, including $2.2m in stock compensation expense, or 14.9% of total revenue.

As a result operating margin in the first quarter of 2007 was 22.7%. Excluding non cash based share compensation expense and acquired intangible amortization, operating margin on a non GAAP basis was 33.8% in the first quarter of 2007. GAAP net income for the first quarter was $16.3m, or $0.15 per fully diluted ADS, up 72.7% from $9.4m for the same period last year. Non GAAP net income excluding non cash share based compensation expense and amortization of the intangible assets in Q1 of 2007 was $22.7m, or $0.21 per fully diluted ADS.

In the first quarter of 2007 cash flow from operating activity was $24m. Total depreciation expense was $3.8m.

Now I would like to provide Focus Media business outlook for the second quarter of 2007. Please note that the following outlook statements are based on our current expectations. These statements are forward looking and actual results may differ materially. We expect that the total revenue for the second quarter of 2007 to be between $103m and $107m, fully diluted EPS -- fully diluted earnings per ADS to be between $0.34 and $0.35. Thank you very much. Now we'll open the call for your questions. Operator.

## QUESTIONS AND ANSWERS

**Operator**

Thank you sir. [OPERATOR INSTRUCTIONS]. Ladies and gentlemen please stand by for your first question. And your first question will come from the line of Jason Brueschke with Citigroup. Please proceed.

**Jason Brueschke** - *Citigroup - Analyst*

Thank you. First of all, good morning gentlemen and congratulations really on a fantastic quarter as well as your outlook for the rest of the year. Let me just start with two questions and then I'll get back in the queue. The first one involves the Frame 2.0 announcement that you made this morning. Could you tell us if you've already tested a smaller batch than I think it's 10,000 that you plan to roll out, and maybe what the results of that testing was?

And then give us some idea of what the revenue effect of this improvement is likely to be as well as the associated costs. And I'll have another question on the Framedia business.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Okay. Dr. Tan will answer the question.

**Zhi Tan** - *Focus Media Holdings Ltd - Director of the Board and President*

This is Zhi Tan. We have tested on a small scale and right now we have deployed around 4,000 [sets] around the country. So far we received very positive feedback from customer and from our agents. We believe this will be very highly recognized product both from the quality and from the service provided to the customers. Internal revenue we cannot predict at this time about how much but what I may remind you is that this product will be able to provide a more efficient advertisement to our customer.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Jason this is Daniel Wu here. I think you have seen from the press release this product has been in the making for the last 15 months. Dr. Tan and his team have worked very hard during last year and a half to make this product available today for our media network. So overall we have very high expectation of this business.

Given we have just initially launched this product, I think we're not providing specific revenue guidance for this product, but we think it's going to contribute very positively for Focus Media this year as well as next year.

**Zhi Tan** - *Focus Media Holdings Ltd - Director of the Board and President*

I'd like to add a couple of more points in terms of the technology. This is Zhi Tan here. In terms of technology it is a highly integrated, state of the art, new technology, including wireless, infra red, high resolution, TV, [those things], and remote control, [sensor control]. Those things will be able to provide extremely good services to the customers. So we believe this will be very good positive, very positive product to the customer.

Secondly we also provided some different kind of, in broadcasting facilities to the customer. We have not only provided a single picture but also provide multi facet program design so the customer can give a predefined scheduling basis. For example, the customer can define from Monday to Friday from, 7 a.m. to 9 a.m. develop this [frame one] picture, and from 9 a.m. to 5 p.m. afternoon display another picture. So a customer can provide at lost up to 1,000 pictures and preload it into the system. So by preset a definition given to the system will display according to customer this definition, this schedule. So it will have the ability to provide such a flexibility to the customers.

**Jason Brueschke** - *Citigroup - Analyst*

Great. I guess the follow up question would be this, it seems like this is an ability to segment your deal. In the Commercial network you segment in some ways according to you location, what will be your lead channel etc. This investment you're going to be able to segment by time. And it would seem like you should be able to effectively achieve some kind of peak times and non peak times. And my expectation would be that overall revenues are probably going to be higher because there will be certainly either times of the days, or days of the week, or certain advertisers say a movie that's being launched wants to advertise a lot, say on a Thursday and Friday ahead of the premiere, and you can do some peak pricing. Is that the way we should be thinking about really the advantages of this technology?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Jason, what Dr. Tan was trying to explain before is basically we have the technology of doing this. The technology today is available to do multiple frames for single clients during the same day or selectively at different times during the day or different

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

times during the week. The sales process is gradually refined today. So not saying today we want to do this today, but we are capable of doing that. Potentially that will provide us more capacity to sell and provide better customer service to advertising customers. Today we are actually allowing each frame to carry three different customers at the same time. So basically it's -- the clients -- so this revolving picture and three different clients can be carried on a single frame.

**Jason Brueschke** - *Citigroup - Analyst*

Great. A quick, my second question is just some general information about Framedia in general. Could you tell us how many cities you currently are in, what your geographic expansion plans are for the rest of 2007? And maybe give us an idea of what we think the pricing as you move into more second tier cities is likely to be? Thanks.

**Zhi Tan** - *Focus Media Holdings Ltd - Director of the Board and President*

We have currently deployed about 15 cities, major cities in China, covering most of the major cities. But right now the problem is, tier-II and tier-III cities, there are not many buildings, high-rise buildings in residential area. Therefore we are limited to, not to our competitor, but there is no market in that area. So we have pretty good coverages of those available residential buildings throughout the country.

**Jason Brueschke** - *Citigroup - Analyst*

Okay. Great. Thank you guys.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Okay, sure.

**Operator**

Your next question will come from the line of Kit Low with Goldman Sachs. Please proceed.

**Kit Low** - *Goldman Sachs - Analyst*

Yes. Good Morning. Thanks for taking my question. A couple of quick questions. First one relates to the guidance on second quarter. On the second quarter if there is any way you could flag some guidance over what's the breakdown between the core business and Allyes contribution both in the top line and implicitly in non GAAP in this bottom line, that would be helpful. I will start with that and see if we go to the next one.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Hi Kit. Historically we have not provided a breakdown of segment within the business when we're providing guidance. And we're not going to do that on this call as well. I think traditionally the Company always provides guidance on a quarterly basis and at the beginning of the year on an annual basis, but we're providing a total revenue guidance and EPS guidance.

Our Allyes business is trading very well and we see this growth, as we discussed on the closing call of the Allyes acquisition, it's growth momentum is very strong. And we expect that to continue significantly in our second quarter revenues and earnings. So that has been already incorporated in the guidance we've provided.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Kit Low** - *Goldman Sachs - Analyst*

Okay, thanks. The second quick question relates to the CapEx for the digital frames, for Framedia. What sort of CapEx, is there any revision in CapEx expectations for this year on the back of that? And for the depreciation policy on the back of these frames, would that be consistent with what your current depreciation policy is.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure. I think, first of all, at the beginning of the year when we provide you the CapEx guidance, $20 to $25m, we were not exactly sure what the launch date of Framedia 2.0. So if we're going to launch in the middle of the year, of this year, and we expect installation continuing for the later part of the year, probably is going to have a few million dollars impact on CapEx. Because if you think about those frames they would typically cost roughly about CNY5,000 per unit. And we are going to upgrade at the high end of the market first and gradually push towards the lower end of the market, the mid and lower end of the market. So the impact on CapEx, will be, will increase CapEx by [$5] to a few million dollars depending on the deployment results. That is from the take up by the advertisers.

The depreciation is very straightforward. We are going to keep this five years' depreciation policy. It is same like the LCD network we have on the Commercial Location business.

**Kit Low** - *Goldman Sachs - Analyst*

Right. Thank you.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure. Thank you.

**Operator**

You next question comes from the line of Aaron Kessler of Piper Jaffray. Please proceed.

**Aaron Kessler** - *Piper Jaffray - Analyst*

A couple of questions. On the Framedia, can you give us any sense of the timing of when you'd expect rollout to take, in terms of '07 and '08?

And then can you provide some color around the expense level in Q2? With the higher revenue than we expected, it appears that you're modeling at some higher operating expenses as well or maybe some lower gross margins, so a little guidance on that.

And finally the In-store seemed a little weaker than the rest of them. We thought it'd be a little stronger given you still see some resiliency in the Chinese New Year in the In-store network. Was there any things specifically going on, on that In-store Network?

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Framedia, Frame 2.0 rollout as I said earlier is going to be a gradual process. So we're initially going to launch about 10,000 frames and then gradually increase the number. It depends on the customer uptake as well as it depends on how the business we believe is going to evolve in 2007, 2008. So that will contribute to our 2007 and 2008 business.

Do think it's not an additional market, but it's a case of gradual replace of the high end of the existing market. But it will increase the capacity as well as the advertisers' effectiveness, from the advertiser point of view, to make this media more attractive to high end, high paying advertisers and increase their ROI.

On the margin actually, if you think about Focus Media business, in our business most of the media segments are fixed cost base business. So when, as we said, when the first quarter there's the Chinese New Year holiday during which most people taking time off, so no people in the office building, we do experience a little bit soft in seasonality. So the margin we believe is normal. It doesn't reflect a longer trend. But it has to do -- more to do with the seasonality of the business.

I think In-store business is trading well. It's also affected by seasonality because people do take some time off during Q1. And we continue to expect In-store business this year to grow healthy. And this is -- as you've seen we continue to expand our coverage of hypermarkets. We continue to expand the number of screens we installed in the network. So there's really no difference today for the In-store network, anything particular we needed to highlight.

**Aaron Kessler** - *Piper Jaffray - Analyst*

And finally just on the Wireless business, that appeared up about 50% sequentially and also the margins were very strong. I think you indicated last quarter that the margins might tick down given that there's a one time benefit last quarter. Could you just give us some commentary on the strength of the Wireless business?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure. For the Wireless business, we do see very strong momentum in 2007. If you think about the growth margin this quarter, actually it's lower than Q4 because Q4 we had a one time rebate for mobile operators. Typically those rebate fees are paid at the end of the year. So we believe today that the gross margin of the Mobile business is sustainable going forward.

And also if you look at the growth of the Wireless business, it's both due to organic growth as well as some smaller acquisitions we made in Q1. That allow us to consolidate the platform we have for advertisers to deliver SMS and MMS based messaging to targeted consumer groups based on different business models. And we believe this business will grow very healthy.

And after the 3G network in place in China in a few years, we believe there's many more different business model will be available for the Wireless business to increase its advertising dollars.

**Aaron Kessler** - *Piper Jaffray - Analyst*

Great, thank you and good quarter.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure, thank you.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Operator**

Your next question comes from the line of Jason Helfstein with CIBC World Markets. Please proceed.

**Jason Helfstein** - *CIBC World Markets - Analyst*

Thank you. Three questions.

The first with respect to this quarter, very healthy utilization or occupancy growth this quarter particularly in tier-I markets. Does that set you up for strong pricing in the second quarter? That's question one.

Question two, we did notice however that the average direct cost or the margin per display for the Commercial business did tick up more than we thought. We expected that to be flat to down. Just any talk with respect to the margins in the Commercial Location network.

And then my last question, Daniel, can you remind us the $1.4m below the line, the other, what did that relate to? And did that continue into the second quarter? Thank you.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

First of all regarding pricing going forward, I think Jason --

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

[Interpreted]. First of all, Jason to answer your first question. We expect a very healthy pricing trend going forward, especially today in the high utilization cities versus the smaller cities we have in our network, we have already, have the price ready and start talking to our clients. We will make an announcement and put it on our website very shortly for the price increase for the later part of the year. So overall we believe the pricing trend is very healthy.

On the margins for the Commercial Location network, if you think about the margin compared actually quarter-over-quarter, it's quite similar to first quarter of 2006. So we still expect long term gross margin for the Commercial Location business, without taking into consideration seasonality, will be about 75%. So basically we think that the Commercial Location network this quarter is affected by seasonality.

But otherwise we continue to believe for the big cities, which we have very high utilization rate today, the gross margin will be higher. But for the smaller cities where the utilization is relatively lower, which means the cities we just started our network, the gross margin will be lower given the fixed cost nature of the business. But we believe the long-term gross margin of the overall Commercial Location network will be over 75%.

We are -- on the other expenses, we don't believe that will be recurring. So it's just certain one time related charges we have in various different business. And certain some of them to do with the write down of the inventory costs and that in nature. So we don't expect that to be a recurring cost.

**Jason Helfstein** - *CIBC World Markets - Analyst*

No, I'm talking about, there was other income, the $1.4m. It's like below interest.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

So you say the other -- I'm sorry, I thought you said other costs. Other income. Yes, that also -- it has to do with certain subsidiaries and that's not going to be a recurring income. So it has to do with the consolidation of the business.

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay. If I could follow up on your margin answer, was there any spending with respect to the outdoor LEDs or the movie business that would have hurt the Commercial Location margin?

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Not in the -- not anything we are expecting in the near term. And we are expanding our LED network into additional locations, pending -- we continue to look to expand those business at new locations, new opportunities. Nothing we have announced yet. But we don't expect those things will have a significant impact on our gross margins for the Commercial Location network given the business, those new business are relatively small compared to the existing revenue and margins.

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay. Last one and then I'll let someone else go. Are you reiterating your full guidance? Even though there was no commentary in the press release.

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

We don't -- I think the Company really don't reiterate guidance every call. So I think for this call we were -- for the press release, we said, we're providing Q2 guidance. And I think right now, it's just so close to the last time we talked about full year guidance. So we really don't want to make additional comments on the full year guidance.

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay, thank you.

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Thank you, Jason.

---

**Operator**

Your next question will come from the line of James Lee with WR Hambrecht. Please proceed.

---

**James Lee** - *W R Hambrecht & Co - Analyst*

Hi Daniel. Can you just elaborate about the Mobile advertising business a little bit more? Can you talk about how many new customers you signed on during the quarter? And how many customers you have in total?

And also can you comment about your -- the core business, the Commercial business a little bit. The dynamic is very different in this quarter, first quarter '07 versus first quarter '06, where your utilization rate at 1Q '06 was 75%. Obviously you did very

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call**

well, 89%. But we see a decline in pricing in this quarter versus 11% pricing increase in 1Q '06. Maybe you can explain that dynamic a little bit. Thanks.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure. Your first question was relating to the Mobile business? You breaked up a little bit, I didn't get that.

**James Lee** - *W R Hambrecht & Co - Analyst*

Yes, it was Mobile business, Daniel.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Yes, sure. Regarding the Mobile business, there's really no account of the number of clients because there's a lot of smaller clients and also a lot of the direct clients. So we don't have -- it's an extremely fragmented market. So there are clients who pay us a few hundred dollars. There's people paying us $100,000. So it's a very diversified client universe. So we really don't have a sort of specific number we could provide to you in terms of the number of clients. But we do think the business is improving.

And also it's very different from the other mobile content business because we really don't do any content. What we're providing is an advertising platform for both service providers as well as direct advertising customers to provide advertising messages or services to their choosing client universe, either based on demographics or based on clubs, communities, or based on the certain type of groups they involve or directly their customers. So it's a very diversified customer base as well as diversified revenue model. So that's -- I think that's going to be the trend going forward as well for the Mobile advertising business.

For the Commercial Location business, if you -- thanks for noticing that the utilization rate has picked up in Q1 versus last year Q1. I think of course if you -- do keep in mind during the two weeks Chinese New Year holidays, the office buildings closed. So really there's not much traffic in office buildings. So sometimes in order to sell in the softer Q1 season you have to provide a little bit more discount to advertisers.

So I think it's more of a balance how we run our business, how we balance the utilization rate versus the discounts. And I think this quarter we actually, given the discussion with different advertisers, we believe the balance we achieved this quarter allowed us to achieve very good financial results. So that's how it appears to be. So it's not really -- from our point of view, we don't target a specific utilization rate. Or we don't target a specific, of course, the discount level should be lower or better. But I think more importantly is we want to look at how many advertising dollars we can sell in any given quarter, given the fixed cost nature of the business.

**James Lee** - *W R Hambrecht & Co - Analyst*

Thanks. Daniel, is it fair to say in this quarter one '07, you've changed your sales approach versus the first quarter of last year, where you've become a little more flexible in pricing, given the --

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

This isn't really --

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**James Lee** - *W R Hambrecht & Co - Analyst*

In exchange for your customer taking more slots, given it is riding up.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Yes. I think it's really not a trend. It's not a sales approach James. Really our sales approach has not differed from the day we started Focus Media from today. It's just like different contracts we're negotiating, each of the contracts how you're shifting your balance a little bit. So it really has no shift or no change in sales approach.

**James Lee** - *W R Hambrecht & Co - Analyst*

Okay. Let me have a quick follow up on the Mobile side. You say in the Mobile there are also smaller customers versus your core base in your platforms. I was just wondering how much crossover do you have with your Mobile platform versus your advertising on your advertising on your Commercial platform.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

[Interpreted]. Today if you look at the Mobile Wireless business versus our main Commercial Location business, the Mobile Wireless business is more targeted advertising media. So the customers typically are local level and typically are much smaller in per contract size, in terms of revenue. The Commercial Location network if you think about that, that covers 130m urban consumers on a daily basis. So it's a very attractive platform for many large, multinational, large companies to do advertising to those highly attractive, urban consumer eyeballs.

Today we have started in this quarter to gradually educate our large clients to understand the effectiveness of mobile advertising. So today we do have some service plans to help those clients testing, to test and also to try and use the mobile advertising to reach the target consumers they want to reach. And we believe in the long term, especially with the improvement with the network with the 3G large clients will view mobile advertising become much more important, more and more important going forward as a part of their advertising solutions.

So going forward we do believe there's going to be certain benefits coming from providing this type of service, mobile advertising service, to the large client universe we have. But today the clients are very fragmented and more on the local level. Today that revenue is at the local level. Small client revenue still accounts the majority of the mobile advertising revenues.

**James Lee** - *W R Hambrecht & Co - Analyst*

Thank you, Daniel. Thank you, Jason.

**Operator**

Your next question will come from the line of Richard Ji with Morgan Stanley. Please proceed.

**Richard Ji** - *Morgan Stanley Research Asia Pacific - Analyst*

Hi Jason, Dr. Tan and Daniel and a good quarter.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Thank you.

---

**Richard Ji** - *Morgan Stanley Research Asia Pacific - Analyst*

I have two questions. First starting with the [Poster Frame] advertising, that obviously experienced robust growth and literally built sales up year-over-year, above all other business line. Can you help us understand a little better how sustainable especially in India in terms of your total number of frame available and also total number of frame sold? They both experienced a quite strong growth year-over-year and quarter-over-quarter. Can you help us to understand a little better how sustainable that kind of growth would be going forward?

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Sure. Okay, Dr. Tan will answer the question for you.

---

**Zhi Tan** - *Focus Media Holdings Ltd - Director of the Board and President*

The number of frames available for sales this year increased some of the number due to some secondary cities, tier-II cities [occupation]. So we just put it, added in such cities into our Group. So that's why we have increased the number of frames.

In terms of revenue we did see some good numbers, revenue coming in. But I don't believe this is the same [reason] for the quarter after that. But it is a good revenue stream for sure.

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Richard, sorry, you were breaking up a little bit. So I had to translate for Dr. Tan because we can't hear you very well. But if you can hear us, I think we continue to expect the frames, the number of frames to grow. And also the revenue trajectory going forward, as Dr. Tan said, would be less strong than Q1 because last year Q1 was the first quarter we integrated Framedia. So there's a slight soft business in the first quarter where we integrated the business. So relatively the comparison was a little bit easy for us.

---

**Richard Ji** - *Morgan Stanley Research Asia Pacific - Analyst*

Okay, yes. My second question is regarding your ASP trend, especially in tier-I cities and also for your In-store network. And obviously they both experienced some weakness during the quarter other than the normal seasonality, weak seasonality. How much of that price weakness is due to competition in your In-store network?

And I'm also particularly interested about the discount you're currently giving away on average through your agencies?

Hello?

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Just one second, let me translate for Jason.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

[Interpreted]. Richard, I think to talk about, first of all talk about Commercial Location pricing, in Q1 if you do keep in mind we increased price on January 1 of 2007. There are a lot of accounts given that they know we have a price increase have locked in the last year's price by signing contracts with -- advertising contracts in Q1. They signed the contracts in November and December of last year. So they will be able to enjoy the benefit of the lower price we have in last year. Those contracts, actually we don't sign those contracts any more after the price increase. So all the contracts signed after January 1, 2007 are based on the newer price.

So that's why relatively to the listed price we have the discounts in Q1 are slightly higher. Relative discount based on the listed price we have on the website.

And also we do have -- thanks for noticing, we do have a new sort of listing or sales strategy, given we have multiple channels today in Q1 of 2007. So in this year in Q1, during the Chinese New Year holidays, we actually promoted, have a special promotion package basically combining our multiple channels including the Fashion Channel, the Elite Channel, the Office Building Channel together to sell to the client as a package. It actually contributed positively to the overall revenue. But it's sold at a deeper discount because basically office buildings, there's not many people in the office building.

So that's why -- earlier we talked about you see the utilization rate in the Commercial Location business in Q1 was higher but the ASP was a little bit softer relatively to last year. We don't expect those special packages to be offered during the year except in the holiday period such as Chinese New Year holiday or May 1 or October 1.

So if you look at overall business for the Commercial Location business we believe based on our experience the discount level we offer to agencies as well as clients are actually improving. So the discount levels are decreasing gradually. So we don't see that has any -- if you think about it we continue to push price increase, that's because we do have very good pricing comparison in this media versus other comparable media.

For the In-store network, we do have a competitor which caps certain of level of pricing power we have in the In-store network. But you do see the In-store network are growing. So we believe In-Store network will continue to grow. Today it contributes 11.5% of Focus Media's overall revenue. We believe with addition of Allyes in Q2, the percentage of contribution for In-store network will be less than 10%. So In-store network is a media which we face a competitor, which caps certain pricing power. So it's not -- the pricing power is not as strong as the Commercial and the Poster Frame business.

But we are testing a few business models for the In-store network. We believe those new business models will dramatically the media attractiveness to advertisers and increase our revenue potential. Given the competitive nature of our business, we right now is not able to discuss that with you. But once we have those new business models launched we will report to you at the time we launch those business.

---

**Richard Ji** - *Morgan Stanley Research Asia Pacific - Analyst*

Okay, good. Well understood, thank you.

---

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Thank you.

---

**Operator**

Your next question comes from the line of Eddie Leung with Deutsche Bank. Please proceed.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Eddie Leung** - *Deutsche Bank Asia China - Analyst*

Good morning, Jason, Dr. Tan and Daniel. Three quick questions. The first one is will there be any short-term impact on revenues when you install those digital frames? How long does it take to get them up and running?

The second question is what would be the impact of Allyes on your DSO?

And finally on the regulation side, do you see anything -- basically devolving that may have an impact on your business?

**Zhi Tan** - *Focus Media Holdings Ltd - Director of the Board and President*

Let me answer your first question. I don't believe [frames] will impact on the revenue in the coming days, coming months. As you can see we have installed about 2,000, 3,000 pieces already. And our revenue it has been increased due to -- as result each Frame 2.0, they are at this time the equivalent of three traditional 1.01. So we will have three-fold revenue for that single installed, those frames. So we will be seeing more revenue coming in for that, for this division.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

I'll take the next question on Allyes. Allyes has a longer DSO versus the overall business of Focus Media. Do keep in mind in Q1 the DSO for Focus Media was relatively higher. And that's because the revenue was lower affected by seasonality, but the cash received has not changed. It's pretty much steady over the years. So that's why relatively in a softer season you see a longer DSO for Focus Media. But we expect long term DSO to be within the expectations of 75 to 90 days, 60 to 90 days over the year. So there's really not much difference for Focus Media.

But with the incorporation of Allyes financial statements in the second quarter we expect that the blended DSO may be slightly extended by a few days because Allyes given their large client base with agencies. And those agency clients typically have longer DSO outstanding. But we don't think given the size of the business of Focus Media relatively to the size of the business volume, we don't think that's going to be a significant impact. And do keep in -- also Allyes has a very little [bad debt] experience given their business. So we don't see that's going to have any material impact on the overall business of Focus Media.

The third question is relating to regulatory environment. Today we really don't see anything regulatory, which would potentially affect our business.

**Eddie Leung** - *Deutsche Bank Asia China - Analyst*

Great, thank you very much.

**Operator**

Your next question comes from the line of Lin Shi with Lehman Brothers. Please proceed.

**Lin Shi** - *Lehman Brothers - Analyst*

Hi, good morning. Thank you for taking my questions.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

My first question is on the gross profit margin of Commercial Location network. On a year-on-year basis I notice there's a slight drop, about 1.5%. But on the other hand we've seen the occupancy rate and ASP both go up quite a bit on a year-to-year basis. Given the nature of the fixed cost business, so I just wonder what's the reason behind the gross margin decline?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

That's [as I said before] because last year we had many less cities versus this year. And this year it's a much bigger network. So I think that helps to hopefully answer your question. Because there are many more of cities, which are tier-III, tier-IV, tier-V cities which have low occupancy rate. And this therefore has a lower gross margin. So on a blended basis it's decreased slightly. So there's really, on a city by city basis, this overall gross margin are improving.

**Lin Shi** - *Lehman Brothers - Analyst*

Shall I assume for this, that tier-III, tier-IV cities, the rental expense would be very low?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Yes, it's a fixed cost business. In a city -- if you do think about Focus Media, we started with tier-I cities. tier-III, if you go to [inaudible] and if you go to [inaudible], our tier-IV cities, the occupancy rate today is very, very low. So that we have explained many times, the occupancy rate for Focus Media network is not the same across all different cities.

In the big cities like Beijing, Shanghai or [Shenzhen], in [seasonally adjusted] is 100% sold out in 2005. But in the cities which we newly entered or cities in more remote areas, the occupancy rate is much lower. But it's a fixed cost business. The utilization rate is lower, so the margin is lower.

**Lin Shi** - *Lehman Brothers - Analyst*

Well, okay. Thanks. My second question is Jason seems to be a little bit conservative for the In-store network. I just wonder is that because of the pressure from competition.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

I think year-over-year you saw In-store network is still growing very healthy and over 20%. So as we discussed earlier, there is competitive pricing in the In-store business, but we continue to expect the In-store business to grow very healthy.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

[Interpreted]. If you look at the hypermarket business, in Q1 even in the softer season, we still achieve the 24.7% in terms of gross margin. And relatively to the overall media sector in China, it's a very healthy gross margin. Of course you say it's lower than the Commercial Location business of Focus Media, lower than the Poster Frame of Focus Media. But those are the strengths of Focus Media's overall earnings and margins.

In-store business do have competition. And if the margin is weaker than the Commercial and Poster Frame as we said earlier in the previous conference calls, but still very healthy relatively to other media platforms you see in China. So we think it's a good business and we continue to want to grow that business. And [inaudible] if the market environment changes or if there's new business models, we will be able to initiate and launch, we believe that that business will grow very healthy.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Lin Shi** - *Lehman Brothers - Analyst*

Okay, thanks. Also for Allyes, have you seen any good synergies leveraging on the [technical difficulty] website?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

What, I'm sorry, you breaked up a little bit.

**Lin Shi** - *Lehman Brothers - Analyst*

I mean after you integrated Allyes into your business, have you seen any good synergy in terms of sharing the client base and get a bigger share from the advertisers leveraging on the online Allyes platform?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Let me translate for Jason just for the benefit of people who don't speak Chinese on the call.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

[Interpreted]. Allyes if you remember when we acquired Allyes, Allyes has about 300 to 400 advertising clients. Whereas Focus Media has, last year we had over 2,000 advertising clients. Allyes office also covers only five to six cities in China whereas the Focus Media covers more than 40 cities. So after the acquisition of Allyes, we have started 'cross selling' so-called effort in the two business. So that has been reflected in two areas.

First of all, Allyes already provided training to Focus Media's sales team. And when Focus Media's sales team goes visiting clients, we make a specific effort to introduce the new additional Internet advertising platform we provide as part of the solution to our advertising client. Once the advertiser shows interest, we'll bring the expertise, the experts of the Allyes sales team and after sales service support team to the clients. And they will initiate and continue with the advertising dialog. So that's number one.

Second is, in the cities that Focus Media covers but Allyes does not cover, we have a certain -- Allyes has already started assigning people to those cities. Do keep in mind when Internet advertising just started in China most of the large advertisers on Internet are the multinationals such as autos and banks. But today if you look at how the Internet business is growing, many tier-II, tier-III cities, there are a lot of clients who are not that sophisticated in terms of advertising, who want to do advertising on the Internet. So that allows Allyes to expand their business based on the platform Focus Media already built nationwide.

So from both of view, we do expect Focus Media and Allyes will bring positive revenue and earnings synergies to the Allyes business. And that's why we think as we said earlier Allyes will contribute significantly to the future growth of Focus Media Company.

Thank you, Lin Shi.

**Lin Shi** - *Lehman Brothers - Analyst*

Okay, thank you.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Last question please.

**Operator**

Your final question will come from the line of Louis Corrigan with Kingsford Capital. Please proceed.

**Louis Corrigan** - *Kingsford Capital - Analyst*

Hi. I wanted to return to the question of DSOs. The press release indicates that the core DSOs were 100 days. And looking at the year ago period, you had one month of Target Media revenue and all of their accounts receivable. So even though it shows off that the DSOs a year ago were 100 days as well it seems like that the actual -- you know if you adjust the acquisitions, the DSOs would have been much lower.

So on an apples-to-apples basis it looks like the DSOs were up quite a bit in the first quarter. And at the same time, your pricing in the Commercial Building market was up just 2.3% year-over-year. And at the same time the number of slots that were sold in the Commercial tier-I market was down 25% this year sequentially versus being down just 17% sequentially last year.

So what I'm trying to get at is that it looks like you had a back end loaded quarter. You reduced your prices. And the number of slots sold still declined more in this first quarter than it did in the year ago period, which I guess to me raises the question of, is the demand in the marketplace as strong as we have all been led to expect it will be? Or are you really having to discount in order to -- you've increased your supply a great deal. Are you now having to discount in order to sell slots?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

I think you're making a lot of assumptions in your analysis. I really don't know where you're going. But I think these are two different questions, regarding DSO and pricing. Let me -- I think I answered both questions earlier, but let me repeat that answer a little bit.

I think if you think about DSOs first of all we don't see any difference in terms of cash collection from our advertisers in this quarter versus any previous quarter. So the advertising sales outstanding is normal. Today the business is very different versus last year given we have more business. We have Framedia, we have Target Media integrated. We have the movie theatre business, we have the LED business, we have the mobile advertising business. So I don't think they are directly comparable. You can't strip out exactly what's the impact of Target Media is relevant.

But we don't see any change of trends in cash receipts from advertisers. We believe that the result of increase of DSOs in this particular quarter is just due to lower revenue of seasonal, in the seasonally weak Q1 of every year. So we can also, going forward, we expect Q1 2008 and 2009 will still have this effect just given the seasonality of the business we are in.

Regarding the pricing and the utilization revenue analysis as we said earlier, as well as said by Jason, we negotiate contracts with clients contract by contract. There's really no change of sales approach. What you have seen today in terms of the revenue for the Commercial Location network, year-over-year the Commercial Location network grow by 50.8%. And although it's lower than Q4, it's due to seasonality.

We do have some -- earlier we talked about the special promotion package we offered to clients for bundled channel sales during the two weeks period of Chinese New Year. But these things, really there's no indication as we said, going forward we're not going to be offering those except during holiday period. So I don't follow your analysis.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call**

But what's most important to me as the CFO of the Company is the revenue this year versus first quarter of last quarter has grown significantly and Commercial Location revenues have exceeded our internal expectations. So that's why if you look at the guidance for Q1, was $54m to $56m, when we talked about it in the Q4 conference call. And actual revenue this quarter is higher than that number.

Thank you very much. Is that clear to answer your question?

**Louis Corrigan** - *Kingsford Capital - Analyst*

I guess my follow up to that would be was there something that would have made this first quarter more seasonal than last year's first quarter?

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

No.

**Louis Corrigan** - *Kingsford Capital - Analyst*

It was the same.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Yes. And last year do keep in mind there was integration of Framedia, the integration of Target Media. We don't have the Wireless business. We don't have the LED business. We don't have the movie theatre advertising business.

**Louis Corrigan** - *Kingsford Capital - Analyst*

This is focusing on the commercial tier-I --

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Yes. This quarter there's no difference, this quarter versus last quarter. There are some certain special packages as we talked about, bundled sales, which we don't have multiple channels last quarter -- quarter of last year, in Q1 of 2006. Remember all those channels was launched in March of 2006.

**Louis Corrigan** - *Kingsford Capital - Analyst*

Okay, thank you.

**Daniel Wu** - *Focus Media Holdings Ltd - CFO*

Okay, sure. Thank you.

Thanks everyone. I think we'll conclude the call today.

Operator?

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 17. 2007 / 9:00PM, FMCN - Q1 2007 Focus Media Holding Ltd. Earnings Conference Call

## Operator

Ladies and gentlemen, I would like to thank you for your participation in today's conference. This now concludes the presentation. You may all disconnect. And have a wonderful day.

## Editor

Portions of this transcript that are noted "interpreted" were interpreted on the conference call by an Interpreter present on the live call. The interpreter was provided by the Company sponsoring this Event.

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2007, Thomson Financial. All Rights Reserved.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit F

## Thomson StreetEvents℠

### FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

Event Date/Time: Sep. 27. 2007 / 9:00PM ET

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Jie Chen**
*Focus Media Holding Ltd. - IR Manager*

**Daniel Wu**
*Focus Media Holding Ltd. - CFO*

**Jason Jiang**
*Focus Media Holding Ltd. - Chairman and CEO*

## CONFERENCE CALL PARTICIPANTS

**Jason Brueschke**
*Citi Investment - Analyst*

**James Mitchell**
*Goldman Sachs - Analyst*

**Jason Helfstein**
*CIBC World Markets - Analyst*

**Richard Ji**
*Morgan Stanley - Analyst*

**Ming Zhao**
*SIG - Analyst*

**Aaron Kessler**
*Piper Jaffray - Analyst*

**James Lee**
*WR Hambrecht - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the quarter two 2007 Focus Media Holding earnings conference call. My name is Denise and I will be your coordinator for today. At this time, all participants are in listen-only mode. We will conduct a question and answer session towards the end of this conference. (OPERATOR INSTRUCTIONS). As a reminder, this call is being recorded for replay purposes.

I would now like to turn the presentation over to your host for today's call, Ms. Jie Chen, Investor Relations Manager. Please proceed, ma'am.

---

**Jie Chen** - *Focus Media Holding Ltd. - IR Manager*

Thank you. Welcome to Focus Media's second quarter 2007 earnings conference call. Today, our management will discuss the company's financial results for the second quarter of 2007 and business outlook for the third quarter of 2007.

With me here are Jason Jiang, Chairman of the Board and Chief Executive Officer, Tan Zhi, President, and Daniel Wu, Chief Financial Officer. After Daniel updates you on our second quarter 2007 operational and financial performance, we will open the call for questions. This call is also broadcasted through Internet and is available through our investor relations website, ir.focusmedia.cn.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

Before we begin, I would like to remind you that, during the course of this call, we will make forward-looking statements that are subject to risks and uncertainties. The statements include, but not limited to, statements regarding Focus Media's business objectives and plans, expectations of the development of our networks and our outlook for the third quarter 2007, for example. You can also identify forward-looking statements by terms such as will, expects, anticipates, future, intends, plans, believes, estimates and similar statements.

The accuracy of these statements may be affected by a number of business risks and uncertainties that could cause our actual results to differ materially from those projected or anticipated. These risks and uncertainties include, but are not limited to, our limited operating history for our current operations and short history of the out-of-home audiovisual advertising sector, which may make it difficult for you to evaluate the viability and prospects of our business, integrations of acquired business, competition from present and future competitors in China's growing advertising market, and other risks outlined in our filings with SEC, including our registration statement on Form F-1. We do not undertake any obligation to update those forward-looking information except as required under applicable law.

Now, I will turn the call over to our CFO, Daniel Wu, for a summary of the second quarter 2007 financial results.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Thank you, Jie. Good morning and good evening. I'm pleased to report to you a record result in the second quarter of 2007 for Focus Media. Our total revenue, excluding [sales] tax, reached $113.3m, increasing 126.3% from the same period last year and 97.5% from previous quarter. Our second quarter revenues include $76.9m from digital out-of-home advertising business, $10.9m from our Focus Media Wireless business and $25.2m from our Internet advertising business.

As our digital media offerings to our advertising clients continue to expand, we will be reporting our advertising service revenues under three separate lines going forward. The first one is digital out-of-home, which includes our commercial location network. Commercial location network includes our Premier Office Building Channel A and other commercial locations, and -- other commercial location LCD channels, our outdoor LED network and our movie theater network, etc.

And also, digital out-of-home includes our in-store network and our in-elevator poster frame network. These two are out-of-home LCD and LED networks. Thirdly -- second -- the second line would be mobile advertising revenue. The third one will be Internet advertising.

First, let me review in detail the results of our digital out-of-home advertising business. Total advertising revenue from our digital out-of-home advertising reached $76.9m in the second quarter of 2007, up 64.4% as compared to $46.8m in the same period in 2006.

Within our digital out-of-home advertising business, the revenue from our commercial location network in the second quarter was $51.1m, up 67.8% year over year. The revenue from our in-store network was $7.2m, up 10.8% year over year. The revenue from our poster frame network in the second quarter was $18.5m, up 89.7% year over year. The commercial location network, in-store network and poster frame network contributed 66.4%, 9.6% [sic - see press release] and 24.1% of total digital out-of-home advertising revenue in the second quarter respectively.

Due to continuing expansion of our media offerings and strong demand from our customers, we have started to offer customized media solutions tailored to the needs of our large advertising clients. We have also extended cycle time of our commercial location network in certain cities to more than 12 minutes cycle time we had before.

As a result, the number of 30-second equivalent time slots sold, which we historically call slots sold, and average revenue per 30-second equivalent time slot, which is -- historically, we call that ASP - for our networks are no longer as representative as before. Therefore, going forward, we will no longer provide such data in our earning reports.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

During the second quarter of 2007, Focus Media Wireless generated revenue of $10.9m, up 253.8% from $3.1m in the second quarter of 2006. Advertising service revenue for Allyes, principally for Allyes, were -- was $25.2m in the second quarter of 2007, of which digital marketing service accounts for 90%, digital marketing technology accounts for 3.6 -- 3.4% and digital performance media accounts for 6.6%.

Gross profit for the second quarter of 2007 was $61.8m, representing an increase of 117.2% compared to $28.5m for the same period a year ago. In the second quarter of 2007, gross margin for our digital out-of-door business -- out-of-home business was 63.1%. Within the digital out-of-home business, commercial location business -- commercial location network gross margin was 65%, in-store network gross margin was 28.4% and poster frame network gross margin was 71.6%. The gross margin for our mobile advertising business was 58% and gross margin for our Internet advertising business was 27.1% in the second quarter of 2007.

For the Company as a whole, the blended gross margin for the Company for the second quarter was 54.6% as compared to 56.9% in the second quarter of 2006, lower primarily due to the addition of the lower-margin Internet advertising business to our revenue mix.

Second quarter operating expense totaled $23.7m, including $0.8m in acquired intangible assets resulting from historical acquisitions and net -- non-cash share-based compensation expense of $4.6m. As a result, operating margin in the second quarter of 2007 was 33.7%, up significantly from 25.2% in the first quarter of 2007, as, due to the first quarter seasonality, the gross -- the margin in the first quarter was lower. Excluding non-cash share-based compensation expense and acquired intangible asset amortization expense, operating margin on a non-GAAP basis was 40.4% in the second quarter of 2007.

GAAP net income for the second quarter of 2007 was $37.7m, or $0.32 per fully diluted ADS, up 126.2% from $16.7m for the same period a year ago. Non-GAAP net income, excluding non-cash share-based compensation expense and amortization of historical acquired intangible assets in the second quarter of 2007, was $45.3m, or $0.38 per fully diluted ADS.

Now, I'd like to provide Focus Media business outlook for the third quarter of 2007. Please note that the following outlook statements are based on our current expectations. These statements are forward-looking and actual results may differ materially.

We expect that the total revenue for the third quarter of 2007 to be between $132m and $135m, non-GAAP fully diluted earnings per ADS to be between $0.41 and $0.43. Due to higher than expected growth in our Internet advertising business, we also raised the full-year 2007 revenue estimates to a range of $440m to $450m, as compared to previously announced range of $390m to $400m.

Thanks very much. Now, we'll open the call for your questions. Operator, please.

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS). And your first question comes from the line of Jason Brueschke from Citi Investment. Please proceed, sir. Mr. Brueschke, your line is open. You may ask your question. Mr. Brueschke, you may proceed with your question.

**Jason Brueschke** - *Citi Investment - Analyst*

Hello.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, we've got you, Jason.

---

**Jason Brueschke** - *Citi Investment - Analyst*

Okay, finally. Sorry about that. First of all, good morning. And let me just say congratulations on the completion of the audit committee investigation and that entire process. I'm sure you guys are glad that it's over.

Let me just do a couple of questions. First of all, the audit committee expenses that you incurred for the accounting and the legal in the third quarter. Daniel, could you give us some indication of the magnitude of those expenses and what impact they have or are likely to have on the Q3 EPS guidance that you gave?

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure. Because the audit committee inquiry or investigation has been concluded in the third quarter of 2007, so all the expense will be paid and partially has been paid and will be booked to the Focus Media third quarter 2007 financial statement.

So the guidance we have provided already includes those expenses, taking into consideration of those expenses. Those expenses is a reasonable amount, so we already take that into consideration. But sorry, we cannot discuss specifically what the dollar amount is, due to our agreement with the advisors.

---

**Jason Brueschke** - *Citi Investment - Analyst*

Okay. But the guidance that you gave is not -- the pro-forma guidance is not excluding those expenses. Those are included.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, they already booked into our Q3, so those -- the guidance we are providing to you has taken into consideration of those expenses.

---

**Jason Brueschke** - *Citi Investment - Analyst*

Right. I think my next question, Daniel -- thank you for that. My next question is, regarding the customized advertising solutions for large advertisers, could you give us a sense of what exactly those are?

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure.

---

**Jason Brueschke** - *Citi Investment - Analyst*

And I presume that the expansion of the 12-minute cycle is probably happening in tier-one cities where you're probably having more demand from these large advertisers. Is that the case and is that why we're not getting the -- we'll call it the ASP metrics now, going forward?

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call |
| --- |

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, good point. I think, Jason, you hit it right on the spot. First of all, there are cycle times in certain cities. In addition to tier-one cities, we are also expanding due to the strong demand also from some of the tier-two cities. And second, let me give you an example.

If you think, let's say, about Mercedes-Benz, if they want to advertise with Focus Media commercial location network, and they did, they probably don't want to advertise in all the 5,000 or 6,000 buildings we have in Shanghai. So they may come back to us. They say, "Look, you know, because our brand image and because our highly selective target demographics for our viewers -- potential buyers, we'd like to advertise in only the top 100 buildings or top 50 buildings in Shanghai or in Beijing or in other cities".

So for us, we actually have to do that, because we cannot just say, "Hey, we cannot allow you to advertise in top 50 cities. You have to advertise in all buildings." First of all, it's not only a price issue, but also a brand image issue. They may actually walk away from Focus Media.

So when we're offering those services, let's say, for certain customers, we offer a more targeted selection of locations. The previously provided slot capacity -- 30-second equivalent time slot capacity was based on the scenario that everybody will use the full city, because when we defined a 30-second slot, it was a 30-second slot in a particular city network. So Shanghai, you look at the entire city.

So when we, let's say, have customers who are allowed or who have contracted with us to advertise in select buildings, the slot definition doesn't make sense anymore. So going forward, we -- given the network getting bigger and bigger, given -- our customer becomes more sophisticated and becomes larger.

So there are always going to be such types of situations where the spender rate card, [indicative] rate card format we provided to you our website no longer applicable. So that's why we stopped providing those slot information and utilization information and also ASP information to you, because when those numbers are calculated, historically, if applied to those new situations will actually skew the number, make it incomparable for the new number to the historical period.

Jason, am I explaining this to you clearly?

**Jason Brueschke** - *Citi Investment - Analyst*

Yes. That makes total sense to me. I understand what you're doing and why it creates an apples to oranges type situation.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Okay, thank you.

**Jason Brueschke** - *Citi Investment - Analyst*

Can you maybe -- maybe just one last question. The Internet business is doing extremely well, much better than you had originally guided when you acquired Allyes. And it seems to me this is a consistent pattern with a number of your acquisitions, that once you acquire a company, the rate of growth seems to accelerate dramatically.

Can you comment on what is underlying the growth in this business? Is it just the booming Internet advertising market in general, ahead of the Olympics, or is it more a function of putting them as part of the larger Focus Media network gives you various sales and marketing synergies across the board? If you could give a little color on that, that would be helpful.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, Jason. I think I'm going to ask our CEO, Jason Jiang, to respond to your question. So let me translate for Jason first. Sorry, give me a moment. (Spoken in foreign language).

**Jason Jiang** - *Focus Media Holding Ltd. - Chairman and CEO*

(Spoken in foreign language).

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Jason, let me translate for Jason Jiang. Of course, as you mentioned earlier, the overall Internet advertising industry in China is actually growing very rapidly. So that actually benefits us from the English point of view. But most importantly, for our angle, looking at this particular business, Focus Media today is the largest digital media group in China. And if you look at -- there are two areas we want to focus -- we want to talk about, is when -- is if you look at customer base.

Historically, Focus Media has more than 3,000 large and long-term customers. And Allyes, historically, when we acquired them, they only had about -- roughly about 300 customers. So by -- after we acquired Allyes, the key focus is how to provide an integrated digital media solution to our customers through Allyes products and service offerings. So of course, by expanding the potential customer of Allyes they can address to, we actually be able to increase their growth rate faster than they would be able to do by -- as a standalone business.

The second point we'd like to make is one thing we did is, Jason, and also Focus Media, we actually been looking at those Internet advertising business for a long time. So we do have some knowledge and some insight in terms of how to fine-tuning those business. So after we acquired Allyes, we refined Allyes' business model, focusing on more targeted advertising delivery and also focusing on rich media and also focus on performance media, which is cost per action based advertising business model.

So by focusing on those three areas, we actually be able to increase the margin of Internet advertising business of Allyes. So going forward, for the Internet advertising business, the focus will be two areas. One is to achieve higher growth, higher -- hopefully higher than industry growth for the Internet advertising industry and also focus on improving the margin of the Internet advertising business of Focus Media.

**Jason Brueschke** - *Citi Investment - Analyst*

Great. Thank you, guys, and congratulations, again, on your results, given what had to have been very trying circumstances.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Thank you, Jason.

**Operator**

And your next question comes from the line of James Mitchell from Goldman Sachs. Please proceed, sir.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**James Mitchell** - *Goldman Sachs - Analyst*

Hi. Thank you very much for taking the question, and I apologize, because the first one's kind of mechanical. I guess, in the second quarter, you had $2.7m in amortization of acquired intangible assets. And I think, in the past, that's appeared under your other expenses line, between the gross profit and the operating profit, so next to G&A and sales and marketing. Is that number still appearing there, or have you moved it up the P&L into the gross profit, because it looks like there has been some shifting in gross margin versus operating margin?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, that's a very, very good point. If you go to note six of our financial statement, which we included in our press release, you will see that amortization of our acquired intangible assets, actually, this quarter, was $2.7m, which -- in the table where we reconciliate -- we did reconciliation for -- of non-GAAP and GAAP.

The reason why is due to a different accounting treatment under the advisory of our public auditor, the auditing firm. Historically -- in the U.S., actually, a lot of companies have this practice as well. Historically, we've been grouping all our acquired -- historically acquired intangible amortization expense under the operating expense, which is a lump sum. But of course, you know those intangibles -- when we evaluate those intangibles, they include various items, including customer base, technology, trademarks and also existing contract areas and so on, so forth.

So in the U.S., there are both practices. There are companies who break it down, there are companies who lump it together in -- as one item in the operating expense. Under the advisory of our public auditor, we actually feel it is more accurate, going forward, to break it into different intangibles and categorizing it under cost of sales and also in the operating expense.

So that's why you see the number today is -- in the operating expense is much lower than historical periods. But if you go to look at '06, as I pointed earlier, that particular number is more comparable to historical periods.

**James Mitchell** - *Goldman Sachs - Analyst*

So the $2.7m is now fragmented between G&A, sales and marketing, cost of service.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, it's between cost of sales and sales and marketing.

**James Mitchell** - *Goldman Sachs - Analyst*

Between cost of sales and sales and marketing. And then the other operating income is tax rebates, with the $1.1m.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, those are tax rebates. Historically, we actually put that into other income and, given it's become a recurring item and, under the advisory of our public auditor, they believe it's much more [appropriate] under the newest guidelines of U.S. GAAP, we should include that into our operating expense.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**James Mitchell** - *Goldman Sachs - Analyst*

Okay, it's much more appropriate, but it makes my life harder. Just one other question from me, then. On Allyes, you commented that you see margins expanding over time. I guess, for the second quarter, it looked like it was a 27% or so gross margin for the business. Do you see that margin expanding relatively quickly as you [enjoy] merger synergies, or do you see that margin expanding more gradually over time as you change the business model?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

I think, if you look at what we said -- mentioned in the press release, 90% of our Internet advertising business still is digital media service, which is interactive agency business, itself is a lower margin. I think we discussed a little bit on the call when we acquired Allyes. Those margins can continue to improve as the revenue base becomes larger, revenue growth becomes larger, and also due to the larger media buying power of our Internet advertising business.

So coming back to your question, here, it's going to be a gradual improvement. Still today, the digital media service is still the majority of our Internet advertising business. Going forward, we see from two areas for the margin improvement. One is continued improvement of margin in the digital media service business, as we talked about earlier, due to revenue base growth as well as media buying power and also increasing operating efficiency.

But also, we see a change of the revenue mix in our Internet advertising business, because, if you look at digital performance media, itself is a higher margin business. So as that particular business contributing more and change the mix of those different contributions, we do see the margin of the Internet advertising business will improve. But those will be gradual processes.

**James Mitchell** - *Goldman Sachs - Analyst*

Okay, great. Thank you very much.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Thank you, James.

**Operator**

And your next question comes from the line of Jason Helfstein from CIBC World Markets. Please proceed, sir.

**Jason Helfstein** - *CIBC World Markets - Analyst*

Hi. Thank you. Can you hear me?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, we can hear you well.

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay. A few questions. The first, you guys exceeded your guidance by about 7%, or the midpoint. Can you talk about which areas of the business were better than expected? And I'm looking for some more color. So I understand you don't want to give

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

us the metrics anymore from the commercial network business, but did the commercial network business, I guess, exceed your prior expectations? And if so, how much of that came from price and how much of that came from volume? And is there just a way to talk overall about the pricing that you're seeing going forward? And then I've got a follow-up.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure, sure. If you look at this quarter, it is a very good quarter for Focus Media for the second quarter of the fiscal year. Of course, if you look at within our digital out-of-home business - we talked about a little bit earlier the Internet business doing well, the mobile business doing well - the majority of the revenue is still coming from the digital out-of-home sector.

For the digital out-of-home business, the commercial location actually was doing extremely well, because, as you see, we have a dominant position in those particular -- in that particular media. We have seen more and more advertisers realize the effectiveness of this media, understanding the highly targeted demographic we cover for [urban] consumers in China. So we do see more and more advertisers want to use this media and we continue to see fully sold-out capacity in major cities, in addition to tier-one cities.

So based on that, we do see, of course, volume increase as well as more pricing power, because, as more and more customers want to use this media and as our city network gets sold out, we will have more leverage when we negotiate a contract with advertisers.

So that's really what make us do better this quarter than what we expected. And you see the in-store network, as Jason said in the press release, still a challenging environment. So we'll be focused on more our expanding of the network and expanding the reach at this particular point in time. So there's not much upside which we can talk about from the in-store network.

Frame media, we talk about digital media, the digital frame media, which is doing extremely well. And we continue to see that media will grow as we planned. And also we do see a lot of potential growth in that particular media.

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay. My follow-up, then, actually, with respect to frame media, can you tell us how much revenue in the quarter came from the frame 2.0 initiative? And perhaps, is there a conversion ratio? So once a display converts, is it now three times the revenue, five times the revenue? And then, do you have a goal for how many digital frames you would like to have, either by the end of third quarter or by the end of the year?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

First of all, if you think -- second quarter, the cut-off date is June 30 of 2007. So if you think about -- we are -- as we announced, we are upgrading the -- to digital 2.0 in the middle of the second quarter. The digital frame 2.0 still contributing a very small percentage of the total revenue, because we're still launching this particular network. But end of q -- end of August, we have launched almost 7,000 digital frame 2.0 units and especially focusing on the high end of the market.

We do see very positive customer feedback by upgrading those networks to digital, because it becomes a much better media without reducing the reach and providing a very cost-effective solution for a lot of advertisers. And also, it allow us to address a lot of the different advertising needs, such as advertisers historically doing two-dimensional advertising business. So we do see -- for the network portion we have upgraded, we see very strong result and very strong feedback from the customers.

We want to upgrade those as -- very aggressive going forward, but it's also limited by our resources and also by the manufacture of those machines. So we don't have a target for you for Q3, but we will -- as we talked about earlier, we have phase one, which

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

is 10,000 units. We expect to complete those phase one within this year and we will launch phase two as soon as we complete our phase one installation.

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

Any kind of conversion ratio on the 7,000 you've already done?

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

You mean -- conversion ratio, you mean customers?

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

No. In other words, how much higher revenue are you getting per display for digital than for non-digital?

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

We don't have this particular breakdown. But if you think about -- we are selling those digital frames same as non-digital, except the advertising itself will rotate on a 30-second basis up to three separate advertising per frame per week. So basically, if it's all sold out, the potential revenue from a digital frame will be up to three times. But as I said, right now, the second quarter's cut-off date was June 30, so we don't have enough data to provide you -- to answer your question.

---

**Jason Helfstein** - *CIBC World Markets - Analyst*

Okay. Thank you very much.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure.

---

**Operator**

And your next question comes from the line of Richard Ji from Morgan Stanley. Please proceed, sir.

---

**Richard Ji** - *Morgan Stanley - Analyst*

And congratulations on your very good quarter.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Thank you, Richard.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Richard Ji** - *Morgan Stanley - Analyst*

Thank you. And I have two questions. And the first question is again we -- from our channel check, we know the Olympics-related advertising demand is very robust. And so, from your end, have you been able to -- and typically you raise advertising rate in the middle of the year. And so, can you help us understand a little better how much of advertising rate you have been able to increase so far? And also, on the other hand, given your scale and also the dominance, and have you been able to scale back your discount level to the advertising agencies?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Okay. Let me ask Jason to answer this question for you. I'll translate for Jason.

**Jason Jiang** - *Focus Media Holding Ltd. - Chairman and CEO*

(Spoken in foreign language).

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Richard, I don't need to translate for you, but let me translate for the rest of the group, very briefly. Historically, we've been increasing price twice a year, on January 1 and July 1. We have done so in this year as well. And next year, we continue to expect, because customer already getting used to that, we continue to expect to have two price increases at beginning of the year and mid of the year, on January 1 and July 1.

So for us, in terms of discount, if you look at our -- there's very strong demand for our commercial location network in the major cities. So we are -- given the high demand, high use rate of our network, we are actually getting more and more customers start using our other channels, such as Channel B and other, like golf channels, shopping mall channels and fashion channels, so on and so forth. So by doing that, we're also increasing the overall network revenue potential for Focus Media.

And on your question regarding discounts, reducing discount is always a thing Focus Media want to do, but that needs to be a gradual process. If you look at our comparable media, which are local TV in China, typically, their discount rates are very, very high. We want to increase price, at the same time gradually reduce discount. But if you move too aggressively, although there are very strong demand, it may have a negative -- let's say may affect our relationship with advertisers negatively.

So we will use measured steps in terms of reducing discounts, but we will continue to push up our listing price going forward.

**Richard Ji** - *Morgan Stanley - Analyst*

Thank you. And my second question is regarding your in-store network, and obviously we see some seasonal [rebound] this quarter versus last quarter. Can you give us some highlight about the sell-through rate in this segment, as well as the pricing trend, etc., especially given the competitive dynamics?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes. Let me translate for Jason.

**Jason Jiang** - *Focus Media Holding Ltd. - Chairman and CEO*

(Spoken in foreign language).

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

This is Daniel Wu. Let me translate for Jason. If you look at all the media offerings of Focus Media, the in-store network is actually one of the areas which performs relatively weak. This is due to we do have a significant competitor in the market, who are very aggressive in building their business. And also, of course, if you see, there are mergers acquisitions among stores which -- including the acquisition by Carrefour and also Trust-Mart, so all those things will result in larger market share for those store chains.

So that would give them more bargaining power for the store cost, location cost, which is different from our commercial location network. We don't expect any of those scenarios. But in the in-store network, due to concentration of stores, of course, they have more bargaining power. We talked about this many times on our previous calls with you. If you look at our in-store business, we still see strong customer pick-up, and also demonstrated by revenue growth. So it's still a growing business.

Going forward, we want to increase our [intent] in our competitive strategy to competing with our competitors in this area. Of course, even today, we do have the largest in-store network, but at certain major store locations we want to be more competitive going forward, when we are facing any competitive situation. And also, we want to increase the number of LCD screens we cover in some of the major stores to increase the customer -- increase the result of our advertising effectiveness for our advertising customers.

So, as Jason said, so going forward, we're still very, very -- we're a strong believer of the in-store [portion] of our advertising business. Going forward, our strategy will become a little bit more aggressive than historical levels.

**Richard Ji** - *Morgan Stanley - Analyst*

Okay. Thank you.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Thank you, Richard.

**Operator**

And your next question comes from the line of Ming Zhao from SIG. Please proceed.

**Ming Zhao** - *SIG - Analyst*

Thank you. Good morning. I have a question on the gross margin of the commercial locations. So if we look at the year-over-year or quarter-over-quarter, apparently it's growing. However, if I compare that with the low seventies in the third quarter and the fourth quarter, there's actually a big drop. Could you comment on that? What should we be looking for in the following quarters?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

(Spoken in foreign language). I think if you look at our business and if you're going back to 2006 and 2005 and even 2004, this business is a fixed-cost business. So in a quarter when we do see higher demand and higher revenue, given relatively a fixed-cost nature, the margin characteristics are different. So you cannot compare different quarter with different quarter for Focus Media's commercial location business, just like you cannot compare Q1 and Q2. So I think the more appropriate comparison for you to make, to make any understanding of how the margin trend of the business, is to compare quarter to quarter.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

**Ming Zhao** - *SIG - Analyst*

Okay, but your q -- Okay. So you're talking about that --

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

So you should compare same quarter over last year, that's what I'm saying, not sequentially or sequentially backwards. So when you want to make any conclusion of the margin [characteristics] of the business, you should compare Q2 of 2007 versus Q2 of 2006, because there are seasonality in our business.

**Ming Zhao** - *SIG - Analyst*

Okay. I understand that. All right. The second question I have is, looking at the balance sheet, the goodwill goes up a lot. Is this because some of the [earn-out] payment? Also, why share base you used for the second -- for the third quarter EPS calculation has gone up? So can you --

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure. Good questions. I think first of all, the goodwill increase is due to some of the earn-outs, but also due to the Allyes acquisition. So there are -- when we make the acquisitions, we need to do, basically, purchase price allocation. And some of the purchase price allocation, actually majority of those purchase price allocation, will go to goodwill. So that's why -- those are result. As you know, Focus Media has been quite aggressive historically, so that will result in a higher goodwill.

In terms of share count, if you remember, we had, when we acquired Framedia, we had an earn-out agreement. The earn-out agreement basically said, within one year if we reach a number -- I remember it was 8m to 16m, so if they reached the high end of their net income contribution, we'll be issuing additional shares to Framedia shareholders. And those shares were issued late in Q2.

So if you look at Q2, the impact was not that significant, is because those shares were issued late in Q2. But in Q3, those share counts will have a full quarter effect. So that's why we provide you guidance the average share, fully diluted share outstanding, when we're calculating those guidance, we use a higher fully -- total number of shares outstanding, based on our knowledge of shares issued.

**Ming Zhao** - *SIG - Analyst*

Okay. But back to the goodwill, I thought that the Allyes acquisition was closed in the first quarter, so it's already shown up in the first quarter's goodwill increase. Why it's still here in the second quarter?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

But you're comparing the two columns. One is December 31, 2006 and June 30, 2007, right?

**Ming Zhao** - *SIG - Analyst*

I'm comparing the Q1 versus Q2 end.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Jie Chen** - *Focus Media Holding Ltd. - IR Manager*

(Inaudible).

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes. If you think about -- we just talked about the earn-out of Framedia, right? So the earn-out will result in a different valuation. So that will also increase the goodwill, because the shares were issued after end of Q1 of 2007. Does that make sense to you? Because when we pay them additional consideration based on the earn-out, those will increase the total acquisition value of Framedia, and that particular adjustment will hit in Q2 of 2007.

---

**Ming Zhao** - *SIG - Analyst*

Okay. So it's mainly these earn-outs rather than the Allyes, right?

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Compared to March 31, 2007, you're correct. But I thought you were referring to the table we provided in the press release, which is comparing June 30, 2007 versus December 31, 2006.

---

**Ming Zhao** - *SIG - Analyst*

Okay. I'm comparing Q1 versus Q2. Thank you very much.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Okay. Okay, sure.

---

**Operator**

And your next question comes from the line of Aaron Kessler from Piper Jaffray. Please proceed.

---

**Aaron Kessler** - *Piper Jaffray - Analyst*

Yes, hi, guys. A couple of questions. One, can you comment on whether you made any acquisitions in the quarter? And then, Wireless was really strong. Is there any acquisitions in that and what's -- if not, what's explaining the really strong growth in there? And then I have a couple of follow-up questions.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes. I think we do make acquisitions. I think if it's a material acquisition, we will provide you a public release, but for smaller acquisitions we don't. But we will report that in our annual report end of the year.

So the Wireless growth is due to both organic growth and also acquisitions. As you know, we are right now in the process of building or developing our Wireless advertising business. Those business are non-content-based, advertising-driven, location-driven or demographic-driven SMS, MMS-based advertising business model. And that particular business, we do see

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call

continued growth, as more and more advertisers become more educated to this business model and see the effectiveness of this advertising.

So it's -- as we also discussed in the last quarter conference call, it's difficult for us to give you the breakdown of organic versus acquisition, because once we acquire a small player in the particular sector, those players' network as well as their distribution platform will be integrated into our existing larger network and platform. So it becomes one company. So it's very difficult to separate out what's the contribution going forward from those small acquisitions. So hopefully that addresses your question.

**Aaron Kessler** - *Piper Jaffray - Analyst*

And then, just a couple of follow-ups. On the acquisition front, did you acquire -- we heard rumors you acquired iResearch. Maybe if you can confirm that. And then, also, in the guidance, is all the upside really from the Allyes segment, or is there also some upside from the commercial and the Wireless business, as well, in the guidance for Q3 and Q4 revenues?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

I will actually -- first of all, if you look at -- I'll talk about guidance first. Then, coming back to your first question, Jason's going to answer that question. For the guidance, as we said, the increase of the guidance is principally due to the faster growth of the Internet advertising business. So that, I suppose, answers your second question. So regarding iResearch, I'll ask Jason to answer your question.

**Aaron Kessler** - *Piper Jaffray - Analyst*

Okay.

**Jason Jiang** - *Focus Media Holding Ltd. - Chairman and CEO*

(Spoken in foreign language).

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

This is Daniel Wu. Let me translate for the benefit of people on the call. This Internet advertising business is a long-term strategy of Focus Media. iResearch, we did acquire the business, but it's still run as an independent entity under Focus Media. That particular acquisition will allow Focus Media to have a better understanding of the Internet trend in China, understanding of the websites.

And also, as going forward, well, the important strategy of Focus Media's Internet advertising is behavioral-based advertising, which is performance media. So by having iResearch, we will be able to have better insight into the development and also, let's say, changing of the Internet industry in China, to allow us to then have a better decision-making power in our strategy going forward.

So going forward, iResearch will continue to provide, as it did before, a lot of the information to public for fees, but iResearch will also do some specific proprietary studies just for Focus Media, to help us to improve the growth of our advertising business.

**Aaron Kessler** - *Piper Jaffray - Analyst*

Great. Thank you.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

So yes. Sure, thanks. Just one last point, because you understand Allyes has a huge base of its software deployment and its user database, because the widely-used office software. So one of the things we can do is iResearch will be able to better to focus on analyzing those user traffic and allow us to improve the advertising business model and advertising effectiveness of Internet advertising of Focus Media's business. Thanks.

**Aaron Kessler** - *Piper Jaffray - Analyst*

Great. Thank you.

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes.

**Operator**

Due to time constraints, our final question will come from the line of James Lee from WR Hambrecht. Please proceed, sir.

**James Lee** - *WR Hambrecht - Analyst*

Hi, Daniel. Is there any way you can elaborate on the growth driver of the mobile business a little bit? Obviously, you made some acquisitions, you talked about that a little bit. Maybe you can talk about is it more the expansion of your sales people actually selling the mobile advertising product? Is it more the geographic expansion, maybe entering into new cities, or more the product expansion, like you talked about, maybe adding location-based services into the product mix that's helping driving the mobile advertising revenues?

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Sure. Hi, James. First of all, apologize we weren't able to see you last time you were here. We were very busy on lots of things. And on the mobile advertising business, we do think it's an early-stage growth industry. The growth is mainly coming from -- because we do have the single largest mobile advertising delivery platform, the growth is coming from new customer acquisitions and by expanding into new industries, or new customer base, through either organic growth as well as acquisitions.

So for example, by a small acquisition, a particular target who have strength in enterprise messaging system, we'll be able to integrate that into our platform, so reducing the cost area and help them to better monetizing their customer base by understanding share -- or share the same vision of how the mobile advertising business is going to grow.

So it's hard to -- not trying to avoid your question. It's coming from both customer acquisitions as well as from the expansion into other industries. Is that helpful, James? Hello? Operator?

**Operator**

Hello.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Sep. 27. 2007 / 9:00PM, FMCN - Q2 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes. Did we lose James Lee? Hello?

---

**Operator**

His line is open.

---

**Daniel Wu** - *Focus Media Holding Ltd. - CFO*

Yes, he is not -- okay. So let me summarize for the call. First of all, I do want to emphasize today, with the acquisition of Allyes, with the continued expansion of digital frame 2.0, Focus Media is the largest digital media group in China today. Our major three business lines including digital out-of-home, Internet advertising and Wireless. We have tried our best to look at -- to understand the customers' needs and provide integrated digital media solutions to our customers.

So today, if you look at Focus Media versus even two years ago when we went public, where the majority of revenue from -- 90% coming from commercial location network, or if you look at a year ago, where majority of the revenue still coming from commercial location network, in-store and the frame 2.0, today our business is very different. What we try to build is the largest digital media platform in China for our advertising clients for any place, any screen, any time.

So anyway, that concludes our conference call. Thanks very much for your time. Operator?

---

**Operator**

Ladies and gentlemen, this concludes the presentation. Thank you for your participation in today's conference. Have a great day. You may now disconnect.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2007, Thomson Financial. All Rights Reserved.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit G

Focus Media Share Prices:
Sept. 26, 2007 to Jan. 31, 2008

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 09/26/07 | $59.90 | $60.07 | $58.15 | $60.05 | 5,257,300.00 |
| 09/27/07 | $60.80 | $61.39 | $59.00 | $59.15 | 5,767,500.00 |
| 09/28/07 | $59.80 | $59.93 | $55.58 | $58.02 | 8,447,700.00 |
| 10/01/07 | $58.50 | $58.84 | $56.91 | $57.39 | 2,774,000.00 |
| 10/02/07 | $58.25 | $59.89 | $58.20 | $58.80 | 3,331,600.00 |
| 10/03/07 | $58.29 | $58.30 | $56.56 | $57.11 | 2,287,400.00 |
| 10/04/07 | $56.83 | $58.00 | $56.10 | $57.01 | 1,589,100.00 |
| 10/05/07 | $57.80 | $59.07 | $57.50 | $57.90 | 1,908,200.00 |
| 10/08/07 | $58.70 | $60.03 | $58.25 | $60.00 | 2,881,200.00 |
| 10/09/07 | $59.93 | $62.00 | $58.91 | $61.03 | 3,739,700.00 |
| 10/10/07 | $60.98 | $62.00 | $59.47 | $60.00 | 2,752,400.00 |
| 10/11/07 | $60.98 | $61.90 | $56.42 | $57.64 | 4,160,400.00 |
| 10/12/07 | $57.78 | $58.90 | $56.61 | $58.15 | 2,265,700.00 |
| 10/15/07 | $59.38 | $60.00 | $58.26 | $59.20 | 1,523,300.00 |
| 10/16/07 | $58.62 | $58.81 | $57.22 | $57.57 | 1,375,000.00 |
| 10/17/07 | $58.73 | $59.64 | $57.39 | $58.79 | 2,933,700.00 |
| 10/18/07 | $58.37 | $59.69 | $57.76 | $58.86 | 1,677,300.00 |
| 10/19/07 | $58.71 | $59.23 | $55.05 | $56.14 | 4,950,700.00 |
| 10/22/07 | $55.50 | $56.25 | $54.62 | $55.16 | 2,260,500.00 |
| 10/23/07 | $56.34 | $57.95 | $56.00 | $57.77 | 3,051,800.00 |
| 10/24/07 | $57.22 | $58.00 | $55.66 | $57.47 | 2,071,000.00 |
| 10/25/07 | $55.97 | $57.27 | $54.30 | $55.00 | 3,399,300.00 |
| 10/26/07 | $55.59 | $57.67 | $55.25 | $57.06 | 2,445,600.00 |
| 10/29/07 | $57.06 | $62.89 | $57.06 | $61.86 | 3,688,300.00 |
| 10/30/07 | $62.00 | $62.88 | $60.22 | $60.88 | 2,433,900.00 |
| 10/31/07 | $61.70 | $63.00 | $60.30 | $62.00 | 2,054,600.00 |
| 11/01/07 | $61.88 | $64.69 | $60.21 | $62.73 | 3,671,100.00 |
| 11/02/07 | $63.23 | $65.05 | $61.21 | $65.00 | 2,762,400.00 |
| 11/05/07 | $63.40 | $65.77 | $61.52 | $64.69 | 2,910,300.00 |
| 11/06/07 | $64.82 | $66.30 | $62.01 | $65.10 | 2,936,500.00 |
| 11/07/07 | $63.95 | $65.88 | $63.90 | $64.05 | 6,119,600.00 |
| 11/08/07 | $64.05 | $64.50 | $55.00 | $59.85 | 7,119,000.00 |
| 11/09/07 | $57.31 | $58.56 | $56.00 | $57.01 | 4,361,100.00 |
| 11/12/07 | $55.61 | $56.82 | $50.59 | $52.67 | 7,259,000.00 |
| 11/13/07 | $54.05 | $58.70 | $54.00 | $58.21 | 3,501,800.00 |
| 11/14/07 | $60.04 | $60.73 | $57.00 | $57.01 | 1,983,200.00 |
| 11/15/07 | $57.00 | $57.95 | $53.59 | $54.28 | 3,166,300.00 |
| 11/16/07 | $54.00 | $59.43 | $54.00 | $59.20 | 3,435,400.00 |
| 11/19/07 | $60.00 | $60.50 | $56.69 | $57.15 | 4,767,000.00 |
| 11/20/07 | $53.30 | $54.71 | $47.10 | $52.00 | 13,345,000.00 |
| 11/21/07 | $50.80 | $52.70 | $49.56 | $50.35 | 3,493,700.00 |
| 11/23/07 | $52.00 | $52.06 | $49.50 | $50.35 | 1,007,400.00 |
| 11/26/07 | $50.71 | $53.18 | $50.40 | $51.85 | 2,587,200.00 |
| 11/27/07 | $52.00 | $52.49 | $50.00 | $50.53 | 2,509,200.00 |
| 11/28/07 | $51.50 | $53.75 | $51.10 | $52.88 | 3,492,300.00 |
| 11/29/07 | $53.45 | $55.79 | $52.49 | $54.40 | 3,492,600.00 |
| 11/30/07 | $56.00 | $57.08 | $55.11 | $56.44 | 3,160,400.00 |
| 12/03/07 | $57.46 | $57.46 | $53.62 | $53.67 | 2,509,600.00 |
| 12/04/07 | $54.49 | $54.83 | $51.68 | $52.46 | 2,131,400.00 |
| 12/05/07 | $53.72 | $55.77 | $53.25 | $55.20 | 2,957,100.00 |
| 12/06/07 | $55.30 | $56.41 | $53.70 | $55.65 | 2,718,900.00 |

Focus Media Share Prices:
Sept. 26, 2007 to Jan. 31, 2008

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 12/07/07 | $55.13 | $55.69 | $54.15 | $54.96 | 1,446,000.00 |
| 12/10/07 | $55.98 | $58.03 | $55.94 | $57.00 | 5,525,200.00 |
| 12/11/07 | $57.95 | $58.09 | $53.90 | $54.86 | 2,617,500.00 |
| 12/12/07 | $56.97 | $58.14 | $55.80 | $57.48 | 2,680,900.00 |
| 12/13/07 | $57.00 | $57.48 | $54.76 | $56.50 | 2,074,800.00 |
| 12/14/07 | $56.75 | $59.90 | $55.64 | $57.80 | 3,898,600.00 |
| 12/17/07 | $58.69 | $58.93 | $54.54 | $54.70 | 3,125,400.00 |
| 12/18/07 | $55.88 | $57.38 | $55.00 | $56.39 | 2,523,900.00 |
| 12/19/07 | $56.84 | $57.90 | $56.43 | $57.00 | 1,798,600.00 |
| 12/20/07 | $57.80 | $58.05 | $56.50 | $57.28 | 1,399,400.00 |
| 12/21/07 | $58.00 | $58.50 | $57.35 | $57.75 | 4,177,100.00 |
| 12/24/07 | $58.00 | $59.03 | $57.85 | $58.96 | 1,269,100.00 |
| 12/26/07 | $58.90 | $59.30 | $57.90 | $58.87 | 997,800.00 |
| 12/27/07 | $59.04 | $59.04 | $57.08 | $57.88 | 1,569,100.00 |
| 12/28/07 | $58.00 | $58.10 | $56.10 | $56.84 | 1,924,700.00 |
| 12/31/07 | $57.00 | $58.00 | $56.21 | $56.81 | 1,145,700.00 |
| 01/02/08 | $57.00 | $58.74 | $56.81 | $57.13 | 2,133,400.00 |
| 01/03/08 | $57.93 | $59.37 | $57.20 | $58.98 | 1,695,700.00 |
| 01/04/08 | $57.90 | $58.55 | $55.50 | $55.71 | 2,584,500.00 |
| 01/07/08 | $56.35 | $57.50 | $55.00 | $56.14 | 2,414,400.00 |
| 01/08/08 | $56.61 | $58.11 | $56.00 | $56.21 | 2,117,600.00 |
| 01/09/08 | $55.07 | $57.67 | $54.79 | $56.13 | 3,365,800.00 |
| 01/10/08 | $54.71 | $56.65 | $54.71 | $55.24 | 2,257,900.00 |
| 01/11/08 | $55.99 | $56.36 | $54.53 | $54.95 | 2,290,600.00 |
| 01/14/08 | $55.99 | $56.36 | $54.96 | $55.44 | 2,225,900.00 |
| 01/15/08 | $54.53 | $55.30 | $51.11 | $51.68 | 3,671,000.00 |
| 01/16/08 | $50.99 | $51.67 | $46.58 | $48.91 | 5,534,500.00 |
| 01/17/08 | $49.51 | $50.90 | $44.79 | $45.57 | 4,846,400.00 |
| 01/18/08 | $46.07 | $48.50 | $45.51 | $47.82 | 3,649,300.00 |
| 01/22/08 | $42.00 | $47.00 | $40.61 | $45.99 | 3,746,700.00 |
| 01/23/08 | $45.47 | $48.92 | $43.25 | $47.82 | 3,740,400.00 |
| 01/24/08 | $48.36 | $50.65 | $48.02 | $50.40 | 2,314,000.00 |
| 01/25/08 | $51.28 | $52.50 | $48.40 | $48.79 | 2,729,100.00 |
| 01/28/08 | $48.40 | $49.22 | $47.00 | $48.75 | 1,317,600.00 |
| 01/29/08 | $48.83 | $49.21 | $44.68 | $45.05 | 2,733,200.00 |
| 01/30/08 | $45.08 | $47.24 | $44.91 | $45.52 | 3,250,200.00 |
| 01/31/08 | $44.06 | $49.25 | $43.72 | $48.05 | 4,012,900.00 |

# Exhibit H

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# 424B4

**FOCUS MEDIA HOLDING LIMITED**
**Filed on 11/07/2007**
File Number 333–146913



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Table of Contents**

Filed Pursuant Rule 424(b)(4)
Registration No. 333–146913



# Focus Media Holding Limited

**13,720,873 American Depositary Shares
Representing
68,604,365 Ordinary Shares**

Focus Media Holding Limited, or Focus Media, is offering 5,000,000 American depositary shares, or ADSs, and the selling shareholders identified in this prospectus are offering an additional 8,720,873 ADSs. Each ADS represents five ordinary shares, par value $0.00005 per share of Focus Media. The ADSs may be evidenced by American depositary receipts, or ADRs. We will not receive any proceeds from the ADSs sold by the selling shareholders.

Our ADSs are quoted on the Nasdaq Global Market under the symbol "FMCN." On November 6, 2007, the last sale price for our ADSs as reported on the Nasdaq Global Market was US$65.10 per ADS.

**See "Risk Factors" beginning on page 16 to read about risks you should consider before buying the ADSs.**

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per ADS | Total |
|---|---|---|
| Public offering price | $ 64.7500 | $ 888,426,527 |
| Underwriting discount | $ 1.9425 | $ 26,652,796 |
| Proceeds, before expenses, to Focus Media | $ 62.8075 | $ 314,037,500 |
| Proceeds, before expenses, to the selling shareholders | $ 62.8075 | $ 547,736,231 |

To the extent the underwriters sell more than 13,720,873 ADSs, the underwriters have an option to purchase up to an additional 2,000,000 ADSs from us at the public offering price less the underwriting discount.

The underwriters expect to deliver the ADSs against payment in U.S. dollars in New York, New York on November 13, 2007.

*Joint Bookrunners*

**Citi**               **Credit Suisse**               **Merrill Lynch & Co.**

*Co–Managers*

**CIBC World Markets**                                        **Piper Jaffray**

Prospectus dated November 6, 2007.

**TABLE OF CONTENTS**

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 16 |
| Forward–Looking Statements | 43 |
| Our Corporate Structure | 45 |
| Use of Proceeds | 50 |
| Dividend Policy | 51 |
| Market Price Information for Our ADSs | 52 |
| Capitalization | 53 |
| Exchange Rates | 54 |
| Selected Consolidated Financial and Operating Data | 56 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 60 |
| Business | 88 |
| Our Recent Significant Acquisitions | 101 |
| Regulation of Our Industry | 105 |
| Management | 110 |
| Principal and Selling Shareholders | 120 |
| Related Party Transactions | 124 |
| Description of Share Capital | 130 |
| Description of American Depositary Shares | 138 |
| Shares Eligible for Future Sale | 147 |
| Taxation | 150 |
| Underwriting | 154 |
| Enforcement of Civil Liabilities | 159 |
| Legal Matters | 160 |
| Experts | 160 |
| Where You Can Find Additional Information | 160 |
| Index to Consolidated Financial Statements – Focus Media | F–1 |
| Index to Consolidated Financial Statements – Allyes | F–59 |
| Index to Consolidated Financial Statements – Target Media | F–80 |
| Index to Consolidated Financial Statements – InfoAchieve | F–111 |
| Index to Unaudited Pro Forma Condensed Consolidated Financial Information | P–1 |

i

## PROSPECTUS SUMMARY

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in the ADSs discussed under "Risk Factors", before deciding whether to buy our ADSs.*

*As used in this prospectus, references "Focus Media", "we", "us" and "our" are to Focus Media Holding Limited and its consolidated subsidiaries and affiliates. References to "Framedia" are to Infoachieve Limited and its consolidated subsidiary and affiliates, including Shenzhen E−Times Advertising Co., Ltd., or E−Times Advertising, and its affiliates. References to Target Media are to Target Media Holdings Limited and its consolidated subsidiaries and affiliates. References to "Focus Media Wireless" are to Dotad Holdings Limited and its consolidated subsidiary and affiliate. References to "ACL" are to Appreciate Capital Limited, in which we hold a 70% equity interest and through which we initially acquired our movie theater network. References to "Allyes" are to Allyes Information Technology Co., Ltd. and its consolidated subsidiaries and affiliates.*

### Our Business

We are China's leading multi−platform digital media company, operate the largest out−of−home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat−panel television displays in our network, and also are a leading provider of Internet marketing solutions in China. It is our goal to create the largest multi−platform digital advertising network in China, reaching urban consumers at strategic locations and point−of−interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light−emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of June 30, 2007, our out−of−home advertising network consists of our digital out−of−home advertising network, our mobile handset advertising network and our Internet advertising services network:

***Our Digital Out−of−home Advertising Network*** which focuses on providing out−of−home advertising through liquid crystal display or LCD flat−panel televisions displays, LED billboards, movie screens, and poster and digital frames, includes our commercial location network, in−store network and poster frame network:

- ***our commercial location network***, which consists of:

  - *our LCD display network*, which refers to our network of flat−panel television displays placed in high−traffic areas of commercial and public buildings marketed to advertisers as a network or as seven separate channels targeting different types of consumers — our premier A and B office building channels, travel, fashion, elite, IT mall and healthcare channels;

  - *our outdoor LED billboard network*, which refers to our network of leased 5' x 5' LED digital billboards installed on the street−sides in major shopping districts and other locations with high pedestrian traffic in Shanghai; and

  - *our movie theater advertising network*, which refers to our right to sell advertising time on movie screens for the three minutes prior to movie screenings at movie theaters in China.

- ***our in−store network***, which refers to our network of flat−panel television displays placed in specific product areas inside stores with high−traffic concentrations such as selected consumer product sections, the main aisles and check−out lines in large−scale chain retail stores, or hypermarkets, as well as inside selected supermarkets and convenience stores; and

- ***our poster frame network***, which refers to our network of traditional and digital advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

***Our Mobile Handset Advertising Network***, which refers to our mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS,

1

Table of Contents

offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

***Our Internet Advertising Services Network***, which refers to our Internet advertising agency and advertising services technology, including performance–based software suites.

We derive revenue principally by:

- selling advertising time slots on our out–of–home television networks, which include our commercial location network and our in–store network;

- by selling frame space on our poster and digital frame network;

- selling advertisements on our mobile handset advertising network; and

- providing advertising agency and technology services and software for online advertising.

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day. Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. Our advertising posters include both traditional printed posters as well as digital LCD poster frames with integrated sound, all–angle and remote control technologies. Generally two or three advertising poster frames can be placed in each elevator.

Advertisements on our mobile phone advertising network are advertisements that are sent to mobile phone users over China Mobile and China Unicom's networks.

Our Internet advertising services network, which we acquired through our acquisition of Allyes in March 2007, uses proprietary software applications provide online ad publishing, creative production, tracking, targeting, and performance analysis. We also provide performance–based online advertising services providing advertisers with pay by CPA (cost–per–action), which directly links advertising cost with performance. Our Internet advertising services network has integrated advertising resources from over 5,000 popular websites, making it the largest performance–based online advertising network in China.

As of December 31, 2006, over 4,000 advertisers purchased advertising time on our advertising networks. Our five largest advertising clients in terms of revenue, which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of June 30, 2007, we operated our commercial location network directly in over fifty major cities throughout China, including Beijing, Shanghai, Guangzhou and Shenzhen. As of June 30, 2007, we covered approximately 40 additional cities through contractual arrangements with regional distributors. Between January 1, 2005 and June 30, 2007, the number of displays in our commercial location network increased from 15,415 to 89,687. As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200 leased 5' x 5' digital billboards placed along curbsides in high–pedestrian traffic areas in Shanghai. We had installed over 161,435 advertising poster frames and our in–store network consisted of 41,322 flat–panel displays placed in 3,995 store locations in our directly operated cities, including 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores.

For the six months ended June 30, 2007, we recorded total revenues of $170.6 million and net income of $54.0 million as compared to total revenues of $83.3 million and net income of $26.1 million for the six months ended June 30, 2006. In 2006, we recorded total revenues of $211.9 million and net income of $83.2 million as compared to total revenues of $68.2 million and net income of $23.5 million in 2005.

**Table of Contents**

**Our Strategies, Risks and Uncertainties**

Our objective is to become the leading multi–platform digital media brand in China's advertising industry. We intend to achieve this objective by implementing the following strategies:

- Enhance our market position and revenues by expanding our networks;

- Identify and create new networks and advertising channels that target specific consumer demographics and expand network capacity;

- Promote our brand name and augment our service offerings to attract a wider client base and increase revenues; and

- Continue to explore new digital media opportunities to target segmented consumer groups.

See "Business — Strategies" for additional details on our strategies.

Our ability to realize our business objectives and execute our strategies is subject to risks and uncertainties, including the following:

- our ability to successfully integrate and manage our recently acquired entities, businesses and networks into our existing business;

- our limited operating history for our current operations and the short history of the out–of–home television advertising sector that make it difficult for you to evaluate the viability and prospects of our business;

- competition from present and future competitors in China's growing advertising market, particularly large multi–national advertisers that may now more readily compete in China;

- our limited ability to control and oversee the everyday business activities or regulatory compliance of our regional distributors; and

- the possibility that the PRC government could determine that our operating structure does not comply with PRC government restrictions on foreign investment in the advertising industry, which could potentially subject us to severe penalties.

See "Risk Factors" and other information included in this prospectus for a discussion of these and other risks.

**Our Corporate History and Structure**

We were incorporated on April 11, 2003 as an international business company formed under the laws of the British Virgin Islands, and changed our corporate domicile to the Cayman Islands on April 1, 2005. Our ADSs representing our ordinary shares have been quoted on the Nasdaq Global Market Inc. since our initial public offering on July 13, 2005. Due to PRC government restrictions that apply to foreign investment in China's advertising industry, our advertising business is currently conducted through contractual arrangements among us, our subsidiaries and our consolidated affiliated entities in China. Focus Media Advertisement, several of its subsidiaries and Shanghai New Focus Media Advertisement Co., Ltd., or New Focus Media Advertisement, Shanghai New Structure Advertisement Co., Ltd., or New Structure Advertisement, Shanghai Framedia Advertisement Development Co., Ltd., or Framedia Advertisement, Guangdong Shiji Shenghuo Advertisement Co., Ltd., or Guangdong Framedia, Beijing Focus Media Wireless Co., Ltd., or Focus Media Wireless, and seven PRC entities affiliated with Allyes hold the requisite licenses to provide advertising services in China. Except for New Focus Media Advertisement, which is our indirect subsidiary, we refer to these companies collectively as our PRC operating affiliates. These contractual arrangements enable us to:

- exercise effective control over our PRC operating affiliates and their respective subsidiaries;

- receive a substantial portion of the economic benefits from our PRC operating affiliates and their respective subsidiaries; and

Table of Contents

- have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries, as well as all or part of the assets of Focus Media Advertisement, in each case when and to the extent permitted by PRC law.

See "Our Corporate Structure" and "Related Party Transactions" for further information on our contractual arrangements with these parties.

## Recent Developments

*Audit Committee Investigation.* As a result of an audit committee investigation prompted by allegations raised by the U.S. counsel representing an anonymous investor, we failed to timely file our 2006 annual report on Form 20–F. The unnamed investor, described as holding a short position in our ADSs at the time of the allegations in June 2007, alleged that: (a) Everease, a company previously run by our founder and CEO, Jason Jiang, is a related party as a result of ongoing ties between Everease and Mr. Jiang and members of Mr. Jiang's family; and (b) we made undisclosed rebate payments to a third–party advertising agency through Everease in order to inflate our reported financial performance. Our audit committee commenced an investigation of the allegations on June 28, 2007. It hired independent U.S. legal counsel and independent forensic accountants, who reviewed documents and interviewed witnesses. On September 25, 2007, the audit committee completed its investigation and discussed the results with our independent registered public accounting firm. Based upon its review of the evidence, the audit committee concluded that nothing had come to its attention — apart from the initial allegations that gave rise to the investigation — that would cause the audit committee to believe that we made undisclosed rebate payments to a third party advertising agency through Everease. We informed the investigators that we concluded that Everease is a related party based upon information developed during the investigation. See "Related Party Transactions" for further information on our contractual arrangements with Everease. On September 25, 2007, we filed our 2006 annual report on Form 20–F.

*Appointment of Director.* On September 28, 2007, we appointed David Ying Zhang as our independent director, bringing our total number of directors to nine and giving us a majority of independent directors on our board. See "Management".

*Compliance with Nasdaq Listing Requirements.* On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our 2006 annual report on Form 20–F.

## OUR OFFICES

Our principal executive offices are located at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China, and our telephone number is (86–21) 3212–4661. Our website address is http://www.focusmedia.cn. The information on our website does not form part of this prospectus.

## CONVENTIONS THAT APPLY TO THIS PROSPECTUS

This prospectus contains translations of Renminbi amounts into U.S. dollars at specified rates solely for the convenience of the reader. Unless otherwise noted, all translations from Renminbi to U.S. dollars were made at the noon buying rate in New York, New York for cable transfers in Renminbi per U.S. dollar as certified for customs purposes by the Federal Reserve Bank of New York, or the noon buying rate, as of June 30, 2007, which was RMB 7.6120 to $1.00. We make no representation that the Renminbi amounts referred to in this prospectus could have been or could be converted into U.S. dollars at any particular rate or at all. On October 31, 2007, the noon buying rate was RMB 7.4682 to $1.00.

Unless we indicate otherwise, all information in this prospectus reflects the following:

- no exercise by the underwriters of their option to purchase up to 2,000,000 additional ADSs representing 10,000,000 ordinary shares;

4

Table of Contents

- all share splits, so that share number, per share price and par value data is presented as if the share splits had occurred from our inception; and

- our ADS−to−share ratio change on April 12, 2007, so that all ADS trading prices are presented as if the ratio change had occurred from the original listing of our ADSs on the Nasdaq Global Market in July 2005.

**Table of Contents**

**The Offering**

The following assumes that the underwriters do not exercise their option to purchase additional ADSs in the offering, unless otherwise indicated.

| | |
|---|---|
| Offering price | $64.75 per ADS |
| ADSs offered by Focus Media | 5,000,000 ADSs |
| ADSs offered by the selling shareholders | 8,720,873 ADSs |
| ADSs outstanding after this offering | 111,930,414 ADSs |
| Ordinary shares outstanding after this offering | 643,144,062 ordinary shares |
| ADS to ordinary share ratio | 1:5 |
| Nasdaq Global Market symbol | "FMCN" |
| The ADSs | Each ADS represents five ordinary shares, par value $0.00005 per share. The ADSs may be evidenced by American depositary receipts, or ADRs. The depositary will be the holder of the ordinary shares underlying your ADSs and you will have rights as provided in the amended and restated deposit agreement, or the deposit agreement. Although we do not expect to pay dividends in the foreseeable future, in the event we declare dividends on our ordinary shares, the depositary will pay you the cash dividends and other distributions it receives on our ordinary shares, after converting the funds received into U.S. dollars and deducting its fees and expenses. You may surrender your ADSs to the depositary to withdraw the ordinary shares underlying your ADSs. The depositary will charge you fees for such surrenders and withdrawals. We may amend or terminate the deposit agreement without your consent, and if you continue to hold your ADSs, you agree to be bound by the deposit agreement as amended. You should carefully read the section in this prospectus entitled "Description of American Depositary Shares" to better understand the terms of our ADSs. You should also read the form amended and restated deposit agreement, which is incorporated by reference as an exhibit to the registration statement on Form F–6 (File No. 333–141820). |
| Lock–up Agreements | We have agreed with the underwriters that we will not, without the prior consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated, or Merrill Lynch, for a period of 90 days following the date of this prospectus: (1) offer, sell, contract to sell, pledge, grant any option to purchase, make any share sale or otherwise dispose of any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or (2) enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares subject to certain exceptions. The restrictions above do not apply, among other items, to the ADSs to be sold in this offering and the ordinary shares underlying such ADSs. See "Shares Eligible for Future Sale" and "Underwriting". |
| Depositary | Citibank, N.A. |

6

**Table of Contents**

| | |
|---|---|
| Option to purchase additional ADSs | We have granted the underwriters an option, exercisable within 30 days from the date of this prospectus, to purchase up to an additional 2,000,000 ADSs. |
| Timing and settlement for ADSs | The ADSs are expected to be delivered against payment on November 13, 2007. The ADR evidencing the position of The Depository Trust Company, or DTC, with respect to the ADSs will be updated to reflect the number of ADSs sold hereunder and will continue to be safe kept by a custodian for, and registered in the name of a nominee of DTC in New York, New York. In general, beneficial interests in the ADSs will be shown on, and transfers of these beneficial interests will be effected only through, records maintained by DTC and its direct and indirect participants. |
| Use of proceeds | Our net proceeds from this offering are expected to be approximately $312.5 million, or approximately $438.2 million if the underwriters exercise their over–allotment option in full. We anticipate using the net proceeds of this offering to fund potential acquisitions. We may use any remaining amounts for our future general corporate purposes. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of risks you should carefully consider before deciding to invest in our ADSs. |

**Table of Contents**

**SUMMARY CONSOLIDATED FINANCIAL AND OPERATING DATA**

The following summary consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financial statements, which include the consolidation of Focus Media Advertisement, two entities operating Framedia, Focus Media Wireless and the entities that operate our Internet advertising services network as variable interest entities, thereafter, and are presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our statements of operations for 2004, 2005 and 2006 and our balance sheets as of December 31, 2005 and 2006 are derived from those financial statements that have been included elsewhere in this prospectus. Our statement of operations for each of the six months ended June 30, 2006 and 2007 and balance sheet data as of June 30, 2006 and 2007 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus.

Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The summary consolidated financial information for the periods and as of the dates indicated should be read in conjunction with those statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we were an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time or space to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out–of–home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in–store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless. In March 2007, we acquired Allyes.

| | | For the Year Ended December 31, | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (In thousands of U.S. dollars) | | | |
| **Summary Consolidated Statements of Operations Data:** | | | | | | | |
| Gross Advertising Service revenues | $ 24 | $ 3,671 | $ 29,109 | $ 73,419 | $ 231,186 | $ 90,680 | $ 183,517 |
| Net Advertising Service revenues: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location*[1] | — | $ 3,369 | $ 26,321 | $ 61,435 | $ 132,061 | 51,819 | 82,704 |
| *In–store network*[1] | — | — | — | 5,469 | 26,907 | 11,832 | 13,882 |
| *Poster frame network*[1] | — | — | — | — | 40,904 | 15,845 | 31,217 |
| Mobile handset advertising[1] | — | — | — | — | 10,101 | 3,076 | 16,890 |
| Internet advertising services[1] | — | — | — | — | — | — | 25,236 |
| Advertising service revenue[1] | — | 3,369 | 26,321 | 66,904 | 209,973 | 82,572 | 169,929 |
| Other revenues | — | 389 | 2,889 | 1,325 | 1,932 | 690 | 687 |
| Total net revenues | 24 | 3,758 | 29,210 | 68,229 | 211,905 | 83,262 | 170,616 |
| Cost of revenues: | | | | | | | |
| Net advertising service cost: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location* | — | 1,566 | 6,804 | 18,325 | 42,836 | 19,713 | 30,767 |
| *In–store network* | — | — | — | 7,423 | 18,106 | 8,367 | 10,214 |
| *Poster frame network* | — | — | — | — | 13,621 | 6,014 | 10,011 |

Table of Contents

| | For the Year Ended December 31, | | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | (In thousands of U.S. dollars) | | | | |
| Mobile Handset Advertising | — | — | — | — | 6,052 | 2,405 | 7,323 |
| Internet Advertising | — | — | — | — | — | — | 18,405 |
| Advertising service cost | — | 1,566 | 6,804 | 25,748 | 80,615 | 36,499 | 76,720 |
| Other costs | — | 275 | 1,934 | 976 | 765 | 312 | 303 |
| Total cost of revenues | — | 1,841 | 8,738 | 26,724 | 81,380 | 36,811 | 77,023 |
| Gross profit | 24 | 1,917 | 20,472 | 41,505 | 130,525 | 46,451 | 93,593 |
| Operating expenses: | | | | | | | |
| General and administrative | 21 | 985 | 3,988 | 9,120 | 25,723 | 10,693 | 20,329 |
| Selling and marketing | 3 | 407 | 3,473 | 9,599 | 25,762 | 9,783 | 23,041 |
| Other operating income | — | — | — | — | (1,338) | (157) | (2,384) |
| Goodwill impairment loss | — | — | 58 | — | — | — | — |
| Total operating expenses | 24 | 1,392 | 7,519 | 18,719 | 50,147 | 20,319 | 40.986 |
| Income from operations | — | 525 | 12,953 | 22,786 | 80,378 | 26,132 | 52,607 |
| Interest income | — | 1 | 10 | 1,812 | 4,560 | 1,781 | 4,634 |
| Interest expenses | — | — | — | (50) | (305) | (288) | (7) |
| Other income | — | — | 54 | 70 | 271 | (11) | 252 |
| Other expenses | — | (9) | (58) | (231) | (558) | (470) | (212) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | — | (11,692) | — | — | — | — |
| Income before income taxes and minority interest | — | 517 | 1,267 | 24,387 | 84,346 | 27,144 | 57,274 |
| Total income taxes | — | (482) | (908) | (694) | (1,044) | (989) | (3,286) |
| Minority interest | — | 8 | 13 | (145) | (105) | (51) | 18 |
| Equity loss of affiliates | — | (18) | — | — | — | — | — |
| Net income | — | $  25 | $  372 | $ 23,548 | $ 83,197 | 26,104 | 54,006 |

| | For the Year Ended December 31, | | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Earnings per share data: | | | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | (8,308) | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | (2,191) | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | — | (13,356) | — | — | — | — |

9

Table of Contents

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | For the Six Months Ended June 30, | |
| | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Premium of Series B convertible redeemable preference shares | — | | 12,906 | | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ — | $ 25 | $ (10,577) | $ 23,548 | $ 83,197 | $ 26,104 | $ 54,006 |
| Income (loss) per share — basic | $ — | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ — | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income per share | — | 144,657,600 | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income per share | — | 144,657,600 | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

| | 2002 | 2003 | 2004 | 2005 | 2006 | Actual | As adjusted[2] |
|---|---|---|---|---|---|---|---|
| | | | As of December 31, | | | As of June 30, 2007 | |
| | | | (In thousands of U.S. dollars, except share data) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | $ 15 | $ 716 | $ 22,669 | $ 36,653 | $ 164,611 | $ 187,592 | $ 500,130 |
| Other current assets[3] | 106 | 1,902 | 12,713 | 104,988 | 78,712 | 240,632 | 240,632 |
| Non-current assets | 8 | 2,688 | 21,033 | 70,713 | 862,919 | 1,098,745 | 1,098,745 |
| Total assets | 129 | 5,306 | 56,415 | 212,354 | 1,106,242 | 1,526,969 | 1,839,507 |
| Current liabilities | 7 | 4,119 | 8,634 | 20,694 | 51,837 | 113,069 | 113,069 |
| Non-current liabilities | — | — | — | — | 3,303 | 6,132 | 6,132 |
| Total liabilities | 7 | 4,119 | 8,634 | 20,694 | 55,140 | 119,201 | 119,201 |
| Minority interest | — | 4 | 81 | 245 | 358 | 447 | 447 |
| Mezzanine equity | — | — | 53,273 | — | — | — | — |
| Ordinary shares (nil, 200,000,000, 142,464,600, 378,306,000 and 534,896,873 and 611,242,827 shares issued and outstanding in 2002, 2003, 2004, 2005 and 2006 and June 30, 2007, respectively) | — | 10 | 7 | 19 | 27 | 31 | 32 |
| Other shareholders' equity (deficiency) | 122 | 1,173 | (5,580) | 191,396 | 1,050,717 | 1,407,290 | 1,719,827 |
| Total liabilities and shareholders' equity (deficiency) | $ 129 | $ 5,306 | $ 56,415 | $ 212,354 | $ 1,106,242 | $ 1,526,969 | $ 1,839,507 |

10

**Table of Contents**

| | As of December 31, | | | As of June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location: | | | | |
|    Our direct cities | 12,786 | 45,049 | 80,263 | 85,010 |
|    Our regional distributors[4] | 2,629 | 3,177 | 5,197 | 4,677 |
|    Total | 15,415 | 48,226 | 85,460 | 89,687 |
| Number of displays in our in–store network | — | 27,849 | 38,742 | 41,322 |
| Number of stores in our in–store network | — | 4,130 | 3,898 | 3,995 |
| Number of installed frames in our poster frame network[5] | — | — | 99,784 | 161,435 |

(1) Advertising service revenue is presented net of which includes business tax of 5.55% and cultural industries tax of ranging from 0% to 4.0% of our gross advertising service revenue. The following table sets forth the business tax incurred on our revenues for the periods indicated:

| | For the Year Ended December 31, | | | For the Six Months Ended June 30 | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | **(In thousands of U.S. dollars)** | | | | |
| Business sales taxes: | | | | | |
| **Digital out–of–home** | | | | | |
|    *Commercial locations* | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
|    *In–store network* | — | 524 | 2,803 | 1,221 | 1,442 |
|    *Poster frame network* | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile Handset Advertising** | — | — | 779 | 289 | 398 |
| **Internet Advertising Services** | — | — | — | — | 1,182 |
| Total business sales taxes | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

(2) Our consolidated balance sheet data as of June 30, 2007 are adjusted to give effect to the issuance and sale of 5,000,000 ADSs by us in this offering, after deducting estimated underwriting discounts, commissions and estimated offering expenses payable by us and assuming no exercise of the underwriters' over–allotment option.

(3) Other current assets are equal to total current assets less cash and cash equivalents.

(4) Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(5) Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

11

**Table of Contents**

### CONSOLIDATED PRO FORMA FINANCIAL DATA OF FOCUS MEDIA, TARGET MEDIA AND ALLYES

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes thereto. Financial information with respect to the acquisitions is derived from the historical financial statements and management accounts of Target Media Holdings Limited, or Target Media and Allyes Information Technology Company Limited, or Allyes, appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with US GAAP. These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Target Media and Allyes. The acquired businesses have permitted us to expand our network of out–of–home consumers and to expand into the Internet advertising services business.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2006 presents adjustments as if the acquisitions of Target Media and Allyes had been consummated on January 1, 2006. The unaudited pro forma condensed consolidated statement of operations for the six months ended June 30, 2007 presents adjustments as if the acquisition of Allyes had been consummated on January 1, 2007.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Allyes, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006, and the financial information of Allyes for the period between January 1, 2007 and March 28, 2007, the respective dates of the acquisitions, have not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information for the two–month period ended February 28, 2006 and the period from January 1, 2007 through March 28, 2007 of Target Media and Allyes, respectively, that has been used to calculate the pro forma financial information for the six–month and twelve–month periods ended June 30, 2007 and December 31, 2006, may differ significantly from any actual consolidated statements of operations had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm, and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

12

Table of Contents

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**
**For the Year Ended December 31, 2006**

| | Focus Media For the year ended December 31, 2006 | Allyes For the year ended December 31, 2006 | Target Media For the two months ended February 28, 2006 | Pro forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|---|---|
| | (in thousands of U.S. dollars, except share data) | | | | | |
| **Net Revenues:** | | | | | | |
| Advertising Service Revenue | $ 209,973 | $ 47,235 | $ 3,068 | | | $ 260,276 |
| Other Revenue | 1,932 | 1,899 | — | | | 3,831 |
| **Total net revenues** | **211,905** | **49,134** | **3,068** | | | **264,107** |
| **Cost of Revenues:** | | | | | | |
| Advertising Service Cost | 80,615 | 37,821 | 3,792 | 3,000 | (1) | 125,229 |
| Other Cost | 765 | — | — | | | 765 |
| **Total cost of revenues** | **81,380** | **37,821** | **3,792** | | | **125,994** |
| **Gross profit** | **130,525** | **11,313** | **(724)** | | | **138,114** |
| **Operating expenses (income):** | | | | | | |
| General and administrative | 25,723 | 6,525 | 2,541 | | | 34,789 |
| Selling and marketing | 25,762 | 4,376 | 3,114 | 1,880 | (1) | 35,132 |
| Research and development | — | 649 | — | | | 649 |
| Amortization of acquired Intangible Assets | | | | 205 | (1) | 205 |
| Other operating income | (1,338) | — | — | | | (1,338) |
| **Total operating expenses** | **50,147** | **11,550** | **5,665** | | | **69,437** |
| **Income from operations** | **80,378** | **(237)** | **(6,379)** | | | **68,676** |
| Interest income | 4,560 | 584 | | | | 5,144 |
| Interest expense | (305) | — | (23) | | | (328) |
| Other income | 271 | 201 | | | | 472 |
| Other expense | (558) | (40) | (1,755) | | | (2,354) |
| **Income before income taxes and minority interests** | **84,346** | **508** | **(8,158)** | | | **71,610** |
| Income taxes: | 1,044 | 1,003 | (59) | | | 1,987 |
| **Net income after income taxes before minority interests** | **83,302** | **(495)** | **(8,098)** | | | **69,623** |
| Minority interests | 105 | — | (30) | | | 74 |
| **Net income attributable to holders of ordinary shares** | **$ 83,197** | **$ (495)** | **$ (8,068)** | | | **$ 69,549** |
| Income per share — basic | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating basic income per share | 505,411,079 | | | | (2) | 537,826,734 |
| Income per share — diluted | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating diluted income per share | 521,536,381 | | | | (2) | 553,952,036 |

13

**Table of Contents**

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**
**For the Six Months Ended June 30, 2007**

| | Focus Media For the Six Months Ended June 30, 2007 | Allyes For the Three Months Ended March 28, 2007 | Pro Forma Adjustment | Notes | Pro Forma |
|---|---|---|---|---|---|
| | | (In thousands of U.S. dollars, except share data) | | | |
| **Net Revenues:** | | | | | |
| Advertising Service Revenue | $        169,929 | $        10,350 | | | $        180,279 |
| Other Revenue | 687 | 239 | | | 926 |
| **Total net revenues** | **170,616** | **10,589** | | | **181,205** |
| **Cost of Revenues:** | | | | | |
| Advertising Service Cost | 76,720 | 9,303 | 750 | (1) | 86,773 |
| Other Cost | 303 | — | | | 303 |
| **Total cost of revenues** | **77,023** | **9,303** | | | **87,076** |
| **Gross profit** | **93,593** | **1,286** | | | **94,128** |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 20,329 | 8,049 | | | 28,378 |
| Selling and marketing | 23,041 | 1,344 | 470 | (1) | 24,855 |
| Research and development | — | 199 | | | 199 |
| Other operating income | (2,384) | — | | | (2,384) |
| **Total operating expenses** | **40,986** | **9,592** | | | **51,048** |
| **Income/(loss) from operations** | **52,607** | **(8,306)** | | | **43,080** |
| Interest income | 4,634 | 27 | | | 4,661 |
| Interest expense | (7) | — | | | (7) |
| Other income | 252 | 1 | | | 253 |
| Other expense | (212) | — | | | (212) |
| **Income/(loss) before income taxes and minority interests** | **57,274** | **(8,278)** | | | **47,775** |
| Income taxes: | 3,286 | (157) | | | 3,129 |
| **Net income/(loss) after income taxes before minority interests** | **53,988** | **(8,121)** | | | **44,646** |
| Minority interests | (18) | — | | | (18) |
| **Net income/(loss) attributable to holders of ordinary shares** | **$        54,006** | **$        (8,121)** | | | **$        44,664** |
| Income per share — basic | $        0.10 | | | | $        0.08 |
| Shares used in calculating basic income per share | 560,510,907 | | | (2) | 580,479,987 |
| Income per share — diluted | $        0.09 | | | | $        0.07 |
| Shares used in calculating diluted income per share | 577,365,911 | | | (2) | 597,334,991 |

14

**Table of Contents**

(1) Reflects amortization for the acquired intangibles recorded as a result of our acquisition of Allyes in March 2007 as if the acquisition had been consummated on January 1, 2006.

The aggregate purchase price of $224.7 million of Allyes is comprised of the following:

|  | (In thousands of U.S. dollars) |
|---|---|
| Cash consideration | $ 70,000 |
| Fair Value of ordinary shares issued | 154,698 |
|  | $ 224,698 |

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

Preliminary purchase price allocation:

|  | (In thousands of U.S. dollars) | Amortization Period |
|---|---|---|
| Net tangible assets acquired | 21,957 | |
| Acquired intangible assets | 36,095 | 1–7 years |
| Goodwill | 166,646 | |
| Total | $ 224,698 | |

The preliminary purchase price allocation and preliminary intangible asset valuations described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

Additional payment of up to 9,662,458 ordinary shares may be made contingent upon Allyes attaining certain earning target in 12–months period ended March 28, 2008.

The amortization expense for Allyes of $4,879,893 and $1,219,973 for the year ended December 31, 2006 and three months ended March 28, 2007, respectively have been estimated based on a valuation report provided by a third–party valuation firm.

The amortization expense for Target Media of $205,350 for the two months ended February 28, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(2) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

|  | December 31, 2006 | June 30, 2007 |
|---|---|---|
|  | 505,411,079 | 560,510,907 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 537,826,734 | 580,479,987 |

|  | December 31, 2006 | June 30, 2007 |
|---|---|---|
|  | 521,536,381 | 577,365,911 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 553,952,036 | 597,334,991 |

15

**Table of Contents**

## RISK FACTORS

*You should consider carefully all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in our ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

**Risks Relating to Our Business and Industry**

***Our failure to timely file our 2006 annual report on Form 20–F as a result of allegations raised by an anonymous investor holding a short position in our ADSs may subject us to shareholder litigation, which may materially and adversely affect our business.***

As a result of the audit committee investigation of allegations raised by attorneys representing an anonymous investor, we failed to timely file our 2006 annual report on Form 20–F. The unnamed investor, described as currently holding a short position in our ADSs, alleged that: (a) Everease, a company previously run by our founder and CEO, Jason Jiang, is a related party as a result of ongoing ties between Everease and Mr. Jiang and members of Mr. Jiang's family; and (b) we were making undisclosed rebate payments to a third–party advertising agency through Everease in order to inflate our reported financial performance.

Our audit committee commenced its investigation of the allegations on June 28, 2007. It hired independent U.S. legal counsel and independent forensic accountants, who reviewed documents and interviewed witnesses.

On September 25, 2007, our audit committee completed its previously disclosed investigation into allegations made by U.S. counsel to an investor described as holding a short position in our stock. The results of the investigation have been discussed with our independent registered public accounting firm. Based upon its review of the evidence, the audit committee concluded that nothing had come to its attention — apart from the initial allegations that gave rise to the investigation — that would cause the audit committee to believe that we made undisclosed rebate payments to a third party advertising agency through another advertising agency, namely, Everease. We have informed the investigators that we have concluded that Everease is a related party based upon information developed during the investigation. Based upon its review of the evidence, the audit committee concurs with our conclusion that Everease should be deemed a related party. For detailed descriptions of our related party transactions with Everease, see "Related Party Transactions — Transactions with Everease; "— Other Related Party Transactions — Loan from Relative of Jason Nanchun Jiang." On September 25, 2007, we filed our 2006 annual report on Form 20–F.

Our failure to timely file our 2006 annual report on Form 20–F as a result of the allegations subjected us to delisting review by the Nasdaq Listing Qualifications Panel. We received a Nasdaq Staff Determination letter on July 10, 2007 that we were not in compliance with the filing requirement for continued listing as set forth in Nasdaq Marketplace Rule 4320(e)(12). On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our 2006 annual report on Form 20–F.

In addition, as a result of these allegations, we may be subject to shareholder litigation, which may divert the attention of our management and force us to expend resources to defend against such claims. Any litigation may have a material and adverse effect on our business and future results of operations.

***The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent registered public accounting firm and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information.***

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Target Media and Allyes, it is not intended to show how

16

Table of Contents

the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period.

In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006 (date of acquisition) and Allyes for the period between January 1, 2007 and March 28, 2007 (date of acquisition) has not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information of Target Media and Allyes for that period, including the statements of operations relating to Target Media and Allyes, that has been used to calculate the pro forma financial information as of and for the year ended December 31, 2006 and six–month period ended June 30, 2007 may differ significantly from any actual consolidated financial information had it been audited or reviewed by an independent registered public accounting firm. See "Consolidated Pro Forma Financial Data of Focus Media, Target Media and Allyes".

***We have a limited operating history, which may make it difficult for you to evaluate our business and prospects.***

We began operations of our commercial location network in May 2003. In addition, we have operated our in–store network since April 2005 and acquired and began to operate our poster frame network from January 2006 under the brand name "Framedia". In March 2006, September 2006 and March 2007, respectively, we added a mobile handset advertising network, an outdoor LED billboard advertising network, a movie theater advertising network and an Internet advertising services network to our business. Accordingly, we have a very limited operating history for our current operations upon which you can evaluate the viability and sustainability of our business and its acceptance by advertisers and consumers. It is also difficult to evaluate the viability of our use of audiovisual advertising displays in commercial buildings, hypermarkets, supermarkets and convenience stores and other out–of–home commercial locations and our use of advertising poster frames in residential complexes, SMS–, MMS– and WAP–based mobile handset advertising and Internet advertising services as a business model because we do not have sufficient experience to address the risks frequently encountered by early stage companies using new forms of advertising media and entering new and rapidly evolving markets. These circumstances may make it difficult for you to evaluate our business and prospects.

***We derive a substantial majority of our revenues from the provision of advertising services, and advertising is particularly sensitive to changes in economic conditions and advertising trends.***

Demand for advertising time slots and advertising frame space on our networks, and the resulting advertising spending by our clients, is particularly sensitive to changes in general economic conditions and advertising spending typically decreases during periods of economic downturn. Advertisers may reduce the money they spend to advertise on our networks for a number of reasons, including:

- a general decline in economic conditions;

- a decline in economic conditions in the particular cities where we conduct business;

- a decision to shift advertising expenditures to other available advertising media; or

- a decline in advertising spending in general.

A decrease in demand for advertising media in general and for our advertising services in particular would materially and adversely affect our ability to generate revenue from our advertising services, and our financial condition and results of operations.

***Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period in the future.***

Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period based on the seasonality of consumer spending and corresponding advertising trends in China. In addition, advertising spending generally tends to decrease during January and February each year due to the Chinese Lunar New Year holiday. We also experience a slight decrease in revenues during the hot summer months of July and

17

**Table of Contents**

August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. As a result, you may not be able to rely on period to period comparisons of our operating results as an indication of our future performance. Factors that are likely to cause our operating results to fluctuate, such as the seasonality of advertising spending in China, a deterioration of economic conditions in China and potential changes to the regulation of the advertising, Internet and wireless communications industries in China, are discussed elsewhere in this prospectus. If our revenues for a particular quarter are lower than we expect, we may be unable to reduce our operating expenses for that quarter by a corresponding amount, which would harm our operating results for that quarter relative to our operating results from other quarters.

***Our failure to maintain existing relationships or obtain new relationships with businesses that allow us to access to desirable locations and platforms on which we operate our network could harm or reverse our growth potential and our ability to increase our revenues.***

Our ability to generate revenues from advertising sales depends largely upon our ability to provide large networks of flat–panel displays placed in desirable building, commercial and store locations, of advertising poster frames placed in residential complexes, to secure desirable locations of large outdoor LED digital billboards, throughout major urban areas in China and access to wireless communications and Internet service providers. We also depend on the ability of our third–party location provider to secure desirable LED digital billboard locations for our outdoor LED network. This, in turn, requires that we develop and maintain business relationships with real estate developers, landlords, property managers, hypermarkets, retailers and other businesses and locations in which we rent space for our displays and digital billboards, and wireless communications network and Internet service providers and websites. Although a majority of our display placement agreements and advertising frame placement agreements have terms ranging from three to five years and two to three years, respectively, and upon expiration give us the right to renew the agreement on terms no less favorable than those offered by competing bidders, we may not be able to maintain our relationships with them on satisfactory terms, or at all. If we fail to maintain our relationships with landlords and property managers, or if a significant number of our existing display or advertising frame placement agreements are terminated or not renewed or if we fail to maintain our relationship with our location provider of LED billboard space, advertisers may find advertising on our networks unattractive and may not wish to purchase advertising time slots or advertising frame space on our networks, which would cause our revenues to decline and our business and prospects to deteriorate. Moreover, if we are unable to maintain relationships with wireless communications network operators and Internet service providers, we would be unable to maintain our mobile handset advertising and Internet advertising services networks.

Under some of our display placement agreements in Guangzhou, Shenzhen, Dalian and Chongqing, the property manager has the right to terminate the agreement if landlords or tenants in the building lodge complaints about our flat–panel displays. In addition, some of our display placement agreements in other cities allow the property manager to terminate the agreement if we fail to keep each flat–panel display operational for a minimum amount of time each year. If these tenants complain about our displays, or if the property manager claims we have failed to keep the flat–panel displays operational for the stipulated number of days each year, we may be required to remove our panels from these commercial locations.

In accordance with PRC real estate laws and regulations, prior consent of landlords and property managers is required for any commercial use of the public areas or facilities of residential properties. With regard to our network of advertising poster frames and some of our flat–panel displays placed in the elevators and public areas of residential complexes, we have entered into frame or display placement agreements with property managers and landlords. For those frame or display placement agreements entered into with property managers, we intend to obtain or urge property managers to obtain consents from landlords. However, if the landlords of a residential complex object to our placing advertising poster frames or flat–panel displays in the elevators and public areas of the complex, we may be required to remove our advertising poster frames or flat–panel displays from the complex and may be subject to fines. We may not be able to successfully expand our out–of–home advertising network into new regions or diversify our network into new advertising networks or media platforms, which could harm or reverse our growth potential and our ability to increase our revenues.

18

Table of Contents

***If we are unable to obtain or retain desirable placement locations for our flat–panel displays, advertising poster frames and outdoor LED billboards on commercially advantageous terms or if the supply of desirable locations diminishes or ceases to expand, we could have difficulty in maintaining or expanding our network, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.***

Our location costs, which include lease payments to landlords and property managers under our display placement agreements, maintenance and monitoring fees and other associated costs, comprise a significant portion of our cost of revenues. In 2005, our location costs accounted for 61.7% of our cost of revenues and 24.0% of our total revenues, respectively. In 2006, our location costs accounted for 66.2% of our cost of revenues and 24.3% of our total revenues, respectively. For the six months ended June 30, 2007, our location costs accounted for 73.7% of our cost of revenues and 33.3% of our total revenues, respectively. In the future, we may need to increase our expenditures on our display and frame placement agreements to obtain new and desirable locations, to renew existing locations, and to secure favorable exclusivity and renewal terms. In addition, lessors of space for our flat–panel displays, advertising poster frames and LED billboards may charge increasingly higher display location lease fees, or demand other compensation arrangements, such as profit sharing. If we are unable to pass increased location costs on to our advertising clients through rate increases, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.

In addition, in more developed cities, it may be difficult to increase the number of desirable locations in our network because most such locations have already been occupied either by us or by our competitors, or in the case of outdoor LED billboards, because the placement of outdoor installments may be limited by municipal zoning and planning policies. In recently developing cities, the supply of desirable locations may be small and the pace of economic development and construction levels may not provide a steadily increasing supply of desirable commercial and residential locations. If, as a result of these possibilities, we are unable to increase the placement of our out–of–home television and poster frame advertising networks into commercial and residential locations that advertisers find desirable, we may be unable to expand our client base, sell advertising time slots and poster frame space on our network or increase the rates we charge for time slots and poster frame space, which could decrease the value of our network to advertisers.

***If we are unable to attract advertisers to advertise on our networks, we will be unable to maintain or increase our advertising fees and the demand for time on our networks, which could negatively affect our ability to grow revenues.***

The amounts of fees we can charge advertisers for time slots on our out–of–home television networks depend on the size and quality of our out–of–home television networks and the demand by advertisers for advertising time on our out–of–home television networks. Advertisers choose to advertise on our out–of–home television networks in part based on the size of the networks and the desirability of the locations where we have placed our flat–panel displays and where we lease LED digital billboards as well as the quality of the services we offer. If we fail to maintain or increase the number of locations, displays and billboards in our networks, diversify advertising channels in our networks, or solidify our brand name and reputation as a quality provider of advertising services, advertisers may be unwilling to purchase time on our networks or to pay the levels of advertising fees we require to remain profitable.

In addition, the fees we can charge advertisers for frame space on our poster frame network depends on the quality of the locations in which we place advertising poster frames, demand by advertisers for frame space and the quality of our service. If we are unable to continue to secure the most desirable residential locations for deployment of our advertising poster frames, we may be unable to attract advertisers to purchase frame space on our poster frame network.

Our failure to attract advertisers to purchase time slots and frame space on our networks will reduce demand for time slots and frame space on our networks and the number of time slots and amount of frame space we are able to sell, which could necessitate lowering the fees we charge for advertising time on our network and could negatively affect our ability to increase revenues in the future.

19

Table of Contents

***Our acquisitions of Framedia, Target Media, Focus Media Wireless, ACL, Allyes and any future acquisitions may expose us to potential risks and have an adverse effect on our ability to manage our business.***

Selective acquisitions, such as our recent acquisitions of Framedia, Target Media, Focus Media Wireless, ACL and Allyes, form part of our strategy to further expand our business. If we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business. Our integration of the acquired entities into our business may not be successful and may not enable us to expand into new advertising platforms as well as we expect. This would significantly affect the expected benefits of these acquisitions. Moreover, the integration of Framedia, Target Media, Focus Media Wireless and Allyes into our operations has required, and will continue to require, significant attention from our management. Future acquisitions will also likely present similar challenges.

The diversion of our management's attention and any difficulties encountered in any integration process could have an adverse effect on our ability to manage our business. In addition, we may face challenges trying to integrate new operations, services and personnel with our existing operations. Our recent acquisitions and possible future acquisitions may also expose us to other potential risks, including risks associated with unforeseen or hidden liabilities, the diversion of resources from our existing businesses and technologies, our inability to generate sufficient revenue to offset the costs, expenses of acquisitions and potential loss of, or harm to, relationships with employees and advertising clients as a result of our integration of new businesses and new regulations governing cross–border investment by PRC residents. In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, ACL, Allyes and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

***There may be unknown risks inherent in our acquisitions of Framedia, Target Media, Focus Media Wireless, ACL and Allyes, which could result in a material adverse effect on our business.***

Although we have conducted due diligence with respect to the major acquisitions we have undertaken and undertake, we may not be aware of all of the risks associated with the targets of such acquisitions including Framedia, Target Media, Focus Media Wireless, ACL and Allyes. Any discovery of adverse information concerning Framedia, Target Media, Focus Media Wireless, ACL or Allyes since we acquired these entities could have a material adverse effect on our business, financial condition and results of operations. While we are entitled to seek indemnification in certain circumstances, successfully asserting indemnification or enforcing such indemnification could be costly and time consuming or may not be successful at all.

***Our recent entry into mobile handset advertising and Internet advertising services through our acquisitions of Focus Media Wireless and Allyes, respectively, may expose us to risks associated with operating in the telecommunications and Internet industries in China which could materially affect our financial condition or results of operation.***

In March 2006, we completed our acquisition of Focus Media Wireless, which operates a mobile handset advertising service over China Mobile's and China Unicom's mobile telecommunications networks. As a result, we now operate a portion of our advertising network on mobile telecommunications networks and are subject to risks associated with operations in the telecommunications sector in China. In addition, in March 2007, we acquired Allyes, which operates an Internet advertising agency and service technology business. Our operation of the business of Allyes subjects us to risks associated with operations in the Internet sector in China. These potential risks include:

- loss or deterioration of our relationship with China Mobile or China Unicom, the two primary mobile telecommunications operators in China that currently provide wireless value–added services to mobile phone users;

- loss or deterioration of our relationship with Internet service providers who use our mobile handset advertisement platform;

20

Table of Contents

- failure to reach traditional advertisers and to take advantage of marketing networks through our existing business;

- changes in operating policies or guidelines by mobile telecommunications operators applicable to all wireless value–added service providers using their platforms or which restrict content supplied by others to us;

- regulation of the telecommunications sector in China that could impose burdensome approval or licensing requirements on value–added service providers such as advertising companies that sell advertising time on mobile telecommunications networks;

- a decision by either or both China Mobile and China Unicom to directly enter into the mobile handset advertising business;

- consumer dissatisfaction with, or any related regulations restricting, the use or "pushing" of unsolicited advertisements, commonly known as "spam";

- the performance and reliability of the Internet infrastructure and mobile telecommunications network;

- changes in technology in the Internet and mobile telecommunications industries; and

- the continued growth of the Internet, e–commerce industries and wireless value–added services.

As a result of any such change or event, the operation of our advertising network using the mobile telecommunications networks of the mobile telecommunications operators in China may be disrupted, which could in turn lower our advertising revenues or result in higher operating costs to us, and we cannot assure you that our financial condition and results of operation would not be materially adversely affected.

In addition, under PRC law, the services offered by Focus Media Wireless may be deemed value–added telecommunication services, which requires an operation permit that has a valid period of five years. Focus Media Wireless has been granted the operation permit for its wireless advertising operations. If the permit is revoked or if we are unable to renew the operation permit upon expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected.

***One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business.***

As of June 30, 2007, we covered approximately 40 out of the approximately 90 cities where we provide our commercial location network through contractual arrangements with regional distributors. Under these arrangements, we provide our business model and operating expertise to local advertising companies in exchange for their acting as regional distributors of our advertising services. We also sell our flat–panel displays to our regional distributors, who are responsible for developing and maintaining an advertising network in office buildings and other commercial locations in the city where they operate. We also grant our regional distributors the right to use our "Focus Media" brand name and logo. However, our contractual arrangements with our regional distributors do not provide us with control or oversight over their everyday business activities, and one or more of our regional distributors may engage in activities that violate PRC laws and regulations governing the advertising industry and advertising content, or other PRC laws and regulations generally. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold, which could result in local regulators suspending the operations of the network in those cities. In addition, we do not independently review the advertising content that our regional distributors display on the portion of our commercial location network that they operate independently, and our regional distributors may include advertising content on their part of the commercial location network and violate PRC advertising laws or regulations or expose them and us to lawsuits or result in the revocation of their business license. If any of these events occurs, it could harm our reputation in the industry.

21

**Table of Contents**

***Failure to manage our growth could strain our management, operational and other resources and we may not be able to achieve anticipated levels of growth in the new networks and media platforms we are beginning to operate, either of which could materially and adversely affect our business and growth potential.***

We have been rapidly expanding, and plan to continue to rapidly expand, our operations in China. We must continue to expand our operations to meet the demands of advertisers for larger and more diverse network coverage and the demands of current and future landlords and property managers for installing and configuring flat–panel displays, advertising poster frames and outdoor LED billboards in our existing and future commercial, store, residential and curbside locations. This expansion has resulted, and will continue to result, in substantial demands on our management resources. It has also increased our need for a reliable supply of equipment, particularly flat–panel displays and large LED digital billboards for our out–of–home television networks which are manufactured by a few third–party contract assemblers according to our specifications. To manage our growth, we must develop and improve our existing administrative and operational systems and, our financial and management controls and further expand, train and manage our work force. As we continue this effort, we may incur substantial costs and expend substantial resources in connection with any such expansion due to, among other things, different technology standards, legal considerations and cultural differences. We may not be able to manage our current or future international operations effectively and efficiently or compete effectively in such markets. We cannot assure you that we will be able to efficiently or effectively manage the growth of our operations, recruit top talent and train our personnel. Any failure to efficiently manage our expansion may materially and adversely affect our business and future growth.

As we continue to expand into new networks and new media platforms, we expect the percentage of revenues derived from our commercial location network to decline. However, the new advertising networks and media platforms we pursue may not present the same opportunities for growth that we have experienced with our commercial location network and, accordingly, we cannot assure you that the level of growth of our networks will not decline over time. Moreover, we expect the level of growth of our commercial location network to decrease as many of the more desirable locations have already been leased by us or our competitors.

***If advertisers or the viewing public do not accept, or lose interest in, our out–of–home advertising network, our revenues may be negatively affected and our business may not expand or be successful.***

The market for out–of–home advertising networks in China is relatively new and its potential is uncertain. We compete for advertising spending with many forms of more established advertising media. Our success depends on the acceptance of our out–of–home advertising network by advertisers and their continuing interest in these mediums as components of their advertising strategies. Our success also depends on the viewing public continuing to be receptive towards our advertising network. Advertisers may elect not to use our services if they believe that consumers are not receptive to our networks or that our networks do not provide sufficient value as effective advertising mediums. Likewise, if consumers find some element of our networks, such as the audio feature of our commercial location, in–store and outdoor LED billboard networks, to be disruptive or intrusive, commercial locations and stores may decide not to place our flat–panel displays in their properties and advertisers may view our advertising network as a less attractive advertising medium compared to other alternatives. In that event, advertisers may determine to reduce their spending on our advertising network. If a substantial number of advertisers lose interest in advertising on our advertising network for these or other reasons, we will be unable to generate sufficient revenues and cash flow to operate our business, and our advertising service revenue, liquidity and results of operations could be negatively affected.

***If the Internet and, in particular, Internet marketing are not broadly adopted in China, our ability to generate revenue and sustain profitability from Allyes could be materially and adversely affected.***

Our future revenues and profits from our online advertising agency business we operate through Allyes are dependent in part upon advertisers in China increasingly accepting the use of the Internet as a marketing channel, which is at an early stage in China. Penetration rates for personal computers, the Internet and broadband in China are all relatively low compared to those in more developed countries. Furthermore, many Chinese Internet users are not accustomed to using the Internet for e–commerce or as a medium for other transactions. Many of our current and potential clients have limited experience with the Internet as a marketing channel, and have not historically devoted

22

Table of Contents

a significant portion of their marketing budgets to Internet marketing and promotion. As a result, they may not consider the Internet as effective in promoting their products and services as traditional print and broadcast media.

***The growth of our online advertising agency business is substantially dependent on the acceptance of the cost–per–thousand–impressions, or CPM Internet advertising sales model, and certain performance–based Internet advertising sales models, including CPC and CPA models, by industry participants in China.***

The most prevalent Internet advertising sales model in China currently is cost–per–day, whereby web publishers are paid based on the number of days an Internet ad is on display without regard to the ad's effectiveness or the number of times the ad is displayed. We believe that the full advantages of Internet marketing in general and our Internet marketing solutions specifically can only be fully realized when more sophisticated Internet advertising sales models such as cost–per–thousand–impressions, or CPM, cost–per–click, or CPC, and cost–per–action, or CPA, are used to purchase ad space. If CPM, CPC and CPA fail to gain acceptance in China, our Internet marketing solutions will be less attractive to industry participants, and the market for those solutions may develop more slowly than we expect or even decline, which would materially and adversely affect our prospects and our business. In addition, if industry participants in China favor other newly–developed Internet advertising sales models incompatible with CPM, CPC or CPA, sales of our Internet marketing solutions may suffer and our revenue and profitability may be materially and adversely affected.

***If the delivery of ads or the use of cookies is limited or blocked, our ability to update and expand our user data would be hindered and demand for our Internet marketing solutions could decline.***

Our business may be adversely affected by practices and technologies that impair or undermine the performance of our Internet marketing solutions. For example, Internet users may use software designed to filter or prevent the delivery of Internet ads, including pop–up and pop–under ads; block, disable or remove cookies used by our Internet marketing technologies; or misrepresent measurements of advertising effectiveness. In particular, because we rely on cookies to obtain data about Internet users for our database of user information, widespread usage of software in China that disables or removes cookies would limit our ability to update and expand our user information and hinder our ability to provide effective targeted Internet marketing solutions to our clients. We cannot assure you that the proportion of Internet users who employ these or other similar technologies will not increase, thereby diminishing the efficiency of our Internet marketing solutions and causing demand for those solutions to decline.

***Our role through Allyes as a supplier of ad space may harm our reputation as an independent purchasing agent and the reputation of our performance–based advertising network as a marketplace for ad space.***

We currently participate in both the purchase and supply of Internet ad space through our online advertising agency business. We also facilitate purchases by our clients of ad space on our performance–based advertising network and may act as sales representative to other web publishers in the future. In addition, we supply ad space that we purchase from web publishers on our performance–based advertising network from time to time to advertisers. Our role as a supplier of ad space might harm both our reputation as an independent purchasing agent and the reputation of our performance–based advertising network as a marketplace for ad space. If our reputation as an independent purchasing agent or the reputation of our performance–based advertising network is harmed, our clients may not purchase ad space from us and our business, financial condition and results of operations could be materially and adversely affected.

***Our Internet advertising business could be materially and adversely affected if we are unable to introduce new or enhanced Internet marketing services and technologies that meet our clients' requirements.***

Our future success depends in part upon our ability to enhance and integrate our existing Internet marketing services and technologies that we provide through Allyes and to introduce new, competitively priced services and technologies with features that meet evolving client requirements, all in a timely and cost–effective manner. A

23

**Table of Contents**

number of factors, including the following, could have a negative impact on the success of our services and technologies:

- our failure to anticipate changes in clients' requirements;

- our competitors' introduction of new services and technologies ahead of our new services and technologies, or their introduction of superior or cheaper services and technologies;

- our failure to adapt to Internet advertising technology trends and evolving industry standards; and

- delays or difficulties in technology integration, customization or development.

***The business and prospects of our online advertising agency business could be harmed if "click–through" fraud is not detected.***

We are exposed to the risk of fraudulent clicks on ads posted on the performance–based advertising network of Allyes by individuals seeking to increase the advertising fees paid to our web publishers. We may in the future have to refund revenue that our advertisers have paid to us and that was later attributed to click–through fraud. Click–through fraud occurs when an individual clicks on an ad displayed on a website for the sole intent of generating the revenue share payment to the publisher rather than to view the underlying content. From time to time we have experienced fraudulent clicks on the performance–based advertising network of Allyes and we do not allow our advertisers to be charged for such fraudulent clicks. This negatively affects the profitability of our online advertising agency business, and this type of fraudulent act could hurt our brand. If fraudulent clicks are not detected, the affected advertisers may experience a reduced return on their investment in our performance–based advertising network, which could lead the advertisers to become dissatisfied with our online advertising agency business, and in turn lead to loss of advertisers and the related revenue. Furthermore, fraudulent clicks directed at our performance–based advertising network or at other performance–based advertising platforms might encourage the perception among advertisers in China that performance–based sales models like CPC and CPA are not effective, which could slow or even reverse the development of those sales models in China. This could adversely affect our business and our prospects.

***System failures could significantly disrupt the operations of our online advertising agency business, which would cause us to lose clients or ad inventory.***

Our ability to successfully provide clients with Internet marketing services and our performance–based advertising network, and our ability to access user information depends on the continuing and uninterrupted performance of our systems. Sustained or repeated system failures that interrupt our ability to provide services to clients, including failures affecting our ability to deliver ads quickly and accurately and to access our user information base to provide targeted solutions, would reduce significantly the attractiveness of our services to advertisers and web publishers. Our online advertising agency business could be materially and adversely affected by any damage or failure that impacts data integrity or interrupts or delays our operations. Our computer systems are vulnerable to damage from a variety of sources, including telecommunications failures, power outages, malicious or accidental human acts, and natural disasters. Moreover, despite network security measures, our servers are potentially vulnerable to physical or electronic break–ins, computer viruses and similar disruptive problems in part because we cannot control the maintenance and operation of our third–party data centers. Despite the precautions taken, unanticipated problems affecting our systems could cause interruptions in the delivery of our solutions in the future and our ability to provide a record of past transactions. Our data centers and systems incorporate varying degrees of redundancy. All data centers and systems may not automatically switch over to their redundant counterpart. We carry no business insurance policies to compensate us for losses that could occur due to any failures in our systems.

***If our Internet marketing technologies contain design or performance defects, our reputation and business may be harmed and we may need to expend significant resources to address liability.***

Technologies as complex as ours may contain design and/or performance defects which are not detectable even after extensive internal testing. Such defects may become apparent only after widespread commercial use. Any

24

Table of Contents

design or performance defects in our Internet marketing technologies could have a material and adverse effect on our reputation and business. It is not clear whether China's existing product liability laws apply to technology products like ours. We cannot assure you that if our Internet marketing technologies are found to have design or performance defects, we will not be liable for product liability claims in China. We do not carry any product liability insurance. Our contracts with our clients currently do not contain provisions to completely limit our exposure to liabilities resulting from product liability claims. Although we have not experienced any product liability claims to date, we cannot assure you that we will not do so in the future.

Additionally, we rely on our Internet marketing technologies (particularly our ad serving technology) to enhance our Internet marketing services and our performance–based advertising network. Any defect in those technologies could hinder the effectiveness of our Internet marketing services and our performance–based advertising network, which would have a material and adverse effect on our competitiveness, business and future prospects.

### *We may be liable for content that we serve onto web publishers' websites, which could increase our expenses.*

We purchase ad space and then serve our clients' ads into that ad space. We are liable under PRC law to ensure that the content of the ads that we serve are fair and accurate and are in full compliance with applicable law. Additionally, we may be liable to third–parties for content in our clients' ads that we serve on web publishers' websites or deliver through our performance–based advertising network if those ads contain artwork, text or other content that violates third–parties' copyrights, trademarks, or other intellectual property rights or if the content is defamatory. We typically indemnify web publishers against liability arising from the content or nature of ads that we serve on their websites. Any claims or counterclaims against us could harm our reputation, be time–consuming, could result in costly litigation and could divert management's attention.

### *The successful operation of our business depends upon the performance and reliability of the Internet infrastructure and fixed telecommunications networks in China.*

Our business depends on the performance and reliability of the Internet infrastructure in China. Almost all access to the Internet is maintained through state–owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Information Industry of China. In addition, the national networks in China are connected to the Internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the Internet. We cannot assure you that a more sophisticated Internet infrastructure will be developed in China. We or our clients may not have access to alternative networks in the event of disruptions, failures or other problems with China's Internet infrastructure. In addition, the Internet infrastructure in China may not support the demands associated with our growth strategies. For example, we intend to expand our sales of rich media technologies, which are bandwidth–intensive. Limited bandwidth in China may hamper the effectiveness of our rich media technologies, which could harm our prospects and business and require us to purchase additional servers in our content distribution network.

### *We depend on the leadership and services of Jason Nanchun Jiang, who is our founder, chairman, chief executive officer and our largest shareholder, and our business and growth prospects may be severely disrupted if we lose his services.*

Our future success is dependent upon the continued service of Jason Nanchun Jiang, our founder, chairman and chief executive officer and our largest shareholder. We rely on his industry expertise and experience in our business operations, and in particular, his business vision, management skills, and working relationships with our employees, our other major shareholders, many of our clients and landlords and property managers of the locations in our network. We do not maintain key–man life insurance for Mr. Jiang. If he was unable or unwilling to continue in his present position, or if he joined a competitor or formed a competing company in violation of his employment agreement and noncompetition agreement, we may not be able to replace him easily or at all. As a result, our business and growth prospects may be severely disrupted if we lose his services.

25

**Table of Contents**

***We may need additional capital and we may not be able to obtain it, which could adversely affect our liquidity and financial position.***

    We believe that our current cash and cash equivalents and cash flow from operations will be sufficient to meet our anticipated cash needs including for working capital and capital expenditures, for the foreseeable future. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities, could result in additional dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations and liquidity.

    Our ability to obtain additional capital on acceptable terms is subject to a variety of uncertainties, including:

- investors' perception of, and demand for, securities of alternative advertising media companies;

- conditions of the U.S. and other capital markets in which we may seek to raise funds;

- our future results of operations, financial condition and cash flows;

- PRC governmental regulation of foreign investment in advertising services companies in China;

- economic, political and other conditions in China; and

- PRC governmental policies relating to foreign currency borrowings.

    We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us could have a material adverse effect on our liquidity and financial condition.

***If we are unable to adapt to changing advertising trends and the technology needs of advertisers and consumers, we will not be able to compete effectively and we will be unable to increase or maintain our revenues which may materially and adversely affect our business prospects and revenues.***

    The market for out–of–home advertising requires us to continuously identify new advertising trends and the technology needs of advertisers and consumers, which may require us to develop new features and enhancements for our advertising network. The majority of our displays use 17–inch LCD screens. We also have a growing number of displays that use larger LCD and plasma screens as well as large size LED digital billboards. Portions of our poster frame network are being upgraded to use digital poster LCD displays. Through our recent acquisition of Focus Media Wireless, we now also provide advertising services to mobile phone users over the mobile phone networks of China Mobile and China Unicom, while Allyes provides online advertising services to advertising customers. In the future, subject to relevant PRC laws and regulations, we may use other technology, such as cable or broadband networking, advanced audio technologies and high–definition panel technology. We may be required to incur development and acquisition costs in order to keep pace with new technology needs but we may not have the financial resources necessary to fund and implement future technological innovations or to replace obsolete technology. Furthermore, we may fail to respond to these changing technology needs. For example, if the use of wireless or broadband networking capabilities on our advertising network becomes a commercially viable alternative and meets all applicable PRC legal and regulatory requirements, and we fail to implement such changes on our commercial location network and in–store network or fail to do so in a timely manner, our competitors or future entrants into the market who do take advantage of such initiatives could gain a competitive advantage over us. If we cannot succeed in developing and introducing new features on a timely and cost–effective basis, advertiser demand for our advertising networks may decrease and we may not be able to compete effectively or attract advertising clients, which would have a material and adverse effect on our business prospects and revenues.

***We may be subject to, and may expend significant resources in defending against, government actions and civil suits based on the content and services we provide through our digital out–of–home advertising networks mobile handset advertising network or Internet advertising services network.***

PRC advertising laws and regulations require advertisers, advertising operators and advertising distributors, including businesses such as ours, to ensure that the content of the advertisements they prepare or distribute are fair and accurate and are in full compliance with applicable law. Violation of these laws or regulations may result in penalties, including fines, confiscation of advertising fees, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the PRC government may revoke a violator's license for advertising business operations.

As an out–of–home advertising service provider, we are obligated under PRC laws and regulations to monitor the advertising content that is shown on our out–of–home advertising networks for compliance with applicable law. In addition, each of our regional distributors is obligated under PRC laws and regulations to monitor the advertising content shown on the portion of our out–of–home television advertising network each of them operates. In general, the advertisements shown on our out–of–home television advertising network and the portion of our advertising network operated by our regional distributors have previously been broadcast over public television networks and have been subjected to internal review and verification of such networks. We and our regional distributors are still separately required to independently review and verify these advertisements for content compliance before displaying the advertisements. In addition, where a special government review is required for specific product advertisements before broadcasting, we and our regional distributors are separately obligated to confirm that such review has been performed and approval has been obtained. We employ, and our regional distributors are required to employ under the terms of our agreements with them to employ, qualified advertising inspectors who are trained to review advertising content for compliance with relevant PRC laws and regulations. In addition, for advertising content related to specific types of products and services, such as alcohol, cosmetics, pharmaceuticals and medical procedures, we and our distributors are required to confirm that the advertisers have obtained requisite government approvals including the advertiser's operating qualifications, proof of quality inspection of the advertised products, government pre–approval of the contents of the advertisement and filing with the local authorities. We endeavor to comply, and encourage our regional distributors to take measures to comply, with such requirements, including by requesting relevant documents from the advertisers. Starting in January 2006, we began to operate a network of advertising poster frames placed primarily in elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as print advertisements under PRC laws and regulations and are also subject to the same legal requirements as advertisements shown on our out–of–home television advertising networks. Outdoor advertisements must be registered with the local branch of the State Administration for Industry and Commerce, or SAIC, before dissemination, and advertising distributors are required to submit a registration application form and the content of the advertisement to the local SAIC and receive an advertising registration certificate from the local SAIC. Our reputation will be tarnished and our results of operations may be adversely affected if advertisement shown on our out–of–home television advertising networks, poster frame network or outdoor LED network is provided to us by our advertising clients in violation of relevant PRC advertising laws and regulations or that the supporting documentation and government approvals provided to us by our advertising clients in connection with such advertising content are not complete or that the advertisements that our regional distributors have procured for broadcasting on our network have not received required approval from the relevant local supervisory bodies or are not content compliant.

In addition, we commenced operation of our outdoor LED billboard network in April 2006. The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

China has also enacted regulations governing telecommunication service providers and the distribution of news and other information. In the past, the Chinese government has stopped the distribution of information over the Internet and telecommunications networks that it believes to violate Chinese law, including content that is

27

Table of Contents

pornographic or obscene, incites violence, endangers national security, is contrary to the national interest or is defamatory. China Unicom and China Mobile also have their own policies regarding the distribution of inappropriate content by wireless value–added service providers and have punished certain providers for distributing inappropriate content, including the imposition of fines and service suspensions. Focus Media Wireless undertakes to the telecommunication operators which grant us access to their mobile phone networks that we will not distribute any advertisements with illegal content. We require the Internet service providers which use our mobile handset advertising platform to provide us the same undertaking, but we cannot completely control the content of their advertisements. If any of the content that we deliver through our mobile handset advertising network is found to violate Chinese laws and regulations or the policies of China Mobile and China Unicom, we could be subject to fines or suspensions.

Moreover, civil claims may be filed against us for fraud, defamation, subversion, negligence, copyright or trademark infringement or other violations due to the nature and content of the information displayed on our advertising network. If consumers find the content displayed on our advertising network to be offensive, landlords, property managers, other location providers or telecommunication network operators may seek to hold us responsible for any consumer claims or may terminate their relationships with us.

In addition, if the security of our content management system is breached through the placement of unauthorized compact flash, or CF' cards in our flat–panel displays and unauthorized images, text or audio sounds are displayed on our advertising network, viewers or the PRC government may find these images, text or audio sounds to be offensive, which may subject us to civil liability or government censure despite our efforts to ensure the security of our content management system. Any such event may also damage our reputation. If our advertising viewers do not believe our content is reliable or accurate, our business model may become less appealing to viewers in China and our advertising clients may be less willing to place advertisements on our advertising network.

***We may be subject to intellectual property infringement claims, which may force us to incur substantial legal expenses and, if determined adversely against us, may materially disrupt our business.***

We cannot be certain that our advertising displays or other aspects of our business do not or will not infringe upon patents, copyrights or other intellectual property rights held by third parties. Although we are not aware of any such claims, we may become subject to legal proceedings and claims from time to time relating to the intellectual property of others in the ordinary course of our business. If we are found to have violated the intellectual property rights of others, we may be enjoined from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives. In addition, we may incur substantial expenses in defending against these third party infringement claims, regardless of their merit. Successful infringement or licensing claims against us may result in substantial monetary liabilities, which may materially and adversely disrupt our business.

***Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may adversely affect our business.***

We regard our copyrights, trademarks, trade secrets and other intellectual property as critical to our success. Unauthorized use of the intellectual property used in our business may adversely affect our business and reputation.

We have historically relied on a combination of trademark and copyright law, trade secret protection and restrictions on disclosure to protect our intellectual property rights. We enter into confidentiality and invention assignment agreements with all our employees. We cannot assure you that these confidentiality agreements will not be breached, that we will have adequate remedies for any breach, or that our proprietary technology will not otherwise become known to, or be independently developed by, third parties.

We are in the process of registering in China many of the trademarks used in our business. We cannot assure you that any of our trademark applications will ultimately proceed to registration or will result in registration with scope adequate for our business. Some of our pending applications or registration may be successfully challenged or invalidated by others. If our trademark applications are not successful, we may have to use different marks for affected services or technologies, or enter into arrangements with any third parties who may have prior registrations, applications or rights, which might not be available on commercially reasonable terms, if at all.

28

**Table of Contents**

In addition, policing unauthorized use of our proprietary technology, trademarks and other intellectual property is difficult and expensive, and litigation may be necessary in the future to enforce our intellectual property rights. Future litigation could result in substantial costs and diversion of our resources, and could disrupt our business, as well as have a material adverse effect on our financial condition and results of operations.

***We face significant competition, and if we do not compete successfully against new and existing competitors, we may lose our market share, and our profitability may be adversely affected.***

We compete with other advertising companies in China. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also face competition from other out–of–home television advertising network operators for access to the most desirable locations in cities in China. Individual buildings, hotels, restaurants and other commercial locations and hypermarket, supermarket and convenience store chains may also decide to independently, or through third–party technology providers, install and operate their own flat–panel television advertising screens. Our in–store network faces competition with similar networks operated by domestic out–of–home advertising companies, including Shanghai Xicheng Cultural Dissemination Co., Ltd., also known as CGEN. Our Internet advertising services compete with those provided by domestic and international advertising agencies, including the WPP Group. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, wireless communications, street furniture, billboard, frame and public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

In the future, we may also face competition from new entrants into the out–of–home television advertising sector. Our sector is characterized by relatively low fixed costs and, as is customary in the advertising industry, we do not have exclusive arrangements with our advertising clients. In addition, since December 10, 2005, wholly foreign–owned advertising companies are allowed to operate in China, which may expose us to increased competition from international advertising media companies attracted to opportunities in China.

Increased competition could reduce our operating margins and profitability and result in a loss of market share. Some of our existing and potential competitors may have competitive advantages, such as significantly greater financial, marketing or other resources, or exclusive arrangements with desirable locations, and others may successfully mimic and adopt our business model. Moreover, increased competition will provide advertisers with a wider range of media and advertising service alternatives, which could lead to lower prices and decreased revenues, gross margins and profits. We cannot assure you that we will be able to successfully compete against new or existing competitors.

***We do not maintain any business liability disruption or litigation insurance coverage for our operations, and any business liability, disruption or litigation we experience might result in our incurring substantial costs and the diversion of resources.***

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products and do not, to our knowledge, offer business liability insurance. While business disruption insurance is available to a limited extent in China, we have determined that the risks of disruption, cost of such insurance and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. As a result, we do not have any business liability, disruption or litigation insurance coverage for our operations in China. Any business disruption or litigation may result in our incurring substantial costs and the diversion of resources.

***These have been historical deficiencies with our internal controls and these remain areas of our internal and disclosure controls that require improvements, and we are exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes–Oxley Act of 2002.***

While we believe that we currently have adequate internal control procedures in place, we are still exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes–Oxley Act of 2002. Under the supervision and with the participation of our management, we have evaluated our internal controls systems in order to allow management to report on, and our registered independent public accounting firm

29

Table of Contents

to attest to, our internal controls, as required by Section 404 of the Sarbanes–Oxley Act. We have performed the system and process evaluation and testing required in an effort to comply with the management certification and auditor attestation requirements of Section 404. As a result, we have incurred additional expenses and a diversion of management's time. If we are not able to continue to meet the requirements of Section 404 in a timely manner or with adequate compliance, we might be subject to sanctions or investigation by regulatory authorities, such as the SEC or the Nasdaq Global Market. Any such action could adversely affect our financial results and the market price of our ADSs.

In connection with their audit of our consolidated financial statements as of and for the period ended December 31, 2006, our auditors identified one significant deficiency under standards established by the Public Company Accounting Oversight Board (United States), or the PCAOB, in our internal accounting controls. Specifically, the auditors noted that, with regard to determination of related party status, we lack a process for timely review of changes in relationships with companies that were excluded from related party status in prior years, namely with Everease Advertising & Communication Ltd., or Everease. Following the identification of this significant deficiency, we have consulted with our audit committee and are taking remedial steps to address the deficiency, including reviewing our policies for the evaluation of transactions with past related party companies. If we are unable to implement solutions to any weaknesses in our existing internal and disclosure controls and procedures, or if we fail to maintain an effective system of internal and disclosure controls in the future for our company and for companies that we acquire, we may be unable to accurately report our financial results or prevent fraud and investor confidence and the market price of our ADSs may be adversely impacted.

### Risks Relating to Regulation of Our Business and to Our Structure

***If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties.***

Substantially all of our operations are or will be conducted through Focus Media Technology (Shanghai) Co., Ltd., or Focus Media Technology, Framedia Investment and Beijing Dotad Technology Co., Ltd., or Dotad Technology, our indirectly wholly–owned operating subsidiaries in China, Focus Media Digital Information Technology (Shanghai) Co., Ltd., or Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, and New Allyes Information Technology Co., Ltd., or New Allyes Technology, which we collectively refer to as our PRC operating subsidiaries, and through our contractual arrangements with several of our consolidated affiliated entities in China. PRC regulations require any foreign entities that invest in the advertising services industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been allowed to own directly 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising business outside of China or less than 100% if the foreign investor has at least two years of direct operations in the advertising industry outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify under PRC regulations any earlier than two or three years after we commence any such operations outside of China or until we acquire a company that has directly operated an advertising business outside of China for the required period of time. Accordingly, our PRC operating subsidiaries are currently ineligible to apply for the required licenses for providing advertising services in China. Substantially all of our advertising business is currently provided through our contractual arrangements with our PRC operating subsidiaries' consolidated affiliated entities in China, which we collectively refer to as our PRC operating affiliates, including Focus Media Advertisement and its subsidiaries with regard to our out–of–home television networks, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, Focus Media Wireless with regard to our mobile handset advertising network, and seven PRC companies with regard to our online advertising agency business which operate the business of Allyes, and which we refer to as the Allyes operating affiliates. Our PRC operating affiliates are currently owned in each case either (i) by two PRC citizens designated by us or (ii) by two PRC entities owned by our subsidiaries or by our designated appointees. Our PRC operating affiliates and certain of their respective subsidiaries hold the requisite licenses to provide advertising services in China. Our PRC operating affiliates and their respective subsidiaries directly operate our advertising network. We have been and are expected to continue to be dependent on these PRC operating affiliates and their subsidiaries to operate our advertising

Table of Contents

business for the foreseeable future. We have entered into contractual arrangements with PRC operating affiliates and their respective subsidiaries, pursuant to which we, through our PRC operating subsidiaries, provide technical support and consulting services to our PRC operating affiliates and their subsidiaries. In addition, we have entered into agreements with our PRC operating affiliates and each of their shareholders which provide us with the substantial ability to control these affiliates and their existing and future subsidiaries.

If we, our existing or future PRC operating subsidiaries and affiliates are found to be in violation of any existing or future PRC laws or regulations or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities, including the SAIC, which regulates advertising companies, would have broad discretion in dealing with such violations, including:

- revoking the business and operating licenses of our PRC subsidiaries and affiliates;

- discontinuing or restricting our PRC subsidiaries' and affiliates' operations;

- imposing conditions or requirements with which we or our PRC subsidiaries and affiliates may not be able to comply;

- requiring us or our PRC subsidiaries and affiliates to restructure the relevant ownership structure or operations; or

- restricting or prohibiting our use of the proceeds of this offering to finance our business and operations in China.

The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business.

***We rely on contractual arrangements with our PRC operating affiliates and their subsidiaries and shareholders for our China operations, which may not be as effective in providing operational control as direct ownership.***

We have in the past relied, and to a lesser but significant extent will continue in the future to rely, on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders to operate our advertising business. For a description of these contractual arrangements, see the sections titled "Our Corporate Structure" and "Related Party Transactions". These contractual arrangements may not be as effective in providing us with control over our PRC operating affiliates and their subsidiaries as direct ownership. If we had direct ownership of our PRC operating affiliates and their respective subsidiaries, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of those companies, which in turn could effect changes, subject to any applicable fiduciary obligations, at the management level. However, under the current contractual arrangements, as a legal matter, if our PRC operating affiliates or any of their subsidiaries and shareholders fails to perform its or his respective obligations under these contractual arrangements, we may have to incur substantial costs and resources to enforce such arrangements, and rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you to be effective. For example, if Jason Nanchun Jiang were to refuse to transfer his equity interest in Focus Media Advertisement to us or our designee when we exercise the purchase option pursuant to these contractual arrangements, or if Mr. Jiang were otherwise to act in bad faith toward us, then we may have to take legal action to compel him to fulfill his contractual obligations. In addition, Focus Media Advertisement, which holds certain of the business licenses required to operate our advertising network in China, is jointly owned and effectively managed by Mr. Jiang and Mr. Yu. Similarly, each of the Allyes operating affiliates, which hold the licenses necessary to operate the business of Allyes, is jointly owned by a set of two PRC nationals. Accordingly, it may be difficult for us to change our corporate structure or to bring claims against our PRC operating affiliates if they do not perform their obligations under its contracts with us or if any of the PRC citizens who hold the equity interest in our PRC operating affiliates do not cooperate with any such actions.

Many of these contractual arrangements are governed by PRC law and provide for the resolution of disputes through either arbitration or litigation in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal environment

31

Table of Contents

in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. In the event we are unable to enforce these contractual arrangements, we may not be able to exert effective control over our operating entities, and our ability to conduct our business may be negatively affected.

***Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment.***

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions we have entered into among our subsidiaries and affiliated entities are found not to be on an arm's–length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late payment interest and penalties. See "Management's Discussion and Analysis of Financial Condition and Results of Operation — Taxation" for a discussion of the transactions referred to above. A finding by the PRC tax authorities that Focus Media Digital, Shanghai Focus Media Advertising Agency Co., Ltd., or Focus Media Advertising Agency, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement or New Structure Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings.

***We rely principally on dividends and other distributions on equity paid by our wholly–owned operating subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our operating subsidiary to pay dividends to us could have a material adverse effect on our ability to conduct our business.***

We are a holding company, and we rely principally on dividends and other distributions on equity paid by our PRC operating subsidiaries for our cash requirements, including the funds necessary to service any debt we may incur. If any of our PRC operating subsidiaries incurs debt on its own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us. In addition, the PRC tax authorities may require us to adjust our taxable income under the contractual arrangements our PRC operating subsidiaries currently have in place with our PRC operating affiliates and their respective subsidiaries in a manner that would materially and adversely affect our PRC operating subsidiaries' ability to pay dividends and other distributions to us. Furthermore, relevant PRC laws and regulations permit payments of dividends by our PRC operating subsidiaries only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. Under PRC laws and regulations, each of our PRC operating subsidiaries is also required to set aside a portion of its net income each year to fund specific reserve funds. These reserves are not distributable as cash dividends. In addition, subject to certain cumulative limits, the statutory general reserve fund requires annual appropriations of 10% of after–tax income to be set aside prior to payment of dividends. As a result of these PRC laws and regulations, our PRC operating subsidiaries and our PRC operating affiliates are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2006, the amount of these restricted portions was approximately $223,386,461. Any limitation on the ability of our PRC operating subsidiaries to pay dividends to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends, or otherwise fund and conduct our business.

***Our business operations may be affected by legislative or regulatory changes.***

There are no existing PRC laws or regulations that specifically define or regulate out–of–home television or mobile handset advertising. Changes in laws and regulations or the enactment of new laws and regulations governing placement or content of out–of–home advertising or distribution of mobile handset advertising, our business licenses or otherwise affecting our business in China may materially and adversely affect our business prospects and results of operations. For example, the PRC government has promulgated regulations allowing foreign companies to hold a 100%–interest in PRC advertising companies starting from December 10, 2005. We are

Table of Contents

not certain how the PRC government will implement this regulation or how it could affect our ability to compete in the advertising industry in China.

***PRC regulation of loans and direct investment by offshore holding companies to PRC entities may delay or prevent us from using funds to make loans or additional capital contributions to our PRC operating subsidiaries and affiliates.***

As an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- loans by us to Focus Media Technology, Framedia Investment, Dotad Technology, or New Allyes Technology or any other of our foreign invested enterprises, to finance its activities cannot exceed statutory limits and must be registered with the PRC State Administration of Foreign Exchange or its local counterpart; and

- loans by us to our PRC operating affiliates or their respective subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authorities and must also be registered with the PRC State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital and New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement or any of our foreign invested enterprises through Focus Media Technology, Framedia Investment, Dotad Technology and New Allyes Technology or our other PRC operating affiliates, by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Because our PRC operating affiliates and their respective subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in "Regulation of Our Industry" in this prospectus. We cannot assure you that we can obtain these government registrations or approvals on a timely basis, if at all, with respect to future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement Framedia Investment, Focus Media Advertisement, Dotad Technology, New Allyes Technology or any of their respective subsidiaries. If we fail to receive such registrations or approvals, our ability to use our funds and to capitalize our PRC operations would be negatively affected which would adversely and materially affect our liquidity and our ability to expand our business.

**Risks Relating to the People's Republic Of China**

Substantially all of our assets are located in China and substantially all of our revenues are derived from our operations in China. Accordingly, our business, financial condition, results of operations and prospects are subject, to a significant extent, to economic, political and legal developments in China.

***The PRC's economic, political and social conditions, as well as governmental policies, could affect the financial markets in China and our liquidity and access to capital and our ability to operate our business.***

The PRC economy differs from the economies of most developed countries in many respects, including the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. While the PRC economy has experienced significant growth over the past, growth has been uneven, both geographically and among various sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures benefit the overall PRC economy, but may also have a negative effect on us. For example, under current PRC regulations, starting December 10, 2005, foreign entities are allowed to directly own 100% of a PRC advertising business if the foreign entity has at least three years of direct operations of an advertising business outside of China, or to directly own less than 100% of a PRC advertising business if the foreign entity has at least two years of direct operations of an advertising business outside of China. This may encourage foreign advertising companies with more experience, greater technological know–how and larger financial resources than we have to compete against us and limit the

Table of Contents

potential for our growth. Moreover, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations that are applicable to us.

The PRC economy has been transitioning from a planned economy to a more market–oriented economy. Although the PRC government has implemented measures since the late 1970s emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the PRC government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through the allocation of resources, controlling payment of foreign currency–denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Since late 2003, the PRC government implemented a number of measures, such as raising bank reserves against deposit rates to place additional limitations on the ability of commercial banks to make loans and raise interest rates, in order to slow down specific segments of China's economy which it believed to be overheating. These actions, as well as future actions and policies of the PRC government, could materially affect our liquidity and access to capital and our ability to operate our business.

***The PRC legal system embodies uncertainties which could limit the legal protections available to you and us.***

The PRC legal system is a civil law system based on written statutes. Unlike common law systems, it is a system in which decided legal cases have little precedential value. In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past 26 years has significantly enhanced the protections afforded to various forms of foreign investment in China. Each of our PRC operating subsidiaries and affiliates is subject to PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, we may have to resort to administrative and court proceedings to enforce the legal protection that we enjoy either by law or contract. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. For example, these uncertainties may impede our ability to enforce the contracts we have entered into with the Group. In addition, such uncertainties, including the inability to enforce our contracts, could materially and adversely affect our business and operation. In addition, intellectual property rights and confidentiality protections in China may not be as effective as in the United States or other countries. Accordingly, we cannot predict the effect of future developments in the PRC legal system, particularly with regard to the advertising industry, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement thereof, or the preemption of local regulations by national laws. These uncertainties could limit the legal protections available to us, including our ability to enforce our agreements with the Group, and other foreign investors, including you.

***If tax benefits currently available to us in PRC were no longer available under the new Enterprise Income Taxes (EIT") law which will be effective on January 1, 2008, our effective income tax rates for our PRC operations could increase.***

We are incorporated in the Cayman Islands where no income taxes are imposed.

We generated substantially all our net income from our PRC operations. Our China operations are conducted through various subsidiaries and variable interest entities, or VIEs. Pursuant to the PRC Income Tax Laws, our subsidiaries and VIEs are generally subject to EIT at a statutory rate of 33%, which comprises 30% national income tax and 3% local income tax. Some of the Company's subsidiaries and VIEs are newly incorporated enterprises engaged in advertising industry which are entitled to a two–year tax exemption holiday, commencing from the first operating year. One of our VIEs, Beijing Focus Media Wireless Co., Ltd., is a qualified new technology enterprise and under PRC Income Tax Laws are subject to a preferential tax rate of 15%, plus a three–year tax exemption followed by three years with a 50% reduction in the tax rate, commencing from the first profitable year.

34

Table of Contents

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

***We may be deemed a Chinese resident enterprise under the EIT Law and be subject to PRC taxation on our worldwide income.***

The EIT Law also provides that enterprises established outside of China whose "de facto management bodies" are located in China are considered "resident enterprises" and will generally be subject to the uniform 25% enterprise income tax rate as to their global income, including income we receive from our subsidiaries. The EIT Law, however, does not define the term "de facto management bodies" and it is currently unclear under what situations an enterprise's "de facto management body" would be considered to be located in China. Substantially all of our management is currently based in China, and may remain in China after the effectiveness of the EIT Law. Therefore, we may be treated as a Chinese resident enterprise for enterprise income tax purposes. The tax consequences of such treatment are currently unclear, as they will depend on regulations that have not yet been issued that would implement the EIT Law, and on local tax authorities' ability to follow such regulations in tax administration. See "Dividends payable by us to our foreign investors may become subject to withholding taxes under PRC tax laws" and "Gains on the sales of our shares or ADSs may become subject to PRC income taxes" below.

***Recent PRC regulations relating to offshore investment activities by PRC residents may increase our administrative burden and restrict our overseas and cross–border investment activity. If our shareholders who are PRC residents fail to make any required applications and filings under such regulations, we may be unable to distribute profits and may become subject to liability under PRC laws.***

The PRC National Development and Reform Commission, or NDRC, and SAFE recently promulgated regulations that require PRC residents and PRC corporate entities to register and obtain approvals from relevant PRC government authorities in connection with their direct or indirect offshore investment activities. These regulations apply to our shareholders who are PRC residents and may apply to any offshore acquisitions that we make in the future.

Under the SAFE regulations, PRC residents who make, or have previously made, direct or indirect investments in offshore companies will be required to register those investments. In addition, any PRC resident who is a direct or indirect shareholder of an offshore company is required to file with the local branch of SAFE, with respect to that offshore company, any material change involving capital variation, such as an increase or decrease in capital, transfer or swap of shares, merger, division, long term equity or debt investment or creation of any security interest over the assets located in China. If any PRC shareholder fails to make the required SAFE registration, the PRC subsidiaries of that offshore parent company may be prohibited from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation, to their offshore parent company, and the offshore parent company may also be prohibited from injecting additional capital into their PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

Table of Contents

We cannot assure you that all of our shareholders who are PRC residents will comply with our request to make or obtain any registrations or approvals required under these regulations or other related legislation. Furthermore, as the regulations are relatively new, the PRC government has yet to publish implementing rules, and much uncertainty remains concerning the reconciliation of the new regulations with other approval requirements. It is unclear how these regulations, and any future legislation concerning offshore or cross–border transactions, will be interpreted, amended and implemented by the relevant government authorities. The failure or inability of our PRC resident shareholders to comply with these regulations may subject us to fines and legal sanctions, restrict our overseas or cross–border investment activities, limit our ability to inject additional capital into our PRC subsidiaries and the ability of Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Investment or New Allyes Technology, our PRC subsidiaries, to make distributions or pay dividends, or materially and adversely affect our ownership structure. If any of the foregoing events occur, our acquisition strategy and business operations and our ability to distribute profits to you could be materially and adversely affected.

***The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China.***

Our operations and transactions are subject to review by the PRC tax authorities pursuant to relevant PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, in the case of some of our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China, we cannot assure you that the PRC tax authorities will not require us to pay additional taxes in relation to such acquisitions, in particular where the PRC tax authorities take the view that the previous taxable income of the PRC affiliates of the acquired offshore entities needs to be adjusted and additional taxes be paid. In the event that the sellers failed to pay any taxes required under PRC law in connection with these transactions, the PRC tax authorities might require us to pay the tax, together with late–payment interest and penalties. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Acquisitions".

***A new PRC rule on mergers and acquisitions may subject us to sanctions, fines and other penalties and affect our future business growth through acquisition of complementary business.***

On August 8, 2006, six PRC government and regulatory authorities, including the PRC Ministry of Commerce and the Chinese Securities Regulatory Commission, or the CSRC, promulgated a rule entitled "Provisions regarding Mergers and Acquisitions of Domestic Enterprises by Foreign Investors," or the New M&A Rule, which became effective on September 8, 2006. The New M&A Rule, among other things, requires that an offshore specific purpose vehicle, or SPV, formed for the listing purpose through acquisition of PRC domestic entity and controlled by PRC residents should obtain approval from the CSRC prior to publicly listing its securities on an overseas stock market. Based on consultation with the International Department of the CSRC regarding its interpretation of the New M&A Rule, our PRC counsel, Global Law Offices, advised us that the CSRC approval was not required for this offering. However, we cannot assure you that the relevant PRC government agency, including the Ministry of Commerce or other applicable departments of the CSRC, would reach the same conclusion as our PRC counsel. If the CSRC or other PRC regulatory body subsequently determines that the CSRC's approval was required for this offering, we may face sanctions by the CSRC or other PRC regulatory agencies. In such event, these regulatory agencies may impose fines and penalties on our operations in the PRC, limit our operating privileges in the PRC, delay or restrict the repatriation of the proceeds from this offering into the PRC, or take other actions that could have a material adverse effect on our business, financial condition, results of operations, reputation and prospects, as well as the trading price of our ADSs.

The New M&A Rule also established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time–consuming and complex, including requirements in some instances that the Ministry of Commerce be notified in advance of any change–of–control transaction in which a foreign investor takes control of a PRC domestic enterprise. In the future, we may grow our business in part by acquiring complementary businesses, although we do not have any plans to do so at this time. Complying with the requirements of the New M&A Rule to complete such transactions could be time–consuming, and any required

36

Table of Contents

approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit the completion of such transactions, which could affect our ability to expand our business or maintain our market share.

***Restrictions on currency exchange may limit our ability to utilize our revenues effectively.***

Substantially all of our revenues and operating expenses are denominated in Renminbi. The Renminbi is currently convertible under the "current account", which includes dividends, trade and service–related foreign exchange transactions, but not under the "capital account", which includes foreign direct investment and loans. Currently, each of our PRC subsidiaries may purchase foreign exchange for settlement of "current account transactions", including payment of dividends to us, without the approval of SAFE. However, we cannot assure you that the relevant PRC governmental authorities will not further limit or eliminate our ability to purchase foreign currencies in the future. Since a significant amount of our future revenues will be denominated in Renminbi, any existing and future restrictions on currency exchange may limit our ability to utilize revenues generated in Renminbi to fund our business activities outside China, if any, or expenditures denominated in foreign currencies. Foreign exchange transactions under the capital account are still subject to limitations and require approvals from, or registration with, the State Administration of Foreign Exchange and other relevant PRC governmental authorities. This could affect the ability of each of Focus Media Technology and Framedia Investment to obtain foreign exchange through debt or equity financing, including by means of loans or capital contributions from us.

***Fluctuations in exchange rates could result in foreign currency exchange losses.***

Because our earnings and cash and cash equivalent assets are denominated in Renminbi and the net proceeds from this offering will be denominated in U.S. dollars, fluctuations in exchange rates between U.S. dollars and Renminbi will affect the relative purchasing power of these proceeds and our balance sheet and earnings per share in U.S. dollars following this offering. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our financial results reported in U.S. dollar terms without giving effect to any underlying change in our business or results of operations. Since July 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it is reported to be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on November 6, 2007 the Renminbi was revalued against the U.S. dollar to approximately RMB 7.4515 to the U.S. dollar. The Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the long term, depending on the fluctuation of the basket of currencies against which it is currently valued or it may be permitted to enter into a full float, which may also result in a significant appreciation or depreciation of the Renminbi against the U.S. dollar. Fluctuations in the exchange rate will also affect the relative value of any dividend we issue in the future which will be exchanged into U.S. dollars and earnings from and the value of any U.S. dollar–denominated investments we make in the future.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

***Any future outbreak of severe acute respiratory syndrome or avian flu in China, or similar adverse public health developments, may severely disrupt our business and operations.***

From December 2002 to June 2003, China and other countries experienced an outbreak of a new and highly contagious form of atypical pneumonia now known as severe acute respiratory syndrome, or SARS. On July 5, 2003, the World Health Organization declared that the SARS outbreak had been contained. Since September 2003, however, a number of isolated new cases of SARS have been reported, most recently in central China in April 2004. During May and June of 2003, many businesses in China were closed by the PRC government to prevent transmission of SARS. In addition, many countries, including China, have encountered incidents of the H5N1 strain of bird flu, or avian flu. This disease, which is spread through poultry populations, is capable in some circumstances of being transmitted to humans and is often fatal. A new outbreak of SARS or an outbreak of avian flu may result in

37

Table of Contents

health or other government authorities requiring the closure of our offices or other businesses, including office buildings, retail stores and other commercial venues, which comprise the primary locations where we provide our digital out–of–home advertising services. Any recurrence of the SARS outbreak, an outbreak of avian flu or a development of a similar health hazard in China, may deter people from congregating in public places, including a range of commercial locations such as office buildings and retail stores. Such occurrences would severely impact the value of our digital out–of–home advertising networks to advertisers, significantly reduce the advertising time purchased by advertisers and severely disrupt our business and operations.

**Risks Relating to this Offering, Our ADSs and Our Trading Markets**

***The price of our ADSs has been volatile and may continue to be volatile, which may make it difficult for holders to resell the ADSs when desired or at attractive prices.***

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. Since July 13, 2005, the closing prices of our ADSs on the Nasdaq Global Market has ranged from $8.90 to $66.30 per ADS and the last reported sale price on November 6, 2007 was $65.10. From July 13, 2005 until April 10, 2007, we used an ADS–to–share ratio of 10–to–one. Starting April 11, 2007, we reduced this ratio to five–to–one. All ADS trading prices on the Nasdaq set forth in this prospectus, including historical trading and closing prices, have been adjusted to reflect the new ADS–to–share ratio of five–to–one. Our ADS price may fluctuate in response to a number of events and factors. The financial markets in general, and the market prices for many PRC companies in particular, have experienced extreme volatility that often has been unrelated to the operating performance of such companies.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for specific business reasons. Factors such as variations in our revenues, earnings and cash flow, announcements of new investments, cooperation arrangements or acquisitions, and fluctuations in market prices for our advertising network could cause the market price for our ADSs to change substantially. Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade. We cannot give any assurance that these factors will not occur in the future.

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

In connection with this offering, we have agreed not to sell any ordinary shares or ADSs for 90 days after the date of this prospectus without the written consent of the Merrill Lynch and subject to certain exceptions. The underwriters may from time to time continue to release other securities of ours that are currently subject to lock–up, subject to applicable regulations of the National Association of Securities Dealers, or NASD. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs. See "Underwriting" and "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling our securities after this offering.

***We have in the past failed to comply with Nasdaq Marketplace Rules, including the timely filing of our annual report and maintaining a majority of independent directors on our board of directors.***

Our failure to timely file our 2006 annual report on Form 20–F subjected us to delisting review by the Nasdaq Listing Qualifications Panel. See "— Our failure to timely file the 2006 annual report on Form 20–F as a result of allegations raised by an anonymous investor holding a short position in our ADSs may subject us to shareholder litigation and delisting review, either of which may materially and adversely affect our business". In addition, in the past we previously failed to maintain a majority of independent directors on our board of directors, which put us out of compliance with Nasdaq Marketplace Rule 4350. See "Management". On October 4, 2007, we received a letter from Nasdaq Listing Qualifications notifying us that we had regained compliance with all Nasdaq listing qualifications by filing our annual report for 2006.

Our historical failure to comply with Nasdaq Marketplace Rules has on one occasion subjected us to delisting review. If for any reason we fail to maintain compliance with Nasdaq Marketplace Rules in the future, we could be subject to additional delisting procedures and sanctions, which could affect our reputation and the market value of

38

Table of Contents

our securities, and could result in shareholder litigation, which may divert the attention of our management and force us to expend resources to defend against such claims. Any litigation may have a material and adverse effect on our business and future results of operations.

***A significant percentage of our outstanding ordinary shares is beneficially owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer, and as a result, he may have significantly greater influence on us and our corporate actions by nature of the size of his shareholdings relative to our public shareholders.***

Following this offering, Jason Nanchun Jiang will beneficially own approximately 10.53% of our outstanding ordinary shares, or 10.37% if the underwriters exercise their option to purchase additional ADSs in full. Accordingly, Jason Nanchun Jiang has significant influence in determining the outcome of any corporate transaction or other matter submitted to the shareholders for approval, including mergers, consolidations and the sale of all or substantially all of our assets, election of directors and other significant corporate actions. Further, Jason Nanchun Jiang is also an 85% shareholder of our affiliated PRC entity, Focus Media Advertisement, with which we have contractual arrangements that are essential to our business. The continuing cooperation of Focus Media Advertisement, and its shareholders, branches and subsidiaries, is important to our business. Without Jason Nanchun Jiang's consent, we could be prevented from entering into transactions or conducting business that could be beneficial to us. Accordingly, Mr. Jiang's control of Focus Media Advertisement could hinder any change in control of our business, particularly where such change of control would benefit shareholders other than Mr. Jiang. It would be difficult for us to change our corporate structure if any disputes arise between us and Mr. Jiang or if he fails to carry out his contractual and fiduciary obligations to us. Thus, Jason Nanchun Jiang's interests as an officer and employee may differ from his interests as a shareholder or from the interests of our other shareholders, including you.

***Anti–takeover provisions in our charter documents may discourage any hostile acquisition attempt by a third party, which could limit our shareholders' opportunity to sell their shares at a premium.***

Our amended and restated memorandum and articles of association include provisions that could limit the ability of others to acquire control of us, modify our structure or cause us to engage in change–of–control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of us in a tender offer or similar transaction.

For example, our board of directors will have the authority, without further action by our shareholders, to issue preference shares in one or more series and to fix the powers and rights of these shares, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares. Preference shares could thus be issued quickly with terms calculated to delay or prevent a change in control or make removal of management more difficult. In addition, if the board of directors issues preference shares, the market price of our ordinary shares may fall and the voting and other rights of the holders of our ordinary shares may be adversely affected.

In addition, some actions require the approval of a supermajority of at least two thirds of our board of directors which, among other things, would allow our non–independent directors to block a variety of actions or transactions, such as a merger, asset sale or other change of control, even if all of our independent directors unanimously voted in favor of such action, further depriving our shareholders of an opportunity to sell their shares at a premium. In addition, our directors serve terms of three years each, which terms are not staggered. The length of these terms could present an additional obstacle against the taking of action, such as a merger or other change of control, that could be in the interest of our shareholders.

***We are a Cayman Islands company and, because judicial precedent regarding the rights of shareholders is more limited under Cayman Islands law than under U.S. law, you may have less protection of your shareholder rights than you would under U.S. law.***

Our corporate affairs are governed by our amended and restated memorandum and articles of association, the Cayman Islands Companies Law and the common law of the Cayman Islands. The rights of shareholders to take

39

**Table of Contents**

action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. In addition, some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands.

As a result of all of the above, public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a U.S. company.

***Judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands company and substantially all of our assets are located outside of the United States. All of our current operations are conducted in the PRC. In addition, most of our directors and officers are nationals and residents of countries other than the United States. A substantial portion of the assets of these persons are located outside the United States. As a result, it may be difficult for you to effect service of process within the United States upon these persons. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors, most of whom are not resident in the United States and the substantial majority of whose assets are located outside of the United States. In addition, there is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of United States courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state. In addition, there is uncertainty as to whether such Cayman Islands or PRC courts would be competent to hear original actions brought in the Cayman Islands or the PRC against us or such persons predicated upon the securities laws of the United States or any state.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement.***

Holders of our ADSs may only exercise their voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Upon receipt of voting instructions from a holder of ADSs in the manner set forth in the deposit agreement, the depositary will endeavor to vote the underlying ordinary shares in accordance with these instructions. Under our amended and restated memorandum and articles of association and Cayman Islands law, the minimum notice period required for convening a general meeting is ten days. When a general meeting is convened, you may not receive sufficient notice of a shareholders' meeting to permit you to withdraw your ordinary shares to allow you to cast your vote with respect to any specific matter at the meeting. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if your ordinary shares are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, the depositary will give us a discretionary proxy to vote our ordinary shares underlying your ADSs at shareholders' meetings if you do not vote, unless:

- we have failed to timely provide the depositary with our notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

40

Table of Contents

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- voting at the meeting is made on a show of hands.

The effect of this discretionary proxy is that you cannot prevent our ordinary shares underlying your ADSs from being voted, absent the situations described above, and it may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

***You may not receive distributions on our ordinary shares or any value for them if it is illegal or impractical to make them available to you.***

The depositary of our ADSs has agreed to pay you the cash dividends or other distributions it or the custodian for our ADSs receives on our ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of our ordinary shares your ADSs represent. However, the depositary is not responsible if it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed pursuant to an applicable exemption from registration. The depositary is not responsible for making a distribution available to any holders of ADSs if any government approval or registration required for such distribution cannot be obtained after reasonable efforts made by the depositary. We have no obligation to take any other action to permit the distribution of our ADSs, ordinary shares, rights or anything else to holders of our ADSs. This means that you may not receive the distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may have a material and adverse effect on the value of your ADSs.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***We have not determined a specific use for a portion of our net proceeds from this offering and we may use these proceeds in ways with which you may not agree.***

We have not determined a specific use for a portion of our net proceeds of this offering. Our management will have considerable discretion in the application of these proceeds received by us. You will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. The net proceeds may be used for corporate purposes that do not improve our profitability or increase our ADS price. The net proceeds from this offering may also be placed in investments that do not produce income or lose value.

***Dividends payable by us to our foreign investors may become subject to withholding taxes under PRC tax laws.***

Under the EIT Law, dividends payable to foreign investors which are "derived from sources within the PRC" may be subject to income tax at the rate of 20% by way of withholding. Since we are a holding company and substantially all of our income will come from dividends that we receive from our PRC subsidiaries, dividends that

Table of Contents

we declare from such income may be deemed "derived from sources within the PRC" for purposes of the EIT Law and therefore subject to a 20% withholding tax. While the EIT Law stipulates that such taxes may be exempted or reduced, no rules or guidance implementing the EIT Law have been issued yet, and it is unclear under what circumstances, and to what extent, such tax would be exempted or reduced.

The EIT Law also provides that dividend income between "qualified resident enterprises" is exempted income, which may imply that dividends we receive from our PRC subsidiaries would be exempt from tax, but we cannot assure you that we will be able to obtain such treatment for dividends paid to us by our PRC subsidiaries. Moreover, if we are deemed to be a PRC resident enterprise under the EIT law, a foreign investor in us may be able to claim the benefits of any income tax treaty between his or her resident country and China. We cannot assure you, however, that treaty benefits will be available to you (for example with respect to the withholding tax rate on dividends) even if we are deemed a PRC resident enterprise.

If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our foreign shareholders and ADSs holders, the value of your investment in our ADSs may be materially and adversely affected.

***Gains on the sales of our shares or ADSs may become subject to PRC income taxes.***

Under the EIT Law, our foreign enterprise shareholders and enterprise ADSs holders may be subject to a 20% income tax upon any gains they realize from the transfer of their shares or ADSs, if such income is regarded as income from "sources within the PRC." What will constitute "sources within the PRC" and whether or not there will be any exemption or reduction in taxation for our foreign corporate investors, however, are unclear since no rules or guidance concerning the new tax law has been issued yet. If our foreign shareholders and ADSs holders are required to pay PRC income tax on the transfers of their shares or ADSs, the value of your investment in our ADSs may be materially and adversely affected.

42

Table of Contents

## FORWARD–LOOKING STATEMENTS

This prospectus contains forward–looking statements that are based on our current expectations, assumptions, estimates and projections about us and our industry. All statements other than statements of historical fact in this prospectus are forward–looking statements. These forward–looking statements can be identified by words or phrases such as "may", "promising", "anticipate", "estimate", "plan", "believe", "is/are likely to" or other similar expressions. The forward–looking statements included in this prospectus relate to, among others:

- our goals and strategies;

- our future business development, financial condition and results of operations;

- projected revenues, profits, earnings and other estimated financial information;

- our ability to acquire businesses complementary to our core business and integrate the acquired companies into our business;

- achieving anticipated or potential synergies with companies we acquire, including Framedia, Target Media, E–Times, Focus Media Wireless, ACL and Allyes;

- our plans to expand our advertising network into new cities and regions in China and diversify into new networks, such as mobile handset advertising, outdoor LED billboard advertising, Internet advertising services and new advertising channels;

- the growth or acceptance of Framedia's poster frame network, Focus Media Wireless's mobile handset advertising network, our outdoor LED billboard network and Allyes' Internet advertising services business;

- our plan to develop our business into a multi–platform out–of–home advertising network, including through operation of Focus Media Wireless's mobile handset advertising network services and Allyes' Internet advertising services business;

- our plan to identify and create additional advertising channels that target specific consumer demographics, which could allow us to increase our advertising revenue;

- competition in the PRC advertising industry;

- the expected growth in the urban population, consumer spending, average income levels and advertising spending levels;

- PRC governmental policies and regulations relating to the advertising industry and regulations and policies promulgated by the State Administration of Foreign Exchange;

- other risks outlined in our filings with the Securities and Exchange Commission, including our registration statements on Form F–1, as amended, annual reports of Form 20–F and periodic reports on Form 6–K; and

- those other risks identified in "Risk Factors" of this prospectus.

These forward–looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward–looking statements are reasonable, we cannot assure you that our expectations will turn out to be correct. Our actual results could be materially different from or worse than our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Risk Factors", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Business" and other sections of this prospectus.

This prospectus also contains data relating to the advertising industry that includes projections based on a number of assumptions. The advertising market may not grow at the rates projected by market data, or at all. The failure of these markets to grow at the projected rates may have a material adverse effect on our business and the market price of our ADSs. In particular, the relatively new and rapidly changing nature of the out–of–home advertising sector subjects any projections or estimates relating to the growth prospects or future condition of our sector to significant uncertainties. Furthermore, if any one or more of the assumptions underlying the market data

**Table of Contents**

turns out to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward–looking statements.

The forward–looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. We undertake no obligation to update any forward–looking statements to reflect events or circumstances after the date on which the statements are made or to reflect the occurrence of unanticipated events.

44

Table of Contents

**OUR CORPORATE STRUCTURE**

**Our History**

Our predecessor company, Shanghai Aiqi Advertisement Co., Ltd., or Aiqi Advertisement, was established by immediate family members of Jason Nanchun Jiang in September 1997 and operated as an advertising agency. In May 2003, Aiqi Advertisement discontinued its advertising agency business, was renamed Shanghai Focus Media Advertisement Co., Ltd., commenced operation of our out–of–home television advertising network in China and reorganized its shareholdings. At the same time, we entered into arrangements with Focus Media Advertisement that resulted in the consolidation of Focus Media Advertisement. Following this reorganization Jason Nanchun Jiang continued to hold a controlling interest in Focus Media Advertisement.

In conjunction with the change in our business model in May 2003 and to facilitate foreign investment in our company, we established our offshore holding company, Focus Media Holding Limited as a company registered in the British Virgin Islands in April 2003. In April 2005, we completed the process of changing Focus Media Holding Limited's corporate domicile to the Cayman Islands and we are now a Cayman Islands company. On July 13, 2005, our ADSs were listed for quotation on the Nasdaq Global Market. Throughout our operating history, we have expanded our existing businesses and entered into new business areas through acquisitions. The following paragraphs present the material acquisitions we have entered into during the past three years.

In January 2006, we acquired Framedia, which operates networks of advertising poster frames placed primarily in elevators and public areas of residential complexes in China. In February 2006, we acquired Target Media. Target Media operated an out–of–home advertising network using flat–panel displays placed in elevator lobbies and other public areas in commercial buildings, hospitals, hotels, banks, residential buildings, convenience stores and other locations in cities in China. Following the acquisition of Target Media, we combined Target Media's network into our existing commercial location and in–store networks. Other than holding their existing contracts, the former Target Media entities no longer conduct any operations, and the combined network is operated through our existing corporate entities. In March 2006, we acquired Focus Media Wireless, which operates a mobile handset advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. In September 2006, we acquired a 70% equity interest in ACL, which through its affiliated PRC entity, leases screen time from movie theaters in cities in China, which it then sells as screen time slots to advertisers. We continue, from time to time, to make acquisitions to expand our existing networks and to enter into new areas of business. For instance, in the first half of 2007, we acquired companies to expand our mobile handset advertising network and outdoor LED billboard network as well as entering into the Internet advertising business through several acquisitions including Allyes. We expect that acquisitions will continue to be an important component of our growth strategy.

In March 2007, we acquired Allyes, which operates an Internet advertising services and technology business.

**Our Corporate Structure and Contractual Arrangements**

Substantially all of our operations are conducted in China as follows:

- with regard to the operation of our out–of–home television networks, through Focus Media Technology, our indirect wholly–owned subsidiaries in China, Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, and New Focus Media Advertisement, a 90%–owned subsidiary of Focus Media Digital, and through our contractual arrangements with several of our consolidated affiliated entities in China, including Focus Media Advertisement, and its subsidiaries. Focus Media Advertisement owns the remaining 10% equity interest in Focus Media Digital and New Focus Media Advertisement;

- with regard to the operation of our poster frame network, through Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, each of which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively;

- with regard to the operation of our mobile handset advertising network, through Focus Media Wireless, which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively; and

Table of Contents

- with regard to the operation of the Internet advertising marketing agency business of Allyes, through seven PRC operating companies, which we refer to as the Allyes operating affiliates, each of which is owned by PRC citizens.

Each of Framedia Investment, Dotad Technology, Allyes Information Technology Co., Ltd. and their respective affiliated entities and shareholders, have entered into contractual arrangements substantially similar to those control agreements entered into among Focus Media Technology, Focus Media Digital, New Focus Media Advertisements, Focus Media Advertisement and its shareholders and subsidiaries. See "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Enterprises, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries".

In connection with its entry into the World Trade Organization, China is required to relax restrictions on foreign investment in the advertising industry in China. Accordingly, PRC regulations stipulate that starting from December 10, 2005, foreign investors are allowed to directly own 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising business outside of China or to directly own less than 100% if the foreign entity has at least two years of direct operations in the advertising business outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify for direct ownership of a PRC advertising company under PRC regulations any earlier than two or three years, respectively, after we commence any such operations or until we acquire a company which has directly operated an advertising business for the required period of time. We do not currently know how or when we will be able to qualify under these regulations. Even if we do qualify in the future, it may be burdensome or not cost effective for us to meet the required criteria for direct ownership. If and when we qualify for direct ownership, we intend to explore the commercial feasibility of changing our current structure, including possibly direct ownership of Focus Media Advertisement and its subsidiaries, taking into consideration relevant cost, market, competitive and other factors. In the event we take such steps, we cannot assure you that we will be able to identity or acquire a qualified foreign company for a possible future restructuring or that any restructuring we may undertake to facilitate direct ownership will be successful.

46

**Table of Contents**

The following diagram of our current corporate structure includes our primary businesses and the primary entities involved in the operation of those businesses and excludes dormant entities and entities, which aside from holding existing contracts, no longer conduct any operations:



(1)  Loans used to capitalize our PRC operating companies and to facilitate our control over them.
(2)  Agreements that give us effective control over our PRC operating affiliates and their respective subsidiaries, as described in "Related Party Transactions".
(3)  Agreement that transfer a substantial portion of the economic benefits of our PRC operating affiliates and their respective subsidiaries to us, as described in "Related Party Transactions".
(4)  Each of our PRC operating affiliates is owned by two PRC shareholders, which are in each case either (i) two PRC citizens designated by us or our subsidiaries or (ii) by two PRC entities owned by our subsidiaries or by our designated appointees.
(5)  The wholly–owned entities relating to our out–of–home television network operations include New Focus Media Technology, Focus Media Technology, Focus Media Digital and New Focus Media Digital. These consist of subsidiaries of Focus Media Advertisement, which holds between 60% and 99% of the subsidiaries, with the remaining minority interest held by Jimmy Wei Yu, Focus Media Advertising Agency or unrelated third parties.
(6)  The PRC operating affiliates engaged in the operating of our poster frame network include: New Structure Advertisement, Framedia Advertisement and Guangzhou Framedia.
(7)  The Allyes operating affiliates engaged in the operation of our online advertising agency business consist of seven different companies under our control.
(8)  Our out–of–home television network operations comprises our commercial location, in–store, outdoor LED and movie theater advertising networks.

47

Table of Contents

Accordingly, since we have not been involved in the direct operation of an advertising business outside of China, our domestic PRC subsidiaries, Focus Media Technology, Framedia Investment, Focus Media Digital and New Allyes Technology, which are considered foreign–invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through contractual arrangements with our consolidated affiliated entities in China, including (i) Focus Media Advertisement and its subsidiaries with regard to our commercial location, in–store and outdoor LED networks, (ii) Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, (iii) Focus Media Wireless with regard to our mobile handset advertising network, and (iv) each of the seven Allyes operating affiliates, and each of their respective shareholders with regard to our Internet advertising services network. Focus Media Advertisement is owned by two PRC citizens, Jason Nanchun Jiang, our chairman and chief executive officer, and Jimmy Wei Yu, one of our directors. Each of Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and Focus Media Wireless is owned by Focus Media Advertisement and Focus Media Advertising Agency. Each of the Allyes operating affiliates is owned by two PRC citizens. . Each of Focus Media Advertisement, several of its subsidiaries, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless, and the Allyes operating affiliates, which we refer to collectively as our PRC operating affiliates, holds the requisite licenses to provide advertising, telecommunications or Internet services in China, as applicable. In 2006, we began operating a portion of our advertising business through our 90%–owned indirect subsidiary Focus Media Advertisement after which time we will no longer entirely rely on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders for the operation of our advertising business.

We have been and are expected to continue to be dependent on our PRC operating affiliates to operate our advertising business until we acquire them as our wholly–owned subsidiaries. We and Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, Framedia Investment, Dotad Technology, New Allyes Information Technology (Shanghai) Co., Ltd. and New Allyes Technology, which we refer to as our wholly–foreign owned entities, have entered into contractual arrangements with their respective PRC operating affiliates and shareholders, pursuant to which:

- we are able to exert effective control over our PRC operating affiliates;

- a substantial portion of the economic benefits of our PRC operating affiliates will be transferred to us; and

- each of our wholly–foreign owned entities or their respective designees has an exclusive option to purchase all or part of the equity interests in our PRC affiliated entities or their respective nominee holders, or, in some cases, all or part of the assets of our PRC affiliated entities, in each case when and to the extent permitted by PRC law.

Each of our contractual arrangements with our PRC affiliated entities and their respective shareholders and subsidiaries can only be amended with the approval of our audit committee or another independent body of our board of directors. See "Related Party Transactions" for further information on our contractual arrangements with these parties.

In the opinion of Global Law Office, our PRC legal counsel:

- the respective ownership structures of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

- the contractual arrangements among Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates, subsidiaries and shareholders, in each case governed by PRC law are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- the PRC business operations of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC operating affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

48

Table of Contents

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in advertising businesses, we could be subject to severe penalties. See "Risk Factors — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties", "— Our business operations may be affected by legislative or regulatory changes" and "— The PRC legal system embodies uncertainties which could limit the legal protections available to you and us".

49

Table of Contents

## USE OF PROCEEDS

We estimate that we will receive net proceeds from this offering of approximately $312.5 million, or approximately $438.2 million if the underwriters exercise their option in full to purchase additional ADSs, after deducting underwriting discounts and the estimated offering expenses payable by us. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders.

We anticipate using the net proceeds of this offering to fund potential acquisitions. We may use any remaining amounts for our future general corporate purposes.

The foregoing represents our current intentions with respect to the use of the net proceeds of this offering based upon our present plans and business conditions, but our management will have significant flexibility and discretion in applying the net proceeds of the offering. The occurrence of new business opportunities, unforeseen events or changed business conditions may result in application of the proceeds of this offering in a manner other than as described in this prospectus. At this time, we have not entered into advanced discussions or negotiations with respect to any potential material acquisitions.

To the extent that the net proceeds we receive from this offering are not immediately applied for the above purposes, we intend to invest our net proceeds in short–term, interest bearing debt instruments or bank deposits. These investments may have a material adverse effect on the U.S. federal income tax consequences of your investment in our ADSs. It is possible that we may become a passive foreign investment company for United States federal income tax purposes, which could result in negative tax consequences for you. These consequences are described in more detail elsewhere in this prospectus.

In utilizing the proceeds of this offering in the manner described above, as an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- loans by us to Focus Media Technology and Focus Media Digital through Focus Media Technology, each a foreign invested enterprise, to finance its activities cannot exceed statutory limits and must be registered with the State Administration of Foreign Exchange or its local counterpart; and

- loans by us to Focus Media Advertisement or its subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authority and must also be registered with the State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital, New Focus Media Advertisement through Focus Media Technology, Framedia Investment, Dotad Technology or New Allyes Information by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Because Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless, New Allyes Information and their respective subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in "Regulation of Our Industry". We cannot assure you that we can obtain these government registrations or approvals on a timely basis, if at all, with respect to future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Focus Media Wireless, Focus Media Advertisement, New Allyes Information or any of their respective subsidiaries.

50

**Table of Contents**

**DIVIDEND POLICY**

We have not previously declared any dividends. In 2004, we recorded deemed dividends of $8.3 million, $2.2 million and $13.4 million in connection with our Series A, Series B and Series C−1 and Series C−2 convertible redeemable preference shares, of which $4.9 million of the deemed dividend related to the difference between the fair value at that time of the Series C−1 convertible redeemable preference shares and ordinary shares in connection with a sale of 9,729,600 ordinary shares by Jason Nanchun Jiang, our chairman and CEO, to a third−party investor, which shares were redesignated as Series C−1 convertible redeemable preference shares. These deemed dividends were not cash dividends and upon conversion of our Series A, Series B and Series C−1 and Series C−2 convertible redeemable preference shares into ordinary shares, we are no longer required to record deemed dividends prospectively. We currently intend to retain all available funds and any future earnings for use in the operation and expansion of our business and do not anticipate paying any cash dividends on our ordinary shares, or indirectly on our ADSs, for the foreseeable future.

Future cash dividends, if any, will be at the discretion of our board of directors and will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, shareholders' interests, contractual restrictions and other factors as our board of directors may deem relevant. In addition, we can pay dividends only out of our profits or other distributable reserves. Any dividend we declare will be paid to the holders of ADSs, subject to the terms of the deposit agreement, to the same extent as holders of our ordinary shares, less the fees and expenses payable under the deposit agreement. Other distributions, if any, will be paid by the depositary to holders of our ADSs in any means it deems legal, fair and practical. Any dividend will be distributed by the depositary, in the form of cash or additional ADSs, to the holders of our ADSs. Cash dividends on our ADSs, if any, will be paid in U.S. dollars. See "Description of American Depositary Shares".

51

Table of Contents

### MARKET PRICE INFORMATION FOR OUR ADSs

Our ADSs have been listed on the Nasdaq Global Market since July 13, 2005. Our ADSs trade under the symbol "FMCN". From July 13, 2005 until April 10, 2007, each of our ADSs represented ten of our ordinary shares. Starting April 11, 2007, we reduced this ratio to five–to–one. All ADS trading prices on the Nasdaq set forth in this prospectus, including historical trading and closing prices, have been adjusted to reflect the new ADS–to–share ratio of five–to–one. For the period from July 1, 2006 to November 6, 2007 the closing price of our ADSs on Nasdaq has ranged from US$26.05 to US$66.30 per ADS. The following table provides the high and low trading prices for our ADSs on the Nasdaq Global Market for each month since July 2006 and all prices have been retroactively adjusted to reflect the change in ratio effective on April 12, 2007 for all periods presented.

| | Sale Price | |
|---|---|---|
| Monthly Highs and Lows | High | Low |
| | US$ | US$ |
| **2006 (from July 1)** | | |
| July | 33.72 | 28.31 |
| August | 31.78 | 27.70 |
| September | 31.00 | 27.26 |
| October | 30.46 | 26.05 |
| November | 36.44 | 26.50 |
| December | 36.56 | 33.02 |
| **2007** | | |
| January | 42.92 | 33.50 |
| February | 44.25 | 38.00 |
| March | 40.05 | 35.63 |
| April | 41.26 | 35.81 |
| May | 45.45 | 35.23 |
| June | 52.09 | 41.90 |
| July | 53.29 | 39.25 |
| August | 43.00 | 34.57 |
| September | 61.39 | 39.88 |
| October | 63.00 | 54.30 |
| November (through November 6) | 66.30 | 60.21 |

Table of Contents

## CAPITALIZATION

The following table sets forth, as of June 30, 2007:

- our actual capitalization; and

- our pro forma capitalization, to give effect to the issuance and sale of 5,000,000 ADSs offered by our company in this offering at a public offering price of $64.75 per ADS, or $12.95 per ordinary share, as adjusted to reflect the ratio of one ADS to five ordinary shares, after deducting underwriting discounts, commissions and estimated offering expenses.

You should read this table in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, included elsewhere in this prospectus.

| | As of June 30, 2007 | |
| --- | --- | --- |
| | Actual | Pro Forma[1] |
| | (In thousands of U.S. dollars, except for share data) | |
| Short term borrowings[2] | $    394 | $    394 |
| Shareholders' Equity: | | |
| Ordinary shares ($0.00005 par value; 885,516,600 shares authorized; 611,242,827 shares issued and outstanding (actual) and 636,242,827 shares issued and outstanding) (pro forma) | $    31 | $    32 |
| Additional paid–in capital | 1,242,816 | 1,555,353 |
| Retained earnings | 148,734 | 148,734 |
| Accumulated other comprehensive income | 15,740 | 15,740 |
| Total shareholders' equity | 1,407,321 | 1,719,859 |
| Total capitalization | $  1,407,715 | $  1,720,253 |

(1) Assumes that the underwriters do not exercise their over–allotment option.

(2) None of our short–term borrowings is guaranteed.

53

Table of Contents

## EXCHANGE RATES

Our operating businesses are currently conducted in China and substantially all of our revenues and expenses are denominated in Renminbi. The People's Bank of China, or PBOC, sets and publishes daily a base exchange rate with reference primarily to the supply and demand of Renminbi against a basket of currencies in the market during the prior day. The PBOC also takes into account other factors, such as the general conditions existing in the international foreign exchange markets. Since 1994, the conversion of Renminbi into foreign currencies, including Hong Kong dollars and U.S. dollars, has been based on rates set by the PBOC, which are set daily based on the previous day's inter–bank foreign exchange market rates and current exchange rates in the world financial markets. From 1994 to July 20, 2005, the official exchange rate for the conversion of Renminbi to U.S. dollars was generally stable. Although PRC governmental policies were introduced in 1996 to reduce restrictions on the convertibility of Renminbi into foreign currency for current account items, conversion of Renminbi into foreign exchange for capital items, such as foreign direct investment, loans or securities, requires the approval of the State Administration for Foreign Exchange and other relevant authorities. On July 21, 2005, the PRC government introduced a managed floating exchange rate system to allow the value of the Renminbi to fluctuate within a regulated band based on market supply and demand and by reference to a basket of currencies. On the same day, the value of the Renminbi appreciated by 2.0% against the U.S. dollar. Since then, the PRC government has made, and may in the future make, further adjustments to the exchange rate system. The PBOC announces the closing price of a foreign currency traded against the Renminbi in the inter–bank foreign exchange market after the closing of the market on each working day, and makes it the central parity for the trading against the Renminbi on the following working day.

The conversion of Renminbi into U.S. dollars in this prospectus is based on the noon buying rate in The City of New York for cable transfers of Renminbi as certified for customs purposes by the Federal Reserve Bank of New York. For your convenience, this prospectus contains translations of Renminbi at $1.00 to RMB 7.6120, which was the prevailing rate on June 30, 2007. The prevailing rate at November 6, 2007 was $1.00 to RMB 7.4515. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, the rates stated below, or at all. The PRC government imposes controls over its foreign currency reserves in part through direct regulation of the conversion of Renminbi into foreign exchange and through restrictions on foreign trade.

54

Table of Contents

The following table sets forth information concerning exchange rates between the Renminbi and the U.S. dollar for the periods indicated. These rates are provided solely for your convenience and are not necessarily the exchange rates that we used in this prospectus or will use in the preparation of our periodic reports or any other information to be provided to you.

| | Renminbi per U.S. Dollar Noon Buying Rate | | | |
| | Average | High | Low | Period–End |
|---|---|---|---|---|
| 2001 | 8.2771 | 8.2786 | 8.2709 | 8.2766 |
| 2002 | 8.2770 | 8.2800 | 8.2700 | 8.2800 |
| 2003 | 8.2772 | 8.2800 | 8.2765 | 8.2769 |
| 2004 | 8.2768 | 8.2774 | 8.2764 | 8.2765 |
| 2005 | 8.1940 | 8.2765 | 8.0702 | 8.0702 |
| 2006 | 7.9723 | 8.0702 | 7.8041 | 7.8087 |
| 2007 | | | | |
| January | 7.7876 | 7.8127 | 7.7705 | 7.7714 |
| February | 7.7502 | 7.7632 | 7.7410 | 7.7410 |
| March | 7.7369 | 7.7454 | 7.7232 | 7.7232 |
| April | 7.7247 | 7.7345 | 7.7090 | 7.7090 |
| May | 7.6773 | 7.7065 | 7.6463 | 7.6516 |
| June | 7.6333 | 7.6680 | 7.6120 | 7.6120 |
| July | 7.5757 | 7.6055 | 7.5580 | 7.5720 |
| August | 7.5734 | 7.6181 | 7.5420 | 7.5462 |
| September | 7.5196 | 7.5540 | 7.4928 | 7.4928 |
| October | 7.5016 | 7.5158 | 7.4682 | 7.4682 |
| November (through November 6) | 7.4557 | 7.4582 | 7.4515 | 7.4515 |

*Source:* Federal Reserve Bank of New York.

Table of Contents

### SELECTED CONSOLIDATED FINANCIAL AND OPERATING DATA

The following selected consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financials, which include the consolidation of Focus Media Advertisement, Shanghai Perfect Media, Focus Media Wireless and the entities that operate our Internet advertising services network as variable interest entities, thereafter and are presented in accordance with U.S. GAAP. Our statements of operations for 2004, 2005 and 2006 and our balance sheets as of December 31, 2005 and 2006 are derived from those financial statements that has been included elsewhere in this prospectus.

Our selected consolidated financial information for the years ended December 31, 2002 and 2003 have been derived from Focus Media Advertisement audited consolidated financial statements, which are not included in this prospectus. Our statement of operations for each of the six months ended June 30, 2006 and 2007 and balance sheet data as of June 30, 2006 and 2007 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus. We have prepared the unaudited consolidated financial data on the same basis as the audited consolidated financial statements and have included, in our opinion, all adjustments, consisting only of normal and recurring adjustments, that we consider necessary for a fair presentation of the financial information set forth in those statements. Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The selected consolidated financial information for the periods and as of the dates indicated should be read in conjunction with our financial statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we operated as an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time or space to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out–of–home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in–store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless. In March 2007, we acquired Allyes.

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | **For the Year Ended December 31,** | | | **For the Six Months Ended June 30,** | |
| | | | | (In thousands of U.S. dollars) | | | |
| **Selected Consolidated Statements of Operations Data:** | | | | | | | |
| Gross Advertising Service revenues | $  24 | $ 3,671 | $ 29,109 | $ 73,419 | $ 231,186 | $ 90,680 | $ 183,517 |
| Net Advertising Service revenues: | | | | | | | |
| Digital out–of–home | | | | | | | |
| Commercial location[1] | — | $ 3,369 | $ 26,321 | $ 61,435 | $ 132,061 | 51,819 | 82,704 |
| In–store network[1] | — | — | — | 5,469 | 26,907 | 11,832 | 13,882 |
| Poster frame network[1] | — | — | — | — | 40,904 | 15,845 | 31,217 |
| Mobile handset advertising[1] | — | — | — | — | 10,101 | 3,076 | 16,890 |
| Internet advertising services[1] | — | — | — | — | — | — | 25,236 |
| Advertising service revenue[1] | — | 3,369 | 26,321 | 66,904 | 209,973 | 82,572 | 169,929 |
| Other revenues | — | 389 | 2,889 | 1,325 | 1,932 | 690 | 687 |
| Total net revenues | 24 | 3,758 | 29,210 | 68,229 | 211,905 | 83,262 | 170,616 |

Table of Contents

| | 2002 | 2003 | For the Year Ended December 31, 2004 | 2005 | 2006 | For the Six Months Ended June 30, 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | (In thousands of U.S. dollars) | | | | |
| Cost of revenues: | | | | | | | |
| Net advertising service cost: | | | | | | | |
| Digital out–of–home | | | | | | | |
| *Commercial location* | — | 1,566 | 6,804 | 18,325 | 42,836 | 19,713 | 30,767 |
| *In–store network* | — | — | — | 7,423 | 18,106 | 8,367 | 10,214 |
| *Poster frame network* | — | — | — | — | 13,621 | 6,014 | 10,011 |
| Mobile Handset Advertising | — | — | — | — | 6,052 | 2,405 | 7,323 |
| Internet Advertising | — | — | — | — | — | — | 18,405 |
| Advertising service cost | — | 1,566 | 6,804 | 25,748 | 80,615 | 36,499 | 76,720 |
| Other costs | — | 275 | 1,934 | 976 | 765 | 312 | 303 |
| Total cost of revenues | — | 1,841 | 8,738 | 26,724 | 81,380 | 36,811 | 77,023 |
| Gross profit | 24 | 1,917 | 20,472 | 41,505 | 130,525 | 46,451 | 93,593 |
| Operating expenses: | | | | | | | |
| General and administrative | 21 | 985 | 3,988 | 9,120 | 25,723 | 10,693 | 20,329 |
| Selling and marketing | 3 | 407 | 3,473 | 9,599 | 25,762 | 9,783 | 23,041 |
| Other operating income | — | — | — | — | (1,338) | (157) | (2,384) |
| Goodwill impairment loss | — | — | 58 | — | — | — | — |
| Total operating expenses | 24 | 1,392 | 7,519 | 18,719 | 50,147 | 20,319 | 40,986 |
| Income from operations | — | 525 | 12,953 | 22,786 | 80,378 | 26,132 | 52,607 |
| Interest income | — | 1 | 10 | 1,812 | 4,560 | 1,781 | 4,634 |
| Interest expenses | — | — | — | (50) | (305) | (288) | (7) |
| Other income | — | — | 54 | 70 | 271 | (11) | 252 |
| Other expenses | — | (9) | (58) | (231) | (558) | (470) | (212) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | — | (11,692) | — | — | — | — |
| Income before income taxes and minority interest | — | 517 | 1,267 | 24,387 | 84,346 | 27,144 | 57,274 |
| Total income taxes | — | (482) | (908) | (694) | (1,044) | (989) | (3,286) |
| Minority interest | — | 8 | 13 | (145) | (105) | (51) | 18 |
| Equity loss of affiliates | — | (18) | — | — | — | — | — |
| Net income | — | $ 25 | $ 372 | $ 23,548 | $ 83,197 | 26,104 | 54,006 |

| | 2002 | 2003 | For the Year Ended December 31, 2004 | 2005 | 2006 | For the Six Months Ended June 30, 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Earnings per share data: | | | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | (8,308) | — | — | — | — |

57

Table of Contents

| | 2002 | 2003 | For the Year Ended December 31, 2004 | 2005 | 2006 | For the Six Months Ended June 30, 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| | | | (In thousands of U.S. dollars, except share and per share data) | | | | |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | (2,191) | — | — | — | — |
| Deemed dividend on Series C−1 convertible redeemable preference shares | — | — | (13,356) | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | — | 12,906 | — | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ — | $ 25 | $ (10,577) | $ 23,548 | $ 83,197 | $ 26,104 | $ 54,006 |
| Income (loss) per share — basic | $ — | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ — | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income per share | — | 144,657,600 | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income per share | — | 144,657,600 | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

| | 2002 | 2003 | As of December 31, 2004 | 2005 | 2006 | As of June 30, 2007 |
|---|---|---|---|---|---|---|
| | | | (In thousands of U.S. dollars, except share data) | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | $ 15 | $ 716 | $ 22,669 | $ 36,653 | $ 164,611 | $ 187,592 |
| Other current assets[2] | 106 | 1,902 | 12,713 | 104,988 | 78,712 | 240,632 |
| Non−current assets | 8 | 2,688 | 21,033 | 70,713 | 862,919 | 1,098,745 |
| Total assets | 129 | 5,306 | 56,415 | 212,354 | 1,106,242 | 1,526,969 |
| Current liabilities | 7 | 4,119 | 8,634 | 20,694 | 51,837 | 113,069 |
| Non−current liabilities | — | — | — | — | 3,303 | 6,132 |
| Total liabilities | 7 | 4,119 | 8,634 | 20,694 | 55,140 | 119,201 |
| Minority interest | — | 4 | — | 81 | 245 | 358 | 447 |
| Mezzanine equity | — | — | 53,273 | — | — | — |
| Ordinary shares (nil, 200,000,000, 142,464,600, 378,306,000 and 534,896,873 and 611,242,627 shares issued and outstanding in 2002, 2003, 2004, 2005 and 2006 and June 30, 2007, respectively) | — | 10 | 7 | 19 | 27 | 31 |
| Other shareholders' equity (deficiency) | 122 | 1,173 | (5,580) | 191,396 | 1,050,717 | 1,407,290 |
| Total liabilities and shareholders' equity (deficiency) | $ 129 | $ 5,306 | $ 56,415 | $ 212,354 | $ 1,106,242 | $ 1,526,969 |

Table of Contents

|  | As of December 31, | | | As of June 30, |
|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2007** |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location network: | | | | |
| Our direct cities | 12,786 | 45,049 | 80,263 | 85,010 |
| Our regional distributors[3] | 2,629 | 3,177 | 5,197 | 4,677 |
| Total | 15,415 | 48,226 | 85,460 | 89,687 |
| Number of displays in our in−store network | — | 27,849 | 38,742 | 41,322 |
| Number of stores in our in−store network | — | 4,130 | 3,898 | 3,995 |
| Number of installed frames in our poster frame network[4] | — | — | 99,784 | 161,435 |

(1) Advertising service revenue is presented net of tax which includes business tax of 5.55% and cultural industries tax of ranging from 0% to 4.0% of our gross advertising service revenue. The following table sets for the business tax incurred on our revenues for the periods indicated:

|  | For the Year Ended December 31, | | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
|  | | | (In thousands of U.S. dollars) | | | | |
| Business sales taxes: | | | | | | | |
| **Digital out−of−home** | | | | | | | |
| *Commercial locations* | — | — | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
| *In−store network* | — | — | — | 524 | 2,803 | 1,221 | 1,442 |
| *Poster frame network* | — | — | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile handset advertising** | — | — | — | — | 779 | 289 | 398 |
| **Internet advertising services** | — | — | — | — | — | — | 1,182 |
| Total business sales taxes | — | — | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

(2) Other current assets are equal to total current assets less cash and cash equivalents.

(3) Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(4) Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and the related notes included elsewhere in this prospectus. Our consolidated financial statements have been prepared in accordance with U.S. GAAP. In addition, our consolidated financial statements and the financial data included in this prospectus reflect our reorganization and have been prepared as if our current corporate structure had been in place throughout the relevant periods. The following discussion and analysis contains forward–looking statements that involve risks and uncertainties. Actual results could differ materially from those projected in the forward–looking statements. For additional information regarding these risks and uncertainties, see "Risk Factors".*

**Overview**

Our out–of–home advertising network consists of (i) our digital out–of–home advertising networks, comprising our commercial location network, in–store network and poster frame network, (ii) our mobile handset advertising network; and (iii) our Internet advertising services network. We have experienced significant revenue and earnings growth, and the size of our network has grown significantly since we commenced our current business operations in May 2003.

The significant increase in our operating results since we commenced our current business operations is attributable to a number of factors, including the substantial expansion of our digital out–of–home advertising networks, the ongoing expansion of our mobile handset advertising network, the introduction of Internet advertising services into our platform, the successful execution and integration of strategic acquisitions, such as Framedia, Target Media, Focus Media Wireless, ACL and Allyes, and the growing acceptance of our multi–platform network as an appealing advertising medium by our clients.

We expect our future growth to be driven by a number of factors and trends including:

- Overall economic growth in China, which we expect to contribute to an increase in advertising spending in major urban areas in China where consumer spending is concentrated;

- Our ability to increase sales of advertising time slots and extend the duration of our advertising cycle on our commercial location and in–store networks;

- Our ability to increase sales of frame space on our poster frame network;

- Our ability to expand our client base through promotion of our services and cross–selling;

- Our ability to identify and create new advertising channels by establishing separate advertising networks that enable advertisers to target a diverse range of consumer groups with specific demographic profiles;

- Our ability to successfully enter into the mobile handset advertising business, in part through our recent acquisition of Focus Media Wireless;

- Our ability to successfully operate and market our new outdoor LED billboard network;

- Our ability to successfully operate and market our new Internet advertising services network; and

- Our ability to acquire and integrate companies that operate advertising businesses complementary to our existing operations.

Because our primary source of revenue is our advertising service revenue, we focus on factors that directly affect our advertising service revenue such as the size and scope of our network, the quality of the locations where we place our network and the price we charge for our advertising time slots after taking into account any discounts.

As we continue to expand our network, we expect to face a number of challenges. We have expanded our network rapidly, and we, as well as our competitors, have occupied many of the most desirable locations in China's major cities. In order to continue expanding our network in a manner that is attractive to potential advertising clients, we may continue to enter into new advertising media platforms and to establish additional stand–alone

Table of Contents

networks that provide effective channels for advertisers. In addition, we must react to continuing technological innovations, such as the potential uses of wireless and broadband technology in our network, and changes in the regulatory environment.

Our financial results for 2006 also include those of Framedia that we acquired on January 1, 2006, of Target Media that we acquired on February 28, 2006 and, starting in the second quarter of 2006, those of Focus Media Wireless that we acquired in March 2006. Starting in March 2007, our financial results also include those of Allyes, the acquisition of which we completed in March 2007.

## Revenues

In 2004, 2005 and 2006, and for the six months ended June 30, 2007, we had total revenues of $29.2 million, $68.2 million, $211.9 million and $170.6 million, respectively. We generate revenues from the sale of advertising time slots on our digital out–of–home advertising networks, from the sale of frame space on our poster frame network, from advertising services through our mobile handset advertising network and, since April 2007, from Internet advertising services and software. Our advertising service revenue includes the sale of advertising time slots on our network, as well as a small amount of revenue attributable to other advertising related services we provide to our advertising clients. We also derive revenues from the sale of our flat–panel displays to regional distributors, which we refer to as our advertising equipment revenue. In 2004, 2005 and 2006 and for the six months ended June 30, 2007, our advertising service revenue accounted for 90.1%, 98.0%, 99.1% and 99.6% of our total revenues, respectively. The following table sets forth a breakdown of our total revenues for the periods indicated:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands of U.S. dollars, except percentages) | | | | | | |
| **Net revenues:** | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial location* | $ 26,321 | 90.1% | $ 61,435 | 90.0% | $ 132,061 | 62.3% | $ 51,819 | 62.2% | $ 82,704 | 48.5% |
| *In–store network* | — | — | 5,469 | 8.0% | 26,907 | 12.7% | 11,831 | 14.2% | 13,882 | 8.1% |
| *Poster frame network* | — | — | — | — | 40,904 | 19.3% | 15,846 | 19.0% | 31,217 | 18.3% |
| **Mobile handset advertising** | — | — | — | — | 10,101 | 4.8% | 3,076 | 3.8% | 16,890 | 9.9% |
| **Internet advertising** | — | — | — | — | — | — | — | — | 25,236 | 14.8% |
| | | | | | | | | | | |
| Advertising service revenue | 26,321 | 90.1% | 66,904 | 98.0% | 209,973 | 99.1% | 82,572 | 99.2% | 169,929 | 99.6% |
| Other revenue | 2,889 | 9.9% | 1,325 | 2.0% | 1,932 | 0.9% | 690 | 0.8% | 687 | 0.4% |
| | | | | | | | | | | |
| Total revenues | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |

| | For the Year Ended December 31, | | | For the Six Months Ended June 30 | |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
|---|---|---|---|---|---|
| | | (In thousands of U.S. dollars) | | | |
| **Business sales taxes:** | | | | | |
| **Digital out–of–home** | | | | | |
| *Commercial locations* | 2,788 | 5,991 | 13,641 | 5,048 | 7,582 |
| *In–store network* | — | 524 | 2,803 | 1,221 | 1,442 |
| *Poster frame network* | — | — | 3,989 | 1,549 | 2,984 |
| **Mobile handset advertising** | — | — | 779 | 289 | 398 |
| **Internet advertising services** | — | — | — | — | 1,182 |
| | | | | | |
| Total business sales taxes | 2,788 | 6,515 | 21,212 | 8,107 | 13,588 |

Table of Contents

We also break down our total revenues into related–party and unrelated–party sources. The following table presents a more detailed breakdown of our gross revenues and its component parts:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | (In thousands of U.S. dollars, except percentages) | | | | | | | | | |
| **Revenue:** | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial Locations* | | | | | | | | | | |
| — Unrelated parties | $ 25,386 | 86.9% | $ 59,435 | 87.1% | $ 130,474 | 61.6% | $ 50,485 | 60.6% | $ 87,734 | 51.4% |
| — Related parties | 3,723 | 12.7% | 7,991 | 11.7% | 15,228 | 7.2% | 6,382 | 7.7% | 2,552 | 1.5% |
| Total Commercial Locations | 29,109 | 99.6% | 67,426 | 98.8% | 145,702 | 68.8% | 56,867 | 68.3% | 90,286 | 52.9% |
| *In–store Network* | | | | | | | | | | |
| — Unrelated parties | — | — | 5,475 | 8.0% | 25,330 | 12.0% | 11,006 | 13.2% | 14,009 | 8.2% |
| — Related parties | — | — | 518 | 0.8% | 4,380 | 2.0% | 2,046 | 2.5% | 1,315 | 0.8% |
| Total In–store Network | — | — | 5,993 | 8.8% | 29,710 | 14.0% | 13,052 | 15.7% | 15,324 | 9.0% |
| *Poster Frame Network* | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | 44,893 | 21.2% | 17,395 | 20.9% | 34,104 | 20.0% |
| — Related parties | — | — | — | — | — | — | — | — | 98 | 0.1% |
| Total Poster Frame Network | — | — | — | — | 44,893 | 21.2% | 17,395 | 20.9% | 34,202 | 20.1% |
| **Mobile Handset Advertising** | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | 10,880 | 5.1% | 3,365 | 4.0% | 17,199 | 10.1% |
| — Related parties | — | — | — | — | — | — | — | — | 89 | 0.1% |
| Total Mobile Handset Advertising Network | — | — | — | — | 10,880 | 5.1% | 3,365 | 4.0% | 17,288 | 10.2% |
| **Internet Advertising Services** | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | — | — | — | — | 26,088 | 15.2% |
| — Related parties | — | — | — | — | — | — | — | — | 330 | 0.2% |
| Total Internet Advertising Services Network | — | — | — | — | — | — | — | — | 26,418 | 15.4% |
| Gross Advertising Services Revenue: | 29,109 | 99.6% | 73,419 | 107.6% | 231,185 | 109.1% | 90,680 | 108.9% | 183,518 | 107.6% |
| Less: Sales taxes: | | | | | | | | | | |
| **Digital out–of–home** | | | | | | | | | | |
| *Commercial Locations* | 2,788 | 9.5% | 5,991 | 8.8% | 13,641 | 6.4% | 5,048 | 6.0% | 7,582 | 4.5% |
| *In–store Network* | — | — | 524 | 0.8% | 2,803 | 1.3% | 1,221 | 1.5% | 1,442 | 0.8% |
| *Poster Frame Network* | — | — | — | — | 3,989 | 1.9% | 1,549 | 1.9% | 2,984 | 1.7% |
| **Mobile Handset Advertising** | — | — | — | — | 779 | 0.4% | 289 | 0.3% | 398 | 0.3% |
| **Internet Advertising Services** | — | — | — | — | — | — | — | — | 1,182 | 0.7% |
| Total sales taxes | 2,788 | 9.5% | 6,515 | 9.6% | 21,212 | 10.0% | 8,107 | 9.7% | 13,588 | 8.0% |
| Net Advertising Service Revenue | 26,321 | 90.1% | 66,904 | 98.0% | 209,973 | 99.1% | 82,572 | 99.2% | 169,929 | 99.6% |
| Other revenue: | 2,889 | 9.9% | 1,325 | 2.0% | 1,932 | 0.9% | 690 | 0.8% | 687 | 0.4% |
| Net revenues: | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |

### Advertising Service Revenue

*Sources of Revenue.* We derive most of our total revenues from the sale of time slots and frame space on our digital out–of–home advertising networks to unrelated third parties and to some of our related parties. We report our advertising revenue between related and unrelated parties because historically more than 10% of our advertising

62

**Table of Contents**

service revenues came from clients related to some of our directors. Our advertising services to related parties were provided in the ordinary course of business on the same terms as those provided to our unrelated advertising clients on an arm's–length basis.

Our advertising service revenue is recorded net of any sales discounts and agency rebates from our standard advertising rate cards that we may provide to our advertising clients. These discounts include volume discounts and other customary incentives offered to our advertising clients, including additional broadcast time for their advertisements if we have unused time slots or frame space available in a particular city's advertising cycle, and represent the difference between our standard rate card and the amount we charge our advertising clients. Our advertising clients include advertisers that directly engage in advertisement placements with us and advertising agencies retained by some advertisers to place advertisements on the advertiser's behalf. We occasionally agree to pay advertising agency customers sales rebates calculated on the revenues generated by them. We expect that our advertising service revenue will continue to be the primary source, and constitute the substantial majority of, our revenues for the foreseeable future.

Our advertising service revenue reflects a deduction for business taxes and related surcharges incurred in connection with our operations. Their revenues are subject to a sales tax consisting of approximately 5.55% business tax and a cultural industries tax ranging from 0% to 4.0% on revenues earned from their advertising services provided in China. We deduct these amounts from our advertising service revenues to arrive at our total revenues attributable to advertising services.

*Factors that Affect Our Advertising Service Revenue*

### Digital Out–of–home Advertising Service Revenues

Prices for advertising services on our digital out–of–home advertising networks also vary significantly from city to city as income levels, standards of living and general economic conditions vary significantly from region to region in China, which in turn affect the advertising rates we are able to charge for time slots and frame space.

### Commercial Location Network

Our advertising service revenue derived from our commercial location network is directly affected by the average price we charge for the advertising package provided to our customers, after taking into account any discount offered, as well as by the following factors:

- *LCD display network.* The number of flat–panel displays in our network and the desirability, quality and pedestrian traffic of the locations where we are able to lease space to install our flat–panel displays and;

- *Outdoor LED billboard network.* The number of publicly placed LED billboards in our network and the desirability, quality and pedestrian traffic of the locations of the LED billboards we own or lease from third–parties; and

- *Movie theater advertising network.* The number of movie theaters in which we have leased screen time, our expansion into additional theaters, and the length of the leased screen time, which is currently three minutes per screening per theater prior to movie screenings at movie theaters.

### In–store Network

Our advertising service revenue derived from our in–store network is directly affected by the number of flat–panel displays in our network, the number of hypermarkets, supermarkets and convenience stores in the network, and the average price we charge for the advertising package provided to our customers, after taking into account any discount offered.

Table of Contents

*Poster Frame Network*

Our advertising service revenue derived from our poster frame network is directly affected by:

- the number of frames in our poster frame network. We sell frame space on our poster frame network on a per frame basis. Increasing the number of residential and other locations on our poster frame network allows us to increase the number of frames on our network, thereby increases the available frame space for sale to advertisers. As we upgrade the network to incorporate more digital poster frames, we will also increase the available space as multiple advertisements can be placed on a digital frame on time–shared basis; and

- the average price we charge for frame space on a per frame basis, after taking into account any discount offered.

*Mobile Handset Advertising Service Revenues*

Our advertising service revenue derived from our mobile handset advertising network is directly affected by:

- the number of messages we deliver to mobile phone users. We charge advertisers fees based on the number of successfully delivered messages; and

- the average price we charge per message.

*Internet Advertising Service Revenues*

As of March 2007, we derive revenue from our Internet advertising business operated by Allyes. Our advertising service revenue derived from our Internet advertising services is directly affected by:

- the number of customers who purchase agency services from us. We agree to provide advertising agency services and technology, and we charge fees based on the size and duration of the advertising campaign and the number of daily impressions or "hits" on the Internet advertisement; and

- our ability to identify relevant Internet user traffic and deliver effective advertisements for our advertising clients

*Network Expansion.* Many of the most desirable locations for our digital out–of–home advertising network have been occupied, either by our network as a result of our expansion or by our competitors. As a result, we will need to rely on means other than the rapid increase in the number of locations, flat–panel displays, LED billboards and advertising poster frames in order to continue growing our revenues. We have focused, and expect to continue to focus, on developing new channels in our out–of–home television advertising networks and entering into new types of advertising media operations to continue to grow our revenues and to address these potential capacity constraints on our existing network. These steps have included: (1) expanding our digital out–of–home advertising network through increasing the size and scope of our existing commercial location, in–store and poster frame networks, and adding new media such as LED billboards and movie theater screens to our out–of–home television networks, (2) establishing discrete stand–alone channels on our commercial location network, such as our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels and (3) expanding our media platform into new areas such as mobile handset advertising services and Internet advertising services and software packages. We expect to continue to explore opportunities to open up additional channels on our existing network and to enter into new advertising media platforms in China. We intend to continue expanding our out–of–home advertising network both through increasing the number of locations, displays and advertising poster frames on our commercial location, in–store and poster frame networks and through strategic acquisition of competitors and businesses that complement our existing out–of–home advertising network. In addition, we entered into new advertising platforms through Focus Media Wireless' mobile handset advertising network and our outdoor LED billboard network, and into Internet advertising services through our recent acquisition of Allyes. We believe these measures will enable us to continue the future growth of our business.

*Seasonality.* Our advertising service revenue is subject to key factors that affect the level of advertising spending in China generally. In addition to fluctuations in advertising spending relating to general economic and market conditions, advertising spending is also subject to fluctuations based on the seasonality of consumer

64

Table of Contents

spending. In general, a disproportionately larger amount of advertising spending is concentrated on product launches and promotional campaigns prior to the holiday season in December. In addition, advertising spending generally tends to decrease in China during January and February each year due to the Chinese Lunar New Year holiday as office buildings and other commercial venues in China tend to be closed during the holiday. We believe this effect will be less pronounced with regard to advertising spending on our in–store network, as we believe commercial activity in hypermarkets and supermarkets is stable or even enhanced during the period of Chinese Lunar New Year. We also experience a slight decrease in revenues during the hot summer months of July and August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. Our past experience, although limited, indicates that our revenues would tend to be lower in the first quarter and higher in the fourth quarter of each year, assuming other factors were to remain constant, such as our advertising rates and the number of available time slots on our network.

*Revenue Recognition.* We typically sign standard advertising contracts with our advertising clients, which require us to run the advertiser's advertisements on our network in specified cities for a specified period, typically from four to twelve weeks. We do not bill our advertising clients under these contracts until we perform the advertising service by broadcasting the advertisement on our network. Advertising service revenues are recognized in accordance with Topic 13 of Staff Accounting Bulletin ("SAB") "Revenue Recognition (SAB 101 and SAB 104)" when all four of the following criteria are met: (i) persuasive evidence of agreement exists; (ii) delivery of service has occurred; (iii) the price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

For digital out–of–home advertising revenues, net of agency rebates are recognized ratably over the period in which the advertisement is displayed. Revenue collected from our poster frame network is recognized in substantially the same manner as revenues collected under the advertising contracts used for our commercial location and in–store networks. For mobile handset advertising revenues, advertising revenues primarily consists of service revenue for delivering advertisement and other messages to the targeted mobile phone devices through channels provided by telecommunication vendors. Revenues from such services, net of agency rebates, are recognized when these messages are delivered to the vendor's channels. For Internet advertising services revenue, revenues primary consist of revenues from advertising and advertising–related services and revenues from sales of Adforward software. We sell Adforward subscriptions and perpetual licenses, from which revenues are recognized in accordance with the Statement of Position ("SOP") No. 97–2 "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Under SOP No. 97–2, revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. For perpetual license agreements, revenue is generally recognized when delivery has occurred, software has been installed and training has been provided as we do not currently have vendor–specific objective evidence of fair value, or VSOE, for either installation or training services. When we are considered as an agent, we recognize revenue on a net basis.

We generally collect our advertising service fees by billing our advertising clients within 60 to 90 days after completion of the advertising contract and book these unbilled or unpaid amounts as accounts receivable until we receive payment or determine the account receivable to be uncollectible.

Our accounts receivable are general unsecured obligations of our advertising clients and we do not receive interest on unpaid amounts. We make specific reserves for accounts that we consider to be uncollectible. We also provide a general reserve for uncollectible accounts that we reassess on an annual basis. We made no provision for uncollectible accounts in 2003. In 2004, 2005, 2006 and six months ended June 30, 2007, we made provision of $173,837, $396,657, $1,308,554 and $4,163,933, respectively, for accounts receivable that were outstanding for longer than six months. The average number of days outstanding of our accounts receivable, including from related parties, was 51, 70, 66 and 91, respectively, as of December 31, 2004, 2005, 2006 and June 30, 2007.

### Other Revenue

We also derive a portion of our total revenues from the sale of flat–panel displays to our regional distributors on a cost–plus basis, and franchise fee which we record as other revenue. Other revenue represented 9.9%, 2.0%, 0.9%

65

Table of Contents

and 0.4% of our total revenues in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. Other revenue derived from sale of flat–panel displays is recorded net of the 17% value added tax to which equipment sales in China are subject. We expect that other revenue as a percentage of our total revenues will continue to be low.

**Cost of Revenues**

Our cost of revenues consists of costs directly related to the offering of our advertising services and costs related to our sales of advertising equipment.

The following table sets forth our cost of revenues, divided into its major components, by amount and percentage of our total revenues for the periods indicated:

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30, | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands of U.S. dollars, except percentages) | | | | | | |
| Total revenues | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 211,905 | 100.0% | $ 83,262 | 100.0% | $ 170,616 | 100.0% |
| Cost of revenues: | | | | | | | | | | |
| Advertising service cost: | | | | | | | | | | |
| Digital out–of–home | | | | | | | | | | |
| *Commercial location network* | 6,804 | 23.3% | 18,325 | 26.9% | 42,836 | 20.2% | 19,713 | 23.7% | 30,767 | 18.0% |
| *In–store network* | — | — | 7,423 | 10.9% | 18,106 | 8.5% | 8,367 | 10.0% | 10,214 | 6.0% |
| *Poster frame network* | — | — | — | — | 13,621 | 6.4% | 6,014 | 7.2% | 10,011 | 5.9% |
| Mobile handset advertising | — | — | — | — | 6,052 | 2.9% | 2,405 | 2.9% | 7,323 | 4.3% |
| Internet advertising services | — | — | — | — | — | — | — | — | 18,405 | 10.8% |
| Advertising service cost | 6,805 | 23.3% | 25,748 | 37.8% | 80,615 | 38.0% | 36,499 | 43.8% | 76,720 | 45.0% |
| Other costs | 1,934 | 6.6% | 976 | 1.4% | 765 | 0.4% | 312 | 0.4% | 303 | 0.2% |
| Total cost of revenues | 8,738 | 29.9% | 26,724 | 39.2% | 81,380 | 38.4% | 36,811 | 44.2% | 77,023 | 45.2% |
| Gross profit | 20,472 | 70.1% | 41,505 | 60.8% | 130,525 | 61.6% | 46,451 | 55.8% | 93,593 | 54.8% |

*Advertising Service Costs*

Our cost of revenues related to the offering of our advertising services on our advertising network consists of location costs, flat–panel display depreciation costs, amortization of acquired intangible assets and other cost items, including salaries for and travel expenses incurred by our network maintenance staff and costs for materials.

Our location costs for our out–of–home television networks consist of:

- rental fees and one–time signing payments we pay to landlords, property managers and stores pursuant to the display placement agreements we enter into with them;

- commissions and public relations expenses we incur in connection with developing and maintaining relationships with landlords and property managers; and

- maintenance fees for keeping our displays in proper operating condition.

Generally, we capitalize the cost of our media displays and recognize depreciation costs on a straight–line basis over the term of their useful lives, which we estimate to be five years. The primary factors affecting our depreciation

66

Table of Contents

costs are the number of flat–panel displays in our network and the unit cost for those displays, as well as the remaining useful life of the displays.

Amortization of acquired intangible assets consists of operating and broadcasting rights, lease agreements, completed technology and others. We expect our results of operations for a period of at least seven years beginning in 2006 to be negatively affected by the amortization of intangible assets in relation to, among other things, material contracts and customer lists as a result of several acquisitions, particularly Framedia, Target Media, Focus Media Wireless and Allyes.

Our other cost of revenues consists of salary for and travel expenses incurred by our network maintenance staff and costs for materials and maintenance in connection with the upkeep of our advertising network. The primary factor affecting our other costs of revenues is the size of our network maintenance staff. As the size of our network increases, we expect our network maintenance staff, and associated costs, to increase in absolute terms, but to decrease as a percentage of total revenues.

*Commercial Location Network.*  Location costs are the largest component of our cost of revenues for our commercial location network. The primary factors affecting the amount of our location costs include the number of display placement agreements we enter into and the rental fees we pay under those agreements. We expect these costs to decrease as a percentage of our advertising service revenue for our commercial location network in the future, as our advertising service revenue for our commercial location network is expected to increase faster than the additional cost we incur from entering into new display placement agreements and any increases we may experience in renewing existing display placement agreements. However, when our display placement agreements expire, we may be unable to renew these agreements on favorable terms and the rental fee portion of our location costs attributable to these existing locations could increase. As we continue to increase the size of our network and as we update and replace our existing displays with new technology, our depreciation costs in connection with our commercial location network are expected to increase.

*In–store Network.*  The primary costs of revenues connected with our in–store network are location costs resulting from rental and maintenance fees and depreciation costs for our displays. We expect these costs to continue to increase in 2007 as we expand our in–store network.

*Poster Frame Network.*  The primary costs of revenues connected with our poster frame network are location costs resulting from rental fees. Depreciation costs for our frames and other costs for salary and maintenance fees also account for a significant portion of cost of revenues for our poster frame network. We expect these costs to increase in 2007 as we expand and upgrade our poster frame network but to decrease as a percentage of advertising service revenue for our poster frame network.

*Mobile Handset Advertising Network.*  The primary costs of revenues connected with our mobile handset advertising network are message costs charged by telecommunications network operations. We expect these costs to increase as the number of advertising messages and campaigns on this network increases.

*Internet Advertising Services Network.*  The primary costs of revenues connected with our Internet advertising services network are advertising space leasing costs charged by gateway websites and research and development costs in connection with the development of Internet advertising software packages. We expect these costs to increase as we continue to expand this part of our business as Internet use continues to grow in China.

### Other Costs

Other costs consists of the amounts we pay to the contract assembler who purchases the components and assembles them into the flat–panel displays we sell to our regional distributors. Other costs were 6.6%, 1.4%, 0.4%, 0.4% and 0.2% of our total revenues in 2004, 2005, 2006 and for the six months ended June 30, 2006 and June 30, 2007, respectively. The primary factors affecting other costs are the number of flat–panel displays we sell and the unit cost we pay to our contract assembler for each such flat–panel display.

Table of Contents

*Operating Expenses and Net Income*

Our operating expenses consist of general and administrative, selling and marketing expenses, other operating income. In 2004, our operating expenses also included a goodwill impairment loss. The following table sets forth our operating expenses, divided into their major categories by amount and as a percentage of our total revenues for the periods indicated.

| | For the Year Ended December 31, | | | | | | For the Six Months Ended June 30, | | | |
| | 2004 | | 2005 | | 2006 | | 2006 | | 2007 | |
| | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues | $ | % of Total Revenues |
| | (In thousands of U.S. dollars, except percentages) | | | | | | | | | |
| Gross profit | $ 20,472 | 70.1% | $ 41,505 | 60.8% | $ 130,525 | 61.6% | $ 46,450 | 55.8% | $ 93,593 | 54.8% |
| Operating expenses: | | | | | | | | | | |
| General and administrative | 3,988 | 13.7% | 9,120 | 13.4% | 25,723 | 12.1% | 10,693 | 12.8% | 20,329 | 11.9% |
| Selling and marketing | 3,473 | 11.9% | 9,599 | 14.0% | 25,762 | 12.2% | 9,783 | 11.7% | 23,041 | 13.5% |
| Other operating income | — | 0.0% | — | 0.0% | (1,338) | (0.6)% | (158) | (0.1)% | (2,384) | (1.4)% |
| Goodwill impairment loss | 58 | 0.2% | — | — | — | — | — | — | — | — |
| Total | 7,519 | 25.8% | 18,719 | 27.4% | 50,147 | 23.7% | 20,318 | 24.4% | 40,986 | 24.0% |
| Income from operations | 12,953 | 44.3% | 22,786 | 33.4% | 80,378 | 37.9% | 26,132 | 31.4% | 52,607 | 30.8% |

*General and Administrative.* General and administrative expenses primarily consist of salary and benefits for management, finance and administrative personnel, share–based compensation expense for our administrative staff, office rental, maintenance and utilities expenses, depreciation of office equipment, other office expenses and professional services fees. General and administrative expenses were 13.7%, 13.4%, 12.1% and 11.9% of our total revenues in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. Salaries and benefits accounted for 20.2%, 26.9%, 23.3% and 19.7% of our general and administrative expenses in 2004, 2005, 2006 and six months ended June 30, 2007, respectively. We expect that our general and administrative expenses will be relatively stable as a percentage of total revenues in the near term but to increase in absolute terms as we hire additional personnel and incur additional costs in connection with the expansion of our business and with being a publicly traded company, including costs of enhancing our internal controls.

*Selling and Marketing.* Our selling and marketing expenses primarily consist of salaries and benefits, share–based compensation expense for our sales staff, marketing and promotional expenses, amortization of certain acquired intangible assets such as customer base, and other costs related to supporting our sales force. Selling and marketing expenses were 11.9%, 14.0%, 12.2% and 13.5% of our total revenues in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. As we acquired more of our regional distributors, continue to expand our client base and have commenced operation of new advertising platforms, we increased our sales force, which resulted in an increase in salary expenses. We now budget approximately 15% of our advertising revenues to be used for selling and marketing in 2007. We expect selling and marketing expenses to remain relatively stable as a percentage of total revenues.

*Share–based Compensation.* Prior to 2006, our share–based compensation expense relating to general and administrative and selling and marketing primarily consists of the amortized portion of deferred share–based compensation recognized by us. We issued options representing 10.87% of our issued share capital under our 2003 Employee Share Option Scheme, or the 2003 Option Plan. In addition, we have issued options representing 3.95% of our issued share capital under our 2005 Share Option Plan, or the 2005 Option Plan. Our share–based compensation relating to general and administrative expenses accounted for 11.6%, 7.5%, 23.8% and 23.2% of our general and administrative expenses in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. Share–based compensation relating to selling and marketing accounted for 0.8%, 0.5%, 8.1% and 18.0% of our selling and marketing expenses in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. The share–based compensation has increased following the effectiveness, as of January 2006, of Statement of Financial Accounting

68

Table of Contents

Standards No. 123(R) relating to share–based compensation, which requires us to record the fair value of such awards as compensation expense. As a result, we recorded total share–based compensation expense of $8.4 million and $9.4 million for 2006 and for the six months ended June 30, 2007, respectively.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities on the date of the financial statements and the reported amounts of revenues and expenses during the financial reporting period. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from those estimates. Some of our accounting policies require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our financial statements as these policies address some of the most significant accounts in our financial statements and their application places the most significant demands on our management's judgment.

*Share–based Compensation*

Through 2005, we accounted for our share option plan using the intrinsic value method under Accounting Principles Board, or APB, No. 25. Effective the beginning of 2006, we adopted Statement of Financial Accounting Standards, or SFAS, No. 123–R, "*Share–Based Payment*", and elected to adopt the modified prospective application method. SFAS No. 123–R requires us to use a fair–value based method to account for share–based compensation. Accordingly, share–based expense is measured at the grant date, based on the fair value of the award, and is recognized as expense over the employees' requisite service period. Our share option plans are described in Note 10 to our consolidated financial statements.

We estimated the fair value of share options granted using the Black–Scholes–Merton option pricing model, which requires the input of highly subjective assumptions, including the estimated expected life of the share options, estimated forfeitures and the price volatility of the underlying shares. The assumptions used in calculating the fair value of share options represent management's best estimates, but these estimates involve inherent uncertainties and the application of management judgement. As a result, if factors change and we use different assumptions, our share–based compensation expense could be materially different in the future. In addition, we estimate our expected forfeiture rate and recognize the expense only for those shares expected to vest. These estimations are based on past employee retention rates and our expectations of future retention rates. We will prospectively revise our estimated forfeiture rates based on actual history. Our compensation expense may change based on changes to our actual forfeitures of these share options.

*Income Taxes*

We account for income taxes under the provisions of SFAS No. 109, "*Accounting for Income Taxes*", with the required disclosures as described in Note 11 to our consolidated financial statements. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In the event we were to determine that we would be able to realize our deferred tax assets in the future in excess of their recorded amount, an adjustment to our deferred tax assets would increase our income in the period such determination was made. Likewise, if we determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to our deferred tax assets would be charged to our income in the period such determination is made. We record income tax expense on our taxable income using the balance sheet liability method at the effective rate applicable to each of our affiliated entities in China in our consolidated statements of operations and comprehensive income.

*Goodwill and Long–lived Assets Impairment*

We test goodwill for possible impairment on an annual basis as of December 31 of each year and at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting

69

Table of Contents

unit below its carrying amount. Circumstances that could trigger an impairment test between annual tests include, but are not limited to:

- a significant adverse change in the business climate or legal factors;

- an adverse action or assessment by a regulator;

- unanticipated competition;

- loss of key personnel;

- the likelihood that a reporting unit or a significant portion of a reporting unit will be sold or disposed of;

- a change in reportable segments;

- results of testing for recoverability of a significant asset group within a reporting unit; and/or

As of December 31, 2004, 2005, 2006 and June 30, 2007, we had a goodwill balance of $9.1 million, $13.3 million, $739.7 million and $924.2 million, respectively, which is not deductible for tax purposes. We incurred a goodwill impairment loss of $58,397 in 2004 in connection with our acquisition of Perfect Media which is part of the commercial location reporting segment. In conducting our annual impairment test, we undertook a valuation of Perfect Media using the expected present value of cash flow and the income approach valuation methods, which resulted in a goodwill impairment loss of $58,397 in 2004, indicating that the value of Perfect Media was less than what we paid at the time we acquired it.

The fair value of each reporting unit is determined by allocating our total fair value among our reporting units using a certain valuation technique. We may incur additional goodwill impairment charges in the future although we cannot predict whether this will occur when we perform our goodwill impairment test each year.

We test long–lived assets for possible impairment if an event occurs or circumstances change that would more likely than not reduce the fair value of an asset group below its carrying amount. Asset recoverability is an area involving management judgement, requiring assessment in two steps as to whether the carrying value of assets can be supported by (1) the undiscounted future cash flows and (2) the net present value of future cash flows derived from such assets using cash flow projections which have been discounted at an appropriate rate. In calculating the net present value of the future cash flows, certain assumptions are required to be made in respect of highly uncertain matters such as revenue growth rates, gross margin percentages and terminal growth rates.

**Taxation**

*Cayman Islands, the British Virgin Islands and Hong Kong*

Under the current laws of the Cayman Islands, the British Virgin Islands and Hong Kong, neither Focus Media Holding Limited, incorporated in the Cayman Islands, nor Infoachieve Limited and Dotad Holdings Limited, incorporated in the British Virgin Islands, are subject to tax on its income or capital gains. Focus Media Hong Kong, our wholly owned subsidiary incorporated in Hong Kong, is subject to profits tax rate of 17.5% on its assessable profits, yet interest derived from deposits placed in Hong Kong with authorized institutions are exempted from the Hong Kong profits tax. In addition, payment of dividends by either company is not subject to withholding tax in those jurisdictions.

*PRC*

Our PRC entities are subject to PRC business tax. We primarily pay business tax on gross revenues generated from our advertising services. Focus Media Advertisement and its subsidiaries, New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement and Framedia Advertisement, pay a 5% business tax, whereas Focus Media Wireless pays a 3% business tax on the gross revenues derived from advertising services and this business tax is deducted from total revenues in calculating the net revenues. Focus Media Technology and Focus Media Digital pay a 5% business tax on the gross revenues derived from their contractual arrangements with Focus Media Advertisement and its subsidiaries and these taxes are primarily recorded in operating expenses.

70

Table of Contents

In addition to business tax and cultural industries tax imposed on our advertising business and VAT imposed on our sales of advertising equipment. Focus Media Technology, Focus Media Digital and Focus Media Advertisement and its subsidiaries, including Focus Media Advertising Agency and New Focus Media Advertisement, are subject to PRC enterprise income tax on their taxable income, except to the extent some of them enjoy temporary tax exempt status as described in further detail below.

Pursuant to PRC law, enterprise income tax is generally assessed at the rate of 33% of taxable income. Focus Media Technology, Focus Media Digital, Focus Media Advertisement and its subsidiaries and New Focus Media Advertisement are currently subject to this 33% enterprise income tax. State Administration of Taxation and its delegates of the PRC are authorized to grant an exemption from enterprise income tax of up to two years to newly established domestic companies that have no direct foreign ownership and that are financially independent and engaged in consulting services, technology services or the information industry, which includes advertising services. A qualifying company must apply for this tax–exempt status for each of the two years separately. Focus Media Digital and Focus Media Advertising Agency were established in October 2004 and both were granted exemptions from enterprise income tax in 2004 and 2005. In 2006 and 2007, we continued our tax exempt status through New Focus Media Advertisement, New Focus Media Agency, Focus Media Defeng Advertisement, New Structure Advertisement and Focus Media Wireless, which were established during the period from October 2005 to June 2006 and have obtained tax–exempt approval for 2006 and 2007.

In November 2004, Focus Media Technology, Focus Media Advertisement and some of its subsidiaries sold all of their flat–panel display equipment to Focus Media Digital at fair market value. As a result of this sale, Focus Media Technology and Focus Media Advertisement recorded a non–cash charge to earnings in the aggregate of $4,773,030 in the fourth quarter of 2004, which reflected the difference between the fair market value of the equipment and its then current book value. In addition, since its establishment, through December 31, 2005, Focus Media Advertising Agency has generated revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for Focus Media Advertising Agency's clients on our network. Finally, Focus Media Agency also license technology used in our business operations from Focus Media Digital in exchange for license fees paid to Focus Media Digital. As a result of Focus Media Agency's amortization of the license fee paid to Focus Media Digital, it incurred a charge to earnings of $3.7 million in the fourth quarter of 2004. See "Related Party Transactions" for further information on these transactions and contractual agreements. Although these transactions were eliminated upon consolidation as transactions among members of our consolidated companies for financial accounting purposes, they did have the affect of reducing our total income tax expense and increasing our after tax net income in 2004.

As a result of these transactions, our effective tax rates were 71.6% and 2.8% in 2004 and 2005, respectively. Excluding the non–recurring non–cash charge resulting from the change in fair value of derivative liability associated with Series B convertible redeemable preference shares and goodwill impairment loss, our effective tax rate for 2004 would have been 7.0%. The tax savings resulting from the non–cash charge to earnings from the write–down of flat–panel display equipment in 2004 and the charge to earnings from the amortization of the license fee paid in 2004 will not continue in the future.

In December 2005, we established New Focus Media Advertisement which has received tax–exempt approval for 2006 and 2007. We further incorporated New Focus Media Agency and Focus Media Defeng Advertisement in 2006 which also received tax–exempt approval for 2006 and 2007. Besides, New Structure Advertisement, which was incorporated in October 2005, also received its tax–exempt approval for 2006 and 2007. Focus Media Wireless, as a high–tech company incorporated in Zhonguancun District, Beijing, China, is exempted from income tax from 2006 to 2008, plus a 50% reduction holiday from 2009 to 2011.

In December 2005, Focus Media Digital sold all of its flat–panel display equipment to New Focus Media Advertisement at fair market value and Focus Media Digital sold all of its technology to New Focus Media Advertisement in January 2006 at a fixed fee. As of January 2006, New Focus Media Advertisement generates revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for New Focus Media Advertisement's clients on our network. Both New Focus Media Agency and Focus Media Defeng Advertisement act as advertising agencies for New Focus Media Advertisement and receive agency fees. While these transactions are eliminated upon

71

Table of Contents

consolidation as they are transactions among members of our consolidated group for financial accounting purposes, they effectively reduce our effective tax rate to 1.3% for 2006. We also expect these transactions will reduce our total income tax expense and increase our after tax net income in 2007. See "Related Party Transactions" for further information on these transactions and contractual agreements. In addition, upon expiration of these tax exemptions, we will consider available options, in accordance with applicable law, that would enable us to qualify for further tax exemptions, if any, to the extent they are then available to us.

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions described above are found not to be on an arm's–length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late–payment interest and penalties. A finding by the PRC tax authorities that we are ineligible for the tax savings we achieved in 2004, 2005 and 2006, or that we expect to achieve in 2007, or that Focus Media Digital, Focus Media Advertising Agency, New Focus Media Advertisement, New Structure Advertisement, or Framedia Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment."

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

**Recently Issued Accounting Standards**

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities, ("SFAS 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 applies under most other accounting pronouncements that require or permit fair value measurements and does not require any new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years, with earlier application encouraged. The provisions of SFAS 157 should be applied prospectively as of the beginning of the fiscal year in which the statement is initially applied, except for a limited form of retrospective application for certain financial instruments. The Group is currently evaluating the impact, if any, of this statement on the consolidated combined financial statements.

72

Table of Contents

**Acquisitions**

Since we commenced our current business operations in May 2003, we have acquired numerous companies to expand the coverage of our network in China and to acquire businesses that are complementary to our operations. See "Our Recent Significant Acquisitions" for descriptions of the most recent such acquisitions.

Some of the businesses we acquired had entities located both in and outside of China. The consideration we paid for these businesses was made in two parts, one part for the entity located in China, and the other part for the entity located outside of China. For consideration paid to acquire entities located in China, we withheld on behalf of sellers who are natural persons 20% of the amount by which the acquisition price exceeded the registered capital of such PRC entity as required under the PRC Individual Income Tax Law and related implementation rules. We were not required to and did not withhold any tax in connection with payments made to acquire the entities located outside of China. See "Risks Relating to the People's Republic of China — The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China".

The financial statements of:

- Infoachive Limited, for the periods ended, and as of, December 31, 2004 and 2005;

- Target Media Holdings Limited, for the periods ended, and as of, December 31, 2004 and 2005; and

- Allyes Information Technology Co., Ltd. for the year ended, and as of, December 31, 2006 are included elsewhere in this prospectus.

**Quarterly Results of Operation**

The following table presents unaudited consolidated quarterly financial data by amount for each of the eight quarters in the period from September 30, 2005 to June 30, 2007. You should read the following table in conjunction with our audited consolidated financial statements and related notes included elsewhere in this prospectus. We have prepared the unaudited consolidated quarterly financial information on substantially the same basis as our audited consolidated financial statements and using information derived from our unaudited consolidated financial statements which are not included in this prospectus. The following information contains normal recurring adjustments which are, in the opinion of our management, necessary for a fair presentation of the results for such unaudited period. Our operating results for any quarter are not necessarily indicative of results that may be expected for any future period.

| Consolidated Statement of Operations Data | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, | December 31, | March 31, | June 30, | September 30, | December 31, | March 31, | June 30, |
| | 2005 | 2005 | 2006 | 2006 | 2006 | 2006 | 2007 | 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Net revenues: | | | | | | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location*[1] | $ 17,287 | $ 20,735 | $ 21,380 | $ 30,438 | $ 38,519 | $ 41,724 | $ 31,644 | $ 51,060 |
| *In–store network*[1] | 1,813 | 3,317 | 5,294 | 6,538 | 7,239 | 7,836 | 6,638 | 7,244 |
| *Poster frame network*[1] | — | — | 6,067 | 9,778 | 11,284 | 13,775 | 12,669 | 18,548 |
| Mobile handset advertising[1] | — | — | — | 3,076 | 3,516 | 3,509 | 6,008 | 10,882 |
| Internet advertising services[1] | — | — | — | — | — | — | — | 25,236 |
| Total advertising service revenue | 19,100 | 24,052 | 32,741 | 49,830 | 60,558 | 66,844 | 56,959 | 112,970 |
| Other revenue | 366 | 553 | 457 | 233 | 90 | 1,152 | 381 | 305 |
| **Total revenues** | **19,466** | **24,605** | **33,198** | **50,063** | **60,648** | **67,996** | **57,340** | **113,275** |

73

Table of Contents

| Consolidated Statement of Operations Data | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Cost of revenues: | | | | | | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location network* | 5,047 | 5,857 | 8,226 | 11,487 | 11,404 | 11,719 | 12,898 | 17,868 |
| *In–store network* | 2,606 | 3,451 | 3,973 | 4,394 | 4,616 | 5,123 | 5,027 | 5,187 |
| *Poster frame network* | — | — | 2,792 | 3,222 | 3,756 | 3,851 | 4,746 | 5,265 |
| Mobile handset advertising network | — | — | — | 2,405 | 2,219 | 1,428 | 2,754 | 4,569 |
| Internet advertising services network | — | — | — | — | — | — | — | 18,405 |
| Advertising service cost: | 7,653 | 9,308 | 14,991 | 21,508 | 21,995 | 22,121 | 25,425 | 51,294 |
| Other cost | 285 | 432 | 232 | 80 | 80 | 373 | 165 | 138 |
| **Total cost of revenues** | **7,938** | **9,740** | **15,223** | **21,588** | **22,075** | **22,494** | **25,590** | **51,432** |
| **Gross profit** | **11,528** | **14,865** | **17,975** | **28,475** | **38,573** | **45,502** | **31,750** | **61,843** |
| Operating expenses: | | | | | | | | |
| General and administrative | 2,337 | 2,585 | 4,395 | 6,298 | 5,956 | 9,074 | 8,683 | 11,646 |
| Selling and marketing | 2,719 | 3,381 | 4,407 | 5,376 | 6,784 | 9,195 | 9,886 | 13,154 |
| Other operating income | — | — | (20) | (137) | (5) | (1,176) | (1,263) | (1,121) |
| Total operating expenses | 5,056 | 5,966 | 8,782 | 11,537 | 12,735 | 17,093 | 17,306 | 23,679 |
| **Income from operations** | **6,472** | **8,899** | **9,193** | **16,938** | **25,838** | **28,409** | **14,444** | **38,164** |
| Interest income (expenses), net | 791 | 939 | 888 | 605 | 1,070 | 1,692 | 2,693 | 1,870 |
| Other income (expenses), net | 8 | (171) | (71) | (408) | (175) | 367 | 92 | 12 |
| Income before income taxes and minority interest | 7,271 | 9,667 | 10,010 | 17,135 | 26,733 | 30,468 | 17,229 | 40,046 |
| Total income taxes | (87) | (204) | (617) | (373) | 317 | (371) | (968) | (2,318) |
| Minority interests | (52) | (38) | 40 | (91) | (45) | (9) | 31 | (13) |
| **Net income attributed to shareholders** | **$ 7,132** | **$ 9,425** | **$ 9,433** | **$ 16,671** | **$ 27,005** | **$ 30,088** | **$ 16,292** | **$ 37,715** |

(1) Advertising service revenue is presented net of sales taxes. The following tables presents the unaudited quarterly sales taxes information:

| | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Sales taxes: | | | | | | | | |
| Commercial location network | $ 1,769 | $ 1,867 | $ 2,082 | $ 2,968 | $ 4,062 | $ 4,529 | $ 3,274 | $ 4,308 |
| In–store network | 187 | 304 | 524 | 697 | 763 | 819 | 688 | 754 |
| Poster frame network | — | — | 591 | 958 | 1,102 | 1,338 | 1,185 | 1,799 |
| Mobile handset advertising network | — | — | — | 289 | 285 | 205 | 12 | 386 |
| Internet advertising services network | — | — | — | — | — | — | — | 1,182 |
| Total | $ 1,956 | $ 2,171 | $ 3,197 | $ 4,912 | $ 6,212 | $ 6,891 | $ 5,159 | $ 8,429 |

74

Table of Contents

The following table presents our unaudited consolidated quarterly financial data as a percentage of our total revenues for the periods indicated.

| Consolidated Statement of Operations Data | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, | December 31, | March 31, | June 30, | September 30, | December 31, | March 31, | June 30, |
| | 2005 | 2005 | 2006 | 2006 | 2006 | 2006 | 2007 | 2007 |
| | (In thousands of U.S. dollars) | | | | | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location network*[1] | 88.8% | 84.3% | 64.4% | 60.8% | 63.6% | 61.4% | 55.2% | 45.1% |
| *In–store network*[1] | 9.3% | 13.5% | 15.9% | 13.1% | 11.9% | 11.5% | 11.6% | 6.4% |
| *Poster frame network*[1] | — | — | 18.3% | 19.5% | 18.6% | 20.2% | 22.1% | 16.4% |
| Mobile handset advertising network[1] | — | — | — | 6.1% | 5.8% | 5.2% | 10.5% | 9.6% |
| Internet advertising services network[1] | — | — | — | — | — | — | — | 22.3% |
| Other revenues | 1.9% | 2.2% | 1.4% | 0.5% | 0.1% | 1.7% | 0.6% | 0.2% |
| **Total revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Cost of revenues: | | | | | | | | |
| Digital out–of–home | | | | | | | | |
| *Commercial location network* | 25.9% | 23.8% | 24.8% | 22.9% | 18.8% | 17.2% | 22.5% | 15.8% |
| *In–store network* | 13.4% | 14.0% | 12.0% | 8.8% | 7.6% | 7.5% | 8.8% | 4.6% |
| *Poster frame network* | — | — | 8.4% | 6.4% | 6.2% | 5.7% | 8.3% | 4.6% |
| Mobile Handset Advertising Network | — | — | — | 4.8% | 3.7% | 2.1% | 4.8% | 4.1% |
| Internet advertising services network | — | — | — | — | — | — | — | 16.2% |
| Other costs | 1.5% | 1.8% | 0.7% | 0.2% | 0.1% | 0.5% | 0.3% | 0.1% |
| **Total cost of revenues** | **40.8%** | **39.6%** | **45.9%** | **43.1%** | **36.4%** | **33.0%** | **44.7%** | **45.4%** |
| **Gross profit** | **59.2%** | **60.4%** | **54.1%** | **56.9%** | **63.6%** | **67.0%** | **55.3%** | **54.6%** |
| Operating expenses: | | | | | | | | |
| General and administrative | 12.0% | 10.5% | 13.2% | 12.6% | 9.8% | 13.3% | 15.1% | 10.3% |
| Selling and marketing | 14.0% | 13.7% | 13.3% | 10.7% | 11.2% | 13.5% | 17.2% | 11.6% |
| Other operating income | — | — | (0.1)% | (0.3)% | (0.0)% | (1.7)% | (2.2)% | (1.0)% |
| Total operating expenses | 26.0% | 24.2% | 26.4% | 23.0% | 21.0% | 25.1% | 30.1% | 20.9% |
| **Income from operations** | **33.2%** | **36.2%** | **27.7%** | **33.9%** | **42.6%** | **41.9%** | **25.2%** | **33.7%** |
| Interest income (expenses), net | 4.1% | 3.8% | 2.7% | 1.2% | 1.8% | 2.5% | 4.7% | 1.7% |
| Other income (expenses), net | 0.1% | (0.7)% | (0.2)% | (0.8)% | (0.3)% | 0.5% | 0.2% | 0.0% |
| Income before income taxes and minority interest | 37.4% | 39.3% | 30.2% | 34.3% | 44.1% | 44.9% | 30.1% | 35.4% |
| Total income taxes | (0.4)% | (0.8)% | (1.9)% | (0.7)% | 0.5% | (0.5)% | 1.7% | 2.0% |
| Minority interest | (0.3)% | (0.2)% | 0.1% | (0.2)% | (0.1)% | 0.0% | (0.1)% | 0.0% |
| **Net income attributable to shareholders** | **36.7%** | **38.3%** | **28.4%** | **33.4%** | **44.5%** | **44.4%** | **28.5%** | **33.4%** |

Table of Contents

(1) Advertising service revenue is presented net of sales taxes. The following table presents the unaudited quarterly percentage of sales taxes against gross revenues:

| | For the Three Months Ended | | | | | | | |
| | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
|---|---|---|---|---|---|---|---|---|
| | (In thousands of U.S. dollars) | | | | | | | |
| Sales taxes: | | | | | | | | |
| Commercial location network | 9.3% | 8.3% | 8.9% | 8.9% | 9.5% | 9.8% | 9.4% | 7.8% |
| In–store network | 9.4% | 8.4% | 9.0% | 9.6% | 9.5% | 9.5% | 9.4% | 9.4% |
| Poster frame network | — | — | 8.9% | 8.9% | 8.9% | 8.9% | 8.6% | 8.8% |
| Mobile handset advertising network | — | — | — | 8.6% | 7.5% | 5.5% | 0.2% | 3.4% |
| Internet advertising services network | — | — | — | — | — | — | — | 4.5% |
| Total | 9.3% | 8.3% | 8.9% | 9.0% | 9.3% | 9.3% | 8.3% | 6.9% |

    Certain quarterly financial information related to each fiscal quarters of the fiscal year ended December 31, 2006 are presented differently from previously announced information in the Forms 6–K furnished to the SEC on May 26, 2006, August 21, 2006, November 20, 2006 and February 26, 2007 as a result of the following:

    *Advertising agency rebates for each fiscal quarter of the fiscal year ended December 31, 2006.* We classified $88,537, $624,365, $425,807, $257,205 and $774,260 advertising agency rebates, respectively, as selling expenses rather than as a reduction of revenues in the quarter ended March 31, June 30, September 30, December 31, 2006 and March 31, 2007, respectively. This adjustment resulted in a decrease in the originally reported gross margin and a decrease to reported selling expenses from our filings on Form 6–K dated May 26, 2006, August 21, 2006, November 20, 2006, February 26, 2007 and June 12, 2007, respectively. The foregoing reclassifications did not affect net income or earnings per share.

**Results of Operations**

***Six Months Ended June 30, 2007 Compared to Six Months Ended June 30, 2006***

    **Total Revenues.** Our total revenues increased substantially from $83.3 million for the six months ended June 30, 2006 to $170.6 million for the six months ended June 30, 2007 due primarily to an increase in our advertising service revenue.

    *Digital Out–of–home Advertising Network.* Advertising service revenue from our digital out–of–home advertising network, which includes our commercial location, in–store and poster frame networks, increased 60.8% from $79.5 million for the six months ended June 30, 2006 to $127.8 million for the six months ended June 30, 2007, primarily due to a 59.6% increase in revenues from our commercial location network and a 97.0% increase in revenues from our poster frame network.

- *Commercial location network.* Advertising service revenue from our commercial location network increased significantly from $51.8 million for the six months ended June 30, 2006 to $82.7 million for the six months ended June 30, 2007. The increase in advertising service revenue is attributable to: (i) continued acceptance of our media by an increasing number of advertising clients; (ii) the steady expansion of our media network, including the number of LCD displays and LED billboards on our network; and (iii) the sale of tailored advertising packages including through the seven specialized channels on our commercial location network and by targeting advertising campaigns on specific lists of buildings requested by advertising clients.

- *In–store network.* Advertising service revenue from our in–store network, increased 17.8% to $13.9 million for the six months ended June 30, 2007 from $11.8 million for the six months ended June 30, 2006. This increase was attributable to steady sales of advertising services on the network as it continued to increase in size. Specifically, the number of displays installed in the in–store network amounted to 41,322 as of June 30,

Table of Contents

2007, up from 35,511 as of June 30, 2006. The number of hypermarkets in our networks, where we derives most of our in−store network revenue, increased from 872 as of June 30, 2006 to 1,205 as of June 30, 2007.

- *Poster frame network.* Advertising service revenue from our poster frame network increased 97.0% to $31.2 million for the six months ended June 30, 2007 compared to $15.8 million for the same period in 2006. This increase in revenue is primarily attributable to robust sales as the total number of frames installed nearly doubled from 82,200 as of June 30, 2006 to 161,435 as of June 30, 2007.

*Mobile Handset Advertising Network.* Advertising service revenue from our mobile handset advertising network increased from $3.0 million for the six months ended June 30, 2006 to $16.9 million for the six months ended June 30, 2007 due to the increasing acceptance by advertisers of mobile handset advertising as telecommunications services and mobile handset ownership continues to grow in China.

*Internet Advertising Services Network.* We commenced providing Internet advertising services and software solutions in March 2007 upon our acquisition of Allyes. Advertising service revenue from our Internet advertising services network totalled $25.2 million for the six months ended June 30, 2007 attributable primarily to sales of our digital media services, sales of our performance−based advertising service 'SmartTrade' and sales of our Internet advertising software package 'AdForward'.

***Cost of Revenues.*** Our cost of revenues increased significantly from $36.5 million for the six months ended June 30, 2006 to $76.7 million for the six months ended June 30, 2007 due to increases in costs of expanding and maintaining our digital out−of−home advertising networks and mobile handset advertising network as well as from costs related to our Internet advertising services network, which we began to incur in April 2007 upon the acquisition of Allyes.

*Digital out−of−home advertising costs.* Cost of revenues associated with our digital out−of−home advertising networks increased 49.6% from $34.1 million for the six months ended June 30, 2006 to $51.0 million for the six months ended June 30, 2007. This increase is primarily attributable to increased costs associated with the expansion of our commercial location network and an increase in the number of LED billboards.

- *Net advertising service cost — commercial location network.* Our net advertising service cost for our commercial location network increased substantially from $19.7 million for the six months ended June 30, 2006 to $30.8 million for the six months ended June 30, 2007. This increase was due to (i) the substantial increase in our advertising service business on our commercial location network between these two periods including substantial increases in our location costs due to a substantial increase in the number of commercial locations where we entered into display placement agreements, (ii) an increase in flat−panel display depreciation costs as a result of an increase in the number of flat−panel displays we own and operate directly from 69,446 as of June 30, 2006 to 85,101 as of June 30, 2007; (iii) our acquisition of 5 regional distributors during this period, (iv) an increase in other direct costs associated with maintaining the network and (v) payments associated with our lease of curbside LED billboards and screen time at movie theaters.

- *Net advertising service cost — in−store network.* We incurred $10.2 million in net advertising service cost for our in−store network for the six months ended June 30, 2007 compared to $8.4 million for the six months ended June 30, 2006, consisting of location costs and depreciation costs relating to the installation and maintenance of our in−store network.

- *Net advertising service cost — poster frame network.* Our net advertising service cost for our poster frame network increased 66.5% to $10.0 million for the six months ended June 30, 2007 compared to $6.0 million for the six months ended June 30, 2006, attributable to location costs and depreciation costs relating to the installation and maintenance of poster frames on our network as we significantly increased the number of traditional poster frames on our network and, in June 2007, began to incur location costs associated with our digital poster frames.

*Net advertising service cost — mobile handset advertising network.* Net advertising service cost associated with our mobile handset advertising network increased significantly from $2.4 million for the six months ended June 30, 2006 to $7.3 million for the six months ended June 30, 2007. These costs consist primarily of message costs charged by mobile operators.

Table of Contents

*Net advertising service cost — Internet advertising service network.* We incurred net advertising service costs of $18.4 million for the six months ended June 30, 2007. These costs consist primarily of advertising space leasing costs charged by gateway websites.

***Gross Profit.*** As a result of the foregoing, our gross profit increased by 101.5% from $46.5 million for the six months ended June 30, 2006 to $93.6 million for the six months ended June 30, 2007 . Our overall gross margin decreased during the same period from 55.8% to 54.8% primarily due to the addition of our Internet advertising services network in the first half of 2007, which has lower margins. For the six months ended June 30, 2007, our gross margin for our digital out–of–home advertising network amounted to 60.1%, including gross margins for our commercial location, in–store and poster frame networks of 62.8%, 26.4% and 67.9%, respectively, compared to a gross margin for our digital out–of–home advertising networks of 61.0% for the six months ended June 30, 2006, including gross margins of 62.0%, 29.3% and 62.0% for our commercial location, in–store and poster frame networks, respectively. Gross margin for mobile handset advertising network increased from 21.8% for the six months ended June 30, 2006 to 56.6% for the six months ended June 30, 2007. Gross margin for out Internet advertising services network was 27.1% for the six months ended June 30, 2007. In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network.

***Operating Expenses.*** Our operating expenses increased significantly from $20.3 million for the six months ended June 30, 2006 to $41.0 million for the six months ended June 30, 2007. Operating expenses remained relatively consistent as a percentage of revenues, 24.4% for the six months ended June 30, 2006 compared to 24.0% for the six months ended June 30, 2007. The increase in operating expenses was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, and in share–based compensation expenses under SFAS 123–R.

- *General and Administrative.* General and administrative expenses increased substantially from $10.7 million for the six months ended June 30, 2006 to $20.3 million for the six months ended June 30, 2007 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as our operations have grown, increases in share–based compensation expense and increases in costs associated with being a publicly listed company.

- *Selling and Marketing.* Selling and marketing expenses increased substantially from $9.8 million for the six months ended June 30, 2006 to $23.0 million for the six months ended June 30, 2007 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force as well as share–based compensation expenses.

***Income from Operations.*** As a result of the foregoing, we had income from operations of $52.6 million for the six months ended June 30, 2007 compared to $26.1 million for the six months ended June 30, 2006.

***Income Before Income Taxes and Minority Interest.*** Income before income taxes and minority interest was $27.1 million for the six months ended June 30, 2006 compared to $57.3 million for the six months ended June 30, 2007, which included interest income and other income (expenses).

- *Interest Income.* Interest income increased from $1.8 million for the six months ended June 30, 2006 to $4.6 million for the six months ended June 30, 2007. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from our follow–on public offerings.

- *Income Taxes.* Our income taxes were $1.0 million for the six months ended June 30, 2006 with an effective tax rate of 3.6% compared to $3.3 million for the six months ended June 30, 2007 with an effective tax rate of 5.7%. The increase resulted from newly acquired subsidiaries with higher effective tax rates.

***Net Income.*** As a result of the foregoing, our net income increased 106.9% from $26.1 million for the six months ended June 30, 2006 to $54.0 million for the six months ended June 30, 2007.

***Year Ended December 31, 2006 Compared to Year Ended December 31, 2005***

***Total Revenues.*** Our total revenues increased substantially from $68.2 million in 2005 to $211.9 million in 2006 due to an increase in our advertising service revenue.

Table of Contents

Our total advertising service revenue increased significantly from $66.9 million in 2005 to $210.0 million in 2006, including the advertising service revenues derived from our poster frame network amounting to $40.9 million and $10.1 million from mobile handset advertising network primarily as a result of our acquisitions in 2006.

*Digital Out–of–home Advertising Network.*  Advertising service revenue from our digital out–of–home advertising network increased significantly from $66.9 million in 2005 to $199.9 million in 2006, primarily due to rapid growth in revenues from our commercial location network as well as from the addition of revenues from our poster frame network.

- *Commercial location network.*  Advertising service revenue from our commercial location network increased significantly from $61.4 million in 2005 to $132.1 million, including $13.8 million to related parties in 2006. The increase in advertising service revenue for our commercial location network is attributable to:

  - An increase in the number of flat–panel displays on our network from 48,226 as of December 31, 2005 to 85,460 as of December 31, 2006 including our regional distributors;

  - Our network reach increased from 58 cities as of December 31, 2005, including 26 cities directly operated by our company and 32 cities operated by our regional distributors, to 91 cities as of December 31, 2006, including 51 cities directly operated by our company and 40 cities operated by our regional distributors;

  - We gained an additional seven minutes of advertising cycle time from each of the regional distributors we acquired between January 1, 2006 and December 31, 2006; and

  - The increase in the average selling price was largely due to increased demand in our Tier II cities, while the average selling price of our advertising services in our Tier I cities increased between these two periods.

- *In–store network* .  Advertising service revenue from our in–store network, which commenced operations in April 2005, totaled $26.9 million in 2006. We expect the contribution to our total revenues from our in–store network to increase in the near future.

- *Poster frame network.*  We generated $40.9 million in net revenues from our poster frame network in 2006. We commenced operation of our poster frame network in 2006 following our acquisition of Framedia.

*Mobile handset advertising network.*  We generated $10.1 million in net revenues from our mobile handset advertising network in 2006. We commenced operations of this network in May 2006.

Other revenues increased from $1.3 million in 2005 to $1.9 million in 2006, primarily from license fees that we received from our overseas franchise companies. By the end of 2006, we granted licenses to approximately 10 overseas franchise companies using the Focus Media brand in operating local LCD advertising networks in India, Malaysia, Indonesia, the Philippines, the Gulf Cooperation Council region (including Saudi Arabia), Hong Kong, Taiwan and Singapore.

**Cost of Revenues.**  Our cost of revenues increased significantly from $26.7 million in 2005 to $81.4 million in 2006 due to increases in our net advertising service cost for our commercial location network, our in–store network and two new business lines: our poster frame network and mobile handset advertising network.

*Net Advertising Service Cost — Digital Out–of–home Advertising Network.*  Our net advertising service cost for our digital out–of–home advertising network increased significantly from $25.7 million in 2005 to $74.6 million in 2006, primarily as a result of substantial growth in the size of our commercial location network and in–store network as well as costs associated with our poster frame network following our acquisition of Framedia.

- *Net advertising service cost — commercial location network.*  Our net advertising service cost for our commercial location network increased substantially from $18.3 million in 2005 to $42.8 million in 2006. This increase was due to the substantial increase in our advertising service business on our commercial location network between these two periods. Our location costs increased substantially from $11.3 million in 2005 to $25.8 million in 2006 due to a substantial increase in the number of commercial locations where we entered into display placement agreements. Our rental fees increased as a percentage of total revenues

79

**Table of Contents**

between these two periods as a result of (1) a significant increase in the number of locations in our commercial location network, including those previously operated by Target Media; and (2) average increased rental payments for the renewal of display placement agreements in the more desirable locations on our commercial location network. Flat–panel display depreciation costs increased from $3.4 million in 2005 to $9.2 million in 2006, as a result of an increase in the number of flat–panel displays we own and operate directly from 45,049 as of December 31, 2005 to 80,623 as of December 31, 2006 and to our acquisition of Target Media and 3 regional distributors during this period. Other cost of revenues related to net advertising service cost increased from $3.2 million in 2005 to $6.1 million in 2006 as a result of (1) increase in number of personnel responsible for monitoring the network following the acquisition of Target Media; (2) an increase in the volume of CF cards we purchased even as the per–unit cost of CF cards decreased and (3) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and monitoring our network.

- *Net advertising service cost — in–store network.* We began incurring net advertising service cost relating to our in–store network in April 2005 when we launched our in–store network. We incurred $18.1 million in net advertising service cost for our in–store network in 2006, consisting of location costs of $12.7 million and depreciation costs relating to the installation and maintenance of our in–store network amounting to $3.5 million.

- *Net advertising service cost — poster frame network.* We began incurring net advertising service cost relating to our poster frame network in 2006 following our acquisition of Framedia. We incurred $13.6 million in net advertising service cost for our poster frame network in 2006, consisting primarily of frame costs and depreciation costs relating to the installation and maintenance of the poster frames.

- *Net advertising service cost — mobile handset advertising network.* We began incurring net advertising service cost relating to our mobile handset advertising network in 2006 following our acquisition of Dotad, now known as Focus Media Wireless. We incurred $6.1 million in net advertising service cost for our mobile handset advertising network in 2006, primarily consisting of message costs charged by mobile network providers

- *Other cost.* We incurred net advertising equipment costs of $975,747 in 2005 compared to $764,959 in 2006, which decrease reflects the fact that we have acquired many of our fastest–growing regional distributors. We expect net advertising equipment costs to continue to decrease.

**Gross Profit.** As a result of the foregoing, our gross profit increased from $41.5 million in 2005 to $130.5 million in 2006 and our overall gross margin increased during the same period from 60.8% to 61.6%. The increase in our gross margin was due to a combination of the continuous increase in the sell–out rate and cost optimization.

**Operating Expenses.** Our operating expenses increased significantly from $18.7 million in 2005 to $50.1 million in 2006. This increase was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business.

- *General and Administrative.* General and administrative expenses increased substantially from $9.1 million in 2005 to $25.7 million in 2006 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as well as accounting and administrative costs related to being a public company. In addition, in connection with the options granted to our directors, employees and consultants since July 2004, we recorded stock–based compensation of $6.1 million in 2006 following the adoption of SFAS No. 123 (revised 2005), *"Share–Based Payment"*.

- *Selling and Marketing.* Selling and marketing expenses increased substantially from $9.6 million in 2005 to $25.8 million in 2006 due to increases in marketing and promotional expenses by our sales force and in salary and benefits associated with the expansion of our sales force.

**Income from Operations.** As a result of the foregoing, we had income from operations of $22.8 million in 2005 compared to $80.4 million in 2006.

Table of Contents

***Income Before Income Taxes and Minority Interest.***  Income before income taxes and minority interest was $24.4 million in 2005 compared to $84.3 million in 2006.

- *Interest Income, net.*  Interest income, net of interest expenses increased from 1.8 million in 2005 to $4.3 million in 2006. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations and proceeds from our follow−on offerings.

- *Other Expense, net.*  We recorded net other expense of $161,148 in 2005 compared to other income of $287,539, in 2006.

- *Income Taxes.*  Our income taxes were $694,453 in 2005 compared to $1,043,538 in 2006.

- *Minority Interests.*  We had minority interests expense of $144,433 and $104,773 in 2005 and 2006, respectively, in connection with the pro rata income attributable to minority shareholders of our subsidiaries.

***Net Income.***  As a result of the foregoing, we recorded net income of $83.2 million in 2006 compared to net income of $23.5 million in 2005.

### Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

***Total Revenues.***  Our total revenues increased substantially from $29.2 million in 2004 to $68.2 million in 2005 due to an increase in our advertising service revenue which was partially offset by a decrease in advertising equipment revenue.

Our total advertising service revenue increased significantly from $26.3 million in 2004 to $66.9 million in 2005.

*Digital out−of−home advertising network.*  Advertising service revenue from our digital out−of−home advertising network, which in 2004 and 2005 consisted of only our commercial location network, increased significantly from $26.3 million in 2004 to $61.4 million, including $7.2 million to related parties in 2005. The increase in advertising service revenue for our commercial location network is attributable to:

- Increased acceptance of our network among our advertising clients, which we believe is primarily due to the increased coverage and effectiveness of our network that grew from 15,415 flat−panel displays as of December 31, 2004 to 48,226 displays as of December 31, 2005, including our regional distributors;

- Our network reach increased from 34 cities as of December 31, 2004, including 11 cities directly operated by our company and 23 cities operated by our regional distributors, to 58 cities as of December 31, 2005, including 26 cities directly operated by our company and 32 cities operated by our regional distributors;

- We gained an additional seven minutes of advertising cycle time from each of our regional distributors after we acquired them between January 1, 2005 and December 31, 2005; and

- On July 1, 2005, we extended the cycle time in our directly operated Tier II cities from nine minutes to twelve minutes.

The decrease in the average selling price was largely due to growth in sales of advertising services with lower selling prices in our Tier II cities, while the average selling price of our advertising services in our Tier I cities increased between these two periods.

*In−store network.*  Advertising service revenue from our in−store network, which commenced operations in April 2005, totaled $5.5 million in 2005. We expect the contribution to our total revenues from our in−store network to increase in the near future.

Our advertising equipment revenue decreased from $2.9 million in 2004 to $1.3 million in 2005. This decrease was primarily attributable to our acquisition of a number of our regional distributors during 2004 and 2005 because, following each acquisition, we no longer sell flat−panel displays to each former regional distributor. This decrease was also partially attributable to decreased sales to our existing regional distributors, as the initial installation of the network in their respective cities of operation was largely completed in 2004 and the first quarter of 2005. We

81

**Table of Contents**

expect advertising equipment revenue to remain stable or decrease over time as we continue to acquire our existing regional distributors and as the most desirable cities for the establishment of similar networks by regional distributors become saturated.

**Cost of Revenues.**  Our cost of revenues increased significantly from $8.7 million in 2004 to $26.7 million in 2005 due to increases in our net advertising service cost for our commercial location network and our in–store network and in our net advertising equipment cost.

- *Net advertising service cost.*  Our net advertising services cost for our digital out–of–home advertising network which during 2004 and 2005 consisted only of commercial location network, increased substantially from $6.8 million in 2004 to $18.3 million in 2005. This increase was due to the substantial increase in our advertising service business on our commercial location network between these two periods. Our location costs increased substantially from $4.6 million in 2004 to $11.3 million in 2005 due to a substantial increase in the number of commercial locations where we entered into display placement agreements. Our rental fees increased as a percentage of total revenues between these two periods as a result of (1) a significant increase in the number of locations in our commercial location network (2) increased rental payments for the renewal of display placement agreements in the more desirable locations on our commercial location network offset in part by lower rental payments paid for new locations in our commercial location network because of a further reduction in the number of available desirable locations that command more expensive rental fees. Flat–panel display depreciation costs increased from $774,375 in 2004 to $3.4 million in 2005, as a result of an increase in the number of flat–panel displays we own and operate directly from 12,786 as of December 31, 2004 to 45,049 as of December 31, 2005 and to our acquisition of 14 regional distributors during this period. Other cost of revenues related to net advertising service cost increased from $1.4 million in 2004 to $3.2 million in 2005 as a result of (1) an increase in the volume of CF cards we purchased even as the per–unit cost of CF cards decreased and (2) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and monitoring our network.

- *Net advertising service cost — in–store network.*  We began incurring net advertising service cost relating to our in–store network in April 2005 when we launched our in–store network. We incurred $7.4 million in net advertising service cost for our in–store network in 2005, consisting of location costs and depreciation costs relating to the installation and maintenance of our in–store network.

- *Net advertising equipment cost.*  We incurred net advertising equipment costs of $1.9 million in 2004 compared to $975,747 in 2005, which decrease reflects the fact that we have acquired many of our fastest–growing regional distributors. We expect net advertising equipment costs to continue to decrease.

**Gross Profit.**  As a result of the foregoing, our gross profit increased from $20.5 million in 2004 to $41.5 million in 2005 although our overall gross margin decreased during the same period from 70.0% to 60.8%. The decrease in our gross margin was largely a result of increased rental payments, including fixed initial payments, to stores and depreciation incurred as we launched our in–store network.

**Operating Expenses.**  Our operating expenses increased significantly from $7.5 million in 2004 to $18.7 million in 2005. This increase was primarily due to increases in our business tax, our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, such as salaries and costs associated with preparing to become a publicly listed company.

- *General and Administrative.*  General and administrative expenses increased substantially from $4.0 million in 2004 to $9.1 million in 2005 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as well as accounting and administrative costs relating to being a public company. In addition, in connection with the options granted to our directors, employees and consultants since July 2004, we recorded stock based compensation of $683,186 in 2005.

- *Selling and Marketing.*  Selling and marketing expenses increased substantially from $3.5 million in 2004 to $9.6 million in 2005 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force.

*Income from Operations.* As a result of the foregoing, we had income from operations of $13.0 million in 2004 compared to $22.8 million in 2005.

*Income Before Income Taxes and Minority Interest.* Income before income taxes and minority interest was $1.3 million in 2004 compared to $24.4 million in 2005, which included interest income and other income (expenses) and change in fair value of series B convertible redeemable preferred shares in 2004.

- *Interest Income, net.* Interest income increased from $9,739 in 2004 to $1.8 million in 2005. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations, sales of our preference shares and proceeds from our initial public offering.

- *Other Expense, net.* We recorded net other expense of $3,843 in 2004 compared to other expense of $161,148 in 2005.

- *Change in Fair Value of Series B Convertible Redeemable Preferred Shares.* We incurred a change in fair value of series B convertible redeemable preferred shares of $11.7 million in 2004. Upon the occurrence of our initial public offering in July 2005, all outstanding preference shares were converted into ordinary shares, and accordingly we did not incur any change in fair value of series B convertible redeemable preferred shares in 2005.

- *Income Taxes.* Our income taxes were $907,550 in 2004 compared to $694,453 in 2005, which decrease resulted from the fact that in 2005, we derived most of our revenue from Focus Media Advertising Agency, which had no tax liability during this period, whereas during 2004, we derived most of our revenues from Focus Media Advertisement, which had tax liability.

- *Minority Interest.* We had minority interest income of $13,516 and minority interest expense of $144,433 in 2004 and 2005, respectively, in connection with the pro rata income attributable to minority shareholders of four of our subsidiaries.

*Net Income.* As a result of the foregoing, we recorded net income of $23.5 million in 2005 compared to net income of $372,752 in 2004.

## Liquidity and Capital Resources

### Cash Flows and Working Capital

To date, we have financed our operations primarily through cash generated from operating activities and sales of equity in private and public transactions. As of June 30, 2007, we had approximately $187.6 million in cash and cash equivalents. As we have expanded our network, entered into a large number of display placement agreements, increased our acquisition of regional distributors and related businesses, and made strategic acquisitions, our cash needs for such acquisitions, the purchase of flat–panel displays, payment of our location and maintenance costs and employee costs increased significantly and accounted for the net cash used in investing activities. Our cash and cash equivalents primarily consist of cash on hand and liquid investments with original maturities of three months or less that are deposited with banks and other financial institutions. We generally deposit our excess cash in interest bearing bank accounts. Although we consolidate the results of our PRC operating affiliates in our consolidated financial statements and we can utilize their cash and cash equivalents in our operations through our PRC operating affiliates, we do not have direct access to the cash and cash equivalents or future earnings of our PRC operating affiliates. However, these cash balances can be utilized by us for our normal operations pursuant to our agreements with our PRC operating affiliates that provide us with effective control over our PRC operating affiliates. In addition, we have access to the cash flows of Focus Media Advertisement and its subsidiaries through contractual arrangements with our subsidiaries Focus Media Technology and Focus Media Digital, which provide technical and other services in exchange for fees. See "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries".

We expect to require cash in order to fund our ongoing business needs, particularly the location costs connected with the placement of our television displays, to fund the ongoing expansion of our network and for payments in connection with our acquisitions. Other possible cash needs may include the upgrading of technology

Table of Contents

on our network as well as any payment of claims that could be made against us. We have not encountered any difficulties in meeting our current cash needs.

The following table shows our cash flows with respect to operating activities, investing activities and financing activities in 2004, 2005 and 2006 and for the six months ended June 30, 2006 and 2007:

|  | For The Year Ended December 31, | | | For the Six Months Ended June 30, | |
|  | 2004 | 2005 | 2006 | 2006 | 2007 |
| --- | --- | --- | --- | --- | --- |
|  | (In thousands of U.S. dollars) | | | | |
| Net cash provided by operating activities | $ 4,045 | $ 11,269 | $ 93,355 | $ 17,393 | $ 56,568 |
| Net cash (used) in investing activities | (11,070) | (117,667) | (121,994) | (98,668) | (158,126) |
| Net cash provided by financing activities | 28,978 | 119,169 | 153,521 | 167,476 | 116,583 |
| Net increase in cash and cash equivalent | 21,953 | 13,984 | 127,958 | 86,031 | 22,981 |

We had net cash provided by operating activities of $4.0 million, $11.3 million, $93.4 million and $56.6 million for 2004, 2005, 2006 and six months ended June 30, 2007, respectively. This was primarily attributable to net income generated from the operation of our advertising network, and adjusted by share–based compensation expense, minority interests, depreciation and amortization expenses, bad debt provision expenses, and change in current assets and liabilities.

We had net cash used in investing activities of $158.1 million for the six months ended June 30, 2007, primarily in connection with the acquisition of companies, including Allyes, prepayments made to acquire certain companies engaged in poster frame advertising business, mobile handset advertising business, outdoor billboards advertising business and Internet advertising services business, purchase of equipment used to expand our networks, and rental deposits paid for locations on our out–of–home television, poster frame and outdoor LED billboard networks. Our acquisition of Allyes involved our payment of $70.0 million in cash and issuance of $154.3 million of our ordinary shares to the seller parties at a fixed value of $7.726 per ordinary share. We had net cash used in investing activities of $122.0 million in 2006, primarily in connection with the acquisition of companies, including Target Media and Focus Media Wireless, subsidiaries and regional distributors, purchase of equipment used to expand our networks, and rental deposits paid for locations on our out–of–home television, poster frame and outdoor LED billboard networks. Our acquisition of Framedia involved our payment of $39.6 million in cash and issuance of $55.4 million of our ordinary shares to the seller parties at a fixed value of $2.456 per ordinary share. In addition, in connection with the earn–out payment for Framedia, we issued an additional 35,830,619 Focus Media ordinary shares, at a fair value of $6.639 per ordinary share, to the seller parties in 2007. Pursuant to the share purchase agreement we entered into with E–Times and Skyvantage, we paid the seller parties $5.0 million. We also paid $94.0 million in cash and issued 77 million ordinary shares to the shareholders of Target Media. The issuance of such additional ordinary shares will also result in lower earnings per share or per ADS when we calculate our earnings for 2007 than would otherwise be the case were such additional shares not issued. We had net cash used in investing activities of $117.7 million in 2005, primarily in connection with the acquisition of companies, subsidiaries and regional distributors, purchase of equipment used to expand our commercial location and in–store networks, and rental deposits paid for locations on both our commercial location and in–store networks. We had net cash used in investing activities of $11.1 million in 2004. This was primarily attributable to our purchase of property and equipment for the operation of our network, rental deposits made in connection with our display placement agreements and our acquisition of eleven businesses, eight of which were our former regional distributors.

We had net cash provided by financing activities of $116.6 million for the six months ended June 30, 2007, primarily from the proceeds of $115.0 million, net of issuance costs, from our follow–on offering in January 2007. $153.5 million net cash was provided by financing activities in 2006, primarily from the proceeds of $142.7 million, net of issuance costs, from our follow–on offerings. $119.2 million net cash was provided by financing activities in 2005, primarily from the proceeds of our initial public offering in July 2005. We had net cash provided by financing activities of $29.0 million in 2004. This was attributable to the proceeds from the issuance of our Series B and Series C–2 convertible redeemable preference shares, offset slightly by the repayment of a short–term loan from one of our shareholders.

Table of Contents

We believe that our current cash and cash equivalents, cash flow from operations and the proceeds from our recent follow−on offerings will be sufficient to meet our anticipated cash needs, including for working capital and capital expenditures, for the foreseeable future. These additional cash needs may include costs associated with the expansion of our network, such as the purchase of flat−panel displays, LED digital billboards, digital poster frames and increased location cost, including in connection with our acquisitions of business and regional distributors. We are also required under PRC law to set aside 10% of our after−tax profits into a general reserve fund. We expect that revenues from operation of our advertising network and the proceeds from our offerings will be sufficient to cover any such obligations and costs. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell debt securities or additional equity securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities could result in additional dilution to our shareholders. The incurrence of indebtedness would result in debt service obligations and could result in operating and financial covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

From time to time, we evaluate possible investments, acquisitions or divestments and may, if a suitable opportunity arises, make an investment or acquisition or conduct a divestment.

**Contractual Obligations and Commercial Commitments**

The following table sets forth our contractual obligations and commitments with definitive payment terms on a consolidated basis which will require significant cash outlays in the future as of December 31, 2006.

| | | Payments Due December 31 | | | | |
|---|---|---|---|---|---|---|
| | **Total** | **2007** | **2008** | **2009** | **2010** | **Thereafter** |
| Display and poster frame placement agreement obligations | $ 107,242 | $ 46,186 | $ 31,363 | $ 19,098 | $ 8,683 | $ 1,912 |
| Office premise lease obligations | 4,198 | 1,971 | 1,153 | 773 | 251 | 50 |
| Total contractual obligations | $ 111,440 | $ 48,157 | $ 32,516 | $ 19,871 | $ 8,934 | $ 1,962 |

Other than certain leasing arrangements relating to the placement of our flat−panel and office premises, as of December 31, 2006, we did not have any long−term debt obligations, operating lease obligations or purchase obligations.

As of December 31, 2006, we had no other indebtedness, material contingent liabilities, or material mortgages or liens. We intend to meet our future funding needs primarily through net cash provided from operating activities and the proceeds of this offering. Our objective is to maintain the safety and liquidity of our cash. Therefore we intend to keep our cash and cash equivalents in short−term bank deposits and short−term bonds.

By June 30, 2007, the Group completed several business acquisitions in which the considerations were partially or fully contingent on future earnings targets for the one to three years ended from the respective dates of acquisition. The aggregate contingent consideration is estimated by management to be approximately $292.5 million, of which $42.8 million has been paid out as deposit for acquisition of subsidiaries. The rest of the payment is contingent on future earnings targets over the next one to four fiscal years.

**Capital Expenditures**

The following table sets forth our historical capital expenditures for the periods indicated. Actual future capital expenditures may differ from the amounts indicated below.

| | For The Year Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | (In thousands of U.S. dollars) | | | |
| Total capital expenditures | $ 6,373 | $ 36,765 | $ 22,878 | $ 11,608 | $ 25,265 |

85

**Table of Contents**

Our capital expenditures were made primarily to acquire flat–panel displays for our advertising network. Our capital expenditures are primarily funded by net cash provided from operating activities. We expect our capital expenditures in 2007, in an amount of approximately \$40.0 million, to primarily consist of purchases of components for our flat–panel displays and new digital poster frames as we continue to expand our commercial location network and in–store network and expand and upgrade our poster frame network. We also intend to upgrade our financial, accounting systems and internal control systems. As opportunities arise, we may make additional acquisitions of regional distributors and other businesses that complement our operations. We believe that we will be able to fund these upgrades and equipment purchases through the revenues we generate, and do not anticipate that these obligations will have a material impact on our liquidity needs.

**Foreign Exchange**

We maintain our accounts in Renminbi and substantially all of our revenues and expenses are denominated in Renminbi, while we report our financial results in U.S. dollars. Fluctuations in exchange rates, primarily those involving the U.S. dollar against the Renminbi, may affect our reported operating results in U.S. dollar terms. In addition, we will receive the proceeds of this offering in U.S. dollars and changes in the U.S. dollar/Renminbi exchange rate could affect the buying power of those proceeds. Under the current foreign exchange system in the PRC, our operations in the PRC may not be able to hedge effectively against currency risk, including any possible future Renminbi devaluation. Moreover, due to the recent devaluation of the U.S. dollar against the Euro and several other currencies, the PRC government recently revised its decade–old policy of pegging the value of the Renminbi to the U.S. dollar. As of July 21, 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it will be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on July 21, 2005 the Renminbi was revalued against the U.S. dollar to approximately RMB 8.11 to the U.S. dollar, representing an upward revaluation of 2.1% of the Renminbi against the U.S. dollar, as compared to the exchange rate on the previous day. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

**Restricted Net Assets**

Relevant PRC laws and regulations permit payments of dividends by our PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, our PRC subsidiaries and our affiliated PRC entities are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2005 and 2006, the amount of our restricted net assets was approximately \$75.9 million and \$223.4 million, respectively.

**Off–Balance Sheet Commitments and Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. In addition, we have not entered into any derivative contracts that are indexed to our own shares and classified as shareholder's equity, or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. Moreover, we do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**Quantitative and Qualitative Disclosures About Market Risk**

*Interest Rate Risk*

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest–bearing bank deposits. We have not used derivative financial instruments in our investment portfolio. Interest earning instruments carry a degree of interest rate risk. We have not been exposed nor do we

Table of Contents

anticipate being exposed to material risks due to changes in market interest rates. However, our future interest income may fall short of expectations due to changes in market interest rates.

*Foreign Currency Risk*

Substantially all our revenues and expenses are denominated in Renminbi. We have not had any material foreign exchange gains or losses. Although in general, our exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will be affected by the foreign exchange rate between U.S. dollars relative to the Renminbi because the value of our business is effectively denominated in Renminbi, while the ADSs will be traded in U.S. dollars. Furthermore, a decline in the value of the Renminbi could reduce the U.S. dollar equivalent of the value of the earnings from, and our investments in, our subsidiaries and PRC–incorporated affiliates in China. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our reported financial results in U.S. dollar terms. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

**Inflation**

In recent years, China has not experienced significant inflation, and thus inflation has not had a significant effect on our business historically. According to the National Bureau of Statistics of China, the change in the Consumer Price Index in China was 0.7%, (0.8)%, 1.2%, 3.9%, 1.8% and 1.5% in 2001, 2002, 2003, 2004, 2005 and 2006, respectively.

**Table of Contents**

## BUSINESS

### Overview

We are China's leading multi–platform digital media company, operate the largest out–of–home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat–panel television displays in our network, and also are a leading provider of Internet marketing solutions in China. It is our goal to create the largest multi–platform digital advertising network in China, reaching urban consumers at strategic locations and point–of–interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of June 30, 2007, our out–of–home advertising network consists of our digital out–of–home advertising network, our mobile handset advertising network and our Internet advertising services network:

*Our Digital Out–of–home Advertising Network* which focuses on providing out–of–home advertising through LCD flat–panel televisions displays, LED billboards, movie screens, and poster and digital frames, includes our commercial location network, in–store network and poster frame network:

- *our commercial location network*, consisting of:

  - *our LCD display network*, which refers to our network of flat–panel television displays placed in high–traffic areas of commercial and public buildings marketed to advertisers as a network or as seven separate channels targeting different types of consumers — our premier A and B office building channels, travel, fashion, elite, IT mall and healthcare channels;

  - *our outdoor LED billboard network*, which refers to our network of leased 5' x 5' LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai; and

  - *our movie theater advertising network*, which refers to our right to sell advertising time on movie screens for the three minutes prior to movie screenings at movie theaters in China.

- *our in–store network*, which refers to our network of flat–panel television displays placed in specific product areas inside stores with high–traffic concentrations such as selected consumer product sections, the main aisles and check–out lines in large–scale chain retail stores, or hypermarkets, as well as inside selected supermarkets and convenience stores; and

- *our poster frame network*, which refers to our network of traditional and digital advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

*Our Mobile Handset Advertising Network*, which refers to our mobile handset advertising services using wireless access protocol or WAP, short messaging service, or SMS, and mixed messaging services, or MMS, offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

*Our Internet Advertising Services Network*, which refers to our Internet advertising agency and advertising services technology, including performance–based software suites.

We derive revenue principally by:

- selling advertising time slots on our out–of–home television networks, which include our commercial location network and our in–store network;

- by selling frame space on our poster and digital frame network;

- selling advertisements on our mobile handset advertising network; and

- providing advertising agency and technology services and software for online advertising.

Table of Contents

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times throughout a day. Advertisements on our outdoor LED billboard network are broadcast repeatedly approximately 120 times throughout a day.

Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. Our advertising posters include both traditional printed posters as well as digital LCD poster frames with integrated sound, all–angle and remote control technologies. Generally two or three advertising poster frames can be placed in each elevator.

Advertisements on our mobile phone advertising network are advertisements that are sent to mobile phone users over China Mobile and China Unicom's networks.

Our Internet advertising services network, which we acquired through our acquisition of Allyes in March 2007, uses proprietary software applications to provide online ad publishing, creative production, tracking, targeting, and performance analysis. We also provide performance–based online advertising services providing advertisers with pay by CPA (cost–per–action), directly link advertising cost with performance. Our Internet advertising services network has integrated advertising resources from over 5,000 popular websites, making it the largest performance–based online advertising network in China.

As of December 31, 2006, over 4,000 advertisers purchased advertising time on our advertising networks. Our five largest advertising clients in terms of revenue, which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006.

Our network has the following key features:

- Substantially all of the content we broadcast or place on our digital out–of–home advertising network consists of advertisements.

- The advertising cycle on our commercial location network consists of advertising content broadcast repeatedly approximately 60 times per day, approximately 120 times per day in the case of our outdoor LED network, and is sold to advertising clients according to advertising packages purchased from us, and for three minutes before the screening of each showing of a film in the case of our movie theater advertising network.

- The advertising cycle of our out–of–home television advertising networks is broadcast repeatedly for approximately twelve–hours per day.

- The majority of our flat–panel displays contain a 17–inch LCD screen, while the remainder contain larger size plasma or LCD screens.

- Over 160,000 450 mm x 600 mm advertising poster frames, including, as of August 31, 2007, approximately 7,000 digital poster frames have been installed in elevators on our poster frame network.

- Approximately 200 5' x 5' LED digital billboards that we lease from a third party and that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

- A mobile handset advertising platform that delivers approximately eight million messages per day with a customer base of over 100 wireless value–added service providers in China and a database of over 70 million mobile handset users with SMS, MMS or WAP capability.

- An Internet advertising services network that offers performance–based advertising services and Internet advertising publishing software suites.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of June 30, 2007, we operated our commercial location network directly in over fifty major cities throughout China, including Beijing, Shanghai, Guangzhou and Shenzhen. As of June 30, 2007, we covered approximately 40 additional cities through contractual arrangements with regional distributors. Between January 1, 2005 and June 30, 2007, the number of displays in our commercial location network increased from 15,415 to 89,687. As of June 30, 2007, our outdoor LED billboard network consisted of approximately 200

Table of Contents

leased 5' x 5' digital billboards placed along curbsides in high−pedestrian traffic areas in Shanghai. We had installed over 161,435 advertising poster frames and our in−store network consisted of 41,322 flat−panel displays placed in 3,995 store locations in our directly operated cities, including 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores.

The following table sets forth operating data related to our network for the periods indicated:

| | For and as of the Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 | March 31, 2007 | June 30, 2007 |
| **Commercial location network:** | | | | | | | | | |
| Number of displays: | | | | | | | | | |
| Our direct cities | 20,267 | 34,079 | 45,049 | 71,230 | 69,446 | 68,723 | 80,263 | 83,256 | 85,010 |
| Our regional distributors(1) | 2,664 | 3,273 | 3,177 | 3,779 | 3,712 | 5,290 | 5,197 | 4,010 | 4,677 |
| Total | 22,931 | 37,352 | 48,226 | 75,009 | 73,158 | 74,013 | 85,460 | 87,296 | 89,687 |
| **In-store network:** | | | | | | | | | |
| Number of displays in our in− store network | 12,779 | 20,061 | 27,849 | 33,765 | 35,511 | 36,387 | 38,742 | 40,736 | 41,322 |
| Number of stores in our in-store network | 1,835 | 2,702 | 4,130 | 5,218 | 4,174 | 3,894 | 3,898 | 3,935 | 3,995 |
| **Poster Frame Network:** | | | | | | | | | |
| Number of frames installed in our poster frame network | — | — | — | 74,353 | 82,200 | 95,878 | 99,784 | 124,542 | 161,435 |
| **Frame slot data:** | | | | | | | | | |
| Number of frame slots available for sale | — | — | — | 208,659 | 243,959 | 267,603 | 294,294 | 195,603 | 161,435 |

(1)  Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

**Our Competitive Strengths**

We believe we have the following competitive strengths:

*Effective and Focused Advertising Network Accepted by Both Advertisers and Consumers.*

Since commencing our current business operations in May 2003, we have created an advertising network that:

- *Targets Segmented Consumer Groups.*  Our flat−panel displays, LED billboards and poster frames are primarily placed in venues that have a high concentration of consumers with higher−than−average disposable incomes or that have a high concentration of consumers who are likely to be interested in particular types of products and services. As a result, our network enables advertisers to target consumers with demographic profiles attractive to them. Moreover, our network allows advertisers to further segment these consumers through separate specified advertising channels, such as our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels, which are marketed as stand−alone channels of our commercial location network. Because our network is able to target specific consumer groups, it allows advertisers to more cost−effectively reach consumers with demographic profiles desirable to them.

- *Reaches Captive Viewers in Low Distraction Environments.*  Our displays are placed in lobbies, near elevator banks, in elevators, on high−traffic urban curbsides and in other environments where there are few broadcast or display media competing for viewers' attention, which we believe increases the effectiveness of our network.

- *Tailored Advertising Solutions.*  Through the various media platforms and specialized channels on our network, we are able to offer tailored advertising solutions to our customers to enable them to target the consumers and locations that are most important to them. For example, we are increasingly providing custom advertising packages to our customers that focus exclusively on a certain suite of buildings, networks and channels accordingly to their requests and needs.

Table of Contents

We believe these characteristics and advantages of our business model have made us an effective and well–accepted alternative advertising medium with a strong market position that enables us to compete successfully in China's advertising market.

***The Largest Digital Out–of–home Advertising Network in China with Nationwide Coverage.***

We believe we operate the largest digital out–of–home advertising network in China based on the number of locations and the number of displays in our network. As of June 30, 2007, we operated:

- 85,010 flat–panel displays installed in over 90 cities in China, and through our regional distributors, we also operated approximately 4,677 flat–panel displays in approximately 40 cities in China;

- 41,322 flat–panel displays installed in 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores in cities in China; and

- 161,435 poster frames available for sale installed in elevators primarily in residential buildings. As of August 31, 2007, our poster frame network also included 6,796 digital poster frames;

- over 200 5' by 5' LED digital billboards placed in high pedestrian traffic outdoor locations in Shanghai; and

- the right to broadcast advertising on movie theater screens for three minutes prior to the screening of each movie in major cities in China.

***Out–of–home Advertising Network with Multiple Media Platforms Provides Advertisers with Complementary and Reinforcing Avenues to Reach Targeted Consumers.***

Our network provides advertisers with multiple advertising media to reach their target audience. Our network currently enables advertisers to reach (1) consumers with higher than average incomes through our commercial location network, (2) consumers at the point–of–purchase through our in–store network, (3) consumers as they leave and return home through our poster frame network, (4) mobile handsets users throughout the day via our mobile handset advertising network, (5) urban consumers throughout the day via our strategically placed outdoor LED billboards in shopping and high pedestrian traffic areas in Shanghai and (6) internet users through our performance–based Internet advertising services and software suites. By offering advertisers a range of advertising media that can reach consumers during different times of the day in a wide variety of locations, we believe our network has enhanced appeal to advertisers over competitors who offer limited advertising media or channels to advertisers. We believe that by offering multiple advertising media platforms, we enable advertisers to reach a wide range of consumers with complementary and mutually reinforcing advertising campaigns and are better able to attract advertisers who want to reach targeted consumer groups through a number of different advertising media in different venues and at different times of the day.

***Sustainable Competitive Advantages through the Size of Our Network and Our Exclusive, Renewable Agreements.***

We believe the following factors provide us with a sustainable business advantage over existing and prospective competitors:

- *Early Market Presence and Coverage in Many of the Most Desirable Locations.* We were one of the first companies to establish a large–scale out–of–home television advertising network in commercial buildings and other commercial locations in China. By recognizing this market opportunity and entering this sector early, we have occupied many of the most desirable locations and have grown the size of our network, which we believe has created high barriers to entry for potential competitors. We believe that we have secured a high percentage of the most desirable locations in many of China's major urban centers, and that this early mover advantage is important because landlords and building managers typically permit only one out–of–home television advertising network operation in each building. We believe that, through our acquisition of Target Media, we have enhanced these advantages. Through our acquisition of Framedia, we also have gained a strong market presence in the poster frame advertising market in residential complexes. We also believe we have established the first outdoor LED digital billboard advertising network in China, currently

Table of Contents

comprising over 200 5' x 5' LED digital billboards placed in high pedestrian traffic outdoor locations in Shanghai that we lease from a third–party location provider.

- *Large–scale Network that Attracts Advertising Clients.* Our multi–platform out–of–home advertising network includes flat–panel displays located in a wide range of commercial, retail locations and in–store locations in over 90 cities in China, poster frames placed in residential complexes in cities in China, LED digital billboards placed in high pedestrian curbside locations in Shanghai, and advertising services provided to mobile handset users. We believe the extent of our network coverage makes us more attractive to advertising clients than competing networks. Through the number of advertising media platforms we operate and the national scope of our network, we enable advertising clients to reach a wide audience in urban consumer markets across China. We believe the size and scope of our network has attained a scale that draws advertising clients to our network and gives us a competitive edge over competing networks as well as over many traditional advertising media.

- *Exclusive and Renewable Display Placement Agreements.* As of June 30, 2007, the majority of our display placement agreements on our out–of–home television advertising networks give us the exclusive right to place our flat–panel displays in the elevator and lobby areas of the locations in which we operate and, in the cities we operate directly, give us the right to renew the contract under terms that are no less favorable than those offered by competing bidders, enabling us to maintain exclusive coverage of many of the most desirable locations in our network for significant lengths of time.

We believe our high market share of desirable locations in key cities in China, the wide extent of our network coverage and the exclusivity and renewal terms contained in the majority of our display placement agreements with landlords and property managers create higher barriers to entry for potential competitors than other out–of–home and outdoor advertising business models.

### Our Brand Name And Reputation Have Attracted A Large Base Of Leading Advertising Clients.

We believe we have established a well recognized brand name in the advertising industry in China by developing a reputation for innovative and effective delivery of large–scale yet focused high–quality advertising to consumers with desirable demographic profiles. This has enabled us to develop a strong client base consisting of major international and brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 10.1% of our revenue in 2006. All of our top ten advertisers based on total advertising contracts in 2005 had entered into advertising contracts with us in 2006. Moreover, the total contract amount accounted for by our top ten advertisers increased by approximately 123.5% from 2005 to 2006. In addition, as of December 31, 2006, more than 4,000 advertisers purchased advertising time on our out–of–home television display networks. The strength and depth of our client base enhance our reputation in the industry and position us to further expand our advertising network.

We believe our acquisitions of Framedia, Focus Media Wireless and Allyes have further enhanced our brand name as a leading digital media company in China.

### Strong Management and Sales Team with Extensive Industry Experience.

We have assembled a management and sales team with extensive experience in China's advertising industry. Jason Nanchun Jiang, our founder, chairman, chief executive officer and a principal shareholder, has over 10 years of experience in China's advertising industry, including his previous experience until 2003 as chief executive officer of Shanghai Everease Advertising Corporation, or Everease. Daniel Wu, our chief financial officer, has over six years of experience in investment banking, including for Merrill Lynch and Lehman Brothers, and served as chief financial officer of Harbour Networks, a telecommunications equipment provider in China. In August 2005, we hired our chief operating officer Cindy Chan, who was deputy general manager for iMPACT, ZenithOptimedia's outdoor media department and the largest outdoor media buyer in China. With our acquisition of Framedia, Zhi Tan, who was chairman and chief executive officer of Framedia and now serves as our president and director. Following our acquisition of Target Media, David Yu, the founder and former chairman and chief executive officer of Target Media, continues to act as co–chairman. Following our acquisition of Allyes, David Zhu, the founder, chairman and

Table of Contents

chief executive officer of Allyes, had added his entrepreneurial and management expertise and remains on as chief executive officer of Allyes. In addition, we employ experienced and knowledgeable managers to run operations in each of the cities we operate directly. Our marketing managers have many years of experience in the advertising industry in China and have worked for a number of major domestic and international advertising firms in China. We believe the strength, experience and diverse background of our management and sales teams have enabled us to expand our advertising network, enhance our reputation in our industry and build up a strong client base.

## Our Strategies

Our objective is to become the number one multi–platform digital media company in China. We intend to achieve this objective by implementing the following strategies:

### Enhance Our Market Position and Revenues by Expanding Our Networks.

We intend to aggressively expand our out–of–home digital media networks in order to erect barriers to expansion and entry by current and prospective competitors, enhance critical mass appeal to our advertisers, and increase our fee rates and revenues. To achieve this goal, we intend to increase the number of locations, flat–panel television displays, poster frames and LED billboards in our network. We intend to aggressively enter into new display and poster frame placement agreements to increase the number of locations in which we install our flat–panel television displays and poster frames in order to enhance our current position in many of the most desirable locations in key urban areas in China.

### Identify And Create New Networks and Advertising Channels that Target Specific Consumer Demographics and Expand Network Capacity.

*In–store Network.* We commenced commercial operations of our in–store network in April 2005, enabling our advertising clients to target consumers at the time and place where consumers are likely to purchase a range of consumer and household products. As of June 30, 2007, we had placed 41,322 flat–panel displays in 3,995 locations on our in–store network. We intend to expand this network and will continue to strengthen efforts to enter into long–term and exclusive relationships with hypermarkets, supermarkets and convenience stores and to market this service to advertisers.

*Targeted Advertising Channels.* We have placed flat–panel television displays in office buildings, shopping malls, restaurants, beauty parlors, golf country clubs, automobile repair shops, banks, pharmacies, airports, hospitals and other commercial locations. As many of these venues are suitable for targeting specific consumer groups, we have begun to separate some of them into distinct stand–alone networks and to market them to specific advertising clients who wish to advertise their products and services to targeted consumer groups. Currently, our premier A and B office building, travel, fashion, elite, IT mall and healthcare channels are marketed as independent channels of our commercial location network, as we believe these channels are attractive to a diverse range of advertisers who wish to target consumers likely to frequent these venues. We believe our ability to identify and create focused advertising networks distinguishes us from our competitors and attracts additional advertising clients who will use our services to reach their target consumers in a more effective manner.

*Complementary Advertising Media Platforms.* We intend to continue expanding the scope of our advertising activities and type of media platforms we employ by entering into new types of advertising media businesses, such as large–size outdoor LED digital billboards, telecommunications channels such as Focus Media Wireless, and online opportunities such as Allyes. We believe by expanding our business into complementary media businesses that focus on venues and at periods of the day less comprehensively covered by traditional advertising media, we will enhance the value of our advertising services to advertisers and provide us with a competitive advantage over existing and potential competitors. We intend to continue expanding into new and complementary advertising media platforms, which will enable us to provide advertisers with additional advertising platforms to reach targeted consumers.

93

**Table of Contents**

***Promote Our Brand Name and Augment Our Service Offerings to Attract a Wider Client Base and Increase Revenues.***

Enhancing our brand name in the industry will allow us to solidify and broaden our client base by enhancing market awareness of our services and our ability to target discrete consumer groups more effectively than mass media. We believe the low cost of reaching consumers with higher–than–average disposable incomes through our network and our development of additional advertising media platforms and channels within our network we plan to develop in the future can enable advertisers to reach that goal. As we increase our advertising client base and increase sales, demand for and sale of time slots and frame space on our network will grow.

***Continue to Explore New Digital Media Opportunities to Target Segmented Consumer Groups.***

Consumer acceptance of technology–driven advertising and entertainment media, including the Internet and advanced mobile communications systems, is a feature of the advertising industry in China. We intend to identify and take advantage of new opportunities in the PRC advertising market in order to enhance our ability to target segmented consumer groups through innovative advertising techniques and media. As new opportunities that fit our brand image, business model and strategy present themselves, we expect to expand our operations and continue to pursue innovative advertising techniques and media that provide effective solutions to advertising clients and target consumers with desirable demographic profiles as we have already done with our acquisitions of Focus Media Wireless and Allyes.

**Our Network**

Our network includes:

- *our digital out–of–home advertising network*, including our commercial location network (LCD display, outdoor LED billboard and movie theater advertising networks), in–store network and poster frame network;

- *our mobile handset advertising network*; and

- *our Internet advertising services network*.

**Digital Out–of–home Advertising Networks**

*Commercial Location Network*

*LCD display network.* The majority of displays on our LCD display network are currently placed in high–traffic areas of commercial office buildings. The locations in our LCD display network also include shopping malls, banks and hotels as well as more specialized locations such as hospitals, beauty parlors and golf country clubs. We market our LCD display network to advertisers of consumer products and services, such as automobiles, home electronics, mobile communications devices and services, cosmetics, health products and financial services. As of June 30, 2007, our LCD display network, including the portions of our LCD display network operated by our regional distributors, was comprised of approximately 89,687 flat–panel displays placed in over 90 cities throughout China. We operate our LCD display network directly in approximately 50 cities and indirectly through contractual arrangements with regional distributors in approximately 40 additional cities. We have established joint ventures in several cities outside of mainland China, including Hong Kong, Taipei and Singapore through contracts with local operators which operate local commercial location networks and which license our brand name. None of these arrangements outside of China currently constitutes a material part of our business.

As we expand the number of venues in our LCD display network, we continue to separate certain types of venues into distinct stand–alone channels of this network. As of June 30, 2007, we had established seven such stand–alone channels that are marketed as separate focused channels of our LCD display network: our premier office building A and B, travel, fashion, elite, IT mall and healthcare channels. We believe that by increasingly offering new advertising channels on our out–of–home television networks, we will be able to offer advertisers more targeted and effective audience reach, thereby enabling us to increase our advertising rates.

Expanding our network through regional distributors enables us to provide our advertisers with broader nationwide coverage and to test, develop and evaluate these regional advertising markets without our having to

94

**Table of Contents**

incur start–up and ongoing expenses at the early stages of their development. We also seek to acquire our regional distributors when we believe it is more likely for us to benefit economically from the full integration of their operations into our network. We do not have the contractual right to purchase our regional distributors, and any such acquisition must be negotiated with each regional distributor separately.

Each of our regional distributors operates independently from us and is responsible for independently complying with all relevant PRC laws and regulations including those related to advertising. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content. See "Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

*Outdoor LED billboard network.*  In April 2006, we commenced operations of an outdoor LED billboard network consisting of 5' x 5' LED digital billboards that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai. Full–color audiovisual commercials are displayed on the digital billboards in a repeating six–minute cycle. The commercials displayed on the LED billboards are highly visible even during bright daylight. As of June 30, 2007, the number of the LED billboards in our street–side outdoor LED billboard network in prime commercial and shopping areas reached approximately 200. We market this part of our network under the name "iStreet Network".

*Movie theater advertising network.*  We operate our movie theater advertising network by leasing screen time from movie theaters in cities in China. We then sell this leased screen time as time slots to advertisers. We have the right to three minutes of screen time prior to the screening of each movie shown in the theater.

### In–store Network

As part of our growth strategy, we commenced operations of our in–store network in April 2005. As of June 30, 2007, we had placed 41,322 flat–panel displays in 1,205 hypermarkets, 734 supermarkets and 2,056 convenience stores throughout China. We believe the rapid expansion of hypermarkets and other chain retail stores in China provides opportunities and incentives for advertisers to take advantage of in–store television advertising networks such as our in–store network. Our in–store network primarily attracts advertisers of food and beverage products, household, kitchen and bathroom products, and household appliances.

### Poster Frame Network

We own and operate a network of traditional and digital advertising poster frames deployed primarily in the elevators and public areas of residential complexes under the brand name "Framedia". We place two or three advertising frames in each elevator in which we lease space and sell frame space to advertising clients on a per frame basis for periods of two weeks or longer. As of June 30, 2007, we had installed 161,435 poster frames including 6,796 digital poster frames in cities throughout China. Our digital frames use high–resolution LCD displays with integrated sound, all–angle viewing and remote control technologies. We believe the new media format provides a more effective advertising media to our advertising customers.

## Mobile Handset Advertising Network

Through Focus Media Wireless, we operate an advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. Focus Media Wireless delivers SMS–, MMS– and WAP–based advertisements to mobile handset users accessed through service providers in China. Focus Media Wireless receives a fee from advertisers for delivering advertisements and pays mobile service providers a fee for accessing their networks. It also sells advertising to other mobile handset service providers and to traditional advertisers. As of June 30, 2007, Focus Media Wireless had accumulated a database of over 70 million mobile handset users with SMS, MMS or WAP capability to whom it can deliver advertisements, based on which Focus Media Wireless is able to deliver advertisements tailored to the users' consumer preferences based on information in the database such as a user's historical purchases, handset model and other indicative data.

Table of Contents

**Internet Advertising Services Network**

In March 2007, we completed the acquisition of 100% of the equity interests in Allyes. Allyes is a leading Internet advertising agency and provider of Internet advertising technology in China. Its proprietary software application suite, 'AdForward', which covers all aspects of online ad publishing, creative production, tracking, targeting, and performance analysis, is used by independent commercial websites and ad agencies in China. Based on the significant number of Internet advertising campaigns it has executed since its inception in 2000, its widely–used Internet application software and its unique tracking technology, Allyes has accumulated a large database of Internet viewers, segmented based on individual behavior. Allyes initiated the performance–based online advertising model in China. Its advertising network, 'SmartTrade', allows advertisers to pay by CPA (cost–per–action), and directly links advertising cost with performance. SmartTrade has integrated advertising resources from over 5,000 popular websites, making it one of the largest performance–based online advertising networks in China, and generating over 300 million daily impressions as of June 30, 2007. We have also expanded our Internet services network through acquisitions such as our purchase in July 2007 of a 70% equity stake in Beijing Wonder Advertising Company Ltd., also known as WonderAd.

*Advertising Clients, Sales and Marketing*

*Our Advertising Clients.* The quality and coverage of our network has attracted a broad base of international and domestic advertising clients. As of December 31, 2006, more than 4,000 advertisers purchased advertising time slots on our out–of–home television networks. Our advertising clients include leading international and domestic brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which were our five largest customers and together accounted for 10.1% of our total revenues in 2006. Our top ten customers in 2006 accounted for 22.2% of our total revenues in that year.

No single advertising client accounted for more than 4% of our revenues in 2006. We believe the appeal and effectiveness of our advertising network is largely evidenced by the number of advertising clients who place multiple advertising campaigns on our network, which is reflected in the percentage increase of advertising fees we receive from clients over time.

*Sales.* We employ an experienced advertising sales force in each city in which we operate. We provide in–house education and training to our sales force to ensure they provide our current and prospective clients with comprehensive information about our services, the advantages of using our advertising networks as marketing channels, and relevant information regarding the advertising industry. Our sales team is organized by city, industry and client accounts. We also market our advertising services from time to time by placing advertisements on third–party media, including primarily magazines and Internet websites. We maintain separate sales teams for our poster frame network, our mobile handset advertising network and our Internet advertising services network. We have begun engaging in cross–selling initiatives to enable existing and potential advertising clients to take advantage of our multi–platform advertising network.

*Advertising Contracts.* We offer advertisers five–, fifteen– or thirty–second time slots on our out–of–home television advertising networks, including our commercial location, in–store, outdoor LED billboard and movie theater advertising networks. For our commercial location network, our standard advertising package includes a time slot on our entire network or a particular channel in each city in which the advertiser wishes to display the advertisement. For our movie theater advertising network, time slots are sold on a regional or entire network basis. Our sales are made pursuant to written contracts with commitments ranging from one week to several months. Our advertising rates vary by city and by the number of cities in which the advertisement is placed, as well as by the length of the time slot purchased and the duration of the advertising campaign. We generally require our clients to submit advertising content at least seven days prior to the campaign start date. We also reserve the right to refuse to disseminate advertisements that are not in compliance with content requirements under PRC laws and regulations.

Advertising contracts for our in–store network, outdoor LED billboard network and movie theater advertising network are substantially similar to those used for our commercial location network. Advertising clients generally purchase time slots on our in–store network on a chain–by–chain basis, while time slots on the outdoor LED billboard network cover the entire network and contracts on our movie theater advertising network are done on regional or entire network basis.

Table of Contents

For our poster frame network, advertising clients purchase frame space on a per–frame basis for terms of two weeks or more. For our mobile handset advertising network, our contracts agree to deliver advertising messages to mobile devices based on specific selection criteria set by the advertisers. For our Internet advertising services network, we provide Internet advertising solutions for advertisers tailored to their needs.

*Network Monitoring and Evaluation.*  We provide a number of services in connection with each client's advertising campaign following the sales process. Our network operations team monitors the displays in our network on a daily basis. They are also responsible for compiling reports that are supplied under some of our agreements to clients as evidence of the broadcast of their advertisements on our network. The report generally includes a list of buildings where our client's advertisements were broadcast as well as photographs of representative television displays showing their advertisements being displayed. The advertising campaign reports are provided to our clients for information purposes and do not constitute a customer acceptance provision. The reports we provide to our clients may also contain portions prepared by independent third–party research companies that verify the proper functioning of our flat–panel displays and the proper dissemination of the advertisement, by conducting on–site evaluations and polls to analyze the effectiveness of and public reaction to the advertisement.

Aside from third–party verification services, we and our regional distributors conduct substantially all client services using our own employees or the employees of the relevant regional distributor. In Beijing and Guangzhou, we contract some of these services to third–party agents. These agents provide us with network development, installation, maintenance, monitoring and reporting services.

*Market Research.*  We believe our advertising clients derive substantial value from our ability to provide advertising services targeted at specific segments of consumer markets. Market research is an important part of evaluating the effectiveness and value of our business to advertisers. We conduct market research, consumer surveys, demographic analysis and other advertising industry research for internal use to evaluate new and existing advertising channels. We also purchase or commission studies containing relevant market study data from reputable third–party market research firms, such as Nielsen Media Research, CTR Market Research and Sinomonitor. Our acquisition of iResearch Consulting Co., Ltd. in September 2007 has also provided us with enhanced in–house market research capabilities. iResearch is a market research company focusing on the Internet and new media industries in urban areas of China. We typically consult such studies to assist us in evaluating the effectiveness of our network to our advertisers. A number of these studies contain research on the numbers and socio–economic and demographic profiles of the people who visit the locations of our network.

## Programming

Substantially all of the content on our digital out–of–home advertising networks consists of audiovisual television advertising provided to us by our advertising clients. We also provide a limited amount of time for landlords and property managers to display location–specific information, building announcements and related promotional material on our network. We do not produce or create any of the advertising content shown on our network, except our own marketing content. All of the advertising content displayed on the portion of the network we operate directly is reviewed by qualified members of our staff to ensure compliance with PRC laws and regulations, while our agreements with our regional distributors require each of them to review the contents shown on the portion of the network they operate for compliance with PRC laws and regulations. See "Regulation of Our Industry — Regulation of Advertising Services — Advertising Content".

Advertisements on our poster frame network consist of full–color glossy advertising posters designed and provided by our advertising clients.

## Pricing

For information regarding factors affecting our pricing, refer to "Factors that Affect Our Advertising Service Revenue" in "Management's Discussion and Analysis of Financial Condition and Results of Operation".

**Table of Contents**

*Relationships with Location Providers*

We install our flat–panel displays in selected spaces we lease in office buildings and other commercial locations, hypermarkets, supermarkets and convenience stores. We install our advertising poster frames in elevators and other public areas in residential complexes. Establishing and maintaining long–term relationships with landlords and property managers is a critical aspect of our business. We employ a team of location relationship personnel in each city in which we operate directly who are responsible for identifying desirable locations, negotiating display and frame placement agreements and engaging in ongoing site placement relations.

In addition to helping us expand our network, our location relationship personnel ensure that the needs and concerns of landlords and property managers are being met and addressed effectively and on a timely basis. These concerns generally include ensuring that the flat–panel displays are properly installed and are in proper working condition. We undertake to landlords and property managers in our network to maintain the proper operation of our flat–panel displays. We generally rely on our own employees to install, maintain, monitor and repair our flat–panel displays and advertising poster frames. Each of our flat–panel displays is inspected at least once daily.

We enter into display placement agreements with individual landlords, property managers, hotels, shopping malls and chain store companies under which we generally pay a fixed annual rent in exchange for the right to display advertising and commercial media in lobby and elevator areas in the case of our commercial location network and in specific product areas in the major aisles and near check–out counters in hypermarkets, supermarkets and convenience stores in the case of our in–store network. In Beijing and Guangzhou, we contract a portion of the location development, monitoring and maintenance work to local agents. We attempt to maintain terms favorable to our network operations in our display placement agreements, such as long–term leases and exclusivity provisions. We are not reliant on any one landlord or property manager for a material portion of our network coverage and as of June 30, 2007, no individual landlord or property manager accounted for more than 1% of the locations in our commercial location network. As hypermarkets, supermarkets and convenience stores have control over multiple locations, a smaller number of display placement agreements and contractual arrangements account for a larger percentage of our in–store network coverage.

We believe that landlords and property managers generally do not view us as a major source of revenue and are instead primarily attracted to our flat–panel displays as an innovative and visually pleasing medium that complements their public areas and that provides an engaging means of conveying building–related information to their tenants. In connection with certain of our display placement agreements, we agree to provide concessions and services, such as displaying building–related notifications, publicity and other information provided by the landlord or property manager or granting time slots to the landlord or property manager for their own promotional purposes.

Our display placement agreements have initial terms ranging anywhere from one to ten years. As of June 30, 2007, we had the right under the majority of our display placement agreements to renew the display placement agreements provided that the terms offered by us are no less favorable than those offered by competing bidders. The rental terms and fees under our display placement agreements vary considerably depending on the city, location of the building, size of the building and number of flat–panel displays that may be installed. Under our display placement agreements, we retain ownership of the flat–panel displays.

We enter into similar frame placement agreements for the deployment of our advertising poster frames in elevators and public areas of residential complexes and commercial buildings. The majority of our frame placement agreements have terms of two to three years, and contain exclusivity and best offer renewal rights.

**Technology and Suppliers**

Out–of–home television advertising is a relatively new advertising medium that owes its development in large part to the emergence of new technologies, such as low–cost, light–weight, flat–panel television displays and compact storage technology. The primary hardware required for the operation of our business consists of components that comprise the flat–panel displays we use in our advertising network. We also develop and install software in our flat–panel displays to assist us with the configuration, editing and operation of our advertising content cycles. Maintaining a steady supply of our proprietary flat–panel displays is important to our operations and the growth of our advertising network.

Table of Contents

We design the distinctive shape of our flat–panel displays, identify suppliers of component parts used in our displays and contract the assembly of our flat–panel displays to third–party contract assemblers. Our contract assemblers are responsible for purchasing the component parts from suppliers we identify each month and assembling the flat–panel displays according to our specifications using components purchased in off–the–shelf form from wholesale distributors. We select component suppliers based on price and quality. As there are many qualified alternative suppliers for our equipment, our obligation to our current contract assemblers is not exclusive. We have never experienced any material delay or interruption in the supply of our flat–panel displays.

Our services provided through Allyes use proprietary ad serving solutions that assist advertisers, advertising agencies and web publishers in creating and delivering Internet ads, monitoring and analyzing website traffic, tracking the performance of advertising campaigns and implementing direct marketing. Most of the Allyes software applications, from Internet marketing technologies to the applications that operate our servers, are proprietary and were developed in–house by Allyes' research and development team.

### Research and Development

We intend to continue to develop a more advanced model of flat–panel display that uses mobile communications and wireless technology to receive, store, configure and play back advertising content. Whether or not we deploy this newer technology will depend upon cost and network security. We are also developing related software systems that will enable us to configure and run the content on our advertising network in conjunction with mobile communications systems. We also continue to develop proprietary software and systems in connection with the operation of and provision of services through our online advertising services business through Allyes.

### Patents and Trademarks

We believe that the value of our advertising network derives from its effectiveness in reaching a large number of consumers with higher–than–average disposable incomes in urban areas. To a great extent, our business model does not rely on advanced or sophisticated technology or on proprietary trade secrets because our flat–panel displays are assembled with components purchased in off–the–shelf form from wholesale distributors. We endeavor to protect certain of the designs and operating software we use in each generation of our flat–panel displays. We currently hold design patents for our new model of flat–panel display and our software. We have the right to use several trademarks relating to the "Focus Media" brand name in China and in Singapore. We also have the right to use several trademarks relating to the "Framedia" brand name in China. Following our acquisition of Allyes, we also acquired all of its intellectual property including that held by its subsidiaries and affiliates.

We do not know if our trademark applications will lead to registered trademarks with the scope of the goods and services we seek, if at all, or whether any trademark we have registered or may receive registration in the future will be challenged or invalidated. See Risk Factor on "Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may adversely affect our business." We have also obtained copyright registration for a number of our software. We will continue to assess appropriate occasions for seeking trademark, copyright and other intellectual property protections for those aspects of our business that we believe provide significant competitive advantages.

The technology developed by Allyes enables us to collect and use data derived from user activity on the Internet. Although we believe that we have the right to use this information and to compile it in our databases, we cannot assure you that any trade secret, copyright or other protection will be available for this information. In addition, our clients and other parties may claim rights to this information.

### Competition

We compete with other advertising companies in China including companies that operate out–of–home or telecommunications–based advertising media networks, such as JCDecaux, ClearMedia, WPP and CGEN. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, wireless telecommunications, street furniture, billboard, frame and

99

**Table of Contents**

public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

**Employees**

As of June 30, 2007, we had a total of 4,445 full–time employees and no part–time employees. The following table sets out the number of staff by business area as of June 30, 2007:

|  | Number of Employees(1) | Percentage |
|---|---|---|
| Sales and marketing | 1,250 | 28.1% |
| Operations | 2,112 | 47.5% |
| Management and administration | 1,083 | 24.4% |
| Total number of employees | 4,445 | 100% |

(1)  This excludes employees our regional distributors and agents who are not directly under our employ.

As required by PRC regulations, we participate in various employee benefit plans that are organized by municipal and provincial governments, including pension, work–related injury benefits, maternity insurance, medical and unemployment benefit plans. We are required under PRC law to make contributions to the employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date.

Generally we enter into a three–year standard employment contract with our officers and managers and a one–year standard employment contract with other employees. According to these contracts, all of our employees are prohibited from engaging in any activities that compete with our business during the period of their employment with us. Furthermore, the employment contracts with officers or managers include a covenant that prohibits officers or managers from engaging in any activities that compete with our business for two years after the period of their employment with us.

**Facilities**

We currently maintain our headquarters at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China. We also have offices in more than 50 other cities including those operated by our regional distributors.

**Legal Proceedings**

On March 16, 2006, Shanghai Xicheng Cultural Dissemination Co., Ltd., also referred to as CGEN, brought a suit against us in Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. CGEN, which is developing a network of flat–panel displays in hypermarkets and supermarkets, claims to have established an exclusive business relationship with the Hymart chain of supermarkets in Shanghai. Hymart notified us that it had requested in writing to terminate its relationship with CGEN. In CGEN's pleadings, it alleges that Focus Media encouraged and supported Hymart to allegedly violate its agreement with CGEN, resulting in losses to CGEN. In its pleadings, CGEN has requested that the court order Focus Media to cease any alleged unfair competitive behavior, to undo the effects of any alleged unfair competition and to pay RMB 13,570,920 (US\$1.7 million) to CGEN. On July 25, 2007, we received the civil judgment of first instance by the Shanghai No. 1 Intermediate People's Court which issued a ruling dismissing the case. CGEN has appealed that ruling. We intend to defend against CGEN's claims to the fullest extent of the law. However, there can be no assurance that we will prevail in any such litigation. We believe the outcome of this suit, even if adversely determined, will not have a material adverse effect on our business or results of operations.

Except as disclosed above, we are not currently a party to any material legal proceeding. From time to time, we may be subject to various claims and legal actions arising in the ordinary course of business.

Table of Contents

## OUR RECENT SIGNIFICANT ACQUISITIONS

**Allyes**

In March 2007, we completed the acquisition of Allyes Information Technology Company Limited, and its wholly–owned PRC subsidiaries New Allyes Information Technology (Shanghai) Co., Ltd. and Allyes Information Technology (Shanghai) Co., Ltd. and their affiliated PRC operating companies. David Zhu, the founder, former chairman and chief executive officer of Allyes, signed an employment agreement with Focus Media and remains as the chief executive officer of Allyes.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the actual Allyes Share Purchase Agreement.

*Purchase Price.* We paid the selling shareholders of Allyes $70 million in cash and 19,969,080 Focus Media ordinary shares upon closing in March 2007. In addition, if Allyes's audited annual net income for the twelve month period ending March 31, 2008 is greater than $9 million, we will issue our ordinary shares to the Allyes selling shareholders equal in value to 25 times the amount by which Allyes's audited annual net income for such twelve month period exceeds $9 million, up to a maximum amount not to exceed $75 million in our ordinary shares, based upon a fixed price per ordinary share of $7.726. Fifty percent of the ordinary shares received by the Allyes selling shareholders at the first closing are locked up for 180 days from March 28, 2007, with the remaining ordinary shares locked up until 365 days from March 28, 2007. The ordinary shares to be received in connection with the earn out, if any, will not be subject to any lock–up.

*Representations and Warranties.* In the share purchase agreement, the Allyes selling shareholders made customary representations and warranties to us, which generally survive for a period of fifteen months following the closing date. However, a number of specified representations and warranties survive for longer periods. We made customary representations and warranties to the Allyes selling shareholders, which survive for a period of one year following the closing date.

*Covenants.* The definitive share purchase agreement includes customary covenants relating to, among other things, the conducting of the business in the ordinary course prior to closing, notification of certain matters, confidentiality, non–compete agreements for key employees, treatment of related party accounts and preparation of financial statements.

*Indemnification.* The management shareholders have agreed to indemnify us for damages resulting from any breach of any representation or warranty, covenant or other agreement made by the management shareholders in the share purchase agreement, including but not limited to losses arising out of materially inaccurate disclosures made in Allyes's financial statements; losses arising out of failure to report any material changes in Allyes or its affiliates; losses arising out of failure to adequately disclose terms of any material contracts of Allyes or its affiliates; and losses arising out of any tax or legal liabilities.

The non–management shareholders have also agreed to indemnify us for damages resulting from any breach of any representation or warranty, covenant or other agreement made by the non–management shareholders in the share purchase agreement.

The Allyes selling shareholders collectively shall not be liable to indemnify losses greater than the aggregate consideration of the share purchase agreement, and each selling shareholder is only liable up to the product of (x) the amount of his percentage equity interest in the company prior to the closing multiplied by (y) the aggregate consideration of the share purchase agreement. The Allyes selling shareholders are not obligated to indemnify our losses until and unless such losses exceed $1 million. If our losses exceed $1 million, the Allyes selling shareholders are liable for all amounts including the first $1 million. Management shareholders will be jointly and severally liable. Non–management shareholders will be severally but not jointly liable.

We have agreed to indemnify the Allyes selling shareholders for damages resulting from any breach of any representation or warranty, covenant or other agreement of ours in the share purchase agreement. Our indemnification obligations are capped at the aggregate consideration of the share purchase agreement.

Table of Contents

Amounts of losses are subject to insurance recoveries and other mitigating circumstances. Indemnification payments may be made in–kind with Focus Media ordinary shares received under the share purchase agreement.

Under the terms of the transaction, we also granted certain registration rights to the former shareholders of Allyes. See "Shares Eligible for Future Sale".

### Control Over Allyes

New Allyes Technology, which is our wholly–owned indirect subsidiary, entered into a series of agreements with the Allyes operating affiliates and their current respective shareholders that provide us with effective control over the Allyes operating affiliates while enabling the Allyes business to be consolidated with Allyes Information Technology Company Limited, which is our wholly–owned direct subsidiary. See "Our Corporate Structure" and "Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders".

## Framedia

On January 1, 2006, we completed the acquisition of Infoachieve Limited, and its affiliate Framedia Advertisement by purchasing 100% of the shares of Infoachieve from Total Team, through which the former shareholders held their respective interests in Infoachieve. Framedia installs and deploys advertising poster frames mainly inside elevators and throughout the public areas of residential complexes in major cities in China and sells frame space to advertising clients.

### Share Purchase Agreement

On October 15, 2005, we entered into a share purchase agreement to acquire the business of Infoachieve, its subsidiary and affiliated PRC entities, by purchasing 100% of the shares in Infoachieve from Total Team. Infoachieve, Total Team and its shareholders are referred to as the seller parties below.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement.

*Structure.* We acquired 100% of the shares of Infoachieve, which controls its affiliates Framedia Advertisement, New Structure Advertisement and Guangdong Framedia through contractual relationships with Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their shareholders. Under the share purchase agreement, we gain control of Framedia Advertisement, New Structure Advertisement and Guangdong Framedia by gaining the right (i) to appoint their equity holders and (ii) to take over the contractual arrangements among Infoachieve, Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their equity holders.

*Purchase Price.* On December 15, 2005, we paid the shareholders of Infoachieve $39.6 million in cash. At the closing on January 1, 2006, we also issued to the former shareholders of Infoachieve 19,306,840 of our ordinary shares. We also issued 2,850,163 of our ordinary shares to Total Team in consideration for their cancellation of the share option plan of Infoachieve prior to our acquisition of it. In March 2007, we issued an additional 35,830,619 of our ordinary shares, to Total Team as part of the purchase consideration. All shares issued to Total Team in connection with our acquisition of Framedia were valued at a fixed price of $2.456 per share and locked up for a specified period of time.

*Representations and Warranties.* In the share purchase agreement, the seller parties made customary representations and warranties to us, which representations and warranties survive for a period of two years following the closing date, and we made customary representations and warranties to the seller parties, which representations and warranties survive for a period of six months following the closing date.

*Covenants.* The share purchase agreement also includes customary covenants relating to, among other things, notification of certain matters, access to information, public announcements, non–competition of certain persons, treatment of related party accounts, agreement to pay back or cancel all outstanding loans of Framedia, and preparation of financial accounts.

Table of Contents

*Voting Rights.*  Under the terms of the share purchase agreement, after we issue shares to Total Team on behalf of the seller parties, each of the shareholders of Total Team is required to exercise their voting rights in Focus Media's shares independently of each other and Total Team's authorized representative is required to solicit a proxy statement from each shareholder indicating how the votes to which each shareholder is entitled should be voted. In the event a shareholder does not provide a proxy, the shareholder will be deemed to have abstained and Total Team will not be entitled to cast such votes.

*Indemnification.*  The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement. The seller parties' indemnification obligation is limited to the total consideration we are to pay to them. If the seller parties indemnify us using our common shares, the value of such shares shall be the value of the shares when any indemnified losses become payable. If the seller parties' lock–up agreements are still in effect at such time, they may dispose of only those shares that cover the amount of the indemnified losses.

We have agreed to indemnify the seller parties for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Our indemnification obligation is limited to the total consideration (excluding any earnout payment) to be paid to the seller parties.

### Control Over Framedia

We have entered into a series of agreements with Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and its current shareholders and New Structure Advertisement that provide us with effective control over Framedia Advertisement, Guangdong Framedia and New Structure Advertisement while enabling the Framedia business to be consolidated with Infoachieve. See "Item 4.C Information on Our Company — Organization Structure — Our Corporate Structure and Contractual Arrangements" and " Item 7.B Major Shareholders and Related Party Transactions — Related Party Transactions — Agreements Among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders".

## Target Media

On February 28, 2006, we acquired Target Media, its affiliated PRC entity Shanghai Target Media and its subsidiary Target Multi–Media, by purchasing 100% of the shares of Target Media from its shareholders. Target Media and several of its principal shareholders, including David Feng Yu, its chairman of the board of directors and SII International Holding Limited, are referred to as the seller parties. Collectively, Target Media's shareholders, including The Carlyle Group, are referred to as the Target Media selling shareholders.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement filed as an exhibit to our registration statement.

*Purchase Price.*  We have agreed to pay the shareholders of Target Media US$94 million in cash, subject to a working capital adjustment, and 77 million of our ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of $45 million was paid at closing on February 28, 2006. The second installment of $25 million was paid on April 28, 2006. The final installment of $24 million was paid on July 31, 2006.

*Focus Media Options.*  We also granted options to purchase up to 3,000,000 of our ordinary shares to an agreed upon list of employees of Target Media who entered into new employment agreements with Focus Media.

*Representations and Warranties.*  In the share purchase agreement, the seller parties made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, the Target Media selling shareholders also made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, we made customary representations and warranties to the Target Media selling shareholders,

103

Table of Contents

which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely.

*Covenants.* The definitive share purchase agreement includes customary covenants relating to, among other things, notification of certain matters, public announcements, non–competition of certain persons, treatment of related party accounts and preparation of financial accounts. The share purchase agreement also contains covenants requiring us to enter into employment agreements with key employees of Target Media.

We agreed under the definitive share purchase agreement and the employment agreement with Mr. David Feng Yu to appoint him as co–chairman of the board of directors and president of Focus Media upon the completion of the acquisition. We also agreed to increase our board of directors from five to seven members at closing, and to assist in the nomination and appointment of David Feng Yu, the founder, chairman and chief executive officer of Target Media, and a nominee of David Feng Yu to fill the additional seats at the first annual meeting of our shareholders following the closing. The director nominated by David Feng Yu will qualify as an independent director for the purpose of complying with NASDAQ listing standards and Sarbanes–Oxley Act requirements so that a majority of our board of directors continues to be independent. See "Item 6.A Directors, Senior Management and Employees — Directors and Senior Management". We have also agreed to permit The Carlyle Group to appoint an observer to our board of directors for a limited period of time.

*Indemnification.* The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement; losses arising out of indebtedness of Target Media not reflected in its financial statements; losses arising out of or pursuant to terms of the contracts of Target Media that were not disclosed to us prior to the closing date due to their commercially sensitive nature and those terms are not in the ordinary course of business of Target Media; and certain tax liabilities.

Two Target Media selling shareholders that hold an approximately 49.7% equity interest in Target Media, or collectively, the Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Controlling Target Media Selling Shareholders, respectively, or failure of Target Media or the Controlling Target Media Selling Shareholders to perform their respective obligations under the share purchase agreement. The Target Media selling shareholders other than the Controlling Target Media Selling Shareholders and The Carlyle Group, or collectively, the Non–Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Non–Controlling Target Media Selling Shareholders, respectively, or failure of the Non–Controlling Target Media Selling Shareholders to perform their obligations under the share purchase agreement. The Carlyle Group has agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to The Carlyle Group, or failure of The Carlyle Group to perform its obligations under the share purchase agreement.

The indemnification obligations of all Target Media selling shareholders (excluding The Carlyle Group) are limited to US$80 million, provided that the Controlling Target Media Selling Shareholders shall be responsible for indemnifying us up to $325 million for additional losses arising out of several specified claims, including such contracts not disclosed to us prior to the closing of the acquisition, which contracts contain clauses that are out of ordinary course of Target Media's business. The indemnification obligation of The Carlyle Group is limited to $16.3 million, except for a breach with respect to their ownership of the shares they are selling to us.

For so long as the shares received by Target Media selling shareholders in this acquisition are restricted from sales in the open market by either the lock–up, or securities laws, the Target Media selling shareholders have the right to settle any indemnification obligation by paying us in kind with our ordinary shares, valued at one–tenth of the closing price of our ADSs (each of which represents ten of our ordinary shares) on the business day prior to the payment of such shares.

We have agreed to indemnify the seller parties for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Certain of our indemnification obligations are capped at $39 million, while several specified indemnification obligations of our company are capped at the total consideration to be paid to the selling shareholders.

**Table of Contents**

**REGULATION OF OUR INDUSTRY**

We operate our business in China under a legal regime consisting of the State Council, which is the highest authority of the executive branch of the National People's Congress, and several ministries and agencies under its authority including the SAIC.

China's Advertising Law was promulgated in 1994. In addition, the State Council, SAIC and other ministries and agencies have issued regulations that regulate our business, which are discussed below.

**Limitations on Foreign Ownership in the Advertising Industry**

The principal regulations governing foreign ownership in the advertising industry in China include:

- The Catalogue for Guiding Foreign Investment in Industry (2004); and

- The Administrative Regulations on Foreign–invested Advertising Enterprises (2004).

These regulations require foreign entities that directly invest in the advertising industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been permitted to own directly a 100% interest in advertising companies in China, but such foreign investors are also required to have at least three years of direct operations in the advertising industry outside of China. PRC laws and regulations do not permit the transfer of any approvals, licenses or permits, including business licenses containing a scope of business that permits engaging in the advertising business. In the event we are able to qualify to acquire the equity interest of Focus Media Advertisement under the rules allowing complete foreign ownership, Focus Media Advertisement would continue to exist as the holder of the required advertising license consistent with current regulatory requirements.

Since we have not been involved in advertising outside of China for the required number of years, our domestic PRC operating subsidiaries, which are considered foreign invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through our contractual arrangements with our consolidated affiliated entities in China, including Focus Media Advertisement and its subsidiaries, New Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless and the Allyes operating affiliates. Each of our PRC operating affiliates is currently owned or controlled either by Jason Nanchun Jiang and Jimmy Wei Yu, both of whom are PRC citizens, or by PRC companies owned by them or by us. Our PRC operating affiliates and certain of their respective subsidiaries hold the requisite licenses to provide advertising services in China. We, Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Dotad Technology and New Allyes Technology have entered into a series of contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders under which:

- we are able to exert effective control over our PRC operating affiliates and their respective subsidiaries;

- a substantial portion of the economic benefits of our PRC operating affiliates and their respective subsidiaries will be transferred to us; and

- we have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries that are owned by Focus Media Advertisement or its nominee holders, as well as all or a part of the assets of our PRC operating affiliates, in each case when and to the extent permitted by PRC law.

See "Our Corporate Structure" and "Related Party Transactions".

In the opinion of Global Law Office, our PRC legal counsel,

- the respective ownership structures of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

- the contractual arrangements (i) among Focus Media, Framedia, Focus Media Wireless, Allyes and their respective PRC affiliates, subsidiaries and PRC shareholders, in each case governed by PRC law are valid,

105

Table of Contents

binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

• the PRC business operations of Focus Media, Framedia, Focus Media Wireless, Allyes and their respective affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government determines that the agreements establishing the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in the advertising industry, we could be subject to severe penalties. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties".

**Regulation of Advertising Services**

*Business License for Advertising Companies*

The principal regulations governing advertising businesses in China include:

• The Advertising Law (1994);

• The Advertising Administrative Regulations (1987); and

• The Implementing Rules for the Advertising Administrative Regulations (2004).

These regulations stipulate that companies that engage in advertising activities must obtain from the SAIC or its local branches a business license which specifically includes operating an advertising business within its business scope. Companies conducting advertising activities without such a license may be subject to penalties, including fines, confiscation of advertising income and orders to cease advertising operations. The business license of an advertising company is valid for the duration of its existence, unless the license is suspended or revoked due to a violation of any relevant law or regulation. We do not expect to encounter any difficulties in maintaining our business licenses. Each of Focus Media Advertisement, its subsidiaries and New Focus Media Advertisement has obtained, or in the case of some of our new directly–operated cities, are in the process of obtaining such a business license from the local branches of the SAIC as required by the existing PRC regulations. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content, although it is possible that one or more of our regional distributors may not be in compliance with all PRC regulations at all times. To our knowledge, all of our regional distributors have received, or are in the process of obtaining, the licenses required to operate an advertising business. If we learn that any of our regional distributors are not in compliance with applicable terms and regulations we notify such regional distributors of the need to complete any necessary procedures and to report any developments to us. If a regional distributor fails to complete the steps necessary to receive the required licenses, we will take steps to terminate the contract with such regional distributor. See "Risk Factors — Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

*Advertising Content*

PRC advertising laws and regulations set forth certain content requirements for advertisements in China, which include prohibitions on, among other things, misleading content, superlative wording, socially destabilizing content or content involving obscenities, superstition, violence, discrimination or infringement of the public interest. Advertisements for anesthetic, psychotropic, toxic or radioactive drugs are prohibited. It is prohibited to

**Table of Contents**

disseminate tobacco advertisements via broadcast or print media. It is also prohibited to display tobacco advertisements in any waiting lounge, theater, cinema, conference hall, stadium or other public area. There are also specific restrictions and requirements regarding advertisements that relate to matters such as patented products or processes, pharmaceuticals, medical instruments, agrochemicals, foodstuff, alcohol and cosmetics. In addition, all advertisements relating to pharmaceuticals, medical instruments, agrochemicals and veterinary pharmaceuticals advertised through radio, film, television, newspaper, magazine, out–of–home and other forms of media, together with any other advertisements which are subject to censorship by administrative authorities according to relevant laws and administrative regulations, must be submitted to the relevant administrative authorities for content approval prior to dissemination. We do not believe that advertisements containing content subject to restriction or censorship comprise a material portion of the advertisements shown on our network.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the content of the advertisements they prepare or distribute are true and in full compliance with applicable law. In providing advertising services, advertising operators and advertising distributors must review the prescribed supporting documents provided by advertisers for advertisements and verify that the content of the advertisements comply with applicable PRC laws and regulations. In addition, prior to distributing advertisements for certain commodities which are subject to government censorship and approval, advertising distributors are obligated to ensure that such censorship has been performed and approval has been obtained. Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the SAIC or its local branches may revoke violators' licenses or permits for advertising business operations. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties in the course of their advertising business.

We employ qualified advertising inspectors who are trained to review advertising content for compliance with relevant laws and regulations.

### Outdoor Advertising

The Advertising Law stipulates that the exhibition and display of outdoor advertisements must not:

- utilize traffic safety facilities and traffic signs;

- impede the use of public facilities, traffic safety facilities and traffic signs;

- obstruct commercial and public activities or create an eyesore in urban areas;

- be placed in restrictive areas near government offices, cultural landmarks or historical or scenic sites; and

- be placed in areas prohibited by the local governments from having outdoor advertisements.

In additional to the Advertising Law, the SAIC promulgated the Outdoor Advertising Registration Administrative Regulations on December 8, 1995, as amended on December 3, 1998, which governs the outdoor advertising industry in China.

Outdoor advertisements in China must be registered with the local SAIC before dissemination. The advertising distributors are required to submit a registration application form and other supporting documents for registration. After review and examination, if an application complies with the requirements, the local SAIC will issue an Outdoor Advertising Registration Certificate for such advertisement. The content of the outdoor advertisement must be submitted for filing with the local SAIC.

The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor

107

**Table of Contents**

advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

*Print Advertising*

Following our acquisition of Framedia on January 1, 2006, we also operate a network of advertising poster frames placed primarily in the elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as "normal print advertisements" under the Print Advertisements Administrative Regulations promulgated by the SAIC on January 13, 2000, as amended on November 30, 2004, or the Print Advertisements Regulations. Under these regulations, print advertisements must not be placed in areas prohibited by laws or regulations from posting print advertisements.

**Regulation of Telecommunications Value–added Service Providers**

The Telecommunications Regulations (2000), or the Telecom Regulations, and the Administrative Measures for Telecommunications Business Operating License (2002), or the Telecom License Measures, contain provisions governing providers of telecommunications services, including value–added service providers. The Telecom Regulations categorize all telecommunication services businesses in China as either infrastructure telecommunication services businesses or value–added telecommunication services businesses. The latter category includes SMS, MMS and WAP services. Under the Telecom Regulations, certain services are classified as being of a value–added nature and require the commercial mobile operator of such services to obtain an operating license, including online data processing and transaction processing, call centers and Internet access. The Telecom Regulations also set forth extensive guidelines with respect to different aspects of telecommunications operations in China. Under the Telecom License Measures, an approved value–added telecommunication services provider must conduct its business in accordance with the specifications recorded on its value–added telecommunication services operating license. Under PRC law, it is unclear whether the services offered by Focus Media Wireless should be deemed value–added telecommunication services, which requires an operation permit which has a valid period of five years. Focus Media Wireless has applied for an operation permit for its wireless advertising operations. If Focus Media Wireless is deemed by the PRC regulatory authorities to be providing value–added telecommunication services but an operation permit is not issued or if, once issued, it is revoked or if we are unable to renew its operation permit upon its expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected. See "Risk Factors — Our recent entry into mobile handset and Internet advertising services through our acquisition of Focus Media Wireless and Allyes may expose us to risks associated with operating in the telecommunications and Internet industries in China which could materially affect our financial condition or results of operation".

**Regulation of Foreign Exchange in Certain Onshore and Offshore Transactions**

In January and April 2005, the PRC State Administration of Foreign Exchange, or SAFE, issued two rules that require PRC residents to register with and receive approvals from SAFE in connection with their offshore investment activities. SAFE has announced that the purpose of these regulations is to achieve the proper balance of foreign exchange and the standardization of the cross–border flow of funds.

On October 21, 2005, SAFE issued the Notice on Issues Relating to the Administration of Foreign Exchange in Fund–raising and Reverse Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or Notice 75, which became effective as of November 1, 2005. Notice 75 replaced the two rules issued by SAFE in January and April 2005 mentioned above.

According to Notice 75:

- prior to establishing or assuming control of an offshore company for the purpose of financing that offshore company with assets or equity interests in an onshore enterprise in the PRC, each PRC resident, whether a natural or legal person, must complete the overseas investment foreign exchange registration procedures with the relevant local SAFE branch;

Table of Contents

- an amendment to the registration with the local SAFE branch is required to be filed by any PRC resident that directly or indirectly holds interests in that offshore company upon either (1) the injection of equity interests or assets of an onshore enterprise to the offshore company, or (2) the completion of any overseas fund raising by such offshore company; and

- an amendment to the registration with the local SAFE branch is also required to be filed by such PRC resident when there is any material change involving a change in the capital of the offshore company, such as (1) an increase or decrease in its capital, (2) a transfer or swap of shares, (3) a merger or division, (4) a long term equity or debt investment, or (5) the creation of any security interests over the relevant assets located in China.

Moreover, Notice 75 applies retroactively. As a result, PRC residents who have established or acquired control of offshore companies that have made onshore investments in the PRC in the past are required to complete the relevant overseas investment foreign exchange registration procedures by March 31, 2006. Under the relevant rules, failure to comply with the registration procedures set forth in Notice 75 may result in restrictions being imposed on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliate and the capital inflow from the offshore entity, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

As a Cayman Islands company, and therefore a foreign entity, if Focus Media Holding purchases the assets or equity interest of a PRC company owned by PRC residents in exchange for our equity interests, such PRC residents will be subject to the registration procedures described in Notice 75. Moreover, PRC residents who are beneficial holders of our shares are required to register with SAFE in connection with their investment in us.

As a result of the lack of implementing rules and other uncertainties relating to the interpretation and implementation of Notice 75, we cannot predict how these regulations will affect our business operations or strategies. For example, our present or future PRC subsidiaries' ability to conduct foreign exchange activities, such as remittance of dividends and foreign–currency– denominated borrowings, may be subject to compliance with such SAFE registration requirements by relevant PRC residents, over whom we have no control. In addition, we cannot assure you that any such PRC residents will be able to complete the necessary approval and registration procedures required by the SAFE regulations. We require all the shareholders in Focus Media Holding who are PRC residents to comply with any SAFE registration requirements, but we have no control over either our shareholders or the outcome of such registration procedures. Such uncertainties may restrict our ability to implement our acquisition strategy and adversely affect our business and prospects.

109

**Table of Contents**

**MANAGEMENT**

The following table sets forth certain information relating to our directors and executive officers. The business address of each of our directors and executive officers is 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China.

| Name | Age | Position |
| --- | --- | --- |
| Jason Nanchun Jiang | 34 | Chairman of the Board of Directors and Chief Executive Officer |
| David Feng Yu(1) | 45 | Co–chairman of the Board of Directors |
| Jimmy Wei Yu | 34 | Director |
| Fumin Zhuo(2) | 55 | Director |
| Neil Nanpeng Shen(2) | 39 | Director |
| Charles Chao(2) | 41 | Director |
| Daqing Qi(3) | 43 | Director |
| David Ying Zhang(4) | 34 | Director |
| Zhi Tan | 52 | President and Director |
| Daniel Mingdong Wu | 40 | Chief Financial Officer |
| Diana Congrong Chen | 39 | Chief Operating Officer |
| July Lilin Wang | 35 | Chief Accounting Officer |
| Cindy Yan Chan | 41 | Chief Strategy Officer |
| Ergo Xueyuan Liu | 36 | Vice President — Commercial Location Network |
| Acer Jiawei Zhang | 30 | Vice President — In–store Network |

(1) Mr. Yu was appointed as co–chairman of the board of directors of Focus Media on February 28, 2006 pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

(2) Independent director and a member of our audit committee, compensation committee and nomination committee.

(3) Mr. Qi was appointed as an independent director on February 28, 2006 by the seller parties of Target Media pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

(4) David Ying Zhang was appointed as an independent director on September 28, 2007 by our nominations committee and board of directors in order to restore a majority of independent directors to our board.

*Jason Nanchun Jiang*, our founder, has served as the chairman of our board of directors and our chief executive officer since May 2003. From 1994 to 2003, Mr. Jiang was the chief executive officer of Everease Advertising Corporation. Starting in 2003, Mr. Jiang was general manager of Aiqi Advertising, an advertising company founded by his immediate family members in 1997 which was renamed Focus Media Advertisement in May 2003 in connection with the establishment of our current business operations. In December 2003, Mr. Jiang was selected by China News Publisher's Media magazine as one of the "Media People of the Year". In September 2003, Mr. Jiang was selected by the Television and Newspaper Committees of the China Advertising Commission as one of its "contemporary outstanding advertising media personalities". Mr. Jiang received a Bachelor of Arts degree in Chinese language and literature from Huadong Normal University in 1995.

*David Feng Yu* resigned from his position as president since January 2007 and retains his position as co–chairman of the Board. He has served as co–chairman of our board of directors and as our president since February 28, 2006. From 2003 until February 2006, Mr. Yu was chairman and chief executive Officer of Target Media, which we acquired in February 2006. From 2000 to 2003, Mr. Yu was chief executive offer and the sole beneficial owner of Dian Yang, whose flat panel display advertising business was transferred to Target Media in December 2003. From 1999 to 2000, Mr. Yu was the general manager of Shanghai Yuanye Info Tech Co., Ltd. In May 2005, Mr. Yu was selected by the Advertising Newspaper in China as one of the "Most Influential Advertising

110

Table of Contents

People of the Year." In December 2004, Mr. Yu was selected by China Venture Capital Forum 2004 as one of the "Top 10 Enterprisers of the Year." Mr. Yu received an Executive M.B.A. degree from China Europe International Business School in 2001 and a Master of Arts degree in philosophy from Fudan University in 1991.

*Jimmy Wei Yu* has served as our director since May 2003. Mr. Yu is the chairman and chief executive officer of United Capital Investment (China) limited, the management company of United China Investment Limited and KTB/UCI China Ventures I Limited and UCI China Venture II Limited. Mr. Yu is also the chairman of Shanghai Multimedia Park Venture Capital, a position he has held since 2003. From 1995 to 1999, Mr. Yu served in various capacities in several telecommunications companies, including as chief representative of UTStarcom (Hong Kong) Ltd. He also has been the chief representative of Softbank China Venture capital, which is the management company of SB China Holdings Pte. Ltd.

*Fumin Zhuo* has served as our director since December 2004 and has more than 27 years of experience in investment and corporate management. Mr. Zhuo has also served as a general partner in SIG Capital Limited since July 2005. Prior to this, Mr. Zhuo served as chairman and chief executive officer of Vertex China Investment Company (VCI), a company concentrating in investments in the Greater China region, since he joined the fund in July 2002. From 1995 to July 2002, Mr. Zhuo was chief executive officer of Shanghai Industrial Holding Ltd. and chairman of SIIC Medical Science & Technology (Group). Prior to this, starting in 1987, Mr. Zhuo served as chief assistant officer of the Shanghai Economic System Reform Committee. Mr. Zhuo has extensive experience in venture capital fund formation, mergers and acquisitions, and investment management. Mr. Zhuo graduated from Shanghai Jiaotong University's Electrical Engineering School with a degree in enterprise management and also holds a Master's degree in economics from Fudan University.

*Neil Nanpeng Shen* has served as our director since December 2004. Mr. Shen is the founding managing partner of Sequoia Capital China, or Sequoia China, a China–focused venture capital fund which was established in August 2005. Prior to founding Sequoia China, Mr. Shen was president and chief financial officer of Ctrip.com International Limited, or Ctrip, a Nasdaq–listed online travel services company he co–founded and for which he continues to serve as a director. Prior to founding Ctrip, Mr. Shen worked for more than eight years in the investment banking industry in New York and Hong Kong. He was a director at Deutsche Bank Hong Kong where he worked from 1996 to 1999. Prior to 1996, he worked at Chemical Bank, Lehman Brothers and Citibank in various investment banking positions. Mr. Shen is also co–founder and co–chairman of Home Inns & Hotels Management (Hong Kong) Limited. Mr. Shen received his Master's degree from the School of Management at Yale University and his Bachelor's degree from Shanghai Jiaotong University.

*Charles Chao* was appointed as our director in November 2005 to replace Ted Tak Dee Sun who passed away in September 2005. Mr. Chao is president and chief executive officer of SINA Corporation, an online media company listed on the NASDAQ Global Market. Before he joined SINA Corporation in September 1999, Mr. Chao served as an experienced audit manager with PricewaterhouseCoopers LLP, providing auditing and business consulting services for high tech companies in Silicon Valley, California. Mr. Chao received his master of professional accounting from University of Texas at Austin. He also holds an MA degree in journalism from University of Oklahoma and a BA degree in Journalism from Fudan University in Shanghai, China. Mr. Chao is a certified public accountant and a member of the American Institute of Certified Public Accountants.

*Daqing Qi* was appointed as our director in February 28, 2006 upon the closing of our acquisition of Target Media. Professor Qi is professor of accounting and associate dean of the Cheong Kong Graduate School of Business, where he has taught since 2002. From 1996 until 2002, Professor Qi taught in the School of Accountancy at the Chinese University of Hong Kong. Professor Qi also has extensive experience in providing executive training and consulting services in accounting and corporate finance to government departments and private companies, including the Ministry of Information Industries of the People's Republic of China, the Shanghai Municipal Government, China Mobile, China Unicom, China Telecom, China Netcom, Nokia and Ericsson. Professor Qi also serves on the board of directors of Sohu.com, a Nasdaq–listed company that provides online services in China. Professor Qi holds a B.S. degree in biophysics and a B.A. degree in journalism from Fudan University, an MBA degree from the University of Hawaii Manoa with a concentration in accounting and finance and a Ph.D. degree in accounting from the Eli Broad Graduate School of Management of Michigan State University.

Table of Contents

*David Ying Zhang* was appointed as our director on September 28, 2007. Mr. Zhang is the managing director and head of the Beijing office of WI Harper, a private equity investment fund. Mr. Zhang joined WI Harper in late 2001 in the San Francisco office and moved back to China in early 2003. Prior to joining WI Harper, Mr. Zhang was a senior venture associate with ABN AMRO Capital focusing on the life sciences, information technology, and Internet sectors. Before joining ABN AMRO Capital, Mr. Zhang worked at Salomon Smith Barney. At WI Harper, Mr. Zhang Mr. Zhang has been responsible for investments in a number of companies including Pollex, Cardiva, Celestry Designs, Focus Media and iKang Healthcare. Mr. Zhang was born in Shanghai, grew up in the United States and holds a M.S. degree in biotechnology and business from Northwestern University and a B.S. in biology and chemistry from California State University, San Francisco.

*Zhi Tan* was appointed as our president and director in January 2007. Prior to his appointment as president, Dr. Tan was the senior vice president in charge of the operations of our poster frame network. Dr. Tan was previously the chairman and chief executive officer of Framedia. Dr. Tan has extensive management and operational experience. He served as senior advisor at Tom.com of Hong Kong prior to join Framedia. From 1999 to 2002, he was the chief executive officer of 8848.net Corporation, which was one of the largest online e–commerce organizations in China. Before joining 8848.net, Dr. Tan was deputy general manager for Microsoft China in 1999. Prior to Microsoft, Dr. Tan was senior vice–president for UTStarcom China from 1995 to 1998. He was directly responsible for all aspects of operations for both Microsoft China and UTStarcom China. Dr. Tan received his PhD in Computer Science from Worcester Polytechnic Institute of Massachusetts in 1987 and a B.S. in Computer Engineering from Jilin Industrial University in China in 1980.

*Daniel Mingdong Wu* has served as our chief financial officer since February 2005. Mr. Wu was chief financial officer and a director of Harbour Networks Ltd. from January 2004 until January 2005. Prior to that, Mr. Wu was a partner of Bridgecross Ltd. from 2001 until 2003 and acting chief financial officer of Wi–Comm United Communications Inc. from May 2003 until January 2004. From 2000 until 2001, Mr. Wu was a vice president for technology investment banking at Merrill Lynch (Asia Pacific) Ltd. From 1996 to 2000, Mr. Wu worked in the global communications group of Lehman Brothers Inc. Mr. Wu holds a B.A. degree from the State University of New York at Buffalo and an MBA degree from Columbia Business School.

*Diana Congrong Chen* was appointed as our chief operating officer in November 2006. Ms. Chen joined Focus Media as chief marketing officer in May 2005. Before joining Focus Media, Ms. Chen worked for Phoenix Satellite TV from 1998 to 2004, serving as general manager, director of international advertising and president of East China region. While at Phoenix Satellite TV, Ms. Chen successfully developed business in Zhejiang and East China region and was awarded Best Sales Team for several years. In 2004, Ms. Chen was honored with a Most Outstanding Employee Award by Phoenix Satellite TV. Prior to that, Ms. Chen was the vice president of sales for Tucano Clothing China and office manager for China Animal By–product Import and Export Co. Ms. Chen holds a B.A. degree in journalism from Zhejiang University.

*July Lilin Wang* joined Focus Media as chief accounting officer in April 2005. Prior to joining Focus Media, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office from April 2004 to April 2005. From November 2002 to April 2004, Ms. Wang was a senior supervisor at Ernst & Young's San Jose, California office. From 1994 to 2002, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office. Ms. Wang received a B.A. degree in economics from Shanghai University of Economics and Finance.

*Cindy Yan Chan* joined Focus Media in August 2005 as chief strategy officer. Ms. Chan has over 10 years of experience in the advertising industry in China. Before joining Focus Media, Ms. Chan was deputy general manger for iMPACT, ZenithOptimedia's outdoor media department, an outdoor media buyer in China, from 2000 to 2005. Ms. Chan is also among the most reputable media researchers in China, and has published articles on the theory of outdoor media and China's outdoor media market, which has been quoted in prominent publications such as Forbes magazine and Media magazine. Ms. Chan holds a master's degree in economics from Nankai University.

*Ergo Xueyuan Liu* joined Focus Media as Vice President — Commercial Location Network in June 2004. Prior to joining Focus Media, Mr. Liu worked for Everease as an account manager from March 2003 until June 2004. From June 2002 until February 2003, Mr. Liu was general manager and a director of Beijing Fanenchangmei Advertising Co., Ltd., prior to which he was general manager of Manager magazine from January 2001 until May 2002. In 1999 and 2000, Mr. Liu worked in the enterprise department of the Shenzhen Special Economic Zone

Table of Contents

Group Company and was assistant manager of Yigao Electronics Co., Ltd. Mr. Liu received a B.A. degree in Chinese literature from Huazhong College of Engineering (now Huazhong Science and Technology University) in 1992.

*Acer Jiawei Zhang* joined Focus Media as Vice President — In–store Network in March 2005. Prior to joining Focus Media, Mr. Zhang worked for Media Partners International Holdings Inc. from 2001 to 2004, serving as account director, business director of the Beijing branch office and director of agency relations. While at Media Partners International, Mr. Zhang established a national "key account" service system, improved consulting and client services, and managed the development of its digital outdoor media project. From 1998 to 2001, Mr. Zhang was a sales director for Media Century Holdings Inc. in the Wuhan, Chengdu and Beijing offices. At Media Century, Mr. Zhang assisted with developing new markets and preparing for its domestic initial public offering and assisted in the acquisition of one of its key competitors. Mr. Zhang received a B.A. degree in arts design from Hubei Polytechnic Institute.

We increased the maximum number of our board of directors from seven to twelve members in May 2007. Our board of directors currently consists of nine directors.

## Duties of Directors

Under Cayman Islands law, our directors have a duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skills that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our amended and restated memorandum and articles of association. A company has the right to seek damages if a duty owed by our directors is breached.

The functions and powers of our board of directors include, among others:

- convening shareholders' meetings and reporting its work to shareholders at such meetings;

- implementing shareholders' resolutions;

- determining our business plans and investment proposals;

- formulating our profit distribution plans and loss recovery plans;

- determining our debt and finance policies and proposals for the increase or decrease in our registered capital and the issuance of debentures;

- formulating our major acquisition and disposition plans, and plans for merger, division or dissolution;

- proposing amendments to our amended and restated memorandum and articles of association; and

- exercising any other powers conferred by the shareholders' meetings or under our amended and restated memorandum and articles of association.

## Terms of Directors and Executive Officers

Each of our directors holds office until a successor has been duly elected and qualified unless the director was appointed by our board of directors, in which case such director holds office until the next following annual meeting of shareholders at which time such director is eligible for reelection. All of our executive officers are appointed by and serve at the discretion of our board of directors.

## Board Practices

### Board Committees

Our board of directors has established an audit committee, a compensation committee and a nominations committee.

*Audit Committee.*  Our audit committee currently consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Shen is the chairman of our audit committee. Our board of directors has determined that all of our audit

Table of Contents

committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15) and meet the criteria for independence set forth in Section 10A(m)(3) of the U.S. Securities Exchange Act of 1934, or the Exchange Act.

Our audit committee is responsible for, among other things:

- recommending to our shareholders, if appropriate, the annual re–appointment of our independent auditors and pre–approving all auditing and non–auditing services permitted to be performed by the independent auditors;

- annually reviewing an independent auditors' report describing the auditing firm's internal quality–control procedures, any material issues raised by the most recent internal quality control review, or peer review, of the independent auditors and all relationships between the independent auditors and our company;

- setting clear hiring policies for employees or former employees of the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- reviewing and approving all proposed related–party transactions, as defined in Item 404 of Regulation S–K under the U.S. securities laws;

- discussing the annual audited financial statements with management and the independent auditors;

- discussing with management and the independent auditors major issues regarding accounting principles and financial statement presentations;

- reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments;

- reviewing with management and the independent auditors the effect of regulatory and accounting initiatives, as well as off–balance sheet structures on our financial statements;

- discussing policies with respect to risk assessment and risk management;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- timely reviewing reports from the independent auditors regarding all critical accounting policies and practices to be used by our company, all alternative treatments of financial information within U.S. GAAP that have been discussed with management and all other material written communications between the independent auditors and management;

- establishing procedures for the receipt, retention and treatment of complaints received from our employees regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time;

- meeting separately, periodically, with management, the internal auditors and the independent auditors; and

- reporting regularly to the full board of directors.

*Compensation Committee.*  Our current compensation committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Chao is the chairman of our compensation committee. Our board of directors has determined that all of our compensation committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Our compensation committee is responsible for:

- determining and recommending the compensation of our chief executive officer;

Table of Contents

- reviewing and making recommendations to our board of directors regarding our compensation policies and forms of compensation provided to our directors and officers;

- reviewing and determining bonuses for our officers;

- reviewing and determining share–based compensation for our directors and officers;

- administering our equity incentive plans in accordance with the terms thereof; and

- such other matters that are specifically delegated to the compensation committee by our board of directors from time to time.

*Nominations Committee.* Our current nominations committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Zhuo is the chairman of our nominations committee. Our board of directors has determined that all of our nominations committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Our nominations committee is responsible for, among other things, selecting and recommending the appointment of new directors to our board of directors.

## Corporate Governance

Our board of directors has adopted a code of business conduct and ethics, which is applicable to our employees, officers and directors. Our code of business conduct and ethics is available on our website.

In addition, our board of directors has adopted a set of corporate governance guidelines. The guidelines reflect certain guiding principles with respect to our board's structure, procedures and committees. The guidelines are not intended to change or interpret any law, or our amended and restated memorandum and articles of association.

## Compensation Of Directors And Executive Officers

In 2006, we paid aggregate cash compensation of approximately $850,000 to our directors and executive officers as a group. In 2004, 2005, 2006 and for the six months ended June 30, 2007, we granted to selected directors, officers and employees options to acquire an aggregate 25,208,200, 23,843,630, 14,800,000 and 1,300,000 ordinary shares, respectively. We have no service contracts with any of our directors or executive officers that provide benefits to them upon termination. We do not pay or set aside any amounts for pension, retirement or other benefits for our officers and directors.

## Share Option Plans

Our 2003 Employee Share Option Scheme, or our 2003 Option Plan, was adopted by our board of directors at a meeting on June 1, 2003. Our members and board of directors adopted our 2005 Share Option Plan, or our 2005 Option Plan, in May 2005. At our 2005 shareholders meeting, our shareholders approved the adoption of our 2006 Share Option Plan, or our 2005 Option Plan. Our option plans are intended to promote our success and to increase shareholder value by providing an additional means to attract, motivate, retain and reward selected directors, officers, employees and third–party consultants and advisors.

Originally, under our 2003 Option Plan, not more than 30% of our share capital was reserved for grants of options. Prior to the adoption of our 2005 Option Plan, we issued options equivalent to 10.87% of our issued share capital under our 2003 Option Plan. Under our 2005 Option Plan, the amount of options we may issue has been reduced to an aggregate of 20% of our share capital, including the 10.87% already granted under our 2003 Option Plan. In addition, during the three years from the adoption of our 2005 Option Plan, we may issue no more than 5% of our share capital for grants of options. Under our 2006 Option Plan, from the three years from the adoption of the 2006 Option Plan, we may issue no more than 3.6% of our outstanding share capital from time to time.

**Table of Contents**

Under our 2003 Option Plan:

- In July and August 2004, we granted:

- options to purchase 12,181,600 shares to certain members of our board of directors and our management group. Each of these options has an exercise price of $0.24 per share. 8,460,800 of these options vest over three years while the remaining 3,720,800 options vest over one year.

- options to purchase 8,461,800 shares to members of our staff. Each of these options has an exercise price of $0.24 per share. 2,159,800 of these options vest over three years while the remaining 6,302,000 options vest over one year.

- options to purchase 4,564,800 shares, representing 1.4% of our pre−offering diluted share capital, to third−party consultants and advisors. Each of these options have an exercise price of $0.24 per share. 1,310,400 of these options vest over three years while the remaining 3,254,400 options vest over one year.

Under our 2005 Option Plan:

- In January 2005, we granted additional options to purchase 1,200,000 of our ordinary shares to some of our directors with an exercise price of $0.58 per share. All of these options vest over three years.

- In February 2005, we granted:

- options to purchase 2,000,000 and 2,100,000 of our ordinary shares with an exercise price of $0.58 and $0.75, respectively, to certain of our executive officers and options to purchase 720,000 of our ordinary shares with an exercise price of $0.75 to certain of our employees. All of these options vest over three years.

- options to purchase 1,240,000 of our ordinary shares to third−party consultants and advisors with an exercise price of $0.75. All of these options vest over three years.

- In July 2005, we granted:

- options to purchase 11,683,630 of our ordinary shares with an exercise price of $1.70, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 100,000 of our ordinary shares to a third−party consultant with an exercise price of $1.70. All of these options vest over three years.

- In November 2005, we granted:

- options to purchase 800,000 of our ordinary shares with an exercise price of $2.60, to certain of our executive officers and employees. All of these options vest over three years.

- options to purchase 4,000,000 of our ordinary shares with an exercise price of $2.70, to certain of our executive officers and employees. All of these options vest over three years.

- In March 2006, we granted options to purchase 3,000,000 of our ordinary shares with an exercise price of $5.09, to certain of our executive officers, employees and directors. All of these options vest over three years.

Under our 2006 Option Plan:

- In November 2006, we granted options to purchase 11,800,000 of our ordinary shares to certain of our employees, executive officers and directors. Of these options, 10,300,000 were issued to non−management employees and 1,500,000 were issued to our directors and officers. The issuance to our officers and directors included a grant to Jason Nanchun Jiang of options to purchase 500,000 of our ordinary shares. No other director or officer, upon exercise of all options granted, would beneficially own more than 1% of our outstanding ordinary shares. All of the options granted vest over a three year period, beginning one year from the date of issuance. The exercise price of the options is $5.724 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on November 14, 2016.

**Table of Contents**

- In March 2007 and May 2007, we granted options to purchase 1,200,000 and 100,000 of our ordinary shares to certain of our employees. The exercise price of the options is $7.20 and $7.394 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on March 18, 2017 and May 8, 2017, respectively.

- In October 2007, we granted options to purchase 9,592,685 of our ordinary shares to certain of our employees, executive officers and directors. Of these options, 6,982,500 were issued to non–management employees and 2,610,185 were issued to our directors and officers. The issuance to our officers and directors included grants to Jason Nanchun Jiang and Zhi Tan our option plans to purchase 210,185 and 250,000 of our ordinary shares, respectively. No other director or officer, upon exercise of all options granted, would beneficially own more than 1% of our outstanding ordinary shares. All of the options granted vest over a three year period, beginning one year from the date of issuance. The exercise price of the options is $11.422 per share which was based on the market price of our ADSs at the time the options were granted. The options expire on October 3, 2017.

Options generally do not vest unless the grantee remains under our employment or in service with us on the given vesting date. However, in circumstances where there is a death or disability of the grantee, or, for certain option holders, a change in the control of our company, the vesting of options will be accelerated to permit immediate exercise of all options granted to a grantee.

Our compensation committee, which administers our option plans, has wide discretion to award options. Subject to the provisions of our option plans and the above allocation targets, our committee that administers our option plans determines who will be granted options, the type and timing of options to be granted, vesting schedules and other terms and conditions of options, including the exercise price. Any of our employees may be granted options. The number of options awarded to a person, if any, is based on the person's potential ability to contribute to our success, the person's position with us and other factors chosen by our board of directors.

Generally, to the extent an outstanding option granted under our option plans has not become vested on the date the grantee's employment by or service with us terminates, the option will terminate and become unexercisable.

Our board of directors may amend, alter, suspend, or terminate each of our option plan at any time, provided, however, that in order to increase the limit of 20% of our share capital that may be granted as options, our board of directors must first seek the approval of our shareholders and, if such amendment, alteration, suspension or termination would adversely affect the rights of an optionee under any option granted prior to that date, the approval of such optionee. Without further action by our board of directors, our 2003 Option Plan, 2005 Option Plan and 2006 Option Plan will terminate in June 2013, May 2015 and August 2016, respectively.

Table of Contents

The table below sets forth the option grants made to our directors and executive officers pursuant to our 2003, 2005 and 2006 Option Plan as of October 23, 2007.

| | Number of Ordinary Shares to be Issued Upon Exercise of Options | Exercise per Ordinary Share | | Date of Grant | Date of Expiration |
|---|---|---|---|---|---|
| | | | (In U.S. dollars) | | |
| Jason Nanchun Jiang | 5,882,000 | $ | 0.24 | August 25, 2004 | August 24, 2014 |
| " | 3,080,000 | $ | 2.60 | November 2, 2005 | November 1, 2015 |
| " | 1,051,100 | $ | 2.70 | November 16, 2005 | November 15, 2015 |
| " | 210,185 | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| David Feng Yu | * | $ | 5.09 | March 10, 2006 | March 9, 2016 |
| Jimmy Wei Yu | * | $ | 0.24 | July 5, 2004 | July 4, 2014 |
| " | * | $ | 0.24 | August 25, 2004 | August 24, 2014 |
| " | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Fuming Zhuo | * | $ | 0.24 | August 10, 2004 | August 9, 2014 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Neil Nanpeng Shen | * | $ | 0.58 | January 1, 2005 | December 31, 2014 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Charles Chao | * | $ | 2.60 | November 2, 2005 | November 1, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Daqing Qi | * | $ | 5.09 | March 10, 2006 | March 9, 2016 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Zhi Tan | * | $ | 5.72 | November 16, 2006 | November 15, 2015 |
| " | 250,000 | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Daniel Mingdong Wu | * | $ | 0.58 | February 2, 2005 | February 1, 2015 |
| " | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| July Lilin Wang | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Ergo Xueyuan Liu | * | $ | 0.24 | July 5, 2004 | July 4, 2014 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Acer Jiawei Zhang | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Diana Congrong Chen | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |
| Cindy Yan Chan | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| " | * | $ | 11.42 | October 3, 2007 | October 2, 2017 |

\*  Upon exercise of all options granted, would beneficially own less than 1% of our outstanding ordinary shares, assuming all of our outstanding preference shares are converted into our ordinary shares.

*Manager Non–Competition Agreement*

Pursuant to the manager non–competition agreement entered into by and between us and Jason Nanchun Jiang in December 2004, Jason Nanchun Jiang agrees not to engage in activities that compete with our business operations during the term of his employment with us and for a period of two years after any termination of his

Table of Contents

employment with us. Jason Nanchun Jiang also agrees not to disclose to any third party any confidential information regarding us or any of our subsidiaries and affiliated companies or to accept or invest in any opportunity that is in line with our business operations, came to him as a result of his employment with us or involves any of our assets, unless approved by our board of directors.

119

Table of Contents

**PRINCIPAL AND SELLING SHAREHOLDERS**

The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d–3 under the Exchange Act, of our ordinary shares, as of October 31, 2007 and as adjusted to reflect the sale of the ADSs offered in this offering for:

- each person known to us to own beneficially more than 5% of our ordinary shares;

- each of our directors and executive officers who beneficially own our ordinary shares; and

- each selling shareholder participating in this offering.

Beneficial ownership includes voting or investment power with respect to the securities. Except as indicated below, and subject to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all ordinary shares shown as beneficially owned by them. The number of our ordinary shares outstanding used in calculating the percentage for each listed person includes our ordinary shares underlying options held by such person that are exercisable within 60 days of October 31, 2007, but excludes ordinary shares underlying options held by any other person. Percentage of beneficial ownership is based on 618,144,062 ordinary shares outstanding prior to this offering and 643,144,062 ordinary shares outstanding after completion of this offering, assuming the underwriters do not exercise their over–allotment options. The underwriters may choose to exercise the over–allotment options in full, in part or not at all.

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to be Sold by Selling Shareholders in This Offering | | Shares Beneficially Owned After This Offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Principal Shareholders** | | | | | | |
| JJ Media Investment Holding Ltd./ Jason Nanchun Jiang[1] | 68,604,595 | 10.95% | — | — | 68,604,595 | 10.53% |
| Total Team Investments Limited[2] | 35,830,622 | 5.80% | 35,830,620 | 5.80% | * | * |
| | | | | | | |
| **Directors and Executive Officers**[3] | | | | | | |
| JJ Media Investment Holding Ltd./ Jason Nanchun Jiang[4] | 68,604,595 | 10.95% | — | — | 68,604,595 | 10.53% |
| David Feng Yu | * | * | — | — | * | * |
| Jimmy Wei Yu | * | * | — | — | * | * |
| Neil Nanpeng Shen[5] | * | * | 51,815 | 0.01% | * | * |
| Charles Chao | * | * | — | — | * | * |
| Fumin Zhuo | * | * | — | — | * | * |
| Daqing Qi | * | * | — | — | * | * |
| David Ying Zhang | * | * | — | — | * | * |
| Zhi Tan[6] | 36,172,233 | 5.85% | 35,830,620 | 5.80% | * | * |
| Daniel Mingdong Wu | * | * | — | — | * | * |
| Diana Congrong Chen | * | * | — | — | * | * |
| July Lilin Wang | * | * | — | — | * | * |
| Cindy Yan Chan | * | * | — | — | * | * |
| Ergo Xueyuan Liu | * | * | — | — | * | * |
| Acer Jiawei Zhang | * | * | — | — | * | * |
| | | | | | | |
| **Other Selling Shareholders** | | | | | | |
| IDG Technology[7] | 10,342,583 | 1.67% | 6,499,089 | 1.05% | 3,843,494 | 0.60% |
| Magic Elite Group Ltd.[8] | 2,394,845 | 0.39% | 1,197,420 | 0.19% | 1,197,425 | 0.19% |
| Dallsfield Ltd.[9] | 1,500,000 | 0.24% | 1,500,000 | 0.24% | — | — |
| LinkValue Ltd.[10] | 1,104,575 | 0.18% | 552,285 | 0.09% | 552,290 | 0.09% |

Table of Contents

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to be Sold by Selling Shareholders in This Offering | | Shares Beneficially Owned After This Offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Techware Holding Company Ltd.[11] | 641,365 | 0.10% | 320,680 | 0.05% | 320,685 | 0.05% |
| Aura Investment Holdings Limited[12] | 562,817 | 0.09% | 281,405 | 0.05% | 281,412 | 0.04% |
| KingHill International Holding Co, Limited[13] | 546,151 | 0.09% | 273,075 | 0.04% | 273,076 | 0.04% |
| Sharvest Capital Limited[14] | 481,025 | 0.08% | 240,510 | 0.04% | 240,515 | 0.04% |
| Premacy Co. Limited[15] | 426,578 | 0.07% | 213,285 | 0.03% | 213,293 | 0.03% |
| Sea Dragon Holding Company Ltd[16] | 380,241 | 0.06% | 190,120 | 0.03% | 190,121 | 0.03% |
| Latitude Holdings Group Limited[17] | 168,594 | 0.03% | 84,295 | 0.01% | 84,299 | 0.01% |
| Trans China Ltd.[18] | 156,946 | 0.03% | 78,470 | 0.01% | 78,476 | 0.01% |
| Captains Enterprises Limited[19] | 103,863 | 0.02% | 51,930 | 0.01% | 51,933 | 0.01% |
| Dai Zhou[20] | 110,444 | 0.02% | 55,220 | 0.01% | 55,224 | 0.01% |
| Smart Master International Limited[21] | 576,630 | 0.09% | 51,815 | 0.01% | 524,815 | 0.08% |
| Wei Li[22] | 84,877 | 0.01% | 42,435 | 0.01% | 42,442 | 0.01% |
| Junzhi Li[23] | 3,223 | 0.00% | 1,610 | 0.00% | 1,613 | 0.00% |
| Yuling Han[24] | 3,223 | 0.00% | 1,610 | 0.00% | 1,613 | 0.00% |
| Junni Zhai[25] | 2,829 | 0.00% | 1,410 | 0.00% | 1,419 | 0.00% |
| Jun Zhang[26] | 2,358 | 0.00% | 1,175 | 0.00% | 1,183 | 0.00% |
| Lu Li[27] | 2,309 | 0.00% | 1,150 | 0.00% | 1,159 | 0.00% |
| Yunhai Bai[28] | 1,768 | 0.00% | 880 | 0.00% | 888 | 0.00% |

\*      Upon exercise of all options currently exercisable or vesting within 60 days of the date of this prospectus, would beneficially own less than 1% of our ordinary shares.

(1)    Includes 53,975,959 ordinary shares owned by JJ Media Investment Holding Ltd., 6,228,185 ordinary shares held by Citi (Nominees) Limited and beneficially owned by Mr. Jiang upon the expiry of the variable pre–paid forward contract entered into with Credit Suisse in September 2006 which expired in September 2007, and 5,222,552 and 3,177,899 options to purchase our ordinary shares owned by Target Sales International Limited and Target Management Group Limited, respectively. Other than Citi (Nominees) Limited, all of these entities are 100% owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer.

(2)    Total Team, a British Virgin Island company, is 13.37%, 10.79%, 10.46%, 9.99%, 9.30%, 9.23%, 8.14%, 5.81%, 5.76%, 5.54%, 5.23%, 4.04%, 1.74% and 0.58% owned by First Choice Investments Limited (jointly owned by Zhi Tan, our president, Gongquan Wang and Hong Chen), IDG Technology Venture Investment III, L.P. (owned by a group of unrelated parties), All in One International Limited (wholly owned by Lei Liu), Timeleader Profits Limited (wholly owned by Haiqi Zhao), Be First Investments Limited (wholly owned by Yue Yin), Yee On Investments Limited (wholly owned by Shisheng Liu), Excellent China (Group) Limited (wholly owned by Chunlong Xu), Dukeland Investments Limited (wholly owned by Xiaolu Sun who is Mr. Zhi Tan's wife), Red Focus Inc. (wholly owned by Xuxia Yang), Nice Excel Investments Limited (wholly owned by Zhixue Ding), Sparkle Media Limited (wholly owned by Haijin Li), Yufai Investments Limited (wholly owned by Yong Shi), Best Star Profits Limited (wholly owned by Zefei Wu) and Hong Chen, respectively. Each shareholder of Total Team exercises the investment and voting power over our ordinary shares held by Total Team in proportion to its respective ownership right in Total Team. The address of Total Team is c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(3)    The address of our current directors and executive officers is c/o 28F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China.

(4)    See note 1.

121

Table of Contents

(5)  Includes 576,630 ordinary shares held by Smart Master International Limited, or Smart Master, a British Virgin Islands company, which is 100% owned by Neil Nanpeng Shen, and includes 51,815 ordinary shares being sold in this offering. The address of Smart Master is Suite 3202A, 32/F, The Centrium, 60 Wyndham Street, Central, Hong Kong.

(6)  Includes 35,830,622 ordinary shares held by Total Team (including 35,830,620 ordinary shares being sold in this offering) and 341,611 options to purchase our ordinary shares owned by Dukeland Investments Limited (wholly owned by Xiaolu Sun who is Dr. Tan's wife). Dr. Tan is a joint shareholder of First Choice Investment Limited, which holds a 13.37% equity interest in Total Team. Dr. Tan disclaims beneficial ownership in the shares owned by Total Team except to the extent of his pecuniary interest therein.

(7)  IDG Technology includes 5,934,524 ordinary shares owned by IDG Technology Venture Investments, L.P. (including 2,362,000 ordinary shares being sold in this offering), 416,210 ordinary shares owned by IDG–Accel China Growth Fund L.P. (including 208,105 ordinary shares being sold in this offering), 86,545 ordinary shares owned by IDG–Accel China Growth Fund–A L.P. (including 43,270 ordinary shares being sold in this offering), 39,180 ordinary shares owned by IDG–Accel China Investors L.P. (including 19,590 ordinary shares being sold in this offering), and 3,866,124 ordinary shares beneficially owned by IDG Technology Venture Investment III, L.P. through Total Team (see note 2 above). The general partner of IDG Technology Venture Investments, LP is IDG Technology Venture Investments, LLC. Messrs. Patrick McGovern and Quan Zhou are managing members of IDG Technology Venture Investments, LLC. The address of IDG Technology Venture Investments, LP is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Growth Fund L.P. is IDG–Accel China Growth Fund Associates L.P. The general partner of IDG–Accel China Growth Fund Associates L.P. is IDG–Accel China Growth Fund GP Associates Ltd. Messrs. Patrick McGovern and Quan Zhou are directors of IDG–Accel China Growth Fund GP Associates Ltd. The address of IDG–Accel China Growth Fund L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Growth Fund–A L.P. is IDG–Accel China Growth Fund Associates L.P. The general partner of IDG–Accel China Growth Fund Associates L.P. is IDG–Accel China Growth Fund GP Associates Ltd. Messrs. Patrick McGovern and Quan Zhou are directors of IDG–Accel China Growth Fund GP Associates Ltd. The address of IDG–Accel China Growth Fund–A L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China. The general partner of IDG–Accel China Investors L.P. is IDG–Accel China Investors Associates Ltd. Messrs. Jim Breyer and Mr. Quan Zhou are the directors of IDG–Accel China Investors Associates Ltd. The address of IDG–Accel China Investors L.P. is c/o IDGVC Venture Investment Consultancy (Beijing) Co., Ltd., Room 616, Tower A, COFCO Plaza, 8 Jianguomenwai Avenue, Beijing, China.

(8)  Magic Elite Group Ltd., or Magic Elite, a British Virgin Islands company, holds the ordinary shares converted from share options of Allyes owned by the employees of Allyes when we acquired Allyes in March 2007. The address of Magic Elite is Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands.

(9)  Dallsfield Ltd., a British Virgin Islands company, is 100% owned by Maodong Xu. The address of Dallsfield Ltd. is 28/F., No. 369, Zhao Feng World Trade Tower, Jiangsu Road, Shanghai, PRC.

(10)  LinkValue Ltd., a British Virgin Islands company, is 40.47%, 37.42% and 22.11% owned by Kaizhen Xu, Jie Li and YellowBee Holdings Limited, or YellowBee (wholly owned by Jianfeng Wang). The address of LinkValue Ltd. is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(11)  Techware Holding Company Ltd., or Techware, a British Virgin Islands company, is 50.85%, 30.68% and 18.47% owned by YellowBee (wholly owned by Jianfeng Wang), Aura Investment Holdings Limited, or Aura (wholly owned by Jingbo Wang) and China Alliance Investment Limited (wholly owned by Yuanzhe Fu). The address of Techware is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(12)  The address of Aura is Room 101, Building No. 789, Tianshanxi Road, Shanghai, China.

Table of Contents

(13) KingHill International Holding Co, Limited, or KingHill, a British Virgin Islands company, is 100% owned by Jiangang Wang. The address of KingHill is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(14) Sharvest Capital Limited, or Sharvest, a British Virgin Islands company, is 10.00% and 90.00% owned by Chen Yang and Jiefang Ji. The address of Sharvest is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(15) Premacy Co. Limited, or Premacy, a British Virgin Islands company, is 31.80%, 3.22% and 64.98% owned by Aura (wholly owned by Jingbo Wang), Newcastle Investment Holdings Limited (wholly owned by William Chen) and Ting Jia. The address of Premacy is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(16) Sea Dragon Holding Company Ltd, or Sea Dragon, a British Virgin Islands company, is 100% owned by Hailong Zhu. The address of Sea Dragon is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(17) Latitude Holdings Group Limited, or Latitude, a British Virgin Islands company, is 100% owned by Wei Chen. The address of Latitude is 21/F Cloud Nine Plaza, 1018 Changning Road, Changning District, Shanghai 200042, China.

(18) Trans China Ltd., a British Virgin Islands company, is 100% owned by Kingsland Pacific Ltd. (wholly owned by Joseph Ho). The address of Trans China Ltd. is Balizhuang Xili, Bldg 72 Rm 904, Ocean Plaza, Chao Yang District, Beijing 100025, China.

(19) Captains Enterprises Limited, or Captains, a British Virgin Islands company, is 100% owned by Kingsland Pacific Ltd. (wholly owned by Joseph Ho). The address of Trans China Ltd. is Balizhuang Xili, Bldg 72 Rm 904, Ocean Plaza, Chao Yang District, Beijing 100025, China.

(20) The address of Dai Zhou is Unit 6C, Buliding No. 1, Jiari Wan, Huaqiao Cheng, Nanshan District, Shenzhen, China.

(21) See note 5.

(22) The address of Wei Li is Room 20–9–201 Dongkou Qu, Tiantong Yuan, Changping District, Beijing, China.

(23) The address of Junzhi Li is Room 17–114, Buliding No. 2, Bei Yuan, Beiyuan Road, Chaoyang District, Beijing, China.

(24) The address of Yuling Han is Room 6–1–501, Benjiarun Garden, Donghuashi Street, Beijing, China.

(25) The address of Junni Zhai is Room No. 3, Gate No. 1, No. 126, Building No. 19, Xisanhuan Road, Haidian District, Beijing, China.

(26) The address of Jun Zhang is Room E–1007, No. 16, Jingmao Guoji Building, Baliqiao nan Street, Tongzhou District, Beijing, China.

(27) The address of Lu Li is 11/F, Unit D, Buliding D, Hui Fang Gardon, Xuefu Road Nanshan District, Shenzhen, China.

(28) The address of Yunhai Bai is Room 506, Buliding No. 4, Yijia Garden, No. 8, Tonghuinan Road, Tongzhou District, Beijing, China.

As of October 17, 2007, 491,047,705 shares were registered in the name of a nominee of Citibank, N.A., the depositary under the deposit agreement. We have no further information as to shares held, or beneficially owned, by U.S. persons. Since the completion of our initial public offering in July 2005, all ordinary shares underlying the ADSs quoted on the Nasdaq Global Market, Inc. have been held in Hong Kong by the custodian, Citibank Hong Kong, on behalf of Citibank, N.A., the depositary.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

**Table of Contents**

**RELATED PARTY TRANSACTIONS**

Details of advertising service revenue from related parties in 2004, 2005 and 2006 and the six months ended June 30, 2006 and 2007 are as follows:

| Name of Related Parties | Director Interested | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2004 | 2005 | 2006 | 2006 | 2007 |
| Shanghai Everease Advertising & Communication Ltd. | Jason Nanchun Jiang | $ 1,302,331 | $ 1,552,039 | $ 7,764,977 | $ 1,084,189 | $ 3,735,103 |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 1,227,267 | 2,330,945 | 3,885,546 | 2,606,373 | 104 |
| Shanghai Jobwell Business Consulting Co., Ltd. | Jimmy Wei Yu | 411,034 | 1,050,258 | 1,382,695 | 749,684 | — |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | 372,488 | 757,850 | 1,122,945 | 1,122,945 | — |
| Shanghai Wealove Business Consulting Co., Ltd. | Jimmy Wei Yu | — | — | 671,488 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | 361,371 | 908,100 | 982,527 | 420,218 | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | Jimmy Wei Yu | — | 1,646,120 | 3,230,040 | 2,106,475 | 44,542 |
| Beijing Sina Internet Information Services Co., Ltd. | Charles Chao | — | — | 190,563 | 149,958 | 59,345 |
| Beijing Sohu New–age Information Technology Co., Ltd. | Daqing Qi | — | — | 119,768 | 9,573 | 272,337 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | Neil Nanpeng Shen | — | — | 78,742 | — | — |
| UUSEE | Neil Nanpeng Shen | — | — | — | — | 27,939 |
| Beijing Yadu Science & Technology Co., Ltd. | Fumin Zhuo | — | — | — | — | 97,826 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | Neil Nanpeng Shen | 48,287 | 264,120 | 178,933 | 178,933 | 105,014 |
| Total | | $ 3,722,778 | $ 8,509,432 | $ 19,608,224 | $ 8,428,348 | $ 4,342,210 |

In 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited), office rentals were paid to Multimedia Park Venture Capital amounting to $140,305, $395,083, $476,902, $226,506 and $306,137, respectively.

In 2006, Everease charged us $47,804 for providing administration services.

In March 2006, Weiqiang Jiang, father of Jason Nanchun Jiang, provided a short–term loan to us of approximately $2.5 million to relieve a temporary shortage of Renminbi we experienced at that time. The loan was unsecured and was provided to us at no interest. At the end of June 2006, we paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

124

Table of Contents

Details of amounts due from related parties as of December 31, 2004, 2005, 2006 and June 30, 2007 are as follows:

| Name of Related Parties | Note | Director Interested | As of December 31, | | | As of June 30, 2007 |
|---|---|---|---|---|---|---|
| | | | 2004 | 2005 | 2006 | |
| Shanghai Everease Advertising & Communication Ltd. | 1 | Jason Nanchun Jiang | $ 1,259,138 | $ 572,525 | $ 6,331,549 | $ 5,346,287 |
| Multimedia Park Venture Capital | 1 | Jimmy Wei Yu | 690,212 | 330,700 | 12,705 | 9,464 |
| Shanghai Jobwell Business Consulting Ltd. | 1 | Jimmy Wei Yu | 275,971 | 546,207 | — | — |
| Shanghai Wealove Wedding Service Co., Ltd. | 1 | Jimmy Wei Yu | 251,556 | 662,954 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | 1 | Jimmy Wei Yu | 263,155 | 533,469 | — | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | 1 | Jimmy Wei Yu | — | 474,351 | 403,889 | — |
| Beijing Sina Internet Information Services Co., Ltd. | 1 | Charles Chao | — | — | — | 802,317 |
| Beijing Sohu New–age Information Technology Co., Ltd. | 1 | Daqing Qi | — | — | — | 864,335 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | 1 | Neil Nanpeng Shen | — | — | — | 58,888 |
| UUSEE | 1 | Neil Nanpeng Shen | — | — | — | 32,828 |
| Beijing Yadu Science & Technology Co., Ltd. | 1 | Fumin Zhuo | — | — | — | 65,758 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | 1 | Neil Nanpeng Shen | — | — | 39,699 | — |
| David Yu | 2 | David Yu | — | — | 1,064,947 | — |
| | | | $ 2,740,032 | $ 3,120,206 | $ 7,852,789 | $ 7,179,877 |

Details of amounts due to related parties as of December 31, 2004, 2005, 2006 and June 30, 2007 are as follows:

| Name of Related Parties | Note | Director Interested | As of December 31, | | | As of June 30, 2007 |
|---|---|---|---|---|---|---|
| | | | 2004 | 2005 | 2006 | |
| 51.com | 3 | Neil Nanpeng Shen | — | — | — | 27,477 |
| Beijing Sina Internet Information Services Co., Ltd. | 3 | Charles Chao | — | — | — | 3,238,744 |
| Qihoo.com | 3 | Neil Nanpeng Shen | — | — | — | 116,174 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | 3 | Neil Nanpeng Shen | — | — | — | 205 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | 3 | Neil Nanpeng Shen | — | — | — | 7,550 |
| Zhi Tan | 4 | Zhi Tan | — | — | 345,768 | — |
| | | | $ — | $ — | $ 345,768 | $ 3,390,150 |

(1) These amounts represent trade receivables for advertising services provided.

(2) The amount represents a payment due from the ex–shareholder of Target Media for an indemnification of a contingent liability which arose after the acquisition. This amount was paid out in cash in 2007.

(3) These amounts represent trade payables for web spaces leased.

(4) The amount represents the amount due to the president of Focus Media for operating funds of Framedia. The loan was non–interest bearing and was repayable within one year.

125

Table of Contents

**Agreements among Us, Our Wholly Foreign–Owned Subsidiaries, Our PRC Operating Affiliates and Their Shareholders and Subsidiaries**

The following is a summary of the material provisions of these agreements. For more complete information you should read these agreements in their entirety. Directions on how to obtain copies of these agreements are provided in this prospectus under "Additional Information".

We have entered into a series of contractual arrangements with our PRC operating affiliates and their respective shareholders and subsidiaries, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with our PRC operating affiliates and their respective shareholders and subsidiaries may only be amended with the approval of our audit committee or another independent body of our board of directors. In connection with our acquisition of Framedia, we entered into a series of contractual arrangements with Focus Media Advertisement's subsidiaries relating to our poster frame network, Framedia Advertisement, New Structure Advertisement, and Guangdong Framedia, each of which is a subsidiary of Focus Media Advertisement, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and their shareholders may only be amended in writing by all of its parties unless the provisions being amended only involve certain parties' interests in which case the amendment shall be made in writing by such parties. Each of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement is 90%–owned by Focus Media Advertisement and 10%–owned by Focus Media Advertising Agency, respectively. In addition, with regard to Allyes, which we acquired in March 207, New Allyes Information has entered into a series of contractual arrangements with the Allyes operating affiliates and their shareholders, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of the contractual arrangements with the Allyes operating affiliates and their shareholders may only be amended with the approval of our audit committee or another independent body of our board of directors.

*Transfer of Ownership When Permitted By Law*

Pursuant to call option agreements, including in certain cases subsequent participation letters by new subsidiaries of our PRC operating affiliates, by and among our wholly foreign–owned subsidiaries, our PRC operating affiliates, and their respective shareholders and its subsidiaries, the two shareholders of each of our PRC operating affiliates, which shareholders are either (i) two PRC citizens designated by us or (ii) two PRC entities owned by our subsidiaries or by our designated appointees, has granted the relevant wholly foreign–owned subsidiary or its designee an exclusive option to purchase all or part of their equity interests in the relevant PRC operating affiliate, and its subsidiaries, or all or part of the assets of the relevant PRC operating affiliate, in each case, at any time determined by the relevant wholly foreign–owned subsidiary and to the extent permitted by PRC law. In some cases, pursuant to separate letters of, undertaking each such shareholder agrees to pay to the relevant wholly foreign–owned subsidiary or us any excess of the purchase price paid for the equity interests in, or assets of, the relevant PRC operating affiliate or its subsidiaries over the respective registered capital of such affiliate or its subsidiaries in the event that the wholly–foreign owned subsidiary or its designee exercises such option.

*Voting Arrangements*

Pursuant to voting rights proxy agreements and in certain cases subsequent participation letters by new subsidiaries of the PRC operating affiliates, by and among our wholly foreign–owned subsidiaries, the PRC operating affiliates and their subsidiaries, each of the respective shareholders of the PRC operating affiliates has granted a PRC individual designated by the wholly foreign–owned subsidiaries the right to appoint all of the directors and senior management of the PRC operating affiliates and those subsidiaries and all of their other voting rights as shareholders of the PRC operating affiliates and their subsidiaries, as the case may be, as provided under the articles of association of each such entity. Under the voting rights proxy agreement, there are no restrictions on the number, to the extent allowed under the respective articles of association of the PRC operating affiliates and their respective subsidiaries, or identity of those persons we can appoint as directors and officers.

**Table of Contents**

### Equity Pledge Agreements

Pursuant to equity pledge agreements and, in certain instances, subsequent participation letters by new subsidiaries of the PRC operating affiliates, by and among the relevant wholly foreign–owned subsidiaries, the relevant PRC operating affiliates and their respective subsidiaries, each shareholder of the relevant PRC operating affiliates has pledged his or its equity interest in the relevant PRC operating affiliates and their subsidiaries, as the case may be, to certain of the wholly foreign–owned subsidiaries to secure their obligations under the relevant contractual control agreements to which each is a party, including but not limited to, the obligations of the relevant PRC operating affiliates and their respective subsidiaries under certain technical services agreements, trademark licence agreements and exclusive services agreements, as the case may be, and the obligation of each shareholder of the PRC operating affiliates under the respective loan agreements between the relevant shareholder and wholly foreign–owned subsidiary, for the sole purpose of increasing the registered capital of the PRC operating affiliates, as the case may be and acquiring certain of our regional distributors, respectively. See ''— Loans to the Shareholders of the PRC Operating Affiliates''. Under these equity pledge agreements, each shareholder has agreed not to transfer, assign, pledge or otherwise dispose of their interest in the relevant PRC operating affiliate or its subsidiaries, as the case may be, without the prior written consent of the relevant wholly foreign–owned subsidiary.

### Equity Trust Agreements

Pursuant to the equity trust agreement by and among Focus Media Advertisement and Focus Media Technology dated as of March 28, 2005, Focus Media Advertisement holds a 9% equity interest in Focus Media Digital in trust for the benefit of Focus Media Technology. Under the equity trust agreement, Focus Media Technology provides trust funds to Focus Media Advertisement to be used for the purchase of a 9% equity interest in Focus Media Digital and Focus Media Technology agrees to be the beneficiary of any profits or other benefit generated that is attributable to the management, use or disposal of the trust funds. Through these arrangements, we have enabled our indirect subsidiary, Focus Media Technology, to beneficially hold an additional 9% of the interest in Focus Media Digital in addition to the 90% equity interest it holds in its own name.

### Trademark License Agreement

Pursuant to the trademark license agreement by and among Focus Media Technology, Focus Media Advertisement and its subsidiaries dated as of March 28, 2005, Focus Media Technology has agreed to license the use of its trademarks to be registered in China to Focus Media Advertisement and its subsidiaries in exchange for a monthly licensing fee of RMB10,000 ($1,247) for each affiliated company using such trademarks.

### Cooperation Agreements

Pursuant to the cooperation agreements by and among New Focus Media Advertisement, Focus Media Advertisement and its subsidiaries, dated as of May 22, 2006, New Focus Media Advertisement entrusted Focus Media Advertisement and its subsidiaries to disseminate advertisements as required by New Focus Media Advertisement in all locations rented by Focus Media Advertisement and its subsidiaries, and to sell advertising time slots for those locations, and each of Focus Media Advertisement and its subsidiaries ensures the allocation of advertising time slots on its respective portion of the advertising network adequate for the dissemination of advertising content as agreed upon between New Focus Media Advertisement and its advertising clients. New Focus Media Advertisement pays a dissemination fee to Focus Media Advertisement and its relevant subsidiaries for dissemination services on a cost–plus basis.

### Asset Transfer Agreement

Pursuant to the asset transfer agreement entered into by and between Focus Media Digital and New Focus Media Advertisement, dated as of December 31, 2005, Focus Media Digital transferred to New Focus Media Advertisement all of its assets relating to its out–of–home LCD television advertising business at fair market value.

127

Table of Contents

*Technology Transfer Agreement*

Pursuant to the technology and assets transfer agreement by and between Focus Media Digital and New Focus Media Advertisement, dated as of May 22, 2006, Focus Media Digital transferred to New Focus Media Advertisement all of its technology at a fixed fee.

*Advertisement Dissemination Agreement*

Pursuant to the advertisement dissemination agreement by and between New Focus Media Advertisement and Focus Media Advertising Agency, dated as of May 22, 2006, New Focus Media Advertisement agrees to disseminate advertisements for Focus Media Advertising Agency pursuant to the agreements by and among Focus Media Advertising Agency and its clients, and Focus Media Advertising Agency agrees to pay a dissemination fee to New Focus Media Advertisement for the dissemination services.

*Exclusive Services Agreement*

Pursuant to the exclusive services agreements by and among New Allyes Information, and certain of its PRC operating affiliates, New Allyes Information has agreed to provide exclusive services in respect of the business operations of Shanghai the relevant PRC operating affiliates and those operating affiliates have agreed to pay a service fee totaling equal to 100% of their tax excluded annual revenues to New Allyes Information.

**Other Related Party Transactions**

*Registration Rights Agreement*

See "Shares Eligible for Future Sale" for a description of our amended shareholders' agreement.

*Loans to Shareholders of Our PRC Operating Affiliates*

Pursuant to loan agreements entered into by the relevant wholly foreign–owned subsidiaries and the shareholders of each of our PRC operating affiliates, respectively, the shareholders obtained a loan of the registered capital of the relevant PRC operating affiliate from the relevant wholly foreign–owned for the sole purpose of establishing or increasing, as the case may be, the registered capital of each such PRC operating affiliate. As of December 31, 2006, the full amounts of the loans to these shareholders remained outstanding. The relevant wholly foreign–owned subsidiary granted these loans without interest.

*Loan from Relative of Jason Nanchun Jiang*

In March 2006, Weiqiang Jiang, the father of Jason Nanchun Jiang, provided a short–term loan to us of RMB 20.0 million ($2.5 million) to relieve a temporary shortage of Renminbi we experienced at that time. The loan was unsecured and was provided to us at no interest. At the end of June 2006, we paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

**Transactions with Everease**

Prior to establishing our business, Jason Nanchun Jiang, our founder, chairman and chief executive officer, served as the legal representative and general manager of Everease from 2000 to 2004. From 2004 to March 2005, Ms. Shen Yacheng, the mother of Jason Jiang, served as legal representative of Everease. Everease and our company were considered to be under common control through March 2005 and all transaction we entered into with Everease were treated as related party transactions. Subsequent to Shen Yacheng's resignation in March 2005, Jason's father continued to serve as finance manager of Everease (effective from 1994) as a result of which he is able to exert a certain degree of influence over Everease. Therefore, Everease continues to be deemed a related party of Focus Media. In connection with the audit of our financial statements as of and for the period ended December 31, 2006, our auditors noted that, with regard to determination of related party status, we lack a process for timely review of changes in relationships with companies that were excluded from related party status in prior years. The auditors identified this as a significant deficiency under standards established by the PCAOB in our internal accounting controls. See "Risk Factors — There have been historical deficiencies with our internal

128

Table of Contents

controls and there remain areas of our internal and disclosure controls that require improvement, and we are exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes–Oxley Act of 2002."

### Everease Non–Competition Agreement

Pursuant to the Everease non–competition Agreement between Everease and us, dated as of November 2004, Everease, its affiliates, or its directors, officers or employees have agreed not to disclose any confidential information regarding Focus Media to any third–party without our written consent. In addition, for so long as Jason Nanchun Jiang continues to hold any equity interest in our company and for two years thereafter, none of Everease, its affiliates, or its directors, officers or employees may (i) engage in, or lend its name to, any business that competes with our business, (ii) deal in a competitive manner with any of our customers, (iii) solicit any of our directors, officers, employees or agents to become directors, officers, employees or agents of others entities, or (iv) engage in any business conducted under a name that is the same as, or similar to, ours or any trade name used by us where the use of such name is reasonably likely be confused for our name. Everease entered into the non–competition agreement in consideration of its business relationship with us at the time, which relationship was subsequently terminated, and received no cash or other monetary compensation.

### Advertising Services Provided to Everease

We have provided our advertising services to Everease in the aggregate amounts of $1.3 million, $1.6 million, $7.7 million and $3.8 million in 2004, 2005 and 2006 and for the six months ended June 30, 2007, respectively. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

### Certain Services Provided by Everease

In 2006, Everease charged us $47,804 for providing administration services.

### Transactions with Entities Affiliated with Jimmy Wei Yu

We have provided our advertising services to certain companies for which Jimmy Wei Yu, one of our directors, also serves as a director. The advertising service revenue for these services totalled in the aggregate $2.3 million, $6.7 million and $11.3 million in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively. As of June 30, 2007, $9,464 remained outstanding.

These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

### Transactions with Ctrip.com International

We have provided our advertising services to Ctrip.com International, Limited, which is affiliated with Neil Nanpeng Shen, one of our directors, in the aggregate amount of $48,287, $264,120, $178,933 and $58,888 in 2004, 2005, 2006 and for the six months ended June 30, 2007, respectively, all of which has been paid as of June 30, 2007. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

129

**Table of Contents**

**DESCRIPTION OF SHARE CAPITAL**

As of the date hereof, our authorized share capital is $990,000 divided into 19,800,000,000 shares, par value $0.00005 per share, and the issued share capital is $30,907.20 divided into 618,144,062 ordinary shares fully paid or credited as fully paid.

We were incorporated as Focus Media Holding Limited in the British Virgin Islands on April 11, 2003 as an international business company. On April 1, 2005, we changed our corporate domicile to the Cayman Islands, becoming an exempted company with limited liability under the Companies Law (2004 Revision) Cap. 22 of the Cayman Islands, or the Companies Law. Our shareholders who are non–residents of the Cayman Islands may freely hold and vote their shares. A Cayman Islands exempted company:

- is a company that conducts its business outside of the Cayman Islands;

- is exempted from certain requirements of the Companies Law, including a filing of an annual return of its shareholders with the Registrar of Companies or the Immigration Board;

- does not have to make its register of shareholders open to inspection; and

- may obtain an undertaking against the imposition of any future taxation.

Our amended and restated memorandum and articles of association authorize the issuance of up to 19,800,000,000 shares, par value $0.00005 per share. The following summarizes the terms and provisions of our share capital upon the completion of this offering, as well as the material applicable laws of the Cayman Islands. This summary is not complete, and you should read the form of our amended and restated memorandum and articles of association, which are filed as exhibits to the registration statement of which this prospectus is a part.

The following discussion primarily concerns ordinary shares and the rights of holders of ordinary shares. The holders of ADSs will not be treated as our shareholders and will be required to surrender their ADSs for cancellation and withdrawal from the depositary facility in which the ordinary shares are held in order to exercise shareholders' rights in respect of the ordinary shares. The depositary will agree, so far as it is practical, to vote or cause to be voted the amount of ordinary shares represented by ADSs in accordance with the non–discretionary written instructions of the holders of such ADSs.

**Meetings**

Subject to our regulatory requirements, an annual general meeting and any extraordinary general meeting shall be called by not less than 10 days' notice in writing. Notice of every general meeting will be given to all of our shareholders other than those that, under the provisions of our amended and restated articles of association or the terms of issue of the ordinary shares they hold, are not entitled to receive such notices from us, and also to our principal external auditors. Extraordinary general meetings may be called only by the chairman of our board of directors or a majority of our board of directors, and may not be called by any other person. All business shall be deemed extraordinary that is transacted at an extraordinary general meeting, and also all business that is transacted at an annual general meeting other than with respect to (1) declarations of dividends, (2) the adoption of our financial statements and reports of directors and auditors thereon, (3) the granting of any mandate or authority to our directors, to grant options not in excess of 20% of the nominal value of our existing issued share capital, (4) our ability to repurchase our securities, (5) the election of directors, (6) the appointment of auditors (where special notice of the intention to make such appointment is not required by the Companies Law) and other officers, and (7) the fixing of the remuneration of the auditors and the voting of remuneration or extra remuneration to the directors.

Notwithstanding that a meeting is called by shorter notice than that mentioned above, but, subject to applicable regulatory requirements, it will be deemed to have been duly called, if it is so agreed (1) in the case of a meeting called as an annual general meeting by all of our shareholders entitled to attend and vote at the meeting; or (2) in the case of any other meeting, by a majority in number of our shareholders having a right to attend and vote at the meeting, being a majority together holding not less than 75% in nominal value of the ordinary shares giving that right.

130

Table of Contents

At any general meeting, two shareholders entitled to vote and present in person or by proxy that represent not less than one–third of our issued and outstanding voting shares will constitute a quorum. No business other than the appointment of a chairman may be transacted at any general meeting unless a quorum is present at the commencement of business. However, the absence of a quorum will not preclude the appointment of a chairman. If present, the chairman of our board of directors shall be the chairman presiding at any shareholders meetings.

A corporation being a shareholder shall be deemed for the purpose of our amended and restated articles of association to be present in person if represented by its duly authorized representative being the person appointed by resolution of the directors or other governing body of such corporation to act as its representative at the relevant general meeting or at any relevant general meeting of any class of our shareholders. Such duly authorized representative shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were our individual shareholder.

The quorum for a separate general meeting of the holders of a separate class of shares is described in "— Modification of Rights" below.

**Voting Rights Attaching to the Shares**

Subject to any special rights or restrictions as to voting for the time being attached to any shares, at any general meeting on a show of hands every shareholder who is present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly authorized representative) shall have one vote, and on a poll every shareholder present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly appointed representative) shall have one vote for each fully paid share which such shareholder is the holder.

No shareholder shall be entitled to vote or be reckoned in a quorum, in respect of any share, unless such shareholder is registered as our shareholder at the applicable record date for that meeting and all calls or installments due by such shareholder to us have been paid.

If a clearing house (or its nominee(s)) is our shareholder, it may authorize such person or persons as it thinks fit to act as its representative(s) at any meeting or at any meeting of any class of shareholders, provided that, if more than one person is so authorized, the authorization shall specify the number and class of shares in respect of which each such person is so authorized. A person authorized pursuant to this provision is entitled to exercise the same powers on behalf of the recognized clearing house (or its nominee(s)) as if such person was the registered holder of our shares held by that clearing house (or its nominee(s)) including the right to vote individually on a show of hands.

While there is nothing under the laws of the Cayman Islands which specifically prohibits or restricts the creation of cumulative voting rights for the election of our directors, unlike the requirement under Delaware law that cumulative voting for the election of directors is permitted only if expressly authorized in the certificate of incorporation, it is not a concept that is accepted as a common practice in the Cayman Islands, and we have made no provisions in our amended and restated memorandum and articles of association to allow cumulative voting for such elections.

**Protection of Minority Shareholders**

The Grand Court of the Cayman Islands may, on the application of shareholders holding not less than one fifth of our shares in issue, appoint an inspector to examine our affairs and report thereon in a manner as the Grand Court shall direct.

Any shareholder may petition the Grand Court of the Cayman Islands which may make a winding up order, if the court is of the opinion that it is just and equitable that we should be wound up.

Claims against us by our shareholders must, as a general rule, be based on the general laws of contract or tort applicable in the Cayman Islands or their individual rights as shareholders as established by our amended and restated memorandum and articles of association.

The Cayman Islands courts ordinarily would be expected to follow English case law precedents which permit a minority shareholder to commence a representative action against, or derivative actions in our name to challenge (1) an act which is ultra vires or illegal, (2) an act which constitutes a fraud against the minority and the wrongdoers

131

**Table of Contents**

are themselves in control of us, and (3) an irregularity in the passing of a resolution which requires a qualified (or special) majority.

**Pre–emption Rights**

There are no pre–emption rights applicable to the issue of new shares under either Cayman Islands law or our amended and restated memorandum and articles of association.

**Liquidation Rights**

Subject to any special rights, privileges or restrictions as to the distribution of available surplus assets on liquidation for the time being attached to any class or classes of shares (1) if we are wound up and the assets available for distribution among our shareholders are more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the excess shall be distributed pari passu among those shareholders in proportion to the amount paid up at the commencement of the winding up on the shares held by them, respectively, and (2) if we are wound up and the assets available for distribution among the shareholders as such are insufficient to repay the whole of the paid–up capital, those assets shall be distributed so that, as nearly as may be, the losses shall be borne by the shareholders in proportion to the capital paid up at the commencement of the winding up on the shares held by them, respectively.

If we are wound up, the liquidator may with the sanction of our special resolution and any other sanction required by the Companies Law, divide among our shareholders in specie or kind the whole or any part of our assets (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as the liquidator deems fair upon any property to be divided and may determine how such division shall be carried out as between the shareholders or different classes of shareholders. The liquidator may also vest any part of these assets in trustees upon such trusts for the benefit of the shareholders as the liquidator shall think fit, but so that no shareholder will be compelled to accept any assets, shares or other securities upon which there is a liability.

**Modification of Rights**

Except with respect to share capital (as described below) alterations to our amended and restated memorandum and articles of association may only be made by special resolution of no less than two–thirds of votes cast at a meeting of the shareholders.

Subject to the Companies Law of the Cayman Islands, all or any of the special rights attached to shares of any class (unless otherwise provided for by the terms of issue of the shares of that class) may be varied, modified or abrogated with the sanction of a special resolution passed at a separate general meeting of the holders of the shares of that class. The provisions of our articles of association relating to general meetings shall apply similarly to every such separate general meeting, but so that the quorum for the purposes of any such separate general meeting or at its adjourned meeting shall be a person or persons together holding (or represented by proxy) not less than one–third in nominal value of the issued shares of that class, every holder of shares of the class shall be entitled on a poll to one vote for every such share held by such holder and that any holder of shares of that class present in person or by proxy may demand a poll.

The special rights conferred upon the holders of any class of shares shall not, unless otherwise expressly provided in the rights attaching to or the terms of issue of such shares, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

**Alteration of Capital**

We may from time to time by ordinary resolution:

- increase our capital by such sum, to be divided into shares of such amounts, as the resolution shall prescribe;

- consolidate and divide all or any of our share capital into shares of larger amount than our existing shares;

**Table of Contents**

- cancel any shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person, and diminish the amount of our share capital by the amount of the shares so cancelled subject to the provisions of the Companies Law;

- sub–divide our shares or any of them into shares of smaller amount than is fixed by our amended and restated memorandum and articles of association, subject nevertheless to the Companies Law, and so that the resolution whereby any share is sub–divided may determine that, as between the holders of the share resulting from such subdivision, one or more of the shares may have any such preference or other special rights, over, or may have such deferred rights or be subject to any such restrictions as compared with the others as we have power to attach to unissued or new shares; and

- divide shares into several classes and without prejudice to any special rights previously conferred on the holders of existing shares, attach to the shares respectively as preferential, deferred, qualified or special rights, privileges, conditions or such restrictions which in the absence of any such determination in general meeting may be determined by our directors.

We may, by special resolution, subject to any confirmation or consent required by the Companies Law, reduce our share capital or any capital redemption reserve in any manner authorized by law.

**Transfer of Shares**

Subject to any applicable restrictions set forth in our amended and restated memorandum and articles of association, any of our shareholders may transfer all or any of his or her shares by an instrument of transfer in the usual or common form or in a form prescribed by the Nasdaq Global Market or in any other form which our directors may approve.

Our directors may decline to register any transfer of any share which is not paid up or on which we have a lien. Our directors may also decline to register any transfer of any share unless:

- the instrument of transfer is lodged with us accompanied by the certificate for the shares to which it relates and such other evidence as our directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of share;

- the instrument of transfer is properly stamped (in circumstances where stamping is required);

- in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four; and

- a fee of such maximum sum as the Nasdaq Global Market may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer, they shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, on notice being given by advertisement in such one or more newspapers or by any other means in accordance with the requirements of the Nasdaq Global Market, be suspended and the register closed at such times and for such periods as our directors may from time to time determine; provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year as our directors may determine.

**Share Repurchase**

We are empowered by the Companies Law and our amended and restated memorandum and articles of association to purchase our own shares, subject to certain restrictions. Our directors may only exercise this power on our behalf, subject to the Companies Law, our amended and restated memorandum and articles of association and to any applicable requirements imposed from time to time by the U.S. Securities and Exchange Commission, the Nasdaq Global Market, or by any recognized stock exchange on which our securities are listed.

**Table of Contents**

**Dividends**

Subject to the Companies Law, we may declare dividends in any currency to be paid to our shareholders but no dividend shall be declared in excess of the amount recommended by our directors. Dividends may be declared and paid out of our profits, realized or unrealized, or from any reserve set aside from profits which our directors determine is no longer needed. Our board of directors may also declare and pay dividends out of the share premium account or any other fund or account which can be authorized for this purpose in accordance with the Companies Law.

Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provides (1) all dividends shall be declared and paid according to the amounts paid up on the shares in respect of which the dividend is paid, but no amount paid up on a share in advance of calls shall be treated for this purpose as paid up on that share and (2) all dividends shall be apportioned and paid pro rata according to the amounts paid upon the shares during any portion or portions of the period in respect of which the dividend is paid.

Our directors may also pay any dividend that is payable on any shares semi–annually or on any other dates, whenever our financial position, in the opinion of our directors, justifies such payment.

Our directors may deduct from any dividend or other moneys payable to any shareholder all sums of money (if any) presently payable by such shareholder to us on account of calls, installments or otherwise.

No dividend or other money payable by us on or in respect of any share shall bear interest against us.

In respect of any dividend proposed to be paid or declared on our share capital, our directors may resolve and direct that (1) such dividend be satisfied wholly or in part in the form of an allotment of shares credited as fully paid up, provided that our shareholders entitled thereto will be entitled to elect to receive such dividend (or part thereof if our directors so determine) in cash in lieu of such allotment or (2) the shareholders entitled to such dividend will be entitled to elect to receive an allotment of shares credited as fully paid up in lieu of the whole or such part of the dividend as our directors may think fit. We may also, on the recommendation of our directors, resolve in respect of any particular dividend that, notwithstanding the foregoing, it may be satisfied wholly in the form of an allotment of shares credited as fully paid up without offering any right of shareholders to elect to receive such dividend in cash in lieu of such allotment.

Any dividend, interest or other sum payable in cash to the holder of shares may be paid by check or warrant sent by mail addressed to the holder at his registered address, or addressed to such person and at such addresses as the holder may direct. Every check or warrant shall, unless the holder or joint holders otherwise direct, be made payable to the order of the holder or, in the case of joint holders, to the order of the holder whose name stands first on the register in respect of such shares, and shall be sent at his or their risk and payment of the check or warrant by the bank on which it is drawn shall constitute a good discharge to us.

All dividends unclaimed for one year after having been declared may be invested or otherwise made use of by our board of directors for the benefit of our company until claimed. Any dividend unclaimed after a period of six years from the date of declaration of such dividend may be forfeited and, if so forfeited, shall revert to us.

Whenever our directors or our shareholders in general meeting have resolved that a dividend be paid or declared, our directors may further resolve that such dividend be satisfied wholly or in part by the distribution of specific assets of any kind, and in particular of paid up shares, debentures or warrants to subscribe for our securities or securities of any other company. Where any difficulty arises with regard to such distribution, our directors may settle it as they think expedient. In particular, our directors may issue fractional certificates, ignore fractions altogether or round the same up or down, fix the value for distribution purposes of any such specific assets, determine that cash payments shall be made to any of our shareholders upon the footing of the value so fixed in order to adjust the rights of the parties, vest any such specific assets in trustees as may seem expedient to our directors, and appoint any person to sign any requisite instruments of transfer and other documents on behalf of a person entitled to the dividend, which appointment shall be effective and binding on our shareholders.

134

Table of Contents

**Untraceable Shareholders**

We are entitled to sell any shares of a shareholder who is untraceable, provided that:

1. all checks or warrants in respect of dividends of such shares, not being less than three in number, for any sums payable in cash to the holder of such shares have remained uncashed for a period of twelve years prior to the publication of the advertisement and during the three months referred to in paragraph (3) below;

2. we have not during that time received any indication of the whereabouts or existence of the shareholder or person entitled to such shares by death, bankruptcy or operation of law; and

3. we have caused an advertisement to be published in newspapers in the manner stipulated by our amended and restated memorandum and articles of association, giving notice of our intention to sell these shares, and a period of three months has elapsed since such advertisement and the Nasdaq Global Market has been notified of such intention.

The net proceeds of any such sale shall belong to us, and when we receive these net proceeds we shall become indebted to the former shareholder for an amount equal to such net proceeds.

**Differences in Corporate Law**

The Companies Law is modeled after similar laws in the United Kingdom but does not follow recent changes in United Kingdom laws. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the United States.

*Mergers and Similar Arrangements.* Cayman Islands law does not provide for mergers as that expression is understood under United States corporate law. However, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement in question is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three–fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder would have the right to express to the court the view that the transaction should not be approved, the court can be expected to approve the arrangement if it satisfies itself that:

- the company is not proposing to act illegally or ultra vires and the statutory provisions as to majority vote have been complied with;

- the shareholders have been fairly represented at the meeting in question;

- the arrangement is such as a businessman would reasonably approve; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law or that would amount to a "fraud on the minority".

When a takeover offer is made and accepted by holders of 90.0% of the shares within four months, the offerer may, within a two–month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection may be made to the Grand Court of the Cayman Islands but is unlikely to succeed unless there is evidence of fraud, bad faith or collusion.

If the arrangement and reconstruction are thus approved, any dissenting shareholders would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of United States corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

*Shareholders' Suits.* We are not aware of any reported class action or derivative action having been brought in a Cayman Islands court. In principle, we will normally be the proper plaintiff and a derivative action may not be

135

**Table of Contents**

brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of its authority, could be effected duly if authorized by more than a simple majority vote which has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority".

*Corporate Governance.*  Cayman Islands laws do not restrict transactions with directors, requiring only that directors exercise a duty of care and owe a fiduciary duty to the companies for which they serve. Under our amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of The Nasdaq Global Market or unless disqualified by the chairman of the relevant board meeting, so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested and may be counted in the quorum at such meeting.

### Board of Directors

We are managed by our board of directors. Our amended and restated memorandum and articles of association provide that the number of our directors will be fixed from time to time exclusively pursuant to an ordinary resolution adopted by our members, but must consist of not less than three directors. We have set our board of directors to have not less than three directors and not more than twelve directors. Any director on our board may be removed by way of an ordinary resolution of shareholders. Any vacancies on our board of directors or additions to the existing board of directors can be filled by way of an ordinary resolution of shareholders or by the affirmative vote of a simple majority of the remaining directors, although this may be less than a quorum where the number of remaining directors falls below the minimum number fixed by our board of directors. Any director so appointed by the board of directors shall hold office only until the next following annual general meeting of the Company and shall then be eligible for re–election. Our directors shall serve a 3 year term from their appointment date and shall retire from office (unless he vacates his office sooner) at the expiry of such term provided their successors are elected or appointed. Such directors who retire at the expiry of their term are eligible for re–election. Our directors are not required to hold any of our shares to be qualified to serve on our board of directors.

Meetings of our board of directors may be convened at any time deemed necessary by our secretary on request of a director or by any director.

A meeting of our board of directors shall be competent to make lawful and binding decisions if at least three of the members of our board of directors are present or represented unless the board has fixed any other number. At any meeting of our directors, each director is entitled to one vote.

Questions arising at a meeting of our board of directors are required to be decided by simple majority votes of the members of our board of directors present or represented at the meeting. In the case of a tie vote, the chairman of the meeting shall have a second or deciding vote. Our board of directors may also pass resolutions without a meeting by unanimous written consent.

Certain actions require the approval of a supermajority of at least two–thirds of our board of directors, including:

- the appointment or removal of our chief executive officer, chief financial officer and other executive officers of the Company;

- any anti–takeover action in response to a takeover attempt;

- the establishment of any joint venture requiring a capital contribution from us in excess of $1,000,000;

- our acquisition of any company for aggregate consideration in excess of the equivalent of $10,000,000;

- any material change to our business scope;

Table of Contents

- any merger resulting in our shareholders immediately prior to such merger holding less than a majority of the voting power of the outstanding share capital of the surviving business entity;

- the sale or transfer of all or substantially all of our assets;

- any change in our dividend policy or the declaration or payment of a dividend or other distribution by us other than a distribution or dividend to us, our subsidiaries or our consolidated affiliated entities; or

- the settlement by us of any litigation in excess of $250,000.

**Committees of Board Of Directors**

Pursuant to our amended and restated articles of association, our board of directors has established an audit committee, a compensation committee and a nominations committee.

**Issuance of Additional Ordinary Shares or Preference Shares**

Our amended and restated memorandum of association authorizes our board of directors to issue additional ordinary shares from time to time as our board of directors shall determine, to the extent of available authorized but unissued shares.

Our amended and restated memorandum of association authorizes our board of directors to establish from time to time one or more series of preference shares and to determine, with respect to any series of preference shares, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the dividend rights, dividend rates, conversion rights, voting rights; and

- the rights and terms of redemption and liquidation preferences.

Our board of directors may issue series of preference shares without action by our shareholders to the extent authorized but unissued. Accordingly, the issuance of preference shares may adversely affect the rights of the holders of the ordinary shares. In addition, the issuance of preference shares may be used as an anti–takeover device without further action on the part of the shareholders. Issuance of preference shares may dilute the voting power of holders of ordinary shares.

Subject to applicable regulatory requirements, our board of directors may issue additional ordinary shares without action by our shareholders to the extent of available authorized but unissued shares. The issuance of additional ordinary shares may be used as an anti–takeover device without further action on the part of the shareholders. Such issuance may dilute the voting power of existing holders of ordinary shares.

**Registration Rights**

See "Shares Eligible for Future Sale".

**Inspection of Books and Records**

Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements. See "Where You Can Find Additional Information".

Table of Contents

**DESCRIPTION OF AMERICAN DEPOSITARY SHARES**

**American Depositary Shares**

Citibank, N.A. is the depositary bank for the American Depositary Shares. Citibank's depositary offices are located at 388 Greenwich Street, New York, New York 10013. American Depositary Shares are frequently referred to as "ADSs" and represent ownership interests in securities that are on deposit with the depositary bank. ADSs may be represented by certificates that are commonly known as "American Depositary Receipts" or "ADRs". The depositary bank typically appoints a custodian to safekeep the securities on deposit. In this case, the custodian is Citibank Hong Kong, located at 10/F, Harbour Front (II), 22,Tak Fung Street, Hung Hom, Kowloon, Hong Kong.

We appointed Citibank as depositary bank pursuant to a deposit agreement dated as of July 18, 2005, as amended and restated by the amended and restated deposit agreement, dated as of April 9, 2007. A copy of the form of amended and restated deposit agreement (the "deposit agreement") is on file with the SEC under cover of a Registration Statement on Form F–6 (File No. 333–141820). You may obtain a copy of the deposit agreement from the SEC's Public Reference Room at Headquarters Office, 100 F Street, N.E., Room 1580, Washington, D.C. 20549 and from the SEC's website (http://www.sec.gov). Please refer to Registration Number 333–141820 when retrieving such copy.

We are providing you with a summary description of the material terms of the ADSs and of your material rights as an owner of ADSs. Please remember that summaries by their nature lack the precision of the information summarized and that a holder's rights and obligations as an owner of ADSs will be determined by reference to the terms of the deposit agreement and not by this summary. We urge you to review the deposit agreement in its entirety.

Each ADS represents the right to receive five ordinary shares on deposit with the custodian. An ADS will also represent the right to receive any other property received by the depositary bank or the custodian on behalf of the owner of the ADS but that has not been distributed to the owners of ADSs because of legal restrictions or practical considerations.

If you become an owner of ADSs, you will become a party to the deposit agreement and therefore will be bound to its terms and to the terms of the ADR that represents your ADSs. The deposit agreement and the ADR specify our rights and obligations as well as your rights and obligations as owner of ADSs and those of the depositary bank. As an ADS holder you appoint the depositary bank to act on your behalf in certain circumstances. The deposit agreement and the ADRs are governed by New York law. However, our obligations to the holders of ordinary shares will continue to be governed by the laws of the Cayman Islands which may be different from the laws in the United States.

In addition, applicable laws and regulations may require you to satisfy reporting requirements and obtain regulatory approvals in certain circumstances. You are solely responsible for complying with such reporting requirements and obtaining such approvals. Neither the depositary, the custodian, us or any of their or our respective agents or affiliates shall be required to take any actions whatsoever on behalf of you to satisfy such reporting requirements or obtain such regulatory approvals under applicable laws and regulations.

As an owner of ADSs, you may hold your ADSs either by means of an ADR registered in your name, through a brokerage or safekeeping account, or through an account established by the depositary bank in your name reflecting the registration of uncertificated ADSs directly on the books of the depositary bank (commonly referred to as the "direct registration system" or "DRS"). The direct registration system reflects the uncertificated (book–entry) registration of ownership of ADSs by the depositary bank. Under the direct registration system, ownership of ADSs is evidenced by periodic statements issued by the depositary bank to the holders of the ADSs. The direct registration system includes automated transfers between the depositary bank and The Depository Trust Company ("DTC"), the central book–entry clearing and settlement system for equity securities in the United States. If you decide to hold your ADSs through your brokerage or safekeeping account, you must rely on the procedures of your broker or bank to assert your rights as ADS owner. Banks and brokers typically hold securities such as the ADSs through clearing and settlement systems such as DTC. The procedures of such clearing and settlement systems may limit your ability to exercise your rights as an owner of ADSs. Please consult with your broker or bank if you have any questions concerning these limitations and procedures. This summary description assumes you have opted to own the ADSs

138

**Table of Contents**

directly by means of an ADS registered in your name and, as such, we will refer to you as the "holder". When we refer to "you," we assume the reader owns ADSs and will own ADSs at the relevant time.

**Dividends and Distributions**

As a holder, you generally have the right to receive the distributions we make on the securities deposited with the custodian bank. Your receipt of these distributions may be limited, however, by practical considerations and legal limitations. Holders will receive such distributions under the terms of the deposit agreement in proportion to the number of ADSs held as of a specified record date.

**Distributions of Cash**

Whenever we make a cash distribution for the securities on deposit with the custodian, we will deposit the funds with the custodian. Upon receipt of confirmation of the deposit of the requisite funds, the depositary bank will arrange for the funds to be converted into U.S. dollars and for the distribution of the U.S. dollars to the holders, subject to the laws of the Cayman Islands and regulations.

The conversion into U.S. dollars will take place only if practicable and if the U.S. dollars are transferable to the United States. The amounts distributed to holders will be net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. The depositary will apply the same method for distributing the proceeds of the sale of any property (such as undistributed rights) held by the custodian in respect of securities on deposit.

The distribution of cash will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement.

**Distributions of Shares**

Whenever we make a free distribution of ordinary shares for the securities on deposit with the custodian, we will deposit the applicable number of shares with the custodian. Upon receipt of confirmation of such deposit, the depositary bank will *either* distribute to holders new ADSs representing the ordinary shares deposited *or* modify the ADS–to–ordinary shares ratio, in which case each ADS you hold will represent rights and interests in the additional shares so deposited. Only whole new ADSs will be distributed. Fractional entitlements will be sold and the proceeds of such sale will be distributed as in the case of a cash distribution.

The distribution of new ADSs or the modification of the ADS–to–shares ratio upon a distribution of shares will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes or governmental charges, the depositary bank may sell all or a portion of the new shares so distributed.

No such distribution of new ADSs will be made if it would violate a law (i.e., the U.S. securities laws) or if it is not operationally practicable. If the depositary bank does not distribute new ADSs as described above, it may sell the ordinary shares received upon the terms described in the deposit agreement and will distribute the proceeds of the sale as in the case of a distribution of cash.

**Distributions of Rights**

Whenever we intend to distribute rights to purchase additional ordinary shares, we will give prior notice to the depositary bank and we will assist the depositary bank in determining whether it is lawful and reasonably practicable to distribute rights to purchase additional ADSs to holders.

The depositary bank will establish procedures to distribute rights to purchase additional ADSs to holders and to enable such holders to exercise such rights if it is lawful and reasonably practicable to make the rights available to holders of ADSs, and if we provide all of the documentation contemplated in the deposit agreement (such as opinions to address the lawfulness of the transaction). You may have to pay fees, expenses, taxes and other governmental charges to subscribe for the new ADSs upon the exercise of your rights. The depositary bank is not

**Table of Contents**

obligated to establish procedures to facilitate the distribution and exercise by holders of rights to purchase new ordinary shares other than in the form of ADSs.

The depositary bank will *not* distribute the rights to you if:

- We do not timely request that the rights be distributed to you or we request that the rights not be distributed to you; or

- We fail to deliver satisfactory documents to the depositary bank; or

- It is not reasonably practicable to distribute the rights.

The depositary bank will sell the rights that are not exercised or not distributed if such sale is lawful and reasonably practicable. The proceeds of such sale will be distributed to holders as in the case of a cash distribution. If the depositary bank is unable to sell the rights, it will allow the rights to lapse.

**Elective Distributions**

Whenever we intend to distribute a dividend payable at the election of shareholders either in cash or in additional shares, we will give prior notice thereof to the depositary bank and will indicate whether we wish the elective distribution to be made available to you. In such case, we will assist the depositary bank in determining whether such distribution is lawful and reasonably practicable.

The depositary bank will make the election available to you only if it is reasonably practical and if we have provided all of the documentation contemplated in the deposit agreement. In such case, the depositary bank will establish procedures to enable you to elect to receive either cash or additional ADSs, in each case as described in the deposit agreement.

If the election is not made available to you, you will receive either cash or additional ADSs, depending on what a shareholder in the Cayman Islands would receive upon failing to make an election, as more fully described in the deposit agreement.

**Other Distributions**

Whenever we intend to distribute property other than cash, ordinary shares or rights to purchase additional ordinary shares, we will notify the depositary bank in advance and will indicate whether we wish such distribution to be made to you. If so, we will assist the depositary bank in determining whether such distribution to holders is lawful and reasonably practicable.

If it is reasonably practicable to distribute such property to you and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will distribute the property to the holders in a manner it deems practicable.

The distribution will be made net of fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes and governmental charges, the depositary bank may sell all or a portion of the property received.

The depositary bank will *not* distribute the property to you and will sell the property if:

- We do not request that the property be distributed to you or if we ask that the property not be distributed to you; or

- We do not deliver satisfactory documents to the depositary bank; or

- The depositary bank determines that all or a portion of the distribution to you is not reasonably practicable.

The proceeds of such sale will be distributed to holders as in the case of a cash distribution.

**Table of Contents**

**Redemption**

Whenever we decide to redeem any of the securities on deposit with the custodian, we will notify the depositary bank. If it is reasonably practicable and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will mail notice of the redemption to the holders.

The custodian will be instructed to surrender the shares being redeemed against payment of the applicable redemption price. The depositary bank will convert the redemption funds received into U.S. dollars upon the terms of the deposit agreement and will establish procedures to enable holders to receive the net proceeds from the redemption upon surrender of their ADSs to the depositary bank. You may have to pay fees, expenses, taxes and other governmental charges upon the redemption of your ADSs. If less than all ADSs are being redeemed, the ADSs to be retired will be selected by lot or on a *pro rata* basis, as the depositary bank may determine.

**Changes Affecting Shares**

The ordinary shares held on deposit for your ADSs may change from time to time. For example, there may be a change in nominal or par value, a split–up, cancellation, consolidation or reclassification of such shares or a recapitalization, reorganization, merger, consolidation or sale of assets.

If any such change were to occur, your ADSs would, to the extent permitted by law, represent the right to receive the property received or exchanged in respect of the ordinary shares held on deposit. The depositary bank may in such circumstances deliver new ADSs to you or call for the exchange of your existing ADSs for new ADSs. If the depositary bank may not lawfully distribute such property to you, the depositary bank may sell such property and distribute the net proceeds to you as in the case of a cash distribution.

**Issuance Of ADSs Upon Deposit of Ordinary Shares**

The depositary bank may create ADSs on your behalf if you or your broker deposit ordinary shares with the custodian. The depositary bank will deliver these ADSs to the person you indicate only after you pay any applicable issuance fees and any charges and taxes payable for the transfer of the ordinary shares to the custodian. Your ability to deposit ordinary shares and receive ADSs may be limited by U.S. and legal considerations in the Cayman Islands applicable at the time of deposit.

The issuance of ADSs may be delayed until the depositary bank or the custodian receives confirmation that all required approvals have been given and that the ordinary shares have been duly transferred to the custodian. The depositary bank will only issue ADSs in whole numbers.

When you make a deposit of ordinary shares, you will be responsible for transferring good and valid title to the depositary bank. As such, you will be deemed to represent and warrant that:

- The ordinary shares are duly authorized, validly issued, fully paid, non–assessable and legally obtained.

- All preemptive (and similar) rights, if any, with respect to such ordinary shares have been validly waived or exercised.

- You are duly authorized to deposit the ordinary shares.

- The ordinary shares presented for deposit are free and clear of any lien, encumbrance, security interest, charge, mortgage or adverse claim, and are not, and the ADSs issuable upon such deposit will not be, "restricted securities" (as defined in the deposit agreement).

- The shares presented for deposit have not been stripped of any rights or entitlements.

If any of the representations or warranties are incorrect in any way, we and the depositary bank may, at your cost and expense, take any and all actions necessary to correct the consequences of the misrepresentations.

**Table of Contents**

**Transfer, Combination And Split Up Of ADRs**

As an ADR holder, you will be entitled to transfer, combine or split up your ADRs and the ADSs evidenced thereby. For transfers of ADRs, you will have to surrender the ADRs to be transferred to the depositary bank and also must:

- Ensure that the surrendered ADR certificate is properly endorsed or otherwise in proper form for transfer;

- Provide such proof of identity and genuineness of signatures as the depositary bank deems appropriate;

- Provide any transfer stamps required by the State of New York or the United States; and

- Pay all applicable fees, charges, expenses, taxes and other government charges payable by ADR holders pursuant to the terms of the deposit agreement, upon the transfer of ADRs.

To have your ADRs either combined or split up, you must surrender the ADRs in question to the depositary bank with your request to have them combined or split up, and you must pay all applicable fees, charges and expenses payable by ADR holders, pursuant to the terms of the deposit agreement, upon a combination or split up of ADRs.

**Withdrawal of Shares upon Cancellation of ADSs**

As a holder, you will be entitled to present your ADSs to the depositary bank for cancellation and then receive the corresponding number of underlying ordinary shares at the custodian's offices. Your ability to withdraw the ordinary shares may be limited by U.S. and legal considerations applicable at the time of withdrawal. In order to withdraw the ordinary shares represented by your ADSs, you will be required to pay to the depositary the fees for cancellation of ADSs and any charges and taxes payable upon the transfer of the ordinary shares being withdrawn. You assume the risk for delivery of all funds and securities upon withdrawal. Once canceled, the ADSs will not have any rights under the deposit agreement.

If you hold ADSs registered in your name, the depositary bank may ask you to provide proof of identity and genuineness of any signature and such other documents as the depositary bank may deem appropriate before it will cancel your ADSs. The withdrawal of the shares represented by your ADSs may be delayed until the depositary bank receives satisfactory evidence of compliance with all applicable laws and regulations. Please keep in mind that the depositary bank will only accept ADSs for cancellation that represent a whole number of securities on deposit.

You will have the right to withdraw the securities represented by your ADSs at any time except for:

- Temporary delays that may arise because (i) the transfer books for the ordinary shares or ADSs are closed, or (ii) ordinary shares are immobilized on account of a shareholders' meeting or a payment of dividends.

- Obligations to pay fees, taxes and similar charges.

- Restrictions imposed because of laws or regulations applicable to ADSs or the withdrawal of securities on deposit.

The deposit agreement may not be modified to impair your right to withdraw the securities represented by your ADSs except to comply with mandatory provisions of law.

**Voting Rights**

As a holder, you generally have the right under the deposit agreement to instruct the depositary bank to exercise the voting rights for the ordinary shares represented by your ADSs. The voting rights of holders of ordinary shares are described in "Description of Share Capital — Voting Rights Attaching to the Shares" above.

At our request, the depositary bank will distribute to you any notice of shareholders' meeting received from us together with information explaining how to instruct the depositary bank to exercise the voting rights of the securities represented by ADSs.

If the depositary bank timely receives voting instructions from a holder of ADSs, it will endeavor to vote the securities represented by the holder's ADSs in accordance with such voting instructions.

142

**Table of Contents**

In the event of voting by a show of hands, each shareholder has one vote irrespective of the number of shares held by such person and the depositary shall vote or cause the custodian to vote all the shares then on deposit in accordance with instructions received from a majority of holders giving voting instructions. In the event of poll voting, each shareholder has an amount of votes equal to the number of shares held as of record date for the meeting and the depositary shall vote or cause the custodian to vote the shares on deposit in respect of ADSs for which holder of ADSs have timely given voting instructions to the depositary.

If the depositary timely receives voting instructions from a holder of ADSs that fail to specify the manner in which the depositary is to vote the shares represented by that holder's ADSs, the depositary will deem the holder to have voted in favor of the items set forth in the voting instructions. If the depositary does not timely receive voting instructions from a holder of ADSs and we have timely provided the depositary with our notice of meeting and related materials, that holder will be deemed, and the depositary will deem that holder to have instructed the depositary to give a discretionary proxy to a person designated by us to vote the shares represented by the ADSs at our discretion, unless:

- we have failed to timely provide the depositary with our notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- voting at the meeting is made on a show of hands.

Please note that the ability of the depositary bank to carry out voting instructions may be limited by practical and legal limitations and the terms of the securities on deposit. We cannot assure you that you will receive voting materials in time to enable you to return voting instructions to the depositary bank in a timely manner. Securities for which no voting instructions have been received will not be voted.

**Fees and Charges**

As an ADS holder, you will be required to pay the following service fees to the depositary bank:

| Service | Fees |
|---|---|
| Issuance of ADSs | Up to U.S. 5¢ per ADS issued |
| Cancellation of ADSs | Up to U.S. 5¢ per ADS canceled |
| Distribution of cash dividends or other cash distributions | Up to U.S. 2¢ per ADS held |
| Distribution of ADSs pursuant to share dividends, free share distributions or exercise of rights | Up to U.S. 5¢ per ADS issued |
| Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to U.S. 5¢ per share (or share equivalent) distributed |
| Annual Depositary Services Fee | Annually up to U.S. 2¢ per ADS held at the end of each calendar year, except to the extent of any cash dividend fee(s) charged during such calendar year |
| Transfer of ADRs | U.S. $1.50 per certificate presented for transfer |

As an ADS holder you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges such as:

- Fees for the transfer and registration of ordinary shares charged by the registrar and transfer agent for the ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of ordinary shares).

- Expenses incurred for converting foreign currency into U.S. dollars.

- Expenses for cable, telex and fax transmissions and for delivery of securities.

Table of Contents

- Taxes and duties upon the transfer of securities (i.e., when ordinary shares are deposited or withdrawn from deposit).

- Fees and expenses incurred in connection with the delivery or servicing of ordinary shares on deposit.

We have agreed to pay certain other charges and expenses of the depositary bank. Note that the fees and charges you may be required to pay may *vary* over time and may be changed by us and by the depositary bank. You will receive prior notice of such changes.

**Amendments and Termination**

We may agree with the depositary bank to modify the deposit agreement at any time without your consent. We undertake to give holders 30 days' prior notice of any modifications that would materially prejudice any of their substantial rights under the deposit agreement. We will not consider to be materially prejudicial to your substantial rights any modifications or supplements that are reasonably necessary for the ADSs to be registered under the Securities Act or to be eligible for book–entry settlement, in each case without imposing or increasing the fees and charges you are required to pay. In addition, we may not be able to provide you with prior notice of any modifications or supplements that are required to accommodate compliance with applicable provisions of law.

You will be bound by the modifications to the deposit agreement if you continue to hold your ADSs after the modifications to the deposit agreement become effective. The deposit agreement cannot be amended to prevent you from withdrawing the ordinary shares represented by your ADSs (except as permitted by law).

We have the right to direct the depositary bank to terminate the deposit agreement. Similarly, the depositary bank may in certain circumstances on its own initiative terminate the deposit agreement. In either case, the depositary bank must give notice to the holders at least 30 days before termination.

Upon termination, the following will occur under the deposit agreement:

- *for a period of six months after termination,* you will be able to request the cancellation of your ADSs and the withdrawal of the ordinary shares represented by your ADSs and the delivery of all other property held by the depositary bank in respect of those ordinary shares on the same terms as prior to the termination. During such six–month period, the depositary bank will continue to collect all distributions received on the ordinary shares on deposit (i.e., dividends) but will not distribute any such property to you until you request the cancellation of your ADSs.

- *After the expiration of such six–month period,* the depositary bank may sell the securities held on deposit. The depositary bank will hold the proceeds from such sale and any other funds then held for the holders of ADSs in a non–interest bearing account. At that point, the depositary bank will have no further obligations to holders other than to account for the funds then held for the holders of ADSs still outstanding.

**Books of Depositary**

The depositary bank will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the ADSs and the deposit agreement.

The depositary bank will maintain in New York facilities to record and process the issuance, cancellation, combination, split–up and transfer of ADRs. These facilities may be closed from time to time, to the extent not prohibited by law.

**Limitations on Obligations and Liabilities**

The deposit agreement limits our obligations and the depositary bank's obligations to you. Please note the following:

- We and the depositary bank are obligated only to take the actions specifically stated in the deposit agreement without negligence or bad faith.

144

Table of Contents

- The depositary bank disclaims any liability for any failure to carry out voting instructions, for any manner in which a vote is cast or for the effect of any vote, provided that it acts in good faith and in accordance with the terms of the deposit agreement.

- The depositary bank disclaims any liability for any failure to determine the lawfulness or practicality of any action, for the content of any document forwarded to you on our behalf or for the accuracy of any translation of such a document, for the investment risks associated with investing in ordinary shares, for the validity or worth of the ordinary shares, for any tax consequences that result from the ownership of ADSs, for the credit–worthiness of any third party, for allowing any rights to lapse under the terms of the deposit agreement, for the timeliness of any of our notices or for our failure to give notice.

- We and the depositary bank will not be obligated to perform any act that is inconsistent with the terms of the deposit agreement.

- We and the depositary bank disclaim any liability if we are prevented or forbidden from acting on account of any law or regulation, any provision of our amended and restated memorandum and articles of association, any provision of any securities on deposit or by reason of any act of God or war or other circumstances beyond our control.

- We and the depositary bank disclaim any liability by reason of any exercise of, or failure to exercise, any discretion provided for in the deposit agreement or in our amended and restated memorandum and articles of association or in any provisions of securities on deposit.

- We and the depositary bank further disclaim any liability for any action or inaction in reliance on the advice or information received from legal counsel, accountants, any person presenting shares for deposit, any holder of ADSs or authorized representatives thereof, or any other person believed by either of us in good faith to be competent to give such advice or information.

- We and the depositary bank also disclaim liability for the inability by a holder to benefit from any distribution, offering, right or other benefit which is made available to holders of ordinary shares but is not, under the terms of the deposit agreement, made available to you.

- We and the depositary bank may rely without any liability upon any written notice, request or other document believed to be genuine and to have been signed or presented by the proper parties.

- We and the depositary bank also disclaim liability for any consequential or punitive damages for any breach of the terms of the deposit agreement.

**Pre–release Transactions**

The depositary bank may, in certain circumstances, issue ADSs before receiving a deposit of ordinary shares or release ordinary shares before receiving ADSs for cancellation. These transactions are commonly referred to as "pre–release transactions". The deposit agreement limits the aggregate size of pre–release transactions and imposes a number of conditions on such transactions (i.e., the need to fully collateralize, the type of collateral required, the representations required from brokers, etc.). The depositary bank may retain the compensation received from the pre–release transactions.

**Taxes**

You will be responsible for the taxes and other governmental charges payable on the ADSs and the securities represented by the ADSs. We, the depositary bank and the custodian may deduct from any distribution the taxes and governmental charges payable by holders and may sell any and all property on deposit to pay the taxes and governmental charges payable by holders. You will be liable for any deficiency if the sale proceeds do not cover the taxes that are due.

The depositary bank may refuse to issue ADSs, to deliver, transfer, split and combine ADRs or to release securities on deposit until all taxes and charges are paid by the applicable holder. The depositary bank and the custodian may take reasonable administrative actions to obtain tax refunds and reduced tax withholding for any

**Table of Contents**

distributions on your behalf. However, you may be required to provide to the depositary bank and to the custodian proof of taxpayer status and residence and such other information as the depositary bank and the custodian may require to fulfill legal obligations. You are required to indemnify us, the depositary bank and the custodian for any claims with respect to taxes based on any tax benefit obtained for you.

**Foreign Currency Conversion**

The depositary bank will arrange for the conversion of all foreign currency received into U.S. dollars if such conversion is practical, and it will distribute the U.S. dollars in accordance with the terms of the deposit agreement. You may have to pay fees and expenses incurred in converting foreign currency, such as fees and expenses incurred in complying with currency exchange controls and other governmental requirements.

If the conversion of foreign currency is not practical or lawful, or if any required approvals are denied or not obtainable at a reasonable cost or within a reasonable period, the depositary bank may take the following actions in its discretion:

- Convert the foreign currency to the extent practical and lawful and distribute the U.S. dollars to the holders for whom the conversion and distribution is lawful and practical.

- Distribute the foreign currency to holders for whom the distribution is lawful and practical.

- Hold the foreign currency (without liability for interest) for the applicable holders.

146

**Table of Contents**

<div align="center">SHARES ELIGIBLE FOR FUTURE SALE</div>

Upon completion of this offering, we will have outstanding 111,930,414 ADSs representing approximately 87.02% of our ordinary shares assuming no exercise by the underwriters of their over–allotment option. All of the ADSs sold in this offering and the ordinary shares they represent will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs.

**Lock–up Agreements**

We have agreed with the underwriters that we will not, without the prior consent of Merrill Lynch, for a period of 90 days following the date of this prospectus:

- offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

- enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, our ordinary shares or such other securities, in cash or otherwise. The restrictions above do not apply to (1) the ADSs to be sold in this offering and the ordinary shares underlying such ADSs, (2) or the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 32.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of June 30, 2007.

The underwriters may release other securities held by us that are currently subject to lock–up, subject to applicable FINRA regulations. The underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would depend on a number of factors, which may include market conditions, the performance of our ADSs in the market and our financial condition at that time.

In connection with our acquisition of Allyes, the former Allyes shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition. Any additional shares they may receive upon payment of the earn–out payment, if any, will not be subject to lock–up. See "Our Recent Significant Acquisitions".

**Rule 144**

Under Rule 144 as currently in effect, beginning twelve months after the date of our most recently filed annual report a person who owns our restricted ordinary shares and who has beneficially owned those shares for at least one year is entitled to sell within any three–month period a number of shares, including ADSs representing such number of shares, that does not exceed the greater of the following:

- 1% of the number of our ordinary shares then outstanding, in the form of ADSs or otherwise, which will equal approximately 4 million shares immediately after this offering; and

- the average weekly trading volume of our ADSs on the Nasdaq Global Market during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

<div align="center">147</div>

**Table of Contents**

Sales under Rule 144 are also subject to manner of sale provisions, notice requirements and the availability of current public information about us. Persons who are not our affiliates may be exempt from these restrictions under Rule 144(k) discussed below.

**Rule 144(k)**

Under Rule 144(k), a person who is not one of our affiliates at any time during the three months preceding a sale, and who has beneficially owned the shares, in the form of ADSs or otherwise, proposed to be sold for at least two years, including the holding period of any prior owner other than an affiliate, is entitled to sell those shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless otherwise restricted, "144(k) shares" may be sold at any time.

**Registration Rights**

Upon the closing of our acquisition of Allyes, we granted the former shareholders of Allyes registration rights with regard to the ordinary shares we issued to them. Under the terms of our agreement with the former Allyes shareholders:

- prior to September 18, 2009 or prior to the time when the shares proposed to be sold by the former Allyes shareholders may be sold in a 90-day period under Rule 144, any former Allyes shareholders or shareholders holding 3 million of our ordinary shares in aggregate may request that we effect the registration of the ordinary shares held by them, provided that if the offering is part of an underwritten offering, the expected proceeds from such an offering would not be less than 40 million; we are obligated to effect up to three such registrations; and

- one of the Allyes shareholders, Magic Elite, on a date at least 150 days and no more than 330 days following March 28, 2007, may request that we effect the registration of the ordinary shares held by the shareholder; we are obligated to effect only one such registration.

We are not obligated to take any action to effect any such registration more than once in any six month period or within six months of any other public offering we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement.

Registrable securities are ordinary shares issued or issuable to the former Allyes shareholders. We are not, however, obligated to effect any such demand registration:

- if we, within ten days of receipt of a request for such registration, give notice of our bona fide intention to effect the filing of a registration statement with the SEC (or any comparable regulatory agency for a registration in a jurisdiction other than the United States) within 60 days of receipt of such request (other than a registration of securities in a business combination transaction pursuant to Rule 145 under the Securities Act or an offering solely to employees);

- within six months immediately following the effective date of any registration statement pertaining to our securities (other than a registration in a transaction pursuant to Rule 145 under the Securities Act or with respect to an employee benefit plan); or

- if we furnish to the holders of registrable securities a certificate signed by our Chief Executive Officer stating that in the good faith judgment of our Board of Directors, it would be materially detrimental to us or our shareholders for a registration statement to be filed in the near future, in which event we have the right to defer the filing of the registration statement, no more than once during any 12 month period, for a period not to exceed 90 days from the receipt of the request to file such registration statement.

Holders of registrable securities also have "piggyback" registration rights, which may require us to register all or any part of the registrable securities then held by such holders when we register any of our ordinary shares other than a registration:

- relating solely to the sale of securities to participants in our share option plan;

- relating to a corporate reorganization or other transaction pursuant to Rule 145 under the Securities Act;

148

Table of Contents

- on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the registrable securities; and

If any of the offerings involves an underwriting, the managing underwriter of any such offering has certain rights to limit the number of shares included in such registration. However, the number of registrable securities included in an underwritten public offering subsequent to our initial public offering pursuant to "piggyback" registration rights may not be reduced to less than 30% of the aggregate securities included in such offering.

We are not obligated to register any registrable securities if, in the opinion of counsel retained by us concurred in by counsel for the holder of registrable securities, no registration under the Securities Act (or comparable law) is required in connection with the sale of the registrable securities to the public.

**Share Option Plan**

Since July 2003, when we first granted options to purchase our ordinary shares, we have granted in options to purchase in aggregate 76,110,615 of our ordinary shares. All of these ordinary shares are or will be eligible for sale in the public market from time to time, subject to vesting and exercise provisions of the options, Rule 144 volume limitations applicable to our affiliates and other holders of restricted shares and the lock–up agreements.

We filed a registration statement under the Securities Act covering a total of 44,251,830 ordinary shares reserved for issuance under our 2003 Plan and 2005 Plan on February 28, 2006. The ordinary shares registered under such registration statement, subject to the lockup agreements and Rule 144 volume limitations applicable to affiliates, are available for sale in the open market upon the exercise of vested options.

149

Table of Contents

<div align="center">TAXATION</div>

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty or withholding tax applicable to us or to any holder of ADS, or ordinary shares. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. No stamp duty is payable in the Cayman Islands on transfers of shares of Cayman Islands companies except those which hold interests in land in the Cayman Islands. The Cayman Islands is not party to any double taxation treaties. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Pursuant to Section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, we have obtained an undertaking from the Governor–in–Council:

- (1) that no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciation shall apply to us or our operations; and

- (2) that the aforesaid tax or any tax in the nature of estate duty or inheritance tax shall not be payable on the shares, debentures or other obligations of the Company.

The undertaking for us is for a period of twenty years from May 3, 2005.

**People's Republic of China Taxation**

Under the Income Tax Law for Enterprises with Foreign Investment and Foreign Enterprises currently in effect, any dividends payable by foreign–invested enterprises to non–PRC investors are exempt from any PRC withholding tax. In addition, under currently effective PRC laws, any dividends payable, or distributions made, by us to holders or beneficial owners of our ADSs will not be subject to any PRC tax, provided that such holders or beneficial owners are not deemed as PRC residents, including individuals and enterprises, under the PRC tax law and have not become subject to PRC tax.

On March 16, 2007, the National People's Congress approved and promulgated a new tax law named "Enterprise Income Tax Law of the PRC", or the EIT Law, which will take effect beginning January 1, 2008. Under the EIT Law, enterprises established under the laws of non–PRC jurisdictions but whose "de facto management body" is located in the PRC are considered "resident enterprises" for PRC tax purposes. The EIT Law does not define the term "de facto management" and it is currently unclear under which situation a non–PRC enterprise's "de facto management body" is considered to be located in the PRC. However, substantially all of our management is currently based in the PRC, and may remain in the PRC after the effectiveness of the EIT Law. If we are treated as a "resident enterprise" for PRC tax purposes, we will be subject to PRC income tax on our worldwide income at a uniform tax rate of 25%, which will include the dividend income we receive from our subsidiaries. In addition, although the EIT Law provides that dividend income between qualified "resident enterprises" is exempted income, it is unclear what is considered to be a qualified "resident enterprise" under the EIT Law.

Moreover, the EIT Law provides that an income tax rate of 20% will normally be applicable to dividends payable to non–PRC investors who are individuals or considered as "non–resident enterprise", to the extent such dividends are derived from sources within the PRC, although such income tax may be subsequently exempted or reduced by the State Council. We are a Cayman Islands holding company and substantially all of our income may be derived from dividends we receive from our operating subsidiaries located in the PRC. If we declare dividends from such income, it is unclear whether such dividends will be deemed to be derived from sources within the PRC under the EIT law and be subject to the 20% income tax.

In addition, under the EIT Law, foreign shareholders enterprise and enterprise ADSs holders may be subject to a 20% income tax upon any gains they realize from the transfer of their shares or ADSs, if such income is regarded as income from sources with the PRC. However, what will constitute as income from sources within the PRC and

<div align="center">150</div>

**Table of Contents**

whether or not there will be any exemption or reduction in taxation for our foreign shareholders or ADS holders are still currently unclear.

**United States Federal Income Taxation**

The following summary describes the material United States federal income tax consequences to U.S. Holders (defined below) under present law of an investment in the ADSs or ordinary shares. This summary applies only to investors that acquire their ADSs or ordinary shares in the offering, that hold the ADSs or ordinary shares as capital assets and that have the U.S. dollar as their functional currency. This discussion is based on the tax laws of the United States as in effect on the date of this Prospectus and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this prospectus, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax consequences described below.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- certain financial institutions;

- insurance companies;

- a regulated investment company;

- a real estate investment trust;

- broker dealers;

- U.S. expatriates;

- traders that elect to mark to market;

- tax−exempt entities;

- persons liable for alternative minimum tax;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own 10.0% or more of our voting stock; or

- persons holding ADSs or ordinary shares through partnerships or other pass−through entities.

The discussion below of the U.S. federal income tax consequences to "U.S. Holders" will apply if you are a beneficial owner of ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- an individual citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized under the laws of the United States, any State thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If you are a partner in partnership or other entity taxable as a partnership that holds ADSs or ordinary shares, your tax treatment generally will depend on your status and the activities of the partnership.

**PROSPECTIVE PURCHASERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE APPLICATION OF THE U.S. FEDERAL TAX RULES TO THEIR PARTICULAR**

Table of Contents

CIRCUMSTANCES AS WELL AS THE STATE AND LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF ADSs OR ORDINARY SHARES.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you should be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes. Exchanges of ordinary shares for ADSs and ADSs for ordinary shares generally will not be subject to U.S. federal income tax.

The U.S. Treasury has expressed concerns that intermediaries in the chain of ownership between the holder of an ADS and the issuer of the security underlying the ADS may be taking actions that are inconsistent with the claiming, by U.S. Holders of ADSs, of foreign tax credits for U.S. federal income tax purposes. Such actions would also be inconsistent with the claiming of the reduced rate of tax applicable to dividends received by certain non–corporate U.S. Holders, as described below. Accordingly, the analysis of the creditability of PRC taxes, if any, and the availability of the reduced tax rate for dividends received by certain non–corporate holders below could be affected by actions taken by intermediaries in the chain of ownership between the holder of an ADS and our company.

**Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares**

The gross amount of all our distributions to you with respect to the ADSs or ordinary shares generally will be included in your gross income as foreign source dividend income on the date of actual or constructive receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The dividends will not be eligible for the dividends–received deduction allowed to corporations in respect of dividends received from other U.S. corporations.

With respect to non–corporate U.S. Holders including individual U.S. Holders, for taxable years beginning before January 1, 2011, certain dividends received from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. U.S. Treasury Department guidance indicates that our ADSs, but not our ordinary shares, are readily tradable on an established securities market in the United States. Thus, we believe that dividends we pay on our ordinary shares that are represented by ADSs, but not on our Shares that are not so represented, currently meet such conditions required for the reduced tax rates. There can be no assurance that our ADSs will be considered readily tradable on an established securities market in later years. A qualified foreign corporation also includes a foreign corporation that is eligible for the benefits of certain income tax treaties with the United States. In the event that we are deemed to be a Chinese "resident enterprise" under the PRC tax law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC, and if we are eligible for such benefits, dividends we pay on our ordinary shares, regardless of whether such shares are represented by ADSs, would be subject to the reduced rates of taxation. See "— People's Republic of China Taxation." Non–corporate U.S. Holders that do not meet a minimum holding period requirement during which they are not protected from the risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. The rate reduction will also not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You are urged to consult your tax advisors regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

To the extent that the amount of the distribution exceeds our current and accumulated earnings and profits, it will be treated first as a tax–free return of your tax basis in your ADSs or ordinary shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain. We do not intend to calculate our earnings and profits under U.S. federal income tax principles. Therefore, a U.S. Holder should expect that a distribution will generally be treated as a dividend.

152

Table of Contents

In the event that we are deemed to be a Chinese "resident enterprise" under the PRC tax law, you may be subject to PRC withholding taxes on dividends paid to you with respect to the ADSs or ordinary shares. See discussion under "Taxation — People's Republic of China Taxation". In that case, however, you may be able to obtain a reduced rate of PRC withholding taxes under the treaty between the United States and the PRC if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends, if any, may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. The rules governing the foreign tax credit are complex. You are urged to consult your tax advisors regarding the availability of the foreign tax credit under your particular circumstances.

**Taxation of Disposition of ADSs or Ordinary Shares**

You will recognize taxable gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss generally will be capital gain or loss. If you are a non–corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes. However, in the event that gain from the disposition of the ADSs or ordinary shares may be taxed in the PRC (see discussion under "Taxation — People's Republic of China Taxation"), the gain would be treated as PRC–source income under the income tax treaty between the United States and the PRC. You are urged to consult your tax advisors regarding the tax consequences if a foreign tax is imposed on gain on a disposition of our ADSs or ordinary shares, including the availability of the foreign tax credit under your particular circumstances.

**Passive Foreign Investment Company**

We do not believe that we are, for U.S. federal income tax purposes, a passive foreign investment company (a "PFIC"), and we expect to operate in such a manner so as not to become a PFIC. If, however, we are or become a PFIC, you could be subject to additional U.S. federal income taxes on gain recognized with respect to the ADSs or ordinary shares and on certain distributions, plus an interest charge on certain taxes treated as having been deferred under the PFIC rules. Non–corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us for taxable years beginning before January 1, 2011, if we are a PFIC in the taxable year in which such dividends are paid or in the preceding taxable year.

**Information Reporting and Backup Withholding**

Dividend payments with respect to ADSs or ordinary shares and proceeds from the sale, exchange or redemption of ADSs or ordinary shares may be subject to information reporting to the Internal Revenue Service, unless you are an exempt recipient such as a corporation. A backup withholding tax may apply, however, backup withholding will not apply to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification or who is otherwise exempt from backup withholding. U.S. Holders who are required to establish their exempt status generally must provide such certification on Internal Revenue Service Form W–9. You are urged to consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the Internal Revenue Service and furnishing any required information.

**Table of Contents**

## UNDERWRITING

Focus Media, the selling shareholders and the underwriters named below have entered into an underwriting agreement with respect to the ADSs being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of ADSs indicated in the following table. Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated are joint bookrunners. Citigroup Global Markets Inc.'s address is 388 Greenwich Street, New York, New York 10013. Credit Suisse Securities (USA) LLC's address is Eleven Madison Avenue, New York, New York 10010–3629. Merrill Lynch, Pierce, Fenner & Smith Incorporated's address is 4 World Financial Center, 250 Vesey Street, New York, New York 10080.

| Underwriters | Number of ADSs |
|---|---:|
| Citigroup Global Markets Inc. | 4,390,679 |
| Credit Suisse Securities (USA) LLC | 4,390,679 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 4,390,679 |
| CIBC World Markets Corp. | 343,023 |
| Piper Jaffray & Co. | 205,813 |
| Total | 13,720,873 |

The underwriters are committed to take and pay for all of the ADSs being offered, if any are taken, other than the ADSs covered by the option described below unless and until this option is exercised.

If the underwriters sell more ADSs than the total number set forth in the table above, the underwriters have an option to buy up to an additional 2,000,000 ADSs from us to cover such sales. They may exercise that option for 30 days. If any ADSs are purchased pursuant to this option, the underwriters will severally purchase ADSs in approximately the same proportion as set forth in the table above.

The following tables show the per ADS and total underwriting discounts and commissions to be paid to the underwriters by Focus Media and the selling shareholders. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase a total of 2,000,000 additional ADSs from us.

### Paid by Focus Media

|  | No Exercise | Full Exercise |
|---|---:|---:|
| Per ADS | $ 1.9425 | $ 1.9425 |
| Total | $ 9,712,500 | $ 13,597,500 |

### Paid by Selling Shareholders

|  | No Exercise | Full Exercise |
|---|---:|---:|
| Per ADS | $ 1.9425 | $ 1.9425 |
| Total | $ 16,940,296 | $ 16,940,296 |

Total underwriting discounts and commissions to be paid to the underwriters represent 3% of the total amount of the offering.

ADSs sold by the underwriters to the public will initially be offered at the public offering price set forth on the cover of this prospectus. Any ADSs sold by the underwriters to securities dealers may be sold at a discount of up to $1.1655 per ADS from the public offering price. Any such securities dealers may resell any ADSs purchased from the underwriters to certain other brokers or dealers at a discount of up to $0.10 per ADS from the public offering price. If all the ADSs are not sold at the public offering price, the representative may change the offering price and the other selling terms.

Total expenses for this offering are estimated to be approximately $2.4 million, including SEC registration fees of $28,946, FINRA filing fees of $75,500, printing fees of approximately $400,000, legal fees of approximately $500,000, accounting fees of approximately $800,000, roadshow costs and expenses of approximately

Table of Contents

$120,000, travel and other out–of–pocket expenses of approximately $20,000 and ADS issuance fees of approximately $440,000. All amounts are estimated except for the fees relating to the SEC registration and the FINRA filing. The underwriters have agreed to pay for the roadshow, printing, out–of–pocket expenses and filing fees for this offering.

Some of the underwriters are expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker–dealers registered with the SEC.

The underwriters have entered into an agreement in which they agree to restrictions on where and to whom they and any dealer purchasing from them may offer ADSs, as a part of the distribution of the ADSs. The underwriters also have agreed that they may sell ADSs among themselves.

Focus Media has agreed with the underwriters that it will not, without the prior consent of Merrill Lynch, for a period of 90 days following the date of this prospectus:

- offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or its ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

- enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of its ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, its ordinary shares or such other securities, in cash or otherwise.

The 90–day restricted period described in the preceding paragraph will be automatically extended if (1) during the last 17 days of the 90–day restricted period the company issues an earnings release or announces material news or a material event; or (2) prior to the expiration of the 90–day restricted period, the company announces, or if the representatives of the underwriters determine, that the company will release earnings results during the 15–day period following the last day of the 90–day period, in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18–day period beginning on the issuance of the earnings release of the announcement of the material news or material event. The restrictions applicable to Focus Media do not apply to (1) the ADSs to be sold in this offering, and the ordinary shares underlying such ADSs, (2) the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 32.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of June 30, 2007.

The lock–up period will be extended if, (i) during the final 17 days of the lock–up period, any earnings release or announcement of a material event or news or, (ii) prior to the expiry of a lock–up period, the Company announces that it will release earnings results during the 15–day period following the last day of the lock–up period. In each case the applicable lock–up period will be automatically extended until the expiration of the 18–day period beginning on the date of release of the earnings results or the announcement of the material news or material event, as applicable unless the representatives waive, in writing, such extension.

In connection with our acquisition of Allyes, the former Allyes shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition. Any additional shares they may receive upon payment of the earn–out payment, if any, will not be subject to lock–up.

The representatives of the underwriters may release the securities subject to the above restrictions at any time, subject to applicable FINRA regulations. The representatives of the underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would

155

Table of Contents

depend on a number of factors, which may include market conditions, the performance of Focus Media's ADSs in the market and Focus Media's financial condition at that time.

Our ADSs are listed for quotation on the Nasdaq Global Market under the symbol "FMCN".

In connection with the offering, the underwriters may purchase and sell ADSs in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of ADSs than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional ADSs from Focus Media and the selling shareholders. The underwriters may close out any covered short position by either exercising their option to purchase additional ADSs or purchasing ADSs in the open market. In determining the source of ADSs to close out the covered short position, the underwriters will consider, among other things, the price of ADSs available for purchase in the open market as compared to the price at which they may purchase additional ADSs pursuant to the option granted to them. "Naked" short sales are any sales in excess of such option. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for, or purchases of, ADSs made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased ADSs sold by, or for the account of, such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of the ADSs, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the ADSs. As a result, the price of the ADSs may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they are required to be conducted in accordance with applicable laws and regulations, and may be discontinued at any time. These transactions may be effected on the Nasdaq Global Market, in the over–the–counter market or otherwise.

**Selling restrictions**

No action has been taken in any jurisdiction (except in the United States) that would permit a public offering of the ADSs, or the possession, circulation or distribution of this prospectus or any other material relating to us or the ADSs in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither this prospectus nor any other offering material relating to the ADSs may be distributed or published, in or from any jurisdiction except under circumstances that will result in compliance with the applicable laws and regulations thereof.

*Cayman Islands*

This prospectus does not constitute an invitation or offer to the public in the Cayman Islands of the ADSs, whether by way of sale or subscription. The underwriters have not offered or sold, and will not offer or sell, directly or indirectly, any ADSs in the Cayman Islands.

*United Kingdom*

No offer of ADSs has been made or will be made to the public in the United Kingdom within the meaning of Section 102B of the Financial Services and Markets Act 2000, as amended, or FSMA, except to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by us of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority, or FSA. Each underwriter: (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial

Table of Contents

Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which Section 21 of FSMA does not apply to us; and (ii) has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the ADSs in, from or otherwise involving the United Kingdom.

### Hong Kong

The ADSs may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the ADSs may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to ADSs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

### Japan

The ADSs have not been and will not be registered under the Securities and Exchange Law of Japan, or the Securities and Exchange Law, and ADSs will not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re–offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to any exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

### Singapore

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the ADSs may not be circulated or distributed, nor may the ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

### European Economic Area

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive, which we refer to as a Relevant Member State, with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, which we refer to as the Relevant Implementation Date, no offer of ADSs has been made and or will be made to the public in that Relevant Member State prior to the publication of a prospectus in relation to the ADSs which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that, with effect from and including the Relevant Implementation Date, an offer of ADSs may be made to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than €43,000,000 and (iii) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or (c) in any other circumstances which do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive. For the purposes of this provision, the expression

**Table of Contents**

an "offer of ADSs to the public" in relation to any ADSs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the ADSs to be offered so as to enable an investor to decide to purchase or subscribe for the ADSs, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

No action may be taken in any jurisdiction other than the United States that would permit a public offering of the ADSs or the possession, circulation or distribution of this prospectus in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither the prospectus nor any other offering material or advertisements in connection with the ADSs may be distributed or published in or from any country or jurisdiction except under circumstances that will result in compliance with any applicable rules and regulations of any such country or jurisdiction.

A prospectus in electronic format will be made available on the websites maintained by the global coordinator or one or more securities dealers. The global coordinator may agree to allocate a number of ADSs for sale to their online brokerage account holders. ADSs to be sold pursuant to an Internet distribution will be allocated on the same basis as other allocations. In addition, ADSs may be sold by the underwriters to securities dealers who resell ADSs to online brokerage account holders.

Focus Media and the selling shareholders have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act.

This prospectus may be used by the underwriters and other dealers in connection with offers and sales of the ADSs, including the ADSs initially sold by the underwriters in the offering being made outside of the United States, to persons located in the United States.

Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking and other services for Focus Media or its officers and directors for which they have received customary fees and commissions.

The underwriters and their affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking and other services for Focus Media or its officers and directors for which they have received or will receive customary fees, commissions and expenses.

In addition, certain of the underwriters and/or their affiliates have purchased in the past, and the underwriters may continue to purchase in the future, advertising services from Focus Media on an arm's length basis and on market terms.

Contracts entered into with Focus Media by Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated and/or their affiliates for such sales aggregated to $1.2 million for 2006. The underwriters and/or their affiliates expect to spend approximately $4.88 million to purchase advertising services from Focus Media in 2007.

**Table of Contents**

## ENFORCEMENT OF CIVIL LIABILITIES

We are registered under the laws of the Cayman Islands as an exempted company with limited liability. We are registered in the Cayman Islands because of certain benefits associated with being a Cayman Islands corporation, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of foreign exchange control or currency restrictions and the availability of professional and support services. However, the Cayman Islands has a less developed body of securities laws as compared to the United States and provides protections for investors to a significantly lesser extent. In addition, Cayman Islands companies do not have standing to sue before the federal courts of the United States.

Substantially all of our assets are located outside the United States. In addition, a majority of our directors and officers and our special PRC counsel, Global Law Office are nationals or residents of jurisdictions other than the United States and all or a substantial portion of their assets are located outside the United States. As a result, it may be difficult for investors to effect service of process within the United States upon us or these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us, our officers and directors and Global Law Office.

We have appointed CT Corporation System as our agent to receive service of process with respect to any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States or of any state in the United States or any action brought against us in the Supreme Court of the State of New York in the County of New York under the securities laws of the State of New York.

Conyers Dill & Pearman, our counsel as to Cayman Islands law, and Global Law Office, our counsel as to PRC law, have advised us that there is uncertainty as to whether the courts of the Cayman Islands or the PRC would, respectively, (1) recognize or enforce judgments of United States courts obtained against us or our directors or officers or Global Law Office predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States, or (2) entertain original actions brought in the Cayman Islands or the PRC against us or our directors or officers or Global Law Office predicated upon the securities laws of the United States or any state in the United States.

Conyers Dill & Pearman have informed us that the uncertainty with regard to Cayman Islands law relates to whether a judgment obtained from the U.S. courts under civil liability provisions of the securities law will be determined by the courts of the Cayman Islands as penal or punitive in nature. The courts of the Cayman Islands will not recognize or enforce such judgments against a Cayman company, and because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands. Conyers Dill & Pearman, has further advised us that a final and conclusive judgment in the federal or state courts of the United States under which a sum of money is payable, other than a sum payable in respect of taxes, fines, penalties or similar charges, may be subject to enforcement proceedings as a debt in the courts of the Cayman Islands under the common law doctrine of obligation.

Global Law Office has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Global Law Office has advised us further that under PRC law, a foreign judgment, which does not otherwise violate basic legal principles, state sovereignty, safety or social public interest, may be recognized and enforced by a PRC court, based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. As there currently exists no treaty or other form of reciprocity between China and the United States governing the recognition of judgments, including those predicated upon the liability provisions of the U.S. federal securities laws, there is uncertainty whether and on what basis a PRC court would enforce judgments rendered by U.S. courts.

Table of Contents

## LEGAL MATTERS

We are being represented by Simpson Thacher & Bartlett LLP with respect to legal matters of United States federal securities and New York State law. Certain legal matters in connection with this offering will be passed upon for the underwriters by Debevoise & Plimpton LLP. The validity of the ordinary shares represented by the ADSs offered in this offering and legal matters as to Cayman Islands law will be passed upon for us by Conyers Dill & Pearman. Legal matters as to PRC law will be passed upon for us by Global Law Office and for the underwriters by Commerce & Finance Law Offices. Conyers Dill & Pearman and Simpson Thacher & Bartlett LLP may rely upon Global Law Office with respect to matters governed by PRC law. Debevoise & Plimpton LLP may rely upon Commerce & Finance Law Offices with respect to matters governed by PRC law.

## EXPERTS

Our consolidated financial statements and the related financial statements as of December 31, 2005 and 2006 and for each of the three years in the period ended December 31, 2004, 2005 and 2006 included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of and for the year ended December 31, 2006 for Allyes Information Technology Company Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of December 31, 2003, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005 for Infoachieve Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements of Target Media Holdings Limited as of December 31, 2004 and 2005 and for each of the years in the two–year period ended December 31, 2005 have been included in this registration statement in reliance upon the report of KPMG, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of such firm as experts in accounting and auditing.

The statements included in this prospectus under the caption "Prospectus Summary", "Risk Factors", "Our Corporate Structure", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Our Industry", "Business", "Regulation of Our Industry", "Management", "Related Party Transactions", "Taxation" and "Enforcement of Civil Liabilities", to the extent they constitute matters of PRC law, have been reviewed and confirmed by Global Law Office, special PRC counsel to us, as experts in such matters, and are included herein in reliance upon such review and confirmation.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form F–1 (Registration Number 333–146913) and a registration statement on Form F–6 (Registration Number 333–141820), including relevant exhibits and schedules under the Securities Act, covering the ordinary shares represented by the ADSs offered by this prospectus, as well as the ADSs. You should refer to our registration statements and their exhibits and schedules if you would like to find out more about us and about the ADSs and the ordinary shares represented by the ADSs. This prospectus summarizes material provisions of contracts and other documents that we refer you to. Since the prospectus may not contain all the information that you may find important, you should review a full text of these documents.

The SEC also maintains a website that contains reports, proxy statements and other information about issuers, such as us, who file electronically with the SEC. The address of that website is http://www.sec.gov. The information on that website is not a part of this prospectus.

160

**Table of Contents**

We will furnish to Citibank, N.A., as depositary of our ADSs, our annual reports. When the depositary receives these reports, it will upon our request promptly provide them to all holders of record of ADSs. We will also furnish the depositary with all notices of shareholders' meetings and other reports and communications in English that we make available to our shareholders. The depositary will make these notices, reports and communications available to holders of ADSs and will upon our request mail to all holders of record of ADSs the information contained in any notice of a shareholders' meeting it receives.

We are subject to periodic reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. Accordingly, we are required to file reports, including annual reports on Form 20–F, and other information with the SEC. As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of proxy statements to shareholders under the federal proxy rules contained in Sections 14(a), (b) and (c) of the Exchange Act, and our executive officers, directors and principal shareholders are exempt from the reporting and short–swing profit recovery provisions contained in Section 16 of the Exchange Act. The registration statements, reports and other information so filed can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of these documents upon payment of a duplicating fee, by writing to the SEC. Please call the SEC at 1–800–SEC–0330 for further information on the operation of the public reference rooms.

161

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**CONTENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated balance sheets as of December 31, 2004, 2005 and 2006 and June 30, 2007 (unaudited) | F–4 |
| Consolidated statements of operations for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited) | F–6 |
| Consolidated statements of shareholders' equity (deficiency) and comprehensive income for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2007 (unaudited) | F–7 |
| Consolidated statements of cash flows for the years ended December 31, 2004, 2005 and 2006 and for the six months ended June 30, 2006 (unaudited) and 2007 (unaudited) | F–9 |
| Notes to the consolidated financial statements | F–12 |
| Additional information — Financial statement schedule I | F–56 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF FOCUS MEDIA HOLDING LIMITED

We have audited the accompanying consolidated balance sheets of Focus Media Holding Limited and subsidiaries (the "Group") as of December 31, 2004, 2005 and 2006 and the related consolidated statements of operations, shareholders' equity (deficiency) and comprehensive income, and cash flows for each of the three years in the period ended December 31, 2004, 2005 and 2006, and the related financial statement schedule included in Schedule 1. We also have audited management's assessment, included in the accompanying Report by Management on Internal Control over Financial Reporting, that the Group maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in the *Report by Management on Internal Control over Financial Reporting,* management excluded from its assessment the internal control over financial reporting at Infoachieve Limited, Dotad Holdings Limited, DongGuan Advertisement & Communications Co., Ltd., Appreciate Capital Ltd., Bestwin Partners Limited and Glomedia Holdings Limited, which were acquired on January 1, March 20, April 8, September 1, October 1 and December 1, 2006, respectively, and whose aggregated financial statements constitute 4.6 percent and 4.0 percent of net and total assets, respectively, 25.2 percent of revenues, and 31.4 percent of net income of the consolidated financial statement amounts as of and for the year ended December 31, 2006. Accordingly, our audit did not include the internal control over financial reporting at Infoachieve Limited, Dotad Holdings Limited, DongGuan Advertisement & Communications Co., Ltd., Appreciate Capital Ltd., Bestwin Partners Limited or Glomedia Holdings Limited. The Group's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on these financial statements and financial statement schedule, an opinion on management's assessment, and an opinion on the effectiveness of the Group's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audit of financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with the authorization of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements. Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are

**Table of Contents**

subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2004, 2005 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, 2005 and 2006, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein. Also in our opinion, management's assessment that the Group maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

As discussed in Note 2(s) to the consolidated financial statements, effective January 1, 2006, the Group changed its method of accounting for share–based payments to conform to Statement of Financial Accounting Standards No. 123R "Share–based Payment".

Furthermore, in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

/s/ Deloitte Touche Tohmatsu CPA Ltd.
Shanghai, China
September 25, 2007

F–3

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| | | | | (Unaudited) |
| | | (In U.S. Dollars) | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ 22,669,106 | $ 36,653,180 | $ 164,610,942 | $ 187,591,825 |
| Investment in equity and debt securities | — | 34,835,850 | — | 41,317,191 |
| Accounts receivable, net of allowance for doubtful accounts of $173,837, $396,657, $1,308,554 and $4,163,933 in 2004, 2005, 2006 and June 30, 2007 (unaudited), respectively | 6,619,949 | 21,188,531 | 61,614,343 | 118,769,566 |
| Inventories | 1,243,140 | 479,529 | 519,095 | 2,339,283 |
| Prepaid expenses and other current assets | 1,746,996 | 4,444,303 | 5,199,355 | 15,787,855 |
| Deposits paid for acquisition of subsidiaries | 362,472 | 40,919,530 | 3,526,370 | 31,872,785 |
| Amounts due from related parties | 2,740,032 | 3,120,206 | 7,852,789 | 7,179,877 |
| Rental deposits | | | | 23,365,408 |
| **Total current assets** | **35,381,695** | **141,641,129** | **243,322,894** | **428,223,790** |
| Rental deposits | 1,606,378 | 11,819,095 | 11,833,290 | — |
| Equipment, net | 9,197,143 | 43,694,888 | 70,249,324 | 81,229,140 |
| Acquired intangible assets, net | 708,306 | 1,157,920 | 34,717,019 | 73,009,317 |
| Goodwill | 9,058,086 | 13,298,072 | 739,743,871 | 924,201,721 |
| Other long–term assets | 463,051 | 742,914 | 6,375,682 | 20,304,604 |
| **Total assets** | **$ 56,414,659** | **$ 212,354,018** | **$ 1,106,242,080** | **$ 1,526,968,572** |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | | |
| **Current liabilities:** | | | | |
| Short–term debts | $ — | $ 991,301 | $ 2,769,459 | $ 393,933 |
| Accounts payable | 607,091 | 5,847,530 | 5,987,593 | 32,167,361 |
| Accrued expenses and other current liabilities | 6,591,435 | 11,746,902 | 38,674,175 | 65,178,999 |
| Income taxes payable | 1,435,486 | 2,108,071 | 4,060,170 | 10,840,551 |
| Amounts due to related parties | — | — | 345,768 | 3,390,150 |
| Deferred tax liabilities | — | — | — | 1,097,630 |
| **Total current liabilities** | **8,634,012** | **20,693,804** | **51,837,165** | **113,068,624** |
| Deferred tax liabilities | — | — | 3,303,110 | 6,132,493 |
| **Total liabilities** | **$ 8,634,012** | **$ 20,693,804** | **$ 55,140,275** | **$ 119,201,117** |
| **Commitments (Note 16)** | | | | |
| **Minority interest** | 80,692 | 245,563 | 357,814 | 446,701 |
| **Mezzanine equity** | | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and 41,967,400, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 6,295,110 | — | — | — |

F–4

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED BALANCE SHEETS — (Continued)**

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| | | | | **(Unaudited)** |
| | | (In U.S. Dollars) | | |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and 48,191,600, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 12,062,696 | — | — | — |
| Series C–1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and 34,054,000, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 17,500,350 | — | — | — |
| Series C–2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and 34,053,400, nil shares issued and outstanding in 2004, 2005, 2006 and 2007 (unaudited), respectively) | 17,415,000 | — | — | — |
| **Shareholders' equity (deficiency)** Ordinary shares ($0.00005 par value; 885,516,600, 19,800,000,000, 19,800,000,000 and 19,800,000,000 shares authorized in 2004, 2005, 2006 and June 30, 2007 (unaudited); 142,464,600, 378,306,000, 534,896,873 and 611,242,827 issued and outstanding in 2004, 2005, 2006 and June 30, 2007 (unaudited), respectively) | 7,124 | 18,916 | 26,745 | 30,562 |
| Additional paid–in capital | 5,981,154 | 177,419,761 | 709,196,246 | 1,242,816,802 |
| Acquisition consideration to be issued | | | 237,879,480 | — |
| Deferred share–based compensation | (969,959) | (246,569) | | |
| Retained earnings (accumulated deficit) | (10,550,414) | 12,997,237 | 96,194,969 | 148,733,828 |
| Accumulated other comprehensive income (loss) | (41,106) | 1,225,306 | 7,446,551 | 15,739,562 |
| **Total shareholders' equity (deficiency)** | $ (5,573,201) | $ 191,414,651 | $ 1,050,743,991 | $ 1,407,320,754 |
| **Total liabilities, mezzanine equity and shareholders' equity (deficiency)** | $ 56,414,659 | $ 212,354,018 | $ 1,106,242,080 | $ 1,526,968,572 |

The accompanying notes are an integral part of these consolidated financial statements.

F–5

Table of Contents

## FOCUS MEDIA HOLDING LIMITED

## CONSOLIDATED STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | (In U.S. Dollars, expect per share data) | | | (Unaudited) | (Unaudited) |
| **Net revenues:** | | | | | |
| Advertising Service Revenue | $ 26,321,179 | $ 66,903,679 | $ 209,973,935 | $ 82,571,649 | $ 169,929,351 |
| Other Revenue | 2,888,720 | 1,325,234 | 1,931,530 | 689,992 | 686,634 |
| **Total net revenues** | **29,209,899** | **68,228,913** | **211,905,465** | **83,261,641** | **170,615,985** |
| **Cost of revenues:** | | | | | |
| Advertising Service Cost | 6,804,410 | 25,748,318 | 80,615,408 | 36,499,457 | 76,720,176 |
| Other Cost | 1,934,331 | 975,747 | 764,959 | 311,976 | 303,017 |
| **Total cost of revenues** | **8,738,741** | **26,724,065** | **81,380,367** | **36,811,433** | **77,023,193** |
| **Gross profit** | **20,471,158** | **41,504,848** | **130,525,098** | **46,450,208** | **93,592,792** |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 3,987,496 | 9,119,846 | 25,723,413 | 10,693,275 | 20,328,874 |
| Selling and marketing | 3,472,088 | 9,599,226 | 25,761,948 | 9,782,742 | 23,040,846 |
| Other operating income | — | — | (1,338,334) | (157,732) | (2,384,031) |
| Goodwill impairment | 58,397 | — | — | — | — |
| **Total operating expenses/(income)** | **7,517,981** | **18,719,072** | **50,147,027** | **20,318,285** | **40,985,689** |
| **Income from operations** | **12,953,177** | **22,785,776** | **80,378,071** | **26,131,923** | **52,607,103** |
| Interest income | 9,739 | 1,811,782 | 4,560,798 | 1,781,089 | 4,633,869 |
| Interest expense | — | (49,873) | (305,287) | (288,488) | (6,971) |
| Other income | 53,940 | 70,471 | 271,451 | (10,910) | 252,442 |
| Other expense | (57,783) | (231,619) | (558,990) | (469,662) | (211,890) |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | (11,692,287) | — | — | — | — |
| **Income before income taxes and minority interest** | **1,266,786** | **24,386,537** | **84,346,043** | **27,143,952** | **57,274,553** |
| Income taxes | 907,550 | 694,453 | 1,043,538 | 988,919 | 3,286,351 |
| **Net income after income taxes before minority interest** | **359,236** | **23,692,084** | **83,302,505** | **26,155,033** | **53,988,202** |
| Minority interest | 13,516 | (144,433) | (104,773) | (50,943) | 18,165 |
| **Net income** | **372,752** | **23,547,651** | **83,197,732** | **26,104,090** | **54,006,367** |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | (13,356,087) | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — | — | — | — |
| **Net income (loss) attributable to holders of ordinary shares** | **$ (10,576,414)** | **$ 23,547,651** | **$ 83,197,732** | **$ 26,104,090** | **$ 54,006,367** |
| Income (loss) per share — basic | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Income (loss) per share — diluted | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |
| Shares used in calculating basic income (loss) per share | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Shares used in calculating diluted income (loss) per share | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |

The accompanying notes are an integral part of these consolidated financial statements.

F–6

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIENCY)
AND COMPREHENSIVE INCOME**

| | Ordinary Shares | Amount | Additional Paid–in Capital | Deferred Share Based Compensation | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficiency) | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|
| | | | | (In U.S. dollars, except share data) | | | | |
| **Balance at January 1, 2004** | 200,000,000 | $ 10,000 | $ 1,188,817 | $ — | $ 26,000 | $ (41,755) | $ 1,183,062 | — |
| Issuance of ordinary shares | 14,594,200 | 730 | 4,484,068 | — | — | — | 4,484,798 | — |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | (62,400,000) | (3,120) | (1,048,469) | — | — | — | (1,051,589) | — |
| Reclassification of ordinary shares to Series C–1 convertible redeemable preference shares | (9,729,600) | (486) | (101,932) | — | — | — | (102,418) | — |
| Deferred share–based compensation | — | — | 1,334,835 | (1,334,835) | — | — | — | — |
| Share–based compensation expense | — | — | 123,835 | 364,876 | — | — | 488,711 | — |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | — | — | (8,308,411) | — | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | — | — | (2,191,442) | — | (2,191,442) | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | — | — | — | (13,356,087) | — | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | — | — | — | — | 12,906,774 | — | 12,906,774 | — |
| Cumulative translation adjustment | — | — | — | — | — | 649 | 649 | $ 649 |
| Net income | — | — | — | — | 372,752 | — | 372,752 | 372,752 |
| **Balance at December 31, 2004** | 142,464,600 | $ 7,124 | $ 5,981,154 | $ (969,959) | $ (10,550,414) | $ (41,106) | $ (5,573,201) | $ 373,401 |
| Series A convertible redeemable preference shares converted into ordinary shares upon initial public offering | 41,967,400 | 2,098 | 6,293,012 | — | — | — | 6,295,110 | — |
| Series B convertible redeemable preference shares converted into ordinary shares upon initial public offering | 48,191,600 | 2,409 | 12,060,287 | — | — | — | 12,062,696 | — |
| Series C–1 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,054,000 | 1,703 | 17,498,647 | — | — | — | 17,500,350 | — |
| Series C–2 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,053,400 | 1,703 | 17,413,297 | — | — | — | 17,415,000 | — |
| Issuance of ordinary shares upon initial public offering, net of issuance cost of $13,703,370 | 77,575,000 | 3,879 | 118,170,251 | — | — | — | 118,174,130 | — |
| Deferred share–based compensation | — | — | (264,751) | 264,751 | — | — | — | — |
| Share–based compensation expense | — | — | 267,864 | 458,639 | — | — | 726,503 | — |
| Unrealized loss on debt securities | — | — | — | — | — | (164,150) | (164,150) | $ (164,150) |
| Cumulative translation adjustments | — | — | — | — | — | 1,430,562 | 1,430,562 | 1,430,562 |
| Net income | — | — | — | — | 23,547,651 | — | 23,547,651 | 23,547,651 |
| **Balance at December 31, 2005** | 378,306,000 | $ 18,916 | $ 177,419,761 | $ (246,569) | $ 12,997,237 | $ 1,225,306 | $ 191,414,651 | $ 24,814,063 |

F–7

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIENCY)**
**AND COMPREHENSIVE INCOME — (continued)**

| | Ordinary Shares | Amount | Additional Paid-in Capital | Deferred Share Based Compensation | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficiency) | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In U.S. dollars, except share data) | | | |
| **Balance at December 31, 2005** | 378,306,000 | $ 18,916 | $ 177,419,761 | $ (246,569) | $ 12,997,237 | $ 1,225,306 | $ 191,414,651 | — |
| Issuance of ordinary shares upon follow-on offering on January 27, 2006, net of issuance cost of $3,466,700 | 15,000,000 | 750 | 61,782,550 | — | — | — | 61,783,300 | |
| Issuance of ordinary shares upon follow-on offering on June 16, 2006, net of issuance cost of $2,740,407 | 16,000,000 | 800 | 80,966,793 | — | — | — | 80,967,593 | — |
| Issuance of ordinary shares in connection with acquisitions | 99,254,193 | 4,962 | 365,660,061 | — | — | — | 365,665,023 | — |
| Issuance of ordinary shares pursuant to share option plans | 26,336,680 | 1,317 | 15,246,244 | — | — | — | 15,247,561 | — |
| Ordinary shares to be issued in connection with acquisitions | — | — | 237,879,480 | — | — | — | 237,879,480 | — |
| Adjustment for the adoption of SFAS 123R | — | — | (246,569) | 246,569 | — | — | — | |
| Share-based compensation expense | — | — | 8,367,406 | — | — | — | 8,367,406 | — |
| Unrealized gain on debt securities | — | — | — | — | — | 164,150 | 164,150 | $ 164,150 |
| Cumulative translation adjustments | — | — | — | — | — | 6,057,095 | 6,057,095 | 6,057,095 |
| Net income | — | — | — | — | 83,197,732 | — | 83,197,732 | 83,197,732 |
| **Balance at December 31, 2006** | 534,896,873 | $ 26,745 | $ 947,075,726 | $ — | $ 96,194,969 | $ 7,446,551 | $ 1,050,743,991 | $ 89,418,977 |
| Issuance of ordinary shares upon follow-on offering in January, 2007, net of issuance cost of $668,911 | 15,000,000 | 750 | 114,873,031 | — | — | — | 114,873,781 | — |
| Issuance of ordinary shares in connection with acquisitions | 57,299,699 | 2,864 | 166,047,247 | — | — | — | 166,050,111 | — |
| Issuance of ordinary shares pursuant to share option plans | 4,046,255 | 203 | 5,384,083 | — | — | — | 5,384,286 | — |
| Share-based compensation expense | — | — | 9,436,715 | — | — | — | 9,436,715 | — |
| Net profit for the period | — | — | — | — | 54,006,367 | — | 54,006,367 | 54,006,367 |
| Adjustment to retained earnings upon adoption of FIN 48 on January 1, 2007 | — | — | — | — | (1,467,508) | — | (1,467,508) | — |
| Unrealized gains on equity securities | — | — | — | — | — | 601,893 | 601,893 | 601,893 |
| Translation adjustments | — | — | — | — | — | 7,691,118 | 7,691,118 | 7,691,118 |
| **Balance at June 30, 2007 (unaudited)** | 611,242,827 | $ 30,562 | $ 1,242,816,802 | $ — | $ 148,733,828 | $ 15,739,562 | $ 1,407,320,754 | $ 62,299,378 |

The accompanying notes are an integral part of these consolidated financial statements.

F–8

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2006** (Unaudited) | **2007** (Unaudited) |
| | | | (In U.S. Dollars) | | |
| Operating activities: | | | | | |
| Income (loss) attributable to holders of ordinary shares | $ (10,576,414) | $ 23,547,651 | $ 83,197,732 | $ 26,104,090 | $ 54,006,367 |
| Deemed dividend on Series A convertible redeemable preference shares | 8,308,411 | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | 2,191,442 | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | 13,356,087 | — | — | — | — |
| Premium relating to Series B convertible redeemable preference shares | (12,906,774) | — | — | — | — |
| Net income | 372,752 | 23,547,651 | 83,197,732 | 26,104,090 | 54,006,367 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest | (13,516) | 144,433 | 104,773 | 50,943 | (18,165) |
| Bad debt provision | 173,837 | 235,604 | 1,844,605 | 770,198 | 2,415,557 |
| Share–based compensation | 488,711 | 726,503 | 8,367,406 | 3,362,908 | 9,436,715 |
| Depreciation and amortization | 923,163 | 4,927,016 | 19,511,552 | 8,623,010 | 12,711,757 |
| Loss on disposal of equipment | 22,470 | — | — | — | — |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | 11,692,287 | — | — | — | — |
| Goodwill impairment | 58,397 | — | — | — | — |
| Deferred taxes | 78,586 | (20,664) | (63,383) | 371,250 | (993,241) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | | |
| Accounts receivable, net | (4,525,148) | (14,710,176) | (22,289,344) | (8,946,951) | (13,408,874) |
| Inventories | (1,030,529) | (408,223) | 23,334 | (255,662) | (1,819,183) |
| Prepaid expenses and other current assets | (1,740,427) | (2,347,426) | 7,857,172 | 9,441,676 | 8,171,806 |
| Amounts due from related parties | (2,487,456) | (380,174) | (4,732,583) | (1,186,331) | (7,505,920) |
| Rental deposits | (1,035,474) | (10,076,230) | 3,104,667 | 4,384,783 | (11,532,118) |
| Accounts payable | (1,609,816) | 5,007,564 | (3,174,405) | (3,924,856) | 6,127,476 |
| Accrued expenses and other current liabilities | 4,174,214 | 3,950,903 | (1,673,496) | (22,123,772) | (5,803,423) |
| Amounts due to related parties | (2,322,276) | — | — | — | 2,709,578 |
| Income tax payable | 825,100 | 672,585 | 1,276,252 | 722,211 | 2,070,151 |
| **Net cash provided by operating activities** | $ **4,044,875** | $ **11,269,366** | $ **93,354,282** | $ **17,393,497** | $ **56,568,483** |

F–9

Table of Contents

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | (In U.S. Dollars) | (Unaudited) | (Unaudited) |
| Investing activities: | | | | | |
| Purchase of equipment and other long−term assets | $ (6,373,124) | $ (36,765,294) | $ (22,878,254) | $ (11,607,977) | $ (25,264,583) |
| Acquisition of intangible assets | — | — | (6,403,114) | — | (105,049) |
| Purchase of subsidiaries, net of cash acquired | (4,697,378) | (4,982,523) | (124,062,515) | (87,060,235) | (56,771,608) |
| Deposit paid to acquire subsidiaries | — | (40,919,530) | (3,710,369) | — | (35,267,750) |
| Disposal of an equity investment | — | — | 60,005 | — | — |
| Expiration (investment) in debt securities | — | (35,000,000) | 35,000,000 | — | — |
| Investment in equity securities | | | | | (40,715,298) |
| **Net cash used in investing activities** | **$ (11,070,502)** | **$ (117,667,347)** | **$ (121,994,247)** | **$ (98,668,212)** | **$ (158,126,288)** |
| Financing activities: | | | | | |
| Repayment of short−term loan from a shareholder | (500,000) | — | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs of $nil, $13,703,370, $6,207,107, $5,076,536 and $668,911 in 2004, 2005, 2006 and June 30, 2006 (unaudited) and 2007 (unaudited), respectively | — | 118,174,130 | 142,750,893 | 143,881,465 | 114,873,781 |
| Proceeds from issuance of ordinary shares pursuant to share option plans | — | — | 15,247,561 | 4,798,131 | 5,384,286 |
| Proceeds from issuance of Series B convertible redeemable preference shares (net of issuance costs of $437,304) | 12,062,696 | — | | | |
| Proceeds from issuance of Series C−2 convertible redeemable preference shares (net of issuance costs of $85,000) | 17,415,000 | — | — | — | — |
| Proceeds from short−term loans | — | 991,301 | 24,598,037 | 24,598,037 | — |
| Repayment of short−term loans | — | — | (29,402,066) | (6,051,378) | (3,771,783) |
| Capital injection from minority shareholders | — | 3,089 | 326,307 | 249,470 | 96,972 |
| **Net cash provided by financing activities** | **$ 28,977,696** | **$ 119,168,520** | **$ 153,520,732** | **$ 167,475,725** | **$ 116,583,256** |
| Effect of exchange rate changes | $ 649 | $ 1,213,535 | $ 3,076,995 | (169,833) | 7,955,432 |
| **Net increase in cash and cash equivalents** | **$ 21,952,718** | **$ 13,984,074** | **$ 127,957,762** | **$ 86,031,177** | **22,980,883** |
| Cash and cash equivalents, beginning of year/period | 716,388 | 22,669,106 | 36,653,180 | 36,653,180 | 164,610,942 |
| Cash and cash equivalents, end of year/period | $ 22,669,106 | $ 36,653,180 | $ 164,610,942 | $ 122,684,357 | $ 187,591,825 |
| Supplemental disclosure of cash flow information | | | | | |
| Income taxes paid | $ 738 | $ 94,391 | $ 153,526 | $ 114,485 | $ 577,991 |
| Interest paid | $ — | $ 11,581 | $ 244,702 | $ 26,463 | $ — |

F−10

Table of Contents

|  | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|  | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
|---|---|---|---|---|---|
|  |  |  | (In U.S. Dollars) |  |  |
| **SUPPLEMENTAL DISCLOSURES OF NON–CASH INVESTING AND FINANCING ACTIVITIES** |  |  |  |  |  |
| Non–cash investing activities: |  |  |  |  |  |
| Acquisition of subsidiaries: |  |  |  |  |  |
| Value of ordinary shares issued | $ 4,484,798 | $ — | $ 365,665,023 | $ 365,665,023 | $ 166,050,111 |
| Ordinary share consideration to be issued | $ — | $ — | $ 237,879,480 | $ — | $ — |
| Accounts payable | $ 538,860 | $ 99,130 | $ 4,530,745 | $ 27,318,061 | $ 1,242,042 |
| Non–cash financing activities: |  |  |  |  |  |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | $ 9,360,000 | $ — | $ — | $ — | $ — |
| Reclassification of Series A convertible redeemable preference shares to Series C–1 convertible redeemable preference share | $ 3,064,890 | $ — | $ — | $ — | $ — |
| Reclassification of Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference share | $ 976,955 | $ — | $ — | $ — | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

F–11

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED)
(In U.S. dollars except share data and unless otherwise stated)**

**1.   Organization and Principal Activities**

Focus Media Holding Limited and all of its subsidiaries (collectively referred to as the "Group") are mainly engaged in selling out–of home television advertising time slots on its network of flat–panel television advertising displays located in high traffic areas such as commercial locations and in–store network. Starting from 2006, the Group also engaged in providing advertising services on in–elevator poster frames network and mobile handset advertising network.

PRC regulations currently limit foreign ownership of companies that provide advertising services, including out–of–home television advertising services. To comply with these regulations, the Group conducts substantially all of its activities through Focus Media Advertisement Co., Ltd. ("Focus Media Advertisement") and its subsidiaries, a variable interest entity which was renamed from Aiqi, and was established in Shanghai China on September 2, 1997. On April 11, 2004, the majority shareholder of Focus Media Advertisement, Jason Nanchun Jiang, incorporated Focus Media Holding Limited ("Focus Media Holding" or the "Company") with the same shareholders of Focus Media Advertisement. Focus Media Advertisement entered into various agreements with 100% owned subsidiaries of Focus Media Holding, i.e. Focus Media Technology (Shanghai) Co., Ltd. ("Focus Media Technology") and Focus Media Digital Information Technology (Shanghai) Co., Ltd. ("Focus Media Digital"), including a transfer of trademarks and exclusive services agreement. Under these agreements, Focus Media Advertisement has the right to use the trade name of Focus Media Technology, and Focus Media Digital, provides technical and consulting services to Focus Media Advertisement and its subsidiaries. In return, Focus Media Advertisement and its subsidiaries are required to pay Focus Media Technology services fees for the use of trade name and Focus Media Digital for the technical and consulting services it receives. The technical and consulting service fees are adjusted at the Focus Media Digital's sole discretion. Focus Media Digital is entitled to receive service fees in an amount up to all of the net income of Focus Media Advertising.

In addition, Focus Media Holding, through Focus Media Technology, has been assigned all voting rights by the direct and indirect owners of Focus Media Advertisement through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally Focus Media Holding, through Focus Media Technology has the option to acquire the equity interests of Focus Media Advertisement and its subsidiaries for a purchase price equal to the respective registered capital of Focus Media Advertisement and its subsidiaries or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. Each of the shareholders of Focus Media Advertisement has agreed to pay Focus Media Holding, any excess of the purchase price paid for such equity interests in, or assets of, Focus Media Advertisement or its subsidiaries over the registered capital of Focus Media Advertisement or its subsidiaries in the event that such option is exercised.

Through contractual arrangements described above, Focus Media Holding is deemed the primary beneficiary of Focus Media Advertisement resulting in Focus Media Advertisement being deemed a subsidiary of Focus Media Holding under the requirements of FIN 46 (Revised), "Consolidation of Variable Interest Entities" ("FIN 46(R)"). In substance, an existing company, Focus Media Advertisement, has been reorganized as a subsidiary of the new company Focus Media Holding. Focus Media Holding has the same controlling shareholder and the same non–controlling shareholders. Accordingly, the Group's financial statements reflect the financial statements of Focus Media Advertisement through May 2003 and, thereafter, the consolidated financial statements of Focus Media Holding and its subsidiaries, which include Focus Media Advertisement and its subsidiaries.

As of June 30, 2007, the major subsidiaries of Focus Media Holding and Focus Media Advertisement are included in the Appendix 1 attached.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**2.  Summary of Significant Accounting Policies**

*(a)   Basis of Presentation*

The consolidated financial statements of the Group have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*(b)   Basis of Consolidation*

The consolidated financial statements include the financial statements of Focus Media Holding, its majority–owned subsidiaries and its variable interest entity, Focus Media Advertisement and its majority–owned subsidiaries. All inter–company transactions and balances have been eliminated upon consolidation.

*(c)   Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of 3 months or less when purchased.

*(d)   Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's financial statements include allowance for doubtful accounts, useful lives and impairment for long–lived assets and goodwill, the recognition and measurement of current and deferred income tax assets, and the valuation and recognition of share–based compensation. The actual results experienced by the Company may differ from management's estimates.

*(e)   Significant Risks and Uncertainties*

The Group participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: the Group's limited operating history, rapid growth associated with newly acquired business; advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on share market in the U.S.; competition from other competitors; regulatory or other PRC related factors; risks associated with the Group's ability to attract and retain employees necessary to support its growth; risks associated with the Group's growth strategies; and general risks associated with the advertising industry.

*(f)   Investment in Equity and Debt Securities*

The Group classifies all of its short–term investments as available–for–sale securities. Such short–term investments consist primarily of equity and debt instrument which are stated at fair market value, with unrealized gains and losses recorded as accumulated other comprehensive income (loss).

*(g)   Inventory*

Inventory is comprised of media display equipments and compact flash cards, which are held for sale. Inventory is stated at the lower of cost or market value. Adjustments are recorded to write down the cost of obsolete and excess inventory to the estimated market value based on historical and forecast demand.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**(h)  Equipment, Net**

Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Media display equipment | 5 years |
| Computers and office equipment | 5 years |
| Vehicles | 5 years |
| Leasehold Improvements | lesser of the term of the lease or the estimated useful lives of the assets |

The Group assembles certain of the media display equipment. In addition to costs under assembly contracts, external costs directly related to the assembly of such equipment, including duty and tariff, equipment installation and shipping costs, are capitalized.

**(i)  Acquired intangible assets, net**

Acquired intangible assets, which consist of operation and broadcasting rights, lease agreements, customer bases, customer backlogs, trademarks, non–compete agreements, and acquired technology are valued at cost less accumulated amortization. Amortization is calculated using the straight–line method over their expected useful lives of 1 to 10 years.

**(j)  Impairment of Long–Lived Assets**

The Group evaluates its long–lived assets and finite–lived intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. When these events occur, the Group measures impairment by comparing the carrying amount of the assets to the future undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the future undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss equal to the excess of the carrying amount over the fair value of the assets.

**(k)  Goodwill**

SFAS No. 142 *"Goodwill and Other intangible Assets"* requires the Group to complete a two–step goodwill impairment test. The first step compares the fair value of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

Management performed the annual goodwill impairment test as of December 31, 2004 and an impairment loss of $58,397 was recorded for the Perfect Media Holding Ltd. ("Perfect Media") reporting unit. The fair value of the Perfect Media reporting unit was estimated using a combination of expected present value of future cash flow and income approach valuation methodologies. The Group recorded an impairment charge because the amount the Group paid for the acquisition of Perfect Media exceeded its fair market value. Commencing in 2005, the financial

F–14

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

information of Perfect Media was prepared together with that of Commercial location network. Management also performed an annual goodwill impairment test for each of its reporting units as of December 31, 2005 and 2006, and no impairment loss was required.

The changes in the carrying amount of goodwill by segment for the year ended December 31, 2004, 2005 and 2006 and six months ended June 30, 2007 (unaudited) are as follows:

| | Out–of–Home Television Advertising Services | In–elevator Poster–frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Total |
|---|---|---|---|---|---|
| Balance as of January 1, 2004 | $ — | $ — | $ — | $ — | $ — |
| Goodwill acquired during the year | 9,519,658 | — | — | — | 9,519,658 |
| Modification of preliminary purchase price allocation | (18,124) | — | — | — | (18,124) |
| Tax benefits arising from acquired subsidiaries | (385,051) | — | — | — | (385,051) |
| Impairment losses | (58,397) | — | — | — | (58,397) |
| **Balance as of December 31, 2004** | **$ 9,058,086** | $ — | $ — | $ — | **$ 9,058,086** |
| Goodwill acquired during the year | 4,043,747 | — | — | — | 4,043,747 |
| Tax benefits arising from acquired subsidiaries | (244,236) | — | — | — | (244,236) |
| Modification of preliminary purchase price allocation | 64,477 | — | — | — | 64,477 |
| Translation adjustments | 375,998 | — | — | — | 375,998 |
| **Balance as of December 31, 2005** | **$ 13,298,072** | $ — | $ — | $ — | **$ 13,298,072** |
| Goodwill acquired during the year | 374,932,052 | 96,926,862 | 8,364,095 | — | 480,223,009 |
| Modification of preliminary purchase price allocation | 5,177,181 | 2,756,299 | 80,369 | — | 8,013,849 |
| Goodwill recorded as a result of contingent consideration resolved | — | 237,879,480 | — | — | 237,879,480 |
| Translation adjustments | 329,461 | — | — | — | 329,461 |

F–15

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

| | Out–of–Home Television Advertising Services | In–elevator Poster–frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Total |
|---|---|---|---|---|---|
| Balance as of December 31, 2006 | $ 393,736,766 | $ 337,562,641 | $ 8,444,464 | $ — | $ 739,743,871 |
| Goodwill acquired during the year | 373,072 | — | — | 171,512,259 | 171,885,331 |
| Modification of preliminary purchase price allocation | 980,796 | (455,646) | 37,851 | — | 563,001 |
| Recognition of contingent consideration resolved | — | — | 11,769,000 | — | 11,769,000 |
| Translation adjustments | 240,518 | — | — | — | 240,518 |
| Balance as of June 30, 2007 (unaudited) | $ 395,331,152 | $ 337,106,995 | $ 20,251,315 | $ 171,512,259 | $ 924,201,721 |

*(l)*    *Revenue Recognition*

The Group's revenues are primarily derived from advertising services and to a lesser extent, sales from advertising equipment, and sales from Internet subscriptions and perpetual licenses to its Adforward software.

Revenues from advertising services and advertising equipment are recognized when (i) persuasive evidence of an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

The Group generates advertising service revenues from the sale of advertising time slots in the out–of–home television advertising networks, the sales of frame space on the poster frame network, and the sales of advertising service through the mobile handset advertising and internet network. . In the majority of advertising arrangements, the Group acts as a principal in the transaction and records advertising revenues on a gross basis. The associated expenses are recorded as cost of revenues. In some instances the Group is considered as an agent, it recognizes revenue on a net basis. Revenues from advertising services are recognized, net of agency rebates, ratably over the period in which the advertisement is displayed, assuming all other revenue recognition criteria have been met.

Revenues from the sale of advertising equipment are recognized upon delivery, assuming all other revenue recognition criteria have been met.

Adforward software sales typically include multiple elements, including sale of software licenses and services. Service includes installation, training and post contract customer support ("PCS"), which consists of when–and–if available software license updates and technical support. The Group recognizes revenues based on the provisions of the American Institute of Certified Public Accountants Statement of Position ("SOP") No. 97–2, "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Revenues under multiple–element arrangements are allocated to each element in the arrangement primarily using the residual method based upon the fair value of the undelivered elements, which is specific to the Group (vendor–specific objective evidence of fair value or VSOE). This means that the Group defers revenue from the arrangement fee equivalent to the fair value of the undelivered elements. Discounts, if any, are applied to the delivered elements, usually software licenses, under the residual method. VSOE for PCS is determined based on either the renewal rate specified in each contract or the price

F–16

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

charged when each element is sold separately. If the Group does not have VSOE for the undelivered elements, revenue recognition is deferred until VSOE for such elements are obtained or until all elements have been delivered.

The Group sells Adforward subscriptions and perpetual licenses. Revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. Under perpetual license agreements, revenue recognition is generally commenced when delivery has occurred, software has been installed and training has been provided as the Group does not currently have VSOE for either installation or training services.

The Group entered into franchise arrangements with a number of third party franchisors. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 45 "Accounting For Franchise Fee Revenue", revenue from initial franchise fees was recognized when the franchise sale transaction was completed, that is, when all material services or conditions relating to the sale had been substantially performed or satisfied by the franchisor.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Group presents advertising service revenue, net of sales taxes incurred, as follows:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| | | | (In U.S. dollars) | | |
| Advertising Service Revenue, Net of Agency rebates | | | | | |
| *Commercial Locations* | | | | | |
| — Unrelated parties | $ 25,386,634 | $ 59,434,823 | $ 130,474,324 | $ 50,485,084 | $ 87,733,556 |
| — Related parties | 3,722,778 | 7,991,434 | 15,227,937 | 6,382,176 | 2,551,865 |
| Total Commercial Locations | 29,109,412 | 67,426,257 | 145,702,261 | 56,867,260 | 90,285,421 |
| *In–store Network* | | | | | |
| — Unrelated parties | — | 5,475,192 | 25,330,654 | 11,006,074 | 14,009,857 |
| — Related parties | — | 517,998 | 4,380,287 | 2,046,172 | 1,314,907 |
| Total in–store network | — | 5,993,190 | 29,710,941 | 13,052,246 | 15,324,764 |
| *In–elevator poster frame* | | | | | |
| — Unrelated parties | — | — | 44,893,004 | 17,394,650 | 34,103,674 |
| — Related parties | — | — | — | — | 97,826 |
| Total In–elevator poster frame | — | — | 44,893,004 | 17,394,650 | 34,201,500 |
| *Mobile handset advertising* | | | | | |
| — Unrelated parties | — | — | 10,880,075 | 3,365,206 | 17,199,534 |
| — Related parties | — | — | — | — | 88,525 |
| Total mobile handset advertising | — | — | 10,880,075 | 3,365,206 | 17,288,059 |
| *Internet advertising* | | | | | |
| — Unrelated parties | — | — | — | — | 26,088,417 |
| — Related parties | — | — | — | — | 329,543 |
| Total Internet advertising | — | — | — | — | 26,417,960 |
| Advertising Services Revenue: | 29,109,412 | 73,419,447 | 231,186,281 | 90,679,362 | 183,517,704 |

F–17

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | (In U.S. dollars) | (Unaudited) | (Unaudited) |
| Less: Sales taxes: | | | | | |
| *Commercial Locations* | 2,788,233 | 5,991,497 | 13,641,118 | 5,048,856 | 7,583,093 |
| *In–store Network* | — | 524,271 | 2,803,349 | 1,220,902 | 1,442,318 |
| *In–elevator poster frame* | — | — | 3,988,769 | 1,549,146 | 2,983,542 |
| *Mobile handset advertising* | — | — | 779,110 | 288,809 | 397,438 |
| *Internet Advertising* | — | — | — | — | 1,181,962 |
| Total sales taxes | 2,788,233 | 6,515,768 | 21,212,346 | 8,107,713 | 13,588,353 |
| **Net Advertising Service Revenue** | 26,321,179 | 66,903,679 | 209,973,935 | 82,571,649 | 169,929,351 |
| Add: Other Revenue: | 2,888,720 | 1,325,234 | 1,931,530 | 689,992 | 686,634 |
| **Net revenues:** | $ 29,209,899 | $ 68,228,913 | $ 211,905,465 | $ 83,261,641 | $ 170,615,985 |

   (m)   *Operating Leases*

     Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

   (n)   *Advertising Costs*

     The Group expenses advertising costs as incurred. Total advertising expenses were $17,919, $45,712, $1,157,672, $569,296 and $568,908 for the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited), respectively, and have been included as part of selling and marketing expenses.

   (o)   *Foreign Currency Translation*

     The functional and reporting currency of Focus Media Holding is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in other income or other expenses.

     The financial records of the Group's subsidiaries and its variable interest entity are maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive income (loss) in the statement of shareholders' equity (deficiency).

   (p)   *Income Taxes*

     Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance

F–18

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(q)    Comprehensive Income*

Comprehensive income includes foreign currency translation adjustments and unrealized gains (losses) on marketable securities classified as available–for–sale debt securities. Comprehensive income is reported in the statements of shareholders' equity (deficiency).

*(r)    Fair Value of Financial Instruments*

Financial instruments include cash and cash equivalents, investment in available–for–sale debt securities, and short–term loans. The carrying values of cash and cash equivalents, investment in available–for–sale debt securities and short–term borrowing approximate their fair values due to their short–term maturities.

*(s)    Share–based Compensation*

Effective January 1, 2006 the Group adopted SFAS No. 123 (revised 2005), *"Share–Based Payment"* ("SFAS 123–R"), using the modified prospective application transition method, which establishes accounting for share–based awards exchanged for employee services. Accordingly, share–based compensation cost is measured at grant date, based on the fair value of the award, and recognized in expense over the requisite service period. The Group previously applied Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees"* ("APB 25"), and related Interpretations and provided the pro forma disclosures required by SFAS No. 123, *"Accounting for Stock–Based Compensation"* ("SFAS 123"). APB 25 required the Group to record a compensation charge for the excess of the market value of the share at the grant date or any other measurement date over the amount an employee must pay to acquire the share. The compensation expense is recognized over the service period which is the vesting period.

**Periods prior to the adoption of SFAS 123–R**

Prior to the adoption of SFAS 123–R, the Group provided the disclosures required under SFAS 123, as amended by SFAS No. 148, *"Accounting for Stock–Based Compensation — Transition and Disclosures"*.

F–19

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

The following table illustrates the effect on net income and income per share as if the Group had applied the fair value recognition provisions of SFAS 123 to options granted under the Group's share–based compensation plans prior to the adoption. For purposes of this pro forma disclosure the value of the options was estimated using the Black–Scholes option–pricing model and amortized using an accelerated method over the respective vesting periods of the awards.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Net income, as reported | $ 372,752 | $ 23,547,651 |
| Add: Share–based compensation as reported | 488,711 | 726,503 |
| Less: Share–based compensation determined using the fair value method | (566,819) | (3,225,668) |
| Pro forma net income | $ 294,644 | $ 21,048,486 |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — |
| Pro forma net income (loss) attributable to holders of ordinary shareholders | $ (10,654,522) | $ 21,048,486 |
| Basic income (loss) per share: | | |
| As reported | $ (0.07) | $ 0.09 |
| Pro forma | $ (0.07) | $ 0.08 |
| Diluted income (loss) per share: | | |
| As reported | $ (0.07) | $ 0.06 |
| Pro forma | $ (0.07) | $ 0.06 |

As required by SFAS 123–R, management has made an estimate of expected forfeitures and is recognizing compensation costs only for those equity awards expected to vest. The cumulative effect of initially adopting SFAS 123–R was not significant. The Group's total share–based compensation expense for the year ended December 31, 2006 was $8,367,406. As a result of adopting SFAS 123–R, income before income tax and net income were both lower by $8,119,732 than if the Group had continued to account for share–based compensation under APB 25. The impact on basic and diluted earnings per shares in 2006 was a decrease of $0.02 and $0.02 per share respectively.

The following table summarizes the share–based compensation recognized in the consolidated statement of operations:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| Cost of sales | $ — | $ — | $ 146,942 | $ — | $ 565,885 |
| General and administrative | 461,183 | 683,186 | 6,130,076 | 2,685,304 | 4,726,193 |
| Selling and marketing | 27,528 | 43,317 | 2,090,388 | 677,604 | 4,144,637 |

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*(t)  Income (loss) per Share*

Basic income (loss) per share is computed by dividing income (loss) attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the year. Diluted income per ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation in loss years as their effects would be anti–dilutive.

*(u) Recently Issued Accounting Standards*

In September 2006, the FASB issued SFAS No. 157, *"Fair Value Measurements"* ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 applies under most other accounting pronouncements that require or permit fair value measurements and does not require any new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years, with earlier application encouraged. The provisions of SFAS 157 should be applied prospectively as of the beginning of the fiscal year in which the statement is initially applied, except for a limited form of retrospective application for certain financial instruments. The Group is currently evaluating the impact, if any, of this statement on the consolidated financial statements and related disclosures.

In February 2007, the FASB issued SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities"*, ("SFAS 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. The Group is currently evaluating the impact, if any, of this statement on its consolidated financial statements and related disclosures.

In June 2006, the FASB issued Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes"* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, *"Accounting for Income Taxes"*. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Group adopted FIN 48 on January 1, 2007 and estimated the cumulative effect on adoption of FIN 48 to be a reduction of consolidated retained earnings as of January 1, 2007 of approximately $1.5 million.

In June 2006, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 06–3, *"How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (That Is, Gross Versus Net Presentation)"* ("EITF 06–3"). The scope of EITF 06–3 includes sales, use, value added and some excise taxes that are assessed by a governmental authority on specific revenue–producing transactions between a seller and customer. EITF 06–3 states that a company should disclose its accounting policy (i.e. gross or net presentation) regarding the presentation of taxes within its scope, and if significant, these disclosures should be applied retrospectively to the financial statements for all periods presented. EITF 06–3 is effective for interim and annual reporting periods beginning after December 15, 2006. The Group is currently evaluating the impact, if any, of this statement on its consolidated combined financial statements and related disclosures.

*(v)  Reclassification*

Certain prior year amounts have been reclassified to conform to the current period's presentation.

F–21

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

3. **Acquisitions**

*2004 Acquisitions:*

In 2004, the Group acquired 10 entities in order to expand their out–of–home television advertising networks for total cash consideration of $4,921,069. As a result of these acquisitions, the Group recorded goodwill and intangible assets of $4,657,492 and $603,520, respectively. All of the goodwill was assigned to the out–of–home television advertising services segment.

In addition, on September 22, 2004, the Group acquired 100% of the outstanding ordinary shares of Perfect Media which includes its then variable interest entity Shanghai Perfect Media, an advertising services provider, in exchange for cash of $500,000 and 14,594,200 ordinary shares having a fair value $4,484,798, or approximately $0.31 per ordinary share, The fair value of the Group's ordinary shares was determined by management considering multiple factors, including a retrospective valuation performed by a third party valuation firm.

The valuation was based on the guideline companies approach which incorporates the market performance of comparable listed companies as well as the financial results and growth trends of the Group to derive the total equity value of the Group. The valuation model then allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two scenarios: preference shares that have a value in excess of their conversion price were treated as if they had converted into ordinary shares; and preference shares that have a value below their conversion price were assigned a value that took into consideration their liquidation preference. Ordinary shares were assigned a value equal to their pro rata share of the residual amount (if any) that remained after consideration of the liquidation preference of preferred stock with a value below their conversion price.

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The Group's primary reason for the acquisition of Perfect Media was its complementary business model and its strong relationships with landlords and property managers of commercial building locations in which the Group desired to locate its flat–panel displays. The acquisition of Perfect Media resulted in a significant amount of goodwill because the amount the Group paid for Perfect Media exceeded its fair market value. The Group was willing to pay in excess of Perfect Media's fair market value in order to maintain its competitive advantage within the commercial buildings the Group already occupied. F–18

The purchase price was allocated as follows:

|  |  | Amortization Period |
| --- | --- | --- |
| Net tangible assets acquired | $ 40,597 |  |
| Intangible assets: |  |  |
| Lease Agreements | 185,947 | 2.3 years |
| Customer base | 14,016 | 7 years |
| Goodwill | 4,744,238 | N/A |
| Total | $ 4,984,798 |  |

*2005 Acquisitions:*

In 2005, the Group acquired nine entities in order to further expand its out–of–home television advertising network for total consideration of $3,083,244, which was paid primarily in cash. As a result of these acquisitions,

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

the Group recorded goodwill and intangible assets of $2,847,388 and $382,400, respectively. All of the goodwill was assigned to the out–of–home television advertising services segment.

In addition, on March 21, 2005, the Group acquired Capital Beyond Limited, including its then variable interest entity Guangdong Framedia, an advertising services provider, in exchange for cash consideration of $2,054,008, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization Period |
|---|---|---|
| Net tangible assets acquired | $    337,252 |  |
| Intangible assets: |  |  |
| Lease agreements | 471,818 | 2.3 years |
| Customer base | 10,633 | 7 years |
| Goodwill | 1,234,305 | N/A |
| Total | $ 2,054,008 |  |

*2006 Acquisitions:*

On January 1, 2006, the Group acquired Infoachieve Limited ("Infoachieve"), which included its then variable interest entity Shanghai Framedia Advertising Development Ltd. ("Framedia"), the largest in–elevator poster frame advertising network operator in China. The purchase price included cash of $39,600,000, all of which was paid as of December 31, 2005, and 22,157,003 ordinary shares having a fair value of $54,690,130, or approximately $2.47 per ordinary share. The fair value of the ordinary shares was based on the average market price of Focus Media Holding's ordinary shares over a reasonable period before and after the date that the terms of the acquisition were agreed to and announced. Framedia achieved certain earnings targets for the year ended December 31, 2006 and, as a result, on June 15, 2007 the Group issued 35,830,619 ordinary shares as additional purchase consideration. As the contingency was resolved as of December 31, 2006, the Group recorded $237,879,480 in consideration payable as a component of shareholders' equity, which represents the fair value of the 35,830,619 shares as of December 31, 2006.

The aggregate purchase price is comprised of the following:

| | |
|---|---|
| Cash consideration | $    39,600,000 |
| Other acquisition costs | 311,110 |
| Value of the ordinary shares issued | 54,690,130 |
| Value of contingent consideration resolved (ordinary shares to be issued) | 237,879,480 |
| Total consideration | $  332,480,720 |

F–23

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition as follows:

|  |  |  | Amortization Period |
|---|---|---|---|
| Net tangible liabilities assumed | $ | (8,443,960) |  |
| Intangible assets: |  |  |  |
| Lease agreements |  | 8,281,999 | 6 years |
| Customer base |  | 2,664,685 | 7 years |
| Non−compete agreement |  | 463,558 | 3 years |
| Trademark |  | 939,377 | 1 years |
| Contract backlog |  | 70,120 | 1 years |
| Goodwill |  | 328,504,941 | N/A |
| Total | $ | 332,480,720 |  |

The goodwill was assigned to the in−elevator poster frame advertising services segment.

On February 28, 2006, the Group acquired Target Media Holdings Limited ("Target Media"), which used to be the Group's biggest competitor in out−of−home television advertising services, and its wholly−owned subsidiary, Target Media Multi−Media technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity, Shanghai Target Media Co., Ltd. ("STM"), one of the largest out−of−home advertising network operators in China. The purchase price included cash of $94,000,000, all of which was paid in 2006, and 77,000,000 ordinary shares having a fair value of $310,464,000, or $4.032 per ordinary share. The fair value of the ordinary shares was based on average market price of Focus Media Holding's ordinary shares over a reasonable period before and after the date that the terms of the acquisition were agreed to and announced.

The aggregate purchase price of $407,321,524 consisted of the following:

| Cash consideration | $ | 94,000,000 |
|---|---|---|
| Other acquisition costs |  | 2,857,524 |
| Value of the ordinary shares issued |  | 310,464,000 |
| Total consideration | $ | 407,321,524 |

The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition as follows:

|  |  |  | Amortization Period |
|---|---|---|---|
| Net tangible assets acquired | $ | 19,629,853 |  |
| Intangible assets: |  |  |  |
| Lease agreements |  | 4,510,494 | 10 years |
| Customer base |  | 449,631 | 7 years |
| Trademark |  | 5,721,874 | 10 years |
| Contract backlog |  | 148,550 | 1 years |
| Goodwill |  | 376,861,122 | N/A |
| Total | $ | 407,321,524 |  |

F−24

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The goodwill was assigned to the out–of–home television advertising services segment.

The purchase price allocation and intangible asset valuations for each of the two acquisitions described above were determined by management based on a number of factors including a valuation report provided by a third party valuation firm. The valuation report utilized and considered generally accepted valuation methodologies such as the income, market, cost and actual transaction of Group shares approach. The Group has incorporated certain assumptions which include projected cash flows and replacement costs.

In the valuation of lease agreements, customer base and contract backlog, an indication of value was developed through the application of a form of income approach, known as excess earnings method. The first step to apply the excess earning method was to estimate the future debt–free net income attributable to the intangible asset. The resulting debt–free net income was then reduced by an estimated fair rate of return on contributory assets necessary to realize the projected earnings attributable to the intangible assets. These assets include fixed assets, working capital and other intangible assets.

The valuation of the trademark was based on the relief from royalty method whereby an asset is valued based upon the after–tax cash flow savings accruing to the owner by virtue of the fact that the owner does not have to pay a "fair royalty" to a third party for the use of that asset. Accordingly, a portion of the owner's earnings, equal to the after–tax royalty that would have been paid for use of the asset can be attributed to that asset. The value of the asset depends on the present worth of future after–tax royalties attributable to the asset to their present worth at market–derived rates of return appropriate for the risks of that particular asset.

Also in 2006, the Group completed a number of individually insignificant acquisitions which are described below:

On March 21, 2006, the Group acquired Dotad Media Holdings Limited ("Dotad"') in exchange for cash consideration of $15,000,000, all of which was paid as of December 31, 2006. On June 15, 2007, additional 1,500,000 ordinary shares were issued as Dotad has met its earning targets in the first year it was acquired. An additional 1,500,000 ordinary shares is issuable contingent upon Dotad's meeting certain earning targets in 2007. The Group acquired intangible assets of $6,587,095 and recognized goodwill of $8,444,464. The goodwill was assigned to the mobile handset advertising services segment.

The Group acquired three entities in the poster–frame advertising business for cash consideration of $10,670,222. The Group recognized acquired intangible assets of $1,682,771 and recognized goodwill of $9,057,700, which was assigned to the in–elevator poster frame advertising services segment.

The Group acquired three entities which provide out–of–home television advertising services and the remaining minority interest in six subsidiaries, for cash consideration of $5,314,923 and 97,190 ordinary shares. Certain of these acquisitions have contingent consideration based on future earnings targets, The group recognized acquired intangible assets of $12,507 and recognized goodwill of $3,453,332, which was assigned to the out–of–home television advertising services segment.

The Group acquired 70% of the outstanding shares of Appreciated Capital Ltd. and its then variable interest entity Beijing YangShiSanWei Advertisement Co., Ltd. (collectively, "ACL"). ACL sells advertising in movie theatres to its customers. The purchase consideration is fully contingent and is based on earnings targets for the years ending August 31, 2007, 2008 and 2009, subject further to the attainment of certain operational targets. The Group advanced $2.8 million to ACL. The purchase price allocation can not be completed until the contingent consideration is resolved. As such, the Group has recorded a liability of $358,574, which is equal to the excess of the fair value of the assets acquired over cost on the date of acquisition.

F–25

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Acquisitions in the six months ended June 30, 2007 (unaudited):*

In January and February 2007, the Group acquired five companies which provide in–elevator poster frame advertising services. The purchase consideration for each of these five entities is contingent upon the achievement of certain earning targets over the next one to three fiscal years. The Group made an advance payment of $6.2 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group acquired five companies which provide mobile handset advertising services. The purchase consideration for each of these five entities is contingent upon the achievement of certain earnings target over the next 12 months to 25 months. The Group made an advance payment of $8.7 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group acquired a billboard advertising company. The purchase consideration is contingent upon the operating results over the next three years. The Group made an advance payment of $3 million, which will be deducted from the contingent purchase price consideration.

In March 2007, the Group completed acquisition of Allyes Information Technology Company Limited, or Allyes, a Cayman Islands company, which operates an Internet advertising marketing agency and technology services company through its PRC affiliated entities. Allyes is the largest Internet advertising agency and provider of Internet advertising technology in China. The purchase price consideration was $70 million in cash and 19,969,080 ordinary shares having a fair value of $154,281,112, or $7.726 per ordinary share. Additional consideration of 9,662,458 ordinary shares is issuable, contingent upon Allyes meeting certain earnings targets during the twelve month period from April 1, 2007 to March 31, 2008.

The aggregate purchase price, excluding contingent consideration, of $224,698,474 consisted of the following:

| | | |
|---|---|---:|
| Cash consideration | $ | 70,000,000 |
| Other acquisition costs | | 417,362 |
| Value of the ordinary shares issued | | 154,281,112 |
| Total consideration | $ | 224,698,474 |

The purchase price has been preliminarily allocated as follows:

| | | | Amortization Period |
|---|---|---:|---:|
| Net tangible assets acquired | $ | 21,957,393 | |
| Intangible assets: | | | |
| Acquired technology | | 11,832,000 | 6 years |
| Customer relationship | | 10,249,000 | 7 years |
| Other | | 14,014,000 | 1–7 years |
| Goodwill | | 166,646,081 | N/A |
| Total | $ | 224,698,474 | |

In the second quarter of 2007, the Group completed acquisitions of eight companies which primarily provide mobile handset advertising, Internet advertising and outdoor billboard advertising services, for an aggregate purchase considerations of approximately $7.5 million plus additional consideration contingent upon the achievement of certain earnings targets over the next one to three fiscal years. The Group also made an advance payment of $16.3 million, which will be deducted from the contingent purchase price consideration.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**Pro forma (unaudited)**

The following summarized unaudited pro forma results of operations for the years ended December 31, 2004, 2005 and 2006 and six months ended June 30, 2007, have been prepared assuming that the individually material acquisitions, being Infoachieve Limited, Target Media Holdings Limited, Capital Beyond Limited, Perfect Media and Allyes Information Technology Company Limited, occurred as of January 1, 2004, 2005, 2006 and 2007. These pro forma results have been prepared for comparative purposes only based on management's best estimate and do not purport to be indicative of the results of operations which actually would have resulted had the acquisitions occurred as of January 1, 2004, 2005, 2006 and 2007.

| | Pro Forma | | | |
|---|---|---|---|---|
| | For the Years Ended December 31, | | | For the Six Months Ended June 30, |
| | **2004** | **2005** | **2006** | **2007** |
| | **(Unaudited)** | **(Unaudited)** | **(Unaudited)** | **(Unaudited)** |
| Revenues | $  29,296,705 | $  113,750,432 | $  264,107,708 | $  181,204,576 |
| Net income (loss) attributable to holders of ordinary shares | (10,703,970) | 3,127,583 | 69,549,229 | 44,664,816 |
| Income (loss) per share — basic | $  (0.06) | $  0.01 | $  0.13 | $  0.08 |
| Income (loss) per share — diluted | $  (0.06) | $  0.01 | $  0.13 | $  0.07 |

**4.  Investment in Equity and Debt Securities**

The following is a summary of short–term available–for–sale equity and debt securities:

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| | | | | **(Unaudited)** |
| Debt Securities | $  — | $  35,000,000 | $  — | $  — |
| Equity Securities | — | — | — | 40,715,298 |
| Gross unrealized gains (loss) | — | (164,150) | — | 601,893 |
| Fair Value | $  — | $  34,835,850 | $  — | $  41,317,191 |

**5.  Accounts Receivable, net**

Accounts receivable, net consists of the following:

| | December 31, | | | June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| | | | | **(Unaudited)** |
| Billed receivables | $  4,782,521 | $  13,684,419 | $  37,922,093 | $  103,502,684 |
| Unbilled receivables | 1,837,428 | 7,504,112 | 23,692,250 | 15,266,882 |
| Total | $  6,619,949 | $  21,188,531 | $  61,614,343 | $  118,769,566 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of balance sheet dates.

F–27

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

6.  **Acquired Intangible Assets, Net**

As of December 31, 2004, 2005, 2006 and the six months ended June 30,2007 (unaudited), the Group has the following amounts related to intangible assets:

| | December 31, | | | June 30, 2007 |
| | 2004 | 2005 | 2006 | (Unaudited) |
|---|---|---|---|---|
| Cost: | | | | |
| Operation and broadcasting rights | $ — | $ — | $ 6,403,114 | $ 6,565,557 |
| Lease agreements | 511,929 | 1,249,843 | 16,336,586 | 18,613,024 |
| Customer bases | 273,820 | 430,879 | 7,827,587 | 20,233,245 |
| Trademark | — | — | 6,861,065 | 15,716,237 |
| Acquired technology | — | — | 2,546,519 | 14,800,472 |
| Others | — | — | 1,177,276 | 8,378,045 |
| Total | $ 785,749 | $ 1,680,722 | $ 41,152,147 | $ 84,306,580 |
| Accumulated amortization: | | | | |
| Operation and broadcasting rights | $ — | $ — | $ 80,039 | $ 410,347 |
| Lease agreements | 58,888 | 447,578 | 3,015,639 | 4,514,815 |
| Customer bases | 18,555 | 75,224 | 1,051,403 | 2,151,849 |
| Trademark | — | — | 1,462,163 | 1,801,212 |
| Acquired technology | — | — | 381,978 | 1,164,172 |
| Others | — | — | 443,906 | 1,254,868 |
| Total | $ 77,443 | $ 522,802 | $ 6,435,128 | $ 11,297,263 |
| Intangible assets, net: | $ 708,306 | $ 1,157,920 | $ 34,717,019 | $ 73,009,317 |

The Group recorded amortization expense as follows:

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
| | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
|---|---|---|---|---|---|
| Cost of revenues | $ 58,888 | $ 382,359 | $ 3,207,079 | $ 1,363,026 | $ 3,062,647 |
| Selling and marketing | 18,555 | 55,478 | 2,567,002 | 1,129,363 | 1,541,394 |
| Total | $ 77,443 | $ 437,837 | $ 5,774,081 | $ 2,492,389 | $ 4,604,041 |

The Group will record amortization expense of $5,724,504, $5,490,514, $5,148,733, $5,078,621 and $4,585,056 for the years ended December 31, 2007, 2008, 2009, 2010 and 2011, respectively.

F–28

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**7.  Equipment, Net**

Equipment, net consists of the following:

| | December 31, | | | June 30, 2007 |
|---|---|---|---|---|
| | 2004 | 2005 | 2006 | (Unaudited) |
| Media display equipment | $ 9,384,262 | $ 40,191,968 | $ 77,088,464 | $ 85,657,032 |
| Computers and office equipment | 675,053 | 1,267,696 | 3,360,590 | 6,541,392 |
| Leasehold improvements | 167,932 | 537,130 | 713,524 | 723,718 |
| Vehicles | 83,834 | 349,575 | 658,825 | 1,027,533 |
| | $ 10,311,081 | $ 42,346,369 | $ 81,821,403 | $ 93,949,675 |
| Less: accumulated depreciation and amortization | (1,142,742) | (5,975,119) | (22,767,910) | (31,893,128) |
| | 9,168,339 | 36,371,250 | 59,053,493 | 62,056,547 |
| Assembly in progress | 28,804 | 7,323,638 | 11,195,831 | 19,172,593 |
| Total | $ 9,197,143 | $ 43,694,888 | $ 70,249,324 | $ 81,229,140 |

Depreciation expense for 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) was $870,597, $4,489,178, $13,666,912, $6,132,059 and $8,058,205, respectively.

Assembly in process relates to the assembly of flat–panel television screens. No provision for depreciation is made on assembly in process until such time as the relevant assets are completed and put into use.

**8.  Short–term Debts**

| | December 31, | | | June 30, 2007 |
|---|---|---|---|---|
| | 2004 | 2005 | 2006 | (Unaudited) |
| Short term bank loan (a) | $ — | $ 991,301 | $ — | $ 393,933 |
| Other loan due to ex–shareholders of Framedia (b) | — | — | 2,769,459 | — |
| Total | $ — | $ 991,301 | $ 2,769,459 | $ 393,933 |

(a)  The Group had $nil, $991,301, $nil and $393,933 outstanding under a line of credit arrangement as of December 31, 2004, 2005 2006 and June 30, 2007 (unaudited), respectively. The amount available for additional borrowings under this line of credit at December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited) was $nil, $2,106,516, $nil and $nil, respectively. The line of credit was subject to an interest rate of 10%, discounted by an amount equal to the six month loan interest rate of The People's Bank of China. As of December 31, 2005, the line of credit bore interest at 4.698% per annum. The Group recorded interest expense under the line of credit in 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) of $nil, $49,873, $305,287, $288,488 and $6,971, respectively.

(b)  At December 31, 2006, the short–term loan from ex–shareholders of Framedia are non–interest bearing, all of which are repayable within one year.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**9.  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

| | December 31, | | | June 30, |
| | 2004 | 2005 | 2006 | 2007 |
| | | | | (Unaudited) |
|---|---|---|---|---|
| Accrued sales commissions | $ 691,888 | $ 2,583,270 | $ 5,813,761 | $ 8,091,174 |
| Other accrued expenses | 67,929 | 577,863 | 1,844,781 | 2,777,196 |
| Other taxes payables | 1,728,850 | 3,037,443 | 7,451,787 | 9,560,768 |
| Advance from customers | 1,459,976 | 3,387,224 | 6,381,032 | 14,902,876 |
| Accrued employee payroll and welfare | 473,054 | 1,059,717 | 1,465,142 | 2,975,594 |
| Accrued offering costs | 767,821 | — | — | — |
| Payables related to acquisitions | 538,860) | 99,130) | 4,530,745)) | 12,332,330 |
| Amount due to minority shareholders of subsidiary | 426,858 | 200,848 | — | — |
| Withholding individual PRC income tax | — | — | 9,046,576 | 6,932,777 |
| Others | 436,199 | 801,407 | 2,140,351 | 7,606,284 |
| Total | $ 6,591,435 | $ 11,746,902 | $ 38,674,175 | $ 65,178,999 |

**10.  Share–based Compensation**

In June 2003, the Group adopted the 2003 Employee Share Option Scheme ("2003 Plan") under which not more than 30% of issued share capital was reserved for grants of options. In May 2005, the Group adopted the 2005 Share Option Plan ("2005 Plan"), under which the amount of options that may issue has been reduced to an aggregate of 20% of issued share capital, including the 10.87% already granted under the 2003 Plan. In addition, during the three years after the adoption of our 2005 Plan, the Group may issue no more than 5% of issued share capital for grants of options. In October 2006, the Group further adopted the 2006 Employee Share Option Plan ("2006 Plan"), under which the Group may issue no more than 3.6% of issued ordinary shares for grant of options. The option plans are intended to promote the success and to increase shareholder value by providing an additional means to attract, motivate, retain and reward selected directors, officers, employees and third–party consultants and advisors.

In 2004, 2005, 2006 and six months ended June 30, 2007 (unaudited), options to purchase 25,208,200, 23,843,630, 14,800,000 and 1,300,000 ordinary shares were authorized under the option plans, respectively. Under the terms of each option plan, options are generally granted at prices equal to the fair market value as determined by the Board of Directors, expire 10 years from the date of grant and generally vest over three years while certain options granted vest over one year. Subsequent to the initial public offering, options were generally granted at the fair market value of the ordinary shares at the date of grant. As of December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited), options to purchase 25,208,200, 49,051,830, 37,515,150 and 34,768,895 ordinary shares were granted to employees and non–employees. Share options granted to external consultants and advisors in exchange for services were expensed based on the estimated fair value utilizing the Black–Scholes option pricing model.

F–30

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

The fair value of options granted is estimated on the date of grant using the Black–Scholes option–pricing model with the following weighted–average assumptions:

| | For the Years Ended December 31, | | | For the Six Months Ended June 30, |
|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** |
| | | | | **(unaudited)** |
| Option granted to employees: | | | | |
| Average risk–free rate of return | 2.97% | 3.10–4.43% | 4.74%–4.80% | 4.61%–4.68% |
| Weighted average expected option life | 1–3 years | 2–3 years | 2 years | 2 years |
| Volatility rate | 36.2% | 30.49%–36.2% | 40.0–53.7% | 50.61% |
| Dividend yield | 0% | 0% | 0% | 0% |

Prior to the initial public offering in July 2005, the derived fair value of the ordinary shares underlying the options was determined by management by factoring into their consideration a retrospective valuation conducted by a third party valuation firm using a generally accepted valuation methodology, the guideline companies approach, which incorporates certain assumptions including the market performance of comparable listed companies as well as the financial results and growth trends of the Group, to derive the total equity value of the Group. The valuation model allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two assumptions: where conversion into ordinary shares would result in a higher economic value, preference shares were treated as if they had converted into ordinary shares; and preference shares that have a value higher than their conversion price were assigned a value that took into consideration their liquidation preference.

The ordinary shares were assigned a value equal to their pro rata share of the residual amount, if any, that remained after consideration of the liquidation preference of preferred shares with a value below their conversion price. Also prior to July 2005, the expected volatilities are estimated based on the average volatility of comparable companies with the time period commensurate with the expected time period. Following the initial public offering, the expected volatilities were estimated based on the historical volatility. The expected term of options granted represents the period of time that options granted are expected to be outstanding. The risk–free interest rate assumption is determined using the Federal Reserve nominal rates for U.S. Treasury zero–coupon bonds with maturities similar to those of the expected term of the award.

The weighted average fair value of options granted as of December 31, 2004, 2005, 2006 and six months ended June 30, 2007 (unaudited) was $0.09, $0.39, $1.77 and $2.76, respectively.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

A summary of the share option activities are as follows:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Remaining Contract Term (in years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Options outstanding at January 1, 2006 | 49,051,830 | $ | 0.89 | | | |
| Granted | 14,800,000 | | 5.60 | | | |
| Cancelled | — | | — | | | |
| Exercised | 26,336,680 | | 0.58 | | | |
| Options outstanding at December 31, 2006 | 37,515,150 | $ | 2.97 | 8.81 years | $ | 137,600,699 |
| Granted | 1,300,000 | | 7.21 | | | |
| Cancelled | — | | | | | |
| Exercised | 4,046,255 | | 1.29 | | | |
| Options outstanding at June 30, 2007 (unaudited) | 34,768,895 | $ | 3.33 | 8.45 years | $ | 235,477,683 |
| Options vested or expected to vest at December 31, 2006 | 34,000,844 | $ | 0.66 | 7.82 years | $ | 203,335,095 |
| Options exercisable at December 31, 2006 | 7,664,164 | $ | 0.94 | 8.00 years | $ | 43,688,834 |
| Options vested or expected to vest at June 30, 2007 (unaudited) | 41,613,095 | $ | 0.86 | 7.44 years | $ | 384,508,746 |
| Options exercisable at June 30, 2007 (unaudited) | 11,230,160 | $ | 1.36 | 7.66 years | $ | 98,126,788 |

The total intrinsic value of options exercised during the years ended December 31, 2004, 2005, 2006 and six months period ended June 30, 2007 (unaudited), was $nil, $nil, $146,119,111 and $24,487,297, respectively.

As of December 31, 2006 and June 30, 2007 (unaudited), there was $25,111,999 and $19,267,984, respectively, in total unrecognized compensation expense related to unvested share–based compensation arrangements, which is expected to be recognized over weighted–average period of 1.29 years and 0.86 years, respectively.

**11. Income Taxes**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gain. In addition, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*British Virgin Islands*

The Group's subsidiaries incorporated in the BVI are not subject to taxation.

F–32

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Hong Kong*

Focus Media (China) Holding Ltd.is subject to Hong Kong profit tax at a rate of 17.5% on its assessable profit. No Hong Kong profit tax has been provided as the Group does not have assessable profit that is earned in or derived from Hong Kong during the years presented.

*PRC*

Pursuant to the PRC Income Tax Laws, the Company's subsidiaries and VIEs are generally subject to Enterprise Income Taxes ("EIT") at a statutory rate of 33%, which comprises 30% national income tax and 3% local income tax. Some of the Company's subsidiaries and VIEs are newly incorporated enterprises engaged in the advertising industry which are entitled to a two–year tax exemption holiday, commencing from the first operating year. One of the subsidiaries of the Company, Beijing Focus Media Wireless Co., Ltd., is a qualified new technology enterprise and under PRC Income Tax Laws and is subject to a preferential tax rate of 15%, plus a three–year tax exemption followed by three years with a 50% reduction in the tax rate, commencing from the first profitable year.

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transition to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises that qualify as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate.

Most of the Company's subsidiaries and VIEs are expected to transition from 33% to 25% starting from January 1, 2008. Those that currently enjoy a lower tax rate of 15% will gradually transition to the uniform tax rate of 25% from 2008 to 2012 unless the company obtains the "new and high technology enterprise" status under the new tax law.

*Composition of income tax expense*

The current and deferred portion of income tax expense (benefit) included in the consolidated statements of operations for the years ended December 31 is as follows:

|  | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|  | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| --- | --- | --- | --- | --- | --- |
| Current income tax expense | $ 828,962 | $ 715,117 | $ 1,106,921 | $ 617,669 | $ 3,784,693 |
| Deferred income tax expense (benefit) | 78,588 | (20,664) | (63,383) | 371,250 | (498,342) |
| Income tax expense | $ 907,550 | $ 694,453 | $ 1,043,538 | $ 988,919 | $ 3,286,351 |

F–33

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Reconciliation of the differences between statutory tax rate and the effective tax rate*

Reconciliation between total income tax expense and that amount computed by applying the PRC statutory income tax rate of 33% to income before taxes is as follows:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2005** | **2006** |
| Statutory rate | 33.0% | 33.0% | 33.0% |
| Effect of different tax rate of group entities operation in other jurisdiction | 318.4% | 0.0% | 2.4% |
| Effect on tax holiday | (182.8)% | (31.5)% | (35.6)% |
| Permanent differences | (78.4)% | 1.1% | 2.2% |
| Change in valuation allowance | (18.6)% | 0.2% | (0.7)% |
| Effective tax rate | 71.6% | 2.8% | 1.3% |

The following table sets forth the effects of the tax holidays granted to the entities of the Group for the periods presented:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2005** | **2006** |
| Tax holiday effect | $ 7,007,620 | $ 23,212,97 | $ 99,641,998 |
| Net income per share effect — basic | $ 0.04 | $ 0.09 | $ 0.2 |
| Net income per share effect — diluted | $ 0.04 | $ 0.06 | $ 0.19 |

The principal components of the Group's deferred income tax assets/liabilities are as follows:

|  | December 31, | | | June 30, |
|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2007** |
|  | | | | **(Unaudited)** |
| Deferred tax assets: | | | | |
|   Net operating loss carry forwards | $ 276,673 | $ 545,208 | $ 2,317,316 | $ 3,061,405 |
|   Accrued expenses temporarily non–deductible | 54,281 | 46,695 | 242,106 | 84,018 |
|   Pre–operating expenses | 62,862 | 80,102 | — | — |
|   Bad debt provision | 57,147 | 130,897 | 704,429 | 1,199,508 |
| Total deferred tax assets | $ 450,963 | $ 802,902 | $ 3,263,851 | $ 4,344,931 |
| Valuation allowance on deferred tax assets | — | (59,988) | (2,438,008) | (3,466,395) |
| Net deferred tax assets | $ 450,963 | $ 742,914 | $ 825,843 | $ 878,536 |
| Deferred tax liabilities: | | | | |
|   Intangible assets basis difference | $ — | $ — | $ 3,303,110 | $ 7,230,123 |
| Total deferred tax liabilities | $ — | $ — | $ 3,303,110 | $ 7,230,123 |

A significant portion of the deferred tax assets recognized relate to net operating loss carry forwards. The Group had tax losses of $7,689,311 as of December 31, 2006 to be carried forward against future taxable income, which will expire if unused in the years ending December 31, 2008 through 2011. The Group operates through multiple subsidiaries and the valuation allowance is considered on each individual subsidiary basis. Where a

F–34

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

valuation allowance was not recorded, the Group believes that there was sufficient positive evidence to support its conclusion not to record a valuation allowance as it expects to generate sufficient taxable income in the future.

The valuation allowance in 2005 and 2006 has been increased in connection with an increase in net operating loss carry forwards for which the Group believes it cannot generate future taxable income sufficient to recognize the income tax benefit.

In July 2006, the Financial Accounting Standards Board (FASB) issued FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109 (FIN 48), which clarifies the accounting and disclosure for uncertainty in tax positions, as defined in that statement. FIN 48 prescribes a more–likely–than–not threshold for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This interpretation also provides guidance on de–recognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, accounting for income taxes in interim periods and income tax disclosures.

The Group adopted the provisions of FIN 48 effective January 1, 2007. Based on its FIN 48 analysis documentation, the Group has made its assessment of the level of tax authority for each Tax Position (including the potential application of interest and penalties) based on the technical merits, and has measured the unrecognized tax benefits associated with the Tax Positions. The adoption of FIN 48 has reduced the retained earnings as of January 1, 2007 by $1.5 million with a corresponding increase in the liability for uncertain tax positions, which is transfer pricing related matters. Based on the current China tax practice, it appears there is a prevailing administrative practice not to assess interest or penalty on transfer pricing related adjustments. Therefore, it is more likely than not that interest or penalty is not required to be accrued for the assessment of the transfer pricing related tax position. As a result, no corresponding interests and/or penalties are assessed in association with the transfer pricing related matters for the purpose of FIN 48 adoption. The aforementioned liability is recorded in other current liabilities in the consolidated balance sheet. The Group has no material unrecognized tax benefit which would favorably affect the effective income tax rate in future periods. The Group classifies interest and/or penalties related to income tax matters in income tax expenses. The additional increase in the FIN 48 liability for uncertain tax positions during the period ended June 30, 2007 was immaterial.

According to the PRC Tax Administration and Collection Law, the statute of limitations is three years if the underpayment of taxes is due to computational errors made by the taxpayer or the withholding agent. The statute of limitations will be extended to five years under special circumstances, which are not clearly defined (but an underpayment of tax liability exceeding RMB 100,000 is specifically listed as a special circumstance). In the case of a related party transaction, the statute of limitations is 10 years. There is no statute of limitation in the case of tax evasion.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

**12.    Net income (loss) per Share**

The following table sets forth the computation of basic and diluted income (loss) per share for the years indicated:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | (In U.S. Dollars, expect per share data) | | | | |
| Income (loss) attributable to holders of ordinary shares (numerator): | $ (10,576,414) | $ 23,547,651 | $ 83,197,732 | $ 26,104,090 | $ 54,006,367 |
| Shares (denominator): | | | | | |
| Weighted average ordinary shares outstanding used in computing basic income (loss) per share | 160,998,600 | 252,128,545 | 505,411,079 | 473,678,589 | 560,510,907 |
| Plus weighted average preference shares outstanding | — | 84,119,675 | — | — | — |
| Plus incremental weighted average ordinary shares from assumed conversions of stock option using treasury stock method | — | 29,689,874 | 16,125,302 | 31,998,480 | 16,855,004 |
| Weighted average ordinary shares outstanding used in computing diluted income (loss) per share | 160,998,600 | 365,938,094 | 521,536,381 | 495,677,069 | 577,365,911 |
| Net income (loss) per share — basic | $ (0.07) | $ 0.09 | $ 0.16 | $ 0.06 | $ 0.10 |
| Net income (loss) per share — diluted | $ (0.07) | $ 0.06 | $ 0.16 | $ 0.05 | $ 0.09 |

For the above mentioned years, the Group had securities outstanding which could potentially dilute basic earnings per share in the future, but which were excluded from the computation of diluted net income (loss) per share in the periods presented, as their effects would have been anti–dilutive. Such outstanding securities consist of the following:

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | | (Unaudited) | (Unaudited) |
| | (In U.S. Dollars, expect per share data) | | | | |
| Series A convertible redeemable preference shares | 41,967,400 | — | — | — | — |
| Series B convertible redeemable preference shares | 48,191,600 | — | — | — | — |
| Series C–1 convertible redeemable preference shares | 34,054,000 | — | — | — | — |
| Series C–2 convertible redeemable preference shares | 34,053,400 | — | — | — | — |

F–36

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | For The Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | | **(Unaudited)** | **(Unaudited)** |
| | | | (In U.S. Dollars, expect per share data) | | |
| Outstanding options to purchase ordinary shares | 25,208,200 | 49,051,830 | 37,515,150 | 35,541,220 | 34,768,895 |
| Total | 183,474,600 | 49,051,830 | 37,515,150 | 35,541,220 | 34,768,895 |

**13.    Convertible Redeemable Preference Shares**

Each Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares was automatically converted into ordinary shares at the then effective conversion price upon the closing of a qualified underwritten public offering of the ordinary shares of the Group. Upon the completion of the Group's initial public offering on July 13, 2005, all of the issued and outstanding Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares were converted into ordinary shares.

*a)* In April 2004, the Group issued 52,083,400 Series B convertible redeemable preference shares to a group of third party investors for cash proceeds of $12,062,696, net of issuance costs of $437,304. The holders of Series B redeemable convertible preference shares could have redeemed the Series B convertible redeemable preference shares at any time (i) before December 31, 2006 if the Group received a notice from the holders of a majority of Series B convertible redeemable preference shares indicating a material breach by the Group and its affiliates of their representation, warranties or covenants under Series B convertible redeemable preference shares, the shareholders agreement or the Restructuring Documents (as defined in the amended Series B Purchase Agreement), or (ii) after April 28, 2004 ("Redemption Start Date"), at the option of a majority of the holders of the Series B convertible redeemable preference shares then outstanding. In the event of a redemption pursuant to this right, the Group could have redeemed up to all of the Series B convertible redeemable preference shares at a redemption price per redeemable convertible preference share equal to $0.24×(1+(0.15×N)) plus all declared but unpaid dividends. N refers to a fraction, the numerator of which is the number of calendar days between April 28, 2004 and the Redemption Start Date and the denominator of which is 365. The Group recorded a deemed dividend of $2,191,442 in 2004, which resulted from the amortization of the 15% redemption premium associated with Series B convertible redeemable preference shares. According to the articles of association amended on November 29, 2004, the redemption price of Series B preferred stock was $0.24.

*b)* In April 2004, 62,400,000 outstanding ordinary shares were reclassified and re–designated into 62,400,000 Series A convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $8,308,411 which represents the difference between the fair value of the Series A convertible redeemable preference shares at the date of re–designation of $0.15 and the initial issuance price of the ordinary shares of $0.05 for 10,000,000 shares and approximately $0.01 for 52,400,000 shares.

The holders of Series A convertible redeemable preference shares had the right to cause the Group to redeem such preference shares, at any time commencing on a Redemption Start Date, at the option of a majority of holders of Series A redeemable convertible preference shares at a redemption price per Series A convertible redeemable preference share equal to $0.06 plus all declared but unpaid dividends. Series A convertible redeemable preference shares could not have been redeemed until the Group had redeemed all of the Series B convertible redeemable preference shares and paid the aggregate Series B convertible redeemable preference shares redemption price in full.

*c)* On November 29, 2004, the Group issued 34,053,400 Series C–2 convertible redeemable preference shares to group of third party investors for cash proceeds of $17,415,000, net of issuance costs of $85,000. The holder of a

F–37

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

Series C–2 convertible redeemable preference share could have redeemed Series C–2 convertible redeemable preference shares at any time after the earlier of (i) such time as the holders of a majority of the Series C–2 convertible redeemable preference share delivered notice in writing to the Group that the Group and/or its affiliates was in material breach of any of its representations, warranties and covenants under the Series C Purchase Agreement, the Shareholders Agreement or the Ancillary Documents (as defined in the Series C Purchase Agreement) so long as such notice was to have been delivered before December 31, 2006 and (ii) anytime following the fourth anniversary of the issuance of the Series C–2 convertible redeemable preference share under the Series C Purchase Agreement. In connection with the redemption of any Series C–2 convertible redeemable preference share, the Group was to pay a redemption price equal to the Series C–2 convertible redeemable preference share Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–2 convertible redeemable preference share through to the date of redemption thereof.

*d)* On November 29, 2004, certain investors of Series A and/or Series B convertible redeemable preference shares sold 20,432,600 outstanding Series A convertible redeemable preference shares and 3,891,800 outstanding Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference shares investors at a price of US$0.51. These Series A convertible redeemable preference shares and Series B convertible redeemable preference shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $8,458,464 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of Series A and Series B convertible redeemable preference shares of $0.15 and $0.24, respectively.

*e)* In December 2004, an investor of ordinary shares sold 9,729,600 outstanding ordinary shares to third party investors at a price of $0.51. These ordinary shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $4,897,623 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of ordinary shares of $0.01.

Prior to the redemption or conversion of all Series C–2 convertible redeemable preference shares issued by the Group, any holder of Series C–1 convertible redeemable preference shares thereof could have, at any time, required the Group to redeem such shares out of funds legally available therefore in connection with the redemption of any Series C–1 convertible redeemable preference shares under this Clause, the Group would have paid a redemption price equal to the Series C–1 convertible redeemable preference shares Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–1 convertible redeemable preference shares through to the date of redemption thereof.

The significant terms of the Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares are as follows:

*Conversion*

Each Series A and Series B convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.15 and $0.24, respectively, upon the consummation of a Series A/B Qualified Public Offering or obtaining the necessary written consent from the holders of Series A and Series B convertible redeemable preference shares. A Series A/B Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that was registered under the Securities Act of 1933 representing at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $200,000,000 immediately prior to the offering.

F–38

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Each Series C–1 and Series C–2 convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.51 and $0.51, respectively, upon the consummation of a Series C Qualified Public Offering or obtaining the necessary written consent from the holders of Series C–1 and Series C–2 convertible redeemable preference shares. A Series C Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that has been registered under the Securities Act of 1933 which represents at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $335,000,000 immediately prior to the offering.

The conversion price of Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares was subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization.

Additionally, the conversion price was to be adjusted for dilution in the following circumstances:

    1) In the event that the Group issued additional ordinary shares at a price per share less than the then prevailing Series A, Series B and Series C convertible redeemable preference shares' respective conversion price, the Series A, Series B and Series C convertible redeemable preference shares' respective conversion price was to be reduced, concurrently with such issuance, to a price (calculated to the nearest cent) equal to the price per share at which such additional shares were to be issued.

    2) If the Group's financial results of 2004 and 2005 did not meet specified targets. Under the terms of the amended and restated memorandum and articles of association in April 2005, the performance–based adjustment was not triggered in 2004.

*Voting Rights*

Each Series A, Series B, Series C–1 and Series C–2 redeemable convertible preference share had voting rights equivalent to the number of shares of ordinary shares into which it was convertible.

*Dividends*

The holders of Series A, Series B, Series C–1 and Series C–2 redeemable convertible preference shares were to be entitled to receive out of any funds legally available therefore, when and if declared by the Board of Directors of the Group, dividends at the rate or in the amount as the Board of Directors considers appropriate.

*Liquidation Preference*

In the event of any liquidation, dissolution or winding up of the Group, as defined, the holders of Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares were to receive $0.06 per share, $0.24 per share, $0.51 per share and $0.51 per share, respectively, plus all declared but unpaid dividends. Such amounts were to be adjusted for any share splits, share dividends and recapitalization.

In the event of any liquidation, dissolution or winding up of the Group caused by a "Trade Sale", which is defined as any sales of shares, merger, consolidation or other similar transaction involving the Group in which its shareholders do not retain a majority of the voting power in the surviving entity, or a sale of all or substantially all the Group's assets, the holder of Series B redeemable convertible preference shares were to receive the higher of (i) 200% of the original purchase price of the Series B preference shares, for each Series B redeemable convertible preference share outstanding or (ii) the amount the holder would have received if all of the Series B redeemable convertible preference shares held by such holder were to be converted to ordinary shares immediately prior to such

F–39

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

liquidation, dissolution or winding up of the Group. According to the articles of association amended on November 29, 2004 (the "Modification Date"), the net settlement feature of the Series B convertible redeemable preference shares under trade sale was removed.

The embedded conversion option of Series B convertible redeemable preference shares has been recorded at its fair value of $1,179,689 and accounted for separately as an embedded conversion option. The Group has accounted for the derivative liability relating to the conversion option by adjusting the liability to its estimated fair value at each subsequent balance sheet date up to the Modification Date, with adjustments recorded as other income or expenses. In 2004, the Group adjusted the derivative liability to fair market value and recorded a change in fair value of the derivative liability of $11,692,287 in the consolidated statements of operations. The Group recorded a deemed dividend of $1,179,689 in 2004, which resulted from the accretion of the discount of Series B convertible redeemable preference shares. On the Modification Date, the Group has re−combined the fair value of the derivative liability of $12,871,976 with Series B convertible redeemable preference shares and subsequently recorded an accretion of premium of $12,906,774, which represented the difference of the carrying balance of Series B convertible redeemable preference shares at the Modification Date and its initial issuance date.

**14.    Ordinary Shares**

(1) In April 2003 the Group issued 2,000,000 ordinary shares for cash proceeds of $1,625,000.

(2) In May 2003, the Board of Directors approved a share split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's financial statements.

(3) In April 2004, 62,400,000 outstanding ordinary shares were reclassified and redesignated into 62,400,000 Series A convertible redeemable preference shares.

(4) In September 2004, the Group issued 14,594,200 ordinary shares as partial consideration of the acquisition of Perfect Media (Note 3).

(5) In December 2004, 9,729,600 outstanding ordinary shares were sold and redesignated in 9,729,600 Series C−1 convertible redeemable preference shares.

(6) On May 31, 2005, shareholders of the Group approved a 200−for−1 split of the Company's shares, with immediate effect. The 200−for−1 share split of the Company's shares has been retroactively applied to all periods presented.

(7) Upon initial public offering on July 13, 2005, the Group issued 77,575,000 ordinary shares, for US$1.7 per ordinary share, for total proceeds of US$118,174,130, net of offering expenses.

(8) On January 1, 2006, the Group issued 22,157,003 ordinary shares as partial consideration of the acquisition of Infoachieve (Note 3).

(9) On January 27, 2006, the Group issued 15,000,000 ordinary shares, for US$4.35 per ordinary share, for total proceeds of US$61,783,300, net of offering expenses.

(10) On February 28, 2006, the Group issued 77,000,000 ordinary shares as partial consideration of the acquisition of all the outstanding ordinary shares of Target Media (Note 3).

(11) On March 1, 2006, the Group issued 74,720 ordinary shares related to an acquisition (Note 3).

(12) On May 30, 2006, the Group issued 22,470 ordinary shares related to an acquisition (Note 3).

(13) On June 16, 2006, the Group issued 16,000,000 ordinary shares, for US$5.4 per ordinary share, for total proceeds of US$80,967,593, net of offering expenses.

F–40

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

(14) During the year ended December 31, 2006, the Group issued 26,336,680 ordinary shares pursuant to share–based compensation plans upon exercise of options.

(15) On January 27, 2007, the Group issued 15,000,000 ordinary shares, for US$7.95 per ordinary share, for total proceeds of US$114,873,031, net of offering expenses.

(16) On March 28, 2007, the Group issued 19,969,080 ordinary shares related to an acquisition (Note 3).

(17) In June, 2007, the Group issued 37,330,619 ordinary shares as a result of contingent consideration resolved in connection with the Infoachieve and Dotad acquisitions (Note 3).

**15.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $338,923, $619,831, $2,326,895 and $1,475,967 for the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2007(unaudited), respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group subsidiaries in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end) until such cumulative appropriation reaches 50% of the registered capital; the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. For the years ended December 31, 2004, 2005 and 2006, the Group made total appropriations of $1,488,000, $98,729, and $650,851 respectively.

**16.    Commitments**

*Leases commitments*

The Group has entered into certain leasing arrangements relating to the placement of the flat–panel television screens in various locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expense under operating leases for 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited) were $3,648,829, $15,481,200, $50,106,121, $22,774,932 and $40,308,808, respectively.

F–41

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Future minimum lease payments under non–cancelable operating lease agreements were as follows:

|  | For the Years Ended December 31, |
| --- | --- |
| 2007 | $ 48,156,647 |
| 2008 | 32,515,865 |
| 2009 | 19,871,379 |
| 2010 | 8,933,276 |
| 2011 and thereafter | 1,961,718 |
| Total | $ 111,438,885 |

**17.    Segment Information**

The Group is mainly engaged in operating an out–of–home advertising network in the PRC using flat–panel television advertising displays located in high traffic commercial locations and in–store areas. The Group also provides in–elevator poster frame advertising services, mobile handset advertising services and internet advertising services.

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO"), who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. The Group uses the management approach to determine the operating segments. The management approach considers the internal organization and reporting used by the Group's chief operating decision maker for making decisions, allocating resources and assessing the performance. The Group has four operating segments and determined that it has four reporting segments, which are out–of–home television advertising services (consists commercial location advertising network and in–store advertising network), in–elevator poster frames, mobile handset advertising and internet advertising. The fifth operating segment did not meet the significance threshold for separate disclosure and has been classified in "other". These segments all derive their revenues from the sale of advertising services. In March 2007, the Group further acquired Allyes Information Technology Co., Ltd., which is referred to as Internet advertising services. The Group did not have any Internet advertising service business prior to the acquisition and therefore, the segmental information is only provided from March 2007 onwards.

The Group's chief operating decision maker does not assign assets to these segments. Consequently, it is not practical to show assets by reportable segments. Prior to 2006, the Group only had a single operating segment, out–of–home television advertising services. The in–elevator poster frame advertising services, mobile handset advertising services and others segments were the result of acquisitions made in 2006.

F–42

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

The following table presents selected financial information relating to the Group's segments for 2006:

| | Out–of–Home Television Advertising Services | In–Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|
| Net revenues — external | $ 160,210,414 | $ 40,904,235 | $ 10,100,965 | $ 689,851 | — | $ 211,905,465 |
| Net revenues — intersegment | — | 245,274 | — | — | (245,274) | — |
| Total net revenues | 160,210,414 | 41,149,509 | 10,100,965 | 689,851 | (245,274) | 211,905,465 |
| Cost of revenues — external | 60,948,103 | 13,622,059 | 6,051,846 | 758,359 | — | 81,380,367 |
| Cost of revenues — intersegment | 245,274 | — | — | — | (245,274) | — |
| Total cost of revenues | 61,193,377 | 13,622,059 | 6,051,846 | 758,359 | (245,274) | 81,380,367 |
| Gross profit (loss) | 99,017,037 | 27,527,450 | 4,049,119 | (68,508) | — | 130,525,098 |
| Interest income | 4,419,572 | 123,740 | 17,194 | 292 | — | 4,560,798 |
| Interest expense | 304,294 | 52 | 941 | — | — | 305,287 |
| Depreciation and amortization | 15,008,162 | 3,599,827 | 843,896 | 59,667 | — | 19,511,552 |
| Income taxes | 1,060,314 | 103,434 | (120,210) | — | — | 1,043,538 |
| Net income (loss) | $ 61,447,995 | $ 20,006,067 | $ 2,222,970 | $ (479,300) | — | $ 83,197,732 |

For the six months ended June 30, 2006 (unaudited):

| | Out–of–Home Television Advertising Services | In–Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|
| Net revenues — external | 63,649,748 | 15,845,504 | 3,076,397 | 689,992 | — | 83,261,641 |
| Net revenues — intersegment | | 173,767 | | | (173,767) | — |
| Total net revenues | 63,649,748 | 16,019,271 | 3,076,397 | 689,992 | (173,767) | 83,261,641 |
| Cost of revenues — external | 28,114,514 | 6,008,726 | 2,376,217 | 311,976 | | 36,811,433 |
| Cost of revenues — intersegment | 173,767 | | | | (173,767) | |
| Total cost of revenues | 28,288,281 | 6,008,726 | 2,376,217 | 311,976 | (173,767) | 36,811,433 |
| Gross profit (loss) | 35,361,467 | 10,010,545 | 700,180 | 378,016 | — | 46,450,208 |
| Interest income | 1,673,678 | 101,830 | 5,581 | — | — | 1,781,089 |
| Interest expense | 287,987 | 39 | 462 | | | 288,488 |
| Depreciation and amortization | 6,651,282 | 1,696,695 | 274,945 | — | — | 8,622,922 |
| Income taxes | 985,938 | 2,981 | | | | 988,919 |
| Net income (loss) | 19,175,568 | 6,720,653 | 208,679 | — | — | 26,104,090 |

F–43

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

For the six months ended June 30, 2007 (unaudited):

| | Out-of-Home Television Advertising Services | In-Elevator Poster Frame Advertising Services | Mobile Handset Advertising Services | Internet Advertising Services | Others | Elimination | Total |
|---|---|---|---|---|---|---|---|
| Net revenues — external | 96,584,774 | 31,217,958 | 16,890,621 | 25,235,998 | 686,634 | | 170,615,985 |
| Net revenues — intersegment | | 182,493 | | | | (182,493) | — |
| Total net revenues | 96,584,774 | 31,400,451 | 16,890,621 | 25,235,998 | 686,634 | (182,493) | 170,615,985 |
| Cost of revenues — external | 40,981,343 | 10,010,772 | 7,323,056 | 18,405,005 | 303,017 | | 77,023,193 |
| Cost of revenues — intersegment | 182,493 | | | | | (182,493) | — |
| Total cost of revenues | 41,163,836 | 10,010,772 | 7,323,056 | 18,405,005 | 303,017 | (182,493) | 77,023,193 |
| Gross profit (loss) | 55,420,938 | 21,389,679 | 9,567,565 | 6,830,993 | 383,617 | — | 93,592,792 |
| Interest income | 4,357,062 | 65,911 | 39,388 | 171,508 | — | — | 4,633,869 |
| Interest expense | 6,074 | 897 | — | — | — | — | 6,971 |
| Depreciation and amortization | 8,770,889 | 1,789,700 | 718,400 | 1,383,257 | — | — | 12,662,246 |
| Income taxes | 1,036,479 | 588,833 | 472,935 | 1,188,104 | — | — | 3,286,351 |
| Net income (loss) | 31,111,291 | 12,748,294 | 7,239,494 | 2,907,288 | — | — | 54,006,367 |

*Geographic Information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

*Major Customers*

As of December 31, 2004, 2005, 2006 and June 30, 2007 (unaudited), there were no customers who accounted for 10% or more of the Group's net revenues or accounts receivables.

F–44

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

*Major Service lines*

The Group derives revenues from the following major service lines:

| | For the Years Ended December 31 | | | | | | For the Six Months Ended June 30 | | | |
| | 2004 | %of total | 2005 | %of total | 2006 | %of total | 2006 (Unaudited) | %of total | 2007 | %of total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net revenues | | | | | | | | | | |
| Commercial location network | $ 26,321,179 | 90.1% | $ 61,434,760 | 90.0% | $ 131,371,292 | 62.0% | $ 51,818,404 | 62.2% | $ 80,862,803 | 47.4% |
| In-store network | — | — | 5,468,919 | 8.0% | 26,907,592 | 12.7% | 11,831,344 | 14.2% | 13,882,446 | 8.1% |
| Poster frame network | — | — | — | — | 40,904,235 | 19.3% | 15,845,504 | 19.0% | 31,217,958 | 18.3% |
| Mobile handset advertising network | — | — | — | — | 10,100,965 | 4.7% | 3,076,397 | 3.7% | 16,890,621 | 9.9% |
| Movie theaters | — | — | — | — | 689,851 | 0.3% | — | — | 25,235,998 | 14.8% |
| Internet advertising network | — | — | — | — | — | — | — | — | 1,839,525 | 1.1% |
| Advertising service revenue | 26,321,179 | 90.1% | 66,903,679 | 98.0% | 209,973,935 | 99.0% | 82,571,649 | 99.2% | 169,929,351 | 99.6% |
| Equipment revenue | 2,888,720 | 9.9% | 1,325,324 | 2.0% | 945,606 | 0.5% | 409,575 | 0.5% | 346,168 | 0.2% |
| Franchise revenue | — | — | — | — | 985,924 | 0.5% | 280,417 | 0.3% | 340,466 | 0.2% |
| Total net revenues | $ 29,209,899 | 100.0% | $ 68,228,913 | 100.0% | $ 211,905,465 | 100.0% | $ 83,261,641 | 100.0% | $ 170,615,985 | 100.0% |

F—45

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

18.    Related Party Transactions

Details of advertising service revenue from related parties are as follows:

| Name of Related Parties | Director Interested | Year Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2004 | 2005 | 2006 | 2006 (Unaudited) | 2007 (Unaudited) |
| Shanghai Everease Advertising & Communication Ltd. ("Everease") | Jason Nanchun Jiang | $ 1,302,331 | $ 1,552,039 | $ 7,764,977 | $ 1,084,189 | $ 3,735,103 |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 1,227,267 | 2,330,945 | 3,885,546 | 2,606,373 | 104 |
| Shanghai Jobwell Business Consulting Co., Ltd. | Jimmy Wei Yu | 411,034 | 1,050,258 | 1,382,695 | 749,684 | — |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | 372,488 | 757,850 | 1,122,945 | 1,122,945 | — |
| Shanghai Wealove Business Consulting Co., Ltd. | Jimmy Wei Yu | — | — | 671,488 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | 361,371 | 908,100 | 982,527 | 420,218 | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | Jimmy Wei Yu | — | 1,646,120 | 3,230,040 | 2,106,475 | 44,542 |
| Beijing Sina Internet Information Services Co., Ltd. | Charles Chao | — | — | 190,563 | 149,958 | 59,345 |
| Beijing Sohu New–age Information Technology Co., Ltd. | Daqing Qi | — | — | 119,768 | 9,573 | 272,337 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | Neil Nanpeng Shen | — | — | 78,742 | — | — |
| UUSEE | Neil Nanpeng Shen | — | — | — | — | 27,939 |
| Beijing Yadu Science & Technology Co., Ltd | Fumin Zhuo | — | — | — | — | 97,826 |
| Ctrip Travel Information Technology Shanghai) Co., Ltd. | Neil Nanpeng Shen | 48,287 | 264,120 | 178,933 | 178,933 | 105,014 |
| Total | | $ 3,722,778 | $ 8,509,432 | $ 19,608,224 | $ 8,428,348 | $ 4,342,210 |

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

Details of amounts due from related parties are as follows:

| Name of Related Parties | Note | Director Interested | December 31, 2004 | December 31, 2005 | December 31, 2006 | June 30, 2007 (Unaudited) |
|---|---|---|---|---|---|---|
| Shanghai Everease Advertising & Communication Ltd. | (a) | Jason Nanchun Jiang | $ 1,259,138 | $ 572,525 | $ 6,331,549 | $ 5,346,287 |
| Multimedia Park Venture Capital | (a) | Jimmy Wei Yu | 690,212 | 330,700 | 12,705 | 9,464 |
| Shanghai Jobwell Business Consulting Ltd. | (a) | Jimmy Wei Yu | 275,971 | 546,207 | — | — |
| Shanghai Wealove Wedding Service Co., Ltd. | (a) | Jimmy Wei Yu | 251,556 | 662,954 | — | — |
| Shanghai Hetong Network Technology Co., Ltd. | (a) | Jimmy Wei Yu | 263,155 | 533,469 | — | — |
| Shanghai Shengchu Advertising Agency Co., Ltd. | (a) | Jimmy Wei Yu | — | 474,351 | 403,889 | — |
| Beijing Sina Internet information Services Co., Ltd | (a) | Charles Chao | — | — | — | 802,317 |
| Beijing Sohu New–age Information Technology Co., Ltd | (a) | Daqing Qi | — | — | — | 864,335 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | (a) | Neil Nangpeng Shen | — | — | — | 58,888 |
| UUSEE | (a) | Neil Nangpeng Shen | — | — | — | 32,828 |
| Beijing Yadu Science & Technology Co., Ltd | (a) | Fumin Zhuo | — | — | — | 65,758 |
| Home–Inn Hotel Management (Beijing) Co., Ltd | (a) | Neil Nanpeng Shen | — | — | 39,699 | — |
| David Yu | (b) | David Yu | — | — | 1,064,947 | — |
| Total | | | $ 2,740,032 | $ 3,120,206 | $ 7,852,789 | $ 7,179,877 |

Note (a)  — These amounts represent trade receivables for advertising services provided.

Note (b)  — The amount represents a payment due from the ex–shareholder of Target Media for an indemnification of a contingent liability which arose after the acquisition. This amount was paid out in cash in 2007.

F–47

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

Details of amounts due to related parties are as follows:

| Name of Related Parties | Note | Director Interested | As of December 31, 2004 | 2005 | 2006 | June 30, 2007 (Unaudited) |
|---|---|---|---|---|---|---|
| 51.com | (d) | Neil Nanpeng Shen | — | — | — | 27,477 |
| Beijing Sina Internet Information Services Co., Ltd. | (d) | Charles Chao | — | — | — | 3,238,744 |
| Qihoo.com | (d) | Neil Nanpeng Shen | — | — | — | 116,174 |
| Home−Inn Hotel Management (Beijing) Co., Ltd | (d) | Neil Nanpeng Shen | — | — | — | 205 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | (d) | Neil Nanpeng Shen | — | — | — | 7,550 |
| Zhi Tan | (c) | Zhi Tan | — | — | 345,768 | — |
| | | | $  — | $  — | $ 345,768 | $  3,390,150 |

Note (c)  — The amount represents the amount due to the president of Focus Media for operating funds of Framedia. The loan was non−interest bearing and was repayable within one year.

Note (d)  — These amounts represent trade payables for web spaces leased.

**Other related party transactions**

For each of the years ended December 31, 2004, 2005, 2006 and six months ended June 30, 2006 (unaudited) and 2007 (unaudited), office rentals were paid to Multimedia Park Venture Capital amounting to $140,305, $395,083, $476,902, $226,506 and $306,137, respectively.

In 2006, Everease charged the Group $47,804 for providing administration services.

In March 2006, Weiqiang Jiang, father of Jason Nanchun Jiang, provided a short−term loan to the Group of approximately $2.5 million to relieve a temporary shortage of Renminbi the Group experienced at that time. The loan was unsecured and non−interesting bearing. At the end of June 2006, the Group paid $2.5 million to Everease and they remitted this fund to Weiqiang Jiang on our behalf to repay the loan outstanding.

**19.    Restricted Net Assets**

Relevant PRC statutory laws and regulations permit payments of dividends by the Group's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after−tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, the Group's PRC subsidiaries and PRC affiliates are restricted in their ability to transfer a portion of their net assets to Focus Media Holding in the form of dividends, loans or advances, which restricted portion amounted to approximately $223,386,461 as of December 31, 2006.

**20.    Subsequent Events**

In the third quarter of 2007, the Group completed acquisitions of nine companies which primarily provide out−of−home television advertising, poster−frame advertising, mobile handset advertising and Internet advertising services, for an aggregate purchase considerations of approximately $0.9 million plus additional consideration

F−48

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

contingent upon the achievement of certain earnings targets over the next one to three fiscal years. The Group also will make aggregate down payment of $24.9 million, which will be deducted from the contingent purchase price consideration.

F–49

Table of Contents

FOCUS MEDIA HOLDING LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE
SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)

**Appendix 1**

**Subsidiaries of Focus Media Holding Limited**

The following table sets forth information concerning our direct subsidiaries:

| Subsidiary | Place of Incorporation | Percentage of Ownership |
|---|---|---|
| Focus Media (China) Holding Ltd. | Hong Kong | 100% |
| Focus Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Perfect Media Holding Ltd. | British Virgin Islands ("BVI") | 100% |
| Focus Media Qingdao Holding Ltd. | BVI | 100% |
| Focus Media Dalian Holding Ltd. | BVI | 100% |
| Focus Media Changsha Holding Ltd. | BVI | 100% |
| Focus Media Digital Information Technology (Shanghai) Co., Ltd. | PRC | 100% |
| New Focus Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Sorfari Holdings Limited | BVI | 100% |
| Focus Media Tianjin Limited | BVI | 80% |
| Capital Beyond Limited | BVI | 100% |
| Shanghai New Focus Media Advertisement Co., Ltd. | PRC | 90% |
| Shanghai New Focus Media Agency Co., Ltd. | PRC | 90% |
| Shanghai Focus Media Defeng Advertisement Co., Ltd. | PRC | 90% |
| Shanghai Focus Media Baiwang Advertising Co., Ltd. | PRC | 70% |
| Shanghai Focus Media Xiangkun Advertising Co., Ltd. | PRC | 70% |
| Infoachieve Limited | BVI | 100% |
| Shanghai Framedia Investment Consultation Co., Ltd. | PRC | 100% |
| Target Media Holdings Limited | Cayman Islands | 100% |
| Target Media Multi–Media Technology (Shanghai) Co., Ltd. | PRC | 100% |
| Dotad Holdings Limited | BVI | 100% |
| ProfitBest Worldwide Limited | BVI | 100% |
| Wiseglobal Investments Limited | BVI | 100% |
| Summitworld Limited | BVI | 100% |
| Newking Investment Limited | BVI | 100% |
| Surge Zhenghe Holding Limited | BVI | 100% |
| Speedaccess Limited | BVI | 100% |
| Peakbright Group Limited | BVI | 100% |
| Homesky Investment Limited | BVI | 100% |
| Bestwin Partners Limited | BVI | 100% |
| Glomedia Holdings Limited | BVI | 100% |
| Appreciate Capital Ltd. | BVI | 70% |
| Richcrest Pacific Limited | BVI | 100% |
| Wealthstar Holdings Limited | BVI | 100% |

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| Subsidiary | Place of Incorporation | Percentage of Ownership |
|---|---|---|
| Highmark Asia Limited | BVI | 100% |
| Plentiworth Investment Limited | BVI | 100% |
| Directwealth Holdings Limited | BVI | 100% |
| Better off Investments Limited | BVI | 100% |
| Topstart Holdings Limited | BVI | 100% |
| Vast Well Development Limited | BVI | 100% |
| Crownsky Limited | BVI | 100% |
| Pear Commercial Inc. | BVI | 100% |
| Active Max Limited | BVI | 100% |
| Allyes Information Technology Company Limited | BVI | 100% |
| Advantage Way Limited | BVI | 100% |
| Angeli Education Development Limited | BVI | 100% |

The following table sets forth information concerning Focus Media Advertisement's subsidiaries each of which is incorporated in China:

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Shanghai Focus Media Advertising Co., Ltd. | 90.0%(1) | Shanghai | Advertising agency |
| Shanghai Perfect Media Advertising Agency Co., Ltd. | 90.0%(1) | Shanghai | Advertising company that operates advertising services network on shoe–shining machines |
| Qingdao Fukesi Advertisement Co., Ltd. | 90.0%(1) | Qingdao | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Changsha Focus Media Shiji Advertisement Co., Ltd. | 90.0%(1) | Changsha | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Dalian Focus Media Advertising Co., Ltd. | 90.0%(1) | Dalian | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Qianjian Advertising Co., Ltd. | 90.0%(1) | Shanghai | Operation and maintenance of out–of–home television advertising network in banking locations |
| Guangzhou Framedia Advertising Company Ltd. | 90.0%(1) | Guangzhou | Operation and maintenance of out–of–home television advertising network |
| Zhuhai Focus Media Culture and Communication Company Ltd. | 90.0%(1) | Zhuhai | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Focus Media Digital Information Technology Co., Ltd. | 10%(3) | Shanghai | Technical and business consultancy |
| Shenzhen Bianjie Building Advertisement Co., Ltd. | 90.0%(2) | Shenzhen | Operation and maintenance of frame advertising network |
| Hebei Tianma Weiye Advertising Company Ltd. | 90.0%(2) | Hebei | Operation and maintenance of out–of–home television advertising network (former regional distributor) |

F–51

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

|  | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Xiamen Focus Media Advertising Company Ltd. | 90.0%(2) | Xiamen | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Sichuan Focus Media Advertising Communications Co., Ltd. | 90.0%(3) | Chengdu | Operation and maintenance of out–of–home television advertising network |
| Shanghai New Structure Advertisement Co., Ltd. | 90.0%(2) | Shanghai | Technical and business consultancy for poster frame network |
| Shanghai Framedia Advertising Development Co., Ltd. | 90.0%(2) | Shanghai | Operation and maintenance of advertising poster frame network |
| GuangZhou Shiji Shenghuo Advertisement Co., Ltd. | 90.0%(2) | Guangzhou | Operation and maintenance of advertising poster frame network |
| Hefei Fukesi Advertising Co. Ltd. | 90.0%(2) | Hefei | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Jinan Focus Media Advertising Co., Ltd. | 90.0%(2) | Jinan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shenzhen E–Times Consulting Co., Ltd. | 90.0%(2) | Shenzhen | Operation and maintenance of advertising poster frame network |
| Shanghai Target Media Co., Ltd. | 90.0%(2) | Shanghai | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Shenyang Target Media Ltd. | 90.0%(2) | Shenyang | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Fuzhou Hengding United Media Ltd. | 90.0%(2) | Fuzhou | Dormant (Former operation and maintenance of Target Media's out–of–home television advertising network) |
| Beijing Focus Media Wireless Co., Ltd. | 90.0%(2) | Beijing | Operation of mobile handset advertising service network |
| Guangzhou Feisha Advertisement Co., Ltd. | 90.0%(2) | Guangzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| DongGuan Focus Media Advertisement & Communications Co., Ltd. | 90.0%(2) | Dongguan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai FengJing Advertisement & Communications Co., Ltd. | 95.0%(2) | Shanghai | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Zhengzhou Focus Media Advertisement & Communications Co., Ltd. | 85.0%(2) | Zhengzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shijiazhuang Focus Media HuiHuang Business Advertisement Co., Ltd. | 90.0%(2) | Shijiazhuang | Operation and maintenance of advertising poster frame network |
| Nanjing Focus Media Advertising Co., Ltd. | 90.0%(3) | Nanjing | Operation and maintenance of out–of–home television advertising network (former regional distributor) |

F–52

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Yunnan Focus Media Co., Ltd. | 89.5%(2) | Kunming | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Tianjin Focus Tongsheng Advertising Company Ltd. | 80.0%(2) | Tianjin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Zhejiang Ruihong Focus Media Advertising Communications Co., Ltd. | 80.0%(2) | Hangzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Wuhan Geshi Focus Media Advertising Co., Ltd. | 75.0%(2) | Wuhan | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Xian Focus Media Advertising & Information Company Ltd. | 70.0%(3) | Xian | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shenyang Focus Media Advertising Co., Ltd. | 70.0%(3) | Shenyang | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Fuzhou Focus Media Advertising Co., Ltd. | 70.0%(3) | Fuzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Chongqing Geyang Focus Media Culture & Broadcasting Co., Ltd. | 60.0%(2) | Chongqing | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai On–Target Advertisement Co., Ltd. | 60.0%(3) | Shanghai | Dormant |
| BeiJing YangShiSanWei Advertisement Co., Ltd. | 70.0%(3) | Beijing | Operation and maintenance of In–movie theater advertising network |
| Shanghai Jiefang Focus Media Advertisement & Communications Co., Ltd. | 70.0%(3) | Shanghai | Operation and maintenance of Direct Mailing advertising network |
| Jilin Focus Media Advertising Co., Ltd. | 100.0% | Jilin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Haerbin Focus Media Advertising Co., Ltd. | 100.0% | Haerbin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Haerbin Yifang Focus Media Advertising Co., Ltd. | 100.0% | Haerbin | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Quanzhou New Continetal Culture and Communication Company Ltd. | 100.0% | Quanzhou | Operation and maintenance of out–of–home television advertising network (former regional distributor) |
| Shanghai Direct Media Advertising Co., Ltd. | 100.0% | Shanghai | Operation and maintenance of Direct Mailing advertising network |
| Tianjin Saige Advertising Planning Co., Ltd. | 100.0% | Tianjin | Operation and maintenance of advertising poster frame network |
| Beijing QuanShi Advertising Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Shanghai Allyes Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |

F–53

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Shanghai Interactive Information Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shenzhen BaiFen Innovation Advertising Co., Ltd. | 100.0% | Shenzhen | Provide internet advertising agency services |
| Shanghai Meisien Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Tianjin FeiNiao Interactive Advertising Co., Ltd. | 100.0% | Tianjin | Provide internet advertising agency services |
| Shanghai QuanShi Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Beijing LangTian Interactive Advertising Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Shanghai KuanTong Advertising Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shanghai iResearch Marketing Consulting Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Shanghai Aike Marketing Consulting Co., Ltd. | 100.0% | Shanghai | Provide internet advertising agency services |
| Catch Stone Advertising (Beijing) Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Yibolande Advertising (Beijing) Co., Ltd. | 100.0% | Beijing | Provide internet advertising agency services |
| Beijing Pengpai Dongli Advertising Co., Ltd. | 100.0% | Beijing | Operation and maintenance of advertising poster frame network |
| Shanghai Yuanyuan Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation and maintenance of advertising poster frame network |
| Shanghai Yuanchi Advertising Agency Co., Ltd. | 100.0% | Zhejiang | Operation and maintenance of advertising poster frame network |
| Shanghai Lizhu Advertising Agency Co., Ltd. | 100.0% | Zhejiang | Operation and maintenance of advertising poster frame network |
| Shanghai Honghao Advertising Agency Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Nanjing Haozheng Advertising Media Co., Ltd. | 100.0% | | Operation and maintenance of advertising poster frame network |
| Suzhou Haozheng Advertising Media Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Nanjing Hongzhong Advertising Media Co., Ltd. | 100.0% | Jiangsu | Operation and maintenance of advertising poster frame network |
| Shengyang Longyuantao Advertising Agency Co., Ltd. | 100.0% | Liaoning | Operation and maintenance of advertising poster frame network |
| Shengyang Xiangyida Advertising Agency Co., Ltd. | 100.0% | Liaoning | Operation and maintenance of advertising poster frame network |
| Shanghai Zhiyi Advertising Agency Co., Ltd. | 100.0% | Wuhan | Operation and maintenance of advertising poster frame network |
| Wuhan Daosen Advertising Agency Co., Ltd. | 100.0% | Wuhan | Operation and maintenance of advertising poster frame network |
| Yitong Wireless Information Techonology (Beijing) Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Guangzhou Xuanwu Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2005 AND 2006 AND FOR THE**
**SIX MONTHS ENDED JUNE 30, 2006 (UNAUDITED) AND 2007 (UNAUDITED) — (Continued)**

| | Focus Media Advertisement's Ownership Percentage | Region of Operations | Primary Business |
|---|---|---|---|
| Guangzhou Xuanfu Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |
| Zhengzhou Meihe SMS Technolofy Co., Ltd. | 100.0% | He'nan | Operation of mobile handset advertising service network |
| Beifang Meihe Telecommunication Technology (Beijing) Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Shenzhen Julan Information Technology Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Shenzhen Julan Network Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Guangzhou Julan Information Technology Co., Ltd. | 100.0% | Guangzhou | Operation of mobile handset advertising service network |
| Dongguan Julan Information Technology Co., Ltd. | 100.0% | Dongguan | Operation of mobile handset advertising service network |
| Shenzhen Fenxin Techonology Development Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Beijing Century Zhongkai Technology Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Beijing Eastern Boxin Technology Co., Ltd. | 100.0% | Beijing | Operation of mobile handset advertising service network |
| Shenzhen Jingzhun Fenzhong Technology Co., Ltd. | 100.0% | Shenzhen | Operation of mobile handset advertising service network |
| Beijing Together Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |
| Shanghai Qianzhong Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Chuanzhi Huakuang Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Beijing Chuanzhi Huakuang Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |
| Shanghai Xinnuo Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Chuanzhi Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Shanghai Ruili Advertising Agency Co., Ltd. | 100.0% | Shanghai | Operation of outdoor billboards advertising service network |
| Beijing Huakuang Chuangzhi Advertising Agency Co., Ltd. | 100.0% | Beijing | Operation of outdoor billboards advertising service network |

(1) The remaining equity interest is held by Jimmy Wei Yu as our nominee holder.

(2) The remaining equity interest is held by Focus Media Advertising Agency.

(3) The remaining equity interest in this entity is owned by unrelated third parties.

(4) The remaining equity interest in this entity is owned by Focus Media Digital.

F–55

Table of Contents

ADDITIONAL INFORMATION — FINANCIAL STATEMENT SCHEDULE 1

**FOCUS MEDIA HOLDING LIMITED**

These financial statements have been prepared in conformity with accounting principles generally accepted in the United States

**FINANCIAL INFORMATION OF PARENT COMPANY**

**BALANCE SHEETS**

| | December 31, | | |
|---|---|---|---|
| | **2004** | **2005** | **2006** |
| | (In U.S. Dollars, except share data) | | |
| **Assets** | | | |
| Cash and cash equivalents | $          — | $          — | $     37,483,101 |
| Prepaid expenses and other current assets | — | 121,482 | 151,257 |
| Amounts due from related parties | 25,072,466 | 94,813,430 | 94,949,887 |
| Acquired intangible assets, net | — | — | 6,323,076 |
| Investments in subsidiaries and affiliates | 23,806,034 | 96,877,616 | 925,981,259 |
| **Total assets** | **$   48,878,500** | **$  191,812,528** | **$  1,064,888,580** |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | |
| **Current liabilities:** | | | |
| Accrued expenses and other current liabilities | 1,178,545 | 397,877 | 14,144,589 |
| **Total current liabilities** | **1,178,545** | **397,877** | **14,144,589** |
| **Mezzanine equity** | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and 41,967,400, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 6,295,110 | — | — |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and 48,191,600, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 12,062,696 | — | — |
| Series C–1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and 34,054,000, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 17,500,350 | — | — |
| Series C–2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and 34,053,400, nil and nil shares issued and outstanding in 2004, 2005 and 2006, respectively) | 17,415,000 | — | — |
| **Shareholders' equity (deficiency)** | | | |
| Ordinary shares ($0.00005 par value; 885,516,600, 19,800,000,000 and 19,800,000,000 shares authorized in 2004, 2005 and 2006; 142,464,600, 378,306,000 and 534,896,873 shares issued and outstanding in 2004, 2005 and 2006, respectively) | 7,124 | 18,916 | 26,745 |
| Additional paid–in capital | 5,981,154 | 177,419,761 | 709,196,246 |
| Acquisition consideration to be issued | — | — | 237,879,480 |
| Deferred share–based compensation | (969,959) | (246,569) | — |
| Retained earnings (accumulated deficit) | (10,550,414) | 12,997,237 | 96,194,969 |
| Accumulated other comprehensive income (loss) | (41,106) | 1,225,306 | 7,446,551 |
| **Total shareholders' equity (deficiency)** | **$   (5,573,201)** | **$  191,414,651** | **$  1,050,743,991** |
| **Total liabilities, mezzanine equity and shareholders' equity (deficiency)** | **$   48,878,500** | **$  191,812,528** | **$  1,064,888,580** |

Table of Contents

FINANCIAL INFORMATION OF PARENT COMPANY

STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | (In U.S. dollars) | | |
| **Net revenues:** | $ — | $ — | $ 719,978 |
| **Cost of revenues:** | — | — | 146,943 |
| **Gross profit** | — | — | 573,035 |
| **Operating expenses:** | | | |
| General and administrative | 461,183 | 1,300,511 | 7,894,125 |
| Selling and marketing | 27,528 | 43,317 | 2,090,387 |
| Amortization of acquired intangible assets | — | — | 79,377 |
| **Total operating expenses** | **488,711** | **1,343,828** | **10,063,889** |
| **Loss from operations** | **(488,711)** | **(1,343,828)** | **(9,490,854)** |
| Interest income | — | — | 791,669 |
| Other expense | — | (7,339) | (44,755) |
| Equity in earnings of subsidiaries and equity affiliates | 12,553,750 | 24,898,818 | 91,941,672 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | (11,692,287) | — | — |
| **Income (loss) before income taxes** | **372,752** | **23,547,651** | **83,197,732** |
| Income tax expenses | — | — | — |
| **Net income (loss)** | **372,752** | **23,547,651** | **83,197,732** |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — | — |
| Deemed dividend on Series C−1 convertible redeemable preference shares | (13,356,087) | — | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — | — |
| **Income (loss) attributable to holders of ordinary shares** | **$ (10,576,414)** | **$ 23,547,651** | **$ 83,197,732** |

F−57

Table of Contents

**Financial Information of parent company**

STATEMENTS OF CASHFLOWS

| | For the Year Ended December 31 | | |
| --- | --- | --- | --- |
| | **2004** | **2005** | **2006** |
| | | (In U.S. dollars) | |
| **Operating activities:** | | | |
| Income (loss) attributable to holders of ordinary shares | $ (10,576,414) | $ 23,547,651 | $ 83,197,732 |
| Deemed dividend on Series A convertible redeemable preference shares | 8,308,411 | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | 2,191,442 | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | 13,356,087 | — | — |
| Premium relating to Series B convertible redeemable preference shares | (12,906,774) | — | — |
| Net income (loss) | 372,752 | 23,547,651 | 83,197,732 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Share–based compensation | 488,711 | 726,503 | 8,367,406 |
| Amortization of intangibles | | | 80,039 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | 11,692,287 | — | — |
| Equity in earning of subsidiaries | (12,553,750) | (24,898,818) | (91,941,672) |
| Changes in assets and liabilities: | | | |
| Prepaid expenses and other current assets | — | (121,482) | (29,775) |
| Amounts due from related parties | (23,915,404) | (69,740,965) | (136,456) |
| Accrued expenses and other current liabilities | 1,178,545 | (780,665) | 9,239,041 |
| Net cash used in operating activities | $ (22,736,859) | $ (71,267,776) | $ 8,776,315 |
| **Investing activities:** | | | |
| Investments in subsidiaries and affiliates | (6,741,485) | (8,208,870) | (124,508,517) |
| Deposit paid to acquire subsidiaries | — | (40,919,530) | (696,228) |
| Purchase of intangibles | — | — | (3,225,161) |
| Net cash used in investing activities | $ (6,741,485) | $ (49,128,400) | $ (128,429,906) |
| **Financing activities:** | | | |
| Proceeds from issuance of ordinary shares | — | 118,174,130 | 142,750,893 |
| Proceeds from issuance of ordinary shares pursuant to stock option plans | — | — | 15,247,561 |
| Proceeds from issuance of Series B convertible redeemable preference shares (net of issuance costs of $437,304) | 12,062,696 | — | — |
| Proceeds from issuance of Series C–2 convertible redeemable preference shares (net of issuance costs of $85,000) | 17,415,000 | — | — |
| Net cash provided by financing activities | $ 29,477,696 | $ 118,174,130 | $ 157,998,454 |
| Effect of exchange rate changes | 648 | 2,222,046 | (861,762) |
| Net increase in cash and cash equivalents | — | — | 37,483,101 |
| Cash and cash equivalents, beginning of year | — | — | — |
| Cash and cash equivalents, end of year | $ — | $ — | $ 37,483,101 |

F–58

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

|  | Page |
|---|---|
| Independent Auditors' Report | F–60 |
| Consolidated balance sheet as of December 31, 2006 | F–61 |
| Consolidated statement of operations for the year ended December 31, 2006 | F–62 |
| Consolidated statements of shareholders' equity and comprehensive income for the year ended December 31, 2006 | F–63 |
| Consolidated statement of cash flows for the year ended December 31, 2006 | F–64 |
| Notes to the consolidated financial statements | F–65 |

Table of Contents

## INDEPENDENT AUDITORS' REPORT

TO THE BOARD OF DIRETORS OF FOCUS MEDIA HOLDING LIMITED ("FOCUS MEDIA")

    We have audited the accompanying consolidated balance sheet of Allyes Information Technology Company Limited and subsidiaries (the "Company") as of December 31, 2006 and the related consolidated statements of operations, shareholders' equity and comprehensive income, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements based on our audit.

    We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

    In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2006 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/  Deloitte Touche Tohmatsu CPA Ltd.
Shanghai, China
October 24, 2007

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED BALANCE SHEET**
**(In U.S. dollars, except share data)**

|  |  | December 31, 2006 |
|---|---|---|
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ | 21,468,931 |
| Accounts receivable, net of allowance for doubtful accounts of $212,749 |  | 22,803,220 |
| Rebate receivable |  | 3,025,631 |
| Deferred income taxes |  | 454,124 |
| Prepaid expenses and other current assets |  | 1,703,796 |
| Total current assets |  | 49,455,702 |
| Equipment, net |  | 1,065,575 |
| Acquired intangible assets, net |  | 126,035 |
| Other non–current assets |  | 249,183 |
| Non–current deferred income taxes |  | 7,939 |
| Total assets | $ | 50,904,434 |
| **Liabilities and shareholders' equity:** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ | 12,143,975 |
| Accrued employee bonus |  | 1,048,179 |
| Customer receipts in advance |  | 755,412 |
| Income tax payable |  | 1,826,176 |
| Accrued expenses and other current liabilities |  | 4,021,351 |
| Total current liabilities |  | 19,795,093 |
| Deferred income taxes |  | 31,271 |
| Total liabilities |  | 19,826,364 |
| Commitments (Note 11) |  |  |
| **Shareholders' equity:** |  |  |
| Series A convertible preference shares |  |  |
| $0.0001 par value; 40,000,000 shares authorized, issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $471,000 |  | 4,000 |
| Series A–1 convertible preference shares |  |  |
| $0.0001 par value; 44,925,500 shares authorized, issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $1,615,566 |  | 4,493 |
| Series B convertible preference shares |  |  |
| $0.0001 par value; 60,556,758 shares authorized issued and outstanding |  |  |
| as of December 31, 2006; liquidation value $58,750,000 |  | 6,056 |
| Common shares, $0.0001 par value, 354,517,742 shares authorized, |  |  |
| 62,188,023 issued and outstanding as of December 31, 2006 |  | 6,219 |
| Additional paid–in capital |  | 26,834,540 |
| Subscription receivables |  | (594,810) |
| Retained earnings |  | 3,499,999 |
| Accumulated other comprehensive income |  | 1,317,573 |
| Total shareholders' equity |  | 31,078,070 |
| Total liabilities and shareholders' equity | $ | 50,904,434 |

The accompanying notes are an integral part of these consolidated financial statements.

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF OPERATIONS**
**(In U.S. dollars, except share data)**

|  |  | For the Year Ended December 31, 2006 |
|---|---|---|
| Revenues: |  |  |
| Advertising service revenue | $ | 47,234,757 |
| Other revenue |  | 1,899,197 |
| Total net revenues |  | 49,133,954 |
| Cost and expenses: |  |  |
| Cost of revenues |  | 37,820,920 |
| General and administrative |  | 6,524,900 |
| Selling and marketing |  | 4,376,213 |
| Research and development |  | 648,732 |
| Total cost and expenses |  | 49,370,765 |
| Loss from operations |  | (236,811) |
| Interest income |  | 583,738 |
| Other income |  | 201,078 |
| Other expense |  | (40,200) |
| Income before income taxes |  | 507,805 |
| Income taxes: |  |  |
| –Current |  | 1,149,557 |
| –Deferred |  | (146,613) |
| Total income taxes |  | 1,002,944 |
| Net loss | $ | (495,139) |

The accompanying notes are an integral part of these consolidated financial statements.

F–62

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY AND COMPREHENSIVE INCOME**
**(In U.S. dollars, except share data)**

| | Convertible Preference Shares | | | | | | Common Shares | | Additional Paid-in Capital | Subscription Receivables | Retained Earnings | Accumulated Other Comprehensive Income | Total | Comprehensive Income |
| | Series A Shares | | Series A-1 Shares | | Series B Shares | | | | | | | | | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2006 | 40,000,000 | $ 4,000 | 44,925,500 | $ 4,493 | 60,556,758 | $ 6,056 | 57,203,006 | $ 5,720 | $ 25,820,611 | $ (116,575) | $ 3,995,138 | $ 528,700 | $ 30,248,143 | |
| Exercise of share options | — | — | — | — | — | — | 5,295,700 | 530 | 652,377 | (572,069) | — | — | 80,838 | — |
| Repurchase of common shares | — | — | — | — | — | — | (310,683) | (31) | (153,926) | 72,576 | — | — | (81,381) | — |
| Share-based compensation | — | — | — | — | — | — | — | — | 515,478 | — | — | — | 515,478 | — |
| Collection of subscription receivables | — | — | — | — | — | — | — | — | — | 21,258 | — | — | 21,258 | — |
| Cumulative translation adjustment | — | — | — | — | — | — | — | — | — | — | — | 788,873 | 788,873 | $ 788,873 |
| Net loss | — | — | — | — | — | — | — | — | — | — | (495,139) | — | (495,139) | (495,139) |
| Balance as of December 31, 2006 | 40,000,000 | $ 4,000 | 44,925,500 | $ 4,493 | 60,556,758 | $ 6,056 | 62,188,023 | $ 6,219 | $ 26,834,540 | $ (594,810) | $ 3,499,999 | $ 1,317,573 | $ 31,078,070 | $ 293,734 |

F–63

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**CONSOLIDATED STATEMENT OF CASH FLOWS**

**(In U.S. dollars, except share data)**

|  | For The Year Ended December 31, 2006 |
|---|---:|
| Operating activities: |  |
| Net loss | $ (495,139) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |
| Bad debt provision | 413,983 |
| Depreciation | 232,185 |
| Amortization | 51,160 |
| Impairment of acquired intangible assets | 287,765 |
| Share–based compensation | 515,478 |
| Loss on disposal of equipment | 40,200 |
| Deferred income taxes | (146,613) |
| Changes in assets and liabilities: |  |
| Accounts receivable | (10,898,678) |
| Rebate receivable | 14,511 |
| Prepaid expenses and other current assets | (1,103,549) |
| Other non–current assets | 411,623 |
| Accounts payable | 921,825 |
| Accrued employee bonus | 312,011 |
| Customer receipts in advance | 40,433 |
| Accrued expenses and other current liabilities | 2,590,515 |
| Income tax payable | 1,208,830 |
|  |  |
| Net cash used in operating activities | (5,603,460) |
|  |  |
| Investing activities: |  |
| Purchase of equipment | (630,654) |
| Payment for acquisitions of subsidiary and operation | (323,998) |
|  |  |
| Cash used in investing activities | (954,652) |
|  |  |
| Financing activities: |  |
| Proceeds from exercise of employee share options | 80,838 |
| Collection of subscription receivables from employees | 21,258 |
| Payment for repurchase of common shares | (81,381) |
|  |  |
| Net cash provided by financing activities | 20,715 |
|  |  |
| Effect of exchange rate changes | 777,513 |
| Net decrease in cash and cash equivalents | (5,759,884) |
| Cash and cash equivalents, beginning of year | 27,228,815 |
|  |  |
| Cash and cash equivalents, end of year | $ 21,468,931 |

The accompanying notes are an integral part of these consolidated financial statements.

F–64

Table of Contents

ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2006
(In U.S. dollars, except share data)

1.  Organization and Principal Activities

Allyes Information Technology Company Limited (the "Company"), a Cayman Island Company, was established under the Cayman law on March 10, 2000. Allyes (China) Holding Company Limited ("Allyes China"), a wholly–owned subsidiary of the Company, was registered in Hong Kong on March 29, 2000. In June 2000, New Allyes Information Technology (Shanghai) Co., Ltd. ("New Allyes Shanghai"), a wholly–own subsidiary of Allyes China, was established in Shanghai, China. New Allyes Shanghai's primary business is the development and sale of Adforward software, which enables advertisers to receive real–time analysis of the effectiveness of online advertisements.

Through various contractual arrangements as described below and under the requirements of FIN 46 (Revised), "Consolidation of Variable Interest Entities" ("FIN 46(R)"), New Allyes Shanghai is deemed the primary beneficiary of a group of subsidiaries that are deemed variable interest entities ("VIEs") under the requirements of FIN 46(R). These subsidiaries primarily engage in commercial advertisement agency businesses and specialize in the design, development and placement of online advertisements primarily on large Chinese gateway websites or mid–sized specialized websites, and include the following:

*Names of variable interest entities:*

| Entities | Date of Acquisition | Date of Incorporation | Place of Incorporation |
|---|---|---|---|
| Beijing QuanShi Advertising Co., Ltd. ("Beijing QS") | N/A | December 4, 2000 | The People's Republic of China (the "PRC") |
| Shanghai Allyes Advertising Co., Ltd. ("Shanghai Allyes") | N/A | January 20, 2003 | PRC |
| Shanghai Interactive Information Advertising Co., Ltd. ("Shanghai Interactive") | N/A | October 11, 2004 | PRC |
| Shenzhen BaiFen Innovation Advertising Co., Ltd. ("Shenzhen BF") | November 1, 2004 | June 4, 2001 | PRC |
| Shanghai Meisien Advertising Co., Ltd. ("Shanghai Meisien") | N/A | November 3, 2004 | PRC |
| Tianjin FeiNiao Interactive Advertising Co., Ltd. ("Tianjin FN") | July 1, 2005 | October 11, 2004 | PRC |
| Shanghai QuanShi Advertising Co., Ltd. ("Shanghai QS") | N/A | April 30, 2005 | PRC |
| Beijing LangTian Interactive Advertising Co., Ltd. ("Beijing LT") | February 15, 2006 | December 30, 2005 | PRC |
| Shanghai KuanTong Advertising Co., Ltd. ("Shanghai KT") | N/A | June 28, 2006 | PRC |

PRC law restricts foreign ownership of entities engaged in advertising businesses in China. For the Company and its subsidiaries, namely Allyes China and New Allyes Shanghai, to comply with these restrictions, the Company conducts its commercial trading and advertising activities through the VIEs that hold the acquired advertising licenses. All of the VIEs are 100% owned by four PRC nationals: Zhu Hailong, Chief Executive Officer of the Company, Wang Jiangang, Chief Technology Officer of the Company, Zhang Suyang, Board Director, and Xiong Xiangdong, one of the founding shareholders of the Company. The contributions made by these four individuals in forming the VIEs were financed by New Allyes Shanghai.

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

New Allyes Shanghai has entered into various agreements with the VIEs, including the use of trademarks and intellectual property of the Company and exclusive service agreements, entitling New Allyes Shanghai to receive service fees up to but not exceeding the net income of the VIEs. New Allyes Shanghai has also been assigned all voting rights by the owners of the VIEs through agreements that are valid indefinitely and which cannot be amended or terminated except through the written consent of all parties. In addition, New Allyes Shanghai has the option to acquire all of the equity interests of the VIEs once permitted under PRC law.

FIN 46(R) requires VIEs to be consolidated by the primary beneficiary of the VIE if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the VIE to finance its activities without additional subordinated financial support from other parties. New Allyes Shanghai holds all of the variable interests in and is the primary beneficiary of these VIEs and has consolidated all such VIEs in accordance with FIN 46(R) since their respective dates of inception or date on which the variable interest was obtained ("date of acquisition).

**2.   Summary of Significant Accounting Policies**

*(a)   Basis of Presentation*

The accompanying financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*(b)   Basis of Consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiaries and variable interest entities for which it is the primary beneficiary. All inter–company transactions and balances have been eliminated upon consolidation.

*(c)   Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

*(d)   Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements including computation of fair value for share–based awards, allowance for doubtful accounts, estimates to recognize rebate receivable estimates to compute the fair value of the Company's common stock, useful lives and impairment of equipment and intangible assets and valuation allowance for deferred tax assets. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes to be reasonable under the circumstances.

*(e)   Significant Risks and Uncertainties*

The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: the Company's limited operating history; advances and trends in new technologies and industry standards; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth; risks associated with the Company's growth strategies; and general risks associated with the advertising industry.

F–66

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*(f)   Rebates Receivable*

The Company receives incentives from suppliers that operate gateway websites providing advertising space, in the form of product and volume rebates. These incentives are generally paid to the Company on a monthly, quarterly, or annual basis depending on the agreements with the suppliers and are determined based on the actual cash payments made to the suppliers based on a pre–determined sliding scale.

The Company estimates the rebate receivable at the end of each month based on the aggregate purchases of advertising space using the applicable actual rebate rate. Rebates are recorded as a reduction of cost of revenues.

*(g)   Equipment, Net*

Equipment, net is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Computers and office equipment | 5 years |
| Vehicles | 5 years |

*(h)   Acquired Intangible Assets*

Acquired intangible assets represent customer bases, which are valued at cost less accumulated amortization. Amortization is calculated using the straight–line method over their expected useful life of 7 years.

*(i)   Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amount of the assets, the Company would recognize an impairment loss equal to the excess of the carrying value of the asset over its fair value.

*(j)   Customer Receipts in Advance*

The Company receives prepayments for services in advance from certain customers. The amount received in advance is deferred and recognized in the period the service is performed.

*(k)   Revenue Recognition*

Revenues primary consist of revenues from advertising and advertising–related services and revenues from sales of Adforward software.

Advertising revenues, net of agency rebates are recognized ratably over the period in which the advertisement is displayed. Advertising revenues are recognized in accordance with Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition in Financial Statements" ("SAB 104"). In accordance with SAB 104, revenues are recognized when all four of the following criteria are met: (i) persuasive evidence of agreement exists; (ii) delivery of service has occurred; (iii) the price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

In the majority of advertising arrangements, the Company acts as a principal in the transaction and records advertising revenues on a gross basis, in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 99–19, "Reporting Revenue Gross as a Principal versus Net as an Agent." The associated expenses are

F–67

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

recorded as cost of revenues. In some instances, the Company acts as a preferred representative for certain customer's online advertising business and earns a commission equal to a fixed percentage of the respective transaction. In such instances, the Company is considered as an agent and recognizes commission revenue on a net basis.

Adforward software sales typically include multiple elements, including sale of software licenses and services. Service includes installation, training and post contract customer support ("PCS"), which consists of when–and–if available software license updates and technical support. The Company recognizes revenues based on the provisions of the American Institute of Certified Public Accountants Statement of Position ("SOP") No. 97–2, "Software Revenue Recognition", as amended by SOP No. 98–9, "Modification of SOP No. 97–2, Software Revenue Recognition, With Respect to Certain Transactions." Revenues under multiple–element arrangements are allocated to each element in the arrangement primarily using the residual method based upon the fair value of the undelivered elements, which is specific to the Company (vendor–specific objective evidence of fair value or VSOE). This means that the Company defers revenue from the arrangement fee equivalent to the fair value of the undelivered elements. Discounts, if any, are applied to the delivered elements, usually software licenses, under the residual method. VSOE for PCS is determined based on either the renewal rate specified in each contract or the price charged when each element is sold separately. If the Company does not have VSOE for the undelivered elements, revenue recognition is deferred until VSOE for such elements are obtained or until all elements have been delivered.

The Company sells Adforward subscriptions and perpetual licenses. Revenues are recognized for subscription arrangements ratably over the subscription period for those with fixed fees and as earned (based on actual usage) under our variable fee arrangements. Under perpetual license agreements, revenue recognition is generally commenced when delivery has occurred, software has been installed and training has been provided as the Company does not currently have VSOE for either installation or training services.

*(l)*  *Operating Leases*

Leases where substantially all the risks and rewards of ownership of assets remain with the leasing company are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

*(m)*  *Foreign Currency Translation*

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into the US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.

The financial records of the Company's subsidiaries and its VIEs are maintained in their local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive income in the statement of shareholders' equity.

F–68

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*(n)    Income Taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(o)    Comprehensive Income*

Comprehensive income includes net loss and foreign currency translation adjustments. Comprehensive income is reported in the statement of shareholders' equity.

*(p)    Concentration of Credit Risk*

Financial instruments that potentially expose the Company to concentration of credit risk consist primarily of cash, cash equivalents and accounts receivable. All of the Company's cash and cash equivalents are held at financial institutions that management believes to be of high credit quality. The Company conducts credit evaluations of customers and generally does not require collateral or other security from its customers. The Company establishes an allowance for doubtful accounts primarily based upon the age of the receivables and factors surrounding the credit risk of specific customers.

*(q)    Fair Value of Financial Instruments*

The carrying amounts of the Company's financial instruments, including cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities, approximate fair value due to the their short–term nature.

*(r)    Share–Based Compensation*

The Company may grant share options to its employees, directors, consultants and advisors. Under the provisions of Statement of Financial Accounting Standard ("SFAS") 123(R), "Share–based Payment" ("SFAS 123(R)"), share–based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the requisite service period (generally the vesting period of the equity grant).

The Company elected to early adopt the provisions of SFAS 123(R) prior to January 1, 2006.

*(s)    Recently Issued Accounting Standards*

In September 2006, the Financial Accounting Standard Board ("FASB") issued Statement No. 157, "Fair Value Measurements" (SFAS 157). The Statement defines fair value, establishes a framework for measuring fair value in Generally Accepted Accounting Principles ("GAAP"), and expands disclosures about fair value measurements. SFAS 157 does not require any new fair value measurements but applies under other financial pronouncements that permit or require fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007 and early application is encouraged. The Company does not expect the adoption of this Statement to have a material impact on its results of operations or financial position.

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (SFAS 159). SFAS 159 expands opportunities to use fair value measurements in financial reporting and permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS 159 is effective for us on January 1, 2008, although it may be early adopted on January 1, 2007 if the Company also adopts

F–69

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

SFAS 157 at that time. The Company has not decided if it will early adopt SFAS 159 or if it will choose to measure any eligible financial assets and liabilities at fair value.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"). FIN 48 clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 will be effective for us beginning in fiscal year 2007. The Company is currently evaluating the interpretation to determine the effect on its financial statements and related disclosures.

In June 2006, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 06–3, "How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (That Is, Gross Versus Net Presentation)" ("EITF 06–3"). The scope of EITF 06–3 includes sales, use, value added and some excise taxes that are assessed by a governmental authority on specific revenue–producing transactions between a seller and customer. EITF 06–3 states that a company should disclose its accounting policy (i.e. gross or net presentation) regarding the presentation of taxes within its scope, and if significant, these disclosures should be applied retrospectively to the financial statements for all periods presented. EITF 06–3 is effective for interim and annual reporting periods beginning after December 15, 2006. The Company is currently evaluating the impact, if any, of this statement on its consolidated combined financial statements and related disclosures.

**3. Acquisitions**

During 2006, the Company made the following acquisitions in order to continue to expand its customer base in desirable locations:

(1) Beijing LT

On February 15, 2006, Shanghai Allyes and Shanghai QS acquired 100% of equity interest in Beijing LT for cash consideration of $124,057. The only asset acquired from this acquisition was cash equal to the purchase price. As a result, the purchase price, net of cash acquired was zero.

On February 21, 2006, Beijing LT entered into an Asset Transfer Agreement (the "Agreement") with the selling corporate shareholder of Beijing LT (the "Selling Corporate Shareholder") to acquire fixed assets and a customer list for cash consideration of $640,311, payable in three installments. The first installment of $256,125 was paid at the date of execution of the Agreement. The second installment of $192,093 was to be paid before March 31, 2007 if the net income of Beijing LT from February 1, 2006 to January 31, 2007 was greater than $256,125. The third installment of $192,093 was to be paid before March 31, 2008, if the General Manager maintained employment with Beijing LT for at least two years subsequent to February 1, 2006.

As discussed in Note 13, the Agreement was terminated in 2007. The second installment was not earned or paid. The terms of the third installment, which the Company considered to be additional compensation, were modified.

F–70

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

The purchase price was allocated as follows:

|  | Amount |
|---|---|
| Tangible assets — equipment, net | $ 7,158 |
| Intangible assets — customer bases | 320,367 |
| Deferred tax liability | (71,400) |
| **Total** | **$ 256,125** |

Deferred tax liability was recognized upon acquisition of the customer–based intangible assets.

(2) Shenzhen BF

In March 2006, the Company paid an additional $67,873 contingent consideration associated with the acquisition of Shenzhen BF in November 2004, which has been allocated to intangible assets.

**4. Equipment, Net**

Equipment, net consists of the following:

|  | December 31, 2006 |
|---|---|
| Computers and office equipment | $ 1,373,869 |
| Vehicles | 121,706 |
| Total | 1,495,575 |
| Less: accumulated depreciation | (430,000) |
| **Equipment, net** | **$ 1,065,575** |

The Company recorded depreciation expense of $232,185 for the year ended December 31, 2006.

**5. Intangible Assets**

The Company's intangible assets consist of the following:

|  | December 31, 2006 |
|---|---|
| Customer bases | $ 481,543 |
| Less: Accumulated amortization | (355,508) |
| **Customer bases, net** | **$ 126,035** |

The Company recorded amortization expense of $51,160 for the year ended December 31, 2006. The Company expects to record amortization expense of $25,311 for each of the next four years and $24,791 for the remaining years.

Beijing LT's primary business is to act as an agent for a third party website under a Cooperation Agreement ("Cooperation Agreement"). Near the end of 2006, the third party significantly increased the contract price making the acquired operations of Beijing LT unprofitable. Consequently, the Company decided not to renew the Cooperation Agreement and to terminate the Agreement (See Note 3) as discussed in Note 13. As a result, the Company recorded a full impairment of $287,765 related to the Beijing LT customer base given a lack of future projected earnings.

**Table of Contents**

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

**6.   Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

|  | December 31, 2006 |
|---|---:|
| Professional fees | $  1,910,190 |
| Business tax and other taxes payable | 1,296,160 |
| Deferred revenue | 390,000 |
| Others | 425,001 |
| **Total** | **$  4,021,351** |

**7.   Share–Based Compensation and Warrant**

On August 18, 2000, the Company adopted the 2000 employee share option plan (the "Option Plan"), which allows the Company to offer a variety of incentive awards to employees, directors, consultants and advisors or any members of the Company. The purpose of the Option Plan is to promote the success of the Company and to increase shareholder value by providing an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons of the Company. The Company granted 67,222,733 share options during the period from 2001 to 2005, and a further 340,000 share options to its employees under the Option Plan in 2006. Under the terms of the Option Plan, the share options are generally granted at exercise prices not less than 100% of the fair market value as determined by the Board of Directors and expire 10 years from the date of grant and vest over 3 years.

The fair value of the common shares underlying the options were determined by the Company for all grants and considered several factors, including retrospective valuations. These valuations utilized the guideline companies approach, which incorporates certain assumptions including the market performance of comparable listed companies as well as the financial results and growth trends of the Company, to derive the total equity value of the Company. The valuation model allocated the equity value between the common shares and the preference shares and determined the fair value of common shares based on two assumptions: conversion into common shares would result in a higher economic value, preference shares were treated as if they had converted into common shares; and preference shares that have a value higher than their conversion price were assigned a value that takes into consideration their liquidation preference. The common shares were assigned a value equal to their pro rata share of the residual amount, if any, that remained after consideration of the liquidation preference of preference shares with a value below their conversion price.

The fair value of options granted during the year ended December 31, 2006 was estimated on the date of grant using the Black–Scholes option pricing model, assuming no dividends and the following weighted average assumptions:

|  | 2006 |
|---|---:|
| Risk–free rate of return | 5.78% |
| Expected term | 6.0 years |
| Expected volatility | 68% |
| Expected dividend yield | 0% |

Expected volatility is based on the standard deviation of similar companies' daily stock prices. The expected term of options represents the period of time that options granted are expected to be outstanding. The risk–free rate

F–72

Table of Contents

ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2006
(In U.S. dollars, except share data)

of return is based on the US treasury bond yield curve in effect at the time of grant for periods corresponding with the expected term of the option.

The Company recorded share–based compensation expenses with respect to Option Plan of $515,478 for the year ended December 31, 2006.

A summary of the share option activity during the year ended December 31, 2006 is as follows:

| Share Options | Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In years) |
|---|---|---|---|---|
| Outstanding as of January 1, 2006 | 44,330,116 | $ | 0.24 | |
| Granted | 340,000 | $ | 0.60 | |
| Exercised | (5,295,700) | $ | 0.12 | |
| Forfeited | (358,966) | $ | 0.29 | |
| Outstanding as of December 31, 2006 | 39,015,450 | $ | 0.26 | 8.1 |
| Vested and expected to vest as of December 31, 2006 | 35,699,137 | $ | 0.26 | 8.1 |
| Exercisable as of December 31, 2006 | 16,868,095 | $ | 0.21 | 7.7 |

The Company granted 340,000 stock options during the year ended December 31, 2006, with a weighted average grant–date fair value per share of $0.004. The intrinsic value of stock options exercised was approximately $10,799 for the year ended December 31, 2006.

As of December 31, 2006, there was $485,043 of total unrecognized compensation cost related to unvested share–based compensation arrangements granted under the Option Plan which is expected to be recognized over a weighted–average period of 1.1 years.

*Restricted Shares*

On June 1, 2006, the Company granted 2,725,055 shares to an officer of the Company at the price of $0.50 per share. The shares are subject to repurchase by the Company. The repurchase right on 908,352 of these shares will expire on June 1, 2007 if the officer remains employed with the Company. The repurchase right on the remaining 1,816,703 shares will expire rateably on a monthly basis from June 1, 2007 to May 31, 2009 for as long as the officer is employed with the Company. In addition, the Company entered into a loan agreement (the "Loan Agreement") with the officer to grant an interest–free, non–recourse loan to the officer of $1,349,992 to purchase the restricted shares. The loan will be due and payable if the officer breaches any term of the Loan Agreement or fails to perform any obligation specified in the Loan Agreement; voluntarily ceases to be an employee; or immediately prior to the US public offering of the Company's common shares. If at any time before the repurchase right has expired or the Company merges with or into another corporation, the repurchase right on all shares shall immediately expire.

The arrangement is treated as a share option until the loan is repaid. Further, as the shares sold were on a non–recourse basis and are accounted for as options, issuance of the restricted shares was not recorded. Rather, compensation cost will be recognized over the service period with an offsetting increase in additional paid–in

F–73

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

capital. The fair value of the award was $19, and was therefore not recorded as the amount was insignificant, and was based on the following assumptions:

| | |
|---|---|
| Risk−free rate of return | 5.40% |
| Expected term | 2.3 years |
| Expected volatility | 49% |
| Expected dividend yield | 0% |

A summary of the non−vested restricted share activity is as follows:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding as of January 1, 2006 | — | $ | — |
| Granted | 2,725,055 | | 0.00 |
| Restricted shares outstanding as of December 31, 2006 | 2,725,055 | $ | 0.00 |

*2004 Warrants*

In December 2004, warrants were issued in connection with the issuance of a convertible note (the "2004 Note"). In May 2005, the Company repaid the 2004 Note and fixed the exercise price of the warrants at $0.20 and modified the expiration date to June 2007.

As of December 31, 2006, the above warrants were exercisable into 8,817,720 common shares.

*2005 Warrants*

In May 2005, warrants were issued in connection with an investor's purchase of 11,752,500 common shares. The warrants have an exercise price of $0.30 and will expire in June 2007.

As of December 31, 2006, the 2005 Warrants were exercisable into 11,752,500 common shares.

The 2004 and 2005 Warrants were canceled as a result of the Company's acquisition by Focus Media on March 28, 2007 (refer to Note 13).

**8.   Income Taxes**

*Cayman Islands*

The Company is a tax−exempted company incorporated in the Cayman Islands.

*Hong Kong*

Allyes China has not recorded a tax provision for Hong Kong tax purposes as it does not have any assessable profit in Hong Kong.

*PRC*

Except for Allyes China, the Company's subsidiaries are subject to Enterprise Income Tax ("EIT") on the taxable income in accordance with the Enterprise Income Tax Law and the Income Tax Law of the PRC concerning Foreign Investment Enterprise and Foreign Enterprises (collectively "PRC Enterprise Income Tax Laws").

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

New Allyes Shanghai enjoys EIT preferential treatment and is entitled to a two–year EIT exemption followed by a three–year, 50% reduction in rate, effective from the first profit making year after absorbing all prior year tax losses which can be carried forward for five years. New Allyes Shanghai entered the first profit making year in 2004 and was therefore subject to 50% EIT rate reduction for the year ended December 31, 2006.

Shanghai QS, Beijing LT and Shanghai KT also enjoy EIT preferential treatment and are entitled to a two–year EIT exemption, effective from the first year of establishment. The exemption period ended December 31, 2006 for Shanghai QS and Beijing LT, and is to be ended December 31, 2007 for Shanghai KT. All three companies were exempted from EIT for the year ended December 31, 2006.

The Company's remaining entities registered in the PRC are subject to a statutory EIT rate of 33% in accordance with the relevant PRC Enterprise Income Tax Laws.

On March 16, 2007, the PRC National People's Congress passed the China Corporate Income Tax Law which will change the income tax rates for most enterprises from 33% at the present to 25%. This new law will become effective on January 1, 2008. There will be a transition period for enterprises, whether foreign–invested or domestic, which currently receive preferential tax treatments granted by relevant tax authorities. Enterprises that are subject to an enterprise income tax rate lower than 25% may continue to enjoy the lower rate and gradually transfer to the new tax rate within five years after the effective date of the new law. Enterprises that are currently entitled to exemptions or reductions from the standard income tax rate for a fixed term may continue to enjoy such treatment until the fixed term expires. Preferential tax treatments will continue to be granted to industries and projects that are strongly supported and encouraged by the state, and enterprises otherwise classified as "new and high technology enterprises strongly supported by the state" will be entitled to a 15% enterprise income tax rate. The income tax rates for most of the Company's PRC entities are expected to transit from 33% to 25% starting from January 1, 2008.

Income tax expense (benefit) consists of the following:

|  | Year Ended December 31, 2006 |
|---|---|
| Current income tax expense | $  1,149,557 |
| Deferred income tax benefit | (146,613) |
| Total income taxes | $  1,002,944 |

The effective income tax rate for the year ended December 31, 2006 differs from the statutory rate primarily due to excess of payroll over EIT deduction limit, write–off of bad debt without tax authority approval, impairment loss recognized and tax holiday effect of certain PRC entities.

F–75

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

The principal components of the Company's deferred income tax assets and liabilities as of December 31, 2006 are as follows:

|  | Current | Non–current |
|---|---|---|
| Deferred tax assets: | | |
| Bad debt provision | 69,737 | — |
| Accrued expenses temporarily non–deductible | 320,037 | — |
| Others | 64,350 | 7,939 |
| Total deferred tax assets | $ 454,124 | $ 7,939 |
| Deferred tax liabilities: | | |
| Acquired intangible assets | $ — | $ 31,271 |

The Company operates through multiple subsidiaries and the valuation allowance is considered on each individual subsidiary basis. Where a valuation allowance was not recorded, the Company believes that sufficient positive evidence exists to generate sufficient taxable income in the future.

**9. Convertible Preference Shares**

*Series A Preference Shares*

On July 15, 2000, the Company issued an aggregate of 40,000,000 shares of Series A Preference Shares at $0.0001 per share for gross proceeds of $4,000.

*Series A–1 Preference Shares*

The Company issued 42,840,000 and 2,085,500 shares of Series A–1 Preference Shares at $0.0001 per share for gross proceeds of $4,284 and $209 on August 1, 2001 and September 1, 2004, respectively.

*Series B Preference Shares*

The Company issued 50,463,966 and 10,092,792 shares of Series B Preference Shares at $0.0001 per share for gross proceeds of $5,047 and $1,009 on May 23, 2005 and September 6, 2005, respectively.

The convertible preference shares are not redeemable at the option of holder.

The significant terms of the Series A, Series A–1, and Series B convertible preference shares are as follows:

*Conversion*

A. Optional Conversion

Any preference share may, at the option of the holder, be converted at any time into common shares based on the then–effective conversion price.

The conversion price is initially equal to original issue price and may be subsequently adjusted for:

(i) Share splits or combination

(ii) Common share dividends and distributions

(iii) Other dividends

(iv) Reorganizations, mergers, consolidations, reclassifications, exchanges or substitutions.

F–76

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

(v) Sale of shares below conversion price

(vi) Material adjustment to financial statements

(vii) Other dilutive events

The initial conversion ratio for each series of preference shares was 1:1 except for automatic conversion.

B. Automatic Conversion

Series A and Series A−1 preference shares shall automatically be converted into common shares upon the closing of a qualified initial public offering (the "IPO"), based on the then−effective conversion price.

Series B shall automatically be converted upon the closing of a qualified IPO into the greater of:

(i) the number of common shares that each Series B would be convertible into based on the then−effective conversion price; or

(ii) a number of common shares that shall be calculated as follows:

    a) if the closing of such IPO is on or before the 12 month anniversary of the original Series B issue date and the offering prices of the common shares is less than 150% of the original Series B issue price (US$0.50), then the number of common shares each Series B can be converted into shall be the result of:

    Number of common shares = ((Original Series B Issue Price) X 150%) / (Offering Price)

    b) If the closing of a qualified IPO is after 12 month anniversary but on or before the 18 month anniversary of the original Series B issue date and the offering prices of the common shares is less than 175% of the original Series B issue price (US$0.50), then the number of common shares each Series B can be converted into shall be the result of:

    Number of common shares = ((Original Series B Issue Price) X 175%) / (Offering Price)

    c) If the closing of such IPO is after the 18 month anniversary of the original Series B issue date and the offering price of the common shares is less than 200% of the original Series B issue price (US$0.495403), then the number of common shares each Series B can be converted into shall be the result of:

    Number of common shares = ((Original Series B Issue Price) X 200%) / (Offering Price)

*Voting Rights*

Each preference share shall be entitled to the same number of votes as the number of common shares into which as if preference shares were converted.

*Dividends*

The holders of Series A and Series B preference shares shall be entitled to receive on a pari passu basis, when, as, and if declared by the Board of Directors but only out of funds that are legally available, cash dividends at the rate or in the amount as the Board considers appropriate. No dividends shall be declared or paid on the common shares until a dividend is declared or paid on each outstanding preference share.

F−77

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

*Liquidation Preference*

Upon any liquidation, dissolution, or winding up of the Company (a "Liquidation Event"), whether voluntary or involuntary:

(A) Before any distribution or payment shall be made to the holders of Series A, Series A−1 and common shares, each holder of Series B preference shares shall be entitled to receive, on a pari passu basis, an amount equal to the original Series B issue price (US$0.50) plus all declared and unpaid dividends.

Additionally, each holder of Series B preference shares shall be entitled to receive, an amount equal to:

(i) Original issue price x 0.50, if the liquidation date is on or before the 12 month anniversary of the original Series B issue date;

(ii) Original issue price x 0.75, if the liquidation date is after the 12 month anniversary but on or before the 18 month anniversary of the original Series B issue date;

(iii) Original issue price x 1.00, if the liquidation date is after the 18 month anniversary of the original Series B issue date;

(B) After distribution or payment to holders of Series B preference shares, each holder of Series A preference shares shall be entitled to receive, on a pari passu basis, an amount equal to original Series A issue price (US$0.01 as adjusted for two 1:100 stock−splits) and original Series A−1 issue price (US$0.02 as adjusted for two 1:100 stock−splits) plus all declared and unpaid dividends.

Additionally, each holder of Series A preference shares shall be entitled to receive US$0.001 for each Series A preference share and US$0.01 for each Series A−1 preference share.

**10.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Company located in the PRC participate in a government−mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Company to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits was $655,051 for the year ended December 31, 2006.

**11.    Commitments**

*Leases*

The Company has entered into certain leasing arrangements relating to the Company's office. Rental expense under operating leases for the year ended December 31, 2006 was $804,979.

Future minimum lease payments under non−cancelable operating lease agreements were as follows;

| December 31, | |
| --- | --- |
| 2007 | $ 1,113,145 |
| 2008 | 838,410 |
| 2009 | 758,696 |
| 2010 | 689,769 |
| 2011 | 689,769 |

F−78

Table of Contents

**ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENT — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2006**
**(In U.S. dollars, except share data)**

| | |
|---|---:|
| 2012 and thereafter | 205,986 |
| Total | $ 4,295,775 |

**12.    Restricted Net Assets**

Relevant PRC statutory laws and regulations permit payments of dividends by the Company's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as a general reserve fund. As a result of these PRC laws and regulations, the Company's PRC subsidiaries and PRC affiliates are restricted in their ability to transfer a portion of their net assets in the form of dividends. Assets subject to restriction amounted to $827,814 as of December 31, 2006.

**13.    Subsequent events**

*Termination of Beijing LT's Business*

On March 15, 2007, the Company terminated the Agreement (See Note 3) and executed a contract (the "Contract") with the Selling Corporate Shareholder and the General Manager of Beijing LT. Under the Contract, the Company will pay the Selling Corporate Shareholder (of which the General Manager has an 80% ownership interest) a percentage of the total collected amount of Beijing LT's accounts receivable outstanding as of the date of the Contract, not to exceed $384,187.

*Acquisition by Focus Media*

On February 28, 2007, the Company's shareholders entered into a definitive Share Purchase Agreement (the "Share Purchase Agreement") with Focus Media pursuant to which Focus Media acquired 100% of the Company's share capital. The consideration was $70 million in cash and 19,969,080 common shares with a fair value of $154,281,112 or $7.726 per common share. Additional consideration of 9,662,458 common shares are to be issued by Focus Media contingent upon the Company meeting certain earning targets during the twelve–month period from April 1, 2007 to March 31, 2008. The acquisition was completed in March 2007. Coincident with the acquisition, all the Company's outstanding options and warrants were cancelled.

*Release of Restricted Shares*

Effective upon the Company's acquisition by Focus Media, the repurchase right related to certain issued shares (refer to Note 7) expired.

On March 31, 2007, the officer holding the previously restricted shares severance agreement under which the Company agreed to pay the officer US$62,341 and the loan payable from the officer to the Company as a result of the purchase of the restricted shares is due and payable on December 31, 2007.

*Dividend Payment*

On March 28, 2007, the Board of Directors approved a special cash dividend of US$5 million which is payable to an entity wholly owned by the CEO, who is also a shareholder of the Company. The Company recorded this non prorate dividend as compensation charge.

* * * * *

F–79

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Table of Contents**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–81 |
| Consolidated Balance Sheets as of December 31, 2004 and 2005 | F–82 |
| Consolidated Statements of Operations for the years ended December 31, 2004 and 2005 | F–83 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2004 and 2005 | F–84 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004 and 2005 | F–85 |
| Notes to the Consolidated Financial Statements for the years ended December 31, 2004 and 2005 | F–86 |

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
TARGET MEDIA HOLDINGS LIMITED:

We have audited the accompanying consolidated balance sheets of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the years in the two–year period ended December 31, 2005, all expressed in Renminbi. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the results of their operations and their cash flows for each of the years in the two–year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

The accompanying consolidated financial statements as of and for the year ended December 31, 2005, have been translated into United States dollars solely for the convenience of the reader. We have audited the translation and, in our opinion, such consolidated financial statements expressed in Renminbi have been translated into United States dollars on the basis set forth in note 2(c) to the consolidated financial statements.

/s/ KPMG

Hong Kong, China
February 13, 2006

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2004 AND 2005**

| | Note | December 31, 2004 RMB | December 31, 2005 RMB | December 31, 2005 US$ |
|---|---|---|---|---|
| | | (Amounts in thousands, except share data) | | |
| **Assets** | | | | |
| Current assets | | | | |
|   Cash and cash equivalents | | 103,804 | 83,837 | 10,388 |
|   Time deposits | (3) | 828 | 20,596 | 2,552 |
|   Accounts receivable, net | (4) | 45,505 | 123,423 | 15,293 |
|   Due from related parties | (15) | 4,611 | 116 | 14 |
|   Prepaid expenses and other current assets | (5) | 5,969 | 76,371 | 9,463 |
|   Deferred tax assets | (10) | 112 | 112 | 14 |
|   Total current assets | | 160,829 | 304,455 | 37,724 |
| Rental deposits | | 202 | 2,250 | 279 |
| Property, equipment and software, net | (6) | 35,586 | 173,821 | 21,539 |
| Long–term prepayments | (6) | — | 14,617 | 1,811 |
| Intangible assets | (7) | — | 7,982 | 989 |
| Goodwill | (7) | — | 1,613 | 200 |
| Total assets | | 196,617 | 504,738 | 62,542 |
| **Liabilities and shareholders' equity** | | | | |
| Current liabilities | | | | |
|   Accounts and bills payable | | 5,311 | 48,428 | 6,001 |
|   Accrued expenses and other payables | (8) | 8,052 | 69,948 | 8,667 |
|   Due to related parties | (15) | 10,033 | 30,000 | 3,717 |
|   Income tax payable | | 442 | 442 | 55 |
|   Total current liabilities | | 23,838 | 148,818 | 18,440 |
| Deferred tax liability | (7) | — | 377 | 47 |
| Total liabilities | | 23,838 | 149,195 | 18,487 |
| Commitments and contingencies | (11) | | | |
| Series A redeemable convertible preferred shares: US$0.0001 par value; 44,000,000 authorized; 41,641,679 shares issued and outstanding as of December 31, 2004 and 2005 | (12) | 130,978 | 157,512 | 19,518 |
| Series B redeemable convertible preferred shares: US$0.0001 par value; 22,000,000 authorized; nil and 21,820,243 shares issued and outstanding as of December 31, 2004 and 2005, respectively | (12) | — | 128,528 | 15,926 |
| Shareholders' equity | | | | |
|   Common shares: US$0.0001 par value; 200,000,000 and 210,000,000 shares authorized as of December 31, 2004 and 2005, respectively; 111,100,000 shares issued and outstanding as of December 31, 2004 and 2005 | (13) | 92 | 92 | 11 |
|   Paid–in capital | | 25,045 | 62,712 | 7,771 |
|   Statutory reserves | | 5,011 | 7,166 | 888 |
|   Retained earnings (deficit) | | 11,653 | (467) | (59) |
| Total shareholders' equity | | 41,801 | 69,503 | 8,611 |
| Total liabilities and shareholders' equity | | 196,617 | 504,738 | 62,542 |

The accompanying notes are an integral part of these consolidated financial statements.

F–82

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Note | 2004 RMB | 2005 RMB | 2005 US$ |
|---|---|---|---|---|
| | | (Amounts in thousands, except per share data) | | |
| Advertising service revenue | | 80,475 | 271,911 | 33,693 |
| Cost of revenues | | (32,407) | (131,710) | (16,321) |
| Gross profit | | 48,068 | 140,201 | 17,372 |
| Operating expenses: | | | | |
| Sales and marketing | | (16,317) | (69,277) | (8,584) |
| General and administrative | | (5,344) | (15,696) | (1,945) |
| Total operating expenses | | (21,661) | (84,973) | (10,529) |
| Income from operations | | 26,407 | 55,228 | 6,843 |
| Other income (expenses): | | | | |
| Interest income | | 86 | 628 | 78 |
| Interest expense | | (362) | (79) | (10) |
| Exchange loss | | (25) | (755) | (94) |
| Income before income tax expense and minority interests | | 26,106 | 55,022 | 6,817 |
| Income tax expense | (10) | (330) | — | — |
| Income after income tax expense | | 25,776 | 55,022 | 6,817 |
| Minority interests | | — | 180 | 22 |
| Net income | | 25,776 | 55,202 | 6,839 |
| Accretion to Series A redeemable convertible preferred shares redemption value | | (8,663) | (26,534) | (3,288) |
| Accretion to Series B redeemable convertible preferred shares redemption value | | — | (7,747) | (960) |
| Beneficial conversion of Series A redeemable convertible preferred shares | | — | (24,378) | (3,021) |
| Beneficial conversion of Series B redeemable convertible preferred shares | | — | (6,508) | (806) |
| Net income (loss) available to common shareholders | | 17,113 | (9,965) | (1,236) |

The accompanying notes are an integral part of these consolidated financial statements.

F–83

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Common shares | | Paid–in capital | Statutory reserves | Retained earnings (deficit) | Total shareholders' equity |
|---|---|---|---|---|---|---|
| | Number of shares | Amount | | | | |
| | | RMB | RMB | RMB | RMB | RMB |
| | | | (Amounts in thousands, except share data) | | | |
| January 1, 2004 | — | | 23,184 | — | (449) | 22,735 |
| Issuance of common shares | 111,100,000 | 92 | — | — | — | 92 |
| Share–based compensation (note 9) | — | — | 1,861 | — | — | 1,861 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (8,663) | (8,663) |
| Net income | — | — | — | — | 25,776 | 25,776 |
| Appropriation to statutory reserves | — | — | — | 5,011 | (5,011) | — |
| December 31, 2004 | 111,100,000 | 92 | 25,045 | 5,011 | 11,653 | 41,801 |
| Share–based compensation (note 9) | — | — | 6,781 | — | — | 6,781 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (26,534) | (26,534) |
| Accretion to Series B redeemable convertible preferred shares redemption value | — | — | — | — | (7,747) | (7,747) |
| Beneficial conversion of Series A redeemable convertible preferred shares | — | — | 24,378 | — | (24,378) | — |
| Beneficial conversion of Series B redeemable convertible preferred shares | — | — | 6,508 | — | (6,508) | — |
| Net income | — | — | — | — | 55,202 | 55,202 |
| Appropriation to statutory reserves | — | — | — | 2,155 | (2,155) | — |
| December 31, 2005 | 111,100,000 | 92 | 62,712 | 7,166 | (467) | 69,503 |
| December 31, 2005 (US$) | | 11 | 7,771 | 888 | (59) | 8,611 |

The accompanying notes are an integral part of these consolidated financial statements.

F–84

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

|  | Years ended December 31, | | |
|---|---|---|---|
|  | 2004 | 2005 | 2005 |
|  | RMB | RMB | US$ |
|  | (Amounts in thousands) | | |
| Cash flows from operating activities: | | | |
| Net income | 25,776 | 55,202 | 6,839 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | | |
| Minority interests | — | (180) | (22) |
| Allowance for doubtful accounts | 340 | — | — |
| Gain on disposal of equipment | (69) | (37) | (5) |
| Depreciation and amortization | 4,383 | 19,594 | 2,428 |
| Share–based compensation | 1,861 | 6,781 | 840 |
| Deferred income tax | (112) | — | — |
| Changes in operating assets and liabilities, net of effects of business acquired: | | | |
| Accounts receivable | (45,845) | (77,534) | (9,607) |
| Due from related parties | (4,611) | 4,495 | 557 |
| Prepaid expenses and other current assets | (5,501) | (53,457) | (6,623) |
| Rental deposits | (202) | (2,048) | (254) |
| Accounts and bills payable | 1,730 | 1,225 | 152 |
| Accrued expenses and other payables | 7,789 | 57,856 | 7,169 |
| Due to related parties | (737) | (33) | (4) |
| Income tax payable | 442 | — | — |
| Net cash (used in) provided by operating activities | (14,756) | 11,864 | 1,470 |
| Cash flows from investing activities: | | | |
| Purchase of time deposits | (828) | (45,524) | (5,641) |
| Maturity of time deposits | — | 25,756 | 3,191 |
| Initial investment deposits | — | (16,945) | (2,100) |
| Purchase of property, equipment and software | (24,045) | (127,420) | (15,789) |
| Purchase of intangible assets | — | (4,809) | (596) |
| Proceeds from disposal of equipment | 346 | 255 | 32 |
| Net cash paid for acquisitions of subsidiaries | — | (3,925) | (486) |
| Net cash used in investing activities | (24,527) | (172,612) | (21,389) |
| Cash flows from financing activities: | | | |
| Proceeds from loan from shareholder | 31,655 | 30,000 | 3,717 |
| Repayment of loan from shareholder | (21,655) | (10,000) | (1,239) |
| Proceeds from issuance of common shares | 92 | — | — |
| Proceeds from issuance of redeemable convertible preferred shares, net of issuance costs | 122,315 | 120,781 | 14,966 |
| Distributions to shareholders in connection with the Restructuring | (10,000) | — | — |
| Net cash provided by financing activities | 122,407 | 140,781 | 17,444 |
| Net increase(decrease) in cash and cash equivalents | 83,124 | (19,967) | (2,475) |
| Cash and cash equivalents at beginning of year | 20,680 | 103,804 | 12,863 |
| Cash and cash equivalents at end of year | 103,804 | 83,837 | 10,388 |
| Supplemental disclosures of cash flow and non–cash information: | | | |
| Cash paid for income taxes | — | — | — |
| Cash paid for interest | 348 | 79 | 10 |
| Accrual for purchase of property, equipment and software | 3,581 | 41,765 | 5,175 |
| Accrual for purchase of intangible assets | — | 4,040 | 501 |

The accompanying notes are an integral part of these consolidated financial statements.

F–85

Table of Contents

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

**(1) Principal Activities, Organization and Basis of Presentation**

*Principal activities*

The accompanying consolidated financial statements consist of the financial statements of Target Media Holdings Limited (the "Company"), its wholly–owned subsidiary, Target Media Multi–Media Technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity ("VIE"), Shanghai Target Media Co., Ltd. ("STM"). The Company and its subsidiary and consolidated VIE are collectively referred to as the "Group". The Group is principally engaged in operating a nationwide flat panel display advertising network in the People's Republic of China ("PRC"), which is made up of liquid crystal displays, or LCD, and plasma screens placed in the elevator lobbies or other waiting areas of commercial buildings, high–end residential buildings, hotels, banks and supermarkets. Using the advertisement content provided by its customers, the Group displays commercial advertisements for its customers on this network to capture targeted consumers who work, live or shop at these locations.

On January 7, 2006, the Company signed a definitive agreement ("the Agreement") with Focus Media Holding Limited ("Focus Media") whereby Focus Media will purchase 100% of the Company's equity interests from selling shareholders in exchange for a total consideration of US$325,000, of which US$94,000 will be paid in cash and US$231,000 will be paid in the form of Focus Media's ordinary shares (priced at US$30.00 per ADS, each of which represents 10 Focus Media ordinary shares), equal to 77 million Focus Media ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of US$45,000 is to be paid upon closing. The second installment of US$25,000 is to be paid on April 28, 2006. The final installment of US$24,000 is to be paid on July 31, 2006, and may be increased or decreased based on a calculation of Target Media's net working capital as of the closing date. All of the Focus Media ordinary shares to be delivered at closing under the Agreement will be in the form of newly issued shares. This proposed business combination is expected to close following the satisfaction or waiver of customary closing conditions provided in the Agreement.

*Organization*

In July 2004, the shareholders of STM incorporated the Company in the Cayman Islands as part of the reorganization of STM (the "Reorganization"). The purpose of the Reorganization was to enable a group of foreign investors to invest in STM where current PRC laws restrict direct foreign investment or ownership in advertising companies in the PRC. In connection with the Reorganization, the Company entered into the following series of transactions:

(1) The formation and incorporation and issuance of the Company's common shares to the STM shareholders in the same direct proportion to their relative equity interests of STM in August 2004. See note 13.

(2) The formation and incorporation of TMM as a wholly–owned subsidiary of the Company in August 2004.

(3) The entering into certain contractual agreements and arrangements between TMM and STM in August 2004 since the Company and TMM currently are ineligible to apply and hold the required licenses for provision of advertising services in the PRC.

(4) The issuance of the Company's Series A redeemable convertible preferred shares to a group of foreign investors for cash consideration of US$15,000 as discussed in note 12(a).

The contractual agreements and arrangements between TMM and STM have resulted in the Company receiving substantially all the economic benefits and residual returns, absorbing substantially all the risks of expected losses of STM, and controlling the operating and financial decision making of STM. In addition, under the terms of these contractual agreements and arrangements, the Company, through TMM and its de facto agents, is

F–86

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

considered to be the primary beneficiary of STM since it holds substantially all the variable interests of STM and is determined to be most closely associated with STM.

Under Financial Accounting Standard Board ("FASB") Interpretation No. 46(R), "*Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51*" ("FIN 46R"), a variable interest entity is required to be consolidated by the primary beneficiary of the entity if the equity investors in the entity do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. Accordingly, the financial statements of STM have been consolidated in the Company's financial statements from August 2004, which is the date when the Company first became the primary beneficiary of STM through the above contractual agreements and arrangements.

The fees, payments or other sources of income and expenses arising from the transactions between TMM and STM under the terms of these agreements are eliminated against the related expenses or income on consolidation and do not have any impact on the consolidated financial position and operations and cash flow of the Group other than to reflect such amounts on a separate legal entity basis. The key terms and salient features of these contractual agreements and arrangements, which became effective from August 2004, are as follows:

*Assets Purchase Agreement*  Under the Assets Purchase Agreement, TMM purchased all of the tangible and intangible assets of STM other than (i) advertisement contracts with customers, (ii) flat panel display placement contracts, and (iii) other assets prohibited from transfer under applicable PRC laws and regulations. The purchase price was equal to the net book value of these assets as of July 31, 2004 and is payable by TMM through deducting the fees and expenses payable to TMM by STM under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement described below.

*Lease and Service Agreement*  Under the Lease and Service Agreement, STM exclusively leases flat panel display and related equipment from TMM. STM also undertakes to exclusively procure certain services from TMM from time to time, including (i) repair and maintenance of flat panel display equipment, (ii) secondment of TMM's employees to STM and (iii) business promotion services. Equipment rental is charged based on the amount of depreciation charge of the equipment plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. Service fees are charged based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the Lease and Service Agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration. The terms of this agreement also prohibit STM from purchasing or leasing flat panel display equipment, hiring new employees and procuring the services described above from any other third parties without TMM's written consent.

*Software License and Exclusive Technical Service Agreement*  Under the Software License and Exclusive Technical Service Agreement, TMM provides a non–exclusive, non–transferable and non–assignable license to STM to install and run its licensed software solely in the PRC. TMM is the exclusive technical service provider to STM and STM is not permitted to procure any similar or identical technical services from other third parties. STM further agrees that TMM is the sole owner of any and all intellectual property rights or any other rights arising by way of research and development under this agreement. The software license fees payable by STM to TMM shall be based on a certain percentage of the business income generated from the use of TMM's software in STM's business operations as determined and approved by TMM and the Board of Directors of the Company. The technical service fees payable by STM to TMM shall be based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*Guarantee Agreement*  Under the Guarantee Agreement and as security for STM's obligations under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement, each of the shareholders of STM has guaranteed STM's performance under, and settlement of obligations arising from the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement by pledging all their equity interests in STM. Furthermore, the shareholders of STM have agreed to appoint the general manager, chief financial officer and other senior management of STM according to the Company's or TMM's instruction.

*Future Equity Transfer Agreement*  Under the Future Equity Transfer Agreement, the shareholders of STM shall transfer to the Company or its nominee, and the Company or its nominee shall acquire, when the PRC laws permit, their entire equity interests in the registered capital of STM at a nominal amount of RMB 10, provided that the prevailing PRC laws at the time of transfer do not require a valuation of the transferred equity interests or post other restrictions. Furthermore, the terms of the Future Equity Transfer Agreement place significant restrictions on the shareholders of STM as summarized below:

(a) Without the written consent of the Company, each of the shareholders of STM shall not use their equity interests in STM as a guarantee or security against a loan, or shall not cause STM to enter into any loan transaction.

(b) Without the written consent of the Company, each of the shareholders of STM shall not dispose of their equity interests in the registered capital of STM in any form, including but not limited to transfer, security, or other forms of entitlements.

(c) Without the written consent of the Company, each of the shareholders of STM shall not adopt any measure which may cause the current approved business scope of STM to be altered, or may cause STM to be liquidated or wound up.

(d) Each of the shareholders of STM shall cause their respective nominees on STM's Board not to pay any dividend or declare any dividend payable to the legal shareholders unless the Company's prior approval is obtained.

(e) Each of the shareholders of STM shall invite the Company to attend STM's shareholders and Board of Directors' meetings, cast their votes at the shareholders' meeting in accordance with the Company's instructions and direct their respective nominees on STM's Board to vote in accordance with the Company's instructions.

(f) Each of the shareholders of STM shall ensure that STM's capital structure remains unchanged unless otherwise instructed by the Company, and that STM's registered capital will not be increased, nor will it be assigned, in whole or in part, to any third party without prior written consent of the Company.

With respect to the Company's direct variable interest in STM, no minority interests (or noncontrolling interests) have been presented since the Company, through TMM and its de facto agents (who are also all the shareholders of STM), has a 100% controlling financial interest in STM through the terms of the aforementioned contractual agreements and arrangements. In addition, the common shareholders of the Company and the shareholders of STM are the same and their shareholders' equity interests in the Company are in the same proportion as to their equity interests in STM.

STM is a domestic company incorporated in Shanghai, the PRC, in December 2003 and was formed in connection with the restructuring of Shanghai Dian Yang Digital Media Technology Co., Ltd. ("Dian Yang"), whose sole beneficial equity owner is also the controlling and majority shareholder of STM and the Company. Dian Yang was established in 2000 and initially operated as an advertising agency company by placing advertisements with media companies on behalf of advertising clients. In March 2003, Dian Yang commenced the flat panel display advertising business as an extension to its advertising agency business. As part of the restructuring of Dian Yang

F–88

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

(the "Restructuring"), all tangible and intangible assets, assignable business contracts and employees relevant to the flat panel display advertising business were transferred from Dian Yang to STM in December 2003 at the time of STM's incorporation. In connection with the transfer, RMB 20,000 was distributed to Dian Yang, of which RMB 10,000 was paid by STM at the end of December 2003 and the remaining RMB 10,000 was paid by STM in January 2004. Following the Restructuring, STM began to operate the flat panel display advertising business.

### Basis of presentation

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("US GAAP").

Since the controlling and majority shareholder of STM prior to the Reorganization remained the controlling and majority shareholder of the Company after consummation of the Reorganization, the assets and liabilities of STM have been stated and recognized by the Company at the historical carrying amounts of STM. As discussed above, the financial position and results of operations of STM have been consolidated and included in the Company's consolidated financial statements from August 2004 onwards. For the periods prior to August 2004, since the Company was formed for the sole purpose of the Reorganization to allow a group of foreign investors to invest in STM's flat panel display advertising business, the accompanying consolidated financial statements include the financial position and the related results of operations of STM from the earliest date presented through August 2004 at historical cost basis with no lapse in financial information. Accordingly, the results of operations for the years ended December 31, 2004 and 2005 are comparable.

As of December 31, 2005, the Group had working capital (current assets less current liabilities) of approximately RMB 155,637 (US$19,285) and off–balance sheet operating lease commitments of RMB 117,994 (US$14,621) payable over the next 12–months (see note 11). The Company has historically relied on capital infusions and credit enhancements from its shareholders to provide working capital to fund its flat panel display network build–out and acquisitions. Management believes that its current cash on hand and expected cash flow from operations will be sufficient to meet its operating requirements, including existing operating lease commitments over the foreseeable future. However, should the acquisition of the Company by Focus Media (see note 1) not occur or the consummation date be delayed beyond a short period of time, it may be necessary for the Company to seek additional capital infusions from current and new shareholders and/or provide shareholder credit enhancements to third party lenders to satisfy its anticipated liquidity requirements for further network expansion. Should the Company be unable to obtain liquidity at levels necessary to meet its anticipated requirements or at commercially acceptable rates, future network expansion plans may need to be curtailed or postponed.

### (2)  Summary of Significant Accounting Policies

#### (a) Principles of consolidation

The consolidated financial statements include the financial statements of the Company, its subsidiary and its VIE, since the Company is the primary beneficiary. All significant inter company balances and transactions have been eliminated on consolidation.

#### (b) Use of estimates

The preparation of financial statements in conformity with US GAAP requires management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, management reviews its estimates, including those related to the allowance for doubtful accounts, estimates to

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

recognize rebate receivables, valuation allowance for deferred tax assets, asset depreciable lives and residual values, and carrying values of long–lived assets, based on currently available information. Changes in facts and circumstances may result in revised estimates.

*(c) Foreign currencies*

The Group's functional currency is the Renminbi ("RMB"). Monetary assets and liabilities denominated in foreign currencies are translated into RMB using the applicable exchange rates quoted by the People's Bank of China at the balance sheet dates. All such exchange gains and losses are included in the consolidated statements of operations.

The accompanying consolidated financial statements have been expressed in RMB. The translations of amounts from RMB into United States dollars ("US$") as of and for the year ended December 31, 2005, are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB 8.0702, on December 31, 2005, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2005, or at any other rate. See also note 14.

*(d) Commitments and contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated.

*(e) Cash and cash equivalents*

Cash and cash equivalents consist of cash at bank and on hand and certificates of deposit with an initial term of less than three months when purchased. None of the Group's cash and cash equivalents is restricted for withdrawal.

*(f) Accounts receivable*

Accounts receivable billed are recorded at the invoiced amount and are non interest bearing. The allowance for doubtful accounts is the Group's best estimate of the amount of probable credit losses in the Group's existing accounts receivable. The Group determines the allowance based on historical write–off experience by customer types and reviews specific larger amounts individually for collectibility. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Group does not have any off–balance–sheet credit exposure related to its customers.

*(g) Property, equipment and software, net*

Property, equipment and software are stated at cost, net of accumulated depreciation, amortization and impairment.

F–90

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Depreciation and amortization are calculated using the straight–line method over the following estimated useful lives, taking into account the assets' estimated residual value:

| | |
|---|---|
| Flat panel display equipment, primarily LCD and plasma television screens | 5 years |
| Computers and office equipment and software | 3–5 years |
| Motor vehicles | 5 years |
| Leasehold improvements | Shorter of 5 years or term of the lease |

In accordance with SFAS 143, *"Accounting for Asset Retirement Obligations,"* legal obligations associated with the retirement of long–lived assets that result from the acquisition, construction, development or normal use of the asset are recognized at fair value in the period in which the liability is incurred if a reasonable estimate of fair value can be made. For the periods presented there were no legal retirement obligations associated with the placement and use of the Group's flat panel display equipment.

*(h) Impairment of long–lived assets*

In accordance with Statements of Financial Accounting Standards ("SFAS") No. 144, *"Accounting for the Impairment or Disposal of Long–Lived Assets,"* long–lived assets, such as property, equipment and software, and acquired intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. No impairment of long–lived assets was recognized for the years ended December 31, 2004 and 2005.

*(i) Goodwill and other intangible assets*

Goodwill and intangible assets which are determined to have indefinite useful lives are not amortized, but instead tested for impairment at least annually in accordance with the provisions of SFAS No. 142, *"Goodwill and Other Intangible Assets."* Intangible assets with determinable useful lives are amortized over their respective useful lives and reviewed for impairment in accordance with SFAS No. 144.

*(j) Fair value of financial instruments*

Financial instruments of the Group include cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties, other receivables, accounts and bills payable, and amounts due to related parties, for which the carrying values approximate their fair values due to their short–term maturities.

*(k) Statutory Reserve*

TMM and STM are required under PRC laws to provide for certain statutory reserves, such as a general reserve, an enterprise expansion fund and a staff welfare and bonus fund. TMM and STM are required to allocate at least 10% of their after tax profits as reported in their PRC statutory financial statements to the general reserve and have the right to discontinue allocations to the general reserve if the balance of such reserve has reached 50% of their registered capital. These statutory reserves are not available for distribution to the shareholders (except in liquidation) and may not be transferred in the form of loans, advances or cash dividends. As of December 31, 2004 and 2005, RMB 5,011 and RMB 7,166 were appropriated from retained earnings and set aside for these statutory

F–91

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

reserves respectively by TMM and STM. As of December 31, 2005, a future appropriation of RMB 91,220 is necessary to reach the general reserve requirement.

*(l) Revenue recognition*

The Group's revenue is derived from the rendering of advertising services. Revenues from advertising services are recognized ratably on a straight–line basis over the period in which the advertisement is contractually required to be displayed, starting from the date the customer provides the advertisement content and the Group displays such content on its flat panel display equipment, and only when all four of the following criteria are met: (i) pervasive evidence of an arrangement exists; (ii) the advertising services have been rendered; (iii) the service fee is fixed or determinable; and (iv) collectibility is reasonably assured.

Billing terms of the Group's advertising service contracts are in the form of the following: (i) full billing after the end of the advertisement displayed period (the "Service Period"); (ii) progress billings over the Service Period; and (iii) partial cash down payment at the beginning of the Service Period with the remainder being billed in the form of progress payments during or after the end of the Service Period. Payments are due between 30 to 90 days from the date of billing. The Group's accounts receivable comprise amounts billed under the contract terms and revenues recognized under contractual terms but not yet billed (unbilled receivables). The Group expects that substantially all unbilled receivables will be billed and collected within twelve months of the balance sheet date. Historically the Group has been able to collect substantially all amounts due under the contract terms without making any concessions on payments.

*(m) Cost of revenues*

Cost of revenues consists primarily of operating lease costs associated with the placement of flat panel display equipment, business tax and surcharges, depreciation of flat panel display equipment and personnel and other related expenses that are directly attributable to the rendering of advertising services.

The Group's advertising revenues are subject to a 5% business tax on revenues generated from services in the PRC. In addition, advertising revenues are subject to a cultural and education development fee at 4% of revenue earned and various other surcharges at 5% of the business tax levied.

*(n) Operating leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the respective lease terms.

*(o) Advertising costs*

The Group expenses its advertising and promotion costs as incurred. Total advertising and promotion costs were RMB 333 and RMB 497 for the years ended December 31, 2004 and 2005, respectively, and were included in sales and marketing expenses.

*(p) Income taxes*

Deferred income taxes are provided using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforward. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided to reduce the carrying amount of deferred tax assets if it is considered more likely than not that some portion, or all, of the deferred tax assets will not be realized.

*(q) Share–based compensation*

The Company has adopted SFAS No. 123R, *"Share–based Payment"*, which requires that share–based payment transactions with employees, such as share options, be measured based on the grant–date fair value of the equity instrument issued and recognized as compensation expense over the requisite service period, with a corresponding addition to paid–in capital. Under this method, compensation cost related to employee share options or similar equity instruments is measured at the grant date based on the fair value of the award and is recognized over the period during which an employee is required to provide service in exchange for the award, which generally is the vesting period.

The Company accounts for equity instruments issued to non–employee vendors in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 96–18, *"Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* All transactions in which goods or services are received in exchange for equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date of the fair value of the equity instrument issued is the date on which the counterparty's performance is completed. For the periods presented, the Company did not issue any equity instruments to non–employee vendors.

*(r) Employee benefit plans*

As stipulated by the regulations of the PRC, the Company's subsidiary and consolidated VIE and its acquired companies participate in various defined contribution plans organized by municipal and provincial governments for their employees. These companies are required to make contributions to these plans at rates ranging from 9% to 24% of the salaries, bonuses and certain allowances of employees. The Group has no other material obligation for the payment of employee benefits associated with these plans beyond the annual contributions described above. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date. Employee benefits associated with these plans are expensed when incurred. During the years ended December 31, 2004 and 2005, the Group made contributions of RMB 903 and RMB 3,221, respectively.

*(s) Segment reporting*

The Company uses the management approach in determining operating segments. The management approach considers the internal organization and reporting used by the Company's chief operating decision maker for making operating decisions, allocating resources and assessing performance. Based on this assessment, the Company has determined that it has only one operating segment which is the rendering of flat panel display advertising services in the PRC.

*(t) Comprehensive income*

Comprehensive income is defined as the change in equity during a period from transactions and other events and circumstances except for transactions resulting from investments by shareholders and distributions to shareholders. The Company has no comprehensive income other than net income for the years ended December 31, 2004 and 2005.

F–93

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(3)  Time Deposits**

As of December 31, 2005, time deposits amounting to RMB 19,789 have been pledged as security for bank guarantees in respect of RMB 43,620 of bills payable issued by the Company to equipment vendors.

**(4)  Accounts Receivable, Net**

Accounts receivable, net is analyzed as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 RMB | 2005 RMB |
| Billed receivables | 20,496 | 96,185 |
| Unbilled receivables | 25,349 | 27,578 |
|  | 45,845 | 123,763 |
| Less: allowance for doubtful accounts | (340) | (340) |
|  | 45,505 | 123,423 |

The activities in the allowance for doubtful accounts for accounts receivable for the years ended December 31, 2004 and 2005, were as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 RMB | 2005 RMB |
| Beginning allowance for doubtful accounts | — | 340 |
| Additions charged to bad debt expense | 340 | — |
| Ending allowance for doubtful accounts | 340 | 340 |

**(5)  Prepaid Expenses and Other Current Assets**

Components of prepaid expenses and other current assets are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 RMB | 2005 RMB |
| Prepaid lease rental expenses | 4,710 | 24,996 |
| Advances to employees | 470 | 2,033 |
| Tax receivable | 655 | — |
| Initial investment deposits | — | 16,945 |
| Deferred share offering expenses | — | 30,773 |
| Other receivables and deposits | 134 | 1,624 |
|  | 5,969 | 76,371 |

On September 30, 2005, the Company entered into a Memorandum of Understanding ("MOU") with Tulip Media (International) Limited, or Tulip International, and its shareholders to acquire all of the outstanding equity interest of Tulip International and its group companies ("the Tulip Group"). The Tulip Group provides outdoor advertising services primarily through outdoor light emitting diodes, or LED, advertising displays, neon light

F–94

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

displays and traditional billboard displays that are located mostly in Shanghai. As of December 31, 2005, a refundable initial cash deposit of US$2,000 (equivalent to RMB 16,145) was paid to Tulip Group that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of the Tulip Group pursuant to the current MOU.

On January 1, 2006, STM signed a definitive agreement to acquire 20% equity interest in Shanghai Xinna Media Co., Ltd. ("Xinna") for a total cash consideration of RMB 7,500. As of December 31, 2005, a refundable initial cash deposit of RMB 800 was paid to Xinna's shareholders that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of Xinna pursuant to the current definitive agreement.

Deferred share offering expenses represent specific incremental direct costs of the initial public offering ("IPO") of the Company's common shares that will be charged against the gross proceeds of the offering or to the statement of operations in the period in which the offering is aborted. On January 7, 2006, upon signing of the definitive agreement with Focus Media (see note 1), the Company temporarily postponed its IPO process pending the outcome of acquisition discussions with Focus Media. Should the acquisition by Focus Media be consummated, the IPO will be aborted and the deferred share offering expenses will be charged to the statement of operations in that period.

**(6) Property, Equipment and Software, Net**

Property, equipment and software, net consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
|  | **RMB** | **RMB** |
| Flat panel display equipment | 36,826 | 182,075 |
| Computers and office equipment | 1,722 | 6,114 |
| Leasehold improvements | 709 | 4,198 |
| Motor vehicles | 860 | 2,003 |
| Software | 250 | 2,533 |
|  | 40,367 | 196,923 |
| Less: Accumulated depreciation and amortization | (4,781) | (23,102) |
|  | 35,586 | 173,821 |

Long–term prepayments in the accompanying consolidated balance sheet represent deposits on flat panel display equipment that will be reclassified to property, equipment and software upon the transfer of title and risks and rewards of ownership to the Company from the equipment suppliers.

**(7) Acquisitions of Business and Assets**

In October 2005, STM acquired 70% of the equity interests in Shenyang Target Media Ltd. ("Shenyang TM") for a total cash consideration of RMB 3,150. In addition, in October 2005, STM acquired 100% of the equity interests in Fuzhou Heng Ding United Media Ltd. ("Heng Ding") for a total cash consideration of RMB 1,280. The acquisitions have been accounted for as purchase business combinations with the results of operations included in the Company's consolidated financial statements since the date of acquisition. No supplemental financial information on a pro forma basis as if consummation of the acquisitions, had occurred on January 1, 2004, is provided

F–95

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

since these acquisitions are not considered material to the financial position and results of operations of the Company.

Shenyang TM and Heng Ding are regional providers of flat panel display advertising services in Liaoning province and Fujian province of the PRC. As a result of these acquisitions, the Company has expanded its network coverage and has enhanced its market position in the aforementioned regions in the PRC. The following table summarizes the estimated fair value of the assets acquired and liabilities assumed on the date of acquisition. The final allocation of the purchase price is as follows:

|  | Shenyang TM RMB | Heng Ding RMB | Total RMB |
|---|---|---|---|
| Cash | 500 | 5 | 505 |
| Other current assets | 347 | 37 | 384 |
| Property and equipment | 560 | 173 | 733 |
| Intangible assets | 1,509 | 470 | 1,979 |
| Goodwill | 791 | 822 | 1,613 |
| Total assets acquired | 3,707 | 1,507 | 5,214 |
| Current payables | — | (227) | (227) |
| Deferred tax liability | (377) | — | (377) |
| Minority interests | (180) | — | (180) |
| Total liabilities assumed | (557) | (227) | (784) |
|  | 3,150 | 1,280 | 4,430 |

The goodwill represents the benefits that the acquired enterprises will bring to the Company in the future by providing access to potential strategic partners and customers as a result of expanding its network coverage.

During the year ended December 31, 2005, the Company entered into an agreement with Shandong Fu Er Media Limited ("Fu Er") and acquired all of Fu Er's flat panel display equipment, computers, office equipments and lease contracts for the placement of flat panel displays, for a total cash consideration of RMB 7,280. Total cash consideration of RMB 7,280 was allocated to fixed assets of RMB 1,498 and lease contracts of RMB 5,782, respectively, based on their estimated fair value at the date of acquisition. As of December 31, 2005, STM has paid RMB 3,240 of the purchase price to Fu Er. The remaining balance of RMB 4,040 will be paid in 2006.

During the year ended December 31, 2005, the Company acquired lease contracts for the placement of flat panel displays from Wuhan Hai Ming Broadcasting Advertising Ltd. ("Hai Ming") for a total cash consideration of RMB 1,088.

Intangible assets representing the market rate adjustment of acquired lease contracts for the placement of the flat panel displays is as follows:

|  | December 31, 2005 | |
|---|---|---|
|  | RMB | Amortization period |
| Flat panel display lease | 8,849 | 2–5 yrs |
| Less: Accumulated amortization | (867) |  |
|  | 7,982 |  |

F–96

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Aggregate amortization expense of intangible assets was RMB 867 for the year ended December 31, 2005. Estimated amortization expense for future years is as follows: RMB 2,918 in 2006, RMB 2,457 in 2007, RMB 2,049 in 2008, RMB 221 in 2009, RMB 161 in 2010 and RMB 176 in the years thereafter.

In addition, see note 5 for the potential acquisitions of the Tulip Group and equity investment in Xinna.

**(8) Accrued Expenses and Other Payables**

Components of accrued expenses and other payables are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Accrued payroll and welfare | 3,881 | 14,130 |
| Accrued expenses | 1,764 | 36,210 |
| Business tax and surcharges payable | 2,264 | 14,269 |
| Receipts in advance | 143 | 5,339 |
|  | 8,052 | 69,948 |

**(9) Share–Based Compensation**

Upon the approval by the Board of Directors, the Company grants share options to its executives and employees to reward for services.

During the year ended December 31, 2004, 12,495,344 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.36 to US$0.45 with a contractual term of ten years and vesting period of four years.

During the year ended December 31, 2005, 8,009,077 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.50 to US$0.80 with a vesting period of four years.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

The fair value of each option award is estimated on the date of grant using a lattice–based option valuation model that uses the assumptions and exercise price of the options noted in the following table. Because the Company does not maintain an internal market for its shares, the expected volatility was based on the historical volatilities of comparable publicly traded advertising companies operating in the PRC and in the United States. The Company uses historical data to estimate employee termination within the valuation model. The expected life of options granted is derived from the output of the option valuation model and represents the period of time that options granted are expected to be outstanding. The employees that were granted the share options are expected to exhibit the same behavior. Since the share options once exercised will primarily trade in the U.S. capital market and there was no comparable PRC zero coupon rate, the risk–free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

| | 2004 | |
| --- | --- | --- |
| | **August** | **December** |
| Expected volatility | 45% | 45% |
| Expected dividends | 0% | 0% |
| Expected life | 5 years | 5 years |
| Risk–free interest rate | 3.36% | 3.71% |
| Exercise price | US$0.36 | US$0.45 |
| Estimated fair value of underlying common shares | US$0.36 | US$0.48 |

| | 2005 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **April** | **May** | **August** | **November** | **December** |
| Expected volatility | 45% | 45% | 45% | 45% | 45% |
| Expected dividends | 0% | 0% | 0% | 0% | 0% |
| Expected life | 5 years | 5 years | 5 years | 5 years | 5 years |
| Risk–free interest rate | 3.85% | 3.77% | 4.26% | 4.54% | 4.47% |
| Exercise price | US$0.50 | US$0.55 | US$0.68 | US$0.80 | US$0.80 |
| Estimated fair value of underlying common shares | US$0.66 | US$0.66 | US$0.68 | US$1.65 | US$1.65 |

The estimated fair value of the underlying common shares on the date of grant was determined based on management valuation of the Company's common shares which considered the cash issuance prices for the Series A and Series B redeemable convertible preferred shares paid by groups of unrelated investors (see note 12), the purchase price of the company's equity interests to be paid by an unrelated party (see note 1), the proximity of such transactions to the date of the share option grant and the forecasted profitability and cash flows of the Company. The weighted–average grant–date fair value of options granted during 2004 and 2005 was US$0.13 and US$0.58 per share, respectively. The Company recorded non–cash share–based compensation expense of RMB 1,861 and RMB 6,781 for the years ended December 31, 2004 and 2005, respectively in respect of share options granted in 2004 and 2005, of which RMB 193 and RMB 839 was allocated to costs of revenues, RMB 1,668 and RMB 4,615 was allocated to general and administrative expenses, and nil and RMB 1,327 was allocated to sales and marketing expenses, respectively.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

A summary of option activities during 2004 and 2005 is presented below:

| | Number of Shares | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Outstanding as of January 1, 2004 | — | | — | | |
| Granted | 12,495,344 | US$ | 0.37 | | |
| Exercised | — | | — | | |
| Forfeited or expired | (399,800) | US$ | 0.37 | | |
| Outstanding as of December 31, 2004 | 12,095,544 | US$ | 0.37 | 9.7 years | RMB 11,296 |
| Granted | 8,009,077 | US$ | 0.73 | | |
| Exercised | — | | — | | |
| Forfeited or expired | (708,852) | US$ | 0.51 | | |
| Outstanding as of December 31, 2005 | 19,395,769 | US$ | 0.52 | 9.1 years | RMB 42,857 |
| Exercisable as of December 31, 2005 | 4,438,645 | US$ | 0.52 | 9.1 years | |

The following is additional information relating to options outstanding as of December 31, 2005:

| Options outstanding as of December 31, 2005 | | | | Options exercisable as of December 31, 2005 | | | |
|---|---|---|---|---|---|---|---|
| Number of Shares | Exercise Price Per Share | | Remaining Contractual Life | Number of Shares | Exercise Price Per Share | | Remaining Contractual Life |
| 10,587,840 | US$ | 0.36 | 8.7 | 3,256,312 | US$ | 0.36 | 8.7 |
| 1,507,704 | US$ | 0.45 | 9.0 | 452,311 | US$ | 0.45 | 9.0 |
| 100,000 | US$ | 0.55 | 9.5 | 10,000 | US$ | 0.55 | 9.5 |
| 963,873 | US$ | 0.68 | 9.6 | 96,387 | US$ | 0.68 | 9.6 |
| 1,650,000 | US$ | 0.68 | 9.6 | 165,000 | US$ | 0.68 | 9.6 |
| 777,500 | US$ | 0.80 | 9.9 | 77,750 | US$ | 0.80 | 9.9 |
| 3,808,852 | US$ | 0.80 | 10.0 | 380,885 | US$ | 0.80 | 10.0 |
| 19,395,769 | | | 9.1 | 4,438,645 | | | 9.1 |

As of December 31, 2005, there was RMB 42,617 of total unrecognized compensation cost related to nonvested share options. This cost is expected to be recognized over the next four years. The Company is expected to issue new shares to satisfy share option exercises.

**(10) Income Taxes**

The Company, its subsidiary and consolidated VIE file separate income tax returns.

*Cayman Islands*  Under the current laws of the Cayman Islands, the Company is not subject to tax on its income or capital gains. In addition, upon any payment of dividends by the Company, no Cayman Islands withholding tax is imposed.

*Peoples' Republic of China*  TMM is governed by the income tax law of the PRC concerning foreign investment and foreign enterprises (the "Income Tax Law"). Under the Income Tax Law, foreign enterprises satisfying certain criteria can enjoy preferential tax treatment. Since TMM has obtained the status of a software enterprise, and is registered and operating in the Shanghai Zhangjiang High Technology Park, it has been granted a

F–99

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

reduced income tax rate of 15% and a "tax holiday" for exemption from foreign enterprise income tax for 2 years starting from the calendar year of 2005 and is entitled to a 50% tax reduction for the succeeding 3 years beginning from 2007. In addition, TMM is entitled to exemption from local income tax.

STM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2004. Upon the expiration of the tax holiday, STM will be subject to the PRC enterprise income tax rate of 33%.

Shenyang TM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2005. Upon the expiration of the tax holiday, Shenyang TM will be subject to the PRC enterprise income tax rate of 33%. Heng Ding is subject to the PRC enterprise income tax rate of 33%.

Income tax expense attributable to income from operations, which substantially is derived from PRC sources, consists of:

|  | 2004 RMB | 2005 RMB |
|---|---|---|
| Current | 442 | — |
| Deferred | (112) | — |
|  | 330 | — |

Income tax expense attributable to income from operations was RMB 330 and nil for the years ended December 31, 2004 and 2005, respectively, and differed from the amounts computed by applying the statutory PRC enterprise income tax rate of 33% to pre−tax income from operations as a result of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 RMB | 2005 RMB |
| Computed expected tax expense | 8,615 | 18,157 |
| Increase (reduction) in income taxes resulting from: | | |
| Tax rate differential | 92 | 4,238 |
| Tax holiday | (8,382) | (22,452) |
| Non−deductible items | 5 | 57 |
|  | 330 | — |

F−100

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
|  | **RMB** | **RMB** |
| Deferred tax assets: | | |
| Allowance for doubtful accounts | 112 | 112 |
| Less: valuation allowance | — | — |
| Net deferred tax assets | 112 | 112 |
| Deferred tax liabilities: | | |
| Intangible assets acquired in a business combination | — | (377) |
| Total deferred liabilities | — | (377) |
| Net deferred tax asset/(liability) | 112 | (265) |

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible or utilized. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon an assessment of the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax assets are deductible or can be utilized, no valuation allowance has been provided as of December 31, 2004 and 2005. The deferred tax assets of RMB 112 as of December 31, 2004 and 2005, represent the tax benefits of deductible temporary differences which are more likely than not to be realized in a non tax holiday year. The amount of the deferred tax assets considered realizable, however, could be reduced in the near term if estimates of future taxable income are reduced.

The PRC tax system is subject to substantial uncertainties and has been subject to recently enacted changes, the interpretation and enforcement of which are also uncertain. There can be no assurance that changes in PRC tax laws or their interpretation or their application will not subject the Group's PRC entities to substantial PRC taxes in the future.

**(11) Commitments and Contingencies**

The Group has entered into operating lease agreements relating to the placement of flat panel display equipment.

The Group has also entered into operating lease arrangements in connection with the lease of the Group's office premises.

F–101

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Future minimum lease payments under non–cancelable operating leases (with initial or remaining lease terms in excess of one year) as of December 31, 2005 are as follows:

|  | Flat Panel Display Equipment RMB | Office Premises RMB |
|---|---|---|
| 2006 | 111,467 | 6,527 |
| 2007 | 87,074 | 3,978 |
| 2008 | 53,161 | 2,177 |
| 2009 | 32,950 | — |
| 2010 | 12,321 | — |
| Thereafter | 18,272 | — |
|  | 315,245 | 12,682 |

Rental expenses incurred under operating leases for placement of flat panel display equipment for the years ended December 31, 2004 and 2005, amounted to RMB 15,210 and RMB 72,942, respectively. Rental expenses incurred under operating leases for office premises for the years ended December 31, 2004 and 2005 amounted to RMB 1,685 and RMB 6,532, respectively.

**(12) Redeemable Convertible Preferred Shares**

*(a) Issuance of Series A redeemable convertible preferred shares*

In August 2004, the Company issued 41,641,679 Series A redeemable convertible preferred shares ("Series A Shares") to a group of investors at US$0.360216 per share (the "Series A issue price") for total cash consideration of US$15,000 (RMB 124,148 ). The holders of Series A Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of Series A Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series A Shares at a redemption price equal to 100% of the Series A issue price, plus an additional amount equal to 20% of the Series A issue price compounded annually from the date of issuance to the date of redemption plus all declared but unpaid dividends (the "Series A Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 8,663 and RMB 26,534 for the years ended December 31, 2004 and 2005, respectively. Total direct external incremental costs of issuing the security of RMB 1,833 was charged against the proceeds of the Series A Shares.

The significant terms of the Series A Shares are as follows:

*Conversion*

The holders of Series A Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series A Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public offering price of at least four times the Series A issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

F–102

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Each Series A Share is convertible into one common share, subject to a conversion ratio adjustment equal to US$6,900 divided by the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005 (the "Series A Performance Multiplier"). The Series A Performance Multiplier shall be limited to a maximum of 1.6 common shares (that is, one Series A Share converted into 1.6 common shares or 66,626,686 common shares, on a fully converted basis) and a minimum of 0.727273 common shares (that is, one Series A Share converted into 0.727273 common shares or 30,284,869 common shares, on a fully converted basis) and shall be automatically set at 1.6 in the event that the audited US GAAP consolidated net income of the Group for the period from July 1, 2004 to June 30, 2005, is not made available to the holders of Series A Shares before November 15, 2005, for the purpose of determining the Series A Performance Multiplier.

The conversion price of Series A Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series A Share Subscription Agreement at a price per share less than the then prevailing Series A Shares' respective conversion price ("Additional Common Shares"), the Series A Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Common Shares are issued (the "Series A Dilution Adjustment"). Common shares specifically excluded from this provision include common shares issued or issuable upon conversion of Series A Shares, up to 15,274,168 common shares which are issuable or issued under the Company's equity incentive plan, common shares issued in an underwritten public offering, common shares issued in a bona fide acquisition or merger transaction, and common shares issued to third party providers in exchange for services rendered to the Company. The impact of such potential adjustment to the conversion price is contingent upon the issuance of Additional Common Shares at an issuance price less than the conversion price of Series A Shares. No issuance of Additional Common Shares was made during the years ended December 31, 2004 and 2005 which caused the conversion price of Series A Shares to be reduced under this adjustment provision.

The Company has determined that at the date of issuance of the Series A Shares there was no embedded beneficial conversion feature attributable to the Series A Shares, since the initial conversion price of the Series A Shares is equal to the Series A issue price, which was negotiated and agreed between the Company and a group of third party investors on an arm's length basis and, which was determined by management to approximate the fair value of the Company's common shares at the commitment date since there was no existence of a public or active market of the Company's common shares, nor were there any cash transactions involving the Company's common shares that occurred prior to this date. In addition, under the provisions of EITF Issue No. 00–27 *"Application of Issue No. 98–5 to Certain Convertible Instrument"*, the Company has determined that the contingent beneficial conversion feature relating to the conversion ratio adjustment in respect of the Series A Performance Multiplier will be recognized only when the Performance Multiplier is determined and the contingency is resolved and with respect of the Series A Dilution Adjustment, upon the issuance of Additional Common Shares.

Based on the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005, the Company has calculated the Series A Performance Multiplier to be 1.196365 which resulted in a conversion ratio of 1.000000 to 1.196365 for Series A Shares. Accordingly, on a fully–converted basis, the Series A Shares will be converted to 49,818,647 common shares under the conversion terms of the Series A Shares. The intrinsic value of the contingent beneficial conversion feature of the Series A Shares of RMB 24,378 was recognized as an addition to paid–in capital with a corresponding charge to net income available to common shareholders on June 30, 2005, the date the contingency period ended and the contingency was resolved. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series A Shares.

F–103

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

In January 2006, the Company entered into an agreement with the Series A shareholders whereby each of the Series A shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series A shares to 1.00000 to 1.05767 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series A Shares. The impact of the adjustment on the Series A conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series A shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series A Share has voting rights equivalent to the number of common shares into which it is convertible.

*Registration rights*

Holders of Series A Shares have registration rights similar to the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggyback registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series A Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate prior to any dividend payments to common shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series A Shares shall receive an amount per share equal to the Series A Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

*(b) Issuance of Series B redeemable convertible preferred shares*

On July 29, 2005, the Company issued 21,820,243 Series B redeemable convertible preferred shares ("Series B Shares") to a group of investors at US$0.687435 per share (the "Series B issue price") for total cash consideration of

F–104

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

US$15,000 (RMB 121,620). The holders of Series B Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of the Series B Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series B Shares at a redemption price equal to 100% of the Series B issue price, plus an additional amount equal to 15% of the Series B issue price, compounded annually from the date of issuance to the date of redemption, plus all declared but unpaid dividends (the "Series B Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 7,747 for the year ended December 31, 2005. Total direct external incremental costs of issuing the security of RMB 839 were charged against the proceeds of the Series B Shares.

The significant terms of the Series B Shares are as follows:

*Conversion*

The holders of Series B Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series B Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below, upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public offering price of at least two times the Series B issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

Each Series B Share is convertible into one common share, where the conversion price is equal to the Series B issue price, except in the event that the initial conversion ratio for the Series A Shares is adjusted for the Series A Performance Multiplier as described in note 12(a), the conversion price for Series B Shares shall immediately be adjusted by multiplying the Series B conversion price then in effect by a fraction, the numerator of which shall be 152,741,679, and the denominator of which shall be the sum of (i) the number of outstanding common shares, and (ii) the number of outstanding Series A Shares multiplied by the Series A Performance Multiplier (the "Series B Performance Multiplier").

The conversion price of Series B Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series B Share Subscription Agreement at a price per share less than the then prevailing Series B Shares' respective conversion price ("Additional Series B Common Shares"), the Series B Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Series B Common Shares are issued ("Series B Dilution Adjustment"). The impact of the Series B Dilution Adjustment to the conversion price is contingent upon the issuance of Additional Series B Common Shares at an issuance price less than the conversion price of Series B Shares. No issuance of Additional Series B Common Shares was made during the year ended December 31, 2005 which caused the conversion price of Series B Shares to be reduced under this adjustment provision.

As a result of the initial conversion ratio for the Series A Shares being adjusted for the Series A Performance Multiplier described in note 12(a), the Company has calculated the Series B Performance Multiplier to be 0.949186 which resulted in a conversion ratio of 1.000000 to 1.053535 for Series B Shares. Accordingly, on a fully–converted basis, the Series B Shares will be converted into 22,988,390 common shares under the conversion terms of the Series B Shares. The intrinsic value of the contingent beneficial conversion feature of the Series B Shares of RMB 6,508 was recognized as an addition to paid–in capital with a corresponding charge to net income available to

F–105

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

common shareholders on July 29, 2005, the date of the issuance of the Series B Shares. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series B Shares.

In January 2006, the Company entered into an agreement with the Series B shareholders whereby each of the Series B shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, as discussed in note 12 (a), in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series B shares to 1.00000 to 1.01572 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series B Shares. The impact of the adjustment on the Series B conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series B shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series B Share has voting rights equivalent to the number of common shares into which it is convertible.

*Registration rights*

Holders of Series B Shares have registration rights similar to the holders of Series A Shares and the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggy back registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series B Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate, prior to any dividend payments to common shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series B Shares shall receive an amount per share equal to the Series B Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

F–106

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(13) Common Shares**

The Company's Memorandum and Articles of Association, as amended, authorizes the Company to issue 210,000,000 shares with a par value of US$0.0001 per share. In August 2004, the Company issued 111,100,000 common shares at par value in connection with the Reorganization as discussed in note 1. During the years ended December 31, 2004 and 2005, no additional common shares were issued by the Company.

**(14) Concentration of Risks**

*Credit and concentration risks*  The carrying amounts of cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties and other receivables represent the Group's maximum exposure to credit risk in relation to financial assets. As of December 31, 2004 and 2005, substantially all of the Group's cash and cash equivalents were held in major financial institutions located in the PRC and the Hong Kong Special Administrative Region, which management believes have high credit ratings. Accounts receivable are typically unsecured and denominated in RMB, and are derived from revenues generated in the PRC. The Group performs ongoing credit evaluations of its customers' financial condition and, generally, requires no collateral from its customers.

All of the Group's customers are located in the PRC. The following are the customers that directly or indirectly contributed, on an individual basis, 10% or more of revenue for the year ended December 31, 2004 or for the year ended December 31, 2005:

| | 2004 | | 2005 | |
|---|---|---|---|---|
| | RMB | % | RMB | % |
| SAIC–Volkswagen Sales Co., Ltd. | 19,978 | 25% | 30,006 | 11% |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 9,567 | 12% | 19,767 | 7% |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 12% | 14,187 | 5% |

As of December 31, 2004 and 2005, approximately 56% and 15% of the Group's gross accounts receivable were due from the above customers.

The accounts receivable due from major customers, as of December 31, 2004 and 2005, were as follows:

| | 2004 | 2005 |
|---|---|---|
| | RMB | RMB |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 15,926 |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 8,567 | 2,946 |
| SAIC–Volkswagen Sales Co., Ltd. | 7,276 | — |
| | 25,789 | 18,872 |

As of January 31, 2006, the Group received subsequent collections of approximately RMB 4,000 from the above customers with respect to outstanding accounts receivable as of December 31, 2005. The Group expects to collect all the remaining outstanding balances from these customers in accordance with the contract terms.

The Group does not have concentrations of available sources of labor, services, franchises, or other rights that could, if suddenly eliminated, severely impact its operations.

*Business and economic risks*  The Group operates in a dynamic industry with limited operating history and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: advances and new trends in new technologies and industry standards; competition from other competitors; changes in certain strategic relationships or customer relationships;

F–107

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

regulatory or other factors; the ability to obtain necessary financial and other resources at commercially viable terms; dependence on revenues generated from operations in the cities of Shanghai, Beijing, Guangzhou and Shenzhen; the ability to attract and retain employees necessary to support the Group's growth and general risks associated with the advertising industry.

The Group conducts its principal operations in the PRC and, accordingly, is subject to special considerations and significant risks not typically associated with companies operating in the United States and Western Europe. These include risks associated with, among others, the political, economic, legal environment and social uncertainties in the PRC, government agencies' influence over certain aspects of the Group's operations and competition in the advertising industry.

The Group is currently targeting the PRC market. The Chinese government regulates the provision of advertising services through strict business licensing requirements and other governmental regulations. These regulations include limiting foreign ownership in Chinese companies providing advertising services. Management, after consultation and advice from PRC legal counsel, is of the opinion that the Company's business structure and contractual agreements with STM comply with existing PRC laws and regulations. However, there are uncertainties regarding the interpretation and application of current PRC laws and regulations and any change in such laws and regulations that renders these business structure and contractual agreements to be non–compliant could have an adverse effect on the Group's business, financial position and result of operations.

In addition, the ability to negotiate and implement specific business development projects in a timely and favorable manner may be impacted by political considerations unrelated to or beyond the control of the Group. Although the PRC government has been pursuing economic reform policies for the past two decades, no assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered. There is also no guarantee that the PRC government's pursuit of economic reforms will be consistent or effective and as a result, changes in the rate or method of taxation, and changes in State policies and regulations affecting the advertising industry may have a negative impact on the Group's operating results and financial position.

*Currency risk*  Substantially all of the revenue generating operations of the Group are transacted in RMB, which is not fully convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted by the People's Bank of China. However, the unification of the exchange rate does not imply convertibility of RMB into United States dollars or other foreign currencies. All foreign exchange transactions must take place either through the People's Bank of China or other institutions authorized to buy and sell foreign exchange or at a swap center. Approval of foreign currency payments by the People's Bank of China or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

On July 21, 2005, the People's Bank of China announced that the PRC government reformed the exchange rate regime by adopting a managed floating exchange rate regime based on market supply and demand with reference to a basket of currencies. The exchange rate of United States dollars against RMB was adjusted to RMB 8.11 per United States dollar with effect from July 21, 2005. This reform did not have a material impact on the Group's financial position or results of operations.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(15) Related Party Transactions**

The principal related party transactions during the years ended December 31, 2004 and 2005 were as follows:

| | Note | 2004 RMB | 2005 RMB |
|---|---|---|---|
| Provision of advertising services | (a) | 1,511 | — |
| Collection of advertising revenues on behalf of STM | (b) | 4,173 | 2,349 |
| Payments made by a related party on STM's behalf | (b) | 1,073 | 5,399 |
| Loan from a shareholder | (c) | 31,655 | 30,000 |
| Repayment of shareholder loan | (c) | 21,655 | 10,000 |
| Interest expense | (c) | 348 | 79 |
| Lease of office premises | (d) | 540 | 810 |

Amounts due from and due to related parties as of December 31, 2004 and 2005 were as follows:

| | Note | 2004 RMB | 2005 RMB |
|---|---|---|---|
| **Due from related parties:** | | | |
| Huashan Dian Yang Hospital Service Co., Ltd. ("HS DY") | (a) | 1,511 | — |
| Dian Yang | (b) | 3,100 | 50 |
| The Company's Chief Executive Officer ("CEO") | (d) | — | 66 |
| | | 4,611 | 116 |
| **Due to related parties:** | | | |
| Shanghai Investment Information Co., Ltd. ("SII") | (c) | 10,000 | 30,000 |
| The Company's CEO | (d) | 33 | — |
| | | 10,033 | 30,000 |

Notes:

(a)    During 2004, the Group provided advertising services to HS DY, a company in which the Company's CEO has an equity interest. As of December 31, 2004, the balance due from HS DY was RMB 1,511, which was collected in full in August 2005. The Company has not provided any advertising services to HS DY since then.

(b)    Dian Yang, an entity controlled by the Company's CEO and also a 9% shareholder of STM, makes lease payments and collects advertising revenues on STM's behalf until certain unassignable contracts expire. The unassignable contracts associated with advertising contracts have expired at the end of 2005, and the unassignable contracts associated with display placements will expire by the end of 2008, except for three contracts which will expire in 2009, 2010 and 2011 respectively. The balance as of December 31, 2004 and December 31, 2005, represented the amount of revenue collected by Dian Yang on behalf of STM, less payments made by STM on behalf of Dian Yang. The balance is interest free and is settled continuously and periodically.

(c)    SII is a shareholder of the Company and of STM. SII provided a short–term loan of RMB 30,000 to STM in 2004, of which RMB 20,000 was repaid in November 2004 and RMB 10,000 was repaid in January 2005. The balance bore interest at a monthly rate of 0.39825%. The interest expense incurred by STM on this loan was RMB 348 for the year ended December 31, 2004 and RMB 40 for the year ended December 31, 2005.

In August 2004, SII International Holding Limited, a company wholly–owned by SII, provided a short–term loan of US$200 (equivalent to RMB 1,655) to the Company at a monthly interest rate of 0.02%. The loan was repaid in full in September 2004.

F–109

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

In December 2005, SII provided a short–term loan of RMB 30,000 to STM. The loan bears interest at a monthly rate of 0.3915%. The interest expense incurred by STM on this loan was RMB 39 for the year ended December 31, 2005. This loan is due for full repayment in June 2006.

(d)   The Group leased office premises from the Company's CEO. Rental expense of RMB 540 and RMB 810, which was determined with reference to market price, was charged for the years ended December 31, 2004 and 2005, respectively. The lease agreement with the Company's CEO will expire in 2006. As of December 31, 2005, the amount due from the CEO of RMB 66 related to miscellaneous expense paid by STM on behalf of the CEO.

F–110

Table of Contents

**INFOACHIEVE LIMITED**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

| | Page(s) |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–112 |
| Consolidated balance sheets as of December 31, 2004 and 2005 | F–113 |
| Consolidated statements of operations for the years ended December 31, 2004 and 2005 | F–114 |
| Consolidated statements of shareholders' equity and other comprehensive income (loss) for the years ended December 31, 2004 and 2005 | F–115 |
| Consolidated statements of cash flows for the years ended December 31, 2004 and 2005 | F–116 |
| Notes to consolidated financial statements | F–118 |

F–111

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND
SHAREHOLDERS OF INFOACHIEVE LIMITED

We have audited the accompanying consolidated balance sheets of Infoachieve Limited and its subsidiaries (the "Group") as of December 31, 2004 and 2005 and the related consolidated statements of operations, shareholders' equity and comprehensive loss, and cash flows for the years ended December 31, 2004 and 2005. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2004 and 2005 and the results of its operations and its cash flows for the above stated periods in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.
Beijing, China
May 8, 2006

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED BALANCE SHEETS**

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
|  | **(In U.S. dollars, except share data)** | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  228,909 | $  1,355,010 |
| Accounts receivable, net of allowance for doubtful accounts of $Nil and $3,994 in 2004 and 2005 | 1,293,569 | 3,728,200 |
| Inventories | 6,572 | 791 |
| Prepaid expenses and other current assets | 367,635 | 733,110 |
| Amounts due from related parties | 501,819 | — |
| Total current assets | 2,398,504 | 5,817,111 |
| Equipment, net | 1,031,010 | 1,013,871 |
| Acquired intangible assets, net | — | 764,282 |
| Goodwill | — | 13,936,500 |
| Total assets | $  3,429,514 | $  21,531,764 |
| | | |
| **Liabilities and shareholders' equity** | | |
| Current liabilities: | | |
| Short–term loans from shareholders | $  365,802 | $  3,109,685 |
| Accounts payable | 113,817 | 590,035 |
| Accrued expenses and other current liabilities | 868,129 | 8,057,141 |
| Amounts due to related parties | 1,677,741 | 761,292 |
| Total current liabilities | 3,025,489 | 12,518,153 |
| Commitments (Note 13) | | |
| **Shareholders' equity** | | |
| Ordinary shares ($0.01 par value; 4,620,000 shares authorized in 2004 and 2005, respectively; 40,000 and 1,000,000 issued and outstanding in 2004 and 2005, respectively) | 400 | 10,000 |
| Additional paid–in capital | 543,110 | 27,812,636 |
| Accumulated deficit | (140,669) | (18,739,464) |
| Accumulated other comprehensive income (loss) | 1,184 | (69,561) |
| Total shareholders' equity | $  404,025 | $  9,013,611 |
| Total liabilities and shareholders' equity | $  3,429,514 | $  21,531,764 |

The accompanying notes are an integral part of these consolidated financial statements.

F–113

**Table of Contents**

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the years ended December 31, | |
|---|---|---|
| | **2004** | **2005** |
| | **(In U.S. dollars, except share data)** | |
| Revenues: | | |
|    Advertising service revenue | $ 4,323,551 | $ 11,828,519 |
| Cost of revenues: | | |
|    Advertising service cost | 3,336,840 | 7,233,043 |
| Gross profit | 986,711 | 4,595,476 |
| Operating expenses: | | |
|    General and administrative (including share–based compensation of nil and $1,395,100 for 2004 and 2005, respectively) | 543,351 | 5,428,018 |
|    Selling and marketing | 821,518 | 3,363,704 |
| Total operating expenses | 1,364,869 | 8,791,722 |
| Loss from operations | (378,158) | (4,196,246) |
|    Interest income | 1,691 | 2,012 |
|    Interest expense | (254,962) | (172,569) |
|    Other income (expense), net | 36,820 | (3,857) |
| Loss before income taxes | (594,609) | (4,370,660) |
| Income taxes | 3,880 | 1,941 |
| Total income taxes | 3,880 | 1,941 |
| Net loss | (598,489) | (4,372,601) |
| Deemed dividend on ordinary shares | — | (15,187,200) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | (1,136,700) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | (378,985) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | (623,700) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | (207,820) |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Loss per share–basic and diluted | $ (35.10) | $ (27.10) |
| Shares used in calculating basic and diluted loss per share | 17,049 | 808,302 |

The accompany notes are an integral part of these consolidated financial statements.

F–114

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
AND OTHER COMPREHENSIVE INCOME (LOSS)**

| | Ordinary Shares | Amount | Additional paid–in capital | Retained earnings (Accumulated deficit) | Accumulated other comprehensive income (loss) | Total shareholders' equity | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|
| | | | (In U.S. dollars, except share data) | | | | |
| **Balance at January 1, 2004** | — | $ — | $ 477,950 | $ 457,820 | $ 31 | $ 935,801 | $ 61,134 |
| Issuance of ordinary shares to incorporate Infoachieve | 40,000 | 400 | — | — | — | 400 | |
| Incorporation of Wuhan Framedia | — | — | 65,160 | — | — | 65,160 | |
| Cumulative translation adjustment | — | — | — | — | 1,153 | 1,153 | 1,153 |
| Net loss | — | — | — | (598,489) | — | (598,489) | (598,489) |
| **Balance at December 31, 2004** | 40,000 | $ 400 | $ 543,110 | $ (140,669) | 1,184 | $ 404,025 | $ (597,336) |
| Issuance of ordinary shares | 960,000 | 9,600 | 15,187,200 | (15,187,200) | — | 9,600 | |
| Reclassification of ordinary shares to Series A–1 convertible redeemable preference shares | (270,000) | (2,700) | — | — | — | (2,700) | — |
| Reclassification of ordinary shares to Series A–2 convertible redeemable preference shares | (110,000) | (1,100) | — | — | — | (1,100) | |
| Issuance of ordinary shares for acquisitions | 614,200 | 6,142 | 8,878,966 | — | — | 8,885,108 | |
| Liquidation of entities under common control | — | — | (545,087) | 3,308,211 | — | 2,763,124 | |
| Issuance of ordinary shares to Chief Executive Officer | 40,000 | 400 | 1,394,700 | — | — | 1,395,100 | — |
| Deemed dividend on Series A–1 convertible redeemable preference shares | — | — | — | (1,515,685) | — | (1,515,685) | |
| Deemed dividend on Series A–2 convertible Redeemable preference shares | — | — | — | (831,520) | — | (831,520) | |
| Conversion of Series A–1 convertible redeemable preference shares to ordinary shares | 270,000 | 2,700 | 1,515,685 | — | — | 1,518,385 | — |
| Conversion of Series A–2 convertible redeemable preference shares to ordinary shares | 110,000 | 1,100 | 831,520 | — | — | 832,620 | — |
| Cancellation of ordinary shares | (654,200) | (6,542) | 6,542 | — | — | — | |
| Cumulative translation adjustment | — | — | — | — | (70,745) | (70,745) | (70,745) |
| Net loss | — | — | — | (4,370,601) | — | (4,370,601) | (4,370,601) |
| **Balance at December 31, 2005** | 1,000,000 | $ 10,000 | $ 27,812,636 | $ (18,739,464) | $ (69,561) | $ 9,013,611 | $ (4,441,346) |

F–115

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| | (In U.S. dollars) | |
| Operating activities: | | |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Deemed dividend on ordinary shares | — | 15,187,200 |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | 1,136,700 |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | 378,985 |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | 623,700 |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | 207,820 |
| Net loss | (598,489) | (4,372,601) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Share–based compensation expense | — | 1,395,100 |
| Depreciation and amortization | 157,990 | 471,326 |
| Bad debt allowance | — | 3,994 |
| Changes in assets and liabilities, net of effects of acquisitions | | |
| Accounts receivable, net | (568,897) | (2,438,625) |
| Inventories | 35 | 5,152 |
| Prepaid expenses and other current assets | (75,185) | (369,658) |
| Amounts due from related parties | (133,800) | 248,522 |
| Accounts payable | 34,696 | 476,204 |
| Accrued expenses and other current liabilities | 566,431 | 7,099,537 |
| Amounts due to related parties | 738,591 | (916,449) |
| Net cash provided by operating activities | 121,372 | 1,602,501 |
| Investing activities: | | |
| Acquisition of businesses, net of cash acquired of $nil | — | (1,703,972) |
| Purchase of equipment | (636,378) | (561,068) |
| Net cash used in investing activities | $ (636,378) | $ (2,265,040) |
| Financing activities: | | |
| Proceeds from short–term loans from shareholders | $ 365,802 | $ 2,743,883 |
| Repayment of short–term loans from shareholders | (81,892) | |
| Proceeds of amounts due to related parties | 435,681 | 761,292 |
| Repayment of amounts due to related parties | (120,824) | (1,655,390) |
| Proceeds from issuance of ordinary shares | 400 | 9,600 |
| Net cash provided by financing activities | $ 599,167 | $ 1,859,385 |
| Effect of exchange rate changes | $ 1,153 | $ (70,745) |
| Net increase in cash and cash equivalents | 85,314 | 1,126,101 |

F–116

Table of Contents

**INFOACHIEVE LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)**

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2004 | | 2005 |
| | (In U.S. dollars) | | |
| Cash and cash equivalents, beginning of year | | 143,595 | 228,909 |
| Cash and cash equivalents, end of year | $ | 228,909 | $ 1,355,010 |
| Supplemental disclosure of cash flow information | | | |
| Income taxes paid | $ | 3,880 | $ 7,673 |
| Interest paid | $ | — | $ — |
| Supplemental disclosures of non–cash activities: | | | |
| Non–cash investing activities: | | | |
| Acquisition of businesses: | | | |
| Value of ordinary shares issued | $ | — | $ 8,885,108 |
| Cash consideration | | — | 6,209,656 |
| Businesses acquired (including intangibles of $1,036,914, goodwill of $13,936,500, equipment of $121,350) | $ | — | $ 15,094,764 |
| Non–cash financing activities: | | | |
| Reclassification of ordinary shares to Series A–1 convertible redeemable preference shares | $ | — | $ 1,139,400 |
| Reclassification of ordinary shares to Series A–2 convertible redeemable preference shares | $ | — | $ 624,800 |
| Issuance of ordinary shares to shareholders in exchange for services | $ | — | $ 15,187,200 |
| Issuance of ordinary shares to Chief Executive Officer in exchange for services | $ | — | $ 1,395,100 |
| Conversion of Series A–1 convertible redeemable preference shares to ordinary shares | $ | — | $ 1,518,385 |
| Conversion of Series A–2 convertible redeemable preference shares to ordinary shares | $ | — | $ 832,620 |

The accompany notes are an integral part of these consolidated financial statements.

F–117

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**1.  Organization and Principal Activities**

Prior to April 28, 2004, the Group operated through the following entities (collectively "the Combined Entities"):

| Entities under common control | Place of incorporation | Date of incorporation |
|---|---|---|
| Shanghai Framedia Advertisement Co., Ltd. ("Shanghai Framedia") | People's Republic of China ("PRC") | November 4, 2002 |
| Beijing Framedia Advertisement Co., Ltd. ("Beijing Framedia") | PRC | May 9, 2000 |
| Guangdong Framedia Advertisement Co., Ltd. ("Guangdong Framedia") | PRC | December 16, 2003 |
| Shenzhen Framedia Advertisement Co., Ltd. ("Shenzhen Framedia") | PRC | May 8, 2003 |
| Wuhan Framedia Advertisement Co., Ltd. ("Wuhan Framedia") | PRC | November 28, 2003 |

Subsequent to April 28, 2004, Framedia Advertisement Development (Shanghai) Co., Ltd. ("Framedia Development"), a PRC entity, was incorporated by the same shareholders of the Combined Entities and all of the operations of the Combined Entities were transferred to Framedia Development.

On July 28, 2004, the same shareholders of the Combined Entities and Framedia Development incorporated Infoachieve Limited ("Infoachieve"), a British Virgin Islands entity.

In substance, the combined entities which are existing companies have been reorganized into the new company Framedia Development. Accordingly, the Group's financial statements are prepared by including the financial statements of the combined entities through April 2004 and subsequently the Group's consolidated financial statements which include Framedia Development, Infoachieve and its variable interest entities.

The Group is principally engaged in the sale of frame space advertising in high–end residential complex in the PRC.

The PRC rules and regulations currently limit direct foreign ownership in companies that provide advertising services, including frame space advertising services. To comply with these rules and regulations, when the shareholders established Infoachieve in July 2004, Framedia Development entered into various agreements with Infoachieve, including transfer of operation agreements and exclusive consulting and service agreements. Under these agreements, Infoachieve is the exclusive provider of management consulting services to Framedia Development. In return, Framedia Development is required to pay Infoachieve services fees for the management consulting services received. The management consulting service fees are the net profits of Framedia Development. In addition, Infoachieve has been assigned all voting rights by the direct owners of Framedia Development through agreements valid for ten years. Finally, Infoachieve has the option to acquire the equity interest of Framedia Development. Infoachieve holds all the variable interests of Framedia Development and has been determined to be most closely associated with Framedia Development and is considered the primary beneficiary of Framedia Development.

On June 1, 2005, Infoachieve provided loans to two of its shareholders to acquire 100% of the outstanding shares of Guangdong Century Sparkle Advertisement Co., Ltd. ("Sparkle"), a frame advertisement service provider. Principal terms of the loan agreements provide that (i) Infoachieve entitles to receive service fees by providing management consulting services to Sparkle; (ii) Infoachieve has been assigned all voting rights valid indefinitely that cannot be amended or terminated except by written consent of all parties; and (iii) Infoachieve has

F–118

Table of Contents

## INFOACHIEVE LIMITED

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
### FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005

the options to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle and is considered the primary beneficiary of Sparkle.

Through the above arrangements, under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)"), Framedia Development and Sparkle have become the variable interest entities of Infoachieve, as a result, the financial statements of Framedia Development and Sparkle have been consolidated with Infoachieve as its subsidiaries since they were established or acquired.

On June 16, 2005, Infochieve applied to establish Shanghai Framedia Investment Consultation Co., Ltd. ("Framedia Consultation") in Shanghai with an operating period of 30 years, and related capital contribution was completed on December 21, 2005. Framedia Consultation is wholly owned by Infochieve and is engaged in provision of consultation and management services to other entities within the group and to third party customers.

As of December 31, 2005, Infoachieve's variable interest entities and subsidiary include the following entities:

| Entity | Date of incorporation | Place of incorporation |
|---|---|---|
| Framedia Development* | April 28, 2004 | PRC |
| Sparkle* | March 25, 2005 | PRC |
| Framedia Consultation | June 16, 2005 | PRC |

\* Represents a variable interest entity.

These Companies have been entities under common control which has established the basis to consolidate them from their inception. Accordingly, the accompanying financial statements include the financial statements of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia, Framedia Development and Infoachieve and its variable interest entities, collectively the "Group."

From June 2005 to December 2005, Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia were liquidated, their balances sheets as of December 31, 2005 have not been included in the consolidated balance sheet as of December 31, 2005.

Between June 1, 2005 and December 31, 2005, the Group through Infoachieve acquired the frame advertising net assets from eight companies that operated in the same industry in the PRC. These acquisitions were accounted for as acquisition of a business and for details, see Note 3, Acquisitions.

On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team Investments Limited ("Total Team") in the British Virgin Islands. According to the Share Purchase Agreement, the shareholders of Infoachieve transferred all the issued shares in Infoachieve Limited to Total Team. Total Team became the only shareholder of Infoachieve.

### 2.  Summary of Significant Accounting Policies

#### (a)  Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP"). The consolidated financial statements reflect the operations of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia and Wuhan Framedia through April 2004 and the Group's consolidated financial statements thereafter.

#### (b)  Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

F–119

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*(c)   Use of estimates*

The preparation of the consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include allowance for doubtful accounts, the useful lives and impairment of equipment, intangible assets and goodwill and valuation allowance for deferred tax assets.

*(d)   Significant risks and uncertainties*

The Group participates in a dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations, or cash flows: the Group's limited operating history; advances and trends in new technologies and industry standards; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Group's ability to attract and retain employees necessary to support its growth; risks associated with the Group's growth strategies; and general risks associated with the advertising industry.

*(e)   Equipment, net*

Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Frame | 5 years |
| Computer and office equipment | 5 years |
| Liquid crystal display | 5 years |

*(f)   Impairment of long–lived assets*

The Group reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the longlived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets. The Group recognized impairment loss of Nil and $115,789 for the years ended December 31, 2004 and 2005. In 2005, the Group decided to replace the remaining tangible assets acquired through the acquisitions and assessed the recoverable amounts of the net tangible assets to be nil, therefore, the Group recognized an impairment loss of $115,789 which is equal to the remaining amount of the tangible assets acquired from the acquisitions.

*(g)   Goodwill*

SFAS No. 142 requires the Group to complete a two–step goodwill impairment test. The first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. SFAS No. 142 requires completion of this first step within the first six months of initial adoption and annually thereafter. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry

F–120

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

Management has performed the annual goodwill impairment test, no events had occurred and no indications had been identified as of December 31, 2005 that reduced the fair value of the Group's reporting units below the carrying value of the goodwill and intangible assets.

The changes in the carrying amount of goodwill for the year ended December 31, 2005 are as follows:

| | | |
|---|---|---:|
| Balance as of January 1, 2005 | $ | — |
| Goodwill acquired during the year | | 13,936,500 |
| Goodwill impaired since acquired | | — |
| Balance as of December 31, 2005 | $ | 13,936,500 |

**(h)  Revenue recognition**

The Group's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Accordingly, revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Group presents advertising service revenue, net of business tax incurred, which amounts to $442,593 and $1,066,409 for the years ended December 31, 2004 and 2005, respectively.

**(i)  Operating leases**

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

**(j)  Foreign currency translation**

The reporting currency of the Group is the United States dollar ("US dollar"). The functional currency of the Group is the Renminbi ("RMB"). Monetary assets and liabilities denominated in currencies other than US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than US dollar during the periods are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the consolidated statements of operations.

**(k)  Income taxes**

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws and regulations applicable to the Group as enacted by the relevant tax authorities.

F–121

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*(l)  Comprehensive income/loss*

Comprehensive income/loss includes foreign currency translation adjustments. Comprehensive income/loss is reported in the statements of shareholders' equity.

*(m)  Concentration of credit risk*

Financial instruments that potentially expose the Group to concentrations of credit risk consist primarily of cash and cash equivalents and accounts receivable. The Group places their cash and cash equivalents with financial institutions with high–credit ratings and quality.

The Group conducts credit evaluations of customers and generally do not require collateral or other security from their customers. The Group establishes an allowance for doubtful accounts primarily based upon the age of the receivables and factors surrounding the credit risk of specific customers.

*(n)  Fair value of financial instruments*

Financial instruments include cash and cash equivalents and short–term loans from shareholders. The carrying values of cash and cash equivalents and short–term loans from shareholders approximate their fair values due to their short–term maturities.

*(o)  Loss per share*

Basic loss per share is computed by dividing loss attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the years. Diluted loss per ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation of diluted loss per ordinary share in loss years as their effects would be antidilutive. Basic loss per share is equal to diluted loss per share as there are no potential convertible securities for the end of years presented.

*(p)  Recently issued accounting standards*

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share–Based Payment" ("SFAS No. 123R"). This statement is a revision to SFAS No. 123 and supercedes APB Opinion No. 25. This statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services, primarily focusing on the accounting for transactions in which an entity obtains employee services in share–payment transactions. Entities are required to measure the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award (with limited exceptions).That cost will be recognized over the period during which an employee is required to provide service, the requisite service period (usually the vesting period), In exchange for the award. The grant–date fair value of employee share options and similar instruments are to be estimated using option–pricing models. If an equity award is modified after the grant date, incremental compensation cost will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. This statement is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. In accordance with the standard, the Company is required to adopt SFAS No. 123R effective January 1, 2006.

Upon adoption, the Company has two application methods to choose from: the modified–prospective transition approach or the modified–retrospective transition approach. Under the modified–prospective transition method the Company would be required to recognize compensation cost for share–based awards to employees based on their grant–date fair value from the beginning of the fiscal period in which the recognition provisions are first applied as well as compensation cost for awards that were granted prior to, but not vested as of the date of adoption. Prior

F–122

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

periods remain unchanged and pro forma disclosures previously required by SFAS No. 123 continue to be required. Under the modified–retrospective transition method, the Company would restate prior periods by recognizing compensation cost in the amounts previously reported in the pro forma footnote disclosure under SFAS No. 123. Under this method, the Company is permitted to apply this presentation to all periods presented or to the start of the fiscal year in which SFAS No. 123R is adopted. The Company would follow the same guidelines as in the modified–prospective transition method for awards granted subsequent to adoption and those that were granted and not yet vested. The Company believes that the impact that the adoption of SFAS No. 123R will have on its financial position or results of operations will not be significant.

In March 2006, the FASB issued FSP FAS 123(R)–2, "Practical Accommodation to the Application of Grant Date as Defined in FASB Statement No. 123(R)", which provides clarification of the concept of mutual understanding between employer and employee with respect to the grant date of a share–based payment award. This FSP provides that a mutual understanding of the key terms and conditions of an award shall be presumed to exist on the date the award is approved by management if the recipient does not have the ability to negotiate the key terms and conditions of the award and those key terms and conditions will be communicated to the individual recipient within a relatively short time period after the date of approval. This guidance shall be applied upon initial adoption of SFAS 123(R). The Company is currently evaluating the effect that the adoption of the FSP will have on its consolidated results of operations and financial condition but does not expect it to have a material impact.

In May 2005, the FASB issued SFAS No. 154, Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20 and FASB Statement No. 3. SFAS No. 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of the correction of an error. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The Company does not expect the adoption of SFAS No. 154 on January 1, 2006 to have a material impact on its results of operations and financial condition.

In February 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments–an amendment of FASB Statements No. 133 and 140." SFAS No. 155 amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", to permit fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided that the whole instrument is accounted for on a fair value basis. SFAS No. 155 amends SFAS No. 140, "Accounting for the Impairment or Disposal of Long–Lived Assets", to allow a qualifying special–purpose entity (SPE) to hold a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS No. 155 applies to all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006, with earlier application allowed. The Company does not expect the adoption of SFAS No. 155 to have a material impact on its consolidated results of operations and financial condition.

In March 2005, the FASB issued FIN 47, "Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143" ("FIN 47"), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The Company does not expect the adoption of FIN 47 will have a material impact on its results of operations and financial condition.

F–123

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**3.  Acquisitions**

During 2005 and 2004, the Group has made the following acquisitions to continue to expand its networks in desirable locations to establish other stand alone networks that provide effective channels for advertisers:

(a) On June 1, 2005, two shareholders of Infoachieve, Lei Liu and Shi Yong acquired 100% of the equity of Guangdong Century Sparkle Advertising Co., Ltd. ("Sparkle"), a frame advertising service provider, in exchange for cash of $701,330 and 90,000 ordinary shares of Infoachieve having a fair value of $15.62 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. The cash consideration was satisfied by a loan from the Group to Lei Liu and Yong Shi. At the completion of the acquisition, Lei Liu and Yong Shi entered into various agreements with Infoachieve, including an exclusive service agreement entitled Infoachieve to receive service fees in an amount up to all of the net income of Sparkle. In addition, Infoachieve has been assigned all the voting rights by Lei Liu and Yong Shi through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally, Infoachieve has the option to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle. Therefore Infoachieve is the primary beneficiary of Sparkle. As a result, the consolidated financial statements reflect the consolidation of Sparkle into Infoachieve. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,107,130 consisted of the following:

| | |
|---|---:|
| Cash consideration | $   701,330 |
| Value of the ordinary shares issued | 1,405,800 |
| Total consideration | $ 2,107,130 |

The purchase price was allocated as follows:

| | | Amortization period |
|---|---:|---:|
| Net tangible assets acquired | $      23,942 | |
| Intangible assets: | | |
|     Lease agreements | 111,473 | 5 years |
|     Customer base | 18,237 | 5 years |
|     Contract backlog | 14,372 | 2.5 months |
| Goodwill | 1,939,106 | N/A |
| Total | $ 2,107,130 | |

(b) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Langmei Co. Ltd., a frame advertising service provider, in exchange for cash of $828,295 and 160,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $3,106,695 consisted of the following:

| | |
|---|---:|
| Cash consideration | $   828,295 |
| Value of the ordinary shares issued | 2,278,400 |
| Total consideration | $ 3,106,695 |

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $    12,563 |  |
| Intangible assets: |  |  |
| Lease agreements | 56,878 | 5 years |
| Customer base | 41,314 | 5 years |
| Contract backlog | 49,891 | 2.5 months |
| Goodwill | 2,946,049 | N/A |
| Total | $  3,106,695 |  |

(c) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Xinchengsihai Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,207,730. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $      6,642 |  |
| Intangible assets: |  |  |
| Lease agreements | 63,043 | 5 years |
| Customer base | 5,918 | 5 years |
| Contract backlog | 483 | 2.5 months |
| Goodwill | 1,131,644 | N/A |
| Total | $  1,207,730 |  |

(d) On July 5, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Tuojia Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $870,617 and 95,200 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,226,265 consisted of the following:

| Cash consideration | $    870,617 |
| --- | --- |
| Value of the ordinary shares issued | 1,355,648 |
| Total consideration | $  2,226,265 |

F–125

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 21,263 | |
| Intangible assets: | | |
| Lease agreements | 92,546 | 5 years |
| Customer base | 12,323 | 5 years |
| Contract backlog | 43,735 | 2.5 months |
| Goodwill | 2,056,398 | N/A |
| Total | $ 2,226,265 | |

(e) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Shanghai Yangguangjiaxin Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $241,838 and 99,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,651,598 consisted of the following:

| | |
|---|---|
| Cash consideration | $ 241,838 |
| Value of the ordinary shares issued | 1,409,760 |
| Total consideration | $ 1,651,598 |

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 15,340 | |
| Intangible assets: | | |
| Lease agreements | 140,475 | 5 years |
| Customer base | 11,233 | 5 years |
| Contract backlog | 30,680 | 2.5 months |
| Goodwill | 1,453,870 | N/A |
| Total | $ 1,651,598 | |

(f) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Guangzhou Liju Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $483,676 and 140,000 ordinary shares of Infoachieve having a fair market value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,477,276 consisted of the following:

| | |
|---|---|
| Cash consideration | $ 483,676 |
| Value of the ordinary shares issued | 1,993,600 |
| Total consideration | $ 2,477,276 |

F–126

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $ 10,146 |  |
| Intangible assets: |  |  |
| Lease agreements | 139,751 | 5 years |
| Customer base | 21,863 | 5 years |
| Contract backlog | 16,427 | 2.5 months |
| Goodwill | 2,289,089 | N/A |
| Total | $ 2,477,276 |  |

(g) On September 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Lingxian Media Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,011,097. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $ 25,893 |  |
| Intangible assets: |  |  |
| Lease agreements | 52,898 | 5 years |
| Customer base | 19,852 | 5 years |
| Contract backlog | 25,030 | 2.5 months |
| Goodwill | 887,424 | N/A |
| Total | $ 1,011,097 |  |

(h) On October 1, 2005, the Group acquired the signed lease agreements, frames and ongoing advertising agreements of Shenzhen Xinghuo Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $865,073 and 30,000 ordinary shares having a fair market value of $14.73 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,306,973 consisted of the following:

| | |
| --- | --- |
| Cash consideration | $ 865,073 |
| Value of the ordinary shares issued | 441,900 |
| Total consideration | $ 1,306,973 |

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 5,561 |  |
| Intangible assets: |  |  |
| Lease agreements | 53,910 | 5 years |
| Customer base | 6,055 | 5 years |
| Contract backlog | 8,527 | 2.5 months |
| Goodwill | 1,232,920 | N/A |
| Total | $ 1,306,973 |  |

*Pro forma*

The following summarized unaudited pro forma results of operations for the year ended December 31, 2005 assuming that all acquisitions during the year ended December 31, 2005 occurred as of January 1, 2004 and 2005. These pro forma results have been prepared for comparative purposes only based on management's best estimate and do not purport to be indicative of the results of operations which actually would have resulted had the acquisitions occurred as of January 1, 2004 and 2005.

|  | Pro forma | |
|---|---|---|
|  | Year ended December 31, 2004 | Year ended December 31, 2005 |
|  | (unaudited) | (unaudited) |
| Revenues | $ 14,110,552 | $ 12,084,864 |
| Net loss attributable to holders of ordinary shares | $ (550,713) | $ (18,624,320) |
| Loss per share — basic and diluted | $ (32.30) | $ (23.04) |

**4. Accounts Receivable, Net**

Accounts receivable, net consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Billed receivables | $ 589,634 | $ 3,149,886 |
| Unbilled receivables | 703,935 | 578,314 |
|  | $ 1,293,569 | $ 3,728,200 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of the balance sheet dates.

F–128

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

5. **Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Other receivables | $ 135,576 | $ 383,835 |
| Prepaid expenses | 111,870 | 279,743 |
| Employee advances | 72,026 | 69,532 |
| Other taxes refundable | 48,163 | — |
| | $ 367,635 | $ 733,110 |

6. **Equipment, Net**

Equipment, net consists of the following:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Frame | $ 641,008 | $ 1,148,014 |
| Computers and office equipment | 174,164 | 351,315 |
| Liquid crystal displays | 562,080 | — |
| | 1,377,252 | 1,499,329 |
| Less: accumulated depreciation and amortization | (346,242) | (485,458) |
| | $ 1,031,010 | $ 1,013,871 |

7. **Acquired Intangible Assets, Net**

Acquired intangible assets, net consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Lease agreements | $ — | $ 710,974 |
| Customer base | — | 136,795 |
| Contract backlogs | — | 189,145 |
| Less: accumulated amortization | — | (272,632) |
| | $ — | $ 764,282 |

In 2005, the Group acquired certain lease agreements, customer base and contract backlogs through various acquisitions (see Note 3). The Group recorded an amortization expense of $272,632 for the year ended December 31, 2005. The Group will record amortization expenses of $172,883, $172,883, $172,883, $172,883 and $72,750 for 2006, 2007, 2008, 2009 and 2010, respectively.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**8.  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

| | December 31, | |
|---|---|---|
| | **2004** | **2005** |
| Payables related to acquisitions | $        — | $  4,505,684 |
| Professional fees | — | 939,113 |
| Sales commission | 30,688 | 592,729 |
| Advances from employees | 244,847 | 621,330 |
| Other taxes payable | 387,074 | 467,560 |
| Employee payroll and welfare | 43,954 | 299,345 |
| Accrued expenses | 45,315 | 261,504 |
| Advance from customers | 75,580 | 42,007 |
| Others | 40,671 | 327,870 |
| | $  868,129 | $  8,057,141 |

**9.  Income Taxes**

Infoachieve is a tax–exempted company incorporated in the British Virgin Islands.

Beijing Framedia, Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve's variable interest entities were all registered in the PRC, which are all subject to PRC Enterprise Income Tax ("EIT") on the taxable income in accordance with the relevant PRC income tax laws.

The tax rate for Beijing Framedia was 33% and the taxable income was calculated at 8% of gross revenue in the periods presented.

The EIT rate for Shanghai Framedia was 33% but no income tax was provided as Shanghai Framedia was exempted from income tax in 2004 and there was no assessable taxable income in 2005.

The EIT rate for Guangdong Framedia was 33%. No income tax has been provided as Guangdong Framedia was exempted from income tax in the periods presented.

The EIT rate for Shenzhen Framedia was 15% and no income tax was provided as Shenzhen Framedia had no assessable taxable income.

Wuhan Framedia was subject to a fixed amount of income tax, which was $445 per year.

The EIT rate for Framedia Development is 33%. No income tax has been provided in the periods presented as Framedia Development was exempted from income tax in 2004 and 2005.

The EIT rate for Sparkle is 33%, and the taxable income was calculated at 20% of gross revenue in the period presented. Sparkle enjoys an 18% preferential tax rate determined by its operating scale.

The EIT rate for Framedia Consultation was 33%. No income tax has been provided as there was no assessable taxable income in 2005.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The principal components of the Group's deferred income tax assets are as follows:

|  | December 31, | |
|  | 2004 | 2005 |
| --- | --- | --- |
| Deferred tax assets: |  |  |
| Pre–operating expenses | $ — | $ 12,088 |
| Allowance for doubtful accounts | — | 1,318 |
| Total deferred tax assets | — | 13,406 |
| Valuation allowance on deferred tax assets | — | (13,406) |
| Net deferred tax assets | $ — | $ — |

The Group operates through multiple subsidiaries and variable interest entities and the valuation allowance is considered on each individual subsidiary and variable interest entity basis.

The Group did not have any timing differences relating to deferred tax liabilities as of December 31, 2004 and 2005.

Full valuation allowance has been provided for the deferred tax assets arising mainly from pre–operating expenses and allowance for doubtful accounts as the Group believes that it is more likely than not that the deferred tax assets will not be realized.

A reconciliation between total income tax expense and the Group's effective tax rate is as follows:

|  | For the year ended December 31, | |
|  | 2004 | 2005 |
| --- | --- | --- |
| Statutory tax rate | 33.0% | 33.0% |
| Permanent book–tax differences | (27.1)% | (32.7)% |
| Change in valuation allowance | (5.9)% | (0.3)% |
| Effective tax rate | — | — |

**10.    Convertible Redeemable Preference Shares**

(a) In May 2005, 270,000 outstanding ordinary shares were reclassified and re–designated into 270,000 Series A–1 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $1,136,700 which represents the difference between the fair value of the Series A–1 convertible redeemable preference shares at the date of the re–designation of $4.22 and the initial issuance price of the ordinary shares of $0.01 for 270,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $4.22 per share for Series A–1 convertible redeemable preference shares in effect on the redemption date plus all declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $378,985 for the year ended December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

F–131

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

(b) In May 2005, 110,000 outstanding ordinary shares were reclassified and re–designated into 110,000 Series A–2 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $623,700 which represents the difference between the fair value of the Series A–2 convertible redeemable preference shares at the date of the re–designation of $5.68 and the initial issuance price of the ordinary shares of $0.01 for 110,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $5.68 per share for Series A–2 convertible redeemable preference shares in effect on the redemption date plus all declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $207,820 as of December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

The significant terms of the Series A–1 and Series A–2 convertible redeemable preference shares are as follows:

*Conversion*

Each of the Series A–1 and Series A–2 convertible redeemable preference shares is convertible into one ordinary share at a conversion price of $4.22 per share for Series A–1 convertible redeemable preference shares and $5.68 per share for Series A–2 convertible redeemable preference shares, at the option of the holder at any time after the date of issuance of such shares, or is automatically converted into ordinary shares at the then effective Series A conversion price upon a Qualified IPO. The conversion price should be subject to the following adjustment:

Adjustment of the Series A–1 and Series A–2 convertible redeemable preference shares conversion price upon issuance of additional ordinary shares at below Series A convertible redeemable preference shares conversion price — in the event that Infoachieve shall issue any additional ordinary shares at a subscription price per share less than the Series A–1 and Series A–2 convertible redeemable preference shares conversion price, in effect on the date of and immediately prior to such issuance, the Series A convertible redeemable preference shares conversion price shall be reduced to a price equal to the consideration per share for which such additional ordinary shares are issued.

*Voting rights*

All ordinary shares shall have one vote each. Each convertible redeemable preference share shall be entitled to the number of votes equal to the number of ordinary shares into which such Series A convertible redeemable preference could be converted at the record date for determination of the members entitled to vote on such matters. The holders of the Series A–1 and Series A–2 convertible redeemable preference shares and the ordinary shares shall vote together and not as a separate class, except as otherwise specifically required by the merger and acquisition agreements.

*Dividends*

The holders of the Series A–1 and Series A–2 convertible redeemable preference shares shall be entitled to receive out of any funds legally available therefore, when and if declared by the Directors, equivalent dividends or other distributions made or declared, whether in cash, in property or in any shares of Infoachieve, in respect of any other class or series of shares of Infoachieve.

F–132

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of Infoachieve, the holders of Series A–2 convertible redeemable preference shares shall receive the amount equal to 100% of the Series A Original Reference Price. After setting aside or paying in full the preferential amount due to the holders of Series A–2 convertible redeemable preference shares, the holders of the Series A–1 convertible redeemable preference shares shall be entitled to receive, the amount equal to 100% of the Series A Original Reference Price.

Series A Original Reference Price means, with respect to the Series A–1 convertible redeemable preference shares, $4.22, being the price at which the Series A–1 convertible redeemable preference shares were valued on the date on which the Series A–1 preference shares were first created by the Group by the redesignation of ordinary shares then in issue, and, with respect to the Series A–2 preference shares, $5.68, being the price at which the Series A–2 convertible redeemable preference shares were valued on the date on which the Series A–2 convertible redeemable preference shares were first created by the Group by the redesignation of ordinary shares then in issue.

**11. Ordinary Shares**

(a) On July 28, 2004, in order to incorporate Infoachieve, the Group issued 400 ordinary shares to the shareholders of the combined entities for cash proceeds of $400.

(b) On March 12, 2005 the Board of Directors approved a stock split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's consolidated financial statements.

(c) On March 21, 2005, the Group issued 960,000 ordinary shares to the Founders for cash proceeds of $9,600. This has resulted in a deemed dividend of $15,187,200 which represents the difference between the fair value of the ordinary shares at the date of issuance of $15.83 and the par value of $0.01 for 960,000 shares. The fair value was determined based on a retrospective independent third party valuation.

(d) On May 12, 2005, 380,000 outstanding ordinary shares were reclassified and redesignated into 270,000 Series A–1 convertible redeemable preference shares and 110,000 Series A–2 convertible redeemable preference shares. (See Note 10(a)(b))

(e) On May 12, 2005 and September 2, 2005, the principal shareholders of the Group transferred 50,000 ordinary shares of their own and the Group issued 40,000 ordinary shares to the Chief Executive Officer of Infoachieve in return for his service, respectively. These have resulted in a compensation expense of $1,395,100, which was based on the fair value of the price of ordinary shares. The fair value was determined based on a retrospective independent third party valuation.

(f) On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team in the British Virgin Islands. According to the Share Purchase Agreement and the supplemental agreements, following arrangements were made:

(i) 620,000 Ordinary Shares issued to the founders were transferred to Total Team,

(ii) The Chief Executive Officer who owned 40,000 ordinary shares and the shareholders of the entities being acquired by Infoachieve who were issued 614,200 ordinary shares of Infoachieve all agreed to exchange these issues with the same number of shares of Total Team, these 654,200 ordinary shares were cancelled by Total Team immediately after this transfer,

(iii) The 270,000 Series A–1 Preferred Shares and the 110,000 Series A–2 Preferred Shares were first converted to same number of Infoachieve's ordinary shares, then were transferred to Total Team.

After these arrangements, Infoachieve's total issued and outstanding ordinary shares were 1,000,000, which were fully acquired by Focus Media Holding Limited ("Focus Media") on January 1, 2006.

**Table of Contents**

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**12. Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $18,991, and $115,726 for the years ended December 31, 2004 and 2005, respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group's variable interest entities in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) a enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the Group's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. In 2004 and 2005, the Group did not make any appropriations.

**13. Commitments**

*(a) Leases*

The Group has entered into operating leasing arrangements relating to the placement of the print in the commercial locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expenses under operating leases for 2004 and 2005 were $1,935,891 and $3,881,981, respectively.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| | December 31, 2005 |
|---|---|
| December 31, | |
| 2006 | $ 3,687,665 |
| 2007 | 1,446,995 |
| 2008 | 399,542 |
| 2009 | 50,112 |
| 2010 and thereafter | 14,336 |
| | $ 5,598,650 |

**14. Segment and Geographic Information**

The Group is engaged in selling print advertisement on its network of frame located in high traffic areas in commercial locations throughout China.

The Group's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group.

Although the Group operates through multiple cities in China which include Beijing, Shanghai, Guangzhou, Shenzhen and Wuhan, it believes it operates in one segment as all cities provide selling frame space to the customers and advertisers. Accordingly all financial segment information can be found in the consolidated financial statements.

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*Geographic information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

**15.    Major Customers**

Details of the customers accounting for 10% or more of total revenues are as follows:

|  | Years ended December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd. | 16.9 | 15.5 |

Details of the customers accounting for 10% or more of accounts receivable are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd | 26.6 | 22.6 |
| Beijing Guanliang Advertising Co., Ltd. | 18.2 | — |
| Beijing Taihedongfang Advertising Co., Ltd. | 10.3 | — |

**16.    Related Party Balances**

*(a)    Amounts due from related parties*

The amounts due from related parties were cash advances to the Founders to invest in Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve. The amounts were unsecured and interest free and fully repaid in 2005.

*(b)    Short–term loans from shareholders*

At December 31, 2004, the short–term loans from shareholders represented the principal of $365,802, which was interest bearing starting from January 1, 2005 at an interest rate of 7% per annum and was repayable in December 2005.

At December 31, 2005, the short–term loans from shareholders are comprised of the principal of $3,048,522 and the interest calculated at 7% per annum, all of which was repayable within one year.

The short–term loans were provided to the Group to be used as part of the consideration to complete the acquisitions described in Note 3.

*(c)    Amounts due to related parties*

Details of amounts due to related parties as of December 31, 2004 and 2005 were as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Principal shareholders | $ 1,677,741 | $ 761,292 |

At December 31, 2004, the loans from a Founder's relative and employees were unsecured, bore interest ranging from 20% to 30% per annum and were repaid in 2005.

F–135

Table of Contents

**INFOACHIEVE LIMITED**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

At December 31, 2005, the loan from Focus Media Holding Limited ("Focus Media") was unsecured, bore interest 5.58% per annum. As mentioned in note 17, Focus Media became the only shareholder of the Group subsequently.

**17.    Subsequent Events**

(a) Pursuant to the Share Purchase Agreement signed on October 15, 2006 by Focus Media Holding Limited, a publicly listed company on NASDAQ to acquire all the issued shares of Infoachieve Limited, the acquisition was effectively completed on January 1, 2006 and since then Infoachieve Limited has become a subsidiary of Focus Media Holding Limited.

(b) On March 7, 2006, Infoachieve entered into an agreement with its shareholders (IDG Technology Venture Investments Fund, Chen Hong, Shi Yong, Liu Shisheng and Zhao Haiqi, collectively called "Lending Parties")) and Focus Media. According to the agreement, to the extent the 2006 Audited Annual Net Income (as defined in the agreement) of Infoachieve exceeds US$17,000,000, any such excess amount not to exceed USD3,262,483.83 shall be applied by Infoachieve to repay the outstanding principal of the loans made by the Lending Parties to Infoachieve, in proportion to the amounts of the loan made by the Lending Parties, provided (a) the Credits (as defined in Funding Agreement as discussed below), and (b) the Work Capital Credits (as defined in the Share Purchase Agreement) if any, shall have been fully repaid before any loan is repaid pursuant to this Agreement.

On March 7, 2006, Infoachieve entered into the Funding Agreement with Focus Media and Total Team. According to this agreement, Focus Media shall provide a working capital loan of RMB6,361,773.64 or the US dollar equivalent and a loan against accounts receivables of RMB30,000,000 or the US dollar equivalent (collectively the "Credits") to Infoachieve, the Credits shall not bear any interest. Upon receipt of the Credit from Focus Media, Infoachieve shall apply the Credits in their entirety to repay the due and unpaid portion of the cash consideration payable by Infoachieve pursuant to the applicable Acquisition Agreements.

F–136

**Table of Contents**

**INDEX TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION**

| | Page |
|---|---|
| Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information | P–2 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2006 | P–3 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the six–months ended June 30, 2007 | P–4 |
| Notes to the Unaudited Pro Forma Condensed Consolidated Financial Information | P–5 |

P–1

Table of Contents

### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION
### (in U.S. dollars)

**Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information**

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes thereto. Financial information with respect to the acquisitions is derived from the historical financial statements and management accounts of Target Media Holdings Limited, or Target Media and Allyes Information Technology Company Limited, or Allyes, appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with US GAAP. These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Target Media and Allyes. The acquired businesses have permitted us to expand our network of out–of–home consumers and to expand into the Internet advertising business.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2006 presents adjustments as if the acquisitions of Target Media and Allyes had been consummated on January 1, 2006. The unaudited pro forma condensed consolidated statement of operations for the six months ended June 30, 2007 presents adjustments as if the acquisition of Allyes had been consummated on January 1, 2007.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Allyes, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the period between January 1, 2006 and February 28, 2006, and the financial information of Allyes for the period between January 1, 2007 and March 28, 2007, the respective dates of the acquisitions, have not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information for the two–month period ended February 28, 2006 and the period from January 1, 2007 through March 28, 2007 of Target Media and Allyes, respectively, that has been used to calculate the pro forma financial information for the six–month and twelve–month periods ended June 30, 2007 and December 31, 2006, may differ significantly from any actual consolidated statements of operations had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm, and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

Table of Contents

UNAUDITED PRO FORMA CONDENSED CONSOLIDATED

STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2006
(In U.S. Dollars, except share data)

| | FOCUS MEDIA HOLDING LIMITED For The Year Ended December 31, 2006 | ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED For The Year Ended December 31, 2006 | TARGET MEDIA HOLDINGS LIMITED For The Two Months Ended February 28, 2006 | Pro Forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|---|---|
| **Net Revenues:** | | | | | | |
| Advertising Service Revenue | $ 209,973,935 | $ 47,234,757 | $ 3,068,289 | | | $ 260,276,981 |
| Other Revenue | 1,931,530 | 1,899,197 | — | | | 3,830,727 |
| **Total net revenues** | **211,905,465** | **49,133,954** | **3,068,289** | | | **264,107,708** |
| **Cost of Revenues:** | | | | | | |
| Advertising Service Cost | 80,615,408 | 37,820,920 | 3,792,503 | 3,000,000 | (1) | 125,228,831 |
| Other Cost | 764,959 | — | — | | | 764,959 |
| **Total cost of revenues** | **81,380,367** | **37,820,920** | **3,792,503** | | | **125,993,790** |
| **Gross profit** | **130,525,098** | **11,313,034** | **(724,214)** | | | **138,113,918** |
| **Operating expenses/(income):** | | | | | | |
| General and administrative | 25,723,413 | 6,524,900 | 2,541,194 | | | 34,789,507 |
| Selling and marketing | 25,761,948 | 4,376,213 | 3,114,507 | 1,879,893 | (1) | 35,132,561 |
| Research and development | — | 648,732 | — | | | 648,732 |
| Amortization of acquired intangibles | — | — | — | 205,350 | (1) | 205,350 |
| Other operating income | (1,338,334) | — | — | | | (1,338,334) |
| **Total operating expenses** | **50,147,027** | **11,549,845** | **5,655,701** | | | **69,437,816** |
| **Income from operations** | **80,378,071** | **(236,811)** | **(6,379,915)** | | | **68,676,102** |
| Interest income | 4,560,798 | 583,738 | — | | | 5,144,536 |
| Interest expense | (305,287) | — | (23,177) | | | (328,464) |
| Other income | 271,451 | 201,078 | — | | | 472,529 |
| Other expense | (558,990) | (40,200) | (1,755,019) | | | (2,354,209) |
| **Income before income taxes and minority interests** | **84,346,043** | **507,805** | **(8,158,111)** | | | **71,610,494** |
| Income taxes: | 1,043,538 | 1,002,944 | (59,402) | | | 1,987,080 |
| **Net income after income taxes before minority interests** | **83,302,505** | **(495,139)** | **(8,098,709)** | | | **69,623,414** |
| Minority interests | 104,773 | — | (30,588) | | | 74,185 |
| **Net income attributable to holders of ordinary shares** | **$ 83,197,732** | **$ (495,139)** | **$ (8,068,121)** | | | **$ 69,549,229** |
| Income per share — basic | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating basic income per share | 505,411,079 | | | | (2) | 537,826,734 |
| Income per share — diluted | $ 0.16 | | | | | $ 0.13 |
| Shares used in calculating diluted income per share | 521,536,381 | | | | (2) | 553,952,036 |

The accompanying notes are an integral part of these unaudited pro forma condensed consolidated financial statements.

P–3

Table of Contents

UNAUDITED PRO FORMA CONDENSED CONSOLIDATED

STATEMENT OF OPERATIONS
FOR THE SIX MONTHS ENDED JUNE 30, 2007
(In U.S. Dollars, except share data)

| | FOCUS MEDIA HOLDING LIMITED For the 6 Months Ended June 30, 2007 | ALLYES INFORMATION TECHNOLOGY COMPANY LIMITED For the 3 Months Ended March 28, 2007 | Pro Forma Adjustment | Notes | Pro Forma |
|---|---|---|---|---|---|
| **Net Revenues:** | | | | | |
| Advertising Service Revenue | $ 169,929,351 | $ 10,349,639 | | | $ 180,278,990 |
| Other Revenue | 686,634 | 238,952 | | | 925,586 |
| **Total net revenues** | **170,615,985** | **10,588,591** | | | **181,204,576** |
| **Cost of Revenues:** | | | | | |
| Advertising Service Cost | 76,720,176 | 9,303,052 | 750,000 | (1) | 86,773,228 |
| Other Cost | 303,017 | — | | | 303,017 |
| **Total cost of revenues** | **77,023,193** | **9,303,052** | | | **87,076,245** |
| **Gross profit** | **93,592,792** | **1,285,539** | | | **94,128,331** |
| **Operating expenses/(income):** | | | | | |
| General and administrative | 20,328,874 | 8,049,092 | | | 28,377,966 |
| Selling and marketing | 23,040,846 | 1,343,808 | 469,973 | (1) | 24,854,627 |
| Research and development | — | 199,341 | | | 199,341 |
| Other operating income | (2,384,031) | — | | | (2,384,031) |
| **Total operating expenses** | **40,985,689** | **9,592,241** | | | **51,047,903** |
| **Income/(loss) from operations** | **52,607,103** | **(8,306,702)** | | | **43,080,428** |
| Interest income | 4,633,869 | 26,782 | | | 4,660,651 |
| Interest expense | (6,971) | — | | | (6,971) |
| Other income | 252,442 | 1,323 | | | 253,765 |
| Other expense | (211,890) | — | | | (211,890) |
| **Income/(loss) before income taxes and minority interests** | **57,274,553** | **(8,278,597)** | | | **47,775,983** |
| Income taxes: | 3,286,351 | (157,019) | | | 3,129,332 |
| **Net income/(loss) after income taxes before minority interests** | **53,988,202** | **(8,121,578)** | | | **44,646,651** |
| Minority interests | 18,165 | — | | | 18,165 |
| **Net income/(loss) attributable to holders of ordinary shares** | **$ 54,006,367** | **$ (8,121,578)** | | | **$ 44,664,816** |
| Income per share — basic | $ 0.10 | | | | $ 0.08 |
| Shares used in calculating basic income per share | 560,510,907 | | | (2) | 580,479,987 |
| Income per share — diluted | $ 0.09 | | | | $ 0.07 |
| Shares used in calculating diluted income per share | 577,365,911 | | | (2) | 597,334,991 |

The accompanying notes are an integral part of these unaudited pro forma condensed consolidated financial statements.

Table of Contents

## NOTES TO THE UNAUDITED PRO FORMA CONDENSED

## CONSOLIDATED FINANCIAL INFORMATION

The following pro forma adjustment has been made to the unaudited pro forma condensed consolidated financial information.

(1) Reflects amortization for the acquired intangibles recorded as a result of our acquisition of Allyes Information Technology Company Limited ("Allyes") in March 2007 as if the acquisition had been consummated on January 1, 2006.

The aggregate purchase price of $224.7 million of Allyes is comprised of the following:

|  | | (In thousands of U.S. dollars) |
| --- | --- | --- |
| Cash consideration | $ | 70,000 |
| Fair Value of ordinary shares issued | | 154,698 |
|  | $ | 224,698 |

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

Preliminary purchase price allocation:

|  | | (In thousands of U.S. dollars) | Amortization Period |
| --- | --- | --- | --- |
| Net tangible assets acquired | | 21,957 | |
| Acquired intangible assets | | 36,095 | 1–7 years |
| Goodwill | | 166,646 | |
| Total | $ | 224,698 | |

The preliminary purchase price allocation and preliminary intangible asset valuations described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

Additional payment of up to 9,662,458 ordinary shares may be made contingent upon Allyes attaining certain earning target in 12–months period ended March 28, 2008.

The amortization expense for Allyes of $4,879,893 and $1,219,973 for the year ended December 31, 2006 and three months ended March 28, 2007, respectively have been estimated based on a valuation report provided by a third–party valuation firm.

The amortization expense for Target Media of $205,350 for the two months ended February 28, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(2) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

|  | December 31, 2006 | June 30, 2007 |
| --- | --- | --- |
| Shares used in calculating basic income per share on a pro forma basis: | | |
| Weighted average ordinary shares outstanding used in computing basic income per share for Focus Media Holding Limited | 505,411,079 | 560,510,907 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 537,826,734 | 580,479,987 |

**Table of Contents**

**NOTES TO THE UNAUDITED PRO FORMA CONDENSED**

**CONSOLIDATED FINANCIAL INFORMATION — (Continued)**

|  | December 31, 2006 | June 30, 2007 |
|---|---|---|
| Shares used in calculating diluted income per share on a pro forma basis: |  |  |
| Weighted average ordinary shares outstanding used in computing basic income per share for Focus Media Holding Limited | 521,536,381 | 577,365,911 |
| Issuance of ordinary shares for the acquisition of Allyes | 19,969,080 | 19,969,080 |
| Issuance of ordinary shares for the acquisition of Target Media | 12,446,575 | — |
|  | 553,952,036 | 597,334,991 |

P–6

Table of Contents



# Exhibit I

## Thomson StreetEvents℠

### FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

Event Date/Time: Nov. 19. 2007 / 8:00PM ET


© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call**

## CORPORATE PARTICIPANTS

**Jie Chen**
*Focus Media Holding Ltd - IR Manager*

**Daniel Wu**
*Focus Media Holding Ltd - CFO*

**Jason Jiang**
*Focus Media Holding Ltd - Chairman & CEO*

## CONFERENCE CALL PARTICIPANTS

**James Mitchell**
*Goldman Sachs - Analyst*

**Jason Brueschke**
*Citigroup - Analyst*

**Richard Ji**
*Morgan Stanley - Analyst*

**Eddie Leung**
*Merrill Lynch - Analyst*

**Ming Zhao**
*Susquehanna International Group - Analyst*

**Jackie Chan**
*CIBC World Markets - Analyst*

**Aaron Kessler**
*Piper Jaffray & Co - Analyst*

**Marisa Ho**
*Credit Suisse - Analyst*

## PRESENTATION

**Operator**

Good day ladies and gentlemen, and welcome to the third quarter 2007 Focus Media Holding Ltd earnings conference call. My name is Stacy and I will be your moderator for today. At this time, all participants are in a listen-only mode. We will conduct a question and answer session towards the end of the conference. (OPERATOR INSTRUCTIONS). As a reminder, this conference is being recorded for replay purposes. I would now like to turn the presentation over to your host Ms. Jie Chen, Investor Relations Manager. Please proceed, ma'am.

---

**Jie Chen** - *Focus Media Holding Ltd - IR Manager*

Thank you. Welcome to Focus Media's third quarter 2007 earnings conference call. Today our management will discuss the Company's financial results for the third quarter of 2007 and business outlook for the fourth quarter 2007.

With me here are Jason Jiang, Chairman of the Board and Chief Executive Officer, and Daniel Wu, Chief Financial Officer. After Daniel updates you on our third quarter 2007 operational and financial performance, we will open the call for questions. This call is also broadcasted through Internet and available through our investor relations website ir.focusmedia.cn.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

Before we begin, I would like to remind you that during the course of this call we will make forward-looking statements that are subject to risks and uncertainties. The statements include but are not limited to statements regarding Focus Media's business objectives and plans, the expectations of the development of our networks and our outlook for the fourth quarter 2007, for example. You can also identify forward-looking statements by terms such as will, expect, anticipate, future, intends, plans, believes, estimates and similar statements. The accuracy of these statements may be affected by a number of business risks and uncertainties that could cause our actual results to differ materially from those projected or anticipated.

These risks and uncertainties include but are not limited to our limited operating history for the current operations and the short history of the out-of-home audio visual advertising sector, which may make it difficult for you to evaluate the viability and prospects of our business, the integration of acquired business, the competition from present and future competitors in China's growing advertising market and other risks that are outlined in our filing with the SEC including our registration statements on Form F1. We do not undertake any obligation to update this forward-looking information except as required under applicable law.

Now I will turn the call over to our CFO, Daniel Wu for a summary of the third quarter 2007 financial results.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Thank you Jie. I am pleased to report to you another record quarterly results in the third quarter of 2007. Our total revenue excluding sales tax reached $151.4m, increasing 149.6% from the same period last year and 33.6% sequentially. Our third quarter revenue improved $94.7m from our digital out-of-home advertising business, $14m from our Focus Media wireless advertising business and $42.5m from our Internet advertising business.

First let me review in detail the results of our digital out-of-home advertising business. Total advertising revenue from our digital out-of-home reached $94.7m in the third quarter of 2007, up 66.1% as compared to $57m in the same period in 2006 and also increased 23.3% sequentially. Within our digital out-of-home advertising business, the revenue from our commercial location network in the third quarter was $64.5m, up 67.7% year-over-year. The revenue from our in-store network was $71m (sic - see press release) and we'll continue to compete aggressively with our competitors in the in-store business. The revenue from our poster frame network in the third quarter was $23.1m, up over 100% year-over-year as the occupancy rate grew sequentially after taking into consideration the increase of capacity due to the digital upgrade. So the business is growing and continuing to gain momentum.

The commercial location network, in-store network and poster frame network contributed 68.2%, 7.5% and 24.3% of the total digital out-of-home advertising revenue respectively in the third quarter of 2007.

During the third quarter of 2007, Focus Media wireless business generated revenue of $14m, up 298.9% from $3.5m in the third quarter of 2006.

Advertising revenue for our Internet advertising business was $42.5m in the third quarter of 2007, up 68.5% sequentially. Digital marketing service accounted for 94% of the total Internet advertising revenues. Rich Media, pay-for-performance and technology solutions accounted for the remaining 6%.

Gross profit for the third quarter of 2007 was $77.1m representing an increase of 99.9% compared to $38.6m for the same period a year ago. In the third quarter of 2007 gross margins for our digital out-of-home business was 62.7%. Within the digital out-of-home business, commercial location network gross margin was 64.7%, in-store network gross margin was 17.7% and poster frame network gross margin was 71.1%.

Commercial location gross margin was negatively impacted by the acquisition of the leading outdoor billboard operator in China in the second quarter of 2007, which operates over 200 highly attractive outdoor billboard locations in major commercial

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

centers in China. Excluding the non-digital outdoor billboard business, commercial locations gross margin would have been 74.6%. We plan to upgrade some of these sites to digital LED billboards upon expiration of the current contracts with the advertisers. This acquisition provides Focus Media with a stronger strategic position for the growth of our digital out-of-home business in the future.

The gross margin for our mobile advertising business was 56.2% in the third quarter of 2007. The gross margin for our Internet advertising business was 23% in the third quarter, lower than previous quarters due to several small acquisitions in this quarter to strengthen the market leadership of Allyes. We expect the gross margin of our Internet advertising business to trend up going forward as we leverage Allyes' strong technology platform to improve the business operations of these acquired entities. Blended gross margin for the Company for the third quarter was 50.9% as compared to 54.6% in the second quarter of 2007, due to the contribution of the lower margin Internet advertising business and in-store advertising business.

Third quarter operating expense totaled $30m including $1.1m in acquired intangible asset amortization resulting from historical acquisitions and non-cash share based compensation expense of $4.4m. As a result operating margin in the third quarter of 2007 was 31.1%. Excluding non-cash share based compensation expense and acquired intangible amortization expense, operating margin on a non-GAAP basis was $36.4m (sic - see press release) in the third quarter. Operating expense in the third quarter of 2007 also includes a one time expense of approximately $2.1m relating to the recent Audit Committee inquiry during the summer.

GAAP net income for the third quarter of 2007 was $46.6m or $0.37 per fully diluted ADS, up 72% from $27m for the same period a year ago. Non-GAAP net income excluding non-cash share based compensation expense and amortization of acquired intangible assets in the third quarter of 2007 was $54.6m, or $0.43 per fully diluted ADS.

Now I'd like to provide Focus Media's business outlook for the fourth quarter of 2007. Please note the following outlook statements are based on our current expectations. These statements are forward-looking and the actual results may differ materially. We expect the total revenues for the fourth quarter of 2007 to be between $160m and $170m. Non-GAAP fully diluted earnings per ADS should be between $0.48 and $0.50.

Thanks very much. Now we'll open the call for your questions. Operator?

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS). Your first question comes from the line of James Mitchell with Goldman Sachs. Please proceed.

**James Mitchell** - *Goldman Sachs - Analyst*

Hi Daniel, hi Jason. Thank you very much for taking my questions this morning. I had a question just about the billboard acquisition you made during the quarter. I think you've disclosed the gross margin including and excluding billboard which implies that billboard had maybe $5m in cost. I wanted to check first whether the billboard business during the quarter was profitable.

And secondly, whether the billboard business was part of the reason why you had increases in sales and marketing costs and increases in receivables during the quarter versus the previous quarter? Thank you.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Let me answer that question, this is Daniel Wu here. First of all the billboard business we acquired is a part of the business and actually the acquisition was also based on similar patterns of Focus Media's previous acquisitions based on multiple year earn-out agreements. So they have to hit performance targets in order to get paid in multiple installments going forward. And their gross margin was roughly about 25% which is normal in the outdoor billboard industry in China.

And the reason we acquired them as we said in the press release is we really think their sites that currently they operate are very attractive. Potentially some of their important sites in major commercial centers can be upgraded to digital LED, which we believe is a much higher margin business going forward. So we will be looking to upgrade in the future when their advertising contract expires.

The AR increase actually in our business is normal. If you look at the DSOs for this quarter, it's roughly about 82 days. It's higher than roughly about 70 days in the previous quarter. But it's within the expectation of 70 to 90 days, to our average we estimate for Focus Media's business. So the overall AR increase was not relating to this billboard acquisition, but it's pretty much how the business operates going forward. So James, hopefully this answers some of your questions.

**James Mitchell** - *Goldman Sachs - Analyst*

Sure. I was also just asking with the sales and marketing, whether the increase there was partly due to the billboard acquisition or whether it was fully organic.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

It's -- normally in the billboard business we also pay sales and marketing. In our industry the sales and marketing average is roughly about 10% to 12% -- 15%. It really depends on different business and different situations. As we explained earlier, for example, commercial location networks, when in a city we enter first which the revenue base was very small, we typically offer higher sales and marketing commissions and in cities which are more mature, we offer lower. So it's a blended base of that. The outdoor billboard business is nothing unusual, out of that norm. So if you look at the overall sales and marketing expense of Focus Media this quarter, it's roughly about 12%, 13%. So it's our average of how we'd expect going forward.

**James Mitchell** - *Goldman Sachs - Analyst*

Okay. I guess the billboard business is sort of a land grab business like some of your other out-of-home businesses. Anyway thank you, I'll get back in the queue.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure, thank you.

**Operator**

Your next question comes from the line of Jason Brueschke with Citigroup. Please proceed.

**Jason Brueschke** - *Citigroup - Analyst*

Thank you. Good morning, everyone. I have two questions, please. The first one is more of a general question involving gross margins. As the media market in China has really been expanding a lot in the last five years and obviously it's very fragmented,

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

it's apparent that Focus has adopted a strategy of acting as a consolidator, at least in selected parts of this market. And my question within this context is how should we be thinking of modeling the gross margins going forward? Since on the one hand most of your targets have lower gross margins at least initially before you acquire them, and notwithstanding the fact that you have an excellent track record of quickly growing those gross margins after the acquisitions, the timing of these deals certainly makes modeling the gross margins more choppy. So maybe for the next three or four quarters, could you give us some general color on what we should be expecting on that front? And then I have a follow-up question. Thanks.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Thanks, Jason. Let me answer this question first and I think overall, Jason can help me relating to the strategic position for Focus Media acquisitions going forward, relating to gross margin.

First of all, if you look at Focus Media's gross margin, how we look at it is we actually look at each media individually. So if you look at the gross margin for commercial location business itself, without the impact of the acquisition of digital out-of-home, digital billboard business, our gross margin is pretty healthy. It's close to our target of 75%.

So the acquisition of the outdoor billboard business, as we discussed a little bit earlier is to allow us to position ourselves to be able to upgrade those digital sites once the contract with advertisers expires. Because otherwise if we don't get into those business, basically we have to compete with existing billboard location operators for those sites. It makes that business much more difficult and potentially costlier. So the acquisition itself for us allows us first of all to expand our presence, and second to get access to those sites through -- from our point of view, it's a more effective means.

If you look at the in-store business, right now we do have a lot of competition so the business as we talked about in the previous quarter, we do expect that business to be under pressure as long as the competitive situation does not resolve itself. But it's still a small percentage of the overall business. The gross margin is still 17% and that means basically we're still making a breakeven or making a slightly small amount of money in that business.

The poster frame business is pretty healthy, how we look at it. Although we are already taking depreciation expense of the digital upgrade, the gross margin still stays about 70%. We expect long-term gross margin to be 75%.

The mobile advertising business gross margin is between 50% to 60% and we expect that to be within range until the 3G upgrade of network has been implemented by the mobile operators.

Internet advertising is actually the lower margin business that we entered recently. If you look at the business we got, we have acquired Allyes and a few others. It basically allows Focus Media to strategically position ourselves for the growth of the Internet advertising business. We are currently in the process of aggregating traffic and establishing a dominant presence in the Internet advertising service business. Going forward with most of the acquisition already being completed, what we expect to do is using our technology strength to do more targeted advertising going forward.

So in the long-term, of course, Internet advertising business we expect, based on the current model, can move towards 35%, 40% in the long-term, of course potentially it could be better. It really depends on how the pay-for-performance search business in China is going to take off. But also if you look at, if you purely focus on gross margin, if we report gross margin on a net basis for that particular business, of course the revenue base will be smaller but net margin will be higher, as some of the U.S. comparable companies does in this particular business.

So Internet advertising is a business we are investing in right now. But we really don't think that that margin at this time is a good representation of the long-term gross margin of our Internet advertising business.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

So just give me one moment. I'll have Jason to update in terms of the strategic position going forward, in terms of how we look at our margin business.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). In terms of acquisition strategy going forward, if you look at Internet, we have done all the major acquisitions for the leading provider of Internet marketing services in China. So going forward the shift of focus is more focus on technology. So if there are good technology for Internet advertising which will help us to improve our business operation of our Internet advertising business, we potentially will consider acquisitions. But if you think about those acquisitions, they are relatively much smaller in size. It's basically if they are a good, emerging technology which we believe will be helpful to improve the operation of the business we already have. And also do keep in mind Allyes is the leading provider of technology solutions for Internet advertising in China, given their large market share.

The second area is regarding the outdoor location, out-of-home locations. If you think about when we look at those, in China, the high traffic locations for out-of-home advertising, there is a scarcity of resources. So it's a very limited number of where you really can do it, where the value really can demonstrate itself and also be appreciated by the advertisers.

So from a Focus Media point of view, given we are already the largest digital out-of-home media provider in China, if there are opportunities for us to get into some of those highly attractive but limited availability of attractive locations through acquisition, we will be considering that because we believe in the long-term, as the China advertising market continues to grow, the resource of locations is always limited, as the best locations will actually attract the best advertisers which offer the highest return for the advertising business.

So the way we look at it is although we have done this acquisition in the second quarter, which expands our presence in the outdoor billboard business, once the advertising contracts with those advertisers for the existing billboards expires, we are looking to upgrade some of them to digital which we believe in the long-term the margin will be better. But also in the future, if there are good opportunities for us to do this, to get hold of some additional highly attractive locations, we'll consider that as well.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Jason, hopefully this addresses some of your questions.

**Jason Brueschke** - *Citigroup - Analyst*

Very helpful. And my follow-up question or my second question actually has to do with the announcement in the press release that you would consider possibly listing separately the wireless advertising division. We haven't really gotten a lot on this business in the previous three quarters as the business has been growing around 300% year-over-year. It's a sleeper business within the overall portfolio. In light of this announcement that you would consider possibly listing it, could you maybe update us and give us some color on the state of the mobile handset advertising market in China, what your competitive position is? And maybe just a few comments on how this business as you see it may be differing from the wireless value-added services business of say a KongZhong or Hurray, which most people might be more familiar with? Thank you.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Thanks, Jason. I'll translate for Jason.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). First of all, regarding the wireless advertising business which we operate, the biggest difference us versus some of the traditional wireless value-added service providers like KongZhong and Linktone is that we do not receive payment from the consumers. We actually get paid by the advertisers. So basically, it's not we are being paid by the consumers through China Mobile. It's not like China Mobile collects the fees and then pays us for the service the consumer purchase. But the relationship in our business is the advertiser pays us, then we pay China Mobile operators. So the consumer does not pay. So the business model is very different.

If you look at the competitive landscape of this business based on industry research, we are roughly about 50% of the market and the market today is roughly about $100m in China. And the remaining market is actually competing by a lot of smaller competitors, much smaller competitors versus us. So if you look at this competitive landscape, the competitive advantage of Focus Media's wireless advertising business is because we control a database -- we actually have a database of more than 200m mobile users in China, which allows us to do better targeting when we deliver ads to those mobile users.

Targeting is extremely important for mobile advertising going forward. Let me give you a couple of examples. First of all, let's say right now what we're doing is we can provide some WAP advertising business. People access WAP, and once they get on the WAP, the advertising they see is based on an address and this digital ID is actually stored in our database, which identifies their traffic patterns. This is very similar to the Internet advertising business.

Also, for example, we work with MSN not only on the Internet side, which Allyes worked with them. We also represent them on the wireless business, Wireless MSN. So we actually deliver ads through one of the largest wireless information platforms and that allows us to target a very attractive profile of consumers in China.

And also, we are also experimenting some location-based business with local regional mobile operators. For example, in the recent Auto Show in Guangzhou, which is one of the largest auto shows in China, the consumers walking through this Auto Show, they will receive three different advertising. This is based on the location where they are at. And so the advertising of course is relating to auto and it's targeting a very attractive potential group of consumers in China.

So all those ways of doing advertising is very similar to the other part of the Focus Media business. If you look at the Focus Media digital out-of-home, look at Focus Media Internet advertising, it's all about to provide highly targeted advertising for our advertising clients.

So for this market, we believe going forward, given the catalyst of 3G upgrade of China Mobile operators, we believe the market will grow going forward at potentially up to 100% on a year-over-year. It's a very small market right now. It's only about $100m. But it's a huge potential, taking into consideration that there are 500m mobile users in China versus only about 160m Internet users in China.

So this advertising media based on our understanding of the market will grow very, very fast going forward. That's why we are considering a possible carve-out of this business, have a separate listing in different exChane, so the business actually can be better appreciated by the investors who are interested in investing in this business. And of course it allows us to continue to operate this business, in this very fast growing business, through a potential consolidation going forward as well if there is such opportunity exists for this business.

So this was a long answer to your short question, Jason.

**Jason Brueschke** - *Citigroup - Analyst*

No, it's very, very helpful. I appreciate that.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Operator**

Your next question comes from the line of Richard Ji with Morgan Stanley. Please proceed.

**Richard Ji** - *Morgan Stanley - Analyst*

Hi Jason, Danny, good quarter.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Thank you.

**Richard Ji** - *Morgan Stanley - Analyst*

And I have two questions, starting with online advertising. Obviously only two quarters after inception, online advertising already become the number two revenue driver for your Company. And just on that note, I'm just wondering about any revenue contribution from your recent acquisition. In another word, what is the organic growth for your Allyes business?

And a follow-up question is again regarding the synergy between your online business and Allyes business and your other business? How much of the sales come from the direct sales from Allyes and how much of that comes from the cross-selling by your sales force in your other business?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Okay. I'll answer the first question and then ask Jason to answer the second. Let me answer the first question. The Allyes business actually quarter-over-quarter grew roughly slightly over 20%. So that business is also growing very healthy and we believe fourth quarter will be another very good quarter for Internet advertising based on the traditional historical seasonality of this business.

So this business is growing very healthy. The additional acquisition we talked about in the press release of some of the smaller acquisitions allows us to establish our market position in terms of attractive verticals, such as auto, real estate, in-game advertising. So those are more like -- these companies are not in any way similar to the scale of Allyes and have as strong a technology base as Allyes. But those advertisers, those Internet marketing service companies already have their presence in a particular vertical industry. We believe those industries will be helpful to consolidate Allyes business going forward. So that's why we made those smaller acquisitions.

I'll ask Jason to help answer in terms of cross-selling versus the sales by Internet advertising sales.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). I think if you look at the Allyes business, when we acquired them they principally operated in Beijing, Shanghai, Guangzhou. And today, given the vast amount of advertising sales coverage of Focus Media, we have already started a joint sales effort with the Allyes sales team in six major cities in China.

But do keep in mind, the principal sales, the sales is still covered by the Allyes sales marketing team. Our sales marketing people is basically to help them to access to clients of Focus Media and help them to successfully converting clients or [lend] clients through their competitiveness -- competitive Internet advertising business. So it's more like they're still driving the sales marketing

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

effort. We are helping them to get access to clients and converting clients. But this effort has actually demonstrated tremendous results because you can see Allyes advertising clients this year has grown very, very fast versus historical levels.

If you think about the long-term Focus Media strategy for the Internet advertising business, we are not a content based Internet advertising business. What we try to do is we try to drive a pay-by-performance based Internet advertising business. The most important thing for pay-by-performance advertising business, which in the future we believe that's the way the future Internet advertising will be because it's a highly targeted feature of pay-by-performance because this delivers actual results for the advertisers. We believe the most important key element for success in the pay-by-performance is being able to aggregate a large amount of traffic. Because if you do not have the traffic then there is very limited reach for pay-by-performance and that's not going to be very attractive from an advertising perspective.

So going forward, Allyes will continue to focus not necessarily through acquisition but acquisition is one of the possibilities. But we have done all the large acquisitions. But we'll also look at trying to work with the web publishers to come up with plans or partnerships or ways to aggregate a large amount of traffic for Allyes technology platform to service. So by doing that, we believe that will give us a very, very comfortable platform to grow our pay-by-performance business.

Today, the sales and marketing effort is still increasingly driven by the Allyes sales team because they have much more experience and knowledge in this Internet advertising business. But next year, starting from 2008, given the growth of our Internet advertising business, given the [ubiquitousness] of our technology deployment by Allyes, we are looking to actually start doing some of the [vendor based] Internet advertising solutions. So if there are vendor-based products which we will be able to deploy next year, then it's possible we'll leverage the near 2,000 sales marketing people within Focus Media's other business to help Allyes to sell those products to their clients. But still this is a plan in the future.

**Richard Ji** - *Morgan Stanley - Analyst*

Thank you Daniel.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure.

**Richard Ji** - *Morgan Stanley - Analyst*

Another -- hello?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Yes, go ahead. Yes, Richard.

**Richard Ji** - *Morgan Stanley - Analyst*

My second question is regarding your poster frame network. Obviously it shows very robust growth. And I'm just wondering how much of the revenue comes from your Digital Frame 2.0? And obviously Frame 2.0 will increase significantly your advertising inventory for your poster frame network. On the other hand what is the pricing difference between Frame 1.0 and Frame 2.0?

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Let me answer this question. The way how it's sold, if you think about our digital upgrade process, is there is really no different price for digital and the traditional, except if advertiser buys digital they actually only get 30 seconds out of the one and half minute cycle.

So if you think about any advertiser, Volkswagen. If they come to Shanghai and want to do advertising, we may have 20,000, 30,000 different frames in Shanghai. They will provide basically a demographic profile of their preferred location. They do not usually advertise in all the 30,000 buildings, 30,000 locations. They will say I want this type of income level, depends on the model of the car, I want to reach these areas, locations. Or I have a preference to a certain type of people, or certain type of residence profile, like close to college or those type of things.

When they specify those profiles, we go through our database, come up with maybe 5,000 locations where we think it's suitable for their advertising. And once they buy 5,000 locations, out of those 5,000 locations maybe 10% of them are already upgraded to digital. So they don't pay a separate price for digital. They still buy those 5,000 locations, but with the knowledge of those digital sites potentially they have to share with two additional advertisers, they will only get 30 seconds out of one and a half minute cycle. So there's really no different price strategy for the digital frame. It's just a continuous upgrade of our networks.

But of course as the digital rollout is getting larger and larger, the network itself actually can be sold separately. So there may be advertisers -- there are advertisers coming to us, saying I only want to buy digital because my advertising is only -- we believe it's not suitable for traditional advertising, traditional paper-based advertising. Now our advertising we want to have this digital image. In those situations we do sell, but of course the price will be the same as we published on the website, but different discount levels are negotiated, depends on the actual situation. So this is how we sell the digital versus the traditional for the poster frame network.

If you look at what we have reported, the digital frame basically accounts for three times of capacity. So basically if you have 100 traditional and you have 10 digital, then your capacity becomes a 100 plus 10 times 3, so it become 130. So even with the increased capacity in our business, our utilization rate continues to go up sequentially versus last quarter. So basically it shows that digital upgrade has tremendous attraction to a lot of the advertisers. And we really don't see those additional created inventory left open because there are people picking up those inventories because of the attractiveness of the digital upgrade.

---

**Richard Ji** - *Morgan Stanley - Analyst*

Okay, great.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Does that --

---

**Richard Ji** - *Morgan Stanley - Analyst*

Yes.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Answer your question?

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Richard Ji** - *Morgan Stanley - Analyst*

Yes. Very helpful. Thank you Daniel.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Thank you.

**Operator**

Your next question comes from the line of Eddie Leung with Merrill Lynch. Please proceed.

**Eddie Leung** - *Merrill Lynch - Analyst*

Hi. Good morning Jason and Daniel. Good quarter. A question regarding your core office buildings network, could you give us an update on the progress you have made in providing those customized solutions to advertisers in terms of geographical segmentation? And what kind of lessons have you learnt from testing these new offerings in the past quarter?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Okay. Great. Let me translate for Jason.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). A couple of examples we can give to you is as follows. If you think about, let's say if there's a real estate advertiser, he has a new residential project in Shanghai, want to advertise in Shanghai. What we can actually allow him to advertise is -- he can actually only show the advertising in the areas near where their construction project is. So let's say this residential project is in Pu Dong. Shanghai is Pu Dong and Pu Xi. So if they are in Pu Dong, then he don't have to pay for the buildings in Pu Xi to show their advertising. He only needs to pay for those buildings in Pu Dong, where we have network, to show his particular residential project. This particular coverage, this may be only about 20% of all the buildings Focus Media has in Shanghai, but typically this advertiser would have to pay roughly maybe 40% versus the price otherwise he would have to pay for the entire Shanghai if he had to show advertising in all those buildings. So for us it's actually -- it's a better cost, better cost/benefit on a computing basis, allows us to achieve higher margins. But for him his advertising is much more targeted, because he doesn't have to pay for those eyeballs in Pu Xi which potentially the likelihood of becoming his customer is less.

So also another example we could take is Mercedes Benz. If Mercedes Benz only wants to advertise in the top 100 buildings in major cities in China because he believes all his customers is in those top 100 locations in major cities in China. So of course we can charge him our average, relatively to otherwise he would have paid for the entire city, we will charge him a lower rate. But because his advertising is only showing in those 100 buildings, top buildings in the city, we are able to achieve better revenue on per building basis for our network.

So these type of customer advertising is actually gaining more and more traction. Because, first of all, it is very unique. You cannot do it with newspaper, you cannot do it with TV. So it's a highly targeted feature. It allows Focus Media to become more competitive and be more customized for our advertising clients. And actually also allows us to improve our revenue and margin of our commercial location business going forward.

So this idea is very similar to all the other business Focus Media operates. If you think about, we talked about pay-for-performance for Internet advertising, it's the same thing, it's about targeting. If you think about the digital upgrade of Frame 2.0, it's the same

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call |
|---|

thing. It allows us to do much better targeting within the residential sector. So these are the things is consistent with Focus Media's strategy of providing highly targeted advertising solutions for advertisers. So that's how we look at this particular business. Eddie?

---

**Eddie Leung** - *Merrill Lynch - Analyst*

Thank you. It's really a very quick follow up. Are these different solutions available to most clients or just a select group of advertisers?

---

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). Today it's still a small percentage of revenue. But if you think about, not only do we need to provide a tailored solution for the advertiser based on location profile of their requirements, but also let's say if this advertiser only advertising in Pu Dong, we need to find an advertiser who will only advertise in Pu Xi to balance out the utilization of the network, to maximizing the evaluation of the network.

So today it's still early stage. But as more and more advertiser understands the attractiveness of this particular solution, and as our sales and marketing people more and more understand the new sales approach for these type of solutions for a group of advertisers, we believe these type of sales marketing will increase in overall revenues allowing us to increase the margins of our commercial location network.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Eddie?

---

**Eddie Leung** - *Merrill Lynch - Analyst*

Thank you.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure.

---

**Operator**

Your next question comes from the line of Ming Zhao with SIG. Please proceed.

---

**Ming Zhao** - *Susquehanna International Group - Analyst*

Thank you for taking my questions. Two questions. One is for Jason one is for Daniel. Hi Jason. (Spoken in foreign language). So my first question is what cities are those billboards in? How many of them are from Beijing and Shanghai?

And when will those existing advertising contracts start?

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). For this company, the outdoor billboard company we acquired in Q2 of 2007, the majority of their sites are located in Beijing, Guangzhou, Shanghai. Of course they also have locations in major second-tier cities like Chengdu, Wu Han, those locations where have very highly traffic commercial locations in those particular cities.

Typical advertising contract in the China outdoor billboard business is roughly about one year or two years. And of course some of the advertising contract already under execution when we acquired the business, so they may have six months left. So when those current advertising contract expires, we look at selectively upgrade those sites to digital if the opportunity presents to us.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

So does this answer your question? Jason? Mr. Zhao?

**Ming Zhao** - *Susquehanna International Group - Analyst*

Okay. That's good. Another question for Daniel here. If I look at the cash flow statement and try to understanding this item which is the prepayments to acquired subsidiaries. It's about $25m booked for the third quarter of '07. And my question is, if I look at this item, this should be the amount that you -- sort of a deposit payment. But does that mean the acquisitions have been included in the third quarter's revenue contribution?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Yes. But first of all, the full question if the acquisition has been concluded. But do keep in mind a lot of the acquisitions we've done are multiple year earn-out basis. So that's why it's shown as a deposit because it really depends on how they achieve their committed net income target, so that's how they get paid.

**Ming Zhao** - *Susquehanna International Group - Analyst*

But why, if the acquisition is concluded, why this not -- I notice there's another line which is the purchase of subsidiaries.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Yes.

**Ming Zhao** - *Susquehanna International Group - Analyst*

So my understanding would be if it is a closed acquisition, already closed, then why we should not put in the amount into that line?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

It's different. I think the line you're looking at, purchase of subsidiary net of cash acquired is basically, is the cash acquired. But if you look at this deposit to, paid to acquired subsidiary, let's say if we buy a company for $1m. And we pay them 40% advance -- deposit. We'll pay them 40% as deposit. And if they miss their earn-out target in the year one, we can potentially get back some of the money. So that's why it's showing as deposit paid to acquired subsidiaries.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call |
| --- |

**Ming Zhao** - *Susquehanna International Group - Analyst*

Okay, got you. Thank you very much.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Next question operator? Hello, operator?

---

**Operator**

The next question comes from the line of Jackie Chan from CIBC World Markets. Please proceed.

---

**Jackie Chan** - *CIBC World Markets - Analyst*

Hi Jason, Daniel. How are you? My name is Jackie Chan on behalf of Jason Helfstein from CIBC.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Hi Jackie.

---

**Jackie Chan** - *CIBC World Markets - Analyst*

We have a couple of questions regarding the quarter. First of all, [when do you expect] to announce rate card increases?

And how does the recent CCTV auction impact your view of 2008 pricing?

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Okay. First of all on the rate card, we will do a rate card increase for January. We will put that on the website shortly. This, as we discussed previously, it will be similar as we did in 2007.

Regarding the CCTV impact, I'll ask Jason to answer that.

---

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). I think if you look at the CCTV rate card for 2008 it's showing the fastest rate increase historically. So it provides very good comparable because TV advertising is our direct comparable media in China. So it's the benchmark for all advertising. So if CCTV expect a very good year, we would expect the pricing environment for 2008 to be very healthy.

We do expect to increase price in January of 2008 10%, 15% for our rate card for the commercial location network, maybe higher for the other media. And of course in July, we also typically, in the mid of the year, before Olympics in July, we also have another rate card increase expected between 10%, 15%.

But in the Olympic cities, in key cities, we expect the demand of the advertising to be very strong during those period especially in 2008, before and during and after Olympics. So during those periods, we believe our discount rate negotiation would be

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

more favorable. So we would possibly be able to reduce our discount to achieve better advertising returns for our media in 2008.

**Jackie Chan** - *CIBC World Markets - Analyst*

Thanks.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Thanks. Sure.

**Jackie Chan** - *CIBC World Markets - Analyst*

Our next question is for commercial Channel B, which was your bigger driver in the quarter, is it pricing, volume or both of them?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Commercial location Channel B is very similar, it's not much different versus all our other commercial location networks. So itself, we don't -- given how we sell today, we don't have a separate track of its revenues or ASPs by itself. Because a lot of the sales for commercial locations different channels are on [partner] basis. So it's no different from the average commercial location business we have.

**Jackie Chan** - *CIBC World Markets - Analyst*

Okay. Thanks.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure.

**Jackie Chan** - *CIBC World Markets - Analyst*

And my final question was what was the pricing growth in the tier-two markets?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

As we explained earlier, tier-two markets each -- there are so many different tier two cities. If you look at Focus Media we cover directly more than 50 cities. If you say Beijing, Shanghai and [Shenzhen] are tier one, then tier-two city will be more than 40. In those 40 cities the pricing are very different each city. It really depends on the size of the city, size of the network, how long we've been there and also local economy of those cities. So, for example, in Chengdu the price will be a lot higher than Xi'an.

So I wouldn't say that a blended rate of tier two cities is a meaningful indicator of how our business going forward. Because a blended rate for all tier-two cities really depends on the contribution of different revenue of each of the tier-two cities. But overall, as you've seen, we've said the pricing environment is very healthy. So we expect each of those cities as they continue to increase utilization rates, we'll have a pricing power in those tier-two cities.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

**Jackie Chan** - *CIBC World Markets - Analyst*

Okay. Thank you very much.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Okay. Thanks Jackie.

**Jackie Chan** - *CIBC World Markets - Analyst*

Thanks.

**Operator**

Your next question comes from the line of Aaron Kessler with Piper Jaffray. Please proceed.

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

Hi Daniel and Jason. Just a couple of questions. First on the online advertising acquisitions, were those all technology related or were there any content based ones?

And we heard that you may have acquired PCPOP. I don't know if you can indicate whether you did or not.

And then I have one follow-up question.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

What's the company you said?

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

PCPOP I believe.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

PCPOP.

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Okay. First of all online advertising, what we're doing is, as we talked about, we don't do content. So we try to do is we aggregate traffic with services, web publishers. So what we do is called Internet advertising service. So basically we will provide digital market solutions for websites. So we don't get involved in content, as we discussed several times regarding our Internet strategy going forward.

Regarding specific acquisitions, we don't openly to discuss that, but PCPOP is not something we have acquired. But I don't think we want to discuss specifically what we're buying or what we're not buying.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

Okay. And then as a follow-up question, last quarter I believe you indicated you were going to stop giving the metrics for the commercial segment. And a part of the reason why is you're changing the cycle times to more custom based. What's the impact of that, or what will be the impact of the change in cycle times going forward here?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

I think, first of all, regarding the customized solutions, we already discussed earlier on this call when Eddie of Merrill Lynch asked his question.

Regarding the cycle time, we believe in the long term, based on the average standing time in the lift lobbies in China major cities, the potential cycle time could get to about 18 to 20 minutes. But right now we are -- in different cities we have a different cycle time. It really depends on the demand of those particular cities. So hopefully that will answer your question.

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

Will that drive an increase --

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Hold on a second, yes.

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). In addition to the commercial location network expanding cycles in major cities, right now some of the Beijing, Shanghai, Guangzhou centers we already have a base cycle time of 15 minutes. But we also look at extending the coverage of the commercial location network consumers' eyeball through addition of Frame 2.0 digital frame, in, not lobby floors, but on the second, third level or fourth level floor, near the elevators. So it allows us basically in principle to use these different media, adding the media reach of our commercial location network and providing additional exposure time of eyeballs of those highly attractive consumers.

And so if you think about people waiting for the lift twice a day, lunch and the morning peak time, what we try to do is to extend that eyeball exposure from roughly about 300 seconds to 600 seconds, so allow our advertisers to do better and increasing the potential, growth potential and revenue generating potential of our media for the commercial location business.

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

And what's the revenue impact if you're going from a 12 or 15 minute cycle time to maybe 18 to 20 minutes over time? What is the revenue impact and how should we think about that?

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

I think it's -- revenue impact is similar if you think about -- similar to what we have done historically. If you think about three years ago, our business was on a six-minute cycle in Shanghai. So we already increased from six minutes to nine minutes and to 12 minutes and now to 15 minutes. So if you think about the published price of (inaudible) ads, it allow us to use the price we publish for every 30 second spot, continue to increase the price for a 30 second spot based on a similar rate of discount. So

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call |
| --- |

the ASP increases on the same pace as the published increase of list price, but at the same time, allows us to [expand] higher inventory because the cycle times are longer.

So really, what we're doing today is no different than what we did in 2004 and 2005 and 2006.

---

**Aaron Kessler** - *Piper Jaffray & Co - Analyst*

Great. Thank you.

---

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Thanks.

---

**Operator**

Your next question comes from the line of Marisa Ho with Credit Suisse. Please proceed.

---

**Marisa Ho** - *Credit Suisse - Analyst*

Hello Jason, hello Daniel. I just have a quick -- a couple of questions on the latest billboard acquisition. Assuming you start updating those billboard, I mean within about six months to about a year, how long do you think it is going to take for the whole conversion process to be finished? Are we talking about substantially all the 200 billboards being converted to LED going forward?

And what is the CapEx you are budgeting for the conversion?

---

**Jason Jiang** - *Focus Media Holding Ltd - Chairman & CEO*

(Interpreted). I think that we just acquired this outdoor digital company in China in the second quarter so we're still in the process of evaluating all their sites.

In terms of the converting traditional billboards to digital billboards, there are a lot of factors we need to take into consideration such as lighting impact on the surrounding neighborhood, such as the weight tolerance of the current construction, the current building, electricity supply. And of course we need to get government approval if we convert a traditional poster to a digital billboard. So all those things take time to work. Of course, it's reduced the work. The biggest entry barrier are basically access to the sites itself.

So we are in the process of evaluating all those things throughout the outdoor digital billboard network. And we probably will be able to provide some idea in our 2008 guidance for CapEx in 2008. But at this time, we don't have a specific number which we can provide to you because all those things we're evaluating right now site by site.

---

**Marisa Ho** - *Credit Suisse - Analyst*

Excellent. Thanks very much.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 19. 2007 / 8:00PM, FMCN - Q3 2007 Focus Media Holding Ltd. Earnings Conference Call**

**Daniel Wu** - *Focus Media Holding Ltd - CFO*

Sure. Operator, I think that ends the call.

---

## Operator

Thank you for your participation in today's conference. This concludes your presentation. You may now disconnect and have a good day.

---

## Editor

Portions of this transcript that are noted 'interpreted' were interpreted on the conference call by an Interpreter present on the live call. The interpreter was provided by the Company sponsoring this Event.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2007, Thomson Financial. All Rights Reserved.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit J

# CIBC World Markets

**Equity Research**
**Company Update**

November 20, 2007

Media and Internet

**Stock Rating:**
## Sector Outperformer

**Sector Weighting:**
## Market Weight

| | |
|---|---|
| 12-18 mo. Price Target | $70.00 |
| FMCN-NASDAQ (11/20/07) | $52.00 |
| Key Indices: None | |

| | |
|---|---|
| 3-5-Yr. EPS Gr. Rate (E) | 26.0% |
| 52-week Range | $29.32-$66.30 |
| Shares Outstanding | 129.0M |
| Float | 110.0M Shrs |
| Avg. Daily Trading Vol. | 3,204,560 |
| Market Capitalization | $6,708.0M |
| Dividend/Div Yield | Nil / Nil |
| Fiscal Year Ends | December |
| Book Value | $11.37 per Shr |
| 2007  ROE (E) | 18.0% |
| LT Debt | NA |
| Preferred | Nil |
| Common Equity | $1,466.3M |
| Convertible Available | No |

| Earnings per Share | Prev | Current |
|---|---|---|
| 2007 | | $1.51E |
| 2008 | | $1.98E |
| 2009 | | $2.47E |
| P/E | | |
| 2007 | | 34.4x |
| 2008 | | 26.3x |
| 2009 | | 21.1x |
| Non-GAAP EPS diluted. | | |

**GAAP EPS**
2007  $1.33E
2008  $1.74E
2009  $2.20E

**First Call EPS**
2007  $1.42
2008  $1.90
2009  $2.48

**Company Description**
Focus Media is the leading digital out-of-home media company in China, utilizing live motion displays.

www.focusmedia.cn

**Jason Helfstein**
1 (212) 667-6433
Jason.Helfstein@us.cibc.com

**Paul Keung**
1 (212) 667-7789
Paul.Keung@us.cibc.com

# Focus Media

## Emotion is Driving Stock on Transparency Issues, Ests Unchanged; Reit SO Rating

■ After a detailed review of our model, our non-GAAP EPS ests remain unchanged. We believe the sell-off is largely driven by an emotional response to FMCN's lack of transparency.  Moreover, at 26x our '08 est. the stock is trading 20% below its Chinese media peers.

■ After a detailed review/overhaul of our model, we still believe FMCN can achieve our original non-GAAP EPS ests, even with the dilution from the recent offering. We believe 4Q guidance implies seq rev growth of 6%-12% vs. 17% in 3Q, and co is adding 350 digital frames a month pos for '08.

■ On 9/27, mgmt provided 3Q rev guidance 13% ahead of Street expectations, with the implication that upside was from organic growth. However, the upside was entirely from acquisitions.

■ As the billboard acquisition is out of the co's core-expertise, with lower margins, '08 ests were artificially inflated by including these revs at commercial margins.  However, our analysis suggests core margins remain healthy, and we have adjusted '08 for billboard margins.

**Stock Price Performance**



Source: Reuters
*All figures in US dollars, unless otherwise stated.*
07-85396 © 2007

CIBC World Markets does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

**See "Important Disclosures" section at the end of this report for important required disclosures, including potential conflicts of interest.**

**See "Price Target Calculation" and "Key Risks to Price Target" sections at the end of this report, where applicable.**

Find CIBC research on Bloomberg, Reuters, firstcall.com and cibcwm.com

CIBC World Markets Inc., P.O. Box 500, 161 Bay Street, BCE Place, Toronto, Canada M5J 2S8    (416) 594-7000
CIBC World Markets Corp., 300 Madison Avenue, New York, NY  10017-6204    (212) 667-7000   (800) 999-6726

# Emotion is Driving Stock on Transparency; Estimates Unchanged

After a detailed review of our model, our non-GAAP EPS estimates remain unchanged.  We believe the sell-off is largely driven by an emotional response to the company's lack of transparency. Moreover, at 26x our '08 estimate, which represents a 20% discount to its Chinese Media/Internet peers, we believe the stock is attractive at current levels.

- On 9/27, management provided 3Q revenue guidance 13% ahead of Street expectations, with the implication that upside was from organic growth. However, after reporting 3Q earnings on Monday night, we learned that the upside was entirely from the acquisition of billboard and online assets.

- Moreover, these acquired static billboards are somewhat out of the company's core-expertise.  While the company plans to upgrade these to LED displays, its previous outdoor digital displays have not been a success, in our view.  Moreover, until these displays are upgraded (presumably some time in 2008), margins are likely to remain below its commercial business. As such, prior '08 estimates were artificially inflated by including these revenues at commercial margins, and we have accordingly adjusted our '08 for the static billboard margins.

- While we don't have an issue with the company's acquisition strategy, which is generating accretive returns above its cost of capital, the lack of disclosure is an issue for many investors.

- Excluding acquisitions, 3Q commercial revenues increased 13% sequentially, while online increased 20% sequentially. For commercial revenues, we are now assuming 9% sequential revenue growth in 4Q, and we are unaware of additional acquisitions.  Overall, we believe 4Q guidance implies overall sequential revenue growth of 6%-12% (vs. 17% in 3Q).

- However, based on our discussions with ad agency contacts, we believe growth is expected to accelerate into 4Q, implying the company's overall revenue guidance could prove conservative.

- Our analysis of gross margins suggests that core margins remain healthy, and this should not be a concern going into 2008.  Moreover, the company appears to be adding 350 digital frames a month, which we believe are generating $500-$700 per quarter, and acceleration in this business should improve visibility going into '08.

- However, after a detailed review of our model, we still believe the company can achieve our original non-GAAP EPS estimates, even with the dilution from the recent offering (see Exhibit 4).  As such, we reiterate our SO rating and $70 price target.

- Our $70 price target assumes the stock can trade at 30x a calendar-weighted average of our 2008 (25%) and 2009 (75%) estimates of $1.98 and $2.47.  We believe a 30x PE multiple is appropriate, given annual expected EPS growth of 26% from 2007 to 2010, faster than any other media, including most China Internet stocks.

**Emotion is Driving Stock on Transparency Issues, Ests Unchanged, Reit SO Rating - November 20, 2007**

## Exhibit 1.  3Q Actual vs. Expected

| | Guidance | Actual | CIBC Est. | Consensus Est. | Actual vs. CIBC | Actual vs. Consensus |
|---|---|---|---|---|---|---|
| Revenue | $132-135 | $151.4 | $134.0 | $129.4 | 13% | 17% |
| EBITDA | | $59.0 | $60.3 | $58.6 | -2% | 1% |
| Non GAAP Net Income | $52-54 | $54.6 | $53.7 | NA | 2% | NA |
| Non-GAAP EPS | $0.41-0.43 | $0.43 | $0.43 | $0.44 | 1% | -2% |
| GAAP EPS | | $0.37 | $0.37 | $0.37 | -1% | 0% |

Source:  Company reports and CIBC World Markets Corp.

## Exhibit 2.  4Q Guidance vs. Estimates vs. Consensus

| | Guidance | Actual | CIBC Est. | Consensus Est. | Guidance vs. CIBC | Guidance vs. Consensus |
|---|---|---|---|---|---|---|
| Revenue | $160-170 | $170.2 | $140.8 | $142.6 | 17% | 16% |
| EBITDA | | $68.2 | $70.4 | $67.5 | - | - |
| Non GAAP Net Income | $62-64 | $63.9 | $62.7 | NA | 0% | NA |
| Non-GAAP EPS | $0.48-0.50 | $0.50 | $0.50 | $0.49 | -1% | 0% |
| GAAP EPS | | $0.44 | $0.44 | $0.43 | - | - |

Source:  Company reports and CIBC World Markets Corp.

## Exhibit 3.  Quarterly Estimate Revisions

| | 4Q:07E | | |
|---|---|---|---|
| | New | Old | Delta |
| Commercial network advertising | $69.5 | $64.5 | $5.0 |
| In-store network | 7.0 | 7.3 | ($0.3) |
| In-elevator poster frame network | 22.7 | 24.6 | ($1.9) |
| Mobile advertising | 16.0 | 12.0 | $4.0 |
| Online advertising | 54.8 | 32.0 | $22.8 |
| Advertising equipment revenue | 0.1 | 0.3 | ($0.2) |
| **Total revenues** | **$170.2** | **$140.8** | **$29.5** |
| y/y growth | 149% | 106% | |
| | | | |
| EBITDA | $68.2 | $70.4 | ($2.2) |
| y/y growth | 86% | 93% | |
| margin | 40% | 50% | |
| | | | |
| Net income | $56.6 | $56.1 | $0.5 |
| GAAP EPS Diluted | $0.44 | $0.44 | $0.00 |
| Non-GAAP EPS Diluted | $0.50 | $0.50 | ($0.00) |

Source:  Company reports and CIBC World Markets Corp.

**Exhibit 4.  Annual Estimate Revisions**

| | 2008E | | | 2009E | | |
|---|---|---|---|---|---|---|
| | New | Old | Delta | New | Old | Delta |
| Commercial network advertising | $297.1 | $274.2 | $22.9 | $343.9 | $323.8 | $20.1 |
| In-store network | $28.0 | $32.1 | ($4.1) | $30.8 | $38.8 | ($8.0) |
| In-elevator poster frame network | $138.7 | $117.7 | $20.9 | $169.4 | $147.2 | $22.2 |
| Mobile advertising | $66.6 | $50.0 | $16.7 | $86.6 | $64.9 | $21.6 |
| Online advertising | $206.8 | $159.8 | $47.0 | $279.2 | $215.8 | $63.4 |
| Advertising equipment revenue | $1.1 | $1.5 | ($0.5) | $1.1 | $1.5 | ($0.5) |
| **Total revenues** | **$738.2** | **$635.3** | **$102.9** | **$910.9** | **$792.0** | **$118.9** |
| y/y growth | 50% | 42% | | 23% | 25% | |
| | | | | | | |
| **EBITDA** | **$304.1** | **$291.7** | **$12.4** | **$378.9** | **$360.6** | **$18.3** |
| y/y growth | 50% | 42% | | 25% | 24% | |
| margin | 41% | 46% | | 42% | 46% | |
| | | | | | | |
| Net income | $224.8 | $210.4 | $14.4 | $285.6 | $267.2 | $18.4 |
| GAAP EPS Diluted | $1.74 | $1.74 | $0.01 | $2.20 | $2.19 | $0.01 |
| **Non-GAAP EPS Diluted** | **$1.98** | **$1.98** | **($0.00)** | **$2.47** | **$2.47** | **$0.00** |

Source:  Company reports and CIBC World Markets Corp.

# Price Target Calculation

Our $70 price target assumes the stock can trade at 30x a calendar-weighted average of our 2008 (25%) and 2009 (75%) estimates of $1.98 and $2.47.  We believe a 30x PE multiple is appropriate, given annual expected EPS growth of 26% from 2007 to 2010, faster than any other media, including most China Internet stocks.

# Key Risks to Price Target

**Economic slowdown**--Advertising spending is sensitive to changes in general economic conditions and typically decreases during an economic downturn. An economic slowdown might adversely affect advertising spending on Focus Media's network more so than for mainstream media.

**Integration risks related to acquisitions**--Focus Media has completed multiple acquisitions, and integrating these new operations, services and personnel with its existing operations requires significant attention from senior management.

**Regulatory risks**--Outdoor advertising is subject to regulation by several supervisory bodies in China. Regulatory changes may cause uncertainties for Focus Media's operation.

**FMCN likely will face increasing competition from state-owned enterprises, which control China's media and broadcasting sector.**

Emotion is Driving Stock on Transparency Issues, Ests Unchanged, Keep SO Rating - November 26, 2007

## Exhibit 5.  FMCN Income Statement (in million, except per share data)

| | 2005 | 1Q06 | 2Q06 | 3Q06A | 4Q06A | 2006A | 1Q07A | 2Q07A | 3Q07A | 4Q07E | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Commercial network advertising | $61.4 | $21.5 | $31.1 | $38.9 | $42.0 | $133.4 | $32.4 | $51.1 | $64.6 | $69.5 | $217.6 | $297.1 | $343.9 |
| Acqs | | | | | | | | $4.5 | $12.0 | $12.0 | $28.5 | $48.0 | $57.6 |
| Organic | | | | | | | | $46.6 | $52.6 | $57.5 | $189.1 | $249.1 | $286.3 |
| Seq Growth | | | | | | | | | 13% | 9% | | | |
| Y/Y Growth | | | | | | | | 50% | 35% | 37% | 42% | 32% | 16% |
| In-store network | 5.5 | 5.3 | 6.5 | 7.3 | 7.9 | 26.9 | 6.7 | 7.2 | 7.1 | 7.0 | 28.0 | 28.0 | 30.8 |
| In-elevator poster frame network | | 6.1 | 9.8 | 11.3 | 13.8 | 40.9 | 12.7 | 18.5 | 23.1 | 22.7 | 77.1 | 138.7 | 169.4 |
| mobile advertising | | | 3.1 | 3.5 | 3.5 | 10.1 | 6.0 | 10.9 | 14.0 | 16.0 | 46.9 | 66.6 | 86.6 |
| Online Ad (Allyes) | | | | | | | 25.2 | 42.5 | 54.8 | | 122.6 | 206.8 | 279.2 |
| Acqs | | | | | | | $0.0 | $12.2 | $13.4 | | | | |
| Organic | | | | | | | $25.2 | $30.3 | $41.4 | | | | |
| Seq Growth | | | | | | | | 20% | 37% | | | | |
| Other Revenues | 1.3 | 0.3 | 0.1 | 0.1 | 1.2 | 1.7 | 0.4 | 0.3 | 0.1 | 0.1 | 0.9 | 1.1 | 1.1 |
| **Total revenues** | **$68.2** | **$33.1** | **$50.6** | **$61.1** | **$68.3** | **$213.0** | **$58.1** | **$113.3** | **$151.4** | **$170.2** | **$493.0** | **$738.2** | **$910.9** |
| y/y growth | 133% | 245% | 246% | 213% | 177% | 212% | 75% | 124% | 148% | 149% | 131% | 50% | 23% |
| q/q growth, ex. Acq. | | NM | 53% | 21% | 12% | 59% | -15% | 44% | 17% | 12% | -38% | -62% | -53% |
| | | | | | | | | | | | | | |
| **Operating expenses** | | | | | | | | | | | | | |
| Commercial networks, excl. Dep | (18.4) | (6.2) | (8.3) | (8.3) | (8.3) | (31.0) | (9.4) | (13.8) | (18.5) | (19.8) | (61.5) | (86.3) | (99.7) |
| In-store networks, excl. Dep | (7.4) | (3.3) | (3.6) | (3.8) | (4.1) | (14.9) | (3.3) | (4.1) | (4.7) | (4.6) | (17.4) | (17.9) | (19.7) |
| In-elevator poster frame network | | (2.4) | (2.8) | (3.3) | (3.4) | (11.9) | (4.2) | (5.3) | (6.7) | (6.4) | (22.5) | (41.6) | (50.8) |
| Mobile networks | - | | (2.3) | (2.1) | (1.3) | (5.7) | (2.6) | (4.6) | (6.1) | (6.7) | (20.0) | (26.6) | (32.0) |
| Online network | | | | | | | | (18.4) | (32.7) | (41.1) | (92.2) | (155.1) | (201.0) |
| Net advertising service cost, excl. Dep | ($25.8) | ($11.9) | ($17.0) | ($17.4) | ($17.1) | ($63.5) | ($20.1) | ($46.1) | ($68.8) | ($78.7) | ($213.6) | ($327.5) | ($403.3) |
| Gross margins | 62% | 64% | 66% | 71% | 75% | 70% | 65% | 59% | 55% | 54% | 57% | 56% | 56% |
| | | | | | | | | | | | | | |
| Other costs | (1.0) | (0.2) | (0.1) | (0.1) | (0.4) | (0.8) | (0.2) | (0.1) | (0.1) | (0.1) | (0.5) | (0.3) | (0.8) |
| G&A | (7.9) | (3.3) | (4.7) | (4.6) | (6.7) | (19.3) | (6.5) | (9.1) | (10.1) | (9.5) | (35.2) | (43.7) | (48.1) |
| Selling & marketing (ex. stock-based exp.) | (9.5) | (3.7) | (5.0) | (6.3) | (7.5) | (22.5) | (7.8) | (11.1) | (16.7) | (17.0) | (52.6) | (73.7) | (91.0) |
| **Cash operating expenses** | **($44.1)** | **($19.1)** | **($26.8)** | **($28.4)** | **($31.7)** | **($106.0)** | **($34.6)** | **($63.7)** | **($92.4)** | **($102.0)** | **($290.8)** | **($434.1)** | **($532.0)** |
| y/y growth | 173% | 181% | 168% | 119% | 102% | 140% | 81% | 138% | 225% | 222% | 174% | 49% | 23% |
| | | | | | | | | | | | | | |
| **EBITDA** | **$28.4** | **$14.0** | **$23.8** | **$32.7** | **$36.6** | **$107.0** | **$23.5** | **$49.6** | **$59.0** | **$68.2** | **$202.2** | **$304.1** | **$378.9** |
| y/y growth | 98% | 214% | 295% | 317% | 211% | 276% | 67% | 109% | 81% | 86% | 89% | 50% | 25% |
| margin | 42% | 42% | 47% | 54% | 54% | 50% | 40% | 44% | 39% | 40% | 41% | 41% | 42% |
| | | | | | | | | | | | | | |
| Stock-based comp | (0.7) | (1.5) | (1.9) | (1.6) | (3.4) | (8.4) | (4.5) | (4.4) | (4.7) | (4.0) | (15.8) | (19.8) | (23.7) |
| D & A | (4.9) | (3.5) | (5.2) | (5.3) | (5.6) | (19.6) | (5.8) | (7.6) | (8.4) | (8.8) | (30.6) | (33.2) | (37.2) |
| Operating income | $22.8 | $9.0 | $16.7 | $25.8 | $27.6 | $79.1 | $13.2 | $37.0 | $45.9 | $55.5 | $155.9 | $251.2 | $318.0 |
| y/y growth | 76% | 212% | 270% | 297% | 210% | 247% | 46% | 122% | 78% | 101% | 97% | 61% | 27% |
| margin | 33% | 27% | 33% | 42% | 40% | 37% | 23% | 33% | 30% | 33% | 32% | 34% | 35% |
| | | | | | | | | | | | | | |
| Net Interest | 1.8 | 0.9 | 0.6 | 1.1 | 1.7 | 4.3 | 2.4 | 1.9 | 1.6 | 1.6 | 7.8 | 14.0 | 21.0 |
| Other income (expenses) net | (0.2) | 0.0 | (0.1) | 0.0 | 1.2 | 4.3 | 1.4 | 1.1 | 1.2 | 1.3 | 5.0 | 4.0 | 3.0 |
| Change in fair value of derivative | - | | | | | | | | | | - | | |
| Pre-tax Income | $24.4 | $10.0 | $17.1 | $26.7 | $30.5 | $87.7 | $17.2 | $40.0 | $48.7 | $58.4 | $168.6 | $269.2 | $342.0 |
| | | | | | | | | | | | | | |
| Taxes | 0.7 | (0.6) | (0.4) | 0.3 | (0.4) | (1.0) | (1.0) | (2.3) | (2.1) | (1.8) | (7.1) | (44.4) | (56.4) |
| Minority interest | 0.1 | 0.0 | (0.1) | (0.0) | (0.0) | | | | | | | | |
| Equity loss of affiliates | - | | | | | - | | | | | - | - | - |
| **Net income** | **$25.2** | **$9.4** | **$16.7** | **$27.0** | **$30.1** | **$86.6** | **$16.3** | **$37.7** | **$46.6** | **$56.6** | **$161.4** | **$224.8** | **$285.6** |
| Y/Y Growth | | 254% | 291% | 280% | 204% | 243% | 73% | 126% | 73% | 88% | 86% | 39% | 27% |
| Amort of intangibles | 0.4 | 1.0 | 1.5 | 1.6 | 1.7 | 5.8 | 1.9 | 2.7 | 3.3 | 3.3 | 11.2 | 11.2 | 11.2 |
| stock-based comp | 0.7 | 1.5 | 1.9 | 1.6 | 3.4 | 8.4 | 4.5 | 4.9 | 4.7 | 4.0 | 18.1 | 19.8 | 23.7 |
| **Non-GAAP net income** | **$26.4** | **$11.9** | **$20.1** | **$30.2** | **$35.2** | **$100.8** | **$22.7** | **$45.3** | **$54.6** | **$63.9** | **$190.7** | **$255.7** | **$320.5** |
| **GAAP EPS basic** | **$0.93** | **$0.11** | **$0.16** | **$0.26** | **$0.28** | **$0.81** | **$0.15** | **$0.33** | **$0.38** | **$0.46** | **$1.32** | **$1.92** | **$2.44** |
| | | | | | | | | | | | | | |
| **GAAP EPS Diluted** | **$0.35** | **$0.10** | **$0.16** | **$0.25** | **$0.27** | **$0.78** | **$0.15** | **$0.32** | **$0.37** | **$0.44** | **$1.33** | **$1.74** | **$2.20** |
| Y/Y Growth | NM | 130% | 190% | 180% | 128% | 124% | 46% | 102% | 49% | 60% | 71% | 31% | 26% |
| **Non-GAAP EPS Diluted** | **$0.36** | **$0.13** | **$0.19** | **$0.28** | **$0.32** | **$0.91** | **$0.21** | **$0.38** | **$0.43** | **$0.50** | **$1.51** | **$1.98** | **$2.47** |
| Y/Y Growth | | 190% | 249% | 213% | 161% | 151% | 61% | 102% | 57% | 54% | 66% | 31% | 25% |
| FCF/Share | ($0.21) | NM | NM | NM | NM | $0.78 | NM | NM | NM | NM | $1.24 | $1.70 | $2.27 |
| Y/Y Growth | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | 58% | 38% | 34% |
| Shares outstanding (Basic) | 50.4 | 87.6 | 101.8 | 105.1 | 106.5 | 100.3 | 107.2 | 115.7 | 122.3 | 122.5 | 116.9 | 116.9 | 116.9 |
| Shares outstanding (Diluted) | 72.6 | 93.2 | 106.5 | 109.3 | 109.9 | 104.7 | 110.4 | 119.4 | 126.4 | 129.0 | 121.3 | 129.0 | 129.6 |
| Tax rate | -2.8% | 4.0% | 4.0% | 4.2% | 1.2% | 1.2% | 5.6% | 5.8% | 4.3% | 3.0% | 4.2% | 16.5% | 16.5% |

Source:  Company reports and CIBC World Markets Corp.

CIBC World Markets

Emotion is Driving Stock on Transparency Issues, Ests Unchanged, Reit SO Rating - November 20, 2007

## Our EPS estimates are shown below:

|  | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Yearly |
|---|---|---|---|---|---|
| 2007 Current | $0.21A | $0.38A | $0.43A | $0.50E | $1.51E |
| 2008 Current | -- | -- | -- | -- | $1.98E |
| 2009 Current | -- | -- | -- | -- | $2.47E |

# IMPORTANT DISCLOSURES:

**Analyst Certification:**  Each CIBC World Markets research analyst named on the front page of this research report, or at the beginning of any subsection hereof, hereby certifies that (i) the recommendations and opinions expressed herein accurately reflect such research analyst's personal views about the company and securities that are the subject of this report and all other companies and securities mentioned in this report that are covered by such research analyst and (ii) no part of the research analyst's compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by such research analyst in this report.

**Potential Conflicts of Interest:**  Equity research analysts employed by CIBC World Markets are compensated from revenues generated by various CIBC World Markets businesses, including the CIBC World Markets Investment Banking Department within the Corporate and Leveraged Finance Division.  Research analysts do not receive compensation based upon revenues from specific investment banking transactions.  CIBC World Markets generally prohibits any research analyst and any member of his or her household from executing trades in the securities of a company that such research analyst covers.  Additionally, CIBC World Markets generally prohibits any research analyst from serving as an officer, director or advisory board member of a company that such analyst covers.

In addition to 1% ownership positions in covered companies that are required to be specifically disclosed in this report, CIBC World Markets may have a long position of less than 1% or a short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon.

Recipients of this report are advised that any or all of the foregoing arrangements, as well as more specific disclosures set forth below, may at times give rise to potential conflicts of interest.

# Important Disclosure Footnotes for Focus Media Holding Ltd. (FMCN)

1      CIBC World Markets Corp. makes a market in the securities of Focus Media Holding Ltd. .

2a     Focus Media Holding Ltd.  is a client for which a CIBC World Markets company has performed investment banking services  in the past 12 months.

2b     CIBC World Markets Corp. has managed or co-managed a public offering of securities for Focus Media Holding Ltd.  in the past 12 months.

2d     CIBC World Markets Corp. has received compensation for investment banking services from Focus Media Holding Ltd.  in the past 12 months.

2f     CIBC World Markets Corp. expects to receive or intends to seek compensation for investment banking services from Focus Media Holding Ltd.  in the next 3 months.

CIBC
World Markets

Case 1:07-cv-10617-LTS   Document 26-12   Filed 09/05/2008   Page 338 of 350

# CIBC World Markets Price Chart



**HISTORICAL PERFORMANCE OF CIBC WORLD MARKETS' RECOMMENDATIONS FOR FOCUS MEDIA HOLDING LTD. (FMCN)**

| Date | Change Type | Closing Price | Rating | Price Target | Coverage |
|------|-------------|---------------|--------|--------------|----------|
| 06/14/2006 | ▲●▢ | 27.38 | SO | 37.00 | Jason Helfstein |
| 11/27/2006 | ▲ | 33.23 | SO | 38.00 | Jason Helfstein |
| 02/15/2007 | ▲ | 40.16 | SO | 50.00 | Jason Helfstein |
| 02/27/2007 | ▲ | 39.12 | SO | 55.00 | Jason Helfstein |
| 09/28/2007 | ▲ | 58.02 | SO | 70.00 | Jason Helfstein |

CIBC
World Markets

# CIBC World Markets' Stock Rating System

| Abbreviation | Rating | Description |
|---|---|---|
| **Stock Ratings** | | |
| SO | Sector Outperformer | Stock is expected to outperform the sector during the next 12-18 months. |
| SP | Sector Performer | Stock is expected to perform in line with the sector during the next 12-18 months. |
| SU | Sector Underperformer | Stock is expected to underperform the sector during the next 12-18 months. |
| NR | Not Rated | CIBC World Markets does not maintain an investment recommendation on the stock. |
| R | Restricted | CIBC World Markets is restricted*** from rating the stock. |
| **Sector Weightings**** | | |
| O | Overweight | Sector is expected to outperform the broader market averages. |
| M | Market Weight | Sector is expected to equal the performance of the broader market averages. |
| U | Underweight | Sector is expected to underperform the broader market averages. |
| NA | None | Sector rating is not applicable. |

**Broader market averages refer to the S&P 500 in the U.S. and the S&P/TSX Composite in Canada.
"Speculative" indicates that an investment in this security involves a high amount of risk due to volatility and/or liquidity issues.
***Restricted due to a potential conflict of interest.

### Ratings Distribution*: CIBC World Markets' Coverage Universe

| (as of 20 Nov 2007) | Count | Percent | Inv. Banking Relationships | Count | Percent |
|---|---|---|---|---|---|
| Sector Outperformer (Buy) | 376 | 40.8% | Sector Outperformer (Buy) | 191 | 50.8% |
| Sector Performer (Hold/Neutral) | 461 | 50.0% | Sector Performer (Hold/Neutral) | 238 | 51.6% |
| Sector Underperformer (Sell) | 63 | 6.8% | Sector Underperformer (Sell) | 35 | 55.6% |
| Restricted | 12 | 1.3% | Restricted | 12 | 100.0% |

### Ratings Distribution:  Media and Internet Coverage Universe

| (as of 20 Nov 2007) | Count | Percent | Inv. Banking Relationships | Count | Percent |
|---|---|---|---|---|---|
| Sector Outperformer (Buy) | 8 | 61.5% | Sector Outperformer (Buy) | 2 | 25.0% |
| Sector Performer (Hold/Neutral) | 4 | 30.8% | Sector Performer (Hold/Neutral) | 0 | 0.0% |
| Sector Underperformer (Sell) | 1 | 7.7% | Sector Underperformer (Sell) | 0 | 0.0% |
| Restricted | 0 | 0.0% | Restricted | 0 | 0.0% |

Media and Internet Sector includes the following tickers:  DIS, FMCN, GOOG, KNOT, LAMR, MOVE, NWSA, OMC, RATE, VCLK, VIA.B, XFML, YHOO.

*Although the investment recommendations within the three-tiered, relative stock rating system utilized by CIBC World Markets do not correlate to buy, hold and sell recommendations, for the purposes of complying with NYSE and NASD rules, CIBC World Markets has assigned buy ratings to securities rated Sector Outperformer, hold ratings to securities rated Sector Performer, and sell ratings to securities rated Sector Underperformer without taking into consideration the analyst's sector weighting.

# Legal Disclaimer

This report is issued and approved for distribution by (i) in the United States, CIBC World Markets Corp., a member of the New York Stock Exchange ("NYSE"), NASD and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the Investment Dealers Association ("IDA"), the Toronto Stock Exchange, the TSX Venture Exchange and CIPF, (iii) in the United Kingdom, CIBC World Markets plc, which is regulated by the Financial Services Authority ("FSA"), and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC (collectively, "CIBC World Markets"). This report is provided, for informational purposes only, to institutional investor clients of CIBC World Markets in the United States and Canada and retail clients of CIBC World Markets in Canada, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such offer or solicitation would be prohibited. This document and any of the products and information contained herein are not intended for the use of private investors in the United Kingdom. Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc. The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited.

The securities mentioned in this report may not be suitable for all types of investors. This report does not take into account the investment objectives, financial situation or specific needs of any particular client of CIBC World Markets. Recipients should consider this report as only a single factor in making an investment decision and should not rely solely on investment recommendations contained herein, if any, as a substitution for the exercise of independent judgment of the merits and risks of investments. The analyst writing the report is not a person or company with actual, implied or apparent authority to act on behalf of any issuer mentioned in the report. Before making an investment decision with respect to any security recommended in this report, the recipient should consider whether such recommendation is appropriate given the recipient's particular investment needs, objectives and financial circumstances. CIBC World Markets suggests that, prior to acting on any of the recommendations herein, Canadian retail clients of CIBC World Markets contact one of our client advisers in your jurisdiction to discuss your particular circumstances. Non-client recipients of this report who are not institutional investor clients of CIBC World Markets should consult with an independent financial advisor prior to making any investment decision based on this report or for any necessary explanation of its contents. CIBC World Markets will not treat non-client recipients as its clients solely by virtue of their receiving this report.

Past performance is not a guarantee of future results, and no representation or warranty, express or implied, is made regarding future performance of any security mentioned in this report. The price of the securities mentioned in this report and the income they produce may fluctuate and/or be adversely affected by exchange rates, and investors may realize losses on investments in such securities, including the loss of investment principal. CIBC World Markets accepts no liability for any loss arising from the use of information contained in this report, except to the extent that liability may arise under specific statutes or regulations applicable to CIBC World Markets.

Information, opinions and statistical data contained in this report were obtained or derived from sources believed to be reliable, but CIBC World Markets does not represent that any such information, opinion or statistical data is accurate or complete (with the exception of information contained in the Important Disclosures section of this report provided by CIBC World Markets or individual research analysts), and they should not be relied upon as such. All estimates, opinions and recommendations expressed herein constitute judgments as of the date of this report and are subject to change without notice.

Nothing in this report constitutes legal, accounting or tax advice. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice on the tax consequences of investments. As with any investment having potential tax implications, clients should consult with their own independent tax adviser.

This report may provide addresses of, or contain hyperlinks to, Internet web sites. CIBC World Markets has not reviewed the linked Internet web site of any third party and takes no responsibility for the contents thereof. Each such address or hyperlink is provided solely for the recipient's convenience and information, and the content of linked third-party web sites is not in any way incorporated into this document. Recipients who choose to access such third-party web sites or follow such hyperlinks do so at their own risk.

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or recommended to or purchased or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation ("FDIC"), the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested. The CIBC trademark is used under license.

© 2007 CIBC World Markets Corp. and CIBC World Markets Inc. All rights reserved. Unauthorized use, distribution, duplication or disclosure without the prior written permission of CIBC World Markets is prohibited by law and may result in prosecution.

**CIBC** World Markets

# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

EASTRIVER PARTNERS, INC., individually
and on behalf of all others similarly situated,

                            Plaintiffs,

    -v-

FOCUS MEDIA HOLDING LIMITED, et al.,

                            Defendants.

-------------------------------------------------------------x

SCOTT BAUER, individually and on behalf
of all others similarly situated,

                            Plaintiffs,

    -v-

FOCUS MEDIA HOLDING LIMITED, et al.,

                            Defendants.

-------------------------------------------------------------x



No. 07 Civ. 10617 (LTS) (GWG)

No. 07 Civ. 11479 (LTS) (GWG)

## ORDER CONSOLIDATING CASES AND GRANTING MOTIONS FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

Institutional Iron Workers Local No. 25 Pension Fund ("Iron Workers Local No.

25") moves the Court for an Order: (1) consolidating the above-referenced actions; (2)

appointing Iron Workers Local No. 25 as Lead Plaintiff; and (3) appointing the law firm of

Coughlin Stoia Geller Rudman & Robbins LLP as Lead Counsel. The motions are unopposed.

## I. MOTION FOR CONSOLIDATION

Rule 42 of the Federal Rules of Civil Procedure provides that the Court may

consolidate "actions involving a common question of law or fact." Fed. R. Civ. P. 42(a). A

determination on the issue of consolidation is left to the sound discretion of the Court.  Johnson
v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990); Zicklin v. Breuer, 534 F. Supp. 745
(S.D.N.Y. 1982).

      The Court finds that the above-captioned the actions present common factual and
legal issues, involve overlapping defendants and will involve similar subject matter and similar
issues related to class certification.  Accordingly, the Court finds that the actions should be
consolidated, in the interests of judicial economy.  Therefore, it is hereby
ORDERED as follows:

## A. CONSOLIDATION

1.  The above-captioned actions are consolidated for all purposes pursuant to Federal Rule of
Civil Procedure 42(a).  The consolidated securities cases shall be referred to collectively as In re
Focus Media Holding Limited Litigation, Master File No. 07 Civ. 10617 (LTS)(GWG).

2.  No action taken hereunder shall have the effect of making any person, firm or corporation a
party to any action in which the person or entity has not been named, served, or added as such in
accordance with the Federal Rules of Civil Procedure.

## B. MASTER DOCKET AND SEPARATE ACTION DOCKETS

1.  A Master Docket is hereby established for the consolidated proceedings in the actions
consolidated herein and any other actions subsequently consolidated with them for pretrial
purposes (the "Consolidated Actions").  Entries in said Master Docket shall be applicable to the

Consolidated Actions, and entries shall be made therein in accordance with the regular procedures of the Clerk of this Court, except as modified by this Order.

## C. MASTER FILE AND SEPARATE ACTION FILES

1. A Master File is hereby established for the consolidated proceedings in the Consolidated Actions. The Master File shall be Civil Action No. 07 Civ. 10617 (LTS)(GWG). The original of this Order shall be docketed by the Clerk of Court in the Master File herein established.

2. The Clerk shall maintain a separate file for each of the Consolidated Actions, and filings shall be made therein in accordance with the regular procedures of the Clerk of this Court except as modified by Section B of this Order. The Clerk shall docket a copy of this Order in each such separate file. Once the Clerk has docketed this Order, counsel of record in each of the Consolidated Actions will receive a Notice of Electronic Filing.

## D. NEWLY FILED OR TRANSFERRED ACTIONS

1. When a class action that relates to the same subject matter as the Consolidated Actions is hereafter filed in or transferred to this Court and assigned to the undersigned, it shall be consolidated with these actions in the same manner as the cases identified in Section A above (provided that any case transferred to this Court solely for pretrial proceedings shall be consolidated only to that extent absent further order of this Court), except as provided below, and the Clerk of Court shall:

    (a)    Docket a copy of this Order in the file for newly filed or transferred actions.

    (b)    Make an appropriate entry in the Master Docket.

2. The Court requests the assistance of counsel in calling to the attention of the Clerk the filing or transfer of any case which might properly be consolidated with these actions.

## E. APPLICATION OF THIS ORDER TO SUBSEQUENT CASES

1. This Order shall apply to each class action assigned to the undersigned alleging claims similar to those set forth in these actions, whether brought on behalf of holders of Focus Media Holding Limited ("Focus Media") stocks, bonds, or any other securities, so long as Focus Media is named as a defendant in the action. This Order shall apply to each such case which is subsequently filed in or transferred to this Court and which is assigned to the undersigned, unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which the Clerk notifies counsel for that party of this Order. The provisions of this Order shall apply to such action pending the Court's ruling on the application.

2. Unless a plaintiff in a subsequently filed or transferred case is permitted by the Court to use a separate complaint, defendants shall not be required to answer, plead or otherwise move with respect to that complaint in any such case. If a plaintiff in any such case is permitted to use a separate complaint, each defendant shall have thirty days from the date the Court grants such permission within which to answer, plead or otherwise move with respect to any such complaint.

## F. CAPTIONS

1. Every pleading filed in the Consolidated Action, and in any separate action included therein,

shall bear the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ x
IN RE FOCUS MEDIA HOLDING   :
LIMITED LITIGATION                    :                MASTER FILE
                                              :                07 Civ. 10617 (LTS)(GWG)
                                              :
This Document Relates To:           :
                                              :
                                              :
                                              :
_____ x

2. When a pleading is intended to be applicable to all actions to which this Order applies, the

words "All Actions" shall appear immediately after the words "This Document Relates To:" in

the caption. When a pleading is intended to apply to fewer than all of such actions, the docket

number for each individual action to which it is intended to apply and the name of the plaintiff in

said action shall appear immediately after the words "This Document Relates To:" in the caption.

## G. FILING AND DOCKETING PAPERS

1.       When a pleading or other paper is filed, the parties shall electronically or manually file

         such paper pursuant to this Court's Guidelines and Amended Instructions for Electronic

         Case Filing.

         (a)  When a pleading or other paper is <u>electronically</u> filed and the caption, pursuant to this

Order, shows that it is applicable to "Both Actions," the parties shall electronically file such paper in the Master File only.  Docket entries shall not be made to each separate action.

If the caption shows that it is applicable to fewer than "Both Actions," the parties shall electronically file such paper in the Master File and electronically file such paper to the action to which it applies.

(b)  When a pleading or other paper is manually filed and the caption, pursuant to this Order, shows that it is applicable to "Both Actions," the parties shall submit to this Court the original paper for the Master File.  No copies shall be submitted for each separate action.  Upon receiving the original paper, the Clerk shall docket the paper to the Master File only.  Docket entries shall not be made to each separate action.

If the caption shows that it is applicable to fewer than "Both Actions," the parties shall submit to this Court the original paper for the Master File and copies of such paper for the action to which it applies.  Upon receiving the papers, the Clerk shall docket the original paper to the Master File and docket copies of such paper to the action to which it applies.

## II. MOTION FOR APPOINTMENT OF LEAD PLAINTIFF

The PSLRA provides in relevant part that "the court shall . . . appoint as lead plaintiff the member or members of the purported class that the Court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i).  In making its determination on a motion for appointment of a lead plaintiff, the Court is required to adopt the rebuttable presumption that the "most adequate plaintiff" is

> the person or group of persons that– (aa) has either filed the complaint or made a motion in response to [the initial class] notice . . . ; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This presumption may be rebutted only upon proof by a member of the purported class "that the presumptively most adequate plaintiff–(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses which render such plaintiff incapable of adequately representing the class." 15 U.S.C. 78u-4(a)(3)(B)(iii)(II).

No opposition has been submitted to Iron Workers Local No. 25 Pension Fund's application. Moreover, Iron Workers Local No. 25 meets the standards of 15 U.S.C. 78u-4(a)(3)(B)(iii)(I). Iron Workers Local No. 25 has made a motion in response to the initial class notice and alleges a loss of $32,697.53. (Decl. of Mario Alba, Jr., Ex. B.) Since Iron Workers Local No. 25's motion to serve as lead plaintiff is uncontested and its financial interest in this matter has been asserted, it is deemed to have the largest financial interest.

In addition, Iron Workers Local No. 25 has made a preliminary showing of typicality and adequacy under Rule 23 in accordance with the requirements of the PSLRA. "Typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA." In re Oxford Health Plans, 182 F.R.D. 42, 49 (S.D.N.Y. 1998). The claims of Iron Workers Local No. 25 are typical of the class because its claims and injuries arise from the same course of conduct as that from which claims of the other class members arise. Cf. id. at 49-50.

The adequacy of representation component of Rule 23 is also satisfied by Iron

Workers Local No. 25 as there is no conflict of interest between the Iron Workers Local No. 25 entities and members of the purported class, it has obtained qualified and experienced counsel, and it has a significant interest in the outcome in the litigation so as to ensure vigorous prosecution of the case. Cf. Weltz v. Lee, 199 F.R.D. 129, 133 (S.D.N.Y. 2001). The Court's preliminary determination of typicality and adequacy, will not, however, preclude any party from contesting class certification on such bases in the future.

Thus, the Court finds that Iron Workers Local No. 25 is presumptively the most adequate plaintiff. Having received no evidence sufficient to rebut this presumption, the Court hereby grants Iron Workers Local No. 25's motion for appointment as Lead Plaintiff.

## III. MOTION FOR APPOINTMENT OF LEAD COUNSEL

Subject to the Court's approval, the most adequate plaintiff shall select and retain counsel to represent the class. 15 U.S.C. § 78u-4(a)(3)(B)(v). Iron Workers Local No. 25 seeks approval of its selection of Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel. Upon review of the papers submitted in support of the motion, the Court finds that Coughlin Stoia Geller Rudman & Robbins LLP has had substantial experience and success in prosecuting securities fraud actions, rendering it capable of serving as lead counsel in this action. (Alba Decl., Ex. D.) Accordingly, Iron Workers Local No. 25's selection of Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel is approved.

Coughlin Stoia Geller Rudman & Robbins LLP shall serve as Lead Counsel for all plaintiffs in the Consolidated Actions.

Lead Counsel shall have the following responsibilities:

a. Sign any consolidated complaint, motions, briefs, discovery requests, objections, or notices on behalf of all plaintiffs or those plaintiffs filing the particular papers;

b. Conduct all pretrial proceedings on behalf of plaintiffs;

c. Brief and argue motions;

d. Initiate and conduct discovery;

e. Speak on behalf of plaintiffs at any pretrial conference;

f. Employ and consult with experts;

g. Conduct settlement negotiations with defense counsel on behalf of plaintiffs;

h. Call meetings of plaintiffs' counsel; and

i. Distribute to all plaintiffs' counsel copies of all notices, orders, and decisions of the Court; maintain an up-to-date list of counsel available to all plaintiffs' counsel on request; and keep a complete file of all papers and discovery materials filed or generated in the Consolidated Actions, which shall be available to all plaintiffs' counsel at reasonable hours.

This Order resolves docket entry no. 5.

SO ORDERED.

Dated: New York, New York
April 24, 2008

LAURA TAYLOR SWAIN
United States District Judge

# Exhibit L

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# F–1/A

**FOCUS MEDIA HOLDING LIMITED**
**Filed on 06/13/2006**
File Number 333–134714



**Table of Contents**

**As filed with the U.S. Securities and Exchange Commission on June 13, 2006**

Registration No. 333–134714

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**Amendment No. 2**
**to**

# Form F–1
REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# Focus Media Holding Limited
*(Exact name of Registrant as Specified in its Charter)*

| **Cayman Islands** | **7311** | **Not Applicable** |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**Focus Media Holding Limited**
**28–30/F, Zhao Feng World Trade Building**
**369 Jiangsu Road**
**Shanghai 200050**
**China**
**(86–21) 3212–4661**
*(Address and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)*

**CT Corporation System**
**111 Eighth Avenue, 13th Floor**
**New York, New York 10011**
**(212) 894–8940**
*(Name, Address, Including Area Code, and Telephone Number, Including Area Code, of Agent for Service)*

*Copies to:*

| | |
|---|---|
| **Chris K.H. Lin, Esq.** | **Thomas M. Britt III, Esq.** |
| **Simpson Thacher & Bartlett LLP** | **Debevoise & Plimpton LLP** |
| **ICBC Tower, 7th Floor** | **13th Floor** |
| **3 Garden Road, Central** | **Entertainment Building** |
| **Hong Kong SAR** | **30 Queen's Road Central** |
| **China** | **Hong Kong SAR** |
| | **China** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post–effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered(1) | Amount to be Registered(1) | Proposed Maximum Offering Price Per Ordinary Share(2) | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee(4) |
|---|---|---|---|---|
| Ordinary Shares, par value US$0.00005 per share(3) | 63,250,000 | $5.492 | $347,369,000 | $37,168.48 |

(1) Includes (a) all ordinary shares represented by American depositary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of the distribution or within 40 days after the later of the effective date of this registration statement and the date the securities are first bona fide offered to the public, and (b) ordinary shares represented by American depositary shares that are issuable upon the exercise of the underwriters' option to purchase additional shares.

(2) Estimated solely for the purpose of computing the amount of the registration fee. The estimate is made pursuant to Rule 457(c) of the Securities Act of 1933, as amended, based on $5.492, which is based on the average of the high and low sales prices of the Registrant's American depositary shares, as reported by the Nasdaq Stock Market on June 8, 2006.

(3) American depositary shares evidenced by American depositary receipts issuable upon deposit of the ordinary shares registered hereby are included in a separate registration statement on Form F–6 (File No.: 333–126011). Each American depositary share represents ten ordinary shares.

(4) Previously paid.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject To Completion, Dated June 13, 2006



# Focus Media Holding Limited

## 5,500,000 American Depositary Shares
### Representing
### 55,000,000 Ordinary Shares

Focus Media Holding Limited, or Focus Media, is offering 1,000,000 American depositary shares, or ADSs, and the selling shareholders identified in this prospectus are offering an additional 4,500,000 ADSs. Each ADS represents ten ordinary shares, par value $0.00005 per share of Focus Media. The ADSs are evidenced by American depositary receipts, or ADRs. We will not receive any proceeds from the ADSs sold by the selling shareholders.

Our ADSs are quoted on the Nasdaq National Market under the symbol "FMCN." On June 12, 2006, the last sale price for our ADSs as reported on the Nasdaq National Market was US$55.15 per ADS.

*See "Risk Factors" beginning on page 18 to read about risks you should consider before buying the ADSs.*

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per ADS | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount | $ | $ |
| Proceeds, before expenses, to Focus Media | $ | $ |
| Proceeds, before expenses, to the selling shareholders | $ | $ |

To the extent the underwriters sell more than 5,500,000 ADSs, the underwriters have an option to purchase up to an additional 825,000 ADSs from us and the selling shareholders at the public offering price less the underwriting discount.

The underwriters expect to deliver the ADSs evidenced by the ADRs against payment in U.S. dollars in New York, New York on    , 2006.

*Joint Global Coordinators*

**Credit Suisse**                  **Goldman Sachs (Asia) L.L.C.**

*Joint Bookrunners*

**Credit Suisse**                  **Goldman Sachs (Asia) L.L.C.**

**Merrill Lynch & Co.**                  **Citigroup**

*Co−Managers*

**Lehman Brothers**                  **Piper Jaffray**

Prospectus dated    , 2006.

**Table of Contents**

**PROSPECTUS SUMMARY**

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in the ADSs discussed under "Risk Factors", before deciding whether to buy our ADSs.*

*As used in this prospectus, references "Focus Media", "we", "us" and "our" are to Focus Media Holding Limited and its consolidated subsidiaries and affiliates. References to "Framedia" are to Infoachieve Limited and its consolidated subsidiary and affiliates, including Shenzhen E−Times Advertising Co., Ltd., or E−Times Advertising, and its affiliates. References to Target Media are to Target Media Holdings Limited and its consolidated subsidiaries and affiliates. References to "Focus Media Wireless" are to Dotad Holdings Limited and its consolidated subsidiary and affiliate.*

**Our Business**

We operate the largest out−of−home advertising network in China using audiovisual television displays, based on the number of locations and number of flat−panel television displays in our network. It is our goal to create the largest multi−platform out−of−home advertising network in China, reaching urban consumers at strategic locations over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light−emitting diode, or LED, digital billboard and mobile handset advertising networks. To date, our out−of−home advertising network consists of the following:

- *our commercial location network,* which refers to our network of flat−panel television displays placed in high−traffic areas of commercial buildings, such as in lobbies and near elevators, as well as in beauty parlors, karaoke parlors, golf country clubs, auto shops, banks, pharmacies, hotels, airports, airport shuttle buses and in−air flights. Our commercial location network is also marketed to advertisers as six separate channels targeting different types of consumers: our premier A and B office building channels, our travel channel, our fashion channel, our elite channel and our healthcare channel;

- *our in−store network,* which refers to our network of flat−panel television displays placed in specific product areas such as the personal care and food and beverage sections and other store locations with high−traffic concentration such as the main aisles and check−out lines in large−scale chain retail stores, which are referred to in China as hypermarkets, as well as inside selected supermarkets and convenience stores;

- *our poster frame network,* which refers to our network of advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

- *our mobile handset advertising network,* which refers to our wireless access protocol−, or WAP−, based mobile handset advertising services offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

- *our outdoor LED network,* which refers to our network of leased 5' x 5' LED digital billboards installed on the street−sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

We derive revenue principally by:

- selling advertising time slots on our commercial location, in−store and outdoor LED networks, which we refer to collectively as our out−of−home television networks;

1

**Table of Contents**

• by selling frame space on our poster frame network; and

• by selling advertisements on our mobile handset advertising network.

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times per day in twelve minute cycles. Some of our regional distributors use a nine–minute cycle. Advertisements on our outdoor LED network are broadcast repeatedly using a six–minute cycle. Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. For advertising poster frames placed in elevators, generally two or three advertising poster frames can be placed in each elevator. Advertisements on our mobile phone advertising network are WAP–based advertisements that are sent to mobile phone users over China Mobile and China Unicom's networks.

Our flat–panel displays are primarily placed in venues that have a high concentration of consumers with higher–than–average disposable incomes or that have a high concentration of consumers who are likely to be interested in particular types of products and services. Accordingly, our network provides a targeted and cost–effective way for advertising clients to reach segmented consumer groups with attractive demographic characteristics. Due to the captive and low distraction nature of the locations where we place our displays, we believe our commercial location network produces higher consumer recall rates of advertisements than traditional television advertisements.

As of March 31, 2006, approximately 1,800 advertisers purchased advertising time slots on our out–of–home television advertising networks. Our five largest advertising clients in terms of revenue, which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 18.4% of our revenue in 2005. In addition, over 340 advertisers have bought frame space from Framedia since 1999.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of March 31, 2006, we operated our commercial location network directly in a total of 50 cities throughout China, comprising (i) Beijing, Shanghai, Guangzhou and Shenzhen, which we refer to as our Tier I cities, and (ii) 46 other directly operated cities. As of March 31, 2006, we covered an additional 36 cities through contractual arrangements with regional distributors that, together with the other 46 directly operated cities, we refer to as our Tier II cities. Between January 1, 2005 and March 31, 2006, the number of displays in our commercial location network increased from 15,415 to 71,230. As of March 31, 2006, our commercial location network operated by our regional distributors consisted of approximately 3,780 flat–panel displays. We commenced commercial operations of our in–store network in April 2005. As of March 31, 2006, our in–store network consisted of 33,765 flat–panel displays placed in 5,218 store locations in our directly operated cities, including 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores. As of March 31, 2006, we had installed over 74,000 advertising poster frames in our poster frame network primarily in six cities throughout China, including our Tier I cities. As of April 2006, our outdoor LED network consisted of approximately 75 leased 5' x 5' digital billboards placed along curbsides in high–pedestrian traffic areas in Shanghai. As of May 2006, our mobile handset advertising network consisted of a WAP–based advertising platform that delivers approximately eight million messages per day to mobile phone users with WAP capability in China.

For the three months ended March 31, 2006, we recorded total revenues of $33.1 million, income from operations of $9.1 million and net income of $9.4 million as compared to total revenues of $9.6 million, income from operations of $2.9 million and net income of $2.6 million for the three months ended March 31, 2005. In 2005, we recorded total revenues of $68.2 million, income from operations of $22.8 million and net income of $23.5 million as compared to total revenues of $29.2 million, income from operations of $13.0 million and net income of $372,752 in 2004. Our net income of $372,752 in 2004 reflects a one–time non–cash charge of $11.7 million for a change in fair value of derivative liability associated with our Series B convertible redeemable preference shares.

**Table of Contents**

We have not incurred, and we will not incur, any such charges from January 1, 2005 as the redemption feature of our Series B convertible redeemable preference shares was removed prior to December 31, 2004.

### Our Strategies, Risks and Uncertainties

Our objective is to become the leading multi–platform advertising media brand in China's advertising industry. We intend to achieve this objective by implementing the following strategies:

• Enhance our market position and revenues by expanding our networks;

• Identify and create new networks and advertising channels that target specific consumer demographics and expand network capacity;

• Promote our brand name and augment our service offerings to attract a wider client base and increase revenues; and

• Continue to explore new digital media opportunities to target segmented consumer groups.

See "Business — Strategies" for additional details on our strategies.

Our ability to realize our business objectives and execute our strategies is subject to risks and uncertainties, including the following:

• our ability to successfully integrate and manage our recently acquired entities and businesses and our new outdoor LED network into our existing business;

• our limited operating history for our current operations and the short history of the out–of–home television advertising sector that make it difficult for you to evaluate the viability and prospects of our business;

• competition from present and future competitors in China's growing advertising market, particularly large multi–national advertisers that may now more readily compete in China;

• our limited ability to control and oversee the everyday business activities or regulatory compliance of our regional distributors; and

• the possibility that the PRC government could determine that our operating structure does not comply with PRC government restrictions on foreign investment in the advertising industry, which could potentially subject us to severe penalties.

See "Risk Factors" and other information included in this prospectus for a discussion of these and other risks.

### Our Corporate History and Structure

We were incorporated on April 11, 2003 as an international business company formed under the laws of the British Virgin Islands, and changed our corporate domicile to the Cayman Islands on April 1, 2005. Our ADSs representing our ordinary shares have been quoted on the Nasdaq National Market Inc. since our initial public offering on July 13, 2005. Due to PRC government restrictions that apply to foreign investment in China's advertising industry, our advertising business is currently conducted through contractual arrangements among us, our subsidiaries and our consolidated affiliated entities in China, principally Shanghai Focus Media Advertisement Co., or Focus Media Advertisement, and its subsidiaries. Focus Media Advertisement, several of its subsidiaries and Shanghai New Focus Media Advertisement Co., Ltd., or New Focus Media Advertisement, Shanghai New Structure Advertisement Co., Ltd., or New Structure Advertisement, Shanghai Framedia Advertisement Development Co., Ltd., or Framedia Advertisement, Guangdong Shiji Shenghuo Advertisement Co., Ltd., or Guangdong Framedia, and Beijing Focus Media Wireless Co., Ltd., or Focus Media Wireless, hold the requisite licenses to provide advertising services in China. Except for

3

**Table of Contents**

New Focus Media Advertisement, which is our indirect subsidiary, we refer to these companies collectively as our PRC operating affiliates. These contractual arrangements enable us to:

- exercise effective control over our PRC operating affiliates and their respective subsidiaries;

- receive a substantial portion of the economic benefits from our PRC operating affiliates and their respective subsidiaries; and

- have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries, as well as all or part of the assets of Focus Media Advertisement, in each case when and to the extent permitted by PRC law.

See "Our Corporate Structure" and "Related Party Transactions" for further information on our contractual arrangements with these parties.

**Recent Developments**

*Follow–on Public Offering.* On February 2, 2006, we and certain of our shareholders completed a follow–on public offering, which involved the sale by us and some of our shareholders of a total of 7,415,389 of our ADSs, representing 74,153,890 of our ordinary shares at a public offering price of $43.50 per ADS, including an additional 627,560 ADSs representing 6,275,600 ordinary shares at the public offering price pursuant to the underwriters' exercise of their over–allotment option.

*Recent Acquisitions.* On January 1, 2006, we acquired Infoachieve Limited, or Infoachieve, its subsidiary Shanghai Framedia Investment Consulting Co., Ltd., or Framedia Investment, and its affiliated PRC entities including Framedia Advertisement, Guangdong Framedia and New Structure Advertisement. Under the terms of the transaction we acquired a 100% equity stake in Infoachieve from Total Team Investments Limited, or Total Team, the BVI entity through which Infoachieve's shareholders held their respective interests in Infoachieve, for $39.6 million in cash and 22,157,003 of our ordinary shares, subject to an earnout payment and other adjustments. Framedia owns and operates an out–of–home poster frame advertising network placed in residential complexes in China. Framedia installs and deploys advertising poster frames mainly inside elevators and public areas of residential complexes in major cities in China and sells advertising frame space to advertising clients. Details of Framedia's corporate structure, business operations and our acquisition of Framedia are set forth in "Our Corporate Structure", "Business — Our Advertising Network", "Our Recent Significant Acquisitions — Framedia" and "Related Party Transactions".

In January 2006, for an aggregate purchase price of $5.0 million, we acquired Shenzhen E–Times Advertising Co., Ltd., or E–Times Advertising, and Skyvantage Group Limited, or Skyvantage, which we collectively refer to as E–Times and which operate a local out–of–home poster frame advertising network placed in commercial and residential buildings in China. E–Times' network is now a part of our poster frame network, marketed under the brand name "Framedia".

On February 28, 2006, we acquired the business of Target Media Holdings Limited, or Target Media Holdings, its subsidiary Target Media Multi–Media Technology (Shanghai) Co., Ltd., or Target Multi–Media, and its affiliated PRC entity Shanghai Target Media Co., Ltd., or Shanghai Target Media, by purchasing 100% of the equity interests of Target Media Holdings from its then existing shareholders for $94 million in cash and 77.0 million of our ordinary shares, subject to a working capital adjustment. Target Media owned and operated a network of flat–panel displays placed in commercial buildings, hotels, banks, residential buildings, convenience stores and other locations similar to our commercial location network. Other than holding their existing contracts, the original Target Media entities no longer conduct any operations and we have integrated their former network directly into our existing commercial location and in–store networks. Additional details of Target

4

Table of Contents

Media's business, operations and our acquisition of Target Media are set forth in "Our Recent Significant Acquisitions — Target Media".

In March 2006, we acquired Dotad Media Holdings Limited, or Dotad Holdings, and its consolidated affiliated subsidiary and affiliate, which operate a WAP–based advertisement delivery platform in China through China Mobile and China Unicom's mobile networks. Under the terms of the transaction, we acquired 100% of the equity of Dotad Holdings for a purchase price of $15.0 million in cash and up to 3.0 million Focus Media ordinary shares. Following our acquisition of Dotad, we rebranded the company as Focus Media Wireless.

## OUR OFFICES

Our principal executive offices are located at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China, and our telephone number is (86–21) 3212–4661. Our website address is http://www.focusmedia.cn. The information on our website does not form part of this prospectus.

## CONVENTIONS THAT APPLY TO THIS PROSPECTUS

This prospectus contains translations of Renminbi amounts into U.S. dollars at specified rates solely for the convenience of the reader. Unless otherwise noted, all translations from Renminbi to U.S. dollars were made at the noon buying rate in New York, New York for cable transfers in Renminbi per U.S. dollar as certified for customs purposes by the Federal Reserve Bank of New York, or the noon buying rate, as of March 31, 2006, which was RMB 8.0167 to $1.00. We make no representation that the Renminbi amounts referred to in this prospectus could have been or could be converted into U.S. dollars at any particular rate or at all. On June 12, 2006, the noon buying rate was RMB 8.0150 to $1.00.

Unless we indicate otherwise, all information in this prospectus reflects the following:

   • no exercise by the underwriters of their option to purchase up to 825,000 additional ADSs representing 8,250,000 ordinary shares; and

   • all share splits, so that share number, per share price and par value data is presented as if the share splits had occurred from our inception.

5

**Table of Contents**

### The Offering

The following assumes that the underwriters do not exercise their option to purchase additional ADSs in the offering, unless otherwise indicated.

| | |
|---|---|
| Offering price | $          per ADS |
| ADSs offered by Focus Media | 1,000,000 ADSs |
| ADSs offered by the selling shareholders | 4,500,000 ADSs |
| ADSs outstanding after this offering | 27,565,452 ADSs |
| Ordinary shares outstanding after this offering | 522,766,773 ordinary shares |
| ADS to ordinary share ratio | 1:10 |
| Nasdaq National Market symbol | "FMCN" |
| The ADSs | Each ADS represents ten ordinary shares, par value $0.00005 per share. The ADSs will be evidenced by American depositary receipts, or ADRs. The depositary will be the holder of the ordinary shares underlying your ADSs and you will have rights as provided in the deposit agreement. Although we do not expect to pay dividends in the foreseeable future, in the event we declare dividends on our ordinary shares, the depositary will pay you the cash dividends and other distributions it receives on our ordinary shares, after converting the funds received into U.S. dollars and deducting its fees and expenses. You may surrender your ADSs to the depositary to withdraw the ordinary shares underlying your ADSs. The depositary will charge you fees for exchanges. We may amend or terminate the deposit agreement without your consent, and if you continue to hold your ADSs, you agree to be bound by the deposit agreement as amended. You should carefully read the section in this prospectus entitled "Description of American Depositary Shares" to better understand the terms of our ADSs. You should also read the deposit agreement, which is incorporated by reference as an exhibit to the registration statement on Form F–6 filed in connection with our initial public offering (File No. 333–126011). |
| Lock–up Agreements | We and the selling shareholders have agreed with the underwriters that we will not, without the prior consent of Credit Suisse Securities (USA) LLC and Goldman Sachs (Asia) L.L.C., for a period of 90 days following the date of this prospectus: (1) offer, sell, contract to sell, pledge, grant any option to purchase, make any share sale or otherwise dispose of any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or (2) enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares |

6

**Table of Contents**

subject to certain exceptions. The restrictions above do not apply, among other items, to the ADSs to be sold in this offering and the ordinary shares underlying such ADSs. See "Shares Eligible for Future Sale" and "Underwriting".

| | |
|---|---|
| Depositary | Citibank, N.A. |
| Option to purchase additional ADSs | We and the selling shareholders have granted the underwriters an option, exercisable within 30 days from the date of this prospectus, to purchase up to an additional 825,000 ADSs. |
| Timing and settlement for ADSs | The ADSs are expected to be delivered against payment on             , 2006. The ADRs evidencing the ADSs will be deposited with a custodian for, and registered in the name of a nominee of, The Depository Trust Company, or DTC, in New York, New York. In general, beneficial interests in the ADSs will be shown on, and transfers of these beneficial interests will be effected only through, records maintained by DTC and its direct and indirect participants. |
| Use of proceeds | Our net proceeds from this offering are expected to be approximately $           million. We anticipate using approximately $24.0 million of the net proceeds of this offering to fund a portion of the cash consideration in connection with the acquisition of Target Media and $20.0 million in connection with capital expenditures to expand our network. We may use any remaining amounts for our future strategic acquisitions and general corporate purposes. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of risks you should carefully consider before deciding to invest in our ADSs. |

7

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL AND OPERATING DATA

The following summary consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financial statements, which include the consolidation of Focus Media Advertisement and Shanghai Perfect Media as variable interest entities, thereafter, and presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our statements of operations for 2003, 2004 and 2005 and our balance sheets as of December 31, 2003, 2004 and 2005 have been audited by Deloitte Touche Tohmatsu CPA Ltd., an independent registered public accounting firm. The report of Deloitte Touche Tohmatsu CPA Ltd. on those financial statements is included elsewhere in this prospectus. Our statement of operations for each of the three months ended March 31, 2005 and 2006 and balance sheet data as of March 31, 2005 and 2006 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus.

Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The summary consolidated financial information for the periods and as of the dates indicated should be read in conjunction with those statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we were an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time or space to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out−of−home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in−store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless.

8

**Table of Contents**

| | For the year ended December 31, | | | For the three months ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| **Consolidated Statements of Operations Data:** | | | | | |
| | | | (in thousands of U.S. dollars) | | |
| Net revenues: | | | | | |
| Commercial location network[1] | $ 3,369 | $ 26,321 | $ 61,435 | $ 9,432 | $ 21,472 |
| In–store network[1] | — | — | 5,469 | — | 5,293 |
| Poster frame network[1] | — | — | — | | 6,067 |
| Advertising service revenue[1] | 3,369 | 26,321 | 66,904 | $ 9,432 | $ 32,832 |
| Advertising equipment revenue | 389 | 2,889 | 1,325 | 142 | 304 |
| Total net revenues | 3,758 | 29,210 | 68,229 | $ 9,574 | $ 33,136 |
| Cost of revenues: | | | | | |
| Commercial location network | 1,566 | 6,746 | 17,943 | 2,903 | 8,035 |
| In–store network | — | — | 7,423 | 286 | 3,973 |
| Poster frame network | — | — | — | — | 2,397 |
| Advertising service cost | 1,566 | 6,746 | 25,366 | 3,189 | 14,405 |
| Advertising equipment cost | 275 | 1,934 | 976 | 71 | 232 |
| Total cost of revenues | 1,841 | 8,680 | 26,342 | 3,260 | 14,637 |
| Gross profit | 1,917 | 20,530 | 41,887 | 6,314 | 18,499 |
| Operating expenses: | | | | | |
| General and administrative | 985 | 3,986 | 9,120 | 1,881 | 4,395 |
| Selling and marketing | 407 | 3,454 | 9,544 | 1,492 | 4,057 |
| Amortization of acquired intangibles | — | 77 | 437 | 67 | 999 |
| Goodwill impairment loss | — | 58 | — | — | — |
| Total operating expenses | 1,392 | 7,577 | 19,101 | 3,440 | 9,451 |
| Income from operations | 525 | 12,953 | 22,786 | 2,874 | 9,048 |
| Interest income | 1 | 10 | 1,762 | 11 | 916 |
| Other income (expense), net | (9) | (4) | (161) | 5 | 46 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | (11,692) | — | | |
| Income before income taxes and minority interest | 517 | 1,267 | 24,387 | 2,890 | 10,010 |
| Total income taxes | 482 | 908 | 694 | 248 | 617 |
| Minority interest | (8) | (13) | 145 | 0 | (40) |
| Equity loss of affiliates | (18) | — | — | — | — |
| Net income | $ 25 | $ 372 | $ 23,548 | $ 2,642 | $ 9,433 |

9

Table of Contents

| | For the year ended December 31, | | | For the three months ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | (in thousands of U.S. dollars, except share and per share data) | | | | |
| **Earnings per share data:** | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares[2] | — | (8,308) | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares[2] | — | (2,191) | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares[2] | — | (13,356) | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | 12,906 | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ 25 | $ (10,577) | $ 23,548 | $ 2,642 | $ 9,433 |
| Income (loss) per share — basic | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.02 | $ 0.02 |
| Income (loss) per share — diluted | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.01 | $ 0.02 |
| Shares used in calculating basic income per share | 144,657,600 | 160,998,600 | 252,128,545 | 142,464,600 | 438,232,094 |
| Shares used in calculating diluted income per share | 144,657,600 | 160,998,600 | 365,938,094 | 315,212,608 | 465,895,318 |

| | As of December 31, | | | As of March 31, |
|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 |
| | (in thousands of U.S. dollars) | | | |
| **Consolidated Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ 716 | $ 22,669 | $ 36,653 | $ 41,863 |
| Other current assets[3] | 1,902 | 12,713 | 104,988 | 83,440 |
| Non–current assets[4] | 2,688 | 21,033 | 70,713 | 523,442 |
| Total assets | 5,306 | 56,415 | 212,354 | 648,745 |
| Total current liabilities | 4,119 | 8,634 | 20,694 | 92,402 |
| Minority interest | 4 | 81 | 245 | 460 |
| Mezzanine equity | — | 53,273 | — | — |
| Total shareholders' equity (deficiency) | $ 1,183 | $ (5,573) | $ 191,415 | $ 555,883 |

| | As of December 31, | | | As of March 31, |
|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location network: | | | | |
| Our direct cities | 827 | 12,786 | 45,049 | 71,230 |
| Our regional distributors[5] | 201 | 2,629 | 3,177 | 3,779 |
| Total | 1,028 | 15,415 | 48,226 | 75,009 |
| Number of displays in our in–store network | — | — | 27,849 | 33,765 |
| Number of stores in our in–store network | — | — | 4,130 | 5,218 |
| Number of installed frames in our poster frame network[6] | — | — | — | 74,353 |

10

Table of Contents

| | For and as of the three months ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
| **Commercial Location Network[7]:** | | | | | |
| Number of time slots available for sale [8] | 6,010 | 6,737 | 8,346 | 9,028 | 10,717 |
| Number of time slots sold[9] | 1,998 | 3,057 | 4,240 | 4,648 | 3,904 |
| Average utilization rate[10] | 33.2% | 45.4% | 50.8% | 51.5% | 36.4% |
| Average quarterly advertising service revenue per time slot sold (US$) | $    4,721 | $    4,573 | $    4,077 | $    4,461 | $    4,882 |
| **In–store Network[11]:** | | | | | |
| Number of time slots available for sale [8] | — | — | — | — | 245,314 |
| Number of time slots sold[9] | — | — | — | — | 76,498 |
| Average utilization rate[10] | — | — | — | — | 31.2% |
| Average quarterly advertising service revenue per time slot sold (US$) | — | — | — | — | $    69 |
| **Poster Frame Network[12]:** | | | | | |
| Number of frame slots available for sale [13] | — | — | — | — | 208,659 |
| Number of frame slots sold[14] | — | — | — | — | 90,262 |
| Occupancy rate[15] | — | — | — | — | 43.3% |
| Average advertising service revenue per frame slot (US$) (ASP) | — | — | — | — | $    67 |

(1)   Advertising service revenue is presented net of business tax. Business tax on advertising service revenue from our commercial location network amounted to $311,770, $2,788,233, $5,991,497, $936,405 and $2,081,512 in 2003, 2004 and 2005 and for the three months ended March 31, 2005 and 2006, respectively. Business tax on advertising service revenue for our in–store network amounted to $524,271, $nil and $524,357 in 2005 and for the three months ended March 31, 2005 and 2006. Business tax on advertising service revenue for our poster frame network amounted to $590,967 for the three months ended March 31, 2006. Business tax includes business tax of 5.55% and cultural industries tax of 4.0% of our gross advertising service revenue.

(2)   We are no longer required to record deemed dividends prospectively following conversion at the closing of our initial public offering of our Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares into ordinary shares.

(3)   Other current assets is equal to total current assets less cash and cash equivalents.

(4)   Non–current assets is equal to total assets less total current assets.

(5)   Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(6)   Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

(7)   Starting January 1, 2006, time slot data presented for our commercial location network includes only data related to our premier office building A channel. For the three months ended March 31, 2006, advertising services revenues from our premier office building A channel accounted for 91.2% of advertising service revenue for our commercial location network.

(8)   For our commercial location network, includes the time slots for our directly operated cities and the time slots we are entitled to sell on the portion of our network operated by our regional distributors. Number of time slots available refers to the number of 30–second equivalent time slots available on our network during the period presented and is calculated by taking the total advertising time available on our network during the period presented, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots available. For our commercial location network, the number of advertising time slots available for sale is determined by the number of cities in which we directly operate, the two–ninths portion of time slots on our regional distributors' networks which we have the right to sell and the length of the advertising cycle, which is currently twelve minutes in all of our directly operated cities. For our in–store network, the number of advertising time slots available for sale is determined by the number of stores in which we operate.

(9)   Number of time slots sold refers to the number of 30–second equivalent time slots sold during the period presented and is calculated by taking the total advertising time we sold during the period presented, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots sold.

(10)  Utilization rate refers to total time slots sold as a percentage of total time slots available during the relevant period.

11

**Table of Contents**

(11)  We commenced operation of our in–store network in April 2005.

(12)  We commenced operation of our poster frame network in January 2006.

(13)  Includes the number of frame slots available on a monthly basis within each three month period.

(14)  Includes the number of frame slots sold on a monthly basis within each three month period.

(15)  Occupancy rate refers to the total number of frame slots sold as a percentage of total frame slots available during the relevant period.

12

Table of Contents

**Consolidated Pro Forma Financial Data of**
**Focus Media, Framedia, Target Media Holdings and Other Acquired Entities**

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes to such pro forma financial statements. Financial information with respect to the acquisitions are derived from the historical financial statements of Capital Beyond Limited, or Capital Beyond, Infoachieve Limited, or Framedia, and Target Media Holdings Limited or Target Media, appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with U.S. GAAP. These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Capital Beyond, Framedia and Target Media. We refer to these businesses collectively as the acquired businesses. The acquired businesses have permitted us to expand our network, including the growth and further specialized targeting of consumers of our commercial location and in–store networks, and the addition of our poster frame advertising network.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2005 presents adjustments as if the acquisitions of Capital Beyond, Framedia and Target Media had been consummated on January 1, 2005. The unaudited pro forma condensed consolidated statement of operations for the three months ended March 31, 2006 presents adjustments as if the acquisition of Target Media had been consummated on January 1, 2005.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Framedia and Target Media, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the two month period ended February 28, 2006 has not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information of Target Media for that period, including the statement of operations relating to Target Media, that has been used to calculate the pro forma financial information as of and for the three month period ended March 31, 2006 may differ significantly from any actual consolidated statement of operations financial information had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

13

Table of Contents

| | Focus Media Holding for the year ended December 31, 2005 | Capital Beyond for the three months ended March 31, 2005 | Framedia for the year ended December 31, 2005 | Target Media for the year ended December 31, 2005[(1)] | Pro forma Adjustments | Note | Pro Forma |
|---|---|---|---|---|---|---|---|
| | | | (in thousands of U.S. dollars, except share and per share data) | | | | |
| **Unaudited Pro Forma Condensed Consolidated Statement of Operations** | | | | | | | |
| Net revenues: | | | | | | | |
| — Commercial locations | $ 61,435 | $ — | $ — | $ 33,693 | $ — | | $ 95,128 |
| — In-store network | 5,469 | — | — | — | — | | 5,469 |
| — Poster frame network | — | — | 11,828 | — | — | | 11,828 |
| Advertising Service Revenue | 6,904 | — | 11,828 | 33,693 | — | | 112,425 |
| Advertising Equipment Revenue | 1,325 | — | — | — | — | | 1,325 |
| Total net revenues | 68,229 | — | 11,828 | 33,693 | — | | 113,750 |
| Cost of revenues: | | | | | | | |
| — Commercial locations | 17,943 | 122 | — | 16,321 | (56) | (6) | 34,330 |
| — In-store network | 7,423 | — | — | — | — | | 7,423 |
| — Poster frame network | — | — | 7,233 | — | — | | 7,233 |
| Advertising Service Cost | 25,366 | 122 | 7,233 | 16,321 | (56) | | 48,986 |
| Advertising Equipment Cost | 976 | | | | | | 976 |
| Total cost of revenues | 26,342 | 122 | 7,233 | 16,321 | (56) | | 49,962 |
| Gross profit (loss) | 41,887 | (122) | 4,595 | 17,372 | 56 | | 63,788 |
| Operating expenses: | | | | | | | |
| General and administrative | 9,120 | 1 | 5,428 | 1,945 | (308) | (6) | 16,186 |
| Selling and marketing | 9,544 | — | 3,363 | 8,584 | (88) | (6) | 21,403 |
| Amortization of acquired intangibles | 437 | — | — | — | 4,202 | (3) | 4,639 |
| Total operating expenses | 19,101 | 1 | 8,791 | 10,529 | 3,806 | | 42,228 |
| Income (loss) from operations | 22,786 | (123) | (4,196) | 6,843 | (3,750) | | 21,560 |
| Interest income/(expenses) | 1,762 | 0 | (171) | 68 | — | | 1,659 |
| Other income (expenses), net | (161) | (0) | (4) | (94) | — | | (259) |
| Income (loss) before income taxes and minority interests | 24,387 | (123) | (4,371) | 6,817 | (3,750) | | 22,960 |
| Income taxes: | | | | | | | |
| Current | 715 | — | 2 | — | — | | 717 |
| Deferred | (21) | — | — | — | — | | (21) |
| Total income taxes | 694 | — | 2 | — | — | (8) | 696 |
| Net income (loss) after income taxes before minority interests | 23,693 | (123) | (4,373) | 6,817 | (3,750) | | 22,264 |
| Minority interests | 145 | — | — | (22) | — | | 123 |
| Net income (loss) | 23,548 | (123) | (4,373) | 6,839 | (3,750) | | 22,141 |
| Deemed dividend on ordinary shares | — | — | (15,187) | — | — | | (15,187) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | — | (1,136) | — | 1,136 | (5) | — |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | — | (379) | — | 379 | (5) | — |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | — | (624) | — | 624 | (5) | — |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | — | (208) | — | 208 | (5) | — |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | (3,288) | 3,288 | (5) | |
| Accretion to Series B redeemable convertible preferred shares redemption value | — | — | — | (960) | 960 | (5) | |
| Beneficial conversion of Series A redeemable convertible preferred shares | — | — | — | (3,021) | — | | (3,021) |
| Beneficial conversion of Series B redeemable convertible preferred shares | — | — | — | (806) | — | | (806) |
| Net income (loss) attributable to holders of ordinary shares | $ 23,548 | $ (123) | $ (21,907) | $ (1,236) | $ 2,846 | | $ 3,127 |
| Income per share — basic | $ 0.09 | | | | | | $ 0.01 |
| Shares used in calculating basic income per share | 252,128,545 | | | | | (7) | 351,285,548 |
| Income per share — diluted | $ 0.06 | | | | | | $ 0.01 |
| Shares used in calculating diluted income per share | 365,938,094 | | | | | (7) | 465,095,097 |

| | Focus Media Holding for the three months ended March 31,2006 | Target Media for the two months ended February 28, 2006[2] | Pro forma Adjustments | Note | Pro forma |
|---|---|---|---|---|---|
| | | (in thousand of U.S. dollars, except share and per share data) | | | |
| **Unaudited Pro Forma Condensed Consolidated Statement of Operations** | | | | | |
| Net Revenues: | | | | | |
| — Commercial locations | $        21,472 | $        3,068 | $        — | | $        24,540 |
| — In-store network | 5,293 | — | — | | 5,293 |
| — Poster frame network | 6,067 | — | — | | 6,067 |
| Advertising Service Revenue | 32,832 | 3,068 | — | | 35,900 |
| Advertising Equipment Revenue | 304 | — | — | | 304 |
| Total net revenues | 33,136 | 3,068 | — | | 36,205 |
| Cost of Revenues: | | | | | |
| — Commercial locations | 8,035 | 3,793 | — | | 11,828 |
| — In-store network | 3,973 | — | — | | 3,973 |
| — Poster frame network | 2,397 | — | — | | 2,397 |
| Advertising Service Cost | 14,405 | 3,793 | — | | 18,198 |
| Advertising Equipment Cost | 232 | — | — | | 232 |
| Total cost of revenues | 14,637 | 3,793 | — | | 18,430 |
| Gross profit (loss) | 18,499 | (725) | — | | 17,774 |
| Operating expenses: | | | | | |
| General and administrative | 4,395 | 2,541 | — | | 6,936 |
| Selling and marketing | 4,057 | 3,115 | — | | 7,172 |
| Amortization of acquired intangibles | 999 | — | 205 | (4) | 1,204 |
| Total operating expenses | 9,451 | 5,656 | 205 | | 15,312 |
| Income (loss) from operations | 9,048 | (6,380) | (205) | | 2,463 |
| Interest income/(expenses) | 916 | (23) | — | | 893 |
| Other income (expenses), net | 46 | (1,755) | — | | (1,709) |
| Income (loss) before income taxes and minority interests | 10,010 | (8,158) | (205) | | 1,647 |
| Income taxes: | | | | | |
| Current | 65 | (59) | — | | 6 |
| Deferred | 552 | — | — | | 552 |
| Total income taxes | 617 | (59) | — | (8) | 558 |
| Net income (loss) after income taxes before minority interests | 9,393 | (8,099) | (205) | | 1,089 |
| Minority interests | (40) | (31) | — | | (70) |
| Net income (loss) attributable to holders of ordinary shares | $        9,433 | (8,068) | (205) | | 1,159 |
| Income per share — basic | $        0.02 | | | | $        0.00 |
| Shares used in calculating basic income per share | 438,232,094 | | | (7) | 488,709,872 |
| Income per share — diluted | $        0.02 | | | | $        0.00 |
| Shares used in calculating diluted income per share | 465,895,318 | | | (7) | 516,373,096 |

    (1) The translations of amounts from RMB into United States dollars as of and for the year ended December 31, 2005, are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB8.0702, on December 31, 2005, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2005, or at any other rate.

    (2) Translations of amounts from RMB into United States dollars are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB8.0415, on February 28, 2006, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on February 28, 2006, or at any other date.

    (3) Reflects amortization for the acquired intangible assets recorded as a result of our acquisitions of Capital Beyond in March 2005, Framedia in January 2006 and Target Media in February 2006 to reflect amortization for the year ended December 31, 2005.

    The aggregate purchase price of $94.3 million of Framedia is comprised of the following:

| | (in thousands of U.S. dollars) |
|---|---|
| Cash consideration | $        39,600 |
| Other acquisition costs | 311 |
| Fair Value of ordinary shares issued | 54,418 |
| | $        94,329 |

Table of Contents

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.
Preliminary purchase price allocation:

|  | (in thousands of U.S. dollars) | Amortization period |
|---|---|---|
| Net tangible liabilities acquired | 5,684 | |
| Acquired intangible assets | 12,455 | 7 years |
| Goodwill | 87,558 | |
| Total | $          94,329 | |

The preliminary purchase price allocation and preliminary intangible asset valuations for each of the acquisitions described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

The amortization expense for Framedia and Target Media of $2.9 million and $1.2 million, respectively, for the year ended December 31, 2005 have been estimated based on a valuation report provided by a third–party valuation firm.

(4) Reflects amortization for the intangible assets recorded as a result of our acquisition of Target Media which occurred on February 26, 2006 to reflect amortization from January 1, 2006 to February 28, 2006.

The aggregate purchase price of $327.1 million of Target Media is comprised of the following:

|  | (in thousands of U.S. dollars) |
|---|---|
| Cash consideration | $          94,000 |
| Other acquisition costs | 2,058 |
| Fair Value of ordinary shares issued | 231,000 |
|  | $        327,058 |

The cash portion of the purchase price will be paid in three installments. The first installment of $45 million was paid at closing. The second installment of $25 million was paid on April 28, 2006. The final installment of $24 million is to be paid on July 31, 2006. The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

|  | (in thousands of U.S. dollars) | Amortization period |
|---|---|---|
| Net tangible assets acquired | 24,823 | |
| Acquired intangible assets | 10,827 | 7 year |
| Goodwill | 291,408 | |
| Total | $        327,058 | |

The preliminary purchase price allocation and preliminary intangible asset valuations for each of the acquisitions described above were based on a valuation report provided by a third–party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

The amortization expense for Target Media of $205,350, for the period ended March 31, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(5) Assumes the conversion upon completion of the acquisitions of all convertible redeemable convertible preference shares of Framedia and Target Media. Accordingly, the deemed dividends and redemption value accretion relating to these shares have been reversed.

(6) Reflects the adjustment relating to the conformity in accounting policy of Target Media for employee stock options from FAS 123(R) to APB 25 which is the accounting policy adopted by us.

16

**Table of Contents**

(7) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

| | December 31, 2005 | March 31, 2006 |
|---|---|---|
| Shares used in calculating basic income per share on a pro forma basis: | | |
| Weighted average ordinary shares outstanding used in computing basic income per share for Focus Media Holding Limited | 252,128,545 | 438,232,094 |
| Issuance of ordinary shares for the acquisition of Infoachieve Limited | 22,157,003 | — |
| Issuance of ordinary shares for the acquisition of Target Media | 77,000,000 | 50,477,778 |
| | 351,285,548 | 488,709,872 |

| | December 31, 2005 | March 31, 2006 |
|---|---|---|
| Shares used in calculating diluted income per share on a pro forma basis: | | |
| Weighted average ordinary shares outstanding used in computing diluted income per share for Focus Media Holding Limited | 365,938,094 | 465,895,318 |
| Issuance of ordinary shares for the acquisition of Infoachieve Limited | 22,157,003 | — |
| Issuance of ordinary shares for the acquisition of Target Media | 77,000,000 | 50,477,778 |
| | 465,095,097 | 516,373,096 |

(8) There have been no pro forma tax adjustments recorded because none of the pro forma adjustments discussed above has any tax impact.

17

**Table of Contents**

## RISK FACTORS

*You should consider carefully all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in our ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

**Risks Relating to Our Business and Industry**

**We have a limited operating history, which may make it difficult for you to evaluate our business and prospects.**

We began operations of our commercial location network in May 2003. In addition, we have operated our in–store network since April 2005 and acquired and began to operate our poster frame network from January 2006 under the brand name "Framedia". In March and April 2006, respectively, we added a WAP–based mobile phone advertising network and outdoor LED digital billboard advertising network to our business. Accordingly, we have a very limited operating history for our current operations upon which you can evaluate the viability and sustainability of our business and its acceptance by advertisers and consumers. It is also difficult to evaluate the viability of our use of audiovisual advertising displays in commercial buildings, hypermarkets, supermarkets and convenience stores and other out–of–home commercial locations and our use of advertising poster frames in residential complexes and WAP–based mobile handset advertising as a business model because we do not have sufficient experience to address the risks frequently encountered by early stage companies using new forms of advertising media and entering new and rapidly evolving markets. These circumstances may make it difficult for you to evaluate our business and prospects.

**We derive a substantial majority of our revenues from the provision of advertising services, and advertising is particularly sensitive to changes in economic conditions and advertising trends.**

Demand for advertising time slots and advertising frame space on our networks, and the resulting advertising spending by our clients, is particularly sensitive to changes in general economic conditions and advertising spending typically decreases during periods of economic downturn. Advertisers may reduce the money they spend to advertise on our networks for a number of reasons, including:

- a general decline in economic conditions;

- a decline in economic conditions in the particular cities where we conduct business;

- a decision to shift advertising expenditures to other available advertising media; or

- a decline in advertising spending in general.

A decrease in demand for advertising media in general and for our advertising services in particular would materially and adversely affect our ability to generate revenue from our advertising services, and our financial condition and results of operations.

**A substantial majority of our revenues is currently concentrated in four of China's major cities. If any of these major cities experiences an event negatively affecting its advertising industry, our advertising network, and our ability to generate adequate cash flow would be materially and adversely affected.**

A substantial majority of our revenues are currently concentrated in Beijing, Shanghai, Guangzhou and Shenzhen, four of China's major cities. For example, for the three months ended March 31, 2006, more than 55% of advertising service revenue from the premier office building A channel of our commercial location network was derived from these four cities. We expect these four

18

Table of Contents

cities to continue to constitute important sources of our revenues, and as a result of our acquisitions of Framedia and Target Media, this percentage may increase, as a substantial majority of Framedia's revenues are derived from these four cities, and a majority of Target Media's network, before its business and operations were merged into ours, was also located in these four cities. If any of these major cities experiences an event negatively affecting its advertising industry, such as a serious economic downturn, a construction moratorium that would have the effect of materially limiting the supply of new buildings in which we can place our flat–panel displays or advertising poster frames or similar changes in government policy, or a natural disaster, our advertising network and our ability to generate adequate cash flow would be materially and adversely affected.

***Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period in the future.***

Our quarterly operating results are difficult to predict and may fluctuate significantly from period to period based on the seasonality of consumer spending and corresponding advertising trends in China. In addition, advertising spending generally tends to decrease during January and February each year due to the Chinese Lunar New Year holiday. We also experience a slight decrease in revenues during the hot summer months of July and August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. As a result, you may not be able to rely on period to period comparisons of our operating results as an indication of our future performance. Factors that are likely to cause our operating results to fluctuate, such as the seasonality of advertising spending in China, a deterioration of economic conditions in China and potential changes to the regulation of the advertising industry in China, are discussed elsewhere in this prospectus. If our revenues for a particular quarter are lower than we expect, we may be unable to reduce our operating expenses for that quarter by a corresponding amount, which would harm our operating results for that quarter relative to our operating results from other quarters.

***The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent registered public accounting firm and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information.***

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Framedia and Target Media, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period.

The U.S. dollar convenience translation used to present the statement of operations of Target Media for 2005 contained in the unaudited pro forma condensed consolidated financial information may not be the same had U.S. dollars been used as the reporting currency for Target Media's audited statement of operations for 2005.

In addition, the financial information of Target Media for the two month period ended February 28, 2006 has not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information of Target Media for that period, including the statement of operations relating to Target Media, that has been used to calculate the pro forma financial information as of and for the three month period ended March 31, 2006 may differ significantly from any actual consolidated statement of operations financial information had it been audited or reviewed by an independent registered public accounting firm.

19

Table of Contents

See "Consolidated Pro Forma Financial Data of Focus Media, Framedia, Target Media Holdings and Other Acquired Entities".

***Our failure to maintain existing relationships or obtain new relationships with businesses that allow us to place our flat–panel displays and advertising poster frames in their buildings and other commercial locations and to lease outdoor LED digital billboards placed in desirable locations would harm our business and prospects.***

Our ability to generate revenues from advertising sales depends largely upon our ability to provide large networks of flat–panel displays placed in desirable building, commercial and store locations, of advertising poster frames placed in residential complexes, and as of April 2006, to secure desirable locations of large outdoor LED digital billboards, throughout major urban areas in China. We also depend on the ability of our third–party location provider to secure desirable LED digital billboard locations for our outdoor LED network. This, in turn, requires that we develop and maintain business relationships with real estate developers, landlords, property managers, hypermarkets, retailers and other businesses and locations in which we rent space for our displays and digital billboards. As of March 31, 2006, with regard to our commercial location network, we had entered into separate display placement agreements with landlords and property managers to operate 71,230 flat–panel displays in 50 cities in China, and our regional distributors had entered into their own separate display placement agreements with landlords and property managers to operate approximately 3,780 flat–panel displays in 36 other cities in China. In addition, as of March 31, 2006, with regard to our in–store network, we had entered into separate display placement agreements with hypermarkets, supermarkets and convenience stores to operate 33,765 flat–panel displays in 5,218 stores throughout China. As of April 2006, we sell advertising time slots on approximately 75 outdoor LED billboards in locations throughout Shanghai leased through an agreement with a third–party location provider. Although a majority of our display placement agreements and advertising frame placement agreements have terms ranging from three to five years and two to three years, respectively, and upon expiration give us the right to renew the agreement on terms no less favorable than those offered by competing bidders, we may not be able to maintain our relationships with them on satisfactory terms, or at all. If we fail to maintain our relationships with landlords and property managers, or if a significant number of our existing display or advertising frame placement agreements are terminated or not renewed or if we fail to maintain our relationship with our location provider of LED billboard space, advertisers may find advertising on our networks unattractive and may not wish to purchase advertising time slots or advertising frame space on our networks, which would cause our revenues to decline and our business and prospects to deteriorate.

Under some of our display placement agreements in Guangzhou, Shenzhen, Dalian and Chongqing, the property manager has the right to terminate the agreement if landlords or tenants in the building lodge complaints about our flat–panel displays. In addition, some of our display placement agreements in other cities allow the property manager to terminate the agreement if we fail to keep each flat–panel display operational for a minimum amount of time each year. If these tenants complain about our displays, or if the property manager claims we have failed to keep the flat–panel displays operational for the stipulated number of days each year, we may be required to remove our panels from these commercial locations.

In accordance with PRC real estate laws and regulations, prior consent of landlords and property managers is required for any commercial use of the public areas or facilities of residential properties. With regard to our network of advertising poster frames and some of our flat–panel displays placed in the elevators and public areas of residential complexes, we have entered into frame or display placement agreements with property managers and landlords. For those frame or display placement agreements entered into with property managers, we intend to obtain or urge property managers to obtain consents from landlords. However, if the landlords of a residential complex object to our placing advertising poster frames or flat–panel displays in the elevators and public areas of the complex, we may be required to remove our advertising poster frames or flat–

20

Table of Contents

panel displays from the complex and may be subject to fines. We may not be able to successfully expand our out–of–home advertising network into new regions or diversify our network into new advertising networks or media platforms, which could harm or reverse our growth potential and our ability to increase our revenues.

We are pursuing a strategy to expand our network into new regions, new advertising channels, such as our travel, fashion, elite and health–care channels, as well as into residential complexes. We are also expanding our network into new advertising media, such as advertising poster frames, mobile–phone WAP–based advertising, and outdoor LED billboard advertising. For example:

• in January 2006, we acquired Framedia and E–Times, providing us with our poster frame network located primarily in residential complexes;

• we recently began marketing separate channels of our commercial location network, such as our travel, fashion, elite and health–care channels, to enable advertisers to focus on more specifically targeted consumer audiences;

• in March 2006, we acquired Focus Media Wireless, which operates a mobile–phone WAP–based advertising service in China through China Mobile and China Unicom's mobile phone networks; and

• in April 2006, we commenced operation of an outdoor LED network consisting of approximately 75 leased 5' x 5' LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

Because portions of our existing network are rapidly reaching saturation, in order to successfully expand our networks, we must expand our networks to include new regions and new advertising channels. In order to expand our networks into new regions, we must enter into new display or frame placement agreements in new cities. In the case of our commercial location network, we generally expand our networks into new cities by means of establishing new operations through entering into contractual relationships with regional distributors. If these regional distributors are not successful in expanding our commercial location network in other cities, our ability to grow our commercial location network in other regions may be hampered. We may also expand our outdoor LED network into cities other than Shanghai in the future. The process of diversifying our networks into new advertising channels is also time consuming and requires us to expend time and resources in educating landlords and property managers about the benefits of separate advertising channels that are dedicated to specific demographics characteristics. If we are unable to grow our in–store network, poster frame network or outdoor LED network or to successfully diversify into other new advertising channels, our advertising network may not be as attractive as those of our competitors, which could harm or reverse our growth potential and our ability to increase our revenues, or even result in a decrease in revenues.

*If we are unable to obtain or retain desirable placement locations for our flat–panel displays, advertising poster frames and outdoor LED billboards on commercially advantageous terms or if the supply of desirable locations diminishes or ceases to expand, we could have difficulty in maintaining or expanding our network, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.*

Our location costs, which include lease payments to landlords and property managers under our display placement agreements, maintenance and monitoring fees and other associated costs, comprise a significant portion of our cost of revenues. In 2005, our location costs accounted for 61.7% of our cost of revenues and 24.0% of our total revenues, respectively. For the three months ended March 31, 2006, our location costs accounted for 66.4% of our cost of revenues and 28.9% of our total revenues, respectively. In the future, we may need to increase our expenditures on our display and frame placement agreements to obtain new and desirable locations, to renew existing locations, and to secure favorable exclusivity and renewal terms. In addition, lessors of space for our

Table of Contents

flat–panel displays, advertising poster frames and LED billboards may charge increasingly higher display location lease fees, or demand other compensation arrangements, such as profit sharing. If we are unable to pass increased location costs on to our advertising clients through rate increases, our operating margins and earnings could decrease and our results of operations could be materially and adversely affected.

In addition, in more developed cities, it may be difficult to increase the number of desirable locations in our network because most such locations have already been occupied either by us or by our competitors, or in the case of outdoor LED billboards, because the placement of outdoor installments may be limited by municipal zoning and planning policies. In recently developing cities, the supply of desirable locations may be small and the pace of economic development and construction levels may not provide a steadily increasing supply of desirable commercial and residential locations. If, as a result of these possibilities, we are unable to increase the placement of our out–of–home television and poster frame advertising networks into commercial and residential locations that advertisers find desirable, we may be unable to expand our client base, sell advertising time slots and poster frame space on our network or increase the rates we charge for time slots and poster frame space, which could decrease the value of our network to advertisers.

***When our out–of–home television advertising networks reach saturation in the cities where we operate, we may be unable to grow our revenue base or to satisfy all of our advertisers' needs, which could hamper our ability to generate higher levels of revenues over time.***

Our commercial location and in–store networks currently operate primarily with a repeating twelve–minute cycle of advertisements per week broadcast repeatedly approximately 60 times per day consisting of 24 30–second time slots per week, with a limited number of our regional distributors using a nine–minute cycle, and our outdoor LED network using a repeating six–minute cycle. Where demand for time slots by advertisers is high, such as in our Tier I cities, our out–of–home television networks may reach saturation, meaning we cannot sell additional advertising time slots for that week's cycle without further increasing the length of the cycle and correspondingly reducing the number of broadcasts per day of each advertisement. If our commercial location, in–store and outdoor LED networks reach saturation in any particular city, we will be forced to lengthen our advertising cycle to accommodate additional advertisers, as we have done in all of our directly operated cities, or increase our advertising rates to increase our revenues in our existing cities of operation. However, advertisers may be unwilling to accept rate increases or the placement of their advertisement on a longer time cycle that gives their advertisement less exposure each day. If we are unable to increase the duration of our advertising cycle in cities that reach saturation, or if we are unable to pass through rate increases to our advertising clients in those cities, we may be unable to grow our revenue base or to satisfy all of our advertisers' needs, which could hamper our ability to generate higher levels of revenues over time.

***If we are unable to attract advertisers to advertise on our networks, we will be unable to maintain or increase our advertising fees and the demand for time on our networks, which could negatively affect our ability to grow revenues.***

The amounts of fees we can charge advertisers for time slots on our out–of–home television networks depend on the size and quality of our out–of–home television networks and the demand by advertisers for advertising time on our out–of–home television networks. Advertisers choose to advertise on our out–of–home television networks in part based on the size of the networks and the desirability of the locations where we have placed our flat–panel displays and where we lease LED digital billboards as well as the quality of the services we offer. If we fail to maintain or increase the number of locations, displays and billboards in our networks, diversify advertising channels in our networks, or solidify our brand name and reputation as a quality provider of advertising services, advertisers may be unwilling to purchase time on our networks or to pay the levels of advertising fees we require to remain profitable.

22

**Table of Contents**

In addition, the fees we can charge advertisers for frame space on our poster frame network depends on the quality of the locations in which we place advertising poster frames, demand by advertisers for frame space and the quality of our service. If we are unable to continue to secure the most desirable residential locations for deployment of our advertising poster frames, we may be unable to attract advertisers to purchase frame space on our poster frame network.

Our failure to attract advertisers to purchase time slots and frame space on our networks will reduce demand for time slots and frame space on our networks and the number of time slots and amount of frame space we are able to sell, which could necessitate lowering the fees we charge for advertising time on our network and could negatively affect our ability to increase revenues in the future.

***We may be unable to maintain the growth of our network of flat–panel displays into hypermarkets, supermarkets, convenience stores and other types of businesses that have control over many stores, and our failure to maintain such growth could materially reduce the attractiveness of our network and harm our business, reputation and results of operations.***

Our strategy includes expanding our in–store network into hypermarkets and other types of businesses that have control over many store locations such as supermarkets and convenience stores. We commenced operation of our in–store network in April 2005. As of March 31, 2006, we had placed 33,765 flat–panel displays in 5,218 hypermarkets, supermarkets and convenience stores. As a relatively new and untested portion of our business, it is difficult to evaluate whether our in–store network will continue to attract advertisers, and there exists the risk that it may not succeed at all. In 2005 and for the three months ended March 31, 2006 revenues from our in–store network accounted for 9.0% and 16.1% of our advertising service revenue, respectively.

Many of our arrangements with such businesses are and will continue to be handled through a single or small number of display placement agreements designed to cover a chain's entire network of stores, either nationwide or throughout an entire city. We may, therefore, increase our dependence on one or a small number of retail store chains in terms of our coverage. If our network becomes more concentrated in major chains, any dispute we have with any single chain, or any failure to renew our display placement agreements or maintain our exclusivity terms with any single chain, could materially reduce the attractiveness of our in–store network and harm our business, reputation and results of operations.

***Our acquisitions of Framedia, Target Media, Focus Media Wireless and any future acquisitions may expose us to potential risks and have an adverse effect on our ability to manage our business.***

Selective acquisitions, such as our recent acquisitions of Framedia, Target Media and Focus Media Wireless, form part of our strategy to further expand our business. If we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business. Our integration of the acquired entities into our business may not be successful and may not enable us to expand into new advertising platforms as well as we expect. This would significantly affect the expected benefits of these acquisitions. Moreover, the integration of Framedia, Target Media and Focus Media Wireless into our operations have required, and will continue to require, significant attention from our management. Future acquisitions will also likely present similar challenges.

The diversion of our management's attention and any difficulties encountered in any integration process could have an adverse effect on our ability to manage our business. In addition, we may face challenges trying to integrate new operations, services and personnel with our existing operations. Our recent acquisitions and possible future acquisitions may also expose us to other potential risks, including risks associated with unforeseen or hidden liabilities, the diversion of resources from our existing businesses and technologies, our inability to generate sufficient revenue

23

Table of Contents

to offset the costs, expenses of acquisitions and potential loss of, or harm to, relationships with employees and advertising clients as a result of our integration of new businesses and new regulations governing cross–border investment by PRC residents. In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

***There may be unknown risks inherent in our acquisitions of Framedia and Target Media.***

Although we have conducted due diligence with respect to Framedia and Target Media, we may not be aware of all of the risks associated with Framedia or Target Media. Any discovery of adverse information concerning Framedia or Target Media since we acquired these entities could have a material adverse effect on our business, financial condition and results of operations. While we are entitled to seek indemnification in certain circumstances, successfully asserting indemnification or enforcing such indemnification could be costly and time consuming or may not be successful at all.

***Our recent entry into mobile handset advertising through our acquisition of Focus Media Wireless may expose us to risks associated with operating in the telecommunications industry in China which could materially affect our financial condition or results of operation.***

In March 2006, we completed our acquisition of Focus Media Wireless, which operates a mobile handset WAP–based advertising service over China Mobile's and China Unicom's mobile telecommunications networks. As a result, we now operate a portion of our advertising network on mobile telecommunications networks and are subject to risks associated with operations in the telecommunications sector in China. These potential risks include:

- loss or deterioration of our relationship with China Mobile or China Unicom, the two primary mobile telecommunications operators in China that currently provide wireless value–added services to mobile phone users;

- loss or deterioration of our relationship with Internet service providers who use our WAP–based advertisement platform;

- failure to reach traditional advertisers and to take advantage of marketing networks through our existing business;

- changes in operating policies or guidelines by mobile telecommunications operators applicable to all wireless value–added service providers using their platforms or which restrict content supplied by others to us;

- regulation of the telecommunications sector in China that could impose burdensome approval or licensing requirements on value–added service providers such as advertising companies that sell advertising time on mobile telecommunications networks;

- a decision by either or both China Mobile and China Unicom to directly enter into the WAP–based advertising business; or

- consumer dissatisfaction with, or any related regulations restricting, the use or "pushing" of unsolicited advertisements, commonly known as "spam".

As a result of any such change or event, the operation of our advertising network using the mobile telecommunications networks of the mobile telecommunications operators in China may be disrupted, which could in turn lower our advertising revenues or result in higher operating costs to us, and we cannot assure you that our financial condition and results of operation would not be materially adversely affected.

Table of Contents

   In addition, under PRC law, the services offered by Focus Media Wireless may be deemed value–added telecommunication services, which requires an operation permit that has a valid period of five years. Focus Media Wireless has applied for the operation permit for its wireless advertising operations. If Focus Media Wireless is deemed by the PRC regulatory authorities to be providing value–added telecommunication services but an operation permit is not issued or, once issued, if it were revoked or if we are unable to renew its operation permit upon expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected.

*We currently rely on a single third–party location provider to secure sites for our outdoor LED billboard network, and any disruption in its business operations or in our relationship with it would materially and adversely impact the operation of our outdoor LED network, resulting in the loss of a portion of our revenue.*

   To secure locations in Shanghai for our new outdoor LED network, we have entered into a four–year exclusive agreement with Shanghai Yihukuan Media Co., Ltd., or Yihukuan, which leases all of its current, and any future developed, LED digital billboard space in Shanghai to us for an annual fee. Our reliance on a single third–party location provider for the billboard space on our outdoor LED network exposes us to a number of risks in connection with this part of our advertising network. In order to place LED digital billboards in public areas, Yihukuan must apply for and receive approval from relevant authorities of the Shanghai municipal government and continue to comply with relevant outdoor advertising laws and regulations. If the approvals that have been granted to Yihukuan are revoked for any reason, including any failure by Yihukuan to comply with relevant outdoor advertising laws and regulations, or if Yihukuan fails to receive approvals to place additional LED billboards, the outdoor LED network could become unavailable to us, be reduced in size or fail to grow, which may make it less attractive to advertising customers. Moreover, because we pay the annual fee to Yihukuan in advance, we may be unable to recover any deposits and rental fees we pay to it in the event that its network becomes inoperable or is suspended, reduced in size or fails to attract advertisers. In addition, because we rely on Yihukuan for digital billboard space on our outdoor LED network, any loss or deterioration of our relationship with Yihukuan, including any failure to renew our contract with them, may result in disruption to our outdoor LED network operations and the loss of a portion of our revenue.

*One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business.*

   As of March 31, 2006, we covered 36 out of the 86 cities where we provide our commercial location network through contractual arrangements with regional distributors. Under these arrangements, we provide our business model and operating expertise to local advertising companies in exchange for their acting as regional distributors of our advertising services. We also sell our flat–panel displays to our regional distributors, who are responsible for developing and maintaining an advertising network in office buildings and other commercial locations in the city where they operate. We also grant our regional distributors the right to use our "Focus Media" brand name and logo. However, our contractual arrangements with our regional distributors do not provide us with control or oversight over their everyday business activities, and one or more of our regional distributors may engage in activities that violate PRC laws and regulations governing the advertising industry and advertising content, or other PRC laws and regulations generally. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold, which could result in local regulators suspending the operations of the network in those cities. In addition, we do not independently review the advertising content that our regional distributors display on the portion of our commercial location network that they operate independently, and our regional distributors may include advertising content on their part of the commercial location network and violate PRC advertising laws or regulations or expose them and us

**Table of Contents**

to lawsuits or result in the revocation of their business license. If any of these events occurs, it could harm our reputation in the industry.

***Suodi Advertising, our network development and maintenance agent in Beijing, may have a claim against us under the non–competition clause of our contract with it, and if Suodi Advertising were successful in bringing a claim against us, our financial condition and results of operations may be materially and adversely affected.***

    We entered into an agency agreement with Beijing Suodi Advertising Co., Ltd., or Suodi Advertising, that contains a non–competition clause which restricts us from developing new network locations in commercial buildings in Beijing without the assistance of Suodi Advertising through 2008. We have entered into display and frame placement agreements with landlords and property managers of commercial buildings in Beijing without the assistance of Suodi Advertising. We believe that Suodi Advertising does not have the right to require us to terminate or otherwise void the display placement agreements we have entered into without its assistance, although it can pursue claims against us for monetary damages. Although Suodi Advertising has not pursued any claim against us in connection with our having entered into such display and frame placement agreements, we cannot assure you that Suodi will not do so in the future. If Suodi Advertising successfully pursues a claim against us, we could be liable for monetary damages we may have caused to Suodi Advertising. If we are found to have violated our contract with Suodi Advertising, our payment obligations over the five year term of the contract can be accelerated, and we estimate our liability under the agreement could reach as much as $730,000, excluding possible consequential damages, which could materially and adversely affect our financial condition and results of operations.

***Failure to manage our growth could strain our management, operational and other resources and we may not be able to achieve anticipated levels of growth in the new networks and media platforms we are beginning to operate, either of which could materially and adversely affect our business and growth potential.***

    We have been rapidly expanding, and plan to continue to rapidly expand, our operations in China. We must continue to expand our operations to meet the demands of advertisers for larger and more diverse network coverage and the demands of current and future landlords and property managers for installing and configuring flat–panel displays, advertising poster frames and outdoor LED billboards in our existing and future commercial, store, residential and curbside locations. This expansion has resulted, and will continue to result, in substantial demands on our management resources. It has also increased our need for a reliable supply of equipment, particularly flat–panel displays and large LED digital billboards for our out–of–home television networks which are manufactured by a few third–party contract assemblers according to our specifications. To manage our growth, we must develop and improve our existing administrative and operational systems and, our financial and management controls and further expand, train and manage our work force. We have also commenced providing advertising services to mobile phone users through our recent acquisition of Focus Media Wireless. As we continue this effort, we may incur substantial costs and expend substantial resources in connection with any such expansion due to, among other things, different technology standards, legal considerations and cultural differences. We may not be able to manage our current or future international operations effectively and efficiently or compete effectively in such markets. We cannot assure you that we will be able to efficiently or effectively manage the growth of our operations, recruit top talent and train our personnel. Any failure to efficiently manage our expansion may materially and adversely affect our business and future growth.

    As we continue to expand into new networks and new media platforms, we expect the percentage of revenues derived from our commercial location network to decline. However, the new advertising networks and media platforms we pursue may not present the same opportunities for growth that we have experienced with our commercial location network and, accordingly, we cannot assure you that the level of growth of our networks will not decline over time. Moreover, we expect

**Table of Contents**

the level of growth of our commercial location network to decrease as many of the more desirable locations have already been leased by us or our competitors.

***If advertisers or the viewing public do not accept, or lose interest in, our out–of–home advertising network, our revenues may be negatively affected and our business may not expand or be successful.***

The market for out–of–home advertising networks in China is relatively new and its potential is uncertain. We compete for advertising spending with many forms of more established advertising media. Our success depends on the acceptance of our out–of–home advertising network by advertisers and their continuing interest in these mediums as components of their advertising strategies. Our success also depends on the viewing public continuing to be receptive towards our advertising network. Advertisers may elect not to use our services if they believe that consumers are not receptive to our networks or that our networks do not provide sufficient value as effective advertising mediums. Likewise, if consumers find some element of our networks, such as the audio feature of our commercial location, in–store and outdoor LED networks, to be disruptive or intrusive, commercial locations and stores may decide not to place our flat–panel displays in their properties and advertisers may view our advertising network as a less attractive advertising medium compared to other alternatives. In that event, advertisers may determine to reduce their spending on our advertising network. If a substantial number of advertisers lose interest in advertising on our advertising network for these or other reasons, we will be unable to generate sufficient revenues and cash flow to operate our business, and our advertising service revenue, liquidity and results of operations could be negatively affected.

***We depend on the leadership and services of Jason Nanchun Jiang, who is our founder, chairman, chief executive officer and our largest shareholder, and our business and growth prospects may be severely disrupted if we lose his services.***

Our future success is dependent upon the continued service of Jason Nanchun Jiang, our founder, chairman and chief executive officer and our largest shareholder. We rely on his industry expertise and experience in our business operations, and in particular, his business vision, management skills, and working relationships with our employees, our other major shareholders, many of our clients and landlords and property managers of the locations in our network. We do not maintain key–man life insurance for Mr. Jiang. If he was unable or unwilling to continue in his present position, or if he joined a competitor or formed a competing company in violation of his employment agreement and noncompetition agreement, we may not be able to replace him easily or at all. As a result, our business and growth prospects may be severely disrupted if we lose his services.

***We may need additional capital and we may not be able to obtain it, which could adversely affect our liquidity and financial position.***

We believe that our current cash and cash equivalents, cash flow from operations and the proceeds from this offering will be sufficient to meet our anticipated cash needs including for working capital and capital expenditures, for the foreseeable future. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities, including from this offering, could result in additional dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations and liquidity.

Table of Contents

Our ability to obtain additional capital on acceptable terms is subject to a variety of uncertainties, including:

• investors' perception of, and demand for, securities of alternative advertising media companies;

• conditions of the U.S. and other capital markets in which we may seek to raise funds;

• our future results of operations, financial condition and cash flows;

• PRC governmental regulation of foreign investment in advertising services companies in China;

• economic, political and other conditions in China; and

• PRC governmental policies relating to foreign currency borrowings.

We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us could have a material adverse effect on our liquidity and financial condition.

***If we are unable to adapt to changing advertising trends and the technology needs of advertisers and consumers, we will not be able to compete effectively and we will be unable to increase or maintain our revenues which may materially and adversely affect our business prospects and revenues.***

The market for out–of–home advertising requires us to continuously identify new advertising trends and the technology needs of advertisers and consumers, which may require us to develop new features and enhancements for our advertising network. The majority of our displays use 17–inch liquid crystal displays screens. We also have a growing number of displays that use larger LCD and plasma screens as well as large size LED digital billboards. We currently broadcast advertisements on our commercial location network and in–store network primarily through compact flash, or CF, cards that are manually installed in our flat–panel displays each week. Through our recent acquisition of Focus Media Wireless, we now also provide advertising services to mobile phone users over the mobile phone networks of China Mobile and China Unicom. In the future, subject to relevant PRC laws and regulations, we may use other technology, such as cable or broadband networking, advanced audio technologies and high–definition panel technology. We may be required to incur development and acquisition costs in order to keep pace with new technology needs but we may not have the financial resources necessary to fund and implement future technological innovations or to replace obsolete technology. Furthermore, we may fail to respond to these changing technology needs. For example, if the use of wireless or broadband networking capabilities on our advertising network becomes a commercially viable alternative and meets all applicable PRC legal and regulatory requirements, and we fail to implement such changes on our commercial location network and in–store network or fail to do so in a timely manner, our competitors or future entrants into the market who do take advantage of such initiatives could gain a competitive advantage over us. If we cannot succeed in developing and introducing new features on a timely and cost–effective basis, advertiser demand for our advertising networks may decrease and we may not be able to compete effectively or attract advertising clients, which would have a material and adverse effect on our business prospects and revenues.

***We may be subject to, and may expend significant resources in defending against, government actions and civil suits based on the content and services we provide through our out–of–home television advertising networks, poster frame network or mobile handset advertising network.***

PRC advertising laws and regulations require advertisers, advertising operators and advertising distributors, including businesses such as ours, to ensure that the content of the advertisements they

28

**Table of Contents**

prepare or distribute are fair and accurate and are in full compliance with applicable law. Violation of these laws or regulations may result in penalties, including fines, confiscation of advertising fees, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the PRC government may revoke a violator's license for advertising business operations.

As an out–of–home advertising service provider, we are obligated under PRC laws and regulations to monitor the advertising content that is shown on our out–of–home advertising networks for compliance with applicable law. In addition, each of our regional distributors is obligated under PRC laws and regulations to monitor the advertising content shown on the portion of our out–of– home television advertising network each of them operates. In general, the advertisements shown on our out–of–home television advertising network and the portion of our advertising network operated by our regional distributors have previously been broadcast over public television networks and have been subjected to internal review and verification of such networks. We and our regional distributors are still separately required to independently review and verify these advertisements for content compliance before displaying the advertisements. In addition, where a special government review is required for specific product advertisements before broadcasting, we and our regional distributors are separately obligated to confirm that such review has been performed and approval has been obtained. We employ, and our regional distributors are required under the terms of our agreements with them to employ, qualified advertising inspectors who are trained to review advertising content for compliance with relevant PRC laws and regulations. In addition, for advertising content related to specific types of products and services, such as alcohol, cosmetics, pharmaceuticals and medical procedures, we and our distributors are required to confirm that the advertisers have obtained requisite government approvals including the advertiser's operating qualifications, proof of quality inspection of the advertised products, government pre–approval of the contents of the advertisement and filing with the local authorities. We endeavor to comply, and encourage our regional distributors to take measures to comply, with such requirements, including by requesting relevant documents from the advertisers. Starting in January 2006, we began to operate a network of advertising poster frames placed primarily in elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as print advertisements under PRC laws and regulations and are also subject to the same legal requirements as advertisements shown on our out–of–home television advertising networks. Outdoor advertisements must be registered with the local SAIC before dissemination, and advertising distributors are required to submit a registration application form and the content of the advertisement to the local SAIC and receive an advertising registration certificate from the local SAIC. Our reputation will be tarnished and our results of operations may be adversely affected if advertisement shown on our out–of–home television advertising networks, poster frame network or outdoor LED network is provided to us by our advertising clients in violation of relevant PRC advertising laws and regulations or that the supporting documentation and government approvals provided to us by our advertising clients in connection with such advertising content are not complete or that the advertisements that our regional distributors have procured for broadcasting on our network have not received required approval from the relevant local supervisory bodies or are not content compliant.

In addition, we commenced operation of our outdoor LED digital billboard network in April 2006. The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

China has also enacted regulations governing telecommunication service providers and the distribution of news and other information. In the past, the Chinese government has stopped the

29

Table of Contents

distribution of information over the Internet and telecommunications networks that it believes to violate Chinese law, including content that is pornographic or obscene, incites violence, endangers national security, is contrary to the national interest or is defamatory. China Unicom and China Mobile also have their own policies regarding the distribution of inappropriate content by wireless value–added service providers and have punished certain providers for distributing inappropriate content, including the imposition of fines and service suspensions. Focus Media Wireless undertakes to the telecommunication operators which grant us access to their mobile phone networks that we will not distribute any advertisements with illegal content. We require the Internet service providers which use our WAP–based advertising platform to provide us the same undertaking, but we cannot completely control the content of their advertisements. If any of the content that we deliver through our mobile handset advertising network is found to violate Chinese laws and regulations or the policies of China Mobile and China Unicom, we could be subject to fines or suspensions.

Moreover, civil claims may be filed against us for fraud, defamation, subversion, negligence, copyright or trademark infringement or other violations due to the nature and content of the information displayed on our advertising network. If consumers find the content displayed on our advertising network to be offensive, landlords, property managers, other location providers or telecommunication network operators may seek to hold us responsible for any consumer claims or may terminate their relationships with us.

In addition, if the security of our content management system is breached through the placement of unauthorized CF cards in our flat–panel displays and unauthorized images, text or audio sounds are displayed on our advertising network, viewers or the PRC government may find these images, text or audio sounds to be offensive, which may subject us to civil liability or government censure despite our efforts to ensure the security of our content management system. Any such event may also damage our reputation. If our advertising viewers do not believe our content is reliable or accurate, our business model may become less appealing to viewers in China and our advertising clients may be less willing to place advertisements on our advertising network.

***We may be subject to intellectual property infringement claims, which may force us to incur substantial legal expenses and, if determined adversely against us, may materially disrupt our business.***

We cannot be certain that our advertising displays or other aspects of our business do not or will not infringe upon patents, copyrights or other intellectual property rights held by third parties. Although we are not aware of any such claims, we may become subject to legal proceedings and claims from time to time relating to the intellectual property of others in the ordinary course of our business. If we are found to have violated the intellectual property rights of others, we may be enjoined from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives. In addition, we may incur substantial expenses in defending against these third party infringement claims, regardless of their merit. Successful infringement or licensing claims against us may result in substantial monetary liabilities, which may materially and adversely disrupt our business.

***We face significant competition, and if we do not compete successfully against new and existing competitors, we may lose our market share, and our profitability may be adversely affected.***

We compete with other advertising companies in China. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also face competition from other out–of–home television advertising network operators for access to the most desirable locations in cities in China. Individual buildings, hotels, restaurants and other commercial locations and hypermarket, supermarket and convenience store chains may also decide to independently, or through third–party technology providers, install

30

Table of Contents

and operate their own flat–panel television advertising screens. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, street furniture, billboard, frame and public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

In the future, we may also face competition from new entrants into the out–of–home television advertising sector. Our sector is characterized by relatively low fixed costs and, as is customary in the advertising industry, we do not have exclusive arrangements with our advertising clients. These two factors present potential entrants to our sector of the advertising industry with relatively low entry barriers. In addition, since December 10, 2005, wholly foreign–owned advertising companies are allowed to operate in China, which may expose us to increased competition from international advertising media companies attracted to opportunities in China.

Increased competition could reduce our operating margins and profitability and result in a loss of market share. Some of our existing and potential competitors may have competitive advantages, such as significantly greater financial, marketing or other resources, or exclusive arrangements with desirable locations, and others may successfully mimic and adopt our business model. Moreover, increased competition will provide advertisers with a wider range of media and advertising service alternatives, which could lead to lower prices and decreased revenues, gross margins and profits. We cannot assure you that we will be able to successfully compete against new or existing competitors.

***Our senior management and employees have worked together for a short period of time, which may make it difficult for you to evaluate their effectiveness and ability to address challenges.***

Due to our limited operating history and recent additions to our management team, some of our senior management and employees have worked together at our company for only a relatively short period of time. For example, following our acquisition of Framedia in January 2006, Tan Zhi, the former chairman and chief executive officer of Framedia, continues to be involved in the operation of our poster frame network. In addition, David Yu, the former chairman and chief executive officer of Target Media, has joined Focus Media as a co–chairman of our board of directors and president as of March 2006. As a result, it may be difficult for you to evaluate the effectiveness of our senior management and other key employees and their ability to address future challenges to our business.

***We do not maintain any business liability disruption or litigation insurance coverage for our operations, and any business liability, disruption or litigation we experience might result in our incurring substantial costs and the diversion of resources.***

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products and do not, to our knowledge, offer business liability insurance. While business disruption insurance is available to a limited extent in China, we have determined that the risks of disruption, cost of such insurance and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. As a result, we do not have any business liability, disruption or litigation insurance coverage for our operations in China. Any business disruption or litigation may result in our incurring substantial costs and the diversion of resources.

For example, on March 16, 2006, Shanghai Xicheng Cultural Dissemination Co., Ltd., also referred to as CGEN, brought a suit against us in the Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. CGEN, which is developing a network of flat–panel displays in hypermarkets and supermarkets, claims to have established an exclusive business relationship with the Hymart chain of supermarkets in Shanghai. Hymart notified us that it had requested in writing to terminate its relationship with CGEN. In CGEN's pleadings, it alleges that Focus Media encouraged and supported Hymart to allegedly violate its agreement with CGEN, resulting in losses to CGEN. In its pleadings, CGEN has requested that the court order Focus Media to cease any alleged unfair

31

**Table of Contents**

competitive behavior, to undo the effects of any alleged unfair competition and to pay RMB 13,570,920 (US$1.7 million) to CGEN. We intend to defend against CGEN's claims to the fullest extent of the law. However, there can be no assurance that we will prevail in any such litigation.

*We may become a passive foreign investment company, or PFIC, which could result in adverse U.S. tax consequences to U.S. investors.*

Based upon the past and projected composition of our income and valuation of our assets, including goodwill, we believe we were not a passive foreign investment company for 2005, we do not expect to be a passive foreign investment company for 2006, and we do not expect to become one in the future, although there can be no assurance in this regard. If, however, we were a passive foreign investment company, such characterization could result in adverse U.S. tax consequences to you if you are a U.S. investor. For example, if we are a PFIC, our U.S. investors will become subject to increased tax liabilities under U.S. tax laws and regulations and will become subject to burdensome reporting requirements. The determination of whether or not we are a PFIC is made on an annual basis and will depend on the composition of our income and assets from time to time. Specifically, we will be classified as a PFIC for U.S. tax purposes if either: (i) 75% or more of our gross income in a taxable year is passive income, or (ii) the average percentage of our assets by value in a taxable year which produce or are held for the production of passive income (which includes cash) is at least 50%. The calculation of the value of our assets will be based, in part, on the then market value of our ADSs, which is subject to change. In addition, the composition of our income and assets will be affected by how, and how quickly, we spend the cash we raise in this offering. We cannot assure you that we will not be a PFIC for 2006 or any future taxable year. For more information on PFICs, see "Taxation — United States Federal Income Taxation".

*Investor confidence and market price of our ADSs may be adversely impacted if we or our independent registered public accountants are unable to attest to the adequacy of the internal controls over our financial reporting for the fiscal year ending December 31, 2007, as required by Section 404 of the U.S. Sarbanes–Oxley Act.*

We are subject to the reporting requirements of the U.S. Securities and Exchange Commission, or SEC. The SEC, as directed by Section 404 of the U.S. Sarbanes–Oxley Act of 2002, adopted rules requiring public companies, including us, to include a report of management of their internal control structure and procedures for financial reporting in their annual reports on Form 10–K or Form 20–F, as the case may be, that contain an assessment by management of the effectiveness of their internal controls over financial reporting. In addition, independent registered public accountants of these public companies must attest to and report on management's assessment of the effectiveness of their internal controls over financial reporting. These requirements will first apply to our annual report on Form 20–F for the fiscal year ending on December 31, 2007. Our management may not conclude that our internal controls over financial reporting are effective. Moreover, even if our management does conclude that our internal controls over financial reporting are effective, if our independent registered public accountants are not satisfied with our internal control structure and procedures, the level at which our internal controls are documented, designed, operated or reviewed, or if the independent registered public accountants interpret the requirements, rules or regulations differently from us, they may decline to attest to our management's assessment or may issue a report that is qualified. For example, when our auditors audited our financial statements as of and for the period ended December 31, 2004, they identified one "reportable condition", as that term is defined under standards established by the American Institute of Certified Public Accountants, in our internal accounting controls. This reportable condition was cured at the time our auditors audited our financial statements for the period ended December 31, 2005. We cannot assure you that additional internal control and procedure problems will not occur in the future. Any of these possible outcomes could result in an adverse reaction in the financial marketplace due to a loss of investor confidence

Table of Contents

in the reliability of our financial statements, which could negatively impact the market price of our ADSs.

**Risks Relating to Regulation of Our Business and to Our Structure**

***If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties.***

Substantially all of our operations are or will be conducted through Focus Media Technology (Shanghai) Co., Ltd., or Focus Media Technology, Framedia Investment and Beijing Dotad Technology Co., Ltd., or Dotad Technology, our indirectly wholly–owned operating subsidiaries in China, and Focus Media Digital Information Technology (Shanghai) Co., Ltd., or Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, which we collectively refer to as our PRC operating subsidiaries, and through our contractual arrangements with several of our consolidated affiliated entities in China. PRC regulations require any foreign entities that invest in the advertising services industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been allowed to own directly 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising business outside of China or less than 100% if the foreign investor has at least two years of direct operations in the advertising industry outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify under PRC regulations any earlier than two or three years after we commence any such operations outside of China or until we acquire a company that has directly operated an advertising business outside of China for the required period of time. Accordingly, our PRC operating subsidiaries are currently ineligible to apply for the required licenses for providing advertising services in China. Substantially all of our advertising business is currently provided through our contractual arrangements with our PRC operating subsidiaries' consolidated affiliated entities in China, including Focus Media Advertisement and its subsidiaries with regard to our out–of–home television networks, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, and Focus Media Wireless with regard to our mobile handset advertising network, which we collectively refer to as our PRC operating affiliates. Our PRC operating affiliates are currently owned in each case either (i) by two PRC citizens designated by us or (ii) by two PRC entities owned by our subsidiaries or by our designated appointees. Our PRC operating affiliates, certain of their respective subsidiaries, and New Focus Media Advertisement hold the requisite licenses to provide advertising services in China. Our PRC operating affiliates and their respective subsidiaries directly operate our advertising network. We have been and are expected to continue to be dependent on these PRC operating affiliates and their subsidiaries to operate our advertising business for the foreseeable future. We have entered into contractual arrangements with PRC operating affiliates and their respective subsidiaries, pursuant to which we, through our PRC operating subsidiaries, provide technical support and consulting services to our PRC operating affiliates and their subsidiaries. In addition, we have entered into agreements with our PRC operating affiliates and each of their shareholders which provide us with the substantial ability to control these affiliates and their existing and future subsidiaries.

If we, our existing or future PRC operating subsidiaries and affiliates are found to be in violation of any existing or future PRC laws or regulations or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities, including the State Administration for Industry and Commerce, or SAIC, which regulates advertising companies, would have broad discretion in dealing with such violations, including:

- revoking the business and operating licenses of our PRC subsidiaries and affiliates;

- discontinuing or restricting our PRC subsidiaries' and affiliates' operations;

33

Table of Contents

• imposing conditions or requirements with which we or our PRC subsidiaries and affiliates may not be able to comply;

• requiring us or our PRC subsidiaries and affiliates to restructure the relevant ownership structure or operations; or

• restricting or prohibiting our use of the proceeds of this offering to finance our business and operations in China.

The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business.

***We rely on contractual arrangements with our PRC operating affiliates and their subsidiaries and shareholders for our China operations, which may not be as effective in providing operational control as direct ownership.***

We have in the past relied, and to a lesser but significant extent will continue in the future to rely, on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders to operate our advertising business. For a description of these contractual arrangements, see the sections titled "Our Corporate Structure", "Principal and Selling Shareholders" and "Related Party Transactions". These contractual arrangements may not be as effective in providing us with control over Focus Media Advertisement and its subsidiaries as direct ownership. If we had direct ownership of our PRC operating affiliates and their respective subsidiaries, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of those companies, which in turn could effect changes, subject to any applicable fiduciary obligations, at the management level. However, under the current contractual arrangements, as a legal matter, if our PRC operating affiliates or any of their subsidiaries and shareholders fails to perform its or his respective obligations under these contractual arrangements, we may have to incur substantial costs and resources to enforce such arrangements, and rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you to be effective. For example, if Jason Nanchun Jiang were to refuse to transfer his equity interest in Focus Media Advertisement to us or our designee when we exercise the purchase option pursuant to these contractual arrangements, or if Mr. Jiang were otherwise to act in bad faith toward us, then we may have to take legal action to compel him to fulfill his contractual obligations. In addition, Focus Media Advertisement, which holds certain of the business licenses required to operate our advertising network in China, is jointly owned and effectively managed by Mr. Jiang and Mr. Yu. Accordingly, it may be difficult for us to change our corporate structure or to bring claims against Focus Media Advertisement if Focus Media Advertisement does not perform its obligations under its contracts with us or Mr. Jiang and Mr. Yu do not cooperate with any such actions.

Many of these contractual arrangements are governed by PRC law and provide for the resolution of disputes through either arbitration or litigation in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal environment in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. In the event we are unable to enforce these contractual arrangements, we may not be able to exert effective control over our operating entities, and our ability to conduct our business may be negatively affected.

***Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment.***

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions we have entered into among our

34

Table of Contents

subsidiaries and affiliated entities are found not to be on an arm's–length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late payment interest and penalties. See "Managements' Discussion and Analysis of Financial Condition and Results of Operations — Taxation" for a discussion of the transactions referred to above. A finding by the PRC tax authorities that we are ineligible for the tax savings we achieved in 2004, or that Focus Media Digital, Shanghai Focus Media Advertising Agency Co., Ltd., or Focus Media Advertising Agency, New Focus Media Advertisement or New Structure Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings.

***We rely principally on dividends and other distributions on equity paid by our wholly–owned operating subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our operating subsidiary to pay dividends to us could have a material adverse effect on our ability to conduct our business.***

We are a holding company, and we rely principally on dividends and other distributions on equity paid by our PRC operating subsidiaries for our cash requirements, including the funds necessary to service any debt we may incur. If any of our PRC operating subsidiaries incurs debt on its own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us. In addition, the PRC tax authorities may require us to adjust our taxable income under the contractual arrangements our PRC operating subsidiaries currently have in place with our PRC operating affiliates and their respective subsidiaries in a manner that would materially and adversely affect our PRC operating subsidiaries' ability to pay dividends and other distributions to us. Furthermore, relevant PRC laws and regulations permit payments of dividends by our PRC operating subsidiaries only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. Under PRC laws and regulations, each of our PRC operating subsidiaries is also required to set aside a portion of its net income each year to fund specific reserve funds. These reserves are not distributable as cash dividends. In addition, subject to certain cumulative limits, the statutory general reserve fund requires annual appropriations of 10% of after–tax income to be set aside prior to payment of dividends. As a result of these PRC laws and regulations, our PRC operating subsidiaries and our PRC operating affiliates are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2005, the amount of these restricted portions was approximately $75,911,158. Any limitation on the ability of our PRC operating subsidiaries to pay dividends to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends, or otherwise fund and conduct our business.

***Some of our PRC operating affiliates previously engaged in activities outside the authorized scope of their business licenses. This could subject those companies to fines and other penalties, which could have a material adverse effect on our business.***

Under PRC law, the business license of a company sets forth the authorized scope of business it may legally undertake, and in order to engage in activities outside its authorized scope of business, it must apply for and receive approval to expand its scope of business. Three of our PRC operating affiliates, Focus Media Advertisement, Focus Media Technology and Shanghai On–Target Advertisement Co., Ltd., and, prior to our acquisition of them, four of our additional operating affiliates, Zhejiang Ruihong Focus Media Advertising Co., Ltd., Xiamen Advertising Co., Ltd., Shanghai Qianjian Advertising Co., Ltd. and Shanghai Perfect Media Advertising Co., Ltd., historically engaged in business activities that were not within the authorized scope of their respective business licenses. Each of these companies subsequently ceased such conduct or expanded the business scope of their respective business licenses to include such activities; and in

35

Table of Contents

the case of the four entities who exceeded their authorized business scope prior to our acquisition of them, we required such companies to cease such conduct or expand their business scope during the process of our acquiring them. While these companies all currently operate within their authorized scope of business, the relevant PRC authorities have the authority to impose fines or other penalties. In rare instances, these authorities may require the disgorgement of profits or revocation of the business license, but as a matter of practice, the authorities will typically only impose such an extreme penalty after repeated warnings where a violation is blatant and continuing. While we do not believe these past violations will have a material effect on our business, operations or financial condition, due to the discretionary nature of regulatory enforcements in the PRC, we cannot assure you that those of our PRC operating companies that exceeded the scope of their business licenses in the past will not be subject to such fines or penalties, including the disgorgement of profits or revocation of the business license of one or more of these companies, or that such fines or penalties will not have a material adverse effect on our business.

***Our business operations may be affected by legislative or regulatory changes.***

There are no existing PRC laws or regulations that specifically define or regulate out–of–home television or mobile handset advertising. It has been reported that the relevant PRC government authorities are currently considering adopting new regulations governing out–of–home television advertising. We cannot predict the timing and effects of such new regulations. Changes in laws and regulations or the enactment of new laws and regulations governing placement or content of out–of–home advertising or distribution of mobile handset advertising, our business licenses or otherwise affecting our business in China may materially and adversely affect our business prospects and results of operations. For example, the PRC government has promulgated regulations allowing foreign companies to hold a 100%–interest in PRC advertising companies starting from December 10, 2005. We are not certain how the PRC government will implement this regulation or how it could affect our ability to compete in the advertising industry in China.

***PRC regulation of loans and direct investment by offshore holding companies to PRC entities may delay or prevent us from using the proceeds of this offering to make loans or additional capital contributions to our PRC operating subsidiaries and affiliates.***

In utilizing the proceeds of this offering, as an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- loans by us to Focus Media Technology or to Framedia Investment, each a foreign invested enterprise, to finance its activities cannot exceed statutory limits and must be registered with the PRC State Administration of Foreign Exchange or its local counterpart; and

- loans by us to Focus Media Advertisement or its subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authorities and must also be registered with the PRC State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital and New Focus Media Advertisement through Focus Media Technology or Framedia Investment, by means of capital contributions. These capital contributions to Focus Media Technology and Framedia Investment must be approved by the PRC Ministry of Commerce or its local counterpart. Because Focus Media Advertisement and its subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in the "Regulation of Our Industry" section of this prospectus. We cannot assure you that we can obtain these government registrations or approvals on a timely basis, if at all, with respect to

36

Table of Contents

future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Focus Media Advertisement or any of their respective subsidiaries, including Framedia Advertisement, Guangdong Framedia and New Structure Advertisement. If we fail to receive such registrations or approvals, our ability to use the proceeds of this offering and to capitalize our PRC operations would be negatively affected which would adversely and materially affect our liquidity and our ability to expand our business.

**Risks Relating to the People's Republic Of China**

Substantially all of our assets are located in China and substantially all of our revenues are derived from our operations in China. Accordingly, our business, financial condition, results of operations and prospects are subject, to a significant extent, to economic, political and legal developments in China.

***The PRC's economic, political and social conditions, as well as governmental policies, could affect the financial markets in China and our liquidity and access to capital and our ability to operate our business.***

The PRC economy differs from the economies of most developed countries in many respects, including the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. While the PRC economy has experienced significant growth over the past, growth has been uneven, both geographically and among various sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures benefit the overall PRC economy, but may also have a negative effect on us. For example, under current PRC regulations, starting December 10, 2005, foreign entities are allowed to directly own 100% of a PRC advertising business if the foreign entity has at least three years of direct operations of an advertising business outside of China, or to directly own less than 100% of a PRC advertising business if the foreign entity has at least two years of direct operations of an advertising business outside of China. This may encourage foreign advertising companies with more experience, greater technological know–how and larger financial resources than we have to compete against us and limit the potential for our growth. Moreover, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations that are applicable to us.

The PRC economy has been transitioning from a planned economy to a more market–oriented economy. Although the PRC government has implemented measures since the late 1970s emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the PRC government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through the allocation of resources, controlling payment of foreign currency–denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Since late 2003, the PRC government implemented a number of measures, such as raising bank reserves against deposit rates to place additional limitations on the ability of commercial banks to make loans and raise interest rates, in order to slow down specific segments of China's economy which it believed to be overheating. These actions, as well as future actions and policies of the PRC government, could materially affect our liquidity and access to capital and our ability to operate our business.

***The PRC legal system embodies uncertainties which could limit the legal protections available to you and us.***

The PRC legal system is a civil law system based on written statutes. Unlike common law systems, it is a system in which decided legal cases have little precedential value. In 1979, the PRC

37

**Table of Contents**

government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past 26 years has significantly enhanced the protections afforded to various forms of foreign investment in China. Each of our PRC operating subsidiaries and affiliates is subject to PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, we may have to resort to administrative and court proceedings to enforce the legal protection that we enjoy either by law or contract. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. For example, these uncertainties may impede our ability to enforce the contracts we have entered into with Focus Media Advertisement and its subsidiaries. In addition, such uncertainties, including the inability to enforce our contracts, could materially and adversely affect our business and operation. In addition, intellectual property rights and confidentiality protections in China may not be as effective as in the United States or other countries. Accordingly, we cannot predict the effect of future developments in the PRC legal system, particularly with regard to the advertising industry, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement thereof, or the preemption of local regulations by national laws. These uncertainties could limit the legal protections available to us, including our ability to enforce our agreements with Focus Media Advertisement and its subsidiaries, and other foreign investors, including you.

***Recent PRC regulations relating to offshore investment activities by PRC residents may increase our administrative burden and restrict our overseas and cross–border investment activity. If our shareholders who are PRC residents fail to make any required applications and filings under such regulations, we may be unable to distribute profits and may become subject to liability under PRC laws.***

The PRC National Development and Reform Commission, or NDRC, and SAFE recently promulgated regulations that require PRC residents and PRC corporate entities to register with and obtain approvals from relevant PRC government authorities in connection with their direct or indirect offshore investment activities. These regulations apply to our shareholders who are PRC residents and may apply to any offshore acquisitions that we make in the future.

Under the SAFE regulations, PRC residents who make, or have previously made, direct or indirect investments in offshore companies will be required to register those investments. In addition, any PRC resident who is a direct or indirect shareholder of an offshore company is required to file with the local branch of SAFE, with respect to that offshore company, any material change involving capital variation, such as an increase or decrease in capital, transfer or swap of shares, merger, division, long term equity or debt investment or creation of any security interest over the assets located in China. If any PRC shareholder fails to make the required SAFE registration, the PRC subsidiaries of that offshore parent company may be prohibited from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation, to their offshore parent company, and the offshore parent company may also be prohibited from injecting additional capital into their PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

We cannot assure you that all of our shareholders who are PRC residents will comply with our request to make or obtain any registrations or approvals required under these regulations or other related legislation. Furthermore, as the regulations are relatively new, the PRC government has yet to publish implementing rules, and much uncertainty remains concerning the reconciliation of the new regulations with other approval requirements. It is unclear how these regulations, and any future legislation concerning offshore or cross–border transactions, will be interpreted, amended and implemented by the relevant government authorities. The failure or inability of our PRC resident

38

Table of Contents

shareholders to comply with these regulations may subject us to fines and legal sanctions, restrict our overseas or cross–border investment activities, limit our ability to inject additional capital into our PRC subsidiaries and the ability of Focus Media Technology, Focus Media Digital, New Focus Media Advertisement or Framedia Investment, our PRC subsidiaries, to make distributions or pay dividends, or materially and adversely affect our ownership structure. If any of the foregoing events occur, our acquisition strategy and business operations and our ability to distribute profits to you could be materially and adversely affected. See "Regulation of Our Industry — Regulation of Foreign Exchange in Onshore and Offshore Transactions".

***The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China.***

Our operations and transactions are subject to review by the PRC tax authorities pursuant to relevant PRC laws and regulations. However, these laws, regulations and legal requirements change frequently, and their interpretation and enforcement involve uncertainties. For example, in the case of some of our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China, we cannot assure you that the PRC tax authorities will not require us to pay additional taxes in relation to such acquisitions, in particular where the PRC tax authorities take the view that the previous taxable income of the PRC affiliates of the acquired offshore entities needs to be adjusted and additional taxes be paid. In the event that the sellers failed to pay any taxes required under PRC law in connection with these transactions, the PRC tax authorities might require us to pay the tax, together with late–payment interest and penalties. See "Managements' Discussion and Analysis of Financial Condition and Results of Operations — Acquisitions".

***If any of our PRC affiliates becomes the subject of a bankruptcy or liquidation proceeding, we may lose the ability to use and enjoy those assets, which could reduce the size of our advertising network and materially and adversely affect our business, ability to generate revenue and the market price of our ADSs.***

To comply with PRC laws and regulations relating to foreign ownership restrictions in the advertising business, we currently conduct our operations in China through contractual arrangements with Focus Media Advertisement, its shareholders and subsidiaries. As part of these arrangements, Focus Media Advertisement and its subsidiaries hold some of the assets that are important to the operation of our business. If any of these entities goes bankrupt and all or part of their assets become subject to liens or rights of third–party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. If any of Focus Media Advertisement and its subsidiaries undergoes a voluntary or involuntary liquidation proceeding, its shareholders or unrelated third–party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, our ability to generate revenue and the market price of our ADSs.

***Restrictions on currency exchange may limit our ability to utilize our revenues effectively.***

Substantially all of our revenues and operating expenses are denominated in Renminbi. The Renminbi is currently convertible under the "current account", which includes dividends, trade and service–related foreign exchange transactions, but not under the "capital account", which includes foreign direct investment and loans. Currently, each of Focus Media Technology and Framedia Investment may purchase foreign exchange for settlement of "current account transactions", including payment of dividends to us, without the approval of SAFE. However, we cannot assure you that the relevant PRC governmental authorities will not further limit or eliminate our ability to purchase foreign currencies in the future. Since a significant amount of our future revenues will be denominated in Renminbi, any existing and future restrictions on currency exchange may limit our

39

**Table of Contents**

ability to utilize revenues generated in Renminbi to fund our business activities outside China, if any, or expenditures denominated in foreign currencies. Foreign exchange transactions under the capital account are still subject to limitations and require approvals from, or registration with, the State Administration of Foreign Exchange and other relevant PRC governmental authorities. This could affect the ability of each of Focus Media Technology and Framedia Investment to obtain foreign exchange through debt or equity financing, including by means of loans or capital contributions from us.

***Fluctuations in exchange rates could result in foreign currency exchange losses.***

Because our earnings and cash and cash equivalent assets are denominated in Renminbi and the net proceeds from this offering will be denominated in U.S. dollars, fluctuations in exchange rates between U.S. dollars and Renminbi will affect the relative purchasing power of these proceeds and our balance sheet and earnings per share in U.S. dollars following this offering. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our financial results reported in U.S. dollar terms without giving effect to any underlying change in our business or results of operations. Since July 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it is reported to be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on June 12, 2006 the Renminbi was revalued against the U.S. dollar to approximately RMB8.0150 to the U.S. dollar. The Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the long term, depending on the fluctuation of the basket of currencies against which it is currently valued or it may be permitted to enter into a full float, which may also result in a significant appreciation or depreciation of the Renminbi against the U.S. dollar. Fluctuations in the exchange rate will also affect the relative value of any dividend we issue in the future which will be exchanged into U.S. dollars and earnings from and the value of any U.S. dollar–denominated investments we make in the future.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

***Any future outbreak of severe acute respiratory syndrome or avian flu in China, or similar adverse public health developments, may severely disrupt our business and operations.***

From December 2002 to June 2003, China and other countries experienced an outbreak of a new and highly contagious form of atypical pneumonia now known as severe acute respiratory syndrome, or SARS. On July 5, 2003, the World Health Organization declared that the SARS outbreak had been contained. Since September 2003, however, a number of isolated new cases of SARS have been reported, most recently in central China in April 2004. During May and June of 2003, many businesses in China were closed by the PRC government to prevent transmission of SARS. In addition, many countries, including China, have encountered incidents of the H5N1 strain of bird flu, or avian flu. This disease, which is spread through poultry populations, is capable in some circumstances of being transmitted to humans and is often fatal. A new outbreak of SARS or an outbreak of avian flu may result in health or other government authorities requiring the closure of our offices or other businesses, including office buildings, retail stores and other commercial venues, which comprise the primary locations where we provide our advertising services. Any recurrence of the SARS outbreak, an outbreak of avian flu or a development of a similar health hazard in China, may deter people from congregating in public places, including a range of commercial locations such as office buildings and retail stores. Such occurrences would severely impact the value of our out–of–

40

Table of Contents

home advertising network to advertisers, significantly reduce the advertising time purchased by advertisers and severely disrupt our business and operations.

**Risks Relating to this Offering, Our ADSs and Our Trading Markets**

***The price of our ADSs has been volatile and may continue to be volatile, which may make it difficult for holders to resell the ADSs when desired or at attractive prices.***

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. Since July 13, 2005, the closing prices of our ADSs on the Nasdaq National Market has ranged from $17.60 to $69.95 per ADS and the last reported sale price on June 12, 2006 was $55.15. Our ADS price may fluctuate in response to a number of events and factors. The financial markets in general, and the market prices for many PRC companies in particular, have experienced extreme volatility that often has been unrelated to the operating performance of such companies.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for specific business reasons. Factors such as variations in our revenues, earnings and cash flow, announcements of new investments, cooperation arrangements or acquisitions, and fluctuations in market prices for our advertising network could cause the market price for our ADSs to change substantially. Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade. We cannot give any assurance that these factors will not occur in the future.

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

Sales of substantial amounts of our ADSs in the public market, or the perception that these sales could occur, could adversely affect the market price of our ADSs and could materially impair our future ability to raise capital through offerings of our ADSs. For example, we issued 22,157,003 new ordinary shares in connection with our acquisition of Framedia and in 2007 we may be required to issue additional new ordinary shares based on a fixed ordinary share price of $2.456 per ordinary share up to $88.0 million to the former shareholders of Framedia if Framedia meets agreed upon earnings and operating targets in 2006. In addition, upon completion of our acquisition of Target Media in February 2006, we issued 77.0 million of our ordinary shares to the current shareholders of Target Media Holdings. We may also be required to issue up to 3.0 million of our ordinary shares to the former shareholders of Focus Media Wireless based on certain earnings targets for 2006 and 2007. See "Our Recent Significant Acquisitions".

There are 512,766,773 ordinary shares (equivalent to 51,276,677 ADSs) outstanding as of the date of this prospectus. In addition, as of June 2, 2006, there were outstanding options to purchase 36,102,420 ordinary shares, 6,555,580 of which are exercisable as of that date. 291,715,933 of our ordinary shares outstanding as of the date of this prospectus are "restricted securities" as defined in Rule 144 and may not be sold in the absence of registration other than in accordance with Rule 144 under the Securities Act or another exemption from registration thereunder.

In connection with this offering, we and the selling shareholders have agreed not to sell any ordinary shares or ADSs for 90 days after the date of this prospectus without the written consent of the underwriters and subject to certain exceptions. In addition, in connection with our initial public offering on July 13, 2005, we, our controlling shareholders, the selling shareholders in our initial public offering and our directors and executive officers agreed, until July 13, 2006 to sell no more than half of their ordinary shares or ADSs owned immediately prior to the initial public offering, which sales include sales from the initial public offering, the public offering of additional ADSs pursuant to the underwriters' exercise of their over–allotment option in August 2005, the public offering of additional ADSs in January 2006, the public offering of additional ADSs pursuant to the underwriters' exercise of their over–allotment option in February 2006 and this offering. In order to facilitate this offering, the underwriters to the initial public offering have released these securities from these

41

Table of Contents

restrictions with regard to us and the selling shareholders participating in this offering. Moreover, the underwriters may from time to time continue to release other securities of ours or those held by our shareholders that are currently subject to lock–up, subject to applicable regulations of the National Association of Securities Dealers, or NASD. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs. See "Underwriting" and "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling our securities after this offering.

*A significant percentage of our outstanding ordinary shares is beneficially owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer, and as a result, he may have significantly greater influence on us and our corporate actions by nature of the size of his shareholdings relative to our public shareholders.*

Following this offering, Jason Nanchun Jiang beneficially will own, through his 100% ownership of JJ Media Investment Holding Ltd., approximately 18.36% of our outstanding ordinary shares or 17.30% if the underwriters exercise their option to purchase additional ADSs in full. Jason Nanchun Jiang is currently and is expected to remain an affiliate within the meaning of the Securities Act after the offering, due to the size of his respective shareholdings in us after the offering. Accordingly, Jason Nanchun Jiang has significant influence in determining the outcome of any corporate transaction or other matter submitted to the shareholders for approval, including mergers, consolidations and the sale of all or substantially all of our assets, election of directors and other significant corporate actions. Further, Jason Nanchun Jiang is also an 85% shareholder of our affiliated PRC entity, Focus Media Advertisement, with which we have contractual arrangements that are essential to our business. The continuing cooperation of Focus Media Advertisement, and its shareholders, branches and subsidiaries, is important to our business. Without Jason Nanchun Jiang's consent, we could be prevented from entering into transactions or conducting business that could be beneficial to us. Accordingly, Mr. Jiang's control of Focus Media Advertisement could hinder any change in control of our business, particularly where such change of control would benefit shareholders other than Mr. Jiang. It would be difficult for us to change our corporate structure if any disputes arise between us and Mr. Jiang or if he fails to carry out his contractual and fiduciary obligations to us. Thus, Jason Nanchun Jiang's interests as an officer and employee may differ from his interests as a shareholder or from the interests of our other shareholders, including you.

*Anti–takeover provisions in our charter documents may discourage our acquisition by a third party, which could limit our shareholders' opportunity to sell their shares at a premium.*

Our amended and restated memorandum and articles of association include provisions that could limit the ability of others to acquire control of us, modify our structure or cause us to engage in change–of–control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of us in a tender offer or similar transaction.

For example, our board of directors will have the authority, without further action by our shareholders, to issue preference shares in one or more series and to fix the powers and rights of these shares, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares. Preference shares could thus be issued quickly with terms calculated to delay or prevent a change in control or make removal of management more difficult. In addition, if the Board of Directors issues preference shares, the market price of our ordinary shares may fall and the voting and other rights of the holders of our ordinary shares may be adversely affected.

In addition, some actions require the approval of a supermajority of at least two thirds of our board of directors which, among other things, would allow our non–independent directors to block a

42

**Table of Contents**

variety of actions or transactions, such as a merger, asset sale or other change of control, even if all of our independent directors unanimously voted in favor of such action, further depriving our shareholders of an opportunity to sell their shares at a premium. In addition, our directors serve terms of three years each, which terms are not staggered. The length of these terms could present an additional obstacle against the taking of action, such as a merger or other change of control, that could be in the interest of our shareholders.

***We are a Cayman Islands company and, because judicial precedent regarding the rights of shareholders is more limited under Cayman Islands law than under U.S. law, you may have less protection of your shareholder rights than you would under U.S. law.***

Our corporate affairs are governed by our amended and restated memorandum and articles of association, the Cayman Islands Companies Law and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. In addition, some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands.

As a result of all of the above, public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a U.S. company.

***Judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands company and substantially all of our assets are located outside of the United States. All of our current operations are conducted in the PRC. In addition, most of our directors and officers are nationals and residents of countries other than the United States. A substantial portion of the assets of these persons are located outside the United States. As a result, it may be difficult for you to effect service of process within the United States upon these persons. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors, most of whom are not resident in the United States and the substantial majority of whose assets are located outside of the United States. In addition, there is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of United States courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state. In addition, there is uncertainty as to whether such Cayman Islands or PRC courts would be competent to hear original actions brought in the Cayman Islands or the PRC against us or such persons predicated upon the securities laws of the United States or any state.

***We have not determined a specific use for a portion of our net proceeds from this offering and we may use these proceeds in ways with which you may not agree.***

We have not determined a specific use for a portion of our net proceeds of this offering. Our management will have considerable discretion in the application of these proceeds received by us. You will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. The net proceeds may be used for corporate

43

**Table of Contents**

purposes that do not improve our profitability or increase our ADS price. The net proceeds from this offering may also be placed in investments that do not produce income or lose value.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement.***

Holders of our ADSs may only exercise their voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Upon receipt of voting instructions from a holder of ADSs in the manner set forth in the deposit agreement, the depositary will endeavor to vote the underlying ordinary shares in accordance with these instructions. Under our amended and restated memorandum and articles of association and Cayman Islands law, the minimum notice period required for convening a general meeting is ten days. When a general meeting is convened, you may not receive sufficient notice of a shareholders' meeting to permit you to withdraw your ordinary shares to allow you to cast your vote with respect to any specific matter at the meeting. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if your ordinary shares are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, the depositary will give us a discretionary proxy to vote our ordinary shares underlying your ADSs at shareholders' meetings if you do not vote, unless:

• we have failed to timely provide the depositary with our notice of meeting and related voting materials;

• we have instructed the depositary that we do not wish a discretionary proxy to be given;

• we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

• a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

• voting at the meeting is made on a show of hands.

The effect of this discretionary proxy is that you cannot prevent our ordinary shares underlying your ADSs from being voted, absent the situations described above, and it may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

***You may not receive distributions on our ordinary shares or any value for them if it is illegal or impractical to make them available to you.***

The depositary of our ADS has agreed to pay you the cash dividends or other distributions it or the custodian for our ADSs receives on our ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of our ordinary shares your ADSs represent. However, the depositary is not responsible if it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed pursuant to an applicable

44

Table of Contents

exemption from registration. The depositary is not responsible for making a distribution available to any holders of ADSs if any government approval or registration required for such distribution cannot be obtained after reasonable efforts made by the depositary. We have no obligation to take any other action to permit the distribution of our ADSs, ordinary shares, rights or anything else to holders of our ADSs. This means that you may not receive the distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may have a material and adverse effect on the value of your ADSs.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs represented by American Depositary Receipts are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

45

**Table of Contents**

**FORWARD–LOOKING STATEMENTS**

This prospectus contains forward–looking statements that are based on our current expectations, assumptions, estimates and projections about us and our industry. All statements other than statements of historical fact in this prospectus are forward–looking statements. These forward–looking statements can be identified by words or phrases such as "may", "will", "expect", "anticipate", "estimate", "plan", "believe", "is/are likely to" or other similar expressions. The forward–looking statements included in this prospectus relate to, among others:

- our goals and strategies;

- our future business development, financial condition and results of operations;

- projected revenues, profits, earnings and other estimated financial information;

- our ability to acquire businesses complementary to our core business and integrate the acquired companies into our business;

- achieving anticipated or potential synergies with companies we acquire, including Framedia, Target Media, E–Times and Focus Media Wireless;

- our plans to expand our advertising network into new cities and regions in China and diversify into new networks, such as WAP–based mobile handset advertising and outdoor LED billboard advertising, and new advertising channels;

- the growth or acceptance of Framedia's poster frame network, Focus Media Wireless's mobile handset advertising network and our outdoor LED billboard network;

- our plan to develop our business into a multi–platform out–of–home advertising network, including through operation of Focus Media Wireless's mobile handset advertising network services;

- our plan to identify and create additional advertising channels that target specific consumer demographics, which could allow us to increase our advertising revenue;

- competition in the PRC advertising industry;

- the expected growth in the urban population, consumer spending, average income levels and advertising spending levels;

- PRC governmental policies and regulations relating to the advertising industry and regulations and policies promulgated by the State Administration of Foreign Exchange;

- other risks outlined in our filings with the Securities and Exchange Commission, including our registration statements on Form F–1, as amended; and

- those other risks identified in "Risk Factors" of this prospectus.

These forward–looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward–looking statements are reasonable, we cannot assure you that our expectations will turn out to be correct. Our actual results could be materially different from or worse than our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Risk Factors", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Business" and other sections of this prospectus.

This prospectus also contains data relating to the advertising industry that includes projections based on a number of assumptions. The advertising market may not grow at the rates projected by market data, or at all. The failure of these markets to grow at the projected rates may have a material adverse effect on our business and the market price of our ADSs. In particular, the relatively new and rapidly changing nature of the out–of–home advertising sector subjects any projections or

**Table of Contents**

estimates relating to the growth prospects or future condition of our sector to significant uncertainties. Furthermore, if any one or more of the assumptions underlying the market data turns out to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward–looking statements.

The forward–looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. We undertake no obligation to update any forward–looking statements to reflect events or circumstances after the date on which the statements are made or to reflect the occurrence of unanticipated events.

47

**Table of Contents**

## OUR CORPORATE STRUCTURE

**Our History**

Our predecessor company, Shanghai Aiqi Advertisement Co., Ltd., or Aiqi Advertisement, was established by immediate family members of Jason Nanchun Jiang in September 1997 and operated as an advertising agency. In May 2003, Aiqi Advertisement discontinued its advertising agency business, was renamed Shanghai Focus Media Advertisement Co., Ltd., commenced operation of our out–of–home television advertising network in China and reorganized its shareholdings. At the same time, we entered into arrangements with Focus Media Advertisement that resulted in the consolidation of Focus Media Advertisement. Following this reorganization Jason Nanchun Jiang continued to hold a controlling interest in Focus Media Advertisement.

In conjunction with the change in our business model in May 2003 and to facilitate foreign investment in our company, we established our offshore holding company, Focus Media Holding Limited as a company registered in the British Virgin Islands in April 2003. In April 2005, we completed the process of changing Focus Media Holding Limited's corporate domicile to the Cayman Islands and we are now a Cayman Islands company. On July 13, 2005, our ADSs were listed for quotation on the Nasdaq National Market.

In January 2006, we acquired Framedia and E–Times, which operate networks of advertising poster frames placed primarily in elevators and public areas of residential complexes in China. In February 2006, we acquired Target Media. Target Media operated an out–of–home advertising network using flat–panel displays placed in elevator lobbies and other public areas in commercial buildings, hospitals, hotels, banks, residential buildings, convenience stores and other locations in cities in China. Following the acquisition of Target Media, we combined Target Media's network into our existing commercial location and in–store networks. Other than holding their existing contracts, the former Target Media entities no longer conduct any operations, and the combined network is operated through our existing corporate entities. In March 2006, we acquired Focus Media Wireless, which operates a WAP–based advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. See "Our Recent Significant Acquisitions".

**Our Corporate Structure and Contractual Arrangements**

Substantially all of our operations are conducted in China as follows:

- with regard to the operation of our out–of–home television networks, through Focus Media Technology, our indirect wholly–owned subsidiaries in China, Focus Media Digital, a 90%–owned subsidiary of Focus Media Technology, and New Focus Media Advertisement, a 90%–owned subsidiary of Focus Media Digital, and through our contractual arrangements with several of our consolidated affiliated entities in China, including Focus Media Advertisement, and its subsidiaries. Focus Media Advertisement owns the remaining 10% equity interest in Focus Media Digital and New Focus Media Advertisement;

- with regard to the operation of our poster frame network, through Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, each of which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively; and

- with regard to the operation of our mobile handset advertising network, through Focus Media Wireless, which is 90% owned by Focus Media Advertisement and 10% owned by Focus Media Advertising Agency, respectively.

Each of Framedia Investment and Dotad Technology and their respective affiliated entities and shareholders, have entered into contractual arrangements substantially similar to those control agreements entered into among Focus Media Technology, Focus Media Digital, New Focus Media Advertisements, Focus Media Advertisement and its shareholders and subsidiaries. See "Related

48

**Table of Contents**

Party Transactions — Agreements Among Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement" and "— Agreements Among Focus Media Advertisement, Focus Media Advertising Agency, Focus Media Wireless and Dotad Technology".

    The following diagram illustrates our current corporate structure other than dormant entities and the former Target Media entities, which aside from holding their existing contracts, no longer conduct any operations:



(1)    Loans used to capitalize our PRC operating companies and to facilitate our control over them.

(2)    Agreements that give us effective control over Focus Media Advertisement and its subsidiaries, as described in "Related Party Transactions".

(3)    Agreement that transfer a substantial portion of the economic benefits of Focus Media Advertisement and its subsidiaries to us, as described in "Related Party Transactions".

(4)    Agreements that give Framedia Investment effective control over the PRC–based operations of Framedia, as described in "Related Party Transactions".

(5)    The remaining equity interests in Focus Media Advertisement's subsidiaries are held by Jimmy Wei Yu, Focus Media Advertising Agency or unrelated third parties.

(6)    Agreements that give Dotad Technology effective control over the PRC–based operations of Focus Media Wireless, as described in "Related Party Transactions".

(7)    Our out–of–home television network operations comprises our commercial location, in–store and outdoor LED networks.

    In connection with its entry into the World Trade Organization, China is required to relax restrictions on foreign investment in the advertising industry in China. Accordingly, PRC regulations stipulate that starting from December 10, 2005, foreign investors are allowed to directly own 100% of PRC companies operating an advertising business if the foreign entity has at least three years of direct operations in the advertising business outside of China or to directly own less than 100% if the foreign entity has at least two years of direct operations in the advertising business outside of China. We do not currently directly operate an advertising business outside of China and cannot qualify for direct ownership of a PRC advertising company under PRC regulations any earlier than two or three years, respectively, after we commence any such operations or until we acquire a company which has directly operated an advertising business for the required period of time. We do not currently know how or when we will be able to qualify under these regulations. Even if we do qualify in the future, it may be burdensome or not cost effective for us to meet the required criteria for direct

49

Table of Contents

ownership. If and when we qualify for direct ownership, we intend to explore the commercial feasibility of changing our current structure, including possibly direct ownership of Focus Media Advertisement and its subsidiaries, taking into consideration relevant cost, market, competitive and other factors. In the event we take such steps, we cannot assure you that we will be able to identity or acquire a qualified foreign company for a possible future restructuring or that any restructuring we may undertake to facilitate direct ownership will be successful.

Accordingly, since we have not been involved in the direct operation of an advertising business outside of China, our domestic PRC subsidiaries, Focus Media Technology and Focus Media Digital, which are considered foreign–invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through contractual arrangements with our consolidated affiliated entities in China, including (i) Focus Media Advertisement and its subsidiaries with regard to our commercial location, in–store and outdoor LED networks, (ii) Framedia Advertisement, Guangdong Framedia and New Structure Advertisement with regard to our poster frame network, and (iii) Focus Media Wireless with regard to our mobile handset advertising network. Focus Media Advertisement is owned by two PRC citizens, Jason Nanchun Jiang, our chairman and chief executive officer, and Jimmy Wei Yu, one of our directors, affiliated with UCI Group (China) Limited, one of our principal shareholders, while each of Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and Focus Media Wireless is owned by Focus Media Advertisement and Focus Media Advertising Agency. Each of Focus Media Advertisement, several of its subsidiaries, our newly established indirect subsidiary New Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and Focus Media Wireless, which we refer to collectively as our PRC operating affiliates, holds the requisite licenses to provide advertising services in China. In 2006, we expect to begin operating a portion of our advertising business through our 90%–owned indirect subsidiary New Focus Media Advertisement after which time we will no longer entirely rely on contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders for the operation of our advertising business.

We have been and are expected to continue to be dependent on our PRC operating affiliates to operate our advertising business until we acquire them as our wholly–owned subsidiaries. We and Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment and Dotad Technology, which we refer to as our wholly–foreign owned entities, have entered into contractual arrangements with their respective PRC operating affiliates and shareholders, pursuant to which:

• we are able to exert effective control over our PRC operating affiliates;

• a substantial portion of the economic benefits of our PRC operating affiliates will be transferred to us; and

• each of our wholly–foreign owned entities or their respective designees has an exclusive option to purchase all or part of the equity interests in our PRC affiliated entities or their respective nominee holders, or, in some cases, all or part of the assets of our PRC affiliated entities, in each case when and to the extent permitted by PRC law.

Each of our contractual arrangements with our PRC affiliated entities and their respective shareholders and subsidiaries can only be amended with the approval of our audit committee or another independent body of our board of directors. See "Related Party Transactions" for further information on our contractual arrangements with these parties.

In the opinion of Global Law Office, our PRC legal counsel:

• the respective ownership structures of Focus Media, Framedia, Focus Media Wireless and their respective PRC operating affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

50

Table of Contents

- the contractual arrangements among Focus Media, Framedia, Focus Media Wireless and their respective PRC operating affiliates, subsidiaries and shareholders, in each case governed by PRC law are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- the PRC business operations of Focus Media, Framedia, Focus Media Wireless and their respective PRC operating affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in advertising businesses, we could be subject to severe penalties. See "Risk Factors — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties", "— Our business operations may be affected by legislative or regulatory changes" and "— The PRC legal system embodies uncertainties which could limit the legal protections available to you and us".

51

**Table of Contents**

## USE OF PROCEEDS

We estimate that we will receive net proceeds from this offering of approximately $   million, whether or not the underwriters exercise their option in full to purchase additional ADSs, after deducting underwriting discounts and the estimated offering expenses payable by us. We will not receive any of the proceeds from the sale of ADSs by the selling shareholders.

We anticipate using approximately $24.0 million of the net proceeds of this offering to fund a portion of the cash consideration in connection with our acquisition of Target Media and $20.0 million for capital expenditures in connection with the expansion of our network. We may use any remaining amounts for future strategic acquisitions and general corporate purposes. If and when we qualify for direct ownership of Focus Media Advertisement, as discussed more fully in "Our Corporate Structure — Our Corporate Structure and Contractual Arrangements", we may explore the possibility of using a portion of the proceeds of this offering to acquire Focus Media Advertisement, taking into consideration relevant cost, market, competitive and other factors.

The foregoing represents our current intentions with respect to the use of the net proceeds of this offering based upon our present plans and business conditions, but our management will have significant flexibility and discretion in applying the net proceeds of the offering. The occurrence of new business opportunities, unforeseen events or changed business conditions may result in application of the proceeds of this offering in a manner other than as described in this prospectus.

To the extent that the net proceeds we receive from this offering are not immediately applied for the above purposes, we intend to invest our net proceeds in short–term, interest bearing, debt instruments or bank deposits. These investments may have a material adverse effect on the U.S. federal income tax consequences of your investment in our ADSs. It is possible that we may become a passive foreign investment company for United States federal income tax purposes, which could result in negative tax consequences for you. These consequences are described in more detail in "Risk Factors — Risks Relating to Our Business and Industry — We may become a passive foreign investment company, or PFIC, which could result in adverse U.S. tax consequences to U.S. investors" and "Taxation — United States Federal Income Taxation — Passive Foreign Investment Companies".

In utilizing the proceeds of this offering in the manner described above, as an offshore holding company of our PRC operating subsidiaries and affiliates, we may make loans to our PRC subsidiaries and consolidated PRC affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Any loans to our PRC subsidiaries or consolidated PRC affiliated entities are subject to PRC regulations and approvals. For example:

- • loans by us to Focus Media Technology and Focus Media Digital through Focus Media Technology, each a foreign invested enterprise, to finance its activities cannot exceed statutory limits and must be registered with the State Administration of Foreign Exchange or its local counterpart; and

- • loans by us to Focus Media Advertisement or its subsidiaries, which are domestic PRC enterprises, must be approved by the relevant government authority and must also be registered with the State Administration of Foreign Exchange or its local counterpart.

We may also determine to finance Focus Media Technology, Focus Media Digital, New Focus Media Advertisement through Focus Media Technology, Framedia Investment or Dotad Technology by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Because Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Wireless and their respective subsidiaries are domestic PRC enterprises, we are not likely to finance their activities by means of capital contributions due to regulatory issues relating to foreign investment in domestic PRC enterprises, as well as the licensing and other regulatory issues discussed in "Regulation of Our Industry" included elsewhere in this prospectus. We cannot assure you that we can obtain these

Table of Contents

government registrations or approvals on a timely basis, if at all, with respect to future loans or capital contributions by us to Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment, Focus Media Wireless, Focus Media Advertisement or any of their respective subsidiaries. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — PRC regulation of loans and direct investment by offshore holding companies to PRC entities may delay or prevent us from using the proceeds of this offering to make loans or additional capital contributions to our PRC operating subsidiaries and affiliates".

**Table of Contents**

## DIVIDEND POLICY

We have not previously declared any dividends. In 2004, we recorded deemed dividends of $8.3 million, $2.2 million and $13.4 million in connection with our Series A, Series B and Series C–1 and Series C–2 convertible redeemable preference shares, of which $4.9 million of the deemed dividend related to the difference between the fair value at that time of the Series C–1 convertible redeemable preference shares and ordinary shares in connection with a sale of 9,729,600 ordinary shares by Jason Nanchun Jiang, our chairman and CEO, to a third–party investor, which shares were redesignated as Series C–1 convertible redeemable preference shares. These deemed dividends were not cash dividends and upon conversion of our Series A, Series B and Series C–1 and Series C–2 convertible redeemable preference shares into ordinary shares, we are no longer required to record deemed dividends prospectively. We currently intend to retain all available funds and any future earnings for use in the operation and expansion of our business and do not anticipate paying any cash dividends on our ordinary shares, or indirectly on our ADSs, for the foreseeable future.

Future cash dividends, if any, will be at the discretion of our board of directors and will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, shareholders' interests, contractual restrictions and other factors as our board of directors may deem relevant. In addition, we can pay dividends only out of our profits or other distributable reserves. Any dividend we declare will be paid to the holders of ADSs, subject to the terms of the deposit agreement, to the same extent as holders of our ordinary shares, less the fees and expenses payable under the deposit agreement. Other distributions, if any, will be paid by the depositary to holders of our ADSs in any means it deems legal, fair and practical. Any dividend will be distributed by the depositary, in the form of cash or additional ADSs, to the holders of our ADSs. Cash dividends on our ADSs, if any, will be paid in U.S. dollars. See "Description of American Depositary Shares".

54

Table of Contents

### MARKET PRICE INFORMATION FOR OUR ADSs

Our ADSs, each representing ten of our ordinary shares, have been listed on the Nasdaq National Market since July 13, 2005. Our ADSs trade under the symbol "FMCN". For the period from July 13, 2005 to June 12, 2006 the trading price of our ADSs on Nasdaq has ranged from US$17.60 to US$69.95 per ADS. The following table provides the high and low trading prices for our ADSs on the Nasdaq National Market Inc. for each of the twelve months since July 2005.

|  | Sale Price | |
|---|---|---|
|  | **High** | **Low** |
|  | **US$** | **US$** |
| **Monthly Highs and Lows** | | |
| **2005** (from July 13) | | |
| July (from July 13 until July 31) | 21.00 | 17.60 |
| August | 22.09 | 18.25 |
| September | 27.00 | 18.25 |
| October | 27.31 | 22.50 |
| November | 31.94 | 26.00 |
| December | 35.30 | 29.70 |
| **2006** | | |
| January | 53.34 | 34.51 |
| February | 56.95 | 47.71 |
| March | 59.99 | 50.00 |
| April | 65.15 | 54.00 |
| May | 69.95 | 60.14 |
| June (through June 12) | 68.69 | 50.84 |

Table of Contents

## CAPITALIZATION

The following table sets forth, as of March 31, 2006:

• our actual capitalization; and

• our pro forma capitalization, to give effect to the issuance and sale of          ADSs offered by our company in this offering at a public offering price of $        per ADS, after deducting underwriting discounts, commissions and estimated offering expenses.

You should read this table in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, included elsewhere in this prospectus.

| | As of March 31, 2006 | |
| --- | --- | --- |
| | Actual | Pro Forma[1][2] |
| | (in thousands of U.S. dollars, except for share data) | |
| Short term borrowings[3] | $ 8,024 | $ |
| **Shareholders' Equity:** | | |
| Ordinary shares ($0.00005 par value; 885,516,600 shares authorized; 506,457,633 shares issued and outstanding (actual) and         shares issued and outstanding)(pro forma) | $ 25 | $ |
| Additional paid–in capital | 530,089 | |
| Deferred share–based compensation | — | |
| Retained earnings | 22,430 | |
| Accumulated other comprehensive loss | 3,339 | |
| Total shareholders' equity | 555,883 | |
| Total capitalization | $ 563,907 | $ |

(1)   Assumes that the underwriters do not exercise their over–allotment option.

(2)   To give effect to this offering.

(3)   None of our short–term borrowings is guaranteed.

**Table of Contents**

## EXCHANGE RATES

Our operating businesses are currently conducted in China and substantially all of our revenues and expenses are denominated in Renminbi. The People's Bank of China, or PBOC, sets and publishes daily a base exchange rate with reference primarily to the supply and demand of Renminbi against a basket of currencies in the market during the prior day. The PBOC also takes into account other factors, such as the general conditions existing in the international foreign exchange markets. Since 1994, the conversion of Renminbi into foreign currencies, including Hong Kong dollars and U.S. dollars, has been based on rates set by the PBOC, which are set daily based on the previous day's inter–bank foreign exchange market rates and current exchange rates in the world financial markets. From 1994 to July 20, 2005, the official exchange rate for the conversion of Renminbi to U.S. dollars was generally stable. Although PRC governmental policies were introduced in 1996 to reduce restrictions on the convertibility of Renminbi into foreign currency for current account items, conversion of Renminbi into foreign exchange for capital items, such as foreign direct investment, loans or securities, requires the approval of the State Administration for Foreign Exchange and other relevant authorities. On July 21, 2005, the PRC government introduced a managed floating exchange rate system to allow the value of the Renminbi to fluctuate within a regulated band based on market supply and demand and by reference to a basket of currencies. On the same day, the value of the Renminbi appreciated by 2.0% against the U.S. dollar. Since then, the PRC government has made, and may in the future make, further adjustments to the exchange rate system. The PBOC announces the closing price of a foreign currency traded against the Renminbi in the inter–bank foreign exchange market after the closing of the market on each working day, and makes it the central parity for the trading against the Renminbi on the following working day.

The conversion of Renminbi into U.S. dollars in this prospectus is based on the noon buying rate in The City of New York for cable transfers of Renminbi as certified for customs purposes by the Federal Reserve Bank of New York. For your convenience, this prospectus contains translations of Renminbi at $1.00 to RMB8.0167, which was the prevailing rate on March 31, 2006. The prevailing rate at June 12, 2006 was $1.00 to RMB8.0150. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, the rates stated below, or at all. The PRC government imposes controls over its foreign currency reserves in part through direct regulation of the conversion of Renminbi into foreign exchange and through restrictions on foreign trade.

The following table sets forth information concerning exchange rates between the Renminbi and the U.S. dollar for the periods indicated. These rates are provided solely for your convenience and are not necessarily the exchange rates that we used in this prospectus or will use in the preparation of our periodic reports or any other information to be provided to you.

|  | **Renminbi per U.S. dollar noon buying rate** | | | |
|---|---|---|---|---|
|  | **Average** | **High** | **Low** | **Period–End** |
| 2001 | 8.2770 | 8.2786 | 8.2676 | 8.2766 |
| 2002 | 8.2770 | 8.2800 | 8.2669 | 8.2800 |
| 2003 | 8.2770 | 8.2800 | 8.2272 | 8.2769 |
| 2004 | 8.2768 | 8.2774 | 8.2764 | 8.2765 |
| 2005 | 8.1940 | 8.2765 | 8.0702 | 8.0702 |
| December | 8.0755 | 8.0808 | 8.0702 | 8.0702 |
| 2006 |  |  |  |  |
| January | 8.0654 | 8.0702 | 8.0596 | 8.0608 |
| February | 8.0512 | 8.0616 | 8.0415 | 8.0415 |
| March | 8.0350 | 8.0505 | 8.0167 | 8.0167 |
| April | 8.0143 | 8.0240 | 8.0050 | 8.0140 |
| May | 8.0140 | 8.0300 | 8.0025 | 8.0215 |
| June (through June 12) | 8.0138 | 8.0225 | 8.0057 | 8.0150 |

*Source:* Federal Reserve Bank of New York.

**Table of Contents**

### SELECTED CONSOLIDATED FINANCIAL AND OPERATING DATA

The following selected consolidated financial information has been derived from our consolidated financial statements. Our consolidated financial statements are prepared by including the financial statements of Focus Media Advertisement, formerly Aiqi Advertising, through May 2003 and our consolidated financials, which include the consolidation of Focus Media Advertisement as a variable interest entity, thereafter and presented in accordance with U.S. GAAP. Our statements of operations for 2002, 2003, 2004 and 2005 and our balance sheets as of December 31, 2002, 2003, 2004 and 2005 have been audited by Deloitte Touche Tohmatsu CPA Ltd., an independent registered public accounting firm. The report of Deloitte Touche Tohmatsu CPA Ltd. on those financial statements is included elsewhere in this prospectus.

Our selected consolidated financial information for the years ended December 31, 2001 have been derived from Focus Media Advertisement unaudited consolidated financial statements, which are not included in this prospectus. Our statement of operations for each of the three months ended March 31, 2005 and 2006 and balance sheet data as of March 31, 2005 and 2006 has been derived from our unaudited consolidated financial data which has been included elsewhere in this prospectus. We have prepared the unaudited consolidated financial data on the same basis as the audited consolidated financial statements and have included, in our opinion, all adjustments, consisting only of normal and recurring adjustments, that we consider necessary for a fair presentation of the financial information set forth in those statements. Our historical results for any prior or interim period are not necessarily indicative of results to be expected for a full fiscal year or for any future period. The selected consolidated financial information for the periods and as of the dates indicated should be read in conjunction with our financial statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations".

Prior to May 2003, we operated as an advertising agency, the operations and services of which differ markedly from our current business. As an advertising agency, we assisted media companies in selling their advertising time or space to companies seeking to advertise in exchange for a commission. In May 2003, we ceased acting as an advertising agency and commenced our current business as an operator of an out–of–home advertising network, consisting first of our commercial location network. In April 2005, we commenced commercial operations of our in–store network and through our acquisition of Framedia, we commenced operation of our poster frame network on January 1, 2006. In February 2006, we acquired Target Media and in March 2006, we acquired Focus Media Wireless.

| | 2001 | 2002 | For the year ended December 31, | | | For the three months ended March 31, | |
| | | | 2003 | 2004 | 2005 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|
| | | | (in thousands of U.S. dollars) | | | | |
| **Selected Consolidated Statements of Operations Data:** | | | | | | | |
| Net revenues: | | | | | | | |
| Commercial location network[1] | | | $ 3,369 | $ 26,321 | $ 61,435 | $ 9,432 | $ 21,472 |
| In-store network[1] | | | — | — | 5,469 | — | 5,293 |
| Poster frame network[1] | | | — | — | — | — | 6,067 |
| Advertising service revenue[1] | — | — | 3,369 | 26,321 | 66,904 | 9,432 | 32,832 |
| Advertising equipment revenue | — | — | 389 | 2,889 | 1,325 | 142 | 304 |
| Total net revenues | 30 | 24 | 3,758 | 29,210 | 68,229 | 9,574 | 33,136 |

58

Table of Contents

| | 2001 | 2002 | 2003 | 2004 | 2005 | For the three months ended March 31, | |
|---|---|---|---|---|---|---|---|
| | | | For the year ended December 31, | | | 2005 | 2006 |
| | | | (in thousands of U.S. dollars) | | | | |
| Cost of revenues: | | | | | | | |
| Net advertising service cost: | | | | | | | |
|    Commercial location network | | | 1,566 | 6,746 | 17,943 | 2,903 | 8,035 |
|    In–store network | | | — | — | 7,423 | 286 | 3,973 |
|    Poster frame network | | | — | — | — | — | 2,397 |
|   Advertising service cost | — | — | 1,566 | 6,746 | 25,366 | 3,189 | 14,405 |
|   Advertising equipment cost | — | — | 275 | 1,934 | 976 | 71 | 232 |
| Total cost of revenues | — | — | 1,841 | 8,680 | 26,342 | 3,260 | 14,637 |
| Gross profit | 30 | 24 | 1,917 | 20,530 | 41,887 | 6,314 | 18,499 |
| Operating expenses: | | | | | | | |
|   General and administrative | 28 | 21 | 985 | 3,988 | 9,120 | 1,881 | 4,395 |
|   Selling and marketing | 2 | 3 | 407 | 3,454 | 9,544 | 1,492 | 4,057 |
|   Amortization of acquired intangibles | — | — | — | 77 | 437 | 67 | 999 |
|   Goodwill impairment loss | — | — | — | 58 | — | — | — |
| Total operating expenses | 30 | 24 | 1,392 | 7,577 | 19,101 | 3,440 | 9,451 |
| Income from operations | — | — | 525 | 12,953 | 22,786 | 2,874 | 9,048 |
| Interest income | — | — | 1 | 10 | 1,762 | 11 | 916 |
| Other income (expense), net | — | — | (9) | (4) | (161) | 5 | 46 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | — | — | (11,692) | — | — | — |
| Income before income taxes and minority interest | — | — | 517 | 1,267 | 24,387 | 2,890 | 10,010 |
| Total income taxes | — | — | 482 | 908 | 694 | 248 | 617 |
| Minority interest | — | — | (8) | (13) | 145 | 0 | (40) |
| Equity loss of affiliates | — | — | (18) | — | — | — | — |
| Net income | — | — | $ 25 | $ 372 | $ 23,548 | $ 2,642 | $ 9,433 |

59

Table of Contents

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|
| | | | For the year ended December 31, | | | For the three months ended March 31, | |
| | | | (in thousands of U.S. dollars, except share and per share data) | | | | |
| **Earnings per share data:** | | | | | | | |
| Deemed dividend on Series A convertible redeemable preference shares[2] | — | — | — | (8,308) | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares[2] | — | — | — | (2,191) | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares[2] | — | — | — | (13,356) | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | — | — | 12,906 | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ — | $ — | $ 25 | $ (10,577) | $ 23,548 | $ 2,642 | $ 9,433 |
| Income (loss) per share — basic | $ — | $ — | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.02 | $ 0.02 |
| Income (loss) per share — diluted | $ — | $ — | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.01 | $ 0.02 |
| Shares used in calculating basic income per share | — | — | 144,657,600 | 160,998,600 | 252,128,545 | 142,464,600 | 438,232,094 |
| Shares used in calculating diluted income per share | — | — | 144,657,600 | 160,998,600 | 365,938,094 | 315,212,608 | 465,895,318 |

| | 2001 | 2002 | 2003 | 2004 | 2005 | As of March 31, 2006 |
|---|---|---|---|---|---|---|
| | | | As of December 31, | | | |
| | | | (in thousands of U.S. dollars) | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | $ 12 | $ 15 | $ 716 | $ 22,669 | $ 36,653 | $ 41,863 |
| Other current assets[3] | 120 | 106 | 1,902 | 12,713 | 104,988 | 83,440 |
| Non–current assets[4] | 12 | 8 | 2,688 | 21,033 | 70,713 | 523,442 |
| Total assets | 144 | 129 | 5,306 | 56,415 | 212,354 | 648,745 |
| Total current liabilities | 22 | 7 | 4,119 | 8,634 | 20,694 | 92,403 |
| Minority interest | — | — | 4 | 81 | 245 | 460 |
| Mezzanine equity | — | — | — | 53,273 | — | |
| Total shareholders' equity (deficiency) | $ 122 | $ 122 | $ 1,183 | $ (5,573) | $ 191,415 | $ 555,882 |

| | 2003 | 2004 | 2005 | As of March 31, 2006 |
|---|---|---|---|---|
| | | As of December 31, | | |
| **Selected Operating Data:** | | | | |
| Number of displays in our commercial location network: | | | | |
| Our direct cities | 827 | 12,786 | 45,049 | 71,230 |
| Our regional distributors[5] | 201 | 2,629 | 3,177 | 3,779 |
| Total | 1,028 | 15,415 | 48,226 | 75,009 |
| Number of displays in our in–store network | — | — | 27,849 | 33,765 |
| Number of stores in our in–store network | — | — | 4,130 | 5,218 |
| Number of installed frames[6] | — | — | — | 74,353 |

Table of Contents

| | For and as of the three months ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
| **Commercial Location Network[7]:** | | | | | |
| Number of time slots available for sale [8] | 6,010 | 6,737 | 8,346 | 9,028 | 10,717 |
| Number of time slots sold[9] | 1,998 | 3,057 | 4,240 | 4,648 | 3,904 |
| Average utilization rate[10] | 33.2% | 45.4% | 50.8% | 51.5% | 36.4% |
| Average quarterly advertising service revenue per time slot sold (US$) | $ 4,721 | $ 4,573 | $ 4,077 | $ 4,461 | $ 4,882 |
| **In–store Network[11]:** | | | | | |
| Number of time slots available for sale [8] | — | — | — | — | 245,314 |
| Number of time slots sold[9] | — | — | — | — | 76,498 |
| Average utilization rate[10] | — | — | — | — | 31.2% |
| Average quarterly advertising service revenue per time slot sold (US$) | — | — | — | — | $ 69 |
| **Poster Frame Network[12]:** | | | | | |
| Number of frame slots available for sale [13] | — | — | — | — | 208,659 |
| Number of frame slots sold[14] | — | — | — | — | 90,262 |
| Occupancy rate[15] | — | — | — | — | 43.3% |
| Average advertising service revenue per frame slot (US$)(ASP) | — | — | — | — | $ 67 |

(1)  Advertising service revenue is presented net of business tax. Business tax on advertising service revenue from our commercial location network amounted to $1,405, $311,770, $2,788,233, $5,991,497, $936,405 and $2,081,512 in 2002, 2003, 2004 and 2005 and for the three months ended March 31, 2005 and 2006, respectively. Business tax on advertising service revenue for our in–store network amounted to $524,271, $nil and $524,357 in 2005 and for the three months ended March 31, 2005 and 2006. Business tax on advertising service revenue for our poster frame network amounted to $590,972 for the three months ended March 31, 2006. Business tax includes business tax of 5.55% and cultural industries tax of 4.0% of our gross advertising service revenue.

(2)  We are no longer required to record deemed dividends prospectively following conversion at the closing of our initial public offering of our Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares into ordinary shares.

(3)  Other current assets is equal to total current assets less cash and cash equivalents.

(4)  Non–current assets is equal to total assets less total current assets.

(5)  Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(6)  Number of installed frames includes frames we currently market and frames that have been installed, for instance, in buildings that are still under construction and which we have not yet begun to market.

(7)  Starting January 1, 2006, time slot data presented for our commercial location network includes only data related to our premier office building A channel. For the three months ended March 31, 2006, advertising services revenues from our premier office building A channel accounted for 91.2% of advertising service revenue for our commercial location network.

(8)  For our commercial location network, includes the time slots for our directly operated cities and the time slots we are entitled to sell on the portion of our network operated by our regional distributors. Number of time slots available for sale refers to the number of 30–second equivalent time slots available on our network during the period presented and is calculated by taking the total advertising time available on our network during the period presented, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots available. For our commercial location network, the number of advertising time slots available for sale is determined by the number of cities in which we directly operate, the two–ninths portion of time slots on our regional distributors' networks which we have the right to sell and the length of the advertising cycle, which is currently twelve minutes in all of our directly operated cities. For our in–store network, the number of advertising time slots available for sale is determined by the number of stores in which we operate.

(9)  Number of time slots sold refers to the number of 30–second equivalent time slots sold during the period presented and is calculated by taking the total advertising time we sold during the period presented, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots sold.

(10)  Utilization rate refers to total time slots sold as a percentage of total time slots available during the relevant period.

61

**Table of Contents**

(11)  We commenced operation of our in–store network in April 2005.

(12)  We commenced operation of our poster frame network in January 2006.

(13)  Includes the number of frame slots available on a monthly basis within each three month period.

(14)  Includes the number of frame slots sold on a monthly basis within each three month period.

(15)  Occupancy rate refers to the total number of frame slots sold as a percentage of total frame slots available during the relevant period.

62

**Table of Contents**

**MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and the related notes included elsewhere in this prospectus. Our consolidated financial statements have been prepared in accordance with U.S. GAAP. In addition, our consolidated financial statements and the financial data included in this prospectus reflect our reorganization and have been prepared as if our current corporate structure had been in place throughout the relevant periods. The following discussion and analysis contains forward–looking statements that involve risks and uncertainties. Actual results could differ materially from those projected in the forward–looking statements. For additional information regarding these risks and uncertainties, see "Risk Factors".*

**Overview**

Our out–of–home advertising network consists of (i) our commercial location, in–store and outdoor LED networks, which we collectively refer to as our out–of–home television networks, (ii) our poster frame network and (iii) our mobile handset advertising network. We have experienced significant revenue and earnings growth, and the size of our network has grown significantly, since the commercial launch of our advertising network in May 2003.

The significant increase in our operating results since we commenced our current business operations is attributable to a number of factors, including the substantial expansion of our flat–panel display network, the launch and ongoing expansion of our in–store network, the commencement of operations of our poster frame network, the successful execution of strategic acquisitions, such as our acquisition of Framedia, Target Media, Focus Media Wireless and a number of our regional distributors, and the growing acceptance of our multi–platform network as an appealing advertising medium by our clients.

We expect our future growth to be driven by a number of factors and trends including:

- Overall economic growth in China, which we expect to contribute to an increase in advertising spending in major urban areas in China where consumer spending is concentrated;

- The expansion of our commercial location network since we completed our acquisition of Target Media;

- Our ability to expand our network into new locations and additional cities;

- Our ability to expand our sales force and engage in increased sales and marketing efforts;

- Our ability to increase sales of advertising time slots and extend the duration of our advertising cycle on our commercial location and in–store networks;

- Our ability to expand our client base through promotion of our services and cross–selling;

- Our ability to successfully operate and expand our poster frame network, which we acquired from Framedia in January 2006, including increasing the number of residential complexes in which we place advertising poster frames;

- Our ability to expand our in–store network which commenced operation in April 2005;

- Our ability to integrate Target Media's former out–of–home television advertising networks into our commercial location network and in–store network;

- Our ability to identify and create new advertising channels by establishing separate advertising networks that enable advertisers to target a diverse range of consumer groups with specific demographic profiles. Our commercial location network is currently marketed as six separate channels targeting different types of consumers: our premier A and B office

63

**Table of Contents**

building channels, our travel channel, our fashion channel, our elite channel and our healthcare channel;

- Our ability to successfully enter into the mobile handset network advertising business, in part through our recent acquisition of Focus Media Wireless;

- Our ability to successfully operate and market our new outdoor LED network; and

- Our ability to acquire companies that operate advertising businesses complementary to our existing operations.

    Because our primary source of revenue is our advertising service revenue, we focus on factors that directly affect our advertising service revenue such as the number of advertising time slots that we have available for sale and the price we charge for our advertising time slots after taking into account any discounts. The effective price we charge advertising clients for time slots on our network is affected by the attractiveness of our network to advertisers, the level of demand for time slots in each city and the perceived effectiveness of our network in achieving the goals of our advertising clients. The attractiveness and effectiveness of our commercial location network is in turn directly related to our ability to secure and retain prime locations for our displays and to increase the number of displays, locations and cities in our network.

    As we continue to expand our network, we expect to face a number of challenges. We have expanded our network rapidly, and we, as well as our competitors, have occupied many of the most desirable locations in China's major cities. In order to continue expanding our network in a manner that is attractive to potential advertising clients, we may continue to enter into new advertising media platforms and to establish additional stand–alone networks that provide effective channels for advertisers. In addition, we must react to continuing technological innovations, such as the potential uses of wireless and broadband technology in our network, and changes in the regulatory environment, such as the regulations allowing 100% foreign ownership of PRC advertising companies and new regulations governing cross–border investment by PRC persons.

    Our financial results since the beginning of 2006 also include those of Framedia that we acquired on January 1, 2006, of Target Media that we acquired on February 28, 2006 and, starting in the second quarter of 2006, those of Focus Media Wireless that we acquired in March 2006.

**Revenues**

    In 2003, 2004 and 2005, and for the three months ended March 31, 2006, we had total revenues of $3.8 million, $29.2 million, $68.2 million and $33.1 million, respectively. We generate revenues primarily from the sale of advertising time slots on our out–of–home television advertising networks and, beginning in 2006, from the sale of frame space on our poster frame network. Our advertising service revenue includes the sale of advertising time slots on our network, as well as a small amount of revenue attributable to other advertising related services we provide to our advertising clients. We also derive revenues from the sale of our flat–panel displays to regional distributors, which we refer to as our advertising equipment revenue. In 2003, 2004 and 2005, and for the three months ended March 31, 2006, our advertising service accounted for 89.6%,

Table of Contents

90.1%, 98.1% and 99.1% of our total revenues, respectively. The following table sets forth a breakdown of our total revenues for the periods indicated:

| | For the year ended December 31, | | | | | | For the three months ended March 31, | | | |
| | 2003 | | 2004 | | 2005 | | 2005 | | 2006 | |
| | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net revenues:** | | | | | | | | | | |
| Commercial location network[1] | $ 3,369 | 89.6% | $ 26,321 | 90.1% | $ 61,435 | 90.0% | $ 9,432 | 98.5% | $ 21,472 | 64.8% |
| In–store network:[1] | — | — | — | — | 5,469 | 8.0% | — | — | 5,293 | 16.0% |
| Poster frame network[1] | — | — | — | — | — | — | — | — | 6,067 | 18.3% |
| Advertising service revenue | 3,369 | 89.6% | 26,321 | 90.1% | 66,904 | 98.1% | 9,432 | 98.5% | 32,832 | 99.1% |
| Advertising equipment revenue | 389 | 10.4% | 2,889 | 9.9% | 1,325 | 1.9% | 142 | 1.5% | 304 | 0.9% |
| Total revenues | $ 3,758 | 100.0% | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 9,574 | 100.0% | $ 33,136 | 100.0% |

(in thousands of U.S. dollars, except percentages)

(1)  Advertising service revenue is presented net of business tax. Business tax on advertising service revenue from our commercial location network amounted to $311,770, $2.8 million, $6.0 million, $936,405 and $2.1 million in 2003, 2004 and 2005, and for the three months ended March 31, 2005 and 2006, respectively. Business tax on advertising service revenue for our in–store network amounted to $524,271, $nil and $524,357 in 2005 and for the three months ended March 31, 2005 and 2006. Business tax on advertising service revenue for our poster frame network amounted to $590,972 for the three months ended March 31, 2006. Business tax includes business tax of 5.55% and cultural industries tax of 4.0%.

**Table of Contents**

We also break down our total revenues into related–party and unrelated–party sources. The following table presents a more detailed breakdown of our gross revenues and its component parts:

| | For the year ended December 31, | | | | | | For the three months ended March 31, | | | |
| | 2003 | | 2004 | | 2005 | | 2005 | | 2006 | |
| | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands of U.S. dollars, except percentages) | | | | | |
| **Gross Advertising Service Revenue:** | | | | | | | | | | |
| *Commercial Locations* | | | | | | | | | | |
| — Unrelated parties | $ 2,581 | 68.7% | $ 25,322 | 86.7% | $ 62,633 | 91.8% | $ 9,234 | 96.5% | $ 21,400 | 64.6% |
| — Related parties | 1,099 | 29.2% | 3,788 | 13.0% | 4,793 | 7.0% | 1,134 | 11.8% | 2,154 | 6.5% |
| Total Commercial Locations | 3,680 | 97.9% | 29,109 | 99.7% | 67,426 | 98.8% | 10,368 | 108.3% | 23,554 | 71.1% |
| *In–store Network* | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | 5,475 | 8.0% | — | — | 5,215 | 15.7% |
| — Related parties | — | — | — | — | 518 | 0.8% | — | — | 602 | 1.8% |
| Total in–store network | — | — | — | — | 5,993 | 8.8% | — | — | 5,818 | 17.5% |
| *Poster Frame Network* | | | | | | | | | | |
| — Unrelated parties | — | — | — | — | — | — | — | — | 6,658 | 20.1% |
| — Related parties | — | — | — | — | — | — | — | — | — | — |
| Total Poster Frame Network | — | — | — | — | — | — | — | — | 6,658 | 20.1% |
| **Gross Advertising Services Revenue:** | 3,680 | 97.9% | 29,109 | 99.7% | 73,419 | 107.6% | 10,368 | 108.3% | 36,030 | 108.7% |
| **Less: Sales taxes:** | | | | | | | | | | |
| *Commercial Locations* | 311 | 8.3% | 2,788 | 9.6% | 5,991 | 8.7% | 936 | 9.8% | 2,082 | 6.2% |
| *In–store Network* | — | — | — | — | 524 | 0.8% | — | — | 524 | 1.6% |
| *Poster Frame Network* | — | — | — | — | — | — | — | — | 592 | 1.8% |
| Total sales taxes | 311 | 8.3% | 2,788 | 9.6% | 6,515 | 9.5% | 936 | 9.8% | 3,198 | 9.6% |
| **Net Advertising Service Revenue** | 3,369 | 89.6% | 26,321 | 90.1% | 66,904 | 98.1% | 9,432 | 98.5% | 32,832 | 99.1% |
| **Add: Advertising Equipment Revenue:** | 389 | 10.4% | 2,889 | 9.9% | 1,325 | 1.9% | 142 | 1.5% | 304 | 0.9% |
| **Net revenues:** | $ 3,758 | 100.0% | $ 29,210 | 100.0% | $ 68,229 | 100.0% | $ 9,574 | 100.0% | $ 33,136 | 100.0% |

*Advertising Service Revenue*

   *Sources of Revenues.* We derive most of our total revenues from the sale of time slots on our commercial location network and our in–store network to unrelated third parties and to some of our related parties. Beginning in the first quarter of 2006, we began to derive revenue from the sale of frame space on our poster frame network and WAP–based mobile handset advertisements. We report our advertising revenue between related and unrelated parties because historically more than 10% of our advertising service revenues came from clients related to some of our directors. Our advertising services to related parties were provided in the ordinary course of business on the same terms as those provided to our unrelated advertising clients on an arm's–length basis. In addition, we generate a small percentage of advertising services revenue from other advertising related services we provide to our advertising clients. Prior to May 2003, these other advertising–related services included commissions we received when we operated as an advertising agent. Since May 2003, these other advertising–related services have been derived from technical services we provide to some of our regional distributors and other advertising–related services commissioned by some of our advertising clients.

   Our advertising service revenue is recorded net of any sales discounts from our standard advertising rate cards that we may provide to our advertising clients. These discounts include volume discounts and other customary incentives offered to our advertising clients, including additional broadcast time for their advertisements if we have unused time slots available in a particular city's advertising cycle, and represent the difference between our standard rate card and the amount we charge our advertising clients. Our advertising clients include advertisers that directly engage in

**Table of Contents**

advertisement placements with us and advertising agencies retained by some advertisers to place advertisements on the advertiser's behalf. We expect that our advertising service revenue will continue to be the primary source, and constitute the substantial majority of, our revenues for the foreseeable future.

Our advertising service revenue reflects a deduction for business taxes and related surcharges incurred in connection with the operations of Focus Media Advertisement and its subsidiaries. Their revenues are subject to a sales tax consisting of a 5.55% business tax and a 4.0% cultural industries tax on revenues earned from their advertising services provided in China. We deduct these amounts from our advertising service revenues to arrive at our total revenues attributable to advertising services.

*Factors that Affect Our Advertising Service Revenue.*

*Commercial location network.* Our advertising service revenue derived from our commercial location network is directly affected by:

- the number of advertising time slots that we have available to sell, which is determined by the number of cities in which we directly operate, our expansion into additional cities, the two–ninths portion of cycle time available on our regional distributors' networks and the length of the advertising cycle, which is currently twelve minutes except in some cities operated by our regional distributors that use a nine minute cycle. We calculate the number of time slots available by taking the total advertising time available on our network during a particular period, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots available. We can increase the number of advertising time slots that we have available to sell by expanding into additional cities or acquiring our regional distributors, which provides us with the remaining seven–ninths of the time slots per cycle operated by the regional distributor. The length of our advertising cycle can potentially be extended to longer durations depending on demand in each city. The twelve–minute advertising cycle amounts to the equivalent of 24 30–second time slots per week. In cities where our regional distributors use a nine–minute advertising cycle, the cycle amounts to the equivalent of 18 30–second time slots per week; and

- the average price we charge for our advertising time slots, which we calculate by dividing our advertising service revenue by the number of 30–second equivalent time slots sold during that period, after taking into account any discount offered. We calculate average quarterly advertising service revenue for our Tier I, Tier II cities and as a blended average of all cities each quarter.

*In–store network.* Our advertising service revenue derived from our in–store network is directly affected by:

- the number of advertising time slots that we have available to sell, which is determined by the number of stores in which we operate, our expansion into additional stores, and the length of the advertising cycle, which is currently twelve minutes, or 24 30–second equivalent time slots. As with our commercial location network, for our in–store network we calculate the number of time slots according to the number of 30–second equivalent time slots available. The length of our advertising cycle can potentially be extended to longer durations depending on demand in each city; and

- the average price we charge for our advertising time slots, which we calculate by dividing our advertising service revenue by the number of 30–second equivalent time slots sold during that period, after taking into account any discount offered. Our revenues are also affected by the average quarterly advertising service revenue we derive per 30–second equivalent time slot sold per quarter.

**Table of Contents**

*Poster frame network.* Our advertising service revenue derived from our poster frame network is directly affected by:

• the number of frames in our poster frame network. We sell frame space on our poster frame network on a per frame basis. Increasing the number of residential and other locations on our poster frame network allows us to increase the number of frames on our network, thereby increases the available frame space for sale to advertisers. We generally place up to three advertising poster frames in each elevator where we deploy frames per display; and

• the average price we charge for frame space on a per frame basis, after taking into account any discount offered.

*Mobile handset advertising network.* Our advertising service revenue derived from our mobile handset advertising network is directly affected by:

• the number of messages we deliver to WAP users. We send WAP message advertisements to WAP users from approximately 100 WAP service providers, and we charge fees based on the number of successfully delivered messages; and

• the average price we charge per message.

Prices for time slots on our commercial location and in–store networks and for frame space on our poster frame network also vary significantly from city to city as income levels, standards of living and general economic conditions vary significantly from region to region in China, which in turn affect the advertising rates we are able to charge for time slots and frame space.

**Network Expansion.** Many of the most desirable locations for our network have been occupied, either by our network as a result of our expansion or by our competitors. As a result, we will need to rely on means other than the rapid increase in the number of locations, flat–panel displays and advertising poster frames in order to continue growing our revenues. We have focused, and expect to continue to focus, on developing new channels in our out–of–home television advertising networks and entering into new types of advertising media operations to continue to grow our revenues and to address these potential capacity constraints on our existing network. In recent months, these steps have included: (1) expanding our in–store network and (2) establishing discrete stand–alone channels on our commercial location network, such as our premier A and B office building, travel, fashion, elite and healthcare channels, enabling us to increase the number of time slots available for sale. We expect to continue to explore opportunities to open up additional channels on our existing network and to enter into new advertising media platforms in China. We believe these measures will enable us to continue the future growth of our business. We have also expanded our advertising network with the addition of Framedia's poster frame network in January 2006. We intend to continue expanding our out–of–home advertising network both through increasing the number of locations, displays and advertising poster frames on our commercial location, in–store and poster frame networks and through strategic acquisition of competitors and businesses that complement our existing out–of–home advertising network. Following our acquisition of Target Media in February 2006, we expanded our network significantly by combining Target Media's flat–panel display network with our network. In addition, we recently entered into new advertising platforms through Focus Media Wireless' WAP–based mobile handset advertising network and our outdoor LED digital billboard network.

**Seasonality.** Our advertising service revenue is subject to key factors that affect the level of advertising spending in China generally. In addition to fluctuations in advertising spending relating to general economic and market conditions, advertising spending is also subject to fluctuations based on the seasonality of consumer spending. In general, a disproportionately larger amount of advertising spending is concentrated on product launches and promotional campaigns prior to the holiday season in December. In addition, advertising spending generally tends to decrease in China during January and February each year due to the Chinese Lunar New Year holiday as office buildings and other commercial venues in China tend to be closed during the holiday. We believe

68

Table of Contents

this effect will be less pronounced with regard to advertising spending on our in–store network, as we believe commercial activity in hypermarkets and supermarkets is stable or even enhanced during the period of Chinese Lunar New Year. We also experience a slight decrease in revenues during the hot summer months of July and August each year, when there is a relative slowdown in overall commercial activity in urban areas in China. Our past experience, although limited, indicates that our revenues would tend to be lower in the first quarter and higher in the fourth quarter of each year, assuming other factors were to remain constant, such as our advertising rates and the number of available time slots on our network. We expect this effect to be partially offset by steady or enhanced advertising service revenue from our in–store network, which we believe is less susceptible to the effects of seasonality than our commercial location network, poster frame network and mobile handset advertising network.

*Revenue Recognition.* We typically sign standard advertising contracts with our advertising clients, which require us to run the advertiser's advertisements on our network in specified cities for a specified period, typically from four to twelve weeks. We recognize advertising service revenue ratably over the performance period of the advertising contract, so long as collection of our fee remains probable. We do not bill our advertising clients under these contracts until we perform the advertising service by broadcasting the advertisement on our network. Revenue collected from our poster frame network is recognized in substantially the same manner as revenues collected under the advertising contracts used for our commercial location and in–store networks.

We generally collect our advertising service fees by billing our advertising clients within 60 to 90 days after completion of the advertising contract and book these unbilled or unpaid amounts as accounts receivable until we receive payment or determine the account receivable to be uncollectible. Target Media's accounts receivable historically remained outstanding for longer periods of time than ours. We expect the average number of days outstanding for our accounts receivable to be higher as a result of our acquiring Target Media's accounts receivable. We expect the average period that our accounts receivable will remain outstanding to revert to our historical levels after we begin to apply our accounts receivable policy to Target Media's accounts receivable.

Our accounts receivable are general unsecured obligations of our advertising clients and we do not receive interest on unpaid amounts. We make specific reserves for accounts that we consider to be uncollectible. We also provide a general reserve for uncollectible accounts that we reassess on an annual basis. We made no provision for uncollectible accounts in 2003. In 2004 and 2005 and for the three months ended March 31, 2006, we made provision of $173,837, $235,604 and $194,723, respectively, for accounts receivable that were outstanding for longer than six months. The average number of days outstanding of our accounts receivable, including from related parties, was 71, 66, 71 and 75, respectively, as of December 31, 2003, 2004 and 2005 and March 31, 2006.

### Advertising Equipment Revenue

We also derive a portion of our total revenues from the sale of flat–panel displays to our regional distributors on a cost–plus basis, which we record as advertising equipment revenue. Our advertising equipment revenue represented 10.4%, 9.9%, 1.9% and 0.9% of our total revenues in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. Our advertising equipment revenue is recorded net of the 17% value added tax to which equipment sales in China are subject.

We expect that advertising equipment sales as a percentage of our total revenues will continue to be low because as we acquire our regional distributors, any growth in our network in these cities will not involve any future sales of advertising equipment; and growth in the size of the networks of our regional distributors is expected to slow as the most desirable locations have been occupied by them or our competitors.

69

Table of Contents

We recognize advertising equipment revenue when delivery of flat–panel displays has occurred and risk of ownership has passed to the distributor. We bill our regional distributors for flat–panel displays upon delivery and generally require payment within three to five days of delivery.

**Cost of Revenues**

Our cost of revenues consists of costs directly related to the offering of our advertising services and costs related to our sales of advertising equipment. The following table sets forth our cost of revenues, divided into its major components, by amount and percentage of our total revenues for the periods indicated:

| | \$ | % of total revenues | \$ | % of total revenues | \$ | % of total revenues | \$ | % of total revenues | \$ | % of total revenues |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2003** | | **2004** | | **2005** | | **2005** | | **2006** | |
| | **For the year ended December 31,** | | | | | | **For the three months ended March 31,** | | | |
| | (in thousands of U.S. dollars, except percentages) | | | | | | | | | |
| Total revenues | \$ 3,758 | 100.0% | \$ 29,210 | 100.0% | \$ 68,229 | 100.0% | \$ 9,574 | 100.0% | \$ 33,136 | 100.0% |
| Cost of revenues: | | | | | | | | | | |
| Net advertising service cost: | | | | | | | | | | |
| Commercial location network | 1,566 | 41.7% | 6,746 | 23.1% | 17,943 | 26.3% | 2,903 | 30.3% | 8,035 | 24.3% |
| In–store network | — | — | — | — | 7,423 | 10.9% | 286 | 3.0% | 3,973 | 12.0% |
| Poster frame network | — | — | — | — | — | — | — | — | 2,397 | 7.2% |
| Advertising service cost | 1,566 | 41.7% | 6,746 | 23.1% | 25,366 | 37.2% | 3,189 | 33.3% | 14,405 | 43.5% |
| Net advertising equipment cost | 275 | 7.3% | 1,934 | 6.6% | 976 | 1.4% | 71 | 0.7% | 232 | 0.7% |
| Total cost of revenues | 1,841 | 49.0% | 8,680 | 29.7% | 26,342 | 38.6% | 3,260 | 34.0% | 14,637 | 44.2% |
| Gross profit | 1,917 | 51.0% | 20,530 | 70.3% | 41,887 | 61.4% | 6,314 | 66.0% | 18,499 | 55.8% |

*Net Advertising Service Costs*

Our cost of revenues related to the offering of our advertising services on our advertising network consists of location costs, flat–panel display depreciation costs and other cost items, including salaries for and travel expenses incurred by our network maintenance staff and costs for materials.

Our location costs for our out–of–home television networks consist of:

- rental fees and one–time signing payments we pay to landlords, property managers and stores pursuant to the display placement agreements we enter into with them;

- commissions and public relations expenses we incur in connection with developing and maintaining relationships with landlords and property managers; and

- maintenance fees for keeping our displays in proper operating condition.

Generally, we capitalize the cost of our media displays and recognize depreciation costs on a straight–line basis over the term of their useful lives, which we estimate to be five years. The primary factors affecting our depreciation costs are the number of flat–panel displays in our network and the unit cost for those displays, as well as the remaining useful life of the displays. We expect our results of operations for a period of at least seven years beginning in 2006 to be negatively affected by the amortization of intangible assets in relation to, among other things, material contracts and customer lists as a result of several acquisitions, particularly Framedia and Target Media.

Our other cost of revenues consists of salary for and travel expenses incurred by our network maintenance staff and costs for materials and maintenance in connection with the upkeep of our advertising network. The primary factor affecting our other costs of revenues is the size of our network maintenance staff. As the size of our network increases, we expect our network maintenance staff, and associated costs, to increase in absolute terms, but to decrease as a percentage of total revenues.

70

**Table of Contents**

    ***Commercial Location Network.*** Location costs are the largest component of our cost of revenues for our commercial location network. The primary factors affecting the amount of our location costs include the number of display placement agreements we enter into and the rental fees we pay under those agreements. We expect these costs to decrease as a percentage of our advertising service revenue for our commercial location network in the future, as our advertising service revenue for our commercial location network is expected to increase faster than the additional cost we incur from entering into new display placement agreements and any increases we may experience in renewing existing display placement agreements. However, when our display placement agreements expire, we may be unable to renew these agreements on favorable terms and the rental fee portion of our location costs attributable to these existing locations could increase. As we continue to increase the size of our network and as we update and replace our existing displays with new technology, our depreciation costs in connection with our commercial location network are expected to increase.

    ***In–store Network.*** The primary costs of revenues connected with our in–store network are location costs resulting from rental and maintenance fees and depreciation costs for our displays. We expect these costs to continue to increase in 2006 as we expand our in–store network and to decrease as a percentage of advertising service revenue for our in–store network.

    ***Poster Frame Network.*** The primary costs of revenues connected with our poster frame network are location costs resulting from rental fees. Depreciation costs for our frames and other costs for salary and maintenance fees also account for a significant portion of cost of revenues for our poster frame network. We expect these costs to increase in 2006 as we expand our poster frame network but to decrease as a percentage of advertising service revenue for our poster frame network.

***Net Advertising Equipment Cost***

    Our net advertising equipment cost consists of the amounts we pay to the contract assembler who purchases the components and assembles them into the flat–panel displays we sell to our regional distributors. Our net advertising equipment cost accounted for 7.3%, 6.6%, 1.4% and 0.7% of our total revenues in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. The primary factors affecting our net advertising equipment cost are the number of flat–panel displays we sell and the unit cost we pay to our contract assembler for each such flat–panel display.

***Operating Expenses and Net Income***

    Our operating expenses consist of general and administrative and selling and marketing expenses. In 2004, our operating expenses also included a goodwill impairment loss. The following

71

Table of Contents

table sets forth our operating expenses, divided into their major categories by amount and as a percentage of our total revenues for the periods indicated.

| | For the year ended December 31, | | | | | | For the three months ended March 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2003** | | **2004** | | **2005** | | **2005** | | **2006** | |
| | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues | $ | % of total revenues |
| | (in thousands of U.S. dollars, except percentages) | | | | | | | | | |
| Gross profit | $1,917 | 51.0% | $20,530 | 70.3% | $41,887 | 61.4% | $6,314 | 65.9% | $18,499 | 55.8% |
| Operating expenses: | | | | | | | | | | |
| General and administrative | 985 | 26.2% | 3,988 | 13.7% | 9,120 | 13.4% | 1,881 | 19.6% | 4,395 | 13.3% |
| Selling and marketing | 407 | 10.8% | 3,454 | 11.8% | 9,544 | 14.0% | 1,492 | 15.6% | 4,057 | 12.2% |
| Amortization of acquired intangibles | — | — | 77 | 0.3% | 437 | 0.6% | 67 | 0.7% | 999 | 3.0% |
| Goodwill impairment loss | — | — | 58 | 0.2% | — | — | — | —% | — | — |
| Total | 1,392 | 37.0% | 7,577 | 26.0% | 19,101 | 28.0% | 3,440 | 35.9% | 9,451 | 28.5% |
| Income from operations | 525 | 14.0% | 12,953 | 44.3% | 22,786 | 33.4% | 2,874 | 30.0% | 9,048 | 27.3% |

*General and Administrative.* General and administrative expenses primarily consist of salary and benefits for management, business tax mainly relating to license fees paid by our affiliated PRC companies to Focus Media Advertisement and to Focus Media Digital, accounting and administrative personnel, office rental, maintenance and utilities expenses, depreciation of office equipment, other office expenses and professional services fees. General and administrative expenses accounted for 26.2%, 13.7%, 13.4% and 13.3% of our total revenues in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. Salaries and benefits accounted for 28.1%, 20.2%, 26.9% and 20.2% of our general and administrative expenses in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. We expect that our general and administrative expenses will be relatively stable as a percentage of total revenues in the near term but to increase in absolute terms as we hire additional personnel and incur additional costs in connection with the expansion of our business and with being a publicly traded company, including costs of enhancing our internal controls.

*Share–based Compensation Relating to General and Administrative.* Our share–based compensation expense relating to general and administrative consists of the amortized portion of deferred share–based compensation recognized by us. We issued options representing 10.87% of our issued share capital under our 2003 Employee Share Option Scheme, or the 2003 Option Plan. In addition, we have issued options representing 3.95% of our issued share capital under our 2005 Share Option Plan, or the 2005 Option Plan. Our share–based compensation relating to general and administrative accounted for 7.5% and 25.7% of our general and administrative expenses in 2005 and for the three months ended March 31, 2006, respectively. Our general and administrative expenses, including our share–based compensation, have increased and are expected to continue to increase following the effectiveness, as of January 2006, of the new accounting treatment Statement of Financial Accounting Standards No. 123(R) relating to share–based compensation. As a result, we recorded compensation expense of $1.5 million for the three months ended March 31, 2006.

*Selling and Marketing.* Our selling and marketing expenses primarily consist of salaries and benefits for our sales staff, marketing and promotional expenses, and other costs related to supporting our sales force. Selling and marketing expenses accounted for 10.8%, 11.8%, 14.0% and 12.2% of our total revenues in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. As we acquired more of our regional distributors, continue to expand our client base and have commenced operation of new advertising platforms, we increased our sales force, which resulted in an increase in salary expenses. We now budget approximately 15% of our advertising revenues to be used for selling and marketing. We expect selling and marketing expenses to remain relatively stable as a percentage of total revenues.

Table of Contents

*Amortization of Acquired Intangibles.* Our amortization of acquired intangibles consists of the amortized portion of intangible assets we acquired through our acquisition of other companies, businesses and assets. Amortization of acquired intangibles accounted for 0.6%, 0.7% and 3.0% of our total revenues in 2005 and for the three months ended March 31, 2005 and 2006, respectively.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities on the date of the financial statements and the reported amounts of revenues and expenses during the financial reporting period. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from those estimates. Some of our accounting policies require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our financial statements as their application places the most significant demands on our management's judgment.

*Share–based Compensation*

Through 2005, we accounted for our stock option plan using the intrinsic value method under Accounting Principles Board, or APB, No. 25. Effective the beginning of 2006, we adopted Statement of Financial Accounting Standards, or SFAS, No. 123–R, "Share–Based Payment", and elected to adopt the modified prospective application method. SFAS No. 123–R requires us to use a fair–value based method to account for share–based compensation. Accordingly, share–based expense is measured at the grant date, based on the fair value of the award, and is recognized as expense over the employees' requisite service period. Total compensation cost of our share plans in the first quarter 2006 was $1.5 million. The expected impact that the adoption of the standard will have on our stock–based compensation costs for 2006 is $6.1 million.

We estimated the fair value of share options granted using the Black–Scholes–Merton option pricing model formula and a simple option award approach. The fair value was then amortized on a straight–line basis over the requisite service periods of the awards, which is generally the vesting period. This option–pricing model requires the input of highly subjective assumptions, including the option's expected life, estimated forfeitures and the price volatility of the underlying shares.

*Income Taxes*

We account for income taxes under the provisions of SFAS No. 109, "Accounting for Income Taxes", with the required disclosures as described in note 15 to our consolidated financial statements. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In the event we were to determine that we would be able to realize our deferred tax assets in the future in excess of their recorded amount, an adjustment to our deferred tax assets would increase our income in the period such determination was made. Likewise, if we determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to our deferred tax assets would be charged to our income in the period such determination is made. We record income tax expense on our taxable income using the balance sheet liability method at the effective rate applicable to each of our affiliated entities in China in our consolidated statements of operations and comprehensive income.

*Goodwill and Acquisition Impairment*

Beginning in 2002, with the adoption of SFAS No. 142, "Goodwill and Other Intangible Assets", goodwill is no longer amortized, but instead tested for impairment upon first adoption and annually

73

Table of Contents

thereafter, or more frequently if events or changes in circumstances indicate that it might be impaired. SFAS No. 142 requires us to complete a two–step goodwill impairment test. The first step compares the fair values of each business unit to its carrying amount, including goodwill. If the fair value of each business unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. SFAS No. 142 requires completion of this first step within the first six months of initial adoption and annually thereafter. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a business unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

As of December 31, 2003, 2004 and 2005 and March 31, 2006, we had a goodwill balance of nil, $9.1 million, $13.3 million and $406.8 million, respectively, which is not deductible for tax purposes. We incurred a goodwill impairment loss of $58,397 in 2004 in connection with our acquisition of Perfect Media. In conducting our annual impairment test, we undertook a valuation of Perfect Media using the expected present value of cash flow and the income approach valuation methods, which resulted in a goodwill impairment loss of $58,397 in 2004, indicating that the value of Perfect Media was less than what we paid at the time we acquired it. We will perform the annual goodwill impairment test generally as of December 31, to determine if there is any further goodwill impairment. We recorded goodwill of $9.1 million in 2004 in connection with the acquisition of ten of the eleven companies we acquired during that year, which will be subject to the annual goodwill impairment test on December 31 of each year. The purpose of our acquisitions of our regional distributors was to expand the size of our network while our acquisition of Shanghai Qianjian Advertising Co., Ltd., or Qianjian, and Perfect Media enhanced our advertising services by adding to our existing network complementary lines of business, such as advertising networks placed in commercial banks, in the case of Qianjian, and advertising services offered at automatic shoe–shine machines located in buildings, in the case of Perfect Media. The recognition of goodwill from these acquisitions was a result of a purchase price in excess of the tangible assets of these companies and the goodwill they had generated from the operation of various advertising services. We recorded goodwill of $392 million in connection with Infoachieve, Target Media and Focus Media Wireless which we acquired during the first quarter of 2006.

Commencing in 2005, we reorganized the financial information reviewed by the chief decision maker, the chief executive officer, whereby the financial information of Perfect Media was prepared and presented together with that of out–of–home media display advertising services. Accordingly, we believe we have only one operating segment which is out–of–home advertising services as of December 31, 2005. As a result, for the purpose of SFAS No. 142, goodwill was tested for impairment at the consolidated level as of December 31, 2005.

We may incur additional goodwill impairment charges in the future although we cannot predict whether this will occur when we perform our goodwill impairment test each year.

**Taxation**

**_Cayman Islands, the British Virgin Islands and Hong Kong._**

Under the current laws of the Cayman Islands, the British Virgin Islands and Hong Kong, neither Focus Media Holding Limited, incorporated in the Cayman Islands, nor Infoachieve Limited and Dotad Holdings Limited, incorporated in the British Virgin Islands, are subject to tax on its income or capital gains. Focus Media Hong Kong, our wholly owned subsidiary incorporated in Hong

Table of Contents

Kong, is subject to profits tax rate of 17.5% on its assessable profits, yet interest derived from deposits placed in Hong Kong with authorized institutions are exempted from the Hong Kong profits tax. In addition, payment of dividends by either company is not subject to withholding tax in those jurisdictions.

*PRC*

Our PRC entities are subject to PRC business tax. We primarily pay business tax on gross revenues generated from our advertising services. Focus Media Advertisement and its subsidiaries, and New Focus Media Advertisement, pay a 5% business tax on the gross revenues derived from advertising services and this business tax is deducted from total revenues in calculating the net revenues. Focus Media Technology and Focus Media Digital pay a 5% business tax on the gross revenues derived from their contractual arrangements with Focus Media Advertisement and its subsidiaries and these taxes are primarily recorded in operating expenses.

In addition to business tax and cultural industries tax imposed on our advertising business and VAT imposed on our sales of advertising equipment, Focus Media Technology, Focus Media Digital and Focus Media Advertisement and its subsidiaries, including Focus Media Advertising Agency and New Focus Media Advertisement, are subject to PRC enterprise income tax on their taxable income, except to the extent some of them enjoy temporary tax exempt status as described in further detail below.

Pursuant to PRC law, enterprise income tax is generally assessed at the rate of 33% of taxable income. Focus Media Technology, Focus Media Digital, Focus Media Advertisement and its subsidiaries and New Focus Media Advertisement are currently subject to this 33% enterprise income tax. State Administration of Taxation and its delegates of the PRC are authorized to grant an exemption from enterprise income tax of up to two years to newly established domestic companies that have no direct foreign ownership and that are financially independent and engaged in consulting services, technology services or the information industry, which includes advertising services. A qualifying company must apply for this tax–exempt status for each of the two years separately. Focus Media Digital and Focus Media Advertising Agency were established in October 2004 and both were granted exemptions from enterprise income tax in 2004 and 2005. In 2006 and 2007, we intend to continue our tax exempt status through New Focus Media Advertisement, which were established in December 2005 and has obtained tax–exempt approval for 2006 and 2007.

In November 2004, Focus Media Technology, Focus Media Advertisement and some of its subsidiaries sold all of their flat–panel display equipment to Focus Media Digital at fair market value. As a result of this sale, Focus Media Technology and Focus Media Advertisement recorded a non–cash charge to earnings in the aggregate of $4,773,030 in the fourth quarter of 2004, which reflected the difference between the fair market value of the equipment and its then current book value. In addition, since its establishment, through December 31, 2005, Focus Media Advertising Agency has generated revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for Focus Media Advertising Agency's clients on our network. Finally, Focus Media Advertisement and its subsidiaries also license technology used in our business operations from Focus Media Digital in exchange for license fees paid to Focus Media Digital. As a result of Focus Media Advertisement's amortization of the license fee paid to Focus Media Digital, it incurred a charge to earnings of $3.7 million in the fourth quarter of 2004. See "Related Party Transactions" for further information on these transactions and contractual agreements. Although these transactions were eliminated upon consolidation as transactions among members of our consolidated companies for financial accounting purposes, they did have the affect of reducing our total income tax expense and increasing our after tax net income in 2004.

As a result of these transactions, our effective tax rates were 72% and 2.9% in 2004 and 2005, respectively. Excluding the non–recurring non–cash charge resulting from the change in fair value of

Table of Contents

derivative liability associated with Series B convertible redeemable preference shares and goodwill impairment loss, our effective tax rate for 2004 would have been 7.0%. The tax savings resulting from the non–cash charge to earnings from the write–down of flat–panel display equipment in 2004 and the charge to earnings from the amortization of the license fee paid in 2004 will not continue in the future.

In December 2005, we established New Focus Media Advertisement which has received tax–exempt approval for 2006 and 2007.

In December 2005, Focus Media Digital sold all of its flat–panel display equipment to New Focus Media Advertisement at fair market value and Focus Media Digital sold all of its technology to New Focus Media Advertisement in January 2006 at a fixed fee. As of January 2006, New Focus Media Advertisement generates revenue by selling time slots on our advertising network and pays a dissemination fee to Focus Media Advertisement and its certain subsidiaries, which places advertisements for New Focus Media Advertisement's clients on our network. While we expect these transactions to be eliminated upon consolidation as transactions among members of our consolidated companies for financial accounting purposes, we expect them to have the affect of reducing our total income tax expense and increasing our after tax net income in 2006 and 2007. See "Related Party Transactions" for further information on these transactions and contractual agreements. In addition, upon expiration of these tax exemptions, we will consider available options, in accordance with applicable law, that would enable us to qualify for further tax exemptions, if any, to the extent they are then available to us.

Under PRC law, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. If any of the transactions described above are found not to be on an arm's–length basis, or to result in an unreasonable reduction in tax under PRC law, the PRC tax authorities have the authority to disallow our tax savings, adjust the profits and losses of our respective PRC entities and assess late–payment interest and penalties. A finding by the PRC tax authorities that we are ineligible for the tax savings we achieved in 2004 and 2005, or that we expect to achieve in 2006 and 2007, or that Focus Media Digital, Focus Media Advertising Agency, New Focus Media Advertisement, New Structure Advertisement, or Framedia Advertisement are ineligible for their tax exemptions, would substantially increase our taxes owed and reduce our net income and the value of your investment. As a result of this risk, you should evaluate our results of operations and financial condition without regard to these tax savings. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — Contractual arrangements we have entered into among our subsidiaries and affiliated entities may be subject to scrutiny by the PRC tax authorities and a finding that we owe additional taxes or are ineligible for our tax exemption, or both, could substantially increase our taxes owed, and reduce our net income and the value of your investment."

**Recently Issued Accounting Standards**

In February 2006, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standard, or SFAS, No. 155, "Accounting for Certain Hybrid Instruments–an amendment of FASB Statements 133 and 140", which is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006. The statement improves financial reporting by eliminating the exemption from applying SFAS No. 133 to interests in securitized financial assets so that similar instruments are accounted for similarly regardless of the form of the instruments. The statement also improves financial reporting by allowing a preparer to elect fair value measurement at acquisition, at issuance, or when a previously recognized financial instrument is subject to a re–measurement event, on an instrument–by–instrument basis, in cases in which a derivative would otherwise have to bifurcated, if the holder elects to account for the whole instrument on a fair value basis. We are currently evaluating the impact, if any, of this statement on our consolidated combined financial statements.

76

Table of Contents

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share–Based Payment", or SFAS 123–R, which is a revision of SFAS No. 123, "Accounting for Share–Based Compensation", or SFAS 123. SFAS 123–R supersedes APB 25, "Accounting for Stock Issued to Employees". Generally, the approach in SFAS 123–R is similar to the approach described in SFAS 123. However, SFAS 123–R requires all share–based payments to employees, including grants of employee stock options, to be recognized in the income statement based on the grant–date fair values. Pro forma disclosure previously permitted under SFAS 123 is no longer an alternative. Through 2005, we accounted for our share option plans using the intrinsic value method under APB 25. Effective the beginning of 2006, we adopted SFAS 123–R and elected to adopt the modified prospective application method. SFAS 123–R requires us to use a fair–value based method to account for share–based compensation. Accordingly, share–based compensation cost is measured at the grant date. As a result, we recorded compensation expense of $1.5 million for the three months ended March 31, 2006.

In November 2004, the FASB issued SFAS No. 151, "Inventory Costs — an amendment of ARB No. 43, Chapter 4", or SFAS 151. SFAS 151 clarifies the accounting that requires abnormal amounts of idle facility expenses, freight, handling costs, and spoilage costs to be recognized as current–period charges. It also requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. SFAS 151 will be effective for inventory costs incurred on or after July 1, 2005. The adoption of this standard will not have a material effect on our financial position or results of operations.

In December 2004, the FASB issued SFAS No. 153, "Exchanges of Nonmonetary Assets — an amendment of APB Opinion No. 29", or SFAS 153, which amends Accounting Principles Board Opinion No. 29, "Accounting for Nonmonetary Transactions", to eliminate the exception for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. SFAS 153 is effective for nonmonetary assets exchanges occurring in fiscal periods beginning after June 15, 2005. The adoption of this statement will not have a material effect on our financial position or results of operations.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections", or SFAS 154, which replaces Accounting Principles Board Opinions No. 20, "Accounting Changes" and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements — An Amendment of APB Opinion No. 28." SFAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. SFAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The adoption of this statement will not have a material effect on our financial position or results of operations.

**Acquisitions**

Since we commenced our current business operations in May 2003, we have acquired 24 companies to expand the coverage of our network in China and to acquire businesses that are complementary to our operations. See "Our Recent Significant Acquisitions".

Some of the businesses we acquired had entities located both in and outside of China. The consideration we paid for these businesses was made in two parts, one part for the entity located in China, and the other part for the entity located outside of China. For consideration paid to acquire entities located in China, we withheld on behalf of sellers who are natural persons 20% of the amount by which the acquisition price exceeded the registered capital of such PRC entity as required under the PRC Individual Income Tax Law and related implementation rules. We were not required to and did not withhold any tax in connection with payments made to acquire the entities located outside of China. See "Risk Factors — Risks Relating to the People's Republic of China —

77

Table of Contents

The PRC tax authorities may require us to pay additional taxes in connection with our acquisitions of offshore entities that conducted their PRC operations through their affiliates in China".

The financial statements of:

• Infoachieve, for the periods ended, and as of, December 31, 2003, 2004 and 2005;

• Target Media Holdings, for the periods ended, and as of, December 31, 2004 and 2005;

• Perfect Media Holding Ltd. for the periods ended, and as of, December 31, 2003 and September 30, 2004;

• Focus Media Changsha Holding Ltd., Focus Media Qingdao Holding Ltd. and Focus Media Dalian Holding Ltd. for the period ended, and as of, October 31, 2004; and

• Capital Beyond Limited for the periods ended, and as of, December 31, 2004 and March 31, 2005, respectively,

are included elsewhere in this prospectus.

**Quarterly Results of Operation**

The following tables present unaudited consolidated quarterly financial data by amount and as a percentage of our total revenues for each of the eight quarters in the period from April 1, 2004 to March 31, 2006. You should read the following table in conjunction with our audited consolidated financial statements and related notes included elsewhere in this prospectus. We have prepared the unaudited consolidated quarterly financial information on substantially the same basis as our audited consolidated financial statements and using information derived from our unaudited consolidated financial statements which are not included in this prospectus. The following information contains normal recurring adjustments which are, in the opinion of our management, necessary for a fair presentation of the results for such unaudited period. Our operating results for any quarter are not necessarily indicative of results that may be expected for any future period.

|  | For the three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Consolidated Statement of Operations Data | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
|  | (in thousands of U.S. dollars) | | | | | | | |
| **Net revenues:** | | | | | | | | |
| Commercial location network[1] | $ 5,495 | $ 7,049 | $ 11,083 | $ 9,432 | $ 13,981 | $ 17,287 | $ 20,735 | $ 21,472 |
| In-store network[1] | — | — | — | — | 339 | 1,813 | 3,317 | 5,293 |
| Poster frame network[1] | — | — | — | — | — | — | — | 6,067 |
| Total advertising service revenue | 5,495 | 7,049 | 11,083 | 9,432 | 14,320 | 19,100 | 24,052 | 32,832 |
| Advertising equipment revenue | 905 | 863 | 683 | 142 | 264 | 366 | 553 | 304 |
| Total revenues | 6,400 | 7,912 | 11,766 | 9,574 | 14,584 | 19,466 | 24,605 | 33,136 |
| **Cost of revenues:** | | | | | | | | |
| Commercial location network | 1,372 | 1,655 | 2,680 | 3,189 | 4,066 | 4,943 | 6,031 | 8,035 |
| In-store network | — | — | — | — | 1,365 | 2,606 | 3,165 | 3,973 |
| Poster frame network | — | — | — | — | — | — | — | 2,397 |
| Advertising service cost: | 1,372 | 1,655 | 2,680 | 3,189 | 5,431 | 7,549 | 9,196 | 14,405 |
| Advertising equipment cost | 722 | 668 | 242 | 71 | 189 | 285 | 432 | 232 |
| Total cost of revenues | 2,094 | 2,323 | 2,922 | 3,260 | 5,620 | 7,834 | 9,628 | 14,637 |
| Gross profit | 4,306 | 5,589 | 8,844 | 6,314 | 8,964 | 11,632 | 14,977 | 18,499 |

Table of Contents

| | For the three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Consolidated Statement of Operations Data | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
| | (in thousands of U.S. dollars) | | | | | | | |
| Operating expenses: | | | | | | | | |
| General and administrative | 500 | 1,105 | 2,005 | 1,881 | 2,346 | 2,337 | 2,585 | 4,395 |
| Selling and marketing | 704 | 936 | 1,497 | 1,492 | 1,954 | 2,703 | 3,366 | 4,057 |
| Amortization of acquired intangibles | 5 | 10 | 62 | 67 | 123 | 120 | 128 | 999 |
| Goodwill impairment loss | — | — | 59 | — | — | — | — | — |
| Total operating expenses | 1,209 | 2,051 | 3,623 | 3,440 | 4,423 | 5,160 | 6,079 | 9,451 |
| Income from operations | 3,097 | 3,538 | 5,221 | 2,874 | 4,541 | 6,472 | 8,898 | 9,048 |
| Interest income | 1 | 1 | 5 | 11 | 20 | 791 | 940 | 916 |
| Other income (expenses), net | — | — | (2) | 5 | (3) | 8 | (171) | 46 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | (3,166) | (8,526) | — | — | — | — | — |
| Income (loss) before income taxes and minority interest | 3,098 | 373 | (3,302) | 2,890 | 4,558 | 7,271 | 9,667 | 10,010 |
| Total income taxes | (1,065) | (1,382) | 1,922 | (248) | (155) | (87) | (204) | (617) |
| Minority interest | (49) | 10 | 54 | 0 | (55) | (52) | (38) | 40 |
| Equity income (loss) of affiliates | — | — | — | — | — | — | — | — |
| Net income (loss) | 1,984 | (999) | (1,326) | 2,642 | 4,348 | 7,132 | 9,425 | 9,433 |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308) | — | — | — | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191) | — | — | — | — | — | — | — |
| Deemed dividend on Series C−1 convertible redeemable preference shares | — | — | (13,356) | — | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | — | 12,906 | — | — | — | — | — |
| Income (loss) attributable to holders of ordinary shares | $ (8,515) | $ (999) | $ (1,776) | $ 2,642 | $ 4,348 | $ 7,132 | $ 9,425 | $ 9,433 |

(1)  Advertising service revenue is presented net of business tax. Business tax on advertising service revenue from our commercial location network amounts to, $574,729, $714,647, $1.6 million, $936,405, $1.4 million, $1.8 million, $1.9 million and $2.1 million for the three months ended June 30, 2004, September 30, 2004, December 31, 2004, March 31, 2005, June 30, 2005, September 30, 2005, December 31, 2005 and March 31, 2006, respectively. Business tax on advertising service revenue for our in−store network amounted to $31,927, $187,515, $301,828 and $524,357 for the three months ended June 30, 2005, September 30, 2005, December 31, 2005 and March 31, 2006. Business tax on advertising service revenue for our poster frame network amounted to $590,972 for the three months ended March 31, 2006. Business tax includes business tax of 5.55% and cultural industries tax of 4.0%.

| | For the three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Consolidated Statement of Operations Data | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
| Net revenues: | | | | | | | | |
| Commercial location network[1] | 85.9% | 89.1% | 94.2% | 98.5% | 95.9% | 88.8% | 84.3% | 64.8% |
| In−store network | — | — | — | — | 2.3% | 9.3% | 13.5% | 16.0% |
| Poster frame network | — | — | — | — | — | — | — | 18.3% |
| Advertising equipment revenue | 14.1% | 10.9% | 5.8% | 1.5% | 1.8% | 1.9% | 2.2% | 0.9% |
| Total revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Table of Contents

|  | For the three months ended | | | | | | | |
| Consolidated Statement of Operations Data | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
|---|---|---|---|---|---|---|---|---|
| **Cost of revenues:** | | | | | | | | |
| Net advertising service cost: | | | | | | | | |
| Commercial location network | 21.4% | 20.9% | 22.8% | 33.3% | 27.9% | 25.4% | 24.5% | 24.3% |
| In–store network | — | — | — | — | 9.4% | 13.4% | 12.9% | 12.0% |
| Poster frame network | — | — | — | — | — | — | — | 7.2% |
| Net advertising equipment cost | 11.3% | 8.5% | 2.1% | 0.7% | 1.3% | 1.5% | 1.8% | 0.7% |
| Total cost of revenues | 32.7% | 29.4% | 24.9% | 34.0% | 38.6% | 40.3% | 39.2% | 44.2% |
| Gross profit | 67.3% | 70.6% | 75.1% | 66.0% | 61.4% | 59.7% | 60.8% | 55.8% |
| **Operating expenses:** | | | | | | | | |
| General and administrative | 7.8% | 14.0% | 17.0% | 19.7% | 16.1% | 12.0% | 10.5% | 13.3% |
| Selling and marketing | 11.0% | 11.8% | 12.7% | 15.6% | 13.4% | 13.9% | 13.7% | 12.2% |
| Intangible amortization | 0.1% | 0.1% | 0.5% | 0.7% | 0.8% | 0.6% | 0.5% | 3.0% |
| Goodwill impairment loss | — | — | 0.5% | | | | | |
| Total operating expenses | 18.9% | 25.9% | 30.7% | 36.0% | 30.3% | 26.5% | 24.6% | 28.5% |
| Income from operations | 48.4% | 44.7% | 44.4% | 30.0% | 31.1% | 33.2% | 36.2% | 27.3% |
| Interest income | — | — | 0.04% | 0.1% | 0.1% | 4.1% | 3.8% | 2.8% |
| Other expenses, net | — | — | (0.01)% | — | — | 0.1% | (0.7)% | 0.1% |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | (40.0)% | (72.5)% | — | — | — | — | — |
| Income (loss) before income taxes and minority interest | 48.4% | 4.7% | (28.1)% | 30.1% | 31.2% | 37.4% | 39.3% | 30.2% |
| Total income taxes | (16.6)% | (17.4)% | 16.3% | (2.6)% | (1.0)% | (0.4)% | (0.8)% | (1.9)% |
| Minority interest | (0.8)% | 0.1% | 0.5% | 0 | (0.4)% | (0.3)% | (0.2)% | 0.1% |
| Equity income (loss) of affiliates | — | — | — | — | — | — | — | — |
| Net income (loss) | 31.0% | (12.6)% | (11.3)% | 27.6% | 29.8% | 36.7% | 38.3% | 28.5% |
| Deemed dividend on Series A convertible redeemable preference shares | (129.8)% | — | — | — | — | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (34.2)% | — | — | — | — | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | — | 113.5% | — | — | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | — | 109.7% | — | — | — | — | — |
| Income (loss) attributable to holders of ordinary shares | (133.0)% | (12.6)% | (15.1)% | 27.6% | 29.8% | 36.7% | 38.3% | 28.5% |

(1)  Advertising service revenue is presented net of business tax. Business tax on advertising service revenue from our commercial location network represents 9.0%, 9.0%, 13.6%, 9.8%, 9.5%, 9.1%, 7.6% and 6.3% of total revenues for the three months ended June 30, 2004, September 30, 2004, December 31, 2004, March 31, 2005, June 30, 2005, September 30, 2005, December 31, 2005 and March 31, 2006, respectively. Business tax on advertising service revenue for our in–store network represented 0.2%, 1.0%, 1.2% and 1.6% of total revenues for the three months ended June 30, 2005, September 30, 2005, December 31, 2005 and March 31, 2006. Business tax on advertising service revenue for our poster frame network represented 1.8% of total revenues for the three months ended March 31, 2006. Business tax includes business tax of 5.55% and cultural industries tax of 4.0%.

**Table of Contents**

**Results of Operations**

***Three Months Ended March 31, 2006 Compared to Three Months Ended March 31, 2005***

 ***Total Revenues.*** Our total revenues increased substantially from $9.6 million for the three months ended March 31, 2005 to $33.1 million for the three months ended March 31, 2006 due primarily to an increase in our advertising service revenue.

 Our total advertising service revenue increased significantly from $9.4 million for the three months ended March 31, 2005 to $32.8 million for the three months ended March 31, 2006.

 *Commercial location network.* Advertising service revenue from our commercial location network increased significantly from $9.4 million for the three months ended March 31, 2005 to $21.5 million for the three months ended March 31, 2006. The increase in advertising service revenue for our commercial location network is attributable to an increase in the number of 30–second–equivalent advertising time slots we sold on our commercial location network, together with an increase in the average selling price per time slot sold. For example, the number of time slots we sold on our premier office A channel, which accounted for 91.2% of advertising service revenue from our commercial location network for the three months ended March 31, 2006, increased from 1,998 for the three months ended March 31, 2005 to 3,904 for the three months ended March 31, 2006 while the average selling price per time slot sold also increased from $4,721 for the three months ended March 31, 2005 to $4,882 for the three months ended March 31, 2006. Network capacity on our premier office A channel, measured by number of available time slots, also increased from 6,010 as of March 31, 2005 to 10,717 as of March 31, 2006. The increase in the number of 30–second–equivalent advertising time slots sold between these two periods on our commercial location network including on individually marketed channels of the network, such as the premier office A channel, was due primarily to the following factors:

- Our network reach increased from 44 cities as of March 31, 2005, including 22 cities directly operated by our company and 22 cities operated by our regional distributors, to 86 cities as of March 31, 2006, including 50 cities directly operated by our company and 36 cities operated by our regional distributors;

- We gained an additional seven minutes of advertising cycle time from each of the four regional distributors we acquired during the period between April 1, 2005 and March 31, 2006;

- On July 1, 2005, we extended the cycle time in our directly operated Tier II cities from nine minutes to twelve minutes;

- On February 28, 2006, we completed our acquisition of Target Media and integrated its network into our out–of–home television networks, increasing the number of cities in which we operate and increasing the overall number of time slots available and sold on our network; and

- On March 1, 2006, we launched several additional channels, which enable advertisers to reach targeted consumer groups under our commercial location network.

 *In–store network.* Advertising service revenue from our in–store network, which commenced operations in April 2005, was $5.3 million for the three months ended March 31, 2006. During the first quarter of 2006, we expanded the size of our in–store network to 5,218 stores, including 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores, which included the addition on March 1, 2006 of Target Media's displays placed in convenience stores. The number of displays installed in the in–store network amounted to 33,765 as of March 31, 2006 and the total number of 30–second equivalent time slots (calculated on a per week per store basis) sold for the three months ended March 31, 2006 was 76,498. The number of 30–second equivalent time slots available for sale, or network capacity, was 245,314, for an in–store network utilization rate of 31.2%. Average

Table of Contents

advertising revenue per 30–second equivalent time slot per store per week was $69 for the three months ended March 31, 2006.

   *Poster frame network.* Advertising service revenue from our poster frame network, which we commenced operating in January 2006 following our acquisitions of Framedia and E–Times, was $6.1 million for the three months ended March 31, 2006. During this period, the number of monthly frame slots sold totaled 90,262 out of 208,659 available monthly frame slots during this period for a poster frame network occupancy rate of 43.3%. Average advertising revenue per monthly frame slot was $67 for the three months ended March 31, 2006.

   *Advertising equipment revenue.* Our advertising equipment revenue increased from $142,163 for the three months ended March 31, 2005 to $304,066 for the three months ended March 31, 2006 due to the increase in number of LCD displays we sold to our regional distributors. We expect advertising equipment revenue to remain stable or decrease over time as we continue to acquire our existing regional distributors and as the most desirable cities for the establishment of similar networks by regional distributors become saturated.

   **Cost of Revenues.** Our cost of revenues increased significantly from $3.3 million for the three months ended March 31, 2005 to $14.6 million for the three months ended March 31, 2006 due to increases in our net advertising service cost for our commercial location and the incurrence of service costs in connection with our in–store network, which was launched in April 2005, and our poster frame network, which we commenced operating in January 2006.

- *Net advertising service cost — commercial location network.* Our net advertising services cost for our commercial location network increased substantially from $3.2 million for the three months ended March 31, 2005 to $8.0 million for the three months ended March 31, 2006. This increase was due to (i) the substantial increase in our advertising service business on our commercial location network between these two periods including substantial increases in our location costs due to a substantial increase in the number of commercial locations where we entered into display placement agreements, (ii) an increase in flat–panel display depreciation costs as a result of an increase in the number of flat–panel displays we own and operate directly from 16,025 as of March 31, 2005 to 71,230 as of March 31, 2006 and to our acquisition of four regional distributors during this period and (iii) an increase in other direct costs associated with maintaining the network.

- *Net advertising service cost — in–store network.* We began incurring net advertising service cost relating to our in–store network in the first quarter of 2005 as we began to install flat–panel displays in stores, although we did not commence commercial operations of the network until April 2005. We incurred $nil in net advertising service cost for our in–store network for the three months ended March 31, 2005 compared to $4.0 million for the three months ended March 31, 2006, consisting of location costs and depreciation costs relating to the installation and maintenance of our in–store network.

- *Net advertising service cost — poster frame network.* We began incurring net advertising service cost relating to our poster frame network in January 2006 after acquiring Framedia and E–Times. We incurred $2.4 million in net advertising service cost for our poster frame network for the three months ended March 31, 2006, consisting of location costs and depreciation costs relating to the installation and maintenance of poster frames on our network.

- *Net advertising equipment cost.* We incurred net advertising equipment costs of $70,571 for the three months ended March 31, 2005 compared to $231,814 for the three months ended March 31, 2006, which directly related to the number of displays we sold to our regional distributors.

   **Gross Profit.** As a result of the foregoing, our gross profit increased by 193.0% from $6.3 million for the three months ended March 31, 2005 to $18.5 million for the three months ended

**Table of Contents**

March 31, 2006 although our overall gross margin decreased during the same period from 66.0% to 55.8%. The decrease in our gross margin was largely a result of increased rental payments, including fixed initial payments, to stores and depreciation costs incurred as we launched our in–store network. For the three months ended March 31, 2006, our gross margins for our commercial location, in–store and poster frame networks were 62.6%, 24.9% and 60.5%, respectively. In the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network.

    ***Operating Expenses.*** Our operating expenses increased significantly from $3.4 million for the three months ended March 31, 2005 to $9.5 million for the three months ended March 31, 2006 but decreased as a percentage of revenues over this period from 35.9% to 28.5%. The increase in operating expenses was primarily due to increases in our business tax, our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, and in share–based compensation expenses under SFAS 123–R and intangible amortization mainly resulting from the acquisition of Target Media and Framedia.

-   *General and Administrative.* General and administrative expenses increased substantially from $1.9 million for the three months ended March 31, 2005 to $4.4 million for the three months ended March 31, 2006 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as our operations have grown, increases in share–based compensation expense and increases in costs associated with being a publicly listed company.

-   *Selling and Marketing.* Selling and marketing expenses increased substantially from $1.5 million for the three months ended March 31, 2005 to $4.1 million for the three months ended March 31, 2006 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force as well as share–based compensation expenses.

-   *Amortization of acquired intangibles.* Amortization of acquired intangibles increased substantially from $67,352 for the three months ended March 31, 2005 to $1.0 million for the three months ended March 31, 2006 due to several significant acquisitions we completed during the first quarter of 2006, namely our acquisitions of Framedia, Target Media and E–Times.

    ***Income from Operations.*** As a result of the foregoing, we had income from operations of $9.0 million for the three months ended March 31, 2006 compared to $2.9 million for the three months ended March 31, 2005.

    ***Income Before Income Taxes and Minority Interest.*** Income before income taxes and minority interest was $2.9 million for the three months ended March 31, 2005 compared to $10.0 million for the three months ended March 31, 2006, which included interest income and other income (expenses).

-   *Interest Income.* Interest income increased from $10,895 for the three months ended March 31, 2005 to $915,952 for the three months ended March 31, 2006. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from our initial public offering and follow–on public offering.

-   *Income Taxes.* Our income taxes were $248,801 for the three months ended March 31, 2005 with an effective tax rate of 9.0% compared to $616,790 for the three months ended March 31, 2006 with an effective tax rate of 6.2%. The increase resulted from a change in deferred tax assets.

    ***Net Income.*** As a result of the foregoing, our net income increased 257% from $2.6 million for the three months ended March 31, 2005 to $9.4 million for the three months ended March 31, 2006.

Table of Contents

***Year Ended December 31, 2005 Compared to Year Ended December 31, 2004***

   ***Total Revenues.*** Our total revenues increased substantially from $29.2 million in 2004 to $68.2 million in 2005 due to an increase in our advertising service revenue which was partially offset by a decrease in advertising equipment revenue.

   Our total advertising service revenue increased significantly from $26.3 million in 2004 to $66.9 million in 2005.

   *Commercial location network.* Advertising service revenue from our commercial location network increased significantly from $26.3 million in 2004 to $61.4 million, including $4.8 million to related parties in 2005. The increase in advertising service revenue for our commercial location network is attributable to:

- an increase in the number of 30–second–equivalent advertising time slots we sold on our commercial location network from 4,723 in 2004 to 13,943 in 2005 and partially offset by a decrease in the average selling price per time slot sold from $5,573 in 2004 to $4,461 in 2005. Total network capacity, measured by number of available time slots, also increased from 5,170 as of December 31, 2004 to 9,028 as of December 31, 2005. The increase in the number of 30–second–equivalent advertising time slots sold between these two periods is due primarily to the following factors:
  - Our network reach increased from 34 cities as of December 31, 2004, including 11 cities directly operated by our company and 23 cities operated by our regional distributors, to 58 cities as of December 31, 2005, including 26 cities directly operated by our company and 32 cities operated by our regional distributors;

  - We gained an additional seven minutes of advertising cycle time from each of our regional distributors after we acquired them between January 1, 2005 and December 31, 2005; and

  - On July 1, 2005, we extended the cycle time in our directly operated Tier II cities from nine minutes to twelve minutes.
- The increase in the number of 30–second–equivalent advertising time slots sold on our commercial location network was also attributable to increased acceptance of our network among our advertising clients, which we believe is primarily due to the increased coverage and effectiveness of our network that grew from 15,415 flat–panel displays as of December 31, 2004 to 48,226 displays as of December 31, 2005, including our regional distributors.

- The decrease in the average selling price was largely due to growth in sales of time slots with lower selling prices in our Tier II cities, while the average selling price of our advertising services in our Tier I cities increased between these two periods.

   *In–store network.* Advertising service revenue from our in–store network, which commenced operations in April 2005, totaled $5.5 million in 2005. We expect the contribution to our total revenues from our in–store network to increase in the near future.

   Our advertising equipment revenue decreased from $2.9 million in 2004 to $1.3 million in 2005. This decrease was primarily attributable to our acquisition of a number of our regional distributors during 2004 and 2005 because, following each acquisition, we no longer sell flat–panel displays to each former regional distributor. This decrease was also partially attributable to decreased sales to our existing regional distributors, as the initial installation of the network in their respective cities of operation was largely completed in 2004 and the first quarter of 2005. We expect advertising equipment revenue to remain stable or decrease over time as we continue to acquire our existing regional distributors and as the most desirable cities for the establishment of similar networks by regional distributors become saturated.

84

Table of Contents

***Cost of Revenues.*** Our cost of revenues increased significantly from $8.7 million in 2004 to $26.3 million in 2005 due to increases in our net advertising service cost for our commercial location network and our in–store network and in our net advertising equipment cost.

- *Net advertising service cost — commercial location network.* Our net advertising services cost for our commercial location network increased substantially from $6.7 million in 2004 to $17.9 million in 2005. This increase was due to the substantial increase in our advertising service business on our commercial location network between these two periods. Our location costs increased substantially from $4.6 million in 2004 to $11.3 million in 2005 due to a substantial increase in the number of commercial locations where we entered into display placement agreements. Our rental fees increased as a percentage of total revenues between these two periods as a result of (1) a significant increase in the number of locations in our commercial location network (2) increased rental payments for the renewal of display placement agreements in the more desirable locations on our commercial location network offset in part by lower rental payments paid for new locations in our commercial location network because of a further reduction in the number of available desirable locations that command more expensive rental fees. Flat– panel display depreciation costs increased from $774,375 in 2004 to $3.4 million in 2005, as a result of an increase in the number of flat–panel displays we own and operate directly from 12,786 as of December 31, 2004 to 45,049 as of December 31, 2005 and to our acquisition of 14 regional distributors during this period. Other cost of revenues related to net advertising service cost increased from $1.4 million in 2004 to $3.2 million in 2005 as a result of (1) an increase in the volume of CF cards we purchased even as the per–unit cost of CF cards decreased and (2) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and monitoring our network.

- *Net advertising service cost — in–store network.* We began incurring net advertising service cost relating to our in–store network in April 2005 when we launched our in–store network. We incurred $7.4 million in net advertising service cost for our in–store network in 2005, consisting of location costs and depreciation costs relating to the installation and maintenance of our in–store network.

- *Net advertising equipment cost.* We incurred net advertising equipment costs of $1.9 million in 2004 compared to $975,747 in 2005, which decrease reflects the fact that we have acquired many of our fastest–growing regional distributors. We expect net advertising equipment costs to continue to decrease.

***Gross Profit.*** As a result of the foregoing, our gross profit increased from $20.5 million in 2004 to $41.9 million in 2005 although our overall gross margin decreased during the same period from 70.0% to 61.3%. The decrease in our gross margin was largely a result of increased rental payments, including fixed initial payments, to stores and depreciation costs incurred as we launched our in–store network.

***Operating Expenses.*** Our operating expenses increased significantly from $7.6 million in 2004 to $19.1 million in 2005. This increase was primarily due to increases in our business tax, our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business, such as salaries and costs associated with preparing to become a publicly listed company.

- *General and Administrative.* General and administrative expenses increased substantially from $4.0 million in 2004 to $9.1 million in 2005 mainly due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits as well as accounting and administrative costs relating to being a public company. In addition, in connection with the options granted to our directors, employees and consultants since July 2004, we recorded stock based compensation of $726,503 in 2005.

85

Table of Contents

• *Selling and Marketing.* Selling and marketing expenses increased substantially from $3.5 million in 2004 to $9.5 million in 2005 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the expansion of our sales force.

**Income from Operations.** As a result of the foregoing, we had income from operations of $13.0 million in 2004 compared to $22.8 million in 2005.

**Income Before Income Taxes and Minority Interest.** Income before income taxes and minority interest was $1.3 million in 2004 compared to $24.4 million in 2005, which included interest income and other income (expenses) and change in fair value of series B convertible redeemable preferred shares in 2004.

• *Interest Income.* Interest income increased from $9,739 in 2004 to $1.8 million in 2005. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations, sales of our preference shares and proceeds from our initial public offering.

• *Other Expense.* We recorded other expense of $3,843 in 2004 compared to other expense of $161,148 in 2005.

• *Change in Fair Value of Series B Convertible Redeemable Preferred Shares.* We incurred a change in fair value of series B convertible redeemable preferred shares of $11.7 million in 2004. Upon the occurrence of our initial public offering in July 2005, all outstanding preference shares were converted into ordinary shares, and accordingly we did not incur any change in fair value of series B convertible redeemable preferred shares in 2005.

• *Income Taxes.* Our income taxes were $907,550 in 2004 compared to $694,453 in 2005, which decrease resulted from the fact that in 2005, we derived most of our revenue from Focus Media Advertising Agency, which had no tax liability during this period, whereas during 2004, we derived most of our revenues from Focus Media Advertisement, which had tax liability.

• *Minority Interest.* We had minority interest expense of $13,516 and $144,434 in 2004 and 2005, respectively, in connection with the pro rata income attributable to minority shareholders of four of our subsidiaries.

**Net Income.** As a result of the foregoing, we recorded net income of $23.5 million in 2005 compared to net income of $372,752 in 2004.

**Year Ended December 31, 2004 Compared to Year Ended December 31, 2003**

**Total Revenues.** Our total revenues increased substantially from $3.8 million in 2003 to $29.2 million in 2004 due primarily to an increase in our advertising service revenue and partially to sales of our flat–panel displays to our regional distributors which commenced in the fourth quarter of 2003. For the periods prior to January 1, 2005, our out–of–home advertising network consisted of our commercial location network, and all discussion for these periods, including references to our network, refers only to our commercial location network.

Our advertising service revenue increased significantly from $3.4 million in 2003 to $26.3 million in 2004 (including $3.4 million to related parties). This increase is attributable to:

• the fact that we commenced our advertising network operations in May 2003 and therefore derived no revenues from the sale of time slots on our advertising network for the first five months of 2003;

• an increase in the number of 30–second–equivalent advertising time slots we sold from 415 in 2003 to 4,723 in 2004, which increase was slightly offset by a decrease in the average selling price per time slot sold $8,088 in 2003 to $5,573 in 2004. The increase in the

Table of Contents

number of 30–second–equivalent advertising time slots sold between these two periods is due primarily to the following factors:

- we expanded our network to include an additional 24 cities in 2004, including eleven cities operated by our company and 23 cities operated by our regional distributors;

- we gained an additional seven minutes of advertising cycle time from each of our regional distributors after we acquired them in 2004; and

- we extended the cycle time from nine minutes in 2003 to twelve minutes in 2004 in our Tier I cities.

The increase in the number of 30–second–equivalent advertising time slots sold was also attributable to an increase in our utilization rate from 25.0% in 2003 to 36.8% in 2004, which reflects the increased acceptance of our network among our advertising clients, which we believe is primarily due to the increased coverage and effectiveness of our network that grew from 923 commercial locations in 2003 to 8,977 commercial locations in 2004, and from 1,028 flat–panel displays in 2003 to 15,415 displays in 2004, including our regional distributors.

The decrease in the average selling price was largely due to growth in sales of time slots with lower selling prices in our second–tier cities, while the average selling price of our advertising services in our major four cities increased between 2003 and 2004. We commenced sales of flat–panel displays to regional distributors in the fourth quarter of 2003 and generated $389,282 in advertising equipment revenue in 2003 compared to $2.9 million in 2004. Revenues generated by the eleven companies we acquired in 2004 accounted for approximately 1% of our total revenues in 2004.

***Cost of Revenues.*** Our cost of revenues increased significantly from $1.8 million in 2003 to $8.7 million in 2004 due to increases in both of our net advertising service cost and net advertising equipment cost.

- *Net Advertising Service Cost.* Our net advertising services cost increased substantially from $1.6 million in 2003 to $6.7 million in 2004. This increase was due to the substantial increase in our advertising service business between these two periods.

- Our location costs increased substantially from $1.2 million in 2003 to $4.6 million in 2004 due to a substantial increase in the number of commercial locations where we entered into display placement agreements from 754 in 2003 to 8,866 in 2004. Despite the increase in our rental expense between these two periods, our rental fees decreased as a percentage of total revenues in 2004 as a result of (i) the increase in our advertising services revenue significantly outpacing the increase in rental payments due to the increase in the number of display placement agreements we entered into and (ii) lower rental payments paid for new locations because many of the most desirable and expensive locations had been occupied either by us or our competitors.

- Flat–panel display depreciation costs increased from $148,701 in 2003 to $774,375 in 2004, as a result of an increase in the number of flat–panel displays we own and operate directly from 827 as of December 31, 2003 to 12,786 as of December 31, 2004. This increase in our depreciation costs was also attributable to our acquisition of eight regional distributors during this period. Flat–panel display depreciation costs decreased as a percentage of total revenues, however, because the growth in our advertising services revenue significantly outpaced our purchase of flat–panel displays and corresponding depreciation costs.

- Other cost of revenues related to net advertising service cost increased significantly from $257,574 in 2003 to $1.4 million in 2004. This was primarily a result of (i) an increase in the volume of DVDs we purchased even as the per–unit cost of DVDs decreased and (ii) an increase in salary and benefit expenses for personnel responsible for location relations and display placement agreements with landlords and property managers and for maintaining and

87

**Table of Contents**

monitoring our network. Other cost of revenues related to net advertising service cost decreased as a percentage of total revenues between these two periods as a result of the increase in advertising service revenue significantly outpacing the increase in other cost of revenues.

- *Net Advertising Equipment Cost.* We incurred net advertising equipment costs of $275,360 in 2003 compared to $1.9 million in 2004, reflecting our cost for flat–panel displays we sold to our regional distributors. We did not commence our regional distributor relationships until November 2003 and, accordingly, we recorded significantly lower costs related to such sales in 2003. We expect net advertising equipment costs to decrease as our purchase of flat–panel displays for resale to regional distributors decreases as a result of our ongoing acquisition of our regional distributors.

**Gross Profit.** As a result of the foregoing, our gross profit increased from $1.9 million in 2003 to $20.5 million in 2004.

**Operating Expenses.** Our operating expenses increased significantly from $1.4 million in 2003 to $7.6 million in 2004. This increase was primarily due to increases in our selling and marketing expenses and in our general and administrative expenses associated with the growth of our business and to the share–based compensation expense we recognized in 2004.

- *General and Administrative.* General and administrative expenses increased substantially from $1.0 million in 2003 to $4.0 million in 2004 due to an increase in the size of our administrative staff and corresponding increases in expenses for salary and benefits of $435,665 as our operations have grown, an increase in our office rental payments of $292,078 as we established branch offices in a number of new cities, and increases in public relations expenses, communications and travel expenses and fees for professional services of $170,898. General and administrative expenses, however, decreased as a percentage of total revenues from 26.2% to 13.7% due to (i) the overall growth of our total revenues which outpaced these expenses and (ii) our establishment of a dedicated sales force in 2004 and assignment of sales, maintenance and location relationship personnel previously included within our administrative department, respectively, to our newly established sales and location relationship and maintenance departments. Our general and administrative expenses in 2004 include share–based compensation. We incurred share–based compensation expense of $488,711 in 2004 relating to the issuance of options to purchase 25,208,200 of our ordinary shares that were granted to certain directors, officers, employees and individual consultants and advisers in July and August 2004. We did not incur share–based compensation expense in 2003.

- *Selling and Marketing.* Selling and marketing expenses increased substantially from $406,634 in 2003 to $3.5 million in 2004 due to increases in marketing and promotional expenses by our sales force, and in salary and benefits associated with the creation and expansion of our sales force. Marketing and promotional expenses, for which we budget 10% of our advertising revenues, increased significantly from $355,398 in 2003 to $2.8 million in 2004 as a result of increased sales and promotional activities relating to the increase in our advertising services revenue between these two periods. Salary expenses in connection with our sales force increased from $49,870 in 2003 to $471,723 in 2004 because, prior to 2004, we did not have a dedicated sales force and for prior periods all salary expenses of our employees were classified under general and administrative expenses. Our salary expenses increased slightly as a percentage of total revenues between these two periods because we hired additional sales staff to meet the growth in our advertising business.

- *Goodwill Impairment Loss.* We incurred a one–time goodwill impairment loss of $58,397 in 2004 in connection with our acquisition of Perfect Media. This goodwill impairment loss represents the difference between the amount we paid to acquire Perfect Media on September 22, 2004 and the fair market value of Perfect Media. In conducting our annual

88

**Table of Contents**

impairment test, we undertook a valuation of Perfect Media using the expected present value of cash flow and the income approach valuation methods, which resulted in a goodwill impairment loss of $58,397 in 2004, indicating that the value of Perfect Media was less than what we paid at the time we acquired it.

**Income from Operations.** As a result of the foregoing, we had income from operations of $525,110 in 2003 compared to $13.0 million in 2004.

**Income Before Income Taxes and Minority Interest.** Income before income taxes and minority interest was $516,751 in 2003 compared to income of $1.3 million in 2004, which included taxes and minority interest included interest income and other expenses and a one–time non–cash charge of $11.7 million for the change in fair value of derivative liability associated with Series B convertible redeemable preference shares.

  • *Interest Income.* Interest income increased from $1,005 in 2003 to $9,739 in 2004. This interest income was the result of a significant increase in our cash and cash equivalents balances resulting from cash payments collected from our advertising operations and sales of our preference shares.

  • *Change in Fair Value of Derivative Liability Associated with Series B Convertible Redeemable Preference Shares.* We recorded a one–time non–cash charge to reflect the change in fair value of derivative liability associated with Series B convertible redeemable preference shares of $11.7 million in 2004, which, under applicable accounting rules required us to mark to market the conversion feature of our Series B convertible redeemable preference shares because they may be net settled in cash upon conversion. We will not incur any such charges commencing January 1, 2005 as the redemption feature of our Series B convertible redeemable preference shares was removed prior to December 31, 2004.

  • *Other Income (Expense).* We recorded other expense of $9,364 in 2003 compared to other expense of $3,843 in 2004.

  • *Income Taxes.* Our income taxes increased from $481,505 in 2003 to $907,550 in 2004 increased taxable income by certain of our consolidated entities that are subject to PRC income tax.

  • *Minority Interest.* We had minority interest income of $8,360 and $13,516 in 2003 and 2004, respectively in connection with the pro rata loss attributable to four affiliates in which we hold a minority interest.

**Net Income.** As a result of the foregoing, we recorded net income of $372,752 in 2004 compared to net income of $25,483 in 2003. Our net income of $372,752 in 2004 includes a one–time non–cash charge of $11.7 million reflecting the change in fair value of derivative liability associated with our Series B convertible redeemable preference shares. We will not incur any such charges commencing January 1, 2005 as the redemption feature of our Series B convertible redeemable preference shares was removed prior to December 31, 2004.

**Liquidity and Capital Resources**

*Cash Flows and Working Capital*

　　To date, we have financed our operations primarily through cash generated from operating activities and sales of equity in private and public transactions. As of March 31, 2006, we had approximately $41.9 million in cash and cash equivalents. As we have expanded our network, entered into a large number of display placement agreements, increased our acquisition of regional distributors and related businesses, and made strategic acquisitions, our cash needs for such acquisitions, the purchase of flat–panel displays, payment of our location and maintenance costs and employee costs increased significantly and accounted for the net cash used in investing activities. Our cash and cash equivalents primarily consist of cash on hand, liquid investments with original

Table of Contents

maturities of three months or less that are deposited with banks and other financial institutions. We generally deposit our excess cash in interest bearing bank accounts. Although we consolidate the results of Focus Media Advertisement and its subsidiaries in our consolidated financial statements and we can utilize their cash and cash equivalents in our operations through Focus Media Advertisement and its subsidiaries, we do not have direct access to the cash and cash equivalents or future earnings of Focus Media Advertisement. However, these cash balances can be utilized by us for our normal operations pursuant to our agreements with Focus Media Advertisement and its subsidiaries that provide us with effective control over Focus Media Advertisement and its subsidiaries. In addition, we have access to the cash flows of Focus Media Advertisement and its subsidiaries through contractual arrangements with our subsidiaries Focus Media Technology and Focus Media Digital, which provide technical and other services in exchange for fees. See "Related Party Transactions — Agreements Among Us, Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Focus Media Advertisement and Its Subsidiaries".

We expect to require cash in order to fund our ongoing business needs, particularly the location costs connected with the placement of our television displays, to fund the ongoing expansion of our network and for payments in connection with our acquisitions. Other possible cash needs may include the upgrading of technology on our network as well as any payment of claims that could be made against us. We have not encountered any difficulties in meeting our current cash needs.

The following table shows our cash flows with respect to operating activities, investing activities and financing activities in 2003, 2004, 2005 and for the three months ended March 31, 2005 and 2006:

| | For the year ended December 31, | | | For the three months ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | (in thousands of U.S. dollars) | | |
| Net cash provided by (used in) operating activities | $ 1,320 | $ 4,045 | $ 11,269 | $ (877) | $ 4,766 |
| Net cash used in investing activities | (2,706) | (11,070) | (117,667) | (6,678) | (66,073) |
| Net cash provided by financing activities | 2,125 | 28,978 | 119,169 | — | 66,091 |
| Net increase (decrease) in cash and cash equivalents | 701 | 21,953 | 13,984 | (7,555) | 5,210 |
| Cash and cash equivalents at beginning of period | 15 | 716 | 22,669 | 22,669 | 36,653 |
| Cash and cash equivalents at end of period | $ 716 | $ 22,669 | $ 36,653 | $ 15,114 | $ 41,863 |

We had cash provided by operating activities of $4.8 million for the three months ended March 31, 2006. This was primarily attributable to net income generated from the operation of our advertising network, adjusted up $908,927, $2.5 million, $1.7 million and $551,714 to reflect amounts due from related parties, accounts receivable, rental deposits and deferred tax assets, respectively, and adjusted down $18.6 million and $908,927 to reflect accrued expenses and other current liabilities and amounts due from related parties, respectively. We had cash provided by operating activities of $11.3 million in 2005. This was primarily attributable to net income generated from the operation of our advertising network, adjusted up $666,703, $5.0 million, $672,585 and $4.0 million to reflect amounts due from related parties, accounts payable, income taxes payable and accrued expenses and other current liabilities, respectively, and adjusted down $15.8 million and $2.3 million to reflect accounts receivable and prepaid expenses and other current assets, respectively. We had net cash provided by operating activities of $4.0 million in 2004. This was primarily attributable to our net income from operation of our network, adjusted down $4.5 million, $2.5 million, $1.6 million and $1.7 million to reflect our accounts receivable from our advertising clients and regional distributors, a

90

**Table of Contents**

decrease in amounts due from related parties, accounts payable from location and maintenance costs owed to third parties and prepaid expenses and other current assets including location costs, respectively, and adjusted up $11.7 million, $4.2 million and $0.8 million to reflect the change in fair value of derivative liability, accrued expenses from location costs and maintenance costs and other current liabilities and income taxes payable, respectively. We had net cash provided by operating activities of $1.3 million in 2003. This was primarily attributable to accounts payable for location costs and equipment, accrued expenses and other current liabilities, amount due to related parties and income taxes payable, which was partially offset by accounts receivable from our advertising clients and regional distributors, prepaid expenses and other current assets, amount due from related parties and inventory, which consists primarily of our television displays.

We had net cash used in investing activities of $66.1 million for the three months ended March 31, 2006, primarily in connection with the acquisition of companies, including Target Media and Focus Media Wireless, subsidiaries and regional distributors, purchase of equipment used to expand our networks, and rental deposits paid for locations on our out–of–home television, poster frame and outdoor LED networks. Our acquisition of Framedia involved our payment of $39.6 million in cash and issuance of $55.4 million of our ordinary shares to the seller parties at a fixed value of $88 per ordinary share. In addition, subject to Framedia's attainment of certain financial performance goals in 2006, we may be obligated to issue up to $88 million in additional Focus Media ordinary shares, at a fixed value of $2.456 per ordinary share, to the selling parties in 2007. Pursuant to the share purchase agreement we entered into with E–Times and Skyvantage, we paid the seller parties $5.0 million. We also paid $70 million in cash and issued 77 million ordinary shares to the shareholders of Target Media. The issuance of such additional ordinary shares will also result in lower earnings per share or per ADS when we calculate our earnings for 2007 than would otherwise be the case were such additional shares not issued. See "Risk Factors — Risks Relating to this Offering — The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price", "Our Recent Significant Acquisitions  — Framedia" and "— Target Media". We had net cash used in investing activities of $117.7 million for in 2005, primarily in connection with the acquisition of companies, subsidiaries and regional distributors, purchase of equipment used to expand our commercial location and in–store networks, and rental deposits paid for locations on both our commercial location and in–store networks. We had net cash used in investing activities of $11.1 million in 2004. This was primarily attributable to our purchase of property and equipment for the operation of our network, rental deposits made in connection with our display placement agreements and our acquisition of eleven businesses, eight of which were our former regional distributors. We had net cash used in investing activities of $2.7 million in 2003, largely as a result of purchases of property and equipment and the acquisition of a business from a related party.

$66.1 million net cash was provided by financing activities for the three months ended March 31, 2006, primarily from the proceeds of our follow–on public offering in February 2006. $119.2 million net cash was provided by financing activities in 2005, primarily from the proceeds of our initial public offering in July 2005. We had net cash provided by financing activities of $29.0 million in 2004. This was attributable to the proceeds from the issuance of our Series B and Series C–2 convertible redeemable preference shares, offset slightly by the repayment of a short–term loan from one of our shareholders. We had net cash provided by financing activities of a $2.1 million in 2003. This was attributable to the proceeds from the issuance of ordinary shares in May 2003 and proceeds from a short–term loan from one of our shareholders. We used this loan for our business operations and the loan was secured by our ordinary shares. We repaid the loan when it came due in June 2004.

We believe that our current cash and cash equivalents, cash flow from operations and the proceeds from this offering will be sufficient to meet our anticipated cash needs, including for working capital and capital expenditures, for the foreseeable future. These additional cash needs may include costs associated with the expansion of our network, such as the purchase of flat–panel displays and LED digital billboards and increased location cost, including in connection with our

**Table of Contents**

acquisition of Framedia, Target Media, E–Times and Focus Media Wireless, as well as possible acquisitions of our regional distributors. We are also required under PRC law to set aside 10% of our after–tax profits into a general reserve fund. We expect that revenues from operation of our advertising network and the proceeds from this offering will be sufficient to cover any such obligations and costs. We may, however, require additional cash resources due to changed business conditions or other future developments. If these sources are insufficient to satisfy our cash requirements, we may seek to sell debt securities or additional equity securities or obtain a credit facility. The sale of convertible debt securities or additional equity securities could result in additional dilution to our shareholders. The incurrence of indebtedness would result in debt service obligations and could result in operating and financial covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

From time to time, we evaluate possible investments, acquisitions or divestments and may, if a suitable opportunity arises, make an investment or acquisition or conduct a divestment.

**Contractual Obligations and Commercial Commitments**

The following table sets forth our contractual obligations and commitments with definitive payment terms on a consolidated basis which will require significant cash outlays in the future as of March 31, 2006.

|  | | | | Payments due by March 31, | | | |
|  | Total | 2007 | 2008 | 2009 | 2010 | 2011 and Thereafter |
|---|---|---|---|---|---|---|
|  | | | (in thousands of U.S. dollars) | | | |
| Display and poster frame placement agreement obligations | $ 115,263 | $ 41,468 | $ 32,225 | $ 21,429 | $ 14,159 | $ 5,982 |
| Office premise lease obligations | 3,365 | 1,878 | 806 | 420 | 50 | 211 |
| Short–term debt[(1)] | 8,024 | 8,024 | — | — | — | — |
| Total contractual obligations | $ 126,652 | $ 51,370 | $ 33,031 | $ 21,849 | $ 14,209 | $ 6,193 |

(1)   Includes interest.

Other than certain leasing arrangements relating to the placement of our flat–panel, as of March 31, 2006, we did not have any long–term debt obligations, operating lease obligations or purchase obligations. However, pursuant to our option agreement with the owners of Focus Media Advertisement, Focus Media Technology has an option, exercisable at such time as it becomes legally permissible to acquire 100% of the equity interest in Focus Media Advertisement at a purchase price equal to the registered capital of Focus Media Advertisement or such higher price as required by PRC law on the date of such purchase. Under the share purchase agreement for the acquisition of Target Media, we are required to pay a final installment of $24 million on July 31, 2006, and may be increased or decreased based on a calculation of Target Media's net working capital as of the closing date.

As of March 31, 2006, we held short–term debt securities with a market value of $34.8 million. As of March 31, 2006, we had no other indebtedness, material contingent liabilities, or material mortgages or liens. We intend to meet our future funding needs primarily through net cash provided from operating activities and the proceeds of this offering. Our objective is to maintain the safety and liquidity of our cash. Therefore we intend to keep our cash and cash equivalents in short–term bank deposits and short–term bonds.

Table of Contents

**Capital Expenditures**

The following table sets forth our historical capital expenditures for the periods indicated. Actual future capital expenditures may differ from the amounts indicated below.

|  | For the year ended December 31, | | | For the three months ended March 31, | |
| --- | --- | --- | --- | --- | --- |
|  | 2003 | 2004 | 2005 | 2005 | 2006 |
|  | (in thousands of U.S. dollars) | | | | |
| Total capital expenditures | $1,468 | $6,373 | $36,765 | $3,621 | $8,354 |

Our capital expenditures were made primarily to acquire flat–panel displays for our advertising network. Our capital expenditures are primarily funded by net cash provided from operating activities. We expect our capital expenditures in 2006, in an amount of approximately $20.0 million, to primarily consist of purchases of components for our flat–panel displays and new poster frames as we continue to expand our commercial location network, in–store network and poster frame network, and possible expenditures for the purchase of outdoor LED digital billboards. We also intend to upgrade our financial, accounting systems and internal control systems. As opportunities arise, we may make additional acquisitions of regional distributors and other businesses that complement our operations. We believe that we will be able to fund these upgrades and equipment purchases through the revenues we generate, and do not anticipate that these obligations will have a material impact on our liquidity needs.

**Foreign Exchange**

We maintain our accounts in Renminbi and substantially all of our revenues and expenses are denominated in Renminbi, while we report our financial results in U.S. dollars. Fluctuations in exchange rates, primarily those involving the U.S. dollar against the Renminbi, may affect our reported operating results in U.S. dollar terms. In addition, we will receive the proceeds of this offering in U.S. dollars and changes in the U.S. dollar/ Renminbi exchange rate could affect the buying power of those proceeds. Under the current foreign exchange system in the PRC, our operations in the PRC may not be able to hedge effectively against currency risk, including any possible future Renminbi devaluation. Moreover, due to the recent devaluation of the U.S. dollar against the Euro and several other currencies, the PRC government recently revised its decade–old policy of pegging the value of the Renminbi to the U.S. dollar. As of July 21, 2005 the Renminbi is no longer pegged solely to the U.S. dollar. Instead, it will be pegged against a basket of currencies, determined by the People's Bank of China, against which it can rise or fall by as much as 0.3% each day. For example, on July 21, 2005 the Renminbi was revalued against the U.S. dollar to approximately RMB8.11 to the U.S. dollar, representing an upward revaluation of 2.1% of the Renminbi against the U.S. dollar, as compared to the exchange rate the previous day. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

**Restricted Net Assets**

Relevant PRC laws and regulations permit payments of dividends by our PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income for our general reserve fund should be set aside prior to payment of dividends. As a result of these PRC laws and regulations, our PRC subsidiaries and our affiliated PRC entities are restricted in their ability to transfer a portion of their net assets to us whether in the form of dividends, loans or advances. As of December 31, 2004 and 2005, the amount of our restricted net assets was approximately $14.8 million and $75.9 million, respectively.

93

**Table of Contents**

**Off–Balance Sheet Commitments and Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. In addition, we have not entered into any derivative contracts that are indexed to our own shares and classified as shareholder's equity, or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. Moreover, we do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**Quantitative and Qualitative Disclosures About Market Risk**

*Interest Rate Risk*

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest–bearing bank deposits. We have not used derivative financial instruments in our investment portfolio. Interest earning instruments carry a degree of interest rate risk. We have not been exposed nor do we anticipate being exposed to material risks due to changes in market interests rates. However, our future interest income may fall short of expectations due to changes in market interest rates.

*Foreign Currency Risk*

Substantially all our revenues and expenses are denominated in Renminbi. We have not had any material foreign exchange gains or losses. Although in general, our exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will be affected by the foreign exchange rate between U.S. dollars relative to the Renminbi because the value of our business is effectively denominated in Renminbi, while the ADSs will be traded in U.S. dollars. Furthermore, a decline in the value of the Renminbi could reduce the U.S. dollar equivalent of the value of the earnings from, and our investments in, our subsidiaries and PRC–incorporated affiliates in China. In addition, appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar would affect our reported financial results in U.S. dollar terms. See "Risk Factors — Risks Relating to the People's Republic of China — Fluctuations in exchange rates could result in foreign currency exchange losses".

**Inflation**

In recent years, China has not experienced significant inflation, and thus inflation has not had a significant effect on our business historically. According to the National Bureau of Statistics of China, the change in the Consumer Price Index in China was 0.7%, (0.8)%, 1.2%, 3.9% and 1.8% in 2001, 2002, 2003, 2004 and 2005, respectively.

94

**Table of Contents**

## OUR INDUSTRY

**China's Advertising Market**

The advertising market in China is one of the largest and fastest growing advertising markets in the world and has the following characteristics:

- *Largest Market in Asia Excluding Japan.* Advertising spending in China totaled $9.7 billion in 2005 according to ZenithOptimedia's March 2006 *Advertising Expenditure Forecasts* report, making it the largest advertising market in Asia excluding Japan.

- *High Growth Rate.* According to ZenithOptimedia, advertising spending in China grew 15.0% between 2004 and 2005 compared to the average worldwide growth rate of 4.9%, making it one of the fastest growing advertising markets in the world during that period.

- *Urban Concentration of Advertising Spending.* Advertising spending in China is highly concentrated in China's more economically developed regions and increasingly concentrated in urban areas. For example, Beijing, Shanghai and Guangdong province (Guangdong province includes the major cities of Guangzhou and Shenzhen), together accounted for 51.6% of total advertising spending in China in 2004, according to the State Administration for Industry and Commerce.

- *Importance of New Alternative Advertising Media.* Alternative advertising media, which is a term we use to refer to media other than traditional broadcast and print media, account for a larger percentage of total advertising spending in China compared to Europe, the United States and other countries in Asia.

- *Fragmented Industry.* The advertising industry in China is highly fragmented and is not dominated by a small number of advertising companies. According to the China Advertising Association, there were approximately 76,210 advertising companies in China in 2004.

**Market Size and Composition.** According to ZenithOptimedia statistics, China's advertising market in terms of advertising spending is expected to remain the largest in Asia excluding Japan through at least 2008. The following table sets forth historical and estimated future advertising spending in the countries and regions described and for the years indicated:

|  | 2002 | 2003 | 2004 | 2005 | 2006E | 2007E | 2008E |
|---|---|---|---|---|---|---|---|
|  | (in billions of U.S. dollars) | | | | | | |
| **China** | 6.1 | 7.7 | 8.4 | 9.7 | 11.3 | 13.2 | 16.2 |
| South Korea | 6.8 | 7.1 | 6.8 | 6.9 | 7.1 | 7.2 | 7.4 |
| India | 2.0 | 2.5 | 3.0 | 3.7 | 4.1 | 4.5 | 4.9 |
| Taiwan | 2.0 | 2.1 | 1.8 | 1.7 | 1.8 | 1.9 | 2.0 |
| Hong Kong | 1.9 | 1.8 | 2.2 | 2.5 | 2.8 | 2.9 | 3.1 |
| Other Asia[1] (excluding Japan) | 5.7 | 6.5 | 7.9 | 8.7 | 9.9 | 11.1 | 12.6 |
| Total Asia (excluding Japan) | 24.3 | 27.7 | 30.2 | 33.3 | 36.9 | 40.8 | 46.1 |
| Japan | 38.8 | 38.8 | 40.3 | 41.0 | 42.6 | 44.9 | 45.5 |
| Total Asia | 63.2 | 66.5 | 70.5 | 74.3 | 79.6 | 85.7 | 91.6 |
| United States | 149.8 | 152.3 | 161.5 | 166.2 | 174.9 | 182.3 | 189.6 |

(1) Other Asia includes Indonesia, Malaysia, Philippines, Singapore, Thailand and Vietnam.
*Source: Advertising Expenditure Forecasts, ZenithOptimedia, March 2006.*

The advertising industry is generally divided into television, newspaper, magazine, radio and other types of advertising media. Other advertising media includes Internet, outdoor, billboard, out–of–home, bus–stop display and other outdoor advertising media. Other advertising media account for a larger percentage of total advertising spending in China than in Europe, the United States or other

**Table of Contents**

countries in the Asia Pacific region. The following table sets forth the percentage breakdown of advertising spending by medium in the countries and regions described below for 2005:

| Country/Region: | Television | Newspaper | Magazine | Radio | Other |
|---|---|---|---|---|---|
| China | 41.9% | 32.5% | 3.0% | 4.7% | 17.9% |
| United States | 33.3% | 30.2% | 14.4% | 12.4% | 9.7% |
| Europe[1] | 33.5% | 31.3% | 18.6% | 5.8% | 10.7% |

(1)   Europe includes Austria, Belgium, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Netherlands, Norway, Poland, Portugal, Spain, Sweden, Switzerland, and the United Kingdom.
*Source: Advertising Expenditure Forecasts, ZenithOptimedia, March 2006.*

   *Growth.* We believe advertising spending in China has considerable growth potential over the next few years. According to ZenithOptimedia, advertising spending in China is expected to increase to $16.2 billion in 2008 from $9.7 billion in 2005, a compound annual growth rate of 18.5% from 2005 to 2008, a much faster rate compared to 7.2%, 4.5% and 4.2%, respectively, for Asia, the United States and Europe. However, we cannot provide any assurance that we or our business will benefit from growth that occurs in China's advertising industry. The following table sets forth the historical and prospective growth in China's advertising spending:



(in billions of U.S. dollars)

| 2002 | 2003 | 2004 | 2005 | 2006E | 2007E | 2008E |
|---|---|---|---|---|---|---|
| $6.1 | $7.7 | $8.4 | $9.7 | $11.3 | $13.2 | $16.2 |

**Year-on-Year Growth Rate**

| 19.7% | 24.9% | 10.3% | 15.0% | 16.4% | 16.5% | 22.6% |
|---|---|---|---|---|---|---|

*Source: Advertising Expenditure Forecasts, ZenithOptimedia, March 2006.*

   The growth of China's advertising industry is being driven by a number of factors including:

   • *High and Sustained Levels of Economic Growth.* China's economy has grown and continues to grow rapidly compared to the growth experienced by other developed economies. China's GDP grew by 12.6%, 13.8% and 11.9% in 2003, 2004 and 2005, respectively, and is projected to grow by 9.5%, 8.6%, and 9.4% in 2006, 2007 and 2008 according to ZenithOptimedia.

   • *Growing Consumer Class.* We believe the emergence and ongoing expansion of a consumer class concentrated in major cities in China will encourage companies to spend

96

Table of Contents

increasing amounts on advertising for new products and services particularly in major urban areas.

- *Relatively Low Levels of Advertising Spending in China Per Capita and as a Percentage of GDP.* Advertising spending per capita and as a percentage of GDP in China remains *very* low relative to other countries and regions, indicating that there is significant growth potential in China's advertising industry as its consumer markets continue to develop and income levels increase.

The following table sets forth advertising spending per capita and as a percentage of GDP for the countries and regions indicated for 2005:

| | Advertising Spending | |
| | Per Capita | As a Percentage of GDP |
|---|---|---|
| Country/Region | (in U.S. dollars except percentage) | |
| **China** | $ 7 | 0.5% |
| Hong Kong | $ 362 | 1.4% |
| South Korea | $ 143 | 1.0% |
| Japan | $ 321 | 0.9% |
| Asia[(1)] Weighted Average | $ 24 | 0.8% |
| United Kingdom | $ 355 | 1.0% |
| United States | $ 561 | 1.3% |

(1)   Asia includes China, Hong Kong, India, Indonesia, Japan, Malaysia, Philippines, Singapore, South Korea, Taiwan, Thailand, and Vietnam.
*Source: Advertising Expenditure Forecasts, ZenithOptimedia, March 2006.*

   ***Rapid Urbanization and Concentration of Advertising Spending.*** While the total size of China's advertising market is expected to increase by a compound annual growth rate of 16.3% from 2004 to 2007, we expect that advertising spending in certain regions and urban areas will increase at a faster rate compared to the national average. This is due to:

- *Rapid urbanization.* According to the National Bureau of Statistics of China, China's urban population increased from 17.9% in 1978 to 29.0% in 1995, to 41.8%, or 543 million people, in 2004. China's Academy of Social Sciences estimates that China's urban population will reach 610 million people by 2010.

- *Faster growth of consumer spending in urban areas.* Rapid urbanization, in turn, will result in faster growth of consumer spending in urban areas, which already accounts for a disproportionately larger amount of consumer spending. According to the National Bureau of Statistics, in 2004, 77.4% of retail sales for consumer goods took place in urban areas. Retail sales in urban areas grew by 14.4% compared to growth in rural areas of 9.9% relative to the same period in 2003.

   The impact of these trends is particularly notable in certain regions and urban centers. For example, Beijing, Shanghai and Guangdong province (Guangdong includes the major cities of Guangzhou and Shenzhen) together accounted for 51.6% of total advertising spending in China in 2004, according to the State Administration for Industry and Commerce, while accounting for only 8.9% of the population in 2004.

97

Table of Contents

*Role of New Alternative Media — Mobile Handset Advertising.* We believe that much of growth in the advertising industry in China will take place in non–traditional advertising media, such as the Internet, mobile handset advertising, out–of–home advertising, and other new alternative media platforms. China is the world's largest mobile telecommunications market with approximately 375 million mobile handset users as of December 2005, according to China's Ministry of Information Industry. Moreover, an increasing number of mobile handset users are using handsets that support higher technology platforms such as WAP applications. According to China Mobile's annual report for 2004, over 10,000 WAP applications were supported by the Monternet platform used by China Mobile. We believe that this large and growing user base offers attractive market opportunities for companies that provide advertising services to companies who want to reach mobile handset users through wireless value–added services, including WAP–based advertising.

98

**Table of Contents**

# BUSINESS

## Overview

We operate the largest out–of–home advertising network in China using audiovisual television displays, based on the number of locations and number of flat–panel television displays in our network. It is our goal to create the largest multi–platform out–of–home advertising network in China, reaching urban consumers at strategic locations over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor LED digital billboard and mobile handset advertising networks. To date, our out–of–home advertising network consists of the following:

- *our commercial location network,* which refers to our network of flat–panel television displays placed in high–traffic areas of commercial buildings, such as in lobbies and near elevators, as well as in beauty parlors, karaoke parlors, golf country clubs, auto shops, banks, pharmacies, hotels, airports, airport shuttle buses and in–air flights. Our commercial location network is also marketed to advertisers as six separate channels targeting different types of consumers: our premier A and B office building channels, our travel channel, our fashion channel, our elite channel and our healthcare channel;

- *our in–store network,* which refers to our network of flat–panel television displays placed in specific product areas such as the personal care and food and beverage sections and other store locations with high–traffic concentration such as the main aisles and check–out lines in large–scale chain retail stores, which are referred to in China as hypermarkets, as well as inside selected supermarkets and convenience stores;

- *our poster frame network,* which refers to our network of advertising poster frames placed mainly in the elevators and public areas of residential complexes which we market under the brand name Framedia;

- *our mobile handset advertising network,* which refers to our mobile handset advertising services offered on the mobile telecommunications networks of China Mobile Communications Corporation, or China Mobile, and China United Telecommunications Corporation, or China Unicom; and

- *our outdoor LED network,* which refers to our network of leased 5' x 5' LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

We derive revenue principally by:

- selling advertising time slots on our commercial location, in–store and outdoor LED networks;

- selling frame space on our poster frame network; and

- selling advertisements on our WAP–based mobile handset advertising network.

A majority of the content displayed on our commercial location and in–store networks consists of advertisements which are broadcast repeatedly approximately 60 times per day in twelve minute cycles. Some of our regional distributors use a nine–minute cycle. Advertisements on our outdoor LED network are broadcast repeatedly using a six–minute cycle. Our poster frame network consists of advertising poster frames placed in elevators and public areas in residential complexes and commercial locations. For advertising poster frames placed in elevators, generally two or three advertising poster frames can be placed in each elevator. Advertisements on our mobile handset advertising network are WAP–based advertisements that are sent to mobile handset users over China Mobile's and China Unicom's networks.

As of March 31, 2006, approximately 1,800 advertisers purchased advertising time slots on our out–of–home television advertising networks. Our five largest advertising clients in terms of revenue,

**Table of Contents**

which include leading international and domestic brand name advertisers, were Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which together accounted for approximately 18.4% of our revenue in 2005. In addition, over 340 advertisers have bought frame space from Framedia since 1999.

Our network has the following key features:

• Substantially all of the content we broadcast on our flat–panel displays and place on our advertising poster frames consists of advertisements.

• The advertising cycle on our out–of–home television advertising networks consists of twelve minutes of advertising content broadcast repeatedly 60 times per day, or six minutes broadcast repeatedly in the case of our outdoor LED network, and is sold to advertising clients in 30–, 15– or five–second time slots.

• The advertising cycle of our out–of–home television advertising networks is broadcast repeatedly, for approximately twelve–hours per day.

• The majority of our flat–panel displays contain a 17–inch LCD screen, while the remainder contain larger size plasma or LCD screens.

• Over 74,000 450 mm x 600 mm plastic advertising poster frames have been installed in elevators on our poster frame network.

• Approximately 75 5' x 5' LED digital billboards that we lease from a third party and that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic.

• A WAP–based advertising platform that delivers approximately eight million messages per day with a customer base of over 100 wireless value–added service providers in China and a database of over 70 million mobile handset users with WAP capability.

Since we commenced our current business operations in May 2003, we have experienced significant growth in our network and in our financial results. As of March 31, 2006, we operated our commercial location network directly in a total of 50 cities throughout China, comprising (i) Beijing, Shanghai, Guangzhou and Shenzhen, which we refer to as our Tier I cities, and (ii) 46 other directly operated cities. As of March 31, 2006, we covered an additional 36 cities through contractual arrangements with regional distributors that, together with the other 46 directly operated cities, we refer to as our Tier II cities. Between January 1, 2005 and March 31, 2006, the number of displays in our commercial location network increased from 15,415 to 71,230. As of March 31, 2006, our commercial location network operated by our regional distributors consisted of approximately 3,780 flat–panel displays. We commenced commercial operations of our in–store network in April 2005. As of March 31, 2006, our in–store network consisted of 33,765 flat–panel displays placed in 5,218 store locations in our directly operated cities, including 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores. As of March 31, 2006, we had installed over 74,000 advertising poster frames in our poster frame network primarily in six cities throughout China, including our Tier I cities. As of April 2006, our outdoor LED network consisted of approximately 75 leased 5' x 5' digital billboards placed along curbsides in high–pedestrian traffic areas in Shanghai. As of May 2006, our mobile handset advertising network consisted of a WAP–based advertising platform that delivers approximately eight million messages per day to mobile handset users with WAP capability in China.

100

Table of Contents

The following table sets forth operating data related to our network for the periods indicated:

| | For and as of the three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 | March 31, 2006 |
| **Commercial location network:** | | | | | | | | |
| Number of displays: | | | | | | | | |
|   Our direct cities | 3,128 | 7,476 | 12,786 | 16,025 | 20,267 | 34,079 | 45,049 | 71,230 |
|   Our regional distributors[1] | 1,040 | 2,318 | 2,629 | 1,847 | 2,664 | 3,273 | 3,177 | 3,779 |
| Total | 4,168 | 9,794 | 15,415 | 17,872 | 22,931 | 37,352 | 48,226 | 75,009 |
| Time slot data:[2] | | | | | | | | |
|   Number of time slots available for sale | 2,347 | 3,542 | 5,170 | 6,010 | 6,737 | 8,346 | 9,028 | 10,717 |
|   Number of time slots sold | 832 | 1,280 | 2,209 | 1,998 | 3,057 | 4,240 | 4,648 | 3,904 |
|   Utilization rate[3] | 35.4% | 36.1% | 42.7% | 33.2% | 45.4% | 50.8% | 51.5% | 36.4% |
|   Average advertising service revenue per time slot (ASP) (US$) | $ 6,607 | $ 5,506 | $ 5,018 | $ 4,721 | $ 4,573 | $ 4,077 | $ 4,461 | $ 4,882 |
| **In–store network:** | | | | | | | | |
| Number of displays in our in–store network | — | — | — | 3,149 | 12,779 | 20,061 | 27,849 | 33,765 |
| Number of stores in our in–store network | — | — | — | 423 | 1,835 | 2,702 | 4,130 | 5,218 |
| Time slot data: | | | | | | | | |
|   Number of time slots available for sale | — | — | — | — | — | — | — | 245,314 |
|   Number of time slots sold | — | — | — | — | — | — | — | 76,498 |
|   Utilization rate[3] | — | — | — | — | — | — | — | 31.2% |
|   Average advertising service revenue per time slot (ASP) (US$) | — | — | — | — | — | — | $ | 69 |
| **Poster Frame Network:** | | | | | | | | |
| Number of frames installed in our poster frame network | — | — | — | — | — | — | — | 74,353 |
| **Frame slot data:** | | | | | | | | |
|   Number of frame slots available for sale | — | — | — | — | — | — | — | 208,659 |
|   Number of frame slots sold | — | — | — | — | — | — | — | 90,262 |
|   Occupancy rate[4] | — | — | — | — | — | — | — | 43.3% |
|   Average advertising service revenue per frame (US$) (ASP) | — | — | — | — | — | — | $ | 67 |

(1)    Data that has been provided by our regional distributors is based on the results of surveys we requested them to provide to us and it is possible such data is not entirely accurate or exact.

(2)    Starting January 1, 2006, time slot data presented for our commercial location network includes only data related to our premier office building A channel. For the three months ended March 31, 2006, advertising services revenues from our premier office building A channel accounted for 91.2% of advertising service revenue for our commercial location network.

(3)    Utilization rate refers to total time slots sold as a percentage of total time slots available during the relevant period.

(4)    Occupancy rate refers to the total frame space sold as a percentage of total frame space available during the relevant period.

**Table of Contents**

**Our Competitive Strengths**

We believe we have the following competitive strengths:

***Effective and Focused Advertising Network Accepted by Both Advertisers and Consumers.***

Since commencing our current business operations in May 2003, we have created an advertising network that:

- *Targets Segmented Consumer Groups.* Our flat–panel displays and frames are primarily placed in venues that have a high concentration of consumers with higher–than–average disposable incomes or that have a high concentration of consumers who are likely to be interested in particular types of products and services. As a result, our network enables advertisers to target consumers with demographic profiles attractive to them. Moreover, our network allows advertisers to further segment these consumers through separate specified advertising channels, such as our premier A and B office building channels, our travel channel, our fashion channel, our elite channel and our healthcare channel, which are marketed as stand–alone channels of our commercial location network. Because our network is able to target specific consumer groups, it allows advertisers to more cost–effectively reach consumers with demographic profiles desirable to them.

- *Reaches Captive Viewers in Low Distraction Environments.* Our flat–panel displays are placed in lobbies, near elevator banks and in other environments where there are few broadcast or display media competing for viewers' attention, which we believe increases the effectiveness of our network. In addition, the advertising poster frames on our poster frame network are placed primarily in elevators of residential complexes presenting advertisements to viewers in what we believe is a relatively captive and low–distraction environment.

We believe these characteristics and advantages of our business model have made us an effective and well–accepted alternative advertising medium with a strong market position that enables us to compete successfully in China's advertising market.

***The Largest Out–of–home Television Advertising Network in China with Nation–wide Coverage***

We believe we operate the largest out–of–home television advertising network in China based on the number of locations and the number of flat–panel displays in our network. As of March 31, 2006, we operated:

- 71,230 flat–panel displays installed in 50 cities in China, and through our regional distributors, we also operated approximately 3,780 flat–panel displays in 36 cities in China; and

- 33,765 flat–panel displays installed in 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores in cities in China.

***Out–of–home Advertising Network with Multiple Media Platforms Provides Advertisers with Complementary and Reinforcing Methods of Reaching Targeted Consumers***

Our network provides advertisers with multiple advertising media to reach their target audience. Our network currently enables advertisers to reach (1) consumers with higher than average incomes through our commercial location network, (2) consumers at the point–of–purchase through our in–store network, (3) consumers as they leave and return home through our poster frame network, (4) mobile handsets users throughout the day via our WAP–based advertising push campaigns and (5) urban consumers throughout the day via our strategically placed outdoor LED billboards in shopping and high pedestrian traffic areas in Shanghai. By offering advertisers a range of advertising media that can reach consumers during different times of the day in a wide variety of locations, we believe our network has enhanced appeal to advertisers over competitors who offer limited advertising media or channels to advertisers. We believe that by offering multiple advertising media

102

**Table of Contents**

platforms, we enable advertisers to reach a wide range of consumers with complementary and mutually reinforcing advertising campaigns and are better able to attract advertisers who want to reach targeted consumer groups through a number of different advertising media in different venues and at different times of the day.

*Sustainable Competitive Advantages through the Size of Our Network and Our Exclusive, Renewable Agreements.*

    We believe the following factors provide us with a sustainable business advantage over existing and prospective competitors:

- *Early Market Presence and Coverage in Many of the Most Desirable Locations.* We were one of the first companies to establish a large–scale out–of–home television advertising network in commercial buildings and other commercial locations in China. By recognizing this market opportunity and entering this sector early, we have occupied many of the most desirable locations and have grown the size of our network, which we believe has created high barriers to entry for potential competitors. We believe that we have secured a high percentage of the most desirable locations in many of China's major urban centers, and that this early market presence advantage is important because landlords and building managers typically permit only one out–of–home television advertising network operation in each building. We believe that, through our acquisition of Target Media, we have enhanced these advantages. Through our acquisition of Framedia, we also gain a strong market presence in the poster frame advertising market in residential complexes. We also believe we have established the first outdoor LED digital billboard advertising network in China, currently comprising approximately 75 5' x 5' LED digital billboards placed in high pedestrian traffic outdoor locations in Shanghai that we lease from a third–party location provider.

- *Large–scale Network that Attracts Advertising Clients.* Our multi–platform out–of–home advertising network includes flat–panel displays located in a wide range of commercial, retail locations and in–store locations in over 80 cities in China, poster frames placed in residential complexes in cities in China, LED digital billboards placed in high pedestrian curbside locations in Shanghai, and advertising services provided to mobile handset users. We believe the extent of our network coverage makes us more attractive to advertising clients than competing networks. Through the number of advertising media platforms we operate and the national scope of our network, we enable advertising clients to reach a wide audience in urban consumer markets across China. We believe the size and scope of our network has attained a scale that draws advertising clients to our network and gives us a competitive edge over competing networks as well as over many traditional advertising media.

- *Exclusive and Renewable Display Placement Agreements.* As of March 31, 2006, the majority of our display placement agreements on our out–of–home television advertising networks give us the exclusive right to place our flat–panel displays in the elevator and lobby areas of the locations in which we operate and, in the cities we operate directly, give us the right to renew the contract under terms that are no less favorable than those offered by competing bidders, enabling us to maintain exclusive coverage of many of the most desirable locations in our network for significant lengths of time.

    We believe our high market share of desirable locations in key cities in China, the wide extent of our network coverage and the exclusivity and renewal terms contained in the majority of our display placement agreements with landlords and property managers create higher barriers to entry for potential competitors than other out–of–home and outdoor advertising business models, such as billboards.

103

Table of Contents

***Our Brand Name And Reputation Have Attracted A Large Base Of Leading Advertising Clients.***

We believe we are building a respected brand name in the advertising industry in China by developing a reputation for innovative and effective delivery of large–scale yet focused high–quality television advertising to consumers with desirable demographic profiles. This has enabled us to develop a strong client base consisting of major international and brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola which were our five largest customers and together accounted for approximately 18.4% of our revenue in 2005. All of our top ten advertisers based on total advertising contracts in 2005 had entered into advertising contracts with us in 2004. Moreover, the total contract amount accounted for by these advertisers increased by approximately 150% from 2004 to 2005. In addition, as of March 31, 2006, more than 1,800 advertisers purchased advertising time on our out–of–home television networks. The strength and depth of our client base enhance our reputation in the industry and position us to further expand our advertising network.

We believe our acquisitions of Framedia, E–Times and Focus Media Wireless have further enhanced our brand name in China by adding a large out–of–home poster frame advertising network and a WAP–based mobile handset advertising network in China to our network. Over 340 advertisers have bought frame space on Framedia's advertising network since 1999.

***Strong Management and Sales Team with Extensive Industry Experience.***

We have assembled a management and sales team with extensive experience in China's advertising industry. Jason Nanchun Jiang, our founder, chairman, chief executive officer and a major shareholder, has 10 years of experience in China's advertising industry, including his previous experience until 2003 as chief executive officer of Shanghai Everease Advertising Corporation, or Everease, one of China's top 50 advertising agencies. Daniel Mingdong Wu, our chief financial officer, has over six years of experience in investment banking, including for Merrill Lynch and Lehman Brothers, and served as chief financial officer of Harbour Networks, a telecommunications equipment provider in China. In August 2005, we hired our chief strategy officer Cindy Yan Chan, who was deputy general manager for iMPACT, ZenithOptimedia's outdoor media department and the largest outdoor media buyer in China. With our acquisition of Framedia, Zhi Tan, chairman and chief executive officer of Framedia, continues to be involved in the operation of our poster frame network. Following our acquisition of Target Media, David Yu, the founder and former chairman and chief executive officer of Target Media, has joined us as co–chairman and president. In addition, we employ experienced and knowledgeable managers to run operations in each of the cities we operate directly. Our marketing managers have an average of eight years' experience in the advertising industry in China and have worked for a number of major domestic and international advertising firms in China. We believe the strength and experience of our management and sales teams have enabled us to expand our advertising network, enhance our reputation in our industry and build up a strong client base.

**Our Strategies**

Our objective is to become the leading multi–platform advertising media brand in China's advertising industry. We intend to achieve this objective by implementing the following strategies:

***Enhance Our Market Position and Revenues by Expanding Our Networks.***

We intend to aggressively expand our flat–panel display and frame networks in order to erect barriers to expansion and entry by current and prospective competitors, enhance critical mass

104

**Table of Contents**

appeal to our advertisers, and increase our fee rates and revenues. To achieve this goal, we intend to:

- *Increase the Number of Locations and Flat−Panel and Poster Frame Displays in Our Network.* We intend to aggressively enter into new display and poster frame placement agreements to increase the number of locations in which we install our flat−panel displays and poster frames in order to enhance our current position in many of the most desirable locations in key urban areas in China.

- *Expand into New Cities including through Strategic Acquisitions of Important Regional Distributors.* We expect to continue to acquire certain of our regional distributors as a means to expand the size and scope of our network. Pursuant to our arrangements with our regional distributors, they are licensed to use our technology, and bear all of the revenues, profits or losses of their operations. This method enables us to evaluate the potential profitability of executing our business model in a specific city and expanding the size of the network before we incur the expense of operating in the city directly. As of March 31, 2006, we have successfully acquired 17 of our regional distributors. We will continue to pursue this strategy as a means of expanding our national coverage and offering advertising clients wider distribution of their advertising content.

***Identify And Create New Networks and Advertising Channels that Target Specific Consumer Demographics and Expands Network Capacity.***

   *In−store Network.* We commenced commercial operations of our in−store network in April 2005, enabling our advertising clients to target consumers at the time and place where consumers are likely to purchase a range of consumer and household products. As of March 31, 2006, we had placed 33,765 flat−panel displays in 5,218 locations on our in−store network. We intend to expand this network and will continue to strengthen efforts to enter into long−term and exclusive relationships with hypermarkets, supermarkets and convenience stores and to market this service to advertisers. For example, we recently increased the size of our in−store network by adding the convenience stores from Target Media's former network to our in−store network.

   ***Targeted Advertising Channels.*** We have placed flat−panel displays in office buildings, shopping malls, restaurants, beauty parlors, golf country clubs, automobile repair shops, banks, pharmacies, airports, hospitals and other commercial locations. As many of these venues are suitable for targeting specific consumer groups, we have begun to separate some of them into distinct stand−alone networks and to market them to specific advertising clients who wish to advertise their products and services to targeted consumer groups. Currently, our premier A and B office building channels, travel channel, fashion channel, elite channel and healthcare channel are marketed as independent channels of our commercial location network, as we believe these channels are attractive to a diverse range of advertisers who wish to target consumers likely to frequent these venues. We believe our ability to identify and create focused advertising networks distinguishes us from our competitors and attracts additional advertising clients who will use our services to reach their target consumers in a more effective manner.

   ***Complementary Advertising Media Platforms.*** We intend to continue expanding the scope of our advertising activities and type of media platforms we employ by entering into new types of advertising media businesses, such as large−size outdoor LED digital billboards. We believe by expanding our business into complementary media businesses that focus on venues and at periods of the day less comprehensively covered by traditional advertising media, we will enhance the value of our advertising services to advertisers and provide us with a marketing advantage over existing and potential competitors. We intend to continue expanding into new and complementary advertising media platforms, such as direct marketing advertising, which will enable us to provide advertisers with additional out−of−home advertising platforms to reach targeted consumers.

**Table of Contents**

***Promote Our Brand Name and Augment Our Service Offerings to Attract a Wider Client Base and Increase Revenues.***

Enhancing our brand name in the industry will allow us to solidify and broaden our client base by enhancing market awareness of our services and our ability to target discrete consumer groups more effectively than mass media. We believe the low cost of reaching consumers with higher–than–average disposable incomes through our network and our development of additional advertising media platforms and channels within our network we plan to develop in the future can enable advertisers to reach that goal. As we increase our advertising client base and increase sales, demand for and sale of time slots and frame space on our network will grow. As demand for time slots and frame space on our network increases, we believe we will be able to increase our rates and thereby improve our results of operations.

***Continue to Explore New Digital Media Opportunities to Target Segmented Consumer Groups.***

Consumer acceptance of technology–driven advertising and entertainment media, including the Internet and advanced mobile communications systems, is a feature of the advertising industry in China. We intend to identify and take advantage of new opportunities in the PRC advertising market in order to enhance our ability to target segmented consumer groups through innovative advertising techniques and media. As new opportunities that fit our brand image and business model present themselves, we expect to expand our operations and continue to pursue innovative advertising techniques and media that provide effective solutions to advertising clients and target consumers with desirable demographic profiles.

**Our Network**

Our network includes:

- commercial locations, which consists of our premier A and B office building, travel, fashion, elite and healthcare channels, each of which can be marketed separately to advertisers;

- supermarkets, convenience stores and large–scale chain retail stores, which we refer to as hypermarkets, comprising our in–store network;

- our poster frame network of advertising poster frames placed primarily in elevators and public areas of residential complexes and marketed under the brand name Framedia;

- as of March 2006, our mobile handset advertising network offered on China Mobile's and China Unicom's mobile telecommunications networks; and

- as of April 2006, approximately 75 leased LED digital billboards installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai.

Our commercial locations network and in–store network use audiovisual flat–panel LCD and plasma displays, while Framedia's poster frame network consists of advertising poster frames. Our mobile handset advertising services consist of the sale of short message advertisements that are delivered to mobile handset users through the mobile telecommunication networks of China's mobile telecommunications operators using a WAP–based advertisement delivery platform. Our outdoor LED network uses large 5' x 5' LED digital billboards that we lease from a third–party location provider.

**Commercial Location Network**

The majority of displays on our commercial location network are currently placed in high–traffic areas of commercial office buildings. The locations in our commercial location network also include shopping malls, banks and hotels as well as more specialized locations such as hospitals, beauty parlors and golf country clubs. We market our commercial location network to advertisers of consumer products and services, such as home electronics, mobile communications devices and services, cosmetics, health products and financial services. As of March 31, 2006, our commercial

Table of Contents

location network, including the portions of our commercial location network operated by our regional distributors, was comprised of approximately 75,000 flat–panel displays placed in 86 cities throughout China. We operate our commercial location network directly in 50 cities and indirectly through contractual arrangements with regional distributors in an additional 36 cities. We have established joint ventures in several cities outside of China, including Hong Kong, Taipei and Singapore through contracts with local operators which operate local commercial locations networks and which license our brand name. None of these arrangements outside of China currently constitutes a material part of our business.

As we expand the number of venues in our commercial location network, we continue to separate certain types of venues into distinct stand–alone channels of this network. As of March 31, 2006, we had established six such stand–alone channels that are marketed as separate focused channels of our commercial location network: our premier office building A and B, travel, fashion, elite and healthcare channels. We believe that by increasingly offering new advertising channels on our out–of–home television networks, we will be able to offer advertisers more targeted and effective audience reach, thereby enabling us to increase our advertising rates.

*Our Direct Operations.* As of March 31, 2006, we operated our commercial location network directly in 50 cities throughout China, including Beijing, Shanghai, Guangzhou and Shenzhen, or our Tier I cities. We believe that many of the other cities in which we operate directly will contribute to our future revenue growth as the populations and income levels in these cities continue to grow. Following our acquisition of Target Media on February 28, 2006, we incorporated Target Media's advertising network, which included a network substantially similar to our commercial location network with a focus on office buildings as well as on convenience stores, into our pre–existing commercial location and in–store networks.

*Our Regional Distributors.* As of March 31, 2006, we entered into distribution agreements with 36 regional distributors who currently operate in 36 of the 86 cities covered by our commercial locations network. Under the terms of our contractual relationships with our regional distributors:

- We provide training, operational and logistical instructions to our regional distributors and allow them to use our brand name, all at no cost.

- We also sell our flat–panel displays to our regional distributors.

- Each regional distributor is responsible for signing display placement agreements with commercial locations to establish and grow a network presence in the city in which they operate.

- Each regional distributor is responsible for selling advertising time slots to advertisers and for maintenance, monitoring and other client services.

- Our regional distributors have the right to sell seven–ninths of the cycle time, while we retain the right to sell two–ninths of the cycle time on the portion of the network for which they are responsible. This gives us the flexibility to sell those time slots directly to advertisers or to sell the time to the regional distributor.

- We do not share any of the revenues, profits or losses of our regional distributors.

Expanding our network through regional distributors enables us to provide our advertisers with broader nationwide coverage and to test, develop and evaluate these regional advertising markets without our having to incur start–up and ongoing expenses at the early stages of their development. We also seek to acquire our regional distributors when we believe it is more likely for us to benefit economically from the full integration of their operations into our network. We do not have the contractual right to purchase our regional distributors, and any such acquisition must be negotiated with each regional distributor separately.

**Table of Contents**

Each of our regional distributors operates independently from us and is responsible for independently complying with all relevant PRC laws and regulations including those related to advertising. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content. See "Risk Factors — Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

**In–store Network**

As part of our growth strategy, we commenced operations of our in–store network in April 2005. As of March 31, 2006, we had placed 33,765 flat–panel displays in 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores throughout China. We believe the rapid expansion of hypermarkets and other chain retail stores in China provides opportunities and incentives for advertisers to take advantage of in–store television advertising networks such as our in–store network. Our in–store network primarily attracts advertisers of food and beverage products, household, kitchen and bathroom products, and household appliances. We increased the size of our in–store network by adding the convenience stores from Target Media's former network to our in–store network.

**Poster Frame Network**

We own and operate a network of advertising poster frames deployed primarily in the elevators and public areas of residential complexes under the brand name "Framedia". We place two or three advertising frames in each elevator in which we lease space and sell frame space to advertising clients on a per frame per month basis. As of March 31, 2006, we had installed approximately 74,000 frames in cities throughout China.

**Mobile Handset Advertising Network**

Through Focus Media Wireless, we operate a WAP–based advertising delivery platform on the mobile telecommunications networks of China Mobile and China Unicom. Focus Media Wireless delivers WAP–based advertisements to mobile handset users accessed through service providers in China. Focus Media Wireless receives a fee from WAP service providers for delivering advertisements and pays mobile service providers a fee for accessing their networks. It also sells WAP–based advertising to other WAP service providers and to traditional advertisers. Our WAP–based advertising platform currently delivers approximately eight million WAP messages per day. Focus Media Wireless's customer base includes over 100 wireless value–added service providers in China. Focus Media Wireless has accumulated a database of over 70 million mobile handset users with WAP capability to whom it can deliver advertisements. Focus Media Wireless is able to deliver advertisements tailored to the users' consumer preferences based on information in the database such as a user's historical purchases, handset model and other indicative data.

**Outdoor LED Network**

In April 2006, we commenced operations of an outdoor LED network consisting of 5' x 5' LED digital billboards that we lease from a third–party location provider and that are installed on the street–sides in major shopping districts and other locations with high pedestrian traffic in Shanghai. Full–color audiovisual commercials are displayed on the digital billboards in a repeating six–minute cycle. The commercials displayed on the LED displays are highly visible even during bright daylight. As of May 1, 2006, our outdoor LED network consisted of approximately 75 leased 5' x 5' LED digital billboards.

108

**Table of Contents**

*Advertising Clients, Sales and Marketing*

*Our Advertising Clients.* The quality and coverage of our network has attracted a broad base of international and domestic advertising clients. As of March 31, 2006, more than 1,800 advertisers purchased advertising time slots on our out–of–home television networks. Our advertising clients include leading international and domestic brand name advertisers such as Dong Feng Auto (including joint venture brands with Toyota and Peugeot), China Mobile, Samsung, NEC and Motorola, which were our five largest customers and together accounted for 18.4% of our total revenues in 2005. Our top ten customers in 2005 accounted for 28.5% of our total revenues in that year. In addition, over 340 advertisers have bought frame space on Framedia's poster frame network since 1999.

Advertisers purchase advertising time slots on our advertising network either directly from us or through their advertising agencies which purchase advertising time on our network on behalf of their domestic and international clients.

Our top thirty advertising clients accounted for 46.6%, 39.0% and 44.9% of our revenues in 2003, 2004 and 2005, respectively. No single advertising client accounted for more than 7% of our revenues in 2003, 2004 or 2005. We believe the appeal and effectiveness of our advertising network is largely evidenced by the number of advertising clients who place multiple advertising campaigns on our network, which is reflected in the percentage increase of advertising fees we receive from clients over time.

*Sales.* We employ an experienced advertising sales force in each city in which we operate. Our marketing managers have an average of eight years' experience in the advertising industry in China. We provide in–house education and training to our sales force to ensure they provide our current and prospective clients with comprehensive information about our services, the advantages of using our out–of–home television advertising network as a marketing channel, and relevant information regarding the advertising industry. Our sales team is organized by city, industry and client accounts. We also market our advertising services from time to time by placing advertisements on third–party media, including primarily magazines and Internet websites. We maintain separate devoted sales teams for our commercial locations network, including our outdoor LED network, and our in–store network. We maintain separate sales teams for our poster frame network and our mobile handset advertising network. We have begun engaging in cross–selling initiatives to enable existing and potential advertising clients to take advantage of our multi–platform advertising network.

*Advertising Contracts.* We offer advertisers five–, fifteen– or thirty–second time slots on our out–of–home television advertising networks, including our commercial location, in–store and outdoor LED networks. For our commercial location network, our standard advertising package includes a time slot on our entire network or a particular channel in each city in which the advertiser wishes to display the advertisement. Our sales are made pursuant to written contracts with commitments ranging from one week to several months. Our advertising rates vary by city and by the number of cities in which the advertisement is placed, as well as by the length of the time slot purchased and the duration of the advertising campaign.

Our standard advertising contract provides that up to 10% of the specific locations at which an advertisement will be displayed for an advertiser may vary from the list of sites provided under the relevant contract. If the number of locations and/or the actual sites where advertisements are displayed vary from the sites prescribed under the contract by more than 10%, we will arrange to extend the duration of the advertising campaign or display such advertisements at additional sites, although to date, we have never needed to do so. This provision gives us flexibility to account for any potential technical problems, advertiser conflicts or turnover in the composition of our physical network location.

**Table of Contents**

We generally require our clients to submit advertising content at least seven days prior to the campaign start date. We also reserve the right to refuse to disseminate advertisements that are not in compliance with content requirements under PRC laws and regulations.

Advertising contracts for our in–store network and outdoor LED network are substantially similar to those used for our commercial location network. Advertising clients generally purchase time slots on our in–store network on a store–by–store basis, while time slots on the outdoor LED network cover the entire network.

For our poster frame network, advertising clients purchase frame space on a per–frame basis for terms of one month or more. For our mobile handset advertising network, our contracts agree to reach the WAP users from among our list of WAP service providers.

***Network Monitoring and Evaluation.*** We provide a number of services in connection with each client's advertising campaign following the sales process. Our network operations team monitors the displays in our network on a daily basis. They are also responsible for compiling reports that are supplied under some of our agreements to clients as evidence of the broadcast of their advertisements on our network. The report generally includes a list of buildings the advertisements of clients were broadcast as well as photographs of representative television displays showing their advertisements being displayed. The advertising campaign reports are provided to our clients for information purposes and do not constitute a customer acceptance provision. The reports we provide to our clients may also contain portions prepared by independent third–party research companies that verify the proper functioning of our flat–panel displays and the proper dissemination of the advertisement, by conducting on–site evaluations and polls to analyze the effectiveness of and public reaction to the advertisement.

Aside from third–party verification services, we and our regional distributors conduct substantially all client services using our own employees or the employees of the relevant regional distributor. In Beijing and Guangzhou, we contract some of these services to third–party agents. These agents provide us with network development, installation, maintenance, monitoring and reporting services.

***Market Research.*** We believe our advertising clients derive substantial value from our ability to provide advertising services targeted at specific segments of consumer markets. Market research is an important part of evaluating the effectiveness and value of our business to advertisers. We conduct market research, consumer surveys, demographic analysis and other advertising industry research for internal use to evaluate new and existing advertising channels. We also purchase or commission studies containing relevant market study data from reputable third–party market research firms, such as Nielsen Media Research, CTR Market Research and Sinomonitor. We typically consult such studies to assist us in evaluating the effectiveness of our network to our advertisers. A number of these studies contains research on the numbers and socio–economic and demographic profiles of the people who visit the locations of our network.

**Programming**

Substantially all of the content on our out–of–home television advertising networks consists of audiovisual television advertising provided to us by our advertising clients. We also provide a limited amount of time for landlords and property managers to display location–specific information, building announcements and related promotional material on our network. We do not produce or create any of the advertising content shown on our network, except our own marketing content. All of the advertising content displayed on the portion of the network we operate directly is reviewed by qualified members of our staff to ensure compliance with PRC laws and regulations, while our agreements with our regional distributors require each of them to review the contents shown on the portion of the network they operate for compliance with PRC laws and regulations. See "Regulation of Our Industry — Regulation of Advertising Services — Advertising Content".

110

**Table of Contents**

Each flat–panel display contains a pre–recorded CF card containing a twelve–minute cycle of advertising content and other information, such as building–specific promotional information. We change the CF cards to update the advertising content in each flat–panel display in our network on a weekly basis. We and each regional distributor compile each twelve–minute cycle from advertisements of five, 15 or 30 seconds in length provided by advertisers to us and our regional distributors. Each of our flat–panel displays plays the advertising content on the CF card repeatedly throughout the day so that the twelve–minute cycle is broadcast in each building within our network a total of approximately 60 times per day, respectively. See "— Technology and Suppliers". Some of our regional distributors use a nine–minute cycle, while our outdoor LED network uses a six–minute cycle.

Advertisements on our poster frame network consist of full–color glossy advertising posters designed and provided by our advertising clients. Advertisements on Focus Media Wireless's WAP–based advertisement delivery platform consist of WAP–based messages sent to individual mobile handset users.

**Pricing**

*Commercial Location Network*

We generate revenues through the sale of advertising time slots on our commercial location network. Our revenues are directly affected by:

- the number of advertising time slots that we have available to sell, which is determined by the number of cities in which we directly operate, our expansion into additional cities, the two–ninths portion of cycle time available on our regional distributors' networks and the length of the advertising cycle, which is currently twelve minutes except in some cities operated by our regional distributors that use a nine minute cycle. We calculate the number of time slots available by taking the total advertising time available on our network during a particular period, calculated in aggregate seconds, which we then divide by 30 to determine the number of 30–second equivalent time slots available. We can increase the number of advertising time slots that we have available to sell by expanding into additional cities or acquiring our regional distributors, which provides us with the remaining seven–ninths of the time slots per cycle operated by the regional distributor. The length of our advertising cycle can potentially be extended to longer durations depending on demand in each city. The twelve–minute advertising cycle amounts to the equivalent of 24 30–second time slots per week. In cities where our regional distributors use a nine–minute advertising cycle, the cycle amounts to the equivalent of 18 30–second time slots per week; and

- the average price we charge for our advertising time slots, which we calculate by dividing our advertising service revenue by the number of 30–second equivalent time slots sold during that period, after taking into account any discount offered.

*In–store Network*

Our advertising service revenue derived from our in–store network is directly affected by:

- the number of advertising time slots that we have available to sell, which is determined by the number of stores in which we operate, our expansion into additional stores, and the length of the advertising cycle, which is currently twelve minutes, or 24 30–second equivalent time slots. As with our commercial location network, for our in–store network we calculate the number of time slots according to the number of 30–second equivalent time slots available. The length of our advertising cycle can potentially be extended to longer durations depending on demand in each city; and

**Table of Contents**

- the average price we charge for our advertising time slots, which we calculate by dividing our advertising service revenue by the number of 30–second equivalent time slots sold during that period, after taking into account any discount offered.

*Poster Frame Network*

Our advertising service revenue derived from our poster frame network is directly affected by:

- the number of frames in our poster frame network. We sell frame space on our poster frame network on a per frame basis. Increasing the number of residential and other locations on our poster frame network allows us to increase the number of frames on our network, thereby increases the available frame space for sale to advertisers. We currently place up to three advertising poster frames in each elevator where we deploy frames; and

- the average price we charge for frame space on a per frame basis, after taking into account any discount offered.

*Mobile Handset Advertising Network*

Our advertising service revenue derived from our mobile handset advertising network is directly affected by:

- the number of messages we deliver to WAP users. We agree to send WAP message advertisements to WAP users from approximately 100 WAP service providers, and we charge fees based on the number of successfully delivered messages; and

- the average price we charge per message.

Prices for time slots on our commercial location and in–store networks and for frame space on our poster frame network also vary significantly from city to city as income levels, standards of living and general economic conditions vary significantly from region to region in China, which in turn affect the advertising rates we are able to charge for time slots and frame space.

**Relationships with Location Providers**

We install our flat–panel displays in selected spaces we lease in office buildings and other commercial locations, hypermarkets, supermarkets and convenience stores. We install our advertising poster frames in elevators and other public areas in residential complexes. Establishing and maintaining long–term relationships with landlords and property managers is a critical aspect of our business. We employ a team of location relationship personnel in each city in which we operate directly who are responsible for identifying desirable locations, negotiating display and frame placement agreements and engaging in ongoing site placement relations.

In addition to helping us expand our network, our location relationship personnel ensure that the needs and concerns of landlords and property managers are being met and addressed effectively and on a timely basis. These concerns generally include ensuring that the flat–panel displays are properly installed and are in proper working condition. We undertake to landlords and property managers in our network to maintain the proper operation of our flat–panel displays. We generally rely on our own employees to install, maintain, monitor and repair our flat–panel displays and advertising poster frames. Each of our flat–panel displays is inspected at least once daily.

We enter into display placement agreements with individual landlords, property managers, hotels, shopping malls and chain store companies under which we generally pay a fixed annual rent in exchange for the right to display advertising and commercial media in lobby and elevator areas in the case of our commercial location network and in specific product areas in the major aisles and near check–out counters in hypermarkets, supermarkets and convenience stores in the case of our in–store network. In Beijing and Guangzhou, we contract a portion of the location development, monitoring and maintenance work to local agents. We attempt to maintain terms favorable to our

**Table of Contents**

network operations in our display placement agreements, such as long–term leases and exclusivity provisions. For example, as of March 31, 2006, approximately 90% of our display placement agreements in our commercial location and in–store networks gave us the exclusive right to place television advertising in the lobby and elevator bank area of the locations in which we operate. We are not reliant on any one landlord or property manager for a material portion of our network coverage and as of March 31, 2006, no individual landlord or property manager accounted for more than 1% of the locations in our commercial location network. As hypermarkets, supermarkets and convenience stores have control over multiple locations, a smaller number of display placement agreements and contractual arrangements account for a larger percentage of our in–store network coverage. As of March 31, 2006, we had entered into display placement agreements covering 809 hypermarkets, 1,126 supermarkets and 3,283 convenience stores on our in–store network.

We believe that landlords and property managers generally do not view us as a major source of revenue and are instead primarily attracted to our flat–panel displays as an innovative and visually pleasing medium that complements their public areas and that provides an engaging means of conveying building–related information to their tenants. In connection with certain of our display placement agreements, we agree to provide concessions and services, such as displaying building–related notifications, publicity and other information provided by the landlord or property manager or granting time slots to the landlord or property manager for their own promotional purposes.

Our display placement agreements have initial terms ranging anywhere from one to ten years. As of March 31, 2006, approximately 41.4% of our display placement agreements will expire after December 31, 2007. As of March 31, 2006, we had the right under the majority of our display placement agreements to renew the display placement agreements provided that the terms offered by us are no less favorable than those offered by competing bidders. The rental terms and fees under our display placement agreements vary considerably depending on the city, location of the building, size of the building and number of flat–panel displays that may be installed. Under our display placement agreements, we retain ownership of the flat–panel displays.

We enter into similar frame placement agreements for the deployment of its advertising poster frames in elevators and public areas of residential complexes and commercial buildings. The majority of our frame placement agreements have terms of two to three years, and contain exclusivity and best offer renewal rights.

To secure locations in Shanghai for our outdoor LED network, we have entered into a four–year exclusive agreement with Shanghai Yihukuan Media Co., Ltd., which leases all of its current, and any future developed, LED digital billboard space in Shanghai to us for an annual fee.

**Technology and Suppliers**

Out–of–home television advertising is a relatively new advertising medium that owes its development in large part to the emergence of new technologies, such as low–cost, light–weight, flat–panel television displays and compact storage technology. The primary hardware required for the operation of our business consists of components that comprise the flat–panel displays we use in our advertising network. We also develop and install software in our flat–panel displays to assist us with the configuration, editing and operation of our advertising content cycles. Maintaining a steady supply of our proprietary flat–panel displays is important to our operations and the growth of our advertising network.

We design the distinctive shape of our flat–panel displays, identify suppliers of component parts used in our displays and contract the assembly of our flat–panel displays to third–party contract assemblers. Our contract assemblers are responsible for purchasing the component parts from suppliers we identify each month and assembling the flat–panel displays according to our specifications using components purchased in off–the–shelf form from wholesale distributors. We select component suppliers based on price and quality. Since we commenced our current operations, we have used only one contract assembler at any one time, which we believe is

113

Table of Contents

logistically more efficient and also enables us to better protect the proprietary design of our flat–panel displays. As there are many qualified alternative suppliers for our equipment, our obligation to our current contract assemblers is not exclusive. We have never experienced any material delay or interruption in the supply of our flat–panel displays.

*Patents and Trademarks*

We believe that the value of our advertising network derives from its effectiveness in reaching a large number of consumers with higher–than–average disposable incomes in urban areas. To a great extent, our business model does not rely on advanced or sophisticated technology or on proprietary trade secrets because our flat–panel displays are assembled with components purchased in off–the–shelf form from wholesale distributors. We endeavor to protect certain of the designs and operating software we use in each generation of our flat–panel displays. We are currently applying for design patents for our new model of flat–panel display and our software. As of March 31, 2006, we held one design patent for our flat–panel display technology. We have the right to use several trademarks relating to the "Focus Media" brand name in China and in Singapore. We also have the right to use several trademarks relating to the "Framedia" brand name in China.

**Competition**

We compete with other advertising companies in China including companies that operate out–of–home advertising media networks, such as JCDecaux and Clear Media. We compete for advertising clients primarily on the basis of network size and coverage, location, price, the range of services that we offer and our brand name. We also compete for overall advertising spending with other alternative advertising media companies, such as Internet, street furniture, billboard, frame and public transport advertising companies, and with traditional advertising media, such as newspapers, television, magazines and radio.

In the future, we may also face competition from new entrants into the out–of–home television advertising network sector. In addition, starting December 10, 2005, wholly foreign–owned advertising companies are allowed to be established. China's ongoing deregulation of the advertising market in China will expose us to greater competition with existing or new advertising companies in China including PRC subsidiaries of large well–established multi–national companies.

**Employees**

As of March 31, 2006, we had a total of 3,250 full–time employees and no part–time employees. The following table sets out the number of staff by business area as of March 31, 2006:

| | Number of employees[1] | Percentage |
|---|---|---|
| Sales and marketing | 744 | 23% |
| Operations | 1,871 | 58% |
| Management and administration | 635 | 19% |
| **Total number of employees** | 3,250 | 100% |

(1)  This excludes employees our regional distributors and agents who are not directly under our employ.

As required by PRC regulations, we participate in various employee benefit plans that are organized by municipal and provincial governments, including pension, work–related injury benefits, maternity insurance, medical and unemployment benefit plans. We are required under PRC law to make contributions to the employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date.

Table of Contents

Generally we enter into a three–year standard employment contract with our officers and managers and a one–year standard employment contract with other employees. According to these contracts, all of our employees are prohibited from engaging in any activities that compete with our business during the period of their employment with us. Furthermore, the employment contracts with officers or managers include a covenant that prohibits officers or managers from engaging in any activities that compete with our business for two years after the period of their employment with us.

**Facilities**

We currently maintain our headquarters at 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China. We also have offices in 53 other cities including those operated by our regional distributors.

**Legal Proceedings**

On March 16, 2006, Shanghai Xicheng Cultural Dissemination Co., Ltd., also referred to as CGEN, brought a suit against us in Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. CGEN, which is developing a network of flat–panel displays in hypermarkets and supermarkets, claims to have established an exclusive business relationship with the Hymart chain of supermarkets in Shanghai. Hymart notified us that it had requested in writing to terminate its relationship with CGEN. In CGEN's pleadings, it alleges that Focus Media encouraged and supported Hymart to allegedly violate its agreement with CGEN, resulting in losses to CGEN. In its pleadings, CGEN has requested that the court order Focus Media to cease any alleged unfair competitive behavior, to undo the effects of any alleged unfair competition and to pay RMB 13,570,920 (US$1.7 million) to CGEN. We intend to defend against CGEN's claims to the fullest extent of the law. However, there can be no assurance that we will prevail in any such litigation. We believe the outcome of this suit, even if adversely determined, will not have a material adverse effect on our business or results of operations.

Except as disclosed above, we are not currently a party to any material legal proceeding. From time to time, we may be subject to various claims and legal actions arising in the ordinary course of business.

115

**Table of Contents**

**OUR RECENT SIGNIFICANT ACQUISITIONS**

**E–Times**

In January 2006, for an aggregate purchase price of $5.0 million, we acquired the assets of Shenzhen E–Times Advertising Co., Ltd. and the equity of Skyvantage Group Limited, which operated a local out–of–home poster frame advertising network placed in commercial and residential buildings. We refer to these entities collectively as E–Times. Following our acquisition of E–Times and, as described below, Framedia, we combined Framedia and E–Times' networks, which were substantially similar businesses, and now market our poster frame network under the brand name "Framedia".

**Framedia**

On January 1, 2006, we completed the acquisition of Infoachieve, and its affiliate Framedia Advertisement by purchasing 100% of the shares of Infoachieve from Total Team, through which Infoachieve held their respective interests in Infoachieve. Framedia installs and deploys poster frames mainly inside elevators and throughout the public areas of residential complexes in major cities in China and sells frame space to advertising clients.

***Share Purchase Agreement***

On October 15, 2005, we entered into a share purchase agreement to acquire the business of Infoachieve, its subsidiary and affiliated PRC entities, by purchasing 100% of the shares in Infoachieve from Total Team. Infoachieve, Total Team and its shareholders are referred to as the seller parties below.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement.

***Structure.*** We acquired 100% of the shares of Infoachieve, which controls its affiliates Framedia Advertisement, New Structure Advertisement and Guangdong Framedia through contractual relationships with Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their shareholders. Under the share purchase agreement, we gain control of Framedia Advertisement, New Structure Advertisement and Guangdong Framedia by gaining the right (i) to appoint their equity holders and (ii) to take over the contractual arrangements among Infoachieve, Framedia Advertisement, New Structure Advertisement and Guangdong Framedia and their equity holders.

***Purchase Price.*** On December 15, 2005, we paid the shareholders of Infoachieve $39.6 million in cash. At the closing on January 1, 2006, we also issued to the former shareholders of Infoachieve 19,306,840 Focus Media ordinary shares. We also issued 2,850,163 of our ordinary shares to Total Team in consideration for their cancellation of the share option plan of Infoachieve prior to our acquisition of it. Depending on Framedia's achievement of an earnings target in 2006, we may issue additional Focus Media ordinary shares to Total Team in an amount no greater than $88.0 million as an earnout payment plus 400,000 ordinary shares that we withheld from the initial share consideration pending Framedia's attainment of certain benchmarks, so that the maximum aggregate payment for our acquisition of Framedia will be $183.0 million. All shares issued or issuable to Total Team in connection with our acquisition of Framedia are valued at a fixed price of $2.456 per share and locked up for a specified period of time.

***Representations and Warranties.*** In the share purchase agreement, the seller parties made customary representations and warranties to us, which representations and warranties survive for a period of two years following the closing date, and we made customary representations and warranties to the seller parties, which representations and warranties survive for a period of six months following the closing date.

116

Table of Contents

*Covenants.* During the period from the date of the share purchase agreement to the earnout payment date, Infoachieve and the other seller parties have agreed to operate Framedia's business in the ordinary course of business and to use commercially reasonable efforts to preserve its business intact and preserve its relationships with customers, suppliers, employees and others doing business with Framedia. In furtherance of these covenants, from the date of the share purchase agreement until the closing date, Infoachieve and Framedia have agreed not to take actions as specified in the share purchase agreement, without our prior written consent.

The share purchase agreement also includes customary covenants relating to, among other things, notification of certain matters, access to information, public announcements, non–competition of certain persons, treatment of related party accounts, agreement to pay back or cancel all outstanding loans of Framedia, preparation of financial accounts; and to allow us to appoint certain management members to Framedia prior to the closing date. The share purchase agreement also contains covenants requiring us to enable the seller parties to operate Framedia as an independent business unit in 2006, and to retain certain existing senior management of Framedia.

*Voting Rights.* Under the terms of the share purchase agreement, after we issue shares to Total Team on behalf of the seller parties, each of the shareholders of Total Team is required to exercise their voting rights in Focus Media's shares independently of each other and Total Team's authorized representative is required to solicit a proxy statement from each shareholder indicating how the votes to which each shareholder is entitled should be voted. In the event a shareholder does not provide a proxy from a shareholder, the shareholder will be deemed to have abstained and Total Team will not be entitled to cast such votes.

*Indemnification.* The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement. The seller parties' indemnification obligation is limited to the total consideration we are to pay to them. If the seller parties indemnify us using our common shares, the value of such shares shall be the value of the shares when any indemnified losses become payable. If the seller parties' lock–up agreements are still in effect at such time, they may dispose of only those shares that cover the amount of the indemnified losses.

We have agreed to indemnify the seller parties for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Our indemnification obligation is limited to the total consideration (excluding any earnout payment) to be paid to the seller parties.

### Control Over Framedia

We have entered into a series of agreements with Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and its current shareholders and New Structure Advertisement that provide us with effective control over Framedia Advertisement, Guangdong Framedia and New Structure Advertisement while enabling the Framedia business to be consolidated with Infoachieve. These agreements are substantially similar to the control agreements we have entered into with Focus Media Technology, Focus Media Digital, Focus Media Advertisement and its shareholders and subsidiaries. See "Our Corporate Structure — Our Corporate Structure and Contractual Arrangements" and "Related Party Transactions — Agreements Among Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement".

### Target Media

On February 28, 2006, we acquired Target Media Holdings, its affiliated PRC entity Shanghai Target Media and its subsidiary Target Multi–Media, by purchasing 100% of the shares of Target Media Holdings from its shareholders. Target Media and several of its principal shareholders, including David Feng Yu, its chairman of the board of directors and SII International Holding Limited,

117

Table of Contents

are referred to as the seller parties. Collectively, Target Media's shareholders, including The Carlyle Group, are referred to as the Target Media selling shareholders.

The following is a brief summary of material provisions of the share purchase agreement. This summary is qualified in its entirety by reference to the share purchase agreement filed as an exhibit to our registration statement.

*Purchase Price.* We have agreed to pay the shareholders of Target Media US$94 million in cash, subject to a working capital adjustment, and 77 million Focus Media ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of $45 million was paid at closing on February 28, 2006. The second installment of $25 million was paid on April 28, 2006. The final installment of $24 million is to be paid on July 31, 2006, and may be increased or decreased based on a calculation of Target Media's net working capital as of the closing date. All of the Focus Media ordinary shares delivered at closing under the share purchase agreement were newly issued shares.

*Focus Media Options.* We have also granted options to purchase up to 3,000,000 Focus Media ordinary shares to an agreed upon list of current employees of Target Media who entered into new employment agreements with Focus Media.

*Representations and Warranties.* In the share purchase agreement, the seller parties made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, the Target Media selling shareholders also made customary representations and warranties to us, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely. In the definitive share purchase agreement, we made customary representations and warranties to the Target Media selling shareholders, which generally survive for a period of six months following the closing date. However, a number of specified representations and warranties survive for longer periods or indefinitely.

*Covenants.* The definitive share purchase agreement includes customary covenants relating to, among other things, notification of certain matters, public announcements, non–competition of certain persons, treatment of related party accounts and preparation of financial accounts. The share purchase agreement also contains covenants requiring us to enter into employment agreements with key employees of Target Media.

We agreed under the definitive share purchase agreement and the employment agreement with Mr. David Feng Yu to appoint him as co–chairman of the board of directors and president of Focus Media upon the completion of the acquisition. He is in charge of developing our outdoor LED network. We also agreed to increase our board of directors from five to seven members at closing, and to assist in the nomination and appointment of David Feng Yu, the founder, chairman and chief executive officer of Target Media, and a nominee of David Feng Yu to fill the additional seats at the first annual meeting of our shareholders following the closing. The director nominated by David Feng Yu will qualify as an independent director for the purpose of complying with NASDAQ listing standards and Sarbanes–Oxley Act requirements so that a majority of our board of directors continues to be independent. See "Management". We have also agreed to permit The Carlyle Group to appoint an observer to our board of directors for a limited period of time.

*Indemnification.* The seller parties have agreed to indemnify us for damages resulting from inaccuracies of their representations and warranties or failure to perform their obligations under the share purchase agreement; losses arising out of indebtedness of Target Media not reflected in its financial statements; losses arising out of or pursuant to terms of the contracts of Target Media that were not disclosed to us prior to the closing date due to their commercially sensitive nature and those terms are not in the ordinary course of business of Target Media; and certain tax liabilities.

Table of Contents

Two Target Media selling shareholders that hold an approximately 49.7% equity interest in Target Media, or collectively, the Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Controlling Target Media Selling Shareholders, respectively, or failure of Target Media or the Controlling Target Media Selling Shareholders to perform their respective obligations under the share purchase agreement. The Target Media selling shareholders other than the Controlling Target Media Selling Shareholders and The Carlyle Group, or collectively, the Non–Controlling Target Media Selling Shareholders, have agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to Target Media and the Non–Controlling Target Media Selling Shareholders, respectively, or failure of the Non–Controlling Target Media Selling Shareholders to perform their obligations under the share purchase agreement. The Carlyle Group has agreed to indemnify us for damages resulting from inaccuracies of representations and warranties in relation to The Carlyle Group, or failure of The Carlyle Group to perform its obligations under the share purchase agreement.

The indemnification obligations of all Target Media selling shareholders (excluding The Carlyle Group) are limited to US$80 million, provided that the Controlling Target Media Selling Shareholders shall be responsible for indemnifying us up to $325 million for additional losses arising out of several specified claims, including such contracts not disclosed to us prior to the closing of the acquisition, which contracts contain clauses that are out of ordinary course of Target Media's business. The indemnification obligation of The Carlyle Group is limited to $16.3 million, except for a breach with respect to their ownership of the shares they are selling to us.

For so long as the shares received by Target Media selling shareholders in this acquisition are restricted from sales in the open market by either the lock–up, or securities laws, the Target Media selling shareholders have the right to settle any indemnification obligation by paying us in kind with our ordinary shares, valued at one–tenth of the closing price of our ADSs (each of which represents ten of our ordinary shares) on the business day prior to the payment of such shares.

We have agreed to indemnify the seller shareholders for damages resulting from inaccuracies of our representations and warranties or failure to perform our obligations under the share purchase agreement. Certain of our indemnification obligations are capped at $39 million, while several specified indemnification obligations of our company are capped at the total consideration to be paid to the selling shareholders.

**Focus Media Wireless**

In March 2006, Focus Media acquired Dotad Media Holdings Limited, or Dotad Holdings, and its wholly–owned PRC subsidiary Dotad Technology and their affiliated PRC operating company, now called Beijing Focus Media Wireless Co., Ltd., or Focus Media Wireless, which operate a WAP–based advertisement delivery platform in China through China Mobile and China Unicom's mobile networks. Following our acquisition of Dotad Holdings, we rebranded the company under the brand name Focus Media Wireless. Under the terms of the transaction, Focus Media acquired 100% of the equity of Dotad for a purchase price of $15.0 million in cash. In addition under the terms of the agreement, if Focus Media Wireless attains net income of at least $5 million and $8 million during the twelve month periods ended March 31, 2007 and March 31, 2008, respectively, for each of these two net earnings attainments, we will issue 1,500,000 of our ordinary shares to the seller parties.

119

Table of Contents

## REGULATION OF OUR INDUSTRY

We operate our business in China under a legal regime consisting of the State Council, which is the highest authority of the executive branch of the National People's Congress, and several ministries and agencies under its authority including the State Administration for Industry and Commerce, or SAIC.

China's Advertising Law was promulgated in 1994. In addition, the State Council, SAIC and other ministries and agencies have issued regulations that regulate our business, which are discussed below.

**Limitations on Foreign Ownership in the Advertising Industry**

The principal regulations governing foreign ownership in the advertising industry in China include:

• The Catalogue for Guiding Foreign Investment in Industry (2004); and

• The Administrative Regulations on Foreign–invested Advertising Enterprises (2004).

These regulations require foreign entities that directly invest in the advertising industry to have at least two years of direct operations in the advertising industry outside of China. Since December 10, 2005, foreign investors have been permitted to own directly a 100% interest in advertising companies in China, but such foreign investors are also required to have at least three years of direct operations in the advertising industry outside of China. PRC laws and regulations do not permit the transfer of any approvals, licenses or permits, including business licenses containing a scope of business that permits engaging in the advertising business. In the event we are able to qualify to acquire the equity interest of Focus Media Advertisement under the rules allowing complete foreign ownership, Focus Media Advertisement would continue to exist as the holder of the required advertising license consistent with current regulatory requirements.

Since we have not been involved in advertising outside of China for the required number of years, our domestic PRC operating subsidiaries, which are considered foreign invested, are currently ineligible to apply for the required advertising services licenses in China. Our advertising business is currently mainly provided through our contractual arrangements with our consolidated affiliated entities in China, including Focus Media Advertisement and its subsidiaries, New Focus Media Advertisement, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and Focus Media Wireless. Each of our PRC operating affiliates is currently owned or controlled either by Jason Nanchun Jiang and Jimmy Wei Yu, both of whom are PRC citizens, or by PRC companies owned by them or by us. Our PRC operating affiliates and certain of their respective subsidiaries hold the requisite licenses to provide advertising services in China. We, Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Framedia Investment and Dotad Technology have entered into a series of contractual arrangements with our PRC operating affiliates and their respective subsidiaries and shareholders under which:

• we are able to exert effective control over our PRC operating affiliates and their respective subsidiaries;

• a substantial portion of the economic benefits of our PRC operating affiliates and their respective subsidiaries will be transferred to us; and

• we have an exclusive option to purchase all or part of the equity interests in our PRC operating affiliates and all or part of the equity interests in Focus Media Advertisement's subsidiaries that are owned by Focus Media Advertisement or its nominee holders, as well as all or a part of the assets of our PRC operating affiliates, in each case when and to the extent permitted by PRC law.

120

Table of Contents

See "Our Corporate Structure" and "Related Party Transactions".
In the opinion of Global Law Office, our PRC legal counsel,

- the respective ownership structures of Focus Media, Framedia, Focus Media Wireless and their respective PRC affiliates and subsidiaries are in compliance with existing PRC laws and regulations;

- the contractual arrangements (i) among Focus Media, Framedia, Focus Media Wireless and their respective PRC affiliates, subsidiaries and PRC shareholders, in each case governed by PRC law are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- the PRC business operations of Focus Media, Framedia, Focus Media Wireless and their respective affiliates and subsidiaries as described in this prospectus, are in compliance with existing PRC laws and regulations in all material respects.

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities, in particular the SAIC which regulates advertising companies, will not in the future take a view that is contrary to the opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government determines that the agreements establishing the structure for operating our PRC advertising business do not comply with PRC government restrictions on foreign investment in the advertising industry, we could be subject to severe penalties. See "Risk Factors — Risks Relating to Regulation of Our Business and to Our Structure — If the PRC government finds that the agreements that establish the structure for operating our China business do not comply with PRC governmental restrictions on foreign investment in the advertising industry, we could be subject to severe penalties".

**Regulation of Advertising Services**
*Business License for Advertising Companies*
The principal regulations governing advertising businesses in China include:

- The Advertising Law (1994);

- The Advertising Administrative Regulations (1987); and

- The Implementing Rules for the Advertising Administrative Regulations (2004).

These regulations stipulate that companies that engage in advertising activities must obtain from the SAIC or its local branches a business license which specifically includes operating an advertising business within its business scope. Companies conducting advertising activities without such a license may be subject to penalties, including fines, confiscation of advertising income and orders to cease advertising operations. The business license of an advertising company is valid for the duration of its existence, unless the license is suspended or revoked due to a violation of any relevant law or regulation. We do not expect to encounter any difficulties in maintaining our business licenses. Each of Focus Media Advertisement, its subsidiaries and New Focus Media Advertisement has obtained, or in the case of some of our new directly–operated cities, are in the process of obtaining such a business license from the local branches of the SAIC as required by the existing PRC regulations. Some of our regional distributors may not possess all the licenses required to operate an advertising business, or may fail to maintain the licenses they currently hold. We periodically monitor our regional distributors to ensure they have obtained all required licenses and are complying with regulations relating to advertising content, although it is possible that one or more

**Table of Contents**

of our regional distributors may not be in compliance with all PRC regulations at all times. To our knowledge, all of our regional distributors have received, or are in the process of obtaining, the licenses required to operate an advertising business. If we learn that any of our regional distributors are not in compliance with applicable terms and regulations we notify such regional distributors of the need to complete any necessary procedures and to report any developments to us. If a regional distributor fails to complete the steps necessary to receive the required licenses, we will take steps to terminate the contract with such regional distributor. See "Risk Factors — Risks Relating to Our Business and Industry — One or more of our regional distributors could engage in activities that are harmful to our reputation in the industry and to our business".

***Advertising Content***

PRC advertising laws and regulations set forth certain content requirements for advertisements in China, which include prohibitions on, among other things, misleading content, superlative wording, socially destabilizing content or content involving obscenities, superstition, violence, discrimination or infringement of the public interest. Advertisements for anesthetic, psychotropic, toxic or radioactive drugs are prohibited. It is prohibited to disseminate tobacco advertisements via broadcast or print media. It is also prohibited to display tobacco advertisements in any waiting lounge, theater, cinema, conference hall, stadium or other public area. There are also specific restrictions and requirements regarding advertisements that relate to matters such as patented products or processes, pharmaceuticals, medical instruments, agrochemicals, foodstuff, alcohol and cosmetics. In addition, all advertisements relating to pharmaceuticals, medical instruments, agrochemicals and veterinary pharmaceuticals advertised through radio, film, television, newspaper, magazine, out–of–home and other forms of media, together with any other advertisements which are subject to censorship by administrative authorities according to relevant laws and administrative regulations, must be submitted to the relevant administrative authorities for content approval prior to dissemination. We do not believe that advertisements containing content subject to restriction or censorship comprise a material portion of the advertisements shown on our network.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the content of the advertisements they prepare or distribute are true and in full compliance with applicable law. In providing advertising services, advertising operators and advertising distributors must review the prescribed supporting documents provided by advertisers for advertisements and verify that the content of the advertisements comply with applicable PRC laws and regulations. In addition, prior to distributing advertisements for certain commodities which are subject to government censorship and approval, advertising distributors are obligated to ensure that such censorship has been performed and approval has been obtained. Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the SAIC or its local branches may revoke violators' licenses or permits for advertising business operations. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties in the course of their advertising business.

We employ qualified advertising inspectors who are trained to review advertising content for compliance with relevant laws and regulations.

Table of Contents

***Outdoor Advertising***

The Advertising Law stipulates that the exhibition and display of outdoor advertisements must not:

- utilize traffic safety facilities and traffic signs;

- impede the use of public facilities, traffic safety facilities and traffic signs;

- obstruct commercial and public activities or create an eyesore in urban areas;

- be placed in restrictive areas near government offices, cultural landmarks or historical or scenic sites; and

- be placed in areas prohibited by the local governments from having outdoor advertisements.

In additional to the Advertising Law, the SAIC promulgated the Outdoor Advertising Registration Administrative Regulations on December 8, 1995, as amended on December 3, 1998, which governs the outdoor advertising industry in China.

Outdoor advertisements in China must be registered with the local SAIC before dissemination. The advertising distributors are required to submit a registration application form and other supporting documents for registration. After review and examination, if an application complies with the requirements, the local SAIC will issue an Outdoor Advertising Registration Certificate for such advertisement. The content of the outdoor advertisement must be submitted for filing with the local SAIC.

The placement and installation of LED billboards are subject to municipal zoning requirements and governmental approvals, including application for an outdoor advertising registration certificate for each LED billboard subject to a term of use of no more than six years for each LED billboard. If the existing LED billboards placed by our LED location provider or us are required to be removed, the attractiveness of this portion of our advertising network will be diminished. Moreover, failure by an owner of LED billboards to maintain outdoor advertising registration certificates would result in the inability to lease or market such space for the placement of advertisements.

***Print Advertising***

Following our acquisition of Framedia on January 1, 2006, we also operate a network of advertising poster frames placed primarily in the elevators and public areas of residential complexes. The advertisements shown on our poster frame network are defined as "normal print advertisements" under the Print Advertisements Administrative Regulations promulgated by the SAIC on January 13, 2000, as amended on November 30, 2004, or the Print Advertisements Regulations. Under these regulations, print advertisements must not be placed in areas prohibited by laws or regulations from posting print advertisements.

**Regulation of Telecommunications Value–added Service Providers**

The Telecommunications Regulations (2000), or the Telecom Regulations, and the Administrative Measures for Telecommunications Business Operating License (2002), or the Telecom License Measures, contain provisions governing providers of telecommunications services, including value–added service providers. The Telecom Regulations categorize all telecommunication services businesses in China as either infrastructure telecommunication services businesses or value–added telecommunication services businesses. The latter category includes WAP services. Under the Telecom Regulations, certain services are classified as being of a value–added nature and require the commercial mobile operator of such services to obtain an operating license, including online data

123

**Table of Contents**

processing and transaction processing, call centers and Internet access. The Telecom Regulations also set forth extensive guidelines with respect to different aspects of telecommunications operations in China. Under the Telecom License Measures, an approved value–added telecommunication services provider must conduct its business in accordance with the specifications recorded on its value–added telecommunication services operating license. Under PRC law, it is unclear whether the services offered by Focus Media Wireless should be deemed value–added telecommunication services, which requires an operation permit which has a valid period of five years. Focus Media Wireless has applied for an operation permit for its wireless advertising operations. If Focus Media Wireless is deemed by the PRC regulatory authorities to be providing value–added telecommunication services but an operation permit is not issued or if, once issued, it is revoked or if we are unable to renew its operation permit upon its expiration, we will be required to suspend our services relating to our mobile handset advertising network, and our advertising service revenue derived from this portion of our network would be adversely affected. See "Risk Factors — Our recent entry into mobile handset advertising through our acquisition of Focus Media Wireless may expose us to risks associated with operating in the telecommunications industry in China which could materially affect our financial condition or results of operation".

**Regulation of Foreign Exchange in Certain Onshore and Offshore Transactions**

In January and April 2005, the PRC State Administration of Foreign Exchange, or SAFE, issued two rules that require PRC residents to register with and receive approvals from SAFE in connection with their offshore investment activities. SAFE has announced that the purpose of these regulations is to achieve the proper balance of foreign exchange and the standardization of the cross–border flow of funds.

On October 21, 2005, SAFE issued the Notice on Issues Relating to the Administration of Foreign Exchange in Fund–raising and Reverse Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or Notice 75, which became effective as of November 1, 2005. Notice 75 replaced the two rules issued by SAFE in January and April 2005 mentioned above.

According to Notice 75:

- prior to establishing or assuming control of an offshore company for the purpose of financing that offshore company with assets or equity interests in an onshore enterprise in the PRC, each PRC resident, whether a natural or legal person, must complete the overseas investment foreign exchange registration procedures with the relevant local SAFE branch;

- an amendment to the registration with the local SAFE branch is required to be filed by any PRC resident that directly or indirectly holds interests in that offshore company upon either (1) the injection of equity interests or assets of an onshore enterprise to the offshore company, or (2) the completion of any overseas fund raising by such offshore company; and

- an amendment to the registration with the local SAFE branch is also required to be filed by such PRC resident when there is any material change involving a change in the capital of the offshore company, such as (1) an increase or decrease in its capital, (2) a transfer or swap of shares, (3) a merger or division, (4) a long term equity or debt investment, or (5) the creation of any security interests over the relevant assets located in China.

Moreover, Notice 75 applies retroactively. As a result, PRC residents who have established or acquired control of offshore companies that have made onshore investments in the PRC in the past are required to complete the relevant overseas investment foreign exchange registration procedures by March 31, 2006. Under the relevant rules, failure to comply with the registration procedures set forth in Notice 75 may result in restrictions being imposed on the foreign exchange activities of the

124

Table of Contents

relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliate and the capital inflow from the offshore entity, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

As a Cayman Islands company, and therefore a foreign entity, if Focus Media Holding purchases the assets or equity interest of a PRC company owned by PRC residents in exchange for our equity interests, such PRC residents will be subject to the registration procedures described in Notice 75. Moreover, PRC residents who are beneficial holders of our shares are required to register with SAFE in connection with their investment in us.

As a result of the lack of implementing rules and other uncertainties relating to the interpretation and implementation of Notice 75, we cannot predict how these regulations will affect our business operations or strategies. For example, our present or future PRC subsidiaries' ability to conduct foreign exchange activities, such as remittance of dividends and foreign–currency–denominated borrowings, may be subject to compliance with such SAFE registration requirements by relevant PRC residents, over whom we have no control. In addition, we cannot assure you that any such PRC residents will be able to complete the necessary approval and registration procedures required by the SAFE regulations. We require all the shareholders in Focus Media Holding who are PRC residents to comply with any SAFE registration requirements, but we have no control over either our shareholders or the outcome of such registration procedures. Such uncertainties may restrict our ability to implement our acquisition strategy and adversely affect our business and prospects.

Table of Contents

## MANAGEMENT

The following table sets forth certain information relating to our directors and executive officers. The business address of each of our directors and executive officers is 28–30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China.

| Name | Age | Position |
|------|-----|----------|
| Jason Nanchun Jiang | 33 | Chairman of the Board of Directors and Chief Executive Officer |
| David Feng Yu[1] | 44 | Co–chairman of the Board of Directors and President |
| Jimmy Wei Yu | 33 | Director |
| Fumin Zhuo[2] | 54 | Director |
| Neil Nanpeng Shen[2] | 38 | Director |
| Charles Chao[2] | 40 | Director |
| Daqing Qi[3] | 43 | Director |
| Daniel Mingdong Wu | 39 | Chief Financial Officer |
| Diana Congrong Chen | 38 | Chief Marketing Officer |
| July Lilin Wang | 34 | Chief Accounting Officer |
| Cindy Yan Chan | 40 | Chief Strategy Officer |
| Ergo Xueyuan Liu | 35 | Vice President — Commercial Location Network |
| Acer Jiawei Zhang | 29 | Vice President — In–store Network |

(1)  Mr. Yu was appointed as co–chairman of the board of directors and President of Focus Media on February 28, 2006 pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

(2)  Independent director and a member of our audit committee, compensation committee and nomination committee.

(3)  Mr. Qi was appointed as an independent director on February 28, 2006 by the seller parties of Target Media pursuant to the terms of the share purchase agreement between us and Target Media in connection with our acquisition of Target Media.

   **Jason Nanchun Jiang,** our founder, has served as the chairman of our board of directors and our chief executive officer since May 2003. From 1994 to 2003, Mr. Jiang was the chief executive officer of Everease Advertising Corporation, which is one of the top 50 advertising agencies in China. Starting in 2003, Mr. Jiang was general manager of Aiqi Advertising, an advertising company founded by his immediate family members in 1997 which was renamed Focus Media Advertisement in May 2003 in connection with the establishment of our current business operations. In December 2003, Mr. Jiang was selected by China News Publisher's Media magazine as one of the "Media People of the Year". In September 2003, Mr. Jiang was selected by the Television and Newspaper Committees of the China Advertising Commission as one of its "contemporary outstanding advertising media personalities". Mr. Jiang received a Bachelor of Arts degree in Chinese language and literature from Huadong Normal University in 1995.

   **David Feng Yu** has served as co–chairman of our board of directors and as our president since February 28, 2006. From 2003 until February 2006, Mr. Yu was chairman and chief executive Officer of Target Media, which we acquired in February 2006. From 2000 to 2003, Mr. Yu was chief executive offer and the sole beneficial owner of Dian Yang, whose flat panel display advertising business was transferred to Target Media in December 2003. From 1999 to 2000, Mr. Yu was the general manager of Shanghai Yuanye Info Tech Co., Ltd. In May 2005, Mr. Yu was selected by the Advertising Newspaper in China as one of the "Most Influential Advertising People of the Year." In December 2004, Mr. Yu was selected by China Venture Capital Forum 2004 as one of the "Top 10

Table of Contents

Enterprisers of the Year." Mr. Yu received an Executive M.B.A. degree from China Europe International Business School in 2001 and a Master of Arts degree in philosophy from Fudan University in 1991.

   *Jimmy Wei Yu* has served as our director since May 2003. Mr. Yu is the chairman and chief executive officer of United Capital Investment (China) limited, which is one of our principal shareholders and the management company of United China Investment Limited and KTB/UCI China Ventures I Limited and UCI China Venture II Limited. Mr. Yu is also the chairman of Shanghai Multimedia Park Venture Capital, a position he has held since 2003. From 1995 to 1999, Mr. Yu served in various capacities in several telecommunications companies, including as Chief Representative of UTStarcom (Hong Kong) Ltd. He also has been the Chief Representative of Softbank China Venture Capital, which is the management company of SB China Holdings Pte. Ltd., one of our shareholders, since its incorporation in 1999.

   *Fumin Zhuo* has served as our director since December 2004 and has more than 27 years of experience in investment and corporate management. Mr. Zhuo has also served as a general partner in SIG Capital Limited since July 2005. Prior to this, Mr. Zhuo served as chairman and chief executive officer of Vertex China Investment Company (VCI), a company concentrating in investments in the Greater China region, since he joined the fund in July 2002. From 1995 to July 2002, Mr. Zhuo was chief executive officer of Shanghai Industrial Holding Ltd. and chairman of SIIC Medical Science & Technology (Group). Prior to this, starting in 1987, Mr. Zhuo served as chief assistant officer of the Shanghai Economic System Reform Committee. Mr. Zhuo has extensive experience in venture capital fund formation, mergers and acquisitions, and investment management. Mr. Zhuo graduated from Shanghai Jiaotong University's Electrical Engineering School with a degree in enterprise management and also holds a Master's degree in economics from Fudan University.

   *Neil Nanpeng Shen* has served as our director since December 2004. Mr. Shen is the founding managing partner of Sequoia Capital China, or Sequoia China, a China–focused venture capital fund which was established in August 2005. Prior to founding Sequoia China, Mr. Shen was president and chief financial officer of Ctrip.com International Limited, or Ctrip, a Nasdaq–listed on–line travel services company he co–founded and for which he continues to serve as a director. Prior to founding Ctrip, Mr. Shen worked for more than eight years in the investment banking industry in New York and Hong Kong. He was a director at Deutsche Bank Hong Kong where he worked from 1996 to 1999. Prior to 1996, he worked at Chemical Bank, Lehman Brothers and Citibank in various investment banking positions. Mr. Shen is also co–founder and co–chairman of Home Inns & Hotels Management (Hong Kong) Limited. Mr. Shen received his Master's degree from the School of Management at Yale University and his Bachelor's degree from Shanghai Jiaotong University.

   *Charles Chao* was appointed as our director in November 2005 to replace Ted Tak Dee Sun who passed away in September 2005. Mr. Chao is president and chief executive officer of SINA Corporation, an online media company listed on the Nasdaq National Market. Before he joined SINA Corporation in September 1999, Mr. Chao served as an experienced audit manager with PricewaterhouseCoopers LLP, providing auditing and business consulting services for high tech companies in Silicon Valley, California. Mr. Chao received his master of professional accounting from University of Texas at Austin. He also holds an MA degree in journalism from University of Oklahoma and a BA degree in Journalism from Fudan University in Shanghai, China. Mr. Chao is a certified public accountant and a member of the American Institute of Certified Public Accountants.

   *Daqing Qi* was appointed as our director in February 28, 2006 upon the closing of our acquisition of Target Media. Professor Qi is professor of accounting and associate dean of the Cheong Kong Graduate School of Business, where he has taught since 2002. From 1996 until 2002, Professor Qi was an associate professor in the School of Accountancy at the Chinese University of Hong Kong. Professor Qi also has extensive experience in providing executive training and consulting services in accounting and corporate finance to government departments and private companies, including the Ministry of Information Industries of the People's Republic of China, the

127

**Table of Contents**

Shanghai Municipal Government, China Mobile, China Unicom, China Telecom, China Netcom, Nokia and Ericsson. Professor Qi also serves on the board of directors of Sohu.com, a Nasdaq–listed company that provides online services in China. Professor Qi holds a B.S. degree in biophysics and a B.A. degree in journalism from Fudan University, an MBA degree from the University of Hawaii Manoa with a concentration in accounting and finance and a Ph.D. degree in accounting from the Eli Broad Graduate School of Management of Michigan State University.

 ***Daniel Mingdong Wu*** has served as our chief financial officer since February 2005. Mr. Wu was chief financial officer and a director of Harbour Networks Ltd. from January 2004 until January 2005. Prior to that, Mr. Wu was a partner of Bridgecross Ltd. from 2001 until 2003 and acting chief financial officer of Wi–Comm United Communications Inc. from May 2003 until January 2004. From 2000 until 2001, Mr. Wu was a vice president for technology investment banking at Merrill Lynch (Asia Pacific) Ltd. From 1996 to 2000, Mr. Wu worked in the global communications group of Lehman Brothers Inc. Mr. Wu holds a B.A. degree from the State University of New York at Buffalo and an MBA degree from Columbia Business School.

 ***Diana Congrong Chen*** joined Focus Media as chief marketing officer in May 2005. Before joining Focus Media, Ms. Chen worked for Phoenix Satellite TV from 1998 to 2004, serving as general manager, director of international advertising and president of East China region. While at Phoenix Satellite TV, Ms. Chen successfully developed business in Zhejiang and East China region and was awarded Best Sales Team for several years. In 2004, Ms. Chen was honored with a Most Outstanding Employee Award by Phoenix Satellite TV. Prior to that, Ms. Chen was the vice president of sales for Tucano Clothing China and office manager for China Animal By–product Import and Export Co. Ms. Chen holds a B.A. degree in journalism from Zhejiang University.

 ***July Lilin Wang*** joined Focus Media as chief accounting officer in April 2005. Prior to joining Focus Media, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office from April 2004 to April 2005. From November 2002 to April 2004, Ms. Wang was a senior supervisor at Ernst & Young's San Jose, California office. From 1994 to 2002, Ms. Wang worked as a senior manager at Ernst & Young's Shanghai office. Ms. Wang received a B.A. degree in economics from Shanghai University of Economics and Finance.

 ***Cindy Yan Chan*** joined Focus Media in August 2005 as chief strategy officer. Ms. Chan has over 10 years of experience in the advertising industry in China. Before joining Focus Media, Ms. Chan was deputy general manger for iMPACT, ZenithOptimedia's outdoor media department, an outdoor media buyer in China, from 2000 to 2005. Ms. Chan is also among the most reputable media researchers in China, and has published articles on the theory of outdoor media and China's outdoor media market, which has been quoted in prominent publications such as Forbes magazine and Media magazine. Ms. Chan holds a master's degree in economics from Nankai University.

 ***Ergo Xueyuan Liu*** joined Focus Media as Vice President — Commercial Location Network in June 2004. Prior to joining Focus Media, Mr. Liu worked for Everease as an account manager from March 2003 until June 2004. From June 2002 until February 2003, Mr. Liu was general manager and a director of Beijing Fanenchangmei Advertising Co., Ltd., prior to which he was general manager of Manager magazine from January 2001 until May 2002. In 1999 and 2000, Mr. Liu worked in the enterprise department of the Shenzhen Special Economic Zone Group Company and was assistant manager of Yigao Electronics Co., Ltd. Mr. Liu received a B.A. degree in Chinese literature from Huazhong College of Engineering (now Huazhong Science and Technology University) in 1992.

 ***Acer Jiawei Zhang*** joined Focus Media as Vice President — In–store Network in March 2005. Prior to joining Focus Media, Mr. Zhang worked for Media Partners International Holdings Inc. from 2001 to 2004, serving as account director, business director of the Beijing branch office and director of agency relations. While at Media Partners International, Mr. Zhang established a national "key account" service system, improved consulting and client services, and managed the development of its digital outdoor media project. From 1998 to 2001, Mr. Zhang was a sales director for Media Century Holdings Inc. in the Wuhan, Chengdu and Beijing offices. At Media Century, Mr. Zhang

128

Table of Contents

assisted with developing new markets and preparing for its domestic initial public offering and assisted in the acquisition of one of its key competitors. Mr. Zhang received a B.A. degree in arts design from Hubei Polytechnic Institute.

We increased our board of directors from five to seven members when we completed our acquisition of Target Media, and assisted in the nomination and appointment of David Feng Yu, the founder, chairman and chief executive officer of Target Media, and Daqing Qi to fill the additional seats as of February 28, 2006.

**Duties of Directors**

Under Cayman Islands law, our directors have a duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skills that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our amended and restated memorandum and articles of association. A company has the right to seek damages if a duty owed by our directors is breached.

The functions and powers of our board of directors include, among others:

• convening shareholders' meetings and reporting its work to shareholders at such meetings;

• implementing shareholders' resolutions;

• determining our business plans and investment proposals;

• formulating our profit distribution plans and loss recovery plans;

• determining our debt and finance policies and proposals for the increase or decrease in our registered capital and the issuance of debentures;

• formulating our major acquisition and disposition plans, and plans for merger, division or dissolution;

• proposing amendments to our amended and restated memorandum and articles of association; and

• exercising any other powers conferred by the shareholders' meetings or under our amended and restated memorandum and articles of association.

**Terms of Directors and Executive Officers**

Each of our directors holds office until a successor has been duly elected and qualified unless the director was appointed by our board of directors, in which case such director holds office until the next following annual meeting of shareholders at which time such director is eligible for reelection. All of our executive officers are appointed by and serve at the discretion of our board of directors.

**Board Practices**

*Board Committees*

Our board of directors has established an audit committee, a compensation committee and a nominations committee.

*Audit Committee.* Our audit committee currently consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Shen is the chairman of our audit committee. Our board of directors has determined that all of our audit committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15) and meet the criteria for independence set forth in Section 10A(m)(3) of the U.S. Securities Exchange Act of 1934, or the Exchange Act.

Table of Contents

Our audit committee is responsible for, among other things:

- recommending to our shareholders, if appropriate, the annual re–appointment of our independent auditors and pre–approving all auditing and non–auditing services permitted to be performed by the independent auditors;

- annually reviewing an independent auditors' report describing the auditing firm's internal quality–control procedures, any material issues raised by the most recent internal quality control review, or peer review, of the independent auditors and all relationships between the independent auditors and our company;

- setting clear hiring policies for employees or former employees of the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- reviewing and approving all proposed related–party transactions, as defined in Item 404 of Regulation S–K under the U.S. securities laws;

- discussing the annual audited financial statements with management and the independent auditors;

- discussing with management and the independent auditors major issues regarding accounting principles and financial statement presentations;

- reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments;

- reviewing with management and the independent auditors the effect of regulatory and accounting initiatives, as well as off–balance sheet structures on our financial statements;

- discussing policies with respect to risk assessment and risk management;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- timely reviewing reports from the independent auditors regarding all critical accounting policies and practices to be used by our company, all alternative treatments of financial information within U.S. GAAP that have been discussed with management and all other material written communications between the independent auditors and management;

- establishing procedures for the receipt, retention and treatment of complaints received from our employees regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time;

- meeting separately, periodically, with management, the internal auditors and the independent auditors; and

- reporting regularly to the full board of directors.

*Compensation Committee.* Our current compensation committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Chao is the chairman of our compensation committee. Our board of directors has determined that all of our compensation committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Table of Contents

Our compensation committee is responsible for:

- determining and recommending the compensation of our chief executive officer;

- reviewing and making recommendations to our board of directors regarding our compensation policies and forms of compensation provided to our directors and officers;

- reviewing and determining bonuses for our officers;

- reviewing and determining share–based compensation for our directors and officers;

- administering our equity incentive plans in accordance with the terms thereof; and

- such other matters that are specifically delegated to the compensation committee by our board of directors from time to time.

*Nominations Committee.* Our current nominations committee consists of Neil Nanpeng Shen, Charles Chao and Fumin Zhuo. Mr. Zhuo is the chairman of our nominations committee. Our board of directors has determined that all of our nominations committee members are "independent directors" within the meaning of Nasdaq Marketplace Rule 4200(a)(15).

Our nominations committee is responsible for, among other things, selecting and recommending the appointment of new directors to our board of directors.

**Corporate Governance**

Our board of directors has adopted a code of business conduct and ethics, which is applicable to our employees, officers and directors. Our code of business conduct and ethics is available on our website.

In addition, our board of directors has adopted a set of corporate governance guidelines. The guidelines reflect certain guiding principles with respect to our board's structure, procedures and committees. The guidelines are not intended to change or interpret any law, or our amended and restated memorandum and articles of association.

**Compensation Of Directors And Executive Officers**

In 2005, we paid aggregate cash compensation of approximately $512,947 to our directors and executive officers as a group. In 2004, 2005 and for the three months ended March 31, 2006, we granted to selected directors, officers and employees options to acquire an aggregate 20,643,400, 22,503,630 and 3,000,000 ordinary shares, respectively. We have no service contracts with any of our directors or executive officers that provide benefits to them upon termination. We do not pay or set aside any amounts for pension, retirement or other benefits for our officers and directors.

**Share Option Plans**

Our 2003 Employee Share Option Scheme, or our 2003 Option Plan, was adopted by our board of directors at a meeting on June 1, 2003. Our members and board of directors adopted our 2005 Share Option Plan, or our 2005 Option Plan, in May 2005. Both of our option plans are intended to promote our success and to increase shareholder value by providing an additional means to attract, motivate, retain and reward selected directors, officers, employees and third–party consultants and advisors.

Originally, under our 2003 Option Plan, not more than 30% of our share capital was reserved for grants of options. Prior to the adoption of our 2005 Option Plan, we issued options equivalent to 10.87% of our issued share capital under our 2003 Option Plan. Under our 2005 Option Plan, the amount of options we may issue has been reduced to an aggregate of 20% of our share capital, including the 10.87% already granted under our 2003 Option Plan. In addition, during the three years

131

Table of Contents

from the adoption of our 2005 Option Plan, we may issue no more than 5% of our share capital for grants of options.

Under our 2003 Option Plan:

- In July and August 2004, we granted:
  - options to purchase 12,181,600 shares to certain members of our board of directors and our management group. Each of these options has an exercise price of $0.24 per share. 8,460,800 of these options vest over three years while the remaining 3,720,800 options vest over one year.

  - options to purchase 8,461,800 shares to members of our staff. Each of these options has an exercise price of $0.24 per share. 2,159,800 of these options vest over three years while the remaining 6,302,000 options vest over one year.

  - options to purchase 4,564,800 shares, representing 1.4% of our pre–offering diluted share capital, to third–party consultants and advisors. Each of these options have an exercise price of $0.24 per share. 1,310,400 of these options vest over three years while the remaining 3,254,400 options vest over one year.

Under our 2005 Option Plan:
- In January 2005, we granted additional options to purchase 1,200,000 of our ordinary shares to some of our directors with an exercise price of $0.58 per share. All of these options vest over three years.

- In February 2005, we granted:
  - options to purchase 2,000,000 and 2,100,000 of our ordinary shares with an exercise price of $0.58 and $0.75, respectively, to certain of our executive officers and options to purchase 720,000 of our ordinary shares with an exercise price of $0.75 to certain of our employees. All of these options vest over three years.

  - options to purchase 1,240,000 of our ordinary shares to third–party consultants and advisors with an exercise price of $0.75. All of these options vest over three years.
- In July 2005, we granted:
  - options to purchase 11,683,630 of our ordinary shares with an exercise price of $1.70, to certain of our executive officers and employees. All of these options vest over three years.

  - options to purchase 100,000 of our ordinary shares to a third–party consultant with an exercise price of $1.70. All of these options vest over three years.
- In November 2005, we granted:
  - options to purchase 800,000 of our ordinary shares with an exercise price of $2.60, to certain of our executive officers and employees. All of these options vest over three years.

  - options to purchase 4,000,000 of our ordinary shares with an exercise price of $2.70, to certain of our executive officers and employees. All of these options vest over three years.
- In March 2006, we granted options to purchase 3,000,000 of our ordinary shares with an exercise price of $5.09, to certain of our executive officers, employees and directors. All of these options vest over three years.

Options generally do not vest unless the grantee remains under our employment or in service with us on the given vesting date. However, in circumstances where there is a death or disability of

132

**Table of Contents**

the grantee, or, for certain option holders, a change in the control of our company, the vesting of options will be accelerated to permit immediate exercise of all options granted to a grantee.

Our compensation committee, which administers our option plans, has wide discretion to award options. Subject to the provisions of our option plans and the above allocation targets, our committee that administers our option plans determines who will be granted options, the type and timing of options to be granted, vesting schedules and other terms and conditions of options, including the exercise price. Any of our employees may be granted options. The number of options awarded to a person, if any, is based on the person's potential ability to contribute to our success, the person's position with us and other factors chosen by our board of directors.

Generally, to the extent an outstanding option granted under our option plans has not become vested on the date the grantee's employment by or service with us terminates, the option will terminate and become unexercisable.

Our board of directors may amend, alter, suspend, or terminate each of our option plan at any time, provided, however, that in order to increase the limit of 20% of our share capital that may be granted as options, our board of directors must first seek the approval of our shareholders and, if such amendment, alteration, suspension or termination would adversely affect the rights of an optionee under any option granted prior to that date, the approval of such optionee. Without further action by our board of directors, our 2003 Option Plan and our 2005 Option Plan will terminate in June 2013 and May 2015, respectively.

The table below sets forth the option grants made to our directors and executive officers pursuant to our 2003 and 2005 Option Plan as of March 31, 2006.

| Name | Number of ordinary shares to be issued upon exercise of options | Exercise price per ordinary share | | Date of grant | Date of expiration |
|------|------|------|------|------|------|
| | | (in U.S. dollars) | | | |
| Jason Nanchun Jiang | 5,882,000 | $ | 0.24 | August 25, 2004 | August 24, 2014 |
| David Feng Yu | 1,300,000 | $ | 5.09 | March 10, 2006 | March 9, 2016 |
| Jimmy Wei Yu | 2,376,200 | $ | 0.24 | July 5, 2004 | July 4, 2014 |
| Jimmy Wei Yu | 3,923,400 | $ | 0.24 | August 25, 2004 | August 24, 2014 |
| Jimmy Wei Yu | 200,000 | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| Fuming Zhuo | * | $ | 0.24 | August 10, 2004 | August 9, 2014 |
| Neil Nanpeng Shen | * | $ | 0.58 | January 1, 2005 | December 31, 2014 |
| Charles Chao | * | $ | 2.60 | November 2, 2005 | November 1, 2016 |
| Daqing Qi | * | $ | 5.09 | March 10, 2006 | March 9, 2016 |
| Daniel Mingdong Wu | * | $ | 0.58 | February 2, 2005 | February 1, 2015 |
| Daniel Mingdong Wu | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| Daniel Mingdong Wu | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| July Lilin Wang | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| Ergo Xueyuan Liu | * | $ | 0.24 | July 5, 2004 | July 4, 2014 |
| Acer Jiawei Zhang | * | $ | 0.75 | February 2, 2005 | February 1, 2015 |
| Diana Congrong Chen | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |
| Cindy Yan Chan | * | $ | 1.70 | July 13, 2005 | July 13, 2015 |

* Upon exercise of all options granted, would beneficially own less than 1% of our outstanding ordinary shares.

**Table of Contents**

***Manager Non–Competition Agreement***

    Pursuant to the manager non–competition agreement entered into by and between us and Jason Nanchun Jiang in December 2004, Jason Nanchun Jiang agrees not to engage in activities that compete with our business operations during the term of his employment with us and for a period of two years after any termination of his employment with us. Jason Nanchun Jiang also agrees not to disclose to any third party any confidential information regarding us or any of our subsidiaries and affiliated companies or to accept or invest in any opportunity that is in line with our business operations, came to him as a result of his employment with us or involves any of our assets, unless approved by our board of directors.

<div align="center">134</div>

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d–3 under the Exchange Act, of our ordinary shares, as of May 30, 2006 and as adjusted to reflect the sale of the ADSs offered in this offering for:

• each person known to us to own beneficially more than 5% of our ordinary shares;

• each of our directors and executive officers who beneficially own our ordinary shares; and

• each selling shareholder participating in this offering.

Beneficial ownership includes voting or investment power with respect to the securities. Except as indicated below, and subject to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all ordinary shares shown as beneficially owned by them. The number of our ordinary shares outstanding used in calculating the percentage for each listed person includes our ordinary shares underlying options held by such person that are exercisable within 60 days of June 13, 2006, but excludes ordinary shares underlying options held by any other person. Percentage of beneficial ownership is based on 512,766,773 ordinary shares outstanding prior to this offering and 522,766,773 ordinary shares outstanding after completion of this offering, assuming the underwriters do not exercise their over–allotment options. The underwriters may choose to exercise the over–allotment options in full, in part or not at all.

| Name | Shares beneficially owned prior to this offering | | Shares to be sold by selling shareholders in this offering | | Shares beneficially owned after this offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Principal Shareholders** | | | | | | |
| JJ Media Investment Holding Ltd./ Jason Nanchun Jiang [1] | 101,619,429 | 19.01% | 5,000,182 | 0.97% | 96,619,247 | 18.36% |
| Target Media International Limited/ David Feng Yu [2] | 35,584,287 | 6.94% | — | — | 35,584,287 | 6.81% |
| Carlyle Entities [3] | 27,516,914 | 5.37% | — | — | 27,516,914 | 5.26% |
| Total Team [4] | 22,157,003 | 4.32% | — | — | 22,157,003 | 4.24% |
| **Directors and Executive Officers** [5] | | | | | | |
| Jason Nanchun Jiang [6] | 101,619,429 | 19.01% | 5,000,182 | 0.97% | 96,619,247 | 18.36% |
| David Feng Yu [7] | 35,584,287 | 6.94% | — | — | 35,584,287 | 6.81% |
| Jimmy Wei Yu [8] | 11,166,242 | 1.75% | 9,034,317 | 1.75% | 2,131,925 | * |
| Neil Nanpeng Shen | — | * | — | — | — | * |
| Charles Chao | — | — | — | — | — | — |
| Fumin Zhuo | — | * | — | — | — | * |
| Daqing Qi | — | — | — | — | — | — |
| Daniel Mingdong Wu | — | * | — | — | — | * |
| Diana Congrong Chen | — | * | — | — | — | * |
| July Lilin Wang | — | * | — | — | — | * |
| Cindy Yan Chan | — | * | — | — | — | * |
| Ergo Xueyuan Liu | — | * | — | — | — | * |
| Acer Jiawei Zhang | — | * | — | — | — | * |

Table of Contents

| Name | Shares beneficially owned prior to this offering | | Shares to be sold by selling shareholders in this offering | | Shares beneficially owned after this offering | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Other Selling Shareholders** | | | | | | |
| GS Focus Holding Limited[(9)] | 22,183,470 | 4.33% | 15,350,770 | 2.99% | 6,832,700 | 1.33% |
| UCI Entities[(10)] | 11,123,236 | 1.75% | 9,034,317 | 1.75% | 2,088,919 | * |
| Victory Venture Capital Limited[(11)] | 4,864,705 | 0.95% | 4,864,705 | 0.95% | — | — |
| SB China Holdings Pte. Ltd[(12)] | 4,500,006 | 0.88% | 4,500,006 | 0.88% | — | — |
| International Network Capital Global[(13)] | 4,166,715 | 0.81% | 4,166,715 | 0.81% | — | — |
| Venture TDF Technology Fund III L.P. [(14)] | 2,083,305 | 0.41% | 2,083,305 | 0.41% | — | — |

* Upon exercise of all options currently exercisable or vesting within 60 days of the date of this prospectus, would beneficially own less than 1% of our ordinary shares.

(1) Includes 98,126,991 ordinary shares owned by JJ Media Investment Holding Ltd. and 2,993,450 and 498,988 options to purchase our ordinary shares owned by Target Sales International Limited and Target Management Group Limited. All of these entities are 100% owned by Jason Nanchun Jiang, our founder, chairman and chief executive officer.

(2) Represents 35,584,287 ordinary shares owned by Target Media International Limited, or Target Media International, which is 100% owned by David Feng Yu, our co–chairman and president. The address of Target Media International is Suite 3801, K. Wah Centre, No. 1010 Huaihai Middle Road, Shanghai 200031, PRC.

(3) Represents 22,618,903 and 4,898,011 ordinary shares owned by Carlyle Asia Venture Partners II, L.P. and CAVP II Co– Investment, L.P., respectively, which are collectively referred to in this prospectus as the Carlyle Entities. The general partner of each Carlyle Entity is CIPA General Partner, L.P. The general partner of CIPA General Partner, L.P. is CIPA Ltd., a Cayman Islands exempted limited liability company which is wholly owned by TC Group Cayman, L.P. The general partner of TC Group Cayman, L.P. is TCG Holdings Cayman, L.P. The general partner of TCG Holdings Cayman, L.P. is Carlyle Offshore Partners II Limited, a Cayman Islands exempted limited liability company. Carlyle Offshore Partners II Limited has ultimate investment and voting power over the shares held by the Carlyle Entities. The address of the Carlyle Entities is Suite 2801, 28th Floor, 2 Pacific Place, 88 Queensway, Hong Kong.

(4) Total Team, a British Virgin Island company, is 13.37%, 10.79%, 10.46%, 9.99%, 9.30%, 9.23%, 8.14%, 5.81%, 5.76%, 5.54%, 5.23%, 4.04%, 1.74% and 0.58% owned by First Choice Investments Limited (owned by a group of unrelated parties), IDG Technology Venture Investment III, L.P. (owned by a group of unrelated parties), All in One International Limited (wholly owned by Lei Liu), Timeleader Profits Limited (wholly owned by Haiqi Zhao), Be First Investments Limited (wholly owned by Yue Yin), Yee On Investments Limited (wholly owned by Shisheng Liu), Excellent China (Group) Limited (wholly owned by Chunlong Xu), Dukeland Investments Limited (wholly owned by Xiaolu Sun), Red Focus Inc. (wholly owned by Xuxia Yang), Nice Excel Investments Limited (wholly owned by Zhixue Ding), Sparkle Media Limited (wholly owned by Haijin Li), Yufai Investments Limited (wholly owned by Yong Shi), Best Star Profits Limited (wholly owned by Zefei Wu) and Hong Chen, respectively. Each shareholder of Total Team exercises the investment and voting power over our ordinary shares held by Total Team in proportion to its respective ownership right in Total Team. The address of Total Team is c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(5) The address of our current directors and executive officers is c/o 28F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, China.

(6) See note 1.

(7) See note 2.

(8) Represents 5,042,503, 100,002, 2,432,408 and 1,459,404 ordinary shares, owned by United China Investment Limited, Multimedia Park Venture Capital Ltd., United Capital Investment China Venture II Limited and KTB/UCI China Ventures I Limited, respectively, and 56,250, 496,256, 263,094, 1,237,500 and 78,825 options to purchase our ordinary shares owned by Multimedia Park Venture Capital Ltd., United Capital Investment Group Limited, Media Investment Consulting Limited, Universal Media Consulting Limited and Union Enterprises Group Limited, respectively. These entities are collectively referred to in this prospectus as the UCI Entities. Jimmy Wei Yu, one of our directors, has the sole investment and voting power over the shares owned by the UCI Entities, except with respect to the shares owned by KTB/UCI, for which Jimmy Wei Yu shares the investment and voting power with Wonho Hong. The address of the UCI Entities is TrustNet Chambers, P.O. Box 3444, Road Town,

Table of Contents

Tortola, British Virgin Islands. Jimmy Wei Yu disclaims beneficial ownership of the shares owned by the UCI Entities except to the extent of his pecuniary interest therein.

(9)    GS Focus Holding Limited is a Cayman Islands company whose shareholders are investment funds, or the GS Funds, affiliated with or managed by Goldman, Sachs & Co., a wholly owned subsidiary of The Goldman Sachs Group, Inc. One of the joint bookrunners of this offering, Goldman Sachs (Asia) L.L.C., is also a wholly owned subsidiary of The Goldman Sachs Group, Inc., Goldman, Sachs & Co. and Goldman Sachs (Asia) L.L.C. disclaims beneficial ownership of the shares owned by GS Focus Holding Limited, except to the extent of their pecuniary interest in the GS Funds. The address of GS Focus Holding Limited is c/o Goldman, Sachs & Co., 10th floor, 85 Broad Street, New York, NY 10004, U.S.A.

(10)   See note 8.

(11)   Victory Venture Capital Limited, or Victory Venture, is a British Virgin Islands company. Defu Zhang, a director of Victory Venture, exercises the investment and voting power over the shares owned thereby. The address of Victory Venture is TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands.

(12)   SB China Holdings Pte Ltd., or SB China, is owned by SOFTBANK CORP., a public company listed on the Tokyo Stock Exchange. The address of SB China is 20 Raffles Place, #09–01, Ocean Towers, Singapore 048620.

(13)   Includes 1,494,005, 1,041,704, 625,002, 589,404 and 416,600 ordinary shares owned by Springboard–Harper Technology Fund (Cayman) Ltd., or SHTFC, Hannibal International Ltd., or HIL, International Network Capital Global Fund, or INCGF, Springboard–Harper Technology Fund Pte. Ltd., or SHTFP, and International Network Capital Global Investment Ltd., or INCGI, respectively. These entities are collectively referred to in this prospectus as International Network Capital Global. Decisions regarding the shares owned by International Network Capital Global are made by their respective investment committee of these entities. Each of such committees disclaims its beneficial ownership except to the extent of its respective pecuniary interest therein. The addresses of SHTFC, HIL, INCGF, SHTFP and INCGI are Ugland House, P.O. Box 309, George Town, Grand Cayman, Cayman Islands; 13F, No. 59, Tun–Hua South Road, Section 2, Taipei, Taiwan; 10F–2, 76 Tun–Hua South Road, Section 2, Taipei, Taiwan; 63 Market Street, #09–02, Singapore 048942 and c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Center, Road Town, Tortola, British Virgin Islands, respectively.

(14)   Thomas Kalon Ng, Chao Chin Yuen, Darren Ho Kah Leong, David Su Tuong Sing, Ng Tee Khiang and Tina Ju Lin Chi, are directors of Venture TDF China LLC, general partner of Venture TDF Technology Fund III L.P., or Venture TDF, and they jointly exercise the investment and voting power over the shares owned by Venture TDF. The address of Venture TDF is P.O. Box 309, Ugland House, South Church Street, Grand Cayman, Cayman Islands.

**Founders and Initial Investors**

The following share and par value information is presented as if all share splits discussed below had already occurred.

Table of Contents

Our holding company, Focus Media Holding, was established in April 2003 when we commenced our current business operations. In April 2003, we issued: (i) 140,000,000 ordinary shares, par value US$0.00005 per share, to JJ Media Investment Holding Ltd., a company controlled by Jason Nanchun Jiang, our chairman and chief executive officer, (ii) 5,000,000 ordinary shares to Yibing Zhou, (iii) 45,000,000 ordinary shares to China Alliance Investment Ltd., or China Alliance, and (iv) 10,000,000 ordinary shares to SB China Holdings Pte. Ltd., an affiliate of SOFTBANK Corp. that we refer to as Softbank.

In May 2003, we executed a 100–to–1 share split of our ordinary shares.

Immediately following this, our shareholders' holdings were as follows:

| Shareholder | Ordinary Shares Beneficially Owned | Percentage |
|---|---|---|
| JJ Media/ Jason Nanchun Jiang | 140,000,000 | 70.0% |
| China Alliance | 45,000,000 | 22.5 |
| Softbank | 10,000,000 | 5.0 |
| Yibing Zhou | 5,000,000 | 2.5 |
| Total | 200,000,000 | 100.0% |

### Issuance of Series A Convertible Redeemable Preference Shares and Subsequent Transfers

In February 2004, China Alliance entered into sale and purchase agreements with Softbank, Shanghai Venture Capital (HK) Co., Ltd., or SVC, Multimedia Park Venture Capital Limited, or Multimedia, and United China Investment Limited, or UCI, pursuant to which China Alliance transferred 4,000,000 ordinary shares to Softbank, 10,000,000 ordinary shares to SVC, 5,000,000 ordinary shares to Multimedia and 10,000,000 ordinary shares to UCI.

In March 2004, Jason Nanchun Jiang, through JJ Media, Yibing Zhou and Softbank transferred 6,000,000, 1,400,000 and 2,800,000 shares, respectively, to UCI.

In March 2004, each of China Alliance, Softbank, SVC, Multimedia and UCI, or collectively the Series A shareholders, entered into a shareholders agreement with us pursuant to which each Series A shareholder exchanged its ordinary shares for an equal number of Series A convertible redeemable preference shares. Following these transactions and as of March 2004, our shareholders' holdings were as follows:

| Shareholder | Shares Beneficially Owned | Percentage |
|---|---|---|
| JJ Media/ Jason Nanchun Jiang[1] | 134,000,000 | 67.0% |
| UCI[2] | 20,200,000 | 10.1 |
| China Alliance[2] | 16,000,000 | 8.0 |
| Softbank[2] | 11,200,000 | 5.6 |
| SVC[2] | 10,000,000 | 5.0 |
| Multimedia[1] | 5,000,000 | 2.5 |
| Yibing Zhou[1] | 3,600,000 | 1.8 |
| Total | 200,000,000 | 100.0% |

(1)  Holder of ordinary shares.

(2)  Holder of Series A convertible redeemable preference shares convertible into ordinary shares.

Table of Contents

**Issuance of Series B Convertible Redeemable Preference Shares and Subsequent Transfers**

In April 2004, we entered into a sale and purchase agreement with the Series B investors, which consisted of CDH FM Limited, or CDH, International Network Capital Global, Venture TDF Technology Fund III L.P., or Venture TDF, Milestone Digital Media Holding Ltd., or Milestone, Draper Fisher Jurvetson ePlanet, Elite Select Group Ltd., or Elite Select, Farmac Holdings Ltd., or Farmac, and Powerful Team Energy Investment Limited, or Powerful Team with their transferees, pursuant to which we issued 52,083,400 Series B convertible redeemable preference shares convertible into ordinary shares to the Series B investors at a price of $0.24 per preference share.

In April 2004, China Alliance and SVC transferred a total of 13,202,800 Series A convertible redeemable preference shares to Pacific Advance Capital Limited, or Pacific Advance Capital, and UCI at a price of $0.20 per share. Also in April 2004 Softbank, Multimedia and Pacific Advance. Capital transferred a total of 17,076,000 Series A convertible redeemable preference shares to Draper Fisher Jurvetson ePlanet, CMF Technology Fund, or CMF, and Snow Hill Developments Limited, or Snow Hill, in each case at a price of $0.24 per share.

In September 2004, we issued 14,458,200 ordinary shares to Victory Venture Capital Limited as partial consideration for our acquisition of Perfect Media.

Following these transactions and as of September 2004, our shareholders' holdings were as follows:

| Shareholder | Shares Beneficially Owned | Percentage |
|---|---|---|
| JJ Media/ Jason Nanchun Jiang [1] | 134,000,000 | 50.25% |
| UCI [2] | 25,410,000 | 9.53 |
| CDH [3] | 25,000,000 | 9.37 |
| Draper Fisher Jurvetson ePlanet [2][3] | 14,992,800 | 5.62 |
| Victory Venture [1] | 14,594,200 | 5.47 |
| Softbank [2] | 9,000,000 | 3.37 |
| China Alliance [2] | 8,706,800 | 3.26 |
| International Network Capital Global [3] | 8,333,400 | 3.13 |
| Milestone [3] | 8,333,400 | 3.13 |
| Venture TDF [3] | 4,166,600 | 1.56 |
| CMF [2] | 4,166,600 | 1.56 |
| Yibing Zhou [1] | 3,600,000 | 1.35 |
| Other shareholders of less than 1% [2][3] | 6,373,800 | 2.40 |
| Total | 266,677,600 | 100.00% |

(1)   Holder of ordinary shares.

(2)   Holder of Series A convertible redeemable preference shares convertible into ordinary shares.

(3)   Holder of Series B convertible redeemable preference shares convertible into ordinary shares.

**Issuance of Series C Convertible Redeemable Preference Shares and Subsequent Transfers**

In November 2004, we, UCI, Milestone and China Alliance entered into a sale and purchase agreement with the Series C investors, which consisted of GS Focus Holding Limited, 3i Group, KTB/UCI China Ventures I Limited and Max Wealth Enterprises Limited, pursuant to which we issued a total of 58,377,200 Series C convertible redeemable preference shares to the Series C investors at a price of $0.51 per preference share.

Table of Contents

In December 2004, Jason Nanchun Jiang sold 9,729,600 ordinary shares to Capital International Private Equity Fund IV, L.P. and CGPE IV, L.P. at a price of $0.51 per ordinary share, which shares were simultaneously exchanged for Series C convertible redeemable preference shares. At the same time, Yibing Zhou and Victory Venture sold a total of 8,464,800 ordinary shares to UCI, Smart Create Group Ltd., East Concord Ltd., Meridian Pacific Angel Capital Co., Ltd., Li Lai Holding Ltd., Elufar Ltd. and Tong An Investment Co. Ltd. at a price of $0.51 per share.

In May 2005, we executed a 200–to–1 share split of our ordinary shares and each series of convertible redeemable preference shares.

**Our Initial Public Offering**

In July 2005, we and certain of our shareholders sold an aggregate of 11,615,000 ADSs, representing 116,150,000 ordinary shares in our initial public offering. Since July 13, 2005, our ADSs have been quoted on the Nasdaq National Market Inc. under the symbol "FMCN".

Upon the completion of our initial public offering, pursuant to the terms of our Series A, Series B and Series C convertible redeemable preference shares, all of the outstanding convertible redeemable preference shares were mandatorily converted into our ordinary shares and none of our existing shareholders have voting rights that differ from the voting rights of other shareholders:

**Our Recent Acquisition of Framedia**

In connection with our recent acquisition of Framedia, we issued 22,157,003 new ordinary shares to the seller parties (excluding Framedia) in that transaction on January 3, 2006. Subject to Framedia's attainment of an earnings target in 2006, we may issue an additional number of shares with a value of up to $88.0 million in 2007, at a fixed per ordinary share price of $2.456 per ordinary share.

**Our Follow–On Public Offering**

We and certain selling shareholders of our company completed a public offering and sale of an additional 7,415,389 ADSs, each representing ten of our ordinary shares, par value US$0.00005 per share, on February, 2006, including the sale by the selling shareholders of 627,560 ADSs pursuant to the underwriters' over–allotment option.

**Our Acquisition of Target Media**

In connection with our acquisition of Target Media, we issued 77,000,000 new ordinary shares to the seller parties in that transaction on February 28, 2006. We also granted options to purchase up to 3,000,000 Focus Media ordinary shares to an agreed upon list of current employees of Target Media who entered, or will enter, into new employment agreements with Focus Media on or after the closing date.

As of June 2, 2006, other than an aggregate 55.21% of our outstanding shares held by the Carlyle Entities, GS Focus Holding Limited, Draper Fisher Jurvetson ePlanet, Capital International Private Equity Fund IV, L.P. and CGPE IV, L.P., each of which is a United States corporation or limited partnership, and the ordinary shares underlying the outstanding ADSs which are held in Hong Kong by the custodian, Citibank Hong Kong, on behalf of Citibank, N.A., the depositary, none of our outstanding ordinary shares is held in the United States. Since the completion of our initial public offering in July 2005, all ordinary shares underlying the ADSs quoted on the Nasdaq National Market, Inc., have been held in Hong Kong by the custodian, Citibank Hong Kong, on behalf of Citibank, N.A., the depositary.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

140

**Table of Contents**

**RELATED PARTY TRANSACTIONS**

**Agreements among Us, Focus Media Technology, Focus Media Digital, New Focus Media Advertisement, Focus Media Advertisement and its Subsidiaries**

We have entered into a series of contractual arrangements with Focus Media Advertisement and its shareholders and subsidiaries, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with Focus Media Advertisement and its shareholders and subsidiaries may only be amended with the approval of our audit committee or another independent body of our board of directors.

The following is a summary of the material provisions of these agreements. For more complete information you should read these agreements in their entirety. Directions on how to obtain copies of these agreements are provided in this prospectus under "Where You Can Find Additional Information".

*Transfer of Ownership When Permitted By Law*

Pursuant to the call option agreement, dated as of March 28, 2005, and subsequent participation letters by new subsidiaries of Focus Media Advertisement, by and among Focus Media Technology, Focus Media Advertisement and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu, each of Jason Nanchun Jiang, as a shareholder of Focus Media Advertisement, Jimmy Wei Yu, as a shareholder of Focus Media Advertisement and certain of its subsidiaries, and Focus Media Advertisement, as a shareholder of its subsidiaries, has granted Focus Media Technology or its designee an exclusive option to purchase all or part of their equity interests in Focus Media Advertisement, and its subsidiaries, or all or part of the assets of Focus Media Advertisement, in each case, at any time determined by Focus Media Technology and to the extent permitted by PRC law. Pursuant to a separate letter of undertaking entered into by and among us, Focus Media Technology, Jason Nanchun Jiang and Jimmy Wei Yu, dated as of March 28, 2005, each of Jason Nanchun Jiang and Jimmy Wei Yu agrees to pay to Focus Media Technology or us any excess of the purchase price paid for the equity interests in, or assets of, Focus Media Advertisement or its subsidiaries over the respective registered capital of Focus Media Advertisement or its subsidiaries in the event that Focus Media Technology or its designee exercises such option.

*Voting Arrangement*

Pursuant to the voting rights proxy agreement, dated as of March 28, 2005, and subsequent participation letters by new subsidiaries of Focus Media Advertisement, by and among Focus Media Technology, Focus Media Advertisement and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu, Jason Nanchun Jiang, Jimmy Wei Yu and Focus Media Advertisement have granted a PRC individual designated by Focus Media Technology the right to appoint all of the directors and senior management of Focus Media Advertisement and those subsidiaries that it jointly owns with Jimmy Wei Yu and all of their other voting rights as shareholders of Focus Media Advertisement and its subsidiaries, as the case may be, as provided under the articles of association of each such entity. Under the voting rights proxy agreement, there are no restrictions on the number, to the extent allowed under the respective articles of association of Focus Media Advertisement and its subsidiaries, or identity of those persons we can appoint as directors and officers.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement dated as of March 28, 2005, and subsequent participation letters by new subsidiaries of Focus Media Advertisement, by and among Focus Media Technology, Focus Media Digital, Focus Media Advertisement and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu, each of Jason Nanchun Jiang, Jimmy Wei Yu and Focus Media Advertisement has pledged his or its equity interest in Focus Media Advertisement and its

141

Table of Contents

subsidiaries, as the case may be, to Focus Media Technology and Focus Media Digital to secure their obligations under the relevant contractual control agreements to which each is a party, including but not limited to, the obligations of Focus Media Advertisement and its subsidiaries under the technical services agreement and the trademark licence agreement and the obligation of each of Jason Nanchun Jiang and Jimmy Wei Yu under the respective loan agreement dated March 28, 2005, entered into by Focus Media Technology and Jason Nanchun Jiang and Jimmy Wei Yu, pursuant to which Jason Nanchun Jiang obtained a loan in the amount of RMB35.5 million ($4.4 million) from Focus Media Technology for the sole purpose of increasing the registered capital of Focus Media Advertisement and Jimmy Wei Yu received a series of loans from Focus Media Technology for purposes of increasing the registered capital of Focus Media Advertisement, and acquiring certain of our regional distributors, respectively. See "— Loans to Jason Nanchun Jiang and Jimmy Wei Yu". Under this equity pledge agreement, Jason Nanchun Jiang, Jimmy Wei Yu and Focus Media Advertisement have agreed not to transfer, assign, pledge or otherwise dispose of their interest in Focus Media Advertisement or its subsidiaries, as the case may be, without the prior written consent of Focus Media Technology and Focus Media Digital.

***Equity Trust Agreement***

Pursuant to the equity trust agreement by and among Focus Media Advertisement and Focus Media Technology dated as of March 28, 2005, Focus Media Advertisement holds a 9% equity interest in Focus Media Digital in trust for the benefit of Focus Media Technology. Under the equity trust agreement, Focus Media Technology provides trust funds to Focus Media Advertisement to be used for the purchase of a 9% equity interest in Focus Media Digital and Focus Media Technology agrees to be the beneficiary of any profits or other benefit generated that is attributable to the management, use or disposal of the trust funds. Through these arrangements, we have enabled our indirect subsidiary, Focus Media Technology, to beneficially hold an additional 9% of the interest in Focus Media Digital in addition to the 90% equity interest it holds in its own name.

***Trademark License Agreement***

Pursuant to the trademark license agreement by and among Focus Media Technology, Focus Media Advertisement and its subsidiaries dated as of March 28, 2005, Focus Media Technology has agreed to license the use of its trademarks to be registered in China to Focus Media Advertisement and its subsidiaries in exchange for a monthly licensing fee of RMB10,000 ($1,247) for each affiliated company using such trademarks.

***Cooperation Agreements***

Pursuant to the cooperation agreements by and among New Focus Media Advertisement, Focus Media Advertisement and its subsidiaries, dated as of May 22, 2006, New Focus Media Advertisement entrusted Focus Media Advertisement and its subsidiaries to disseminate advertisements as required by New Focus Media Advertisement in all locations rented by Focus Media Advertisement and its subsidiaries, and to sell advertising time slots for those locations, and each of Focus Media Advertisement and its subsidiaries ensures the allocation of advertising time slots on its respective portion of the advertising network adequate for the dissemination of advertising content as agreed upon between New Focus Media Advertisement and its advertising clients. New Focus Media Advertisement pays a dissemination fee to Focus Media Advertisement and its relevant subsidiaries for dissemination services on a cost–plus basis.

***Asset Transfer Agreement***

Pursuant to the asset transfer agreement entered into by and between Focus Media Digital and New Focus Media Advertisement, dated as of December 31, 2005, Focus Media Digital transferred to New Focus Media Advertisement all of its assets relating to its out–of–home LCD television advertising business at fair market value.

142

**Table of Contents**

***Technology Transfer Agreement***

Pursuant to the technology and assets transfer agreement by and between Focus Media Digital and New Focus Media Advertisement, dated as of May 22, 2006, Focus Media Digital transferred to New Focus Media Advertisement all of its technology at a fixed fee.

***Advertisement Dissemination Agreement***

Pursuant to the advertisement dissemination agreement by and between New Focus Media Advertisement and Focus Media Advertising Agency, dated as of May 22, 2006, New Focus Media Advertisement agrees to disseminate advertisements for Focus Media Advertising Agency pursuant to the agreements by and among Focus Media Advertising Agency and its clients, and Focus Media Advertising Agency agrees to pay a dissemination fee to New Focus Media Advertisement for the dissemination services.

**Agreements Among Focus Media Advertisement, Focus Media Advertising Agency, Framedia Investment, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement**

In connection with our acquisition of Framedia, we entered into a series of contractual arrangements with Focus Media Advertisement's subsidiaries relating to our poster frame network, Framedia Advertisement, New Structure Advertisement, and Guangdong Framedia, each of which is a subsidiary of Focus Media Advertisement, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with Framedia Advertisement, Guangdong Framedia, New Structure Advertisement and their shareholders may only be amended in writing by all of its parties unless the provisions being amended only involve certain parties' interests in which case the amendment shall be made in writing by such parties. Each of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement is 90%–owned by Focus Media Advertisement and 10%–owned by Focus Media Advertising Agency, respectively.

The following is a summary of the material provisions of these agreements. For more complete information you should read these agreements in their entirety. Directions on how to obtain copies of these agreements are provided in this prospectus under "Where You Can Find Additional Information".

***Transfer of Ownership When Permitted By Law***

Pursuant to the call option agreements by and among Framedia Investment, Framedia Advertisement, Guangdong Framedia, New Structure Advertisement, Focus Media Advertisement and Focus Media Advertising Agency dated as of January 13, 2006 and May 22, 2006, each of Focus Media Advertisement and Focus Media Advertising Agency as the shareholders of Framedia Advertisement, New Structure Advertisement and Guangdong Framedia, have granted Framedia Investment or its designee an exclusive option to purchase all or part of their equity interests in Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, in each case, at any time determined by Framedia Investment and to the extent permitted by PRC law.

***Voting Arrangement***

Pursuant to the voting rights proxy agreements by and among Framedia Investment, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, Focus Media Advertisement and Focus Media Advertising Agency, dated as of January 13, 2006 and May 22, 2006, Focus Media Advertisement and Focus Media Advertising Agency have granted a PRC individual designated by Framedia Investment the right to appoint all of the directors and senior management of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement and all of their other voting rights as shareholders of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, as the case may be, as provided under the articles of association of each

**Table of Contents**

such entity. Under the voting rights proxy agreement, there are no restrictions on the number, to the extent allowed under the respective articles of association of Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, or identity of those persons we can appoint as directors and officers.

***Equity Pledge Agreement***

Pursuant to the equity pledge agreements by and among Framedia Investment, Focus Media Advertisement, Focus Media Advertising Agency, Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, dated as of January 13, 2006 and May 22, 2006, each of Focus Media Advertisement and Focus Media Advertising Agency has pledged his or its equity interest in Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, as the case may be, to Framedia Investment to secure their obligations under the relevant contractual control agreements to which each is a party, including the obligations of each of Focus Media Advertisement and Focus Media Advertising Agency under the call option agreement and the voting rights proxy agreement with Framedia Investment. Under this equity pledge agreement, Focus Media Advertisement and Focus Media Advertising Agency have agreed not to transfer, assign, pledge or otherwise dispose of their interest in Framedia Advertisement, Guangdong Framedia and New Structure Advertisement, as the case may be, without the prior written consent of Framedia Investment.

**Agreements Among Focus Media Advertisement, Focus Media Advertising Agency,**

**Focus Media Wireless and Dotad Technology**

In connection with our acquisition of Focus Media Wireless, we entered into a series of contractual arrangements with Focus Media Wireless which is a subsidiary of Focus Media Advertisement, including contracts relating to the provision of services and certain shareholder rights and corporate governance matters. Each of our contractual arrangements with Focus Media Wireless and their shareholders may only be amended in writing by all of its parties unless the provisions being amended only involve certain parties' interests in which case the amendment shall be made in writing by such parties. Focus Media Wireless is 90%−owned by Focus Media Advertisement and 10%−owned by Focus Media Advertising Agency.

The following is a summary of the material provisions of these agreements. For more complete information you should read these agreements in their entirety. Directions on how to obtain copies of these agreements are provided in this prospectus under "Where You Can Find Additional Information".

***Transfer of Ownership When Permitted By Law***

Pursuant to the call option agreement by and among Dotad Technology, Focus Media Wireless, Focus Media Advertisement and Focus Media Advertising Agency dated as of May 22, 2006, each of Focus Media Advertisement and Focus Media Advertising Agency as the shareholders of Focus Media Wireless, have granted Dotad Technology or its designee an exclusive option to purchase all or part of their equity interests in Focus Media Wireless, at any time determined by Dotad Technology and to the extent permitted by PRC law.

***Voting Arrangement***

Pursuant to the voting rights proxy agreement by and among Dotad Technology, Focus Media Wireless, Focus Media Advertisement and Focus Media Advertising Agency, dated as of May 22, 2006, Focus Media Advertisement and Focus Media Advertising Agency have granted a PRC individual designated by Dotad Technology the right to appoint all of the directors and senior management of Focus Media Wireless and all of their other voting rights as shareholders of Focus Media Wireless, as provided under its articles of association. Under the voting rights proxy

144

**Table of Contents**

agreement, there are no restrictions on the number, to the extent allowed under the articles of association of Focus Media Wireless, or identity of those persons we can appoint as directors and officers.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement by and among Dotad Technology, Focus Media Advertisement, Focus Media Advertising Agency and Focus Media Wireless, dated as of May 22, 2006, each of Focus Media Advertisement and Focus Media Advertising Agency has pledged his or its equity interest in Focus Media Wireless to Dotad Technology to secure their obligations under the relevant contractual control agreements to which each is a party, including the obligations of each of Focus Media Advertisement and Focus Media Advertising Agency under the call option agreement and the voting rights proxy agreement with Dotad Technology. Under this equity pledge agreement, Focus Media Advertisement and Focus Media Advertising Agency have agreed not to transfer, assign, pledge or otherwise dispose of their interest in Focus Media Wireless without the prior written consent of Dotad Technology.

**Other Related Party Transactions**

*Shareholders Agreement*

Pursuant to the terms of the shareholders agreement with all of our existing shareholders, such shareholders are entitled to demand registration rights and piggyback registration rights. At any time after six months following the closing of our initial public offering,

- any of our shareholders representing a majority of the ordinary shares converted from the Series A convertible redeemable preference shares;

- any of our shareholders representing a majority of the ordinary shares converted from the Series B convertible redeemable preference shares; or

- any of our shareholders who are former Target Media shareholders representing 25% of the ordinary shares issued to them as a group as consideration in connection with our acquisition of Target Media;

may require us to effect the registration, on a form other than Form F–3, of the registrable securities then held by such shareholder. In addition, at any time after six months following the closing of our initial public offering, any of our shareholders representing 20% of the ordinary shares converted from the Series C convertible redeemable preference shares may require registration for registrable securities with reasonably anticipated aggregate price (net of selling expenses) of at least US$20 million. We are not obligated to take any action to effect any such registration on more than two occasions each on behalf of each group of shareholders described above or more than once in any six month period or within six months of any other public offering we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement.

In addition, holders of any of our registrable securities may require us to effect a registration statement on Form F–3 (or any successor form or any comparable form for a registration in a jurisdiction other than the United States) for a public offering of registrable securities so long as the reasonably anticipated aggregate price to the public (net of selling expenses) would be at least $1,000,000 and we are entitled to use Form F–3 (or a comparable form) for such offering. Holders of registrable securities may demand a registration on Form F–3 on unlimited occasions, although we are not obligated to effect more than once in any six month period if within six months of any other public offering we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement.

145

**Table of Contents**

Registrable securities are ordinary shares not previously sold to the public and issued or issuable to holders of our preference shares, including (i) ordinary shares issued upon conversion of our preference shares, (ii) ordinary shares issued or issuable upon exercise of their options or warrants to purchase ordinary shares, and (iii) ordinary shares issued pursuant to share splits, share dividends and similar distributions to holders of our preference shares. Under certain circumstances, such demand registration may also include ordinary shares other than registrable securities.

Holders of registrable securities also have "piggyback" registration rights, which may require us to register all or any part of the registrable securities then held by such holders when we register any of our ordinary shares.

If any of the offerings involves an underwriting, the managing underwriter of any such offering has certain rights to limit the number of shares included in such registration. However, the number of registrable securities included in an underwritten public offering subsequent to our initial public offering pursuant to "piggyback" registration rights may not be reduced to less than 30% of the aggregate securities included in such offering without the consent of a majority of the holders of registrable securities who have requested their shares to be included in the registration and underwriting.

We are generally required to bear all of the registration expenses incurred in connection with any registration pursuant to the shareholders agreement.

***Loans to Jason Nanchun Jiang and Jimmy Wei Yu***

On June 10, 2003, we, Jason Nanchun Jiang and Jimmy Wei Yu and one of our employees, Yuanzhe Fu, and two of our former employees, Yibing Zhou and Yiqing Hou, executed a loan agreement of indefinite term, under which we agreed to extend to each of Jason Nanchun Jiang, Jimmy Wei Yu, Yuanzhe Fu, Yibing Zhou and Yiqing Hou a loan in the aggregate amount of RMB10.0 million ($1.2 million) for the sole purpose of establishing and operating Focus Media Advertisement. Each of the above individuals also agreed to pledge to us his respective shares in us to secure each of their respective obligations under the loan agreement. In November 2004, Yuanzhe Fu, Yibing Zhou and Yiqing Hou transferred their share in us to Jimmy Wei Yu and as a result, their respective rights and obligations under the loan agreement were assumed by Jimmy Wei Yu. As of March 31, 2006, the full amount of the loan remained outstanding. We granted this loan without interest and it is payable on demand with thirty days' prior notice to Mr. Jiang and Mr. Yu. Pursuant to the loan agreements entered into by Focus Media Technology and Jason Nanchun Jiang and Jimmy Wei Yu, respectively, Jason Nanchun Jiang obtained a loan in the amount of RMB35.5 million ($4.4 million) from Focus Media Technology for the sole purpose of increasing the registered capital of Focus Media Advertisement and Jimmy Wei Yu received a series of loans totaling RMB5,085,000 ($628,394) from Focus Media Technology for purposes of increasing the registered capital of Focus Media Advertisement and acquiring certain of our regional distributors, respectively. As of March 28, 2005, the full amounts of the loans to Messrs. Jiang and Yu remained outstanding. Focus Media Technology granted these loans without interest. The loans have a term of ten years starting from March 28, 2005 and are payable in full at the end of such ten–year term or, with thirty–days' written notice from Focus Media Technology to Messrs. Jiang and Yu, on demand. These loan arrangements have been acknowledged and confirmed by the relevant parties in the loan agreement between Focus Media Technology and Jason Nanchun Jiang and in the loan agreement by and among Focus Media Technology, Focus Media Advertisement and Jimmy Wei Yu, both dated March 28, 2005.

***Loan from Relative of Jason Nanchun Jiang***

In March 2006, Weiqiang Jiang, the father of Jason Nanchun Jiang, provided a short–term loan to us of RMB 20.0 million ($2.5 million) to relieve a temporary shortage of Renminbi we were experiencing at that time. The loan is unsecured and was provided to us at no interest. As of

146

Table of Contents

March 31, 2006, the full amount of the loan remained outstanding. The loan will become due and payable in full on June 30, 2006.

**Transactions with Everease**

    Prior to establishing our business, Jason Nanchun Jiang, our founder, chairman and chief executive officer, served as the chief executive officer of Everease from 1994 to 2003. Everease and our company were considered to be under common control and any transaction we entered into with Everease were treated as related party transactions. Starting in the first quarter of 2005, Everease ceased to be our related party. Our previous related party transactions with Everease are described below.

***Asset and Business Purchase Agreement***

    Pursuant to the asset and business purchase agreement entered into between Everease and Focus Media Advertisement dated July 2003, Focus Media Advertisement purchased equipment and assets from Everease for a consideration of RMB10 million ($1.2 million). The equipment consisted primarily of LCD flat–panel displays and the business and other assets consisted of contracts and other operations in connection with Everease's operation of the flat–panel displays in commercial locations.

***Transfer Agreement***

    Pursuant to the transfer arrangements among Everease, Jason Nanchun Jiang and Focus Media in May 2003, Everease and Jason Nanchun Jiang transferred certain know–how in connection with flat–panel display synchronization technology to us for a fee of $750,000. The know–how consisted primarily of technology and engineering concepts used in the synchronization of our network panels that are placed in close proximity to one another as well as other related expertise and knowledge provided by Mr. Jiang in his services to us.

***Everease Non–Competition Agreement***

    Pursuant to the Everease Non–competition Agreement between Everease and us, dated as of November 2004, Everease, its affiliates, or its directors, officers or employees have agreed not to disclose any confidential information regarding Focus Media to any third–party without our written consent. In addition, for so long as Jason Nanchun Jiang continues to hold any equity interest in our company and for two years thereafter, none of Everease, its affiliates, or its directors, officers or employees may (i) engage in, or lend its name to, any business that competes with our business, (ii) deal in a competitive manner with any of our customers, (iii) solicit any of our directors, officers, employees or agents to become directors, officers, employees or agents of others entities, or (iv) engage in any business conducted under a name that is the same as, or similar to, ours or any trade name used by us where the use of such name is reasonably likely be confused for our name. Everease entered into the non–competition agreement in consideration of its business relationship with us at the time, which relationship was subsequently terminated, and received no cash or other monetary compensation.

***Cooperation and Transfer Agreements***

    Everease and Beijing Suodi Advertising Co., Ltd., or Suodi Advertising, entered into a series of project cooperation agreements in February, April and June 2003 under which Suodi Advertising agreed to develop Everease's flat–panel television advertising network by entering into display placement agreements, to sell advertising time slots on Everease's advertising network and to maintain the flat–panel displays on the network. In August 2003, Everease, Suodi Advertising and Focus Media Advertisement entered into a transfer agreement under which Everease transferred to

**Table of Contents**

Focus Media Advertisement all of its rights and obligations under its original project cooperation agreements with Suodi Advertising.

***Advertising Services Provided to Everease***

    We have provided our advertising services to Everease in the aggregate amounts of $978,058 and $1.2 million in 2003 and 2004, respectively. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis. Starting in the first quarter of 2005, Everease ceased to be our related party.

**Transactions with Entities Affiliated with Jimmy Wei Yu**

    We have provided our advertising services to certain companies for which Jimmy Wei Yu, one of our directors, also serves as a director. The advertising service revenue for these services totalled in the aggregate $120,821, $2.2 million, $5.0 million and $2.7 million in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. As of March 31, 2006, $2.9 million remained outstanding.

    These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

**Transactions with Ctrip.com International**

    We have provided our advertising services to Ctrip.com International, Limited, which is affiliated with Neil Nanpeng Shen, one of our directors, in the aggregate amount of $nil, $43,662, $264,120 and $40,719 in 2003, 2004 and 2005 and for the three months ended March 31, 2006, respectively. Amounts due from Ctrip International in connection with these advertising services totalled $44,895 as of March 31, 2006. These advertising services were provided in the ordinary course of business on terms substantially similar to those provided to our unrelated advertising clients on an arm's–length basis.

148

**Table of Contents**

## DESCRIPTION OF SHARE CAPITAL

As of the date hereof, our authorized share capital is $990,000 divided into 19,800,000,000 shares, par value $0.00005 per share, and the issued share capital is $25,638 divided into 512,766,773 ordinary shares fully paid or credited as fully paid.

We were incorporated as Focus Media Holding Limited in the British Virgin Islands on April 11, 2003 as an international business company. On April 1, 2005, we changed our corporate domicile to the Cayman Islands, becoming an exempted company with limited liability under the Companies Law (2004 Revision) Cap. 22 of the Cayman Islands, or the Companies Law. Our shareholders who are non–residents of the Cayman Islands may freely hold and vote their shares. A Cayman Islands exempted company:

• is a company that conducts its business outside of the Cayman Islands;

• is exempted from certain requirements of the Companies Law, including a filing of an annual return of its shareholders with the Registrar of Companies or the Immigration Board;

• does not have to make its register of shareholders open to inspection; and

• may obtain an undertaking against the imposition of any future taxation.

Our amended and restated memorandum and articles of association authorize the issuance of up to 19,800,000,000 shares, par value $0.00005 per share. The following summarizes the terms and provisions of our share capital upon the completion of this offering, as well as the material applicable laws of the Cayman Islands. This summary is not complete, and you should read the form of our amended and restated memorandum and articles of association, which are filed as exhibits to the registration statement of which this prospectus is a part.

The following discussion primarily concerns ordinary shares and the rights of holders of ordinary shares. The holders of ADSs will not be treated as our shareholders and will be required to surrender their ADSs for cancellation and withdrawal from the depositary facility in which the ordinary shares are held in order to exercise shareholders' rights in respect of the ordinary shares. The depositary will agree, so far as it is practical, to vote or cause to be voted the amount of ordinary shares represented by ADSs in accordance with the non–discretionary written instructions of the holders of such ADSs.

**Meetings**

Subject to our regulatory requirements, an annual general meeting and any extraordinary general meeting shall be called by not less than 10 days' notice in writing. Notice of every general meeting will be given to all of our shareholders other than those that, under the provisions of our amended and restated articles of association or the terms of issue of the ordinary shares they hold, are not entitled to receive such notices from us, and also to our principal external auditors. Extraordinary general meetings may be called only by the chairman of our board of directors or a majority of our board of directors, and may not be called by any other person. All business shall be deemed extraordinary that is transacted at an extraordinary general meeting, and also all business that is transacted at an annual general meeting other than with respect to (1) declarations of dividends, (2) the adoption of our financial statements and reports of directors and auditors thereon, (3) the granting of any mandate or authority to our directors, to grant options not in excess of 20% of the nominal value of our existing issued share capital, (4) our ability to repurchase our securities, (5) the election of directors, (6) the appointment of auditors (where special notice of the intention to make such appointment is not required by the Companies Law) and other officers, and (7) the fixing of the remuneration of the auditors and the voting of remuneration or extra remuneration to the directors.

Notwithstanding that a meeting is called by shorter notice than that mentioned above, but, subject to applicable regulatory requirements, it will be deemed to have been duly called, if it is so

149

Table of Contents

agreed (1) in the case of a meeting called as an annual general meeting by all of our shareholders entitled to attend and vote at the meeting; or (2) in the case of any other meeting, by a majority in number of our shareholders having a right to attend and vote at the meeting, being a majority together holding not less than 75% in nominal value of the ordinary shares giving that right.

At any general meeting, two shareholders entitled to vote and present in person or by proxy that represent not less than one–third of our issued and outstanding voting shares will constitute a quorum. No business other than the appointment of a chairman may be transacted at any general meeting unless a quorum is present at the commencement of business. However, the absence of a quorum will not preclude the appointment of a chairman. If present, the chairman of our board of directors shall be the chairman presiding at any shareholders meetings.

A corporation being a shareholder shall be deemed for the purpose of our amended and restated articles of association to be present in person if represented by its duly authorized representative being the person appointed by resolution of the directors or other governing body of such corporation to act as its representative at the relevant general meeting or at any relevant general meeting of any class of our shareholders. Such duly authorized representative shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were our individual shareholder.

The quorum for a separate general meeting of the holders of a separate class of shares is described in "— Modification of Rights" below.

**Voting Rights Attaching to the Shares**

Subject to any special rights or restrictions as to voting for the time being attached to any shares, at any general meeting on a show of hands every shareholder who is present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly authorized representative) shall have one vote, and on a poll every shareholder present in person or by proxy (or, in the case of a shareholder being a corporation, by its duly appointed representative) shall have one vote for each fully paid share which such shareholder is the holder.

No shareholder shall be entitled to vote or be reckoned in a quorum, in respect of any share, unless such shareholder is registered as our shareholder at the applicable record date for that meeting and all calls or installments due by such shareholder to us have been paid.

If a clearing house (or its nominee(s)) is our shareholder, it may authorize such person or persons as it thinks fit to act as its representative(s) at any meeting or at any meeting of any class of shareholders, provided that, if more than one person is so authorized, the authorization shall specify the number and class of shares in respect of which each such person is so authorized. A person authorized pursuant to this provision is entitled to exercise the same powers on behalf of the recognized clearing house (or its nominee(s)) as if such person was the registered holder of our shares held by that clearing house (or its nominee(s)) including the right to vote individually on a show of hands.

While there is nothing under the laws of the Cayman Islands which specifically prohibits or restricts the creation of cumulative voting rights for the election of our directors, unlike the requirement under Delaware law that cumulative voting for the election of directors is permitted only if expressly authorized in the certificate of incorporation, it is not a concept that is accepted as a common practice in the Cayman Islands, and we have made no provisions in our amended and restated memorandum and articles of association to allow cumulative voting for such elections.

**Protection of Minority Shareholders**

The Grand Court of the Cayman Islands may, on the application of shareholders holding not less than one fifth of our shares in issue, appoint an inspector to examine our affairs and report thereon in a manner as the Grand Court shall direct.

150

**Table of Contents**

Any shareholder may petition the Grand Court of the Cayman Islands which may make a winding up order, if the court is of the opinion that it is just and equitable that we should be wound up.

Claims against us by our shareholders must, as a general rule, be based on the general laws of contract or tort applicable in the Cayman Islands or their individual rights as shareholders as established by our amended and restated memorandum and articles of association.

The Cayman Islands courts ordinarily would be expected to follow English case law precedents which permit a minority shareholder to commence a representative action against, or derivative actions in our name to challenge (1) an act which is ultra vires or illegal, (2) an act which constitutes a fraud against the minority and the wrongdoers are themselves in control of us, and (3) an irregularity in the passing of a resolution which requires a qualified (or special) majority.

**Pre–emption Rights**

There are no pre–emption rights applicable to the issue of new shares under either Cayman Islands law or our amended and restated memorandum and articles of association.

**Liquidation Rights**

Subject to any special rights, privileges or restrictions as to the distribution of available surplus assets on liquidation for the time being attached to any class or classes of shares (1) if we are wound up and the assets available for distribution among our shareholders are more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the excess shall be distributed pari passu among those shareholders in proportion to the amount paid up at the commencement of the winding up on the shares held by them, respectively, and (2) if we are wound up and the assets available for distribution among the shareholders as such are insufficient to repay the whole of the paid–up capital, those assets shall be distributed so that, as nearly as may be, the losses shall be borne by the shareholders in proportion to the capital paid up at the commencement of the winding up on the shares held by them, respectively.

If we are wound up, the liquidator may with the sanction of our special resolution and any other sanction required by the Companies Law, divide among our shareholders in specie or kind the whole or any part of our assets (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as the liquidator deems fair upon any property to be divided and may determine how such division shall be carried out as between the shareholders or different classes of shareholders. The liquidator may also vest any part of these assets in trustees upon such trusts for the benefit of the shareholders as the liquidator shall think fit, but so that no shareholder will be compelled to accept any assets, shares or other securities upon which there is a liability.

**Modification of Rights**

Except with respect to share capital (as described below) alterations to our amended and restated memorandum and articles of association may only be made by special resolution of no less than two–thirds of votes cast at a meeting of the shareholders.

Subject to the Companies Law of the Cayman Islands, all or any of the special rights attached to shares of any class (unless otherwise provided for by the terms of issue of the shares of that class) may be varied, modified or abrogated with the sanction of a special resolution passed at a separate general meeting of the holders of the shares of that class. The provisions of our articles of association relating to general meetings shall apply similarly to every such separate general meeting, but so that the quorum for the purposes of any such separate general meeting or at its adjourned meeting shall be a person or persons together holding (or represented by proxy) not less than one–third in nominal value of the issued shares of that class, every holder of shares of the class shall be

151

Table of Contents

entitled on a poll to one vote for every such share held by such holder and that any holder of shares of that class present in person or by proxy may demand a poll.

The special rights conferred upon the holders of any class of shares shall not, unless otherwise expressly provided in the rights attaching to or the terms of issue of such shares, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

**Alteration of Capital**

We may from time to time by ordinary resolution:

• increase our capital by such sum, to be divided into shares of such amounts, as the resolution shall prescribe;

• consolidate and divide all or any of our share capital into shares of larger amount than our existing shares;

• cancel any shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person, and diminish the amount of our share capital by the amount of the shares so cancelled subject to the provisions of the Companies Law;

• sub–divide our shares or any of them into shares of smaller amount than is fixed by our amended and restated memorandum and articles of association, subject nevertheless to the Companies Law, and so that the resolution whereby any share is sub–divided may determine that, as between the holders of the share resulting from such subdivision, one or more of the shares may have any such preference or other special rights, over, or may have such deferred rights or be subject to any such restrictions as compared with the others as we have power to attach to unissued or new shares; and

• divide shares into several classes and without prejudice to any special rights previously conferred on the holders of existing shares, attach to the shares respectively as preferential, deferred, qualified or special rights, privileges, conditions or such restrictions which in the absence of any such determination in general meeting may be determined by our directors.

We may, by special resolution, subject to any confirmation or consent required by the Companies Law, reduce our share capital or any capital redemption reserve in any manner authorized by law.

**Transfer of Shares**

Subject to any applicable restrictions set forth in our amended and restated memorandum and articles of association, any of our shareholders may transfer all or any of his or her shares by an instrument of transfer in the usual or common form or in a form prescribed by the Nasdaq National Market or in any other form which our directors may approve.

Our directors may decline to register any transfer of any share which is not paid up or on which we have a lien. Our directors may also decline to register any transfer of any share unless:

• the instrument of transfer is lodged with us accompanied by the certificate for the shares to which it relates and such other evidence as our directors may reasonably require to show the right of the transferor to make the transfer;

• the instrument of transfer is in respect of only one class of share;

• the instrument of transfer is properly stamped (in circumstances where stamping is required);

• in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four; and

152

**Table of Contents**

- a fee of such maximum sum as the Nasdaq National Market may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer, they shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, on notice being given by advertisement in such one or more newspapers or by any other means in accordance with the requirements of the Nasdaq National Market, be suspended and the register closed at such times and for such periods as our directors may from time to time determine; provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year as our directors may determine.

**Share Repurchase**

We are empowered by the Companies Law and our amended and restated memorandum and articles of association to purchase our own shares, subject to certain restrictions. Our directors may only exercise this power on our behalf, subject to the Companies Law, our amended and restated memorandum and articles of association and to any applicable requirements imposed from time to time by the U.S. Securities and Exchange Commission, the Nasdaq National Market, or by any recognized stock exchange on which our securities are listed.

**Dividends**

Subject to the Companies Law, we may declare dividends in any currency to be paid to our shareholders but no dividend shall be declared in excess of the amount recommended by our directors. Dividends may be declared and paid out of our profits, realized or unrealized, or from any reserve set aside from profits which our directors determine is no longer needed. Our board of directors may also declare and pay dividends out of the share premium account or any other fund or account which can be authorized for this purpose in accordance with the Companies Law.

Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provides (1) all dividends shall be declared and paid according to the amounts paid up on the shares in respect of which the dividend is paid, but no amount paid up on a share in advance of calls shall be treated for this purpose as paid up on that share and (2) all dividends shall be apportioned and paid pro rata according to the amounts paid upon the shares during any portion or portions of the period in respect of which the dividend is paid.

Our directors may also pay any dividend that is payable on any shares semi–annually or on any other dates, whenever our financial position, in the opinion of our directors, justifies such payment.

Our directors may deduct from any dividend or other moneys payable to any shareholder all sums of money (if any) presently payable by such shareholder to us on account of calls, installments or otherwise.

No dividend or other money payable by us on or in respect of any share shall bear interest against us.

In respect of any dividend proposed to be paid or declared on our share capital, our directors may resolve and direct that (1) such dividend be satisfied wholly or in part in the form of an allotment of shares credited as fully paid up, provided that our shareholders entitled thereto will be entitled to elect to receive such dividend (or part thereof if our directors so determine) in cash in lieu of such allotment or (2) the shareholders entitled to such dividend will be entitled to elect to receive an allotment of shares credited as fully paid up in lieu of the whole or such part of the dividend as our directors may think fit. We may also, on the recommendation of our directors, resolve in respect

153

**Table of Contents**

of any particular dividend that, notwithstanding the foregoing, it may be satisfied wholly in the form of an allotment of shares credited as fully paid up without offering any right of shareholders to elect to receive such dividend in cash in lieu of such allotment.

Any dividend, interest or other sum payable in cash to the holder of shares may be paid by check or warrant sent by mail addressed to the holder at his registered address, or addressed to such person and at such addresses as the holder may direct. Every check or warrant shall, unless the holder or joint holders otherwise direct, be made payable to the order of the holder or, in the case of joint holders, to the order of the holder whose name stands first on the register in respect of such shares, and shall be sent at his or their risk and payment of the check or warrant by the bank on which it is drawn shall constitute a good discharge to us.

All dividends unclaimed for one year after having been declared may be invested or otherwise made use of by our board of directors for the benefit of our company until claimed. Any dividend unclaimed after a period of six years from the date of declaration of such dividend may be forfeited and, if so forfeited, shall revert to us.

Whenever our directors or our shareholders in general meeting have resolved that a dividend be paid or declared, our directors may further resolve that such dividend be satisfied wholly or in part by the distribution of specific assets of any kind, and in particular of paid up shares, debentures or warrants to subscribe for our securities or securities of any other company. Where any difficulty arises with regard to such distribution, our directors may settle it as they think expedient. In particular, our directors may issue fractional certificates, ignore fractions altogether or round the same up or down, fix the value for distribution purposes of any such specific assets, determine that cash payments shall be made to any of our shareholders upon the footing of the value so fixed in order to adjust the rights of the parties, vest any such specific assets in trustees as may seem expedient to our directors, and appoint any person to sign any requisite instruments of transfer and other documents on behalf of a person entitled to the dividend, which appointment shall be effective and binding on our shareholders.

**Untraceable Shareholders**

We are entitled to sell any shares of a shareholder who is untraceable, provided that:

1. all checks or warrants in respect of dividends of such shares, not being less than three in number, for any sums payable in cash to the holder of such shares have remained uncashed for a period of twelve years prior to the publication of the advertisement and during the three months referred to in paragraph (3) below;

2. we have not during that time received any indication of the whereabouts or existence of the shareholder or person entitled to such shares by death, bankruptcy or operation of law; and

3. we have caused an advertisement to be published in newspapers in the manner stipulated by our amended and restated memorandum and articles of association, giving notice of our intention to sell these shares, and a period of three months has elapsed since such advertisement and the Nasdaq National Market has been notified of such intention.

The net proceeds of any such sale shall belong to us, and when we receive these net proceeds we shall become indebted to the former shareholder for an amount equal to such net proceeds.

**Differences in Corporate Law**

The Companies Law is modeled after similar laws in the United Kingdom but does not follow recent changes in United Kingdom laws. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant

Table of Contents

differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the United States.

**Mergers and Similar Arrangements.** Cayman Islands law does not provide for mergers as that expression is understood under United States corporate law. However, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement in question is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three–fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder would have the right to express to the court the view that the transaction should not be approved, the court can be expected to approve the arrangement if it satisfies itself that:

- the company is not proposing to act illegally or ultra vires and the statutory provisions as to majority vote have been complied with;

- the shareholders have been fairly represented at the meeting in question;

- the arrangement is such as a businessman would reasonably approve; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law or that would amount to a "fraud on the minority".

When a takeover offer is made and accepted by holders of 90.0% of the shares within four months, the offerer may, within a two–month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection may be made to the Grand Court of the Cayman Islands but is unlikely to succeed unless there is evidence of fraud, bad faith or collusion.

If the arrangement and reconstruction are thus approved, any dissenting shareholders would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of United States corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

**Shareholders' Suits.** We are not aware of any reported class action or derivative action having been brought in a Cayman Islands court. In principle, we will normally be the proper plaintiff and a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of its authority, could be effected duly if authorized by more than a simple majority vote which has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority".

*Corporate Governance.* Cayman Islands laws do not restrict transactions with directors, requiring only that directors exercise a duty of care and owe a fiduciary duty to the companies for which they serve. Under our amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of The Nasdaq Stock Market, Inc. or unless disqualified by the chairman of the relevant board meeting, so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested and may be counted in the quorum at such meeting.

Table of Contents

**Board of Directors**

We are managed by our board of directors. Our amended and restated memorandum and articles of association provide that the number of our directors will be fixed from time to time exclusively pursuant to an ordinary resolution adopted by our members, but must consist of not less than three directors. Initially we have set our board of directors to have not less than three directors and not more than seven directors. Any director on our board may be removed by way of an ordinary resolution of shareholders. Any vacancies on our board of directors or additions to the existing board of directors can be filled by way of an ordinary resolution of shareholders or by the affirmative vote of a simple majority of the remaining directors, although this may be less than a quorum where the number of remaining directors falls below the minimum number fixed by our board of directors. Any director so appointed by the board of directors shall hold office only until the next following annual general meeting of the Company and shall then be eligible for re–election. Our directors shall serve a 3 year term from their appointment date and shall retire from office (unless he vacates his office sooner) at the expiry of such term provided their successors are elected or appointed. Such directors who retire at the expiry of their term are eligible for re–election. Our directors are not required to hold any of our shares to be qualified to serve on our board of directors.

Meetings of our board of directors may be convened at any time deemed necessary by our secretary on request of a director or by any director.

A meeting of our board of directors shall be competent to make lawful and binding decisions if at least three of the members of our board of directors are present or represented unless the board has fixed any other number. At any meeting of our directors, each director is entitled to one vote.

Questions arising at a meeting of our board of directors are required to be decided by simple majority votes of the members of our board of directors present or represented at the meeting. In the case of a tie vote, the chairman of the meeting shall have a second or deciding vote. Our board of directors may also pass resolutions without a meeting by unanimous written consent.

Certain actions require the approval of a supermajority of at least two–thirds of our board of directors, including:

- the appointment or removal of our chief executive officer, chief financial officer and other executive officers of the Company;

- any anti–takeover action in response to a takeover attempt;

- the establishment of any joint venture requiring a capital contribution from us in excess of $1,000,000;

- our acquisition of any company for aggregate consideration in excess of the equivalent of $10,000,000;

- any material change to our business scope;

- any merger resulting in our shareholders immediately prior to such merger holding less than a majority of the voting power of the outstanding share capital of the surviving business entity;

- the sale or transfer of all or substantially all of our assets;

- any change in our dividend policy or the declaration or payment of a dividend or other distribution by us other than a distribution or dividend to us, our subsidiaries or our consolidated affiliated entities; or

- the settlement by us of any litigation in excess of $250,000.

156

**Table of Contents**

**Committees of Board Of Directors**

Pursuant to our amended and restated articles of association, our board of directors has established an audit committee, a compensation committee and a nominations committee.

**Issuance of Additional Ordinary Shares or Preference Shares**

Our amended and restated memorandum of association authorizes our board of directors to issue additional ordinary shares from time to time as our board of directors shall determine, to the extent of available authorized but unissued shares.

Our amended and restated memorandum of association authorizes our board of directors to establish from time to time one or more series of preference shares and to determine, with respect to any series of preference shares, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the dividend rights, dividend rates, conversion rights, voting rights; and

- the rights and terms of redemption and liquidation preferences.

Our board of directors may issue series of preference shares without action by our shareholders to the extent authorized but unissued. Accordingly, the issuance of preference shares may adversely affect the rights of the holders of the ordinary shares. In addition, the issuance of preference shares may be used as an anti–takeover device without further action on the part of the shareholders. Issuance of preference shares may dilute the voting power of holders of ordinary shares.

Subject to applicable regulatory requirements, our board of directors may issue additional ordinary shares without action by our shareholders to the extent of available authorized but unissued shares. The issuance of additional ordinary shares may be used as an anti–takeover device without further action on the part of the shareholders. Such issuance may dilute the voting power of existing holders of ordinary shares.

**Registration Rights**

Pursuant to the terms of the shareholders agreement with all of our existing shareholders, and, upon the closing of our acquisition of Target Media, with the current shareholders of Target Media, such shareholders are entitled to demand registration rights and piggyback registration rights. At any time after six months following the closing of our initial public offering,

- any of our shareholders representing a majority of the ordinary shares converted from the Series A convertible redeemable preference shares;

- any of our shareholders representing a majority of the ordinary shares converted from the Series B convertible redeemable preference shares;

- any of our shareholders representing 20% of the ordinary shares converted from the Series C convertible redeemable preference shares; or

- any of the former Target Media shareholders representing 25% of the ordinary shares issued to them as a group as consideration in connection with our acquisition of Target Media;

may require us to effect the registration, on a form other than Form F–3, of at least 25% of the registrable securities then outstanding. We are not obligated to take any action to effect any such registration on more than two occasions each on behalf of each group of shareholders described above or more than once in any six month period or within six months of any other public offering

Table of Contents

we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement.

In addition, holders of any of our registrable securities may require us to effect a registration statement on Form F–3 (or any successor form or any comparable form for a registration in a jurisdiction other than the United States) for a public offering of registrable securities so long as the reasonably anticipated aggregate price to the public (net of selling expenses) would be at least $1,000,000 and we are entitled to use Form F–3 (or a comparable form) for such offering. Holders of registrable securities may demand a registration on Form F–3 on unlimited occasions, although we are not obligated to effect more than once in any six month period if within six months of any other public offering we conduct in which they had the opportunity to participate without the exclusion of any shares eligible for registration under the shareholders agreement. securities may demand a registration on Form F–3 on unlimited occasions, although we are not obligated to effect more than one such registration in any six month period.

Registrable securities are ordinary shares issued or issuable to the holders of our preference shares, including: (1) ordinary shares issued upon conversion of any of our preference shares, (2) ordinary shares issued or issuable upon exercise of any options to purchase ordinary shares or series A convertible redeemable preference shares, and (3) ordinary shares issued pursuant to share splits, share dividends and similar distributions to the holders of our preference shares. Upon completion of this offering, GS Focus Holding Limited, the holder of 27,643,880 ordinary shares, or approximately 6.33% of our then–outstanding shares (assuming the underwriters do not exercise their option to purchase additional ADSs), together with its transferees (if any) will be entitled to request that we register their ordinary shares under the Securities Act, following the expiration of the lockup agreements described below, under "Shares Eligible for Future Sale", to the extent that such requesting shareholders hold at least 50% of the registrable securities held by GS Focus Holding Limited and its transferees. Under certain circumstances, such demand registration may also include ordinary shares other than registrable securities.

We are not, however, obligated to effect any such demand registration:

- in any particular jurisdiction in which we would be required to execute a general consent to service of process in effecting such registration, qualification or compliance, unless we are already subject to service in that jurisdiction and except as may be required by the Securities Actor other applicable law in a jurisdiction other than the United States in which the registration is being effected;

- if we, within ten days of receipt of a request for such registration, give notice of our bona fide intention to effect the filing of a registration statement with the SEC (or any comparable regulatory agency for a registration in a jurisdiction other than the United States) within 60 days of receipt of such request (other than a registration of securities in a business combination transaction pursuant to Rule 145 under the Securities Act or an offering solely to employees);

- within six months immediately following the effective date of any registration statement pertaining to our securities (other than a registration of securities in a transaction pursuant to Rule 145 under the Securities Act or with respect to an employee benefit plan); or

- if we furnish to the holders of registrable securities a certificate signed by our chief executive officer stating that in the good faith judgment of our board of directors, it would be seriously detrimental to us or our shareholders for a registration statement to be filed in the near future, in which event we have the right to defer the filing of the registration statement, no more than once during any 12 month period, for a period not to exceed 60 days from the receipt of the request to file such registration statement so long as we do not file a registration statement with respect to the public offering of our securities during such 60 day period.

158

Table of Contents

Holders of registrable securities also have "piggyback" registration rights, which may require us to register all or any part of the registrable securities then held by such holders when we register any of our ordinary shares other than a registration:

- relating solely to the sale of securities to participants in our share option plan;

- relating to a corporate reorganization or other transaction pursuant to Rule 145 under the Securities Act;

- on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the registrable securities; and

- in which the only ordinary shares being registered are ordinary shares issuable upon conversion of debt securities that are also being registered.

If any of the offerings involves an underwriting, the managing underwriter of any such offering has certain rights to limit the number of shares included in such registration. However, the number of registrable securities included in an underwritten public offering subsequent to our initial public offering pursuant to "piggyback" registration rights may not be reduced to less than 25% of the aggregate securities included in such offering.

We are generally required to bear all of the registration expenses incurred in connection with one demand registration on a form other than Form F–3, unlimited Form F–3 and piggyback registrations, except underwriting discounts and selling commissions, as well as the registration expenses incurred in connection with any registration of ordinary shares owned by holders of our ordinary shares that were issued upon conversion of our Series A, Series B or Series C convertible redeemable preference shares.

We are not obligated to register any registrable securities if:

- we obtain from the SEC (or a comparable regulatory agency in a jurisdiction other than the United States) a "no–action" letter in which the SEC (or such comparable regulatory agency) has indicated that it will take no action under the Securities Act (or comparable law) if any holder of registrable securities disposes of such securities and that the securities may be sold to the public without registration in accordance with any established procedure or "safe harbor" without unreasonable legal risk or uncertainty; or

- in the opinion of counsel retained by us concurred in by counsel for the holder of registrable securities, no registration under the Securities Act (or comparable law) is required in connection with the sale of the registrable securities to the public.

**Inspection of Books and Records**

Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements. See "Where You Can Find Additional Information".

159

**Table of Contents**

## DESCRIPTION OF AMERICAN DEPOSITARY SHARES

**American Depositary Shares**

Citibank, N.A. is the depositary bank for the American Depositary Shares. Citibank's depositary offices are located at 388 Greenwich Street, New York, New York 10013. American Depositary Shares are frequently referred to as "ADSs" and represent ownership interests in securities that are on deposit with the depositary bank. ADSs may be represented by certificates that are commonly known as "American Depositary Receipts" or "ADRs". The depositary bank typically appoints a custodian to safekeep the securities on deposit. In this case, the custodian is Citibank Hong Kong, located at 10/F, Harbour Front (II), 22,Tak Funh Street, Hunh Hom, Kowloon, Hong Kong.

We appointed Citibank as depositary bank pursuant to a deposit agreement dated as of July 18, 2005. A copy of the deposit agreement is on file with the SEC under cover of a Registration Statement on Form F–6 (File No. 333–126011). You may obtain a copy of the deposit agreement from the SEC's Public Reference Room at Headquarters Office, 100 F Street, N.E., Room 1580, Washington, D.C. 20549 and from the SEC's website (http://www.sec.gov). Please refer to Registration Number 333–126011 when retrieving such copy.

We are providing you with a summary description of the material terms of the ADSs and of your material rights as an owner of ADSs. Please remember that summaries by their nature lack the precision of the information summarized and that a holder's rights and obligations as an owner of ADSs will be determined by reference to the terms of the deposit agreement and not by this summary. We urge you to review the deposit agreement in its entirety.

Each ADS represents the right to receive ten ordinary shares on deposit with the custodian. An ADS will also represent the right to receive any other property received by the depositary bank or the custodian on behalf of the owner of the ADS but that has not been distributed to the owners of ADSs because of legal restrictions or practical considerations.

If you become an owner of ADSs, you will become a party to the deposit agreement and therefore will be bound to its terms and to the terms of the ADR that represents your ADSs. The deposit agreement and the ADR specify our rights and obligations as well as your rights and obligations as owner of ADSs and those of the depositary bank. As an ADS holder you appoint the depositary bank to act on your behalf in certain circumstances. The deposit agreement and the ADRs are governed by New York law. However, our obligations to the holders of ordinary shares will continue to be governed by the laws of the Cayman Islands which may be different from the laws in the United States.

As an owner of ADSs, you may hold your ADSs either by means of an ADR registered in your name, through a brokerage or safekeeping account, or through an account established by the depositary bank in your name reflecting the registration of uncertificated ADSs directly on the books of the depositary bank (commonly referred to as the "direct registration system" or "DRS"). The direct registration system reflects the uncertificated (book–entry) registration of ownership of ADSs by the depositary bank. Under the direct registration system, ownership of ADSs is evidenced by periodic statements issued by the depositary bank to the holders of the ADSs. The direct registration system includes automated transfers between the depositary bank and The Depository Trust Company ("DTC"), the central book–entry clearing and settlement system for equity securities in the United States. If you decide to hold your ADSs through your brokerage or safekeeping account, you must rely on the procedures of your broker or bank to assert your rights as ADS owner. Banks and brokers typically hold securities such as the ADSs through clearing and settlement systems such as DTC. The procedures of such clearing and settlement systems may limit your ability to exercise your rights as an owner of ADSs. Please consult with your broker or bank if you have any questions concerning these limitations and procedures. This summary description assumes you have opted to own the ADSs directly by means of an ADS registered in your name and, as such, we will refer to

160

Table of Contents

you as the "holder". When we refer to "you," we assume the reader owns ADSs and will own ADSs at the relevant time.

**Dividends and Distributions**

As a holder, you generally have the right to receive the distributions we make on the securities deposited with the custodian bank. Your receipt of these distributions may be limited, however, by practical considerations and legal limitations. Holders will receive such distributions under the terms of the deposit agreement in proportion to the number of ADSs held as of a specified record date.

**Distributions of Cash**

Whenever we make a cash distribution for the securities on deposit with the custodian, we will deposit the funds with the custodian. Upon receipt of confirmation of the deposit of the requisite funds, the depositary bank will arrange for the funds to be converted into U.S. dollars and for the distribution of the U.S. dollars to the holders, subject to the laws of the Cayman Islands and regulations.

The conversion into U.S. dollars will take place only if practicable and if the U.S. dollars are transferable to the United States. The amounts distributed to holders will be net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. The depositary will apply the same method for distributing the proceeds of the sale of any property (such as undistributed rights) held by the custodian in respect of securities on deposit.

The distribution of cash will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement.

**Distributions of Shares**

Whenever we make a free distribution of ordinary shares for the securities on deposit with the custodian, we will deposit the applicable number of shares with the custodian. Upon receipt of confirmation of such deposit, the depositary bank will *either* distribute to holders new ADSs representing the ordinary shares deposited *or* modify the ADS–to–ordinary shares ratio, in which case each ADS you hold will represent rights and interests in the additional shares so deposited. Only whole new ADSs will be distributed. Fractional entitlements will be sold and the proceeds of such sale will be distributed as in the case of a cash distribution.

The distribution of new ADSs or the modification of the ADS–shares ratio upon a distribution of shares will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes or governmental charges, the depositary bank may sell all or a portion of the new shares so distributed.

No such distribution of new ADSs will be made if it would violate a law (i.e., the U.S. securities laws) or if it is not operationally practicable. If the depositary bank does not distribute new ADSs as described above, it may sell the ordinary shares received upon the terms described in the deposit agreement and will distribute the proceeds of the sale as in the case of a distribution of cash.

**Distributions of Rights**

Whenever we intend to distribute rights to purchase additional ordinary shares, we will give prior notice to the depositary bank and we will assist the depositary bank in determining whether it is lawful and reasonably practicable to distribute rights to purchase additional ADSs to holders.

The depositary bank will establish procedures to distribute rights to purchase additional ADSs to holders and to enable such holders to exercise such rights if it is lawful and reasonably practicable to make the rights available to holders of ADSs, and if we provide all of the documentation contemplated in the deposit agreement (such as opinions to address the lawfulness

161

**Table of Contents**

of the transaction). You may have to pay fees, expenses, taxes and other governmental charges to subscribe for the new ADSs upon the exercise of your rights. The depositary bank is not obligated to establish procedures to facilitate the distribution and exercise by holders of rights to purchase new ordinary shares other than in the form of ADSs.

The depositary bank will *not* distribute the rights to you if:

- • We do not timely request that the rights be distributed to you or we request that the rights not be distributed to you; or

- • We fail to deliver satisfactory documents to the depositary bank; or

- • It is not reasonably practicable to distribute the rights.

The depositary bank will sell the rights that are not exercised or not distributed if such sale is lawful and reasonably practicable. The proceeds of such sale will be distributed to holders as in the case of a cash distribution. If the depositary bank is unable to sell the rights, it will allow the rights to lapse.

**Elective Distributions**

Whenever we intend to distribute a dividend payable at the election of shareholders either in cash or in additional shares, we will give prior notice thereof to the depositary bank and will indicate whether we wish the elective distribution to be made available to you. In such case, we will assist the depositary bank in determining whether such distribution is lawful and reasonably practicable.

The depositary bank will make the election available to you only if it is reasonably practical and if we have provided all of the documentation contemplated in the deposit agreement. In such case, the depositary bank will establish procedures to enable you to elect to receive either cash or additional ADSs, in each case as described in the deposit agreement.

If the election is not made available to you, you will receive either cash or additional ADSs, depending on what a shareholder in the Cayman Islands would receive upon failing to make an election, as more fully described in the deposit agreement.

**Other Distributions**

Whenever we intend to distribute property other than cash, ordinary shares or rights to purchase additional ordinary shares, we will notify the depositary bank in advance and will indicate whether we wish such distribution to be made to you. If so, we will assist the depositary bank in determining whether such distribution to holders is lawful and reasonably practicable.

If it is reasonably practicable to distribute such property to you and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will distribute the property to the holders in a manner it deems practicable.

The distribution will be made net of fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes and governmental charges, the depositary bank may sell all or a portion of the property received.

The depositary bank will *not* distribute the property to you and will sell the property if:

- • We do not request that the property be distributed to you or if we ask that the property not be distributed to you; or

- • We do not deliver satisfactory documents to the depositary bank; or

- • The depositary bank determines that all or a portion of the distribution to you is not reasonably practicable.

The proceeds of such a sale will be distributed to holders as in the case of a cash distribution.

162

**Table of Contents**

**Redemption**

Whenever we decide to redeem any of the securities on deposit with the custodian, we will notify the depositary bank. If it is reasonably practicable and if we provide all of the documentation contemplated in the deposit agreement, the depositary bank will mail notice of the redemption to the holders.

The custodian will be instructed to surrender the shares being redeemed against payment of the applicable redemption price. The depositary bank will convert the redemption funds received into U.S. dollars upon the terms of the deposit agreement and will establish procedures to enable holders to receive the net proceeds from the redemption upon surrender of their ADSs to the depositary bank. You may have to pay fees, expenses, taxes and other governmental charges upon the redemption of your ADSs. If less than all ADSs are being redeemed, the ADSs to be retired will be selected by lot or on a *pro rata* basis, as the depositary bank may determine.

**Changes Affecting Shares**

The ordinary shares held on deposit for your ADSs may change from time to time. For example, there may be a change in nominal or par value, a split–up, cancellation, consolidation or reclassification of such shares or a recapitalization, reorganization, merger, consolidation or sale of assets.

If any such change were to occur, your ADSs would, to the extent permitted by law, represent the right to receive the property received or exchanged in respect of the ordinary shares held on deposit. The depositary bank may in such circumstances deliver new ADSs to you or call for the exchange of your existing ADSs for new ADSs. If the depositary bank may not lawfully distribute such property to you, the depositary bank may sell such property and distribute the net proceeds to you as in the case of a cash distribution.

**Issuance Of ADSs Upon Deposit of Ordinary Shares**

The depositary bank may create ADSs on your behalf if you or your broker deposit ordinary shares with the custodian. The depositary bank will deliver these ADSs to the person you indicate only after you pay any applicable issuance fees and any charges and taxes payable for the transfer of the ordinary shares to the custodian. Your ability to deposit ordinary shares and receive ADSs may be limited by U.S. and legal considerations in the Cayman Islands applicable at the time of deposit.

The issuance of ADSs may be delayed until the depositary bank or the custodian receives confirmation that all required approvals have been given and that the ordinary shares have been duly transferred to the custodian. The depositary bank will only issue ADSs in whole numbers.

When you make a deposit of ordinary shares, you will be responsible for transferring good and valid title to the depositary bank. As such, you will be deemed to represent and warrant that:

• The ordinary shares are duly authorized, validly issued, fully paid, non–assessable and legally obtained.

• All preemptive (and similar) rights, if any, with respect to such ordinary shares have been validly waived or exercised.

• You are duly authorized to deposit the ordinary shares.

• The ordinary shares presented for deposit are free and clear of any lien, encumbrance, security interest, charge, mortgage or adverse claim, and are not, and the ADSs issuable upon such deposit will not be, "restricted securities" (as defined in the deposit agreement).

• The shares presented for deposit have not been stripped of any rights or entitlements.

163

**Table of Contents**

If any of the representations or warranties are incorrect in any way, we and the depositary bank may, at your cost and expense, take any and all actions necessary to correct the consequences of the misrepresentations.

**Transfer, Combination And Split Up Of ADRs**

As an ADR holder, you will be entitled to transfer, combine or split up your ADRs and the ADSs evidenced thereby. For transfers of ADRs, you will have to surrender the ADRs to be transferred to the depositary bank and also must:

- Ensure that the surrendered ADR certificate is properly endorsed or otherwise in proper form for transfer;

- Provide such proof of identity and genuineness of signatures as the depositary bank deems appropriate;

- Provide any transfer stamps required by the State of New York or the United States; and

- Pay all applicable fees, charges, expenses, taxes and other government charges payable by ADR holders pursuant to the terms of the deposit agreement, upon the transfer of ADRs.

To have your ADRs either combined or split up, you must surrender the ADRs in question to the depositary bank with your request to have them combined or split up, and you must pay all applicable fees, charges and expenses payable by ADR holders, pursuant to the terms of the deposit agreement, upon a combination or split up of ADRs.

**Withdrawal of Shares upon Cancellation of ADSs**

As a holder, you will be entitled to present your ADSs to the depositary bank for cancellation and then receive the corresponding number of underlying ordinary shares at the custodian's offices. Your ability to withdraw the ordinary shares may be limited by U.S. and legal considerations applicable at the time of withdrawal. In order to withdraw the ordinary shares represented by your ADSs, you will be required to pay to the depositary the fees for cancellation of ADSs and any charges and taxes payable upon the transfer of the ordinary shares being withdrawn. You assume the risk for delivery of all funds and securities upon withdrawal. Once canceled, the ADSs will not have any rights under the deposit agreement.

If you hold ADSs registered in your name, the depositary bank may ask you to provide proof of identity and genuineness of any signature and such other documents as the depositary bank may deem appropriate before it will cancel your ADSs. The withdrawal of the shares represented by your ADSs may be delayed until the depositary bank receives satisfactory evidence of compliance with all applicable laws and regulations. Please keep in mind that the depositary bank will only accept ADSs for cancellation that represent a whole number of securities on deposit.

You will have the right to withdraw the securities represented by your ADSs at any time except for:

- Temporary delays that may arise because (i) the transfer books for the ordinary shares or ADSs are closed, or (ii) ordinary shares are immobilized on account of a shareholders' meeting or a payment of dividends.

- Obligations to pay fees, taxes and similar charges.

- Restrictions imposed because of laws or regulations applicable to ADSs or the withdrawal of securities on deposit.

The deposit agreement may not be modified to impair your right to withdraw the securities represented by your ADSs except to comply with mandatory provisions of law.

Table of Contents

**Voting Rights**

As a holder, you generally have the right under the deposit agreement to instruct the depositary bank to exercise the voting rights for the ordinary shares represented by your ADSs. The voting rights of holders of ordinary shares are described in "Description of Share Capital — Voting Rights Attaching to the Shares" above.

At our request, the depositary bank will distribute to you any notice of shareholders' meeting received from us together with information explaining how to instruct the depositary bank to exercise the voting rights of the securities represented by ADSs.

If the depositary bank timely receives voting instructions from a holder of ADSs, it will endeavor to vote the securities represented by the holder's ADSs in accordance with such voting instructions.

In the event of voting by a show of hands, each shareholder has one vote irrespective of the number of shares held by such person and the depositary shall vote or cause the custodian to vote all the shares then on deposit in accordance with instructions received from a majority of holders giving voting instructions. In the event of poll voting, each shareholder has an amount of votes equal to the number of shares held as of record date for the meeting and the depositary shall vote or cause the custodian to vote the shares on deposit in respect of ADSs for which holder of ADSs have timely given voting instructions to the depositary.

If the depositary timely receives voting instructions from a holder of ADSs that fail to specify the manner in which the depositary is to vote the shares represented by that holder's ADSs, the depositary will deem the holder to have voted in favor of the items set forth in the voting instructions. If the depositary does not timely receive voting instructions from a holder of ADSs and we have timely provided the depositary with our notice of meeting and related materials, that holder will be deemed, and the depositary will deem that holder to have instructed the depositary to give a discretionary proxy to a person designated by us to vote the shares represented by the ADSs at our discretion, unless:

- we have failed to timely provide the depositary with our notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- voting at the meeting is made on a show of hands.

Please note that the ability of the depositary bank to carry out voting instructions may be limited by practical and legal limitations and the terms of the securities on deposit. We cannot assure you that you will receive voting materials in time to enable you to return voting instructions to the depositary bank in a timely manner. Securities for which no voting instructions have been received will not be voted.

Table of Contents

**Fees and Charges**

As an ADS holder, you will be required to pay the following service fees to the depositary bank:

| Service | Fees |
|---|---|
| Issuance of ADSs | Up to U.S. 5¢ per ADS issued |
| Cancellation of ADSs | Up to U.S. 5¢ per ADS canceled |
| Distribution of cash dividends or other cash distributions | Up to U.S. 2¢ per ADS held |
| Distribution of ADSs pursuant to share dividends, free share distributions or exercise of rights | Up to U.S. 5¢ per ADS issued |
| Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to U.S. 5¢ per share (or share equivalent) distributed |
| Annual Depositary Services Fee | Annually up to U.S. 2¢ per ADS held at the end of each calendar year, except to the extent of any cash dividend fee(s) charged during such calendar year |
| Transfer of ADRs | U.S. $1.50 per certificate presented for transfer |

As an ADS holder you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges such as:

- Fees for the transfer and registration of ordinary shares charged by the registrar and transfer agent for the ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of ordinary shares).

- Expenses incurred for converting foreign currency into U.S. dollars.

- Expenses for cable, telex and fax transmissions and for delivery of securities.

- Taxes and duties upon the transfer of securities (i.e., when ordinary shares are deposited or withdrawn from deposit).

- Fees and expenses incurred in connection with the delivery or servicing of ordinary shares on deposit.

We have agreed to pay certain other charges and expenses of the depositary bank. Note that the fees and charges you may be required to pay may *vary* over time and may be changed by us and by the depositary bank. You will receive prior notice of such changes.

**Amendments and Termination**

We may agree with the depositary bank to modify the deposit agreement at any time without your consent. We undertake to give holders 30 days' prior notice of any modifications that would materially prejudice any of their substantial rights under the deposit agreement. We will not consider to be materially prejudicial to your substantial rights any modifications or supplements that are reasonably necessary for the ADSs to be registered under the Securities Act or to be eligible for book–entry settlement, in each case without imposing or increasing the fees and charges you are required to pay. In addition, we may not be able to provide you with prior notice of any modifications or supplements that are required to accommodate compliance with applicable provisions of law.

You will be bound by the modifications to the deposit agreement if you continue to hold your ADSs after the modifications to the deposit agreement become effective. The deposit agreement cannot be amended to prevent you from withdrawing the ordinary shares represented by your ADSs (except as permitted by law).

We have the right to direct the depositary bank to terminate the deposit agreement. Similarly, the depositary bank may in certain circumstances on its own initiative terminate the deposit

166

Table of Contents

agreement. In either case, the depositary bank must give notice to the holders at least 30 days before termination.

Upon termination, the following will occur under the deposit agreement:

- *for a period of six months after termination,* you will be able to request the cancellation of your ADSs and the withdrawal of the ordinary shares represented by your ADSs and the delivery of all other property held by the depositary bank in respect of those ordinary shares on the same terms as prior to the termination. During such six−months period, the depositary bank will continue to collect all distributions received on the ordinary shares on deposit (i.e., dividends) but will not distribute any such property to you until you request the cancellation of your ADSs.

- *After the expiration of such six−months period,* the depositary bank may sell the securities held on deposit. The depositary bank will hold the proceeds from such sale and any other funds then held for the holders of ADSs in a non−interest bearing account. At that point, the depositary bank will have no further obligations to holders other than to account for the funds then held for the holders of ADSs still outstanding.

**Books of Depositary**

The depositary bank will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the ADSs and the deposit agreement.

The depositary bank will maintain in New York facilities to record and process the issuance, cancellation, combination, split−up and transfer of ADRs. These facilities may be closed from time to time, to the extent not prohibited by law.

**Limitations on Obligations and Liabilities**

The deposit agreement limits our obligations and the depositary bank's obligations to you. Please note the following:

- We and the depositary bank are obligated only to take the actions specifically stated in the deposit agreement without negligence or bad faith.

- The depositary bank disclaims any liability for any failure to carry out voting instructions, for any manner in which a vote is cast or for the effect of any vote, provided that it acts in good faith and in accordance with the terms of the deposit agreement.

- The depositary bank disclaims any liability for any failure to determine the lawfulness or practicality of any action, for the content of any document forwarded to you on our behalf or for the accuracy of any translation of such a document, for the investment risks associated with investing in ordinary shares, for the validity or worth of the ordinary shares, for any tax consequences that result from the ownership of ADSs, for the credit−worthiness of any third party, for allowing any rights to lapse under the terms of the deposit agreement, for the timeliness of any of our notices or for our failure to give notice.

- We and the depositary bank will not be obligated to perform any act that is inconsistent with the terms of the deposit agreement.

- We and the depositary bank disclaim any liability if we are prevented or forbidden from acting on account of any law or regulation, any provision of our amended and restated

- memorandum and articles of association, any provision of any securities on deposit or by reason of any act of God or war or other circumstances beyond our control.

167

Table of Contents

- We and the depositary bank disclaim any liability by reason of any exercise of, or failure to exercise, any discretion provided for the deposit agreement or in our amended and restated memorandum and articles of association or in any provisions of securities on deposit.

- We and the depositary bank further disclaim any liability for any action or inaction in reliance on the advice or information received from legal counsel, accountants, any person presenting shares for deposit, any holder of ADSs or authorized representatives thereof, or any other person believed by either of us in good faith to be competent to give such advice or information.

- We and the depositary bank also disclaim liability for the inability by a holder to benefit from any distribution, offering, right or other benefit which is made available to holders of ordinary shares but is not, under the terms of the deposit agreement, made available to you.

- We and the depositary bank may rely without any liability upon any written notice, request or other document believed to be genuine and to have been signed or presented by the proper parties.

- We and the depositary bank also disclaim liability for any consequential or punitive damages for any breach of the terms of the deposit agreement.

**Pre–release Transactions**

The depositary bank may, in certain circumstances, issue ADSs before receiving a deposit of ordinary shares or release ordinary shares before receiving ADSs for cancellation. These transactions are commonly referred to as "pre–release transactions". The deposit agreement limits the aggregate size of pre–release transactions and imposes a number of conditions on such transactions (i.e., the need to fully collateralize, the type of collateral required, the representations required from brokers, etc.). The depositary bank may retain the compensation received from the pre–release transactions.

**Taxes**

You will be responsible for the taxes and other governmental charges payable on the ADSs and the securities represented by the ADSs. We, the depositary bank and the custodian may deduct from any distribution the taxes and governmental charges payable by holders and may sell any and all property on deposit to pay the taxes and governmental charges payable by holders. You will be liable for any deficiency if the sale proceeds do not cover the taxes that are due.

The depositary bank may refuse to issue ADSs, to deliver, transfer, split and combine ADRs or to release securities on deposit until all taxes and charges are paid by the applicable holder. The depositary bank and the custodian may take reasonable administrative actions to obtain tax refunds and reduced tax withholding for any distributions on your behalf. However, you may be required to provide to the depositary bank and to the custodian proof of taxpayer status and residence and such other information as the depositary bank and the custodian may require to fulfill legal obligations. You are required to indemnify us, the depositary bank and the custodian for any claims with respect to taxes based on any tax benefit obtained for you.

**Foreign Currency Conversion**

The depositary bank will arrange for the conversion of all foreign currency received into U.S. dollars if such conversion is practical, and it will distribute the U.S. dollars in accordance with the terms of the deposit agreement. You may have to pay fees and expenses incurred in converting foreign currency, such as fees and expenses incurred in complying with currency exchange controls and other governmental requirements.

168

Table of Contents

If the conversion of foreign currency is not practical or lawful, or if any required approvals are denied or not obtainable at a reasonable cost or within a reasonable period, the depositary bank may take the following actions in its discretion:

• Convert the foreign currency to the extent practical and lawful and distribute the U.S. dollars to the holders for whom the conversion and distribution is lawful and practical.

• Distribute the foreign currency to holders for whom the distribution is lawful and practical.

• Hold the foreign currency (without liability for interest) for the applicable holders.

169

**Table of Contents**

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this offering, we will have outstanding 27,565,452 ADSs representing approximately 53.76% of our ordinary shares. All of the ADSs sold in this offering and the ordinary shares they represent will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs.

**Lock–up Agreements**

We have agreed with the underwriters that we will not, without the prior consent of Credit Suisse Securities (USA) LLC and Goldman Sachs (Asia) L.L.C., for a period of 90 days following the date of this prospectus:

- offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or our ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

- enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of our ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, our ordinary shares or such other securities, in cash or otherwise. The restrictions above do not apply to (1) the ADSs to be sold in this offering and the ordinary shares underlying such ADSs, (2) or the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 25.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of March 31, 2006.

In addition, the selling shareholders have entered into a similar lock–up agreement with respect to our ordinary shares and ADSs for a period of 90 days from the date of this prospectus. The restrictions applicable to the selling shareholders do not apply to the ADSs to be sold in this offering, the ordinary shares underlying such ADSs or, other than with regard to Jason Nanchun Jiang and one entity controlled by Jimmy Wei Yu, our ordinary shares issued to any selling shareholder upon the exercise of that selling shareholder's options granted under our 2003 Option Plan or our 2005 Option Plan prior to March 31, 2006.

In connection with our initial public offering in July 2005, our directors, officers and shareholders entered into similar lock–up agreements with respect to our ordinary shares and ADSs, pursuant to which, until the first anniversary of the date of this prospectus, such persons may not sell or otherwise dispose of more than half of their ordinary shares or ADSs owned immediately prior to this offering. In order to facilitate this offering, the underwriters to the initial public offering have released these securities with regard to us and the selling shareholders participating in this offering from the restrictions described above. Moreover, the underwriters may continue to release other securities held by us or held by our shareholders that are currently subject to lock–up, subject to applicable NASD regulations. The underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would depend on a number of factors, which may include market conditions, the performance of our ADSs in the market and our financial condition at that time.

In connection with our acquisition of Framedia, the seller parties entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until March 31, 2007, provided that each of them who is a PRC resident has complied with all applicable SAFE registration requirements. In addition, any of our ordinary shares that may be issuable to them as part of an

170

Table of Contents

earn–out payment in the first quarter of 2007 will be subject to further lock–up until June 30, 2007, provided that each of them who is a PRC resident has complied with all applicable SAFE registration requirements.

In connection with our acquisition of Target Media, the Target Media selling shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition.

**Rule 144**

In general, under Rule 144 as currently in effect, beginning 90 days after the date of this prospectus a person who owns our restricted ordinary shares and who has beneficially owned those shares for at least one year is entitled to sell within any three–month period a number of shares, including ADSs representing such number of shares, that does not exceed the greater of the following:

- 1% of the number of our ordinary shares then outstanding, in the form of ADSs or otherwise, which will equal approximately 4 million shares immediately after this offering; and

- the average weekly trading volume of our ADSs on the Nasdaq National Market during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

Sales under Rule 144 are also subject to manner of sale provisions, notice requirements and the availability of current public information about us. Persons who are not our affiliates may be exempt from these restrictions under Rule 144(k) discussed below.

**Rule 144(k)**

Under Rule 144(k), a person who is not one of our affiliates at any time during the three months preceding a sale, and who has beneficially owned the shares, in the form of ADSs or otherwise, proposed to be sold for at least two years, including the holding period of any prior owner other than an affiliate, is entitled to sell those shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless otherwise restricted, "144(k) shares" may be sold at any time.

**Registration Rights**

Upon completion of this offering, the holders of 125,861,414 of our ordinary shares or their transferees will be entitled to request that we register their ordinary shares under the Securities Act, following the expiration of the lockup agreements described above. In addition, after we complete our acquisition of Target Media, the current shareholders of Target Media will hold an aggregate 77,000,000 of our ordinary shares that they or their transferees will be entitled to request that we register under the Securities Act, following the expiration of the lockup agreements to which their shareholders will be subject. See "Description of Share Capital — Registration Rights" and "Our Recent Significant Acquisitions — Target Media — Share Purchase Agreement".

**Share Option Plan**

As of March 31, 2006, options to purchase 36,102,420 of our ordinary shares were granted and outstanding. All of these ordinary shares will be eligible for sale in the public market from time to

171

Table of Contents

time, subject to vesting and exercise provisions of the options, Rule 144 volume limitations applicable to our affiliates and other holders of restricted shares and the lock–up agreements.

We filed a registration statement under the Securities Act covering a total of 44,251,830 ordinary shares reserved for issuance under our 2003 Plan and 2005 Plan on February 28, 2006. The ordinary shares registered under such registration statement, subject to the lockup agreements and Rule 144 volume limitations applicable to affiliates, are available for sale in the open market upon the exercise of vested options.

172

Table of Contents

## TAXATION

**Cayman Islands Taxation**

The following discussion of the material Cayman Islands federal income tax consequences of an investment in our ADSs is based upon laws and relevant interpretations thereof in effect as of the date of this prospectus, all of which are subject to change, possibly with retroactive effect. This discussion does not deal with all possible tax consequences relating to an investment in our ADSs, such as the tax consequences under state, local and other tax laws. To the extent that the discussion relates to matters of Cayman Islands tax law, it represents the opinion of Conyers, Dill & Pearman, our special Cayman Islands counsel.

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty or withholding tax applicable to us or to any holder of ADS, or ordinary shares. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. No stamp duty is payable in the Cayman Islands on transfers of shares of Cayman Islands companies except those which hold interests in land in the Cayman Islands. The Cayman Islands is not party to any double taxation treaties. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Pursuant to Section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, we have obtained an undertaking from the Governor−in−Council:

(1) that no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciation shall apply to us or our operations; and

(2) that the aforesaid tax or any tax in the nature of estate duty or inheritance tax shall not be payable on the shares, debentures or other obligations of the Company.

The undertaking for us is for a period of twenty years from May 3, 2005.

**United States Federal Income Taxation**

The following discussion, to the extent that it states matters of law or legal conclusions and subject to the qualifications herein, represents the opinion of Simpson Thacher & Bartlett LLP, our United States counsel, on the material United States federal income tax consequences of the ownership of our ADSs as of the date hereof. Except where noted, it deals only with ADSs held as capital assets. This discussion does not represent a detailed description of the United States federal income tax consequences applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are:

• a bank;

• a dealer in securities or currencies;

• a financial institution;

• a regulated investment company;

• a real estate investment trust;

• an insurance company;

• a tax−exempt organization;

• a person holding our ADSs as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;

173

**Table of Contents**

- a trader in securities that has elected the mark–to–market method of accounting for your securities;

- a person liable for alternative minimum tax;

- a person who owns 10% or more of our voting stock;

- a partnership or other pass through entity for United States federal income tax purposes; or

- a person whose "functional currency" is not the United States dollar.

Furthermore, the discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be repealed, revoked or modified so as to result in United States federal income tax consequences different from those discussed below. In addition, this summary is based, in part, upon representations made by the depositary to us and assumes that the deposit agreement, and all other related agreements, will be performed in accordance with their terms. **IF YOU ARE CONSIDERING THE PURCHASE, OWNERSHIP OR DISPOSITION OF OUR ADSS, YOU SHOULD CONSULT YOUR OWN TAX ADVISORS CONCERNING THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO YOU IN LIGHT OF YOUR PARTICULAR SITUATION AS WELL AS ANY CONSEQUENCES ARISING UNDER THE LAWS OF ANY OTHER TAXING JURISDICTION.**

As used herein, the term "United States Holder" means a beneficial holder of an ADS that is:

- an individual citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust which either (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If a partnership holds ADSs, the tax treatment of a partner will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our ADSs, you should consult your tax advisors.

**ADSs**

If you hold ADSs, for United States federal income tax purposes, you generally will be treated as the owner of the underlying Shares that are represented by such ADSs. Accordingly, deposits or withdrawals of Shares for ADSs will not be subject to United States federal income tax.

The United States Treasury has expressed concerns that parties to whom ADSs are pre–released may be taking actions that are inconsistent with the claiming, by United States Holders of ADSs, of foreign tax credits for United States federal income tax purposes. Such actions would also be inconsistent with the claiming of the reduced rate of tax applicable to dividends received by certain non–corporate United States Holders, as described below. Accordingly, the availability of the reduced tax rate for dividends received by certain non–corporate United States Holders could be affected by future actions that may be taken by the United States Treasury.

174

**Table of Contents**

*Taxation of Dividends*

Subject to the discussion below under "Passive Foreign Investment Companies", the gross amount of distributions on the ADSs will be taxable as dividends, to the extent paid out of our current or accumulated earnings and profits, as determined under United States federal income tax principles. Such income will be includable in your gross income as ordinary income on the day actually or constructively received by the depositary. Such dividends will not be eligible for the dividends received deduction allowed to corporations under the Code. With respect to non–corporate United States investors, certain dividends received before January 1, 2011 from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. United States Treasury Department guidance indicates that our ADSs, which are listed on the Nasdaq National Market, will be readily tradable on an established securities market in the United States. Non–corporate holders that do not meet a minimum holding period requirement during which they are not protected from the risk of loss or that elect to treat the dividend income as "investment income" pursuant to section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You should consult your own tax advisors regarding the application of this legislation to your particular circumstances.

To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits for a taxable year, as determined under United States federal income tax principles, the distribution will first be treated as a tax–free return of capital, causing a reduction in the adjusted basis of the ADSs (thereby increasing the amount of gain, or decreasing the amount of loss, to be recognized by you on a subsequent disposition of the ADSs), and the balance in excess of adjusted basis will be taxed as capital gain recognized on a sale or exchange. However, we do not expect to keep earnings and profits in accordance with United States federal income tax principles. Therefore, you should expect that a distribution will generally be treated as a dividend (as discussed above).

Distributions of ADSs, ordinary shares or rights to subscribe for ordinary shares that are received as part of a pro rata distribution to all of our shareholders generally will not be subject to United States federal income tax. The basis of the new ADSs, ordinary shares or rights so received will be determined by allocating your basis in the old ADSs between the old ADSs and the new ADSs, ordinary shares or rights received, based on their relative fair market values on the date of distribution. However, the basis of the rights will be zero if:

- the fair market value of the rights is less than 15 percent of the fair market value of the old ADSs at the time of distribution, unless you elect to determine the basis of the old ADSs and of the rights by allocating the adjusted basis of the old ADSs between the old ADSs and the rights, or

- the rights are not exercised and thus expire.

*Passive Foreign Investment Companies*

We operate an active advertising business in China and based on the past and projected composition of our income and valuation of our assets, including goodwill, after the completion of the offering and the receipt of net proceeds of approximately $         million, we believe we were not a passive foreign investment company for 2005, we do not expect to be a passive foreign investment company ("PFIC"), for 2006, and we do not expect to become one in the future, although there can be no assurance in this regard. Because PFIC status is a factual determination, our United States counsel expresses no opinion with respect to our PFIC status and also expresses no opinion with respect to our expectations contained in this paragraph.

**Table of Contents**

We will be a PFIC for any taxable year in which:

- at least 75% of our gross income is passive income, or

- at least 50% of the value (determined on a quarterly basis) of our assets is attributable to assets that produce or are held for the production of passive income.

For this purpose, passive income includes dividends, interest, royalties and rents (other than royalties and rents derived in the active conduct of a trade or business and not derived from a related person). If we own at least 25% (by value) of the stock of another corporation, we will be treated, for purposes of the PFIC tests, as owning our proportionate share of the other corporation's assets and receiving our proportionate share of the other corporation's income.

The determination of whether we are a PFIC is made annually for each taxable year of the Company. Accordingly, it is possible that we may become a PFIC in the current or any future taxable year due to changes in our asset or income composition. We could become a PFIC, for example though a combination of factors, such as a failure to spend a sufficient amount of the net proceeds of the offering (resulting in our holding cash, a passive asset) coupled with a decrease in the price of our Shares (resulting in a tax decrease in the value of our goodwill, an active asset). Because of the fact specific nature of the inquiry, we cannot predict at this time what portion of the net proceeds we would need to spend in order to avoid PFIC status. If we are a PFIC for any taxable year during which you hold our ADSs, you will be subject to special tax rules discussed below.

If we are a PFIC for any taxable year during which you hold our ADSs, you will be subject to special tax rules with respect to any "excess distribution" received and any gain realized from a sale or other disposition, including a pledge, of ADSs. Distributions received in a taxable year that are greater than 125% of the average annual distributions received during the shorter of the three preceding taxable years or your holding period for the ADSs will be treated as excess distributions. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

- the amount allocated to each other year will be subject to tax at the highest tax rate in effect for that year and the interest charge applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

In addition, non–corporate United States Holders will not be eligible for reduced rates of taxation on any dividends received from us prior to January 1, 2011, if we are a PFIC in the taxable year in which such dividends are paid or in the preceding taxable year. You will be required to file Internal Revenue Service Form 8621 if you hold our ADSs in any year in which we are classified as a PFIC.

In certain circumstances, in lieu of being subject to the excess distribution rules discussed above, you may make an election to include gain on the stock of a PFIC as ordinary income under a mark–to–market method provided that such stock is regularly traded on a qualified exchange. Under current law, the mark–to–market election may be available because the ADSs will be listed on the Nasdaq National Market, which constitutes a qualified exchange as designated in the Internal Revenue Code, although there can be no assurance that the ADSs will be "regularly traded".

If you make an effective mark–to–market election, you will include in each year as ordinary income the excess of the fair market value of your ADSs at the end of the year over your adjusted tax basis in the ADSs. You will be entitled to deduct as an ordinary loss each year the excess of your adjusted tax basis in the ADSs over their fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the mark–to–market election.

**Table of Contents**

Your adjusted tax basis in the ADSs will be increased by the amount of any income inclusion and decreased by the amount of any deductions under the mark–to–market rules. If you make a mark–to–market election it will be effective for the taxable year for which the election is made and all subsequent taxable years unless the ADSs are no longer regularly traded on a qualified exchange or the Internal Revenue Service consents to the revocation of the election. You are urged to consult your tax advisor about the availability of the mark–to–market election, and whether making the election would be advisable in your particular circumstances.

Alternatively, you can sometimes avoid the rules described above by electing to treat us as a "qualified electing fund" under section 1295 of the Code. This option is not available to you because we do not intend to comply with the requirements necessary to permit you to make this election.

You are urged to consult your tax advisors concerning the United States federal income tax consequences of holding ADSs if we are considered a PFIC in any taxable year.

*Taxation of Capital Gains*

Subject to the discussion above under "Passive Foreign Investment Companies", for United States federal income tax purposes, you will recognize taxable gain or loss on any sale or exchange of ADSs in an amount equal to the difference between the amount realized for the ADSs and your tax basis in the ADSs. Such gain or loss will generally be capital gain or loss. Capital gains of non–corporate United States Holders derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Any gain or loss recognized by you will generally be treated as United States source gain or loss for United States foreign tax credit purposes.

***Information reporting and backup withholding***

Information reporting will apply to dividends in respect of our ADSs and the proceeds from the sale, exchange or redemption of our ADSs that are paid to you within the United States (and in certain cases, outside the United States), unless you are an exempt recipient such as a corporation. A backup withholding tax may apply to such payments if you fail to provide a taxpayer identification number or certification of other exempt status or fail to report in full dividend and interest income.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is furnished to the Internal Revenue Service.

PROSPECTIVE PURCHASERS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY ADDITIONAL TAX CONSEQUENCES RESULTING FROM PURCHASING, HOLDING OR DISPOSING OF ADSs, INCLUDING THE APPLICABILITY AND EFFECT OF THE TAX LAWS OF ANY STATE, LOCAL OR FOREIGN JURISDICTION, INCLUDING ESTATE, GIFT, AND INHERITANCE LAWS.

Table of Contents

## UNDERWRITING

Focus Media, the selling shareholders and the underwriters named below have entered into an underwriting agreement with respect to the ADSs being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of ADSs indicated in the following table. Credit Suisse Securities (USA) LLC and Goldman Sachs (Asia) L.L.C. are the representatives of the underwriters. Credit Suisse Securities (USA) LLC's address is Eleven Madison Avenue, New York, New York 10010–3629. Goldman Sachs (Asia) L.L.C.'s address is 68th Floor, Cheung Kong Center, 2 Queen's Road Central, Hong Kong. Credit Suisse Securities (USA) LLC and Goldman Sachs (Asia) LLC are acting in this offering as the joint global coordinators, and, with Merrill Lynch, Pierce, Fenner & Smith Incorporated and Citigroup Global Markets Inc., as joint bookrunners.

| Underwriters | Number of ADSs |
|---|---|
| Credit Suisse Securities (USA) LLC | |
| Goldman Sachs (Asia) L.L.C. | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Citigroup Global Markets Inc. | |
| Lehman Brothers Inc. | |
| Piper Jaffray & Co. | |
| Total | |

The underwriters are committed to take and pay for all of the ADSs being offered, if any are taken, other than the ADSs covered by the option described below unless and until this option is exercised.

If the underwriters sell more ADSs than the total number set forth in the table above, the underwriters have an option to buy up to an additional 1,190,000 ADSs from us and the selling shareholders to cover such sales. They may exercise that option for 30 days. If any ADSs are purchased pursuant to this option, the underwriters will severally purchase ADSs in approximately the same proportion as set forth in the table above.

The following tables show the per ADS and total underwriting discounts and commissions to be paid to the underwriters by Focus Media and the selling shareholders. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase a total of 1,190,000 additional ADSs.

### Paid by Focus Media

| | No Exercise | Full Exercise |
|---|---|---|
| Per ADS | $ | $ |
| Total | $ | $ |

### Paid by Selling Shareholders

| | No Exercise | Full Exercise |
|---|---|---|
| Per ADS | $ | $ |
| Total | $ | $ |

Total underwriting discounts and commissions to be paid to the underwriters represent        % of the total amount of the offering.

Table of Contents

ADSs sold by the underwriters to the public will initially be offered at the public offering price set forth on the cover of this prospectus. Any ADSs sold by the underwriters to securities dealers may be sold at a discount of up to $          per ADS from the public offering price. Any such securities dealers may resell any ADSs purchased from the underwriters to certain other brokers or dealers at a discount of up to $          per ADS from the public offering price. If all the ADSs are not sold at the public offering price, the representatives may change the offering price and the other selling terms.

Total expenses for this offering are estimated to be approximately $  million, including SEC registration fees of $          , NASD filing fees of $          , printing fees of approximately $          , legal fees of approximately $          , accounting fees of approximately $          , roadshow costs and expenses of approximately $          , and travel and other out–of–pocket expenses of approximately $          . All amounts are estimated except for the fees relating to the SEC registration, the NASD filing and the Nasdaq National Market.

Some of the underwriters are expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker–dealers registered with the SEC. Goldman Sachs (Asia) L.L.C. is expected to make offers and sales in the United States through its selling agent, Goldman, Sachs & Co.

The underwriters have entered into an agreement in which they agree to restrictions on where and to whom they and any dealer purchasing from them may offer ADSs, as a part of the distribution of the ADSs. The underwriters also have agreed that they may sell ADSs among themselves.

Focus Media has agreed with the underwriters that it will not, without the prior consent of Credit Suisse Securities (USA) LLC and Goldman Sachs (Asia) L.L.C., for a period of 90 days following the date of this prospectus:

• offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, or file a registration statement with respect to any of the ADSs or its ordinary shares or any securities that are convertible into or exercisable or exchangeable for the ADSs or our ordinary shares; or

• enter into any swap or other agreement that transfers to any other entity, in whole or in part, any of the economic consequences of ownership of its ADSs or ordinary shares;

whether any transaction described above is to be settled by the delivery of ADSs, its ordinary shares or such other securities, in cash or otherwise.

The 90–day restricted period described in the preceding paragraph will be automatically extended if (1) during the last 17 days of the 90–day restricted period the company issues an earnings release or announces material news or a material event; or (2) prior to the expiration of the 90–day restricted period, the company announces, or if the representatives of the underwriters determine, that the company will release earnings results during the 15–day period following the last day of the 90–day period, in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18–day period beginning on the issuance of the earnings release of the announcement of the material news or material event. The restrictions applicable to Focus Media do not apply to (1) the ADSs to be sold in this offering, and the ordinary shares underlying such ADSs, (2) the issuance of our ordinary shares in connection with bona fide strategic acquisitions by us not to exceed 25.0 million ordinary shares of our company in the aggregate, (3) grants of options pursuant to our employee stock option plans or (4) any ordinary shares of our company to be issued by us upon the exercise of any options described in clause (3) above granted as of March 31, 2006.

In addition, the selling shareholders have entered into similar lock–up agreements with respect to Focus Media's ordinary shares and ADSs for a period of 90 days from the date of this prospectus.

179

**Table of Contents**

The restrictions applicable to the selling shareholders do not apply to the ADSs to be sold in this offering, the ordinary shares underlying such ADSs or, other than with regard to Jason Nanchun Jiang and one entity controlled by Jimmy Wei Yu, our ordinary shares issued to any selling shareholder upon the exercise of that selling shareholder's options granted under our 2003 Option Plan or our 2005 Option Plan prior to December 31, 2005. In addition, in each case, the lock–up period will be extended if, (i) during the final 17 days of the lock–up period, any earnings release or announcement of a material event or news or, (ii) prior to the expiry of a lock–up period, the Company announces that it will release earnings results during the 15–day period following the last day of the lock–up period. In each case the applicable lock–up period will be automatically extended until the expiration of the 18–day period beginning on the date of release of the earnings results or the announcement of the material news or material event, as applicable unless the representatives waive, in writing, such extension.

In connection with Focus Media's initial public offering in July 2005, Focus Media and Focus Media's directors, officers and pre–IPO shareholders entered into lock–up agreements. The lock–up agreement entered into by Focus Media is substantially the same as the lock–up agreement it entered into in connection with this offering as described above, except that the restricted period under the prior lock–up agreement extended for 180 days from the date of the prospectus used in the initial public offering, instead of 90 days for this offering. Focus Media's directors, officers and pre–IPO shareholders also entered into lock–up agreements with respect to Focus Media's ordinary shares and ADSs for a period of 180 days following the July 13, 2005 date of the prospectus used in the initial public offering and, thereafter until July 13, 2006, such persons are not permitted to sell or otherwise dispose of more than half of their ordinary shares or ADSs owned immediately prior to Focus Media's initial public offering, which amount includes ordinary shares or ADSs sold in the initial public offering, the public offering of additional ADSs pursuant to the underwriters' exercise of their over–allotment option in August 2005, our public offering completed in January 2006 and in this offering. In order to facilitate this offering, the underwriters to the initial public offering have released these securities from these restrictions with regard to us and the selling shareholders participating in this offering.

In connection with our acquisition of Framedia, the seller parties entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until March 31, 2007, provided that each of them who is a PRC resident has complied with all applicable SAFE registration requirements. In addition, any of our ordinary shares that may be issuable to them as part of an earn–out payment in the first quarter of 2007 will be subject to further lock–up until June 30, 2007, provided that each of them who is a PRC resident has complied with all applicable SAFE registration requirements.

In connection with our acquisition of Target Media, the Target Media selling shareholders entered into lock–up agreements with us in which they agreed not to sell or otherwise dispose of any of our ordinary shares received as part of the initial share consideration payment to them until 180 days after completion of the acquisition, at which time each will be able to sell up to 50% of the shares received as part of the initial share consideration payment. The remaining 50% of the shares will be locked–up until the anniversary of the completion of the acquisition.

The representatives of the underwriters may release the securities subject to the above restrictions at any time, subject to applicable NASD regulations. The representatives of the underwriters have no pre–established conditions to waiving the terms of the lock–up agreements, and any decision by them to waive those conditions would depend on a number of factors, which may include market conditions, the performance of Focus Media's ADSs in the market and Focus Media's financial condition at that time.

Our ADSs are listed for quotation on the Nasdaq National Market under the symbol "FMCN".

**Table of Contents**

In connection with the offering, the underwriters may purchase and sell ADSs in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of ADSs than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional ADSs from Focus Media and the selling shareholders. The underwriters may close out any covered short position by either exercising their option to purchase additional ADSs or purchasing ADSs in the open market. In determining the source of ADSs to close out the covered short position, the underwriters will consider, among other things, the price of ADSs available for purchase in the open market as compared to the price at which they may purchase additional ADSs pursuant to the option granted to them. "Naked" short sales are any sales in excess of such option. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for, or purchases of, ADSs made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased ADSs sold by, or for the account of, such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of the ADSs, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the ADSs. As a result, the price of the ADSs may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they are required to be conducted in accordance with applicable laws and regulations, and may be discontinued at any time. These transactions may be effected on the Nasdaq National Market, in the over–the–counter market or otherwise.

Each of the underwriters has represented and agreed that: (a) it has not made or will not make an offer of ADSs to the public in the United Kingdom within the meaning of section 102B of the Financial Services and Markets Act 2000 (as amended) (FSMA) except to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by the company of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority (FSA); (b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to the company; and (c) it has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the ADSs in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a Relevant Member State), each Underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the Relevant Implementation Date) it has not made and will not make an offer of ADSs to the public in that Relevant Member State prior to the publication of a prospectus in relation to the ADSs which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of ADSs to the public in that Relevant Member State at any time: (a) to legal

**Table of Contents**

entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or (c) in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive. For the purposes of this provision, the expression an "offer of ADSs to the public" in relation to any ADSs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the ADSs to be offered so as to enable an investor to decide to purchase or subscribe the ADSs, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The ADSs have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each underwriter has agreed that it will not offer or sell any ADSs, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re–offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines in Japan.

The ADSs may not be offered or sold by means of any document other than to persons whose ordinary business is to buy or sell shares or debentures, whether as principal or agent, or in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) of Hong Kong, and no advertisement, invitation or document relating to the ADSs may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to ADSs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made thereunder.

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the ADSs may not be circulated or distributed, nor may the ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA. Where the ADSs are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the ADSs under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

Table of Contents

No action may be taken in any jurisdiction other than the United States that would permit a public offering of the ADSs or the possession, circulation or distribution of this prospectus in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither the prospectus nor any other offering material or advertisements in connection with the ADSs may be distributed or published in or from any country or jurisdiction except under circumstances that will result in compliance with any applicable rules and regulations of any such country or jurisdiction.

A prospectus in electronic format will be made available on the websites maintained by the global coordinator or one or more securities dealers. The global coordinator may agree to allocate a number of ADSs for sale to their online brokerage account holders. ADSs to be sold pursuant to an Internet distribution will be allocated on the same basis as other allocations. In addition, ADSs may be sold by the underwriters to securities dealers who resell ADSs to online brokerage account holders.

Focus Media has agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act.

This prospectus may be used by the underwriters and other dealers in connection with offers and sales of the ADSs, including the ADSs initially sold by the underwriters in the offering being made outside of the United States, to persons located in the United States.

Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking and other services for Focus Media or its officers and directors for which they have received customary fees and commissions.

**Table of Contents**

### ENFORCEMENT OF CIVIL LIABILITIES

We are registered under the laws of the Cayman Islands as an exempted company with limited liability. We are registered in the Cayman Islands because of certain benefits associated with being a Cayman Islands corporation, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of foreign exchange control or currency restrictions and the availability of professional and support services. However, the Cayman Islands has a less developed body of securities laws as compared to the United States and provides protections for investors to a significantly lesser extent. In addition, Cayman Islands companies do not have standing to sue before the federal courts of the United States.

Substantially all of our assets are located outside the United States. In addition, a majority of our directors and officers and our special PRC counsel, Global Law Office are nationals or residents of jurisdictions other than the United States and all or a substantial portion of their assets are located outside the United States. As a result, it may be difficult for investors to effect service of process within the United States upon us or these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us, our officers and directors and Global Law Office.

We have appointed CT Corporation System as our agent to receive service of process with respect to any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States or of any state in the United States or any action brought against us in the Supreme Court of the State of New York in the County of New York under the securities laws of the State of New York.

Conyers Dill & Pearman, our counsel as to Cayman Islands law, and Global Law Office, our counsel as to PRC law, have advised us that there is uncertainty as to whether the courts of the Cayman Islands or the PRC would, respectively, (1) recognize or enforce judgments of United States courts obtained against us or our directors or officers or Global Law Office predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States, or (2) entertain original actions brought in the Cayman Islands or the PRC against us or our directors or officers or Global Law Office predicated upon the securities laws of the United States or any state in the United States.

Conyers Dill & Pearman have informed us that the uncertainty with regard to Cayman Islands law relates to whether a judgment obtained from the U.S. courts under civil liability provisions of the securities law will be determined by the courts of the Cayman Islands as penal or punitive in nature. The courts of the Cayman Islands will not recognize or enforce such judgments against a Cayman company, and because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands. Conyers Dill & Pearman, has further advised us that a final and conclusive judgment in the federal or state courts of the United States under which a sum of money is payable, other than a sum payable in respect of taxes, fines, penalties or similar charges, may be subject to enforcement proceedings as a debt in the courts of the Cayman Islands under the common law doctrine of obligation.

Global Law Office has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Global Law Office has advised us further that under PRC law, a foreign judgment, which does not otherwise violate basic legal principles, state sovereignty, safety or social public interest, may be recognized and enforced by a PRC court, based either on treaties between China

184

**Table of Contents**

and the country where the judgment is made or on reciprocity between jurisdictions. As there currently exists no treaty or other form of reciprocity between China and the United States governing the recognition of judgments, including those predicated upon the liability provisions of the U.S. federal securities laws, there is uncertainty whether and on what basis a PRC court would enforce judgments rendered by U.S. courts.

**LEGAL MATTERS**

We are being represented by Simpson Thacher & Bartlett LLP with respect to legal matters of United States federal securities and New York State law. Certain legal matters in connection with this offering will be passed upon for the underwriters by Debevoise & Plimpton LLP. The validity of the ordinary shares represented by the ADSs offered in this offering and legal matters as to Cayman Islands law will be passed upon for us by Conyers Dill & Pearman. Legal matters as to PRC law will be passed upon for us by Global Law Office and for the underwriters by Commerce & Finance Law Offices Conyers Dill & Pearman and Simpson Thacher & Bartlett LLP may rely upon Global Law Office with respect to matters governed by PRC law. Debevoise & Plimpton LLP may rely upon Commerce & Finance Law Offices with respect to matters governed by PRC law.

**EXPERTS**

The consolidated financial statements as of and for the years ended December 31, 2003, 2004 and 2005 for Focus Media Holding Limited included in this prospectus and the related financial statement schedule included elsewhere in the registration statement have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein, and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of December 31, 2003 and September 30, 2004 and for the year ended December 31, 2003 and the nine months ended September 30, 2004 for Perfect Media Holding included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of October 31, 2004 and for the period from March 11, 2004 to October 31, 2004 for Focus Media Changsha Holding Ltd. included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of October 31, 2004 and for the period from March 22, 2004 to October 31, 2004 for Focus Media Qingdao Holding Ltd. included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of October 31, 2004 and for the period from March 24, 2004 to October 31, 2004 for Focus Media Dalian Holding Ltd. included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of December 31, 2004 and for the year ended December 31, 2004 for Capital Beyond Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their

185

**Table of Contents**

reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements as of December 31, 2003, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005 for Infoachieve Limited included in this prospectus have been audited by Deloitte Touche Tohmatsu CPA Ltd., independent registered public accounting firm, as stated in their reports appearing herein and are included in reliance upon the reports of such firm, given on their authority as experts in accounting and auditing.

The consolidated financial statements of Target Media Holdings Limited as of December 31, 2004 and 2005 and for each of the years in the two–year period ended December 31, 2005 have been included in this registration statement in reliance upon the report of KPMG, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of such firm as experts in accounting and auditing.

The statements included in this prospectus under the caption "Prospectus Summary", "Risk Factors", "Our Corporate Structure", "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Our Industry", "Business", "Regulation of Our Industry", "Management", "Related Party Transactions", "Taxation" and "Enforcement of Civil Liabilities", to the extent they constitute matters of PRC law, have been reviewed and confirmed by Global Law Office, special PRC counsel to us, as experts in such matters, and are included herein in reliance upon such review and confirmation.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form F–1 (Registration Number 333–134714), and a registration statement on Form F–6 (Registration Number 333–126011), including relevant exhibits and schedules under the Securities Act, covering the ordinary shares represented by the ADSs offered by this prospectus, as well as the ADSs. You should refer to our registration statements and their exhibits and schedules if you would like to find out more about us and about the ADSs and the ordinary shares represented by the ADSs. This prospectus summarizes material provisions of contracts and other documents that we refer you to. Since the prospectus may not contain all the information that you may find important, you should review a full text of these documents.

The SEC also maintains a website that contains reports, proxy statements and other information about issuers, such as us, who file electronically with the SEC. The address of that website is http://www.sec.gov. The information on that website is not a part of this prospectus.

We will furnish to Citibank, N.A., as depositary of our ADSs, our annual reports. When the depositary receives these reports, it will upon our request promptly provide them to all holders of record of ADSs. We will also furnish the depositary with all notices of shareholders' meetings and other reports and communications in English that we make available to our shareholders. The depositary will make these notices, reports and communications available to holders of ADSs and will upon our request mail to all holders of record of ADSs the information contained in any notice of a shareholders' meeting it receives.

186

Table of Contents

We are subject to periodic reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. Accordingly, we are required to file reports, including annual reports on Form 20–F, and other information with the SEC. As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of proxy statements to shareholders under the federal proxy rules contained in Sections 14(a), (b) and (c) of the Exchange Act, and our executive officers, directors and principal shareholders are exempt from the reporting and short–swing profit recovery provisions contained in Section 16 of the Exchange Act. The registration statements, reports and other information so filed can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of these documents upon payment of a duplicating fee, by writing to the SEC. Please call the SEC at 1–800–SEC–0330 for further information on the operation of the public reference rooms.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**CONTENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated balance sheets as of December 31, 2003, 2004 and 2005 and as of March 31, 2006 (unaudited) | F–3 |
| Consolidated statements of operations for the years ended December 31, 2003, 2004 and 2005 and for the three months ended March 31, 2005 (unaudited) and 2006 (unaudited) | F–4 |
| Consolidated statements of shareholders' equity (deficiency) and comprehensive income (loss) for the years ended December 31, 2003, 2004 and 2005 and for the three months ended March 31, 2006 (unaudited) | F–5 |
| Consolidated statements of cash flows for the years ended December 31, 2003, 2004 and 2005 and for the three months ended March 31, 2005 (unaudited) and 2006 (unaudited) | F–6 |
| Notes to the consolidated financial statements | F–8 |

**Table of Contents**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
FOCUS MEDIA HOLDING LIMITED

We have audited the accompanying consolidated balance sheets of Focus Media Holding Limited and its subsidiaries (the "Group") as of December 31, 2003 and 2004 and 2005 and the related consolidated statements of operations, shareholders' equity (deficiency) and comprehensive income (loss), and cash flows for the years ended December 31, 2003 and 2004 and 2005, and related financial schedule included in Schedule 1. These financial statements and related financial statement schedule are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements and related financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Focus Media Holding Limited and its subsidiaries as of December 31, 2003 and 2004 and 2005 and the results of its operations and its cash flows for the above stated years in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects, the information set forth therein.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China
June 2, 2006

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, | | | March 31, 2006 |
|---|---|---|---|---|
| | 2003 | 2004 | 2005 | (Unaudited) |
| | | (In U.S. Dollars, except share data) | | |
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ 716,388 | $ 22,669,106 | $ 36,653,180 | $ 41,862,726 |
| Investment in available–for–sale securities | — | — | 34,835,850 | 34,792,100 |
| Accounts receivable, net of allowance for doubtful accounts of $nil, $173,837, $396,657 and $782,210 in 2003, 2004, 2005 and as of March 31, 2006 (unaudited) | 1,409,461 | 6,619,949 | 22,235,408 | 37,250,248 |
| Inventories | 90,950 | 1,243,140 | 479,529 | 605,290 |
| Prepaid expenses and other current assets | 148,906 | 2,109,468 | 45,363,833 | 7,810,070 |
| Amounts due from related parties | 252,576 | 2,740,032 | 2,073,329 | 2,982,256 |
| **Total current assets** | **2,618,281** | **35,381,695** | **141,641,129** | **125,302,690** |
| Rental deposits | 570,904 | 1,606,378 | 11,819,095 | 13,245,315 |
| Equipment, net | 1,978,399 | 9,197,143 | 43,694,888 | 70,993,193 |
| Acquired intangible assets, net | — | 708,306 | 1,157,920 | 30,881,195 |
| Goodwill | — | 9,058,086 | 13,298,072 | 406,790,780 |
| Long–term investments | 12,082 | 12,088 | — | 1,117,843 |
| Other long term assets | — | — | — | 220,553 |
| Deferred tax assets | 126,769 | 450,963 | 742,914 | 193,506 |
| **Total assets** | **$ 5,306,435** | **$ 56,414,659** | **$ 212,354,018** | **$ 648,745,075** |
| | | | | |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | | |
| **Current liabilities:** | | | | |
| Short–term bank loans | $     — | $     — | $   991,301 | $ 1,247,349 |
| Other short–term loans | — | — | — | 6,776,335 |
| Accounts payable | 436,244 | 607,091 | 5,847,530 | 8,279,605 |
| Accrued expenses and other current liabilities | 561,234 | 6,591,435 | 11,746,902 | 71,414,099 |
| Amounts due to related parties | 2,013,898 | — | — | 2,496,212 |
| Short–term loan from a shareholder | 500,000 | — | — | — |
| Income taxes payable | 608,275 | 1,435,486 | 2,108,071 | 2,188,412 |
| **Total current liabilities** | **4,119,651** | **8,634,012** | **20,693,804** | **92,402,012** |
| Commitments (Note 20) | | | | |
| Minority interest | 3,722 | 80,692 | 245,563 | 459,758 |
| **Mezzanine equity** | | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and nil, 41,967,400, nil and nil shares issued and outstanding in 2003, 2004, 2005 and as of March 31, 2006 (unaudited), respectively) | — | 6,295,110 | — | — |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and nil, 48,191,600, nil and nil shares issued and outstanding in 2003, 2004, 2005 and as of March 31, 2006 (unaudited), respectively) | — | 12,062,696 | — | — |
| Series C–1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and nil, 34,054,000, nil and nil shares issued and outstanding in 2003, 2004, 2005 and as of March 31, 2006 (unaudited), respectively) | — | 17,500,350 | — | — |
| Series C–2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and nil, 34,053,400, nil and nil shares issued and outstanding in 2003, 2004, 2005 and as of March 31, 2006 (unaudited), respectively) | — | 17,415,000 | — | — |
| **Shareholders' equity (deficiency)** | | | | |
| Ordinary shares ($0.00005 par value; 1,000,000,000, 885,516,600 ,19,800,000,000 and 19,800,000,000 shares authorized in 2003, 2004, 2005 and as of March 31, 2006 (unaudited); 200,000,000, 142,464,600, 378,306,000 and 506,457,633 shares issued and outstanding in 2003, 2004, 2005 and as of March 31, 2006 (unaudited), respectively) | 10,000 | 7,124 | 18,916 | 25,324 |
| Additional paid–in capital | 1,188,817 | 5,981,154 | 177,419,761 | 530,088,836 |
| Deferred share based compensation | — | (969,959) | (246,569) | — |
| Retained earnings (accumulated deficit) | 26,000 | (10,550,414) | 12,997,237 | 22,430,006 |
| Accumulated other comprehensive income (loss) | (41,755) | (41,106) | 1,225,306 | 3,339,139 |
| Total shareholders' equity (deficiency) | $ 1,183,062 | $ (5,573,201) | $ 191,414,651 | $ 555,883,305 |
| **Total liabilities, mezzanine equity and shareholders' equity (deficiency)** | **$ 5,306,435** | **$ 56,414,659** | **$ 212,354,018** | **$ 648,745,075** |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the years ended December 31, | | | Three months ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | | **(Unaudited)** | **(Unaudited)** |
| | | | (In U.S. Dollars, except share data) | | |
| **Net revenues:** | | | | | |
| — Commercial Locations | $ 3,368,557 | $ 26,321,179 | $ 61,434,760 | $ 9,431,521 | $ 21,472,376 |
| — In-store Network | — | — | 5,468,919 | — | 5,293,091 |
| — Poster Frame Network | — | — | — | — | 6,067,314 |
| Advertising Service Revenue | 3,368,557 | 26,321,179 | 66,903,679 | 9,431,521 | 32,832,781 |
| Advertising Equipment Revenue | 389,282 | 2,888,720 | 1,325,234 | 142,163 | 304,066 |
| **Total net revenues** | **3,757,839** | **29,209,899** | **68,228,913** | **9,573,684** | **33,136,847** |
| Cost of revenues: | | | | | |
| — Commercial locations | 1,565,887 | 6,745,522 | 17,943,318 | 2,902,606 | 8,035,150 |
| — In-store network | — | — | 7,422,641 | 286,004 | 3,973,244 |
| — Poster Frame Network | — | — | — | — | 2,397,268 |
| Advertising Service Cost | 1,565,887 | 6,745,522 | 25,365,959 | 3,188,610 | 14,405,662 |
| Advertising Equipment Cost | 275,360 | 1,934,331 | 975,747 | 70,571 | 231,814 |
| **Total cost of revenues** | **1,841,247** | **8,679,853** | **26,341,706** | **3,259,181** | **14,637,476** |
| **Gross profit** | **1,916,592** | **20,530,046** | **41,887,207** | **6,314,503** | **18,499,371** |
| Operating expenses: | | | | | |
| General and administrative | 984,848 | 3,987,496 | 9,119,846 | 1,881,111 | 4,395,342 |
| Selling and marketing | 406,634 | 3,453,533 | 9,543,748 | 1,491,644 | 4,057,199 |
| Amortization of acquired intangible assets | — | 77,443 | 437,837 | 67,352 | 999,178 |
| Goodwill impairment loss | — | 58,397 | | | |
| **Total operating expenses** | **1,391,482** | **7,576,869** | **19,101,431** | **3,440,107** | **9,451,719** |
| **Income from operations** | **525,110** | **12,953,177** | **22,785,776** | **2,874,396** | **9,047,652** |
| Interest income | 1,005 | 9,739 | 1,761,909 | 10,985 | 915,952 |
| Other income (expenses), net | (9,364) | (3,843) | (161,148) | 5,315 | 46,149 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | | (11,692,287) | | | |
| **Income before income taxes and minority interest** | **516,751** | **1,266,786** | **24,386,537** | **2,890,696** | **10,009,753** |
| Income taxes: | | | | | |
| Current | 608,274 | 828,962 | 715,117 | 223,536 | 65,076 |
| Deferred | (126,769) | 78,588 | (20,664) | 25,265 | 551,714 |
| Total income taxes | 481,505 | 907,550 | 694,453 | 248,801 | 616,790 |
| **Net income after income taxes before minority interest and equity loss of affiliates** | **35,246** | **359,236** | **23,692,084** | **2,641,895** | **9,392,963** |
| Minority interest | (8,360) | (13,516) | 144,433 | (598) | (39,806) |
| Equity loss of affiliates | (18,123) | | | | |
| **Net income** | **25,483** | **372,752** | **23,547,651** | **2,642,493** | **9,432,769** |
| Deemed dividend on Series A convertible redeemable preference shares | — | (8,308,411) | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | (2,191,442) | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | (13,356,087) | — | — | — |
| Premium of Series B convertible redeemable preference shares | — | 12,906,774 | — | — | — |
| **Income (loss) attributable to holders of ordinary shares** | **$ 25,483** | **$ (10,576,414)** | **$ 23,547,651** | **$ 2,642,493** | **$ 9,432,769** |
| Income (loss) per share — basic | $ 0.00 | $ (0.07) | $ 0.09 | $ 0.02 | $ 0.02 |
| Income (loss) per share — diluted | $ 0.00 | $ (0.07) | $ 0.06 | $ 0.01 | $ 0.02 |
| Shares used in calculating basic income (loss) per share | 144,657,600 | 160,998,600 | 252,128,545 | 142,464,600 | 438,232,094 |
| Shares used in calculating diluted income (loss) per share | 144,657,600 | 160,998,600 | 365,938,094 | 315,212,608 | 465,895,318 |

The accompanying notes are an integral part of these consolidated financial statements.

F–4

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIENCY) AND COMPREHENSIVE INCOME (LOSS)**

| | Ordinary Shares | Ordinary Amount | Additional paid-in capital | Deferred share based compensation | Retained earnings (accumulated deficit) | Accumulated other comprehensive income (loss) | Total shareholders' equity (deficiency) | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|---|
| | | | | (In U.S. dollars, except share data) | | | | |
| Balance at January 1, 2003 | — | $ — | $ 125,000 | $ — | $ 517 | $ (4,183) | $ 121,334 | $ — |
| Issuance of ordinary shares | 200,000,000 | 10,000 | 1,615,000 | — | — | — | 1,625,000 | |
| Capital distribution relating to Everease | — | — | (551,183) | — | — | — | (551,183) | |
| Cumulative translation adjustment | — | — | — | — | — | (37,572) | (37,572) | $ (37,572) |
| Net income | — | — | — | — | 25,483 | — | 25,483 | 25,483 |
| Balance at December 31, 2003 | 200,000,000 | $ 10,000 | $ 1,188,817 | $ — | 26,000 | $ (41,755) | $ 1,183,062 | $ (12,089) |
| Issuance of ordinary shares | 14,594,200 | 730 | 4,484,068 | — | — | — | 4,484,798 | |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | (62,400,000) | (3,120) | (1,048,469) | — | — | — | (1,051,589) | — |
| Reclassification of ordinary shares to Series C–1 convertible redeemable preference shares | (9,729,600) | (486) | (101,932) | — | — | — | (102,418) | |
| Deferred share based compensation | — | — | 1,334,835 | (1,334,835) | — | — | — | |
| Amortization of share–based compensation expense | — | — | 123,835 | 364,876 | — | — | 488,711 | |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | — | — | (8,308,411) | — | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | — | — | (2,191,442) | — | (2,191,442) | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | — | — | — | (13,356,087) | — | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | — | — | — | — | 12,906,774 | — | 12,906,774 | — |
| Cumulative translation adjustment | — | — | — | — | — | 649 | 649 | $ 649 |
| Net income | — | — | — | — | 372,752 | — | 372,752 | 372,752 |
| Balance at December 31, 2004 | 142,464,600 | $ 7,124 | $ 5,981,154 | (969,959) | $ (10,550,414) | $ (41,106) | $ (5,573,201) | $ 373,401 |
| Series A convertible redeemable preference shares converted into ordinary shares upon initial public offering | 41,967,400 | 2,098 | 6,293,012 | — | — | — | 6,295,110 | — |
| Series B convertible redeemable preference shares converted into ordinary shares upon initial public offering | 48,191,600 | 2,409 | 12,060,287 | — | — | — | 12,062,696 | — |
| Series C–1 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,054,000 | 1,703 | 17,498,647 | — | — | — | 17,500,350 | — |
| Series C–2 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,053,400 | 1,703 | 17,413,297 | — | — | — | 17,415,000 | — |
| Issuance of ordinary shares upon initial public offering, net of issuance cost of $13,703,370 | 77,575,000 | 3,879 | 118,170,251 | — | — | — | 118,174,130 | — |
| Deferred share based compensation | — | — | (264,751) | 264,751 | — | — | — | |
| Amortization of share–based compensation expense | — | — | 267,864 | 458,639 | — | — | 726,503 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unrealized loss on available–for–sale securities | — | — | — | — | — | (164,150) | (164,150) | $ (164,150) |
| Cumulative translation adjustments | — | — | — | — | — | 1,430,562 | 1,430,562 | 1,430,562 |
| Net income | — | — | — | — | 23,547,651 | — | 23,547,651 | 23,547,651 |
| **Balance at December 31, 2005** | **378,306,000** | **$ 18,916** | **$ 177,419,761** | **$ (246,569)** | **$ 12,997,237** | **$ 1,225,306** | **$ 191,414,651** | **$ 24,814,063** |
| Adjustment for adoption of SFAS 123 – R (unaudited) | — | — | (246,569) | 246,569 | — | — | — | — |
| Issuance of ordinary shares for acquisitions (unaudited) | 99,231,723 | 4,962 | 285,786,238 | — | — | — | 285,791,200 | — |
| Issuance of ordinary shares upon secondary offering, net of issuance cost of $3,466,700 (unaudited) | 15,000,000 | 750 | 61,782,550 | — | — | — | 61,783,300 | — |
| Exercise of employee stock options (unaudited) | 13,919,910 | 696 | 3,880,316 | — | — | — | 3,881,012 | — |
| Amortization of share–based compensation expense (unaudited) | — | — | 1,466,540 | — | — | — | 1,466,540 | — |
| Net income (unaudited) | — | — | — | — | 9,432,769 | — | 9,432,769 | $ 9,432,769 |
| Unrealized loss on available–for–sale securities (unaudited) | — | — | — | — | — | (43,750) | (43,750) | (43,750) |
| Cumulative translation adjustments (unaudited) | — | — | — | — | — | 2,157,583 | 2,157,583 | 2,157,583 |
| **Balance at March 31, 2006 (unaudited)** | **506,457,633** | **$ 25,324** | **$ 530,088,836** | **$ —** | **$ 22,430,006** | **$ 3,339,139** | **$ 555,883,305** | **$ 11,546,602** |

The accompanying notes are an integral part of these consolidated financial statements.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the year ended December 31 | | | For the three months ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | (In U.S. dollars) | (Unaudited) | (Unaudited) |
| Operating activities: | | | | | |
| Income (loss) attributable to holders of ordinary shares | $ 25,483 | $ (10,576,414) | $ 23,547,651 | $ 2,642,493 | $ 9,432,769 |
| Deemed dividend on Series A convertible redeemable preference shares | — | 8,308,411 | — | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | 2,191,442 | — | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | 13,356,087 | — | — | — |
| Premium relating to Series B convertible redeemable preference shares | — | (12,906,774) | — | — | — |
| Net income | 25,483 | 372,752 | 23,547,651 | 2,642,493 | 9,432,769 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest | (8,360) | (13,516) | 144,433 | (598) | (39,806) |
| Bad debt provision | — | 173,837 | 235,604 | 36,364 | 194,723 |
| Share based compensation | — | 488,711 | 726,503 | 333,960 | 1,466,540 |
| Depreciation and amortization | 143,876 | 923,163 | 4,927,016 | 622,175 | 3,605,818 |
| Loss on disposal of equipment | — | 22,470 | — | — | — |
| Investment loss on equity investment | 18,123 | — | — | — | — |
| Change in fair value of derivative liability | — | 11,692,287 | — | — | — |
| Goodwill impairment | — | 58,397 | — | — | — |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | | |
| Accounts receivable, net | (1,331,107) | (4,525,148) | (15,757,053) | (1,804,368) | 2,621,774 |
| Inventories | (80,660) | (1,030,529) | (408,223) | (788,522) | (124,346) |
| Prepaid expenses and other current assets | (121,304) | (1,740,427) | (2,347,426) | (77,708) | 2,918,858 |
| Amounts due from related parties | (252,576) | (2,487,456) | 666,703 | 1,425,866 | (908,927) |
| Rental deposits | (570,904) | (1,035,474) | (10,076,230) | (2,728,890) | 1,692,642 |
| Deferred taxes assets | (126,769) | 78,586 | (20,664) | 25,265 | 551,714 |
| Accounts payable | 429,144 | (1,609,816) | 5,007,564 | 1,017,042 | (683,773) |
| Accrued expenses and other current liabilities | 573,053 | 4,174,214 | 3,950,903 | (2,217,452) | (18,622,722) |
| Amounts due to related parties | 2,013,898 | (2,322,276) | — | — | 2,496,212 |
| Income tax payable | 608,235 | 825,100 | 672,585 | 637,052 | 164,289 |
| **Net cash provided by (used in) operating activities** | **$ 1,320,132** | **$ 4,044,875** | **$ 11,269,366** | **$ (877,321)** | **$ 4,765,765** |
| Investing activities: | | | | | |
| Purchase of equipment | $ (1,467,730) | $ (6,373,124) | $ (36,765,294) | $ (3,621,229) | $ (8,353,954) |
| Acquisition of assets from a related party | (1,208,131) | — | — | — | — |
| Purchase of subsidiaries, net of cash acquired | — | (4,697,378) | (4,982,523) | (3,056,622) | (57,718,824) |
| Deposit paid to acquire subsidiaries | — | — | (40,919,530) | — | — |
| Acquisition of equity investment | (30,205) | — | — | — | — |
| Investment in available–for–sale securities | — | — | (35,000,000) | — | — |
| **Net cash used in investing activities** | **$ (2,706,066)** | **$ (11,070,502)** | **$ (117,667,347)** | **$ (6,677,851)** | **$ (66,072,778)** |
| Financing activities: | | | | | |
| Proceeds from short–term loan from a shareholder | 500,000 | — | — | — | — |
| Repayment of short–term loan from a shareholder | — | (500,000) | — | — | — |
| Proceeds from issuance of ordinary shares, net of issuance costs of $nil in 2003, $13,703,370 in 2005, and $3,466,700 in 2006 (unaudited) | 1,625,000 | — | 118,174,130 | — | 65,664,312 |

F–6

Table of Contents

| | For the year ended December 31 | | | For the three months ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | (In U.S. dollars) | (Unaudited) | (Unaudited) |
| Proceeds from issuance of Series B convertible redeemable preference shares (net of issuance costs of $437,304) | — | 12,062,696 | — | — | — |
| Proceeds from issuance of Series C–2 convertible redeemable preference shares (net of issuance costs of $85,000) | — | 17,415,000 | — | — | — |
| Proceeds from short–term bank loans | — | — | 991,301 | — | 1,247,349 |
| Repayment of short–term bank loans | — | — | — | — | (991,301) |
| Repayment of short short–term loans | — | — | — | — | (78,802) |
| Capital injection from minority shareholders | — | — | 3,089 | — | 249,470 |
| **Net cash provided by financing activities** | **$ 2,125,000** | **$ 28,977,696** | **$ 119,168,520** | **$ —** | **$ 66,091,028** |
| Effect of exchange rate changes | $ (37,572) | $ 649 | $ 1,213,535 | $ — | $ 425,531 |
| **Net increase/ (decrease) in cash and cash equivalents** | **$ 701,494** | **$ 21,952,718** | **$ 13,984,074** | **$ (7,555,172)** | **$ 5,209,546** |
| Cash and cash equivalents, beginning of year/period | 14,894 | 716,388 | 22,669,106 | 22,669,106 | 36,653,180 |
| Cash and cash equivalents, end of year /period | $ 716,388 | $ 22,669,106 | $ 36,653,180 | $ 15,113,934 | $ 41,862,726 |
| Supplemental disclosure of cash flow information Income taxes paid | $ — | $ 738 | $ 94,391 | $ — | $ — |
| Interest paid | $ — | $ — | $ 11,581 | $ — | $ 26,651 |
| Supplemental disclosures of non–cash investing activity: Issuance of ordinary shares in exchange for technical know–how | $ 750,000 | $ — | $ — | $ — | $ — |
| Acquisition of subsidiaries: | | | | | |
| Value of ordinary shares issued | $ — | $ 4,484,798 | $ — | $ — | $ 285,791,199 |
| Cash consideration | — | 4,423,515 | 5,137,252 | 4,079,091 | 106,782,978 |
| Accounts payable | — | 538,860 | | | 49,219,897 |
| Assets acquired (including intangible assets and goodwill) | $ — | $ 9,447,173 | $ 5,137,252 | $ 4,079,091 | $ 441,794,074 |
| Non–cash financing activities: | | | | | |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | $ — | $ 9,360,000 | $ — | $ — | $ — |
| Reclassification of Series A convertible redeemable preference shares to Series C–1 convertible redeemable preference shares | $ — | $ 3,064,890 | $ — | $ — | $ — |
| Reclassification of Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference shares | $ — | $ 976,955 | $ — | $ — | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

F–7

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

**1.     Organization and Principal Activities**

Prior to May 2003, the Group operated through Shanghai Focus Media Advertisement Co. Ltd. ("Focus Media Advertisement") (formerly Shanghai Aiqi Advertising Co., Ltd. ("Aiqi")) which was established in September 1997. On April 11, 2003, the majority shareholder of Focus Media Advertisement, Jason Nanchun Jiang, incorporated Focus Media Holding Limited ("Focus Media Holding") with the same shareholders of Focus Media Advertisement. Through contractual arrangements described below, Focus Media Holding is deemed the primary beneficiary of Focus Media Advertisement resulting in Focus Media Advertisement being deemed a subsidiary of Focus Media Holding under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)") in substance, an existing company, Focus Media Advertisement, has been reorganized as a subsidiary of the new company Focus Media Holding. Focus Media Holding has the same controlling shareholder, the same non–controlling shareholders. Accordingly, the Group's financial statements are prepared by including the financial statements of Focus Media Advertisement through May 2003 and thereafter is the consolidated financial statements which includes Focus Media Holding and its subsidiaries and Focus Media Advertisement and its subsidiaries. As of March 31, 2006, the subsidiaries of Focus Media Holding and Focus Media Advertisement's subsidiaries include the following entities:

*Focus Media Holding Subsidiaries:*

| Subsidiary | Date of acquisition | Date of incorporation | Place of incorporation | Percentage of ownership |
|---|---|---|---|---|
| Focus Media (China) Holding Ltd. ("Focus Media Hong Kong") | N/A | April 23, 2003 | Hong Kong ("HK") | 100% |
| Focus Media Technology (Shanghai) Co., Ltd. ("Focus Media Technology") | N/A | June 19, 2003 | PRC | 100% |
| Perfect Media Holding Ltd. ("Perfect Media") | September 22, 2004 | June 4, 2004 | British Virgin Islands ("BVI") | 100% |
| Focus Media Qingdao Holding Ltd. ("Focus Media Qingdao") | October 15, 2004 | March 22, 2004 | BVI | 100% |
| Focus Media Dalian Holding Ltd. ("Focus Media Dalian") | October 15, 2004 | March 24, 2004 | BVI | 100% |
| Focus Media Changsha Holding Ltd. ("Focus Media Changsha") | October 15, 2004 | March 11, 2004 | BVI | 100% |
| Focus Media Digital Information Technology (Shanghai) Co., Ltd. ("Focus Media Digital") | N/A | October 27, 2004 | PRC | 100% |
| New Focus Media Technology (Shanghai) Co., Ltd. ("New Focus Media Technology") | N/A | September 5, 2005 | PRC | 100% |
| Sorfari Holdings Limited ("Sorfari") | March 22, 2005 | June 7, 2004 | BVI | 100% |
| Focus Media Tianjin Limited ("Focus Media Tianjin") | March 21, 2005 | November 19, 2004 | BVI | 80% |
| Capital Beyond Limited ("CBL") | March 21, 2005 | November 15, 2004 | BVI | 100% |
| Shanghai New Focus Media Advertisement Co ("New Focus Media Advertisement") | N/A | December 20, 2005 | PRC | 90% |
| Infoachieve Limited ("Infoachieve") | January 1, 2006 | July 28, 2004 | BVI | 100% |
| Shanghai Framedia Investment Consultation Co., Ltd. ("Framedia Consultation") | January 1, 2006 | June 16, 2005 | PRC | 100% |
| Target Media Holdings Limited ("Target Media Holding") | February 28, 2006 | July, 2004 | Cayman Islands | 100% |
| Target Media Multi–Media Technology (Shanghai) Co., Ltd. ("TMM") | February 28, 2006 | August 17, 2004 | PRC | 100% |
| Dotad Holdings Limited ("Dotad") | March 21, 2006 | February 17, 2006 | BVI | 100% |

F–8

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
(In U.S. dollars except share data and unless otherwise stated)

*Focus Media Advertisement Subsidiaries:*

| Subsidiary | Date of acquisition | Date of incorporation | Place of incorporation | Percentage of ownership |
|---|---|---|---|---|
| Sichuan Focus Media Advertising Co., Ltd. ("Focus Media Sichuan") | N/A | October 16, 2003 | PRC | 90% |
| Shanghai Focus Media Advertising Agency Co., Ltd. ("Focus Media Advertising Agency") | N/A | October 15, 2004 | PRC | 100% |
| Shanghai On–Target Advertisement Co., Ltd. ("On– Target") | April 23, 2004 | April 15, 2003 | PRC | 60% |
| Wuhan Ge Shi Focus Media Advertising Co., Ltd. ("Focus Media Wuhan") | April 23, 2004 and March 1, 2006 | November 13, 2003 | PRC | 100% |
| Yunnan Focus Media Advertising Co., Ltd. ("Focus Media Yunnan") | July 9, 2004 and November 9, 2004 | March 3, 2004 | PRC | 89.5% |
| Nanjing Focus Media Advertising Co., Ltd. ("Focus Media Nanjing") | August 10, 2004 | September 18, 2003 | PRC | 90% |
| Zhejiang Rui Hong Focus Media Advertising Co., Ltd. ("Focus Media Zhejiang") | September 15, 2004 | March 24, 2004 | PRC | 80% |
| Shanghai Perfect Media Advertising Co., Ltd. ("Shanghai Perfect Media") | September 22, 2004 | June 4, 2003 | PRC | 100% |
| Qingdao Fukesi Advertisement Co. Ltd.("Qingdao Advertising") | October 15, 2004 | March 22, 2004 | PRC | 100% |
| Dalian Focus Media Advertising Co., Ltd. ("Dalian Advertising") | October 15, 2004 | March 24, 2004 | PRC | 100% |
| Changsha Focus Media Shiji Advertisement Co., Ltd. ("Changsha Advertising") | October 15, 2004 | March 11, 2004 | PRC | 100% |
| Chongqing Geyang Focus Media Culture Advertising & Broadcasting Co. Ltd. ("Chongqing Advertising") | September 15, 2004 | October 10, 1999 | PRC | 60% |
| Shanghai Qianjian Advertising Co., Ltd. ("Qianjian Advertising") | October 15, 2004 | July 3, 2003 | PRC | 100% |
| Xi'an Focus Media Culture & Information Communication Co., Ltd. ("Xian Focus Media") | March 21, 2005 | September 16, 2003 | PRC | 70% |
| Xiamen Guomao Advertising Co., Ltd. ("Xiamen Advertising") | March 4, 2005 | March 23, 1998 | PRC | 100% |
| Tianjin Tongsheng Modern Display and Advertisement Co., Ltd. ("Tianjin Advertising") | March 21, 2005 | September 3, 1998 | PRC | 80% |
| Zhuhai Focus Media Culture and Communication Co., Ltd. ("Focus Media Zhuhai") | March 21, 2005 | June 21, 2004 | PRC | 100% |
| Hebei Tianmaweiye Advertisement Co., Ltd. ("Hebei Advertising") | March 22, 2005 | December 6, 2004 | PRC | 100% |
| Guangdong Framedia Advertisement Co., Ltd. ("Guangdong Framedia") | March 21, 2005 | December 16, 2003 | PRC | 100% |
| Shenzhen Bianjie Building Advertising Co., Ltd. ("Shenzhen Bianjie") | August 15, 2005 | December 16, 2003 | PRC | 100% |
| Hefei Focus Advertising Co., Ltd. ("Hefei Advertising") | N/A | October 27, 2005 | PRC | 100% |
| Fuzhou Focus Advertising Co., Ltd. ("Fuzhou Advertising") | December 12, 2005 | October 21, 2005 | PRC | 70% |
| Jinan Focus Media Advertising Co., Ltd. (Jinan Advertising") | December 6, 2005 | June 7, 2005 | PRC | 100% |
| Shenyang Focus Media Advertising Co., Ltd. ("Shenyang Advertising") | November 20, 2005 | March 12, 2004 | PRC | 100% |

F–9

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
(In U.S. dollars except share data and unless otherwise stated)

| Subsidiary | Date of acquisition | Date of incorporation | Place of incorporation | Percentage of ownership |
|---|---|---|---|---|
| Framedia Advertisement Development (Shanghai) Co., Ltd. ("Framedia Development") | January 1, 2006 | April 28, 2004 | PRC | 100% |
| New Framedia Advertisement (Shanghai) Co., Ltd. ("New Framedia") | January 1, 2006 | November 21, 2005 | PRC | 100% |
| Guangdong Century Sparkle Advertisement Co., Ltd. ("Sparkle") | January 1, 2006 | March 25, 2005 | PRC | 100% |
| Shanghai Target Media Co., Ltd. ("STM") | February 28, 2006 | December 16, 2003 | PRC | 100% |
| Shenyang Target Media Ltd. ("Shenyang TM") | February 28, 2006 | June 15, 2005 | PRC | 100% |
| Fuzhou Heng Ding United Media Ltd. ("Heng Ding") | February 28, 2006 | December 16, 2003 | PRC | 100% |
| Shanghai New Target Media Co., Ltd. ("New STM") | February 28, 2006 | January 22, 2006 | PRC | 100% |
| Shenzhen E–times Consulting Co., Ltd. ("E–times Consulting") | January 1, 2006 | December 21, 2005 | PRC | 100% |
| Beijing Focus Media Wireless Co., Ltd. ("Focus Media Wireless") | March 21, 2006 | December 8, 2005 | PRC | 100% |

Focus Media Holding and all of its subsidiaries including Focus Media Advertisement and its subsidiaries are collectively referred to as the "Group".

In May 2003, in connection with the establishment of Focus Media Holding, the Group changed its business model from operating as an advertising agency generating revenue from commissions for selling advertisements to media companies on behalf of advertising clients to selling out–of–home television advertising time slots on its network of flat–panel television advertising displays located in high traffic areas in commercial locations.

PRC regulations currently limit foreign ownership of companies that provide advertising services, including out–of–home television advertising services. To comply with these regulations, the Group conducts substantially all of its activities through Focus Media Advertisement and its subsidiaries, a variable interest entity which was renamed from Aiqi, and was established in Shanghai China on September 2, 1997. Focus Media Advertisement entered into various agreements with the Group, including a transfer of trademarks and exclusive services agreement. Under these agreements, Focus Media Advertisement has the right to use the trade name of the Group, and the Group, through Focus Media Technology, is the provider of technical and consulting services to Focus Media Advertisement. In return, Focus Media Advertisement is required to pay the Group services fees for the use of trade name and for the technical and consulting services it receives. The technical and consulting service fees are adjusted at the Group's sole discretion. The Group is entitled to receive service fees in an amount up to all of the net income of Focus Media Advertising. The Group has also provided funds to Focus Media Advertisement in an amount up to $732,536 as of March 31, 2006 (unaudited), to finance the development of its business.

In addition, the Group has been assigned all voting rights by the direct and indirect owners of Focus Media Advertisement through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally the Group has the option to acquire the equity interests of Focus Media Advertisement and its subsidiaries for a purchase price equal to the respective registered capital of Focus Media Advertisement and its subsidiaries or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. Each of the shareholders of Focus Media Advertisement has agreed to pay the Group any excess of the purchase price paid for such equity interests in, or assets of, Focus Media Advertisement or its

F–10

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

subsidiaries over the registered capital of Focus Media Advertisement or its subsidiaries in the event that such option is exercised.

The Group and its related parties hold all the variable interests of Focus Media Advertisement and the Group has been determined to be most closely associated with Focus Media Advertisement. Therefore the Group is the primary beneficiary of Focus Media Advertisement. The agreements described above provided for effective control of Focus Media Advertisement to be transferred to the Group at April 11, 2003. Focus Media Advertisement had operating activity prior to entering into these agreements with the Group. As a result, the consolidated financial statements reflect the consolidation of Focus Media Advertisement starting from May 2003.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46 "Consolidation of Variable Interest Entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after January 31, 2003. FASB issued FIN 46 (Revised) "Consolidation of Variable Interest Entities", which provides for the deferral of the implementation date to the end of the first reporting period after March 15, 2004, unless the Group has a special purpose entity, in which case the provisions must be applied for fiscal years ended December 31, 2003. However, the Group has elected to retroactively apply FIN 46 (Revised) and has consolidated Focus Media Advertisement as its variable interest entity from May 2003.

**2.     Summary of Significant Accounting Policies**
*(a) Basis of Presentation*

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP"). The consolidated financial statements reflect consolidated operations thereafter.

*(b) Basis of Consolidation*

The consolidated financial statements include the financial statements of the Group, its majority owned subsidiaries and its variable interest entity, Focus Media Advertisement and its majority owned subsidiaries. All inter–company transactions and balances have been eliminated upon consolidation. The affiliated companies where the Group owns more than 20% of the investment are accounted for using the equity method of accounting. The Group's share of earnings of the equity investments are included in the accompanying consolidated statements of operations.

*(c) Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of 3 months or less when purchased.

*(d) Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and

F–11

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's financial statements include allowance for doubtful accounts, the useful lives of and impairment for equipment and intangible assets, valuation allowance for deferred tax assets and impairment of goodwill.

*(e) Significant Risks and Uncertainties*

The Group participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: the Group's limited operating history; advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on share market in the U.S.; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Group's ability to attract and retain employees necessary to support its growth, risks associated with the Group's growth strategies; and general risks associated with the advertising industry.

*(f) Investment in Available–for–sale Securities*

The Group classifies all of its short–term investments as available–for–sale securities. Such short–term investments consist primarily of debt instrument which are stated at fair market value, with unrealized gains and losses recorded as accumulated other comprehensive income (loss). Unrealized losses, which are deemed other than temporary, are recorded in the statement of operations as other expenses.

*(g) Inventory*

Inventory is stated at the lower of cost or market value.

*(h) Equipment, Net*

Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Media display equipment | 5 years |
| Computers and office equipment | 5 years |
| Vehicles | 5 years |
| Leasehold Improvements | lesser of the term of the lease or the estimated useful lives of the assets |

The Group assembles certain of the media display equipment. In addition to costs under assembly contracts, external costs directly related to the assembly of such equipment, including duty and tariff, equipment installation and shipping costs are capitalized.

*(i) Impairment of Long–Lived Assets*

The Group reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than

F–12

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets.

*(j) Goodwill*

    Beginning in 2002, with the adoption of Statement of Financial Accounting Standards ("SFAS") 142, "Goodwill and Other Intangible Assets," goodwill is no longer amortized, but instead tested for impairment upon first adoption and annually thereafter, or more frequently if events or changes in circumstances indicate that it might be impaired. SFAS No. 142 requires the Group to complete a two–step goodwill impairment test. The first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. SFAS No. 142 requires completion of this first step within the first six months of initial adoption and annually thereafter. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

    Management performed the annual goodwill impairment test as of December 31, 2004 and an impairment loss of $58,397 was recorded for the Perfect Media reporting unit. The fair value of the Perfect Media reporting unit was estimated using a combination of expected present value of future cash flow and income approach valuation methodologies. The Group recorded an impairment charge because the amount the Group paid for the acquisition of Perfect Media exceeded its fair market value. Management also performed an annual goodwill impairment test as of December 31, 2005, and no impairment loss was required.

F–13

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The changes in the carrying amount of goodwill for the year ended December 31 2004, 2005 and three months ended March 31, 2006 (unaudited) are as follows:

| | Perfect Media | In–elevator poster frame network advertising services | Mobile–phone advertising service | Out–of–home television advertising services |
|---|---|---|---|---|
| Balance as of January 1, 2004 | $            — | $            — | $            — | $            — |
| Goodwill acquired during the year | 4,783,749 | — | — | 4,717,785 |
| Tax benefits arising from acquired subsidiaries | (39,527) | — | — | (345,524) |
| Impairment losses | (58,397) | — | — | — |
| Balance as of December 31, 2004 | $     4,685,825 | — | — | 4,372,261 |
| Transfer to out–of–home advertising services | (4,685,825) | — | — | 4,685,825 |
| Goodwill acquired during the year | — | — | — | 4,043,747 |
| Tax benefits arising from acquired subsidiaries | — | — | — | (244,236) |
| Modification of original purchase price allocation | — | — | — | 64,477 |
| Translation adjustments | — | — | — | 375,998 |
| Balance as of December 31, 2005 | — | — | — | 13,298,072 |
| Goodwill acquired during the period (unaudited) | — | 91,842,602 | 8,320,374 | 291,781,399 |
| Translation adjustments (unaudited) | — | 695,404 | — | 852,929 |
| Balance as of March 31, 2006 (unaudited) | | $  92,538,006 | $  8,320,374 | $  301,246,575 |

Commencing in 2005, the Group reorganized the financial information reviewed by the chief decision maker, the CEO, whereby the financial information of Perfect Media was prepared and presented together with that of out–of–home television advertising services. Accordingly, the Group believes it has only one operating segment which is the out–of–home advertising services as of December 31, 2005. As a result, for the purpose of SFAS No. 142, goodwill was tested for impairment at the consolidated level as of December 31, 2005.

As a result of the acquisition of Infoachieve and Dotad in the period ended March 31, 2006 (unaudited), the Group has two new operating and reporting segments, including poster frame network advertising services and mobile–phone advertising service.

*(k) Revenue Recognition*

The Group's revenues are primarily derived from advertising services and to a lesser extent, sales from advertising equipment. Revenues from advertising services are recognized ratably over the year in which the advertisement is displayed. Revenues from advertising equipment are recognized once the advertising equipment is delivered. Accordingly, revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the

F–14

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

Prior to May 2003, the Group operated as an advertising agency, by which it acted as an advertising agency generating revenue from commissions for selling advertisements to media companies on behalf of advertising clients. The Group was responsible for collecting the full charges and remitted flat amount, less commissions to the media companies. The commission revenue represented the negotiated percentage of the sales price. The Group evaluates the criteria outlined in Emerging Issues Task Force ("EITF") No. 99–19, "Reporting Revenue Gross as Principal Versus Net as an Agent," in determining whether it is appropriate to record the gross amount of revenues and related costs or the net amount earned after deducting fees remitted to media companies. Accordingly, the Group recorded the net amount billed to its customers since the Group was the agent in these transactions, and had little latitude in establishing prices, and was not involved in the determination of the service specifications.

F–15

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The Group presents advertising service revenue, net of sales taxes incurred, as follows:

| | For the years ended December 31, | | | Three months ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | | (Unaudited) | (Unaudited) |
| | | | (In U.S. dollars, except per share data) | | |
| Gross Advertising Service Revenue: | | | | | |
| *Commercial Locations* | | | | | |
| — Unrelated parties | $ 2,581,448 | $ 25,321,614 | $ 62,632,982 | $  9,233,745 | $  21,200,216 |
| — Related parties | 1,098,879 | 3,787,798 | 4,793,275 | 1,134,181 | 2,353,672 |
| Total Commercial Locations | 3,680,327 | 29,109,412 | 67,426,257 | 10,367,926 | 23,553,888 |
| *In–store Network* | | | | | |
| — Unrelated parties | — | — | 5,475,192 | — | 5,215,360 |
| — Related parties | — | — | 517,998 | — | 602,088 |
| Total in–store network | — | — | 5,993,190 | — | 5,817,448 |
| *Poster Frame Network* | | | | | |
| — Unrelated parties | — | — | — | — | 6,658,286 |
| — Related parties | — | — | — | — | — |
| Total Poster Frame Network | — | — | — | — | 6,658,286 |
| Gross Advertising Services Revenue: | 3,680,327 | 29,109,412 | 73,419,447 | 10,367,926 | 36,029,622 |
| Less: Sales taxes: | | | | | |
| *Commercial Locations* | 311,770 | 2,788,233 | 5,991,497 | 936,405 | 2,081,512 |
| *In–store Network* | — | — | 524,271 | — | 524,357 |
| *Poster Frame Network* | — | — | — | — | 590,972 |
| Total sales taxes | 311,770 | 2,788,233 | 6,515,768 | 936,405 | 3,196,841 |
| Net Advertising Service Revenue | 3,368,557 | 26,321,179 | 66,903,679 | 9,431,521 | 32,832,781 |
| Add: Advertising Equipment Revenue: | 389,282 | 2,888,720 | 1,325,234 | 142,163 | 304,066 |
| **Net revenues:** | **$ 3,757,839** | **$ 29,209,899** | **$ 68,228,913** | **$  9,573,684** | **$  33,136,847** |

*(l) Operating Leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

*(m) Advertising Costs*

The Group expenses advertising costs as incurred. Total advertising expenses were $17,919, $45,712, $76,428, $15,985, and $271,700 for the years ended December 31, 2003, 2004, and 2005 and the three months ended March 31, 2005 (unaudited) and 2006 (unaudited), respectively and have been included as part of selling and marketing expenses.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*(n) Foreign Currency Translation*

The functional and reporting currency of Focus Media Holding is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.

The financial records of the Group's subsidiaries and its variable interest entity are maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive income (loss) in the statement of shareholders' equity (deficiency).

*(o) Income Taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(p) Comprehensive Income (Loss)*

Comprehensive income (loss) includes foreign currency translation adjustments and unrealized gains (losses) on marketable securities classified as available for sale. Comprehensive income (loss) is reported in the statements of shareholders' equity (deficiency).

*(q) Fair Value of Financial Instruments*

Financial instruments include cash and cash equivalents, investment in available–for–sale securities, short–term borrowing and the Series A, Series B and Series C convertible redeemable preference shares. The carrying values of cash and cash equivalents, investment in available–for–sale securities and short–term borrowing approximate their fair values due to their short–term maturities. The Group utilized a third party valuations firm to determine the fair value of the mezzanine equity component and the embedded liability of the Series A, Series B and Series C convertible redeemable preference shares. The valuation report utilized generally accepted valuation methodologies such as the current value method and the market value approach, which incorporates certain assumptions such as the Group's expected future cash flows and discount rates.

*(r) Share–based Compensation*

Effective January 1, 2006 the Group adopted SFAS No. 123 (revised 2004), "Share–Based Payment" ("SFAS 123–R") using the modified prospective application transition method, which establishes accounting for share–based awards exchanged for employee services. Accordingly,

F–17

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

share–based compensation cost is measured at grant date, based on the fair value of the award, and recognized in expense over the requisite service period. The Group previously applied Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related Interpretations and provided the pro forma disclosures required by SFAS No. 123, "Accounting for Stock–Based Compensation" ("SFAS 123"). APB 25 required the Group to record a compensation charge for the excess of the market value of the share at the grant date or any other measurement date over the amount an employee must pay to acquire the share. The compensation expense is recognized over the service period which is the vesting period.

***Periods prior to the adoption of SFAS 123–R.*** Prior to the adoption of SFAS 123–R, the Group provided the disclosures required under SFAS 123, as amended by SFAS No. 148, *"Accounting for Stock–Based Compensation — Transition and Disclosures"* ("SFAS 148").

The following table illustrates the effect on net income and income per share as if the Group had applied the fair value recognition provisions of SFAS 123 to options granted under the Group's share–based compensation plans prior to the adoption. For purposes of this pro forma disclosure the value of the options was estimated using the Black–Scholes option–pricing model and amortized using an accelerated method over the respective vesting periods of the awards. Disclosures for the

F–18

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

three months ended March 31, 2006 are not presented because share–based payments were accounted for under SFAS 123–R's fair–value method during this period.

| | Years ended December 31, | | Three months ended March 31, 2005 |
|---|---|---|---|
| | **2004** | **2005** | |
| | | | **(Unaudited)** |
| Net income, as reported | $ 372,752 | $ 23,547,651 | $ 2,642,493 |
| Add: Share based compensation as reported | 488,711 | 726,503 | 333,960 |
| Less: Share based compensation determined using the fair value method | (566,819) | (3,225,668) | (877,618) |
| Pro forma net income | $ 294,644 | $ 21,048,486 | $ 2,098,835 |
| Deemed dividend on Series A convertible redeemable preference shares | (8,308,411) | — | — |
| Deemed dividend on Series B convertible redeemable preference shares | (2,191,442) | — | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | (13,356,087) | — | — |
| Premium of Series B convertible redeemable preference shares | 12,906,774 | — | — |
| Pro forma net income (loss) attributable to holders of ordinary shareholders | $ (10,654,522) | $ 21,048,486 | $ 2,098,835 |
| Basic income (loss) per share: | | | |
| As reported | $ (0.07) | $ 0.09 | $ 0.02 |
| Pro forma | $ (0.07) | $ 0.08 | $ 0.01 |
| Diluted income (loss) per share: | | | |
| As reported | $ (0.07) | $ 0.06 | $ 0.01 |
| Pro forma | $ (0.07) | $ 0.06 | $ 0.01 |

The fair value of each employee, officer and director option granted is estimated on the date of grant using the Black–Scholes option–pricing model with the following assumptions used for grants during the applicable period.

| | | | Three months ended March 31, | |
|---|---|---|---|---|
| | **2004** | **2005** | **2005** | **2006** |
| | | | **(Unaudited)** | **(Unaudited)** |
| Option granted to employees: | | | | |
| Average risk–free rate of return | 2.97% | 3.10–4.43% | 3.38% | 4.74% |
| Weighted average expected option life | 1–3 years | 2–3 years | 3 years | 2 years |
| Volatility rate | 36.2% | 30.49%–36.2% | 36.2% | 40.0% |
| Dividend yield | 0% | 0% | 0% | 0% |

Prior to 2004 the Group did not grant share options to employees, directors or consultants or advisors or any members of the Group.

F–19

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*Adoption of SFAS 123–R.* Effective the quarter ended March 31, 2006, the Group recorded share–based compensation cost totaling the amount that would have been recognized had the fair value method been applied since the effective date of SFAS 123–R. Results for prior periods have not been restated. The effect of recording share–based compensation for the three month period ended March 31, 2006 (unaudited) was that the Group recorded additional share–based compensation of $1,389,563.

As required by SFAS 123–R, management has made an estimate of expected forfeitures and is recognizing compensation costs only for those equity awards expected to vest. The cumulative effect of initially adopting SFAS 123–R was not significant.

*(s) Income (loss) per Share*

Basic income (loss) per share is computed by dividing income (loss) attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the year/period. Diluted income per ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation in loss years as their effects would be antidilutive.

*(t) Recently Issued Accounting Standards*

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Instruments–an amendment of FASB Statements 133 and 140", which is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006. The statement improves financial reporting by eliminating the exemption from applying SFAS No. 133 to interests in securitized financial assets so that similar instruments are accounted for similarly regardless of the form of the instruments. The Statement also improves financial reporting by allowing a preparer to elect fair value measurement at acquisition, at issuance, or when a previously recognized financial instrument is subject to a re–measurement event, on an instrument–by–instrument basis, in cases in which a derivative would otherwise have to bifurcated, if the holder elects to account for the whole instrument on a fair value basis. The Group is currently evaluating the impact, if any, of this Statement on the consolidated combined financial statements.

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123–R, which is a revision of SFAS 123. SFAS 123–R supersedes APB 25, "Accounting for Stock Issued to Employees." Generally, the approach in SFAS 123–R is similar to the approach described in SFAS 123. However, SFAS 123–R requires all share–based payments to employees, including grants of employee stock options, to be recognized in the income statement based on the grant–date fair values. Pro forma disclosure previously permitted under SFAS 123 is no longer an alternative. Through 2005, the Group accounted for its stock option plans using the intrinsic value method under APB 25. Effective the beginning of 2006, the Group adopted SFAS 123–R and elected to adopt the modified prospective application method. SFAS 123–R requires the Group to use a fair–value based method to account for share–based compensation. Accordingly, share–based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as expense over the employees' requisite service period. Total compensation cost for the Group's stock plan in the first quarter of 2006 (unaudited) was $1,466,540. The expected impact that the adoption of the standard will have on the Group for 2006 (unaudited) is $6,061,212.

F–20

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

In November 2004, the FASB issued SFAS No. 151, "Inventory Costs — an amendment of ARB No. 43, Chapter 4" ("SFAS 151"). SFAS 151 clarifies the accounting that requires abnormal amounts of idle facility expenses, freight, handling costs, and spoilage costs to be recognized as current–period charges. It also requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. SFAS 151 will be effective for inventory costs incurred on or after July 1, 2005. The adoption of this standard will not have a material effect on the Group's financial position or results of operations.

In December 2004, the FASB issued SFAS No. 153, "Exchanges of Nonmonetary Assets — an amendment of APB Opinion No. 29" ("SFAS 153"), which amends Accounting Principles Board Opinion No. 29, "Accounting for Nonmonetary Transactions" to eliminate the exception for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. SFAS 153 is effective for nonmonetary assets exchanges occurring in fiscal periods beginning after June 15, 2005. The adoption of this statement will not have a material effect on the Group's financial position or results of operations.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections" ("SFAS 154"), which replaces Accounting Principles Board Opinions No. 20, "Accounting Changes" and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements — An Amendment of APB Opinion No. 28." SFAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. SFAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The adoption of this statement will not have a material effect on the Group's financial position or results of operations.

*(u) Reclassification*

Certain prior year amounts have been reclassified to conform with the current period's presentation.

*(v) Unaudited interim financial information*

The interim financial information as of March 31, 2006 and for the three months ended March 31, 2005 and 2006 are unaudited and have been prepared on the same basis as the audited financial statements. In the opinion of management, such unaudited financial information includes all adjustments (consisting only of normal recurring adjustments) necessary for a fair presentation of the interim information. Operating results for the three months ended March 31, 2006 are not necessarily indicative of the results that may be expected for the year ended December 31, 2006.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

3.    **Acquisitions**

  During the years ended December 31, 2004, 2005 and three months ended March 31, 2006, the Group made the following acquisitions to continue to expand their networks in desirable locations and to establish other stand alone networks that provide effective channels for advertisers:

  *(1)* On April 23, 2004, the Group increased its existing ownership of On–Target from 30% to 60% by acquiring an additional 30% of the outstanding ordinary shares of On–Target, an advertising agency, in exchange for cash of $36,247. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $  197,555 | |
| Intangible assets: | | |
|     Customer base | 138,898 | 7 years |
| Goodwill | 94,904 | N/A |
| Total | $    36,247 | |

  *(2)* On April 23, 2004, the Group acquired 75% of the outstanding ordinary shares of Focus Media Wuhan ("Focus Media Wuhan"), an advertising service provider, for zero cash consideration. Subsequently, on March 1, 2006, the Group acquired remaining 25% of the outstanding ordinary shares of Focus Media Wuhan for share consideration of 74,720 ordinary shares, valued at of $5 per ordinary share, which was determined based on average market price of Focus Media Holding's common shares traded over 3 days before and after the acquisition were agreed and announced. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  | April 23, 2004 | March 1, 2006 | Amortization period |
|---|---|---|---|
|  |  | (Unaudited) | |
| Net tangible liabilities assumed | $        4,667 | $          — | |
| Intangible assets: | | | |
|     Lease Agreements | 29,269 | — | 2.3 years |
| Goodwill | — | 373,600 | N/A |
| Total | $      24,602 | $    373,600 | |

F–22

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*(3)* In July and November, 2004, the Group acquired 89.5% of the outstanding ordinary shares of Focus Media Yunnan, an advertising service provider, in exchange for cash of $273,062, of which $217,483 was paid as of December 31, 2004 and the remainder was paid in 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $ 27,181 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 6,103 | 2.3 years |
|    Customer base | 6,050 | 7 years |
| Goodwill | 233,728 | N/A |
| Total | $ 273,062 |  |

*(4)* On August 10, 2004, the Group acquired 90% of the outstanding ordinary shares of Focus Media Nanjing, an advertising service provider for zero consideration. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible liabilities assumed | $ 270,230 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 13,810 | 2.3 years |
|    Customer base | 41,321 | 7 years |
| Goodwill | 215,099 | N/A |
| Total | $ — |  |

*(5)* On September 15, 2004, the Group acquired 80% of the outstanding ordinary shares of Focus Media Zhejiang, an advertising service provider, in exchange for cash of $821,593 of which $410,797 was paid as of December 31, 2004 and the remainder was paid in 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
| --- | --- | --- |
| Net tangible assets acquired | $ 315,347 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 47,169 | 2.3 years |
|    Customer base | 24,357 | 7 years |
| Goodwill | 434,720 | N/A |
| Total | $ 821,593 |  |

F–23

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

(6) On September 22, 2004, the Group acquired 100% of the outstanding ordinary shares of Perfect Media which includes its then variable interest entity Shanghai Perfect Media, an advertising services provider, in exchange for cash of $500,000 and 14,594,200 ordinary shares having a fair value of $0.31 per ordinary share which was determined by a retrospective valuation performed by an unrelated party.

The valuation was based on the guideline companies approach which incorporates the market performance of comparable listed companies as well as the financial results and growth trends of the Group to derive the total equity value of the Group. The valuation model then allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two scenarios: preference shares that have a value in excess of their conversion price were treated as if they had converted into ordinary shares; and preference shares that have a value below their conversion price were assigned a value that took into consideration their liquidation preference. Ordinary shares were assigned a value equal to their pro rata share of the residual amount (if any) that remained after consideration of the liquidation preference of preferred stock with a value below their conversion price.

Immediately following the acquisitions, Perfect Media became a wholly owned subsidiary of Focus Media Holding and Shanghai Perfect Media became a wholly owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The Group's primary reason for the acquisition of Perfect Media was its complementary business model and its strong relationships with landlords and property managers of commercial building locations in which the Group desired to locate its flat–panel displays. The acquisition of Perfect Media resulted in a significant amount of goodwill because the amount the Group paid for Perfect Media exceeded its fair market value. The Group was willing to pay in excess of Perfect Media's fair market value in order to maintain its competitive advantage within the commercial buildings the Group already occupied. The aggregate purchase price of $4,984,798 consisted of the following:

| | | |
|---|---|---:|
| Cash consideration | $ | 500,000 |
| Value of the ordinary shares issued | | 4,484,798 |
| Total consideration | $ | 4,984,798 |

The purchase price was allocated as follows:

| | | | Amortization period |
|---|---|---:|---|
| Net tangible assets acquired | $ | 1,086 | |
| Intangible assets: | | | |
|     Lease Agreements | | 185,947 | 2.3 years |
|     Customer base | | 14,016 | 7 years |
| Goodwill | | 4,783,749 | N/A |
| Total | $ | 4,984,798 | |

F–24

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

(7) On October 15, 2004, the Group acquired 100% of the outstanding ordinary shares of Focus Media Qingdao including its then variable interest entity Qingdao Advertising, an advertising services provider, in exchange for cash of $989,496. Immediately following the acquisition Focus Media Qingdao became a wholly owned subsidiary of Focus Media Holding and Qingdao Advertising became a wholly owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $ 74,642 | |
| Intangible assets: | | |
| Lease Agreements | 54,733 | 2.3 years |
| Customer base | 9,183 | 7 years |
| Goodwill | 1,000,222 | N/A |
| Total | $ 989,496 | |

(8) On October 15, 2004, the Group acquired 100% of the outstanding ordinary shares of Focus Media Dalian including its then variable interest entity Dalian Advertising, an advertising services provider, in exchange for cash of $989,584. Immediately following the acquisition Focus Media Dalian became a wholly owned subsidiary of Focus Media Holding and Dalian Advertising became a wholly owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $ 40,347 | |
| Intangible assets: | | |
| Lease Agreements | 24,044 | 2.3 years |
| Customer base | 13,653 | 7 years |
| Goodwill | 992,234 | N/A |
| Total | $ 989,584 | |

F–25

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

(9) On October 15, 2004, the Group acquired 100% of the outstanding ordinary shares of Focus Media Changsha including its then variable interest entity Changsha Advertising, an advertising services provider, in exchange for cash of $989,484. Immediately following the acquisition Focus Media Changsha became a wholly owned subsidiary of Focus Media Holding and Changsha Advertising became a wholly owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $    76,098 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 81,194 | 2.3 years |
|    Customer base | 5,316 | 7 years |
| Goodwill | 979,072 | N/A |
| Total | $   989,484 |  |

(10) On October 15, 2004, the Group acquired 100% of the outstanding ordinary shares of Qianjian Advertising, an advertising services provider, in exchange for cash of $338,307 of which $265,822 was paid as of December 31, 2004 and the remainder was paid in 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $   125,599 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 37,818 | 2.3 years |
|    Customer base | — | 7 years |
| Goodwill | 174,890 | N/A |
| Total | $   338,307 |  |

F–26

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

   *(11)* On March 21, 2005, the Group increased its existing ownership of Xian Focus Media Culture & Communication Co., Ltd, an advertising service provider, from 10% to 70% by acquiring an additional 60% of the outstanding ordinary shares, in exchange for cash consideration of $84,577, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---:|---|
| Net tangible liabilities assumed | $  99,663 |  |
| Intangible assets: |  |  |
| Lease Agreements | 20,637 | 2.3 years |
| Customer base | 4,313 | 7 years |
| Goodwill | 159,290 | N/A |
| Total | $  84,577 |  |

   *(12)* On March 4, 2005, the Group acquired 100% of the outstanding ordinary shares of Xiamen Advertising, an advertising services provider, in exchange for cash consideration of $327,505, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---:|---|
| Net tangible assets acquired | $  100,704 |  |
| Intangible assets: |  |  |
| Lease Agreements | 23,923 | 2.3 years |
| Customer base | 47,967 | 7 years |
| Goodwill | 154,911 | N/A |
| Total | $  327,505 |  |

F–27

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*(13)* On March 21, 2005, the Group acquired 80% of the outstanding ordinary shares of Focus Media Tianjin, including its then variable interest entity Tianjin Advertising, an advertising services provider, in exchange for cash consideration of $797,439, all of which was paid as of December 31, 2005. Immediately following the acquisition, Focus Media Tianjin became an 80% owned subsidiary of Focus Media Holding and Tianjin Advertising became an 80% owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $ 100,825 |  |
| Intangible assets: |  |  |
|     Lease Agreements | 40,306 | 2.3 years |
|     Customer base | 83,417 | 7 years |
| Goodwill | 774,541 | N/A |
| Total | $ 797,439 |  |

*(14)* On March 21, 2005, the Group acquired 100% of the outstanding ordinary shares of Focus Media Zhuhai, an advertising services provider, in exchange for cash consideration of $42,288, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $ 18,003 |  |
| Intangible assets: |  |  |
|     Lease Agreements | 60,291 | 2.3 years |
| Total | $ 42,288 |  |

F–28

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*(15)* On March 21, 2005, the Group acquired 100% of the outstanding ordinary shares of CBL, including its then variable interest entity Guangdong Framedia, an advertising services provider, in exchange for cash consideration of $2,054,008, all of which was paid as of December 31, 2005. Immediately following the acquisition, CBL became a 100% owned subsidiary of Focus Media Holding and Guangdong Framedia became a 100% owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 337,252 | |
| Intangible assets: | | |
| Lease Agreements | 471,818 | 2.3 years |
| Customer base | 10,633 | 7 years |
| Goodwill | 1,234,305 | N/A |
| Total | $ 2,054,008 | |

*(16)* On March 22, 2005, the Group acquired 100% of the outstanding ordinary shares of Sorfari, including its then variable interest entity Hebei Advertising, an advertising services provider, in exchange for cash consideration of $773,274, all of which was paid as of December 31, 2005. Immediately following the acquisition, Sorfari became a 100% owned subsidiary of Focus Media Holding and Hebei Advertising became a 100% owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 94,639 | |
| Intangible assets: | | |
| Lease Agreements | 19,090 | 2.3 years |
| Goodwill | 659,545 | N/A |
| Total | $ 773,274 | |

*(17)* On August 15, 2005, the Group acquired 100% of the outstanding ordinary shares of Shenzhen Bianjie, in exchange for cash consideration of $457,185. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $   50,166 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 22,141 | 2.34 years |
| Goodwill | 485,210 | N/A |
| Total | $   457,185 |  |

    *(18)* On November 20, 2005, the Group acquired 100% of the outstanding ordinary shares of Shenyang Advertising, an advertising services provider, in exchange for cash consideration of $495,651, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $   16,949 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 24,460 | 1.8 years |
| Goodwill | 454,242 | N/A |
| Total | $   495,651 |  |

    *(19)* On December 6, 2005, the Group acquired 100% of the outstanding ordinary shares of Jinan Advertising, an advertising services provider, in exchange for cash consideration of $61,956, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $   78,470 |  |
| Intangible assets: |  |  |
|    Lease Agreements | 18,723 | 3.1 years |
| Goodwill | 121,703 | N/A |
| Total | $   61,956 |  |

    *(20)* On December 12, 2005, the Group acquired 100% of the outstanding ordinary shares of Fuzhou Advertising, an advertising services provider, in exchange for cash consideration of $43,369, all of which was paid as of December 31, 2005. The acquisition was recorded using the purchase

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $  26,237 |  |
| Intangible assets: |  |  |
| Lease Agreements | 17,132 | 3.5 years |
| Total | $  43,369 |  |

*Unaudited*

(21) On January 1, 2006, the Group acquired 100% of the outstanding ordinary shares of Infoachieve Limited ("Infoachieve"), which includes its then variable interest entity Shanghai Framedia Advertisement Development Ltd. ("Framedia"), the largest poster frame advertising network operator in China, in exchange for cash of $39,600,000, all of which were paid as of December 31, 2005, as well as 22,157,003 ordinary shares having a fair value of $2.456 per ordinary share which was determined based on average market price of Focus Media Holding's common shares traded over 3 days before and after the acquisition were agreed and announced. Additional payment of up to 35,830,619 ordinary shares may be made contingent upon Infoachieve attaining certain earnings target in 2006.

Immediately following the acquisitions, Infoachieve became a wholly owned subsidiary of Focus Media Holding and Framedia became a wholly owned subsidiary of Focus Media Advertisement. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $94,328,709 consisted of the following:

|  |  |  |
|---|---|---|
| Cash consideration | $ | 39,600,000 |
| Other acquisition costs |  | 311,110 |
| Value of the ordinary shares issued |  | 54,417,599 |
| Total consideration | $ | 94,328,709 |

The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible liabilities assumed | $  5,684,145 |  |
| Intangible assets: |  |  |
| Lease Agreements | 8,300,000 | 6 years |
| Customer base | 2,676,000 | 7 years |
| Non–compete agreement | 466,000 | 3 years |
| Trademark | 943,000 | 1 years |
| Contract backlog | 70,000 | 1 years |
| Goodwill | 87,557,854 | N/A |
| Total | $  94,328,709 |  |

F–31

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*(22)* On January 1, 2006, the Group acquired the signed lease agreements, frames and ongoing advertising agreements of Shenzhen E–times Advertising Co., Ltd. ("E–times") and Skyvantage Group Limited, one of the major poster frame advertising network operators in South China, in exchange for cash consideration of $5,000,000. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. Accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $5,034,008 consisted of the following:

| | | |
|---|---|---|
| Cash consideration | $ | 5,000,000 |
| Other acquisition costs | | 34,008 |
| Total consideration | $ | 5,034,008 |

The purchase price was preliminarily allocated as follows:

| | | | Amortization period |
|---|---|---|---|
| Intangible assets: | | | |
| Lease Agreements | $ | 749,260 | 6 years |
| Goodwill | | 4,284,748 | N/A |
| Total | $ | 5,034,008 | |

*(23)* On February 28, 2006, the Group acquired 100% of the outstanding ordinary shares of Target Media Holdings Limited ("Target Media"), its wholly–owned subsidiary, Target Media Multi–Media technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity Shanghai Target Media Co., Ltd. ("STM"), one of the largest out–of–home advertising network operator in China, in exchange for cash of $94,000,000, of which $44,780,103 was paid as of March 31, 2006 the remaining will be paid in 2006, as well as 77,000,000 ordinary shares having a fair value of $3 per ordinary share which was determined based on average market price of Focus Media Holding's common shares were traded over 3 days before and after the acquisition were agreed and announced.

Immediately following the acquisitions, Target Media became a wholly owned subsidiary of Focus Media Holding, and TTM became a wholly owned subsidiary of Focus Media Advertisement, whereas STM became a consolidated variable interest entity. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $327,057,757 consisted of the following:

| | | |
|---|---|---|
| Cash consideration | $ | 94,000,000 |
| Other acquisition costs | | 2,057,757 |
| Value of the ordinary shares issued | | 231,000,000 |
| Total consideration | $ | 327,057,757 |

F–32

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 24,822,958 |  |
| Intangible assets: |  |  |
| Lease Agreements | 4,509,000 | 10 years |
| Customer base | 449,000 | 7 years |
| Trademark | 5,720,000 | 10 years |
| Contract backlog | 149,000 | 1 years |
| Goodwill | 291,407,799 | N/A |
| Total | $ 327,057,757 |  |

*(24)* On March 21, 2006, the Group acquired 100% of the outstanding ordinary shares of Dotad Media Holdings Limited ("Dotad"'). Dotad will be renamed as Focus Media Wireless, a leading mobile–phone advertising service provider in China, in exchange for cash consideration of $15,000,000, all of which was paid as of March 31, 2006. Contingent upon Dotad's meeting certain earning targets in 2006 and 2007, additional share consideration will be paid up to $15 million in the form of Focus Media Holding's ordinary shares (valued at $5 per ordinary shares), for an aggregate potential payment of up to $30 million. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. Additional payment of up to 3,000,000 ordinary shares may be made contingent upon Dotad's attaining certain earnings targets in 2006 and 2007. The purchase price was allocated as follows:

The purchase price was preliminarily allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 82,270 |  |
| Intangible assets: |  |  |
| Customer base | 3,999,751 | 7 years |
| Completed technology | 2,480,354 | 5 years |
| License | 16,216 | 5 years |
| Partnership | 101,035 | 5 years |
| Goodwill | 8,320,374 | N/A |
| Total | $ 15,000,000 |  |

The purchase price allocation and intangible asset valuations for each of the acquisitions described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of Group shares approach. The Group has incorporated certain assumptions which include projected cash flows and replacement costs.

***Pro forma***

The following summarized unaudited pro forma results of operations for the years ended December 31, 2004, 2005 and three months ended March 31, 2006, assuming that all acquisitions

F–33

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

during the year ended December 31, 2005 and three months ended March 31, 2006 occurred as of January 1, 2004, 2005 and January 1, 2006. These pro forma results have been prepared for comparative purposes only and do not purport to be indications of the results of operations which actually would have resulted had the significant acquisitions occurred as of January 1, 2004, 2005 and 2006.

| | Year ended December 31, | | For the three months ended March 31, |
|---|---|---|---|
| | **2004** | **2005** | **2006** |
| | **(Unaudited)** | **(Unaudited)** | **(Unaudited)** |
| Revenues | $ 37,799,600 | $ 113,750,432 | $ 36,205,136 |
| Net income (loss) attributable to holders of ordinary shares | (14,944,599) | 3,250,017 | 1,159,298 |
| Income (loss) per share — basic | $ (0.06) | $ 0.01 | $ 0.00 |
| Income (loss) per share — diluted | (0.06) | 0.01 | 0.00 |

**4.    Investment in Available–for–Sale Securities**

The following is a summary of short–term available–for–sale securities:

| | December 31, | | | March 31, |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| | | | | **(Unaudited)** |
| Federal home loan cost | $ — | $ — | $ 35,000,000 | $ 35,000,000 |
| Gross unrealized loss | — | — | (164,150) | (207,900) |
| Fair Value | $ — | $ — | $ 34,835,850 | $ 34,792,100 |

All the securities are due within one year

**5.    Accounts Receivable, net**

Accounts receivable, net consist of the following:

| | December 31, | | | March 31, |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| | | | | **(Unaudited)** |
| Billed receivables | $ 858,649 | $ 4,782,521 | $ 14,587,026 | $ 31,218,690 |
| Unbilled receivables | 550,812 | 1,837,428 | 7,648,382 | 6,031,558 |
| | $ 1,409,461 | $ 6,619,949 | $ 22,235,408 | $ 37,250,248 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of balance sheet dates.

F–34

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

**6.    Inventories**

Inventories consist of the following:

| | December 31, | | | March 31, |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2006 |
| | | | | (Unaudited) |
| Finished goods | $ 74,140 | $ 1,075,210 | $ 433,844 | $ 599,120 |
| Spare parts and consumables | 16,810 | 167,930 | 45,685 | 6,170 |
| | $ 90,950 | $ 1,243,140 | $ 479,529 | $ 605,290 |

**7.    Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

| | December 31, | | | March 31, |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2006 |
| | | | | (Unaudited) |
| Other receivables | $ 100,576 | $ 295,650 | $ 751,602 | $ 1,121,396 |
| Other taxes refundable | — | — | — | 732,357 |
| Advances to supplier | — | — | 1,274,353 | 2,036,393 |
| Staff advances | 48,330 | 239,136 | 964,555 | 1,129,394 |
| Prepaid expenses | — | 162,304 | 276,861 | 327,104 |
| Interest receivables | — | — | 417,369 | 374,789 |
| Deposit for acquisitions | — | 362,472 | 40,919,530 | 2,063,690 |
| Note receivables | — | 42,288 | — | 24,947 |
| Loan to Infoachieve | — | — | 759,563 | — |
| Deferred offering costs | — | 1,007,618 | — | — |
| | $ 148,906 | $ 2,109,468 | $ 45,363,833 | $ 7,810,070 |

**8.    Acquired Intangible Assets, Net**

Acquired intangible assets, net consist of the following:

| | December 31, | | | March 31, |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2006 |
| | | | | (Unaudited) |
| Lease agreements | $ — | $ 529,676 | $ 1,278,059 | $ 14,876,822 |
| Customer bases | — | 273,820 | 430,879 | 7,568,078 |
| Trademark | — | — | — | 6,682,799 |
| Completed technology | — | — | — | 2,480,354 |
| Contract backlog | — | — | — | 219,533 |
| Non–compete agreement | — | — | — | 466,883 |
| Partnership | — | — | — | 101,035 |
| License | — | — | — | 16,216 |
| Less: accumulated amortization | — | (95,190) | (551,018) | (1,530,525) |
| | $ — | $ 708,306 | $ 1,157,920 | $ 30,881,195 |

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

During the year 2004, 2005 and the three months ended March 31, 2005 and 2006, the Group acquired certain lease agreements and customer bases through various acquisitions (see Note 3). The Group also recorded amortization expense of $nil, $77,443, $437,837 $67,352, and $999,178 for the years ended December 31, 2003, 2004 and 2005 and the three months ended March 31, 2005 (unaudited) and 2006 (unaudited), respectively. The Group will record amortization expense of $5,461,966, $4,561,595, $4,400,871, $4,154,231 and $4,145,868, for 2006, 2007, 2008, 2009 and 2010, respectively.

**9.    Long–term Investments**
Investment consists of the following:

| | December 31, | | | March 31, |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| | | | | **(Unaudited)** |
| Xian Focus Media Advertising Co. Ltd. ("Xian Focus Media") [a] | $ 12,082 | $ 12,088 | $ — | $ — |
| Shanghai Xinna Media Co., Ltd. ("Xinna") [b] | — | — | — | 911,033 |
| Tianjin Subway Media Service Co., Ltd. [c] | — | — | — | 144,443 |
| Target Network Chengcheng Co. Ltd. [d] | — | — | — | 62,367 |
| | $ 12,082 | $ 12,088 | $ — | $ 1,117,843 |

(a)    On September 23, 2003, the Group acquired 10% of the outstanding ordinary shares of Xian Focus Media. The Group has accounted for its investment in Xian Focus Media using the cost method of accounting. Subsequently in March 2005, the Group acquired an additional 60% of the outstanding ordinary shares of Xian Focus Media. Accordingly, the Group commenced consolidating Xian Focus Media upon obtaining control of this subsidiary (See Note 3(11)).

(b)    On January 6, 2006, STM acquired 20% equity interest in Xinna for cash consideration of $911,033. The Group has accounted for its investment in Xinna using the equity method of accounting.

(c)    On September 22, 2005, STM, a subsidiary of Target Media, formed a 50% owned entity — Tianjin Subway Media Service Co., Ltd. ("Tianjin Subway Project") with a third party for a cash consideration of $144,443. The Group has accounted for its investment in Tianjin Subway Project using the equity method of accounting.

(d)    In November 2005, STM, a subsidiary of Target Media, invested $62,367 in a 50% owned entity named Target Network Chengcheng Co. Ltd. ("Chengcheng"). The Group has accounted for its investment in Chengcheng using the equity method of accounting.

F–36

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

**10.    Equipment, Net**

Equipment, net consists of the following:

|  | December 31, | | | March 31, |
|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2006** |
|  |  |  |  | **(Unaudited)** |
| Media display equipment | $ 1,830,972 | $ 9,384,262 | $ 40,191,968 | $ 68,852,703 |
| Computers and office equipment | 292,200 | 675,053 | 1,267,696 | 2,844,038 |
| Leasehold improvements | 14,505 | 167,932 | 537,130 | 869,779 |
| Vehicles | — | 83,834 | 349,575 | 445,639 |
|  | $ 2,137,677 | $ 10,311,081 | $ 42,346,369 | $ 73,012,159 |
| Less: accumulated depreciation and amortization | (159,278) | (1,142,742) | (5,975,119) | (12,505,458) |
| Assembly in progress | — | 28,804 | 7,323,638 | 10,486,492 |
|  | $ 1,978,399 | $ 9,197,143 | $ 43,694,888 | $ 70,993,193 |

The Group wrote down certain LCD display equipment for the total of $1,871,024 because the location were close down.
Assembly in process relates to the assembly of flat–panel television screens. These assets will be placed in service in late 2006.

**11.    Short–term Bank Loans**

The Group had $4,365,723 outstanding under credit arrangement which consisted of lines of credit and revolving credit agreement at March 31, 2006 (unaudited). The amount available to the Group for additional borrowings under the lines of credit and resolving agreement was $3,118,374 at March 31, 2006 (unaudited). The agreement was subject to interest rates of 10% discount of six–month loan interest rate of The People's Bank of China. The interest expenses incurred in 2005 and the three months ended March 31, 2006 (unaudited) amounted to $46,005 and $13,297, respectively. The bank loans bear interest at 4.698% per annum as of December 31, 2005 and March 31, 2006 (unaudited), respectively.

**12.    Other Short Term Loans**

Other short term loans consist of:

|  | December 31, | | | March 31, |
|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2006** |
|  |  |  |  | **(Unaudited)** |
| Other loan due to ex–shareholder of Target Media [(a)] | $ — | $ — | $ — | $ 3,742,048 |
| Other loan due to ex–shareholder of Framedia [(b)] | — | — | — | 3,034,287 |
|  | $ — | $ — | $ — | $ 6,776,335 |

(a)   In December 2005, the ex–shareholder of Target Media and STM, Shanghai Investment Information Co., Ltd. ("SII") provided a short term loan of $3,742,048 to STM. The loan bears interest at an annual rate of 4.698%. The interest expenses incurred in the three months ended March 31, 2006 (unaudited) amounted to $14,580.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

(b)     At March 31, 2006 (unaudited), the short−term loans from ex−shareholders of Framedia are non−interest bearing, all of which was repayable within one year.

**13.     Accrued Expenses and Other Current Liabilities**
Accrued expenses and other current liabilities consist of the following:

| | December 31, | | | March 31, |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| | | | | **(Unaudited)** |
| Accrued expenses | $ 119,840 | $    759,817 | $   3,161,133 | $    5,146,963 |
| Other taxes payables | 248,288 | 1,728,850 | 3,037,443 | 6,679,253 |
| Advance from customers | 94,308 | 1,459,976 | 3,387,224 | 5,687,075 |
| Accrued employee payroll and welfare | 86,426 | 473,054 | 1,059,717 | 1,052,173 |
| Accrued offering costs | — | 767,821 | — | — |
| Accrued merger and acquisition costs | — | — | — | 1,100,000 |
| Payables related to acquisitions | — | 538,860 | 99,130 | 50,027,231 |
| Amount due to minority shareholders of subsidiary | — | 426,858 | 200,848 | 326,916 |
| Others | 12,372 | 436,199 | 801,407 | 1,394,488 |
| | $ 561,234 | $ 6,591,435 | $ 11,746,902 | $  71,414,099 |

**14.     Share Option**
In June 2003, the Group adopted the 2003 employee share option scheme (the "Option Plan") which allows the Group to offer a variety of incentive awards to employees, directors or consultants and advisors or any members of the Group. For 2004, 2005, and 3 months ended March 31, 2006 (unaudited), options to purchase 25,208,200, 23,843,630 and 3,000,000 ordinary shares are authorized under the Option Plan, respectively. Under the terms of the Option Plan, options are generally granted at prices equal to the fair market value as determined by the Board of Directors and expire 10 years from the date of grant and generally vest over 3 years while certain options granted vest over 1 year. Subsequent to the initial public offering, options will be granted at the fair market value of the ordinary shares at the date of grant. As of December 31, 2004, 2005 and March 31, 2006 (unaudited), options to purchase 25,208,200 and 49,051,830 and 38,131,920 ordinary shares were granted and outstanding. Not more than 30% of the Group's share capital is reserved for issuance under the Option Plan.

*Options to Employees*
In July and August 2004, the Group granted 20,643,400 share options with an exercise price of $0.24 to purchase ordinary shares to directors, officers and employees. The Group recorded deferred share based compensation of $969,959 as of December 31, 2004 and compensation expense of $364,876 for 2004 related to the difference between the exercise price and the deemed fair value of the ordinary shares. Prior to the Group's initial public offering, the derived fair value of the ordinary shares underlying the options was determined for the July and August 2004 grants, based on a retrospective third−party valuation conducted by a third party valuation firm using a generally accepted valuation methodology, the guideline companies approach, which incorporates certain assumptions including the market performance of comparable listed companies as well as

F−38

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

the financial results and growth trends of the Group, to derive the total equity value of the Group. The valuation model allocated the equity value between the ordinary shares and the preference shares and determined the fair value of ordinary shares based on two assumptions: where conversion into ordinary shares would result in a higher economic value, preference shares were treated as if they had converted into ordinary shares; and preference shares that have a value higher than their conversion price were assigned a value that took into consideration their liquidation preference. Our ordinary shares were assigned a value equal to their pro rata share of the residual amount, if any, that remained after consideration of the liquidation preference of preferred shares with a value below their conversion price.

In January and February 2005, the Group granted 6,020,000 share options with exercise prices ranging from $0.58 to $0.75 to purchase ordinary shares to directors, officers and employees. In July 2005, the Group granted 11,683,630 share options with exercise price of $1.7 to purchases ordinary shares to directors, offers and employees. In November 2005, the Group further granted 4,800,000 share options with exercise price ranging from $2.6 to $2.7 to purchases ordinary shares to directors, officers and employees. The Group recorded deferred share based compensation of $264,751 as of December 31, 2005 and compensation expense of $458,639 for 2005, related to the difference between the exercise price and the deemed fair value of the ordinary shares. The Group determined the fair value of ordinary shares for those grants in January and February 2005 using the Series C preference share price of $0.51 and the fair value of ordinary shares for the grants in July and November 2005 using the fair market value of the ordinary shares quoted in the Nasdaq Stock Exchange.

In March 2006, the Group granted 3,000,000 share options with exercise prices of $5.093 to purchase ordinary shares to directors, officers and employees. Effective January 1, 2006, the Group adopted SFAS 123–R. The fair value of stock options granted to employees is determined using the Black–Scholes option pricing model. The determination of the fair value of share–based compensation awards on the date of grant using an option–pricing model is affected by the Group's stock price as well as assumptions regarding a number of complex and subjective variables, including the expected volatility of the Group's stock price over the term of the awards, actual and projected employee stock option exercise behaviors, risk–free interest rate and expected dividends. As a result, the Group recorded compensation expense of $1,466,540 for three months ended March 31, 2006 (unaudited).

*Options to Non–employees*

In 2004, the Group also granted 4,564,800 share options with an exercise price of $0.24 to purchase ordinary shares to its external consultants and advisors in exchange for past services, which part of them vest over 1 year and part of them vest over 3 years. In February 2005, the Group granted 1,240,000 share options with an exercise price of $0.75 to purchase ordinary shares to its external consultants and advisors in exchange for services. In July 2005, the Group granted 100,000 share options with an exercise of $1.7 to purchase ordinary shares to its external consultants and advisors in exchange for services. No options were granted to external consultants and advisors subsequent to July 2005. The Group recorded compensation expense of approximately $123,835 and $267,864 and $26,710 for 2004, 2005 and three months ended March 31, 2006 (unaudited), respectively, estimated using the Black–Scholes option pricing model as such method provides a more accurate estimate of the fair value of services received by the external consultants and advisors.

F–39

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

A summary of share–based compensation recognized in the consolidated statement of operations are as follows:

|  | Years ended December 31, | | Three months ended March 31, | |
|  | 2004 | 2005 | 2005 | 2006 |
|  |  |  | (Unaudited) | (Unaudited) |
| General and administrative | $ 461,183 | $ 683,186 | $ 320,273 | $ 1,129,610 |
| Selling and marketing | 27,528 | 43,317 | 13,687 | 336,910 |
|  | $ 488,711 | $ 726,503 | $ 333,960 | $ 1,466,540 |

The fair value of each employee, officer and director option granted is estimated on the date of grant using the Black–Scholes option–pricing model with the following assumptions used for grants during the applicable period.

|  | Year ended December 31, | | Three months ended March 31, | |
|  | 2004 | 2005 | 2005 | 2006 |
|  |  |  | (Unaudited) | (Unaudited) |
| Option granted to employees: |  |  |  |  |
| Average risk–free rate of return | 2.97% | 3.10–4.43% | 3.38% | 4.74% |
| Weighted average expected option life | 1–3 years | 2–3 years | 3 years | 2 years |
| Volatility rate | 36.2% | 30.49%–36.2% | 36.2% | 40.0% |
| Dividend yield | 0% | 0% | 0% | 0% |

Prior to 2004 the Group did not grant share options to employees, directors or consultants or advisors or any members of the Group.

A summary of the share option activity is as follows:

|  | Number of option | | Weighted average exercise price |
|  |  |  |  |
| Options outstanding at December 31, 2003 | — | $ | — |
| Granted | 25,208,200 | $ | 0.24 |
| Cancelled | — |  | — |
| Options outstanding at December 31, 2004 | 25,208,200 | $ | 0.24 |
| Granted | 23,843,630 | $ | 1.59 |
| Cancelled | — |  | — |
| Options outstanding at December 31, 2005 | 49,051,830 | $ | 0.89 |
| Granted | 3,000,000 | $ | 5.09 |
| Cancelled | — |  | — |
| Exercised | (13,919,910) | $ | 0.29 |
| Options outstanding at March 31, 2006 (unaudited) | 38,131,920 | $ | 1.44 |

F–40

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The weighted average per share fair value of options as of their respective grant dates was as follows:

|  | Years ended December 31, | | Three months ended March 31, | |
|---|---|---|---|---|
|  | **2004** | **2005** | **2005** | **2006** |
|  |  |  | **(Unaudited)** | **(Unaudited)** |
| Ordinary shares | $ 0.10 | $ 0.23 | $    0.16 | $    0.37 |

The following table summarizes information with respect to share options outstanding at December 31, 2005:

|  | Options outstanding | | | Option exercisable | | |
|---|---|---|---|---|---|---|
|  | No. of outstanding | Weighted average remaining contractual life | Weighted average exercise price | Number exercisable | Weighted average exercise price | Aggregate Intrinsic value |
| Ordinary shares: |  |  |  |  |  |  |
| $0.24 | 25,208,200 | 8.62 yrs | $   0.24 | 17,892,580 | $   0.24 | $  199,751 |
| $0.58 | 3,200,000 | 9.14 yrs | $   0.58 | 800,000 | $   0.58 | — |
| $0.75 | 4,060,000 | 9.17 yrs | $   0.75 | 1,015,000 | $   0.75 | 47,234 |
| $1.70 | 11,783,630 | 9.58 yrs | $   1.70 | — |  | 36,308 |
| $2.60–$2.70 | 4,800,000 | 9.92 yrs | $   2.70 | — |  | 71,999 |
|  | 49,051,830 |  |  | 19,707,580 |  | $  355,292 |

The following table summarizes information with respect to share options outstanding at March 31, 2006 (unaudited):

|  | Options outstanding | | | Options exercisable | | |
|---|---|---|---|---|---|---|
|  | Number of outstanding | Weighted average remaining contractual life | Weighted average exercise price | Number exercisable | Weighted average exercise price | Aggregate intrinsic value |
| Ordinary shares: |  |  |  |  |  |  |
| $0.24 | 12,805,160 | 8.44 years | $   0.24 | 6,366,680 | $   0.24 | $  150,170 |
| $0.58 | 2,512,500 | 8.88 years | $   0.58 | 250,000 | $   0.58 | — |
| $0.75 | 3,230,630 | 8.92 years | $   0.75 | 312,500 | $   0.75 | $   37,661 |
| $1.70 | 11,783,630 | 9.33 years | $   1.70 | — | — | $   29,470 |
| $2.60 – $2.70 | 4,800,000 | 9.67 years | $   2.70 | — | — | $   61,015 |
| $5.09 | 3,000,000 | 10 years | $   5.09 | — | — | — |
|  | 38,131,920 |  |  | 6,929,180 |  | $  278,316 |

As of March 31, 2006 (unaudited), there was $9,924,890 of total unrecognized compensation expense related to non–vested share–based compensation arrangement granted under the Option Plan. That cost is expected to be recognized over a weighted–average period of 2.04 years.

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The following table summarizes information regarding options issued within 12–month prior to March 31, 2006:

| Grant date | Number of options issued | Fair value of ordinary shares | Exercise price | Intrinsic value | Type of valuation |
|---|---|---|---|---|---|
| July 5, 2004 | 14,391,800 | $ 0.29 | $ 0.24 | $ 0.05 | (a) |
| August 1, 2004 | 506,800 | $ 0.29 | $ 0.24 | $ 0.85 | (a) |
| August 10, 2004 | 504,200 | $ 0.29 | $ 0.24 | $ 8.05 | (a) |
| August 25, 2004 | 9,805,400 | $ 0.29 | $ 0.24 | $ 0.05 | (a) |
| January 1, 2005 | 1,200,000 | $ 0.51 | $ 0.58 | — | (b) |
| February 2, 2005 | 2,000,000 | $ 0.51 | $ 0.58 | — | (b) |
| February 2, 2005 | 4,060,000 | $ 0.51 | $ 0.75 | — | (b) |
| July 13, 2005 | 11,783,630 | $ 1.70 | $ 1.70 | — | (c) |
| November 2, 2005 | 800,000 | $ 2.60 | $ 2.70 | $ 0.10 | (d) |
| November 2, 2005 | 4,000,000 | $ 2.70 | $ 2.70 | — | (d) |
| March 10, 2006 | 3,000,000 | $ 5.06 | $ 5.09 | — | (d) |
| | 52,051,830 | | | | |

*Type of Valuation*

(a)    The fair value was determined based on a retrospective unrelated party valuation.

(b)    Based on Series C–2 convertible redeemable preference shares sold to third party members for cash proceeds (Note 17(c))

(c)    The fair value was determined based on the initial public offering price on the grant date.

(d)    The fair value was determined based on the closing quoted market price of the ordinary shares quoted in the Nasdaq Stock Exchange.

**15.    Income Taxes**

Focus Media Holding and certain of its subsidiaries are tax–exempted companies incorporated in the British Virgin Islands.

Focus Media Hong Kong has not recorded a tax provision for Hong Kong tax purposes as the Group does not have any assessable profit in Hong Kong. The Group's remaining subsidiaries, registered in the PRC (with the exception of Focus Media Technology, New Focus Media Technology, Framedia Consultation and TMM), are all domestically owned and subject to PRC Enterprise Income Tax ("EIT") on the taxable income in accordance with the relevant PRC income tax laws. Focus Media Technology is a Foreign Invested Enterprise and subject to the Foreign Enterprise Income Tax ("FEIT") on the taxable income as calculated in accordance with the relevant PRC income tax law. EIT and FEIT rate for each Group member operating in the PRC is ranging from 15% to 33%.

F–42

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

The principal components of the Group's deferred income tax assets are as follows:

|  | December 31, | | | March 31, |
|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2006** |
|  |  |  |  | **(Unaudited)** |
| Deferred tax assets: |  |  |  |  |
| Net operating loss carry forwards | $ 215,308 | $ 276,673 | $ 545,208 | $ 2,891,620 |
| Accrued expenses temporarily non–deductible | 42,363 | 54,281 | 46,695 | 590,374 |
| Pre–operating expenses | 75,764 | 62,862 | 80,102 | 74,954 |
| Bad debt provision | 29,044 | 57,147 | 130,897 | 193,506 |
| Total deferred tax assets | $ 362,479 | $ 450,963 | $ 802,902 | $ 3,750,454 |
| Valuation allowance on deferred tax assets | (235,710) | — | (59,988) | (3,556,948) |
| Net deferred tax assets | $ 126,769 | $ 450,963 | $ 742,914 | $ 193,506 |

The Group did not have any timing differences relating to deferred tax liabilities as of December 31, 2003, 2004, 2005 and March 31, 2006 (unaudited).

A significant portion of the deferred tax assets recognized relate to net operating loss carry forwards. The Group operates through multiple subsidiaries and the valuation allowance is considered on each individual subsidiary basis. Where a valuation allowance was not recorded, the Group believes that there was sufficient positive evidence to support its conclusion not to record a valuation allowance as it expects to generate sufficient taxable income in the future.

The valuation allowance from 2003 to 2004 has decreased as the Group has implemented a tax planning strategy which more likely than not allow the Group to utilize its deferred tax assets. The valuation allowance in 2004, 2005 and for the three months ended March 31, 2006 (unaudited) have been increased in connection to the net operating losses which the Group believes cannot generate future taxable income to recognize the income tax benefit.

Reconciliation between total income tax expense and the amount computed by applying the statutory income tax rate to income before taxes is as follows:

|  | Years ended December 31, | | | Three months ended March 31, | |
|---|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2005** | **2006** |
|  |  |  |  | **(Unaudited)** | **(Unaudited)** |
| Statutory rate | 33.0% | 33.0% | 33.0% | 33.0% | 33.0% |
| Permanent book–tax difference | 45.0% | 58.0% | (30.3)% | (24.0)% | (61.7)% |
| Change in valuation allowance | 15.0% | (19.0)% | 0.2% | — | 34.9% |
| Effective tax rate | 93.0% | 72.0% | 2.9% | 9.0% | 6.2% |

F–43

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

**16.    Net income (loss) per Share**

The following table sets forth the computation of basic and diluted income (loss) per share for the years/periods indicated:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | | **(Unaudited)** | **(Unaudited)** |
| Income (loss) attributable to holders of ordinary shareholders (numerator): | $     25,483 | $ (10,576,414) | $  23,547,651 | $     2,642,493 | $     9,432,769 |
| Shares (denominator): | | | | | |
| Weighted average ordinary shares outstanding used in computing basic income (loss) per share | 144,657,600 | 160,998,600 | 252,128,545 | 142,464,600 | 438,232,094 |
| Plus weighted average preference shares outstanding | — | — | 84,119,675 | 158,266,400 | — |
| Plus incremental weighted average ordinary shares from assumed conversions of stock option using treasury stock method | — | — | 29,689,874 | 14,481,608 | 27,663,224 |
| Weighted average ordinary shares outstanding used in computing diluted income (loss) per share | 144,657,600 | 160,998,600 | 365,938,094 | 315,212,608 | 465,895,318 |
| Net income (loss) per share — basic | $          0.00 | $          (0.07) | $          0.09 | $          0.02 | $          0.02 |
| Net income (loss) per share — diluted | $          0.00 | $          (0.07) | $          0.06 | $          0.01 | $          0.02 |

F–44

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

For the above mentioned years/periods, the Group had securities outstanding which could potentially dilute basic earnings per share in the future, but which were excluded from the computation of diluted net income (loss) per share in the years/periods presented, as their effects would have been antidilutive. Such outstanding securities consist of the following:

|  | December 31, | | | March 31, | |
|  | 2003 | 2004 | 2005 | 2005 | 2006 |
|  |  |  |  | (Unaudited) | (Unaudited) |
| Series A convertible redeemable preference shares | — | 41,967,400 | — | 41,967,400 | — |
| Series B convertible redeemable preference shares | — | 48,191,600 | — | 48,191,600 | — |
| Series C–1 convertible redeemable preference shares | — | 34,054,000 | — | 34,054,000 | — |
| Series C–2 convertible redeemable preference shares | — | 34,053,400 | — | 34,053,400 | — |
| Outstanding options to purchase ordinary shares | — | 25,208,200 | 49,051,830 | 32,468,200 | 38,131,920 |
|  | — | 183,474,600 | 49,051,830 | 190,734,600 | 38,131,920 |

**17.     Convertible Redeemable Preference Shares**

Each Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares was automatically converted into ordinary shares at the then effective conversion price upon the closing of a qualified underwritten public offering of the ordinary shares of the Group. Upon the completion of the Group's initial public offering on July 13, 2005, all of the issued and outstanding Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares were converted into ordinary shares.

*a)* In April 2004, the Group issued 52,083,400 Series B convertible redeemable preference shares to a group of third party investors for cash proceeds of $12,062,696, net of issuance costs of $437,304. The holders of Series B redeemable convertible preference shares could have redeemed the Series B convertible redeemable preference shares at any time (i) before December 31, 2005 if the Group received a notice from the holders of a majority of Series B convertible redeemable preference shares indicating a material breach by the Group and its affiliates of their representation, warranties or covenants under Series B convertible redeemable preference shares, the shareholders agreement or the Restructuring Documents (as defined in the amended Series B Purchase Agreement), or (ii) after April 28, 2004 ("Redemption Start Date"), at the option of a majority of the holders of the Series B convertible redeemable preference shares then outstanding. In the event of a redemption pursuant to this right, the Group could have redeemed up to all of the Series B convertible redeemable preference shares at a redemption price per Series 13 redeemable convertible preference share equal to $0.24x(1+(0.15xN)) plus all declared but unpaid dividends. N refers to a fraction the numerator of which is the number of calendar days between April 28, 2004

F–45

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

and the Redemption Start Date and the denominator of which is 365. The Group recorded a deemed dividend of $2,191,442 in 2004, which resulted from the amortization of the 15% redemption premium associated with Series B convertible redeemable preference shares. According to the articles of association amended on November 29, 2004, the redemption price of Series B preferred stock is $0.24.

*b)* In April 2004, 62,400,000 outstanding ordinary shares were reclassified and re–designated into 62,400,000 Series A convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $8,308,411 which represents the difference between the fair value of the Series A convertible redeemable preference shares at the date of re–designation of $0.15 and the initial issuance price of the ordinary shares of $0.05 for 10,000,000 shares and approximately $0.01 for 52,400.000 shares.

The holders of Series A convertible redeemable preference shares had the right to cause the Group to redeem such preference shares, at any time commencing on a Redemption Start Date, at the option of a majority of holders of Series A redeemable convertible preference shares at a redemption price per Series A convertible redeemable preference share equal to $0.06 plus all declared but unpaid dividends. Series A convertible redeemable preference shares could not have been redeemed until the Group had redeemed all of the Series B convertible redeemable preference shares and paid the aggregate Series B convertible redeemable preference shares redemption price in full.

*c)* On November 29, 2004, the Group issued 34,053,400 Series C–2 convertible redeemable preference shares to group of third party investors for cash proceeds of $17,415,000, net of issuance costs of $85,000. The holder of a Series C–2 convertible redeemable preference share could have redeemed Series C–2 convertible redeemable preference shares at any time after the earlier of (i) such time as the holders of a majority of the Series C–2 convertible redeemable preference share delivered notice in writing to the Group that the Group and/or its affiliates was in material breach of any of its representations, warranties and covenants under the Series C Purchase Agreement, the Shareholders Agreement or the Ancillary Documents (as defined in the Series C Purchase Agreement) so long as such notice was to have been delivered before December 31, 2006 and (ii) anytime following the fourth anniversary of the issuance of the Series C–2 convertible redeemable preference share under the Series C Purchase Agreement. In connection with the redemption of any Series C–2 convertible redeemable preference share, the Group was to pay a redemption price equal to the Series C–2 convertible redeemable preference share Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–2 convertible redeemable preference share through to the date of redemption thereof.

*d)* On November 29, 2004, certain investors of Series A and/or Series B convertible redeemable preference shares sold 20,432,600 outstanding Series A convertible redeemable preference shares and 3,891,800 outstanding Series B convertible redeemable preference shares to Series C–1 convertible redeemable preference shares investors at a price of US$0.51. These Series A convertible redeemable preference shares and Series B convertible redeemable preference shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $8,458,464 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of Series A and Series B convertible redeemable preference shares of $0.15 and $0.24, respectively.

F–46

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

*e)* In December 2004, an investor of ordinary shares sold 9,729,600 outstanding ordinary shares to third party investors at a price of $0.51. These ordinary shares were re–designated as Series C–1 convertible redeemable preference shares. The re–designation resulted in a deemed dividend of $4,897,623 which represented the difference between the fair value of the Series C–1 convertible redeemable preference shares of $0.51 and the issuance price of ordinary shares of $0.01.

Prior to the redemption or conversion of all Series C–2 convertible redeemable preference shares issued by the Group, any holder of Series C–1 convertible redeemable preference shares thereof could have, at any time, required the Group to redeem such shares out of funds legally available therefore in connection with the redemption of any Series C–1 convertible redeemable preference shares under this Clause, the Group would have paid a redemption price equal to the Series C–1 convertible redeemable preference shares Issue Price of $0.51 plus all declared but unpaid dividends on the Series C–1 convertible redeemable preference shares through to the date of redemption thereof.

The significant terms of the Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares are as follows:

*Conversion*

Each Series A and Series B convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.15 and $0.24, respectively, upon the consummation of a Series A/ B Qualified Public Offering or obtaining the necessary written consent from the holders of Series A and Series B convertible redeemable preference shares. A Series A/B Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that was registered under the Securities Act of 1933 representing at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $200,000,000 immediately prior to the offering.

Each Series C–1 and Series C–2 convertible redeemable preference share was automatically convertible into one ordinary share at any time after the date of issuance of such shares, subject to anti–dilution or performance adjustment based on an initial conversion price of $0.51 and $0.51, respectively, upon the consummation of a Series C Qualified Public Offering or obtaining the necessary written consent from the holders of Series C–1 and Series C–2 convertible redeemable preference shares. A Series C Qualified Public Offering referred to the closing of an underwritten public offering of the ordinary shares of the Group in the United States that has been registered under the Securities Act of 1933 which represents at least 25% of the fully–diluted share capital of the Group immediately following the offering, at a price per share that values the Group at no less than $335,000,000 immediately prior to the offering.

The conversion price of Series A, Series B, Series C–1 and Series C–2 convertible redeemable preference shares was subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization.

F–47

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

Additionally, the conversion price was to be adjusted for dilution in the following circumstances:

    1) In the event that the Group issued additional ordinary shares at a price per share less than the then prevailing Series A, Series B and Series C convertible redeemable preference shares' respective conversion price, the Series A, Series B and Series C convertible redeemable preference shares' respective conversion price was to be reduced, concurrently with such issuance, to a price (calculated to the nearest cent) equal to the price per share at which such additional shares were to be issued.

    2) If the Group's financial results of 2004 and 2005 did not meet specified targets. Under the terms of the amended and restated memorandum and articles of association in April 2005, the performance–based adjustment was not triggered in 2004.

*Voting Rights*

Each Series A, Series B, Series C−1 and Series C−2 redeemable convertible preference share had voting rights equivalent to the number of shares of ordinary shares into which it was convertible.

*Dividends*

The holders of Series A, Series B, Series C−1 and Series C−2 redeemable convertible preference shares were to be entitled to receive out of any funds legally available therefore, when and if declared by the Board of Directors of the Group, dividends at the rate or in the amount as the Board of Directors considers appropriate.

*Liquidation Preference*

In the event of any liquidation, dissolution or winding up of the Group, as defined, the holders of Series A, Series B, Series C−1 and Series C−2 redeemable convertible preference shares were to receive $0.06 per share, $0.24 per share, $0.51 per share and $0.51 per share, respectively, plus all declared but unpaid dividends. Such amounts were to be adjusted for any share splits, share dividends and recapitalization.

In the event of any liquidation, dissolution or winding up of the Group caused by a "Trade Sale", which is defined as any sales of shares, merger, consolidation or other similar transaction involving the Group in which its shareholders do not retain a majority of the voting power in the surviving entity, or a sale of all or substantially all the Group's assets, the holder of Series B redeemable convertible preference shares were to receive the higher of (i) 200% of the original purchase price of the Series B preference shares, for each Series B redeemable convertible preference share outstanding or (ii) the amount the holder would have received if all of the Series B redeemable convertible preference shares held by such holder were to be converted to ordinary shares immediately prior to such liquidation, dissolution or winding up of the Group. According to the articles of association amended on November 29, 2004 (the "Modification Date"), the net settlement feature of the Series B convertible redeemable preference shares under trade sale was removed.

The embedded conversion option of Series B convertible redeemable preference shares has been recorded at its fair value of $1,179,689 and accounted for separately as an embedded conversion option. The Group has accounted for the derivative liability relating to the conversion option by adjusting the liability its estimated fair value at each subsequent balance sheet date up to the Modification Date, with adjustments recorded as other income or expenses. In 2004, the Group

F–48

**Table of Contents**

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

adjusted the derivative liability to fair market value and recorded a change in fair value of the derivative liability of $11,692,287 in the consolidated statements of operations. The Group recorded a deemed dividend of $1,179,689 in 2004, which resulted from the accretion of the discount of Series B convertible redeemable preference shares. On the Modification Date, the Group has re–combined the fair value of the derivative liability of $12,871,976 with Series B convertible redeemable preference shares and subsequently recorded an accretion of premium of $12,906,774, which represented the difference of the carrying balance of Series B convertible redeemable preference shares at the Modification Date and its initial issuance date.

**18.    Ordinary Shares**

(a) In April 2003 the Group issued 2,000,000 ordinary shares for cash proceeds of $1,625,000.

(b) In May 2003, the Board of Directors approved a share split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's financial statements.

(c) In April 2004, 62,400,000 outstanding ordinary shares were reclassified and redesignated into 62,400,000 Series A convertible redeemable preference shares.

(d) In September 2004, the Group issued 14,594,200 ordinary shares as partial consideration of the acquisition of all the outstanding ordinary shares of Perfect Media (Note 3 (6)).

(e) In December 2004, 9,729,600 outstanding ordinary shares were sold and redesignated in 9,729,600 Series C–1 convertible redeemable preference shares.

(f) On May 31, 2005, shareholders of the Group approved a 200–for–1 split of the Company's shares, with immediate effect. The 200–for–l share split of the Company's shares has been retroactively applied to all periods presented.

(g) Upon initial public offering, the Group issued 77,575,000 ordinary shares, for US$1.7 per ordinary share, for total proceeds of US$118,174,130, net of offering expenses.

(h) On January 1, 2006, the Group issues 22,157,003 ordinary shares, for US$2.46 per share, as partial consideration of the acquisition of all the outstanding ordinary shares of Infoachieve (Note 3 (21)).

(i) In January 2006 upon the secondary offering, the Group issued 15,000,000 ordinary shares, for US$4.35 per ordinary share, for total proceeds of US$61,783,300, net of offering expenses of US$3,466,700.

(j) On February 28, 2006, the Group issues 77,000,000 ordinary shares, for US$3.00 per share, as partial consideration of the acquisition of all the outstanding ordinary shares of Target Media (Note 3 (23)).

(k) On March 1, 2006, the Group issues 74,720 ordinary shares, for US$5.00 per share, as full consideration of the acquisition of the remaining 25% outstanding ordinary shares of in Focus Media Wuhan (Note 3 (2))

**19.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care,

F–49

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $60,609, $338,923, $619,831 and $440,349 for the years ended December 31, 2003, 2004, 2005 and three months ended March 31, 2006 (unaudited), respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group subsidiaries in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end) until such cumulative appropriation reaches 50% of the registered capital; the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. In 2003, 2004, 2005, the Group made total appropriations of $nil, $1,488,000, $98,729, respectively.

**20.    Commitments**
*(a) Leases*

The Group has entered into certain leasing arrangements relating to the placement of the flat–panel television screens and poster frames in various locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expense under operating leases for 2003, 2004, 2005 and three months ended March 31, 2006 (unaudited) were $803,079, $3,648,829 and $15,481,200 and $2,910,231, respectively.

Future minimum lease payments under non–cancelable operating lease agreements were as follows (unaudited):

|  | | March 31, |
|---|---|---|
| 2007 | $ | 43,346,190 |
| 2008 | | 33,031,315 |
| 2009 | | 21,849,103 |
| 2010 | | 14,209,352 |
| 2011 | | 4,508,331 |
| 2012 and thereafter | | 1,684,262 |
|  | $ | 118,628,553 |

**21.    Segment and Geographic Information**

The Group is engaged in operating out–of–home advertising network in China using audiovisual television displays, based on the number of locations and number of flat–panel television displays in our network.

The Group's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. Based on this assessment, the Group has determined that it has three operating and reporting segments as of March 31, 2006 (unaudited), which are poster frame network

F–50

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

advertising services, mobile–phone advertising services and out–of–home television advertising services. The out–of–home television advertising service is still the most significant segment as of March 31, 2006 (unaudited). The Group has not provided 2003, 2004 or 2005 segment disclosure for the poster frame network advertising service or the mobile phone advertising services because they did not exist prior to 2006.

The following table presents selected financial information relating to the Group's segments for the three months ended March 31, 2005 (unaudited) and 2006 (unaudited):

| | Poster frame network advertising services | Mobile phone advertising services | Out–of–home advertising services |
|---|---|---|---|
| Revenue | | | |
| For the three months ended March 31, 2005 (unaudited) | — | — | 9,431,521 |
| For the three months ended March 31, 2006 (unaudited) | 6,067,314 | — | 26,765,467 |
| Cost of revenue | | | |
| For the three months ended March 31, 2005 (unaudited) | — | — | 3,188,610 |
| For the three months ended March 31, 2006 (unaudited) | 2,397,268 | — | 12,008,394 |
| Net income | | | |
| For the three months ended March 31, 2005 (unaudited) | — | — | 2,642,493 |
| For the three months ended March 31, 2006 (unaudited) | 2,626,783 | — | 6,805,986 |
| Total assets | | | |
| For the three months ended March 31, 2005 (unaudited) | — | — | 60,839,516 |
| For the three months ended March 31, 2006 (unaudited) | 17,980,760 | — | 630,764,315 |

*Geographic Information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

As of December 31, 2003, 2004, 2005, there were no customers which accounted for 10% or more of the Group's net revenues and accounts receivable. As of March 31, 2006 (unaudited), one of our customers, Portland Outdoor Advertising Co., Ltd., accounted for 6.11% of the Group's net revenue and 11.69% of net accounts receivable. As of December 31, 2003, 2004 and 2005, Portland Outdoor Advertising Co., Ltd., accounted for nil, nil and 6.52% of the Group's net revenue and nil, nil and 10.92% of net accounts receivable, respectively.

Although the Group operates through multiple cities in China which include Beijing, Shanghai, Guangzhou and Shenzhen, it believes it operates in one segment as all cities provide selling out–of–home television advertising time slots on their network of flat–panel television advertising displays. Accordingly all financial segment information can be found in the consolidated financial statements.

**22.    Related Party Transactions**

In 2003, Jason Nanchun Jiang, a major shareholder of the Group, contributed technical know–how which valued at historical cost of $nil.

F–51

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

In 2003, the Group purchased equipment from a company under common control for cash proceeds of $1,208,131.

Details of gross advertising service revenue from related parties for the years ended December 31, 2003, 2004, 2005 and three months ended March 31, 2005 (unaudited) and 2006 (unaudited) are as follows:

| Name of related parties | Director interested | Year ended December 31, | | | Three months ended March 31, | |
|---|---|---|---|---|---|---|
| | | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | | | (Unaudited) | (Unaudited) |
| Everease Advertising & Communication Ltd. | Jason Nanchun Jiang | $  978,058 | $1,367,351 | $        — | $  307,387 | $        — |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 120,821 | 1,227,267 | 2,330,945 | 660,417 | 1,636,076 |
| Shanghai Jobwell Business Consulting Ltd. | Jimmy Wei Yu | — | 411,034 | 1,050,258 | 16,637 | 474,754 |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | — | 372,488 | 757,850 | 10,817 | 410,158 |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | — | 361,371 | 908,100 | 15,865 | 390,089 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | Neil Nanpeng Shen | — | 48,287 | 264,120 | 123,058 | 44,683 |
| | | $1,098,879 | $3,787,798 | $5,311,273 | $ 1,134,181 | $ 2,955,760 |

F–52

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005 AND FOR THE**
**THREE MONTHS ENDED MARCH 31, 2005 (UNAUDITED) AND 2006 (UNAUDITED)**
**(In U.S. dollars except share data and unless otherwise stated)**

Details of amounts due from related parties as of December 31, 2003, 2004, 2005 and March 31, 2006 (unaudited) are as follows:

| | | | December 31, | | March 31, |
|---|---|---|---|---|---|
| Name of related parties | Director interested | 2003 | 2004 | 2005 | 2006 |
| | | | | | (Unaudited) |
| Shanghai Everease Advertising & Communication Ltd. | Jason Nanchun Jiang | $252,576 | $  1,259,138 | $    — | $    — |
| Multimedia Park Venture Capital | Jimmy Wei Yu | — | 690,212 | 330,700 | 1,656,268 |
| Shanghai Jobwell Business Consulting Ltd. | Jimmy Wei Yu | — | 275,971 | 546,207 | 477,022 |
| Shanghai Wealove Wedding Service Co., Ltd. | Jimmy Wei Yu | — | 251,556 | 662,953 | 412,118 |
| Shanghai Hetong Network Technology Co., Ltd. | Jimmy Wei Yu | — | 263,155 | 533,469 | 391,953 |
| Ctrip Travel Information Technology (Shanghai) Co., Ltd. | | — | — | — | 44,895 |
| | | $252,576 | $  2,740,032 | $2,073,329 | $  2,982,256 |

Details of amounts due to related parties as of December 31, 2003, 2004, 2005 and March 31, 2006 (unaudited) are as follows:

| | | | December 31, | | March 31, |
|---|---|---|---|---|---|
| Name of related parties | Director interested | 2003 | 2004 | 2005 | 2006 |
| | | | | | (Unaudited) |
| Shanghai Everease Advertising & Communication Ltd. | Jason Nanchun Jiang | $1,386,124 | $  — | $  — | $    — |
| Weiqiang Jiang (direct family member) | Jason Nanchun Jiang | — | — | — | 2,496,212 |
| Multimedia Park Venture Capital | Jimmy Wei Yu | 627,774 | — | — | — |
| | | $2,013,898 | $  — | $  — | $  2,496,212 |

In March 2006, Weiqiang Jiang, the father of Jason Nanchun Jiang, provided a short–term loan to the Group of approximately $2.5 million to relieve a temporary shortage of Renminbi the Group experienced at that time. The loan is unsecured and was provided to us at no interest. The loan will become due and payable in full on June 30, 2006.

**22.    Restricted Net Assets**

Relevant PRC statutory laws and regulations permit payments of dividends by the Group's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, PRC laws and regulations require that annual appropriations of 10% of after–tax income should be set aside prior to payment of dividends as general reserve fund. As a result of these PRC laws and regulations, the Group's PRC subsidiaries and PRC affiliates are restricted in their ability to transfer a portion of their net assets to either in the form of dividends, loans or advances, which restricted portion amounted to approximately $14,792,000 and $75,911,158 as of December 31, 2004 and 2005, respectively.

F–53

**Table of Contents**

**PERFECT MEDIA HOLDING LIMITED**
**INDEX TO FINANCIAL STATEMENTS**

**Contents**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–55 |
| Consolidated balance sheets as of December 31, 2003 and September 30, 2004 | F–56 |
| Consolidated statements of operations for the period from June 4, 2003 to December 31, 2003 and for the nine months ended September 30, 2004 | F–57 |
| Consolidated statements of shareholders' equity and comprehensive loss for the period from June 4, 2003 to December 31, 2003 and for the nine months ended September 30, 2004 | F–58 |
| Consolidated statements of cash flows for the period from June 4, 2003 to December 31, 2003 and for the nine months ended September 30, 2004 | F–59 |
| Notes to the consolidated financial statements | F–60 |

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
PERFECT MEDIA HOLDING LIMITED

    We have audited the accompanying consolidated balance sheets of Perfect Media Holding Limited and its subsidiary (the "Company") as of December 31, 2003 and September 30, 2004 and the related consolidated statements of operations, shareholders' equity and others comprehensive loss, and cash flows for the period from June 4, 2003 to December 31, 2003 and for the nine months ended September 30, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

    We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstance, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

    In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Perfect Media Holding Limited and its subsidiary as of December 31, 2003 and September 30, 2004 and the results of its operations and its cash flows for the above stated periods in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China
February 2, 2005

F–55

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2003 |  | September 30, 2004 |
|---|---|---|---|
|  | (In U.S. dollars) |  |  |
| **Assets** |  |  |  |
| Current assets: |  |  |  |
| Cash and cash equivalents | $ 20,341 | $ | 1,219 |
| Amounts due from related parties | — |  | 24,334 |
| Accounts receivable, net of allowance for doubtful account of $nil, $nil in 2003 and 2004 | — |  | 9,436 |
| Inventories | 3,712 |  | 6,560 |
| Other current assets | 50,387 |  | 13,975 |
| Total current assets | 74,440 |  | 55,524 |
| Equipment, net | — |  | 132,222 |
| Total assets | $ 74,440 | $ | 187,746 |
| **Liabilities and shareholders' equity** |  |  |  |
| Current liabilities: |  |  |  |
| Accounts payable | $ — | $ | 181 |
| Income taxes payable | 109 |  | — |
| Accrued expenses and other current liabilities | 7,646 |  | 186,469 |
| Total current liabilities | 7,755 |  | 186,650 |
| Commitments (Note 8) |  |  |  |
| **Shareholders' Equity** |  |  |  |
| Additional paid–in capital | 120,823 |  | 120,823 |
| Accumulated other comprehensive loss | (2) |  | (2) |
| Deficit | (54,136) |  | (119,725) |
| Total shareholders' equity | $ 66,685 | $ | 1,096 |
| Total liabilities and shareholders' equity | $ 74,440 | $ | 187,746 |

The accompanying notes are an integral part of these consolidated financial statements.

F–56

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the period from June 4, 2003 to December 31, 2003 | For the nine months ended September 30, 2004 |
|---|---|---|
| | (In U.S. dollars) | |
| Revenues | $ 4,465 | $ 86,806 |
| Cost of revenues | 2,099 | 27,047 |
| Gross profit | 2,366 | 59,759 |
| Operating expenses: | | |
| General and administrative | 30,814 | 76,637 |
| Selling and marketing | 25,462 | 44,591 |
| Total operating expenses | 56,276 | 121,228 |
| Loss from operations | (53,910) | (61,469) |
| Interest income | — | 42 |
| Loss before income taxes | (53,910) | (61,427) |
| Income taxes | 226 | 4,162 |
| Net loss | $ (54,136) | $ (65,589) |

The accompanying notes are an integral part of these consolidated financial statements.

F–57

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY AND COMPREHENSIVE LOSS**
(in U.S. dollars, except share data)

| | Ordinary | | Additional paid–in capital | Deficit | Accumulated other comprehensive loss | Total shareholders' equity | Comprehensive loss |
|---|---|---|---|---|---|---|---|
| | Share | Amount | | | | | |
| **Balance at June 4, 2003** | — | $ — | $ 120,823 | $ — | $ — | $ 120,823 | |
| Cumulative translation adjustment | — | — | — | | (2) | (2) | $ (2) |
| Net loss | — | — | — | (54,136) | — | (54,136) | (54,136) |
| **Balance at December 31, 2003** | — | — | $ 120,823 | $ (54,136) | $ (2) | $ 66,685 | $ (54,138) |
| Issuance of ordinary share | 1 | — | — | | — | — | $ — |
| Cumulative translation adjustment | — | — | — | — | — | — | |
| Net loss | — | — | — | (65,589) | — | (65,589) | (65,589) |
| **Balance at September 30, 2004** | 1 | $ — | $ 120,823 | $ (119,725) | $ (2) | $ 1,096 | $ (65,589) |

The accompanying notes are an integral part of these consolidated financial statements.

F–58

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the period from June 4, 2003 to December 31, 2003 | | For the nine months ended September 30, 2004 | |
|---|---|---|---|---|
| | (In U.S. dollars) | | | |
| Net loss | $ | (54,136) | $ | (65,589) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | |
| Depreciation and amortization | | — | | 15,259 |
| Changes in assets and liabilities | | | | |
| Amounts due from related parties | | — | | (24,334) |
| Accounts receivable | | — | | (9,436) |
| Inventories | | (3,712) | | (2,848) |
| Other current assets | | (50,387) | | 36,412 |
| Accounts payable | | — | | 181 |
| Income taxes payable | | 109 | | (109) |
| Accrued expenses and other current liabilities | | 7,646 | | 178,823 |
| Net cash provided by (used in) operating activities | $ | (100,480) | $ | 128,359 |
| Investing activities: | | | | |
| Purchase of equipment | $ | — | $ | (147,481) |
| Cash used in investing activities | $ | — | $ | (147,481) |
| Financing activities: | | | | |
| Proceeds from receipt of paid–in capital | | 120,823 | | — |
| Cash provided by financing activities | $ | 120,823 | $ | — |
| Net increase (decrease) in cash and cash equivalents | $ | 20,343 | $ | (19,122) |
| Effect of exchange rate changes | | (2) | | — |
| Cash and cash equivalents, beginning of year | | — | | 20,341 |
| Cash and cash equivalents, end of year | $ | 20,341 | $ | 1,219 |
| Supplemental disclosure of cash flow information | | | | |
| Income taxes paid | $ | 226 | $ | 4,162 |
| Interest paid | $ | — | $ | — |

The accompanying notes are an integral part of these consolidated financial statements.

F–59

**Table of Contents**

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
(in U.S. dollars, unless otherwise stated)

1.    **Organization and Principal Activities**

Perfect Media Holding Limited ("the Company") was incorporated in the British Virgin Islands ("BVI") on June 4, 2004.

The PRC regulations currently limit foreign ownership of companies that provide advertising services. To comply with these regulations, the Company conducts substantially all of its advertising business activities through Shanghai Perfect Media Advertising Co., Ltd. ("Shanghai Perfect Media"), a variable interest entity, which was incorporated in the People's Republic of China (the "PRC") on June 4, 2003. The principal activities of Shanghai Perfect Media are the provision of advertisement services through the display panel of free shoes brushing machinery. Shanghai Perfect Media entered into various agreements with the Company, under which Shanghai Perfect Media pledged all of its equity to the Company and the Company has provided funds in an amount up to $120,820 (RMB 1,000,000) to satisfy its ongoing business requirements. In addition, the Company has been assigned all voting rights by the direct owners of Shanghai Perfect Media through an agreement that cannot be amended or terminated except by written consent of all parties. Finally, the Company has the option to acquire the equity interest of Shanghai Perfect Media.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46, "Consolidation of Variable Interest entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after December 15, 2003, the FASB issued FIN 46 (Revised), which provides for the deferral of the implementation date to the end of the first reporting period after March 15, 2004, unless the Company has a special purpose entity, in which case the provisions must be applied for fiscal years ending December 31, 2003. However, the Company has elected to retroactively apply FIN 46 (Revised) and has consolidated Shanghai Perfect Media as its variable interest entity from its inception.

The Company is the sole beneficiary of Shanghai Perfect Media because all the variable interests are held by the Company. The agreements described above provided for effective control of Shanghai Perfect Media to be transferred to the Company in July 2004. Shanghai Perfect Media had operating activity prior to entering these agreements with the Company. As a result, the consolidated financial statements reflect the consolidation of Shanghai Perfect Media from its inception.

2.    **Summary of Significant Accounting Policies**

*(a)  Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

*(b)  Basis of Consolidation*

The consolidated financial statements include the financial statements of the Company and its variable interest entity, Shanghai Perfect Media. All inter–company transactions and balances have been eliminated upon consolidation.

F–60

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(c) Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

*(d) Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements include the useful lives of and impairment for equipment.

*(e) Significant Risks and Uncertainties*

The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operation, or cash flows: advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on stock markets in the U.S.; competition from other competitors; changes in key suppliers; changes in certain strategic relationships; regulatory or other PRC factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

*(f) Equipment, Net*

Equipment is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Shoes brushing machinery | 5 years |
| Computers and office equipment | 5 years |
| Vehicles | 5 years |
| Leasehold Improvements | lesser of the term of the lease or the estimated useful lives of the assets |

*(g) Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Company would recognize an impairment loss based on the fair value of the assets.

*(h) Revenue Recognition*

The Company's revenues are primarily derived from advertising services displayed on top of free shoes brushing machinery. Revenues from display advertising services are recognized ratably

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

over the period in which the advertisement is displayed. Revenue from displays are recognized once the displays are delivered. Accordingly, revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assures.

*(i)  Operating Leases*
     Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

*(k)  Foreign Currency Translation*
     The functional and reporting currency of Focus Media Holding is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.
     The financial records of the Company's variable interest entity is maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the period. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive loss in the statement of shareholders' equity.

*(l)  Income Taxes*
     Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(m)  Comprehensive Income (Loss)*
     Comprehensive income (loss) includes foreign currency translation adjustment. Comprehensive income (loss) is reported in the statements of shareholders' equity.

*(n)  Fair Value of Financial Instruments*
     Financial instruments include cash and cash equivalents, accounts receivable and accounts payable. The carrying values of cash and cash equivalents, accounts receivable and accounts payable approximate their fair values due to their short–term maturities.

F–62

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(o) Recently Issued Accounting Standards*

In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03–01, "The Meaning of Other–Than–Temporary Impairment and its Application to Certain Investments". EITF No. 03–01 provides guidance on recording other–than–temporary impairments of cost method investments and requires additional disclosures for those investments. The recognition and measurement guidance in EITF No. 03–01 should be applied to other–than–temporary impairment evaluations in reporting periods beginning after June 15, 2004. The disclosure requirements are effective for fiscal years ending after June 15, 2004 and are required only for annual periods. The Company does not believe that the adoption of this standard will have a material impact on its financial positions or results of operations.

In December 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), "Revenue Recognition". SAB 104 updates portions of existing interpretative guidance in order to make this guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The adoption of SAB 104 did not have a material effect on the Company's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". The Statement establishes standards for how an issuer classifies and measures certain financial instruments. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity be classified as liabilities (or assets in some circumstances) in statements of positions or consolidated balance sheets, as appropriate. The financial instruments within the scope of this Statement are: (i) mandatorily redeemable shares that an issuer is obligated to buy back in exchange for cash or other assets; (ii) financial instruments that do or may require the issuer to buy back some of its shares in exchange for cash or other assets; and (iii) financial instruments that embody an obligation that can be settled with shares, the monetary value of which is fixed, tied solely or predominantly to a variable such as a market index, or varies inversely with the value of the issuer's shares (excluding certain financial instruments indexed partly to the issuer's equity shares and partly, but not predominantly, to something else). This Statement does not apply to features embedded in a financial instrument that is not a derivative in its entirety. The Statement also requires disclosures about alternative ways of settling the instruments and about the capital structure of entities all of whose shares are mandatorily redeemable. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position, cash flows or results of operations.

In January 2003, the FASB issued Interpretation Number ("FIN") No. 46, which clarifies the application of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" and provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. This new model for consolidation applies to an entity in which either: (1) the equity investors (if any) lack one or more characteristics deemed essential to a controlling financial interest or (2) the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. Certain disclosure requirements of FIN 46 were effective for financial statements issued after January 31, 2003. In December 2003, the FASB issued FIN 46 (Revised) to address certain FIN 46

F–63

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

implementation issues. The Company has elected to retroactively apply FIN 46 (Revised) and has consolidated Shanghai Perfect Media as its variable interest entity from its inception.

**3.   Other Current Assets**

Other current assets consist of the following:

|  | December 31, 2003 | September 30, 2004 |
|---|---|---|
| Staff advances and other receivables | $ 16,561 | $ — |
| Advances to suppliers | 33,826 | 13,975 |
|  | $ 50,387 | $ 13,975 |

**4.   Equipment, Net**

Equipment consist of:

|  | December 31, 2003 | September 30, 2004 |
|---|---|---|
| Shoes brushing machinery | $ — | $ 75,633 |
| Computers and office equipment | — | 19,080 |
| Leasehold improvements | — | 20,298 |
| Vehicles | — | 32,470 |
|  | $ — | $ 147,481 |
| Less: accumulated depreciation and amortization | — | (15,259) |
|  | $ — | $ 132,222 |

**5.   Accrued Expenses and Other Current Liabilities**

|  | December 31, 2003 | September 30, 2004 |
|---|---|---|
| Other payables | $ 7,646 | $ 181,235 |
| Accrued expenses | — | 5,234 |
|  | $ 7,646 | $ 186,469 |

**6.   Income Taxes**

The Company is a tax–exempted company incorporated in the British Virgin Islands.

Shanghai Perfect Media, registered in the PRC is subject to PRC Enterprise Income Tax ("EIT") on the taxable income as reported in their respective statutory financial statements adjusted in accordance with the relevant income tax laws. In accordance with "Income Tax Law of China for Private Enterprises", the applicable EIT rate for Shanghai Perfect Media is 4%.

**7.   Mainland China Contribution Plan and Profit Appropriation**

Full time employees of Shanghai Perfect Media in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits,

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require Shanghai Perfect Media to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $480 and $2,155 for the year ended December 31, 2003 and the nine months ended September 30, 2004, respectively.

Pursuant to laws applicable to the entities incorporated in the PRC, Shanghai Perfect Media must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include a (i) general reserve, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the Company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. Shanghai Perfect Media did not make any appropriations to the reserve funds described above as it incurred losses in any of the periods presented.

**8.    Commitments**

The Company leases certain office premises and certain building areas under non–cancelable leases, which expire in 2013. Rental expense under operating leases for 2003 and the nine months ended September 30, 2004 were $5,758 and $22,951, respectively.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| | September 30, 2004 |
|---|---|
| September 30, | |
| 2005 | $       42,103 |
| 2006 | 14,295 |
| 2007 | 9,133 |
| 2008 | 5,582 |
| 2009 | 3,294 |
| Thereafter | 101 |
| | $       74,508 |

**9.    Segment and Geographic Information**

The Company is engaged in providing advertisement services through the display panel of free shoe brushing machinery. The Company's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. The Company believes it operates in one segment, and all financial segment information can be found in the consolidated financial statements.

F–65

Table of Contents

**PERFECT MEDIA HOLDING LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM JUNE 4, 2003 TO DECEMBER 31, 2003 AND**
**THE NINE MONTHS ENDED SEPTEMBER 30, 2004**
**(in U.S. dollars, unless otherwise stated)**

**Geographic Information**

The Company operates, through Shanghai Perfect Media, in the PRC and all of the Company's long lived assets are located in the PRC.

As of December 31, 2003 and September 30, 2004, there were no customers which accounted for 10% or more of the Company's net revenues and accounts receivable.

F–66

**Table of Contents**

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Contents

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–68 |
| Consolidated balance sheet as of October 31, 2004 | F–69 |
| Consolidated statement of operations for the period from March 11, 2004 (Date of inception) to October 31, 2004 | F–70 |
| Consolidated statement of shareholders' deficiency and comprehensive loss for the period from March 11, 2004 (Date of inception) to October 31, 2004 | F–71 |
| Consolidated statement of cash flows for the period from March 11, 2004 (Date of inception) to October 31, 2004 | F–72 |
| Notes to the consolidated financial statements | F–73 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
FOCUS MEDIA CHANGSHA HOLDING LTD.

We have audited the accompanying consolidated balance sheet of Focus Media Changsha Holding Ltd. and its subsidiary (the "Company") as of October 31, 2004 and the related consolidated statement of operations, shareholders' deficiency and comprehensive loss, and cash flows for the period from March 11, 2004 (date of inception) to October 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Focus Media Changsha Holding Ltd. and its subsidiary as of October 31, 2004 and the results of its operations and its cash flows for the above stated period in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China
June 10, 2005

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**CONSOLIDATED BALANCE SHEET**

|  |  | October 31, 2004 |
|---|---|---|
|  |  | (In U.S. dollars) |
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ | 6,421 |
| Accounts receivable, net of allowance for doubtful account of $nil |  | 4,833 |
| Staff advances and other receivables |  | 3,077 |
| Total current assets |  | 14,331 |
| Rental deposits |  | 14,614 |
| Equipment, net |  | 316,104 |
| Total assets | $ | 345,049 |
| **Liabilities and shareholders' deficiency** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ | 3 |
| Accrued expenses and other current liabilities |  | 436,023 |
| Total current liabilities |  | 436,026 |
| Commitments (Note 7) |  |  |
| **Shareholders' Deficiency** |  |  |
| Additional paid–in capital |  | 60,412 |
| Deficit |  | (151,389) |
| Total shareholders' deficiency | $ | (90,977) |
| Total liabilities and shareholders' deficiency | $ | 345,049 |

The accompanying notes are an integral part of these consolidated financial statements.

F–69

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**CONSOLIDATED STATEMENT OF OPERATIONS**

|  | For the period from March 11, 2004 (Date of inception) to October 31, 2004 |
|---|---|
|  | (In U.S. dollars) |
| Revenues | $ 13,054 |
| Cost of revenues | (42,590) |
| Gross loss | (29,536) |
| Operating expenses: |  |
| General and administrative | 116,674 |
| Selling and marketing | 5,216 |
| Total operating expenses | 121,890 |
| Loss from operations | (151,426) |
| Interest income | 75 |
| Other expenses, net | (38) |
| Loss before income taxes | (151,389) |
| Income taxes | — |
| Net loss | $ (151,389) |

The accompanying notes are an integral part of these consolidated financial statements.

F–70

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' DEFICIENCY AND**
**COMPREHENSIVE LOSS**
**(in U.S. dollars, except share data)**

| | Ordinary | | Additional paid–in capital | Deficit | | Total shareholders' deficiency |
|---|---|---|---|---|---|---|
| | Share | Amount | | | | |
| **Balance as of March 11, 2004 (Date of inception)** | — | — | $ — | $ — | $ | — |
| Issuance of ordinary share | 1 | — | 60,412 | — | | 60,412 |
| Net loss | — | — | — | (151,389) | | (151,389) |
| **Balance as of October 31, 2004** | 1 | $ — | $ 60,412 | $ (151,389) | $ | (90,977) |

The accompanying notes are an integral part of these consolidated financial statements.

F–71

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | | For the period from March 11, 2004 (Date of inception) to October 31, 2004 |
|---|---|---:|
| | | **(In U.S. dollars)** |
| Net loss | $ | (151,389) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | | 16,913 |
| Accounts receivable | | (4,833) |
| Staff advances and other receivables | | (3,077) |
| Accounts payable | | 3 |
| Accrued expenses and other current liabilities | | 121,206 |
| | | |
| Net cash used in operating activities | $ | (21,177) |
| | | |
| Investing activities: | | |
| Purchase of equipment | $ | (18,200) |
| Rental deposits | | (14,614) |
| | | |
| Cash used in investing activities | $ | (32,814) |
| | | |
| Financing activities: | | |
| Proceeds from issuance of ordinary share | $ | 60,412 |
| | | |
| Cash provided by financing activities | $ | 60,412 |
| | | |
| Net increase in cash and cash equivalents | $ | 6,421 |
| Cash and cash equivalents, beginning of period | | — |
| | | |
| Cash and cash equivalents, end of period | $ | 6,421 |

The accompanying notes are an integral part of these consolidated financial statements.

F–72

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**1.    Organization and Principal Activities**

Focus Media Changsha Holding Ltd. ("the Company") was incorporated in the British Virgin Islands ("BVI") on March 11, 2004.

The PRC regulations currently limit foreign ownership of companies that provide advertising services. To comply with these regulations, the Company conducts substantially all of its advertising business activities through Changsha Focus Media Shiji Advertising Co., Ltd. ("Changsha Advertising"), a variable interest entity, which was incorporated in the People's Republic of China (the "PRC") on March 11, 2004. The principal activities of Changsha Advertising are the operation and maintenance of out–of–home television advertising network. Through contractual agreements described below, the Company is deemed the primary beneficiary of Changsha Advertising resulting in Changsha Advertising being deemed a subsidiary of the Company under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)").

On March 11, 2004, the sole shareholder of Changsha Advertising entered into various contractual agreements with the Company, under which the shareholder pledged all equity shares it owned to the Company. In addition, the Company was assigned all voting rights by the direct owner of Changsha Advertising through an agreement that cannot be amended or terminated except by written consent of all parties. Finally, the Company has the option to acquire the equity interest of Changsha Advertising for a purchase price equal to the respective registered capital of Changsha Advertising or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. The Company has agreed to pay the shareholder of Changsha Advertising any excess of the purchase price paid for such equity interests in, or assets of Changsha Advertising over the registered capital of Changsha Advertising in the event that such option is exercised.

The Company holds all the variable interest of Changsha Advertisement and the Company has been determined to be the most closely associated with Changsha Advertising. Therefore the Company is the primary beneficiary of Changsha Advertising. The agreements described above provided for effective control of Changsha Advertising to be transferred to the Company on March 11, 2004 (date of inception). As a result, the consolidated financial statements reflect the consolidation of Changsha Advertising starting from March 2004.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46, "Consolidation of Variable Interest entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after December 15, 2003.

**2.    Summary of Significant Accounting Policies**

*(a)  Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

F–73

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(b)  Basis of Consolidation*

The consolidated financial statements include the financial statements of the Company and its variable interest entity, Changsha Advertising. All inter–company transactions and balances have been eliminated upon consolidation.

*(c)  Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

*(d)  Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements include the useful lives of and impairment for equipment.

*(e)  Significant Risks and Uncertainties*

The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operation, or cash flows: advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on stock markets in the U.S.; competition from other competitors; changes in key suppliers; changes in certain strategic relationships; regulatory or other PRC factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

*(f)  Equipment, Net*

Equipment is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Flat–panel television screens | 5 years |
| Computers and office equipment | 5 years |
| Leasehold improvements | lesser of the term of the lease or the estimated useful lives of the assets |

*(g)  Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Company would recognize an impairment loss based on the fair value of the assets.

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**(h)  *Revenue Recognition***

The Company's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assures.

Prepayments for the advertising services are deferred and recognised as revenue when the advertising services are rendered.

The Company presents advertising service revenue, net of business tax incurred, which amounts to $1,228 for the period from March 11, 2004 (Date of inception) to October 31, 2004.

**(i)  *Operating Leases***

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

**(k)  *Foreign Currency Translation***

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statement of operations.

The financial records of the Company's variable interest entity is maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the period. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive loss in the statement of shareholders' deficiency.

**(l) *Income Taxes***

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

F–75

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**(m)   *Comprehensive loss***

The net loss for the period presented was the same as the comprehensive loss for the period presented.

**(n) *Fair Value of Financial Instruments***

Financial instruments include cash and cash equivalents, accounts receivable and accounts payable. The carrying values of cash and cash equivalents, accounts receivable and accounts payable approximate their fair values due to their short–term maturities.

**(o)   *Recently Issued Accounting Standards***

In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03–01, "The Meaning of Other–Than–Temporary Impairment and its Application to Certain Investments". EITF No. 03–01 provides guidance on recording other–than–temporary impairments of cost method investments and requires additional disclosures for those investments. The recognition and measurement guidance in EITF No. 03–01 should be applied to other–than–temporary impairment evaluations in reporting periods beginning after June 15, 2004. The disclosure requirements are effective for fiscal years ending after June 15, 2004 and are required only for annual periods. The adoption of this standard did not have a material impact on its financial positions or results of operations.

In December 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), "Revenue Recognition". SAB 104 updates portions of existing interpretative guidance in order to make this guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The adoption of SAB 104 did not have a material effect on the Company's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". The Statement establishes standards for how an issuer classifies and measures certain financial instruments. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity be classified as liabilities (or assets in some circumstances) in statements of positions or consolidated balance sheets, as appropriate. The financial instruments within the scope of this Statement are: (i) mandatorily redeemable shares that an issuer is obligated to buy back in exchange for cash or other assets; (ii) financial instruments that do or may require the issuer to buy back some of its shares in exchange for cash or other assets; and (iii) financial instruments that embody an obligation that can be settled with shares, the monetary value of which is fixed, tied solely or predominantly to a variable such as a market index, or varies inversely with the value of the issuer's shares (excluding certain financial instruments indexed partly to the issuer's equity shares and partly, but not predominantly, to something else). This Statement does not apply to features embedded in a financial instrument that is not a derivative in its entirety. The Statement also requires disclosures about alternative ways of settling the instruments and about the capital structure of entities all of whose shares are mandatorily redeemable. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position, cash flows or results of operations.

F–76

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

In January 2003, the FASB issued Interpretation Number ("FIN") No. 46, which clarifies the application of Accounting Research Bulletin No. 51, "Financial Statements" and provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. This new model for consolidation applies to an entity in which either: (1) the equity investors (if any) lack one or more characteristics deemed essential to a controlling financial interest or (2) the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. Certain disclosure requirements of FIN 46 were effective for financial statements issued after January 31, 2003. In December 2003, the FASB issued FIN 46 (Revised) to address certain FIN 46 implementation issues. The Company has applied FIN 46 (Revised) and has Changsha Advertising as its variable interest entity from its incorporation.

**3.    Equipment, Net**

Equipment consists of:

| | | |
|---|---|---:|
| Flat–panel television screens | $ | 314,817 |
| Computers and office equipment | | 11,434 |
| Leasehold improvements | | 6,766 |
| | $ | 333,017 |
| Less: accumulated depreciation | | (16,913) |
| | $ | 316,104 |

**4.    Accrued Expenses and Other Current Liabilities**

| | | |
|---|---|---:|
| Accrued expenses | $ | 1,803 |
| Accrued employee payroll and welfare | | 8,474 |
| Other taxes payable | | 711 |
| Advance from customers | | 5,248 |
| Payable for acquisition of equipment | | 314,817 |
| Others | | 104,970 |
| | $ | 436,023 |

**5.    Income Taxes**

The Company is a tax–exempted company incorporated in the British Virgin Islands.

Changsha Advertising, registered in the PRC is subject to PRC Enterprise Income Tax ("EIT") on the taxable income as reported in its statutory financial statements adjusted in accordance with the relevant income tax laws. In accordance with "Income Tax Law of China for Private Enterprises", the applicable EIT rate for Changsha Advertising is 33%. No income tax has been provided in the consolidated financial statements as Changsha Advertising incurred tax loss in the period presented.

F–77

Table of Contents

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**6.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of Changsha Advertising in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require Changsha Advertising to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $2,137 for the period from March 11, 2004 (Date of inception) to October 31, 2004.

Pursuant to laws applicable to the entities incorporated in the PRC, Changsha Advertising must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include a (i) general reserve, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. Changsha Advertising did not make any appropriations to the reserve funds described above as it incurred loss in the period presented.

**7.    Commitments**

The Company leases certain office premises and certain building areas under non–cancelable leases, which expire in 2014. Rental expense under operating leases for the period from March 11, 2004 (Date of inception) to October 31, 2005 was $20,071.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| October 31, | |
| --- | --- |
| 2005 | $ 91,291 |
| 2006 | 79,734 |
| 2007 | 54,843 |
| 2008 | 34,228 |
| 2009 | 27,083 |
| Thereafter | 6,836 |
| | $ 294,015 |

**8.    Segment and Geographic Information**

The Company is engaged in providing advertisement services through the operation and maintenance of out–of–home television advertising network. The Company's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. The Company believes it operates in one segment, and all financial segment information can be found in the consolidated financial statements.

F–78

**Table of Contents**

**FOCUS MEDIA CHANGSHA HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 11, 2004**
**(DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**Geographic Information**

The Company operates, through Changsha Advertising, in the PRC and all of the Company's long lived assets are located in the PRC.

As of October 31, 2004, there was one customer who accounted for 10% or more of the Company's net revenues and accounts receivable, as follows:

|  | Net revenue | Accounts receivable |
|---|---|---|
| Customer A | 68% | 100% |

**9.    Subsequent Event**

On October 15, 2004, Focus Media Holding Limited acquired 100% of the outstanding ordinary shares of the Company including its then variable interest entity Changsha Advertising in exchange of cash of $989,484. Immediately following the acquisition the Company became a wholly owned subsidiary of Focus Media Holding Limited and Changsha Advertising became a wholly owned subsidiary of Focus Media Advertisement Co. Ltd.

F–79

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Contents

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–81 |
| Consolidated balance sheet as of October 31, 2004 | F–82 |
| Consolidated statement of operations for the period from March 22, 2004 (Date of inception) to October 31, 2004 | F–83 |
| Consolidated statement of shareholders' deficiency and comprehensive loss for the period from March 22, 2004 (Date of inception) to October 31, 2004 | F–84 |
| Consolidated statement of cash flows for the period from March 22, 2004 (Date of inception) to October 31, 2004 | F–85 |
| Notes to the consolidated financial statements | F–86 |

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
FOCUS MEDIA QINGDAO HOLDING LTD.

We have audited the accompanying consolidated balance sheet of Focus Media Qingdao Holding Ltd. and its subsidiary (the "Company") as of October 31, 2004 and the related consolidated statement of operations, shareholders' deficiency and comprehensive loss, and cash flows for the period from March 22, 2004 (date of inception) to October 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Focus Media Qingdao Holding Ltd. and its subsidiary as of October 31, 2004 and the results of its operations and its cash flow for the above stated period in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China
June 10, 2005

F–81

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**CONSOLIDATED BALANCE SHEET**

|  |  | October 31, 2004 |
|---|---|---|
|  |  | (In U.S. dollars) |
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ | 5,862 |
| Accounts receivable, net of allowance for doubtful account of $nil |  | 4,400 |
| Inventories — spare parts |  | 2,734 |
| Staff advances and other receivables |  | 454 |
| Total current assets |  | 13,450 |
| Rental deposits |  | 27,187 |
| Equipment, net |  | 232,620 |
| Total assets | $ | 273,257 |
| **Liabilities and shareholders' deficiency** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ | 5,344 |
| Accrued expenses and other current liabilities |  | 354,256 |
| Total current liabilities |  | 359,600 |
| Commitments (Note 8) |  |  |
| **Shareholders' Deficiency** |  |  |
| Additional paid–in capital |  | 60,412 |
| Deficit |  | (146,755) |
| Total shareholders' deficiency | $ | (86,343) |
| Total liabilities and shareholders' deficiency | $ | 273,257 |

The accompanying notes are an integral part of these consolidated financial statements.

F–82

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**CONSOLIDATED STATEMENT OF OPERATIONS**

|  | For the period from March 22, 2004 (Date of inception) to October 31, 2004 |
|---|---|
|  | **(In U.S. dollars)** |
| Revenues | $ 12,052 |
| Cost of revenues | (84,492) |
| Gross loss | (72,440) |
| Operating expenses: |  |
| General and administrative | 59,262 |
| Selling and marketing | 15,073 |
| Total operating expenses | 74,335 |
| Loss from operations | (146,775) |
| Interest income | 74 |
| Other expenses, net | (54) |
| Loss before income taxes | (146,755) |
| Income taxes | — |
| Net loss | $ (146,755) |

The accompanying notes are an integral part of these consolidated financial statements.

F–83

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**CONSOLIDATED STATEMENT OF SHAREHOLDERS' DEFICIENCY AND**
**COMPREHENSIVE LOSS**
**(in U.S. dollars, except share data)**

| | Ordinary | | Additional paid–in capital | Deficit | Total shareholders' deficiency |
|---|---|---|---|---|---|
| | Share | Amount | | | |
| **Balance as of March 22, 2004 (Date of inception)** | — | — | $ — | $ — | $ — |
| Issuance of ordinary share | 1 | — | 60,412 | — | 60,412 |
| Net loss | — | — | — | (146,755) | (146,755) |
| **Balance as of October 31, 2004** | 1 | $ — | $ 60,412 | $(146,755) | $ (86,343) |

The accompanying notes are an integral part of these consolidated financial statements.

F–84

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | For the period from March 22, 2004 (Date of inception) to October 31, 2004 |
|---|---|
| | (In U.S. dollars) |
| Net loss | $ (146,755) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation | 10,666 |
| Accounts receivable | (4,400) |
| Inventories | (2,734) |
| Staff advances and other receivables | (454) |
| Accounts payable | 5,344 |
| Accrued expenses and other current liabilities | 115,798 |
| Net cash used in operating activities | $ (22,535) |
| Investing activities: | |
| Purchase of equipment | $ (4,828) |
| Rental deposits | (27,187) |
| Cash used in investing activities | $ (32,015) |
| Financing activities: | |
| Proceeds from issuance of ordinary share | $ 60,412 |
| Cash provided by financing activities | $ 60,412 |
| Net increase in cash and cash equivalents | $ 5,862 |
| Cash and cash equivalents, beginning of period | — |
| Cash and cash equivalents, end of period | $ 5,862 |

The accompanying notes are an integral part of these consolidated financial statements.

F–85

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
(in U.S. dollars, unless otherwise stated)

**1.    Organization and Principal Activities**

Focus Media Qingdao Holding Ltd. ("the Company") was incorporated in the British Virgin Islands ("BVI") on March 22, 2004.

The PRC regulations currently limit foreign ownership of companies that provide advertising services. To comply with these regulations, the Company conducts substantially all of its advertising business activities through Qingdao Fukesi Advertisement Co., Ltd. ("Qingdao Advertising"), a variable interest entity, which was incorporated in the People's Republic of China (the "PRC") on March 22, 2004. The principal activities of Qingdao Advertising are the operation and maintenance of out–of–home television advertising network. Through contractual agreements described below, the Company is deemed the primary beneficiary of Qingdao Advertising resulting in Qingdao Advertising being deemed a subsidiary of the Company under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)").

On March 22, 2004, the sole shareholder of Qingdao Advertising entered into various contractual agreements with the Company, under which the direct owner pledged all equity shares it owned to the Company. In addition, the Company was assigned all voting rights by the sole shareholder of Qingdao Advertising through an agreement that cannot be amended or terminated except by written consent of all parties. Finally, the Company has the option to acquire the equity interest of Qingdao Advertising for a purchase price equal to the respective registered capital of Qingdao Advertising or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. The Company has agreed to pay the shareholder of Qingdao Advertising any excess of the purchase price paid for such equity interests in, or assets of Qingdao Advertising .over the registered capital of Qingdao Advertising in the event that such option is exercised.

The Company holds all the variable interest of Qingdao Advertisement and the Company has been determined to be the most closely associated with Qingdao Advertising. Therefore the Company is the primary beneficiary of Qingdao Advertising. The agreements described above provided for effective control of Qingdao Advertising to be transferred to the Company on March 22, 2004 (date of inception). As a result, the consolidated financial statements reflect the consolidation of Qingdao Advertising starting from March 2004.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46, "Consolidation of Variable Interest entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after December 15, 2003.

**2.    Summary of Significant Accounting Policies**

*(a)  Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

F–86

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(b)  Basis of Consolidation*
    The consolidated financial statements include the financial statements of the Company and its variable interest entity, Qingdao Advertising. All inter–company transactions and balances have been eliminated upon consolidation.
*(c)  Cash and Cash Equivalents*
    Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.
*(d)  Use of Estimates*
    The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements include the useful lives of and impairment for equipment.
*(e)  Significant Risks and Uncertainties*
    The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operation, or cash flows: advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on stock markets in the U.S.; competition from other competitors; changes in key suppliers; changes in certain strategic relationships; regulatory or other PRC factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.
*(f)  Equipment, Net*
    Equipment is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Flat–panel television screens | 5  years |
| Computers and office equipment | 5  years |

*(g)  Impairment of Long–Lived Assets*
    The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Company would recognize an impairment loss based on the fair value of the assets.

F–87

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(h)  Revenue Recognition*

The Company's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assures.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Company presents advertising service revenue, net of business tax incurred, which amounts to $1,120 for the period from March 22, 2004 (date of inception) to October 31, 2004.

*(i)  Operating Leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

*(k)  Foreign Currency Translation*

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.

The financial records of the Company's variable interest entity is maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the period. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive loss in the statement of shareholders' deficiency.

*(l) Income Taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(m) Comprehensive loss*

The net loss for the period presented was the same as the comprehensive loss for the period presented.

F–88

**Table of Contents**

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(n) Fair Value of Financial Instruments*

Financial instruments include cash and cash equivalents, accounts receivable and accounts payable. The carrying values of cash and cash equivalents, accounts receivable and accounts payable approximate their fair values due to their short–term maturities.

*(o) Recently Issued Accounting Standards*

In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03–01, "The Meaning of Other–Than–Temporary Impairment and its Application to Certain Investments". EITF No. 03–01 provides guidance on recording other–than–temporary impairments of cost method investments and requires additional disclosures for those investments. The recognition and measurement guidance in EITF No. 03–01 should be applied to other–than–temporary impairment evaluations in reporting periods beginning after June 15, 2004. The disclosure requirements are effective for fiscal years ending after June 15, 2004 and are required only for annual periods. The adoption of this standard did not have a material impact on its financial positions or results of operations.

In December 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), "Revenue Recognition". SAB 104 updates portions of existing interpretative guidance in order to make this guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The adoption of SAB 104 did not have a material effect on the Company's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". The Statement establishes standards for how an issuer classifies and measures certain financial instruments. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity be classified as liabilities (or assets in some circumstances) in statements of positions or consolidated balance sheets, as appropriate. The financial instruments within the scope of this Statement are: (i) mandatorily redeemable shares that an issuer is obligated to buy back in exchange for cash or other assets; (ii) financial instruments that do or may require the issuer to buy back some of its shares in exchange for cash or other assets; and (iii) financial instruments that embody an obligation that can be settled with shares, the monetary value of which is fixed, tied solely or predominantly to a variable such as a market index, or varies inversely with the value of the issuer's shares (excluding certain financial instruments indexed partly to the issuer's equity shares and partly, but not predominantly, to something else). This Statement does not apply to features embedded in a financial instrument that is not a derivative in its entirety. The Statement also requires disclosures about alternative ways of settling the instruments and about the capital structure of entities all of whose shares are mandatorily redeemable. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position, cash flows or results of operations.

In January 2003, the FASB issued Interpretation Number ("FIN") No. 46, which clarifies the application of Accounting Research Bulletin No. 51, "Financial Statements" and provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. This new model for consolidation applies to an entity in which either: (1) the equity investors (if any) lack one or more characteristics deemed essential to a controlling

F–89

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

financial interest or (2) the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. Certain disclosure requirements of FIN 46 were effective for financial statements issued after January 31, 2003. In December 2003, the FASB issued FIN 46 (Revised) to address certain FIN 46 implementation issues. The Company has applied FIN 46 (Revised) and has Qingdao Advertising as its variable interest entity from its incorporation.

**3.    Accounts receivable**

Accounts receivable consists of the following:

| | | |
|---|---|---|
| Billed receivables | $ | 3,938 |
| Unbilled receivables | | 462 |
| | $ | 4,400 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the balance sheet date. These amounts become billable according to the contract term. The Company anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of balance sheet date

**4.    Equipment, Net**

Equipment consists of:

| | | |
|---|---|---|
| Flat–panel television screens | $ | 238,458 |
| Computers and office equipment | | 4,828 |
| | $ | 243,286 |
| Less: accumulated depreciation | | (10,666) |
| | $ | 232,620 |

**5.    Accrued Expenses and Other Current Liabilities**

| | | |
|---|---|---|
| Accrued expenses | $ | 1,088 |
| Accrued employee payroll and welfare | | 6,555 |
| Other taxes payable | | 248 |
| Advance from customers | | 3,157 |
| Payable for acquisition of equipment | | 238,458 |
| Others | | 104,750 |
| | $ | 354,256 |

**6.    Income Taxes**

The Company is a tax–exempted company incorporated in the British Virgin Islands.

Qingdao Advertising, registered in the PRC is subject to PRC Enterprise Income Tax ("EIT") on the taxable income as reported in its statutory financial statements adjusted in accordance with the relevant income tax laws. In accordance with "Income Tax Law of China for Private Enterprises", the applicable EIT rate for Qingdao Advertising is 33%. No income tax has been provided in the consolidated financial statements as Qingdao Advertising incurred tax loss in the period presented.

F–90

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**7.     Mainland China Contribution Plan and Profit Appropriation**

Full time employees of Qingdao Advertising in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require Qingdao Advertising to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $1,375 for the period from March 22, 2004 (Date of inception) to October 31, 2004.

Pursuant to laws applicable to the entities incorporated in the PRC, Qingdao Advertising must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include a (i) general reserve, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. Qingdao Advertising did not make any appropriations to the reserve funds described above as it incurred loss in the period presented.

**8.     Commitments**

The Company leases certain office premises and certain building areas under non–cancelable leases, which expire in 2014. Rental expense under operating leases for the period from March 22, 2004 (Date of inception) to October 31, 2005 was $31,943.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| October 31, | |
|---|---:|
| 2005 | $ 87,648 |
| 2006 | 59,080 |
| 2007 | 30,914 |
| 2008 | 18,505 |
| 2009 | 12,402 |
| Thereafter | 11,578 |
| | $ 220,127 |

**9.     Segment and Geographic Information**

The Company is engaged in providing advertisement services through the operation and maintenance of out–of–home television advertising network. The Company's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. The Company believes it operates in one segment, and all financial segment information can be found in the consolidated financial statements.

**Geographic Information**

The Company operates, through Qingdao Advertising, in the PRC and all of the Company's long lived assets are located in the PRC.

F–91

Table of Contents

**FOCUS MEDIA QINGDAO HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 22, 2004 (DATE OF INCEPTION) TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

As of October 31, 2004, there were 2 customers which accounted for 10% or more of the Company's net revenues and accounts receivable, as follows:

|  | Net revenue | Accounts receivable |
| --- | --- | --- |
| Customer A | 12% | 35% |
| Customer B | 16% | 47% |

**10.    Subsequent Event**

On October 15, 2004, Focus Media Holding Limited acquired 100% of the outstanding ordinary shares of the Company including its then variable interest entity Qingdao Advertising in exchange of cash of $989,496. Immediately following the acquisition the Company became a wholly owned subsidiary of Focus Media Holding Limited and Qingdao Advertising became a wholly owned subsidiary of Focus Media Advertisement Co. Ltd.

F–92

**Table of Contents**

**FOCUS MEDIA DALIAN HOLDING LTD.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Contents

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–94 |
| Consolidated balance sheet as of October 31, 2004 | F–95 |
| Consolidated statement of operations for the period from March 24, 2004 (Date of inception) to October 31, 2004 | F–96 |
| Consolidated statement of shareholders' deficiency and comprehensive loss for the period from March 24, 2004 (Date of inception) to October 31, 2004 | F–97 |
| Consolidated statement of cash flows for the period from March 24, 2004 (Date of inception) to October 31, 2004 | F–98 |
| Notes to the consolidated financial statements | F–99 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
FOCUS MEDIA DALIAN HOLDING LTD.

We have audited the accompanying consolidated balance sheet of Focus Media Dalian Holding Ltd. and its subsidiary (the "Company") as of October 31, 2004 and the related consolidated statement of operations, shareholders' deficiency and comprehensive loss, and cash flows for the period from March 24, 2004 (date of inception) to October 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Focus Media Dalian Holding Ltd. and its subsidiary as of October 31, 2004 and the results of its operations and its cash flows for the above stated period in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China

June 10, 2005

F–94

**Table of Contents**

**FOCUS MEDIA DALIAN HOLDING LTD.**
**CONSOLIDATED BALANCE SHEET**

|  |  | October 31, 2004 |
|---|---|---|
|  |  | (In U.S. dollars) |
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ | 11,093 |
| Accounts receivable, net of allowance for doubtful account of $nil |  | 6,903 |
| Staff advances and other receivables |  | 7,107 |
| Total current assets |  | 25,103 |
| Rental deposits |  | 43,843 |
| Equipment, net |  | 267,807 |
| Total assets | $ | 336,753 |
| **Liabilities and shareholders' deficiency** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ | 458 |
| Accrued expenses and other current liabilities |  | 388,476 |
| Total current liabilities |  | 388,934 |
| Commitments (Note 8) |  |  |
| **Shareholders' Deficiency** |  |  |
| Additional paid–in capital |  | 60,412 |
| Deficit |  | (112,593) |
| Total shareholders' deficiency | $ | (52,181) |
| Total liabilities and shareholders' deficiency | $ | 336,753 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**CONSOLIDATED STATEMENT OF OPERATIONS**

|  | For the period from March 24, 2004 (Date of inception) to October 31, 2004 |
|---|---|
|  | (In U.S. dollars) |
| Revenues | $ 36,645 |
| Cost of revenues | (73,318) |
| Gross loss | (36,673) |
| Operating expenses: |  |
| General and administrative | 53,470 |
| Selling and marketing | 22,452 |
| Total operating expenses | 75,922 |
| Loss from operations | (112,595) |
| Interest income | 55 |
| Other expenses, net | (53) |
| Loss before income taxes | (112,593) |
| Income taxes | — |
| Net loss | $ (112,593) |

The accompanying notes are an integral part of these consolidated financial statements.

F–96

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**CONSOLIDATED STATEMENT OF SHAREHOLDERS' DEFICIENCY AND**
**COMPREHENSIVE LOSS**
**(in U.S. dollars, except share data)**

| | Ordinary | | Additional Paid–In Capital | Deficit | Total shareholders' deficiency |
|---|---|---|---|---|---|
| | Share | Amount | | | |
| **Balance as of March 24, 2004 (Date of inception)** | — | $ — | $ — | $ — | $ — |
| Issuance of ordinary share | 1 | — | 60,412 | | 60,412 |
| Net loss | — | — | — | (112,593) | (112,593) |
| **Balance as of October 31, 2004** | 1 | $ — | $ 60,412 | $(112,593) | $ (52,181) |

The accompanying notes are an integral part of these consolidated financial statements.

F–97

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

|  | | For the period from March 24, 2004 (Date of inception) to October 31, 2004 |
|---|---|---|
|  | | **(In U.S. dollars)** |
| Net loss | $ | (112,593) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation | | 15,001 |
| Accounts receivable | | (6,903) |
| Staff advances and other receivables | | (7,107) |
| Accounts payable | | 458 |
| Accrued expenses and other current liabilities | | 116,044 |
| Net cash provided by operating activities | $ | 4,900 |
| Investing activities: | | |
| Purchase of equipment | $ | (10,376) |
| Rental deposits | | (43,843) |
| Cash used in investing activities | $ | (54,219) |
| Financing activities: | | |
| Proceeds from issuance of ordinary share | $ | 60,412 |
| Cash provided by financing activities | $ | 60,412 |
| Net increase in cash and cash equivalents | $ | 11,093 |
| Cash and cash equivalents, beginning of period | | — |
| Cash and cash equivalents, end of period | $ | 11,093 |

The accompanying notes are an integral part of these consolidated financial statements.

F–98

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**1.    Organization and Principal Activities**

Focus Media Dalian Holding Ltd. ("the Company") was incorporated in the British Virgin Islands ("BVI") on March 24, 2004.

The PRC regulations currently limit foreign ownership of companies that provide advertising services. To comply with these regulations, the Company conducts substantially all of its advertising business activities through Dalian Focus Media Advertising Co., Ltd. ("Dalian Advertising"), a variable interest entity, which was incorporated in the People's Republic of China (the "PRC") on March 24, 2004. The principal activities of Dalian Advertising are the operation and maintenance of out–of–home television advertising network. Through contractual agreements described below, the Company is deemed the primary beneficiary of Dalian Advertising resulting in Dalian Advertising being deemed a subsidiary of the Company under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)").

On March 24, 2004, the sole shareholder owner of Dalian Advertising entered into various contractual agreements with the Company, under which the direct owner pledged all equity shares it owned to the Company. In addition, the Company was assigned all voting rights by the direct owner of Dalian Advertising through an agreement that cannot be amended or terminated except by written consent of all parties. Finally, the Company has the option to acquire the equity interest of Dalian Advertising for a purchase price equal to the respective registered capital of Dalian Advertising or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. The Company has agreed to pay the shareholder of Dalian Advertising any excess of the purchase price paid for such equity interests in, or assets of Dalian Advertising over the registered capital of Dalian Advertising in the event that such option is exercised.

The Company holds all the variable interest of Dalian Advertisement and the Company has been determined to be the most closely associated with Dalian Advertising. Therefore the Company is the primary beneficiary of Dalian Advertising. The agreements described above provided for effective control of Dalian Advertising to be transferred to the Company on March 24, 2004 (date of inception). As a result, the consolidated financial statements reflect the consolidation of Dalian Advertising starting from March 2004.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46, "Consolidation of Variable Interest entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after December 15, 2003.

**2.    Summary of Significant Accounting Policies**

*(a)  Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(b)  Basis of Consolidation*
    The consolidated financial statements include the financial statements of the Company and its variable interest entity, Dalian Advertising. All inter–company transactions and balances have been eliminated upon consolidation.
*(c)  Cash and Cash Equivalents*
    Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.
*(d)  Use of Estimates*
    The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements include the useful lives of and impairment for equipment.
*(e)  Significant Risks and Uncertainties*
    The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operation, or cash flows: advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on stock markets in the U.S.; competition from other competitors; changes in key suppliers; changes in certain strategic relationships; regulatory or other PRC factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.
*(f)  Equipment, Net*
    Equipment is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Flat–panel television screens | 5 years |
| Computers and office equipment | 5 years |

*(g)  Impairment of Long–Lived Assets*
    The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Company would recognize an impairment loss based on the fair value of the assets.

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(h) Revenue Recognition*

The Company's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assures.

Prepayments for the advertising services are deferred and recognised as revenue when the advertising services are rendered.

The Company presents advertising service revenue, net of business tax incurred, which amounts to $3,334 for the period from March 24, 2004 (date of inception) to October 31, 2004.

*(i) Operating Leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

*(k) Foreign Currency Translation*

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statement of operations.

The financial records of the Company's variable interest entity is maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the period. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive loss in the statement of shareholders' deficiency.

*(l) Income Taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

*(m) Comprehensive loss*

The net loss for the period presented was the same as the comprehensive loss for the period presented.

F–101

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

*(n)  Fair Value of Financial Instruments*

Financial instruments include cash and cash equivalents, accounts receivable and accounts payable. The carrying values of cash and cash equivalents, accounts receivable and accounts payable approximate their fair values due to their short–term maturities.

*(o)  Recently Issued Accounting Standards*

In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03–01, "The Meaning of Other–Than–Temporary Impairment and its Application to Certain Investments". EITF No. 03–01 provides guidance on recording other–than–temporary impairments of cost method investments and requires additional disclosures for those investments. The recognition and measurement guidance in EITF No. 03–01 should be applied to other–than–temporary impairment evaluations in reporting periods beginning after June 15, 2004. The disclosure requirements are effective for fiscal years ending after June 15, 2004 and are required only for annual periods. The adoption of this standard did not have a material impact on its financial positions or results of operations.

In December 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), "Revenue Recognition". SAB 104 updates portions of existing interpretative guidance in order to make this guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The adoption of SAB 104 did not have a material effect on the Company's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". The Statement establishes standards for how an issuer classifies and measures certain financial instruments. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity be classified as liabilities (or assets in some circumstances) in statements of positions or consolidated balance sheets, as appropriate. The financial instruments within the scope of this Statement are: (i) mandatorily redeemable shares that an issuer is obligated to buy back in exchange for cash or other assets; (ii) financial instruments that do or may require the issuer to buy back some of its shares in exchange for cash or other assets; and (iii) financial instruments that embody an obligation that can be settled with shares, the monetary value of which is fixed, tied solely or predominantly to a variable such as a market index, or varies inversely with the value of the issuer's shares (excluding certain financial instruments indexed partly to the issuer's equity shares and partly, but not predominantly, to something else). This Statement does not apply to features embedded in a financial instrument that is not a derivative in its entirety. The Statement also requires disclosures about alternative ways of settling the instruments and about the capital structure of entities all of whose shares are mandatorily redeemable. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position, cash flows or results of operations.

In January 2003, the FASB issued Interpretation Number ("FIN") No. 46, which clarifies the application of Accounting Research Bulletin No. 51, "Financial Statements" and provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. This new model for consolidation applies to an entity in which either: (1) the equity investors (if any) lack one or more characteristics deemed essential to a controlling

F–102

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

financial interest or (2) the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. Certain disclosure requirements of FIN 46 were effective for financial statements issued after January 31, 2003. In December 2003, the FASB issued FIN 46 (Revised) to address certain FIN 46 implementation issues. The Company has applied FIN 46 (Revised) and has Dalian Advertising as its variable interest entity from its incorporation.

**3.    Accounts receivable**

Accounts receivable consists of the following:

| | |
|---|---:|
| Billed receivables | $    5,292 |
| Unbilled receivables | 1,611 |
| | $    6,903 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the balance sheet date. These amounts become billable according to the contract term. The Company anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of balance sheet date

**4.    Equipment, Net**

Equipment consists of:

| | |
|---|---:|
| Flat–panel television screens | $    272,432 |
| Computers and office equipment | 10,376 |
| | $    282,808 |
| Less: accumulated depreciation | (15,001) |
| | $    267,807 |

**5.    Accrued Expenses and Other Current Liabilities**

| | |
|---|---:|
| Accrued expenses | $    2,150 |
| Accrued employee payroll and welfare | 3,774 |
| Other taxes payable | 1,561 |
| Advance from customers | 6,530 |
| Payable for acquisition of equipment | 272,432 |
| Others | 102,029 |
| | $    388,476 |

**6.    Income Taxes**

The Company is a tax–exempted company incorporated in the British Virgin Islands.

Dalian Advertising, registered in the PRC is subject to PRC Enterprise Income Tax ("EIT") on the taxable income as reported in its statutory financial statements adjusted in accordance with the relevant income tax laws. In accordance with "Income Tax Law of China for Private Enterprises", the applicable EIT rate for Dalian Advertising is 33%. No income tax has been provided in the consolidated financial statements as Dalian Advertising incurred tax loss in the period presented

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

**7.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of Dalian Advertising in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require Dalian Advertising to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $3,108 for the period from March 24, 2004 (Date of inception) to October 31, 2004.

Pursuant to laws applicable to the entities incorporated in the PRC, Dalian Advertising must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include a (i) general reserve, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. Dalian Advertising did not make any appropriations to the reserve funds described above as it incurred loss in the period presented.

**8.    Commitments**

The Company leases certain office premises and certain building areas under non–cancelable leases, which expire in 2009. Rental expense under operating leases for the period from March 24, 2004 (Date of inception) to October 31, 2005 was $32,464.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| October 31, | |
|---|---:|
| 2005 | $ 119,153 |
| 2006 | 85,414 |
| 2007 | 54,255 |
| 2008 | 17,665 |
| 2009 | 3,656 |
| | $ 280,143 |

**9.    Segment and Geographic Information**

The Company is engaged in providing advertisement services through the operation and maintenance of out–of–home television advertising network. The Company's Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. The Company believes it operates in one segment, and all financial segment information can be found in the consolidated financial statements.

**Geographic Information**

The Company operates, through Dalian Advertising, in the PRC and all of the Company's long lived assets are located in the PRC.

F–104

Table of Contents

**FOCUS MEDIA DALIAN HOLDING LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE PERIOD FROM MARCH 24, 2004 TO OCTOBER 31, 2004**
**(in U.S. dollars, unless otherwise stated)**

As of October 31, 2004, there were 2 customers which accounted for 10% or more of the Company's net revenues and accounts receivable, as follows:

|  | Net revenue | Accounts receivable |
| --- | --- | --- |
| Customer A | 15% | 42% |
| Customer B | 25% | 26% |

**10.    Subsequent Event**

On October 15, 2004, Focus Media Holding Limited acquired 100% of the outstanding ordinary shares of the Company including its then variable interest entity Dalian Advertising in exchange of cash of $989,584. Immediately following the acquisition the Company became a wholly owned subsidiary of Focus Media Holding Limited and Dalian Advertising became a wholly owned subsidiary Focus Media Advertisement Co. Ltd.

F–105

**Table of Contents**

**CAPITAL BEYOND LIMITED**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–107 |
| Consolidated balance sheets for the year ended December 31, 2004 and as of March 31, 2005 (Unaudited) | F–108 |
| Consolidated statements of operations for the year ended December 31, 2004 and the three months ended March 31, 2004 (Unaudited) and 2005 (Unaudited) | F–109 |
| Consolidated statements of shareholders' equity and comprehensive loss for the year ended 2004 and for the three months ended March 31, 2005 (Unaudited) | F–110 |
| Consolidated statements of cash flows for the year ended December 31, 2004 and the three months ended March 31, 2004 (Unaudited) and 2005 (Unaudited) | F–111 |
| Notes to the consolidated financial statements | F–112 |

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
CAPITAL BEYOND LIMITED

We have audited the accompanying consolidated balance sheet of Capital Beyond Limited and its subsidiary (the "Company") as of December 31, 2004 and the related consolidated statement of operations, shareholders' equity, and cash flows for the year ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of Capital Beyond Limited and its subsidiary as of December 31, 2004 and the results of its operations and its cash flow for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China
June 10, 2005

F–107

Table of Contents

**CAPITAL BEYOND LIMITED**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2004 | | March 31, 2005 |
|---|---|---|---|
| | | | (Unaudited) |
| | (In U.S. dollars) | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 7,693 | $ | 25,611 |
| Staff advances and other receivables | | 3,474 | | 33,376 |
| Total current assets | | 11,167 | | 58,987 |
| Equipment, net | | 502,989 | | 476,290 |
| Total assets | $ | 514,156 | $ | 535,277 |
| | | | |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities: | | | |
| Amount due to related parties | $ | 27,910 | $ | 101,734 |
| Accrued expenses and other current liabilities | | 3,932 | | 73,855 |
| Total current liabilities | | 31,842 | | 175,589 |
| Commitments (Note 7) | | | |
| **Shareholders' Equity** | | | |
| **Additional paid–in capital** | | 880,419 | | 880,419 |
| **Accumulated deficit** | | (398,105) | | (520,731) |
| **Total shareholders' equity** | | 482,314 | | 359,688 |
| **Total liabilities and shareholders' equity** | $ | 514,156 | $ | 535,277 |

The accompanying notes are an integral part of these consolidated financial statements.

F–108

Table of Contents

**CAPITAL BEYOND LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the year ended December 31, | Three months ended March 31 | |
|---|---|---|---|
| | 2004 | 2004 | 2005 |
| | | (Unaudited) (In U.S. dollars) | (Unaudited) |
| Revenues | $ 276,786 | $ 1,348 | $ — |
| Cost of revenues | 491,673 | 60,144 | 122,038 |
| Gross loss | (214,887) | (58,796) | (122,038) |
| Operating expenses: | | | |
| General and administrative | 59,985 | 11,907 | 607 |
| Selling and marketing | 23,849 | 275 | — |
| Total operating expenses | 83,834 | 12,182 | 607 |
| Loss from operations | (298,721) | (70,978) | (122,645) |
| Interest income | 135 | 18 | 48 |
| Other expenses, net | (134) | (11) | (29) |
| Loss before income taxes | (298,720) | (70,971) | (122,626) |
| Income taxes | — | — | — |
| Net loss | $ (298,720) | $ (70,971) | $ (122,626) |

The accompanying notes are an integral part of these consolidated financial statements.

F–109

Table of Contents

**CAPITAL BEYOND LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
(in U.S. dollars, except share data)

| | Ordinary | | Additional paid–in Capital | | Accumulated deficit | | Total shareholders' equity | |
|---|---|---|---|---|---|---|---|---|
| | Share | Amount | | | | | | |
| **Balance as of January 1, 2004** | 1 | $ — | $ | 120,824 | $ | (99,385) | $ | 21,439 |
| Capital injection by shareholders | — | — | | 759,595 | | — | | 759,595 |
| Net loss | — | — | | — | | (298,720) | | (298,720) |
| **Balance as of December 31, 2004** | 1 | — | | 880,419 | | (398,105) | | 482,314 |
| Net loss | — | — | | — | | (122,626) | | (122,626) |
| **Balance as of March 31, 2005 (unaudited)** | 1 | $ — | $ | 880,419 | $ | (520,731) | $ | 359,688 |

The accompanying notes are an integral part of these consolidated financial statements.

F–110

Table of Contents

**CAPITAL BEYOND LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the year ended December 31, | | Three months ended March 31 | | |
|---|---|---|---|---|---|
| | **2004** | | **2004** | | **2005** |
| | | | **(Unaudited)** | | **(Unaudited)** |
| | | | **(In U.S. dollars)** | | |
| Net loss | $ | (298,720) | $ | (70,971) | $ | (122,626) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | | |
| Depreciation | | 56,631 | | 5,126 | | 26,699 |
| Changes in assets and liabilities | | | | | |
| Amounts due to related parties | | 27,910 | | 240,942 | | 73,824 |
| Inventories | | 6,041 | | (18,910) | | — |
| Staff advances and other receivables | | 11,306 | | (5,272) | | (29,901) |
| Accrued expenses and other current liabilities | | (91,562) | | (94,468) | | 69,922 |
| Net cash provided by (used in) operating activities | $ | (288,394) | $ | 56,447 | $ | 17,918 |
| Investing activities: | | | | | |
| Purchase of equipment | $ | (488,977) | $ | (41,429) | $ | — |
| Rental deposits | | 22,412 | | (6,329) | | — |
| Cash used in investing activities | $ | (466,565) | $ | (47,758) | $ | — |
| Financing activities | | | | | |
| Capital injection | $ | 759,595 | $ | — | $ | — |
| Cash provided by financing activities | $ | 759,595 | $ | — | $ | — |
| Net increase in cash and cash equivalents | $ | 4,636 | $ | 8,689 | $ | 17,918 |
| Cash and cash equivalents, beginning of period | | 3,057 | | 3,057 | | 7,693 |
| Cash and cash equivalents, end of period | $ | 7,693 | $ | 11,746 | $ | 25,611 |

The accompanying notes are an integral part of these consolidated financial statements.

F–111

**Table of Contents**

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
(in U.S. dollars, unless otherwise stated)

**1.    Organization and Principal Activities**

Capital Beyond Limited ("the Company") was incorporated in the British Virgin Islands ("BVI") on December 16, 2003.

The PRC regulations currently limit foreign ownership of companies that provide advertising services. To comply with these regulations, the Company conducts substantially all of its advertising business activities through Guangdong Framedia Advertisement Company Ltd. ("Guangdong Framedia"), a variable interest entity, which was incorporated in the People's Republic of China (the "PRC") on December 16, 2003. The principal activities of Guangdong Framedia are the operation and maintenance of out–of–home television advertising network, as well as lift frame advertising network. Through contractual agreements described below, the Company is deemed the primary beneficiary of Guangdong Framedia resulting in Guangdong Framedia being deemed a subsidiary of the Company under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)").

On December 5, 2004, all of the shareholders of Guangdong Framedia entered into various contractual agreements with the Company, under which all of the shareholders pledged all equity shares it owned to the Company. In addition, the Company was assigned all voting rights by all the shareholders of Guangdong Framedia through an agreement that cannot be amended or terminated except by written consent of all parties. Finally, the Company has the option to acquire the equity interest of Guangdong Framedia for a purchase price equal to the respective registered capital of Guangdong Framedia or a proportionate amount thereof, or such higher price as required under PRC laws at the time of such purchase. The Company has agreed to pay the shareholder of Guangdong Framedia any excess of the purchase price paid for such equity interests in, or assets of Guangdong Framedia over the registered capital of Guangdong Framedia in the event that such option is exercised.

The Company holds all the variable interest of Guangdong Framedia and the Company has been determined to be the most closely associated with Guangdong Framedia. Therefore the Company is the primary beneficiary of Guangdong Framedia. The agreements described above provided for effective control of Guangdong Framedia to be transferred to the Company on December 16, 2003 (date of inception). As a result, the consolidated financial statements reflect the consolidation of Guangdong Framedia starting from date of inception.

In January 2003, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation ("FIN") No. 46, "Consolidation of Variable Interest entities", which requires certain variable interest entitles to be consolidated by the primary beneficiary of the entity if the ownership interest held by the equity investors in the entity does not have characteristics of a controlling financial interest or does not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 was effective for all new variable interest entities created or acquired after December 15, 2003.

**2.    Summary of Significant Accounting Policies**

*(a)  Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

F–112

Table of Contents

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

*(b)  Basis of Consolidation*

The consolidated financial statements include the financial statements of the Company and its variable interest entity, Guangdong Framedia. All inter–company transactions and balances have been eliminated upon consolidation.

*(c)  Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.

*(d)  Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Company's financial statements include the useful lives of and impairment for equipment.

*(e)  Significant Risks and Uncertainties*

The Company participates in a young and dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operation, or cash flows: advances and trends in new technologies and industry standards; share market performance and public interest in companies operating in China that are listed on stock markets in the U.S.; competition from other competitors; changes in key suppliers; changes in certain strategic relationships; regulatory or other PRC factors; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

*(f) Equipment, Net*

Equipment is carried at cost less accumulated depreciation. Depreciation is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Flat–panel television screens | 5 years |
| Computers and office equipment | 5 years |

*(g)  Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Company measures impairment by comparing the carrying value of the long–lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Company would recognize an impairment loss based on the fair value of the assets.

F–113

Table of Contents

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

**(h)  *Revenue Recognition***

The Company's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assures.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Company presents advertising service revenue, net of business tax incurred, which amounts to $25,878, $78 and $Nil for the year ended December 31, 2004 and three months ended March 31, 2004 (unaudited) and 2005 (unaudited), respectively.

**(i)  *Operating Leases***

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statement of operations on a straight–line basis over the lease periods.

**(k)  *Foreign Currency Translation***

The functional and reporting currency of the Company is the United States dollar ("US dollar"). Monetary assets and liabilities denominated in currencies other than the US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the US dollar during the year are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the statements of operations.

The financial records of the Company's variable interest entity is maintained in its local currency, the Renminbi ("RMB"), which is the functional currency. Assets and liabilities are translated at the exchange rates at the balance sheet date, equity accounts are translated at historical exchange rates and revenues, expenses, gains and losses are translated using the average rate for the period. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of other comprehensive loss in the statement of shareholders' equity.

**(l)  *Income Taxes***

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

F–114

Table of Contents

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

*(m)   Comprehensive loss*

    The net loss for the period presented was the same as the comprehensive loss for the period presented.

*(n)   Fair Value of Financial Instruments*

    Financial instruments include cash and cash equivalents, The carrying value of cash and cash equivalents approximates their fair values due to their short–term maturities.

*(o)   Recently Issued Accounting Standards*

    In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03–01, "The Meaning of Other–Than–Temporary Impairment and its Application to Certain Investments". EITF No. 03–01 provides guidance on recording other–than–temporary impairments of cost method investments and requires additional disclosures for those investments. The recognition and measurement guidance in EITF No. 03–01 should be applied to other–than–temporary impairment evaluations in reporting periods beginning after June 15, 2004. The disclosure requirements are effective for fiscal years ending after June 15, 2004 and are required only for annual periods. The adoption of this standard did not have a material impact on its financial positions or results of operations.

    In December 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), "Revenue Recognition". SAB 104 updates portions of existing interpretative guidance in order to make this guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The adoption of SAB 104 did not have a material effect on the Company's consolidated financial statements.

    In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". The Statement establishes standards for how an issuer classifies and measures certain financial instruments. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity be classified as liabilities (or assets in some circumstances) in statements of positions or consolidated balance sheets, as appropriate. The financial instruments within the scope of this Statement are: (i) mandatorily redeemable shares that an issuer is obligated to buy back in exchange for cash or other assets; (ii) financial instruments that do or may require the issuer to buy back some of its shares in exchange for cash or other assets; and (iii) financial instruments that embody an obligation that can be settled with shares, the monetary value of which is fixed, tied solely or predominantly to a variable such as a market index, or varies inversely with the value of the issuer's shares (excluding certain financial instruments indexed partly to the issuer's equity shares and partly, but not predominantly, to something else). This Statement does not apply to features embedded in a financial instrument that is not a derivative in its entirety. The Statement also requires disclosures about alternative ways of settling the instruments and about the capital structure of entities all of whose shares are mandatorily redeemable. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position, cash flows or results of operations.

F–115

**Table of Contents**

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

In January 2003, the FASB issued Interpretation Number ("FIN") No. 46, which clarifies the application of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" and provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. This new model for consolidation applies to an entity in which either: (1) the equity investors (if any) lack one or more characteristics deemed essential to a controlling financial interest or (2) the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. Certain disclosure requirements of FIN 46 were effective for financial statements issued after January 31, 2003. In December 2003, the FASB issued FIN 46 (Revised) to address certain FIN 46 implementation issues. The Company has elected to retroactively apply FIN 46 (Revised) and has consolidated Guangdong Framedia as its variable interest entity from its inception.

3.    **Equipment, Net**
Equipment consists of:

|  | December 31, 2004 | | March 31, 2005 | |
|---|---|---|---|---|
|  | | | (Unaudited) | |
| Flat–panel television screens | $ | 562,080 | $ | 562,080 |
| Less: accumulated depreciation | | (59,091) | | (85,790) |
|  | $ | 502,989 | $ | 476,290 |

4.    **Accrued Expenses and Other Current Liabilities**

|  | December 31, 2004 | | March 31, 2005 | |
|---|---|---|---|---|
|  | | | (Unaudited) | |
| Other payables | $ | — | $ | 69,935 |
| Other taxes payable | | 3,932 | | 3,920 |
|  | $ | 3,932 | $ | 73,855 |

5.    **Income Taxes**

The Company is a tax–exempted company incorporated in the British Virgin Islands.

Guangdong Framedia, registered in the PRC is subject to PRC Enterprise Income Tax ("EIT") on the taxable income as reported in its statutory financial statements adjusted in accordance with the relevant income tax laws. In accordance with "Income Tax Law of China for Private Enterprises", the applicable EIT rate for Guangdong Framedia is 33%. No income tax has been provided in the consolidated financial statements as Guangdong Framedia was exempted from income tax in the periods presented.

6.    **Mainland China Contribution Plan and Profit Appropriation**

Full time employees of Guangdong Framedia in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care,

F–116

Table of Contents

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require Guangdong Framedia to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $5,747, $1,003 and $Nil for the year ended December 31, 2004 and the three months ended March 31, 2004 (unaudited) and 2005 (unaudited), respectively.

Pursuant to laws applicable to the entities incorporated in the PRC, Guangdong Framedia must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include a (i) general reserve, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the Company's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. In 2004, Guangdong Framedia made total appropriation of approximately $46,087.

**7.    Commitments**

The Company leases certain office premises and certain building areas under non–cancelable leases, which expire in 2014. Rental expense under operating leases for year ended December 31, 2004 and the three months ended March 31, 2004 (unaudited) and 2005 (unaudited) were $350,650, $38,060 and $83,163, respectively.

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

|  | December 31, 2004 |
|---|---|
| 2005 | $    445,860 |
| 2006 | 393,022 |
| 2007 | 276,157 |
| 2008 | 213,896 |
| 2009 | 57,998 |
| Thereafter | 48,861 |
|  | $  1,435,794 |

**8.    Segment and Geographic Information**

The Company is engaged in the operation and maintenance of out–of–home television advertising network, as well as lift frame advertising network. The Company's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. The Company believes it operates in one segment, and all financial segment information can be found in the consolidated financial statements.

F–117

Table of Contents

**CAPITAL BEYOND LIMITED**
**NOTES TO THE FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEAR ENDED DECEMBER 31, 2004 AND**
**THE THREE MONTHS ENDED MARCH 31, 2004 (UNAUDITED) AND 2005 (UNAUDITED)**
**(in U.S. dollars, unless otherwise stated)**

**Geographic Information**

The Company operates, through Guangdong Framedia, in the PRC and all of the Company's long lived assets are located in the PRC.

As of December 31, 2004 and March 31, 2004 (unaudited) and 2005 (unaudited), there were no customers which accounted for 10% or more of the Company's net revenues and accounts receivable.

**9.    Related Party Transaction**

The amount due to Beijing Framedia Advertisement Co., Ltd., an entity owned by the same shareholders of the Company, amounted to $27,910, $240,942 and $101,734 as of December 31, 2004, March 31, 2004 (unaudited) and 2005 (unaudited), respectively.

**10.    Subsequent Event**

On March 21, 2005, Focus Media Holding Limited acquired 100% of the outstanding ordinary shares of the Company including its then variable interest entity Guangdong Framedia in exchange of cash of $2,054,008. Immediately following the acquisition the Company became a wholly owned subsidiary of Focus Media Holding Limited and Guangdong Framedia became a wholly owned subsidiary Focus Media Advertisement Co. Ltd.

F–118

Table of Contents

**INFOACHIEVE LIMITED**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

| | Page(s) |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–120 |
| Consolidated balance sheets as of December 31, 2004 and 2005 | F–121 |
| Consolidated statements of operations for the years ended December 31, 2004 and 2005 | F–122 |
| Consolidated statements of shareholders' equity and other comprehensive income (loss) for the years ended December 31, 2004 and 2005 | F–123 |
| Consolidated statements of cash flows for the years ended December 31, 2004 and 2005 | F–124 |
| Notes to consolidated financial statements | F–126 |

F–119

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

TO THE BOARD OF DIRECTORS AND
SHAREHOLDERS OF INFOACHIEVE LIMITED

   We have audited the accompanying consolidated balance sheets of Infoachieve Limited and its subsidiaries (the "Group") as of December 31, 2004 and 2005 and the related consolidated statements of operations, shareholders' equity and comprehensive loss, and cash flows for the years ended December 31, 2004 and 2005. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

   We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

   In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2004 and 2005 and the results of its operations and its cash flows for the above stated periods in conformity with accounting principles generally accepted in the United States of America.

Deloitte Touche Tohmatsu CPA Ltd.

Beijing, China

May 8, 2006

Table of Contents

**INFOACHIEVE LIMITED**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, | | |
|---|---|---|---|
|  | 2004 | | 2005 |
|  | (In U.S. dollars, except share data) | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 228,909 | $ | 1,355,010 |
| Accounts receivable, net of allowance for doubtful accounts of $Nil and $3,994 in 2004 and 2005 | | 1,293,569 | | 3,728,200 |
| Inventories | | 6,572 | | 791 |
| Prepaid expenses and other current assets | | 367,635 | | 733,110 |
| Amounts due from related parties | | 501,819 | | — |
| Total current assets | | 2,398,504 | | 5,817,111 |
| Equipment, net | | 1,031,010 | | 1,013,871 |
| Acquired intangible assets, net | | — | | 764,282 |
| Goodwill | | — | | 13,936,500 |
| Total assets | $ | 3,429,514 | $ | 21,531,764 |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities: | | | |
| Short–term loans from shareholders | $ | 365,802 | $ | 3,109,685 |
| Accounts payable | | 113,817 | | 590,035 |
| Accrued expenses and other current liabilities | | 868,129 | | 8,057,141 |
| Amounts due to related parties | | 1,677,741 | | 761,292 |
| Total current liabilities | | 3,025,489 | | 12,518,153 |
| Commitments (Note 13) | | | |
| **Shareholders' equity** | | | |
| Ordinary shares ($0.01 par value; 4,620,000 shares authorized in 2004 and 2005, respectively; 40,000 and 1,000,000 issued and outstanding in 2004 and 2005, respectively) | | 400 | | 10,000 |
| Additional paid–in capital | | 543,110 | | 27,812,636 |
| Accumulated deficit | | (140,669) | | (18,739,464) |
| Accumulated other comprehensive income (loss) | | 1,184 | | (69,561) |
| Total shareholders' equity | $ | 404,025 | $ | 9,013,611 |
| Total liabilities and shareholders' equity | $ | 3,429,514 | $ | 21,531,764 |

The accompanying notes are an integral part of these consolidated financial statements.

F–121

Table of Contents

**INFOACHIEVE LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| | (In U.S. dollars, except share data) | |
| Revenues: | | |
| Advertising service revenue | $ 4,323,551 | $ 11,828,519 |
| Cost of revenues: | | |
| Advertising service cost | 3,336,840 | 7,233,043 |
| Gross profit | 986,711 | 4,595,476 |
| Operating expenses: | | |
| General and administrative (including share–based compensation of nil and $1,395,100 for 2004 and 2005, respectively) | 543,351 | 5,428,018 |
| Selling and marketing | 821,518 | 3,363,704 |
| Total operating expenses | 1,364,869 | 8,791,722 |
| Loss from operations | (378,158) | (4,196,246) |
| Interest income | 1,691 | 2,012 |
| Interest expense | (254,962) | (172,569) |
| Other income (expense), net | 36,820 | (3,857) |
| Loss before income taxes | (594,609) | (4,370,660) |
| Income taxes | 3,880 | 1,941 |
| Total income taxes | 3,880 | 1,941 |
| Net loss | (598,489) | (4,372,601) |
| Deemed dividend on ordinary shares | — | (15,187,200) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | (1,136,700) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | (378,985) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | (623,700) |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | (207,820) |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Loss per share–basic and diluted | $ (35.10) | $ (27.10) |
| Shares used in calculating basic and diluted loss per share | 17,049 | 808,302 |

The accompany notes are an integral part of these consolidated financial statements.

F–122

Table of Contents

**INFOACHIEVE LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**AND OTHER COMPREHENSIVE INCOME (LOSS)**

| | Ordinary Shares | Amount | Additional paid–in capital | Retained earnings (Accumulated deficit) | Accumulated other comprehensive income (loss) | Total shareholders equity | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|
| | | | (In U.S. dollars, except share data) | | | | |
| Balance at January 1, 2004 | — | $    — | $    477,950 | $    457,820 | $    31 | $    935,801 | $    61,134 |
| Issuance of ordinary shares to incorporate Infoachieve | 40,000 | 400 | — | — | — | 400 | |
| Incorporation of Wuhan Framedia | — | — | 65,160 | — | — | 65,160 | |
| Cumulative translation adjustment | — | — | — | — | 1,153 | 1,153 | 1,153 |
| Net loss | — | — | — | (598,489) | — | (598,489) | (598,489) |
| Balance at December 31, 2004 | 40,000 | $    400 | $    543,110 | $    (140,669) | 1,184 | $    404,025 | $    (597,336) |
| Issuance of ordinary shares | 960,000 | 9,600 | 15,187,200 | (15,187,200) | — | 9,600 | — |
| Reclassification of ordinary shares to Series A–1 convertible redeemable preference shares | (270,000) | (2,700) | — | — | — | (2,700) | — |
| Reclassification of ordinary shares to Series A–2 convertible redeemable preference shares | (110,000) | (1,100) | — | — | — | (1,100) | — |
| Issuance of ordinary shares for acquisitions | 614,200 | 6,142 | 8,878,966 | — | — | 8,885,108 | — |
| Liquidation of entities under common control | — | — | (545,087) | 3,308,211 | — | 2,763,124 | — |
| Issuance of ordinary shares to Chief Executive Officer | 40,000 | 400 | 1,394,700 | — | — | 1,395,100 | — |
| Deemed dividend on Series A–1 convertible redeemable preference shares | — | — | — | (1,515,685) | — | (1,515,685) | — |
| Deemed dividend on Series A–2 convertible Redeemable preference shares | — | — | — | (831,520) | — | (831,520) | — |
| Conversion of Series A–1 convertible redeemable preference shares to ordinary shares | 270,000 | 2,700 | 1,515,685 | — | — | 1,518,385 | — |
| Conversion of Series A–2 convertible redeemable preference shares to ordinary shares | 110,000 | 1,100 | 831,520 | — | — | 832,620 | — |
| Cancellation of ordinary shares | (654,200) | (6,542) | 6,542 | — | — | — | — |
| Cumulative translation adjustment | — | — | — | — | (70,745) | (70,745) | (70,745) |
| Net loss | — | — | — | (4,370,601) | — | (4,370,601) | (4,370,601) |
| Balance at December 31, 2005 | 1,000,000 | $ 10,000 | $27,812,636 | $ (18,739,464) | $ (69,561) | $ 9,013,611 | $ (4,441,346) |

Table of Contents

**INFOACHIEVE LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the years ended December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | (In U.S. dollars) | |
| Operating activities: | | |
| Loss attributable to holders of ordinary shares | $ (598,489) | $ (21,907,006) |
| Deemed dividend on ordinary shares | — | 15,187,200 |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | 1,136,700 |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | 378,985 |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | 623,700 |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | 207,820 |
| Net loss | (598,489) | (4,372,601) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Share–based compensation expense | — | 1,395,100 |
| Depreciation and amortization | 157,990 | 471,326 |
| Bad debt allowance | — | 3,994 |
| Changes in assets and liabilities, net of effects of acquisitions | | |
| Accounts receivable, net | (568,897) | (2,438,625) |
| Inventories | 35 | 5,152 |
| Prepaid expenses and other current assets | (75,185) | (369,658) |
| Amounts due from related parties | (133,800) | 248,522 |
| Accounts payable | 34,696 | 476,204 |
| Accrued expenses and other current liabilities | 566,431 | 7,099,537 |
| Amounts due to related parties | 738,591 | (916,449) |
| Net cash provided by operating activities | 121,372 | 1,602,501 |
| Investing activities: | | |
| Acquisition of businesses, net of cash acquired of $nil | — | (1,703,972) |
| Purchase of equipment | (636,378) | (561,068) |
| Net cash used in investing activities | $ (636,378) | $ (2,265,040) |
| Financing activities: | | |
| Proceeds from short–term loans from shareholders | $ 365,802 | $ 2,743,883 |
| Repayment of short–term loans from shareholders | (81,892) | — |
| Proceeds of amounts due to related parties | 435,681 | 761,292 |
| Repayment of amounts due to related parties | (120,824) | (1,655,390) |
| Proceeds from issuance of ordinary shares | 400 | 9,600 |
| Net cash provided by financing activities | $ 599,167 | $ 1,859,385 |
| Effect of exchange rate changes | $ 1,153 | $ (70,745) |
| Net increase in cash and cash equivalents | 85,314 | 1,126,101 |
| Cash and cash equivalents, beginning of year | 143,595 | 228,909 |
| Cash and cash equivalents, end of year | $ 228,909 | $ 1,355,010 |

F–124

Table of Contents

**INFOACHIEVE LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)**

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2004 | | 2005 | |
| | (In U.S. dollars) | | | |
| Supplemental disclosure of cash flow information | | | | |
| Income taxes paid | $ | 3,880 | $ | 7,673 |
| Interest paid | $ | — | $ | — |
| Supplemental disclosures of non-cash activities: | | | | |
| Non-cash investing activities: | | | | |
| Acquisition of businesses: | | | | |
| Value of ordinary shares issued | $ | — | $ | 8,885,108 |
| Cash consideration | | — | | 6,209,656 |
| Businesses acquired (including intangibles of $1,036,914, goodwill of $13,936,500, equipment of $121,350) | $ | — | $ | 15,094,764 |
| Non-cash financing activities: | | | | |
| Reclassification of ordinary shares to Series A-1 convertible redeemable preference shares | $ | — | $ | 1,139,400 |
| Reclassification of ordinary shares to Series A-2 convertible redeemable preference shares | $ | — | $ | 624,800 |
| Issuance of ordinary shares to shareholders in exchange for services | $ | — | $ | 15,187,200 |
| Issuance of ordinary shares to Chief Executive Officer in exchange for services | $ | — | $ | 1,395,100 |
| Conversion of Series A-1 convertible redeemable preference shares to ordinary shares | $ | — | $ | 1,518,385 |
| Conversion of Series A-2 convertible redeemable preference shares to ordinary shares | $ | — | $ | 832,620 |

The accompany notes are an integral part of these consolidated financial statements.

F-125

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**1.     Organization and Principal Activities**

Prior to April 28, 2004, the Group operated through the following entities (collectively "the Combined Entities"):

| Entities under common control | Place of incorporation | Date of incorporation |
|---|---|---|
| Shanghai Framedia Advertisement Co., Ltd. ("Shanghai Framedia") | People's Republic of China ("PRC") | November 4, 2002 |
| Beijing Framedia Advertisement Co., Ltd. ("Beijing Framedia") | PRC | May 9, 2000 |
| Guangdong Framedia Advertisement Co., Ltd. ("Guangdong Framedia") | PRC | December 16, 2003 |
| Shenzhen Framedia Advertisement Co., Ltd. ("Shenzhen Framedia") | PRC | May 8, 2003 |
| Wuhan Framedia Advertisement Co., Ltd. ("Wuhan Framedia") | PRC | November 28, 2003 |

Subsequent to April 28, 2004, Framedia Advertisement Development (Shanghai) Co., Ltd. ("Framedia Development"), a PRC entity, was incorporated by the same shareholders of the Combined Entities and all of the operations of the Combined Entities were transferred to Framedia Development.

On July 28, 2004, the same shareholders of the Combined Entities and Framedia Development incorporated Infoachieve Limited ("Infoachieve"), a British Virgin Islands entity.

In substance, the combined entities which are existing companies have been reorganized into the new company Framedia Development. Accordingly, the Group's financial statements are prepared by including the financial statements of the combined entities through April 2004 and subsequently the Group's consolidated financial statements which include Framedia Development, Infoachieve and its variable interest entities.

The Group is principally engaged in the sale of frame space advertising in high–end residential complex in the PRC.

The PRC rules and regulations currently limit direct foreign ownership in companies that provide advertising services, including frame space advertising services. To comply with these rules and regulations, when the shareholders established Infoachieve in July 2004, Framedia Development entered into various agreements with Infoachieve, including transfer of operation agreements and exclusive consulting and service agreements. Under these agreements, Infoachieve is the exclusive provider of management consulting services to Framedia Development. In return, Framedia Development is required to pay Infoachieve services fees for the management consulting services received. The management consulting service fees are the net profits of Framedia Development. In addition, Infoachieve has been assigned all voting rights by the direct owners of Framedia Development through agreements valid for ten years. Finally, Infoachieve has the option to acquire the equity interest of Framedia Development. Infoachieve holds all the variable interests of Framedia Development and has been determined to be most closely associated with Framedia Development and is considered the primary beneficiary of Framedia Development.

On June 1, 2005, Infoachieve provided loans to two of its shareholders to acquire 100% of the outstanding shares of Guangdong Century Sparkle Advertisement Co., Ltd. ("Sparkle"), a frame

F–126

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

advertisement service provider. Principal terms of the loan agreements provide that (i) Infoachieve entitles to receive service fees by providing management consulting services to Sparkle; (ii) Infoachieve has been assigned all voting rights valid indefinitely that cannot be amended or terminated except by written consent of all parties; and (iii) Infoachieve has the options to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle and is considered the primary beneficiary of Sparkle.

Through the above arrangements, under the requirements of FIN 46 (Revised) "Consolidation of Variable Interest Entities" ("FIN 46(R)"), Framedia Development and Sparkle have become the variable interest entities of Infoachieve, as a result, the financial statements of Framedia Development and Sparkle have been consolidated with Infoachieve as its subsidiaries since they were established or acquired.

On June 16, 2005, Infochieve applied to establish Shanghai Framedia Investment Consultation Co., Ltd. ("Framedia Consultation") in Shanghai with an operating period of 30 years, and related capital contribution was completed on December 21, 2005. Framedia Consultation is wholly owned by Infochieve and is engaged in provision of consultation and management services to other entities within the group and to third party customers.

As of December 31, 2005, Infoachieve's variable interest entities and subsidiary include the following entities:

| Entity | Date of incorporation | Place of incorporation |
|---|---|---|
| Framedia Development* | April 28, 2004 | PRC |
| Sparkle* | March 25, 2005 | PRC |
| Framedia Consultation | June 16, 2005 | PRC |

* Represents a variable interest entity.

These Companies have been entities under common control which has established the basis to consolidate them from their inception. Accordingly, the accompanying financial statements include the financial statements of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia, Framedia Development and Infoachieve and its variable interest entities, collectively the "Group."

From June 2005 to December 2005, Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia were liquidated, their balances sheets as of December 31, 2005 have not been included in the consolidated balance sheet as of December 31, 2005.

Between June 1, 2005 and December 31, 2005, the Group through Infoachieve acquired the frame advertising net assets from eight companies that operated in the same industry in the PRC. These acquisitions were accounted for as acquisition of a business and for details, see Note 3, Acquisitions.

On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team Investments Limited ("Total Team") in the British Virgin Islands. According to the Share Purchase Agreement, the shareholders of Infoachieve transferred all the issued shares in Infoachieve Limited to Total Team. Total Team became the only shareholder of Infoachieve.

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**2.    Summary of Significant Accounting Policies**
*(a) Basis of presentation*
    The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP"). The consolidated financial statements reflect the operations of Shanghai Framedia, Beijing Framedia, Guangdong Framedia, Shenzhen Framedia and Wuhan Framedia through April 2004 and the Group's consolidated financial statements thereafter.
*(b) Cash and cash equivalents*
    Cash and cash equivalents consist of cash on hand and highly liquid investments which are unrestricted as to withdrawal or use, and which have maturities of three months or less when purchased.
*(c) Use of estimates*
    The preparation of the consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include allowance for doubtful accounts, the useful lives and impairment of equipment, intangible assets and goodwill and valuation allowance for deferred tax assets.
*(d) Significant risks and uncertainties*
    The Group participates in a dynamic industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations, or cash flows: the Group's limited operating history; advances and trends in new technologies and industry standards; competition from other competitors; regulatory or other PRC related factors; and risks associated with the Group's ability to attract and retain employees necessary to support its growth; risks associated with the Group's growth strategies; and general risks associated with the advertising industry.
*(e) Equipment, net*
    Equipment, net is carried at cost less accumulated depreciation and amortization. Depreciation and amortization is calculated on a straight–line basis over the following estimated useful lives:

| | |
|---|---|
| Frame | 5 years |
| Computer and office equipment | 5 years |
| Liquid crystal display | 5 years |

*(f) Impairment of long–lived assets*
    The Group reviews its long–lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the longlived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the

F–128

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

fair value of the assets. The Group recognized impairment loss of Nil and $115,789 for the years ended December 31, 2004 and 2005. In 2005, the Group decided to replace the remaining tangible assets acquired through the acquisitions and assessed the recoverable amounts of the net tangible assets to be nil, therefore, the Group recognized an impairment loss of $115,789 which is equal to the remaining amount of the tangible assets acquired from the acquisitions.

*(g) Goodwill*

SFAS No. 142 requires the Group to complete a two−step goodwill impairment test. The first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. SFAS No. 142 requires completion of this first step within the first six months of initial adoption and annually thereafter. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

Management has performed the annual goodwill impairment test, no events had occurred and no indications had been identified as of December 31, 2005 that reduced the fair value of the Group's reporting units below the carrying value of the goodwill and intangible assets.

The changes in the carrying amount of goodwill for the year ended December 31, 2005 are as follows:

| | | |
|---|---|---|
| Balance as of January 1, 2005 | $ | — |
| Goodwill acquired during the year | | 13,936,500 |
| Goodwill impaired since acquired | | — |
| Balance as of December 31, 2005 | $ | 13,936,500 |

*(h) Revenue recognition*

The Group's revenues are primarily derived from advertising services. Revenues from advertising services are recognized ratably over the period in which the advertisement is displayed. Accordingly, revenue is recognized when all four of the following criteria are met: (i) pervasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred and risks and rewards of ownership have passed to the customer; (iii) the selling price is both fixed and determinable; and (iv) collection of the resulting receivable is reasonably assured.

Prepayments for the advertising services are deferred and recognized as revenue when the advertising services are rendered.

The Group presents advertising service revenue, net of business tax incurred, which amounts to $442,593 and $1,066,409 for the years ended December 31, 2004 and 2005, respectively.

F−129

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

*(i) Operating leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the leasing company are accounted for as operating lease. Payments made under operating leases are charged to the consolidated statements of operations on a straight–line basis over the lease periods.

*(j) Foreign currency translation*

The reporting currency of the Group is the United States dollar ("US dollar"). The functional currency of the Group is the Renminbi ("RMB"). Monetary assets and liabilities denominated in currencies other than US dollar are translated into the US dollar at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than US dollar during the periods are converted into US dollar at the applicable rates of exchange prevailing at the first day of the month transactions occurred. Transaction gains and losses are recognized in the consolidated statements of operations.

*(k) Income taxes*

Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws and regulations applicable to the Group as enacted by the relevant tax authorities.

*(l) Comprehensive income/loss*

Comprehensive income/loss includes foreign currency translation adjustments. Comprehensive income/loss is reported in the statements of shareholders' equity.

*(m) Concentration of credit risk*

Financial instruments that potentially expose the Group to concentrations of credit risk consist primarily of cash and cash equivalents and accounts receivable. The Group places their cash and cash equivalents with financial institutions with high–credit ratings and quality.

The Group conducts credit evaluations of customers and generally do not require collateral or other security from their customers. The Group establishes an allowance for doubtful accounts primarily based upon the age of the receivables and factors surrounding the credit risk of specific customers.

*(n) Fair value of financial instruments*

Financial instruments include cash and cash equivalents and short–term loans from shareholders. The carrying values of cash and cash equivalents and short–term loans from shareholders approximate their fair values due to their short–term maturities.

*(o) Loss per share*

Basic loss per share is computed by dividing loss attributable to holders of ordinary shares by the weighted average number of ordinary shares outstanding during the years. Diluted loss per

F–130

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

ordinary share reflects the potential dilution that could occur if securities or other contracts to issue ordinary shares were exercised or converted into ordinary shares. Ordinary share equivalents are excluded from the computation of diluted loss per ordinary share in loss years as their effects would be antidilutive. Basic loss per share is equal to diluted loss per share as there are no potential convertible securities for the end of years presented.

*(p) Recently issued accounting standards*

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share–Based Payment" ("SFAS No. 123R"). This statement is a revision to SFAS No. 123 and supercedes APB Opinion No. 25. This statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services, primarily focusing on the accounting for transactions in which an entity obtains employee services in share–based payment transactions. Entities are required to measure the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award (with limited exceptions).That cost will be recognized over the period during which an employee is required to provide service, the requisite service period (usually the vesting period), In exchange for the award. The grant–date fair value of employee share options and similar instruments are to be estimated using option–pricing models. If an equity award is modified after the grant date, incremental compensation cost will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. This statement is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. In accordance with the standard, the Company is required to adopt SFAS No. 123R effective January 1, 2006.

Upon adoption, the Company has two application methods to choose from: the modified–prospective transition approach or the modified–retrospective transition approach. Under the modified–prospective transition method the Company would be required to recognize compensation cost for share–based awards to employees based on their grant–date fair value from the beginning of the fiscal period in which the recognition provisions are first applied as well as compensation cost for awards that were granted prior to, but not vested as of the date of adoption. Prior periods remain unchanged and pro forma disclosures previously required by SFAS No. 123 continue to be required. Under the modified–retrospective transition method, the Company would restate prior periods by recognizing compensation cost in the amounts previously reported in the pro forma footnote disclosure under SFAS No. 123. Under this method, the Company is permitted to apply this presentation to all periods presented or to the start of the fiscal year in which SFAS No. 123R is adopted. The Company would follow the same guidelines as in the modified–prospective transition method for awards granted subsequent to adoption and those that were granted and not yet vested. The Company believes that the impact that the adoption of SFAS No. 123R will have on its financial position or results of operations will not be significant.

In March 2006, the FASB issued FSP FAS 123(R)–2, "Practical Accommodation to the Application of Grant Date as Defined in FASB Statement No. 123(R)", which provides clarification of the concept of mutual understanding between employer and employee with respect to the grant date of a share–based payment award. This FSP provides that a mutual understanding of the key terms and conditions of an award shall be presumed to exist on the date the award is approved by management if the recipient does not have the ability to negotiate the key terms and conditions of the award and those key terms and conditions will be communicated to the individual recipient within a relatively short time period after the date of approval. This guidance shall be applied upon initial adoption of SFAS 123(R). The Company is currently evaluating the effect that the adoption of the

F–131

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

FSP will have on its consolidated results of operations and financial condition but does not expect it to have a material impact.

In May 2005, the FASB issued SFAS No. 154, Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20 and FASB Statement No. 3. SFAS No. 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of the correction of an error. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The Company does not expect the adoption of SFAS No. 154 on January 1, 2006 to have a material impact on its results of operations and financial condition.

In February 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments–an amendment of FASB Statements No. 133 and 140." SFAS No. 155 amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", to permit fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided that the whole instrument is accounted for on a fair value basis. SFAS No. 155 amends SFAS No. 140, "Accounting for the Impairment or Disposal of Long–Lived Assets", to allow a qualifying special–purpose entity (SPE) to hold a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS No. 155 applies to all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006, with earlier application allowed. The Company does not expect the adoption of SFAS No. 155 to have a material impact on its consolidated results of operations and financial condition.

In March 2005, the FASB issued FIN 47, "Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143" ("FIN 47"), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The Company does not expect the adoption of FIN 47 will have a material impact on its results of operations and financial condition.

**3.    Acquisitions**

During 2005 and 2004, the Group has made the following acquisitions to continue to expand its networks in desirable locations to establish other stand alone networks that provide effective channels for advertisers:

(a) On June 1, 2005, two shareholders of Infoachieve, Lei Liu and Shi Yong acquired 100% of the equity of Guangdong Century Sparkle Advertising Co., Ltd. ("Sparkle"), a frame advertising service provider, in exchange for cash of $701,330 and 90,000 ordinary shares of Infoachieve having a fair value of $15.62 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. The cash consideration was satisfied by a loan from the Group to Lei Liu and Yong Shi. At the completion of the acquisition, Lei Liu and Yong Shi entered into various agreements with Infoachieve, including an exclusive service agreement entitled Infoachieve to receive service fees in an amount up to all of the net income of Sparkle. In addition, Infoachieve has been assigned all the voting rights by Lei Liu and Yong Shi through an agreement valid indefinitely that cannot be amended or terminated except by written consent of all parties. Finally, Infoachieve has the option to acquire the equity interest of Sparkle. Infoachieve holds all the variable interests of Sparkle and has been determined to be most closely associated with Sparkle. Therefore Infoachieve is the primary

F–132

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

beneficiary of Sparkle. As a result, the consolidated financial statements reflect the consolidation of Sparkle into Infoachieve. The acquisition was recorded using the purchase method of accounting and, accordingly, the acquired assets and liabilities were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,107,130 consisted of the following:

| | | |
|---|---|---:|
| Cash consideration | $ | 701,330 |
| Value of the ordinary shares issued | | 1,405,800 |
| Total consideration | $ | 2,107,130 |

The purchase price was allocated as follows:

| | | | Amortization period |
|---|---|---:|---|
| Net tangible assets acquired | $ | 23,942 | |
| Intangible assets: | | | |
|     Lease agreements | | 111,473 | 5 years |
|     Customer base | | 18,237 | 5 years |
|     Contract backlog | | 14,372 | 2.5 months |
| Goodwill | | 1,939,106 | N/A |
| Total | $ | 2,107,130 | |

(b) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Langmei Co. Ltd., a frame advertising service provider, in exchange for cash of $828,295 and 160,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $3,106,695 consisted of the following:

| | | |
|---|---|---:|
| Cash consideration | $ | 828,295 |
| Value of the ordinary shares issued | | 2,278,400 |
| Total consideration | $ | 3,106,695 |

F–133

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $     12,563 |  |
| Intangible assets: |  |  |
| Lease agreements | 56,878 | 5 years |
| Customer base | 41,314 | 5 years |
| Contract backlog | 49,891 | 2.5 months |
| Goodwill | 2,946,049 | N/A |
| Total | $   3,106,695 |  |

(c) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Xinchengsihai Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,207,730. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $       6,642 |  |
| Intangible assets: |  |  |
| Lease agreements | 63,043 | 5 years |
| Customer base | 5,918 | 5 years |
| Contract backlog | 483 | 2.5 months |
| Goodwill | 1,131,644 | N/A |
| Total | $   1,207,730 |  |

(d) On July 5, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Tuojia Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $870,617 and 95,200 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,226,265 consisted of the following:

|  |  |
|---|---|
| Cash consideration | $     870,617 |
| Value of the ordinary shares issued | 1,355,648 |
| Total consideration | $   2,226,265 |

F–134

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 21,263 | |
| Intangible assets: | | |
| Lease agreements | 92,546 | 5 years |
| Customer base | 12,323 | 5 years |
| Contract backlog | 43,735 | 2.5 months |
| Goodwill | 2,056,398 | N/A |
| Total | $ 2,226,265 | |

(e) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Shanghai Yangguangjiaxin Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $241,838 and 99,000 ordinary shares of Infoachieve having a fair value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,651,598 consisted of the following:

| | |
|---|---|
| Cash consideration | $ 241,838 |
| Value of the ordinary shares issued | 1,409,760 |
| Total consideration | $ 1,651,598 |

The purchase price was allocated as follows:

|  |  | Amortization period |
|---|---|---|
| Net tangible assets acquired | $ 15,340 | |
| Intangible assets: | | |
| Lease agreements | 140,475 | 5 years |
| Customer base | 11,233 | 5 years |
| Contract backlog | 30,680 | 2.5 months |
| Goodwill | 1,453,870 | N/A |
| Total | $ 1,651,598 | |

(f) On July 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Guangzhou Liju Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $483,676 and 140,000 ordinary shares of Infoachieve having a fair market value of $14.24 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied.

F–135

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $2,477,276 consisted of the following:

| | | |
|---|---:|---:|
| Cash consideration | $ | 483,676 |
| Value of the ordinary shares issued | | 1,993,600 |
| Total consideration | $ | 2,477,276 |

The purchase price was allocated as follows:

| | | | Amortization period |
|---|---:|---:|---|
| Net tangible assets acquired | $ | 10,146 | |
| Intangible assets: | | | |
| Lease agreements | | 139,751 | 5 years |
| Customer base | | 21,863 | 5 years |
| Contract backlog | | 16,427 | 2.5 months |
| Goodwill | | 2,289,089 | N/A |
| Total | $ | 2,477,276 | |

(g) On September 1, 2005, the Group through Infoachieve acquired the signed lease agreements, frames and ongoing advertising agreements of Beijing Lingxian Media Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $1,011,097. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied. The acquired net assets were recorded at their fair market value at the date of acquisition. The purchase price was allocated as follows:

| | | | Amortization period |
|---|---:|---:|---|
| Net tangible assets acquired | $ | 25,893 | |
| Intangible assets: | | | |
| Lease agreements | | 52,898 | 5 years |
| Customer base | | 19,852 | 5 years |
| Contract backlog | | 25,030 | 2.5 months |
| Goodwill | | 887,424 | N/A |
| Total | $ | 1,011,097 | |

(h) On October 1, 2005, the Group acquired the signed lease agreements, frames and ongoing advertising agreements of Shenzhen Xinghuo Advertising Co., Ltd., a frame advertising services provider, in exchange for cash of $865,073 and 30,000 ordinary shares having a fair market value of $14.73 per ordinary share which was determined by a retrospective valuation performed by an independent valuation firm. This is considered an acquisition of a business and accordingly the purchase method of accounting has been applied.

F–136

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The acquired net assets were recorded at their fair market value at the date of acquisition. The aggregate purchase price of $1,306,973 consisted of the following:

| | | |
|---|---|---:|
| Cash consideration | $ | 865,073 |
| Value of the ordinary shares issued | | 441,900 |
| Total consideration | $ | 1,306,973 |

The purchase price was allocated as follows:

| | | | Amortization period |
|---|---|---:|---|
| Net tangible assets acquired | $ | 5,561 | |
| Intangible assets: | | | |
|     Lease agreements | | 53,910 | 5 years |
|     Customer base | | 6,055 | 5 years |
|     Contract backlog | | 8,527 | 2.5 months |
| Goodwill | | 1,232,920 | N/A |
| Total | $ | 1,306,973 | |

*Pro forma*

The following summarized unaudited pro forma results of operations for the year ended December 31, 2005 assuming that all acquisitions during the year ended December 31, 2005 occurred as of January 1, 2004 and 2005. These pro forma results have been prepared for comparative purposes only based on management's best estimate and do not purport to be indicative of the results of operations which actually would have resulted had the acquisitions occurred as of January 1, 2004 and 2005.

| | Pro forma | | | |
|---|---|---|---|---|
| | Year ended December 31, 2004 | | Year ended December 31, 2005 | |
| | (unaudited) | | (unaudited) | |
| Revenues | $ | 14,110,552 | $ | 12,084,864 |
| Net loss attributable to holders of ordinary shares | $ | (550,713) | $ | (18,624,320) |
| Loss per share — basic and diluted | $ | (32.30) | $ | (23.04) |

**4.  Accounts Receivable, Net**

Accounts receivable, net consists of the following:

| | December 31, | | | |
|---|---|---|---|---|
| | 2004 | | 2005 | |
| Billed receivables | $ | 589,634 | $ | 3,149,886 |
| Unbilled receivables | | 703,935 | | 578,314 |
| | $ | 1,293,569 | $ | 3,728,200 |

Unbilled receivables represent amounts earned under advertising contracts in progress but not billable at the respective balance sheet dates. These amounts become billable according to the

F–137

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

contract term. The Group anticipates that substantially all of such unbilled amounts will be billed and collected within twelve months of the balance sheet dates.

**5.    Prepaid Expenses and Other Current Assets**
Prepaid expenses and other current assets consist of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 2004 | 2005 |
| Other receivables | $  135,576 | $  383,835 |
| Prepaid expenses | 111,870 | 279,743 |
| Employee advances | 72,026 | 69,532 |
| Other taxes refundable | 48,163 | — |
|  | $  367,635 | $  733,110 |

**6.    Equipment, Net**
Equipment, net consists of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 2004 | 2005 |
| Frame | $  641,008 | $  1,148,014 |
| Computers and office equipment | 174,164 | 351,315 |
| Liquid crystal displays | 562,080 | — |
|  | 1,377,252 | 1,499,329 |
| Less: accumulated depreciation and amortization | (346,242) | (485,458) |
|  | $  1,031,010 | $  1,013,871 |

**7.    Acquired Intangible Assets, Net**
Acquired intangible assets, net consist of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 2004 | 2005 |
| Lease agreements | $  — | $  710,974 |
| Customer base | — | 136,795 |
| Contract backlogs | — | 189,145 |
| Less: accumulated amortization | — | (272,632) |
|  | $  — | $  764,282 |

In 2005, the Group acquired certain lease agreements, customer base and contract backlogs through various acquisitions (see Note 3). The Group recorded an amortization expense of $272,632 for the year ended December 31, 2005. The Group will record amortization expenses of $172,883, $172,883, $172,883, $172,883 and $72,750 for 2006, 2007, 2008, 2009 and 2010, respectively.

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**8.     Accrued Expenses and Other Current Liabilities**

Accrued expenses and other current liabilities consist of the following:

|  | December 31, | |
| --- | --- | --- |
|  | **2004** | **2005** |
| Payables related to acquisitions | $        — | $    4,505,684 |
| Professional fees | — | 939,113 |
| Sales commission | 30,688 | 592,729 |
| Advances from employees | 244,847 | 621,330 |
| Other taxes payable | 387,074 | 467,560 |
| Employee payroll and welfare | 43,954 | 299,345 |
| Accrued expenses | 45,315 | 261,504 |
| Advance from customers | 75,580 | 42,007 |
| Others | 40,671 | 327,870 |
|  | $    868,129 | $    8,057,141 |

**9.     Income Taxes**

Infoachieve is a tax–exempted company incorporated in the British Virgin Islands.

Beijing Framedia, Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve's variable interest entities were all registered in the PRC, which are all subject to PRC Enterprise Income Tax ("EIT") on the taxable income in accordance with the relevant PRC income tax laws.

The tax rate for Beijing Framedia was 33% and the taxable income was calculated at 8% of gross revenue in the periods presented.

The EIT rate for Shanghai Framedia was 33% but no income tax was provided as Shanghai Framedia was exempted from income tax in 2004 and there was no assessable taxable income in 2005.

The EIT rate for Guangdong Framedia was 33%. No income tax has been provided as Guangdong Framedia was exempted from income tax in the periods presented.

The EIT rate for Shenzhen Framedia was 15% and no income tax was provided as Shenzhen Framedia had no assessable taxable income.

Wuhan Framedia was subject to a fixed amount of income tax, which was $445 per year.

The EIT rate for Framedia Development is 33%. No income tax has been provided in the periods presented as Framedia Development was exempted from income tax in 2004 and 2005.

The EIT rate for Sparkle is 33%, and the taxable income was calculated at 20% of gross revenue in the period presented. Sparkle enjoys an 18% preferential tax rate determined by its operating scale.

The EIT rate for Framedia Consultation was 33%. No income tax has been provided as there was no assessable taxable income in 2005.

F–139

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

The principal components of the Group's deferred income tax assets are as follows:

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Deferred tax assets: | | |
| Pre–operating expenses | $ — | $ 12,088 |
| Allowance for doubtful accounts | — | 1,318 |
| Total deferred tax assets | — | 13,406 |
| Valuation allowance on deferred tax assets | — | (13,406) |
| Net deferred tax assets | $ — | $ — |

The Group operates through multiple subsidiaries and variable interest entities and the valuation allowance is considered on each individual subsidiary and variable interest entity basis.

The Group did not have any timing differences relating to deferred tax liabilities as of December 31, 2004 and 2005.

Full valuation allowance has been provided for the deferred tax assets arising mainly from pre–operating expenses and allowance for doubtful accounts as the Group believes that it is more likely than not that the deferred tax assets will not be realized.

A reconciliation between total income tax expense and the Group's effective tax rate is as follows:

|  | For the year ended December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Statutory tax rate | 33.0% | 33.0% |
| Permanent book–tax differences | (27.1)% | (32.7)% |
| Change in valuation allowance | (5.9)% | (0.3)% |
| Effective tax rate | — | — |

**10.    Convertible Redeemable Preference Shares**

(a) In May 2005, 270,000 outstanding ordinary shares were reclassified and re–designated into 270,000 Series A–1 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $1,136,700 which represents the difference between the fair value of the Series A–1 convertible redeemable preference shares at the date of the re–designation of $4.22 and the initial issuance price of the ordinary shares of $0.01 for 270,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $4.22 per share for Series A–1 convertible redeemable preference shares in effect on the redemption date plus all

F–140

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $378,985 for the year ended December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

(b) In May 2005, 110,000 outstanding ordinary shares were reclassified and re–designated into 110,000 Series A–2 convertible redeemable preference shares. The re–designation has resulted in a deemed dividend of $623,700 which represents the difference between the fair value of the Series A–2 convertible redeemable preference shares at the date of the re–designation of $5.68 and the initial issuance price of the ordinary shares of $0.01 for 110,000 shares.

At any time on or after the sixtieth month after the date on which the Series A convertible redeemable preference shares were first allotted and issued, and from time to time thereafter, the Group shall, at the election of any holder of Series A convertible redeemable preference shares, redeem all or part of the Series A convertible redeemable preference shares held by such redeeming holder. The redemption price shall be 150% of the $5.68 per share for Series A–2 convertible redeemable preference shares plus all declared but unpaid dividends thereon up to the date of redemption, proportionally adjusted for share subdivisions, share dividends, reorganizations, reclassifications, consolidations, or mergers. The Group recorded a deemed dividend of $207,820 as of December 31, 2005, which resulted from amortization of the 50% redemption premium associated with Series A–1 convertible redeemable preference shares.

The significant terms of the Series A–1 and Series A–2 convertible redeemable preference shares are as follows:

*Conversion*

Each of the Series A–1 and Series A–2 convertible redeemable preference shares is convertible into one ordinary share at a conversion price of $4.22 per share for Series A–1 convertible redeemable preference shares and $5.68 per share for Series A–2 convertible redeemable preference shares, at the option of the holder at any time after the date of issuance of such shares, or is automatically converted into ordinary shares at the then effective Series A conversion price upon a Qualified IPO. The conversion price should be subject to the following adjustment:

Adjustment of the Series A–1 and Series A–2 convertible redeemable preference shares conversion price upon issuance of additional ordinary shares at below Series A convertible redeemable preference shares conversion price — in the event that Infoachieve shall issue any additional ordinary shares at a subscription price per share less than the Series A–1 and Series A–2 convertible redeemable preference shares conversion price, in effect on the date of and immediately prior to such issuance, the Series A convertible redeemable preference shares conversion price shall be reduced to a price equal to the consideration per share for which such additional ordinary shares are issued.

*Voting rights*

All ordinary shares shall have one vote each. Each convertible redeemable preference share shall be entitled to the number of votes equal to the number of ordinary shares into which such Series A convertible redeemable preference could be converted at the record date for determination

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

of the members entitled to vote on such matters. The holders of the Series A−1 and Series A−2 convertible redeemable preference shares and the ordinary shares shall vote together and not as a separate class, except as otherwise specifically required by the merger and acquisition agreements.

*Dividends*

The holders of the Series A−1 and Series A−2 convertible redeemable preference shares shall be entitled to receive out of any funds legally available therefore, when and if declared by the Directors, equivalent dividends or other distributions made or declared, whether in cash, in property or in any shares of Infoachieve, in respect of any other class or series of shares of Infoachieve.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of Infoachieve, the holders of Series A−2 convertible redeemable preference shares shall receive the amount equal to 100% of the Series A Original Reference Price. After setting aside or paying in full the preferential amount due to the holders of Series A−2 convertible redeemable preference shares, the holders of the Series A−1 convertible redeemable preference shares shall be entitled to receive, the amount equal to 100% of the Series A Original Reference Price.

Series A Original Reference Price means, with respect to the Series A−1 convertible redeemable preference shares, $4.22, being the price at which the Series A−1 convertible redeemable preference shares were valued on the date on which the Series A−1 preference shares were first created by the Group by the redesignation of ordinary shares then in issue, and, with respect to the Series A−2 preference shares, $5.68, being the price at which the Series A−2 convertible redeemable preference shares were valued on the date on which the Series A−2 convertible redeemable preference shares were first created by the Group by the redesignation of ordinary shares then in issue.

**11.    Ordinary Shares**

(a) On July 28, 2004, in order to incorporate Infoachieve, the Group issued 400 ordinary shares to the shareholders of the combined entities for cash proceeds of $400.

(b) On March 12, 2005 the Board of Directors approved a stock split of 100:1 of the ordinary shares which has been retroactively reflected in the Group's consolidated financial statements.

(c) On March 21, 2005, the Group issued 960,000 ordinary shares to the Founders for cash proceeds of $9,600. This has resulted in a deemed dividend of $15,187,200 which represents the difference between the fair value of the ordinary shares at the date of issuance of $15.83 and the par value of $0.01 for 960,000 shares. The fair value was determined based on a retrospective independent third party valuation.

(d) On May 12, 2005, 380,000 outstanding ordinary shares were reclassified and redesignated into 270,000 Series A−1 convertible redeemable preference shares and 110,000 Series A−2 convertible redeemable preference shares. (See Note 10(a)(b))

(e) On May 12, 2005 and September 2, 2005, the principal shareholders of the Group transferred 50,000 ordinary shares of their own and the Group issued 40,000 ordinary shares to the Chief Executive Officer of Infoachieve in return for his service, respectively. These have resulted in a compensation expense of $1,395,100, which was based on the fair value of the price of ordinary shares. The fair value was determined based on a retrospective independent third party valuation.

F–142

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

(f) On October 14, 2005, all the same shareholders of Infoachieve incorporated Total Team in the British Virgin Islands. According to the Share Purchase Agreement and the supplemental agreements, following arrangements were made:

(i) 620,000 Ordinary Shares issued to the founders were transferred to Total Team,

(ii) The Chief Executive Officer who owned 40,000 ordinary shares and the shareholders of the entities being acquired by Infoachieve who were issued 614,200 ordinary shares of Infoachieve all agreed to exchange these issues with the same number of shares of Total Team, these 654,200 ordinary shares were cancelled by Total Team immediately after this transfer,

(iii) The 270,000 Series A–1 Preferred Shares and the 110,000 Series A–2 Preferred Shares were first converted to same number of Infoachieve's ordinary shares, then were transferred to Total Team.

After these arrangements, Infoachieve's total issued and outstanding ordinary shares were 1,000,000, which were fully acquired by Focus Media Holding Limited ("Focus Media") on January 1, 2006.

**12.    Mainland China Contribution Plan and Profit Appropriation**

Full time employees of the Group in the PRC participate in a government–mandated multiemployer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Group to accrue for these benefits based on certain percentages of the employees' salaries. The total contribution for such employee benefits were $18,991, and $115,726 for the years ended December 31, 2004 and 2005, respectively.

Pursuant to laws applicable to entities incorporated in the PRC, the Group's variable interest entities in the PRC must make appropriations from after–tax profit to non–distributable reserve funds. These reserve funds include one or more of the following: (i) a general reserve, (ii) a enterprise expansion fund and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires annual appropriations of 10% of after tax profit (as determined under accounting principles generally accepted in the PRC at each year–end); the other fund appropriations are at the Group's discretion. These reserve funds can only be used for specific purposes of enterprise expansion and staff bonus and welfare and are not distributable as cash dividends. In 2004 and 2005, the Group did not make any appropriations.

**13.    Commitments**

*(a) Leases*

The Group has entered into operating leasing arrangements relating to the placement of the print in the commercial locations where the Group operates the networks and in connection with the lease of the Group's office premises. Rental expenses under operating leases for 2004 and 2005 were $1,935,891 and $3,881,981, respectively.

F–143

Table of Contents

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

Future minimum lease payments under non–cancelable operating leases agreements were as follows:

| December 31, | December 31, 2005 |
|---|---|
| 2006 | $    3,687,665 |
| 2007 | 1,446,995 |
| 2008 | 399,542 |
| 2009 | 50,112 |
| 2010 and thereafter | 14,336 |
| | $    5,598,650 |

**14.     Segment and Geographic Information**

The Group is engaged in selling print advertisement on its network of frame located in high traffic areas in commercial locations throughout China. The Group's chief operating decision maker has been identified as the Chief Executive Officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group.

Although the Group operates through multiple cities in China which include Beijing, Shanghai, Guangzhou, Shenzhen and Wuhan, it believes it operates in one segment as all cities provide selling frame space to the customers and advertisers. Accordingly all financial segment information can be found in the consolidated financial statements.

*Geographic information*

The Group operates in the PRC and all of the Group's long lived assets are located in the PRC.

**15.     Major Customers**

Details of the customers accounting for 10% or more of total revenues are as follows:

| | Years ended December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd. | 16.9 | 15.5 |

Details of the customers accounting for 10% or more of accounts receivable are as follows:

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | % | % |
| Beijing Yitongfeiyang Advertising Co., Ltd | 26.6 | 22.6 |
| Beijing Guanliang Advertising Co., Ltd. | 18.2 | — |
| Beijing Taihedongfang Advertising Co., Ltd. | 10.3 | — |

F–144

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

**16.     Related Party Balances**

(a) Amounts due from related parties

The amounts due from related parties were cash advances to the Founders to invest in Shanghai Framedia, Guangdong Framedia, Shenzhen Framedia, Wuhan Framedia and Infoachieve. The amounts were unsecured and interest free and fully repaid in 2005.

(b) Short–term loans from shareholders

At December 31, 2004, the short–term loans from shareholders represented the principal of $365,802, which was interest bearing starting from January 1, 2005 at an interest rate of 7% per annum and was repayable in December 2005.

At December 31, 2005, the short–term loans from shareholders are comprised of the principal of $3,048,522 and the interest calculated at 7% per annum, all of which was repayable within one year.

The short–term loans were provided to the Group to be used as part of the consideration to complete the acquisitions described in Note 3.

(c) Amounts due to related parties

Details of amounts due to related parties as of December 31, 2004 and 2005 were as follows:

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
| Principal shareholders | $     1,677,741 | $   761,292 |

At December 31, 2004, the loans from a Founder's relative and employees were unsecured, bore interest ranging from 20% to 30% per annum and were repaid in 2005.

At December 31, 2005, the loan from Focus Media Holding Limited ("Focus Media") was unsecured, bore interest 5.58% per annum. As mentioned in note 17, Focus Media became the only shareholder of the Group subsequently.

**17.     Subsequent Events**

(a) Pursuant to the Share Purchase Agreement signed on October 15, 2006 by Focus Media Holding Limited, a publicly listed company on NASDAQ to acquire all the issued shares of Infoachieve Limited, the acquisition was effectively completed on January 1, 2006 and since then Infoachieve Limited has become a subsidiary of Focus Media Holding Limited.

(b) On March 7, 2006, Infoachieve entered into an agreement with its shareholders (IDG Technology Venture Investments Fund, Chen Hong, Shi Yong, Liu Shisheng and Zhao Haiqi, collectively called "Lending Parties")) and Focus Media. According to the agreement, to the extent the 2006 Audited Annual Net Income (as defined in the agreement) of Infoachieve exceeds US$17,000,000, any such excess amount not to exceed USD3,262,483.83 shall be applied by Infoachieve to repay the outstanding principal of the loans made by the Lending Parties to Infoachieve, in proportion to the amounts of the loan made by the Lending Parties, provided (a) the Credits (as defined in Funding Agreement as discussed below), and (b) the Work Capital Credits (as defined in the Share Purchase Agreement) if any, shall have been fully repaid before any loan is repaid pursuant to this Agreement.

F–145

**Table of Contents**

**INFOACHIEVE LIMITED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

On March 7, 2006, Infoachieve entered into the Funding Agreement with Focus Media and Total Team. According to this agreement, Focus Media shall provide a working capital loan of RMB6,361,773.64 or the US dollar equivalent and a loan against accounts receivables of RMB30,000,000 or the US dollar equivalent (collectively the "Credits") to Infoachieve, the Credits shall not bear any interest. Upon receipt of the Credit from Focus Media, Infoachieve shall apply the Credits in their entirety to repay the due and unpaid portion of the cash consideration payable by Infoachieve pursuant to the applicable Acquisition Agreements.

F–146

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Table of Contents**

|  | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–149 |
| Consolidated Balance Sheets as of December 31, 2004 and 2005 | F–150 |
| Consolidated Statements of Operations for the years ended December 31, 2004 and 2005 | F–151 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2004 and 2005 | F–152 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004 and 2005 | F–153 |
| Notes to the Consolidated Financial Statements for the years ended December 31, 2004 and 2005 | F–154 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
TARGET MEDIA HOLDINGS LIMITED:

We have audited the accompanying consolidated balance sheets of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the years in the two–year period ended December 31, 2005, all expressed in Renminbi. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Target Media Holdings Limited and its subsidiaries as of December 31, 2004 and 2005, and the results of their operations and their cash flows for each of the years in the two–year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

The accompanying consolidated financial statements as of and for the year ended December 31, 2005, have been translated into United States dollars solely for the convenience of the reader. We have audited the translation and, in our opinion, such consolidated financial statements expressed in Renminbi have been translated into United States dollars on the basis set forth in note 2(c) to the consolidated financial statements.

/s/ KPMG
Hong Kong, China
February 13, 2006

F–148

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2004 AND 2005**

|  | Note | December 31, 2004 | December 31, 2005 | December 31, 2005 |
|---|---|---|---|---|
|  |  | RMB | RMB | US$ |
|  |  | (Amounts in thousands, except share data) | | |
| **Assets** |  |  |  |  |
| Current assets |  |  |  |  |
| Cash and cash equivalents |  | 103,804 | 83,837 | 10,388 |
| Time deposits | (3) | 828 | 20,596 | 2,552 |
| Accounts receivable, net | (4) | 45,505 | 123,423 | 15,293 |
| Due from related parties | (15) | 4,611 | 116 | 14 |
| Prepaid expenses and other current assets | (5) | 5,969 | 76,371 | 9,463 |
| Deferred tax assets | (10) | 112 | 112 | 14 |
| Total current assets |  | 160,829 | 304,455 | 37,724 |
| Rental deposits |  | 202 | 2,250 | 279 |
| Property, equipment and software, net | (6) | 35,586 | 173,821 | 21,539 |
| Long–term prepayments | (6) | — | 14,617 | 1,811 |
| Intangible assets | (7) | — | 7,982 | 989 |
| Goodwill | (7) | — | 1,613 | 200 |
| Total assets |  | 196,617 | 504,738 | 62,542 |
| **Liabilities and shareholders' equity** |  |  |  |  |
| Current liabilities |  |  |  |  |
| Accounts and bills payable |  | 5,311 | 48,428 | 6,001 |
| Accrued expenses and other payables | (8) | 8,052 | 69,948 | 8,667 |
| Due to related parties | (15) | 10,033 | 30,000 | 3,717 |
| Income tax payable |  | 442 | 442 | 55 |
| Total current liabilities |  | 23,838 | 148,818 | 18,440 |
| Deferred tax liability | (7) | — | 377 | 47 |
| Total liabilities |  | 23,838 | 149,195 | 18,487 |
| Commitments and contingencies | (11) |  |  |  |
| Series A redeemable convertible preferred shares: US$0.0001 par value; 44,000,000 authorized; 41,641,679 shares issued and outstanding as of December 31, 2004 and 2005 | (12) | 130,978 | 157,512 | 19,518 |
| Series B redeemable convertible preferred shares: US$0.0001 par value; 22,000,000 authorized; nil and 21,820,243 shares issued and outstanding as of December 31, 2004 and 2005, respectively | (12) | — | 128,528 | 15,926 |
| Shareholders' equity |  |  |  |  |
| Common shares: US$0.0001 par value; 200,000,000 and 210,000,000 shares authorized as of December 31, 2004 and 2005; 111,100,000 shares issued and outstanding as of December 31, 2004 and 2005 | (13) | 92 | 92 | 11 |
| Paid–in capital |  | 25,045 | 62,712 | 7,771 |
| Statutory reserves |  | 5,011 | 7,166 | 888 |
| Retained earnings (deficit) |  | 11,653 | (467) | (59) |
| Total shareholders' equity |  | 41,801 | 69,503 | 8,611 |
| Total liabilities and shareholders' equity |  | 196,617 | 504,738 | 62,542 |

The accompanying notes are an integral part of these consolidated financial statements.

F–149

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Note | Years ended December 31, | | |
|---|---|---|---|---|
| | | **2004** | **2005** | **2005** |
| | | **RMB** | **RMB** | **US$** |
| | | **(Amounts in thousands, except per share data)** | | |
| Advertising service revenue | | 80,475 | 271,911 | 33,693 |
| Cost of revenues | | (32,407) | (131,710) | (16,321) |
| Gross profit | | 48,068 | 140,201 | 17,372 |
| Operating expenses: | | | | |
| Sales and marketing | | (16,317) | (69,277) | (8,584) |
| General and administrative | | (5,344) | (15,696) | (1,945) |
| Total operating expenses | | (21,661) | (84,973) | (10,529) |
| Income from operations | | 26,407 | 55,228 | 6,843 |
| Other income (expenses): | | | | |
| Interest income | | 86 | 628 | 78 |
| Interest expense | | (362) | (79) | (10) |
| Exchange loss | | (25) | (755) | (94) |
| Income before income tax expense and minority interests | | 26,106 | 55,022 | 6,817 |
| Income tax expense | (10) | (330) | — | — |
| Income after income tax expense | | 25,776 | 55,022 | 6,817 |
| Minority interests | | — | 180 | 22 |
| Net income | | 25,776 | 55,202 | 6,839 |
| Accretion to Series A redeemable convertible preferred shares redemption value | | (8,663) | (26,534) | (3,288) |
| Accretion to Series B redeemable convertible preferred shares redemption value | | — | (7,747) | (960) |
| Beneficial conversion of Series A redeemable convertible preferred shares | | — | (24,378) | (3,021) |
| Beneficial conversion of Series B redeemable convertible preferred shares | | — | (6,508) | (806) |
| Net income (loss) available to common shareholders | | 17,113 | (9,965) | (1,236) |

The accompanying notes are an integral part of these consolidated financial statements.

F–150

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Common shares | | | | | |
| | Number of shares | Amount | Paid–in capital | Statutory reserves | Retained earnings (deficit) | Total shareholders' equity |
|---|---|---|---|---|---|---|
| | | RMB | RMB | RMB | RMB | RMB |
| | | | (Amounts in thousands, except share data) | | | |
| January 1, 2004 | — | — | 23,184 | — | (449) | 22,735 |
| Issuance of common shares | 111,100,000 | 92 | — | — | — | 92 |
| Share–based compensation (note 9) | — | — | 1,861 | — | — | 1,861 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (8,663) | (8,663) |
| Net income | — | — | — | — | 25,776 | 25,776 |
| Appropriation to statutory reserves | — | — | — | 5,011 | (5,011) | — |
| December 31, 2004 | 111,100,000 | 92 | 25,045 | 5,011 | 11,653 | 41,801 |
| Share–based compensation (note 9) | — | — | 6,781 | — | — | 6,781 |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | — | — | (26,534) | (26,534) |
| Accretion to Series B redeemable convertible preferred shares redemption value | — | — | — | — | (7,747) | (7,747) |
| Beneficial conversion of Series A redeemable convertible preferred shares | — | — | 24,378 | — | (24,378) | — |
| Beneficial conversion of Series B redeemable convertible preferred shares | — | — | 6,508 | — | (6,508) | — |
| Net income | — | — | — | — | 55,202 | 55,202 |
| Appropriation to statutory reserves | — | — | — | 2,155 | (2,155) | — |
| December 31, 2005 | 111,100,000 | 92 | 62,712 | 7,166 | (467) | 69,503 |
| December 31, 2005 (US$) | | 11 | 7,771 | 888 | (59) | 8,611 |

The accompanying notes are an integral part of these consolidated financial statements.

F–151

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2005**

| | Years ended December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2005 |
| | RMB | RMB | US$ |
| | | (Amounts in thousands) | |
| Cash flows from operating activities: | | | |
| Net income | 25,776 | 55,202 | 6,839 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | | |
| Minority interests | — | (180) | (22) |
| Allowance for doubtful accounts | 340 | — | — |
| Gain on disposal of equipment | (69) | (37) | (5) |
| Depreciation and amortization | 4,383 | 19,594 | 2,428 |
| Share–based compensation | 1,861 | 6,781 | 840 |
| Deferred income tax | (112) | — | — |
| Changes in operating assets and liabilities, net of effects of business acquired: | | | |
| Accounts receivable | (45,845) | (77,534) | (9,607) |
| Due from related parties | (4,611) | 4,495 | 557 |
| Prepaid expenses and other current assets | (5,501) | (53,457) | (6,623) |
| Rental deposits | (202) | (2,048) | (254) |
| Accounts and bills payable | 1,730 | 1,225 | 152 |
| Accrued expenses and other payables | 7,789 | 57,856 | 7,169 |
| Due to related parties | (737) | (33) | (4) |
| Income tax payable | 442 | — | — |
| Net cash (used in) provided by operating activities | (14,756) | 11,864 | 1,470 |
| | | | |
| Cash flows from investing activities: | | | |
| Purchase of time deposits | (828) | (45,524) | (5,641) |
| Maturity of time deposits | — | 25,756 | 3,191 |
| Initial investment deposits | — | (16,945) | (2,100) |
| Purchase of property, equipment and software | (24,045) | (127,420) | (15,789) |
| Purchase of intangible assets | — | (4,809) | (596) |
| Proceeds from disposal of equipment | 346 | 255 | 32 |
| Net cash paid for acquisitions of subsidiaries | — | (3,925) | (486) |
| Net cash used in investing activities | (24,527) | (172,612) | (21,389) |
| | | | |
| Cash flows from financing activities: | | | |
| Proceeds from loan from shareholder | 31,655 | 30,000 | 3,717 |
| Repayment of loan from shareholder | (21,655) | (10,000) | (1,239) |
| Proceeds from issuance of common shares | 92 | — | — |
| Proceeds from issuance of redeemable convertible preferred shares, net of issuance costs | 122,315 | 120,781 | 14,966 |
| Distributions to shareholders in connection with the Restructuring | (10,000) | — | — |
| Net cash provided by financing activities | 122,407 | 140,781 | 17,444 |
| | | | |
| Net increase(decrease) in cash and cash equivalents | 83,124 | (19,967) | (2,475) |
| Cash and cash equivalents at beginning of year | 20,680 | 103,804 | 12,863 |
| | | | |
| Cash and cash equivalents at end of year | 103,804 | 83,837 | 10,388 |
| | | | |
| Supplemental disclosures of cash flow and non–cash information: | | | |
| Cash paid for income taxes | — | — | — |
| | | | |
| Cash paid for interest | 348 | 79 | 10 |
| | | | |
| Accrual for purchase of property, equipment and software | 3,581 | 41,765 | 5,175 |
| | | | |
| Accrual for purchase of intangible assets | — | 4,040 | 501 |

The accompanying notes are an integral part of these consolidated financial statements.

F–152

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

**(1)  Principal Activities, Organization and Basis of Presentation**

*Principal activities*

The accompanying consolidated financial statements consist of the financial statements of Target Media Holdings Limited (the "Company"), its wholly–owned subsidiary, Target Media Multi–Media Technology (Shanghai) Co., Ltd. ("TMM"), and a consolidated variable interest entity ("VIE"), Shanghai Target Media Co., Ltd. ("STM"). The Company and its subsidiary and consolidated VIE are collectively referred to as the "Group". The Group is principally engaged in operating a nationwide flat panel display advertising network in the People's Republic of China ("PRC"), which is made up of liquid crystal displays, or LCD, and plasma screens placed in the elevator lobbies or other waiting areas of commercial buildings, high–end residential buildings, hotels, banks and supermarkets. Using the advertisement content provided by its customers, the Group displays commercial advertisements for its customers on this network to capture targeted consumers who work, live or shop at these locations.

On January 7, 2006, the Company signed a definitive agreement ("the Agreement") with Focus Media Holding Limited ("Focus Media") whereby Focus Media will purchase 100% of the Company's equity interests from selling shareholders in exchange for a total consideration of US$325,000, of which US$94,000 will be paid in cash and US$231,000 will be paid in the form of Focus Media's ordinary shares (priced at US$30.00 per ADS, each of which represents 10 Focus Media ordinary shares), equal to 77 million Focus Media ordinary shares. The cash portion of the purchase price will be paid in three installments. The first installment of US$45,000 is to be paid upon closing. The second installment of US$25,000 is to be paid on April 28, 2006. The final installment of US$24,000 is to be paid on July 31, 2006, and may be increased or decreased based on a calculation of Target Media's net working capital as of the closing date. All of the Focus Media ordinary shares to be delivered at closing under the Agreement will be in the form of newly issued shares. This proposed business combination is expected to close following the satisfaction or waiver of customary closing conditions provided in the Agreement.

*Organization*

In July 2004, the shareholders of STM incorporated the Company in the Cayman Islands as part of the reorganization of STM (the "Reorganization"). The purpose of the Reorganization was to enable a group of foreign investors to invest in STM where current PRC laws restrict direct foreign investment or ownership in advertising companies in the PRC. In connection with the Reorganization, the Company entered into the following series of transactions:

1) The formation and incorporation of the Company's common shares to the STM shareholders in the same direct proportion to their relative equity interests of STM in August 2004. See note 13.

2) The formation and incorporation of TMM as a wholly–owned subsidiary of the Company in August 2004.

3) The entering into certain contractual agreements and arrangements between TMM and STM in August 2004 since the Company and TMM currently are ineligible to apply and hold the required licenses for provision of advertising services in the PRC.

4) The issuance of the Company's Series A redeemable convertible preferred shares to a group of foreign investors for cash consideration of US$15,000 as discussed in note 12(a).

F–153

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

The contractual agreements and arrangements between TMM and STM have resulted in the Company receiving substantially all the economic benefits and residual returns, absorbing substantially all the risks of expected losses of STM, and controlling the operating and financial decision making of STM. In addition, under the terms of these contractual agreements and arrangements, the Company, through TMM and its de facto agents, is considered to be the primary beneficiary of STM since it holds substantially all the variable interests of STM and is determined to be most closely associated with STM.

Under Financial Accounting Standard Board ("FASB") Interpretation No. 46(R), "*Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51*" ("FIN 46R"), a variable interest entity is required to be consolidated by the primary beneficiary of the entity if the equity investors in the entity do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. Accordingly, the financial statements of STM have been consolidated in the Company's financial statements from August 2004, which is the date when the Company first became the primary beneficiary of STM through the above contractual agreements and arrangements.

The fees, payments or other sources of income and expenses arising from the transactions between TMM and STM under the terms of these agreements are eliminated against the related expenses or income on consolidation and do not have any impact on the consolidated financial position and operations and cash flow of the Group other than to reflect such amounts on a separate legal entity basis. The key terms and salient features of these contractual agreements and arrangements, which became effective from August 2004, are as follows:

***Assets Purchase Agreement*** Under the Assets Purchase Agreement, TMM purchased all of the tangible and intangible assets of STM other than (i) advertisement contracts with customers, (ii) flat panel display placement contracts, and (iii) other assets prohibited from transfer under applicable PRC laws and regulations. The purchase price was equal to the net book value of these assets as of July 31, 2004 and is payable by TMM through deducting the fees and expenses payable to TMM by STM under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement described below.

***Lease and Service Agreement*** Under the Lease and Service Agreement, STM exclusively leases flat panel display and related equipment from TMM. STM also undertakes to exclusively procure certain services from TMM from time to time, including (i) repair and maintenance of flat panel display equipment, (ii) secondment of TMM's employees to STM and (iii) business promotion services. Equipment rental is charged based on the amount of depreciation charge of the equipment plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. Service fees are charged based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the Lease and Service Agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration. The terms of this agreement also prohibit STM from purchasing or leasing flat panel display equipment, hiring new employees and procuring the services described above from any other third parties without TMM's written consent.

***Software License and Exclusive Technical Service Agreement*** Under the Software License and Exclusive Technical Service Agreement, TMM provides a non–exclusive, non–transferable and non–assignable license to STM to install and run its licensed software solely in the PRC. TMM is the exclusive technical service provider to STM and STM is not permitted to

F–154

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

procure any similar or identical technical services from other third parties. STM further agrees that TMM is the sole owner of any and all intellectual property rights or any other rights arising by way of research and development under this agreement. The software license fees payable by STM to TMM shall be based on a certain percentage of the business income generated from the use of TMM's software in STM's business operations as determined and approved by TMM and the Board of Directors of the Company. The technical service fees payable by STM to TMM shall be based on the relevant costs plus a reasonable profit as determined and approved by TMM and the Board of Directors of the Company. The initial term of the agreement is 10 years and is automatically renewable for another 10 years unless, TMM gives written notice of its intention not to renew at least three months prior to expiration.

***Guarantee Agreement*** Under the Guarantee Agreement and as security for STM's obligations under the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement, each of the shareholders of STM has guaranteed STM's performance under, and settlement of obligations arising from the Lease and Service Agreement and the Software License and Exclusive Technical Service Agreement by pledging all their equity interests in STM. Furthermore, the shareholders of STM have agreed to appoint the general manager, chief financial officer and other senior management of STM according to the Company's or TMM's instruction.

***Future Equity Transfer Agreement*** Under the Future Equity Transfer Agreement, the shareholders of STM shall transfer to the Company or its nominee, and the Company or its nominee shall acquire, when the PRC laws permit, their entire equity interests in the registered capital of STM at a nominal amount of RMB 10, provided that the prevailing PRC laws at the time of transfer do not require a valuation of the transferred equity interests or post other restrictions. Furthermore, the terms of the Future Equity Transfer Agreement place significant restrictions on the shareholders of STM as summarized below:

a) Without the written consent of the Company, each of the shareholders of STM shall not use their equity interests in STM as a guarantee or security against a loan, or shall not cause STM to enter into any loan transaction.

b) Without the written consent of the Company, each of the shareholders of STM shall not dispose of their equity interests in the registered capital of STM in any form, including but not limited to transfer, security, or other forms of entitlements.

c) Without the written consent of the Company, each of the shareholders of STM shall not adopt any measure which may cause the current approved business scope of STM to be altered, or may cause STM to be liquidated or wound up.

d) Each of the shareholders of STM shall cause their respective nominees on STM's Board not to pay any dividend or declare any dividend payable to the legal shareholders unless the Company's prior approval is obtained.

e) Each of the shareholders of STM shall invite the Company to attend STM's shareholders and Board of Directors' meetings, cast their votes at the shareholders' meeting in accordance with the Company's instructions and direct their respective nominees on STM's Board to vote in accordance with the Company's instructions.

f) Each of the shareholders of STM shall ensure that STM's capital structure remains unchanged unless otherwise instructed by the Company, and that STM's registered capital will

F–155

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

not be increased, nor will it be assigned, in whole or in part, to any third party without prior written consent of the Company.

With respect to the Company's direct variable interest in STM, no minority interests (or noncontrolling interests) have been presented since the Company, through TMM and its de facto agents (who are also all the shareholders of STM), has a 100% controlling financial interest in STM through the terms of the aforementioned contractual agreements and arrangements. In addition, the common shareholders of the Company and the shareholders of STM are the same and their shareholders' equity interests in the Company are in the same proportion as to their equity interests in STM.

STM is a domestic company incorporated in Shanghai, the PRC, in December 2003 and was formed in connection with the restructuring of Shanghai Dian Yang Digital Media Technology Co., Ltd. ("Dian Yang"), whose sole beneficial equity owner is also the controlling and majority shareholder of STM and the Company. Dian Yang was established in 2000 and initially operated as an advertising agency company by placing advertisements with media companies on behalf of advertising clients. In March 2003, Dian Yang commenced the flat panel display advertising business as an extension to its advertising agency business. As part of the restructuring of Dian Yang (the "Restructuring"), all tangible and intangible assets, assignable business contracts and employees relevant to the flat panel display advertising business were transferred from Dian Yang to STM in December 2003 at the time of STM's incorporation. In connection with the transfer, RMB 20,000 was distributed to Dian Yang, of which RMB 10,000 was paid by STM at the end of December 2003 and the remaining RMB 10,000 was paid by STM in January 2004. Following the Restructuring, STM began to operate the flat panel display advertising business.

*Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("US GAAP").

Since the controlling and majority shareholder of STM prior to the Reorganization remained the controlling and majority shareholder of the Company after consummation of the Reorganization, the assets and liabilities of STM have been stated and recognized by the Company at the historical carrying amounts of STM. As discussed above, the financial position and results of operations of STM have been consolidated and included in the Company's consolidated financial statements from August 2004 onwards. For the periods prior to August 2004, since the Company was formed for the sole purpose of the Reorganization to allow a group of foreign investors to invest in STM's flat panel display advertising business, the accompanying consolidated financial statements include the financial position and the related results of operations of STM from the earliest date presented through August 2004 at historical cost basis with no lapse in financial information. Accordingly, the results of operations for the years ended December 31, 2004 and 2005 are comparable.

As of December 31, 2005, the Group had working capital (current assets less current liabilities) of approximately RMB 155,637 (US$19,285) and off–balance sheet operating lease commitments of RMB 117,994 (US$14,621) payable over the next 12–months (see note 11). The Company has historically relied on capital infusions and credit enhancements from its shareholders to provide working capital to fund its flat panel display network build–out and acquisitions. Management believes that its current cash on hand and expected cash flow from operations will be sufficient to meet its operating requirements, including existing operating lease commitments over the foreseeable future. However, should the acquisition of the Company by Focus Media (see note 1) not occur or the

F–156

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

consummation date be delayed beyond a short period of time, it may be necessary for the Company to seek additional capital infusions from current and new shareholders and/or provide shareholder credit enhancements to third party lenders to satisfy its anticipated liquidity requirements for further network expansion. Should the Company be unable to obtain liquidity at levels necessary to meet its anticipated requirements or at commercially acceptable rates, future network expansion plans may need to be curtailed or postponed.

**(2)    Summary of Significant Accounting Policies**

*(a) Principles of consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiary and its VIE, since the Company is the primary beneficiary. All significant inter company balances and transactions have been eliminated on consolidation.

*(b) Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, management reviews its estimates, including those related to the allowance for doubtful accounts, valuation allowance for deferred tax assets, asset depreciable lives and residual values, and carrying values of long–lived assets, based on currently available information. Changes in facts and circumstances may result in revised estimates.

*(c) Foreign currencies*

The Group's functional currency is the Renminbi ("RMB"). Monetary assets and liabilities denominated in foreign currencies are translated into RMB using the applicable exchange rates quoted by the People's Bank of China at the balance sheet dates. All such exchange gains and losses are included in the consolidated statements of operations.

The accompanying consolidated financial statements have been expressed in RMB. The translations of amounts from RMB into United States dollars ("US$") as of and for the year ended December 31, 2005, are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB 8.0702, on December 31, 2005, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2005, or at any other rate. See also note 14.

*(d) Commitments and contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated.

F–157

**Table of Contents**

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*(e) Cash and cash equivalents*

    Cash and cash equivalents consist of cash at bank and on hand and certificates of deposit with an initial term of less than three months when purchased. None of the Group's cash and cash equivalents is restricted for withdrawal.

*(f) Accounts receivable*

    Accounts receivable billed are recorded at the invoiced amount and are non interest bearing. The allowance for doubtful accounts is the Group's best estimate of the amount of probable credit losses in the Group's existing accounts receivable. The Group determines the allowance based on historical write–off experience by customer types and reviews specific larger amounts individually for collectibility. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Group does not have any off–balance–sheet credit exposure related to its customers.

*(g) Property, equipment and software, net*

    Property, equipment and software are stated at cost, net of accumulated depreciation, amortization and impairment.

    Depreciation and amortization are calculated using the straight–line method over the following estimated useful lives, taking into account the assets' estimated residual value:

| | |
|---|---|
| Flat panel display equipment, primarily LCD and plasma television screens | 5 years |
| Computers and office equipment and software | 3–5 years |
| Motor vehicles | 5 years |
| Leasehold improvements | Shorter of 5 years or term of the lease |

    In accordance with SFAS 143, *"Accounting for Asset Retirement Obligations,"* legal obligations associated with the retirement of long–lived assets that result from the acquisition, construction, development or normal use of the asset are recognized at fair value in the period in which the liability is incurred if a reasonable estimate of fair value can be made. For the periods presented there were no legal retirement obligations associated with the placement and use of the Group's flat panel display equipment.

*(h) Impairment of long–lived assets*

    In accordance with Statements of Financial Accounting Standards ("SFAS") No. 144, *"Accounting for the Impairment or Disposal of Long–Lived Assets,"* long–lived assets, such as property, equipment and software, and acquired intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. No impairment of long–lived assets was recognized for the years ended December 31, 2004 and 2005.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

*(e) Cash and cash equivalents*

Cash and cash equivalents consist of cash at bank and on hand and certificates of deposit with an initial term of less than three months when purchased. None of the Group's cash and cash equivalents is restricted for withdrawal.

*(f) Accounts receivable*

Accounts receivable billed are recorded at the invoiced amount and are non interest bearing. The allowance for doubtful accounts is the Group's best estimate of the amount of probable credit losses in the Group's existing accounts receivable. The Group determines the allowance based on historical write-off experience by customer types and reviews specific larger amounts individually for collectibility. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Group does not have any off-balance-sheet credit exposure related to its customers.

*(g) Property, equipment and software, net*

Property, equipment and software are stated at cost, net of accumulated depreciation, amortization and impairment.

Depreciation and amortization are calculated using the straight-line method over the following estimated useful lives, taking into account the assets' estimated residual value:

| | |
|---|---|
| Flat panel display equipment, primarily LCD and plasma television screens | 5 years |
| Computers and office equipment and software | 3-5 years |
| Motor vehicles | 5 years |
| Leasehold improvements | Shorter of 5 years or term of the lease |

In accordance with SFAS 143, *"Accounting for Asset Retirement Obligations,"* legal obligations associated with the retirement of long-lived assets that result from the acquisition, construction, development or normal use of the asset are recognized at fair value in the period in which the liability is incurred if a reasonable estimate of fair value can be made. For the periods presented there were no legal retirement obligations associated with the placement and use of the Group's flat panel display equipment.

*(h) Impairment of long-lived assets*

In accordance with Statements of Financial Accounting Standards ("SFAS") No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets,"* long-lived assets, such as property, equipment and software, and acquired intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. No impairment of long-lived assets was recognized for the years ended December 31, 2004 and 2005.

F-158

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

*(i) Goodwill and other intangible assets*

Goodwill and intangible assets which are determined to have indefinite useful lives are not amortized, but instead tested for impairment at least annually in accordance with the provisions of SFAS No. 142, *"Goodwill and Other Intangible Assets."* Intangible assets with determinable useful lives are amortized over their respective useful lives and reviewed for impairment in accordance with SFAS No. 144.

*(j) Fair value of financial instruments*

Financial instruments of the Group include cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties, other receivables, accounts and bills payable, and amounts due to related parties, for which the carrying values approximate their fair values due to their short–term maturities.

*(k) Statutory Reserve*

TMM and STM are required under PRC laws to provide for certain statutory reserves, such as a general reserve, an enterprise expansion fund and a staff welfare and bonus fund. TMM and STM are required to allocate at least 10% of their after tax profits as reported in their PRC statutory financial statements to the general reserve and have the right to discontinue allocations to the general reserve if the balance of such reserve has reached 50% of their registered capital. These statutory reserves are not available for distribution to the shareholders (except in liquidation) and may not be transferred in the form of loans, advances or cash dividends. As of December 31, 2004 and 2005, RMB 5,011 and RMB 7,166 were appropriated from retained earnings and set aside for these statutory reserves respectively by TMM and STM. As of December 31, 2005, a future appropriation of RMB 91,220 is necessary to reach the general reserve requirement.

*(l) Revenue recognition*

The Group's revenue is derived from the rendering of advertising services. Revenues from advertising services are recognized ratably on a straight–line basis over the period in which the advertisement is contractually required to be displayed, starting from the date the customer provides the advertisement content and the Group displays such content on its flat panel display equipment, and only when all four of the following criteria are met: (i) pervasive evidence of an arrangement exists; (ii) the advertising services have been rendered; (iii) the service fee is fixed or determinable; and (iv) collectibility is reasonably assured.

Billing terms of the Group's advertising service contracts are in the form of the following: (i) full billing after the end of the advertisement displayed period (the "Service Period"); (ii) progress billings over the Service Period; and (iii) partial cash down payment at the beginning of the Service Period with the remainder being billed in the form of progress payments during or after the end of the Service Period. Payments are due between 30 to 90 days from the date of billing. The Group's accounts receivable comprise amounts billed under the contract terms and revenues recognized under contractual terms but not yet billed (unbilled receivables). The Group expects that substantially all unbilled receivables will be billed and collected within twelve months of the balance sheet date. Historically the Group has been able to collect substantially all amounts due under the contract terms without making any concessions on payments.

F–159

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*(m) Cost of revenues*

Cost of revenues consists primarily of operating lease costs associated with the placement of flat panel display equipment, business tax and surcharges, depreciation of flat panel display equipment and personnel and other related expenses that are directly attributable to the rendering of advertising services.

The Group's advertising revenues are subject to a 5% business tax on revenues generated from services in the PRC. In addition, advertising revenues are subject to a cultural and education development fee at 4% of revenue earned and various other surcharges at 5% of the business tax levied.

*(n) Operating leases*

Leases where substantially all the rewards and risks of ownership of assets remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the respective lease terms.

*(o) Advertising costs*

The Group expenses its advertising and promotion costs as incurred. Total advertising and promotion costs were RMB 333 and RMB 497 for the years ended December 31, 2004 and 2005, respectively, and were included in sales and marketing expenses.

*(p) Income taxes*

Deferred income taxes are provided using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforward. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided to reduce the carrying amount of deferred tax assets if it is considered more likely than not that some portion, or all, of the deferred tax assets will not be realized.

*(q) Share-based compensation*

The Company has adopted SFAS No. 123R, *"Share-based Payment"*, which requires that share-based payment transactions with employees, such as share options, be measured based on the grant-date fair value of the equity instrument issued and recognized as compensation expense over the requisite service period, with a corresponding addition to paid-in capital. Under this method, compensation cost related to employee share options or similar equity instruments is measured at the grant date based on the fair value of the award and is recognized over the period during which an employee is required to provide service in exchange for the award, which generally is the vesting period.

The Company accounts for equity instruments issued to non-employee vendors in accordance with the provisions of Emerging Issues Task Force ("EITF") Issue No. 96-18, *"Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling,*

F-160

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*Goods or Services."* All transactions in which goods or services are received in exchange for equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date of the fair value of the equity instrument issued is the date on which the counterparty's performance is completed. For the periods presented, the Company did not issue any equity instruments to non-employee vendors.

*(r) Employee benefit plans*

As stipulated by the regulations of the PRC, the Company's subsidiary and consolidated VIE and its acquired companies participate in various defined contribution plans organized by municipal and provincial governments for their employees. These companies are required to make contributions to these plans at rates ranging from 9% to 24% of the salaries, bonuses and certain allowances of employees. The Group has no other material obligation for the payment of employee benefits associated with these plans beyond the annual contributions described above. Members of the retirement plan are entitled to a pension equal to a fixed proportion of the salary prevailing at the member's retirement date. Employee benefits associated with these plans are expensed when incurred. During the years ended December 31, 2004 and 2005, the Group made contributions of RMB 903 and RMB 3,221, respectively.

*(s) Segment reporting*

The Company uses the management approach in determining operating segments. The management approach considers the internal organization and reporting used by the Company's chief operating decision maker for making operating decisions, allocating resources and assessing performance. Based on this assessment, the Company has determined that it has only one operating segment which is the rendering of flat panel display advertising services in the PRC.

*(t) Comprehensive income*

Comprehensive income is defined as the change in equity during a period from transactions and other events and circumstances except for transactions resulting from investments by shareholders and distributions to shareholders. The Company has no comprehensive income other than net income for the years ended December 31, 2004 and 2005.

**(3)    Time Deposits**

As of December 31, 2005, time deposits amounting to RMB 19,789 have been pledged as security for bank guarantees in respect of RMB 43,620 of bills payable issued by the Company to equipment vendors.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
(Amounts in thousands, except share data)

**(4)  Accounts Receivable, Net**

Accounts receivable, net is analyzed as follows:

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | RMB | RMB |
| Billed receivables | 20,496 | 96,185 |
| Unbilled receivables | 25,349 | 27,578 |
| | 45,845 | 123,763 |
| Less: allowance for doubtful accounts | (340) | (340) |
| | 45,505 | 123,423 |

The activities in the allowance for doubtful accounts for accounts receivable for the years ended December 31, 2004 and 2005, were as follows:

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | RMB | RMB |
| Beginning allowance for doubtful accounts | — | 340 |
| Additions charged to bad debt expense | 340 | — |
| Ending allowance for doubtful accounts | 340 | 340 |

**(5)  Prepaid Expenses and Other Current Assets**

Components of prepaid expenses and other current assets are as follows:

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| | RMB | RMB |
| Prepaid lease rental expenses | 4,710 | 24,996 |
| Advances to employees | 470 | 2,033 |
| Tax receivable | 655 | — |
| Initial investment deposits | — | 16,945 |
| Deferred share offering expenses | — | 30,773 |
| Other receivables and deposits | 134 | 1,624 |
| | 5,969 | 76,371 |

On September 30, 2005, the Company entered into a Memorandum of Understanding ("MOU") with Tulip Media (International) Limited, or Tulip International, and its shareholders to acquire all of the outstanding equity interest of Tulip International and its group companies ("the Tulip Group"). The Tulip Group provides outdoor advertising services primarily through outdoor light emitting diodes, or LED, advertising displays, neon light displays and traditional billboard displays that are located mostly in Shanghai. As of December 31, 2005, a refundable initial cash deposit of US$2,000 (equivalent to RMB 16,145) was paid to Tulip Group that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of the Tulip Group pursuant to the current MOU.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

On January 1, 2006, STM signed a definitive agreement to acquire 20% equity interest in Shanghai Xinna Media Co., Ltd. ("Xinna") for a total cash consideration of RMB 7,500. As of December 31, 2005, a refundable initial cash deposit of RMB 800 was paid to Xinna's shareholders that will be applied against the purchase price upon consummation of the proposed acquisition. Upon consummation of the proposed acquisition of the Company by Focus Media (see note 1), Focus Media will be permitted to pursue the acquisition of Xinna pursuant to the current definitive agreement.

Deferred share offering expenses represent specific incremental direct costs of the initial public offering ("IPO") of the Company's common shares that will be charged against the gross proceeds of the offering or to the statement of operations in the period in which the offering is aborted. On January 7, 2006, upon signing of the definitive agreement with Focus Media (see note 1), the Company temporarily postponed its IPO process pending the outcome of acquisition discussions with Focus Media. Should the acquisition by Focus Media be consummated, the IPO will be aborted and the deferred share offering expenses will be charged to the statement of operations in that period.

(6)    **Property, Equipment and Software, Net**

Property, equipment and software, net consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Flat panel display equipment | 36,826 | 182,075 |
| Computers and office equipment | 1,722 | 6,114 |
| Leasehold improvements | 709 | 4,198 |
| Motor vehicles | 860 | 2,003 |
| Software | 250 | 2,533 |
|  | 40,367 | 196,923 |
| Less: Accumulated depreciation and amortization | (4,781) | (23,102) |
|  | 35,586 | 173,821 |

Long-term prepayments in the accompanying consolidated balance sheet represent deposits on flat panel display equipment that will be reclassified to property, equipment and software upon the transfer of title and risks and rewards of ownership to the Company from the equipment suppliers.

(7)    **Acquisitions of Business and Assets**

In October 2005, STM acquired 70% of the equity interests in Shenyang Target Media Ltd. ("Shenyang TM") for a total cash consideration of RMB 3,150. In addition, in October 2005, STM acquired 100% of the equity interests in Fuzhou Heng Ding United Media Ltd. ("Heng Ding") for a total cash consideration of RMB 1,280. The acquisitions have been accounted for as purchase business combinations with the results of operations included in the Company's consolidated financial statements since the date of acquisition. No supplemental financial information on a pro forma basis as if consummation of the acquisitions, had occurred on January 1, 2004, is provided since these acquisitions are not considered material to the financial position and results of operations of the Company.

F-163

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

Shenyang TM and Heng Ding are regional providers of flat panel display advertising services in Liaoning province and Fujian province of the PRC. As a result of these acquisitions, the Company has expanded its network coverage and has enhanced its market position in the aforementioned regions in the PRC. The following table summarizes the estimated fair value of the assets acquired and liabilities assumed on the date of acquisition. The final allocation of the purchase price is as follows:

|  | Shenyang TM | Heng Ding | Total |
|---|---|---|---|
|  | RMB | RMB | RMB |
| Cash | 500 | 5 | 505 |
| Other current assets | 347 | 37 | 384 |
| Property and equipment | 560 | 173 | 733 |
| Intangible assets | 1,509 | 470 | 1,979 |
| Goodwill | 791 | 822 | 1,613 |
| Total assets acquired | 3,707 | 1,507 | 5,214 |
| Current payables | — | (227) | (227) |
| Deferred tax liability | (377) | — | (377) |
| Minority interests | (180) | — | (180) |
| Total liabilities assumed | (557) | (227) | (784) |
|  | 3,150 | 1,280 | 4,430 |

The goodwill represents the benefits that the acquired enterprises will bring to the Company in the future by providing access to potential strategic partners and customers as a result of expanding its network coverage.

During the year ended December 31, 2005, the Company entered into an agreement with Shandong Fu Er Media Limited ("Fu Er") and acquired all of Fu Er's flat panel display equipment, computers, office equipments and lease contracts for the placement of flat panel displays, for a total cash consideration of RMB 7,280. Total cash consideration of RMB 7,280 was allocated to fixed assets of RMB 1,498 and lease contracts of RMB 5,782, respectively, based on their estimated fair value at the date of acquisition. As of December 31, 2005, STM has paid RMB 3,240 of the purchase price to Fu Er. The remaining balance of RMB 4,040 will be paid in 2006.

During the year ended December 31, 2005, the Company acquired lease contracts for the placement of flat panel displays from Wuhan Hai Ming Broadcasting Advertising Ltd. ("Hai Ming") for a total cash consideration of RMB 1,088.

Intangible assets representing the market rate adjustment of acquired lease contracts for the placement of the flat panel displays is as follows:

|  | December 31, 2005 | |
|---|---|---|
|  | RMB | Amortization period |
| Flat panel display lease | 8,849 | 2–5 yrs |
| Less: Accumulated amortization | (867) | |
|  | 7,982 | |

Aggregate amortization expense of intangible assets was RMB 867 for the year ended December 31, 2005. Estimated amortization expense for future years is as follows: RMB 2,918 in

F-164

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

2006, RMB 2,457 in 2007, RMB 2,049 in 2008, RMB 221 in 2009, RMB 161 in 2010 and RMB 176 in the years thereafter.
In addition, see note 5 for the potential acquisitions of the Tulip Group and equity investment in Xinna.

(8)   **Accrued Expenses and Other Payables**
Components of accrued expenses and other payables are as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2004 | 2005 |
|  | RMB | RMB |
| Accrued payroll and welfare | 3,881 | 14,130 |
| Accrued expenses | 1,764 | 36,210 |
| Business tax and surcharges payable | 2,264 | 14,269 |
| Receipts in advance | 143 | 5,339 |
|  | 8,052 | 69,948 |

(9)   **Share–Based Compensation**
Upon the approval by the Board of Directors, the Company grants share options to its executives and employees to reward for services.
During the year ended December 31, 2004, 12,495,344 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.36 to US$0.45 with a contractual term of ten years and vesting period of four years.
During the year ended December 31, 2005, 8,009,077 share options were granted to the Company's executives and employees at exercise prices ranging from US$0.50 to US$0.80 with a vesting period of four years.
The fair value of each option award is estimated on the date of grant using a lattice–based option valuation model that uses the assumptions and exercise price of the options noted in the following table. Because the Company does not maintain an internal market for its shares, the expected volatility was based on the historical volatilities of comparable publicly traded advertising companies operating in the PRC and in the United States. The Company uses historical data to estimate employee termination within the valuation model. The expected life of options granted is derived from the output of the option valuation model and represents the period of time that options granted are expected to be outstanding. The employees that were granted the share options are expected to exhibit the same behavior. Since the share options once exercised will primarily trade in the U.S. capital market and there was no comparable PRC zero coupon rate, the risk–free rate for

F–165

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

|  | 2004 | |
|---|---|---|
|  | **August** | **December** |
| Expected volatility | 45% | 45% |
| Expected dividends | 0% | 0% |
| Expected life | 5 years | 5 years |
| Risk–free interest rate | 3.36% | 3.71% |
| Exercise price | US$0.36 | US$0.45 |
| Estimated fair value of underlying common shares | US$0.36 | US$0.48 |

|  | 2005 | | | | |
|---|---|---|---|---|---|
|  | **April** | **May** | **August** | **November** | **December** |
| Expected volatility | 45% | 45% | 45% | 45% | 45% |
| Expected dividends | 0% | 0% | 0% | 0% | 0% |
| Expected life | 5 years | 5 years | 5 years | 5 years | 5 years |
| Risk–free interest rate | 3.65% | 3.77% | 4.26% | 4.54% | 4.47% |
| Exercise price | US$0.50 | US$0.55 | US$0.68 | US$0.80 | US$0.80 |
| Estimated fair value of underlying common shares | US$0.66 | US$0.66 | US$0.68 | US$1.65 | US$1.65 |

The estimated fair value of the underlying common shares on the date of grant was determined based on management valuation of the Company's common shares which considered the cash issuance prices for the Series A and Series B redeemable convertible preferred shares paid by groups of unrelated investors (see note 12), the purchase price of the company's equity interests to be paid by an unrelated party (see note 1), the proximity of such transactions to the date of the share option grant and the forecasted profitability and cash flows of the Company. The weighted–average grant–date fair value of options granted during 2004 and 2005 was US$0.13 and US$0.58 per share, respectively. The Company recorded non–cash share–based compensation expense of RMB 1,861 and RMB 6,781 for the years ended December 31, 2004 and 2005, respectively in respect of share options granted in 2004 and 2005, of which RMB 193 and RMB 839 was allocated to costs of revenues, RMB 1,668 and RMB 4,615 was allocated to general and administrative expenses, and nil and RMB 1,327 was allocated to sales and marketing expenses, respectively.

Table of Contents

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

A summary of option activities during 2004 and 2005 is presented below:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of January 1, 2004 | — | — | | |
| Granted | 12,495,344 | US$ 0.37 | | |
| Exercised | — | — | | |
| Forfeited or expired | (399,800) | US$ 0.37 | | |
| Outstanding as of December 31, 2004 | 12,095,544 | US$ 0.37 | 9.7 years | RMB 11,296 |
| Granted | 8,009,077 | US$ 0.73 | | |
| Exercised | — | — | | |
| Forfeited or expired | (708,852) | US$ 0.51 | | |
| Outstanding as of December 31, 2005 | 19,395,769 | US$ 0.52 | 9.1 years | RMB 42,857 |
| Exercisable as of December 31, 2005 | 4,438,645 | US$ 0.52 | 9.1 years | |

The following is additional information relating to options outstanding as of December 31, 2005:

| Options outstanding as of December 31, 2005 | | | Options exercisable as of December 31, 2005 | | |
|---|---|---|---|---|---|
| Number of Shares | Exercise Price Per Share | Remaining Contractual Life | Number of Shares | Exercise Price Per Share | Remaining Contractual Life |
| 10,587,840 | US$ 0.36 | 8.7 | 3,256,312 | US$ 0.36 | 8.7 |
| 1,507,704 | US$ 0.45 | 9.0 | 452,311 | US$ 0.45 | 9.0 |
| 100,000 | US$ 0.55 | 9.5 | 10,000 | US$ 0.55 | 9.5 |
| 963,873 | US$ 0.68 | 9.6 | 96,387 | US$ 0.68 | 9.6 |
| 1,650,000 | US$ 0.68 | 9.6 | 165,000 | US$ 0.68 | 9.6 |
| 777,500 | US$ 0.80 | 9.9 | 77,750 | US$ 0.80 | 9.9 |
| 3,808,852 | US$ 0.80 | 10.0 | 380,885 | US$ 0.80 | 10.0 |
| 19,395,769 | | 9.1 | 4,438,645 | | 9.1 |

As of December 31, 2005, there was RMB 42,617 of total unrecognized compensation cost related to nonvested share options. This cost is expected to be recognized over the next four years. The Company is expected to issue new shares to satisfy share option exercises.

(10)   Income Taxes

The Company, its subsidiary and consolidated VIE file separate income tax returns.

*Cayman Islands* Under the current laws of the Cayman Islands, the Company is not subject to tax on its income or capital gains. In addition, upon any payment of dividends by the Company, no Cayman Islands withholding tax is imposed.

*Peoples' Republic of China* TMM is governed by the income tax law of the PRC concerning foreign investment and foreign enterprises (the "Income Tax Law"). Under the Income Tax Law,

F-167

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

foreign enterprises satisfying certain criteria can enjoy preferential tax treatment. Since TMM has obtained the status of a software enterprise, and is registered and operating in the Shanghai Zhangjiang High Technology Park, it has been granted a reduced income tax rate of 15% and a "tax holiday" for exemption from foreign enterprise income tax for 2 years starting from the calendar year of 2005 and is entitled to a 50% tax reduction for the succeeding 3 years beginning from 2007. In addition, TMM is entitled to exemption from local income tax.

STM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2004. Upon the expiration of the tax holiday, STM will be subject to the PRC enterprise income tax rate of 33%.

Shenyang TM is entitled to a preferential tax treatment of exemption from enterprise income tax for the first and second years of operations starting from the calendar year of 2005. Upon the expiration of the tax holiday, Shenyang TM will be subject to the PRC enterprise income tax rate of 33%. Heng Ding is subject to the PRC enterprise income tax rate of 33%.

Income tax expense attributable to income from operations, which substantially is derived from PRC sources, consists of:

|  | 2004 | 2005 |
|---|---|---|
|  | RMB | RMB |
| Current | 442 | — |
| Deferred | (112) | — |
|  | 330 | — |

Income tax expense attributable to income from operations was RMB 330 and nil for the years ended December 31, 2004 and 2005, respectively, and differed from the amounts computed by applying the statutory PRC enterprise income tax rate of 33% to pre–tax income from operations as a result of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | RMB | RMB |
| Computed expected tax expense | 8,615 | 18,157 |
| Increase (reduction) in income taxes resulting from: |  |  |
| Tax rate differential | 92 | 4,238 |
| Tax holiday | (8,382) | (22,452) |
| Non–deductible items | 5 | 57 |
|  | 330 | — |

F–168

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

|  | December 31, | |
|---|---|---|
|  | **2004** | **2005** |
|  | **RMB** | **RMB** |
| Deferred tax assets: | | |
|    Allowance for doubtful accounts | 112 | 112 |
| Less: valuation allowance | — | — |
| Net deferred tax assets | 112 | 112 |
| Deferred tax liabilities: | | |
|    Intangible assets acquired in a business combination | — | (377) |
| Total deferred liabilities | — | (377) |
| Net deferred tax asset/(liability) | 112 | (265) |

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible or utilized. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon an assessment of the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax assets are deductible or can be utilized, no valuation allowance has been provided as of December 31, 2004 and 2005. The deferred tax assets of RMB 112 as of December 31, 2004 and 2005, represent the tax benefits of deductible temporary differences which are more likely than not to be realized in a non tax holiday year. The amount of the deferred tax assets considered realizable, however, could be reduced in the near term if estimates of future taxable income are reduced.

The PRC tax system is subject to substantial uncertainties and has been subject to recently enacted changes, the interpretation and enforcement of which are also uncertain. There can be no assurance that changes in PRC tax laws or their interpretation or their application will not subject the Group's PRC entities to substantial PRC taxes in the future.

(11)    **Commitments and Contingencies**

The Group has entered into operating lease agreements relating to the placement of flat panel display equipment.

The Group has also entered into operating lease arrangements in connection with the lease of the Group's office premises.

F-169

Table of Contents

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

Future minimum lease payments under non-cancelable operating leases (with initial or remaining lease terms in excess of one year) as of December 31, 2005 are as follows:

|  | Flat Panel Display Equipment | Office Premises |
|---|---|---|
|  | RMB | RMB |
| 2006 | 111,467 | 6,527 |
| 2007 | 87,074 | 3,978 |
| 2008 | 53,161 | 2,177 |
| 2009 | 32,950 | — |
| 2010 | 12,321 | — |
| Thereafter | 18,272 | — |
|  | 315,245 | 12,682 |

Rental expenses incurred under operating leases for placement of flat panel display equipment for the years ended December 31, 2004 and 2005, amounted to RMB 15,210 and RMB 72,942, respectively. Rental expenses incurred under operating leases for office premises for the years ended December 31, 2004 and 2005 amounted to RMB 1,685 and RMB 6,532, respectively.

(12)    Redeemable Convertible Preferred Shares

*(a) Issuance of Series A redeemable convertible preferred shares*

In August 2004, the Company issued 41,641,679 Series A redeemable convertible preferred shares ("Series A Shares") to a group of investors at US$0.360216 per share (the "Series A issue price") for total cash consideration of US$15,000 (RMB 124,148 ). The holders of Series A Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of Series A Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series A Shares at a redemption price equal to 100% of the Series A issue price, plus an additional amount equal to 20% of the Series A issue price compounded annually from the date of issuance to the date of redemption plus all declared but unpaid dividends (the "Series A Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 8,663 and RMB 26,534 for the years ended December 31, 2004 and 2005, respectively. Total direct external incremental costs of issuing the security of RMB 1,833 was charged against the proceeds of the Series A Shares.

The significant terms of the Series A Shares are as follows:

*Conversion*

The holders of Series A Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series A Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public

F–170

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

offering price of at least four times the Series A issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

Each Series A Share is convertible into one common share, subject to a conversion ratio adjustment equal to US$6,900 divided by the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005 (the "Series A Performance Multiplier"). The Series A Performance Multiplier shall be limited to a maximum of 1.6 common shares (that is, one Series A Share converted into 1.6 common shares or 66,626,686 common shares, on a fully converted basis) and a minimum of 0.727273 common shares (that is, one Series A Share converted into 0.727273 common shares or 30,284,869 common shares, on a fully converted basis) and shall be automatically set at 1.6 in the event that the audited US GAAP consolidated net income of the Group for the period from July 1, 2004 to June 30, 2005, is not made available to the holders of Series A Shares before November 15, 2005, for the purpose of determining the Series A Performance Multiplier.

The conversion price of Series A Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series A Share Subscription Agreement at a price per share less than the then prevailing Series A Shares' respective conversion price ("Additional Common Shares"), the Series A Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Common Shares are issued (the "Series A Dilution Adjustment"). Common shares specifically excluded from this provision include common shares issued or issuable upon conversion of Series A Shares, up to 15,274,168 common shares which are issuable or issued under the Company's equity incentive plan, common shares issued in an underwritten public offering, common shares issued in a bona fide acquisition or merger transaction, and common shares issued to third party providers in exchange for services rendered to the Company. The impact of such potential adjustment to the conversion price is contingent upon the issuance of Additional Common Shares at an issuance price less than the conversion price of Series A Shares. No issuance of Additional Common Shares was made during the years ended December 31, 2004 and 2005 which caused the conversion price of Series A Shares to be reduced under this adjustment provision.

The Company has determined that at the date of issuance of the Series A Shares there was no embedded beneficial conversion feature attributable to the Series A Shares, since the initial conversion price of the Series A Shares is equal to the Series A issue price, which was negotiated and agreed between the Company and a group of third party investors on an arm's length basis and, which was determined by management to approximate the fair value of the Company's common shares at the commitment date since there was no existence of a public or active market of the Company's common shares, nor were there any cash transactions involving the Company's common shares that occurred prior to this date. In addition, under the provisions of EITF Issue No. 00–27 *"Application of Issue No. 98–5 to Certain Convertible Instrument"*, the Company has determined that the contingent beneficial conversion feature relating to the conversion ratio adjustment in respect of the Series A Performance Multiplier will be recognized only when the Performance Multiplier is determined and the contingency is resolved and with respect of the Series A Dilution Adjustment, upon the issuance of Additional Common Shares.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

Based on the Group's audited US GAAP consolidated net income for the period from July 1, 2004 to June 30, 2005, the Company has calculated the Series A Performance Multiplier to be 1.196365 which resulted in a conversion ratio of 1.000000 to 1.196365 for Series A Shares. Accordingly, on a fully–converted basis, the Series A Shares will be converted to 49,818,647 common shares under the conversion terms of the Series A Shares. The intrinsic value of the contingent beneficial conversion feature of the Series A Shares of RMB 24,378 was recognized as an addition to paid–in capital with a corresponding charge to net income available to common shareholders on June 30, 2005, the date the contingency period ended and the contingency was resolved. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series A Shares.

In January 2006, the Company entered into an agreement with the Series A shareholders whereby each of the Series A shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series A shares to 1.00000 to 1.05767 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series A Shares. The impact of the adjustment on the Series A conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series A shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series A Share has voting rights equivalent to the number of common shares into which it is convertible.

*Registration rights*

Holders of Series A Shares have registration rights similar to the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggyback registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series A Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate prior to any dividend payments to common shares.

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series A Shares shall receive an amount per share equal to the Series A Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

*(b) Issuance of Series B redeemable convertible preferred shares*

On July 29, 2005, the Company issued 21,820,243 Series B redeemable convertible preferred shares ("Series B Shares") to a group of investors at US$0.687435 per share (the "Series B issue price") for total cash consideration of US$15,000 (RMB 121,620). The holders of Series B Shares have the right to require the Company to redeem the shares at any time after the fifth anniversary of the date of issuance at the option of a majority of the holders of the Series B Shares then outstanding. In the event of a redemption under this right, the Company shall redeem all of the outstanding Series B Shares at a redemption price equal to 100% of the Series B issue price, plus an additional amount equal to 15% of the Series B issue price, compounded annually from the date of issuance to the date of redemption, plus all declared but unpaid dividends (the "Series B Preference Amount"). The accretion to the redemption value is reflected as a reduction to net income to arrive at net income available to common shareholders in the accompanying consolidated statements of operations and amounted to RMB 7,747 for the year ended December 31, 2005. Total direct external incremental costs of issuing the security of RMB 839 were charged against the proceeds of the Series B Shares.

The significant terms of the Series B Shares are as follows:

*Conversion*

The holders of Series B Shares have the right to convert all or any portion of their holdings into common shares of the Company at any time after the date of issuance of such preferred shares. In addition, each Series B Share is automatically convertible into one common share at any time after the date of issuance of such preferred shares, subject to the conversion ratio adjustment as described below, upon the consummation of a Qualified Public Offering. A Qualified Public Offering refers to the closing of an underwritten public offering of the common shares of the Company on a reputable international stock exchange approved by the Company's Board of Directors at a public offering price of at least two times the Series B issue price and with aggregate gross proceeds to the Company (before payment of underwriters' discounts, commissions and offering expenses) in excess of US$50,000.

Each Series B Share is convertible into one common share, where the conversion price is equal to the Series B issue price, except in the event that the initial conversion ratio for the Series A Shares is adjusted for the Series A Performance Multiplier as described in note 12(a), the conversion price for Series B Shares shall immediately be adjusted by multiplying the Series B conversion price

F–173

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

then in effect by a fraction, the numerator of which shall be 152,741,679, and the denominator of which shall be the sum of (i) the number of outstanding common shares, and (ii) the number of outstanding Series A Shares multiplied by the Series A Performance Multiplier (the "Series B Performance Multiplier").

The conversion price of Series B Shares is subject to adjustment for dilution, including but not limited to share splits, share dividends and recapitalization. In addition, in the event that the Company issues additional common shares other than those specifically excluded under the Series B Share Subscription Agreement at a price per share less than the then prevailing Series B Shares' respective conversion price ("Additional Series B Common Shares"), the Series B Shares' respective conversion price shall be reduced, concurrently with such common share issuance, to a price (calculated to the nearest cent) equal to the price per share at which such Additional Series B Common Shares are issued ("Series B Dilution Adjustment"). The impact of the Series B Dilution Adjustment to the conversion price is contingent upon the issuance of Additional Series B Common Shares at an issuance price less than the conversion price of Series B Shares. No issuance of Additional Series B Common Shares was made during the year ended December 31, 2005 which caused the conversion price of Series B Shares to be reduced under this adjustment provision.

As a result of the initial conversion ratio for the Series A Shares being adjusted for the Series A Performance Multiplier described in note 12(a), the Company has calculated the Series B Performance Multiplier to be 0.949186 which resulted in a conversion ratio of 1.000000 to 1.053535 for Series B Shares. Accordingly, on a fully–converted basis, the Series B Shares will be converted into 22,988,390 common shares under the conversion terms of the Series B Shares. The intrinsic value of the contingent beneficial conversion feature of the Series B Shares of RMB 6,508 was recognized as an addition to paid–in capital with a corresponding charge to net income available to common shareholders on July 29, 2005, the date of the issuance of the Series B Shares. The intrinsic value was measured as the difference between the respective commitment–date fair value of the underlying common shares of the Company issuable upon conversion and the gross proceeds received for or allocated to the Series B Shares.

In January 2006, the Company entered into an agreement with the Series B shareholders whereby each of the Series B shareholders agreed to waive any and all rights with respect to the liquidation preference in the event of the Deemed Liquidation Event (as such term is described below). In addition, as discussed in note 12 (a), in January 2006, the Company reached an agreement with the Series A shareholders, to exclude certain expense items, for the purpose of the calculation of the Series A conversion ratio, from the audited US GAAP consolidated net income for the period from July 1, 2004, to June 20, 2005. The effect of excluding such expense items reduced the conversion ratio of the Series B shares to 1.00000 to 1.01572 of the Company's common shares, and accordingly, resulted in a lower intrinsic value of the beneficial conversion feature of the Series B Shares. The impact of the adjustment on the Series B conversion ratio will be recorded as an adjustment to net income (loss) available to common shareholders in the accounting period when such agreement is executed (that is, in the calendar year ending December 31, 2006). All Series B shareholders will convert the preferred shares into common shares prior to the consummation of the Focus Media business combination and become selling shareholders.

*Voting rights*

Each Series B Share has voting rights equivalent to the number of common shares into which it is convertible.

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

*Registration rights*

Holders of Series B Shares have registration rights similar to the holders of Series A Shares and the common shareholders. These registration rights include demand registration, Form F–3 registration and piggyback registration. Such rights allow the holders of at least 50% of shares having registration rights then outstanding to demand the Company at any time after six months following the closing of a Qualified Public Offering to file a registration statement covering the offer and sales of their securities, subject to certain restrictions and conditions. The Company will pay all expenses relating to any demand, Form F–3 or piggy back registrations, except broker's commission, underwriting discounts, selling commissions and stock transfer taxes.

*Dividends*

Holders of Series B Shares shall be entitled to receive dividends out of any funds legally available for this purpose, when and if declared by the Board of Directors of the Company, at the rate or in the amount as the Board of Directors considers appropriate, prior to any dividend payments to common shares.

*Liquidation preference*

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, or any Deemed Liquidation Event, the holders of Series B Shares shall receive an amount per share equal to the Series B Preference Amount, as adjusted for any share splits, share dividends and recapitalization. A Deemed Liquidation Event is defined in the Company's Articles of Association as (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) that results in the transfer of more than fifty percent of the outstanding voting power of the Company such that its existing shareholders do not retain a majority of the voting power in the surviving entity; or (b) a sale of all or substantially all of the assets of the Company; provided, however, that a Deemed Liquidation Event shall not include any reorganization for tax purposes or for purposes of reincorporating in a different jurisdiction.

**(13)   Common Shares**

The Company's Memorandum and Articles of Association, as amended, authorizes the Company to issue 210,000,000 shares with a par value of US$0.0001 per share. In August 2004, the Company issued 111,100,000 common shares at par value in connection with the Reorganization as discussed in note 1. During the years ended December 31, 2004 and 2005, no additional common shares were issued by the Company.

**(14)   Concentration of Risks**

*Credit and concentration risks* The carrying amounts of cash and cash equivalents, time deposits, accounts receivable, amounts due from related parties and other receivables represent the Group's maximum exposure to credit risk in relation to financial assets. As of December 31, 2004 and 2005, substantially all of the Group's cash and cash equivalents were held in major financial institutions located in the PRC and the Hong Kong Special Administrative Region, which management believes have high credit ratings. Accounts receivable are typically unsecured and denominated in RMB, and are derived from revenues generated in the PRC. The Group performs

F–175

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

ongoing credit evaluations of its customers' financial condition and, generally, requires no collateral from its customers.

All of the Group's customers are located in the PRC. The following are the customers that directly or indirectly contributed, on an individual basis, 10% or more of revenue for the year ended December 31, 2004 or for the year ended December 31, 2005:

|  | 2004 | | 2005 | |
|---|---|---|---|---|
|  | RMB | % | RMB | % |
| SAIC–Volkswagen Sales Co., Ltd. | 19,978 | 25% | 30,006 | 11% |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 9,567 | 12% | 19,767 | 7% |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 12% | 14,187 | 5% |

As of December 31, 2004 and 2005, approximately 56% and 15% of the Group's gross accounts receivable were due from the above customers. The accounts receivable due from major customers, as of December 31, 2004 and 2005, were as follows:

|  | 2004 | 2005 |
|---|---|---|
|  | RMB | RMB |
| Red Bull Vitamin Drink Co., Ltd. | 9,946 | 15,926 |
| Shanghai Xintong Media & Cultural Development Co., Ltd. | 8,567 | 2,946 |
| SAIC–Volkswagen Sales Co., Ltd. | 7,276 | — |
|  | 25,789 | 18,872 |

As of January 31, 2006, the Group received subsequent collections of approximately RMB 4,000 from the above customers with respect to outstanding accounts receivable as of December 31, 2005. The Group expects to collect all the remaining outstanding balances from these customers in accordance with the contract terms.

The Group does not have concentrations of available sources of labor, services, franchises, or other rights that could, if suddenly eliminated, severely impact its operations.

*Business and economic risks* The Group operates in a dynamic industry with limited operating history and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: advances and new trends in new technologies and industry standards; competition from other competitors; changes in certain strategic relationships or customer relationships; regulatory or other factors; the ability to obtain necessary financial and other resources at commercially viable terms; dependence on revenues generated from operations in the cities of Shanghai, Beijing, Guangzhou and Shenzhen; the ability to attract and retain employees necessary to support the Group's growth and general risks associated with the advertising industry.

The Group conducts its principal operations in the PRC and, accordingly, is subject to special considerations and significant risks not typically associated with companies operating in the United States and Western Europe. These include risks associated with, among others, the political, economic, legal environment and social uncertainties in the PRC, government agencies' influence over certain aspects of the Group's operations and competition in the advertising industry.

F–176

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

The Group is currently targeting the PRC market. The Chinese government regulates the provision of advertising services through strict business licensing requirements and other governmental regulations. These regulations include limiting foreign ownership in Chinese companies providing advertising services. Management, after consultation and advice from PRC legal counsel, is of the opinion that the Company's business structure and contractual agreements with STM comply with existing PRC laws and regulations. However, there are uncertainties regarding the interpretation and application of current PRC laws and regulations and any change in such laws and regulations that renders these business structure and contractual agreements to be non-compliant could have an adverse effect on the Group's business, financial position and result of operations.

In addition, the ability to negotiate and implement specific business development projects in a timely and favorable manner may be impacted by political considerations unrelated to or beyond the control of the Group. Although the PRC government has been pursuing economic reform policies for the past two decades, no assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered. There is also no guarantee that the PRC government's pursuit of economic reforms will be consistent or effective and as a result, changes in the rate or method of taxation, and changes in State policies and regulations affecting the advertising industry may have a negative impact on the Group's operating results and financial position.

*Currency risk* Substantially all of the revenue generating operations of the Group are transacted in RMB, which is not fully convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted by the People's Bank of China. However, the unification of the exchange rate does not imply convertibility of RMB into United States dollars or other foreign currencies. All foreign exchange transactions must take place either through the People's Bank of China or other institutions authorized to buy and sell foreign exchange or at a swap center. Approval of foreign currency payments by the People's Bank of China or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

On July 21, 2005, the People's Bank of China announced that the PRC government reformed the exchange rate regime by adopting a managed floating exchange rate regime based on market supply and demand with reference to a basket of currencies. The exchange rate of United States dollars against RMB was adjusted to RMB 8.11 per United States dollar with effect from July 21, 2005. This reform did not have a material impact on the Group's financial position or results of operations.

Table of Contents

TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
DECEMBER 31, 2004 AND 2005
(Amounts in thousands, except share data)

**(15)    Related Party Transactions**

The principal related party transactions during the years ended December 31, 2004 and 2005 were as follows:

| | Note | 2004 | 2005 |
|---|---|---|---|
| | | RMB | RMB |
| Provision of advertising services | (a) | 1,511 | — |
| Collection of advertising revenues on behalf of STM | (b) | 4,173 | 2,349 |
| Payments made by a related party on STM's behalf | (b) | 1,073 | 5,399 |
| Loan from a shareholder | (c) | 31,655 | 30,000 |
| Repayment of shareholder loan | (c) | 21,655 | 10,000 |
| Interest expense | (c) | 348 | 79 |
| Lease of office premises | (d) | 540 | 810 |

Amounts due from and due to related parties as of December 31, 2004 and 2005 were as follows:

| | Note | 2004 | 2005 |
|---|---|---|---|
| | | RMB | RMB |
| **Due from related parties:** | | | |
| Huashan Dian Yang Hospital Service Co., Ltd. ("HS DY") | (a) | 1,511 | — |
| Dian Yang | (b) | 3,100 | 50 |
| The Company's Chief Executive Officer ("CEO") | (d) | — | 66 |
| | | 4,611 | 116 |
| **Due to related parties:** | | | |
| Shanghai Investment Information Co., Ltd. ("SII") | (c) | 10,000 | 30,000 |
| The Company's CEO | (d) | 33 | — |
| | | 10,033 | 30,000 |

Notes:

(a)    During 2004, the Group provided advertising services to HS DY, a company in which the Company's CEO has an equity interest. As of December 31, 2004, the balance due from HS DY was RMB 1,511, which was collected in full in August 2005. The Company has not provided any advertising services to HS DY since then.

(b)    Dian Yang, an entity controlled by the Company's CEO and also a 9% shareholder of STM, makes lease payments and collects advertising revenues on STM's behalf until certain unassignable contracts expire. The unassignable contracts associated with advertising contracts have expired at the end of 2005, and the unassignable contracts associated with display placements will expire by the end of 2008, except for three contracts which will expire in 2009, 2010 and 2011 respectively. The balance as of December 31, 2004 and December 31, 2005, represented the amount of revenue collected by Dian Yang on behalf of STM, less payments made by STM on behalf of Dian Yang. The balance is interest free and is settled continuously and periodically.

(c)    SII is a shareholder of the Company and of STM. SII provided a short-term loan of RMB 30,000 to STM in 2004, of which RMB 20,000 was repaid in November 2004 and RMB 10,000 was repaid in January 2005. The balance bore interest at a monthly rate of 0.39825%. The interest expense incurred by STM on this loan was RMB 348 for the year ended December 31, 2004 and RMB 40 for the year ended December 31, 2005.

F-178

Table of Contents

**TARGET MEDIA HOLDINGS LIMITED AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**DECEMBER 31, 2004 AND 2005**
**(Amounts in thousands, except share data)**

In August 2004, SII International Holding Limited, a company wholly–owned by SII, provided a short–term loan of US$200 (equivalent to RMB 1,655) to the Company at a monthly interest rate of 0.02%. The loan was repaid in full in September 2004.

In December 2005, SII provided a short–term loan of RMB 30,000 to STM. The loan bears interest at a monthly rate of 0.3915%. The interest expense incurred by STM on this loan was RMB 39 for the year ended December 31, 2005. This loan is due for full repayment in June 2006.

(d)   The Group leased office premises from the Company's CEO. Rental expense of RMB 540 and RMB 810, which was determined with reference to market price, was charged for the years ended December 31, 2004 and 2005, respectively. The lease agreement with the Company's CEO will expire in 2006. As of December 31, 2005, the amount due from the CEO of RMB 66 related to miscellaneous expense paid by STM on behalf of the CEO.

F–179

## INDEX TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL
### INFORMATION

|  | Page |
|---|---|
| Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information | P–2 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2005 | P–3 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the three months ended March 31, 2006 | P–4 |
| Notes to the Unaudited Pro Forma Condensed Consolidated Financial Information | P–5 |

Table of Contents

## UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION
### (in U.S. dollars)

**Introduction to Unaudited Pro Forma Condensed Consolidated Financial Information**

The following unaudited pro forma condensed consolidated financial information is derived from the historical financial statements of Focus Media Holding Limited, appearing elsewhere in this prospectus, after giving effects to the pro forma adjustments described in the notes thereto. Financial information with respect to the acquisitions are derived from the historical financial statements of Capital Beyond Limited, Infoachieve Limited and Target Media Holdings Limited ("Target Media") appearing elsewhere in this prospectus.

The preparation of the unaudited pro forma condensed consolidated statements of operations appearing below is based on financial statements prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP"). These principles require the use of estimates that affect the reported amounts of revenues and expenses. Actual results could differ from those estimates. The objective of the unaudited pro forma condensed consolidated statements of operations is to provide information on the impact of the acquisitions of Capital Beyond Limited, Infoachieve Limited and Target Media (the "Acquired Businesses"). These Acquired Businesses permitted Focus Media Holding Limited to expand its network including the growth and further segmentation of its commercial location and in-store networks, and the addition of its poster frame advertising network.

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2005 presents adjustments as if the acquisitions of Acquired Businesses had been consummated on January 1, 2005. The unaudited pro forma condensed consolidated statement of operations for the three months ended March 31, 2006 presents adjustments as if the acquisitions of Target Media had been consummated on January 1, 2005.

The following unaudited pro forma condensed consolidated statements of operations should be read in conjunction with the historical consolidated financial statements, unaudited pro forma condensed consolidated statements of operations and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.

The unaudited pro forma condensed consolidated financial information presented in this prospectus includes all the adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the operating results in the historical periods. However, because such adjustments are based on estimates such as the estimated amortization period for the acquired intangible assets for Framedia and Target Media, it is not intended to show how the consolidated companies would have actually performed if the events described above had in fact occurred on the dates assumed or to project the results of operations or financial position for any future date or period. In addition, the financial information of Target Media for the two month period ended February 28, 2006 has not been audited or reviewed by an independent registered public accounting firm but is derived from management accounts. Accordingly, the financial information of Target Media for that period, including the statement of operations relating to Target Media, that has been used to calculate the pro forma financial information as of and for the three month period ended March 31, 2006 may differ significantly from any actual consolidated statement of operations financial information had it been audited or reviewed by an independent registered public accounting firm. See "Risk Factors — The unaudited pro forma condensed consolidated financial information included in this prospectus contains financial information that has not been audited or reviewed by an independent certified public accounting firm, and that is derived in part by estimates, and accordingly the pro forma financial information may differ significantly from the actual consolidated financial information".

P-2

Table of Contents

# UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS
## FOR THE YEAR ENDED DECEMBER 31, 2005
### (In U.S. Dollars, except share data)

| | Focus Media Holding Limited for the year ended December 31, 2005 | Capital Beyond Limited for the three months ended March 31, 2005 | Infoachieve Limited for the year ended December 31, 2005 | Target Media Limited for the year ended December 31, 2005 (a) | Pro forma Adjustments | Note | Pro Forma |
|---|---|---|---|---|---|---|---|
| **Net Revenues:** | | | | | | | |
| — Commercial locations | $ 61,434,760 | $ — | $ — | $ 33,693,000 | $ — | | $ 95,127,760 |
| — In-store network | 5,468,919 | — | — | — | — | | 5,468,919 |
| — Poster Frame Network | — | — | 11,828,519 | — | — | | 11,828,519 |
| Advertising Service Revenue | 66,903,679 | — | 11,828,519 | 33,693,000 | — | | 112,425,198 |
| Advertising Equipment Revenue | 1,325,234 | — | — | — | — | | 1,325,234 |
| Total net revenues | 68,228,913 | — | 11,828,519 | 33,693,000 | — | | 113,750,432 |
| **Cost of Revenues:** | | | | | | | |
| — Commercial locations | 17,943,318 | 122,038 | — | 16,321,000 | (55,934) | (4) | 34,330,422 |
| — In-store network | 7,422,641 | — | — | — | — | | 7,422,641 |
| — Poster Frame Network | — | — | 7,233,043 | — | — | | 7,233,043 |
| Advertising Service Cost | 25,365,959 | 122,038 | 7,233,043 | 16,321,000 | (55,934) | | 48,986,106 |
| Advertising Equipment Cost | 975,747 | — | — | — | — | | 975,747 |
| Total cost of revenues | 26,341,706 | 122,038 | 7,233,043 | 16,321,000 | (55,934) | | 49,961,853 |
| Gross profit (loss) | 41,887,207 | (122,038) | 4,595,476 | 17,372,000 | 55,934 | | 63,788,579 |
| **Operating expenses:** | | | | | | | |
| General and administrative | 9,119,846 | 607 | 5,428,018 | 1,945,000 | (307,672) | (4) | 16,185,799 |
| Selling and marketing | 9,543,748 | — | 3,363,704 | 8,584,000 | (88,468) | (4) | 21,402,984 |
| Amortization of acquired intangibles | 437,837 | — | — | — | 4,201,715 | (1) | 4,639,552 |
| Total operating expenses | 19,101,431 | 607 | 8,791,722 | 10,529,000 | 3,805,575 | | 42,228,335 |
| Income (loss) from operations | 22,785,776 | (122,645) | (4,196,246) | 6,843,000 | (3,749,641) | | 21,560,244 |
| Interest income/(expenses) | 1,761,909 | 48 | (170,557) | 68,000 | — | | 1,659,400 |
| Other income (expenses), net | (161,148) | (29) | (3,857) | (94,000) | — | | (259,034) |
| Income (loss) before income taxes and minority interests | 24,386,537 | (122,626) | (4,370,660) | 6,817,000 | (3,749,641) | | 22,960,610 |
| **Income taxes:** | | | | | | | |
| Current | 715,117 | — | 1,941 | — | — | | 717,058 |
| Deferred | (20,664) | — | — | — | — | | (20,664) |
| Total income taxes | 694,453 | — | 1,941 | — | — | (6) | 696,394 |
| Net income (loss) after income taxes before minority interests | 23,692,084 | (122,626) | (4,372,601) | 6,817,000 | (3,749,641) | | 22,264,216 |
| Minority interests | 144,433 | — | — | (22,000) | — | | 122,433 |
| Net income (loss) | 23,547,651 | (122,626) | (4,372,601) | 6,839,000 | (3,749,641) | | 22,141,783 |
| Deemed dividend on ordinary shares | — | — | (15,187,200) | — | — | | (15,187,200) |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Redesignation | — | — | (1,136,700) | — | 1,136,700 | (3) | — |
| Deemed dividend on Series A–1 convertible redeemable preference shares — Accretion of redemption premium | — | — | (378,985) | — | 378,985 | (3) | — |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Redesignation | — | — | (623,700) | — | 623,700 | (3) | — |
| Deemed dividend on Series A–2 convertible redeemable preference shares — Accretion of redemption premium | — | — | (207,820) | — | 207,820 | (3) | — |
| Accretion to Series A redeemable convertible preferred shares redemption value | — | — | (3,288,000) | — | 3,288,000 | (3) | — |
| Accretion to Series B redeemable convertible preferred shares redemption value | — | — | (960,000) | — | 960,000 | (3) | — |
| Beneficial conversion of Series A redeemable convertible preferred shares | — | — | (3,021,000) | — | — | | (3,021,000) |
| Beneficial conversion of Series B redeemable convertible preferred shares | — | — | (806,000) | — | — | | (806,000) |
| Net income (loss) attributable to holders of ordinary shares | $ 23,547,651 | $ (122,626) | $ (21,907,006) | $ (1,236,000) | $ 2,845,564 | | $ 3,127,583 |
| Income per share — basic | $ 0.09 | | | | | | $ 0.01 |
| Shares used in calculating basic income per share | 252,128,545 | | | | | (5) | 351,285,548 |
| Income per share — diluted | $ 0.06 | | | | | | $ 0.01 |
| Shares used in calculating diluted income per share | 365,938,094 | | | | | (5) | 465,095,097 |

Note(a) The translations of amounts from RMB into United States dollars ("US$") as of and for the year ended December 31, 2005, are solely for the convenience of the reader and were calculated at the rate of US$1.00 = RMB8.0702, on December 31, 2005, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2005, or at any other rate.

The accompanying notes are an integral part of these unaudited pro forma
condensed consolidated financial statements.

P–3

Table of Contents

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED**
**STATEMENT OF OPERATIONS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2006**
(In U.S. Dollars, except share data)

| | Focus Media Holding Limited for the three months ended March 31, 2006 | Target Media Limited for the two months ended February 28, 2006 (b) | Pro forma Adjustments | Note | Pro Forma |
|---|---|---|---|---|---|
| **Net Revenues:** | | | | | |
| — Commercial locations | $ 21,472,376 | $ 3,068,289 | $ — | | $ 24,540,665 |
| — In-store network | 5,293,091 | | — | | 5,293,091 |
| — Poster Frame Network | 6,067,314 | | — | | 6,067,314 |
| Advertising Service Revenue | 32,832,781 | 3,068,289 | — | | 35,901,070 |
| Advertising Equipment Revenue | 304,066 | | — | | 304,066 |
| **Total net revenues** | 33,136,847 | 3,068,289 | — | | 36,205,136 |
| **Cost of Revenues:** | | | | | |
| — Commercial locations | 8,035,150 | 3,792,503 | — | | 11,827,653 |
| — In-store network | 3,973,244 | | — | | 3,973,244 |
| — Poster Frame Network | 2,397,268 | | — | | 2,397,268 |
| Advertising Service Cost | 14,405,662 | 3,792,503 | — | | 18,198,165 |
| Advertising Equipment Cost | 231,814 | | — | | 231,814 |
| **Total cost of revenues** | 14,637,476 | 3,792,503 | — | | 18,429,979 |
| **Gross profit (loss)** | 18,499,371 | (724,214) | — | | 17,775,157 |
| **Operating expenses:** | | | | | |
| General and administrative | 4,395,342 | 2,541,194 | — | | 6,936,536 |
| Selling and marketing | 4,057,199 | 3,114,507 | — | | 7,171,706 |
| Amortization of acquired intangibles | 999,178 | | 205,350 | (2) | 1,204,528 |
| **Total operating expenses** | 9,451,719 | 5,655,701 | 205,350 | | 15,312,770 |
| **Income (loss) from operations** | 9,047,652 | (6,379,915) | (205,350) | | 2,462,387 |
| Interest income/(expenses) | 915,952 | (23,177) | — | | 892,775 |
| Other income (expenses), net | 46,149 | (1,755,019) | — | | (1,708,870) |
| **Income (loss) before income taxes and minority interests** | 10,009,753 | (8,158,111) | (205,350) | | 1,646,292 |
| **Income taxes:** | | | | | |
| Current | 65,076 | (59,402) | — | | 5,674 |
| Deferred | 551,714 | | — | | 551,714 |
| Total income taxes | 616,790 | (59,402) | — | (6) | 557,388 |
| **Net income (loss) after income taxes before minority interests** | 9,392,963 | (8,098,709) | (205,350) | | 1,088,904 |
| Minority interests | (39,806) | (30,588) | — | | (70,394) |
| **Net income (loss) attributable to holders of ordinary shares** | $ 9,432,769 | $ (8,069,121) | $ (205,350) | | $ 1,159,298 |
| Income per share — basic | $ 0.02 | | | | $ 0.00 |
| Shares used in calculating basic income per share | 438,232,094 | | | (5) | 488,709,872 |
| Income per share — diluted | $ 0.02 | | | | $ 0.00 |
| Shares used in calculating diluted income per share | 465,895,318 | | | (5) | 516,373,096 |

Note(b) Translations of amounts from Renminbi ("RMB") into United States dollars ("US$") are solely for the convenience of the reader and were calculated at the rate of US$1.00=RMB8.0415. on February 28, 2006, representing the noon buying rate in the City of New York for cable transfers of RMB, as certified for customs purposes by the Federal Reserve Bank of New York. No representation is intended to imply that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on February 28, 2006, or at any other date.

The accompanying notes are an integral part of these unaudited pro forma
condensed consolidated financial statements.

P–4

Table of Contents

## NOTES TO THE UNAUDITED PRO FORMA CONDENSED
### CONSOLIDATED FINANCIAL INFORMATION

The following pro forma adjustment has been made to the unaudited pro forma condensed consolidated financial information.

(1) Reflects amortization for the acquired intangible assets recorded as a result of our acquisitions of Capital Beyond Limited in March 2005, Infoachieve Limited in January 2006 and Target Media in February 2006 to reflect amortization for the year ended December 31, 2005.

The aggregate purchase price of $94.3 million of Infoachieve Limited is comprised of the following:

|  |  | (in thousands of U.S. dollars) |
|---|---|---|
| Cash consideration | $ | 39,600 |
| Other acquisition costs |  | 311 |
| Fair Value of ordinary shares issued |  | 54,418 |
|  | $ | 94,329 |

The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price for a reasonable period before and after the date of the announcement of the acquisition.

Preliminary purchase price allocation:

|  |  | (in thousands of U.S. dollars) | Amortization period |
|---|---|---|---|
| Net tangible liabilities acquired |  | 5,684 |  |
| Acquired intangible assets |  | 12,455 | 7 years |
| Goodwill |  | 87,558 |  |
| Total | $ | 94,329 |  |

The preliminary purchase price allocation and preliminary intangible asset valuations for each of the acquisitions described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of shares approach. We have incorporated certain assumptions which include projected cash flows and replacement costs.

The amortization expense for Infoachieve Limited and Target Media of $2,879,074 and $1,211,073, respectively, for the year ended December 31, 2005 have been estimated based on a valuation report provided by a third-party valuation firm.

(2) Reflects amortization for the intangible assets recorded as a result of our acquisition of Target Media which occurred on February 28, 2006 to reflect amortization from January 1, 2006 to February 28, 2006.

The aggregate purchase price of $327.1 million of Target Media is comprised of the following:

|  |  | (in thousands of U.S. dollars) |
|---|---|---|
| Cash consideration | $ | 94,000 |
| Other acquisition costs |  | 2,058 |
| Fair Value of ordinary shares issued |  | 231,000 |
|  | $ | 327,058 |

P–5

Table of Contents

## NOTES TO THE UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION — (Continued)

The cash portion of the purchase price will be paid in three installments. The first installment of $45 million was paid at closing. The second installment is to be paid on April 28, 2006. The final installment of $24 million is to be paid on July 31, 2006. The fair value of the ordinary shares issued for purchase price allocation purposes was estimated using the closing market price before and after the date of the announcement of the acquisition.

|  | (in thousands of U.S. dollars) | Amortization period |
|---|---|---|
| Net tangible assets acquired | 24,823 | |
| Acquired intangible assets | 10,827 | 7 years |
| Goodwill | 291,408 | |
| Total | $ 327,058 | |

The preliminary purchase price allocation and preliminary intangible asset valuations for each of the acquisitions described above were based on a valuation report provided by a third party valuation firm. The valuation report utilizes and considers generally accepted valuation methodologies such as the income, market, cost and actual transaction of Group shares approach. The Group has incorporated certain assumptions which include projected cash flows and replacement costs.

The amortization expense for Target Media of $205,350, for the period ended March 31, 2006 have been estimated based on a valuation report provided by a third party valuation firm.

(3) Assumes the conversion upon completion of the acquisitions of all convertible redeemable convertible preference shares of Infoachieve Limited and Target Media. Accordingly, the deemed dividends and redemption value accretion relating to these shares have been reversed.

(4) Reflects the adjustment relating to the conformity in accounting policy of Target Media for employee stock options from FAS 123(R) to APB 25 which is the accounting policy adopted by Focus Media Holding Limited.

(5) The following table sets forth the shares used in computing pro forma per share amounts for the periods indicated:

|  | December 31, 2005 | March 31, 2006 |
|---|---|---|
| Shares used in calculating basic income per share on a pro forma basis: | | |
| Weighted average ordinary shares outstanding used in computing basic income per share for | | |
| Focus Media Holding Limited | 252,128,545 | 438,232,094 |
| Issuance of ordinary shares for the acquisition of Infoachieve Limited | 22,157,003 | |
| Issuance of ordinary shares for the acquisition of Target Media | 77,000,000 | 50,477,778 |
|  | 351,285,548 | 488,709,872 |

F-6

Table of Contents

### NOTES TO THE UNAUDITED PRO FORMA CONDENSED
#### CONSOLIDATED FINANCIAL INFORMATION — (Continued)

|  | December 31, 2005 | March 31, 2006 |
|---|---|---|
| Shares used in calculating diluted income per share on a pro forma basis: |  |  |
| Weighted average ordinary shares outstanding used in computing diluted income per share for Focus Media Holding Limited | 365,938,094 | 465,895,318 |
| Issuance of ordinary shares for the acquisition of Infoachieve Limited | 22,157,003 | — |
| Issuance of ordinary shares for the acquisition of Target Media | 77,000,000 | 50,477,778 |
|  | 465,095,097 | 516,373,096 |

(6) There have been no pro forma tax adjustments recorded because none of the pro forma adjustments discussed above has any tax impact.

P–7

No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this prospectus. You must not rely on any unauthorized information or representations. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date.

TABLE OF CONTENTS

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 18 |
| Forward–Looking Statements | 46 |
| Our Corporate Structure | 48 |
| Use of Proceeds | 52 |
| Dividend Policy | 54 |
| Market Price Information for Our ADSs | 55 |
| Capitalization | 56 |
| Exchange Rates | 57 |
| Selected Consolidated Financial and Operating Data | 58 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 63 |
| Our Industry | 95 |
| Business | 99 |
| Our Recent Significant Acquisitions | 116 |
| Regulation of Our Industry | 120 |
| Management | 126 |
| Principal and Selling Shareholders | 135 |
| Related Party Transactions | 141 |
| Description of Share Capital | 149 |
| Description of American Depositary Shares | 160 |
| Shares Eligible for Future Sale | 170 |
| Taxation | 173 |
| Underwriting | 178 |
| Enforcement of Civil Liabilities | 184 |
| Legal Matters | 185 |
| Experts | 185 |
| Where You Can Find Additional Information | 186 |
| Index to Consolidated Financial Statements | F–1 |
| Index to Financial Statements | P–1 |
| EX–23.1 CONSENT OF DELOITTE TOUCHE TOHMATSU | |
| EX–23.5 CONSENT OF KPMG | |

# Focus Media Holding Limited

5,500,000
American Depositary Shares
Representing
55,000,000 Ordinary Shares



**Credit Suisse**
**Goldman Sachs (Asia) L.L.C.**
Representatives of the Underwriters

**Merrill Lynch & Co.**
**Citigroup**

**Lehman Brothers**
**Piper Jaffray**

Table of Contents

PART II
Information not required in prospectus

Item 6.    *Indemnification of directors and officers*

The registrant's amended and restated memorandum and articles of association provide that, subject to the Companies Law, every director or other officer of the registrant shall be indemnified out of the assets of the registrant against any liability incurred by him or her in defending any proceedings, whether civil or criminal, which relate to anything done or omitted or alleged to have been done or omitted by him or her as a director or officer of the registrant and in which judgment is given in his or her favor, or in which he or she is acquitted, or in connection with any application in which relief is granted to him or her by the court pursuant to the Companies Law from liability for negligence, default, breach of duty or breach of trust in relation to the affairs of the registrant.

Item 7.    *Recent sales of unregistered securities*

During the past three years, the registrant has issued and sold the securities listed below without registering the securities under Securities Act of 1933, as amended (the "Securities Act"). None of these transactions involved any underwriters' underwriting discounts or commissions, or any public offering. The registrant believes that each of the following issuances was exempt from registration under the Securities Act in reliance on Regulation D, Regulation S or Rule 701 under the Securities Act or pursuant to Section 4(2) of the Securities Act regarding transactions not involving a public offering.

(a) In April 2003, we issued: (i) 7,000 ordinary shares, par value US$0.01 per share, to JJ Media Investment Holding Ltd., a company controlled by Jason Nanchun Jiang, our chairman and chief executive officer, (ii) 250 ordinary shares to Yibing Zhou, (iii) 2,250 ordinary shares to China Alliance Investment Ltd., or China Alliance, and (iv) 500 ordinary shares to SB China Holdings Pte. Ltd., an affiliate of SOFTBANK Corp. that we refer to as Softbank.

(b) In May 2003, we executed a 100 to 1 share split of our ordinary shares.

(c) In February 2004, China Alliance entered into sale and purchase agreements with Softbank, Shanghai Venture Capital (HK) Co., Ltd., or SVC, Multimedia, and UCI, pursuant to which China Alliance transferred 20,000 ordinary shares to Softbank, 50,000 ordinary shares to SVC, 25,000 ordinary shares to Multimedia and 50,000 ordinary shares to UCI.

(d) In March 2004, Jason Nanchun Jiang, through JJ Media, Yibing Zhou and Softbank transferred 30,000, 7,000 and 14,000 shares, respectively, to UCI.

(e) In March 2004, each of China Alliance, Softbank, SVC, Multimedia and UCI, or collectively the Series A shareholders, entered into a shareholders agreement with us pursuant to which each Series A shareholder exchanged its ordinary shares for an equal number of Series A convertible redeemable preference shares.

(f) In April 2004, we entered into a sale and purchase agreement with the Series B investors, which consisted of CDH, International Network Capital Global, Venture TDF Technology Fund III L.P., or Venture TDF, Milestone Digital Media Holding Ltd., or Milestone, Draper Fisher Jurvetson ePlanet, Elite Select Group Ltd., or Elite Select, Farmac Holdings Ltd., or Farmac, and Powerful Team with their transferees, pursuant to which we issued 260,417 Series B convertible redeemable preference shares convertible into ordinary shares to the Series B investors at a price of $48 per preference share.

(g) In April 2004, China Alliance and SVC transferred a total of 66,014 Series A convertible redeemable preference shares to Pacific Advance Capital, and UCI at a price of $40 per share.

II-1

Table of Contents

(h) In April 2004, Softbank, Multimedia and Pacific Advance Capital transferred a total of 85,380 Series A convertible redeemable preference shares to Draper Fisher Juvetson ePlanet, CMF Technology Fund, or CMF, and Snow Hill, in each case at a price of $48 per share.

(i) In September 2004, we issued 72,291 ordinary shares to Victory Venture Capital Limited as partial consideration for our acquisition of Perfect Media.

(j) In November 2004, we, UCI, Milestone and China Alliance entered into a sale and purchase agreement with the Series C investors, which consisted of CS Focus Holding Limited, 3i Group, XTBUCI China Ventures I Limited and Max Wealth Enterprises Limited, pursuant to which we issued a total of 291,886 Series C convertible redeemable preference shares to the Series C investors at a price of $103 per preference share.

(k) In December 2004, Jason Nanzhun Jiang sold 48,648 ordinary shares to Capital Investment Private Equity at a price of $103 per ordinary share, which shares were simultaneously exchanged for Series C preference shares. At the same time, Yibing Zhou and Victory Venture sold a total of 42,324 ordinary shares to UCI, Smart Create Group Ltd., East Concord Ltd., Meridian Pacific Angel Capital Co., Ltd., Li Lai Holding Ltd., Elufar Ltd. and Tong An Investment Co. Ltd. at a price of $103 per share.

(l) In May 2005, we executed a 200 to 1 share split of our ordinary shares and each series of our convertible redeemable preference shares.

(m) On January 3, 2006, we issued an aggregate of 22,157,003 of our ordinary shares to Total Team Investments Limited, in connection with our acquisition of Infoachieve.

(n) On February 28, 2006, we issued an aggregate of 77,000,000 of our ordinary shares to the former shareholders of Target Media, in connection with our acquisition of Target Media.

Item 8.   *Exhibits and financial statement schedules*

(a) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement. |
| 3.1 | Amended and Restated Memorandum and Articles of Association of Focus Media Holding Limited. |
| 3.1† | Specimen Ordinary Share Certificate. |
| 4.1† | |
| 4.2† | Amended and Restated Shareholders Agreement of Focus Media Holding Limited, dated December 2, 2004, among Focus Media Holding Limited, its subsidiaries, its ordinary shareholders, its preferred shareholders and the investors named therein. |
| 4.3† | Deposit Agreement dated July 18, 2005 among the Registrant, Citibank, N.A. and holders of the American Depositary Receipts (Incorporated by reference to the registration statement on Form F-6 (File No. 333-126011) filed with the Securities and Exchange Commission with respect to American Depositary Shares representing ordinary shares). |
| 5.1* | Form of opinion of Conyers, Dill & Pearman, Cayman Islands special counsel to the registrant, regarding the validity of the ordinary shares being registered. |

II-2

| Exhibit Number | Description |
|---|---|
| 5.2* | Form of opinion of Global Law Office, counsel as to PRC law to the registrant, regarding the validity of (i) the corporate structure of Focus Media Technology (Shanghai) Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. and contractual arrangements among Focus Media Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisement Co., Ltd. and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu, (ii) the corporate structure of Framedia Investment and Shanghai Framedia Advertisement Development Co., Ltd. and contractual arrangements among Framedia Investment and Shanghai Framedia Advertisement Development Co., Ltd. and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu and (iii) the corporate structure of Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd., Beijing Focus Media Wireless Technology Co., Ltd., Jason Nanchun Jiang and Jimmy Wei Yu. |
| 8.1* | Form of opinion of Conyers, Dill & Pearman, special Cayman Islands tax counsel to the registrant, regarding tax matters. |
| 8.2* | Form of opinion of Simpson Thacher & Bartlett LLP regarding United States federal taxation matters. |
| 10.1† | Rules of the 2003 Employee Share Option Scheme and form of grant letter. |
| 10.2† | Technology License and Service Agreement, dated March 28, 2005, by and among Focus Media Digital Information Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisements Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.3† | Business Cooperation Agreement, dated March 28, 2005, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.4† | Equity Pledge Agreement, dated March 28, 2005, by and among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.5† | Call Option Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.6† | Shareholders' Voting Rights Proxy Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.7† | Trust Agreement, dated March 28, 2005, by and between Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.8† | Trademark License Agreement, dated March 28, 2005, by and among Focus Media Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisement Co., Ltd. and its subsidiaries. |
| 10.9† | Loan Agreement, dated June 10, 2003, among Focus Media Holding Limited, Jason Nanchun Jiang, Jimmy Wei Yu, Yuanzhe Fu, Yibing Zhou and Yiqing Hou. |
| 10.10† | Loan Agreement, dated March 28, 2005, by and between Jason Nanchun Jiang and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.11† | Loan Agreement, dated March 28, 2005, by and among Jimmy Wei Yu, Focus Media Technology (Shanghai) Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. |
| 10.12† | Form of Employment Agreement of Focus Media Technology (Shanghai) Co., Ltd. |
| 10.13† | Manager Non-Competition Agreement entered into by Focus Media Holding Limited and Jason Nanchun Jiang on November 29, 2004. |

II-3

| Exhibit Number | Description |
|---|---|
| 10.14[†] | Technology Transfer Agreement entered into by Jimmy Wei Yu and Focus Media Digital Information (Shanghai) Co., Ltd., dated November 1, 2004. |
| 10.15[†] | Asset and Business Acquisition Agreement between Shanghai Everease Communication Company and Shanghai Focus Media Advertisement Co., Ltd. dated July 1, 2003. |
| 10.16[†] | Everease Non-competition Agreement between Focus Media Holding Limited and Shanghai Everease Communication Company, dated as of November 2004. |
| 10.17[†] | Sales Contract between Shanghai Everease Communication Company and Shanghai Focus Media Advertisement Co., Ltd., dated May 2003. |
| 10.18[†] | Project Cooperation Framework Agreement between Shanghai Everease Communication Company and Beijing Suodi Advertising Co., Ltd., dated February, April and June 2003. |
| 10.19[†] | Transfer Agreement on Project Cooperation Framework Agreement between Shanghai Focus Media Advertisement Co., Ltd. and Beijing Suodi Advertising Co., Ltd., dated August 28, 2003. |
| 10.20[†] | Business Agency Agreement between Shanghai On-Target Advertising Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. |
| 10.21[†] | Agreement between Shanghai On-Target Advertising Co., Ltd., Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Union Enterprise Holding Co., Ltd. and Shenlong Lin, dated October 15, 2003. |
| 10.22[†] | Acknowledgement Letter entered into as of March 28, 2005 by and among Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.23[†] | Share Option Plan 2005. |
| 10.24[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.25[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.26[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.27[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.28[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.29[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.30[††] | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.31[††] | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.32[††] | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.33†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.34†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.35†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.36†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.37†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.38†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.39†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.40†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.41†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.42†† | Equity Pledge Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.43†† | Call Option Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.44†† | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.45†† | Equity Pledge Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.46†† | Call Option Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.47†† | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |

| Exhibit Number | Description |
|---|---|
| 10.48<sup>††</sup> | Share Purchase Agreement, dated October 15, 2005, as amended and supplemented, among Focus Media Holding Limited, Infoachieve Limited, Total Team Investments Limited and the other Infoachieve parties named therein. |
| 10.49<sup>††</sup> | Share Purchase Agreement, dated as of January 7, 2006, among Focus Media Holding Limited, Target Media Holdings Limited and Its Shareholders. |
| 10.50<sup>††</sup> | Asset Transfer Agreement, dated December 31, 2005, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.51* | Share Purchase Agreement, dated March 7, 2006, by and among Focus Media Holding Limited and Dotad Wireless Holdings Co., Ltd. |
| 10.52* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.53* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.54* | Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.55* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.56* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.57* | Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.58* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.59* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.60* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.61* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.62* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.63* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.64* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |
| 10.65* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |

II–6

| Exhibit Number | Description |
|---|---|
| 10.66* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |
| 10.67* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.68* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.69* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.70* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.71* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.72* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.73* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.74* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.75* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.76* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.77* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.78* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.79* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.80* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.81* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.82* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.83* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.84* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.85* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |
| 10.86* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |
| 10.87* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |

| Exhibit Number | Description |
|---|---|
| 10.88* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.89* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.90* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.91* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.92* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.93* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.94* | Cooperation Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co. Ltd. and its local advertising subsidiaries named therein and Shanghai New Focus Media Advertisement Co. Ltd. |
| 10.95* | Technology Transfer Agreement, dated as of May 22, 2006, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.96* | Advertisement Dissemination Agreement, dated May 22, 2006, by and between Shanghai Focus Media Advertising Agency Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 21.1* | List of Subsidiaries. |
| 23.1 | Consent of Deloitte Touche Tohmatsu Certified Public Accountants Ltd. |
| 23.2* | Consent of Global Law Office (included in Exhibit 5.2). |
| 23.3* | Consent of Conyers, Dill & Pearman (included in Exhibits 5.1 and 8.1). |
| 23.4* | Consent of Simpson Thacher & Bartlett LLP (included in Exhibit 8.2). |
| 23.5 | Consent of KPMG |
| 24.1* | Powers of Attorney (included in signature pages in Part II of this Registration Statement). |

---

\*    Previously filed with this registration statement on Form F–1 (File No. 333–134714).

†    Previously filed with the Registrant's registration statement on Form F–1 (File No. 333–125785).

††   Previously filed with the Registrant's registration statement on Form F–1 (File No. 333–131065).
(b)  *Financial statement schedules*
     Schedule 1 — Financial Information of Parent Company.
These financial statements have been prepared in conformity with accounting principles generally accepted in the United States.

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
**Financial information of parent company**
**Balance Sheets**

| | December 31 | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| | (in U.S. dollars) | | |
| **Assets** | | | |
| Prepaid and other receivables | $ — | $ — | $ 121,482 |
| Amounts due from subsidiaries | 500,000 | 25,072,466 | 94,813,430 |
| Investments in subsidiaries and affiliates | 683,062 | 13,630,141 | 80,677,544 |
| **Total assets** | $ 1,183,062 | $ 38,702,607 | $ 175,612,456 |
| **Liabilities, mezzanine equity and shareholders' equity (deficiency)** | | | |
| **Current liabilities:** | | | |
| Other payable | — | $ 1,178,623 | $ 397,877 |
| **Total current liabilities** | $ — | $ 1,178,623 | $ 397,877 |
| **Mezzanine equity** | | | |
| Series A convertible redeemable preference shares ($0.00005 par value; 41,967,400 shares authorized and nil, 41,967,400 and nil shares issued and outstanding in 2003, 2004 and 2005, respectively) | $ — | 6,295,110 | $ — |
| Series B convertible redeemable preference shares ($0.00005 par value; 48,191,600 shares authorized and nil, 48,191,600 and nil shares issued and outstanding in 2003, 2004 and 2005, respectively) | — | 12,062,696 | — |
| Series C-1 convertible redeemable preference shares ($0.00005 par value; 34,054,000 shares authorized and nil, 34,054,000 and nil shares issued and outstanding in 2003, 2004 and 2005, respectively) | — | 17,500,350 | — |
| Series C-2 convertible redeemable preference shares ($0.00005 par value; 34,053,400 shares authorized and nil, 34,053,400 and nil shares issued and outstanding in 2003, 2004 and 2005, respectively) | — | 17,415,000 | — |
| **Shareholders' equity (deficiency)** | | | |
| Ordinary shares ($0.00005 par value; 1,000,000,000, 885,516,600 and 19,800,000,000 shares authorized in 2003, 2004 and 2005; 200,000,000, 142,464,600 and 378,306,000 shares issued and outstanding in 2003, 2004 and 2005, respectively) | 10,000 | 7,124 | 18,916 |
| Additional paid-in capital | 1,188,817 | 5,981,154 | 177,419,761 |
| Deferred share based compensation | | (969,959) | (246,569) |
| Retained earnings (accumulated deficit) | 26,000 | (20,726,385) | (4,374,275) |
| Accumulated other comprehensive loss | (41,755) | (41,106) | 2,396,746 |
| **Total shareholders' equity (deficiency)** | $ 1,183,062 | $ (15,749,172) | $ 175,214,579 |
| **Total liabilities and shareholders' equity (deficiency)** | $ 1,183,062 | $ 38,702,607 | $ 175,612,456 |

II-9

Table of Contents

**Financial information of parent company**
**Statements of Operations**

| | For the year ended December 31 | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| | | (in U.S. dollars) | |
| Operating expenses: | | | |
| General and administrative (including share-based compensation of $461,183 and $683,186 in 2004 and 2005) | $ — | $ 461,183 | $ 1,300,511 |
| Selling and marketing | — | 27,528 | 43,317 |
| Goodwill impairment loss | — | 58,397 | — |
| Total operating expenses | — | 547,108 | 1,343,828 |
| Loss from operations | — | 547,108 | 1,343,828 |
| Other income (expense), net | — | — | (7,339) |
| Equity in earnings of subsidiaries and equity affiliates | 25,483 | 2,436,176 | 17,703,277 |
| Change in fair value of derivative liability associated with Series B convertible redeemable preference shares | — | (11,692,287) | — |
| Income before income taxes | 25,483 | (9,803,219) | 16,352,110 |
| Income tax expenses | — | — | — |
| Net income (loss) | 25,483 | (9,803,219) | 16,352,110 |
| Deemed dividend on Series A convertible redeemable preference shares | — | (8,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | (2,191,442) | — |
| Deemed dividend on Series C-1 convertible redeemable preference shares | — | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | — | 12,906,774 | — |
| Income (loss) attributable to holders of ordinary shares | $ 25,483 | $ (20,752,385) | $ 16,352,110 |

II-10

Table of Contents

## FOCUS MEDIA HOLDING LIMITED
### Financial information of parent company
### Statements of Shareholders' Equity (Deficiency) and Comprehensive Loss

| | Ordinary | | Additional paid-in capital | Deferred share based compensation | Retained earning (accumulate deficit) | Accumulated other comprehensive income (loss) | Total shareholders' equity (deficiency) | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|---|
| | Share | Amount | | | | | | |
| | | | | (in U.S. dollars, except share data) | | | | |
| Balance at January 1, 2003 | — | — | $ 125,000 | $ — | $ 517 | $ (4,183) | $ 121,334 | $ — |
| Issuance of ordinary shares | 200,000,000 | $ 10,000 | 1,615,000 | — | — | — | 1,625,000 | — |
| Capital distribution relating to Everease | — | — | (551,183) | — | — | — | (551,183) | — |
| Cumulative translation adjustment | — | — | — | — | — | (37,572) | (37,572) | $ (37,572) |
| Net income | — | — | — | — | 25,483 | — | 25,483 | 25,483 |
| **Balance at December 31, 2003** | 200,000,000 | $ 10,000 | $ 1,188,817 | $ — | $ 26,000 | $ (41,755) | $ 1,183,062 | $ (12,089) |
| Issuance of ordinary shares | 14,594,200 | 730 | 4,484,068 | — | — | — | 4,484,798 | — |
| Reclassification of ordinary shares to Series A convertible redeemable preference shares | (62,400,000) | (3,120) | (1,048,469) | — | — | — | (1,051,589) | — |
| Reclassification of ordinary shares to Series C-1 convertible redeemable preference shares | (9,729,600) | (486) | (101,932) | — | — | — | (102,418) | — |
| Deferred share based compensation | — | — | 1,334,835 | (1,334,835) | — | — | — | — |
| Amortization of deferred share based compensation | — | — | 123,835 | 364,876 | — | — | 488,711 | — |
| Deemed dividend on Series A convertible redeemable preference shares | — | — | — | — | (6,308,411) | — | (6,308,411) | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | — | — | — | (2,191,442) | — | (2,191,442) | — |
| Deemed dividend on Series C-1 convertible redeemable preference shares | — | — | — | — | (13,356,087) | — | (13,356,087) | — |
| Premium of Series B convertible redeemable preference shares | — | — | — | — | 12,906,774 | — | 12,906,774 | — |
| Cumulative translation adjustment | — | — | — | — | — | 649 | 649 | $ 649 |
| Net income (loss) | — | — | — | — | (9,803,219) | — | (9,803,219) | (9,803,219) |
| **Balance at December 31, 2004** | 142,464,600 | $ 7,124 | $ 5,981,154 | $ (969,959) | $ (20,726,385) | $ (41,106) | $ (15,749,172) | $ (9,802,570) |

## FOCUS MEDIA HOLDING LIMITED

(in U.S. dollars, except share data)

| | Ordinary Share | Amount | Additional paid-in capital | Deferred share based compensation | Retained earning (accumulated deficit) | Accumulated other comprehensive income (loss) | Total shareholders' equity (deficiency) | Comprehensive income (loss) |
|---|---|---|---|---|---|---|---|---|
| Series A convertible redeemable preference shares converted into ordinary shares upon initial public offering | 41,967,400 | 2,098 | 6,293,012 | — | — | — | 6,295,110 | — |
| Series B convertible redeemable preference shares converted into ordinary shares upon initial public offering | 48,191,600 | 2,409 | 12,060,287 | — | — | — | 12,062,696 | — |
| Series C-1 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,054,000 | 1,703 | 17,498,647 | — | — | — | 17,500,350 | — |
| Series C-2 convertible redeemable preference shares converted into ordinary shares upon initial public offering | 34,053,400 | 1,703 | 17,413,297 | — | — | — | 17,415,000 | — |
| Issuance of ordinary shares upon initial public offering, net of issuance cost of $13,703,370 | 77,575,000 | 3,879 | 118,170,251 | — | — | — | 118,174,130 | — |
| Deferred share based compensation | — | — | 284,751 | (284,751) | — | — | — | — |
| Amortization of deferred share based compensation | — | — | 267,864 | 458,639 | — | — | 726,503 | — |
| Cumulative translation adjustments | — | — | — | — | — | 2,437,852 | 2,437,852 | 2,437,852 |
| Net income | — | — | — | — | 16,352,110 | — | 16,352,110 | 16,352,110 |
| Balance at December 31, 2005 | 378,308,000 | $18,916 | $177,419,761 | (246,669) | $(4,374,276) | $2,396,746 | $175,214,579 | $18,789,962 |

II-12

Table of Contents

**FOCUS MEDIA HOLDING LIMITED**
Financial information of parent company
Statements of Cashflows

| | 2003 | 2004 | 2005 |
|---|---|---|---|
| | | For the year ended December 31 | |
| | | (in U.S. dollars) | |
| **Operating activities:** | | | |
| Income (loss) attributable to holders of ordinary shares | $ 25,483 | $ (20,752,385) | $ 16,352,110 |
| Deemed dividend on Series A convertible redeemable preference shares | — | 8,308,411 | — |
| Deemed dividend on Series B convertible redeemable preference shares | — | 2,191,442 | — |
| Deemed dividend on Series C–1 convertible redeemable preference shares | — | 13,356,087 | — |
| Premium relating to Series B convertible redeemable preference shares | — | (12,906,774) | — |
| Net income (loss) | 25,483 | (9,803,219) | 16,352,110 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Share based compensation | — | 488,711 | 726,503 |
| Change in fair value of derivative liability | — | 11,692,287 | — |
| Equity in loss of subsidiaries | — | (2,436,176) | (17,703,277) |
| Changes in assets and liabilities: | | | |
| Prepaid expenses and other current assets | — | — | (121,482) |
| Amounts due from subsidiaries | (500,000) | (24,572,466) | (69,740,965) |
| Other payables | — | 1,178,623 | (780,746) |
| Net cash provided by (used in) operating activities | (474,517) | (23,452,240) | (71,267,856) |
| **Investing activities:** | | | |
| Investments in subsidiaries and affiliates | (683,062) | (6,026,105) | (8,208,893) |
| Deposit paid to acquire investment | — | — | (40,919,530) |
| Acquisition of assets from a related party | (429,849) | — | — |
| Net cash used in investing activities | (1,112,911) | (6,026,105) | (49,128,424) |
| **Financing activities:** | | | |
| Proceeds from issuance of ordinary shares | 1,625,000 | — | 118,174,130 |
| Proceeds from issuance Series B convertible redeemable preference shares (net of issuance costs of $437,304) | — | 12,062,696 | — |
| Proceeds from issuance Series C–2 convertible redeemable preference shares (net of issuance costs of $85,000) | — | 17,415,000 | — |
| Net cash provided by financing activities | 1,625,000 | 29,477,696 | 118,174,130 |
| Effect of exchange rate changes | (37,572) | 649 | 2,222,150 |
| Net change in cash and cash equivalents | — | — | — |
| Cash and cash equivalents, beginning of year | — | — | — |
| Cash and cash equivalents, end of year | $ — | $ — | $ — |

Item 9.    *Undertakings*

(a) The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant

II–13

Table of Contents

to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(b) The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions described in Item 6, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

<div align="center">II-14</div>

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F–1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Boston, Massachusetts, U.S.A. on June 13, 2006.

Focus Media Holding Limited

By: /s/ Jason Nanchun Jiang

Name: Jason Nanchun Jiang
Title: Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this amendment no. 2 to registration statement has been signed by the following persons in the capacities indicated on June 13, 2006.

| Signature | Capacity |
|---|---|
| /s/ Jason Nanchun Jiang | Chairman and Chief Executive Officer |
| Jason Nanchun Jiang | (principal executive officer) |
| | Co-chairman and President |
| * | Director |
| David Feng Yu | |
| * | Director |
| Jimmy Wei Yu | |
| * | Director |
| Fumin Zhuo | |
| | Director |
| Neil Nanpeng Shen | |
| | Director |
| Charles Chao | |
| | Director |
| Daqing Qi | |
| /s/ Daniel Mingdong Wu | Chief Financial Officer |
| Daniel Mingdong Wu | |
| /s/ July Wang | Chief Accounting Officer |
| July Wang | |
| * | Authorized Representative |
| Donald J. Puglisi | in the United States |

II-15

Table of Contents

| Signature | Capacity |
|---|---|

*By:/s/ Jason Nanchun Jiang

Jason Nanchun Jiang  Attorney-in-fact

II-16

Table of Contents

### Index to exhibits

| Exhibit Number | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement. |
| 3.1† | Amended and Restated Memorandum and Articles of Association of Focus Media Holding Limited. |
| 4.1† | Specimen Ordinary Share Certificate. |
| 4.2† | Amended and Restated Shareholders Agreement of Focus Media Holding Limited, dated December 2, 2004, among Focus Media Holding Limited, its subsidiaries, its ordinary shareholders, its preferred shareholders and the investors named therein. |
| 4.3† | Deposit Agreement dated July 18, 2005 among the Registrant, Citibank, N.A. and holders of the American Depositary Receipts (incorporated by reference to the registration statement on Form F–6 (File No. 333–126011) filed with the Securities and Exchange Commission with respect to American Depositary Shares representing ordinary shares). |
| 5.1* | Form of opinion of Conyers, Dill & Pearman, Cayman Islands special counsel to the registrant, regarding the validity of the ordinary shares being registered. |
| 5.2* | Form of opinion of Global Law Office, counsel as to PRC law to the registrant, regarding the validity of (i) the corporate structure of Focus Media Technology (Shanghai) Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. and contractual arrangements among Focus Media Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisement Co., Ltd. and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu, (ii) the corporate structure of Framedia Investment and Shanghai Framedia Advertisement Development Co., Ltd. and contractual arrangements among Framedia Investment and Shanghai Framedia Advertisement Development Co., Ltd. and its subsidiaries, Jason Nanchun Jiang and Jimmy Wei Yu and (iii) the corporate structure of Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd., Beijing Focus Media Wireless Technology Co., Ltd., Jason Nanchun Jiang and Jimmy Wei Yu. |
| 8.1* | Form of opinion of Conyers, Dill & Pearman, special Cayman Islands tax counsel to the registrant, regarding tax matters. |
| 8.2* | Form of opinion of Simpson Thacher & Bartlett LLP regarding United States federal taxation matters. |
| 10.1† | Rules of the 2003 Employee Share Option Scheme and form of grant letter. |
| 10.2† | Technology License and Service Agreement, dated March 28, 2005, by and among Focus Media Digital Information Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisements Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.3† | Business Cooperation Agreement, dated March 28, 2005, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.4† | Equity Pledge Agreement, dated March 28, 2005, by and among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.5† | Call Option Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.6† | Shareholders' Voting Rights Proxy Agreement, dated March 28, 2005, among Jason Nanchun Jiang, Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd. and the subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.7† | Trust Agreement, dated March 28, 2005, by and between Shanghai Focus Media Advertisement Co., Ltd. and Focus Media Technology (Shanghai) Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
| --- | --- |
| 10.8[†] | Trademark License Agreement, dated March 28, 2005, by and among Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd., Shanghai Focus Media Advertisement Co., Ltd. and its subsidiaries. |
| 10.9[†] | Loan Agreement, dated June 10, 2003, among Focus Media Holding Limited, Jason Nanchun Jiang, Jimmy Wei Yu, Yuanzhe Fu, Yibing Zhou and Yiqing Hou. |
| 10.10[†] | Loan Agreement, dated March 28, 2005, by and between Jason Nanchun Jiang and Focus Media Technology (Shanghai) Co., Ltd. |
| 10.11[†] | Loan Agreement, dated March 28, 2005, by and among Jimmy Wei Yu, Focus Media Technology (Shanghai) Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. |
| 10.12[†] | Form of Employment Agreement of Focus Media Technology (Shanghai) Co., Ltd. |
| 10.13[†] | Manager Non–Competition Agreement entered into by Focus Media Holding Limited and Jason Nanchun Jiang on November 29, 2004. |
| 10.14[†] | Technology Transfer Agreement entered into by Jimmy Wei Yu and Focus Media Digital Information (Shanghai) Co., Ltd., dated November 1, 2004. |
| 10.15[†] | Asset and Business Acquisition Agreement between Shanghai Everease Communication Company and Shanghai Focus Media Advertisement Co., Ltd. dated July 1, 2003. |
| 10.16[†] | Everease Non–competition Agreement between Focus Media Holding Limited and Shanghai Everease Communication Company, dated as of November 2004. |
| 10.17[†] | Sales Contract between Shanghai Everease Communication Company and Shanghai Focus Media Advertisement Co., Ltd., dated May 2003. |
| 10.18[†] | Project Cooperation Framework Agreement between Shanghai Everease Communication Company and Beijing Suodi Advertising Co., Ltd., dated February, April and June 2003. |
| 10.19[†] | Transfer Agreement on Project Cooperation Framework Agreement between Shanghai Focus Media Advertisement Co., Ltd. and Beijing Suodi Advertising Co., Ltd., dated August 28, 2003. |
| 10.20[†] | Business Agency Agreement between Shanghai On–Target Advertising Co., Ltd. and Shanghai Focus Media Advertisement Co., Ltd. |
| 10.21[†] | Agreement between Shanghai On–Target Advertising Co., Ltd., Jimmy Wei Yu, Shanghai Focus Media Advertisement Co., Ltd., Union Enterprise Holding Co., Ltd. and Shenlong Lin, dated October 15, 2003. |
| 10.22[†] | Acknowledgement Letter entered into as of March 28, 2005 by and among Shanghai Focus Media Advertisement Co., Ltd., Focus Media Technology (Shanghai) Co., Ltd., Focus Media Digital Information Technology (Shanghai) Co., Ltd. and subsidiaries of Shanghai Focus Media Advertisement Co., Ltd. |
| 10.23[†] | Share Option Plan 2005. |
| 10.24[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.25[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.26[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.27[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.28[††] | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.29†† | Acknowledgement Letter for Participation of Equity Pledge Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.30†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.31†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.32†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.33†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.34†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.35†† | Acknowledgement Letter for Participation of Call Option Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.36†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Fuzhou Fukesi Advertisement Co., Ltd. |
| 10.37†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.38†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Hefei Fukesi Advertisement Co., Ltd. |
| 10.39†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenyang Focus Media Advertisement Co., Ltd. |
| 10.40†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Advertisement Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.41†† | Acknowledgement Letter for Participation of Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, of Shanghai Focus Media Co., Ltd. and Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.42†† | Equity Pledge Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.43†† | Call Option Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.44†† | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Co., Ltd., Shanghai Framedia Investment Consultancy Co., Ltd. and the Local Advertisement Companies named therein. |
| 10.45†† | Equity Pledge Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.46†† | Call Option Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.47†† | Shareholders' Voting Rights Proxy Agreement, dated January 13, 2006, by and among Lei Liu, Yong Shi, Shanghai Framedia Investment Consultancy Co., Ltd. and Guangdong Century Shenghuo Advertisement Co., Ltd. |
| 10.48†† | Share Purchase Agreement, dated October 15, 2005, as amended and supplemented, among Focus Media Holding Limited, Infoachieve Limited, Total Team Investments Limited and the other Infoachieve parties named therein. |
| 10.49†† | Share Purchase Agreement, dated as of January 7, 2006, among Focus Media Holding Limited, Target Media Holdings Limited and Its Shareholders. |
| 10.50†† | Asset Transfer Agreement, dated December 31, 2005, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.51* | Share Purchase Agreement, dated March 7, 2006, by and among Focus Media Holding Limited and Dotad Media Holdings Ltd. |
| 10.52* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.53* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.54* | Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Beijing Dotad Technology Co., Ltd and Beijing Focus Media Wireless Co., Ltd. |
| 10.55* | Equity Pledge Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.56* | Call Option Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.57* | Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co., Ltd., Shanghai Focus Media Advertising Agency Co., Ltd., Shanghai Framedia Investment Consulting Co., Ltd. and Guandong Shiji Shenghuo Advertisement Co., Ltd. |
| 10.58* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.59* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.60* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.61* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.62* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.63* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai New Focus Media Advertising Agency Co., Ltd. |
| 10.64* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |
| 10.65* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |
| 10.66* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Target Media Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.67* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.68* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.69* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Dongguan Focus Media Advertisement Co., Ltd. |
| 10.70* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.71* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.72* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Fuzhou Fukesi Advertising Co., Ltd. |
| 10.73* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.74* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.75* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Hefei Fukesi Advertising Co., Ltd. |
| 10.76* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.77* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.78* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai On–Target Advertisement Co., Ltd. |
| 10.79* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.80* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.81* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Jiefang Focus Media Advertisement Co., Ltd. |
| 10.82* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.83* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.84* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shanghai Perfect Media Advertising Agency Co., Ltd. |
| 10.85* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |
| 10.86* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |
| 10.87* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenzhen E–Time Commercial Consulting Co., Ltd. |
| 10.88* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.89* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |
| 10.90* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenzhen Bianjie Building Advertisement Co., Ltd. |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.91* | Acknowledgement Letter of Participation of Equity Pledge Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.92* | Acknowledgement Letter of Participation of Call Option Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.93* | Acknowledgement Letter of Participation of Shareholders' Voting Rights Proxy Agreement, dated May 22, 2006, of Shenyang Focus Media Advertising Co., Ltd. |
| 10.94* | Cooperation Agreement, dated May 22, 2006, by and among Shanghai Focus Media Advertisement Co. Ltd. and its local advertising subsidiaries named therein and Shanghai New Focus Media Advertisement Co. Ltd. |
| 10.95* | Technology Transfer Agreement, dated as of May 22, 2006, by and between Focus Media Digital Information Technology (Shanghai) Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 10.96* | Advertisement Dissemination Agreement, dated May 22, 2006, by and between Shanghai Focus Media Advertising Agency Co., Ltd. and Shanghai New Focus Media Advertisement Co., Ltd. |
| 21.1* | List of Subsidiaries. |
| 23.1 | Consent of Deloitte Touche Tohmatsu Certified Public Accountants Ltd. |
| 23.2* | Consent of Global Law Office (included in Exhibit 5.2). |
| 23.3* | Consent of Conyers, Dill & Pearman (included in Exhibits 5.1 and 8.1). |
| 23.4* | Consent of Simpson Thacher & Bartlett LLP (included in Exhibit 8.2). |
| 23.5 | Consent of KPMG |
| 24.1* | Powers of Attorney (included in signature pages in Part II of this Registration Statement). |

*   Previously filed with this registration statement on Form F–1 (File No. 333–134714).
†   Previously filed with the Registrant's registration statement on Form F–1 (File No. 333–125785).
††  Previously filed with the Registrant's registration statement on Form F–1 (File No. 333–131065).

# Exhibit M

6-K 1 htm_2914.htm LIVE FILING

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 6-K

REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934

March 19, 2008

Commission File Number: 000-51387

# Focus Media Holding Limited

_____

(Translation of registrant's name into English)

Cayman Islands
_____

(Jurisdiction of incorporation or organization)

28-30/F, Zhao Feng World Trade Building
369 Jiangsu Road
Shanghai 200050 China
_____

(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:  [x] Form 20-F    [ ] Form 40-F

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):  [ ]

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):  [ ]

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934:  [ ] Yes    [x] No

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b):   n/a

Contents

Signature
Exhibit Index
Exhibit 99.1 – Press Release

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Focus Media Holding Limited

Date: March 19, 2008                   By:    /s/ Daniel Mingdong Wu

Name:  Daniel Mingdong Wu
Title:    Chief Financial Officer

Case 1:07-cv-10617-LTS     Document 26-17     Filed 09/05/2008     Page 5 of 16

# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release - Q4 & 2007 Earnings Release |

EX-99.1 2 exhibit1.htm EX-99.1

**Exhibit 99.1**

**Focus Media Reports Fourth Quarter and Full Year 2007 Results**
Fourth Quarter Revenue Increased by 171.4% and Net Income Increased by 45.6% Year-over-year

SHANGHAI, China, March 18, 2008 – Focus Media Holding Limited (Nasdaq: FMCN), China's largest digital media group, today announced its unaudited financial results for the fourth quarter and full year ended December 31, 2007.

**Highlights for fourth quarter 2007:**

l          Total revenues grew 171.4% year-over-year and 21.9% quarter-over-quarter to $184.6 million.
l          Net income for the fourth quarter was $43.8 million or $0.34 per fully diluted ADS.

l Focus Media provides gross margin, operating margin, net income and earnings per ADS on a non-GAAP basis that exclude non-cash share-based compensation expense and acquired intangible assets amortization expense to enable investors to better assess the Company's operating performance. The non-GAAP measures are described below and reconciled to the corresponding GAAP measure in the section below titled "Use of non-GAAP Financial Measures". Net income, excluding non-cash share-based compensation expenses and amortization of acquired intangible assets resulting from acquisitions (non-GAAP) for the fourth quarter was $68.0 million or $0.52 per fully diluted ADS, exceeding company guidance of $62 million to $64 million.

l In the fourth quarter of 2007, digital out-of-home advertising revenue was $111.0 million, up 75.3% year-over-year, and 17.2% quarter-over-quarter.

n Advertising service revenue from our commercial location network, including revenue from our LCD display networks, outdoor digital and non-digital billboard networks (also referred to as our iStreet Network) and movie theater advertising network, grew 75.9% year-over-year and 13.6% quarter-over quarter to $73.4 million.

n Advertising service revenue from our in-store network was $6.5 million, down 17.4% year-over-year and 8.6% quarter-over-quarter, due to the relatively more competitive environment in our in-store business, mainly from CGEN Technology Company Limited. On January 2, 2008, we closed the acquisition of CGEN and this transaction strengthened our market leadership. The results for 2007 do not include the results of CGEN.

n Advertising service revenue from our in-elevator poster frame network grew 126.4% year-over-year and 35.2% quarter-over-quarter to $31.2 million

l Mobile handset advertising revenue grew 355.8% year-over-year and 14.0% quarter-over-quarter, to $16.0 million in the fourth quarter 2007.

l          Internet advertising revenue was $57.2 million in the fourth quarter of 2007, up 34.5% quarter-over-quarter.
**Highlights for the full year 2007:**
n          Total revenues were $506.6 million in 2007, up 139.1% as compared to $211.9 million in 2006.
n          Operating income was $143.9 million in 2007, up 79.0% as compared to $80.4 million in 2006.

n Net income was $144.4 million in 2007, up 73.6% compared to $83.2 million in 2006. Net income excluding non-cash share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) was $190.6 million in 2007, up 95.9% compared to $97.3 million in 2006.

n Fully diluted earnings per ADS for 2007 was $1.19, compared to $0.80 per ADS for 2006. Fully diluted earnings per ADS excluding non-cash share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) was $1.57 in 2007, compared to $0.93 in 2006.

Commenting on the fourth quarter and full year 2007 results, Executive Chairman Jason Jiang said, "Fourth quarter results far exceeded our own guidance. The upside was driven by robust growth in our in-elevator poster frame business resulting from digital Frame 2.0 upgrade, strong momentum in our mobile handset advertising business, and continued strength in our Internet advertising business. We also made improvements in our Internet advertising business model to increase the gross margin from 23.0% in the third quarter 2007 to 26.4% in the fourth quarter. The results demonstrated the strong leverage built into our business model as we move forward to become the largest digital media company in China. Based on our dialogs with our large advertising clients, we strongly believe the current growth momentum in the China advertising industry will continue after the 2008 Olympic, driven by increasing domestic consumer demand for goods and services as the Chinese economy continues to expand. Our strategy of building the largest life-style digital media platform will allow Focus Media to capture a relatively larger share of this growth. I am fully committed to building Focus Media to be one of the leading digital media

companies in the world."

Dr. Tan Zhi, CEO of Focus Media, said, "2008 will be another very exciting year for Focus Media. Built on the investments and acquisitions we made during 2007, we see very strong growth momentum in all our businesses. We will continue our prudent strategy to build the largest media organization in China."

**Fourth Quarter Financial Results**

  For the fourth quarter of 2007, Focus Media reported total revenues of $184.6 million, an increase of 171.4% compared to $68.0 million for the fourth quarter of 2006, and an increase of 21.9% compared to $151.4 million for the third quarter of 2007.

Our total digital out-of-home advertising revenue was $111.0 million in the fourth quarter of 2007, an increase of 75.3% from $63.3 million in the fourth quarter of 2006 and a sequential increase of 17.2% from $94.7 million in the third quarter of 2007. In the fourth quarter of 2007, commercial location advertising revenue, including new businesses such as outdoor LED and movie theatre advertising, was $73.4 million, contributing 66.1% of total digital out-of-home advertising revenue. Advertising service revenue from our in-store network was $6.5 million, or 5.8% of total digital out-of-home advertising revenue. Advertising service revenue from our in-elevator poster frame network placed primarily in the elevators of residential complexes was $31.2 million in the fourth quarter of 2007, or 28.1% of total digital out-of-home advertising revenue.

As of December 31, 2007, the total installed base of LCD displays and digital frames in our commercial location network was 112,298 nationwide, including 107,533 displays through our directly owned networks, and 4,765 displays through our regional distributors. In the fourth quarter of 2007, we continued to expand the installed base of our hypermarkets network to 1,398 stores as of December 31, 2007. Our in-store network also covers 638 supermarkets and 2,027 convenience stores as of December 31, 2007. The number of displays installed in our in-store network increased to 49,452 as of December 31, 2007 compared to 43,315 as of September 30, 2007. The total number of non-digital frames available for sale on our poster frame network was 179,649 as of December 31, 2007. In addition, as of December 31, 2007, we had installed 10,819 digital frames on our poster frame network, mainly in Beijing, Shanghai, Guangzhou and Shenzhen.

*Mobile Advertising Business*

Advertising service revenue from Focus Media Wireless in the fourth quarter of 2007 was $16.0 million, up 355.8% from $3.5 million in the fourth quarter of 2006 and 14.0% from $14.0 million in the third quarter of 2007.

*Internet Advertising Business*

Internet advertising service revenue was $57.2 million in the fourth quarter of 2007, up 34.5% from $42.5 million in the third quarter of 2007. Digital marketing service accounted for 90% of the total Internet advertising revenue. Rich Media, pay-for-performance and technology solutions accounted for the remaining 10%.

Gross profit for the fourth quarter of 2007 was $87.4 million, representing an increase of 92.1% compared to $45.5 million for the corresponding period a year ago and a 13.4% increase compared to $77.1 million in the third quarter 2007. In the fourth quarter 2007, gross margin for the company was 47.4%, as compared to 50.9% in the third quarter of 2007, mainly due to larger revenue contribution from our lower-gross-margin Internet advertising business and higher intangible amortization expenses resulting from acquisitions in our poster frame, mobile and Internet advertising businesses. Excluding non-cash share-based compensation expense of $0.1 million and acquisition-related intangible asset amortization expense of $10.8 million in the cost of revenues, gross margin (non-GAAP) was 53.3% in the fourth quarter of 2007 compared to 52.6% in the third quarter of 2007. In the fourth quarter of 2007, excluding non-cash share-based compensation expense and acquisition-related intangible asset amortization expense, digital out-of-home gross margin (non-GAAP) increased to 65.9% from 64.2% in the third quarter of 2007 even though our in-store network gross margin decreased significantly due to intense price competition with CGEN during the quarter; mobile handset advertising gross margin (non-GAAP) was 50.1% compared to 57.3% in the third quarter of 2007 due to upfront investments in new WAP-based business initiatives; Internet advertising gross margin (non-GAAP) was 30.1% compared to 25.2% in the third quarter.

In the fourth quarter of 2007, operating expenses totaled $43.3 million, including $6.0 million in acquired intangible asset amortization resulting from acquisitions and non-cash share-based compensation expense of $7.2 million. Selling and marketing expenses in the fourth quarter totaled $27.8 million, including $6.0 million in acquired intangible asset amortization and $3.0 million in share compensation expense. General and administrative expense in the fourth quarter was $17.0 million, including $4.2 million in share compensation expense. Our operating margin in the fourth quarter of 2007 was 23.9%. Excluding non-cash share-based compensation expense and acquired intangible asset amortization expense, operating margin (non-GAAP) was 37.0% in the fourth quarter 2007 compared to 36.4% in the previous quarter.

Total intangible amortization expenses in the fourth quarter of 2007 resulting from historical acquisitions were $16.9 million. Non-cash stock compensation expenses were $7.3 million in the fourth quarter of 2007, or 4.0% of total revenues. Total income taxes were $5.9 million, including $4.2 million provision for uncertain tax positions under FIN 48.

Net income for the fourth quarter of 2007 was $43.8 million, an increase of 45.6% compared to $30.1 million for the same period in 2006. Fully diluted net income per ADS for the fourth quarter of 2007 was $0.34. Net income excluding non-cash share-based compensation expense and acquired intangible assets amortization expense resulting from acquisitions (non-GAAP) in the fourth quarter of 2007 was $68.0 million, or $0.52 per fully diluted ADS.

Fourth quarter 2007 operating cash flow was $65.4 million. Day sales outstanding ("DSO") was 88 days in the fourth quarter. As of December 31, 2007, the company had cash and cash equivalents of $450.4 million.

**Full Year 2007 Results**

For the full year 2007, Focus Media reported total revenues of $506.6 million, an increase of 139.1% compared to $211.9 million in 2006.

Full year net income in 2007 was $144.4 million, up 73.6% compared with $83.2 million in 2006. Net income in 2007 excluding non-cash share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) was $190.6 million compared to $97.3 million in 2006.

By the end of December 31, 2007, the company has 5,175 employees.

**Other Recent Developments**

Focus Media continues to strengthen our product offerings in our digital out-of-home advertising business. In December 2007, we launched the first large-size LED digital outdoor billboard, a 1500 square foot LED digital billboard on a boat navigating roundtrip along the bund area in Shanghai.

Also in January 2008, we closed the acquisition of CGEN Technology Company Limited, a leading operator of in-store digital advertising network in China. With this acquisition, Focus Media has significantly expanded coverage of its digital advertising displays in large chain stores in China.

In March 2008, Dr. Tan Zhi was appointed as Chief Executive Officer of Focus Media. Jason Jiang will remain as Executive Chairman of Focus Media and will continue to spend full-time at Focus Media and be in charge of Focus Media's Internet advertising, mobile handset advertising and other emerging new media opportunities.

**BUSINESS OUTLOOK**

Based on organic growth, the company estimates its total revenues for full year 2008 to range from $900 million to $930 million, of which digital out-of-home is expected to contribute approximately 63%, Internet advertising is expected to contribute approximately 31%, and mobile handset advertising is expected to contribute approximately 6%. Net income of full year 2008 excluding share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) is expected to be between $280 million to $300 million, taking into consideration a 15% effective income tax rate after certain government tax incentives and rebates, or $2.06 to $2.21 per fully diluted ADS based on 136 million annual average total ADS equivalent shares outstanding. In accordance with SFAS No. 123R, the company estimates total share-based compensation expenses in 2008 will be approximately $35 million based on stock options that have been granted as of February 28, 2008. The company expects approximately $50 million in acquisition-related intangible amortization expenses in 2008 including CGEN acquisition, subject to the finalization of the purchase price allocation for recent acquisitions.

The company expects its capital expenditure for 2008 to be approximately $50 million, mainly for the digital Frame 2.0 upgrade and expansion in both of our residential and commercial networks and digital LED investment in our outdoor LED business.

The company estimates its total revenues for the first quarter of 2008 will range from $160 million to $165 million. First quarter 2008 net income excluding share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) is expected to be between $44 million and $45 million or $0.33 to $0.34 per fully diluted ADS based on 133 million average total ADS equivalent shares outstanding.

**USE OF NON-GAAP FINANCIAL MEASURES**

In addition to Focus Media's consolidated financial results under GAAP, the Company also provides non-GAAP financial measures, including non-GAAP gross profit, non-GAAP gross margin, non-GAAP operating margin, non-GAAP net income and non-GAAP earnings per fully diluted ADS, all excluding non-cash share-based compensation and acquired intangible asset amortization expense resulting from acquisitions. The Company believes that these non-GAAP financial measures provide investors with another method for assessing Focus Media's operating results in a manner that is focused on the performance of its ongoing operations. Readers are cautioned not to view non-GAAP results on a stand-alone basis or as a substitute for results under GAAP, or as being comparable to results reported or forecasted by other companies, and should refer to the reconciliation of GAAP results with non-GAAP results in the attached financial information.

The Company believes that both management and investors benefit from referring to these non-GAAP financial measures in assessing the performance of Focus Media and when planning and forecasting future periods. The Company computes its non-GAAP financial measures using the same consistent method from quarter to quarter. The accompanying tables have more details on the GAAP financial measures that are most directly comparable to non-GAAP financial measures and the related reconciliation between these financial measures.

Focus Media Holding Ltd.
Reconciliation of GAAP to Non-GAAP
(U.S. Dollar in thousands, except share data)
(Unaudited)

| | 3 months ended December 31, 2007 | | | | 3 months ended September 30, 2007 | | | |
| | GAAP | GAAPadjustments (a) | (b) | Non-GAAP | GAAP | GAAPadjustments (a) | (b) | Non-GAAP |
|---|---|---|---|---|---|---|---|---|
| **Gross profit** | | | | | | | | |
| Commercial location network | 47,356 | 126 | 3,089 | 50,571 | 41,764 | 288 | 566 | 42,618 |
| In-store network | (981) | — | — | (981) | 1,255 | — | — | 1,255 |
| Poster frame network | 19,773 | — | 3,830 | 23,603 | 16,407 | — | 571 | 16,978 |
| *Digital out-of-home* | 66,148 | 126 | 6,919 | 73,193 | 59,426 | 288 | 1,137 | 60,851 |
| *Mobile Handset Advertising Network* | 6,269 | — | 1,741 | 8,010 | 7,880 | — | 163 | 8,043 |
| *Internet Advertising* | 15,076 | — | 2,165 | 17,241 | 9,793 | — | 926 | 10,719 |
| *Others* | (63) | — | — | (63) | (4) | — | — | (4) |
| *Total* | 87,430 | 126 | 10,825 | 98,381 | 77,095 | 288 | 2,226 | 79,609 |
| *Gross margin* | | | | | | | | |
| Commercial location network | 64.5% | 0.2% | 4.2% | 68.9% | 64.7% | 0.4% | 0.9% | 66.0% |
| In-store network | -15.2% | 0.0% | 0.0% | -15.2% | 17.7% | 0.0% | 0.0% | 17.7% |
| Poster frame network | 63.4% | 0.0% | 12.3% | 75.7% | 71.1% | 0.0% | 2.5% | 73.6% |
| *Digital out-of-home* | 59.6% | 0.1% | 6.2% | 65.9% | 62.7% | 0.3% | 1.2% | 64.2% |
| *Mobile Handset Advertising Network* | 39.2% | 0.0% | 10.9% | 50.1% | 56.2% | 0.0% | 1.2% | 57.3% |
| *Internet Advertising* | 26.4% | 0.0% | 3.8% | 30.1% | 23.0% | 0.0% | 2.2% | 25.2% |
| *Others* | -20.3% | 0.0% | 0.0% | -20.3% | -3.4% | | | -3.4% |
| *Total* | 47.4% | 0.1% | 5.9% | 53.3% | 50.9% | 0.2% | 1.5% | 52.6% |

—

(a)  *To adjust share-based compensation expenses*

(b)  *To adjust amortization of acquisition related intangible assets*

| | Three months ended | | | Year ended | |
| | 2007-12-31 | 2006-12-31 | 2007-9-30 | 2007-12-31 | 2006-12-31 |
|---|---|---|---|---|---|
| **GAAP net income attributable to shareholders** | $ 43,816 | $ 30,088 | $ 46,613 | $ 144,436 | $ 83,197 |
| Amortization of acquired intangible assets | 16,862 | 1,704 | 3,287 | 24,753 | 5,774 |
| Share-based compensation | 7,338 | 3,436 | 4,679 | 21,453 | 8,368 |
| **Non-GAAP net income** | $ 68,016 | $ 35,228 | $ 54,579 | $ 190,642 | $ 97,339 |
| GAAP income per ADS — basic | $ 0.35 | $ 0.28 | $ 0.38 | $ 1.22 | $ 0.82 |
| GAAP income per ADS — diluted | $ 0.34 | $ 0.27 | $ 0.37 | $ 1.19 | $ 0.80 |
| Non-GAAP income per ADS — basic | $ 0.54 | $ 0.33 | $ 0.45 | $ 1.61 | $ 0.96 |
| Non-GAAP income per ADS — diluted | $ 0.52 | $ 0.32 | $ 0.43 | $ 1.57 | $ 0.93 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 125,710,757 | | 106,528,150 | | 122,250,042 | | 118,077,479 | | 101,082,216 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 129,831,533 | | 109,915,074 | | 126,370,818 | | 121,665,290 | | 104,307,276 |
| **GAAP income from operations** | $ | **44,125** | $ | **28,409** | $ | **47,122** | $ | **143,855** | $ **80,378** |
| Amortization of acquired intangible assets | | 16,862 | | 1,704 | | 3,287 | | 24,753 | 5,774 |
| Share-based compensation | | 7,338 | | 3,436 | | 4,679 | | 21,453 | 8,368 |
| **Non-GAAP income from operations** | $ | **68,325** | $ | **33,549** | $ | **55,088** | $ | **190,061** | $ **94,520** |
| **Non-GAAP operating margin** | | 37.0% | | 49.3% | | 36.4% | | 37.5% | 44.6% |

TODAY'S CONFERENCE CALL

The Company will host a conference call to discuss the fourth quarter and full year 2007 results at 9:00 p.m. U.S. Eastern Time on March 18, 2008 (6:00 p.m. U.S. Pacific Time on March 18, 2008 and 9:00 a.m. Beijing/Hong Kong Time on March 19, 2008). The dial-in details for the live conference call are set forth below: U.S. Toll Free Number +1- 800-237-9752, Hong Kong dial-in number +852-3002-1672, International dial-in number +1-617-847-8706; Pass code: 38373357.

A replay of the call will be available from March 18, 2008 until March 25, 2008 (US Eastern Time). The dial-in details for the replay are set forth below: U.S. Toll Free Number +1-888-286-8010, International dial-in number +1-617-801-6888; Pass code 52636178.

ABOUT FOCUS MEDIA HOLDING LIMITED

Focus Media Holding Limited (Nasdaq: FMCN) is China's leading multi- platform digital media company, operating the largest out-of-home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat-panel television displays in our network, and is also a leading provider of mobile handset advertising and Internet marketing solutions in China. Through Focus Media's multi-platform digital advertising network, the company reaches urban consumers at strategic locations and point-of-interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light-emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of December 31, 2007, Focus Media's digital out-of-home advertising network had approximately 112,298 LCD display in its commercial location network, approximately 49,452 LCD displays in its in-store network and 179,649 advertising in-elevator poster frames, installed in over 90 cities throughout China, and approximately 200 outdoor LED billboard displays in Shanghai. For more information about Focus Media, please visit our website at ir.focusmedia.cn.

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F, in each case as amended. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

Investor and Media contact:

Jie Chen

Tel: +86 21 32124661*6607

Email: ir@focusmedia.cn

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS
(U.S. Dollars in thousands)

|  | 2007-12-31 | 2006-12-31 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 450,416 | $ 164,611 |
| Investment in equity securities | 90,145 | — |
| Accounts receivables, net | 206,102 | 61,614 |
| Inventories | 1,654 | 519 |
| Prepaid expenses and other current assets | 62,193 | 5,199 |
| Deposit paid for acquisition of subsidiaries | 37,094 | 3,526 |
| Amount due from related parties | 4,510 | 7,853 |
| Rental deposits | 28,763 | — |
| **Total current assets** | $ 880,877 | $ 243,322 |
| Rental deposits | 5,302 | 11,833 |
| Equipment, net | 95,478 | 70,250 |
| Acquired intangible assets, net | 155,717 | 34,717 |
| Goodwill | 943,398 | 739,744 |
| Other long term assets | 58,184 | 6,376 |
| **Total assets** | $2,138,956 | $1,106,242 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short term debt | $ — | $ 2,769 |
| Accounts payable | 50,379 | 5,987 |
| Accrued expenses and other current liabilities | 190,313 | 38,674 |
| Income taxes payable | 18,947 | 4,060 |
| Amount due to related parties | 12,395 | 347 |
| Deferred tax liabilities | 1,227 | — |
| **Total current liabilities** | $ 273,261 | $ 51,837 |
| Deferred tax liabilities | 6,393 | 3,303 |
| **Total liabilities** | $ 279,654 | $ 55,140 |
| **Minority interests** | 1,913 | 358 |
| **Shareholders' equity** | | |
| Ordinary shares | 32 | 27 |
| Additional paid in capital | 1,581,580 | 709,196 |
| Acquisition consideration to be issued | — | 237,879 |
| Retained earnings | 239,163 | 96,195 |
| Accumulated other comprehensive income | 36,614 | 7,447 |
| Total shareholders' equity | $1,857,389 | $1,050,744 |
| **Total liabilities and shareholders' equity** | $2,138,956 | $1,106,242 |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
(U.S. Dollar in thousands, except share data)

|  | Three months ended | | | Year ended | |
|---|---|---|---|---|---|
|  | 2007-12-31 | 2006-12-31 | 2007-9-30 | 2007-12-31 | 2006-12-31 |
| **Gross revenues (note 3):** | | | | | |
| Digital out-of-home | | | | | |
| Commercial locations | $ 80,128 | $ 46,253 | $ 70,173 | $ 240,587 | $ 145,702 |
| In-store network | 7,150 | 8,655 | 7,813 | 30,287 | 29,710 |
| In-elevator poster frame network | 34,079 | 15,113 | 25,121 | 93,401 | 44,893 |
| Mobile handset advertising | 16,606 | 3,714 | 14,627 | 48,521 | 10,880 |
| Internet advertising | 59,318 | — | 44,234 | 129,970 | — |
| Other revenue | 310 | 1,152 | 117 | 1,113 | 1,932 |
| **Total gross revenues** | 197,591 | 74,887 | 162,085 | 543,879 | 233,117 |
| Less: Sales taxes | 13,039 | 6,891 | 10,693 | 37,320 | 21,212 |
| **Total revenues** | 184,552 | 67,996 | 151,392 | 506,559 | 211,905 |
| **Cost of revenues (note 4):** | | | | | |
| Digital out-of-home | | | | | |
| Commercial locations | 26,034 | 11,719 | 22,825 | 79,625 | 42,836 |
| In-store network | 7,456 | 5,123 | 5,832 | 23,502 | 18,106 |
| In-elevator poster frame network | 11,419 | 3,851 | 6,656 | 28,086 | 13,621 |
| Mobile handset advertising | 9,725 | 1,428 | 6,145 | 23,193 | 6,052 |
| Internet advertising | 42,115 | — | 32,718 | 93,238 | — |
| **Total advertising service costs** | 96,749 | 22,121 | 74,176 | 247,644 | 80,615 |
| Other costs | 373 | 373 | 121 | 797 | 765 |

| | | | | |
|---|---|---|---|---|
| Total cost of revenues | 97,122 | 22,494 | 74,297 | 248,441 | 81,380 |
| Gross profit | 87,430 | 45,502 | 77,095 | 258,118 | 130,525 |
| Operating expenses: | | | | | |
| General and administrative (note 4) | 17,032 | 9,074 | 12,095 | 49,456 | 25,723 |
| Selling and marketing (note 4) | 27,810 | 9,195 | 19,081 | 69,931 | 25,762 |
| Other operating income | (1,537) | (1,176) | (1,203) | (5,124) | (1,338) |
| Total operating expenses | 43,305 | 17,093 | 29,973 | 114,263 | 50,147 |
| Income from operations | 44,125 | 28,409 | 47,122 | 143,855 | 80,378 |
| Interest income, net | 3,530 | 1,692 | 1,595 | 9,752 | 4,255 |
| Other income (expenses), net | 2,523 | 367 | 5 | 2,568 | (287) |
| Income before tax and minority interests | 50,178 | 30,468 | 48,722 | 156,175 | 84,346 |
| Income tax expense | | | | | |
| - Current | 5,916 | 623 | 2,063 | 11,763 | 1,107 |
| - Deferred | (267) | (252) | 46 | (719) | (63) |
| Total income taxes | 5,649 | 371 | 2,109 | 11,044 | 1,044 |
| Income before minority interests | 44,529 | 30,097 | 46,613 | 145,131 | 83,302 |
| Minority Interests | 713 | 9 | | 695 | 105 |
| Net income | 43,816 | $ 30,088 | $ 46,613 | $ 144,436 | $ 83,197 |
| Income per ADS — basic | $ 0.35 | $ 0.28 | $ 0.38 | $ 1.22 | $ 0.82 |
| Income per ADS — diluted | $ 0.34 | $ 0.27 | $ 0.37 | $ 1.19 | $ 0.80 |
| Shares used in calculating basic income per ADS | 125,710,757 | 106,528,150 | 122,250,042 | 118,077,479 | 101,082,216 |
| Shares used in calculating diluted income per ADS | 129,831,533 | 109,915,074 | 126,370,818 | 121,665,290 | 104,307,276 |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASHFLOWS
(U.S. Dollar in thousands)

| | Three months ended | | Year ended | |
|---|---|---|---|---|
| | 2007-12-31 | 2006-12-31 | 2007-12-31 | 2006-12-31 |
| Operating activities: | | | | |
| Net income | $ 43,816 | $ 30,088 | $ 144,436 | $ 83,197 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Minority interest | 713 | 9 | 695 | 105 |
| Bad debt provision | 920 | 447 | 3,655 | 1,845 |
| Share based compensation | 7,338 | 3,436 | 21,453 | 8,368 |
| Depreciation and amortization | 6,223 | 3,893 | 19,444 | 13,737 |
| Amortization of acquired intangible assets | 16,862 | 1,704 | 24,753 | 5,774 |
| Changes in assets and liabilities, net of effects of acquisitions | (10,435) | 7,543 | (51,591) | (19,671) |
| Net cash provided by operating activities | $ 65,437 | $ 47,120 | $ 162,845 | $ 93,355 |
| Investing activities: | | | | |
| Purchase of equipment and other long term assets | (18,852) | (9,574) | (55,776) | (22,878) |
| Acquisition of an intangible asset | — | (6,403) | (105) | (6,403) |
| Purchase of subsidiaries, net of cash acquired | (34,041) | (1,455) | (88,481) | (124,063) |
| Deposits paid to acquire subsidiaries | (15,796) | (691) | (106,068) | (3,710) |
| Issuance of loan receivables | (30,000) | — | — | — |
| Sales /(purchase) of available-for-sale securities | (38,632) | 35,000 | (88,178) | 35,000 |
| Disposal of an investment | — | 60 | — | 60 |
| Net cash used in investing activities | $(137,321) | $ 16,937 | $(338,608) | $(121,994) |
| Financing activities: | | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs | 326,272 | 3,609 | 447,005 | 157,998 |
| Proceeds from short-term debts | — | — | — | 24,598 |
| Capital injection from minority shareholders | — | 77 | 137 | 326 |
| Repayment of short-term debts | — | — | (4,166) | (29,402) |
| Net cash provided by financing activities | $ 326,272 | $ 3,686 | $ 442,976 | $ 153,520 |
| Effect of exchange rate changes | 5,785 | 1,759 | 18,592 | 3,077 |
| Net (decrease) increase in cash and cash equivalents. | $ 260,173 | $ 69,502 | $ 285,805 | $ 127,958 |
| Cash and cash equivalents, beginning of period | 190,243 | 95,109 | 164,611 | 36,653 |

| | | | | |
|---|---|---|---|---|
| **Cash and cash equivalents, end of period** | **$ 450,416** | **$164,611** | **$ 450,416** | **$ 164,611** |
| Supplemental disclosure of cash flow information: | | | | |
| Income taxes paid | $ 211 | $ 124 | $ 1,247 | $ 154 |
| Interest paid | $ 8 | $ — | $ 14 | $ 245 |
| | | | | |
| Supplemental disclosure of non-cash investing activity: | | | | |
| Acquisition of subsidiaries: | | | | |
| Value of ordinary share consideration | $ — | $ — | $166,050 | $365,660 |
| Accounts payable | $16,935 | $4,507 | $ 16,935 | $ 4,507 |

**Notes:**

Note 1:  Basic income per ADS is computed by dividing income attributable to holders of ordinary shares by the weighted average
        number of ADS outstanding during the year/period. Diluted income per ADS reflects the potential dilution that could occur
        if securities or other contracts to issue ADS were exercised or converted into ADS.

Note 2:  The conversion of Renminbi ("RMB") amounts into USD amounts is based on the rate of USD1 = RMB7.3046 on December 28,
        2007.

Note 3:  Details of net revenues are as follows (U.S. Dollars in thousands):

| | Three months ended | | | Year ended | |
|---|---|---|---|---|---|
| | 2007-12-31 | 2006-12-31 | 2007-9-30 | 2007-12-31 | 2006-12-31 |
| **Gross Advertising Service Revenue:** | | | | | |
| **Digital out-of-home:** | | | | | |
| *Commercial locations* | | | | | |
| - Unrelated parties | 80,021 | $42,671 | $ 70,091 | 238,119 | $130,258 |
| - Related parties | 107 | 3,582 | 82 | 2,468 | 15,444 |
| Total Commercial Locations | **80,128** | **46,253** | **70,173** | **240,587** | **145,702** |
| *In-store Network* | | | | | |
| - Unrelated parties | 7,150 | 7,713 | 7,813 | 28,986 | 25,330 |
| - Related parties | — | 942 | — | 1,301 | 4,380 |
| Total in-store network | **7,150** | **8,655** | **7,813** | **30,287** | **29,710** |
| *In-elevator Poster Frame Network* | | | | | |
| - Unrelated parties | 34,025 | 15,113 | 25,029 | 93,157 | 44,893 |
| - Related parties | 54 | — | 92 | 244 | — |
| Total In-elevator Poster Frame Network | **34,079** | **15,113** | **25,121** | **93,401** | **44,893** |
| **Mobile handset advertising** | | | | | |
| - Unrelated parties | 16,606 | 3,714 | 14,592 | 48,407 | 10,880 |
| - Related parties | — | — | 35 | 114 | — |
| **Total mobile handset advertising** | **16,606** | **3,714** | **14,627** | **48,521** | **10,880** |
| **Internet advertising** | | | | | |
| - Unrelated parties | 58,965 | — | 43,552 | 128,830 | — |
| - Related parties | 353 | — | 682 | 1,140 | — |
| **Total internet advertising** | **59,318** | **—** | **44,234** | **129,970** | **—** |
| **Gross Advertising Services Revenue:** | **197,281** | **73,735** | **161,968** | **542,766** | **231,185** |
| Less: Sales taxes: | | | | | |
| Digital out-of-home: | | | | | |
| *Commercial locations:* | 6,738 | 4,529 | 5,584 | 19,904 | 13,641 |
| *In-store Network* | 675 | 819 | 726 | 2,843 | 2,803 |
| *In-elevator Poster Frame Network* | 2,887 | 1,338 | 2,058 | 7,929 | 3,989 |
| Mobile handset advertising | 612 | 205 | 602 | 1,612 | 779 |
| Internet advertising | 2,127 | — | 1,723 | 5,032 | — |
| **Total sales taxes:** | **13,039** | **6,891** | **10,693** | **37,320** | **21,212** |
| **Net Advertising Service Revenue** | **184,242** | **66,844** | **151,275** | **505,446** | **209,973** |
| Add: Other revenue: | 310 | 1,152 | 117 | 1,113 | 1,932 |
| **Net revenues:** | **$184,552** | **$67,996** | **$151,392** | **$506,559** | **$211,905** |

Note 4: Share based compensations included under SFAS 123R are as follows (U.S. Dollars in thousands):

|  | Three months ended | | | Year ended | |
|---|---|---|---|---|---|
|  | 2007-12-31 | 2006-12-31 | 2007-9-30 | 2007-12-31 | 2006-12-31 |
| Cost of revenues | $  126 | $  147 | $  288 | $  979 | $  147 |
| Selling and marketing | 3,005 | 1,202 | 2,017 | 9,524 | 2,090 |
| General and administrative | 4,207 | 2,087 | 2,374 | 10,950 | 6,131 |
| **Sub-total** | **$7,338** | **$3,436** | **$4,679** | **$21,453** | **$8,368** |

Note 5: The Company has performed preliminary purchase price allocation on their acquisition made in 2007 based on an internal valuation performed by management.  The purchase price allocation will be finalized once management has assessed the pending results of independent third party valuations.

Note 6: The earnings per ADS is based on the new conversion ratio of 1 ADS to 5 ordinary shares, effective as of April 11, 2007. The comparative numbers haven been adjusted to reflect the conversion.

Focus Media Holding Ltd.
Reconciliation of GAAP to Non-GAAP
(U.S. Dollar in thousands, except percentages, share and per-share data)
(Unaudited)

|  | 3 months ended December 31, 2007 | | | | 3 months ended September 30, 2007 | | | |
|---|---|---|---|---|---|---|---|---|
|  | GAAP | GAAP adjustments (a) | (b) | Non-GAAP | GAAP | GAAP adjustments (a) | (b) | Non-GAAP |
| **Gross profit** |  |  |  |  |  |  |  |  |
| Commercial location network | 47,356 | 126 | 3,089 | 50,571 | 41,764 | 288 | 566 | 42,618 |
| In-store network | (981) | — | — | (981) | 1,255 | — | — | 1,255 |
| Poster frame network | 19,773 | — | 3,830 | 23,603 | 16,407 | — | 571 | 16,978 |
| *Digital out-of-home* | 66,148 | 126 | 6,919 | 73,193 | 59,426 | 288 | 1,137 | 60,851 |
| *Mobile Handset Advertising Network* | 6,269 | — | 1,741 | 8,010 | 7,880 | — | 163 | 8,043 |
| *Internet Advertising* | 15,076 | — | 2,165 | 17,241 | 9,793 | — | 926 | 10,719 |
| *Others* | (63) | — | — | (63) | (4) | — | — | (4) |
| *Total* | 87,430 | 126 | 10,825 | 98,381 | 77,095 | 288 | 2,226 | 79,609 |
| **Gross margin** |  |  |  |  |  |  |  |  |
| Commercial location network | 64.5% | 0.2% | 4.2% | 68.9% | 64.7% | 0.4% | 0.9% | 66.0% |
| In-store network | -15.2% | 0.0% | 0.0% | -15.2% | 17.7% | 0.0% | 0.0% | 17.7% |
| Poster frame network | 63.4% | 0.0% | 12.3% | 75.7% | 71.1% | 0.0% | 2.5% | 73.6% |
| *Digital out-of-home* | 59.6% | 0.1% | 6.2% | 65.9% | 62.7% | 0.3% | 1.2% | 64.2% |
| *Mobile Handset Advertising Network* | 39.2% | 0.0% | 10.9% | 50.1% | 56.2% | 0.0% | 1.2% | 57.3% |
| *Internet Advertising* | 26.4% | 0.0% | 3.8% | 30.1% | 23.0% | 0.0% | 2.2% | 25.2% |
| *Others* | -20.3% | 0.0% | 0.0% | -20.3% | -3.4% | 0.0% | — | -3.4% |
| *Total* | 47.4% | 0.1% | 5.9% | 53.3% | 50.9% | 0.2% | 1.5% | 52.6% |

———

(a)   *To adjust share-based compensation expenses*

(b)   *To adjust amortization of acquisition related intangible assets*

|  | Three months ended | | | Year ended | |
|---|---|---|---|---|---|
|  | 2007-12-31 | 2006-12-31 | 2007-9-30 | 2007-12-31 | 2006-12-31 |
| **GAAP net income attributable to** |  |  |  |  |  |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **shareholders** | $ | **43,816** | $ | **30,088** | $ | **46,613** | $ | **144,436** | $ | **83,197** |
| Amortization of acquired intangible assets | | 16,862 | | 1,704 | | 3,287 | | 24,753 | | 5,774 |
| Share-based compensation | | 7,338 | | 3,436 | | 4,679 | | 21,453 | | 8,368 |
| **Non-GAAP net income** | $ | **68,016** | $ | **35,228** | $ | **54,579** | $ | **190,642** | $ | **97,339** |
| GAAP income per ADS — basic | $ | 0.35 | $ | 0.28 | $ | 0.38 | $ | 1.22 | $ | 0.82 |
| GAAP income per ADS — diluted | $ | 0.34 | $ | 0.27 | $ | 0.37 | $ | 1.19 | $ | 0.80 |
| Non-GAAP income per ADS — basic | $ | 0.54 | $ | 0.33 | $ | 0.45 | $ | 1.61 | $ | 0.96 |
| Non-GAAP income per ADS — diluted | $ | 0.52 | $ | 0.32 | $ | 0.43 | $ | 1.57 | $ | 0.93 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | | 125,710,757 | | 106,528,150 | | 122,250,042 | | 118,077,479 | | 101,082,216 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | | 129,831,533 | | 109,915,074 | | 126,370,818 | | 121,665,290 | | 104,307,276 |
| **GAAP income from operations** | $ | **44,125** | $ | **28,409** | $ | **47,122** | $ | **143,855** | $ | **80,378** |
| Amortization of acquired intangible assets | | 16,862 | | 1,704 | | 3,287 | | 24,753 | | 5,774 |
| Share-based compensation | | 7,338 | | 3,436 | | 4,679 | | 21,453 | | 8,368 |
| **Non-GAAP income from operations** | $ | **68,325** | $ | **33,549** | $ | **55,088** | $ | **190,061** | $ | **94,520** |
| **Non-GAAP operating margin** | | 37.0% | | 49.3% | | 36.4% | | 37.5% | | 44.6% |

# Exhibit N

6-K 1 htm_2283.htm LIVE FILING

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 6-K

REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934

June 12, 2007

Commission File Number: 000-51387

# Focus Media Holding Limited

———————————————————————————
(Translation of registrant's name into English)

Cayman Islands
———————————————————————————
(Jurisdiction of incorporation or organization)

28-30/F, Zhao Feng World Trade Building
369 Jiangsu Road
Shanghai 200050 China
———————————————————————————
(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F
or Form 40-F:  [x] Form 20-F    [ ] Form 40-F

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation
S-T Rule 101(b)(1):  [ ]

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation
S-T Rule 101(b)(7):  [ ]

Indicate by check mark whether the registrant by furnishing the information contained in this Form is
also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the
Securities Exchange Act of 1934:  [ ] Yes    [x] No

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule
12g3-2(b):   n/a

Case 1:07-cv-10617-LTS     Document 26-18     Filed 09/05/2008     Page 3 of 14

Contents


Signature
Exhibit Index
Exhibit 99.1 – Press Release

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Focus Media Holding Limited

Date: June 12, 2007                By:    /s/ Jason Nanchun Jiang

Name:  Jason Nanchun Jiang
Title:   Chairman and Chief Executive Officer

Case 1:07-cv-10617-LTS    Document 26-18    Filed 09/05/2008    Page 5 of 14

# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Q1 2007 Earnings Release |

EX-99.1 2 exhibit1.htm EX-99.1

**Exhibit 99.1**

### Focus Media Reports First Quarter 2007 Results
First Quarter Revenue Increased by 75.4% and Net Income Increased by 72.7% Year-over-year

SHANGHAI, China, May 17, 2007 – Focus Media Holding Limited (Nasdaq: FMCN), China's largest out-of-home multi-platform life-style media company, today announced its unaudited financial results for the first quarter ended March 31, 2007.

**Highlights for first quarter 2007:**

⌐ Total revenues grew 75.4% year-over-year to $58.1 million.

⌐ Net income for the first quarter was $16.3 million compared to $9.4 million for the three months ended March 31, 2006, growing 72.7% year-over-year. Fully diluted net income per ADS for the first quarter of 2007 was $0.15. Focus Media also provides operating margin, net income and earnings per ADS on a non-GAAP basis that exclude non-cash share-based compensation expense and acquired intangible assets amortization expense to enable investors to better assess the Company's operating performance. The non-GAAP measures are described below and reconciled to the corresponding GAAP measure in the section below titled "Use of non-GAAP Financial Measures". Net income, excluding non-cash share-based compensation expenses and amortization of acquired intangible assets resulting from acquisitions (non-GAAP) for the first quarter was $22.7million or $0.21 per fully diluted ADS., above our guidance range of $20 million to $21 million.

⌐ Our Commercial Location Network

n Advertising service revenue from our commercial location network, including revenue from our outdoor LED network (also referred to as our iStreet Network) and movie theater advertising network, grew 50.8% year-over-year to $32.4 million.

n For our Premier Office Building Channel A ("Premier Channel A"), average advertising revenue per 30-second equivalent time slot ("ASP") in Focus Media's Tier-I Cities (Beijing, Shanghai, Guangzhou and Shenzhen) was $12,092 in the first quarter 2007, down from $13,507 in the fourth quarter of 2006, as certain time slots were sold at a higher discount due to the less-favorable audience traffic during the holiday season.

⌐ Our In-store Network

n Advertising service revenue from our in-store network grew 26.1% year-over-year to $6.7 million in the first quarter of 2007.

n The total number of hypermarkets covered by our in-store network as of March 31, 2007 increased to 1,196 from 1,100 as of December 31, 2006. Substantially all of the revenue from our in-store network during this period was derived from our LCD network in hypermarkets.

⌐ Our In-elevator Poster Frame Network

n Advertising service revenue from our in-elevator poster frame network grew 108.8% year-over-year to $12.7 million in the first quarter 2007.

n The total number of frames available for sale was 124,542 as of March 31, 2007, as compared to 99,784 as of December 31, 2006.

⌐ Focus Media Wireless

n Advertising service revenue from Focus Media Wireless was $6.0 million in the first quarter 2007, as compared to $3.5 million in the fourth quarter 2006.

⌐ Other revenues

n In the first quarter 2007, we derived $0.4 million in the advertising equipment sales revenues from sales to our regional distributors and licensing fee from our partner in Malaysia.

Commenting on the first quarter 2007 results, Chief Executive Officer Jason Jiang said, "As expected, our businesses were impacted by the

Chinese New Year holiday in the first quarter of 2007. However, all of our businesses has posted solid growth year-over-year. We have also seen a solid sales rebound in sales into the second quarter. Most importantly during the first quarter of 2007, we completed the acquisition of Allyes, China's largest internet advertising agency and therefore, established a solid position in China's fast growing Internet advertising market. We expect Allyes to contribute significantly to our future growth."

**First Quarter Financial Results**

  For the first quarter of 2007, Focus Media reported total revenues of $58.1 million, an increase of 75.4% compared to $33.1 million for the first quarter of 2006, but a decrease of 14.9% compared to $68.3 million for the fourth quarter of 2006, due to industry seasonality and the Chinese New Year holiday during the first quarter.

Commercial Location Network

For the commercial location network, advertising service revenue, including revenue from our outdoor LED network and movie theater advertising network, was $32.4 million in the first quarter of 2007, an increase of 50.8% from $21.5 million in the first quarter of 2006.

The total number of displays installed on our commercial location network in our directly operated cities was 83,256 as of March 31, 2007, increasing from 80,263 as of December 31, 2006, while the number of displays in networks operated by our regional distributors was 4,010 as of March 31, 2007.

For our Premier Channel A, which consists primarily of the office building locations on Focus Media's commercial location network prior to the Target Media acquisition, the total number of 30-second equivalent time slots sold ("Slots Sold") in the first quarter of 2007 was 6,414, as compared to 8,533 in the previous quarter. The number of 30-second equivalent time slots available for sale ("Network Capacity") in the first quarter was 16,320 as compared to 15,939 in the fourth quarter of 2006. Slots Sold in Tier-I Cities were 1,117 in the first quarter 2007 which implies a sell-out rate, or Slots Sold expressed as a percentage of Network Capacity, of 89.6% in the first quarter 2007. ASP in the Tier-I Cities was $12,029 in the first quarter 2007, down from $13,507 in the fourth quarter of 2006, as certain time slots were sold at a higher discount during the holiday period. Advertising revenue from Tier-I Cities for our Premier Channel A accounts for approximately 60.2% of the total Premier Channel A revenues. Slots Sold in Tier-II Cities were to 5,298 in the first quarter 2007, which indicates a sell-out rate of 35.1%. The Premier Channel A accounted for approximately 70% of total commercial location advertising service revenues in the quarter while other channels, our outdoor LED network and movie theater advertising business contributed the remaining 30%.

Other revenue in the first quarter was $0.4 million, which include advertising equipment sales to our regional distributors and licensing fee from our partner in Malaysia

In-store Network

Advertising service revenue from our in-store network in the first quarter 2007 was $6.7 million, an increase of 26.1% from $5.3 million in the first quarter 2006. In the first quarter 2007, we continued to expand the installed base of our hypermarkets to 1,196 stores from 1,100 hypermarkets as of December 31, 2006. The installed base of supermarkets and convenience stores was 842 and 1,897, respectively, as of March 31, 2007. The number of displays installed in our in-store network increased to 40,736 as of March 31, 2007 compared to 38,742 as of December 31, 2006.

For the in-store network, the total number of 30-second equivalent time slots (on a per week per store basis) sold in the first quarter of 2007 was 100,322, as compared to 97,774 in the previous quarter. The number of 30-second equivalent time slots available for sale, or network capacity, was 360,309, as compared to 318,342 in the previous quarter. The network sell-out rate was 27.8% based on the increased capacity. Average advertising revenue per 30-second equivalent time slot per week per store was $67 for the in-store network in the first quarter of 2007, as compared to $80 as in the fourth quarter of 2006 due to seasonality.

Poster Frame Network

Advertising service revenue from our poster frame network placed primarily in the elevators of residential complexes was $12.7 million in the first quarter of 2007, 108.8% from $6.1 million in the first quarter of 2006. The total number of frames available for sale was 124,542 as of March 31, 2007, as compared to 99,784 as of December 31, 2006. The number of frame slots (on a monthly basis) sold in the first quarter 2007 increase 17.2% to 195,603, as compared to 166,825 in the previous quarter. The network capacity calculated based on the number of frame slots (on a monthly basis) available for sale in the first quarter of 2007 was 375,346, as compared to 294,294 in the previous quarter. The network sell-out rate was 52.1% based on the increased capacity. Average advertising revenue per frame slot was $65 per month in the first quarter of 2007 as compared to $83 per month in the fourth quarter of 2006 due to seasonality.

Advertising on Wireless Network

Advertising service revenue from Focus Media Wireless in the first quarter of 2007 was $6.0 million, as compared to $3.5 million in the

fourth quarter of 2006.

In the first quarter of 2007, for our commercial location and in-store businesses, we added approximately 187 new advertising clients, bringing the cumulative number of advertisers on the Focus Media commercial location network and in-store network to approximately 2,800.

Gross profit for the first quarter of 2007 was $33.7 million, representing an increase of 82.1% compared to $18.5 million for the corresponding period a year ago. Gross margin for the first quarter was 58.0%, as compared to 55.8% in the first quarter of 2006. In the first quarter 2007, gross margin for the commercial location network (including our outdoor LED network and movie theater advertising business) was 61.7%; the in-store network gross margin was 24.7%; the poster frame network gross margin was 66.9%; Focus Media wireless gross margin was 56.5%.

In the first-quarter of 2007, operating expenses totaled $20.5 million, including $1.9 million in acquired intangible asset amortization resulting from acquisitions and non-cash share-based compensation expense of $4.5 million. Operating expenses as a percentage of total revenues in the first quarter 2007 was 35.3%. Selling and marketing expenses in the first quarter totaled $9.9 million including $2.1 million in share compensation expense, or 17.0% of total revenues. General and administrative expense in the first quarter was $8.7 million including $2.2 million in share-based compensation expense, or 14.9% of total revenues. As a result, operating margin in the first quarter of 2007 was 22.7%. Excluding non-cash share-based compensation expense and acquired intangible asset amortization expense, operating margin (non-GAAP) was 33.8% in the first quarter 2007, as compared to 34.7% in the first quarter of 2006.

Net income for the first quarter of 2007 was $16.3 million, an increase of 72.7% compared to $9.4 million for the same period in 2006.  On April 11, 2007, On April 11, 2007, Focus Media effected a change in ADS-to-share ratio which had the equivalent effect of a share split. The ADS to ordinary share ratio was decreased from 1 ADS to 10 ordinary shares to 1 ADS to 5 ordinary shares. All of the per-ADR data reported after April 11, 2007 is based on the new ratio. Fully diluted net income per ADS for the first quarter of 2007 was $0.15. Net income excluding non-cash share-based compensation expenses and amortization of acquired intangible assets resulting from acquisitions (non-GAAP) in the first quarter of 2007 was $22.7million, or $0.21 per fully diluted ADS.

In the first quarter of 2007, cash flow from operating activities was $24.0 million. Total depreciation expense was $3.8 million. Day sales outstanding ("DSO"), excluding Allyes, was 100 days due to seasonality.

**Other Recent Developments**

In the first quarter of 2007, Focus Media changed the ratio of its American Depositary Shares ("ADSs") to ordinary shares from one (1) ADS representing ten (10) ordinary shares to one (1) ADS representing five (5) ordinary shares, effective as of April 11, 2007. For Focus Media's ADS holders, this ratio change had the same effect as a two-for-one ADS split. There will be no change to Focus Media's underlying ordinary shares.

In March 2007, Focus Media completed its acquisition of Allyes Information Technology Company Limited, the largest internet advertising service company in China. The Allyes acquisition extends our life-style media platform to one of the fastest growing media segments in China, the Internet, reaching high-end urban consumers. Following the close of the acquisition, Allyes became a wholly-owned subsidiary of Focus Media.

On May 15, 2007, the Board of Director confirmed the appointment of Dr. Tan Zhi, president of Focus Media, as a director of the company.

BUSINESS OUTLOOK

The company estimates its total revenues for the second quarter of 2007 will range from $103 million to $107 million, or $112 million to $116 million in gross revenue prior to the deduction of sales tax. Second quarter 2007 net income excluding share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) is expected to be between $40 million and $41 million or $0.34 to $0.35 per fully diluted ADS based on 117 million total ADS equivalent average shares outstanding.

USE OF NON-GAAP FINANCIAL MEASURES

In addition to Focus Media's consolidated financial results under GAAP, the Company also provides non-GAAP financial measures, including non-GAAP operating margin, non-GAAP net income and non-GAAP earning per fully diluted ADS, all excluding non-cash share-based compensation and amortization of acquired intangible assets resulting from acquisitions. The Company believes that these non-GAAP financial measures provide investors with another method for assessing Focus Media's operating results in a manner that is focused on the performance of its ongoing operations. Readers are cautioned not to view non-GAAP results on a stand-alone basis or as a substitute for results under GAAP, or as being comparable to results reported or forecasted by other companies, and should refer to the reconciliation of GAAP results with non-GAAP results for the three-month periods ended March 31 2006 and 2007, and December 31, 2006, in the attached financial information.

The Company believes that both management and investors benefit from referring to these non-GAAP financial measures in assessing the performance of Focus Media's liquidity and when planning and forecasting future periods. The Company computes its non-GAAP financial measures using the same consistent method from quarter to quarter. The accompanying tables have more details on the GAAP financial measures that are most directly comparable to non-GAAP financial measures and the related reconciliation between these financial measures.

Focus Media Holding Ltd.
Reconciliation of Non-GAAP to GAAP
(U.S. Dollar in thousands, except share data)

| | Three months ended | | |
|---|---|---|---|
| | 2007-3-31 | 2006-3-31 | 2006-12-31 |
| | (unaudited) | (unaudited) | (unaudited) |
| GAAP net income attributable to shareholders | $ 16,292 | $ 9,433 | $ 30,088 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Share-based compensation | 4,517 | 1,466 | 3,436 |
| Non-GAAP net income | $ 22,741 | $ 11,898 | $ 35,228 |
| GAAP income per ADS — basic | $ 0.15 | $ 0.11 | $ 0.28 |
| GAAP income per ADS — diluted | $ 0.15 | $ 0.10 | $ 0.28 |
| Non-GAAP income per ADS — basic | $ 0.21 | $ 0.14 | $ 0.33 |
| Non-GAAP income per ADS — diluted | $ 0.21 | $ 0.13 | $ 0.32 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 107,179,635 | 87,646,418 | 106,528,150 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 110,390,777 | 93,179,064 | 109,915,074 |
| GAAP income from operations | $ 13,180 | $ 9,048 | $ 27,556 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Share-based compensation | 4,517 | 1,466 | 3,436 |
| Non-GAAP income from operations | $ 19,629 | $ 11,513 | $ 32,696 |
| Non-GAAP operating margin | 33.8% | 34.7% | 47.9% |

TODAY'S CONFERENCE CALL

Focus Media will host a conference call to discuss the first quarter 2007 financial results and second quarter 2007 business outlook at 9:00 p.m. U.S. Eastern Time on May 17, 2007 (6:00 p.m. U.S. Pacific Time on May 17, 2007; 9:00 a.m. Beijing/Hong Kong time on May 18, 2007). The dial-in details for the live conference call are: U.S. Toll Free Number +1-800-299-8538, Hong Kong dial-in number +852-3002-1672, International dial-in number +1-617-786-2902; Pass code 85296374.

A replay of the call will be available from May 17, 2007 until May 24, 2007 (U.S. Eastern Time). The dial-in details for the replay are: U.S. Toll Free Number +1-888-286-8010; international dial-in number +1-617-801-6888; pass code 85604313. A webcast of this call will also be available live and archived on Focus Media's website at ir.focusmedia.cn.

ABOUT FOCUS MEDIA HOLDING LIMITED

Focus Media Holding Limited (Nasdaq: FMCN) is China's leading out-of-home multi-platform life-style media company, which operates the largest out-of-home advertising network in China using audiovisual flat-panel displays. Based on an audience-centric approach, Focus Media provides targeted advertising channels which cover specific demographics groups and their daily activities, from office buildings to retail chain stores, residential building, shopping malls, golf country clubs, airports, and airport transit buses. As of March 31, 2007, Focus Media had approximately 90,000 display units in its commercial location network, 40,700 display units in our in-store network, 124,500 advertising poster frames installed throughout China and 200 outdoor LED displays in Shanghai. Over 4,000 international and domestic advertisers had placed advertisements through our multi-platform networks as of March 31, 2007. For more information about Focus Media, please visit our website ir.focusmedia.cn.

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities

and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F, in each case as amended. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

Investor and Media contact:

Jie Chen

Tel: +86 21 32124661*6607

Email: ir@focusmedia.cn

<div align="center">

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS

(U.S. Dollars in thousands)

</div>

|  | 2007-3-31 (unaudited) | 2006-12-31 (unaudited) |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $  204,563 | $164,611 |
| Investment in available-for-sale securities | 21,980 | — |
| Accounts receivables, net | 93,720 | 67,942 |
| Inventories | 2,338 | 519 |
| Prepaid expenses and other current assets | 11,916 | 6,268 |
| Deposit paid for acquisition of subsidiaries | 19,745 | 3,526 |
| Amount due from related parties | 453 | 456 |
| **Total current assets** | $  354,715 | **$243,322** |
| Rental Deposits | 14,177 | 11,833 |
| Deposit paid for acquisition of equipment | 5,440 | 4,301 |
| Deposit paid for acquisition of subsidiaries | 7,945 | 525 |
| Equipment, net | 72,478 | 70,250 |
| Acquired intangible assets, net | 103,158 | 34,717 |
| Goodwill | 630,484 | 497,801 |
| Long term investments | 77 | — |
| Other long term assets | 673 | 723 |
| Deferred tax assets | 967 | 826 |
| **Total assets** | **$1,190,114** | **$864,298** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIENCY)** | | |
| **Current liabilities** | | |
| Other short term loans | $        — | $   3,115 |
| Accounts payable | 18,390 | 5,988 |
| Accrued expenses and other current liabilities | 56,470 | 38,489 |
| Income taxes payable | 7,386 | 3,300 |
| **Total current liabilities** | **$   82,246** | **$  50,892** |
| **Non-current liabilities** | | |
| Liabilities assumed upon acquisitions | 1,281 | 183 |
| **Total liabilities** | **$   83,527** | **$  51,075** |
| **Minority interests** | 427 | 358 |
| **Shareholders' equity** | | |
| Ordinary shares | 29 | 27 |
| Additional paid in capital | 985,188 | 709,196 |
| Retained earnings (note 7) | 111,019 | 96,195 |
| Accumulated other comprehensive income | 9,924 | 7,447 |
| Total shareholders' equity | $1,106,160 | $812,865 |
| **Total liabilities and shareholders' equity** | **$1,190,114** | **$864,298** |

<div align="center">

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
(U.S. Dollar in thousands, except share data)

</div>

|  | Three months ended | | |
|---|---|---|---|
|  | 2007-3-31 (unaudited) | 2006-3-31 (unaudited) | 2006-12-31 (unaudited) |
| **Gross revenues (note 3):** | | | |
| - Commercial Locations | $    35,653 | $    23,554 | $    46,495 |
| - In-store Network | 7,366 | 5,818 | 8,673 |
| - In-elevator Poster Frame Network | 13,854 | 6,658 | 15,113 |
| - Mobile Handset Advertising network | 6,020 | — | 3,714 |

| | | | |
|---|---:|---:|---:|
| Other Revenue | 381 | 304 | 1,151 |
| **Total gross revenues** | $ 63,274 | $ 36,334 | $ 75,146 |
| Less: Sales taxes | 5,159 | 3,197 | 6,892 |
| **Total net revenues** | $ 58,115 | $ 33,137 | $ 68,254 |
| **Cost of revenues (note 4):** | | | |
| Net advertising service cost | | | |
| - Commercial Locations | 12,417 | 8,035 | 11,337 |
| - In-store Network | 5,027 | 3,973 | 5,123 |
| - In-elevator Poster Frame Network | 4,195 | 2,397 | 3,389 |
| - Mobile Handset Advertising network | 2,614 | — | 1,297 |
| Other Costs | 165 | 232 | 373 |
| **Total cost of revenues** | 24,418 | 14,637 | 21,519 |
| **Gross profit** | 33,697 | 18,500 | 46,735 |
| **Operating expenses:** | | | |
| General and administrative (note 4) | 8,683 | 4,395 | 8,750 |
| Selling and marketing (note 4) | 9,902 | 4,057 | 8,725 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Total operating expenses | 20,517 | 9,451 | 19,179 |
| **Income from operations** | 13,180 | 9,049 | 27,556 |
| Interest income, net | 2,693 | 916 | 1,693 |
| Other income (expenses), net | 1,356 | 45 | 1,219 |
| **Income before tax and minority interests** | 17,229 | 10,010 | 30,468 |
| Income tax expense | | | |
| - Current | 1,101 | 65 | 624 |
| - Deferred | (133) | 552 | (252) |
| Total income taxes | 968 | 617 | 372 |
| **Income before minority interests** | 16,261 | 9,393 | 30,096 |
| Minority Interests | (31) | (40) | 8 |
| **Net income** | $ 16,292 | $ 9,433 | $ 30,088 |
| Income per ADS — basic | $ 0.15 | $ 0.11 | $ 0.28 |
| Income per ADS — diluted | $ 0.15 | $ 0.10 | $ 0.28 |
| Shares used in calculating basic income per ADS | 107,179,635 | 87,646,418 | 106,528,150 |
| Shares used in calculating diluted income per ADS | 110,390,777 | 93,179,064 | 109,915,074 |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASHFLOWS
(U.S. Dollar in thousands)

| | Three months ended | | |
|---|---:|---:|---:|
| | **2007-3-31** | **2006-3-31** | **2006-12-31** |
| | (unaudited) | (unaudited) | (unaudited) |
| Operating activities: | | | |
| Net income | $ 16,292 | $ 9,433 | $ 30,088 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Minority interest | (31) | (40) | 8 |
| Bad debt provision | 796 | 195 | 447 |
| Share based compensation | 4,517 | 1,467 | 3,436 |
| Depreciation and amortization | 3,838 | 2,606 | 3,893 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Changes in assets and liabilities, net of effects of acquisitions | (3,369) | (9,894) | 7,544 |
| Net cash provided by operating activities | 23,975 | 4,766 | 47,120 |
| Investing activities: | | | |
| Purchase of equipment and other long term assets. | (6,633) | (8,354) | (9,574) |
| Acquisition of an intangible asset | — | — | (6,403) |
| Purchase of subsidiaries, net of cash acquired | (52,260) | — | (444) |
| Diluted minority interest's share | — | (57,719) | (1,011) |
| Deposits paid to acquire subsidiaries | (20,069) | — | (691) |
| Expiration of/ (investment in) available-for-sale securities | (21,980) | — | 35,000 |
| Disposal of an investment | — | — | 60 |
| Net cash provided by/(used in) investing activities. | (100,942) | (66,073) | 16,937 |
| Financing activities: | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs | 117,195 | 65,664 | 3,609 |
| Proceeds from short-term bank loans | — | 1,247 | — |
| Capital injection from minority shareholders | 97 | 250 | 77 |
| Repayment of short-term bank loans | — | (991) | — |
| Repayment of short-term other loans | (3,115) | (79) | — |
| Net cash provided by financing activities | 114,177 | 66,091 | 3,686 |
| Effect of exchange rate changes | 2,742 | 426 | 1,759 |
| Net increase in cash and cash equivalents | 39,952 | 5,210 | 69,502 |

| | | | |
|---|---|---|---|
| Cash and cash equivalents, beginning of period | 164,611 | 36,653 | 95,109 |
| Cash and cash equivalents, end of period | 204,563 | 41,863 | 164,611 |
| Supplemental disclosure of cash flow information: | | | |
|     Income taxes paid | $ 280 | $ — | $ 124 |
|     Interest paid | $ — | $ 13 | $ — |
| | | | |
| Supplemental disclosure of non-cash investing activity: | | | |
| | | | |
| Acquisition of subsidiaries: | | | |
|   Value of ordinary share consideration | $154,281 | $— | $ — |
|   Accounts payable | $ 3,892 | $— | $4,507 |

**Notes:**

Note 1:    Basic income per ADS is computed by dividing income attributable to holders of ordinary shares by the weighted average number of ADS outstanding during the year/period. Diluted income per ADS reflects the potential dilution that could occur if securities or other contracts to issue ADS were exercised or converted into ADS.

Note 2:    The conversion of Renminbi ("RMB") amounts into USD amounts is based on the rate of USD1 = RMB7.7342 on March 31, 2007.

Note 3:    Details of net revenues are as follows (U.S. Dollars in thousands):

| | Three months ended | | |
|---|---|---|---|
| | 2007-3-31 | 2006-3-31 | 2006-12-31 |
| | (unaudited) | (unaudited) | (unaudited) |
| Gross Advertising Service Revenue: | | | |
| *Commercial Locations* | | | |
|   - Unrelated parties | $35,608 | $21,200 | $45,774 |
|   - Related parties | 45 | 2,354 | 721 |
|   Total Commercial Locations | 35,653 | 23,554 | 46,495 |
| *In-store Network* | | | |
|   - Unrelated parties | 7,366 | 5,216 | 8,673 |
|   - Related parties | — | 602 | — |
|   Total in-store network | 7,366 | 5,818 | 8,673 |
| *In-elevator Poster Frame Network* | | | |
|   - Unrelated parties | 13,854 | 6,658 | 15,113 |
|   Total In-elevator Poster Frame Network | 13,854 | 6,658 | 15,113 |
| *Mobile Handset Advertising Network* | | | |
|   - Unrelated parties | 6,020 | — | 3,714 |
|   Total Mobile Handset Advertising Network | 6,020 | — | 3,714 |
| Gross Advertising Services Revenue: | 62,893 | 36,030 | 73,995 |
| Less: Sales taxes£° | | | |
|   *Commercial Locations* | 3,274 | 2,082 | 4,530 |
|   *In-store Network* | 688 | 524 | 819 |
|   *In-elevator Poster Frame Network* | 1,185 | 591 | 1,338 |
|   *Mobile Handset Advertising Network* | 12 | — | 205 |
|   Total sales taxes | 5,159 | 3,197 | 6,892 |
| Net Advertising Service Revenue | 57,734 | 32,833 | 67,103 |
| Add: Other revenue: | 381 | 304 | 1,151 |
| **Net revenues:** | **$58,115** | **$33,137** | **$68,254** |

Note 4: Share based compensations included under SFAS 123R are as follows (U.S. Dollars in thousands):

| | Three months ended | | |
|---|---|---|---|
| | 2007-3-31 | 2006-3-31 | 2006-12-31 |
| | (unaudited) | (unaudited) | (unaudited) |
| Cost of sales | $ 281 | — | $ 147 |
| Selling and marketing | 2,061 | 337 | 1,202 |
| General and administrative | 2,175 | 1,129 | 2,087 |
| Total | $4,517 | $1,466 | $3,436 |

Note 5: The Company has performed preliminary purchase price allocation on their acquisition made in the third and fourth quarters of 2006 and the first quarter of 2007 based on an internal valuation performed by management. The purchase price allocation will be finalized once the independent valuation analysis is completed.

Note 6: The earnings per ADS is based on the new conversion ratio of 1 ADS to 5 ordinary shares, effective as of April 11, 2007. The comparative numbers haven been adjusted to reflect the conversion.

Note 7: Effective January, 1 2007, the Company adopted the provisions of FIN 48, "Accounting for Uncertainty in Income Taxes–an interpretation of FASB Statement No. 109." The cumulative effect on adoption of FIN 48 has been recorded as an adjustment to increase income tax provision and decrease the retained earnings as of January 1, 2007 by $1.5 million, respectively.

<div align="center">

Focus Media Holding Ltd.
Reconciliation of Non-GAAP to GAAP
(U.S. Dollar in thousands, except percentages, share and per-share data)

</div>

| | Three months ended | | |
|---|---|---|---|
| | 2007-3-31 | 2006-3-31 | 2006-12-31 |
| | (unaudited) | (unaudited) | (unaudited) |
| **GAAP net income attributable to shareholders** | $ 16,292 | $ 9,433 | $ 30,088 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Share-based compensation | 4,517 | 1,466 | 3,436 |
| **Non-GAAP net income** | $ 22,741 | $ 11,898 | $ 35,228 |
| GAAP income per ADS — basic | $ 0.15 | $ 0.11 | $ 0.28 |
| GAAP income per ADS — diluted | $ 0.15 | $ 0.10 | $ 0.28 |
| Non-GAAP income per ADS — basic | $ 0.21 | $ 0.14 | $ 0.33 |
| Non-GAAP income per ADS — diluted | $ 0.21 | $ 0.13 | $ 0.32 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 107,179,635 | 87,646,418 | 106,528,150 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 110,390,777 | 93,179,064 | 109,915,074 |
| **GAAP income from operations** | $ 13,180 | $ 9,048 | $ 27,556 |
| Amortization of acquired intangible assets | 1,932 | 999 | 1,704 |
| Share-based compensation | 4,517 | 1,466 | 3,436 |
| **Non-GAAP income from operations** | $ 19,629 | $ 11,513 | $ 32,696 |
| **Non-GAAP operating margin** | 33.8% | 34.7% | 47.9% |

# Exhibit O

6-K 1 htm_2567.htm LIVE FILING

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 6-K

REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934

October 2, 2007

Commission File Number: 000-51387

# Focus Media Holding Limited

───────────────────────────────
(Translation of registrant's name into English)

Cayman Islands
───────────────────────────────
(Jurisdiction of incorporation or organization)

28-30/F, Zhao Feng World Trade Building
369 Jiangsu Road
Shanghai 200050 China
───────────────────────────────
(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:  [x] Form 20-F    [ ] Form 40-F

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):  [ ]

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):  [ ]

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934:  [ ] Yes    [x] No

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b):   n/a

Contents


Signature
Exhibit Index
Exhibit 99.1 – Press Release: 2Q 2007 Earnings Release
Exhibit 99.2 – Press Release: Director Appointment and Nasdaq Letter

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Focus Media Holding Limited

Date: October 2, 2007         By:   /s/ Daniel Mingdong Wu

Name:  Daniel Mingdong Wu
Title:   Chief Financial Officer

# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release: Q2 2007 Earnings Release |
| 99.2 | Director Appointment and Nasdaq Letter |

Case 1:07-cv-10617-LTS    Document 26-19    Filed 09/05/2008    Page 6 of 14

EX-99.1 2 exhibit1.htm EX-99.1

**Exhibit 99.1**

## Focus Media Reports Second Quarter 2007 Results

Second Quarter Revenue Increased by 126.3% and Net Income Increased by 126.2% Year-over-year

SHANGHAI, China, September 27, 2007 – Focus Media Holding Limited (Nasdaq: FMCN), China's largest digital media group, today announced its unaudited financial results for the second quarter ended June 30, 2007.

**Highlights for Second Quarter 2007:**

ı Total revenues grew 126.3% year-over-year and 97.5% quarter-over-quarter to $113.3 million.

ı Net income for the second quarter was $37.7 million, up 126.2% year-over-year and 131.5% quarter-over-quarter. Fully diluted net income per ADS for the second quarter of 2007 was $0.32. Focus Media also provides operating margin, net income and earnings per ADS on a non-GAAP basis that exclude non-cash share-based compensation expense and acquired intangible assets amortization expense to enable investors to better assess the Company's operating performance. The non-GAAP measures are described below and reconciled to the corresponding GAAP measure in the section below titled "Use of non-GAAP Financial Measures". Net income, excluding non-cash share-based compensation expenses and amortization of acquired intangible assets resulting from acquisitions (non-GAAP) for the second quarter was $45.3 million or $0.38 per fully diluted ADS.

ı As our digital media offerings to our advertising clients continue to expand, we will be reporting our advertising service revenues under three separate lines going forward: Digital out-of-home which includes our commercial location network (which includes our Premier Office Building Channel A and other commercial location network channels, our outdoor LED network and our movie theater network), our in-store network and our in-elevator poster frame network; Mobile handset advertising; and Internet advertising. In the second quarter of 2007, digital out-of-home advertising revenue was $76.9 million.

n Advertising service revenue from our commercial location network, including revenue from our outdoor LED network (also referred to as our iStreet Network) and movie theater advertising network, grew 67.8% year-over-year and 61.4% quarter-over quarter to $51.1 million.

n Advertising service revenue from our in-store network grew 10.8% year-over-year and 9.1% quarter-over-quarter to $7.2 million.

n Advertising service revenue from our in-elevator poster frame network grew 89.7% year-over-year and 46.4% quarter-over-quarter to $18.5 million in the second quarter 2007.

ı Mobile handset advertising revenue grew 253.8% year-over-year and 81.1% quarter-over-quarter, to $10.9 million in the second quarter 2007.

ı Internet advertising revenue, primarily from revenues following the acquisition of Allyes in the first quarter 2007, was $25.2 million in the second quarter of 2007.

"We saw strong demand growth in the second quarter of 2007. In addition, upon the successful integration of Allyes, we have further expanded our ability to offer highly-effective cross-media solutions catering to the needs of our advertising clients. We believe Internet advertising will become another key growth driver for Focus Media in the future," said Jason Jiang, CEO of Focus Media. "Among our media networks, the in-store business is characterized by relatively low margin and intense competition. Going forward, we will focus on market share expansion by investing aggressively to secure additional store locations throughout China. Recently, we have signed up RT-Mart, one of the leading hypermarket chains with more than 60 stores in major cities in China and a partner of Auchan Group in France. We believe, by developing the largest in-store digital advertising network in China, we will be able to offer the most attractive media solutions for our fast-moving-consumer-goods (FMCG) advertising clients."

**Second Quarter Financial Results**

For the second quarter of 2007, Focus Media reported total revenues of $113.3 million, an increase of 126.3% compared to $50.1 million for the second quarter of 2006, and an increase of 97.5% compared to $57.3 million for the first quarter of 2007.

Our total digital out-of-home advertising revenue was $76.9 million in the second quarter of 2007, an increase of 64.4% from $46.8 million in the second quarter of 2006 and a sequential increase of 50.8% from $51.0 million in the first quarter of 2007. In the second quarter of 2007, commercial location advertising revenue was $51.1 million, contributing 66.4% of total digital out-of-home advertising revenue.

Advertising service revenue from our in-store network was $7.2 million, or 9.4% of total digital out-of-home advertising revenue. Advertising service revenue from our poster frame network placed primarily in the elevators of residential complexes was $18.5 million in the second quarter of 2007, or 24.1% of total digital out-of-home advertising revenue.

Due to continuing expansion of our media offerings and strong demand from our customers, we have started to offer customized media solutions tailored to the needs of our large advertising clients. We have also extended the cycle time of our commercial location network in certain cities to more than 12 minutes. As a result, the number of 30-second equivalent time slots sold ("Slot Sold") and average revenue per 30-second equivalent time slot ("ASP") for our networks are no longer as representative. Therefore, going forward, we will no longer provide such data in our earning reports.

As of June 30, 2007, the total installed base of displays in our commercial location network was 89,687 nationwide, including 85,010 displays through our directly owned networks, and 4,677 displays through our regional distributors. In the second quarter of 2007, we continued to expand the installed base of our hypermarkets to 1,205 stores from 1,196 hypermarkets as of March 31, 2007. The installed base of supermarkets and convenience stores was 734 and 2,056, respectively, as of June 30, 2007. The number of displays installed in our in-store network increased to 41,322 as of June 30, 2007 compared to 40,736 as of March 31, 2007. The total number of frames available for sale was 161,435 as of June 30, 2007, as compared to 124,542 as of March 31, 2007. As of August 30, 2007, we had installed 6,796 digital 2.0 frames, mainly in Beijing, Shanghai, Guangzhou and Shenzhen.

*Mobile Advertising Business*

Advertising service revenue from Focus Media Wireless in the second quarter of 2007 was $10.9 million, up 253.8% from $3.1 million in the second quarter of 2006 and 81.1% from $6.0 million in the first quarter of 2007.

*Internet Advertising Business*

Advertising service revenue from Allyes was $25.2 million in the second quarter of 2007. Digital marketing service, digital marketing technology and digital performance media contributed 90.0%, 3.4%, 6.6% respectively to the total Internet advertising revenue.

Gross profit for the second quarter of 2007 was $61.8 million, representing an increase of 117.2% compared to $28.5 million for the corresponding period a year ago and a 94.8% increase compared to $31.8 million in the first quarter 2007. In the second quarter 2007, gross margin for our digital out-of-home business was 63.1%. Within the digital out-of-home business, commercial location network gross margin was 65.0%, in-store network gross margin was 28.4%, and the poster frame network gross margin was 71.6%. The gross margin for our mobile advertising business was 58.0%. The gross margin for our Internet advertising business was 27.1% in the second quarter 2007. Blended gross margin for the company for the second quarter was 54.6%, as compared to 56.9% in the second quarter of 2006, primarily due to the addition of the lower-margin Internet advertising business to our revenue mix.

In the second quarter of 2007, operating expenses totaled $23.7 million, including $0.8 million in acquired intangible asset amortization resulting from acquisitions and non-cash share-based compensation expense of $4.6 million. Operating expenses as a percentage of total revenues in the second quarter 2007 was 20.9%, as compared to 30.2% in the previous quarter. Selling and marketing expenses in the second quarter totaled $13.2 million including $2.0 million in share compensation expense, or 11.6% of total revenues. General and administrative expense in the second quarter was $11.6 million including $2.6 million in share-based compensation expense, or 10.3% of total revenues. Our operating margin in the second quarter of 2007 was 33.7%, up significantly from 25.2% in the first quarter 2007. Excluding non-cash share-based compensation expense and acquired intangible asset amortization expense, operating margin (non-GAAP) was 40.4% in the second quarter 2007.

Net income for the second quarter of 2007 was $37.7 million, an increase of 126.2% compared to $16.7 million for the same period in 2006. Fully diluted net income per ADS for the second quarter of 2007 was $0.32. Net income excluding non-cash share-based compensation expense and acquired intangible assets amortization expense resulting from acquisitions (non-GAAP) in the second quarter of 2007 was $45.3 million, or $0.38 per fully diluted ADS.

**Other Recent Developments**

On March 16, 2006, Shanghai Xicheng Cultural Dissemination Co.,Ltd, also referred to as CGEN, brought a suit against us in the Shanghai No. 1 Intermediate People's Court on the grounds of unfair competition. On July 25, 2007, we received the civil judgment of first instance by the Shanghai No.1 Intermediate People's Court which dismissed the lawsuit.

In September 2007, the Audit Committee completed its investigation into allegations made by U.S. counsel to an investor described as holding a short position in Focus Media shares. Based upon its review of the evidence, the audit committee concluded that nothing has come to its attention — apart from the initial allegations that gave rise to the investigation — that would cause the audit committee to believe that Focus Media made undisclosed rebate payments to a third party advertising agency through another advertising agency, namely, Everease. We concluded that Everease is a related party based upon information developed during the investigation. Based upon its review of the evidence, the audit committee concurred with our conclusion that Everease should be deemed a related party. Subsequently, the Company filed its delayed 2006 20-F annual report on September 25, 2007. Our 2006 annual report on form 20-F is

available at the investor relations portion of our website (http://ir.focusmedia.cn).

BUSINESS OUTLOOK

The Company estimates its total revenues for the third quarter of 2007 will range from $132 million to $135 million. Third quarter 2007 net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions (non-GAAP) is expected to be between $52 million and $54 million or $0.41 to $0.43 per fully diluted ADS based on 126 million total ADS equivalent average shares outstanding. Due to higher-than-expected growth in our Internet advertising business, the company also raises its total revenues estimates for full year 2007 to a range of $440 million to $450 million, as compared to the previously announced range of $390 million to $400 million.

USE OF NON-GAAP FINANCIAL MEASURES

In addition to Focus Media's consolidated financial results under GAAP, the Company also provides non-GAAP financial measures, including non-GAAP operating margin, non-GAAP net income and non-GAAP earnings per fully diluted ADS, all excluding non-cash share-based compensation and acquired intangible asset amortization expense resulting from acquisitions. The Company believes that these non-GAAP financial measures provide investors with another method for assessing Focus Media's operating results in a manner that is focused on the performance of its ongoing operations. Readers are cautioned not to view non-GAAP results on a stand-alone basis or as a substitute for results under GAAP, or as being comparable to results reported or forecasted by other companies, and should refer to the reconciliation of GAAP results with non-GAAP results for the three-month periods ended March 31 2007, and the three- and six-month periods ended June 30, 2006 and 2007, in the attached financial information.

The Company believes that both management and investors benefit from referring to these non-GAAP financial measures in assessing the performance of Focus Media and when planning and forecasting future periods. The Company computes its non-GAAP financial measures using the same consistent method from quarter to quarter. The accompanying tables have more details on the GAAP financial measures that are most directly comparable to non-GAAP financial measures and the related reconciliation between these financial measures.

Focus Media Holding Ltd.
Reconciliation of Non-GAAP to GAAP
(U.S. Dollar in thousands, except share data)

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **GAAP net income attributable to shareholders** | $ 37,715 | $ 16,671 | $ 16,292 | $ 54,007 | $ 26,104 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| **Non-GAAP net income** | $ 45,306 | $ 20,062 | $ 22,741 | $ 68,047 | $ 31,960 |
| GAAP income per ADS — basic | $ 0.33 | $ 0.16 | $ 0.15 | $ 0.48 | $ 0.27 |
| GAAP income per ADS — diluted | $ 0.32 | $ 0.16 | $ 0.15 | $ 0.47 | $ 0.26 |
| Non-GAAP income per ADS — basic | $ 0.39 | $ 0.20 | $ 0.21 | $ 0.61 | $ 0.34 |
| Non-GAAP income per ADS — diluted | $ 0.38 | $ 0.19 | $ 0.21 | $ 0.59 | $ 0.32 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 115,701,382 | 101,826,234 | 107,179,635 | 112,102,181 | 94,735,718 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 119,385,064 | 106,547,388 | 110,390,777 | 115,473,182 | 99,135,414 |
| **GAAP income from operations** | $ 38,164 | $ 16,938 | $ 14,444 | $ 52,608 | $ 26,131 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| **Non-GAAP income from operations** | $ 45,755 | $ 20,329 | $ 20,893 | $ 66,648 | $ 31,987 |
| **Non-GAAP operating margin** | 40.4% | 40.6% | 36.4% | 39.1% | 38.4% |

TODAY'S CONFERENCE CALL

Focus Media will host a conference call to discuss the second quarter 2007 financial results and third quarter 2007 business outlook at 9:00 p.m. U.S. Eastern Time on September 27, 2007 (6:00 p.m. U.S. Pacific Time on September 27, 2007; 9:00 a.m. Beijing/Hong Kong time on September 28, 2007). The dial-in details for the live conference call are: U.S. Toll Free Number +1-866-700-7477, Hong Kong dial-in number +852-3002-1672, International dial-in number +1-617-213-8840; Pass code 81045580.

A replay of the call will be available from September 27, 2007 until October 4, 2007 (U.S. Eastern Time). The dial-in details for the replay are: U.S. Toll Free Number +1-888-286-8010; international dial-in number +1-617-801-6888; pass code 34979673. A webcast of this call will also be available live and archived on Focus Media's website at ir.focusmedia.cn.

ABOUT FOCUS MEDIA HOLDING LIMITED

Focus Media Holding Limited (Nasdaq: FMCN) is the largest digital media group in China, leading China's digital out-of-home, mobile advertising and internet advertising markets. Based on audience-centric approach, Focus Media provides targeted advertising channels, powered by a broad portfolio of LCD, digital frame, wireless, internet and other new media technologies, which cover specific demographic groups and their daily activities, from office buildings to retail chain stores, residential buildings, shopping malls, golf country clubs, airports, and airport transit buses in China. As of June 30, 2007, Focus Media digital out-of-home had approximately 131,000 LCD display units and 161,400 advertising poster frames, installed in over 90 cities throughout China and 200 outdoor LED displays in Shanghai. Over 4,000 international and domestic advertisers have placed advertisements through our digital out-of-home advertising networks as of June 30, 2007. For more information about Focus Media, please visit our website at ir.focusmedia.cn.

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F, in each case as amended. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

Investor and Media contact:

Jie Chen

Tel: +86 21 32124661*6607

Email: ir@focusmedia.cn

## FOCUS MEDIA HOLDING LIMITED
## UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS
### (U.S. Dollars in thousands)

|  | 2007-6-30 | 2006-12-31 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $  187,592 | $  164,611 |
| Investment in debt securities | 41,317 | — |
| Accounts receivables, net | 119,118 | 61,614 |
| Inventories | 2,339 | 519 |
| Prepaid expenses and other current assets | 15,788 | 5,199 |
| Deposits paid for acquisition of subsidiaries | 31,873 | 3,526 |
| Amount due from related parties | 6,832 | 7,853 |
| Rental deposits | 23,365 | — |
| **Total current assets** | **$  428,224** | **$  243,322** |
| Rental Deposits | — | 11,833 |
| Equipment, net | 81,229 | 70,250 |
| Acquired intangible assets, net | 73,009 | 34,717 |
| Goodwill | 924,202 | 739,744 |
| Other long term assets | 20,305 | 6,376 |
| **Total assets** | **$1,526,969** | **$1,106,242** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIENCY)** | | |
| **Current liabilities** | | |
| Short term debt | $  394 | $  2,769 |
| Accounts payable | 32,502 | 5,987 |
| Accrued expenses and other current liabilities | 65,179 | 38,674 |
| Income taxes payable | 10,841 | 4,060 |
| Amount due to related parties | 3,055 | 347 |
| Deferred tax liabilities) | 1,098 | — |
| **Total current liabilities** | **$  113,069** | **$  51,837** |
| Deferred tax liabilities | 6,132 | 3,303 |
| **Total liabilities** | **$  119,201** | **$  55,140** |

| | 2007-6-30 | 2006-6-30 |
|---|---|---|
| Minority interests | 447 | 358 |
| **Shareholders' equity** | | |
| Ordinary shares | 31 | 27 |
| Additional paid in capital | 1,242,817 | 709,196 |
| Acquisition consideration to be issued | — | 237,879 |
| Retained earnings | 148,734 | 96,195 |
| Accumulated other comprehensive income | 15,739 | 7,447 |
| Total shareholders' equity | $1,407,321 | $1,050,744 |
| **Total liabilities and shareholders' equity** | **$1,526,969** | **$1,106,242** |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
(U.S. Dollar in thousands, except share data)

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-3-31 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **Gross revenues (note 3):** | | | | | |
| Digital out-of-home | | | | | |
| Commercial Locations | $ 55,368 | $ 33,406 | $ 34,918 | $ 90,286 | $ 56,868 |
| In-store network | 7,998 | 7,235 | 7,326 | 15,324 | 13,053 |
| In-elevator Poster Frame Network | 20,347 | 10,736 | 13,854 | 34,201 | 17,394 |
| Mobile handset advertising | 11,268 | 3,365 | 6,020 | 17,288 | 3,365 |
| Internet advertising | 26,418 | — | — | 26,418 | — |
| Other revenue | 305 | 233 | 381 | 686 | 690 |
| **Total gross revenues** | 121,704 | 54,975 | 62,499 | 184,203 | 91,370 |
| Less: Sales taxes | 8,429 | 4,912 | 5,159 | 13,588 | 8,109 |
| **Total revenues** | 113,275 | 50,063 | 57,340 | 170,615 | 83,261 |
| **Cost of revenues (note 4):** | | | | | |
| Digital out-of-home | | | | | |
| Commercial locations | 17,868 | 11,487 | 12,898 | 30,766 | 19,713 |
| In-store Network | 5,187 | 4,394 | 5,027 | 10,214 | 8,367 |
| In-elevator Poster Frame Network | 5,265 | 3,222 | 4,746 | 10,011 | 6,014 |
| Mobile handset advertising | 4,569 | 2,405 | 2,754 | 7,323 | 2,405 |
| Internet advertising | 18,405 | — | — | 18,405 | — |
| **Total advertising service costs** | 51,294 | 21,508 | 25,425 | 76,719 | 36,499 |
| Other costs | 138 | 80 | 165 | 303 | 312 |
| **Total cost of revenues** | 51,432 | 21,588 | 25,590 | 77,022 | 36,811 |
| **Gross profit** | 61,843 | 28,475 | 31,750 | 93,593 | 46,450 |
| **Operating expenses:** | | | | | |
| General and administrative (note 4) | 11,646 | 6,298 | 8,683 | 20,329 | 10,693 |
| Selling and marketing (note 4) | 13,154 | 5,376 | 9,886 | 23,040 | 9,783 |
| Other operating income | (1,121) | (137) | (1,263) | (2,384) | (157) |
| **Total operating expenses** | 23,679 | 11,537 | 17,306 | 40,985 | 20,319 |
| **Income from operations** | 38,164 | 16,938 | 14,444 | 52,608 | 26,131 |
| Interest income, net | 1,870 | 605 | 2,693 | 4,563 | 1,493 |
| Other income (expenses), net | 12 | (408) | 92 | 104 | (479) |
| **Income before tax and minority interests** | 40,046 | 17,135 | 17,229 | 57,275 | 27,145 |
| Income tax expense | | | | | |
| - Current | 2,683 | 553 | 1,101 | 3,784 | 618 |
| - Deferred | (365) | (180) | (133) | (498) | 372 |
| Total income taxes | 2,318 | 373 | 968 | 3,286 | 990 |
| **Income before minority interests** | 37,728 | 16,762 | 16,261 | 53,989 | 26,155 |
| Minority Interests | 13 | 91 | (31) | (18) | 51 |
| **Net income** | $ 37,715 | $ 16,671 | $ 16,292 | $ 54,007 | $ 26,104 |
| Income per ADS — basic | $ 0.33 | $ 0.16 | $ 0.15 | $ 0.48 | $ 0.27 |
| Income per ADS — diluted | $ 0.32 | $ 0.16 | $ 0.15 | $ 0.47 | $ 0.26 |
| Shares used in calculating basic income per ADS | 115,701,282 | 101,826,234 | 107,179,635 | 112,102,181 | 94,735,718 |
| Shares used in calculating diluted income per ADS | 119,385,064 | 106,547,388 | 110,390,777 | 115,473,182 | 99,135,414 |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASHFLOWS
(U.S. Dollar in thousands)

| | Three months ended | | Six months ended | |
|---|---|---|---|---|
| | 2007-6-30 | 2006-6-30 | 2007-6-30 | 2006-6-30 |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **Operating activities:** | | | | |
| Net income | $ 37,715 | $ 16,671 | $ 54,007 | $ 26,104 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |

| | | | | |
|---|---:|---:|---:|---:|
| Minority interest | 13 | 91 | (18) | 51 |
| Bad debt provision | 1,620 | 575 | 2,416 | 770 |
| Share based compensation | 4,919 | 1,896 | 9,436 | 3,363 |
| Depreciation and amortization | 4,269 | 3,523 | 8,108 | 6,131 |
| Amortization of acquired intangible assets | 2,672 | 1,493 | 4,604 | 2,492 |
| Changes in assets and liabilities, net of effects of acquisitions | (21,754) | (11,622) | (21,983) | (21,518) |
| **Net cash provided by operating activities** | **29,454** | **12,627** | **56,570** | **17,393** |
| **Investing activities:** | | | | |
| Purchase of equipment and other long term assets | (15,274) | (3,254) | (25,265) | (11,608) |
| Acquisition of an intangible asset | (105) | — | (105) | — |
| Purchase of subsidiaries, net of cash acquired | (4,514) | (29,341) | (56,774) | (87,060) |
| Deposits paid to acquire subsidiaries | (15,198) | — | (35,268) | — |
| Investment in debt securities | (18,735) | — | (40,715) | — |
| **Net cash used in investing activities** | **(53,826)** | **(32,595)** | **(158,127)** | **(98,668)** |
| **Financing activities:** | | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs. | 3,063 | 83,015 | 120,258 | 148,680 |
| Proceeds from short-term bank loans | — | 23,351 | — | 24,598 |
| Capital injection from minority shareholders | — | — | 97 | 250 |
| Repayment of short-term bank loans | (656) | (1,247) | (656) | (2,239) |
| Repayment of short-term other loans | — | (3,734) | (3,115) | (3,813) |
| **Net cash provided by financing activities** | **2,407** | **101,385** | **116,584** | **167,476** |
| Effect of exchange rate changes | 4,994 | (596) | 7,955 | (170) |
| **Net (decrease) increase in cash and cash equivalents** | **(16,971)** | **80,821** | **22,982** | **86,031** |
| Cash and cash equivalents, beginning of period | 204,563 | 41,863 | 164,610 | 36,653 |
| **Cash and cash equivalents, end of period** | **187,592** | **122,684** | **187,592** | **122,684** |
| Supplemental disclosure of cash flow information: | | | | |
| Income taxes paid | 297 | 114 | 577 | 114 |
| Interest paid | — | 13 | — | 26 |

| | | | | |
|---|---:|---:|---:|---:|
| Supplemental disclosure of non-cash investing activity: | | | | |
| Acquisition of subsidiaries: | | | | |
| Value of ordinary share consideration | $11,769 | $79,874 | $166,050 | $365,665 |
| Accounts payable | $ 1,129 | $27,318 | $ 1,129 | $ 27,318 |

**Notes:**

Note 1:    Basic income per ADS is computed by dividing income attributable to holders of ordinary shares by the weighted average
number of ADS outstanding during the year/period. Diluted income per ADS reflects the potential dilution that could occur
if securities or other contracts to issue ADS were exercised or converted into ADS.

Note 2:    The conversion of Renminbi ("RMB") amounts into USD amounts is based on the rate of USD1 = RMB7.6155 on
June 30, 2007.

Note 3:    Details of net revenues are as follows (U.S. Dollars in thousands):

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | **2007-6-30** | **2006-6-30** | **2007-3-31** | **2007-6-30** | **2006-6-30** |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **Gross Advertising Service Revenue:** | | | | | |
| **Digital out-of-home:** | | | | | |
| *Commercial locations* | | | | | |
| - Unrelated parties | $ 55,321 | $30,564 | $32,413 | $ 87,734 | $50,586 |
| - Related parties | 47 | 2,842 | 2,505 | 2,552 | 6,382 |
| Total Commercial Locations | 55,368 | 33,406 | 34,918 | 90,286 | 56,868 |
| *In-store Network* | | | | | |
| - Unrelated parties | 7,998 | 6,146 | 6,011 | 14,009 | 11,007 |
| - Related parties | — | 1,089 | 1,315 | 1,315 | 2,046 |
| Total in-store network | 7,998 | 7,235 | 7,326 | 15,324 | 13,053 |
| *In-elevator Poster Frame Network* | | | | | |
| - Unrelated parties | 20,249 | 10,736 | 13,854 | 34,103 | 17,394 |
| - Related parties | 98 | — | — | 98 | — |
| Total In-elevator Poster Frame Network | 20,347 | 10,736 | 13,854 | 34,201 | 17,394 |
| **Mobile handset advertising** | | | | | |
| - Unrelated parties | 11,179 | 3,365 | 6,020 | 17,199 | 3,365 |
| - Related parties | 89 | — | — | 89 | — |
| **Total mobile handset advertising** | **11,268** | **3,365** | **6,020** | **17,288** | **3,365** |
| **Internet advertising** | | | | | |
| - Unrelated parties | 26,088 | — | — | 26,088 | — |
| - Related parties | 330 | — | — | 330 | — |
| **Total internet advertising** | **26,418** | — | — | **26,418** | — |
| **Gross Advertising Services Revenue:** | **121,399** | **54,742** | **62,118** | **183,517** | **90,680** |

| | | | | | |
|---|---|---|---|---|---|
| Less: Sales taxes: | | | | | |
| *Commercial locations:* | 4,308 | 2,968 | 3,274 | 7,582 | 5,050 |
| *In-store Network* | 754 | 697 | 688 | 1,442 | 1,221 |
| *In-elevator Poster Frame Network* | 1,799 | 958 | 1,185 | 2,984 | 1,549 |
| Digital out-of-home | 6,861 | 4,623 | 5,147 | 12,008 | 7,820 |
| Mobile handset advertising | 386 | 289 | 12 | 398 | 289 |
| Internet advertising | 1,182 | — | — | 1,182 | — |
| **Total sales taxes:** | 8,429 | 4,912 | 5,159 | 13,588 | 8,109 |
| **Net Advertising Service Revenue** | 112,970 | 49,830 | 56,959 | 169,929 | 82,571 |
| Add: Other revenue: | 305 | 233 | 381 | 686 | 690 |
| **Net revenues:** | **$113,275** | **$50,063** | **$57,340** | **$170,615** | **$83,261** |

Note 4: Share based compensations included under SFAS 123R are as follows (U.S. Dollars in thousands):

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | **2007-6-30** | **2006-6-30** | **2007-3-31** | **2007-6-30** | **2006-6-30** |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| Cost of revenues | $ 284 | $ | $ 281 | $ 565 | $ — |
| Selling and marketing | 2,084 | 341 | 2,061 | 4,145 | 678 |
| General and administrative | 2,551 | 1,556 | 2,175 | 4,726 | 2,685 |
| **Sub-total** | **$4,919** | **$1,897** | **$4,517** | **$9,436** | **$3,363** |

Note 5: The Company has performed preliminary purchase price allocation on their acquisition made in the third and fourth quarters of 2006 and the first two quarters of 2007 based on an internal valuation performed by management. The purchase price allocation will be finalized once the independent valuation analysis is completed.

Note 6: The earnings per ADS is based on the new conversion ratio of 1 ADS to 5 ordinary shares, effective as of April 11, 2007. The comparative numbers haven been adjusted to reflect the conversion.

Focus Media Holding Ltd.
Reconciliation of Non-GAAP to GAAP
(U.S. Dollar in thousands, except percentages, share and per-share data)

| | Three months ended | | | Six months ended | |
|---|---|---|---|---|---|
| | **2007-6-30** | **2006-6-30** | **2007-3-31** | **2007-6-30** | **2006-6-30** |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **GAAP net income attributable to shareholders** | $ 37,715 | $ 16,671 | $ 16,292 | $ 54,007 | $ 26,104 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| **Non-GAAP net income** | **$ 45,306** | **$ 20,062** | **$ 22,741** | **$ 68,047** | **$ 31,960** |
| GAAP income per ADS — basic | $ 0.33 | $ 0.16 | $ 0.15 | $ 0.48 | $ 0.27 |
| GAAP income per ADS — diluted | $ 0.32 | $ 0.16 | $ 0.15 | $ 0.47 | $ 0.26 |
| Non-GAAP income per ADS — basic | $ 0.39 | $ 0.20 | $ 0.21 | $ 0.61 | $ 0.34 |
| Non-GAAP income per ADS — diluted | $ 0.38 | $ 0.19 | $ 0.21 | $ 0.59 | $ 0.32 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 115,701,382 | 101,826,234 | 107,179,635 | 112,102,181 | 94,735,718 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 119,385,064 | 106,547,388 | 110,390,777 | 115,473,182 | 99,135,414 |
| **GAAP income from operations** | $ 38,164 | $ 16,938 | $ 14,444 | $ 52,608 | $ 26,131 |
| Amortization of acquired intangible assets | 2,672 | 1,494 | 1,932 | 4,604 | 2,493 |
| Share-based compensation | 4,919 | 1,897 | 4,517 | 9,436 | 3,363 |
| **Non-GAAP income from operations** | **$ 45,755** | **$ 20,329** | **$ 20,893** | **$ 66,648** | **$ 31,987** |
| **Non-GAAP operating margin** | 40.4% | 40.6% | 36.4% | 39.1% | 38.4% |

EX-99.2 3 exhibit2.htm EX-99.2

**Exhibit 99.2**

### Focus Media Appoints David Zhang as Independent Director; Receives Nasdaq Letter Regarding Listing Requirements

SHANGHAI, China, October 1, 2007 — Focus Media Holding Limited (NASDAQ: FMCN"), China's largest digital media group, announced that on September 28, 2007, Mr. David Ying Zhang was appointed to its board of directors as an independent director. Mr. Zhang is the managing director and head of the Beijing office of WI Harper, a private equity fund.

Mr. Zhang, 34, has been actively involved in the building, managing, fundraising and institutionalizing WI Harper's Fund VI and has been responsible for investments in companies including Pollex, Cardiva, Celestry Designs, Focus Media and iKang Healthcare Services. Mr. Zhang joined WI Harper in its San Francisco office in late 2001 and moved back to China in early 2003. Prior to joining WI Harper, Mr. Zhang was a senior venture associate with ABN AMRO Capital and was responsible for developing and executing various acquisition strategies for life sciences, information technology and Internet companies. Before joining ABN AMRO Capital, Mr. Zhang worked at Salomon Smith Barney, where he was responsible for analyzing, structuring and marketing companies in the Internet, software and semiconductor sectors. Mr. Zhang was born in Shanghai, grew up in the United States and holds a M.S. degree in biotechnology and business from Northwestern University and a B.S. degree in biology and chemistry from California State University, San Francisco.

Jason Jiang, Chairman and CEO of Focus Media noted, "David brings significant knowledge and expertise about the media and finance industries in China. He is a valuable addition to our board as an independent director."

With the appointment of Mr. Zhang, Focus Media's board regains a majority of independent directors.

Focus Media also announced today that it received a letter from Nasdaq Listing Qualifications on September 28, 2007 stating that as a result of the appointment of David Zhang to its board of directors, Focus Media had regained compliance with the independent director requirements for continued listing on The Nasdaq Global Market set forth in Marketplace Rule 4350. The letter from the Nasdaq noted that the Company's 2006 annual report indicated that the Company had four independent and four non-independent directors, which does not comply with Nasdaq Marketplace Rule 4350. The letter stated that, with the appointment of David Zhang to its board, Focus Media has regained compliance with Rule 4350.

FORWARD-LOOKING STATEMENTS

This press release includes statements that may constitute forward-looking statements made pursuant to the safe harbor provision of the Private Securities Litigation Reform Act of 1995. This information may involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Although Focus Media believes that the expectations reflected in such forward-looking statements are based on reasonable assumptions, such statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

This release is not an offer of securities for sale in the United States. Securities may not be offered or sold in the United States absent registration or an exemption from registration. Any public offering of securities to be made in the United States will be made by means of a prospectus that may be obtained from the issuer or selling security holder and that will contain detailed information about the company and management, as well as financial statements.

ABOUT FOCUS MEDIA HOLDING LIMITED

Focus Media Holding Limited (Nasdaq: FMCN) is the largest digital media group in China, leading China's digital out-of-home, mobile advertising and internet advertising markets. Based on audience-centric approach, Focus Media provides targeted advertising channels, powered by a broad portfolio of LCD, digital frame, wireless, internet and other new media technologies, which cover specific demographic groups and their daily activities, from office buildings to retail chain stores, residential buildings, shopping malls, golf country clubs, airports, and airport transit buses in China. As of June 30, 2007, Focus Media digital out-of-home had approximately 131,000 LCD display units and 161,400 advertising poster frames, installed in over 90 cities throughout China and 200 outdoor LED displays in Shanghai. Over 4,000 international and domestic advertisers have placed advertisements through our digital out-of-home advertising networks as of June 30, 2007. For more information about Focus Media, please visit our website at ir.focusmedia.cn..

Investor and Media contact:
Jie Chen
Tel: +86 21 32124661*6607
Email: ir@focusmedia.cn

# Exhibit P

6-K 1 htm_3127.htm LIVE FILING

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 6-K

## REPORT OF FOREIGN PRIVATE ISSUER
### PURSUANT TO RULE 13a-16 OR 15d-16
### UNDER THE SECURITIES EXCHANGE ACT OF 1934

June 10, 2008

Commission File Number: 000-51387

# Focus Media Holding Limited

_____
(Translation of registrant's name into English)

Cayman Islands
_____
(Jurisdiction of incorporation or organization)

28-30/F, Zhao Feng World Trade Building
369 Jiangsu Road
Shanghai 200050 China
_____
(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:  [x] Form 20-F    [ ] Form 40-F

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):  [ ]

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):  [ ]

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934:  [ ] Yes    [x] No

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b):   n/a

Contents


Signature
Exhibit Index
Exhibit 99.1 — Press Release: Q1 2008 Earnings Release

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Focus Media Holding Limited

Date: June 10, 2008                    By:    /s/ Daniel Mingdong Wu

Name:  Daniel Mingdong Wu
Title:   Chief Financial Officer

Case 1:07-cv-10617-LTS    Document 26-20    Filed 09/05/2008    Page 5 of 15

# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release - Q1 2008 Earnings Release |

EX-99.1 2 exhibit1.htm EX-99.1

**Exhibit 99.1**

### Focus Media Reports First Quarter 2008 Results

SHANGHAI, China, June 5, 2008 – Focus Media Holding Limited (Nasdaq: FMCN), China's leading multi- platform digital media company, today announced its unaudited financial results for the first quarter ended March 31, 2008.

**Highlights for first quarter 2008:**

ι Total GAAP revenues grew 214.7% year-over-year to $161.6 million. Total GAAP revenues exclude $11.3 million of revenue from our mobile handset advertising business which is classified as discontinued operation.

ι GAAP net loss for the first quarter was $53.8 million or $0.42 per fully diluted ADS. The GAAP net loss includes a non-recurring loss of $79.3 million resulting from the restructuring of our mobile handset advertising business.

ι Focus Media provides gross margin, operating margin, net income and earnings per ADS on a non-GAAP basis that exclude non-cash share-based compensation expense, acquired intangible assets amortization expense and one-time items to enable investors to better assess the Company's operating performance. The non-GAAP measures are described below and reconciled to the corresponding GAAP measure in the section below titled "Use of non-GAAP Financial Measures". Net income, excluding non-cash share-based compensation expenses, amortization of acquired intangible assets resulting from acquisitions and one-time charges relating to our discontinued operations (non-GAAP) for the first quarter was $44.8 million or $0.34 per fully diluted ADS.

ι In the first quarter of 2008, digital out-of-home advertising revenue was $108.7 million, up 113.4% year-over-year.

η Advertising service revenue from our commercial location network, including revenue from our LCD display networks, outdoor digital and non-digital billboard networks and movie theater advertising network, grew 96.8% year-over-year to $62.3 million.

η Advertising service revenue from our in-store network, including revenues from CGEN Digital Media Company Limited ("CGEN"), was $17.3 million, an increase of 160.2% year-over-year. On January 2, 2008, we completed the acquisition of CGEN, which has significantly strengthened our market leadership in the in-store advertising market.

η Advertising service revenue from our in-elevator poster frame network grew 130.3% year-over-year to $29.2 million

ι Internet advertising revenue was $49.6 million in the first quarter of 2008.

Dr. Tan Zhi, Chief Executive Officer of Focus Media said, "Our Q1 2008 results were affected by the restructuring of our wireless handset advertising business announced previously. Our digital out-of-home and Internet advertising businesses continued to perform strongly in the first quarter. The recent earthquake in Sichuan province will have a negative impact on our operations in the second quarter, especially to advertising revenues from our networks in the earthquake region, namely Chengdu and Chongqing. However, we believe such affect will be limited to the near term and we continue to look for a strong second-half in 2008."

**First Quarter Financial Results**

For the first quarter of 2008, Focus Media reported total revenues from continuing operations of $161.6 million, an increase of 214.7% compared to $51.3 million for the first quarter of 2007.

Our total digital out-of-home advertising revenue was $108.7 million in the first quarter of 2008, an increase of 113.4% from $51.0 million in the first quarter of 2007. In the first quarter of 2008, commercial location advertising revenue, outdoor LED and movie theatre advertising, was $62.3 million, contributing 57.3% of total digital out-of-home advertising revenue. Advertising service revenue from our in-store network was $17.3 million, or 15.9% of total digital out-of-home advertising revenue. Advertising service revenue from our in-elevator poster frame network placed primarily in the elevators of residential complexes was $29.2 million in the first quarter of 2008, or 26.8% of total digital out-of-home advertising revenue.

As of March 31, 2008, the total installed base of LCD displays and digital frames in our commercial location network was 119,240 nationwide, including 114,426 displays through our directly owned networks, and 4,814 displays through our regional distributors. The total number of displays installed in our in-store network including CGEN was 61,420 as of March 31, 2008. The total number of non-digital frames available for sale on our poster frame network was 225,473 as of March 31, 2008. In addition, as of March 31, 2008, we had 21,447 digital frames installed on our poster frame network.

Internet advertising service revenue was $49.6 million in the first quarter of 2008, lower than $57.2 million in the fourth quarter of 2008 due to seasonality, as the first quarter has historically been the Company's weakest quarter for advertising revenues.

Gross profit for the first quarter of 2008 was $65.5 million, representing an increase of 129.7% compared to $28.5 million in the first quarter of 2007. In the first quarter 2008, GAAP gross margin for the company was 40.5%, as compared to 47.8% in the fourth quarter of 2007, mainly due to the contribution from the lower-margin Internet advertising operations. Excluding non-cash share-based compensation expense of $0.3 million and acquisition-related intangible asset amortization expense of $7.3 million in the cost of revenues, gross margin (non-GAAP) was 45.2% in the first quarter of 2008. In the first quarter of 2008, excluding non-cash share-based compensation expense and acquisition-related intangible asset amortization expense, digital out-of-home gross margin (non-GAAP) was 53.9%; Internet advertising gross margin (non-GAAP) was 26.3%.

In the first quarter of 2008, operating expenses totaled $39.2 million, including $3.3 million in acquired intangible asset amortization resulting from acquisitions and non-cash share-based compensation expense of $8.3 million. Selling and marketing expenses in the first quarter totaled $22.4 million, including $3.3 million in acquired intangible asset amortization and $4.6 million in share compensation expense. General and administrative expense in the first quarter was $18.6 million, including $3.7 million in share compensation expense. Our operating margin in the first quarter of 2008 was 16.3%. Excluding non-cash share-based compensation expense and acquired intangible asset amortization expense, our operating margin (non-GAAP) was 28.2% in the first quarter 2008 compared to 36.6% in the fourth quarter of 2007.

Total intangible amortization expense in the first quarter of 2008 resulting from historical acquisitions was $10.7 million. Non-cash share-based compensation expense was $8.6 million in the first quarter of 2008, or 5.3% of total revenues. Total income tax expense was $5.0 million.

In the first quarter of 2008, due to the restructuring of our mobile handset advertising business, we recorded a $79.3 million impairment charge to reduce the carrying value of the business to its estimated fair value less cost to sell and accrue for legal and contingent acquisition consideration payments. As a result, we incurred a GAAP loss for the first quarter of 2008 of $53.8 million, or $0.42 per fully diluted ADS. Net income excluding non-cash share-based compensation expense, acquired intangible assets amortization expense resulting from acquisitions and the non-recurring impairment charge resulted from the restructuring of mobile handset advertising business in the first quarter of 2008 (non-GAAP) was $44.8 million, or $0.34 per fully diluted ADS.

First quarter 2008 operating cash flow was $7.6 million. Day sales outstanding ("DSO") was 127 days in the first quarter mainly due to the consolidation of $40.7 million accounts receivables from CGEN at the end of Q1 2008 and longer receivable cycles of our Internet advertising business. As of March 31, 2008, the company had cash and cash equivalents of $283.0 million.

**BUSINESS OUTLOOK**

Due to the impact of the recent earthquake in Sichuan province, our full year 2008 revenue guidance excluding discontinued wireless advertising operations is revised to be between $820 million to $850 million as compared to the previous guidance of between announced $860 million to $890 million, Full year 2008 net income from continued operations excluding share-based compensation expenses, amortization of intangible assets resulting from acquisitions and one-time non-recurring impairment charge resulted from the restructuring of mobile handset advertising business (non-GAAP) to be between US$240 million and US$260 million, or $1.76 to $1.91 per fully diluted ADS based on 136 million annual average total ADS equivalent shares outstanding, as compared to the previous guidance of between US$260 million and US$280 million.

The Company estimates its total revenues for the second quarter of 2008 will range from $190 million to $195 million. Second quarter 2008 net income excluding share-based compensation expenses and amortization of intangible assets resulting from acquisitions (non-GAAP) is expected to be between $54 million and $55 million or $0.40 to $0.41 per fully diluted ADS based on 133 million average total ADS equivalent shares outstanding.

**ANNOUCEMENTS**

Focus Media will hold an Analyst Day meeting on Monday June 30, 2008 in its headquarter office: 29/F, No. 369 Jiangsu Road, Shanghai, PR China to provide general updates on the business. Presentations by Focus Media's management team are scheduled to begin at 1:00 p.m. and conclude by approximately 5:00 p.m. Beijing time.

**USE OF NON-GAAP FINANCIAL MEASURES**

In addition to Focus Media's consolidated financial results under GAAP, the Company also provides non-GAAP financial measures, including non-GAAP gross profit, non-GAAP gross margin, non-GAAP operating margin, non-GAAP net income and non-GAAP earnings per fully diluted ADS, all excluding non-cash share-based compensation and acquired intangible asset amortization expense resulting from acquisitions. The Company believes that these non-GAAP financial measures provide investors with another method for assessing Focus Media's operating results in a manner that is focused on the performance of its ongoing operations. Readers are cautioned not to view non-GAAP results on a stand-alone basis or as a substitute for results under GAAP, or as being comparable to results reported or forecasted by

other companies, and should refer to the reconciliation of GAAP results with non-GAAP results in the attached financial information.

The Company believes that both management and investors benefit from referring to these non-GAAP financial measures in assessing the performance of Focus Media and when planning and forecasting future periods. The Company computes its non-GAAP financial measures using the same consistent method from quarter to quarter. The accompanying tables have more details on the GAAP financial measures that are most directly comparable to non-GAAP financial measures and the related reconciliation between these financial measures.

Focus Media Holding Ltd.
Reconciliation of GAAP to Non-GAAP
(U.S. Dollar in thousands, except share data)
(Unaudited)

1. Reconciliation of GAAP gross profit, gross margin to Non-GAAP gross profit and gross margin.

| | | 3 months ended March 31, 2008 | | | | 3 months ended December 31, 2007 | | |
|---|---|---|---|---|---|---|---|---|
| | GAAP | (a) | (b) | Non-GAAP | GAAP | (a) | (b) | Non-GAAP |
| **Gross profit** | | | | | | | | |
| Commercial | | | | | | | | |
| location network | 35,732 | 304 | 1,817 | 37,853 | 47,356 | 126 | 3,089 | 50,571 |
| In-store network | 28 | — | 857 | 885 | (981) | — | - | (981) |
| Poster frame | | | | | | | | |
| network | 17,533 | — | 2,348 | 19,881 | 19,773 | — | 3,830 | 23,603 |
| *Digital out-of-home* | 53,293 | 304 | 5,022 | 58,619 | 66,148 | 126 | 6,919 | 73,193 |
| *Mobile Handset* | | | | | | | | |
| *Advertising Network* | (492) | — | 145 | (347) | (566) | — | — | (566) |
| *Internet Advertising* | 10,872 | — | 2,164 | 13,036 | 15,076 | — | 2,165 | 17,241 |
| *Others* | 1,787 | — | — | 1,787 | (63) | — | — | (63) |
| *Total* | 65,460 | 304 | 7,331 | 73,095 | 80,595 | 126 | 9,084 | 89,805 |
| *Gross margin* | | | | | | | | |
| Commercial | | | | | | | | |
| location network | 57.4% | 0.5% | 2.9% | 60.8% | 64.5% | 0.2% | 4.2% | 68.9% |
| In-store network | 0.2% | 0.0% | 5.0% | 5.1% | (15.2%) | 0.0% | 0.0% | (15.2%) |
| Poster frame | | | | | | | | |
| network | 60.1% | 0.0% | 8.0% | 68.1% | 63.4% | 0.0% | 12.3% | 75.7% |
| *Digital out-of-home* | 49.0% | 0.3% | 4.6% | 53.9% | 59.6% | 0.1% | 6.2% | 65.9% |
| *Mobile Handset* | | | | | | | | |
| *Advertising Network* | (298.2%) | 0.0% | 87.9% | (210.2%) | (379.9%) | 0.0% | 0.0% | (379.9%) |
| *Internet Advertising* | 21.9% | 0.0% | 4.4% | 26.3% | 26.4% | 0.0% | 3.8% | 30.1% |
| *Others* | 57.8% | 0.0% | 0.0% | 57.8% | (20.3%) | 0.0% | 0.0% | (20.3%) |
| *Total* | 40.5% | 0.2% | 4.5% | 45.2% | 47.8% | 0.1% | 5.4% | 53.2% |

—

(a)  *To adjust share-based compensation expenses*

(b)  *To adjust amortization of acquisition related intangible assets*

2. Reconciliation of net income, earnings per share and operating margin from GAAP to Non-GAAP:

| | Three months ended | | |
|---|---|---|---|
| | 2008-3-31 | 2007-3-31 | 2007-12-31 |
| **GAAP net income / (loss) attributable to shareholders** | $  (53,810) | $  16,292 | $  43,816 |
| Amortization of acquired intangible assets | 10,680 | 1,932 | 16,862 |
| Share-based compensation | 8,624 | 4,517 | 7,338 |
| Loss from impairment of discontinued operations (Note 8) | 79,322 | — | — |
| **Non-GAAP net income** | $  44,816 | $  22,741 | $  68,016 |
| GAAP income/(loss) per ADS — basic | $  (0.42) | $  0.15 | $  0.35 |
| GAAP income/(loss) per ADS — diluted | $  (0.42) | $  0.15 | $  0.34 |
| Non-GAAP income per ADS — basic | $  0.35 | $  0.21 | $  0.54 |
| Non-GAAP income per ADS — diluted | $  0.34 | $  0.21 | $  0.52 |
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 128,049,333 | 107,179,635 | 125,710,757 |

| | | | | | |
|---|---|---|---|---|---|
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | | 131,394,654 | | 110,390,777 | | 129,831,533 |
| **GAAP income from operations** | $ | **26,310** | $ | **11,836** | $ | **40,583** |
| Amortization of acquired intangible assets | | 10,680 | | 1,637 | | 13,879 |
| Share-based compensation | | 8,624 | | 4,517 | | 7,338 |
| **Non-GAAP income from operations** | $ | **45,614** | $ | **17,990** | $ | **61,880** |
| **Non-GAAP operating margin** | | 28.2% | | 35.0% | | 36.6% |

TODAY'S CONFERENCE CALL

The Company will host a conference call to discuss the first quarter 2008 results at 9:00 p.m. U.S. Eastern Time on June 5, 2008 (6:00 p.m. U.S. Pacific Time on June 5, 2008 and 9:00 a.m. Beijing/Hong Kong Time on June 6, 2008). The dial-in details for the live conference call are set forth below: U.S. Toll Free Number +1- 800-638-5439, Hong Kong dial-in number +852-3002-1672, International dial-in number +1-617-614-3945; Pass code: 25224862.

A replay of the call will be available from June 5, 2008 until June 12, 2008 (US Eastern Time). The dial-in details for the replay are set forth below: U.S. Toll Free Number +1-888-286-8010, International dial-in number +1-617-801-6888; Pass code 22983881.

ABOUT FOCUS MEDIA HOLDING LIMITED

Focus Media Holding Limited (Nasdaq: FMCN) is China's leading multi- platform digital media company, operating the largest out-of-home advertising network in China using audiovisual digital displays, based on the number of locations and number of flat-panel television displays in our network, and is also a leading provider of mobile handset advertising and Internet marketing solutions in China. Through Focus Media's multi-platform digital advertising network, the company reaches urban consumers at strategic locations and point-of-interests over a number of media formats, including audiovisual television displays in buildings and stores, advertising poster frames and other new and innovative media, such as outdoor light-emitting diode or LED digital billboard, mobile handset advertising networks and Internet advertising platforms. As of March 31, 2008, Focus Media's digital out-of-home advertising network had approximately 119,200 LCD display in its commercial location network, approximately 61,400 LCD displays in its in-store network and 246,900 advertising in-elevator poster frames, installed in over 90 cities throughout China, and approximately 200 outdoor LED billboard displays in Shanghai. For more information about Focus Media, please visit our website at ir.focusmedia.cn.

SAFE HARBOR: FORWARD-LOOKING STATEMENTS

This announcement contains forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and similar statements. Among other things, the Business Outlook section and quotations from management in this press release, as well as Focus Media's strategic and operational plans, contain forward-looking statements. Focus Media may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission on forms 20-F and 6-K., in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Focus Media's beliefs and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those contained in any forward-looking statement. Potential risks and uncertainties include, but are not limited to, risks outlined in Focus Media's filings with the U.S. Securities and Exchange Commission, including its registration statements on Form F-1, F-3, F-6 and 20-F, in each case as amended. Focus Media does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

Investor and Media contact:

Jie Chen

Tel: +86 21 32124661*6607

Email: ir@focusmedia.cn

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS
(U.S. Dollars in thousands)

| | 2008-3-31 | 2007-12-31 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 282,953 | $ 450,416 |
| Investment in equity securities | 128,550 | 90,145 |

| | | |
|---|---:|---:|
| Accounts receivables, net | 251,774 | 206,102 |
| Inventories | 2,023 | 1,654 |
| Prepaid expenses and other current assets | 23,608 | 58,885 |
| Deposit paid for acquisition of subsidiaries | 49,730 | 40,402 |
| Amount due from related parties | 3,825 | 5,092 |
| Rental deposits | 34,763 | 28,763 |
| Total assets of discontinued operations | 17,512 | — |
| **Total current assets** | **$ 794,738** | **$ 881,459** |
| Rental deposits | 6,582 | 5,302 |
| Equipment, net | 129,483 | 95,478 |
| Acquired intangible assets, net | 197,083 | 155,717 |
| Goodwill | 1,048,516 | 943,398 |
| Other long term assets | 43,801 | 58,183 |
| **Total assets** | **$2,220,203** | **$2,139,537** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short term debt | $ 370 | $ — |
| Accounts payable | 69,903 | 50,379 |
| Accrued expenses and other current liabilities | 207,509 | 190,313 |
| Income taxes payable | 24,666 | 21,391 |
| Amount due to related parties | 14,260 | 12,977 |
| Deferred tax liabilities | 14,625 | 1,227 |
| Total liabilities of discontinued operations | 35,592 | — |
| **Total current liabilities** | **$ 366,925** | **$ 276,287** |
| Deferred tax liabilities | 10,140 | 6,393 |
| **Total liabilities** | **$ 377,065** | **$ 282,680** |
| **Minority interests** | 2,083 | 1,913 |
| **Shareholders' equity** | | |
| Ordinary shares | 32 | 32 |
| Additional paid in capital | 1,594,706 | 1,581,580 |
| Retained earnings | 182,908 | 236,718 |
| Accumulated other comprehensive income | 63,409 | 36,614 |
| Total shareholders' equity | $1,841,055 | $1,854,944 |
| **Total liabilities and shareholders' equity** | **$2,220,203** | **$2,139,537** |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
(U.S. Dollar in thousands, except share data)

| | Three months ended | | |
|---|---:|---:|---:|
| | **2008-3-31** | **2007-3-31** | **2007-12-31** |
| **Gross revenues (note 4):** | | | |
| Digital out-of-home: | | | |
| Commercial locations | $ 67,957 | $ 34,918 | $ 80,128 |
| In-store network | 19,077 | 7,326 | 7,150 |
| In-elevator poster frame network | 31,841 | 13,854 | 34,079 |
| Mobile handset advertising | 174 | — | 156 |
| Internet advertising | 51,450 | — | 59,318 |
| Other revenue | 3,090 | 381 | 310 |
| **Total gross revenues** | **173,589** | **56,479** | **181,141** |
| Less: Sales taxes | 12,026 | 5,147 | 12,434 |
| **Total revenues** | **161,563** | **51,332** | **168,707** |
| **Cost of revenues (note 5):** | | | |
| Digital out-of-home: | | | |
| Commercial locations | 26,558 | 12,898 | 26,034 |
| In-store network | 17,243 | 5,027 | 7,456 |
| In-elevator poster frame network | 11,646 | 4,746 | 11,419 |
| Mobile handset advertising | 657 | — | 715 |
| Internet advertising | 38,696 | — | 42,115 |
| **Total advertising service costs** | **94,800** | **22,671** | **87,739** |
| Other costs | 1,303 | 165 | 373 |
| **Total cost of revenues** | **96,103** | **22,836** | **88,112** |
| **Gross profit** | **65,460** | **28,496** | **80,595** |
| **Operating expenses:** | | | |
| General and administrative (note 5) | 18,568 | 8,578 | 16,593 |
| Selling and marketing (note 5) | 22,412 | 9,338 | 24,956 |
| Other operating (income)/expenses, net | (1,830) | (1,256) | (1,537) |
| **Total operating expenses** | **39,150** | **16,660** | **40,012** |
| **Income from operations** | **26,310** | **11,836** | **40,583** |
| Interest income, net | 2,347 | 2,716 | 3,492 |
| Other income (expenses), net | 223 | 70 | 2,702 |
| **Income before tax and minority interests** | **28,880** | **14,622** | **46,777** |

| Income tax expense | 2008-3-31 | 2007-3-31 | 2007-12-31 |
|---|---|---|---|
| - Current | 5,749 | 965 | 4,754 |
| - Deferred | (713) | (125) | (267) |
| Total income taxes | 5,036 | 840 | 4,487 |
| **Income before minority interests** | **23,844** | **13,782** | **42,290** |
| Minority Interests | 198 | (31) | 713 |
| **Net income from continued operations** | **23,646** | **13,813** | **41,577** |
| (Net loss)/income from discontinued operations | (76,852) | 2,607 | 3,401 |
| Income tax | 604 | 128 | 1,162 |
| **Net income/(loss) from discontinued operations** | **(77,456)** | **2,479** | **2,239** |
| **Net income/(loss) attributed to shareholders** | **(53,810)** | **16,292** | **43,816** |
| Income from continued operations — basic | $ 0.18 | $ 0.13 | $ 0.33 |
| Income from continued operations — diluted | $ 0.18 | $ 0.13 | $ 0.32 |
| Income from discontinued operations — basic | $ (0.60) | $ 0.00 | $ 0.02 |
| Income from discontinued operations — diluted | $ (0.60) | $ 0.00 | $ 0.02 |
| Income per ADS — basic | $ (0.42) | $ 0.13 | $ 0.35 |
| Income per ADS — diluted | $ (0.42) | $ 0.13 | $ 0.34 |
| Shares used in calculating basic income per ADS | 128,049,333 | 107,179,635 | 125,710,757 |
| Shares used in calculating diluted income per ADS | 131,394,654 | 110,390,777 | 129,831,533 |

FOCUS MEDIA HOLDING LIMITED
UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASHFLOWS
(U.S. Dollar in thousands)

| | 2008-3-31 | 2007-3-31 | 2007-12-31 |
|---|---|---|---|
| **Operating activities:** | | | |
| Net income/(loss) | $ (53,810) | $ 16,292 | $ 43,816 |
| Adjustments to reconcile net income/(loss) to net cash provided by operating activities: | | | |
| Minority interest | 198 | (31) | 713 |
| Impairment provisions | 79,322 | — | — |
| Bad debt provision | 1,415 | 796 | 920 |
| Share based compensation | 8,624 | 4,517 | 7,338 |
| Depreciation and amortization | 6,481 | 3,838 | 6,223 |
| Amortization of acquired intangible assets | 10,680 | 1,932 | 16,862 |
| Changes in assets and liabilities, net of effects of acquisitions | (45,294) | (3,369) | (10,435) |
| **Net cash provided by operating activities** | **$ 7,616** | **$ 23,975** | **$ 65,437** |
| **Investing activities:** | | | |
| Purchase of equipment and other long term assets | (18,795) | (6,633) | (18,852) |
| Acquisition of an intangible asset | (1,767) | | |
| Purchase of subsidiaries, net of cash acquired | (84,989) | (52,260) | (34,041) |
| Deposits paid to acquire subsidiaries | (13,369) | (20,069) | (15,796) |
| Issuance of loan receivables | — | — | (30,000) |
| Purchases of available-for-sale securities | (37,688) | (21,980) | (38,632) |
| **Net cash used in investing activities** | **$(156,608)** | **$(100,942)** | **$(137,321)** |
| **Financing activities:** | | | |
| Proceeds from issuance of ordinary shares, net of issuance costs | 4,503 | 117,195 | 326,272 |
| Proceeds from short-term debts | 370 | — | — |
| Capital injection from minority shareholders | 214 | 97 | — |
| Repayment of short-term debts | (30,041) | (3,115) | — |
| **Net cash provided by/(used in) financing activities** | **$ (24,954)** | **$ 114,177** | **$ 326,272** |
| Effect of exchange rate changes | 19,498 | 2,742 | 5,785 |
| **Net (decrease) increase in cash and cash equivalents.** | **$(154,448)** | **$ 39,952** | **$ 260,173** |
| Cash and cash equivalents, beginning of period | 450,416 | 164,611 | 190,243 |
| **Cash and cash equivalents, end of period** | **$ 295,968** | **$ 204,563** | **$ 450,416** |
| Supplemental disclosure of cash flow information: | | | |
| Income taxes paid | $ 1,790 | $ 280 | $ 211 |
| Interest paid | $ — | $ — | $ 8 |
| Supplemental disclosure of non-cash investing activity: | | | |
| Acquisition of subsidiaries: | | | |
| Value of ordinary share consideration | $ — | $154,281 | $ — |
| Accounts payable | $25,247 | $ 3,892 | $16,935 |

**Notes:**

Note 1:     Basic income per ADS is computed by dividing income attributable to holders of ordinary shares by the weighted average number of ADS

| | | |
|---|---|---|
| | outstanding during the year/period. Diluted income per ADS reflects the potential dilution that could occur if securities or other contracts to issue ADS were exercised or converted into ADS. | |
| Note 2: | The conversion of Renminbi ("RMB") amounts into USD amounts is based on the rate of USD1 = RMB7.019 on March 31, 2008 for balance sheet accounts which dominated in RMB. | |
| Note 3: | Following the restructuring of our mobile handset advertising business, we have disposed of, or have determined we will dispose of, 10 subsidiaries, which were mainly focusing on the push-based mobile advertising business. Each of these subsidiaries represented a component of an entity as defined by SFAS No.144 "Accounting for the impairment or Disposal of Long-lived Assets". As such, we have classified these subsidiaries as a discontinued operation for all periods presented. Revenue related to discontinued operations was approximately $11.3 million, $6.0 million and $15.8 million for each of the three months ended March 31, 2008, 2007 and December 31, 2007, respectively. | |
| Note 4: | Details of net revenues are as follows (U.S. Dollars in thousands): | |

|  | Three months ended | | |
|---|---|---|---|
|  | **2008-3-31** | **2007-3-31** | **2007-12-31** |
| **Gross Advertising Service Revenue:** | | | |
| **Digital out-of-home:** | | | |
| *Commercial locations* | | | |
| - Unrelated parties | $ 67,580 | $32,413 | $ 80,021 |
| - Related parties | 377 | 2,505 | 107 |
| Total Commercial Locations | **67,957** | **34,918** | **80,128** |
| *In-store Network* | | | |
| - Unrelated parties | 19,077 | 6,011 | 7,150 |
| - Related parties | — | 1,315 | — |
| Total in-store network | **19,077** | **7,326** | **7,150** |
| *In-elevator Poster Frame Network* | | | |
| - Unrelated parties | 31,841 | 13,845 | 34,025 |
| - Related parties | — | 9 | 54 |
| Total In-elevator Poster Frame Network | **31,841** | **13,854** | **34,079** |
| **Mobile handset advertising** | | | |
| - Unrelated parties | 174 | — | 156 |
| - Related parties | — | — | — |
| **Total mobile handset advertising** | **174** | **—** | **156** |
| **Internet advertising** | | | |
| - Unrelated parties | 51,079 | — | 58,965 |
| - Related parties | 371 | — | 353 |
| **Total internet advertising** | **51,450** | **—** | **59,318** |
| **Gross Advertising Services Revenue:** | **170,499** | **56,098** | **180,831** |
| Less: Sales taxes: | | | |
| Digital out-of-home: | | | |
| *Commercial locations:* | 5,667 | 3,274 | 6,738 |
| *In-store Network* | 1,806 | 688 | 675 |
| *In-elevator Poster Frame Network* | 2,662 | 1,185 | 2,887 |
| Mobile handset advertising | 9 | — | 7 |
| Internet advertising | 1,882 | — | 2,127 |
| **Total sales taxes:** | **12,026** | **5,147** | **12,434** |
| **Net Advertising Service Revenue** | 158,473 | 50,951 | 168,397 |
| Add: Other revenue: | 3,090 | 381 | 310 |
| **Net revenues:** | **$161,563** | **$51,332** | **$168,707** |

Note 5: Share-based compensation expense is comprised of the following (U.S. Dollars in thousands):

|  | Three months ended | | |
|---|---|---|---|
|  | **2008-3-31** | **2007-3-31** | **2007-12-31** |
| Cost of revenues | $ 304 | $ 281 | $ 126 |
| Selling and marketing | 4,577 | 2,061 | 3,005 |
| General and administrative | 3,743 | 2,175 | 4,207 |
| **Sub-total** | **$8,624** | **$4,517** | **$7,338** |

Note 6: The Company has performed preliminary purchase price allocation on their acquisition of CGEN, which occurred in the first quarter of 2008 based on an internal valuation performed by management. The purchase price allocation will be finalized once management has assessed the pending results of independent third party valuations.

Note 7: Earnings per ADS is based on the new conversion ratio of 1 ADS to 5 ordinary shares, effective as of April 11, 2007. The comparative numbers haven been adjusted to reflect the conversion.

Note 8: The $79.3 million impairment charge resulting from wireless handset advertising business restructuring includes 1) impairment loss of acquired intangibles and goodwill of $14.4 million and $23.2 million, respectively; 2) contingent purchase consideration and legal cost accrual of $19.1 million; and 3) $22.6 million loss from write-down the carry amount of the discontinued operations other than acquired intangibles and goodwill to its fair value.

Focus Media Holding Ltd.
Reconciliation of GAAP to Non-GAAP
(U.S. Dollar in thousands, except percentages, share and per-share data)
(Unaudited)

1. Reconciliation of GAAP gross profit, gross margin to Non-GAAP gross profit and gross margin.

| | 3 months ended March 31, 2008 | | | | 3 months ended December 31, 2007 | | | |
|---|---|---|---|---|---|---|---|---|
| | GAAP | (a) | (b) | Non-GAAP | GAAP | (a) | (b) | Non-GAAP |
| **Gross profit** | | | | | | | | |
| Commercial location network | 35,732 | 304 | 1,817 | 37,853 | 47,356 | 126 | 3,089 | 50,571 |
| In-store network | 28 | — | 857 | 885 | (981) | — | - | (981) |
| Poster frame network | 17,533 | — | 2,348 | 19,881 | 19,773 | — | 3,830 | 23,603 |
| *Digital out-of-home* | 53,293 | 304 | 5,022 | 58,619 | 66,148 | 126 | 6,919 | 73,193 |
| *Mobile Handset* | | | | | | | | |
| Advertising Network | (492) | — | 145 | (347) | (566) | — | — | (566) |
| *Internet Advertising* | 10,872 | — | 2,164 | 13,036 | 15,076 | — | 2,165 | 17,241 |
| *Others* | 1,787 | — | — | 1,787 | (63) | — | — | (63) |
| *Total* | 65,460 | 304 | 7,331 | 73,095 | 80,595 | 126 | 9,084 | 89,805 |
| *Gross margin* | | | | | | | | |
| Commercial location network | 57.4% | 0.5% | 2.9% | 60.8% | 64.5% | 0.2% | 4.2% | 68.9% |
| In-store network | 0.2% | 0.0% | 5.0% | 5.1% | (15.2%) | 0.0% | 0.0% | (15.2%) |
| Poster frame network | 60.1% | 0.0% | 8.0% | 68.1% | 63.4% | 0.0% | 12.3% | 75.7% |
| *Digital out-of-home* | 49.0% | 0.3% | 4.6% | 53.9% | 59.6% | 0.1% | 6.2% | 65.9% |
| *Mobile Handset* | | | | | | | | |
| Advertising Network | (298.2%) | 0.0% | 87.9% | (210.2%) | (379.9%) | 0.0% | 0.0% | (379.9%) |
| *Internet Advertising* | 21.9% | 0.0% | 4.4% | 26.3% | 26.4% | 0.0% | 3.8% | 30.1% |
| *Others* | 57.8% | 0.0% | 0.0% | 57.8% | (20.3%) | 0.0% | 0.0% | (20.3%) |
| *Total* | 40.5% | 0.2% | 4.5% | 45.2% | 47.8% | 0.1% | 5.4% | 53.2% |

—

(c)  *To adjust share-based compensation expenses*

(d)  *To adjust amortization of acquisition related intangible assets*

2. Reconciliation of net income, earnings per share and operating margin from GAAP to Non-GAAP:

| | Three months ended | | |
|---|---|---|---|
| | 2008-3-31 | 2007-3-31 | 2007-12-31 |
| **GAAP net income / (loss) attributable to shareholders** | $ (53,810) | $ 16,292 | $ 43,816 |
| Amortization of acquired intangible assets | 10,680 | 1,932 | 16,862 |
| Share-based compensation | 8,624 | 4,517 | 7,338 |
| Loss from impairment of disposal group (Note 8) | 79,322 | — | — |
| **Non-GAAP net income** | $ 44,816 | $ 22,741 | $ 68,016 |
| GAAP income/(loss) per ADS — basic | $ (0.42) | $ 0.15 | $ 0.35 |
| GAAP income/(loss) per ADS — diluted | $ (0.42) | $ 0.15 | $ 0.34 |
| Non-GAAP income per ADS — basic | $ 0.35 | $ 0.21 | $ 0.54 |
| Non-GAAP income per ADS — diluted | $ 0.34 | $ 0.21 | $ 0.52 |
| Shares used in calculating basic GAAP /Non-GAAP income per ADS | 128,049,333 | 107,179,635 | 125,710,757 |

| | | | |
|---|---|---|---|
| Shares used in calculating diluted GAAP / Non-GAAP income per ADS | 131,394,654 | 110,390,777 | 129,831,533 |
| **GAAP income from operations** | $ **26,310** | $ **11,836** | $ **40,583** |
| Amortization of acquired intangible assets | 10,680 | 1,637 | 13,879 |
| Share-based compensation | 8,624 | 4,517 | 7,338 |
| **Non-GAAP income from operations** | $ **45,614** | $ **17,990** | $ **61,880** |
| **Non-GAAP operating margin** | 28.2% | 35.0% | 36.6% |

# Exhibit Q

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

IRON WORKERS LOCAL NO. 25 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*In re Harley-Davidson, Inc. Sec. Litig.*, No. 2:05-cv-00547-CNC (E.D. Wis.)
*Belodoff v. Netlist, Inc., et al.*, No. SACV-07-00677-DOC(MLGx) (C.D. Cal.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Greenberg v. American Home Mortgage Invest Corp., et al.*, No. 2:07-cv-3152-TCP-ETB (E.D.N.Y.)
*A1 Credit Company v. RAIT Financial Trust, et al.*, No. 07-3148 (E.D. Pa.)
*Cortese v. Radian Group Inc., et al.*, No. 2:07-cv-03375-MAM (E.D. Pa.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Hutton v. Hansen Natural Corporation, et al.*, No. CV-06-07599-JFW(PLAx) (C.D. Cal.)

FOCUS MEDIA

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of January, 2008.

IRON WORKERS LOCAL NO. 25
PENSION FUND

By: _____

Its:    ADMINISTRATOR

- 2 -

FOCUS MEDIA

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
| --- | --- | --- |
| 10/11/2007 | 900 | $60.97 |
| 10/11/2007 | 4,200 | $61.26 |

# Exhibit R

# Focus Media Holding LTD (FMCN)

28–30/F, ZHAO FENG WORLD TRADE BUILDING
369 JIANGSU ROAD
SHANGHAI, F4 100032
86 21 3212 4
http://www.focusmedia.cn/

# SC 13G/A

**JASON NANCHUN JIANG**
**Filed on 02/15/2008**
File Number 005–81465



**Table of Contents**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 13G

**Under the Securities Exchange Act of 1934**
**(Amendment No. 2)\***

# Focus Media Holding Limited

(Name of Issuer)
Ordinary Shares, par value $0.00005 per share
(Title of Class of Securities)
34415V109
(CUSIP Number)
December 31, 2007
(Date of Event Which Requires Filing of this Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule is filed:

☐ Rule 13d−1(b)

☐ Rule 13d−1(c)

☑ Rule 13d−1(d)

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter the disclosures provided in a prior cover page.

The information required in the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

**Table of Contents**

CUSIP No.     34415V109          Page    2    of    10

| | |
|---|---|
| **1** | NAMES OF REPORTING PERSONS<br><br>Jason Nanchun Jiang<br><br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY) |
| **2** | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)<br><br>(a) ☑<br>(b) ☐ |
| **3** | SEC USE ONLY |
| **4** | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>The People's Republic of China |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | **5** | SOLE VOTING POWER<br><br>68,604,595 [1] |
|---|---|---|
| | **6** | SHARED VOTING POWER<br><br>N/A |
| | **7** | SOLE DISPOSITIVE POWER<br><br>68,604,595 [1] |
| | **8** | SHARED DISPOSITIVE POWER<br><br>N/A |

| | |
|---|---|
| **9** | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>68,604,595 [2] |
| **10** | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)<br><br>☐ |
| **11** | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9)<br><br>10.53% [2][3] |
| **12** | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)<br><br>IN |

[1] Includes 53,975,959 ordinary shares owned by JJ Media Investments Holding Ltd., 6,228,185 ordinary shares held in the name of Citi (Nominees) Limited and beneficially owned in the form of American depositary shares by JJ Media Investments Holding Ltd., 5,222,552 and 3,177,899 options to purchase ordinary shares exercisable within 60 days of this filing owned by Target Sales International Limited and Target Management Group Limited, respectively.
[2] Includes collectively, those ordinary shares and options to purchase ordinary shares described in footnote (1).
[3] The number of ordinary shares outstanding used in calculating the percentage includes 643,635,662 ordinary shares outstanding plus the total number of ordinary shares underlying options held by Mr. Jiang that are exercisable within 60 days of this filing.

**Table of Contents**

CUSIP No.        34415V109                                                              Page      3      of      10

| | |
|---|---|
| **1** | NAMES OF REPORTING PERSONS<br><br>JJ Media Investments Holding Ltd.<br><br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY). |
| **2** | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)<br><br>(a) ☑<br>(b) ☐ |
| **3** | SEC USE ONLY |
| **4** | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>British Virgin Islands |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH: | **5** | SOLE VOTING POWER<br><br>60,204,144[4] |
|---|---|---|
| | **6** | SHARED VOTING POWER<br><br>N/A |
| | **7** | SOLE DISPOSITIVE POWER<br><br>60,204,144[4] |
| | **8** | SHARED DISPOSITIVE POWER<br><br>N/A |

| | |
|---|---|
| **9** | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>60,204,144[4] |
| **10** | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)<br><br>☐ |
| **11** | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9)<br><br>9.35% [4][5] |
| **12** | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)<br><br>CO |

[4] Includes 53,975,959 ordinary shares owned by JJ Media Investments Holding Ltd., which is 100%–owned by Jason Nanchun Jiang, and 6,228,185 ordinary shares held in the name of Citi (Nominees) Limited and beneficially owned in the form of ADSs by JJ Media Investments Holding Ltd.
[5] The number of ordinary shares outstanding used in calculating the percentage includes 643,635,662 ordinary shares outstanding plus the total number of ordinary shares underlying options held by Mr. Jiang that are exercisable within 60 days of this filing.

**Table of Contents**

CUSIP No.        34415V109                                                        Page        4        of        10

| 1 | NAMES OF REPORTING PERSONS |
|---|---|
| | Target Sales International Limited |
| | I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY). |

| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS) |
|---|---|
| | (a)  ☑ |
| | (b)  ☐ |

| 3 | SEC USE ONLY |
|---|---|

| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION |
|---|---|
| | British Virgin Islands |

| NUMBER OF | 5 | SOLE VOTING POWER |
|---|---|---|
| | | 5,222,552[6] |
| SHARES BENEFICIALLY OWNED BY | 6 | SHARED VOTING POWER |
| | | N/A |
| EACH REPORTING PERSON | 7 | SOLE DISPOSITIVE POWER |
| | | 5,222,552[6] |
| WITH: | 8 | SHARED DISPOSITIVE POWER |
| | | N/A |

| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON |
|---|---|
| | 5,222,552[6] |

| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS) |
|---|---|
| | ☐ |

| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9) |
|---|---|
| | 0.80%[6][7] |

| 12 | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS) |
|---|---|
| | CO |

[6] Includes 5,222,552 options to purchase ordinary shares exercisable within 60 days of this filing owned by Target Sales International Limited, which is 100%−owned by Jason Nanchun Jiang.
[7] The number of ordinary shares outstanding used in calculating the percentage includes 643,635,662 ordinary shares outstanding plus the total number of ordinary shares underlying options held by Mr. Jiang that are exercisable within 60 days of this filing.

**Table of Contents**

CUSIP No.        34415V109                                    Page    5    of    10

| 1 | NAMES OF REPORTING PERSONS |
|---|---|
| | Target Management Group Limited |
| | I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY) |

| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS) |
|---|---|
| | (a)  ☑ |
| | (b)  ☐ |

| 3 | SEC USE ONLY |
|---|---|

| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION |
|---|---|
| | British Virgin Islands |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | 5 | SOLE VOTING POWER |
|---|---|---|
| | | 3,177,899[8] |
| | 6 | SHARED VOTING POWER |
| | | N/A |
| | 7 | SOLE DISPOSITIVE POWER |
| | | 3,177,899[8] |
| | 8 | SHARED DISPOSITIVE POWER |
| | | N/A |

| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON |
|---|---|
| | 3,177,899[8] |

| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS) |
|---|---|
| | ☐ |

| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9) |
|---|---|
| | 0.49%[8][9] |

| 12 | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS) |
|---|---|
| | CO |

[8] Includes 3,177,899 options to purchase ordinary shares exercisable within 60 days of this filing owned by Target Management Group Limited, which is 100%−owned by Jason Nanchun Jiang.
[9] The number of ordinary shares outstanding used in calculating the percentage includes 3,177,899 ordinary shares outstanding plus the total number of ordinary shares underlying options held by Mr. Jiang that are exercisable within 60 days of this filing.

## **TABLE OF CONTENTS**

Item 1.     (a)     Name of Issuer:
Item 2.     (a)     Name of Person Filing:
Item 3.            Ownership.
Item 5.            Ownership of Five Percent or Less of a Class
Item 6.            Ownership of More than Five Percent on Behalf of Another Person
Item 7.            Identification and Classification of the Subsidiary Which Acquired the Security Being Reported
on by the Parent Holding Company
Item 8.            Identification and Classification of Members of the Group
Item 9.            Notice of Dissolution of Group
Item 10.           Certification
SIGNATURE

**Table of Contents**

|  |  |  | Page | 6 | of | 10 |
|---|---|---|---|---|---|---|

**Item 1.**    (a)    Name of Issuer:

           Focus Media Holding Limited

       (b)    Address of Issuer's Principal Executive Offices:

           28–30/F, Zhao Feng World Trade Building,
           369 Jiangsu Road,
           Shanghai, China, 200050

**Item 2.**    (a)    Name of Person Filing:

           Jason Nanchun Jiang
           JJ Media Investments Holding Ltd.
           Target Sales International Limited
           Target Management Group Limited

       (b)    Address of Principal Business Office or, if none, Residence:

           c/o Focus Media Holding Limited
           28–30/F, Zhao Feng World Trade Building,
           369 Jiangsu Road, Shanghai, China, 200050

       (c)    Citizenship:

| | |
|---|---|
| Jason Nanchun Jiang | People's Republic of China |
| JJ Media Investments Holding Ltd. | British Virgin Islands |
| Target Sales International Limited | British Virgin Islands |
| Target Management Group Limited | British Virgin Islands |

**Item 3.**    **Ownership.**

           Provide the following information regarding the aggregate number and percentage of the class of securities of the issuer identified in Item 1.

       (a)    Amount beneficially owned:

| | |
|---|---|
| Jason Nanchun Jiang | 68,604,595 |
| JJ Media Investments Holding Ltd. | 60,204,144 |
| Target Sales International Limited | 5,222,552 |
| Target Management Group Limited | 3,177,899 |

       (b)    Percent of class:

| | |
|---|---|
| Jason Nanchun Jiang | 10.53% |
| JJ Media Investments Holding Ltd. | 9.35% |
| Target Sales International Limited | 0.80% |
| Target Management Group Limited | 0.49% |

|  |  | Page | 7 | of | 10 |
|---|---|---|---|---|---|

(c)  Number of shares as to which such person has:

(i) Sole power to vote or to direct the vote:

| | |
|---|---:|
| Jason Nanchun Jiang | 68,604,595 |
| JJ Media Investments Holding Ltd. | 60,204,144 |
| Target Sales International Limited | 5,222,552 |
| Target Management Group Limited | 3,177,899 |

(ii) Shared power to vote or to direct the vote:

Not applicable.

(iii) Sole power to dispose or to direct the disposition of:

| | |
|---|---:|
| Jason Nanchun Jiang | 68,604,595 |
| JJ Media Investments Holding Ltd. | 60,204,144 |
| Target Sales International Limited | 5,222,552 |
| Target Management Group Limited | 3,177,899 |

(iv) Shared power to dispose or to direct the disposition of:

Not applicable.

**Item 5.**   **Ownership of Five Percent or Less of a Class**
Not applicable.

**Item 6.**   **Ownership of More than Five Percent on Behalf of Another Person**
Not applicable.

**Item 7.**   **Identification and Classification of the Subsidiary Which Acquired the Security Being Reported on by the Parent Holding Company**
Not applicable.

**Item 8.**   **Identification and Classification of Members of the Group**
Not applicable.

**Item 9.**   **Notice of Dissolution of Group**
Not applicable.

**Item 10.**   **Certification**
Not applicable.

Table of Contents

Page      8      of      10

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: February 14, 2008

/s/ Jason Nanchun Jiang
Jason Nanchun Jiang


JJ MEDIA INVESTMENTS HOLDING LTD.

By:  /s/ Jason Nanchun Jiang
     Name:  Jason Nanchun Jiang
     Title:   Chairman


TARGET SALES INTERNATIONAL LIMITED

By:  /s/ Jason Nanchun Jiang
     Name:  Jason Nanchun Jiang
     Title:   Chairman


TARGET MANAGEMENT GROUP LIMITED

By:  /s/ Jason Nanchun Jiang
     Name:  Jason Nanchun Jiang
     Title:   Chairman

**Table of Contents**

Page     9     of     10

**EXHIBIT A**
**Joint Filing Agreement**

In accordance with Rule 13d−1(k) promulgated under the Securities Exchange Act of 1934, the undersigned hereby agree to the joint filing with all other Reporting Persons (as such term is defined in the Schedule 13G referred to below) on behalf of each of them of a statement on Schedule 13G (including amendments thereto) with respect to the ordinary shares, par value $0.00005 per share, of Focus Media Holding Limited., a Cayman Islands company, and that this Agreement may be included as an Exhibit to such joint filing. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

[Remainder of this page has been left intentionally blank.]

**Table of Contents**

Page    10    of    10

**SIGNATURES**

IN WITNESS WHEREOF, the undersigned hereby execute this Agreement as of the 14th day of February 2008.

/s/ Jason Nanchun Jiang
Jason Nanchun Jiang


JJ MEDIA INVESTMENTS HOLDING LTD.

By:  /s/ Jason Nanchun Jiang
    Name:  Jason Nanchun Jiang
    Title:   Chairman


TARGET SALES INTERNATIONAL LIMITED

By:  /s/ Jason Nanchun Jiang
    Name:  Jason Nanchun Jiang
    Title:   Chairman


TARGET MANAGEMENT GROUP LIMITED

By:  /s/ Jason Nanchun Jiang
    Name:  Jason Nanchun Jiang
    Title:   Chairman

## CERTIFICATE OF SERVICE

I, Martha DelGiudice, do hereby declare that on the 5th day of September, 2008, I served a true and correct copy of:

**-NOTICE OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**-MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**-AFFIDAVIT OF ANDREW D. W. CATTELL** with Exhibits

via Federal Express, upon:

D. Seamus Kaskela
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087

Richard A. Maniskas
Schiffrin & Barroway L.L.P.
280 King of Prussia Road
Radnor, PA 19087

Martha DelGiudice