UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE FOCUS MEDIA HOLDING
LIMITED LITIGATION

                                MASTER FILE
                                No.  07 Civ. 10617 (LTS)(GWG)

This Document Relates To:
All Actions
--------------------------------------------------------x

**OPINION AND ORDER**

APPEARANCES:

| | |
|---|---|
| COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP<br>  By:  Evan Jay Kaufman, Esq.<br>       Mario Alba, Jr., Esq.<br>       Samuel Howard Rudman, Esq.<br>58 South Service Road, Suite 200<br>Melville, New York 11747<br><br>*Counsel for Lead Plaintiff* | SIMPSON THACHER & BARTLETT LLP<br>  By: Andrew Cattell, Esq.<br>      Bruce Domenick Angiolillo, Esq.<br>      Jonathan K. Youngwood, Esq.<br>425 Lexington Avenue<br>New York, New York 10017<br><br>*Counsel for Defendants Zhi Tan, Donald J. Puglisi, Jason N. Jiang, Daniel M. Wu, and Focus Media Holding Limited*<br><br>SHEARMAN & STERLING LLP<br>  By: Adam S. Hakki, Esq.<br>      Herbert S. Washer, Esq.<br>599 Lexington Avenue<br>New York, New York 10022<br><br>*Counsel for Defendants Credit Suisse Securities USA LLC, Merrill Lynch & Co., and Citigroup Global Markets Inc.* |

LAURA TAYLOR SWAIN, United States District Judge

In this consolidated putative class action, Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff"), asserts claims arising under the Securities Exchange Act of 1934 ("Exchange Act") Section 20(a), 15 U.S.C. § 78t-1 ("Section 20(a)"), Section 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as the Securities Act of 1933 ("Securities Act") Section 11, 15 U.S.C. § 77k ("Section 11"), Section 12(a)(2), 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)"), and Section 15, 15 U.S.C. § 77o ("Section 15"), against defendants Focus Media Holding Limited ("Focus Media" or the "Company"); Jason Nanchun Jiang, Zhi Tan, Daniel Mingdong Wu, and Donald Puglisi, who were all officers and/or directors of the Company during the relevant period ("Individual Defendants"); and Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., and Merrill Lynch & Co., Inc. ("Underwriter Defendants") (collectively, "Defendants"). The Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

Plaintiff's claims are based upon purchases of Focus Media's American Depositary Shares ("FMCN Shares") during Focus Media's November 2007 public secondary offering (the "Secondary Offering") and purchases of FMCN Shares in the marketplace for the period beginning on September 27, 2007, and ending on November 19, 2007. The principal factual predicate for the claims is the decline in the Company's share price following the Company's November 19, 2007, announcement of its financial results for its most recently concluded quarter, including an allegedly disappointing gross margin figure. Defendants move to dismiss the consolidated amended class action complaint ("Complaint" or "CAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. 78u-4 ("PSLRA"). The Court has considered thoroughly the parties' submissions. For the following reasons, Defendants'

motion to dismiss the Complaint is granted in its entirety and Plaintiff's request for leave further to amend the Complaint is denied as futile.

## BACKGROUND[1]

Focus Media is a public company that is incorporated in the Cayman Islands and maintains its principal offices in Shanghai, the People's Republic of China.  Focus Media's American Depositary Shares trade on the NASDAQ stock exchange.  Focus Media provides advertising and marketing solutions to its clients in China through various platforms.  (CAC ¶ 30.)  Focus Media's business has three principal segments: the Digital Out-of-Home Advertising Network, the Mobile Handset Advertising Network, and the Internet Advertising Services Network.  (Id. ¶ 31.)   In fiscal year 2006, Focus Media earned $83,197,000 of net income on $211,905,000 of total net revenues.  When reporting its quarterly financial performance, Focus Media disclosed, among other information, its gross margins, which are a measure of the company's profitability.[2]  (Id. ¶ 37.)

On September 27, 2007, Focus Media issued a press release (the "September 27 Press Release") announcing its financial results for the second quarter of 2007 ("2Q07"), a period that ended on June 30, 2007.  (Id. ¶ 48.)  Along with the financial results for 2Q07, the September 27 Press Release contained earnings guidance for the third quarter of 2007 ("3Q07"), which would end three days later on September 30, 2007.  (Id. ¶ 56.)  As part of this guidance, Focus Media estimated it would report total revenue between $132 million and $135 million and earn non-

---

[1]   The following facts are alleged in the Complaint and are construed as true for purposes of this motion practice.  See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 189 (2d Cir. 2007).

[2]   "A gross margin is a company's total sales revenue minus its costs of goods sold, divided by the total sales revenue, expressed as a percentage."  (CAC ¶ 33.)

GAAP income[3] between $52 million and $54 million in 3Q07.  (Id. ¶ 56; Cattell Aff. Ex. D at 4.)
The 3Q07 guidance did not include any specific estimates with respect to anticipated gross
margins.  Focus Media did not provide any further guidance for 3Q07 until it disclosed its actual
3Q07 results on November 19, 2007.  (CAC ¶ 58.)

       Focus Media hosted a conference call with analysts contemporaneously with the
September 27 Press Release (the "September 27 Conference Call").  (CAC ¶ 49.)  During the
September 27 Conference Call, defendant Chief Financial Officer Wu specifically addressed the
Company's declining gross margin by stating that "[f]or the Company as a whole, the blended
gross margin for the Company in the second quarter was 54.6% compared to 56.9% in the second
quarter of 2006, lower primarily due to the addition of the lower-margin Internet advertising
business to our revenue mix."  (Cattell Aff., Ex. F at 3.)  In response to a question about the future
prospects for the gross margin of the Company's internet advertising business, and the impact on
that gross margin of the March 2007 acquisition of Allyes, an Internet advertising agency and
service technology business (CAC ¶ 66), Wu responded as follows: "90% of our Internet
advertising business still is digital media service, which is interactive agency business, itself a
lower margin . . . Those margins can continue to improve as the revenue base becomes larger,
revenue growth becomes larger, and also due to the larger media buying power of our Internet
advertising business . . . it's going to be a gradual improvement . . . Going forward, we see [] two
areas for the margin improvement . . . But those will be gradual processes."  (CAC ¶ 129; Cattell
Aff. Ex. F at 8.)  In both the September 27 Press Release (Cattell Aff., Ex. D at 6) and the

---

[3]    Non-GAAP income is defined in the September 27, 2007, press release as net income excluding share-based compensation expense and intangible assets amortization expense resulting from acquisitions.  (CAC ¶ 56; Cattell Aff. Ex. D at 4.)

September 27 Conference Call (Cattell Aff., Ex. F at 2), the Company referred investors to the Company's SEC filings, including the Company's Form F-1 Registration Statement, which, in its discussion of gross margin, cautioned that "[i]n the future, our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network." (Cattell Aff., Ex. L at 83.)

On or about November 1, 2007, Focus Media filed a Form F-1/A Registration Statement ("Registration Statement") with the Securities and Exchange Commission as a step toward executing the Secondary Offering. (CAC ¶ 60.) On or about November 7, 2007, the prospectus ("Prospectus") with respect to the Secondary Offering became effective. (Id. ¶ 61.) The Prospectus' discussion of the Company's gross margin also warned that "our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network." (Cattell Aff., Ex. C at 78.) The Prospectus did not include Focus Media's 3Q07 results nor provide any guidance for that quarter other than by reference to the September 27 Press Release.

During the Secondary Offering, Focus Media sold approximately 13.5 million shares at $64.75 per share. (Id. ¶ 61.) The Underwriter Defendants served as underwriters for the Secondary Offering and purchased FMCN Shares from Focus Media, which they re-sold to the investing public. (CAC ¶ 62.) The Individual Defendants each signed the Registration Statement. (Id. ¶ 103.) The putative class includes two groups of purchasers of FMCN Shares: those who purchased shares in the Secondary Offering and those who purchased shares in the open market during the period beginning on September 27, 2007 (when Focus Media released its earnings guidance for 3Q07), and ending on November 19, 2007 (when Focus Media released the actual

3Q07 results).  (Id. ¶ 24.)

After the close of the market on November 19, 2007, Focus Media announced its results for the quarter ending on September 30, 2007.  The release of the 3Q07 results revealed that, although Focus Media's revenue and non-GAAP income were higher than estimated in the September 27 Press Release, the company's gross margin had fallen to 50.9%.[4]  (Id. ¶ 63.)  The gross margins for the previous four quarters had been 54.6% for the second quarter of 2Q07 ("2Q07"), 58.0% for the first quarter of 2007 ("1Q07"), 68.5% for the fourth quarter of 2006 ("4Q06"), and 65.3% for the third quarter of 2006 ("3Q06").  (Id. ¶¶ 38, 40, 48, 63.)  The reasons for Focus Media's declining gross margin included a decline of the gross margin for its In-Store division, whose 3Q07 gross margin of 17.7% represented a 10.7% decrease from the previous quarter and an 18.5.% decline from the same quarter of the previous year (id. ¶¶ 64, 69); a decline of the gross margin for its Internet advertising division, whose gross margin of 23% represented a 4.1% decline from the same quarter of the previous year (id. ¶ 76); and acquisition of various competitor businesses, including the previously undisclosed acquisition of a billboard business whose assets where chiefly in traditional billboards that would not be able to be converted for some time to the digital LED billboards that were the core of FM's outdoor advertising business.  The profit margins on traditional billboards were lower than those on LED billboards.  (Id. ¶ 67).

Focus Media's share price reacted negatively to the announcement of the 3Q07 results. After closing at $57.15 on November 19, 2007, the price fell to $52.00 at the close of trading on November 20, 2007, and continued to decline the next day, closing at $50.35.[5]  (Id.

---

[4]   Focus Media earned non-GAAP income of $54.6 million on total revenues of $151.4 million in 3Q07.  (Cattell Aff. Ex. I at 2.)

[5]   The price of FMCN Shares quickly rebounded, closing at $56.44 on November 30, 2007, and $57.48 on December 12, 2007.

¶ 95.) Various financial news media and equity research publications attributed the share price decline to the lower-than-expected gross margin figure. (Id. ¶¶ 96-97.) This action was initiated on November 27, 2007, and was consolidated with another putative class action on April 24, 2008.

### DISCUSSION

In adjudicating a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.[6]  See Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  This standard applies to all civil actions.  Iqbal, 129 S. Ct. at 1953.

*The Common Requirement to Allege a Misstatement or Omission of Material Fact*

Plaintiff has alleged violations of Sections 11, 12(a)(2) and 15 of the Securities Act and violations of Sections 10(b) and 20(a) of the Exchange Act, in connection with the purchase of FMCN Shares during the November 2007 Secondary Offering, and in the open market between September 27, 2007, and November 19, 2007.  To establish a prima facie case under any of the aforementioned statutes and regulations, Plaintiff must plead a misstatement or omission of a material fact.  See 15 U.S.C. § 77k (Section 11); 15 U.S.C. § 77l(a)(2) (Section 12(a)(2)); 15 U.S.C. § 77o (Section 15); 15 U.S.C. § 78t-1 (Section 20(a)); Dura Pharmaceuticals, Inc., v.

---

[6] The Court may also consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.  See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

Broudo, 544 U.S. 336, 341-42 (2005) (Section 10(b) and Rule 10b-5).  A material omission or misstatement is actionable only if the omitted facts were either: (1) required by SEC regulations to be stated in the relevant communication, or (2) necessary to make the disclosures not misleading. In re N2K Sec. Litig., 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000), aff'd, 202 F.3d 81 (2d Cir. 2000).

*The September 27 Press Release and the September 27 Conference Call*

Plaintiff asserts that the earnings guidance issued by Focus Media as part of the September 27 Press Release announcing its financial results for 2Q07 was materially false and misleading.  Plaintiff alleges that, in light of the fact that 3Q07 would close only three days later, Defendants knew, or were reckless in not knowing, that Focus Media would actually generate lower gross margins in 3Q07 than suggested by its September 27, 2007, revenue and income projections.  For the following reasons, the Court concludes that the press release statements are not actionable.

Plaintiffs seek to hold Defendants liable for Focus Media's failure to disclose financial information about the third quarter before that quarter had concluded.  However, "[t]he disclosure structure set out by the SEC . . . recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be."  In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001).  The case law reflects that "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress," see, e.g., Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 791 (S.D.N.Y. 1997) (citing Zucker v. Quasha, 891 F. Supp. 1010, 1015 (D.N.J. 1995) (finding the defendant not liable for failure to disclose, when the quarter in progress was 95% complete, that it was experiencing a higher actual return rate of gross shipments than predicted in the Registration Statement)).  The facts alleged here do not warrant a contrary

holding.

Focus Media did not offer any guidance in the September 27 Press Release as to the Company's likely third quarter gross margin and it was not under any legal obligation to do so. The Company did provide guidance with respect to its projected 3Q07 revenue and income in the press release and those projections, rather than being materially misleading, proved to be conservative, as the company's actual results exceeded those projections. Plaintiff, however, argues that the guidance proved to be misleading because the actual third quarter revenue exceeded the projected third quarter revenue to a much greater degree than the actual third quarter gross profit exceeded the projected third quarter gross profit, producing a lower actual gross margin figure than the projections had suggested.[7] (Compl. ¶ 90.)

The PSLRA safe harbor provision renders forward-looking statements accompanied by adequate cautionary statement non-actionable: "A person [ ] shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C.A. § 78u-5(c)(1)(A)(i) (West 2009). In determining whether the cautionary language is adequate, courts interpreting both this provision and the analogous "bespeaks caution" doctrine "identify the allegedly undisclosed risk and then read the allegedly fraudulent materials – including the cautionary

---

[7] Although the revenue and income projections implied the likely range of the Company's projected 3Q07 gross margin, they were insufficient to allow an investor to calculate a projected gross margin with precision because various line items (in addition to revenue and income) that were not projected are necessary to perform that calculation. See n.2, supra.

language – to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.  If the court determines that no reasonable investor could have been misled about the nature of the risk when he invested then the complaint fails to state a claim of securities fraud and must be dismissed."[8] In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007)(quoting Halperin v. eBanker USA.com, 295 F.3d 352, 359 (2d Cir. 2002)) (internal quotation marks and citations omitted).

The September 27 Press Release identified the 3Q07 revenue and income projections as forward-looking statements.  (Cattell Aff. Ex. D at 6.)  Additionally, the Company's guidance included cautionary language warning investors that "a number of important factors could cause actual results to differ materially from those contained [in the press release]" and referring investors to the extensive risk disclosures in its SEC filings (id.), which included the warning that "our gross margin may fluctuate depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network" (Cattell Aff. Ex. L at 83).  The Company therefore had explicitly flagged the possibility that its gross margin could be lower in reporting periods that experienced relatively higher contributions from lower margin and less developed components of

---

[8]   Plaintiff contends that the PSLRA safe harbor provision and the "bespeaks caution" doctrine do not protect the 3Q07 projections in the September 27 Press Release and Conference Call because, at the time they were made, the third quarter was nearly over and, so the argument goes, the statements were more akin to appraisals of the Company's recent performance than "forward-looking" statements.  This argument is not supported by any legal authority and is contrary to the principles underlying the reporting schedules in the securities laws and, therefore, is rejected.  See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001).

the Company's business.  This is precisely what occurred in 3Q07 and, therefore, the Court concludes that no reasonable investor who read this cautionary language could have failed to perceive the risk that the Company's actual 3Q07 gross margin could be lower than that suggested by the guidance in the September 27 Press Release.  Accordingly, Plaintiff's allegations with respect to the September 27 Press Release do not plead actionable misstatements or omissions.

        This analysis applies equally to Plaintiff's allegations regarding the September 27 Conference Call, in which the Company included the same revenue and income projections as in the September 27 Press Release as well as the same cautionary language identifying the statements as forward-looking statements and alerting investors to the relevant risks.  (Cattell Aff. Ex. F at 2-3.)  However, in the September 27 Conference Call, unlike in the September 27 Press Release, the Company also addressed specifically its future prospects for its gross margins (as opposed to merely providing revenue and income guidance) with respect to its Internet advertising business.  In that discussion, Wu highlighted the potential for gross margin improvement over time in that business, while emphasizing that it would be gradual in nature ("90% of our Internet advertising business still is digital media service . . . itself a lower margin"; "these margins can continue to improve . . . [but] it's going to be a gradual improvement"; "two areas for margin improvement . . . will be gradual processes").  No reasonable investor could have construed these statements about anticipated gradual improvements over time as anything but optimistic projections related to a time horizon well beyond the quarter in progress.  As "companies must be permitted to operate with a hopeful outlook . . . [and] are not required to take a gloomy, fearful or defeatist view of the future," Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004), Plaintiff's allegations with respect to these statements in the September 27 Conference Call

do not plead actionable misstatements or omissions.

*The Registration Statement for the Secondary Offering*

Plaintiff argues that the Registration Statement for the Secondary Offering contained untrue statements of material facts and omitted facts necessary to make the Registration Statement not misleading. Specifically, Plaintiff argues that the Registration Statement was misleading because it omitted material information concerning the company's declining third quarter gross margin and material information concerning the company's LED billboard division. The Court concludes that neither of these omissions is actionable.

*The Omitted 3Q07 Gross Margin Information*

Plaintiff argues that the financial information provided in the Registration Statement – the Company's final results for the second quarter of 2007 – was insufficient to meet the applicable disclosure requirements because it did not include information regarding actual results for the third quarter that, when later reported, revealed margin declines despite revenue and income increases. SEC Regulation S-X (the "135-Day Rule") requires that the registration statement contain financial statements covering a period that concluded fewer than 135 days before the registration statement's effective date. 17 C.F.R. § 210.3-12(a). Focus Media's registration statement was declared effective on November 7, 2007, fewer than 135 days after the June 30, 2007, close of the second quarter, for which the Registration Statement contained complete financial results. The Registration Statement thus complied with the 135-Day Rule.

Plaintiff argues that the 135-Day Rule sets only a minimum disclosure obligation and that Focus Media's silence with respect to its 3Q07 gross margin is actionable pursuant to principles articulated in case law. In Shaw v. Digital Equip. Corp., the defendants were alleged to have violated the securities law by failing to disclose in Digital Equipment Corporation's offering

documents the company's "disastrous" financial condition.  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1199-1206 (1st Cir. 1996).  The Shaw plaintiffs complained that, at the time Digital Equipment Corporation ("DEC") commenced its offering, the defendants did not disclose that it was experiencing surging operating losses in the quarter that was just eleven days shy of ending.  Id. at 1199-1200.  After the offering was completed and the quarter ended, DEC reported a quarterly operating loss of $183 million, a 150% increase from the previous quarter's loss of $72 million.  Id. at 1200.  The Court concluded that this loss "was far greater than analysts had been expecting," it "bucked the positive trend of reduced losses under the company's new management," id. at 1210, and it represented an "extreme departure from the range of results which could be anticipated based on currently available information . . . ." Id. at 1210.  The Court held that, under these circumstances, the disclosure provisions of the securities laws could have compelled DEC to disclose nonpublic information concerning its ongoing quarter-to-date performance in the offering documents, and the plaintiffs' allegation survived the defendants' motion to dismiss the complaint for failure to state a claim.  Id. at 1199.

In contrast to the "disastrous" operating loss that was central to the plaintiffs' action in Shaw, Focus Media's actual results for 3Q07 exceeded the results forecasted in the September 27 Press Release with respect to both total revenues and income.  These higher than forecasted results were accompanied by a decline in gross margin, which continued a trend observed in the Company's financial results for the previous two quarters: gross margin had declined 10.5% between 4Q06 and 1Q07 and 5.4% from 1Q07 to 2Q07.  When considered in the context of the overall revenue and income figures that exceeded expectations and an identifiable trend of falling gross margins, the 4.7% quarterly gross margin decline in 3Q07 cannot reasonably be characterized as an "extreme departure" from the range of anticipated results that would render actionable the

Registration Statement's omission of information concerning the Company's financial performance in 3Q07.

The Court finds the reasoning of both In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 F. Supp. 2d 8 (S.D.N.Y. 2001), and In re N2K Sec. Litig., 82 F. Supp. 2d 204 (S.D.N.Y. 2000), aff'd, 202 F.3d 81 (2d Cir. 2000), to be persuasive and apposite to the instant case. In Turkcell, the court found that a 9% decline in the defendant company's operating income from the previous quarter did not meet the "extreme departure" standard of Shaw. The Turkcell court reached this conclusion despite the fact that this decline was the company's first quarterly operating income decline. In re Turkcell, 202 F. Supp. 2d at 12-13. In the N2K case, the defendant company's announced per share loss was approximately 8% worse than analysts' expectations, allegedly causing an ensuing 25% decline in the defendant's stock price. In re N2K, 82 F. Supp. 2d at 208. The court similarly concluded that this alleged discrepancy between announced results and expected results was not enough to satisfy the "extreme departure" standard. Id. In both Turkcell and N2K, the courts held that the plaintiffs' allegations failed as a matter of law to rise to the level of material omissions and granted the defendants' motions to dismiss the claims.[9] Here, where the Company's actual revenues and income exceeded its projections and its actual gross margin, although a disappointment to some in the investment community, merely continued the trend of modest gross margin decline exhibited in the previous quarters, there was no "extreme departure" requiring accelerated disclosure of 3Q07 financial results. The Company's compliance with the 135-Day Rule was thus sufficient as a matter of law and, accordingly, Plaintiff's allegation with respect to omission of information concerning the Company's 3Q07

---

[9] In Turkcell, the court denied the defendants' motion to dismiss a separate claim premised upon defendants' allegedly misleading statements related to its actual customer "churn rate." In re Turkcell, 202 F. Supp. 2d at 12.

financial performance in the Registration Statement fails to state a claim.

Plaintiff also asserts that Defendants may be liable for their failure to warn investors in Focus Media's Registration Statement and Prospectus of "known trends [and] uncertainties . . . that [were] reasonably likely to have a material effect" on Focus Media's profitability, as required by SEC Forms F-1 and 20-F and Regulation S-K. However, Focus Media provided ample disclosures in the Prospectus to warn reasonable investors of such risks of investing in FMCN Shares. The risks disclosed included the prospect that competitive forces could lead to decreased profitability and rising costs in connection with its Internet Advertising Services Network and In-store Network. (Cattell Aff. Ex. H at 29, 67.) The disclosures specifically articulated the possibility that the Company's gross margin could fluctuate "depending on the respective financial performance and stage of development of each of our networks as well as the relative contribution to our revenues and costs of each network." (Cattell Aff. Ex. L at 83.) Furthermore, as Plaintiff's complaint acknowledges, margins had trended downward in the three preceding quarters. (CAC ¶¶ 40, 48.) In light of the downward trend in Focus Media's gross margins prevailing at the time of Plaintiff's purchases of FMCN Shares, and the disclosures of the specific risks the Company faced with respect to maintaining profitability, the Court concludes that Plaintiff's argument that Defendant had a legal duty to disclose additional information with respect to Focus Media's gross margin before it released its 3Q07 financial statements fails as a matter of law. See In re N2K, 82 F. Supp. 2d at 208.

*Nondisclosure of Purchases of Traditional Billboards*

In support of its argument that the Registration Statement was misleading, Plaintiff argues that Focus Media improperly failed to disclose its acquisition of traditional billboards during the first half of 2007, an omission that was material due to its depressive effect on profit margins.

(CAC ¶¶ 79-83.) However, the quoted language in the Registration Statement speaks only about the Company's "LED billboard network" and says nothing about the universe of the Company's billboard assets and, accordingly, is not misleading as a matter of law. With respect to the impact of these acquisitions on the Company's 3Q07 gross margin, for the reasons stated above, the Court has concluded that Plaintiff has not pleaded any actionable misstatement or omission related to gross margins in the Registration Statement.

In light of the Court's determination that Plaintiff fails to state an actionable claim of a violation of the disclosure requirements of Sections 11, 12(a)(2) and 15 of the Securities Act and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, the Court need not consider further the parties' arguments regarding the adequacy of Plaintiff's Consolidated Amendment Complaint. Plaintiff's request for leave to replead is denied as futile, in light of the foregoing analysis. Patane v. Clark, 508 F.3d 106, 113 n.6 (2d Cir. 2007).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint is granted in its entirety. The Clerk of Court is respectfully requested to enter judgment accordingly and close this case and the consolidated case, Bauer v. Focus Media Holding Limited, 07 Civ. 11479. This Opinion and Order resolves docket entry no. 24.

SO ORDERED.

Dated: New York, New York
March 29, 2010

LAURA TAYLOR SWAIN
United States District Judge